Page 1

UNITED STATES OF AMERICA,

        PLAINTIFF,

          vs          NO.  1:18-CR-02945-WH

JANY LEVEILLE, ET AL,

        DEFENDANT.


TELEPHONIC INTERVIEW

OF

HANNAH KASTENBAUM, MD

SEPTEMBER 18, 2020

1:03 PM

Page 18

1  investigator in my office, and I want you to find out, you
2  know, an answer to X question, I can send you -- like,
3  there's a messaging -- not messaging -- but like, I can
4  say -- I can send you a note says, you know, "Please find
5  out X."
6      And you can respond. And then it's tracked in
7  the system. So this gets printed out. It's sort of a
8  running log of activity on the case as people enter those
9  notes.
10     Q. Got it.
11     A. And it's separate from the autopsy report, but
12 still part of the file. If you want these, you can
13 request these from the Records Department.
14     Q. And then is there another software package
15 besides the VAST?
16     A. So, yes. I'm sorry. The other one is -- because
17 we have a sense of humor, is DIRT, like what you dig out
18 of the ground. And because it stands for the Death
19 Investigation Reporting Tool. And that's what generates
20 the autopsy report. So the death investigation summary we
21 were looking at comes out of DIRT.
22     Q. Got it. Okay. Great.
23     A. DIRT was a home-grown project.
24     Q. Okay. I think I know the answer to this as well,
25 but did you make any attempts to determine the postmortem

Page 19

1  interval for ▮▮▮▮ or time of death?
2      A. Not really because it's not really possible to
3  do.
4      Q. Okay.
5      A. Like, so that page in the report that we were
6  looking at postmortem changes --
7      Q. Uh-huh.
8      A. -- so that section of the report goes into the
9  report for every person that gets examined by the OMI and
10 its staff. And the questions are all the same. It's just
11 that there are a variety of answers you can choose,
12 because most of the sections in this report are synoptic-
13 based. Like, there are fixed and drop-down menus, and
14 then there is room for free text in other sections.
15     So we look at things like rigor mortis, which is
16 stiffening of the muscles; livor mortis, which is the
17 discoloration visible in the organs and the skin from
18 settling of the blood after the heart stops pumping, and
19 sort of extent of purification or decomposition of the
20 body.
21     But there are sort of rules of some for in a
22 shorter period postmortem, you know, eight to 24 hours
23 rigor mortis sets in and then goes away. Sort of the same
24 time frame for livor mortis, et cetera.
25     But when you get into decomposed and/or mummified

Page 20

1  remains, such as those of ▮▮▮▮, there are a lot of
2  variables. Like, there's no time frame sort of
3  guidelines. Like, how long does it take until a body
4  (inaudible) decomposed or until the brain is liquefied,
5  and the skin is mummified? It depends on the environment
6  the body is in. So it's going to be different in the hot,
7  dry, dry, New Mexican, rural environment than it would be
8  in the humid Pennsylvania environment. So there really
9  isn't any way for me to assess how long he's been dead.
10     He's been dead -- he had been dead a while
11 because he was mummified. His brain was liquefied. That
12 doesn't take long in New Mexico, like that can happen in a
13 week or two, because it's hot. The body rots quickly or
14 more quickly. So it just depends on the environment. So
15 I can't make any assessment of how long he's been dead.
16     Q. If you were given more facts, more information,
17 from say, an investigator or information that the
18 investigators gathered, statements from witnesses or
19 things like that, can you then make a determination, or
20 it's still not possible?
21     A. So I can review and consider information like
22 that, but it's not going to be a medical or pathologic
23 assessment. I mean, I can look at information. It'd be
24 like, "Sure. It looks like he could have been dead three
25 months, six months," whatever the other investigative

Page 21

1  information suggests.
2      But again, it's like -- so I can try and see if
3  the two fit, what the investigation turns up, and what the
4  body looked like, but I don't know that I can so with any
5  degree of certainty.
6      Q. Okay.
7      A. Like, the investigative information is, frankly,
8  your best bet, and that's what I tell families of people
9  who are more recently deceased.
10     "Well, can you tell exactly what time he died or
11 exactly what day?"
12     "No. Sometime after he was last seen alive,"
13 which depends on other investigative information, of
14 course. And also, that I wish I was that good as a
15 television forensic pathologist, who can just, you know,
16 look at the body and touch them and be like, "Oh, well,
17 clearly this happened at 10:30 last night" or, you know,
18 "seven-and-a-half weeks ago" or whatever. But the science
19 doesn't hold up.
20     Q. And so, you don't take information provided from
21 those sources and say, "Okay. To a reasonable degree of
22 medical certainty, I can conclude X, Y, or Z based on what
23 I'm seeing"?
24     A. Yeah.
25     Q. It sounds like what you're saying.

Page 22

1  A  So I can try, but I don't know that there'd
2  really be any medical certainty attached to it
3     Q.  Got it.  Okay.  And then --
4     A  Like, somebody might be able to tell you that,
5  who has a broader knowledge basis in -- what's the word --
6  taxonomy, how bodies break down under different
7  conditions  So an anthropologist might be able to comment
8  on that  But yeah, I won't be able to be real specific
9     Q.  Okay.  And then let's talk about the manner of
10 death, and the manner of death was undetermined?
11    A  Uh-huh
12    Q.  And you listed -- I'm looking at now, page 3 of
13 23 of the Death Investigation Report where it has a
14 summary and an opinion.
15    A  Uh-huh
16    Q.  You said essentially, due to limitations of
17 autopsy, histology and toxicology and decomposed remains,
18 cause of death could not be determined?
19    A  Yeah
20    Q.  So I think I know what autopsy and toxicology is.
21 What's histology?
22    A  So histology is looking at tissue under the
23 microscope  So tissue on slides
24    Q.  Oh, okay.
25    A  Yeah

Page 23

1     Q.  And then the toxicology, I know you sent that
2  out, and we have a report from a toxicologist.  Is that
3  the information that you rely on for this report, the
4  information that the toxicologist provides, or do you do
5  any of your own independent studies or tests?
6     A.  I rely on the information that's (inaudible) the
7  toxicology laboratory provides in the format of their
8  reports.  So there are -- I have two versions of the
9  toxicology report that were generated by NMS Laboratories.
10 They're a reference through a commercial -- not
11 reference -- they were a commercial laboratory that's
12 actually not far from Philadelphia.
13       They do a lot of forensic work for offices like
14 us all over the country, and because they have a large
15 volume of cases that they charge industry prices for, they
16 can generate a lot of data, a lot of methodology, a lot of
17 testing methods.  And they can offer, therefore, tests for
18 a really wide array of drugs, more so than --
19       So at the OMI, the other option for doing
20 toxicology testing was the State Department of Health
21 toxicology lab.  They are much less staffed, funded,
22 equipped, et cetera, because their workload is smaller,
23 and New Mexico is smaller and poorer.  So whenever
24 possible, and certainly when they were more advanced or
25 more specific, the OMI sends their toxicology studies to

Page 24

1  NMS.  That's who they have a contract with.  They went
2  through a bid process at some point.
3        So anyway, so I'm dependent on the information I
4  get in the report from NMS, and then I also -- I think I
5  documented it in the case notes -- I had talked to -- so
6  NMS really provides a spectacular service because you can
7  also call them up and be like, "I have a question about my
8  report.  Can I talk to one of your people?"
9        And they'll call you back and talk to you, or you
10 can reach them by e-mail.  Anyway, so I discussed the case
11 by e-mail with -- where -- I don't want to give you the
12 wrong name -- Bill Anderson, who's a toxicologist, PhD
13 toxicologist, NMS.  He handled a lot of the interpretation
14 work on the OMI cases.  And at some point, I had also
15 called and spoken to a Dr. Dan Isenschmid, who is another
16 PhD toxicologist at NMS.  So I relied on the information I
17 got, any written reports, and that I got from talking to
18 Drs. Anderson and Isenschmid.
19        And then at some point I had in my notes -- so
20 part of when there was a complicated or challenging case
21 that anyone in the office has handled, and you want to get
22 input from your colleagues, you can present the case to
23 them at the -- there's a conference for this -- I forgot
24 how often it was -- once a week, every other week, there
25 was a regular conference.  And everybody came to the

Page 25

1  conference.  All the doc, all the trainees, one of the
2  investigators, et cetera.  And so, you could discuss the
3  cases together.
4        And the other group who came to that conference
5  regularly were the faculty from the Poison Control Center,
6  the New Mexico Poison Control Center, which is based out
7  of UNM Hospital.  And they have -- they are -- let's
8  see -- I think they were largely ER or internal
9  medicine-trained physicians, but who had more experience
10 treating live patients with toxic injections, overdose, et
11 cetera.
12       And so, had more knowledge on that score, and
13 also on the sort of pharmacology, how drugs and substances
14 are not only handled by the body.  So I also had some
15 input from the head of that.  I don't know if he still is,
16 but it was Dr. Steven Seifert, who's the head of Poison
17 Control Center.
18    Q.  And did Dr. Seifert have any opinions that
19 differed in any way from your ultimate opinions in your
20 report?
21    A.  No.  The -- that came up sort of in regards to
22 the toxicology testing where they were concerned that
23 ▇▇▇▇▇▇▇▇ may not have been given his anti-epileptic
24 medications.  So ▇▇▇▇▇▇▇▇ had a history of seizures as
25 a result of his brain injury at birth.  And so, he was

7 (Pages 22 to 25)

Page 26

1  maintained on -- I think the information we got either
2  from his medical records or from the Sheriff's Office --
3  was that he was prescribed Diazepam and levetiracetam, the
4  trade name of which is Keppra.
5       So Diazepam is a benzodiazepine sedative.
6  They're used in the treatment of all kind of things, but
7  can be used for seizures and levetiracetam or Keppra is
8  the medication for seizures.  So we were -- specifically
9  we wanted to know did the testing we ordered cover those
10 drugs, because it's not like TV where you send it off to
11 the tox lab.  They test for everything under the sun, and
12 ten minutes later you have a report.  I wish.  You have to
13 order specific testing.  Like, you have to ask for
14 specific drugs to be tested, and they're offered in panels
15 of drugs.
16      So the panels we ordered did include those two
17 drugs, and the test results were negative for both drugs.
18 But they were testing liver tissue, because ▮▮▮▮▮▮▮▮
19 remains were in such a state that blood no longer exists
20 and had decomposed.
21      So are there any limitations of testing liver
22 tissue instead of blood, like, is this a real negative or
23 not?  You know, does the negative result you're telling me
24 about mean the drug is not in his system, period, or does
25 it mean, well, maybe.  I can't detect it.  Like, maybe

Page 27

1  it's there, but because it's -- the tissue -- the test
2  isn't that great.  And so, it's a false negative.  Is it a
3  limit of detection problem such that -- which all tests
4  have, like, there's -- well, there is a lower limit, like
5  you have to have above X number of X amount of whatever
6  substance in the blood or tissue to trigger the positive
7  result, like, the test can detect?
8       Q.  Sure.  Yeah.
9       A.  So anyway, so these are the sorts of things that
10 I discussed with Dr. Isenschmid and Anderson and
11 Dr. Seifert, and the consensus was that -- so that either
12 scenario is possible.
13      A true negative meaning, there is neither of
14 these drugs in his system, or a false negative because the
15 drug has broken down in the decomposing tissue, or a false
16 negative because the drug is present but in too low a
17 level to be detected, because the limit of detection, the
18 lower limit of detection, apparently, in tissues as
19 opposed to blood is greater.  I don't know why.
20      Q.  Okay.
21      A.  But --
22      Q.  So --
23      A.  So those are the sorts of things we discussed.
24 And just part of the reason the cause or manner came down
25 to undetermined, because I can't be 100 percent certain

Page 28

1  that he didn't have these drugs in his system or that he
2  doesn't have enough for me to find or sort of -- if that
3  makes sense.
4       Q.  It does.  And so, I guess, kind of like the
5  question I asked you before about PMI --
6       A.  Uh-huh.
7       Q.  -- setting aside whether the information is
8  credible or not, if you got information that ▮▮▮▮▮▮▮▮
9  was given his medication or was not given his medication,
10 does that change whether you can give an opinion about
11 cause of death, as it relates to these medications?
12      A.  Unfortunately, no.  Because in general, if -- so
13 in general, people who have seizure disorders whether they
14 are because of a birth insult, like in ▮▮▮▮▮▮▮▮ case,
15 or a brain tumor or head trauma, fall down, hit your head,
16 get into a car accident, whatever, there are a number of
17 different ways in which the brain gets irritated and
18 responds with seizures.
19      And so, people who have seizure disorders are at
20 an increased risk of sudden and unexpected death.  There
21 are various theories as to why.  But then at autopsy -- so
22 these people frequently get autopsied because they're
23 found dead, and that's the only history they have.  And
24 unfortunately, at autopsy -- so seizures, it's like,
25 seizures are diagnosed in living people by either

Page 29

1  witnessing the symptoms, the shaking, the tongue biting,
2  you know, the collapsing, sort of what you -- what the
3  common public thinks of as seizure activity.
4       Q.  Yeah.
5       A.  So that being witnessed or by detecting seizure
6  activity in the brain, which irregular electrical activity
7  in the brain by monitoring the brain for that with an
8  electroencephalogram or EEG.  They hook up little
9  electrodes to the outside of your head, and then they look
10 at your brain waves for a while.  And so, I can no longer
11 do that to a dead person.  There are no more -- there is
12 no more electrical activity in the brain, period, normal
13 or abnormal.
14      So you can't -- there's no way, postmortem in a
15 deceased person, to diagnosis whether or not they had a
16 seizure immediately before they died.  Like, you can't
17 include it or exclude it.  So even if ▮▮▮▮▮▮▮▮
18 remains were -- even if he had been more recently deceased
19 when he got examined, even if -- you know, I probably
20 would not have -- the brain may have -- we may have been
21 able to see why he was having seizures, evidence of his
22 hypoxic insult at birth, evidence in other cases of old
23 trauma or brain tumor, or whatever the cause is, and we
24 can do toxicology testing for anti-epileptic drugs.
25      But just because you take your medications,

8 (Pages 26 to 29)

Page 30

1  doesn't mean you're not going to have breakthrough
2  seizures. So the short version of my -- I'm sorry -- I
3  tend to ramble.
4      Q. That's okay.
5      A. So having even a therapeutic level of your anti-
6  epileptic medication in your blood does not 100 percent
7  guarantee you will not have a seizure. It makes it much
8  less likely, but it doesn't totally exclude it. So people
9  can die of their seizure disorders whether or not they are
10 following their treatment regimen.
11     Q. And upon autopsy after their death, it sounds
12 like there isn't a great way to determine whether the
13 seizures -- what caused the death?
14     A. Correct.
15     Q. Okay. So one of the other questions I have, you
16 listed in manner of death, possibilities. And that
17 include, but are not limited to. And so, the question I
18 have is the ones you did choose to include, why did you
19 include --
20     A. Uh-huh.
21     Q. -- those ones as opposed to others?
22     A. So -- because they seemed like, given what I knew
23 about the story, the circumstances surrounding ▌
24 ▌         departure from Georgia and living at this compound
25 and what I knew of this compound, and the state of the

Page 31

1  other children there, these seem like likely
2  possibilities   Certainly dehydration and starvation are
3  likely possibilities
4       ▌         by virtue of being in the
5  wheelchair, developmentally delayed, is certainly at risk
6  for infection   And I can't totally rule out -- what else
7  did I list -- so infection -- we talked about dehydration
8  and starvation   We talked about why you can't rule in or
9  rule out definitively his underlying seizure disorder, and
10 I can't be 100 percent certain that a medication or other
11 toxic substance wasn't in his blood, because there's a
12 limit of -- a fixed list of substances we did look for,
13 and a fixed list of substances we are -- that the
14 laboratory is capable of looking for   So that doesn't
15 exclude or include 100 percent of a possibility
16     Q. Okay. And regardless of what information you're
17 provided about the story and, you know, witness statements
18 and law enforcement statements --
19     A  Uh-huh
20     Q. -- even with that information, based on the
21 scientific information you obtained, you're not able to
22 say to a reasonable degree of medical certainty what the
23 cause, in fact, was?
24     A  Correct, or that's mostly likely
25     Q. Okay. And you -- because you said the

Page 32

1  possibilities "include, but are not limited to," there are
2  other possibilities out there that may have happened, but
3  given the state of the body --
4      A. Sure.
5      Q. -- you couldn't --
6      A. So I can't -- so there are no signs of injury in
7  his skeleton, which is intact. So we can still get a good
8  look at (inaudible). The CT scan and the X-rays are
9  really good at that. Like, we're not going -- like, I
10 can't -- in a typical autopsy, I do not get a good look at
11 the skeleton because all of the flesh is still there.
12     But -- so the CT scan allows you to see through
13 the flesh, as it does with living people, so you can see
14 the bones. But -- so -- but his organs decomposed. His
15 skin is mostly intact, just mummified. So I feel pretty
16 good that I didn't miss something like a gunshot or a
17 stabbing because I would still be able to see that defect
18 in the skin.
19     But I may not see any evidence on his body if,
20 for example, he got smothered because even in people who
21 are found dead shortly after being smothered, there may
22 not be any autopsy findings. But the state of his remains
23 is certainly going to obscure whatever may have been
24 there. So there's some injuries I can't exclude --
25     Q. Well, let me --

Page 33

1      A  -- in a natural disease I can't exclude, because
2  I can't -- I'm not really getting a very good examination
3  of his organs because they're decomposing
4      Q. Got it. So let me ask you about that. So
5  smothering would be an example, you know, of respiratory
6  arrest. Like, you know, he couldn't breathe, his airway
7  was restricted in some way.
8      A  Uh-huh
9      Q. Is there a way to tell that in non-decomposed
10 children or bodies, if there was a smothering or, you
11 know, some sort of asphyxiation?
12     A  So the types of things we look for in children or
13 adults who are not decomposed -- well, who are decomposed,
14 but also, who are not decomposed -- we look -- so how are
15 the ways in which someone can asphyxiate or suffer a lack
16 of oxygen? Compression of the neck, certainly, that may
17 leave injuries to the skin, to the -- there are muscles
18 that connect various parts of your skull to your clavicle
19 and sternum called your "strap" muscles in your neck   And
20 they're in very set layers
21     So we'll look for injuries to the muscles, so
22 under the skin   We'll look for injuries to the larynx,
23 the voice box, and the hyoid bone, which is a little
24 U-shaped bone at the base of the tongue, a hemorrhage in
25 the tissue   There are fractures of the bones, so the

Page 34

1  structures had to have been fractured at the time of
2  autopsy because those structures -- certainly, a bone is
3  going to -- you know, will not decompose away.  I'm not
4  sure what the time frame for that would be.
5       But the hyoid in children is at least partly
6  cartilage, but that's still present.  So we'll look for
7  injuries to the deeper structures that you can tend to see
8  with compression from the outside of the neck.  We open
9  those structures, so if he had choked on something, we
10 would look for it.  But anything in his airway is going to
11 decompose, just like the rest of him.  So if there was a
12 chunk of chicken that he couldn't swallow because he has
13 swallowing problems, it's probably not there anymore.
14    Q.  So let me ask you this --
15    A.  And then --
16    Q.  You know --
17    A.  -- for suffocation, it is -- we also look for --
18 in any of these kind of asphyxial deaths, petechiae, which
19 are pinpoint hemorrhages that can be seen on the face, on
20 the oral mucosa, inside the eyelids, on the eyes, but
21 those tissues -- so -- you know, we look for them, but I
22 don't recall if he had eyes anymore.  I'd have to look at
23 the pictures.
24    Q.  I think the --
25    A.  I said I couldn't assess them, and they're not --

Page 35

1  both eyes are absent
2    Q.  Yeah, there you go.
3    A   So these -- so sometimes there are findings at
4  autopsy that will go along with an asphyxial death  Not
5  always, sometimes
6    Q.  But there wasn't any evidence in this case of
7  that type of death.
8    A   Correct  But the more subtle evidence, like the
9  petechiae, the pinpoint hemorrhages, I'm not going to be
10 able to see even if they were there because of the state
11 of his remains
12    Q.  Got it.  Okay.  So if say, something, you know,
13 an investigator, a witness, somebody there said, you know,
14 "It's -- there was some kind of, you know, ritual."  There
15 was information about rituals --
16    A   Uh-huh
17    Q.  -- taking place, and this was done on ▮▮▮▮▮▮
18 ▮▮▮▮▮▮
19    A   Uh-huh
20    Q.  And he was put in such a position or a place
21 where asphyxiation was possible, you're not able to take
22 that information with what you have and say, "Yeah, I
23 think to a reasonable degree of medical certainty that
24 happened," because you don't have enough evidence; is that
25 right?

Page 36

1    A.  Yes.  So I think it would be really hard for me
2  to -- I think -- so I would try to consider the
3  information you're giving me from these other
4  investigative sort -- it would be like, "Does that match
5  what I saw at autopsy or not?"  Like, "Can I rule it in or
6  can I rule it out, and to any degree of certainty?"
7       And I think it is unlikely that I could really
8  exclude anything, except like -- well, I don't think his
9  neck was crunched because his hyoid bone is intact, but I
10 can't tell you what position he was in when he died.  So
11 if -- or if he was covered with something or -- you know,
12 so --
13    Q.  Okay.  So --
14    A.  -- am I answering your question?
15    Q.  You are.  I think you said you can't exclude it,
16 but --
17    A.  Yes.
18    Q.  -- also true that you can't take information
19 supplied to you by witnesses or investigators, and reach a
20 conclusion because you don't have enough evidence from
21 your report, your examination, and investigation?
22    A.  Yes.  That doesn't mean that -- so, you know,
23 I've made a medical assessment as best I can of cause and
24 manner of death.  But if there is -- hmmm -- how do I want
25 to -- yeah, which is really as far as I'm able to go.

Page 37

1  So --
2    Q.  Yeah.  And --
3    A.  -- if you're able to make the argument some other
4  way, based on some other evidence -- I mean, you can ask
5  me that.  I'd be like, "Well, it's possible."  That's
6  probably all I'm going to be able to say, "It's possible"
7  or "No, I don't think that's possible because of X, Y, or
8  Z."  But I'm not sure like, how much certainty I'm going
9  to be able to give.  That opinion is probably limited.
10    Q.  Got it.  And I'm not saying it did happen or
11 didn't happen.  I'm just saying --
12    A.  Sure.
13    Q.  -- that because of the state of the body, the
14 decomposition, you can't give a medical opinion for us.
15    A.  Correct.
16    Q.  Okay.  All right.  Is there -- I mean, I always
17 assume that pathologists were the source on cause of
18 death.  You know, could some other physician from some
19 other area help you in any way, or we just don't have
20 enough information because of the state of the body?
21    A.  An anthropologist -- so -- which is not a medical
22 physician, but they're a PhD-level professional --
23    Q.  Uh-huh.
24    A.  -- might be able to render an opinion about how
25 long it takes to get mummified like this.

10 (Pages 34 to 37)

Page 38

1   Q. Okay.
2   A. So they might be able to give you an opinion on
3   that score. But, yeah. We have -- we are the most
4   commonly asked to assign cause and manner of death based
5   on an examination of the body.
6   **Q. Yeah. And I -- you know, I assume if someone**
7   **comes into the ER with a gunshot to the heart and they die**
8   **on the table, the ER doctor could probably tell us the**
9   **cause of death. But otherwise --**
10  A. So the ER doctor can certainly give you an
11  opinion and tell -- look, let me finish.
12  **Q. No, no, no. I --**
13  A. I don't mean -- I don't mean to nay say ER
14  physicians. They are very talented and very knowledgeable
15  people, and I couldn't do what they do.
16  **Q. Yeah, yeah, yeah.**
17  A. But legally, an ER could not write and sign that
18  person's death certificate. So only coroners and medical
19  examiners can certify deaths as being due to anything
20  that's not natural. So --
21  **Q. Got it. Okay.**
22  A. -- an ER physician can -- or the surgeon who
23  opens -- who cracks that guy's chest -- can certainly say,
24  "No, his heart is shredded. That's why he's dead. And
25  this hole and this hole look like bullet holes."

Page 39

1   So yes, they can certainly tell you that. But
2   myself or someone in a position like mine would be the one
3   to sign on the dotted line and put that on a death
4   certificate.
5   **Q. What about to testify in the court to a**
6   **reasonable degree of medical certainty?**
7   A. I mean, I don't know what other -- what
8   physicians in other specialties get asked to testify to
9   and how comfortable they are doing so. I don't know.
10  **Q. Got it. Okay. And I -- you answered the**
11  **question for me, I think already, but there was no**
12  **evidence that you could glean from your examination of**
13  **[redacted] that he had any kind of airway obstruction**
14  **like from food or something else, vomit?**
15  A. Correct. There was no evidence of such.
16  **Q. Okay. Oh, let's see here. I got that one. I'm**
17  **checking a couple of different things.**
18       MS. JOHNSON: (Inaudible). Can I ask just a
19  quick question to Dr. Kastenbaum?
20       MR. VILLA: Yeah. Why don't you go ahead. I
21  think I'm running out of questions. Please.
22            EXAMINATION BY MS. JOHNSON
23  **Q. Okay. Real quick. And I believe this was**
24  **addressed by one of the other physicians. I think the**
25  **radiologist, Dr. Kastenbaum.**

Page 40

1   A. Uh-huh.
2   **Q. There appears on one of the X-rays, it indicates**
3   **Harris lines. What are those, and do they play any**
4   **significance in your ultimate opinion?**
5   A. So my understanding is that -- I'm looking at my
6   notes for reviewing everything. Harris lines are also
7   called growth resumption lines, and they are lines that
8   show up in X-rays of bones. I don't believe there's
9   anything you can see if you're looking at somebody's
10  skeleton. But in X-rays and bones they show up. And my
11  understanding is that they are caused by stoppage and
12  restarting of growth of the bones --
13  **Q. Oh, okay.**
14  A. -- due to some stress on the body. Nutrition,
15  other poor conditions, developmental issues, et cetera.
16       So we had tried to sort of -- this was something
17  that was noted in the anthropology report. And I have a
18  -- Doctor -- let's see -- Dr. Mlady, who was the chair --
19  Gary Mlady was at the time -- I don't know if he still is
20  because I'm not there anymore. He was at the time the
21  chairman of the Department of Radiology at UNM Hospital,
22  and he would do some consult work for us regarding
23  interpreting X-rays and CT scans, because he's a
24  radiologist, and that's what he does. You know, like, his
25  training is different from mine. So his -- I don't

Page 41

1   know -- I don't -- I didn't know if it was in the packet
2   you sent me or not, but he had written like a short,
3   one-paragraph --
4   **Q. I think you --**
5   A. -- report that's signed with his -- there's no
6   real heading on it except the OMI case number. And it
7   says when he looked at extremity radiographs, and then he
8   signs it at the bottom. And there he was looking at -- he
9   was -- we were trying to determine if we could -- what
10  [redacted] skeletal age was, if he could tell how old
11  he was when he died by looking at his skeleton. That's
12  what he was looking at. But then he also mentions the
13  growth arrest line, which is another way of saying "Harris
14  lines." So yeah, my understanding --
15  **Q. (Inaudible).**
16  A. -- is that it is stoppage and restarting of
17  growth of the bone due to some kind of stressor.
18  **Q. Right. And he doesn't -- Dr. Mlady doesn't link**
19  **those to injury or --**
20  A. No. And that would be another thing that
21  Dr. Mlady -- he doesn't write it in his own report, but I
22  have -- I had put in a paper file at the OMI some e-mails
23  we had exchanged -- excuse me -- which is usually how we
24  got a consult out of Dr. Mlady, "Hey, Dr. Mlady, we have a
25  CT scan on case-whatever. Would you look at it?"

11 (Pages 38 to 41)

Page 42

1   Because he can pull it up on his computer at the
2   hospital, and whatever. So he would send an e-mail and
3   say, "I don't see any evidence of injuries." I'm looking
4   through my pile of papers. I'm sorry. I don't know.
5       So I know these documents exist in the OMI file.
6   There are some parts of the file that are exempt from
7   subpoena. You have to get a court order for them. So you
8   would have to ask the Records Department if these fall in
9   that category or not, because I don't know.
10      So I have an e-mail from Dr. Mlady. So he
11  reviewed the CT scan, which basically includes X-rays of
12  the entire skeleton, the whole body, and saw no evidence
13  of skeletal injury.
14  Q.  Okay. That answers my question.
15  A.  So yeah. So it's not in his brief report, but it
16  was in an e-mail. And they're in the file, but I don't
17  know if you're entitled to those. But the records
18  (inaudible), like, you could call and tell them you know
19  these exist, and how do you get them, and they could tell
20  you.
21  Q.  Okay.
22  A.  Because I don't know the rule.
23      MS. JOHNSON: I don't have anything else.
24      Ryan?
25      DR. KASTENBAUM: Okay.

Page 43

1       FURTHER EXAMINATION BY MR. VILLA
2   Q.  I have one question I didn't ask you. You talked
3   about the case review with the your colleagues and the
4   fellows.
5   A.  Uh-huh.
6   Q.  And the trainees and staff, did anyone disagree
7   with your opinions, your conclusions in the report?
8   A.  So there's no formal record of these conferences.
9   But I had taken some notes sort of after, so that I could
10  present the case to the group, et cetera. And I made some
11  notes as to like, well, you should get this information
12  for follow-up, and looks like, according to my notes, that
13  we discussed it as early as later in August.
14      Anyway, no, the consensus was to go with
15  "undetermined." Undetermined because we didn't really
16  have -- we didn't have evidence of anything in particular
17  at autopsy. So the autopsy and follow-up studies are
18  certainly limited by the state of his remains. And so, it
19  seems that the safest best was to go undetermined, based
20  on what we had.
21      MR. VILLA: Okay. That was my only follow-up.
22      Erlinda, did you have anything else or was that
23  all?
24      MS. JOHNSON: I don't. You guys -- you covered
25  everything, I think that we needed to cover.

Page 44

1       MR. VILLA: Okay.
2       MS. JOHNSON: You're very thorough,
3   Dr. Kastenbaum.
4       DR. KASTENBAUM: Thank you.
5       MR. VILLA: Well --
6       DR. KASTENBAUM: A question for you.
7       MR. VILLA: Certainly.
8       DR. KASTENBAUM: So is this -- so you mentioned
9   the name of the case, U.S. versus whoever it was. So this
10  is a criminal proceeding, I assume?
11      MR. VILLA: Yes. We represent --
12      DR. KASTENBAUM: Yeah.
13      MR. VILLA: -- two different -- of the
14  defendants.
15      DR. KASTENBAUM: Sure.
16      MR. VILLA: -- in the case.
17      DR. KASTENBAUM: That's okay. I -- it's none of
18  my business who they are. I never have this information.
19  I'm just curious if you know anything about an eventual
20  trial.
21      MR. VILLA: There is no trial date, right now.
22  The case is --
23      DR. KASTENBAUM: Okay.
24      MR. VILLA: -- currently on a stay for competency
25  proceedings.

Page 45

1       DR. KASTENBAUM: Okay.
2       MR. VILLA: And so, you know, it's probably a
3   long ways away.
4       DR. KASTENBAUM: Okay. Just curious.
5       MR. VILLA: Sure. No problem. Well, thanks
6   again for your time. I'm going to stop the recording.
7       DR. KASTENBAUM: You are very welcome. I will
8   send you an invoice on Monday because all that stuff's on
9   my work computer. Actually, well, I'm working this
10  weekend, but I don't know that I'll have time, so probably
11  Monday. And if you need anything else from me, you know
12  how to get in touch.
13      MR. VILLA: Sounds great.
14          (End of interview.)

12 (Pages 42 to 45)

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

```
                                          Page 46
 1    In Re:
 2    U S  vs  Jany Leveille, et al
 3    _____
 4
 5
 6            C E R T I F I C A T E
 7
 8         I, Michele Nelson, New Mexico Certified
 9    Stenotranscriptionist, DO HEREBY CERTIFY that the above
10    captioned transcription was prepared by me; that the
      RECORDING was reduced to typewritten transcript by me;
11    that I listened to the entire RECORDING; that the
      foregoing transcript is a complete record of all material
12    included thereon, and that the foregoing pages are a true
      and correct transcription of the recorded proceedings, to
13    the best of my knowledge and hearing ability   The
      recording was of GOOD quality
14
              I FURTHER CERTIFY that I am neither employed by
15    nor related to nor contracted with (unless excepted by the
      rules) any of the parties or attorneys in this matter, and
16    that I have no interest whatsoever in the final
      disposition of this matter
17
18
19
20
21
22
23           _____
              Michele Nelson,
24            Certified Stenotranscriptionist
25
```

13 (Page 46)