```
08/31/18                 Taos County Sheriffs Office                        4053
00:42                    Law Supplemental Narrative:                 Page:    1
    Details
  Incident Number    18050268           Name   Rael J
  Sequence Number    11                 Date   20:10:13 08/24/18

    Narrative
     (See below)
```

========================================

Narrative:

On or about January 2, 2018, I, Sergeant Jason Rael, received an email from Sheriff Jerry Hogrefe in regards to a missing child Abdul-Ghani Wahhaj. The email did in part state information the child and his father Siraj Wahhaj may be residing in Costilla, NM or Carson, NM. The email did have attachments to include a National Center for Missing and Exploited Children (NCMEC) flyer and a pick-up order from the State of Georgia. This is the first time I had personal knowledge of this incident.

On or about May 14, 2018, I, Sergeant Jason Rael, of the Taos County Sheriff's Office (TCSO) was advised by Deputy Teodoro Flores (TCSO) of call he received from Taos Central Communications (Dispatch) in regards to an agency assist. The nature of the call was information of a missing child that may be located in Taos County.

Upon review of the incident call narrative given to deputy Flores, I learned the call came in from Federal Bureau of Investigations (FBI) Agent Dennis Suta out of the Atlanta Georgia office of the FBI. Agent Suta advised this missing child case originated out of the State of Georgia. Further information shared was the biological father Siraj ibn Wahhaj was wanted by Clayton County authorities in regards to this case. It was also learned at that time 3yo Abdul-Ghani Wahhaj was taken in December 2017. Further information stated the location of the individuals is that of Lucas Morton a traveling companion. The address given was 55 Panorama Boulevard, Amalia, New Mexico. It was also noted the individuals were armed and dangerous.

I did research the address given, and did confirm the address was within Taos County, NM. Deputy Flores contacted Agent Suta and obtained further information regarding this case. Deputy Flores briefed me on the information he had gathered. It was decided at that time Deputy Flores and I would travel to Amalia and attempt to locate the property. Deputy Flores and I stopped at the Duran's Gas Station in Costilla, New Mexico and Deputy Flores gained information regarding Lucas Morton. It was learned approximately 3-4 weeks prior, Morton and two females were seen at the station. It was also learned there were approximately 8 children with them and they were traveling in a box truck. Other information shared to Deputy Flores was the individuals were living in the area of Panorama Road.

Upon arrival to Amalia I decided to drive to a location from which was out of sight and gave a favorable vantage point from which to surveil the suspected property belonging to Lucas Morton from a distance. I did observe what appeared to be a structure which had a large plastic covering on it. The property did also have a berm made of dirt and also was surrounded by tiers. I did also observe a white box truck on the property. I should also note what appeared to


EXHIBIT B

US v. Jany Leveille et al 23790

be a shooting range on the property. I did speak to an individual who owned the property we were on, and he gave us permission to be there. The property owner who wished to remain anonymous stated he was familiar with the individuals (Lucas Morton) and had heard there was some kind of training camp on the property. The individual stated he heard there were reports of a lot of shooting going on and the neighbors had to ask them to stop shooting. The individual stated the only time anyone is seen, is at night due to their religious beliefs. The individual stated the property was in fact property owned by Lucas Morton. The individual stated he had met Morton face to face and Morton introduced himself. I did then after surveilling the property leave our position and returned back to the TCSO Office.

    Further research into this case did yield Siraj Wahhaj was involved in a traffic accident in Chilton County, Alabama. The date of the crash was December 13, 2017. The Alabama Officer who made contact with Siraj Wahhaj indicated there were 2 adults and 5 children in the vehicle when he made contact. The Alabama Officer also stated a Box-Truck bearing Delaware tag # ClO85217, came and picked up the group. The Box-Truck registration returned to one Lucas Allen Morton of Georgia. The Alabama Officer also noted there were firearms and body armor in the vehicle along with ammunition. When asked where the group was traveling to Siraj stated they were headed to New Mexico on a camping trip. The arrest order for Siraj Wahhaj was not issued yet at the time of the crash.

    On or about May 14, 2018, I was advised by Sheriff Jerry Hogrefe a male later identified as Jason Badger called him and wished to provide information regarding this case. I did make contact with J Badger via cell phone. I did capture this conversation both video/audio on my duty issued Axon Taser Camera. (The following is a summary of the interview. It is not intended to be a verbatim account and does not memorialize all the statements made during the interview)

    Jason Badger stated he was on the internet and came across information of Siraj Wahhaj taking a boy from Georgia, and Lucas Morton had driven them to New Mexico. J Badger stated he knew where they were at. J Badger stated they were on his property, Costilla Meadows in Ventero, NM. I asked Badger how he knew and he told me he had land up there. J Badger went on to say he had friends up there, they told him the Sheriffs were looking for Lucas Morton. Then they looked him up on the internet and found articles regarding child abduction. J Badger looked into it further and found an article on Fox 5 Atlanta, everyone was looking for them, and last thing anyone knew was they were coming to New Mexico on a camping trip. The camping trip they took was on J Badgers land.

    J Badger stated the only reason they were on his land, was the fact that they bought the lot next to his and got mixed up, and then they built on his property. J Badger stated he went out to check his land and they (Lucas Morton and Siraj Wahhaj) were there. J badger stated they decided to swap lots because they had kids and he did not want to kick them out into the street. J Badger stated they were trying to swap land for about 4-5 months.

    I asked Badger if he had made a deal with Siraj or how did he know him. J Badger told me the first time he went up to the property Siraj was the first person he met. J Badger stated he only met him the first time he went up to the property. J badger told me the later times he has been to the property he has only dealt with Lucas Morton. Lucas Morton is the guy that owns the Box-Truck their suspecting they left Georgia in. J Badger stated he did not know any of this (kidnaping) until tonight or else he would have said something sooner.

    J Badger told me a lady in Questa, NM had told him some Sheriffs were looking for Lucas Morton. J Badger stated he wondered why the Sheriffs would be looking for Lucas, because they were supposed to go to New Mexico Title for closing on the property in two weeks. J Badger told me he contacted New Mexico State Police (NMSP), Taos County Sheriffs, and Clayton County Police. Clayton

County Police told him to contact TCSO, and he also called NMSP. J Badger stated he knew where they were at, and for a fact they were there.

I did then get J Badger's home address and advised him I would come out to his home and visit him there. Later that night I arrived at 305 Buna Vista Road in Cerro, New Mexico. I did make contact with J Badger and his wife Tanya Badger. I did capture this conversation both video/audio on my duty issued Axon Taser Camera. (The following is a summary of the interview. It is not intended to be a verbatim account and does not memorialize all the statements made during the interview)

I was greeted by J Badger at the entrance to his property. I was invited into his home where I was introduced to his wife Tanya Badger. After a brief introduction I began the interview. J Badger stated he was looking for land when he moved here (New Mexico) and came across Costilla Meadows, found it cheap, and bought the property in October of 2017. I then advised the Badgers of how I became involved in the case.

J Badger then stated a lady who had knowledge of the land swap told him the Sheriffs were looking for Lucas Morton. J Badger stated he then did research and called Clayton County in Georgia, and then he called NMSP.

J Badger stated when they first saw them on their land both he and his wife met with Siraj, and they saw him with the little boy (Abdul-Ghani) that day, the same one from the missing child poster. J Badger stated then they saw Lucas Morton. J Badger stated Lucas Morton should be there (on their property), technically he can't even leave his land because of his religion. J Badger stated that is the reason they could not close on the land yet. I asked if the Badgers knew if Siraj and Lucas were anti-government. J Badger stated no, but they shoot guns. Tanya Badger stated they just started doing that (shooting Guns) which is weird because they can't even drink certain water, so it is strange that they would be shooting. J Badger stated they are Muslim for a fact. J Badger stated they are nice to him and his wife. I advised they are radical by all accounts so far. I advised they would most likely be nice not to draw attention to themselves. Tanya Badger stated she asked them how they found the land, and they told them they were just tired of the city and wanted a change.

I advised the Badgers we had received information in January 2018 regarding Wahhaj, but they could be in Costilla or Carson, nothing specific. I advised them information we had gathered was accurate so far.

I asked the Badgers what guns they may have seen. J Badger stated he observed an AR-15. Tanya Badger stated something about asking if a bullet would pass through a tire. J Badger stated he may have seen a pistol. J Badger stated he asked Lucas Morton if he shoots, and Lucas told him his brother Siraj is the one who shoots. Tanya Badger interjected and stated they (Lucas Morton) does pay attention, because every time they drive out to the property Lucas calls Jason on the phone and asks if it is him who is driving up.

I asked if they move around during the day or at night. Tanya Badger stated the first couple of times they went out to the property they were, but when they went out to stake the land no one came out. J Badger stated he was out at the property taking pictures about 3-4 weeks prior to this interview. New Mexico Title needed pictures of what they built. J Badger showed me a picture of Lucas Morton on the property. J Badger told me the date of the pictures was April 2018. J Badger showed me a picture of the entry to the property. I also did observe a photograph of a camping trailer which was partially buried in the ground. J Badger showed me pictures of the property from different angles. I did observe berms of dirt and tires stacked on one top of the other. It did appear in one photograph they had started to fill the tires with dirt. J Badger told me there was a shooting range on the property.

J Badger told me the legal description for the property was Unit 2 Lot 28, Costilla Meadows Subdivision. I did provide J Badger consent to search form. I

did ask for his permission to search the property as it would aid in this investigation. I did explain the document and its content. J Badger did sign the consent form and I did take it into my possession. J Badger did also hand sketch a diagram for me on note book paper. J Badger Stated the property was 10 acers.

Tanya Badger stated there were children on the property, 5 kids. J Badger stated he herd there are more (Kids). J Badger stated he was pretty sure the kid Abdul-Ghani and Siraj Wahhaj were there, but he had not seen them in a long time. J Badger stated Lucas Morton drives a box truck. J Badger stated he had taken water to Lucas Morton, but Lucas told him he could not drink the water because of the brand of water it was. J Badger stated there is a guy "Kenny" who helps out Lucas Morton from time to time. J Badger told me he does not know how they (Lucas Morton) get money, but for payment of the land he was going to use money cards. J Badger told me Lucas told him they would not have money until the end of the month. I advised the Badgers there may be up to 12 children on the property. J Badger told me there was no way there was that many, because they have not seen them.

J Badger told me Lucas Morton would be at the Title Company on May 31, 2018 for the closing on the property. J Badger told me he did not know who they were, and they had that little boy, and he did not want to kick them out on the road. Tanya Badger told me the little boy stayed with Siraj. J Badger stated he felt bad because they had kids.

I then advised the Badgers it would not be a good idea to go out to the property and I would be in touch. I then concluded my interview.

I then after this interview relayed the information I received to Undersheriff Steve Miera (TCSO). Undersheriff Miera advised we would meet in the morning and discuss the case further.

On or about May 16, 2108, I met with Federal Bureau of Investigation's (FBI) agents in Undersheriff Miera's office. As best as I can recall Assistant Agent in Charge Christine Paz, Special Agent in Charge Alan Miller, NMSP Lt. Edwardo Martinez, and NMSP Sgt. Westley Cox were present during this meeting. Undersheriff Miera was delayed due to a prior meeting, but did eventually attend. Undersheriff Miera did compile a briefing file for this case and I did provide a copy of the briefing file to all in attendance. During this meeting we discussed the contents of the briefing file and the need to verify the information given by the property owners (Jason and Tanya Badger). Many options were presented by FBI agents, but it remained imperative Officer Safety would be top priority. NMSP Lt. Martinez advised by coincidence he owned property in Costilla Meadows, and if needed we could use his property if needed. It was discussed as a possibility we could place an old RV with surveillance equipment on his property. Other options did include a rouse in which undercover officers would go to the property under the guise of a property survey team, possibly making contact with Lucas Morton when the time came to close on the property at the title company, or even if the chance a patrol officer came into contact with the box-truck we could interview Morton away from the property.

It was determined during the meeting NMSP Sgt. Cox would be my point of contact as he was assigned to the Joint Counter Terrorism Taskforce with the FBI. At the conclusion of the meeting it was decided we needed more intelligence in order to proceed further with the safety of all involved in mind. Thus the meeting was concluded.

Throughout the month of May 2018 I remained in contact with NMSP Sgt. Cox both by email and also phone conversations. The extent of my contact was only in regards to this case and we exchanged information, and updated each other with progressions in this case. During the month of May I was advised by NMSP Sgt. Cox that a fly-over of the compound was conducted and the white Box-Truck was on the property, also only one person was observed walking around on the property.

US v. Jany Leveille et al 23793

A plan was also in the works in implementing a license plate reader in the area in hopes of capturing dates and times of anyone leaving the property in the box-truck. I was also advised the plan to place a camper on Lt. Martinez property was going to take a significant amount of planning and funding. I also received information from an individual who lived in the area and wished to remain anonymous. The individual had stated someone in the compound was receiving mail through the US Postal Service. The mail being received was a large amount of money cards. NMSP Sgt. Cox later advised the Post Master in Amalia, and surrounding Post Offices did not have any known person associated with the property with a valid mail box.

I had also received information by the same source who stated a neighbor named "John" was visited by Lucas, John's wife worked at the Dollar Store in San Louis, Colorado, her name is Melissa. John would drive Lucas wife to the Dollar Store weekly to buy provisions. John lives in the vicinity of the compound and has a friendship with Lucas. The source stated John was called By J Badger and told him to look at the internet. At some point Lucas was at John's house and John confronted Lucas about the missing child. According to the source Lucas became quiet and denied any involvement. The source then stated Lucas was on high alert and has a large set of binoculars; so big he has them set on a tri-pod. Lucas is supposedly watching out 24/7, and has cut off all communications with anyone. J Badger had told me in a conversation I had with him that he suspected word had gotten out and Lucas may know we were onto him. I also advised the County Assessor does not conduct lad surveys and we would have to find an independent private surveyor to assist if we went forward with the undercover survey rouse. Other information gained was the box-truck had not moved and the missing child may still be at the property. This is all the information I can remember for the month of May 2018.

On or about June 6, 2018, I was asked by Undersheriff Miera if I could assist FBI and NMSP Sgt. Cox with a security detail. I was advised FBI would be flying a drone over the property and requested assistance. I did assist the FBI and NMSP Sgt. Cox. We arrived at a location from which was out of sight of the property. FBI launched a drone and flew overhead the compound. During this operation I was able to view images being transmitted by the drone to a laptop computer. At one point during the operation I observe done male wearing a lime green shirt and two small children on the property, it appeared they were burning trash in a pit. The male appeared to be carefully placing one item of trash into the burn pit at a time so as to not make a large amount of smoke. At approximately 19:00 hrs I observed a female adult wearing red exit the box truck, and then I observed a male child with her. The male child appeared to be walking with a distinct limp. The male I observed appeared to be the right age and height as the missing child Abdul-Ghani Wahhaj. After further surveillance I did not observe anyone else on the property. I did take a picture of the laptop screen to document my observation. Measurements of the compound were taken to aid in a possible tactical plan. The child observed may have had a limp in part due to the fact his footwear may not have been the right size. I also learned the FBI had already been flying the drone for some time before I was made aware of the operation, and it was my understanding they were going to conduct one more day of flight. I was advised if we felt like we needed them further, they would stay and assist in any way possible. I then concluded my assistance with the drone operation. I did relay the information I learned to Undersheriff Miera. After some thought and careful consideration it was decided to have FBI show the mother Hakima Ramzi the images of the small boy to confirm it was her son (Abdul-Ghani Wahhaj). On June 11, 2018, I received correspondence from NMSP Sgt. Cox. The email read in part the mother (Hakima) had reviewed the images and stated the boy in the video was NOT her son. FBI was going to check if they could find better video taken and go from there. I will note the information

US v. Jany Leveille et al 23794

from Captain Stubs, Clayton County Police Department report number 17064975 stated in the narrative the missing child could not walk and suffered from seizures. The date of this report was December 10, 2017.

On or about June 12, 2018, I was made aware J Badger had filed civil processes paperwork at TCSO in an effort to have Lucas Morton removed from the property. Sgt. Gilbert Atencio placed the paperwork on my desk as he knew I was working this case. I then advised Undersheriff Steve Miera of the civil process and he advised to place the paperwork in his box, and he would take care of it.

I don't not recall the date I received information the civil process regarding the J Badger case was dismissed by Magistrate Judge E Ortega. I was also made aware J Badger called NMSP and asked for an officer to assist in going to his property and evict Lucas Morton. NMSP Sgt. Cox told me a NMSP uniformed officer drove up the compound and was met at the roadway by Lucas Morton. Lucas Morton was by all accounts nice to the officer and the officer left the property without incident. I was then asked by NMSP Sgt. Cox if I could contact J Badger and ask him if he was willing to assist in this investigation. I was to ask J Badger if he would wear a button camera and go out to the property, and make contact with Lucas Morton, also it would aid in gaining intelligence and perhaps due to the fact J Badger owned the land he would be allowed to move freely around the property. The video gained by this kind of surveillance would be firsthand, and it would most likely capture facial images of anyone in the compound.

On or about July 15, 2018, I made contact with J Badger via cell phone. The following conversation was audio recorded. (The following is a summary of the conversation. It is not intended to be a verbatim account and does not memorialize all the statements made during the conversation)

J Badger answered the phone and stated he was up in Amalia, NM. J Badger stated he was watching Lucas Morton getting water. I asked J Badger if he had any contact with Lucas Morton. J Badger stated he had not had contact with Lucas since he told them to get off the property. J Badger stated it did not look like they had made any attempt to get off the property.

I advised J Badger of the surveillance we had conducted of the compound and there has not been any sign of Siraj Wahhaj on the property thus far. I asked J Badger if he would be willing to wear a button camera and asked him if he would be willing to go to the property and make contact with Lucas Morton. I explained to him how it would help this investigation. I explained it was entirely up to him, and if he didn't feel comfortable it was ok, we would find another way. J Badger asked if he did help and the missing boy (Abdul-Ghani) was not there, how long it would be before he got his property back. J Badger stated he had already gone to NMSP to evict the people from his property, and they were trumped by FBI. Badger seemed to be getting very upset, and I explained we were working hard to resolve the issue in a manor where everyone's safety would not be harmed. J Badger asked if he did wear a button camera, and he had to defend himself, who would have his back. I told him I would ask that question and get back to him. J Badger stated he had no problem helping, but did not want to left out to dry if he had to defend himself. I did give J Badger my office desk phone number and my work cell number. I advised J Badger I would get back with him.

I did advise NMSP Sgt. Cox of my conversation with J Badger regarding the button camera. I also did email Undersheriff Miera of my conversation. During the time I spoke to NMSP Sgt. Cox, I advised him of the tone and frustration of J Badger. I advised NMSP Sgt. Cox I didn't feel it appropriate to send J Badger in, and advised he would most likely be liability rather than an asset at this point. Both NMSP Sgt. Cox and I agreed. I stated to NMSP Sgt. Cox I felt we had expended a large amount of time and resources on this case and I did not know how much further we could proceed given no solid concrete evidence Siraj Wahhaj and Abdul-Ghani were at the compound, but we would exhaust all measures and

leads.

On or about August 2, 2018, I received a message regarding this case from a Captain Stubs of the Clayton County Police Department. The message in part read he was working on a missing children's case with the FBI and they tracked down the group in Costilla where they had a 10 acer plot. Through social media he found out the kids were starving. I did return Cpt. Stubs phone call as soon as I got the message. I did leave a voice mail and asked for call back.

Later on in the day I was called by Detective Rick Porter and he advised me of new information he had received. Det. Porter advised he had received credible information from a source from inside the compound who stated they were starving and needed money. Det. Porter also stated the family is in danger, they are starving, they moved to a compound in the desert, in Taos County. I asked if Det. Porter for a copy of a report or anything that would contain the messages as they would aid in the furtherance of this case. Detective Porter advised he would send me a copy of what he had sent to the FBI (Atlanta Office). I advised Det. Porter I learned the mother of the missing child was going to come to New Mexico. Det. Porter advised she was going to come because she felt like no one was giving her any help. The child has been missing for nine months and they have been at a standstill.

Det. Porter stated he had a way to check the compound, and there was an arrest order for Siraj Ibn Wahhaj and a pick-up order for Abdul-Ghani Wahhaj. I advised Det. Porter I had that information in my case file. I advised Det. Porter I did not know if FBI had been in contact with his agency and informed them of what had been done up to this point. I gave Det. Porter a summary of the case up to this point and advised him we were still working with the FBI. Det. Porter asked if the welfare of the children would change things for a search warrant. I advised Det. Porter I had left a message with NMSP Sgt. Cox, regarding the information of people starving on the compound. Det. Porter advised in the messages it was asked that a care package be sent to the family. I advised Det. Porter if a care package was sent, if at all possible, have a tracking number be attached to the package. Det. Porter stated the care package would be sent to Lucas Morton at the Gas Station in Costilla, NM. I advised if we had a delivery date it would aid in this case, because we may be able to detain Lucas Morton away from the compound, and that would be one less person to contend with on the compound. Det. Porter advised he would make sure a tracking number would be attached to the care package. I advised Det. Porter the information he provided would move this investigation forward. Det. Porter stated if and when we had the child (Abdul-Ghani Wahhaj) in our custody he would fly to New Mexico and bring him home. I advised Det. Porter I would have to go through Child Protective Services, but we would defiantly make that happen. I asked Det. Porter if he knew who had sent the message regarding people starving. Det. Porter stated the message came to a person who reached out and wanted to remain anonymous. Det. Porter stated his source was credible. Det. Porter stated the message's came from Subhana Wahhaj's Facebook account, but it may have been sent from Hujrah Wahhaj, using Subhana's account. I advised Det. Porter as best to my knowledge I had no information as to any names of who may be living at the property, aside from Siraj Ibn Wahhaj and Lucas Morton. Det. Porter stated Lucas Morton was married to Subanah Wahhaj (sister to Siraj Ibn Wahhaj), and Hujra is the second wife of Siraj ibn Wahhaj. I then concluded my conversation with Det. Porter.

I then printed out the email from Det. Porter and attached it to my case file. I then met with Undersheriff Miera and briefed him on the information I had received from Det. Porter. I later learned from Sheriff Hogrefe he immediately upon receipt of the information began to draft a search warrant for the property, to check the welfare of the people living on the property. I was then asked by Undersheriff Miera to assist Deputy David Romo (TCSO) with a

US v. Jany Leveille et al 23796

tactical plan for the property.

On August 3, 2018, I attended and assisted in a briefing at the Taos County Sheriff's Office. The briefing took place at 06:00 in the Sheriff's Office Training Room. I am a member of the Sheriff's Response Team (SRT) and serve in the capacity of team medic. I have attended and completed a New Mexico Department of Public Safety accredited SWAT training, and also am a certified Tac-Med instructor. During the briefing Sheriff Hogrefe did provide a copy of a search warrant which was signed by 8th Judicial District Court Judge Sarah Backus. For a more accurate account of the briefing see the SRT after action report.

Once briefing was completed Deputy Esequiel Romero (TCSO) and I travelled together to the target location. At approximately 08:15 we arrived to a location near the target location and a quick last minute check of equipment and communications was conducted. Once the safety check was concluded we proceeded to the target location. I was dressed in tactical apparel to include olive green top and pants, exterior body armor, and black helmet. My uniform did have SHERIFF displayed and also patches on my sleeves indicating Taos County Sheriff. I did also wear my duty issued Axon Taser body camera. I turned on my body camera as we approached the target location. (The following is a summary of the events of the search warrant on August 3, 2018. It is not intended to be a verbatim account and does not memorialize all the statements made during the search warrant on August 3, 2018)

Just prior to arriving to the target location, over watch, advised via radio, there was a man wearing a green shirt, moving around near the box truck. Upon arrival at approximately 08:20, Deputy Romero and I made contact with a male wearing a light green shirt. I exited my marked Sheriff's patrol vehicle and began to announce in a loud voice "Sheriff's Office Search Warrant". I began to give verbal commands to the male whom I was able to visually identify, from a copy of his driver's license I had viewed prior, as Lucas Morton (Morton). I advised Morton we had a search warrant for the property. I also announced to fellow team members I observed a child seated in the box-truck. The small child was seated in the front passenger side of the box-truck. I gave a verbal command for Morton to turn away from me and place his hands behind his back. Deputy Jake Cordova (TCSO) also gave Morton 3 verbal commands to place his hands behind his back. I asked Morton if he had any weapons on him. Morton stated he did not have any weapons. I then placed hand restraints on Morton. I then conducted a pat down for weapons on the person of Morton. As I patted Morton down, I advised Morton he was just being detained and he was not under arrest. Morton stated he had already been to court and the matter was dismissed. I advised Morton we were going to remove all people from the box-truck, and Morton stated a child was using the "potty". I asked Morton where his brother is at. Morton stated, "I already told you". I advised Morton he never said anything to me about his brother. I advised Morton we had a warrant for his brother out of the State of Georgia. Morton stated that had nothing to do with him. Morton asked to see the search warrant, I advised him we had a search warrant and a copy would be provided at a later time. At various times Morton began to pull himself away from me. At one point I had to call upon Deputy Cordova to assist me to maintain control of Morton. Morton expressed his concern for his family, and repeated we were not upholding the law. At one point while being detained Morton stated if we get hurt it's our fault. Morton also stated, "You guys think you are above the law, you guys are all going to get hurt, bigtime, I promise you". I later was asked by a team member to move up further into what now I would call the compound. I left Morton with Deputy Cordova.

As I approached what I would call the front of the compound, I observed a large amount of trash and what I would describe as the outer perimeter wall, which I had to find another way around, due to the fact of its construction. I

US v. Jany Leveille et al 23797

could at that point smell a foul odor of urine or feces. I had to walk behind the box-truck and step over trash to make my way around the outer wall. I then made my way into what I would describe as the inner perimeter wall, which was constructed by used tires stacked one top of another. Once I cleared the entry point I first made eye contact with a male whom I believed to be our target suspect Siraj Ibn Wahhaj. I also first observed two adult females and six children. The children appeared to be in dirty clothing, one of which had pants which were so torn they didn't fully cover her legs; the children also appeared to not have been bathed in some time. Some of the children did not have socks or shoes. I did observe numerous tripping hazards and open trenches. I observed trash and debris throughout the area where I walked.

I learned from fellow team members a tunnel was located on the compound within the inner perimeter. I also learned from fellow teammates the tunnel extended out from the compound and into the sage. I did observe the location where the end of the tunnel was located, by what I would describe a spider hole. I learned there was a latter in the tunnel at the location of the spider hole. After the scene was deemed safe I was asked by Sheriff Hogrefe to begin getting identification of all the adults.

First I attempted to identify the male whom I suspected to be the target of the search warrant. I did speak to the male who was seated in the back of Deputy Jake Cordova's patrol vehicle. I did record this conversation on my duty issued Axon Taser body camera. (The following is a summary of my conversation with Siraj Wahhaj the day of the search warrant on August 3, 2018. It is not intended to be a verbatim account and does not memorialize all the statements made during the search warrant on August 3, 2018)

I advised the male we were looking for Siraj Wahhaj. I asked the male if he was Siraj Wahhaj, he remained silent and would not answer the question. At one point Office of Special Investigations (OSI) Agent Paul Garcia offered the unidentified male water. The Male drank some water, and I again asked him two more times if he was Siraj Wahhaj. The unidentified male would just cough. I then advised the male if he continued to refuse to give me his name, he would be placed under arrest for concealing identity. I advised him he was just being detained and may be released when we were done. I advised him, his cooperation was up to him. I advised him he would be placed under arrest, transported to the Taos County Adult Detention Center where he would be fingerprinted. I advised him I would submit his fingerprints to the FBI for identification. I asked again for his name, and received no response. I then placed him under arrest for concealing identity. I advised him of his Miranda Warning. I asked him if he understood what I had just told him, and I got no response. I then concluded my conversation with him. Later I took a photograph of the unidentified male and sent it to Detective Porter. Detective Porter later replied the unidentified male was Siraj Wahhaj, the target of the search warrant.

I then attempted to identify the adult females, and the children. All the adult females and children were seated outside near the box-truck. I did utilize my Axon Taser body camera for a portion of my conversation with them. (The following is a summary of my conversation with the adult females, the day of the search warrant on August 3, 2018. It is not intended to be a verbatim account and does not memorialize all the statements made during the search warrant on August 3, 2018) the first person I spoke to was Jany Leveille. Jany told me her date of birth was 3-6-1983. The following are a list of her children.

1. Omar Wahhaj, male, 3yo, date of birth 1-4-15.
2. Mubarakh Wahhaj, female, 5yo, date of birth 8-20-12.
3. Na-Imah Wahhaj, female, 8yo, date of birth 4-1-10.
4. Naseebh Wahhaj, female, 1yo, date of birth 5-19-17.
5. Jamil Louis, male, 13yo, date of birth 12-28-04.
6. Farroll Louis, male, 15yo, date of birth 10-25-02.

US v. Jany Leveille et al 23798

Next I spoke to Hujrah Wahhaj, date of birth 12-20-1980.
1. Nawailah Ali Moumouni, female, 8yo, 1-28-10.

Next I spoke to Subhanah Wahhaj, date of birth 2-28-1983.
1. Aisha Morton, female, 8yo, date of birth 3-8-10.
2. Asiya Morton, female, 6yo, date of birth 10-12-11.
3. Abdullah Morton, male, 4yo, date of birth 11-25-15.
4. Ayana Morton, female, 2yo, date of birth 12/17.

This was my extent in speaking to the adult females. I did take photographs of the children and sent them to Detective Porter in an attempt to identify Abdul-Ghani; Detective Porter advised none of the children located on the property was Abdul-Ghani.

Later on in the day (August 3, 2018) I placed Lucas Morton under arrest for harboring a felon, and transported him to the Taos County Adult Detention Center (ADC) for incarceration. Upon arrival to ADC I was met by Agents from the FBI. FBI Agents interviewed Morton before I booked him into ADC.

After I booked Morton into ADC, I then drove to the New Mexico Department of Children Youth and Family's (CYFD). I did then meet with the adult females, Jany Leveille, Hujrah Wahhaj, and Subhanah Wahhaj. I did utilize my duty issued Axon Taser body camera to record my conversation with them (The following is a summary of my conversation with the adult females, at CYFD, August 3, 2018. It is not intended to be a verbatim account and does not memorialize all the statements made during my conversation at CYFD, August 3, 2018).

I did explain the reason for my contact with them was the property owner Jason Badger, wanted his property back. I also explained I was aware of the fact Lucas Morton had been to court and the case was dismissed. I explained I had checked with the Taos County Assessor's office and the land they had built their home on did belong to Jason Badger. I advised them I was going to issue them a non-traffic citation for trespassing. I did also advise them the citation was going to be a summons to court and that by signing the citation it was not an admission of guilt, but rather a promise to appear. I also advised them the reason for the citation was that Jason Badger had withdrawn his consent for them to be on his property.

I advised the females that I was not going to go further into questioning regarding the reason we had to remove them from the property. I did advise them the main reason we were at the property was the fact we were looking for Abdul-Ghani, and the last indication we had was he was last known to be with them, but we did not find him. I advised them Siraj Wahhaj had a warrant issued for his arrest, and that's why he was taken into custody. I advised them he was held at ADC, and also charged with a state charge of being a fugitive from justice. All three females appeared to not have knowledge of Siraj having a warrant. Jany Liville asked about child custody and stated Siraj had joint custody, she was not clear as to why Siraj was charged with kidnaping his own child. I advised the only knowledge I had was from a detective in Georgia. I did also advise the three of them Lucas Morton was being held at ADC. I then advised them CYFD was involved in the case and they have their own process, but the children will be receiving food and clothing. During my time speaking to the females CYFD Caseworker Tony Barajas entered the room. I handed out the citations and asked them if they had a New Mexico mailing address. They told me they did not have a mailing address. The three signed the citations and I provided them a copy of their citations. This was the extent of my interaction with the three females at CYFD.

US v. Jany Leveille et al 23799