**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**

        Plaintiff,

v.                             **No. 1:18-CR-02945-WJ-5**

**JANY LEVEILLE, et. al.,**

        Defendants.

**DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS
GOVERNMENT CONDUCT AND VIOLATION OF DEFENDANTS'
FIFTH  AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS**

COME NOW, Defendants by and through their counsel of record and respectfully move this court for an Order Dismissing the Indictment against Defendants as the investigation at the heart of the government's charges is the result of the Federal Bureau of Investigation's ("FBI") and other law enforcement officers' outrageous conduct in conducting the investigation of Defendants in violation of their rights of due process and rights to be free from outrageous government conduct pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.  Should the court determine that the FBI and other law enforcement officers' conduct does not rise to the level of a due process violation, the Defendants move the court to dismiss the indictment against them pursuant to the court's inherent supervisory power to supervise the administration of criminal justice.

**INTRODUCTION**

The indictment against Defendants must be dismissed because the FBI and other law enforcement's conduct in its investigation was immoral, outrageous, and shocking to the conscience, in particular in that it directly resulted in the death of a child and the exploitation of other minors. Under the law, outrageous conduct that violates the Constitution is conduct which "offends those canons of decency and fairness" central to the exercise of due process of law.

*Rochin v. California*, 342 U.S. 165, 169 (1952) (*quoting Malinski v. New York*, 324 U.S. 401, 416-417 (1945)).

This case profoundly illustrates that FBI agents blatantly ignored the very real threat to minor child AG's life and well-being by exploiting the search for AG to further their fantasies of outing perceived and unsubstantiated alleged terrorist activities by Defendants. The FBI's outrageous conduct cost AG his life. And when law enforcement descended upon the defendants' homestead, officers seized the defendants' minor children for purposes of furthering their investigation. The investigation into Defendants' activity was so tainted by law enforcement's outrageous conduct, the Court must grant the Defendants' Motion to dismiss the indictment against them.

## STATEMENT OF FACTS

1.      On December 3, 2017, Clayton County Police Department ("CCPD") responded to a domestic disturbance call during which Hakima Ramzi ("Ms. Ramzi") informed officers that her husband, Siraj Wahhaj ("Siraj"), and her 3-year-old child, AG, was missing. [Exhibit A, BN 0988].  Ms. Ramzi reported that Siraj had said he was taking AG to the park on December 1, 2017, and never returned.  [Exhibit B, BN 23416]. When Ms. Ramzi made the report, the CCPD officer told her that the juvenile did not at that time meet criteria to be placed on the Georgia Crime Information Center ("GCIC") as a missing person. *Id.*

2.      On December 10, 2017, Ms. Ramzi filed a Georgia missing person report with the CCPD.  Ms. Ramzi informed Cpt. Stubbs of the CCPD that AG was born with hypoxic ischemic encephalopathy ("HIE") and that AG needed medications, could not walk and suffered from seizures. [Exhibit C, BN 23421, 23427, 782]. CCPD placed a "BOLO" (aka "be on the lookout") on AG and placed AG, Siraj, and the vehicle they were driving, a Jeep with license plate

RFN3009, on the Georgia Crime Information Center ("GCIC") as well as NCIC. [Exhibit D, BN Leveille-AS, at 048.]

3.       On December 12, 2017, the Atlanta Joint Terrorism Task Force ("JTTF") was notified of the police report filed with the CCPD listing Siraj as a missing person. [Exhibit E, BN Leveille-AS, at 111].

4.       On December 13, 2017, Siraj was involved in a roll over car accident in Chilton County, Alabama.  Janey Leveille ("Ms. Leveille"), Siraj's second wife, and seven juveniles were also in the vehicle at the time of the accident. [Exhibit E]. Ms. Leveille and Siraj were cooperative and both told the responding Alabama State Trooper that they were going to New Mexico.  [Exhibit F, BN Leveille, et al, at 0991].  According to the officer, the couple was allegedly acting suspiciously and had allegedly provided inconsistent responses to his questions. [Exhibits E & F].  The Trooper obtained an arrest warrant for Siraj for providing false statements to the police.  [Exhibits G and E]. The Trooper did not issue an arrest warrant for Ms. Leveille.

5.       During the December 13, 2017, accident investigation, the AL Trooper found license plate RFN3009 in the wrecked vehicle. [Exhibits F, BN Leveille et al 0990 – 992; Exhibit H, BN Leveille-AS 068 – 071]. This license plate is the same entered into the system by CCPD on December 10, 2017. *Id.*

6.       Lucas Morton ("Mr. Morton"), whom Siraj called for help, picked up the group in an old Budget rental box truck at the accident scene. [Exhibit F, BN Leveille et al 0990].

7.       On December 14, 2017, Ms. Ramzi was interviewed by Cpt. Stubbs and Det. Porter of the CCPD, Agent Suta of the FBI, and Agent Gooch of the Atlanta JTTF. [Exbibit I, BN Leveille, at 2541]. Ms. Ramzi told both CCPD and the FBI that AG "ha[d] a medical condition which requires him to take medication" and that Ms. Ramzi "fear[ed] that [Siraj] might

not give him the necessary medication." [Exhibit G, BN Leveille-AS, at 109; see also Exhibit J, BN Leveille, at 2819] (FBI 302, stating Ramzi "is concerned for the welfare of [AG] because he was born with medical problems and needs medication for seizures."). Ms. Ramzi informed the CCPD and the FBI specifically that AG was born with hypoxic ischemic encephalopathy ("HIE")[1] and that three-year-old AG had seizures and could not walk. [Exhibit K, BN Leveille, at 2823-2824,(CCPD handwritten notes from 12/14/12 mtg)].

8.      On December 15, 2017, Det. Porter determined that license plate RFN3009 was registered to Siraj. [Exhibit H, BN Leveille-AS, at 072]. The CCPD notified Atlanta JTTF of the vehicle accident involving Siraj and Ms. Leveille. [Exhibit G, BN Leveille-AS, at 109].

9.      On December 18, 2017, the Clayton County Juvenile Court issued a pick-up order[2] for AG (CCJC Case # 0531180001). [Exhibit I, BN Leveille, at 2541]. In addition, Siraj's information was listed on the National Crime Information Center ("NCIC"). [Exhibit I, BN Leveille, at 2541].

10.     On December 20, 2010, Cpt. Stubbs entered a release and verification form for AG to the National Center for Missing and Exploited Children ("NCMEC"). [Exhibit L, BN Leveille-AS, at 078; Exhibit I, BN Leveille, at 2542. The NCMEC Report indicates that the pick-up order explicitly states that "there is probable cause that the child is in danger" and that a "request is submitted for IMMEDIATE processing." [Exhibit M, BN Leveille-AS, at 081].  The NCMEC report once again reminded law enforcement and others that "[AG] needs assistance walking and may have braces for his legs." *Id.*, at 086.

---

[1] "Hypoxic ischemic encephalopathy (HIE) is a type of brain dysfunction that occurs when the brain doesn't receive enough oxygen or blood flow for a period of time. Hypoxic means not enough oxygen; ischemic means not enough blood flow; and encephalopathy means brain disorder." Benioff Children's Hospital; Neonatal Hypoxic Ischemic Encephalopathy, https://bit.ly/2EhehGu (last visited July 24, 2020).

[2] "A juvenile pick-up order is the functional equivalent of an arrest warrant for an adult." *Smith v. Sheriff, Clay Cty., Fla.*, 506 F. App'x 894, 896 n. 2 (11th Cir. 2013).

11.     On December 22, 2017, CCPD released a media advisory regarding AG. [Exhibit N, BN Leveille-AS, at 117]. The advisory noted that Ms. Ramzi advised that AG "suffers from seizures, developmental and cognitive delays and is unable to walk due to suffering a Hypoxic Ischemic Encephalopathy (HIE) at birth." *Id.,* at 117. The advisory further advised that a Clayton County Judge had issued a pick-up order for AG due to AG's potential serious medical emergency and that the group was travelling to New Mexico. *Id.,* at 120. Importantly, the media advisory noted, "There are no criminal charges pending against Siraj Ibn Wahhaj. *The concern is for the wellbeing of [AG's] health.*" *Id.,* at 120 (emphasis added).

12.     On December 28, 2017, CCPD Det. Porter learned that Mr. Morton asked for his mail to be forwarded to a UPS store in Taos, New Mexico. [Exhibit I, BN Leveille, at 2542]. In addition, Det. Porter advised New Mexico Missing Persons Clearing House ("NMMPCH") that AG may be in an area near Taos, New Mexico. *Id.* Det. Porter also forwarded the NCMEC flier, the pick-up order, and the press release to NMMPCH. Ultimately, Det. Porter also contacted Det. Armijo at the Taos County Sheriff's Office ("TCSO") and requested that Det. Armijo search for property belonging to Morton or Siraj. *Id.*

13.     On January 2, 2018, Det. Porter called Det. Armijo at TCSO to notify him that Siraj and AG were in Taos County and requested assistance from TCSO in locating the property. [Exhibit O, BN Leveille-AS, at 214]. Det. Armijo called Det. Porter back and told him that he had located Mr. Morton's property and obtained the precise GPS coordinates of the property from the Taos County Assessor. [Exhibit I, BN Leveille, at 2542; Exhibit O, BN Leveille-AS, at 214]. Det. Porter informed Det. Armijo that the FBI was involved in this case. [Exhibit O, BN Leveille-AS, at 214]. Det. Armijo received and posted the flier of Siraj and AG around the TCSO building. *Id.*

14.     On or about the same day, TCSO Sgt. Rael, received an email from TCSO Sheriff Hogrefe regarding the missing child AG, stating that AG and Siraj may be residing in Costilla or Carson, NM.  [Exhibit P, BN Leveille, at 2710]. Sheriff Hogrefe's email included attachments of the court-issued pick-up order from Georgia and the NCMEC flier. *Id.*

15.     On January 9, 2018, an arrest warrant and pick up order was issued for Siraj by the Clayton County Juvenile Court. [Exhibit Q, BN Leveille, at 00775-78]. The order and the warrant provided the following information, which *again* put law enforcement on notice of AG's emergent health condition and request for "immediate action to protect the welfare of [AG]":

   a. AG "has severe medical issues, to-with [sic]: Hypoxic Ischemic Encephalopathy (HIE) and cannot walk, and suffers seizures, and requires constant attention" *Id.*
   b. Pick up order: "exigent circumstances exist requiring immediate action to protect the welfare of [AG]"

*Id.*

16.     On February 6, 2018, Det. Porter asked Det. Armijo to conduct a welfare check on the occupants of Mr. Morton's property as soon as possible. [Exhibit I, BN Leveille at 2543]. Upon information and belief, a welfare check did not occur.

17.     At the end of April, 2018, more than five (5) months after first learning of the missing medically-fragile child, and despite knowing Mr. Wahhaj and AG had been in New Mexico for much of this time, law enforcement officers and the FBI planned an operation for May 1, 2018, not to rescue AG in New Mexico, but instead to search and explore Siraj Wahhaj's Alabama property using the emergency pick up order for AG as a "ruse" for their entry and authority. [Exhibit R, BN Leveille, at 2836].  The FBI's operation was coordinated by FBI Agents Suta and Gooch, the same FBI agents who had interviewed Ms. Ramzi on December 14, 2017, and who were thus *well-aware* of AG's vulnerable health condition and had personally heard Ms. Ramzi's pleas for help. [Exhibit I, BN Leveille, at 2541]. The operation's "Overall

mission concept" stated that "agents will enter [AL property] . . . under the ruse of a pick up order for [AG] and a warrant for Siraj Wahhaj, in order to conduct more in depth surveillance of the inner portions of the property" [Exhibit R, BN Leveille, at 2836].

18.     On May 14, 2018, FBI Agent Suta called Deputy Teodoro Flores of TCSO advising him that AG may be in Taos County, even though the FBI and TCSO possessed this location information as early as January 2, 2018. *See supra* ¶¶ 12-14. FBI Agent Suta informed Dep. Flores, that Siraj and AG were with Mr. Morton whose exact address was 55 Panorama Blvd, Amalia, NM. [Exhibit P, BN Leveille, at 2710]. TCSO Dep. Flores and Dep. Rael drove to Amalia, NM, to attempt to locate the property. *Id.* During their personal investigation, they learned that Mr. Morton, two females, and approximately eight children were traveling in the area in a box truck and living in the area of Panorama Road. *Id.* Det. Rael also observed a structure on the property. *Id.*

19.     On the same day, Jason Badger ("Mr. Badger"), the owner of the property adjacent to Mr. Morton's called Sheriff Hogrefe who referred the call to Sgt. Rael.  Mr. Badger informed Sgt. Rael that Siraj, Mr. Morton, *et al.* had mistakenly established residence on his property in Amalia. [Exhibit P, BN Leveille, at 2711]. Due to confusion over the identification of the two adjacent tracts of land, Mr. Morton and Mr. Badger were negotiating for months over swapping land parcels. *Id.* When Mr. Badger learned that law enforcement was looking for Mr. Morton, Mr. Badger called New Mexico State Police (NMSP), TCSO, and CCPD to tell them that he knew the exact location of Mr. Morton and Siraj. *Id.*

20.     Later that day, Sgt. Rael spoke with Mr. Badger again who confirmed that AG was on the Amalia property, as he had seen AG on a missing child poster and recognized him on

the property. [Exhibit P, BN Leveille, at 2712].  Mr. Badger had also met and interacted with Siraj on the property. *Id.*

21.     On May 16, 2018, TCSO Sgt. Rael and Undersheriff Miera met with FBI agents Paz and Miller and NMSP Sgt. Cox and discussed the contents of Sgt. Rael's briefing file and the desire to surveil Mr. Morton's property. [Exhibit P, BN Leveille, at 2713].  The group ultimately decided they needed more information. *Id.* TCSO Sgt. Rael and NMSP Sgt. Cox remained in contact through email throughout the month of May 2018, taking *no action* on conducting a welfare check on or attempting to retrieve AG. *Id*.

22.     Throughout May and June of 2018, a variety of plans and the costs for surveilling the property were proposed and evaluated by TCSO and the FBI. *Id*. at 2713-14.

23.     From May 22 to June 2, 2018, New Mexico law enforcement consistently failed to return communication attempts by Det. Porter from Georgia. On May 22, 2018, Det. Porter attempted to get information from all agencies involved in AG's case: Det. Porter called and left messages for Dep. Armijo at TCSO and Agent Suta from FBI. [Exhibit I, BN Leveille, at 2544]. On May 29, 2018, Det. Porter again called and left messages for Dep. Armijo at TCSO and Agent Suta from FBI. *Id.* He also called and left a message for TCSO Sheriff Hogrefe, with no response. *Id.* On June 2, 2018, Det. Porter for a third time called and left messages for Dep. Armijo at TCSO and Agent Suta from FBI with no responses. *Id.* at 2545.

24.     In early June 2018, Dep. Armijo received a package from Undersheriff Miera telling him that the FBI had retained surveillance footage of several children on the property; but Ms. Ramzi said that she did not see AG in the footage. [Exhibit O, BN Leveille AS at 214-215].

25.     By July 15, 2018, Sgt. Rael learned that Mr. Badger had attempted to get Mr. Morton evicted from his Amalia property when negotiations for a property exchange had fallen though, but the FBI had "trumped" his efforts. [Exhibit P, BN Leveille, at 2715].

26.     On July 31, 2018, Det. Porter spoke with an individual who had learned through a Facebook contact that Subhannah Wahhaj was on Mr. Morton's New Mexico property and was in need of food. [Exhibit I, BN Leveille, at 2545]. On August 1, 2018, Det. Porter received copies of those Facebook messages.

27.     On August 2, 2018, Cpt. Stubbs and Det. Porter both reached out to Sgt. Rael regarding the concerning messages they had received communicating the condition of the people on Mr. Morton's New Mexico property, including that there were concerns of starvation. [Exhibit I, BN Leveille, at 2545; Exhibit P, BN Leveille, at 2715-16].

28.     Though the TCSO had been in possession of the documents since January 2018, (supra, ¶ 14), Det. Armijo requested that Det. Porter send duplicate copies of the arrest order for Siraj and the emergency pickup order for AG previously sent to him in January. *Id.* Det. Porter also advised Sgt. Rael that Ms. Ramzi "was coming to New Mexico, because she thought no one was giving her any help. The child has been missing for nine months and they have been at a standstill." *Id.* at 2715-17.

29.     Sgt. Rael told Det. Porter that he had the case for approximately two months "and has taken several steps including aerial surveillance of the area in an attempt to collect enough information for a search warrant." [Exhibit I, BN Leveille, at 2545]. Det. Porter reminded Sgt. Rael that there was an arrest warrant for Siraj and pick-up order for AG. [Exhibit P, BN Leveille, at 2716]. Sgt. Rael responded that he had that info in his case file and advised Det. Porter that he did not know if FBI had been in contact with Det. Porter or his agency and

informed them of what had been done up to this point. *Id.* Sgt. Real then provided Det. Porter

with a case summary and stated that that they were still working with FBI. *Id.* at 2717.

30.     *Det. Porter "asked [Sgt. Rael] if the welfare of the children would change things*

*for a search warrant."* unlike the FBI, Det. Porter was concerned for the children and wanted to

send a care package to Morton. *Id.*

31.     Finally, on August 3, 2018, *nine months* after the child was reported missing,

*eight months* after the pick-up order for AG was issued, a search was finally conducted of the

New Mexico property pursuant to the pick-up order and the arrest warrant, and shortly thereafter,

AG was discovered dead on the property. [Exhibit P, BN Leveille, at 2715; Exhibit I, BN

Leveille, at 2546].

32.     After the search of the property, law enforcement officers seized the defendants'

other minor children and whisked them away under the guise of preserving their safety and

wellbeing. However, law enforcement officers and the FBI's true motives were to deprive the

defendants of their children, hand them over to Children Youth and Families Division (CYFD)

so they could be interviewed by the FBI, delay the filing of a petition by CYFD for the sole

purpose of interviewing the children without parental consent and for the purpose of furthering

the government's purported investigation. [Exhibit S, BN 23637-23638]

33.     The minor children were subsequently interviewed by FBI agents without parental

consent.

34.     At some point during their misguided pursuit of the Wahhaj family on fabricated

suspicions that the family members were suspected terrorists, the FBI issued a bulletin listing the

investigative goals and not a single one included recovery of the child, AG. Indeed, according to

the FBI, their goals were,

If Wahhaj agrees to be interviewed, we would like to address the firearms training and multiple firearms, reason for leaving Atlanta, his trip overseas in 2017, and the meeting with an Imam who taught him exorcism.

[Exhibit G- BN Leveille AS at 109].

## ARGUMENT

I.   **The Indictment Against Defendants Must be Dismissed Because the FBI Outrageously Disregarded the Known Risk to AG's Life in Order to Prolong Its Fantastical Investigation of Defendants, Conduct Which Denied to Defendants Their Rights to Due Process.**

The FBI's outrageous conduct of exploiting the search for AG, a three-year-old boy, to support their pretentious fantasies of outing alleged terrorist activity resulted in AG's death and in the trumped-up charges against Defendants for which they each face mandatory life sentences in violation of their rights to due process under the Fifth Amendment. The indictment against the Defendants must be dismissed.

The doctrine of outrageous government conduct was first recognized in *United States v. Russell,* 411 U.S. 423, 431-32 (1973) in which the Supreme Court stated,

'[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'

*United States v. Harris*, 997 F.2d 812, 815 (10th Cir. 1993) (*quoting Russell,* 411 U.S. at 431-32).

All Circuit Courts of Appeal have now recognized the defense of outrageous government conduct, including the Tenth Circuit. *See, e.g. United States v. Spivey*, 508 F.2d 146 (10th Cir. 1975); *United States v. Chavis*, 880 F.2d 788, 793-94 (4th Cir. 1989).  Whether or not government conduct is so offensive to amount to a due process violation and require dismissal of a case depends on the particular facts of each case. The basic premise is that outrageous conduct violates "'fundamental unfairness'" or "'shock[s] the universal sense of justice.'"  *See Russell*,

11

411 U.S. at 432 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234 (1960)). For

example, in *Rochin v. California*, 342 U.S. 165 (1952), police officers broke into the defendant's

bedroom and unsuccessfully attempted to prevent the defendant from swallowing contraband

drug capsules. The police took the defendant to the hospital where doctors forcibly pumped his

stomach to retrieve the capsules. *Id*. at 166. The Supreme Court held:

> "[W]e are compelled to conclude that the proceedings by which this conviction
> was obtained do more than offend some fastidious squeamishness or private
> sentimentalism about combating crime too energetically. This is conduct that
> shocks the conscience. Illegally breaking into the privacy of the petitioner, the
> struggle to open his mouth and remove what was there, the forcible extraction of
> his stomach contents as this course of proceeding by agents of government to
> obtain evidence is bound to offend even hardened sensibilities. They are methods
> too close to the rack and the screw to permit of constitutional differentiation."

*Id.* at 172; *See also, County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998). The due

process guarantees of the Constitution were intended to prevent government officials

from abusing [their] power or employing it as an instrument of oppression. *Collins v.*

*Harker Height*s, 503 U.S. 115, 126 (1992) (quoting *DeShaney v. Winnebago County*

*Dept. of Soc. Servs.,*489 U.S. 189, 196 (1989) and *Davidson v. Cannon,* 474 U.S. 344,

348 (1986)). The Eleventh Circuit recognized in *United States v. Edenfield*, 995 F.2d 197

(11th Cir. 1993), that even in the investigative or pre-indictment stage of a case,

government misconduct may violate that fundamental fairness, shocking to the universal

sense of justice mandated by the due process clause of the fifth amendment. *Id*. at 200

(quoting *United States v. Tobias*, 662 F.2d 381, 386-87 (5th Cir. 1981) and *Russell*, 411

U.S. at 432); *Cf. also United States v. Silva*, 180 F. Supp. 557 (S.D.N.Y. 1959) (directing

verdict for defendant due to government conduct).

 As previously noted, the Tenth Circuit has recognized the viability of the outrageous

government conduct defense. The Tenth Circuit has acknowledged that the defense of

outrageous governmental conduct is based on the Due Process Clause of the Fifth Amendment [and that] [u]nlike the defense of entrapment, which considers predisposition of defendant to commit the crime, the defense of outrageous governmental conduct looks only at governmental conduct. *United States v. Johnson*, 130 F.3d at 1429 (10th Cir. 1997). The relevant inquiry is whether, considering the totality of the circumstances in any given case, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice." *United States v. Lacey*, 86 F.3d 956, 964 (10th Cir. 1996). The facts of each individual case are pivotal in making an outrageous conduct determination. *Harris*, 997 F.2d 812 (10th Cir. 1993); *see also United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992).

Outrageous conduct may be challenged as a substantive due process violation. *United States v. Mosley,* 965 F.2d 906, 908-909 (10th Cir. 1992)*; see United States v. Dyke*, 718 F.3d 1282, 1287 (10th Cir. 2013) (affirming the viability of the outrageous conduct doctrine)). "'When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct,' because prosecution in such a case would offend the Due Process Clause of the Fifth Amendment." *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994) (*quoting Mosley,* 965 F.2d at 908).

Outrageous conduct is defined as conduct which "violate[s that] fundamental fairness shocking to universal sense of justice, mandated by Due Process Clause of the Fifth Amendment." *United States v. Russell*, 411 U.S. 423, 432 (1973) (*quoting Kinsella v. United States ex rel. Singleton*, 361 U.S. 234 (1960)); *see Mosley*, 965 F.2d at 910 (*quoting Russell*, 411 U.S. at 432 ("To warrant dismissal of an indictment, the government's conduct with respect to that indictment must be outrageous. Outrageousness must be determined by reference to 'the

universal sense of justice.'"). The outrageous government conduct inquiry focuses on the totality

of the circumstances of the case, as no federal court has defined the contours of the outrageous

conduct defense with "any degree of precision." *Mosley*, 965 F.2d at 910. "In such cases

involving such egregious conduct, 'due process principles would absolutely bar the government

from invoking judicial process to obtain a conviction.'" *Harris*, 997 F.2d at 819 (*quoting Russell*,

411 U.S. at 431-432).

The court must dismiss the indictment against Defendants as the government's entire case

is predicated on the FBI's presumptuous and outrageous exploitation of the search for AG in

order to pursue its bombastic fantasies of outing alleged and unsubstantiated terrorism suspicions

of Defendants.

### A. The FBI Outrageously Ignored the Known Risk to AG's Health and Exploited the Search for AG in order to Pursue Its Fantasies of Outing Defendants' Alleged and Unsubstantiated Terroristic Activity.

The FBI exhibited shocking and outrageous conduct when they traded the wellbeing –

and ultimately the life -- of three-year-old AG for their remote, speculative, and as yet

unsubstantiated fantasies that the Muslim-American Defendants *might* be involved in terrorism-

like conduct.

The material facts are undisputed. As early as December 2017, the FBI knew that

1. three-year-old AG was last seen with his father, Siraj Wahhaj on December 1, 2017 [Exhibit B, BN Leveille at 23416];
2. AG was born with hypoxic ischemic encephalopathy ("HIE"), a medical condition that deprived oxygen to his brain causing him to suffer seizures and which denied AG the ability to walk [Exhibit C, BN Leveille-AS, at 052; Exhibit K, BN Leveille, at 2823-2824]
3. AG required regular medication without which his wellbeing was at great risk (*Id.*);
4. an emergency pick-up order had been issued based on the great risk to AG's well-being which called for the immediate retrieval of AG once his location was known [Exhibit I, BN Leveille, at 2541]; and

5. the Defendants and seven minors were in the Taos, New Mexico area, likely on Defendant Lucas Morton's property [Exhibit I, BN Leveille, at 2542; Exhibit O, BN Leveille-AS, at 214].

Despite this compelling information regarding AG's health and the authority the FBI had *in hand* to retrieve AG, the FBI ignored the moral and legal prerogative to prioritize AG's well-being and life, choosing instead to leverage the search for AG as a tool for furthering their fantastical investigation of Siraj and the other Defendants.

*In early January 2018,* armed with information and authority to retrieve AG, the FBI did not enter, approach, or search Mr. Morton's property in an attempt to locate AG. By January 9, 2018, in addition to the existing emergency pick-up order for AG, an arrest warrant was issued for Siraj (Exhibit Q, BN Leveille, at 775-78), which again reminded law enforcement of the risk to AG's health and provided additional reason and authority for the FBI to enter the New Mexico property where they reasonably believed both AG and Siraj were located. Even then, however, the FBI did *nothing* to help AG. The FBI did not act on the pickup order for AG – which requested "*immediate action*" (*Id.* (emphasis added)); the FBI did not even act on the arrest warrant for Siraj. As they had done for a full month since they learned of AG's disappearance and his emergent health condition, the FBI continued to ignore AG's needs and his mother's pleas for the return of her child.

Given AG's known medical circumstances, common sense dictated that time was of the essence for the FBI and local law enforcement with whom the FBI was working, to act on information that might prove to be lifesaving for AG. Indeed, FBI policy dictates that time is critical in the search for a missing child:

- "[T]he FBI considers the victim of child abduction to be in 'imminent danger,' and as a result, cases of child abduction are automatically elevated to the FBI's highest priority. The Chief of the CACU [Crimes Against Children Unit] informed us that local law enforcement in smaller departments or rural

areas generally do not have the necessary personnel or resources to address child abductions.  Further, infrequent occurrence of child abductions make the FBI an asset to these investigations.  Therefore, the FBI makes it a priority to lend its expertise to local law enforcement during these investigations." *See* Office of the Inspector General, Audit Report 09-08; The Federal Bureau' of Investigation's Effort to Combat Crimes Against Children, January 2009, pp. 1-2, https://oig.justice.gov/reports/FBI/a0908/chapter3.htm (last visited Oct. 22, 2022).

- "Responsiveness to child abductions is critical to the well-being of the victimized children and a primary measure for determining the FBI's performance in responding to child abductions." *Id.*
- "The FBI considers child abductions a high priority and has developed internal policies that Special Agents should respond immediately to instances of child abductions." *Id.*

Despite of the FBI's polices, practices, and published declarations that a child's health and well-being are its highest priority, the FBI failed to act in any meaningful way to find and pick up AG. Just *one month* after AG was reported missing with his father, the FBI knew the precise location of Mr. Morton's property near Taos. [Exhibit I, BN Leveille, at 2542; Exhibit O, BN Leveille-AS, at 214].  With this knowledge, the FBI sat idly by, doing nothing to help AG. The FBI ignored the calls from Georgia Det. Porter trying to locate AG. The FBI ignored its own policies, procedures, and values.  The FBI ignored the emergency pick-up order for AG. The FBI ignored the pleas of AG's mother.

On February 6, 2018, CCPD Det. Porter requested that TCSO Armijo conduct a welfare check on AG *as soon as possible* at Mr. Morton's property. Exhibit I, BN Leveille, at 2543. There is no record that such a check ever occurred.  *Days and months continued to pass.*

Rather than acting on the pickup order, the FBI instead considered the search for AG merely a useful tool to pursue its fantasies of outing alleged terrorist activity.  In May 2018, rather than focus on assuring the health and welfare of AG, who was known to be in *New Mexico*, the FBI expressly utilized the emergency pick up order for AG as a "ruse" to search Siraj Wahhaj's *Alabama* property to pursue the perceived bigger and more valuable prize.

16

[Exhibit R, BN Leveille, at 2836]. At that time, FBI case agents Suta and Gooch, the same FBI

agents who had interviewed Ms. Ramzi on December 14, 2017, and who were thus *well-aware*

of AG's vulnerable health condition and had personally heard Ms. Ramzi's pleas for help

(Exhibit I, BN Leveille, at 2541), planned a May 1, 2018, operation to search Siraj Wahhaj's

Alabama property.

The operation's "Overall Mission Concept" stated:

"[A]gents will enter [the Alabama property] . . . *under the ruse of a pick up order
for [AG]* and a warrant for Siraj Wahhaj, in order to conduct more in depth
surveillance of the inner portions of the property.

[Exhibit R, BN Leveille, at 2836]. The Operations Order further explicitly stated,

The goal of the operation is to determine what the property is being used for and
what individuals are operating on the property. . . If contact is made with Siraj Ibn
Wahhaj, he will be taken into custody . . . for his outstanding misdemeanor
warrant out of Chilton County. . . If any other individuals are encountered on the
property, they will be field interviewed *under the ruse of searching for the
missing child*.

[Exhibit T, BN Leveille, at 2843; *see also* Exhibit U, BN Leveille, at 2835 ("On 05/01/2018,

agents entered [the Alabama property] under the ruse of a pick-up order for [AG] and a warrant

for Siraj Wahhaj in order to conduct more in depth surveillance of the inner portions of the

property.")]

The FBI's stated ruse expressly relying on the authority of the emergency pick up order

for AG *begs the question*: If the FBI could lawfully gain entry into the Alabama property under

the authority of the pick-in order, why didn't the FBI and local law enforcement utilize this same

authority to enter Mr. Morton's property in New Mexico in search of the child?[3] The answer is

glaringly clear: *the FBI had no interest in saving AG's life*.  Instead, the FBI chose to exploit the

---

[3] Notably, in *August* 2018, when the TCSO finally learned that some family members may be starving and
in danger, the pick up order and the arrest warrant were precisely the authority relied upon to enter Mr.
Morton's property. *See supra*, ¶ 31.

very existence of the emergency pick up order for AG – and deliberately did not act on the order – so they could use the order as a ready tool when they needed it to further their fantastical investigation into the Defendants alleged terrorist activities. *This conduct is outrageous.*

To the extent that the FBI may desperately seek to excuse their failures regarding AG by claiming their information regarding the location of Defendants and AG was somehow inadequate or unreliable or that they did not have the proper authority to enter Mr. Morton's property, by mid-May 2018, these excuses carried absolutely no weight. On May 1, 2018, as described above, the FBI exercised the authority of both the pick up order and the arrest warrant for Siraj Wahhaj as a ruse to enter his Alabama property. On or around May 14, 2018, FBI Agent Suta called TCSO Dep. Teodoro Flores advising him that AG may be in Taos County and specifically on the property of Mr. Morton for which he provided a *precise* property address in Amalia, New Mexico. [Exhibit P, BN Leveille, at 2710]. Agent Suta requested the assistance of TCSO. *Id.* TCSO Sgt. Rael and Dep. Flores personally drove to Amalia and learned that Mr. Morton, two females and approximately eight children were traveling in a box truck and were living in the area of the address provided. *Id.*

- o Sgt. Rael and Dep. Flores knew Siraj and AG were with Mr. Morton and had his exact address as 55 Panorama Blvd, Amalia, NM. [Exhibit P, BN Leveille, at 2710].
- o Mr. Badger (owner and resident of the neighboring property) had called Sheriff Hogrefe and told him that Siraj, Mr. Morton, and the others were on Mr. Badger's property in Amalia. [*Id.*]
- o Mr. Badger confirmed that AG was on the property as he had seen AG's face on a missing child poster. [*Id.*]

After doing nothing with the information they had to support an investigation of the Morton property in January 2018, including the *precise* location of Mr. Morton's property, in May 2018, the FBI -- shockingly and outrageously -- continued to sit . . . and wait . . . and watch the location where AG was located with his father. The FBI *continued to do nothing* to retrieve

AG or to even conduct any meaningful act to rule out whether AG was on the Morton property. *While the FBI was watching* the property where AG was living, AG died.  The FBI's investigation into its speculative fantasies of terrorism was conducted at the unnecessary and outrageous expense of AG's life.

AG's medical needs were real and emergent. In contrast, the FBI's theories about Siraj Wahhaj's terrorism activities were (and are) imagined, speculative and presumptive. The terrorism activities alleged by the FBI were not based on *any* threats – actual, perceived, or imminent -- to the general public or to any individual.  Indeed, to this day, the government can identify no victim of any of the Defendants' alleged terrorism crimes, but at the same time disingenuously  attempt to lay the blame for AG's death solely at their feet.  Despite warnings regarding the real danger to AG's well-being, the FBI *did nothing* to help him. Instead, the FBI prioritized their fantasies of terrorism over the well-being of a three-year-old child.

The government has developed alleged terrorism offenses and charges against the Defendants through the FBI's outrageous conduct of ignoring the real and known threats to AG's life and well-being, failing to act on its knowledge of AG's location, and instead prolonging its surveillance of Defendants in order to construct manufactured and speculative theories of terrorist activity. *See supra, Pedraza*, 27 F.3d at 1521 ("'When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct,' because prosecution in such a case would offend the Due Process Clause of the Fifth Amendment.").

It wasn't until August 3, 2018, that local law enforcement entered the property.  The government's conduct was intolerable by any standard of justice, let alone morality and human decency. *See United States v. Harris*, 997 F.2d 812, 815–16 (10th Cir. 1993) ("the defense of

outrageous governmental conduct is manifestly reserved for only the most intolerable government conduct." (quotations and citations omitted)).  Had the FBI acted in any way on its knowledge of AG's location as early as January 2018, AG's life would almost surely have been saved (at least pursuant to the government's theory of the case, which alleges that Defendants are responsible for AG's death having occurred during the time that he could have easily been safe elsewhere).  Instead, the Defendants face trumped up charges which carry mandatory sentences of life in prison that are the direct result of the FBI's inaction, an egregious violation of Defendants' due process rights under the Fifth Amendment.

**B.  The FBI's Outrageous and Calculated Inaction Caused the Trumped-Up Charges Against the Defendants in Violation of Defendants' Rights to Due Process.**

The FBI's calculated inaction regarding AG's life was the FBI's barter for the trumped-up charges against Defendants, specifically charges which carry the penalty of mandatory life in prison.  Such egregious and outrageous intentional conduct by the FBI resulted in the creation of criminal charges against Defendants in violation of the Defendants' rights of liberty and due process at the expense of a child's life.

"'When the government's conduct during an investigation is sufficiently outrageous, *the courts will not allow the government to prosecute offenses developed through that conduct,'* because prosecution in such a case would offend the Due Process Clause of the Fifth Amendment." *Pedraza*, 27 F.3d at 1521 (emphasis added)).

> The Due Process Clause of the Fifth Amendment provides that 'No person shall . . . be deprived of life, liberty, or property, without due process of law. . .' This Court has held that the Due Process Clause protects individuals against two types of government action. So-called 'substantive due process' *prevents the government from engaging in conduct that 'shocks the conscience,'* Rochin v. California, 342 U.S. 165, 172 (1952), or interferes with rights 'implicit in the concept of ordered liberty.' *Palko* v. *Connecticut*, 302 U.S. 319, 325-326 (1937).

*United States v. Salerno*, 481 U.S. 739, 746 (1987) (emphasis added).

The Tenth Circuit has suggested that the outrageous conduct defense, though rarely

applied, remains an explicitly viable defense,

> because our society (happily) hasn't degenerated to the point where it often
> needs to be invoked. The significance of this due process guarantee lies *not in
> how often it is successfully asserted but in the assurance it gives us all that the
> law imposes meaningful boundaries on the power of government*. While
> critics may be right that the boundary lines can be difficult to discern,
> defenders reply that the job of policing them is no less important for it.

*United States v. Dyke*, 718 F.3d 1282, 1287 (10th Cir. 2013) (emphasis added).

Meaningful boundaries on the power of government *must* unequivocally prohibit

government agents from prioritizing far-reaching fantasies of outing imagined terroristic activity

over the reliably known health risks of a child.  Meaningful boundaries on government power

*must* set aside a government investigation which is so devoid of meaningful factual evidence that

the government exploits the passage of time in hopeful anticipation that the investigation's

targets conduct themselves in congruence with the government's imagined and preconceived

machinations.

The Defendants have the right to be free from government profiling, religious and

cultural stereotyping, and preconceived expectations of terrorist activity so powerful within the

FBI's investigation that the investigation itself pivoted on the exploitation of the passage of time

at the expense of a child's life. The FBI traded AG's life for trumped up charges including the

prospect of mandatory life sentences for each Defendant in violation of their Fifth Amendment

rights of due process.

The Court must now ask, what was the FBI waiting for during their months of inaction?

The FBI and local law enforcement had a pick-up order for AG and an arrest warrant for Mr.

Wahhaj in January 2018. Both orders provided the government the authority to seize Mr. Wahhaj

and AG. There exists *no viable justification* for the FBI's outrageous lack of action at the expense of AG's life.  But for the FBI's outrageous refusal to act at the expense of AG's life, the Defendants would not face charges and mandatory life sentences in violation of the Defendants' rights of due process under the Fifth Amendment. Such conduct by the FBI cannot be condoned by the courts.

Defendants do not dispute that "[w]ide latitude is accorded to the government to determine how best to fight crime." *Mosley*, 965 F.2d at 910.  Such latitude, however, must stop short of the FBI here ignoring the "lesser" custody pick-up order and risks to a child's life in order to pursue *any* perceived "bigger fish," which here is the FBI's preconceived investigation into unfounded terrorist activity. "To be sure, there is a point at which excessive government zeal may warrant judicial intervention." *United States v. Lacey*, 86 F.3d 956, 964 (10th Cir. 1996). The FBI's conduct in this instance was outrageous and shocking to the conscience, and the indictment against the Defendants must be dismissed.

The civil law standard for outrageousness tracks that of criminal law. While *Mosley* identified outrageous conduct to be "shocking, outrageous, and clearly intolerable" in our community (*Mosley,* 965 F.2d at 910), the civil standard similarly requires conduct which is "outrageous," "intolerable," and "against the generally accepted standards of decency and morality." *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 67 (Ky. 1996).

If the Court permits further prosecution of this matter, it places its imprimatur on this outrageous government behavior.  The Court should reject such law enforcement tactics and grant the Defendants' Motion to Dismiss the indictment pursuant to the Fifth Amendment to the United States Constitution.

II.     **The Seizure of the Defendants' Other Minor Children
        And Interview of them without Parental Consent Violated the
        Defendants' Right to Due Process**

In addition to ignoring AG's emergent condition in order to further a fantastical investigation, law enforcement seized the defendants' other children in order to interview them without parental consent and to further their floundering investigation. A parents' right to the companionship, care, custody, and management of their children is a protected liberty interest under the due process clause of the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000). As a result, the Fourteenth Amendment is implicated whenever the government separates a parent from his or her child. *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997).[4] "Substantive due process rights guard against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999) (*quoting Duchesne v. Sugarman*, 566 F.2d. 817, 825 (2d Cir. 1977). Parents and their children have "a substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state." *Tenenbaum,* 193 F.3d at 600 (2d Cir. 1999).

Additionally, the strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees. *Brokaw v. Mercer County,* 235 F.3d 1000, 1010 n. 4 (7th Cir.2000). Courts have held that parental rights other than custody are sufficient to warrant protections. In *Doe v. Heck*, 327 F.3d 492, 522 (7th Cir. 2003), the Seventh Circuit found that the parents' due process rights were violated when their child was interviewed at school in an abuse investigation without their consent, without a court order and without emergency circumstances.

---

[4] If the state seeks to initiate proceedings to divest the parent of custody, a post-deprivation hearing must be afforded within 72 hours. *Patterson v. Armstrong County Children and Youth Servs.*, 141 F.Supp.2d 512, 531-39 (W.D. Pa. 2001); *Berman v. Young*, 291 F.3d 976, 985 (7th Cir. 2002).

The parents in *Doe*, as with the defendants here, had not lost  custody of their child when interviewed without parental consent. Shockingly, the investigators here seized the children on August 3, 2018, for the sole purpose of interviewing them without parental consent and furthering their "investigation". Indeed, Sheriff Hogrefe admitted, "[i]t was affiant's belief that prolonging charges may benefit of CYFD to gather facts about the children and to further the investigation." [Exhibit S, BN 23637-23638]. This patent admission demonstrates that law enforcement's motive in seizing the defendants' children, separating them from the defendants and interviewing them without parental consent was to exploit the children in order to manipulate them to obtain information the government could maneuver to fit their narrative in a years' long investigation that had yielded no evidence of alleged terrorist activities. Using children to further criminal investigative goals constitutes outrageous government conduct resulting in a violation of the defendants' right to due process and warranting dismissal of the indictment.

### III.     The Egregious Outrageous Conduct of the FBI Warrants Dismissal of the Indictment Pursuant to the Court's Supervisory Power.

The FBI sat idle and watched the New Mexico property while AG allegedly suffered without his medication and when they finally belatedly acted on August 3, 2018, law enforcement seized the defendants' other minor children for the purpose of furthering their investigation by questioning the children without parental consent. First, in *December 2017*, the FBI had the knowledge that AG required daily medication to address his significant health conditions. In *December 2017*, the FBI, knowing there was a concern regarding AG's medical treatment, had an emergency pick-up order for AG, providing them the authority to enter the New Mexico property where AG was located. The FBI *never* acted on their knowledge and

authority.[5]  But for the urging by Det. Porter on the TCSO, the FBI might *still* be sitting and watching the New Mexico property with pick-up order in hand. Had the FBI considered for a moment the well-being and life of AG over their fantasies of outing perceived but as yet unsubstantiated terroristic activity, AG might still be alive.

If this Court finds that law enforcement's conduct does not rise to the sufficient level of outrageousness to justify dismissal under the due process clause of the Fifth and Fourteenth Amendments, the Court must nonetheless execute its inherent supervisory power and dismiss the indictment against Defendants to censure the egregious and outrageous conduct by law enforcement in pursuing its investigation of Defendants. Law enforcement's conduct in this case was barbaric.  The FBI wantonly disregarded the known risk to AG's life in order to prolong its surveillance of the Defendants' homestead. Then, once law enforcement executed its warrant on the homestead, they seized the defendants' minor children to interview them, without parental consent, for the purpose of furthering their investigation. Should the Court allow the indictment against Defendants to stand, the Court would risk indicating that the judiciary condones the use of such outrageously unconscionable investigatory tactics by law enforcement.

"Courts have an interest in preventing their processes from being used to legitimize and perpetuate offensive executive conduct, in assuring public confidence in the administration of law." *United States v. Dyke*, 718 F.3d 1282, 1287 (10th Cir. 2013).  This Court may dismiss an indictment under this Court's supervisory power based on the government's egregious and outrageous conduct of effectively sacrificing the life of AG in order to pursue a speculative investigation into the Defendants' alleged terroristic activities.  *United States v. Barrera–*

---

[5] It was, instead, CCPD Det. Porter from Georgia who implored the TCSO to act on information that the family was starving. With this information and urging, on August 3, 2018 – a *full six months* after the pick-up order was issued -- the TCSO set foot for the first time on the Amalia property

*Moreno,* 951 F.2d 1089, 1091 (9th Cir.1991) (court may exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of a due process violation).

It is well-established that a federal court may use its supervisory power to dismiss an indictment on the basis of government misconduct. *United States v. Owen,* 580 F.2d 365, 367 (9th Cir.1978). "As such, dismissal is used as a prophylactic tool for discouraging future deliberate government impropriety of a similar nature." *Id.; see also United States v. Samango,* 607 F.2d 877 (9th Cir.1979) (court uses supervisory power to dismiss indictment where cumulative effect of errors and prosecutorial misconduct was to produce a biased grand jury); *United States v. Isgro,* 751 F.Supp. 846, 851 (C.D.Cal.1990) (court dismisses indictment because of prosecutorial misconduct before grand jury).

An important function of courts' supervisory power is to guarantee that government prosecution officials act with due regard for the integrity of the administration of justice. *United States v. Basurto,* 497 F.2d 781, 793 (9th Cir.1974).

> A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. *Zeal in tracking down crime is not in itself an assurance of soberness of judgment.* Disinterestendness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that *safeguards must be provided against the dangers of the overzealous as well as the despotic.* The awful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication.

*McNabb,* 318 U.S. at 343 (emphasis added).

In contrast to constitutional grounds for dismissal and "'guided by considerations of justice,'" the supervisory power is premised on the inherent ability of the federal courts to

"formulate procedural rules not specifically required by the Constitution or the Congress."
*United States v. Hasting,* 461 U.S. 499, 505 (1983) (*quoting McNabb* 318 U.S. at 341).

The purposes of the courts' use of its supervisory powers "are threefold: [1] to implement a remedy for violation of recognized rights, [2] to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, and finally, [3] as a remedy designed to deter illegal conduct." *Hasting,* 461 U.S. at 505 (citations omitted). Generally, a court's supervisory power permits that court to supervise the administration of criminal justice. *McNabb,* 318 U.S. at 341.

The court's "supervisory power or due process principles may "impos[e] a bar of conviction . . . where the conduct of law enforcement authorities is sufficiently offensive." *Hampton v. United States*, 425 U.S. 484, 497 (1976) (J. Brennan, dissenting).

> We have to choose, and for my part I think it a less evil that some criminals should escape than that the government should play an ignoble part. For those who agree with me no distinction can be taken between the government as prosecutor and the government as judge. If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed.

*Olmstead v. United States*, 277 U.S. 438, 470 (1928), *majority opinion overruled on other grounds by Katz v. United States*, 389 U.S. 347 (1967) (J. Holmes, dissent).

As *McNabb* and its progeny make clear, the use of the supervisory power, to dismiss an indictment or for any other purpose, does not require a constitutional violation. *United States v. Hogan,* 712 F.2d 757, 761 (2d Cir.1983). The supervisory power may be used not only to vindicate a defendant's rights, but also to preserve judicial integrity and/or to deter illegal or improper conduct. *Hasting,* 461 U.S. at 505; *United States v. Carrasco*, 786 F.2d 1452, 1455 (9th Cir. 1986).

Indeed, the primary purpose of the supervisory power is to protect the legitimate institutional interests of the federal courts.  In light of the primary emphasis placed on vindicating the recognizable institutional goals of the courts, it should come as no surprise that the supervisory power has frequently been used by federal courts as a means of sanctioning and deterring governmental misconduct.  *See United States v. Simpson,* 927 F.2d 1088, 1091 (9th Cir.1991) ("[S]upervisory powers are intended to deter governmental misconduct and protect the integrity of the judicial process, while constitutional analysis preserves fairness for the individual defendant."); *United States v. Skipworth*, 697 F.2d 281, 284 (10th Cir. 1983) (the court suggested that had federal agents engaged in improper conduct, the application of the use of the court's supervisory power to suppress evidence would be proper).

Law enforcement's conduct is undeniably unacceptable in a civil society and renders the entire investigation subject to dismissal pursuant to the Court's inherent supervisory power.  The FBI and other law enforcement's conduct was impermissively ignoble and exceeded the tolerable bounds of allowable conduct by law enforcement.  When ignoring AG's vulnerable medical and physical state, the FBI's "zeal in tracking down crime" was not grounded in "soberness of judgment" and should not be condoned by allowing the government to construct its case against Defendants based on such outrageous and intolerable investigatory conduct.  *See McNabb,* 318 U.S. at 343, *supra*.

Should the Court find that the conduct of law enforcement was not sufficiently outrageous to violate Defendants' due process rights under the Fifth and Fourteenth Amendments, the Court must exercise its supervisory power to dismiss the indictment in the interest of vindicating the institutional goals of the courts and to sanction and deter the intolerable governmental misconduct exhibited in the FBI's investigation.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants urge this Court to dismiss the indictment against Defendants as law enforcement's conduct was sufficiently outrageous and was in violation of Defendants' due process rights pursuant to the Fifth Amendment. Alternatively, the Court must dismiss the indictment pursuant to its supervisory power to supervise the administration of criminal justice.

Respectfully Submitted,

electronically filed 10-24-22
Erlinda O. Johnson
Counsel for Siraj Wahhaj
620 Roma Ave. N.W.
Albuquerque, NM 87102
(505) 792-4048

/s/*Thomas J. Clark*
Thomas J. Clark
Counsel for Siraj Wahhaj
432 Galisteo Street
Santa Fe, NM 87501


/s/_____
Aric Elsenheimer and
Angelica Hall
Office of the Federal Public Defender
Counsel for Jany Leveille
501 Lomas Ave. N.W., #501
Albuquerque, NM 87102

/s/_____
Justine Fox-Young
Counsel for Subhanah Wahhaj


/s/_____
Ryan Villa
Counsel for Subhannah Wahhaj

/s/_____
Matthew Beck
Counsel for Lucas Morton
20 First Plaza Center N.W.
Albuquerque, NM 87102


/s/_____
Joseph Shattuck
Counsel for Lucas Morton



/s/_____
Donald Kochersberger
Counsel for Hujrah Wahhaj
1022 2nd Street N.W.
Albuquerque, NM 87102


/s/_____
Marshall Ray
Counsel for Hujrah Wahhaj
201 12th Street. N.W.
Albuquerque, NM 87102




I hereby certify that a true and correct
Copy of the foregoing was provided
To counsel for the government, via CM/ECF
This 24th day of October 2022.


_____/s/_____
Erlinda O. Johnson
Attorney at Law