UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,

    Plaintiff,

v.                                Case No. 1:18-CR-02945-WJ

JANY LEVEILLE,
SIRAJ IBN WAHHAJ,
HUJRAH WAHHAJ,
SUBHANAH WAHHAJ and
LUCAS MORTON,

    Defendants.


TRANSCRIPT OF PROCEEDINGS

September 12, 2018

(1:03 p.m., Rio Grande Courtroom)


Detention Hearing

EXHIBIT
**D**

BEFORE THE HONORABLE KIRTAN KHALSA

United States Magistrate Judge

## Page 2

```
 1              A P P E A R A N C E S :
 2   FOR PLAINTIFF:
 3       GEORGE C. KRAEHE
             Assistant U.S. Attorney
 4       201 Third Street, N.W.
             Albuquerque, NM  87102
 5       (505) 224-1472
 6       KIMBERLY A. BRAWLEY
             Assistant U.S. Attorney
 7       P.O. Box 607
             Albuquerque, NM  87103
 8
 9       TROY A. EDWARDS, JR.
             U.S. Dept. of Justice-National Security Division
10       950 Pennsylvania Avenue, N.W.
             Washington, DC  20530
11       (202) 305-1601
12
13   FOR DEFENDANT JANY LEVEILLE:
14       KARI CONVERSE
             Assistant Federal Public Defender
15       111 Lomas Blvd., N.W.
             Albuquerque, NM  87102
16       (505) 346-2489
17   FOR DEFENDANT SIRAJ WAHHAJ:
18       ZACHARY A. IVES
             Zach Ives Law Firm
19       P.O. Box 27469
             Albuquerque, NM  87125-7469
20       (505) 257-3787
21   FOR DEFENDANT HUJRAH WAHHAJ:
22       CAREY CORLEW BHALLA
             Law Office of Carey C. Bhalla, LLC
23       925 Luna Circle N.W.
             Albuquerque, NM  87102
24       (505) 508-5589
25
```

## Page 3

```
 1   FOR DEFENDANT SUBHANAH WAHHAJ:
 2       BILLY R. BLACKBURN
             1011 Lomas Blvd., N.W.
 3       Albuquerque, NM  87102
             (505) 242-1600
 4
 5   FOR DEFENDANT LUCAS MORTON:
 6       AMY SIRIGNANO
             Law Office of Amy Sirignano, PC
 7       5901J Wyoming Blvd., N.E., Suite 250
             Albuquerque, NM  87109
 8       (505) 242-2770
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                   I N D E X
 2                                                 Page
 3   ARRAIGNMENT PROCEEDINGS ON ALL DEFENDANTS        8
 4   DETENTION PROCEEDINGS ON ALL DEFENDANTS         11
 5   Proffer by Government                    21
 6   WITNESS:  SPECIAL AGENT TRAVIS TAYLOR
 7       Direct Examination by Mr. Kraehe        21
         Cross Examination by Ms. Bhalla         66
 8       Questions from Court                83
         Cross Examination by Ms. Converse       84
 9       Cross Examination by Ms. Sirignano      95
         Cross Examination by Mr. Ives          103
10       Cross Examination by Mr. Blackburn     118
         Redirect Examination by Mr. Kraehe     128
11       Questions from Court                135
         Follow-Up by Ms. Sirignano          139
12       Follow-Up by Mr. Kraehe             141
         Questions from Court                141
13       Follow-Up by Ms. Bhalla             142
         Follow-Up by Ms. Converse           145
14       Follow-Up by Mr. Blackburn          146
15   DETENTION PROCEEDING ON DEFENDANT SIRAJ WAHHAJ   149
16   DETENTION PROCEEDING ON JANY LEVEILLE          167
17   DETENTION PROCEEDING ON LUCAS MORTON           181
18   DETENTION PROCEEDING ON SUBHANAH WAHHAJ        189
19   DETENTION PROCEEDING ON HUJRAH WAHHAJ          201
20
21
22
23
24
25
```

## Page 5

```
 1           THE COURT:  All right.  We're on the record in
 2   United States of America versus Jany Leveille, et al.  If
 3   I could have entries of appearance, please.
 4           MR. KRAEHE:  Good afternoon, Your Honor, George
 5   Kraehe for the United States.  I'm also here with Kim
 6   Brawley from our office, and also Troy Edwards, who's a
 7   trial attorney with the Counter-Terrorism Section of the
 8   Department of Justice.
 9           THE COURT:  Good afternoon.
10           MS. CONVERSE:  Good afternoon, Your Honor, Kari
11   Converse (indiscernible).
12           THE COURT:  Good afternoon.  Good afternoon,
13   ma'am.
14           MR. IVES:  Good afternoon, Your Honor, Zach Ives
15   on behalf of Mr. Wahhaj, who is present and in custody.
16           THE COURT:  Good afternoon.  Good afternoon, Mr.
17   Wahhaj.
18           MS. SIRIGNANO:  Good afternoon, Your Honor, Amy
19   Sirignano, on behalf of Lucas Morton, who is present and
20   in custody today.
21           THE COURT:  Good afternoon.  Good afternoon, Mr.
22   Morton.
23           MS. BHALLA:  Carey Bhalla (inaudible).  He's
24   present (inaudible).
25           THE COURT:  Good afternoon.  Good afternoon, Ms.
```

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 6**

1 Wahhaj. All right, we're scheduled for detention hearings
2 as well as arraignments. The Grand Jury returned an
3 Indictment yesterday. Have counsel had an opportunity to
4 go over the Indictment with their clients and are you
5 ready to proceed with the arraignment?
6          MS. CONVERSE: Yes, Your Honor.
7          MR. IVES: Yes, Your Honor.
8          MS. SIRIGNANO: Yes.
9          MS. BHALLA: Yes.
10          THE COURT: All right. And then, before we get
11 started, with regard to detention, have you all conferred
12 and are we going to be having some testimony, or are we
13 going to be proceeding by way of proffer? It's the
14 Government's burden of proof.
15          MR. KRAEHE: Your Honor, we'll be proceeding by
16 way of proffer.
17          THE COURT: Okay. And is there going to be
18 objection on the defense side to the proffer?
19          MS. SIRIGNANO: Your Honor, we'd just like to
20 reserve our right after the proffer to call the witness or
21 cross-examine the Government's witness if necessary.
22          THE COURT: Okay. And are you speaking on
23 behalf of everyone with regard to that?
24          MS. SIRIGNANO: We've discussed it, yes.
25          MS. BHALLA: The only clarification I'd like to

**Page 7**

1 make, Your Honor, is that we may choose to also reserve
2 the right to make our own proffer depending on the
3 Government's proffer. So we're not sure which way we're
4 going to go on that.
5          THE COURT: Well, typically, the Government
6 proffers information and if it's proffered with objection
7 by the defense to the evidence being submitted by way of
8 proffer, then the Court's going to weigh it with a little
9 bit less weight than I would with live testimony.
10          However, if the defense doesn't object to the
11 information being proffered, I will weigh the proffer as
12 if live testimony had occurred, and, of course, give an
13 opportunity then for the defense to cross-examine any
14 witness that would have provided live testimony of the
15 information proffered.
16          MR. KRAEHE: And, Your Honor, I would like to
17 state that these proceedings are a little bit unusual, in
18 that there has been a considerable continuance since the
19 detention hearing was originally set and in the interval,
20 as per the agreement among the parties, the United States
21 has provided substantial disclosures that serve as really
22 the best evidence in lieu of any witness testimony.
23          If there were any witness, he would just be
24 testifying as to the evidence that has already been made
25 available to the defendants and which I can make available

**Page 8**

1 to the Court today.
2          THE COURT: Right, and my understanding is that
3 the defense doesn't object to the Government presenting
4 its evidence by way of proffer, but reserves the right to
5 cross-examine any witness on which that proffer would have
6 been based, as well as to present their own witnesses and
7 evidence. Am I incorrect in my understanding?
8          MS. SIRIGNANO: No, Your Honor.
9          THE COURT: Okay. All right. Before we get to
10 the detention phase, why don't we go ahead with the
11 arraignment, and I'm going to ask that all of you come up
12 to the podium as I state your name.
13          United States of America v. Jany Leveille, Siraj
14 Wahhaj, Hujrah Wahhaj and Lucas Morton. So stand in the
15 order that you were called, please, with your counsel.
16 Mr. Wahhaj, you were called second.
17          Okay, and entries of appearance have already
18 been made. Good afternoon, again. If I could have each
19 of you please state your name for the record, starting
20 with you, Ms. Leveille.
21          MS. LEVEILLE: I'm Jany Leveille.
22          MR. WAHHAJ: Siraj Wahhaj.
23          MS. WAHHAJ: Hujrah Wahhaj.
24          MR. MORTON: Lucas Morton.
25          THE COURT: Okay. Have you received a copy of

**Page 9**

1 the Indictment that was filed against you yesterday?
2          MS. LEVEILLE: Yes, I did.
3          MR. WAHHAJ: Yes.
4          MS. WAHHAJ: Yes.
5          MR. MORTON: Yes.
6          THE COURT: Now, the Grand Jury has charged you
7 with the identical crimes that you were charged with in
8 the Criminal Complaint that we went over last week.
9          Count 1 charges all of you with Conspiracy, in
10 violation of 18 United States Code Section 371, and Count
11 2 charges you, Ms. Leveille, with possession of a firearm
12 and ammunition by an alien illegally and unlawfully in the
13 United States.
14          Do you all understand the charges against you?
15          MS. LEVEILLE: Yes, Your Honor.
16          MR. WAHHAJ: Yes.
17          MS. WAHHAJ: Yes.
18          MR. MORTON: Yes.
19          THE COURT: And last week, we advised you of the
20 penalties that you're facing. Do you understand those
21 penalties?
22          MS. LEVEILLE: Yes, Your Honor.
23          MR. WAHHAJ: Yes.
24          MS. WAHHAJ: Yes.
25          MR. MORTON: Yes.

**3 (Pages 6 to 9)**

**Page 10**

1    THE COURT:  Have you had an opportunity to
2  discuss these charges, this Grand Jury Indictment and the
3  penalties you're facing with your attorneys?
4    MS. LEVEILLE:  Yes, Your Honor.
5    MR. WAHHAJ:  Yes.
6    MS. WAHHAJ:  Yes.
7    MR. MORTON:  Yes.
8    THE COURT:  Do you want me to read the
9  Indictment in Court, or do you waive a formal reading?
10    MS. CONVERSE:  Your Honor, we'll waive the
11  formal reading, and enter a plea of not guilty to both
12  charges.
13    MR. IVES:  Your Honor, we'll waive the reading
14  and enter a plea of not guilty to Count 1, which is the
15  only Count against Mr. Wahhaj.
16    MS. BHALLA:  And Your Honor, we will also waive
17  a formal reading and enter a plea of not guilty at this
18  time.
19    MS. SIRIGNANO:  Your Honor, we waive a formal
20  reading of the Indictment and enter a not guilty plea as
21  to Count 1.
22    THE COURT:  All right.  Not guilty pleas will be
23  entered as to each of the defendants on the Counts
24  pertaining to them.  This matter is assigned to Judge
25  Johnson -- Chief Judge Johnson.  He'll notify you of a

**Page 11**

1  trial date.  I will enter a standard Discovery Order and
2  I'm not sure if the Government filed a motion yet to
3  declare this case complex, but are you planning to do
4  that?
5    MR. KRAEHE:  We have not, Your Honor.  We're
6  going to defer a decision on that until we have consulted
7  with defense counsel.
8    THE COURT:  All right.  Well, then, pending any
9  such motion, motions are due October 2nd, and as I said,
10  I'll enter a standard Discovery Order.
11    So is there anything else we need to take up on
12  the arraignment part of this?
13    MS. CONVERSE:  No, Your Honor.
14    THE COURT:  So gentlemen and ladies, please have
15  a seat back at counsel table.
16    Now, with regard to detention, is there any
17  objection to the proffer being made as to all of the
18  defendants jointly, or would you prefer that we handle
19  this individually?
20    MR. IVES:  Your Honor, we would prefer that it
21  be handled individually.
22    THE COURT:  Okay.  And is that everybody else's
23  preference as well?
24    MS. SIRIGNANO:  Yes, Your Honor.
25    MS. BHALLA:  Yes, Your Honor.

**Page 12**

1    MS. CONVERSE:  Yes, Your Honor.
2    THE COURT:  All right, then let's start with --
3  and did you want to say anything about that?  I'm prepared
4  to handle it individually, although if the Government's
5  proffer contains overlapping information, for expediency,
6  I would say that the proffer (indiscernible, audio skips)
7  everybody and to the extent that there's additional
8  information or an objection after that proffer is made to
9  the manner in which it was done in this group setting, we
10  can take that up individually.
11    MR. KRAEHE:  I would only note, Your Honor, that
12  they are charged in -- with a conspiracy count, so that
13  the nature of the evidence against them is, of course,
14  overlapping.
15    THE COURT:  Well, of course.  And the Grand Jury
16  has found probable cause as to the Conspiracy charge, but
17  the Court has to make an individualized determination as
18  to each individual defendant regarding detention.
19    So to the extent that you have a proffer that
20  you want to make that would apply to all of the
21  defendants, why don't you start with that and then we will
22  move into the individual proffers.
23    However, if you're prepared to proffer on
24  detention for each of them individually, then I will call
25  each of them individually first.  So what do you want to

**Page 13**

1  do?
2    MR. KRAEHE:  I will proffer, Your Honor, and
3  then I guess we can sort it out as we go along.
4    THE COURT:  Okay.  I only want to hear the
5  proffer as to the extent that it applies to all of them
6  and I would state that with regard to that, it's most
7  likely on the weight of the evidence aspect of my 3142
8  consideration.  So go ahead.
9    MR. KRAEHE:  Your Honor, I want to state at the
10  outset, as I did before, that we have already made
11  considerable disclosures in this case of a lot of the
12  materials that have been collected in the very expensive
13  investigation that's been conducted to date.
14    I should also state that the investigation is
15  very much on-going.  And to date we have made available to
16  defense, and we are prepared to make available to the
17  Court, some of what has been (indiscernible, audio skips)
18  establishes the facts in this case thus far.
19    I -- what I have provided to the defense are a
20  few hundred pages of 302's, also transcripts of interviews
21  that were conducted of some of the witnesses, including
22  eye-witnesses to the entirety of the events that occurred.
23  There are also photographs of the compound, of the
24  weapons, of other items that were collected in the course
25  of the investigation, and other documents and materials

**4 (Pages 10 to 13)**

**Page 14**

1   that had been collected in the course of the investigation
2   thus far.
3           As I said, this -- this does not begin to
4   include everything that was collected in the investigation
5   this far, but is a sizeable body of evidence, and more
6   than sufficient, I think, to meet the -- (indiscernible,
7   audio skips).
8           THE COURT:  (audio skips) -- and to defense
9   counsel, are you planning to proffer that as evidence?
10          MR. KRAEHE:  I would proffer it to the Court
11  right now,  if it is willing to take it from me.
12          THE COURT:  What specifically are you wanting to
13  proffer?  A binder?
14          MR. KRAEHE:  A binder with 302s, letter, a
15  transcript, also there are journals, and photographs.
16          THE COURT:  Oh, because this detention hearing
17  was continued already beyond the typical five-day time
18  frame of a continuance requested by the defense, I'm
19  reluctant to postpone my consideration of the weight of
20  the evidence until I have time to go through that thick
21  binder.  You certainly can proffer it as an exhibit, but I
22  would like a -- a proffer or testimony so that I can weigh
23  the strength of the evidence separate and apart from this
24  binder exhibit.
25          MR. KRAEHE:  Yes, Your Honor, we're just making

**Page 15**

1   this available to the Court if it wants to (inaudible).
2           MS. SIRIGNANO:  Your Honor, may we approach for
3   one minute on that issue?
4           THE COURT:  You may.
5           MS. SIRIGNANO:  Thank you.
6   (BENCH CONFERENCE - Inaudible)
7           THE COURT:  You may, Mr. Blackburn.  You weren't
8   here -- up here for this bench conference.  I'll ask that
9   you talk to your counsel about what just occurred and I'll
10  note for the record that (indiscernible, audio skips) has
11  been brought into the courtroom.  Good afternoon, ma'am.
12  Are you feeling okay?  Okay?  Are you prepared to proceed
13  with the hearing?
14          MR. BLACKBURN:  I just came over to (inaudible.)
15          THE COURT:  Okay.  Why don't you confer with
16  your client and let me know how you want to proceed.
17  Maybe we should take a short recess, because, again, to
18  the extent that we're going to be proceeding with a group
19  proffer, if your client's going to be prepared to proceed,
20  I'd like to have that done all at -- all together, for
21  expediency.
22          MR. BLACKBURN:  Yeah, Judge, I would need to
23  have my staff go back and bring everything that I brought
24  over this morning, because I did not expect that this
25  afternoon, so.

**Page 16**

1           THE COURT:  Oh, well, if you don't want to -- I
2   mean, if you're not prepared for the detention hearing and
3   you don't want us to postpone -- hold this now -- why
4   don't you confer with your client, let me know.
5           MR. BLACKBURN:  Sure.
6           THE COURT:  I'll take a very short recess and
7   let me know when you all are ready for me to come back on
8   the bench.  But if I haven't heard from you, I'm coming
9   back on in five minutes.
10          COURTROOM DEPUTY:  All rise.
11  (Court in recess.)
12  (Court in session.)
13          MR. BLACKBURN:  Judge, after consulting with my
14  client, which was only very minimal, and as you know, this
15  morning, we only had about ten minutes.  We need to go
16  over this stuff and I've consulted with the Government and
17  I know that -- we talked this morning about if a -- that
18  we could convene at another time, even though Mr. Kraehe
19  was not going to be around, but I think we talked and were
20  able to -- there will be somebody here that we can do it,
21  after we have an opportunity to prepare.
22          I don't have any of my stuff here.  Everybody
23  else had about four hours to go over this with their
24  clients this morning and I haven't.  So I don't think they
25  have any objection to me delaying this until the Court

**Page 17**

1   sets it at a new time, with the convenience of, I guess,
2   counsel.  And that's what I would request.  That's what my
3   client would request also, Your Honor.
4           THE COURT:  Well, this -- this would be my
5   preference.  If Ms. Wahhaj is physically well enough to be
6   present in Court today for this hearing, and you can have
7   your office bring over your material, I would like to
8   begin the detention hearing as to her, see how far we can
9   get and reopen it or continue it to the extent that you
10  need more time and more preparation, or need to pull
11  additional witnesses, rather than continuing it
12  indefinitely.
13          I think that there's at least some information
14  that would pertain to her as well, and we've already had
15  quite a lengthy period of time.  So, if she's physically
16  well enough, I'd like to start this with her
17  (indiscernible).
18          MR. BLACKBURN:  Yeah, and I -- I sort of take a
19  different position from the Government's position that
20  they -- that they've given us considerable discovery.  I
21  -- I don't believe that's true.  They have given us some
22  discovery, had I known --
23          THE COURT:  Plus, they're not obligated to
24  (indiscernible).
25          MR. BLACKBURN:  Which they're not obligated to

**5 (Pages 14 to 17)**

## Page 18

1  do, and had we -- and had I known that there was going to
2  be a Grand Jury meeting on Tuesday, we first wanted to
3  have this hearing on Monday.  We agreed to do it on
4  Wednesday and now we've lost an opportunity to have a full
5  preliminary hearing.
6          That's their -- they took -- that's -- that's
7  fine with them.  I mean, that's proper, it just put us in
8  a little bit different position when we get the discovery
9  at 4:00 yesterday afternoon.
10         So, I just say that for the record, because that
11 puts me in a different position, because we didn't have
12 time to talk this morning, whereas everybody else had all
13 morning to meet with their clients for three or four hours
14 to go over all this discovery, that I haven't been able to
15 go over myself or with my client.  So I'll just put that
16 on the record.
17         THE COURT:  All right.  And again, I'm more than
18 happy to continue the detention hearing, so that if you
19 want to respond to the Government's proffer with
20 additional witnesses or evidence, you can do that, but
21 it's the Government's burden --
22         MR. BLACKBURN:  Oh, I understand.
23         THE COURT:  -- the Government's prepared to
24 proceed with regard to all of the defendants, including
25 Subhanah Wahhaj, correct?

## Page 19

1          MR. KRAEHE:  Absolutely, Your Honor.
2          THE COURT:  And so I'm going to begin the
3  hearing --
4          MR. BLACKBURN:  No, I understand.
5          THE COURT:  -- as to your client, as long as
6  she's physically well enough to do so.  So please, Ms.
7  Wahhaj, are you -- why don't you confer with your
8  attorney.  And if she's physically well enough to sit in
9  Court and begin this hearing, let's do so.
10         MR. BLACKBURN:  She's ready to go.
11         THE COURT:  Okay.
12         MR. BLACKBURN:  Reluctantly, but she'll do it.
13         THE COURT:  All right.
14         MR. BLACKBURN:  Can I have my staff go get all
15 my stuff and bring it over here in the meantime, while I'm
16 waiting -- while, you know, I didn't bring anything, all
17 of my notes, my notes from the -- from the -- but they can
18 do that while we go through this, Your Honor, that's okay.
19         THE COURT:  And we'll put you at the end, and if
20 you don't feel prepared to cross-examine based on the
21 proffer, then we'll talk about continuing it.
22         MR. BLACKBURN:  No, I understand.
23         THE COURT:  Here's a notepad.
24         MR. BLACKBURN:  No, I have that.
25         THE COURT:  Okay.

## Page 20

1          MR. BLACKBURN:  At least I brought that.
2          MR. KRAEHE:  And Your Honor, I would like to
3  note for the record that Mr. Blackburn was prepared to
4  proceed with the detention hearing this morning at 8 a.m.
5  He's had a few additional hours to prepare.  I understand
6  he might not have his materials right here with him, but
7  we had provided more than sufficient materials beyond what
8  we are required to do under any reading of the Rules, and
9  I believe there's sufficient materials here for us to
10 proceed as to all the defendants.
11         THE COURT:  All right, Mr. Kraehe, why don't you
12 come back up.  Before we took our break and before our
13 bench conference, you were proposing to submit some
14 exhibits for the Court's consideration.  Are you
15 withdrawing that?
16         MR. KRAEHE:  Your Honor, it was not our intent
17 to present them as exhibits.  It was our intent to make
18 them available, just for the Court's review, as a part of
19 our proffer.  Basically, they're there to show that our
20 proffer is not just what I'm saying, it is based on
21 considerable materials collected thus far.
22         THE COURT:  I'm not --
23         MR. KRAEHE:  That's why I'm not presenting --
24 I'm not providing anything as exhibits, or as -- as
25 (indiscernible).

## Page 21

1          THE COURT:  All right.  Well, I'm not going to
2  consider anything that hasn't been presented as an
3  exhibit.
4          MR. KRAEHE:  Yes, Your Honor.
5          THE COURT:  So go ahead with your proffer.
6          MR. KRAEHE:  Your Honor, we're going to call
7  Special Agent Travis Taylor.
8          THE COURT:  All right.
9          COURTROOM DEPUTY:  Please raise your right hand.
10 Do you solemnly swear or affirm that the testimony you're
11 about to give in this case will be truth, the whole truth
12 and nothing but the truth?
13         SPECIAL AGENT TAYLOR:  Yes, ma'am.
14         COURTROOM DEPUTY:  Please have a seat, state
15 your name and spell your last name for the record.
16         SPECIAL AGENT TAYLOR:  Travis Taylor,
17 T-A-Y-L-O-R.
18
19         SPECIAL AGENT TRAVIS TAYLOR
20              DIRECT EXAMINATION
21 BY MR. KRAEHE:
22 Q.  Sir, where are you currently employed?
23 A.  The FBI
24 Q.  What do you do for the FBI?
25 A.  I'm a Special Agent with the FBI.

**Page 22**

1    Q.  And where are you currently assigned?
2    A.  The Santa Fe office.
3    Q.  Did you at some point become involved in an
4    investigation involving the defendants who are seated here
5    at the table?
6    A.  Yes, sir.
7    Q.  Okay. Can you identify these defendants?
8    A.  Yes, sir.
9    Q.  And do you see here today Jany Leveille?
10   A.  Yes, sir.
11   Q.  Siraj Ibn Wahhaj?
12   A.  Yes, sir.
13   Q.  Hujrah Wahhaj?
14   A.  Yes, sir.
15   Q.  Subhanah Wahhaj?
16   A.  Yes, sir.
17   Q.  And Lucas Morton?
18   A.  Yes, sir.
19   Q.  And can you tell me how you became involved in the
20   investigation that resulted in the Indictment against
21   them?
22   A.  We were asked by Taos County Sheriffs for assistance
23   in a case approximately June 17 (indiscernible, audio
24   skips) asked for assistance because they believed that
25   Siraj Wahhaj and (minor's name - A.G.) were located on the

**Page 23**

1    property.
2    Q.  Okay.  And I'd like to caution you that we may be
3    discussing minors, including deceased minors and minors
4    who are currently victims.  If you could please refrain
5    from using their names.
6    A.  Yes, sir.
7    Q.  Okay.  I think we can use their initials.  And what
8    was it about A.L. that Taos County needed your assistance
9    with?
10   A.  They needed to locate that -- that he was on the
11   property in order to execute a warrant.
12   Q.  And why -- why did they need to execute a warrant?
13   A.  Because there was a pick-up Order issued from Clayton
14   County P.D. in Georgia.
15   Q.  And what was the substance of this pick-up Order?
16   A.  That A.G. was taken from his biological mother and --
17   without notice as to where he was being taken and she had
18   not received responses to where A.G. was being taken.
19   Q.  Do you know when or about this pick-up Order was
20   issued?
21   A.  A missing persons report was filed on December 10th,
22   and a pick-up Order was filed on December 20th.
23   Q.  Okay.  And December 10th and December 20th of what
24   year?
25   A.  2017.

**Page 24**

1    Q.  And were there subsequent pick-up Orders or Orders of
2    the same kind that were issued by that Court?
3    A.  To my knowledge, that one that I've seen is from
4    December 20th.
5    Q.  Do you know who filed the missing persons report?
6    A.  Hakima Ramzi.
7    Q.  And that information is based on what?
8    A.  The fact that A.G. was taken from her home on
9    approximately November 27th, and was not given back to her
10   and she could not find out where A.G. was being taken.
11   Q.  And how did you learn that Hakima Ramzi had filed a
12   missing person report?
13   A.  Through the missing persons report and through
14   interviews who is Hakima Ramzi and Jamella Gihad.
15   Q.  And who is Jamella Gihad?
16   A.  The step-mother to Siraj Wahhaj, Subhanah Wahhaj,
17   Hujrah Wahhaj and that would be it.
18   Q.  And to your knowledge, who was the biological mother
19   of A.L.?
20   A.  Hakima Ramzi.
21   Q.  And how old was A.L. when he was reported missing?
22   A.  Three.
23   Q.  Did A.L., at the time he was reported missing, have
24   any medical conditions or any characteristics that were of
25   concern to Ms. Ramzi?

**Page 25**

1    A.  Yes, sir.
2    Q.  What were they?
3    A.  H.I.E., hypoxic ischemic encephalopathy, I think.  Is
4    that how you pronounce it?
5    Q.  It's difficult to pronounce.
6    A.  Yes.
7    Q.  Can you describe what that is?
8    A.  The -- A.G. would suffer from prolonged seizures due
9    to the condition he received at birth, H.I.E.
10   Q.  And according to his mother, as reported to Clayton
11   County Police Department, did he require any kind of
12   medical attention or medication for this condition?
13   A.  Yes, sir.
14   Q.  And was this attention something that he required on
15   a continual basis?
16   A.  Yes, sir.
17   Q.  And that's according to the missing persons report,
18   and to the pick-up Order.  Is that right?
19   A.  Yes, sir.
20   Q.  Did you learn -- well, let me ask you this.  Who is
21   A.L.'s biological father?
22   A.  Siraj Wahhaj.
23   Q.  Was Siraj Wahhaj married to Hakima Ramzi?
24   A.  Yes.
25   Q.  And that was a lawful, legal marriage?

**7 (Pages 22 to 25)**

## Page 26

1  A.  Correct.
2  Q.  Did Ms. -- Did Siraj Wahhaj also have a second,
3  so-called wife, or Islamic wife, or something other than a
4  lawful, wedded wife?
5  A.  Yes, sir.
6  Q.  And who was that?
7  A.  Jany Leveille.
8  Q.  Now, did you learn ever how A.L. came to be in New
9  Mexico?
10  A.  Yes, sir.
11  Q.  Tell me how that came to happen.
12  A.  Through witness statements and Jany Leveille's book.
13  Q.  Okay.  And describe what -- what happened.
14  A.  So, A.G. was taken from Georgia and eventually
15  transported to Alabama to Siraj Wahhaj's property in
16  Alabama.  He was taken because of a message received by
17  Jany Leveille from God that they needed to take A.G. and
18  perform ruqya on him.
19  Q.  Okay.  Stop right there.  So, who took A.L. from
20  Georgia to Alabama?
21  A.  Siraj Wahhaj, Jany Leveille, it's -- that is where
22  A.G. rode -- that was (indiscernible) en route to Alabama.
23  Q.  Okay.  And when they went from -- out from Georgia to
24  Alabama, did they go with any other adults?
25  A.  Yes.

## Page 27

1  Q.  Who else?
2  A.  Hujrah Wahhaj, Subhanah Wahhaj and Lucas Morton.
3  Q.  Okay.  And now you told me that Jany Leveille
4  received a message from God.  Is that what you said?
5  A.  Yes.
6  Q.  Okay.  And what are you basing that statement on?
7  A.  I'm basing it off witness statements and from her own
8  book.
9  Q.  And this book, can you describe that please?
10  A.  It's approximately a three-volume book, about a
11  hundred pages and documents several events that happened
12  in their journey from Georgia to events that happened in
13  New Mexico.
14  Q.  Does it document other things?
15  A.  It documents the belief system, as well, the ideology
16  and it also documents the death of A.G. and what happened
17  on that day.
18  Q.  Can you summarize what this belief system is, or?
19  A.  Yes.  Per witness statements and the book as well,
20  Jany Leveille receives messages from God.  She is the only
21  one that can translate those messages and she tells those
22  messages to the other defendants and they also believed
23  that A.G. would, once the shaitans or demons were removed
24  from his body, that he would become Jesus Christ and then
25  tell them what to do after that.

## Page 28

1  Q.  And we'll get to more of that later, but can you tell
2  me whether Jany Leveille claimed some kind of prophetic
3  status or religious personations?
4  A.  She believed that she was the mahdi.
5  Q.  The mahdi?
6  A.  Yes.
7  Q.  And what is the mahdi, to your understanding?
8  A.  To the best of my understanding, it's a messenger
9  from God, a prophet.
10  Q.  Okay.  Did she also believe she was anyone else?
11  A.  Mariam, Mary from many of the religious texts.
12  Q.  As in Mary, mother of Jesus?
13  A.  Yes.
14  Q.  Okay.  And were these things written in the journal
15  that you found?
16  A.  Yes.
17  Q.  Or the book?
18  A.  Yes.
19  Q.  And this book was found where?
20  A.  It was located on a thumb drive that was located in
21  her purse.  During an August 3rd interview with Jany
22  Leveille, she had that purse in her possession, and per
23  the New Mexico Regional Computer Forensic Lab, that thumb
24  drive was connected to a laptop of materials that are
25  determined to be Jany Leveille's.

## Page 29

1  Q.  All right.  And did you learn from any other sources
2  information that conclude that this book was something
3  written by Jany Leveille?
4  A.  Two witnesses mentioned that Jany Leveille had
5  written a book about their story on -- while in New
6  Mexico.
7  Q.  And if you could tell us who those witnesses are,
8  without identifying them.
9  A.  F.L. and J.L.
10  Q.  All right.  And those witnesses have what
11  relationship to Jany Leveille?
12  A.  Biological children of Jany Leveille.
13  Q.  Okay.  And did any of them say they had ever read the
14  -- any -- the -- the book, or parts of it?
15  A.  J.L. has written -- has read it, and F.L. has not.
16  Q.  Is this book handwritten, or is it typed out?
17  A.  It's typed.
18  Q.  And did you receive any information from anyone that
19  led you to conclude that it was Jany Leveille who typed it
20  out?
21  A.  The children said that she had written a book
22  describing their story, and the book that I have read is a
23  -- their story, which is corroborated from other -- other
24  witnesses and it was found on the computer that was --
25  been determined to be hers.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

Page 30

1    Q.  Now you mentioned also previously that Jany Leveille
2    received messages or some kind of divine instruction to
3    perform, you called it ruqya, or ruqya, on -- on A.L.?
4    A.  Yes, sir.
5    Q.  What is -- what is -- I don't know if I'm pronouncing
6    it right --
7         THE COURT:  Mr. Kraehe, I just want one point of
8    clarification.  The witness referred to the child as
9    "A.G.," I thought, and you've referred to the child as
10   "A.L."  Are we talking about the same child?
11        MR. KRAEHE:  Yes, I'm sorry, A.G.
12        THE COURT:  Okay.  Go ahead.
13   A.  Can you repeat the question?
14   Q.  (By Mr. Kraehe)  Can you tell me what ruqya is?
15   A.  Ruqya is a practice that is to expel a body of jinns,
16   or spirits, or shaitans, and it's done by reading passages
17   from the Quran, placing a hand above the forehead of the
18   individual that's having the ritual done to them.
19   Q.  Is this -- so is this a -- a religious ritual of some
20   sort?
21   A.  Yes.
22   Q.  Could you call it an exorcism?
23   A.  It can be compared to that, in the Christian sense.
24   Q.  Have you seen it referred to as -- as exorcism?
25   A.  I've seen it referred to as ruqya and I've seen it

Page 31

1    referred to as a ritual as well.
2    Q.  Okay.  And has -- do you know whether, while they
3    were in Georgia, this procedure or ritual was ever
4    performed on A.G.?
5    A.  Yes, it was.
6    Q.  All right.  And who performed this ritual on A.G.?
7    A.  Siraj Wahhaj.
8    Q.  And do you know whether he also performed this ritual
9    on A.G. when they were in Alabama?
10   A.  To my knowledge, the ritual started in Georgia and
11   got started again in New Mexico.  I'm not aware of what
12   occurred in Alabama.
13   Q.  Okay.  So in Georgia and New Mexico, at least to your
14   knowledge?
15   A.  Yes.
16   Q.  And that's based on what?
17   A.  Witness testimonies and the book as well.
18   Q.  Has anyone to -- described to you how this ritual was
19   carried out and how long it lasted?
20   A.  Yes.
21   Q.  Can you describe that, please.
22   A.  The ritual, once in New Mexico, occurred every day,
23   and from five to twelve hours a day until A.G. passed and
24   died.
25   Q.  Okay.  And, again, the purpose of this ritual was

Page 32

1    what?
2    A.  To expel jinns or shaitans from the child's body.
3    Q.  Did you read anything or receive any information as
4    to (indiscernible, audio skips) Wahhaj's belief as to what
5    was going on with A.G., as far as his health and physical
6    condition?
7         MS. SIRIGNANO:  Your Honor, defense has an
8    objection.  This case is possession of a firearm by --
9    allegedly possession of a firearm by an illegal alien, and
10   we're gone way far afield here.  This is not charged in
11   the Indictment and none of this evidence pertains to the
12   allegations in the Criminal -- or the Indictment, Your
13   Honor, so we just object on this line of questioning.
14        THE COURT:  I'm overruling your objection.  The
15   Court has to consider under 3142(g) a number of factors,
16   including the defendant's personal history, physical and
17   mental condition and other characteristics.  So I find
18   this testimony to be relevant.  Overruled.
19   Q.  (By Mr. Kraehe)  So I think you were telling me about
20   how long these rituals lasted when they were performed?
21   A.  Once in New Mexico, approximately five to 12 hours,
22   per witness statements and every day until A.G. died.
23   Q.  Okay.  And you were telling me also that -- whether
24   Siraj Wahhaj and Jany Leveille had any beliefs or
25   understandings as to the cause of the -- A.G.'s condition?

Page 33

1    A.  That his body was inhabited by shaitans and jinns and
2    that he was (indiscernible, audio skips) the only thing
3    that made him an animate object was the fact that he had
4    shaitans and jinns in his body.
5    Q.  So they believed he was not alive.  To your
6    understanding, was he actually alive?
7    A.  To my understanding, yes.
8    Q.  All right.  And did Jany Leveille ever come to an
9    understanding as to who was A.G.'s mother?
10   A.  Jany Leveille, once the boy was taken, in the Quran
11   and received a message from God that the boy was, in fact,
12   hers.
13   Q.  And can you explain how she came to that conclusion?
14   A.  When they took the -- per her book, when they took
15   A.G., they started to perform ruqya on him, he began to
16   cry during (indiscernible, audio skips).  In the Quran and
17   in the message, it was revealed that the boy was hers and
18   that the boy would also be Jesus Christ.
19   Q.  And how could the child be hers if she did not
20   actually give birth to the child, according to Jany
21   Leveille and as you understand it from the evidence?
22   A.  Per her book as well, during the pregnancy of Hakima
23   Ramzi, she believed that she was also pregnant.  During
24   her pregnancy, after approximately two pregnancy tests, it
25   began to fade, while Hakima Ramzi continued to go through

**Page 34**

1    her pregnancy.  Later she believed that Hakima Ramzi stole
2    A.G. from her womb through black magic.
3    Q.   And was it shortly after that that they left Georgia
4    to go to Alabama and then New Mexico?
5    A.   From her book, it does not give a specific timeline,
6    but it would appear to be a few years from that conclusion
7    to the point in which A.G. was taken.
8    Q.   A few years?
9    A.   From the book, there's not an exact timeline, it's --
10   it's just how you read it.  It would appear to be a few
11   years.
12   Q.   Years or some other?
13   A.   Could be -- the boy was only three at the time, and
14   she talks about --
15   Q.   Oh, I'm sorry, my question was, how long
16   (indiscernible) Jany Leveille's realization that the child
17   was hers, did they leave Georgia?
18   A.   Within a few days.
19   Q.   And again, who took the child from Georgia out of
20   state?
21   A.   Jany Leveille ordered Siraj Wahhaj to take the child.
22   Q.   And did they both leave together?
23   A.   Yes.
24   Q.   All right.  And they left in whose car?
25   A.   Jany Leveille's.

**Page 35**

1    Q.   And in that car, were there firearms?
2    A.   Per witness testimony, yes.
3    Q.   And what -- what kind of firearms?
4    A.   Rifles and pistols, AR-15, 30-aught-6, three-way and
5    several pistols.
6    Q.   Have you come to any conclusions as to how many
7    firearms were taken?
8    A.   Per Taos County's seizure inventory, it was
9    approximately 11.
10   Q.   And have you received information from witnesses as
11   to approximately how many firearms were taken from
12   Georgia?
13   A.   Yes.
14   Q.   And the number?
15   A.   They stated 10 to 11.
16   Q.   And the -- the -- the kinds of weapons that were
17   taken out of Georgia as per witness statements?
18   A.   They mentioned rifles, shotguns and pistols.
19   Q.   And did they also take ammunition from Georgia?
20   A.   Yes.
21   Q.   And did they also take magazines from Georgia?
22   A.   Yes.
23   Q.   (Indiscernible, audio skips) high-capacity kind?
24   A.   For the AR-15, they were told to me as being 30-round
25   magazines.

**Page 36**

1    Q.   Do you have any information as to whether Jany
2    Leveille had her own firearm in Georgia?
3    A.   Per witness statements, Siraj Wahhaj gave her a
4    personal firearm -- firearm in Georgia and it was
5    described as a semi-automatic pistol and that she kept in
6    her closet.
7    Q.   And (indiscernible) evidence collected in this
8    investigation, do you know whether she ever used that
9    firearm?
10   A.   Per witness statements, she did fire a pistol in New
11   Mexico, as well as an AR-15.
12   Q.   Did she also use that firearm in Georgia, to your
13   knowledge?
14   A.   To the best of my knowledge, she also went to a gun
15   range and fired a weapon once there.
16   Q.   And did you ever receive any statements from Jany
17   Leveille herself as to whether she was ever in possession
18   of firearms?
19   A.   Yes.
20   Q.   And what did she say?
21   A.   She said while in Georgia, she was at the gun range
22   with Siraj Wahhaj and fired a weapon once, to the best of
23   my knowledge.
24   Q.   Now, when Siraj Wahhaj and Jany Leveille took A.G.
25   from Georgia to Alabama, did they go with anyone else?

**Page 37**

1    A.   Yes, sir.
2    Q.   Okay.  Who else did they take with them?
3    A.   Per witness statements, and her book as well, Lucas
4    Morton, Subhanah Wahhaj (indiscernible, audio skips)
5    Hujrah Wahhaj accompanied them to Alabama --
6    Q.   All right.
7    A.   -- with their kids as well.
8    Q.   How many children were there?
9    A.   There were 12 kids total.
10   Q.   Okay.  And I won't ask you whose kid belonged to who,
11   but altogether they -- they were how many people?
12   A.   17.
13   Q.   And they went in how many vehicles?
14   A.   Approximately went in three, and this is coming from
15   her -- her book.  While in Alabama, Siraj Wahhaj donated
16   his vehicle to a masjid, then they proceeded to Tennessee
17   where Hujrah got rid of her vehicle there, and then from
18   Tennessee, they all rode in Lucas Morton's box truck.
19   Q.   And when you say one of the vehicles was donated to a
20   masjid, is that another word for mosque?
21   A.   Yes.
22   Q.   Now, would you say that the people who were leaving
23   with Jany Leveille did -- did they also understand that
24   she spoke with God?
25   A.   Per witness statements, that would be correct.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 38**

1  Q.  Okay.  And did they believe that she was the only who
2  could receive messages from God?
3  A.  Every -- supposedly everyone could get messages from
4  God, but she was the only one that could translate those
5  messages and disseminate them to the group.
6  Q.  And is it your understanding that Jany Leveille left
7  Georgia because she received a message from God directing
8  her to do so?
9  A.  To the best of my knowledge, yes, and that she feared
10 that -- that mercenaries were being sent to kill her and
11 her family.
12 Q.  And would you describe the other adults who came with
13 her as being -- as believing her or believing in her
14 messages?
15 A.  Per witness statements, that would be correct.
16 Q.  So they were her followers, in a religious sense, is
17 that how you would describe it?
18 A.  Per witness statements, they followed her and her
19 belief system and received messages from her as to what
20 had God -- what God had told her.
21 Q.  Now, when they got to Alabama, where did they stay?
22 A.  In Alabama?
23 Q.  Yes.
24 A.  Siraj Wahhaj's property.
25 Q.  And can you describe that property briefly?

**Page 39**

1  A.  From what I've been told by other law enforcement
2  officials, there was a trailer there, Lucas Morton's, a
3  camper trailer, and they had built a shed to house goats
4  and chickens and built a tire wall around the trailer, per
5  witness statements.
6  Q.  And how high was this trailer wall, to your
7  understanding?
8  A.  I do not know how high it was in Alabama.
9  Q.  Did this residence in Alabama resemble in any way the
10 residence that they had in Amalia, New Mexico?
11 A.  Per law enforcement statements, the individuals who
12 witnessed in Alabama, who had seen pictures of the one in
13 New Mexico, they said it was very similar.
14 Q.  Was a search ever conducted of the property in
15 Alabama?
16 A.  Yes.
17 Q.  Were there any materials that were located on that
18 property -- well, scratch that.  How long were they in
19 Alabama?
20 A.  Approximately three weeks, to the best of my
21 knowledge.
22 Q.  During the time that they were in Alabama, were they
23 involved in a car accident?
24 A.  Yes.
25 Q.  And that car accident involved whose car?

**Page 40**

1  A.  Jany Leveille's car.
2  Q.  Okay.  And who was in the vehicle at the time that
3  they were in the accident?
4  A.  Siraj Wahhaj, Jany Leveille, A.G., F.L., J.L. and
5  four other children.
6  Q.  And was it a roll-over accident?
7  A.  Yes.
8  Q.  Was the car totaled?
9  A.  To my knowledge, yes.
10 Q.  Did someone come to pick them up in another car?
11 A.  Yes.
12 Q.  Or another vehicle?  You said yes?
13 A.  Yes, sir.
14 Q.  Okay.  And what kind of vehicle was that?
15 A.  A box truck.
16 Q.  All right.  Can you describe the box truck?
17 A.  Similar to what you might see a U-Haul moving van.
18 Q.  And who came in that truck?
19 A.  Lucas Morton.
20 Q.  And did they leave with him in that truck?
21 A.  Yes.
22 Q.  Did they take their possessions?
23 A.  Yes.
24 Q.  Do you know what possessions they took with them?
25 A.  Per witness statements of that event, several

**Page 41**

1  firearms, to include the 11 firearms being in Jany
2  Leveille's truck, were being passed to the box truck
3  through the cab.
4  Q.  Was there an Alabama State Police Report describing
5  what occurred at the time of the accident --
6  A.  Yes.
7  Q.  -- and can you describe the relevant portions of
8  that?
9  A.  The Alabama Police Report described weapons being
10 passed from Siraj Wahhaj, I believe is who it states, to
11 -- through the -- passing weapons through the cabin of the
12 box truck, through a hole into the -- cargo area of the
13 box truck, with another individual receiving those
14 weapons.
15 Q.  Do you know whether -- well, you said they were in
16 Alabama for only three weeks?
17 A.  To the best of my knowledge.
18 Q.  Do you know why they left Alabama?
19 A.  Jany Leveille received a message from God that they
20 needed to go to New Mexico.
21 Q.  And everyone followed her?
22 A.  Yes.
23 Q.  When was the accident?  What was the date of the
24 accident in Alabama?
25 A.  I cannot recall the exact date.  I believe it was in

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 42**

1  December, 2017.
2  Q.  Does December 13th ring a bell?
3  A.  Potentially, yes.
4  Q.  Was it -- it was at or about that time, to your
5  understanding?
6  A.  Correct.
7  Q.  And they drove to New Mexico.  Is that right?
8  A.  Yes.
9  Q.  Do you know what states they passed through?
10  A.  Yes.
11  Q.  How do you know that?
12  A.  Per Jany Leveille's book.
13  Q.  Do you know about how many days it took to go from
14  Alabama to New Mexico?
15  A.  It doesn't state how many days, it just said that
16  they were ordered to drive as expeditiously as possible.
17  Q.  Okay.  So they arrived in New Mexico, based on your
18  best estimate, when?
19  A.  Approximately December, 2017.
20  Q.  Did they arrive with all the same people that left
21  Alabama?
22  A.  Yes.
23  Q.  And that included who?
24  A.  A.G., the other children -- other 11 children, and
25  the five of the defendants here.

**Page 43**

1  Q.  And after they arrived in New Mexico, did they
2  continue performing this religious ritual that you
3  previously described as ruqya on A.G.?
4  A.  Yes, sir.
5  Q.  Did you ever come across any information describing
6  what Jany Leveille and Siraj Wahhaj's beliefs were
7  regarding medication?
8  A.  Yes, sir.
9  Q.  And what were those beliefs?
10  A.  Siraj Wahhaj did not believe in giving medication.
11  He did not believe in receiving medication and that came
12  from Hakima Ramzi.  Hakima Ramzi stated that he never gave
13  A.G. any of his medication, nor took any medication with
14  him to New Mexico.  Jany Leveille, in her book, describes
15  medication as being a tool used to suppress the Muslim
16  belief, I believe is how it's worded.
17  Q.  To your knowledge, did A.G. ever receive any of his
18  necessary medication during the time that he was in New
19  Mexico?
20  A.  No.
21  Q.  Or at any time since Jany Leveille and Siraj Wahhaj
22  took him from Georgia?
23  A.  He did not receive the medication then.
24  Q.  And can you tell us what Hakima Ramzi said about this
25  medication?

**Page 44**

1  A.  That if he did not receive his medication, he would
2  have prolonged seizures.
3  Q.  And did she say what -- did you learn from anyone
4  else what the results of that (inaudible).
5  A.  Per CYFD's forensic pediatrician and chief medical
6  professional, without these two medications, for the
7  condition that A.G. had, he would suffer prolonged
8  seizures and would most likely result in death.
9  Q.  Now, did Siraj Wahhaj or Jany Leveille, or both of
10  them, ever tell the other children what would happen if
11  anyone found out that they had A.G.?
12  A.  Per witness statements, they -- the adults agreed
13  that if they -- anyone had told what had happened to A.G.
14  that they would all go to jail.
15  Q.  Now, after they all arrived in Amalia, New Mexico,
16  did they establish a residence there?
17  A.  They did.
18  Q.  Okay.  And was there already any kind of residence
19  there?  Any kind of dwelling?
20  A.  No.
21  Q.  All right.  What did they use for a dwelling?
22  A.  A camper trailer.
23  Q.  (Inaudible.)
24  A.  And a box truck.
25  Q.  Okay.  About how big was this camper trailer?

**Page 45**

1  A.  22 to 24 feet.
2  Q.  Okay.  And how many bedrooms did it have in it?
3  A.  One bedroom and one bunk room.
4  Q.  And -- and you've seen this?
5  A.  I've seen pictures of the inside of the trailer.  I
6  have not seen a picture of the bunk room.
7  Q.  And you say they also lived in the box truck?
8  A.  Yes, Lucas Morton's family.
9  Q.  And again, about how big was this box truck?
10  A.  I could not say the exact feet, but approximately 20
11  feet, maybe smaller.
12  Q.  Did they have any other dwellings?
13  A.  There was also a hundred foot tunnel dug into the
14  ground.
15  Q.  Did anyone live in there (inaudible).
16  A.  No one, I believe, slept overnight in there.
17  Q.  Okay.  So they all -- all 17 of them lived in this 22
18  foot trailer and the box truck.  Is that your
19  understanding?
20  A.  Yes.
21  Q.  Okay.  And can you describe the residence that they
22  established there over, it must have been at least a
23  couple months that they set it up.  Is that your
24  understanding?
25  A.  Yes, sir.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 46**

1  Q.  All right.  And can you describe it for me?
2  A.  A hole was dug into the ground.  The camper trailer
3  was placed into the hole.  A wooden frame was built above
4  the hole and covered with tarp.  There was a tire wall
5  constructed around the camper trailer and the hole.  A
6  hundred foot tunnel was also dug adjacent to the hole that
7  the camper trailer was placed in and there was
8  approximately two rooms in there.  One A.G.'s body was
9  eventually stored in, and one that was another room used
10  for different purposes, and then there was a firing range
11  to the rear of the compound.
12  Q.  And how -- how deep was this hole that the trailer
13  was set in?
14  A.  I do not know the exact depth.  From pictures, it
15  looks to be the height of the camper trailer.
16  Q.  And the tire wall around the camper trailer, did that
17  surround the entire (indiscernible, audio skips).
18  A.  (Indiscernible, audio skips) of the camper trailer.
19  Q.  About how high was it?
20  A.  From pictures, it looks to be about five to six feet.
21  Q.  And so were the tires, like, stacked on each other?
22  A.  Yes.
23  Q.  And were the tires filled with anything?
24  A.  I cannot recall exactly what portions of the tires
25  were filled or not filled.

**Page 47**

1  Q.  Were some filled with something?
2  A.  I believe that -- I cannot recall to -- exactly what
3  they were filled with.
4  Q.  Okay.  And do you know or did you ever learn what the
5  purpose of the tire wall was?
6  A.  Per witness statements of a minor, they were for a
7  wind barrier.
8  Q.  And were they -- did it serve any other purpose?
9  A.  To my knowledge, I do not know if there was any other
10  purpose.
11  Q.  And the tunnel, what was the purpose of the tunnel?
12  A.  For storage originally, and it was later at a -- a
13  resting ground for A.G.
14  Q.  All right.  Any other purpose?
15  A.  Weapons were also stored at the end of the tunnel,
16  and it was, per witness statements, supposed to be an
17  escape route, in case law enforcement ever came.
18  Q.  And was there anything about the tunnel that to you
19  suggested that it could be used for that purpose?
20  A.  There were approximately four weapons at the end of
21  the tunnel, with magazines laying next to them, per
22  witness statements, and there was a small hole dug at the
23  end of the tunnel for the purpose of making a doorway to
24  escape.  Per witness statements, Siraj Wahhaj, Lucas
25  Morton and F.L. would fend off law enforcement at the end

**Page 48**

1  of the tunnel until the others could escape.
2  Q.  At the time that they were -- well, when they arrived
3  in New Mexico, did the firearms, to your knowledge, arrive
4  with them?
5  A.  Yes.
6  Q.  And that is based on what information?
7  A.  Witness testimony and what had been seized by Taos
8  County Sheriffs.
9  Q.  And did you ever learn where on the compound the
10  weapons were?
11  A.  Yes.
12  Q.  Where were they stored?
13  A.  Approximately four were stored in the tunnel at the
14  time the Sheriffs came.  Approximately five were in the
15  camper trailer underneath -- they were -- at the time the
16  Sheriffs came, they were on a table.  Per witness
17  statements, prior to that event, they were stored
18  underneath Siraj Wahhaj and Jany Leveille's bed.  And per
19  Taos County, during the August 3rd event, a shotgun and a
20  pistol were located behind the passenger seat of the box
21  truck.
22  Q.  Were any firearms -- I forget if you said this --
23  were any of them in the tunnel?
24  A.  Yes, they were.
25  Q.  And where in the tunnel were they?

**Page 49**

1  A.  At the end of the tunnel.
2  Q.  Were any of these firearms at all on the compound,
3  were they locked or secured in any way.
4  A.  Per witness testimony, they were not.
5  Q.  Were they freely accessible to anyone at the compound
6  at any time?
7  A.  Per witness testimony, they were -- they were readily
8  available.
9  Q.  And some of the firearms, were they staged with
10  ammunition nearby?
11  A.  Per witness testimony, yes.
12  Q.  And the purpose of that was what, per witness
13  testimony?
14  A.  For access against law enforcement.
15  Q.  So they could be loaded quickly if they were needed.
16  Is that your understanding?
17  A.  That is my understanding from witness testimony.
18       MR. IVES:  Your Honor, (inaudible), object to
19  the leading questions.
20       THE COURT:  Well, hold on, just try to not lead,
21  but he already answered, so overruled.
22  A.  Sorry.
23  Q.  (By Mr. Kraehe)  During the time that they were on
24  the compound, did -- who used the weapons?
25  A.  There were three eight-year-olds in the compound who

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 50**

1  all fired a weapon, F.L., J.L. and all the defendants had
2  been -- had used a weapon at some point or another, per
3  testimony -- per witness testimony.
4  **Q.  Okay.  And can you say what information you have that**
5  **-- to the effect that Jany Leveille used firearms during**
6  **the time that she was (inaudible)?**
7  A.  Per witness testimony, she fired an AR-15 and a
8  semi-automatic pistol on the compound.
9  **Q.  And did -- where did that witness testimony come**
10 **from?**
11 A.  Did you say who?
12 **Q.  Yeah.**
13 A.  F.L.
14 **Q.  And did she hold a weapon, according to any other**
15 **witness?**
16 A.  J.L. also described her as holding a weapon.
17 **Q.  And that was during the time --**
18 A.  In the compound in New Mexico.
19 **Q.  Okay.  Now, you said also that J.L. and F.L. fired**
20 **the weapons during the time that they were on the**
21 **compound?**
22 A.  That is correct.
23 **Q.  And you described the circumstances that they**
24 **described as (indiscernible, audio skips) weapons?**
25 A.  Per their testimony, they had received training in

**Page 51**

1  speed-loading, moving and shooting, tactical reloading,
2  room-clearing techniques, and they shot at life -- human,
3  life-like targets, per witness testimony.
4  **Q.  How frequently did they do this, per their testimony?**
5  A.  Per witness testimony, every day for approximately a
6  month after A.G. had passed.
7  **Q.  Did any other children describe this while on the**
8  **compound?**
9  A.  Three eight-year-olds had also fired a weapon.
10 **Q.  And did any witnesses tell you what the purpose of**
11 **this training was that they received on the compound?**
12 A.  Witness statements said the purpose was for defense
13 of the compound against -- to include against law
14 enforcement, as well as for an attack against corrupt
15 institutions.
16 **Q.  And tell me more about these corrupt institutions,**
17 **please.  Did you receive any additional information as to**
18 **what these corrupt institutions were?**
19 A.  Yes, they were the banking system, education system,
20 law enforcement, the FBI, and military.
21 **Q.  Did you say educational institutions?**
22 A.  Correct.
23 **Q.  And when were these attacks supposed to occur,**
24 **according to the witnesses that you talked to?**
25 A.  A.G., upon becoming Jesus Christ, after the shaitans

**Page 52**

1  were removed from his body, would instruct the group on
2  where to go to present this message.  The message would be
3  delivered by Jany Leveille (indiscernible, audio skips)
4  A.G. would conduct.  If the people did not believe this
5  message, Siraj Wahhaj and F.L. were to kill or detain
6  those individuals.
7  **Q.  And this information was relayed to the children by**
8  **whom?**
9  A.  Jany Leveille.
10 **Q.  Anyone else?**
11 A.  They -- the witness statements -- the adults all knew
12 what the plan was after A.G. became Jesus Christ.
13 **Q.  Did Jany Leveille convey these prophesies or plans or**
14 **whatever you want to call them to anyone other than the**
15 **children?**
16 A.  She described those plans to the other four
17 defendants here.
18 **Q.  Did she intimate these plans to anyone other than the**
19 **defendants and the children on the compound?**
20 A.  Per her book, she would tell people along their
21 route, from Georgia to New Mexico, that she is the mahdi
22 and read them a message from the Quran that was specific
23 to them.  And in addition, her brother in Haiti, to
24 include his two wives, also believe in the ideology of the
25 defendants here.

**Page 53**

1  **Q.  Did, to your knowledge, Jany Leveille or any of the**
2  **other five defendants write a letter to anyone?**
3  A.  Per witness statements, Jany Leveille wrote a letter
4  to her -- to Siraj Wahhaj's brother, Mohammed Wahhaj.
5  **Q.  And what did this letter state?**
6  A.  It stated, bring all your weapons to New Mexico.  You
7  will see Jesus in approximately four months.
8  **Q.  And did it mention martyrdom?**
9  A.  It did.
10 **Q.  Did it mention righteous?**
11 A.  Yes, sir.
12 **Q.  Do you know whether Jany Leveille or Siraj Wahhaj or**
13 **any of the other defendants attempted to recruit other**
14 **people to their -- to their cause?**
15 A.  Per Jany's book, she had attempted to recruit certain
16 individuals along the way to come here and to include a
17 few other individuals, per statements from witnesses,
18 Siraj Wahhaj wanted to gather an army to conduct -- or to
19 train them how to conduct a jihad.
20 **Q.  And you just used the word "jihad," did someone use**
21 **that word, a witness?**
22 A.  Yes.
23 **Q.  All right.  And who was that witness?**
24 A.  F.L.
25 **Q.  Do you know whether Jany -- do you know whether all**

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

Page 54

1  the defendants who were on the compound in Amalia, were
2  they there voluntarily?
3  A.  Yes, sir.  At one point, Subhanah Wahhaj attempted to
4  leave, but was told that Allah would smite her and that
5  came from Jany's book, to the best of my knowledge.
6  Q.  Did the defendants all have different roles at the
7  compound?
8  A.  Per witness testimony, all five defendants had a role
9  after A.G. became Jesus Christ.
10  Q.  And what were their roles?
11  A.  Hujrah was supposed to be supervisor of Amalia.
12  Siraj Wahhaj was supposed to be an enforcer, along with
13  F.L. and protector of Jany.  Lucas Morgan was supposed to
14  be a mentor of young men.  And J.L. was supposed to be a
15  scholar.
16  Q.  And did you say what F.L. was supposed to be?
17  A.  An enforcer.  As I said earlier, when they would go
18  to deliver a message, those who did not believe, F.L. and
19  Siraj Wahhaj would kill or detain and F.L. was part of
20  that plan.  And Subhanah Wahhaj was supposed to be -- take
21  care of the household.
22  Q.  And did they also play these roles during the time
23  they were in Amalia?
24  A.  Can you repeat the question?
25  Q.  Did they also perform these functions during the time

Page 55

1  they were in Amalia?
2  A.  I know that F.L. and Siraj Wahhaj conducted several
3  different trainings.  I know that Subhanah Wahhaj was
4  instructed to take care of the household.
5  Q.  And who was the leader of the household, of this
6  small community in Amalia?
7  A.  Per witness statements, Jany Leveille.
8  Q.  And Jany Leveille was from where?
9  A.  Haiti.
10  Q.  And do you have any knowledge regarding her
11  immigration status?
12  A.  Per Immigration Enforcement agency, she's been out of
13  status for approximately 20 years.
14  Q.  And to your knowledge, is she unlawfully and
15  illegally in the United States?
16  A.  Yes, sir.
17  Q.  And was she -- she has been illegally and unlawfully
18  in the United States since when?
19  A.  For approximately 20 years.
20  Q.  Now earlier we talked about the ruqya, the rituals
21  that were being performed on -- on (minor's name - A.G.).
22  Did those continue after the group arrived in Amalia?
23  A.  Yes.
24  Q.  How long did they continue?
25  A.  Until A.G. died.

Page 56

1  Q.  And that was -- how long?
2  A.  Per Jany's book, it says December 24th.
3  Q.  And did you receive conflicting information from the
4  other witnesses as to when that occurred?
5  A.  F.L. stated that he believes it occurred in February,
6  2018.
7  Q.  And just looking at the timeline of when the accident
8  was in Alabama and how long they stayed in Alabama, do you
9  -- do you have any belief as to when it was that they --
10  when A.L. died?
11  A.  It's hard to determine a timeline, because there's
12  certain gaps we have not filled yet.  But if leaving -- if
13  they left Alabama on December 10th and per her book, they
14  were there for three weeks -- or left Georgia on December
15  10th, and per her book, were there for three weeks, it
16  would (indiscernible, audio skips) 24th that they arrived
17  in New Mexico.
18  Q.  Okay.  And did any witnesses say for what period of
19  time they continued to perform this ritual on A.G.?
20  A.  Between five and 12 hours a day, every day until A.G.
21  died.
22  Q.  And that was how many days?
23  A.  I don't recall the exact amount of days.
24  Q.  Okay.  And is there a description from anyone as to
25  the circumstances that occurred when A.G. died?

Page 57

1  A.  Yes.
2  Q.  Can you describe that, please.
3  A.  A.G. was crying during the ritual on the day that he
4  died.  He was being held down by Siraj Wahhaj.  He had a
5  hand placed on his forehead.  He began to excrete white
6  slime or foam from his mouth.  Siraj Wahhaj put his head
7  on his chest and determined that his heartbeat was faint.
8  He was ordered by Jany Leveille to continue the ritual, as
9  that was only a test from God.  And several hours later,
10  after the ritual -- or during the rituals, Siraj Wahhaj
11  put his head on A.G.'s chest and it was determined that
12  his heart had stopped.
13  Q.  And was there any testimony or statement from any
14  witness that A.G. was choking?
15  A.  Per witness statements, when A.G. had these rituals
16  performed on him, and had white slime coming out, he
17  exhibited signs that he was choking.
18  Q.  And did any witnesses ever state that Siraj Wahhaj
19  put his hands on A.G.'s neck at any time during these
20  rituals?
21  A.  Witness statements described Siraj Wahhaj putting his
22  hand on A.G.'s neck to lift his head and pour -- and per
23  additional child, an eight-year-old, she felt like she was
24  choking when the ritual was being conducted on her as
25  well.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 58

1  Q.  And just to be clear, was this ritual performed on
2  any children other than A.G.?
3  A.  Yes.
4  Q.  How many other children?
5  A.  To the best of my knowledge, approximately
6  (indiscernible, audio skips) to the best of my knowledge.
7  Q.  And have they described how they felt when this
8  ritual was performed on them?
9  A.  This particular eight-year-old described that she was
10  very scared and that she felt like she was choking.  When
11  asked if she could breathe, she says she could breathe,
12  but that she felt that she was choking.
13  Q.  And where in the residence was the ritual performed,
14  according to witness statements?
15  A.  Per witness statements, the ritual was performed on
16  A.G. in the bedroom.
17  Q.  In the trailer?
18  A.  In the camper trailer.
19  Q.  And to your knowledge, were all the other adults
20  present when these rituals were occurring?
21  A.  Siraj Wahhaj was in the room with A.G., Jany Leveille
22  was in the kitchen adjacent to the living room, and F.L.
23  was also in the living room, which was adjacent to the
24  bedroom.
25  Q.  Was there anyone who was an eye-witness to the death

## Page 59

1  of A.G., other than Siraj Wahhaj?
2  A.  J.L.
3  Q.  All right.  Is your description based largely on his
4  account?
5  A.  Yes.
6  Q.  Is it also based on -- well, who -- who's -- who
7  else's account was it based on?
8  A.  Jany Leveille recounted the day on December 24th of
9  the events I had described previously.
10  Q.  And she said it occurred on December 24th, but you
11  don't know whether that's true?
12  A.  Correct.
13  Q.  What happened after A.G. died?
14  A.  Jane Leveille told Hujrah Wahhaj and Subhanah Wahhaj
15  what had happened and per her book, they went on
16  conducting the various tasks that they were conducting
17  during this ritual.  After that, A.G. was wrapped in a
18  sheet and placed underneath the bed.
19  Q.  Did Jany Leveille ever say what would happen with
20  A.G.?
21  A.  After this event occurred, she went to the Quran,
22  received a message that A.G. would be resurrected as Jesus
23  Christ.
24  Q.  Did she say when he would be resurrected as Jesus
25  Christ?

## Page 60

1  A.  Approximately four months, I believe, is the
2  timeline.
3  Q.  And that would correspond, more or less, to what
4  date?
5  A.  Per witness testimony, April 1st of 2018.
6  Q.  Which was?
7  A.  Easter.
8  Q.  And what did they do with A.G.'s body after he died?
9  A.  They wrapped him a sheet and placed him under the bed
10  in the storage container that's under the camper trailer's
11  bed.
12  Q.  Did they take him out after that?
13  A.  Yes, he was eventually moved to the tunnel, once his
14  body began to smell.
15  Q.  How long was he kept in the trailer?
16  A.  Per witness testimony, it was a few months.
17  Q.  And would he be taken out periodically?
18  A.  Yes.
19  Q.  According to witness testimony, how often would he be
20  taken out?
21  A.  At a point that his body began to emit an odor, Siraj
22  Wahhaj and F.L. would take the body out approximately
23  every other day to wash the body.
24  Q.  And F.L. is a child?
25  A.  Yes.

## Page 61

1  Q.  How old?
2  A.  15.
3  Q.  Was any other child forced to wash the body of A.G.?
4  A.  J.L. at one point had washed the body as well.
5  Q.  Did they do this willingly?
6  A.  F.L. said that he was ordered to do it.
7  Q.  And was that as a consequence of anything he had
8  done?
9  A.  At one point, he said it was punishment, but at
10  another point, he said it was a learning experience.  He
11  was told that it was a learning experience.
12  Q.  And they continued to wash this body for how long
13  after it had -- after A.G. had died?
14  A.  Several months, until it became warmer outside, is
15  how it was described to me.
16  Q.  And during this period, did the body decompose?
17  A.  Yes.
18  Q.  And where did they place the body after these several
19  months had passed?
20  A.  In a room in the tunnel, because it was cooler in
21  there and would prevent the body from decomposing further.
22  Q.  And what else was kept in that tunnel?
23  A.  Weapons.
24  Q.  Anything else?
25  A.  Several materials -- I believe it was several

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 62**

1    personal records and including a journal that had the
2    front page on it called, "Phases of a Terrorist Attack."
3    It was approximately 11 pages.
4    Q.  Did they ever bury the child?
5    A.  In what sense?
6    Q.  Did they dig a hole and bury it?
7    A.  The child was only placed in that tunnel after being
8    moved from the trailer.
9    Q.  Would -- would people use that tunnel during the time
10   this child was there?
11   A.  Yes, many children would play in that tunnel, per
12   their statements.  They would use that tunnel to play as
13   well.
14   Q.  During the time that rituals were performed on A.G.,
15   when he was alive, did he exhibit signs of distress?
16   A.  Per witness testimony, he would usually be screaming
17   and crying and would usually have white (indiscernible,
18   audio skips).
19   Q.  Would anything happen with his eyes?
20   A.  They would roll back, per witness testimony.
21   Q.  And how long did these rituals last?
22   A.  Between six and 12 hours in New Mexico, every day.
23   Q.  To your knowledge, did any of the adults ever call
24   any law enforcement?
25   A.  Per Taos County Sheriff's investigation, no 911 calls

**Page 63**

1    were placed in and around that time period.
2    Q.  Did they ever call any medical personnel?
3    A.  No.
4    Q.  Call EMS?
5    A.  No.
6    Q.  Did they call any authorities whatsoever?
7    A.  No.
8    Q.  Did anyone ever do anything (indiscernible, audio
9    skips).
10   A.  To the best of my knowledge, from Jany's book, that
11   was not connected -- or no one did anything.
12          THE COURT:  Hold on.
13          MS. CONVERSE:  Your Honor, if the witness could
14   be instructed when there's an objection, to await your
15   ruling before getting out his answer?
16          THE COURT:  Yes.
17          MS. CONVERSE:  And --
18          MR. KRAEHE:  I'll withdraw the question, Your
19   Honor.
20          THE COURT:  Okay, but go ahead.  Is there
21   (indiscernible, audio skips).
22          MS. CONVERSE:  (Indiscernible, audio skips)
23   inflammatory.
24          THE COURT:  So, you may not have heard the
25   objection, it was very soft, but when there's an

**Page 64**

1    objection, please don't continue to answer.  Wait until
2    the Court rules on the objection before you answer, if I
3    allow it.  Okay?
4    A.  Yes, ma'am.
5          THE COURT:  All right, go ahead.
6    Q.  (By Mr. Kraehe)  To your knowledge, did any of the
7    defendants ever have any employment while they were in New
8    Mexico?
9    A.  To the best of my knowledge, no.
10   Q.  And do they have any family in New Mexico, other than
11   themselves?
12   A.  To the best of my knowledge, no.
13   Q.  Do they have any ties at all in the community, other
14   than themselves?
15   A.  To the best of my knowledge, no.
16   Q.  Where do they have family ties?
17   A.  In Georgia and New York.
18   Q.  Anywhere else, other than in the United States?
19   A.  To the best of my knowledge, Lucas Morton's father is
20   located in Egypt.
21   Q.  And to the best of your knowledge, has -- have any of
22   the defendants traveled to Egypt?
23   A.  Yes, Lucas Morton and Subhanah Wahhaj.
24   Q.  And do you know whether any of the defendants
25   traveled outside of the United States?

**Page 65**

1    A.  Yes, Hujrah Wahhaj has traveled to Morocco, to Saudi
2    Arabia and Haiti.
3    Q.  Any other countries?
4    A.  The United Kingdom as well.  Hujrah Wahhaj also
5    traveled to the United Kingdom with Siraj Wahhaj.
6    Q.  Do you know if Jany (indiscernible, audio skips).
7    A.  Her statements from her brother in Haiti.  He made
8    statements, too, that the group still believes that
9    Subhanah Wahhaj's child is unborn will be the
10   reincarnation of A.G.
11   Q.  And to your knowledge, do the defendants still
12   believe in the prophesies that Jany Leveille makes?
13   A.  To the best of my knowledge.
14   Q.  Do they still follow him and believe her?
15   A.  I cannot say, since the time that they were picked up
16   on August 3rd, as I have not had an opportunity to speak
17   to them after August 3rd.
18          MR. KRAEHE:  Your Honor, I pass the witness.
19          THE COURT:  Okay.  Who would like to
20   cross-examine first?  Do you all want to take a short
21   recess to confer?  I don't want to have duplicative
22   cross-examination, so I would suggest that, to the extent
23   that you all can confer and coordinate, that would be a
24   good idea.  How much time do you want?
25          MR. BLACKBURN:  Ten minutes, maybe, Your Honor.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

Page 66

1     THE COURT: All right. We'll take a ten-minute
2 recess.
3     COURTROOM DEPUTY: All rise.
4 (Court in recess.)
5 (Court in session.)
6     THE COURT: All right, counsel, who's going to
7 proceed with cross-examination of the witness? And Agent,
8 please come up, you're still under oath.
9     Ms. Bhalla, you may proceed.
10     MS. BHALLA: Thank you, Your Honor.
11
12     CROSS EXAMINATION
13 BY MS. BHALLA:
14 Q.  Good afternoon, Agent Taylor.
15 A.  Good afternoon.
16 Q.  Agent Taylor, you mentioned on your testimony that
17 you did a number of interviews in this case of some of the
18 witnesses, as you called it, from the compound. One of
19 those witnesses was F.L., I believe, and you identified
20 him. Could you please tell us the dates that you
21 interviewed F.L.?
22 A.  August 7th, 9th, and August 21st.
23 Q.  And who else was present at those interviews?
24 A.  August 7th, CYFD guardians brought F.L. On August
25 9th, F.L.'s foster parent and J.L. were there. And August

Page 67

1 21st, CYFD brought -- we were at CYFD on August 21st, and
2 CYFD brought F.L. to talk to me.
3 Q.  Did CYFD sit in on the interview?
4 A.  On August 21st, CYFD was observing through a two-way
5 mirror.
6 Q.  Okay. And what about on August 7th?
7 A.  On August 7th, it was myself and another agent.
8 Q.  Which other agent was present with you?
9 A.  Sam Hartman.
10 Q.  And were there any other adults present in the room,
11 either a legal guardian or a foster parent?
12 A.  No.
13 Q.  And what about on August 9th?
14 A.  Not originally, then the foster mom did come in
15 during another portion of the interview.
16 Q.  Okay. And when -- how old was F.L., can you remind
17 me?
18 A.  15.
19 Q.  15? Okay. So, for at least the first interview,
20 F.L. was interviewed by two agents on August 7th, with no
21 legal guardian present. Is that correct?
22 A.  CYFD brought F.L., but in the room, no.
23 Q.  And there was no CYFD or other legal guardian
24 present during the interview on August 21st. Is that
25 correct?

Page 68

1 A.  CYFD was observing through the two-way window, but
2 they were not (indiscernible, audio skips).
3 Q.  And on August 9th, a foster parent was present?
4 A.  For a portion of the interview.
5 Q.  The first portion or the second portion?
6 A.  It was for clarifying questions at the end of the
7 interview.
8 Q.  Okay. And, so the foster parent was only present for
9 the end of the interview. Is that correct?
10 A.  Correct.
11 Q.  Okay. How long did each of these interviews last?
12 A.  August 7th, approximately a few hours. We took
13 breaks. And August 9th, was approximately one to two
14 hours. And August 21st, was approximately one to two
15 hours as well.
16 Q.  Were each of these interviews recorded?
17 A.  Yes.
18 Q.  Okay. And where did the interviews take place?
19 A.  On August 7th, it was at the FBI space in Santa Fe.
20 Q.  I'm sorry, the FBI what?
21 A.  The FBI office in Santa Fe.
22 Q.  Okay. Thank you.
23 A.  On August 9th, it was at CYFD in Taos. And on August
24 21st, it was also at CYFD in Taos.
25 Q.  Okay. And you mentioned that you also interviewed

Page 69

1 another witness from the compound, J.L. Is that correct?
2 A.  Yes, ma'am.
3 Q.  Okay. And what dates did you interview J.L.?
4 A.  August 9th and August 21st.
5 Q.  Okay. And how old is J.L.?
6 A.  13.
7 Q.  13? And where did the interview on August 9th take
8 place?
9 A.  CYFD Taos.
10 Q.  And who else was present in that interview?
11 A.  I was the only adult present, and then the foster mom
12 came in with the two boys, or F.L. and J.L., in the latter
13 part of the interview.
14 Q.  So at the end of -- at the end of the latter part of
15 the interview on August 9th, when the foster parent
16 stepped in, am I understanding correctly that F.L. and
17 J.L. were together?
18 A.  Yes, they both came in together with their foster
19 mom.
20 Q.  And they both answered questions together?
21 A.  Yes.
22 Q.  Okay. And that interaction was also recorded?
23 A.  Yes.
24 Q.  Audio or video?
25 A.  Audio.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

Page 70

1  Q.  Okay.  And tell me, where did the interview on August
2  21st take -- where did the interview on August 21st take
3  place?
4  A.  CYFD.
5  Q.  And were there any other adults present in the room
6  during that interview?
7  A.  CYFD was just observing through the two-way mirror.
8  No adults other than myself and a Task Force Officer.
9  Q.  And who was the Task Force Officer?
10  A.  Kim Strafella from New York.
11  Q.  Can you spell her last name for me, please?
12  A.  I will (indiscernible, audio skips) R-A-F-E-L-L-A.
13  Q.  Okay, and she's a Task Force Officer?
14  A.  Correct.
15  Q.  So a 13-year-old met with two agents at CYFD, without
16  a parental guardian present in the room.  Is that correct?
17  A.  Yes.
18  Q.  Okay.  Did you interview any other witnesses from the
19  compound that were children?
20  A.  Yes.
21  Q.  Can you please give me the initials of the children
22  that you interviewed and their ages?
23  A.  A.W., eight-year-old, eight years old.  N.W., I
24  believe the last name is W., eight years old.  And I do
25  not recall the name of the third child, but only who the

Page 71

1  child belongs to.
2  Q.  Would the government have an objection to identifying
3  who the child belongs to?
4  MR. KRAEHE:  No objection.
5  Q.  (By Ms. Bhalla)  Could you please identify who that
6  child belonged to?
7  A.  Jany Leveille.
8  Q.  And how old was that child?
9  A.  Eight as well.
10  Q.  Okay.  So the -- and those are the only other
11  children that you interviewed?
12  A.  Yes.
13  Q.  Were three eight-year-olds?
14  A.  Three eight-year-olds, 13 and 15.
15  Q.  Okay.  I want to talk to you a little bit about those
16  interviews with A.W., N.W., and Jany Leveille's child.
17  Could you please tell us when the interviews took place
18  with A.W.?
19  A.  August 22nd, I believe, is the date.
20  Q.  Okay.  Is that the only time?
21  A.  Yes.
22  Q.  Okay.  And where did that interview take place?
23  A.  CYFD.
24  Q.  And who was present in the room for that interview?
25  A.  Kim Strafella, a forensic -- child forensic

Page 72

1  interviewer and CYFD was observing through a two-way
2  mirror.
3  Q.  So you -- so let me make sure I understand this.  So
4  you and Officer Strafella -- is that how you say it?
5  A.  Detective Strafella.
6  Q.  Detective Strafella were present in the interview
7  room, but there was no legal guardian or a parent
8  accompanying the eight-year-old child.  Is that correct?
9  A.  CYFD was observing through a two-way mirror and there
10  was no other guardian inside the room.
11  Q.  How long did that interview last?
12  A.  I believe it was approximately 40 minutes.
13  Q.  Was that -- was that encounter recorded?
14  A.  Yes.
15  Q.  Okay.  Audio or video?
16  A.  Audio.
17  Q.  What about the interview with N.W., when did that
18  take place?
19  A.  August 22nd as well.
20  Q.  And is it the same situation that you and Detective
21  Strafella were in the room?
22  A.  Correct.
23  Q.  And there were no adults present in the room with the
24  minor child?
25  A.  Correct.

Page 73

1  Q.  And how long did that interview last?
2  A.  I do not recall exactly, but I believe it was under
3  an hour.
4  Q.  And was that encounter recorded?
5  A.  Yes, ma'am.
6  Q.  Audio or video?
7  A.  Audio.
8  Q.  Okay.  And this interview also took place at CYFD in
9  Taos?
10  A.  Yes, ma'am.
11  Q.  Who transported the children to the interview?
12  A.  I'm not exactly sure.
13  Q.  Okay.  And when did you interview Jany Leveille's
14  eight-year-old child?
15  A.  August 22nd as well.
16  Q.  Same day?
17  A.  Yes, ma'am.
18  Q.  Okay.  Is it the same set of circumstances, Detective
19  Strafella and you were alone in the room with the minor
20  child?
21  A.  Yes, child forensic interviewer Strafella was also
22  present in the room, no other adults.
23  Q.  Okay.  And how long did that interview last?
24  A.  I believe it was the same timeframe, but I don't
25  remember the exact time.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 74

1    Q.  And was it also audio-recorded?
2    A.  Audio-recorded, yes.
3    Q.  Okay.  Does that encompass all of the interviews of
4 the minor children that you've taken in this case?
5    A.  To the best of my knowledge, yes.
6    Q.  Okay.  I want to move forward a little bit to your
7 testimony about when the defendants left Georgia.  You
8 prepared a number of Affidavits for search warrants in
9 this case.  Do you recall that?
10    A.  Yes, ma'am.
11    Q.  Okay.  I believe that one was filed on August 16th.
12 Is that correct?
13    A.  I don't recall the exact dates.
14    Q.  Does it sound about right?
15    A.  Approximately, yes.
16    Q.  Would it help to refresh your memory if I handed you
17 a stack of your Affidavits for search warrants?
18    A.  Sure.
19    Q.  Okay.  And then maybe you can identify the date?  May
20 I approach, Your Honor.
21        THE COURT:  You may.
22    Q.  (By Ms. Bhalla)  Does that refresh your recollection,
23 Agent Taylor, as to when --
24    A.  Yes, ma'am, it says August 16th.
25    Q.  Okay.  So one of those search warrants was prepared

## Page 75

1 on August 16th.  Is that correct?
2    A.  Yes.
3    Q.  Okay.  And another one was prepared and filed on
4 August 27th.  Is that correct?
5    A.  That's what it says.
6    Q.  Okay.  Do you have any reason to doubt that that's
7 when you filed it?
8    A.  No, ma'am.
9    Q.  And that -- and we can go through the rest of these
10 later, but is it fair to say that you relied heavily on
11 the statements that you took from F.L. and J.L. in
12 preparing these Affidavits?
13    A.  In several of the Affidavits, those testimonies are
14 there, as well as Jany's book.
15    Q.  Okay.  So it's fair to say, then, that you
16 (indiscernible, audio skips) J.L. and N.L. statements to
17 prepare your Affidavits for the search warrants?
18    A.  Yes, ma'am.
19    Q.  Okay.  I want to talk to you a little bit about your
20 testimony today.  You testified about the family -- or
21 some of the defendants leaving Georgia and traveling to
22 Alabama.  And you testified a little bit about the
23 defendants who were responsible for removing A.G. from his
24 mother's custody.  Hujrah Wahhaj was not personally
25 present when A.G. was removed from his mother, was she?

## Page 76

1    A.  From the book that I read and from testimony, Hujrah
2 Wahhaj was sent by Jany Leveille to take A.G. from Hakima
3 Ramzi.
4    Q.  Was she or was she not present?
5    A.  During that time that the child was taken?
6    Q.  Mm-hmm.
7    A.  Not to my knowledge.
8    Q.  Not to your knowledge.  Thank you.  And that's what
9 was reflected in your Affidavit for the search warrant.
10 Isn't that correct?
11    A.  To the best of my knowledge.
12    Q.  And you testified that some of the defendants
13 traveled from Georgia to Alabama.  Hujrah Wahhaj was not
14 in the car with Siraj or any of the other named defendants
15 who also had A.G. in the car.  Is that correct?
16    A.  Per Jany's book, that is what it states.
17    Q.  It -- I'm not asking you to refer to Jany's book.
18 What I'm asking you is, to the best of your knowledge, was
19 Hujrah Wahhaj present in the car with A.G. when A.G.
20 traveled from Georgia to Alabama?
21    A.  No, she was not.
22    Q.  No, she was not.  Okay.  And you also testified and
23 -- about an accident in Alabama that happened.  Is that
24 correct?
25    A.  Yes, ma'am.

## Page 77

1    Q.  Okay.  And to the best of your knowledge, Hujrah
2 Wahhaj was not present at the scene of that accident, nor
3 did she respond to the scene of that -- of that accident.
4 Is that correct?
5    A.  Right.
6    Q.  Okay.  You testified at length today about some of
7 the rituals that you describe were performed over A.G.  Do
8 you recall that testimony?
9    A.  Yes, ma'am.
10    Q.  And at no time did you testify that Hujrah Wahhaj was
11 present during those rituals, or that she performed those
12 rituals.  Is that correct?
13    A.  Correct.
14    Q.  Okay.  In one of your Affidavits, I believe it was
15 the one filed on August 16th, you provided a sworn
16 statement about what happened when law enforcement showed
17 up at the compound.  Do you recall that?
18    A.  Yes, ma'am.
19    Q.  And do you recall providing information that some of
20 the defendants were armed?
21    A.  Yes.
22    Q.  Okay.  Hujrah Wahhaj is not listed as a person who
23 was armed during that encounter, was she?
24    A.  Correct.
25    Q.  Okay.  In fact, she wasn't listed at all in that

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 78

1    encounter, was she?

2    A.  Correct.

3    Q.  After you interviewed F.L. and -- let me go back to

4    my notes. I may have this incorrect. So you interviewed

5    F.L. and J.L. again on August 21st. Is that correct?

6    A.  Yes, ma'am.

7    Q.  Okay. And after you interviewed them, you prepared

8    some additional Affidavits for search warrants. Is that

9    correct?

10    A.  Yes, ma'am.

11    Q.  Okay. One of those was a search warrant, or an

12    Affidavit -- Application for a search warrant for Google,

13    that was filed on August 27, 2018. Is that correct?

14    A.  Yes, ma'am.

15    Q.  Okay. And in that Affidavit, or in that Application

16    for a search warrant, you talked about this plan that the

17    Government alleges the defendant had to conduct some sort

18    of jihad or terrorism plot. Do you recall describing that

19    in that Affidavit?

20    A.  Not the exact words, but yes.

21    Q.  Okay. And do you recall that Hujrah Wahhaj was never

22    mentioned in that factual recitation?

23    A.  In specificity to the converting these institutions.

24    Is that what you're asking?

25    Q.  Correct.

## Page 79

1    A.  Correct.

2    Q.  Okay. You prepared another Application for a search

3    warrant on the same date, I believe, August 27th of 2018,

4    for Facebook. Do you recall that?

5    A.  Yes.

6    Q.  And again, this was an Application that you prepared

7    after interviewing F.L. and J.L. on August 21st. Is that

8    correct?

9    A.  Yes.

10    Q.  Okay. And you recount, sort of, a lot of the same

11    facts in this Application. Is that correct?

12    A.  Yes.

13    Q.  Okay. And the story doesn't change, does it?

14    A.  No.

15    Q.  Okay. So, again (indiscernible, audio skips) Wahhaj

16    was not in the vehicle that contained A.G. when he was

17    transported from Georgia to Alabama. Is that correct?

18    A.  That is correct.

19    Q.  Okay. And Hujrah Wahhaj is not mentioned at all in

20    regards to the traffic accident and the people who

21    responded to the scene in Alabama. Is that correct?

22    A.  That is correct.

23    Q.  Okay. And when you recounted the alleged conspiracy

24    by the defendants to be involved in some sort of jihad,

25    again, Hujrah Wahhaj is not mentioned in that plan, is

## Page 80

1    she?

2    A.  If you're talking about --

3    Q.  In your Application for the search warrant.

4    A.  -- if you're talking about F.L. and Siraj and Jany

5    going to certain institutions, then, no, she was not

6    mentioned in that.

7          THE COURT: Ms. Bhalla, I'm a little bit

8    concerned about where this is going. My concern being

9    that search warrant Affidavits don't always mention all

10    pertinent facts. They may only mention the facts

11    necessary to establish probable cause as to the particular

12    item that they're seeking to search and/or seize items.

13          And so, if what you're getting at with this

14    cross, is that there's no evidence, no testimony, nothing

15    to indicate that Ms. Wahhaj was involved in certain

16    things, it would be a bit more helpful for the Court for

17    you to ask the question that way, rather than whether it

18    was mentioned in a particular search warrant or not.

19          MS. BHALLA: I can clarify, Your Honor.

20          THE COURT: Okay, thank you.

21          MS. BHALLA: And I appreciate that from the

22    Court.

23          THE COURT: Okay.

24    Q.  (By Ms. Bhalla) Agent Taylor, to the best of your

25    knowledge, with the interviews you conducted, J.L. and

## Page 81

1    F.L. never indicated to you that Hujrah Wahhaj was present

2    in the car that transported A.G. from Georgia to Alabama.

3    Is that correct?

4    A.  That is correct.

5    Q.  Okay. And Hujrah Wahhaj -- you have no reason to

6    believe that Hujrah Wahhaj was present or responded to the

7    scene of the accident in Alabama. Is that correct?

8    A.  That is correct.

9    Q.  Okay. And you didn't receive any information from

10    F.L. or J.L. in your investigation of this matter that

11    Hujrah Wahhaj was present or conducted the rituals of A.G.

12    Is that correct?

13    A.  That is correct.

14    Q.  Okay. And based on your interviews of J.L. and F.L.

15    and in your investigation of this case, you have no

16    information to believe that Hujrah Wahhaj was given some

17    role in acting out this alleged jihad conspiracy. Is that

18    correct?

19    A.  Per testimony, she had a role in Amalia and was aware

20    of the overall plan.

21    Q.  She was not involved in the tactical training, was

22    she?

23    A.  No, she did fire a weapon though.

24    Q.  Well, let's talk about that. You just testified that

25    she fired a weapon on direct and you're testifying that

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 82**

1  she fired a weapon now.  Fortunately, I have some
2  transcripts of that interview, that took place on August
3  21st.  And I believe that this was with F.L., you may
4  correct me on this, but you asked, I believe, F.L.,
5  whether or not she was present in the training.  Do you
6  recall asking him that question?
7  A.  I do not recall exactly.
8  Q.  Would it refresh your recollection to review the
9  transcript?
10  A.  Sure.
11  Q.  I'm going to show this to the Government, Your Honor,
12  if I may and then may I approach?
13        THE COURT:  You may.
14        MR. KRAEHE:  No objection, Your Honor.
15  Q.  (By Ms. Bhalla)  Agent Taylor, I'd like to direct
16  your attention to Bates number 53.  I believe it's the top
17  three lines.  If you could take a moment to review that?
18  A.  I have -- I have reviewed it.
19  Q.  Okay.  And isn't it true that you asked whether or
20  not Hujrah was involved in the tactical training.  Do you
21  recall asking that question?
22  A.  Yes.
23  Q.  And the answer was no, wasn't it?
24  A.  He said, "No, it was one time she sat in for fun, but
25  that was it."

**Page 83**

1  Q.  Right.  So she didn't participate in the training,
2  did she?  According to that interview.
3  A.  According to this interview, at the tactical
4  training, correct.
5  Q.  Correct.  Thank you.  May I approach, Your Honor?
6        THE COURT:  You may.
7  Q.  (By Ms. Bhalla)  To the best of your understanding
8  and information in conducting interviews in the -- this
9  case, Hujrah Wahhaj did not arm herself in any way when
10  law enforcement showed up at the compound, did she?
11  A.  No, she did not, to the best of my knowledge.
12        MS. BHALLA:  May I have a moment, Your Honor?
13        THE COURT:  You may.
14        MS. BHALLA:  Thank you, Your Honor.  I pass the
15  witness.
16        THE COURT:  Okay.  I have a question, real
17  quick.  And so why don't you stay up here in case you have
18  any follow-up.  Was Hujrah Wahhaj living in the trailer
19  where A.G.'s body was placed and remained for some period
20  of time before he was moved into the tunnel?
21  A.  I cannot recall exactly where, but one of the -- in
22  one of the 302s or testimony talks about a bedroom being
23  hers, but I do not recall exactly where the bedroom was in
24  the trailer.
25        THE COURT:  But was she living in the trailer --

**Page 84**

1  in the same trailer that A.G.'s body was decaying for a
2  time?
3  A.  I can't -- I don't have any -- I cannot recall
4  exactly where she was living on the compound.  I know that
5  Lucas Morton's family was in the box truck.  And it was
6  described that no one else was living anywhere else, other
7  than the camper trailer, other than Lucas Morton's family.
8        THE COURT:  Do you have any follow-up questions?
9        MS. BHALLA:  I don't.  Thank you, Your Honor.
10        THE COURT:  Okay.
11
12        CROSS EXAMINATION
13  BY MS. CONVERSE:
14  Q.  Agent Taylor, towards the end of your testimony,
15  answering Mr. Kraehe's questions, you said that my client
16  was -- had entered the country on a visitor visa and had
17  been out of status for 20 years?
18  A.  I believe I said that she's been out of status for 20
19  years.
20  Q.  She entered as a 15-year-old with her mother, didn't
21  she?
22  A.  To the best of my recollection, that's what I know
23  (indiscernible).
24  Q.  And that was in 1998?
25  A.  I don't know the exact date.

**Page 85**

1  Q.  You wrote that date in your --
2  A.  It was approximately 20 years ago.
3  Q.  Okay.
4  A.  And I believe that that is the date, but I don't
5  recall from that time period.
6  Q.  And nine years after that, in 2007, she applied for
7  and received protection under the Violence Against Women
8  Act, which is a temporary immigration status, didn't she?
9  A.  I do not know -- I don't recall that exact fact.
10  Q.  You knew that she received it at some point, if not
11  in 2007?
12  A.  I know that she received -- or applied for several
13  visas during her time here, but I do not recall exactly
14  what for.
15  Q.  And she got -- your Complaint Affidavit mentions one
16  time when she applied for a renewal of employment
17  authorization, but there were actually many times when she
18  renewed that, didn't she?
19  A.  Are you talking about the arrest Complaint?
20  Q.  Yes, the Criminal Complaint, document 1 in this case.
21  A.  I did not swear to that Complaint.
22  Q.  Okay.  Were you consulted on it?
23  A.  To a degree, yes.
24  Q.  Do you believe -- is any of the information in there
25  inaccurate?

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 86

1    A. Not to my knowledge, no.
2    Q. Are you aware that she applied for renewals of her
3    employment authorization from the Immigration Service
4    repeatedly?
5    A. From the best of -- to the best of my knowledge, yes.
6    Q. And one of those times was March 3rd of 2017. Is
7    that right?
8    A. I do not know the exact date.
9    Q. Okay. If that's the date in the Complaint, would you
10   dispute that?
11   A. No.
12   Q. And if the Complaint said that that was approved by
13   the Immigration Service on April 20th of 2017, you
14   wouldn't dispute that date, would you?
15   A. I would not dispute that date.
16   Q. And a little bit after that, she filed another
17   Application for adjustment of status. Isn't that right?
18   A. I believe that's correct.
19   Q. That would be May 1st, according to the Complaint?
20   A. I would not dispute that.
21   Q. And adjustment of status is changing from a
22   non-immigrant status to a permanent resident status. Is
23   that right?
24   A. To the best of my knowledge, but I'm not an
25   immigration official. I do not know exactly how it works.

## Page 87

1    Q. And on April 16th of this year, her last employment
2    authorization expired. Is that true?
3    A. To the best of my knowledge.
4    Q. And then two months after that, her adjustment of
5    status was denied because she failed to appear for a
6    hearing. Is that right?
7    A. To the best of my knowledge.
8    Q. Do you know where the notices of that hearing were
9    sent?
10   A. I do not.
11   Q. Do you know whether they were sent to New Mexico?
12   A. I do not.
13   Q. Or Alabama?
14   A. I do not.
15   Q. So you don't have any knowledge whether she ever
16   received it?
17   A. Not to my knowledge.
18   Q. And I'd like to ask you a few questions about her
19   journal. Have you learned that some of the things in the
20   journal aren't completely accurate?
21   A. To this point, I haven't refuted any of the evidence
22   in the journal.
23   Q. You testified on direct that they left Georgia for
24   Alabama on December 10th of last year. Is that right?
25   A. That's when the missing persons report was filed. I

## Page 88

1    do not know exactly what date they left Georgia.
2    Q. You do know that the automobile accident was in --
3    was on December 13th --
4    A. Yes, ma'am.
5    Q. -- of last year. And that was in Alabama?
6    A. Yes.
7    Q. And you said that they were in Alabama three weeks
8    before they continued their journey to New Mexico?
9    A. Per Jany's book.
10   Q. Does her book indicate how long it took them to reach
11   New Mexico?
12   A. No.
13   Q. Did they fly?
14   A. No, per her book, they drove.
15   Q. So driving with 12 kids, can we assume that there
16   might have been a lot of stops involved?
17   A. I can't assume.
18   Q. Are you a father?
19   A. Yes, ma'am.
20   Q. Do you drive with your kids?
21   A. I have before, yes.
22   Q. Do your kids need to use the bathroom?
23   A. Yes, (indiscernible).
24   Q. Do they need -- do they need to stop the car to get
25   out and stretch their legs because they're bouncy, active

## Page 89

1    kids?
2    A. She's very young.
3    Q. Okay. All right. If there was a -- if they left
4    Georgia approximately December 10th, and you said they
5    were in Alabama three weeks, what would three weeks from
6    December 10th be?
7    A. December 31st approximately, (indiscernible).
8    Q. Okay. And we can assume that, even though we don't
9    know how many bathroom stops there were, there were
10   probably quite a few between Alabama and New Mexico, so
11   probably they didn't arrive in New Mexico the day after
12   they left?
13   A. I don't know.
14   Q. At any rate, it would be impossible for A.G. to have
15   died on the 24th, under that -- under the chronology as
16   laid out in Jany's book. Is that right?
17   MR. KRAEHE: Your Honor, I'll object. It calls
18   for speculation. He's already testified that he doesn't
19   know exactly when they left and how long the trip took, so
20   to say that it's impossible, I think is objectionable.
21   THE COURT: I'll -- unless I misunderstood his
22   testimony, my understanding of the testimony was that the
23   evidence demonstrated that after A.G. was taken from
24   Georgia to Alabama, they remained in Alabama for three
25   weeks?

**23 (Pages 86 to 89)**

**Page 90**

1   A. Per Jany's book, they were in Alabama for three

2   weeks.

3      THE COURT: Well, following that chronology, it

4   would be impossible, then, for them to be in New Mexico,

5   if in fact we took the statements in the book to be true.

6   So, --

7      MR. KRAEHE: If that's what she's asking, Your

8   Honor, I didn't -- I didn't understand her question that

9   way, but --

10      THE COURT: Overruled.

11      MS. CONVERSE: Thank you.

12   **Q. (By Ms. Converse) Now this journal was found on a**

13   **thumb-drive in my -- in Ms. Leveille's purse?**

14   A. Yes.

15   **Q. And you concluded it was her purse because she had --**

16   **it's the purse that she had on her on a certain date?**

17   A. On an August 3rd interview with her, yes.

18   **Q. And it was also found on a laptop. Is that correct?**

19   A. Per the New Mexico Regional Computer Forensic Lab, I

20   was told that the thumb-drive had been connected to a

21   laptop, which contained -- the majority of the materials

22   that are on that laptop belong to Jany Leveille.

23   **Q. Was that laptop password-protected?**

24   A. I am not aware.

25   **Q. So you don't know whether others could have used that**

**Page 91**

1   **laptop or not?**

2   A. I do not know.

3   **Q. You testified that there was a -- that there was**

4   **discussion of attacks on educational institutions and I'd**

5   **like to go over that with you for a few minutes.**

6   A. Sure.

7   **Q. Now that information came from interviews with J.L.**

8   **and F.L. Is that correct?**

9   A. Yes, ma'am.

10   **Q. J.L. is 13 years old?**

11   A. Yes, ma'am.

12   **Q. And when you asked J.L., about schools, his answer**

13   **was -- and I'm referring to page 50 of the version of the**

14   **transcript I have -- "they say that the schools, that**

15   **a lot of people die in schools, they get into a big fight**

16   **and people like that." Do you remember his answer?**

17   A. To some degree, I remember that answer

18   (indiscernible).

19   **Q. And you followed up with the question, "Yeah, was any**

20   **part of the plan, once Jesus came in December, was to go**

21   **to a school and get rid of those corrupt institutions?"**

22   **Do you remember J.L.'s answer being, "Oh, no."**

23   A. Yes.

24   **Q. Okay. And -- then you asked him again about the,**

25   **"Which ones? All the ones that you mentioned?" And J.L.**

**Page 92**

1   says, "No, like schools." And you say, "Yeah." And he

2   says, "No, not schools." Do you remember that answer?

3   A. To some degree, yes. Is that the August 7th -- or

4   August 9th interview with J.L.?

5   **Q. Yes.**

6   A. Okay.

7   **Q. And so you came back at him again and asked him, "Was**

8   **-- was -- was it said that there was no talk of going to**

9   **a school or anything like that?" And J.L.'s answer was,**

10   **"No."**

11   A. Correct.

12   **Q. And you asked him again, "I just want to know if**

13   **something like that was actually said," and J.L.'s answer**

14   **was, "No."**

15   A. Correct.

16   **Q. And so then you talked to the 15-year-old, F.L. about**

17   **the same thing. Is that right?**

18   A. Yes, ma'am.

19   **Q. And you asked one question about -- so someone took**

20   **an AR or an AK 47, a rifle, and F.L.'s answer was, "Yeah,**

21   **he didn't take it to go shoot the school. He took it to**

22   **go hunting in New Mexico." Do you remember that answer?**

23   A. That is in reference to a allegation that F.L. had

24   taken -- had planned to take in a -- gun into a school.

25   And when asked that question, he stated that he heard that

**Page 93**

1   from -- when his time in New Mexico in approximately

2   November 2017, and then he told me the story of where he

3   heard it from. And when he was talking to somebody else

4   about that story, that is how it was miscommunicated to a

5   foster mom, CYFD (indiscernible, audio skips).

6   **Q. In fact, he was saying that he had been talking about**

7   **an incident in the past, where a gun had been broughten**

8   **into -- brought into -- he thought it was the earthship**

9   **school.**

10   A. That is correct, yes.

11   **Q. And that that's what he was talking about and that he**

12   **also denied that there was ever any plan to go into**

13   **schools with guns?**

14   A. He denied it -- that there was ever a plan for him to

15   go into a school and conduct a school shooting.

16   **Q. All right. And according to your testimony, the --**

17   **there would be no attacks until A.G. came back to life and**

18   **gave instructions. Is that right?**

19   A. That is correct.

20   **Q. And which of the two children told you that he had no**

21   **idea what would happen if A.G. never came back to life?**

22   A. I don't recall exactly what child, since I

23   interviewed them multiple times.

24   **Q. But they -- they did -- one of the children did tell**

25   **you that -- that nothing would be set into motion unless**

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 94

1  A.G. came back to life?
2  A.  That is correct.
3  Q.  Now, you said on direct that my client admitted to
4  shooting a gun one time in Georgia.  Is that right?
5  A.  Yes.
6  Q.  And she denied ever shooting a gun in New Mexico?
7  A.  She did, yes.
8  Q.  Okay.  And regarding the accident -- car accident in
9  Alabama, you testified about guns being transferred, and
10 I believe the two people doing the transferring were Siraj
11 Wahhaj and Lucas Morton.  Do you remember that testimony?
12 A.  After the accident in Alabama?
13 Q.  Yes.
14 A.  Yes.
15 Q.  And several people were injured and taken to the
16 emergency room there.  Is that right?
17 A.  Yes, ma'am.
18 Q.  And my client was one of them?
19 A.  Correct.
20 Q.  So she wasn't even there, at that point.
21 A.  Correct.  I'd like to -- I don't know exactly when
22 she was taken to the hospital.  I do know she was in the
23 hospital that day.  I don't know exactly the time that the
24 weapons were being transferred, so.
25 Q.  And she is the one who, when FBI and everyone else

## Page 95

1  who arrived, other people who did have guns put them down
2  and surrendered peacefully to you?
3  A.  FBI wasn't there, but it was other law enforcement
4  officials, and that is correct.
5  Q.  Okay.  And finally, all -- all the children who were
6  taken from the compound are in the custody of CYFD?
7  A.  Yes, ma'am.
8  Q.  And CYFD strictly supervises conditions of
9  visitation.  Is that right?
10 A.  To the best of my knowledge.
11 Q.  So there wouldn't be any unsupervised field trips
12 with our clients where Judge Khalsa to release them?
13 A.  To the best of my knowledge.
14      MS. CONVERSE:  That's all I have.  Thank you.
15
16           CROSS EXAMINATION
17 BY MS. SIRINGANO:
18 Q.  Afternoon, agent.
19 A.  Afternoon.
20 Q.  I represent Mr. Morton.  You said initially that your
21 investigation started in 2017, correct?
22 A.  I believe I said I got involved in 2018 in June or
23 May.  I believe that's what I said.
24 Q.  May or June of 2018.  When did the entire FBI
25 investigation of my client start?

## Page 96

1      MR. KRAEHE:  Your Honor, I'm going to object to
2  the extent that that exceeds the scope of direct
3  examination.
4      MS. SIRINGANO:  Your Honor, they're one law
5  enforcement agency.  His investigation is based on earlier
6  investigation and from other law enforcement entities and
7  I'd like to know when exactly my client -- the
8  investigation started by his agency.
9      THE COURT:  Well --
10      MR. KRAEHE:  And if I could approach, Your
11 Honor?
12      THE COURT:  You can.
13      MS. SIRINGANO:  I just need a moment, Your
14 Honor.
15 (BENCH CONFERENCE - Inaudible)
16 Q.  (By Ms. Siringano)  Agent, have you ever interviewed
17 any of Mr. Morton's children?
18 A.  Yes.
19 Q.  Can you say who?
20 A.  A.W.
21 Q.  A.W.  And what date was that?
22 A.  August 22nd.
23 Q.  And A.W. is eight years old?
24 A.  Yes, ma'am.
25 Q.  Okay.  And was a parent or guardian, or excuse me a

## Page 97

1  guardian, present during that interview?
2  A.  CYFD was watching through a two-way mirror.
3  Q.  And the property where the home was built, Mr. Morton
4  had adjacent property in that area, correct?
5  A.  From what I know, he had lot 29 and they constructed
6  the property on lot 28.
7  Q.  And he was in the process of negotiating with the
8  landowner at that time, to have some kind of a land swap,
9  correct?
10 A.  I know that they negotiated the process and from the
11 best of my knowledge, it was denied.
12 Q.  It was denied?  Okay.  You're aware that Mr. Morton
13 was -- had taken a class and he was building an earthship
14 out there on that property?
15 A.  (Indiscernible, audio skips) from what I -- witness
16 testimony, in November, 2017, on how to build earthships.
17 Q.  Okay.  And the materials that were out there are
18 commonly used in building earthships, correct?
19 A.  I honestly don't know exactly what is used to build
20 an earthship.
21 Q.  Tires, the wood pallets, recycled materials, that was
22 all present --
23 A.  Those materials were there, yes.
24 Q.  Yes.  And Mr. Morton was trying to build an earthship
25 also in Alabama, correct?

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 98

1    A.  I know that he built a similar prop -- similar
2  structure in Alabama.
3    **Q.  And he's a union carpenter as his trade, correct?**
4    A.  To the best of my knowledge, I believe that is
5  correct.
6    **Q.  And he was out with a disability, an injury, an**
7  **employment injury when he came to New Mexico, yes?**
8    A.  I do not know that, no.
9    **Q.  And turning to December 13, the accident in Alabama,**
10  **you testified that he came to pick up the family in his**
11  **truck, correct?**
12    A.  That's per the Alabama Police Report, yes.
13    **Q.  Right.  And the Alabama Police Report noted that the**
14  **police didn't take any of the personal property of Mr.**
15  **Wahhaj or any of his firearms, correct?**
16    A.  That is correct.
17    **Q.  The guns in Georgia were not illegal, correct?**
18    A.  Yes, that is correct.
19    **Q.  And the guns were loaded in and the police let them**
20  **be loaded off the scene of the accident, correct?**
21    A.  That is correct.
22    **Q.  You testified that a search warrant (indiscernible,**
23  **audio skips) on Mr. Wahhaj's property in Alabama?**
24    A.  That is correct.
25    **Q.  When was that?**

## Page 99

1    A.  I don't recall the exact date.
2    **Q.  Can you give me a month?**
3    A.  I believe it was in a month or two -- I believe it
4  was in the last 30 days.
5    **Q.  Did you have a copy of that warrant?**
6    A.  I do not have a copy of that warrant with me.  I know
7  that it was conducted by the Mobile division.
8    **Q.  What were they searching for?**
9    A.  Any items that would be related to the -- the offense
10  of 12-01, I believe it was, but I do not remember.  I
11  don't have the search warrant on -- I haven't seen it
12  myself.
13    **Q.  Okay.  But you're able to get a copy, correct?**
14    A.  I could get a copy, yes.
15    **Q.  And what's a 12-01 offense?**
16    A.  12-01 is a kidnapping offense.
17    **Q.  Okay.  And you'll provide the defense with a copy of**
18  **that, since you referred to it?**
19        MR. KRAEHE:  Objection, it's not his job to
20  provide the defense with anything.  It's my job, Your
21  Honor.
22        MS. SIRIGNANO:  Well, presumably, through the
23  Government?
24        THE COURT:  Well, that would be a better
25  question to ask Mr. Kraehe, and he's not on the witness

## Page 100

1  stand, so.
2        MS. SIRIGNANO:  Thank you, Your Honor.
3        THE COURT:  Sustained.
4    **Q.  (By Ms. Sirignano)  So Mr. Morton wasn't present**
5  **during any of these alleged rituals on A.G., correct?**
6    A.  I only know of the ones that occurred in New Mexico,
7  who was present.  I do not know the totality of who was
8  present during all the rituals.
9    **Q.  Okay.  So let's start with New Mexico.  He wasn't**
10  **present during any of the rituals in New Mexico, correct?**
11    A.  Per witness testimony, yes.  No, he was not, I mean,
12  like, yes to your question.
13    **Q.  And so in Alabama or Georgia, are you aware of any**
14  **evidence that --**
15    A.  I have no evidence at this time.
16    **Q.  Okay.  And Lucas Morton didn't own any of the weapons**
17  **that were allegedly on the compound, correct?**
18    A.  I cannot recall exactly which -- if he did or did not
19  own those weapons.
20    **Q.  Have you traced these weapons?**
21    A.  They have, it's within the case file, but I can't
22  recall exactly if he did or did not own those weapons.
23    **Q.  Would a document reflect your recollection for that?**
24    A.  Sure.
25        MS. SIRIGNANO:  May I approach, Your Honor?

## Page 101

1        THE COURT:  You may.
2    **Q.  (By Ms. Sirignano)  I'm handing you page 8 of the**
3  **Affidavit to the Criminal Complaint.  Can you take a look**
4  **at that?**
5    A.  I reviewed it.
6    **Q.  And does that reflect your recollection of whether**
7  **any of these weapons were owned by Mr. Morton?**
8    A.  This is factual and his name is not mentioned as
9  owning the weapons that are listed on page 8.
10        MS. SIRIGNANO:  So, may I approach, Your Honor?
11        THE COURT:  You may.
12        MR. KRAEHE:  No objection, Your Honor.
13    **Q.  (By Ms. Sirignano)  (Inaudible) take a look at the**
14  **FBI 302 dated August 21st, of this year, regarding the**
15  **weapons.**
16    A.  I'm looking at it.
17    **Q.  Does that document detail Mr. Morton owning any**
18  **weapons found on the compound?**
19    A.  No, it does not say his name here.
20    **Q.  Thank you.  So it's fair to say he did not own any of**
21  **those weapons, correct?**
22    A.  Per that document, correct.
23    **Q.  This is a FBI document, correct?**
24    A.  Correct.
25    **Q.  And the day that he was arrested, Mr. Morton was not**

**26 (Pages 98 to 101)**

## Page 102

1  armed, correct?
2  A.  Per testimony, or per the Taos County Sheriffs when
3  they approached, Siraj and Lucas Morton were at the box
4  truck.  Siraj ran to the compound.  Lucas Morton was on
5  the passenger side of the vehicle, trying to reach
6  something.  He came out unarmed.  After a search was
7  conducted, a shotgun and a pistol were located behind the
8  passenger seat of the box truck, per Taos County.
9  Q.  And so he was unarmed when he was arrested, correct?
10  A.  Correct.
11  Q.  When you interviewed the children, a few -- the
12  13-year-old and the 15-year-old, I believe -- initially
13  denied seeing A.G. in New Mexico, correct?
14  A.  That is correct.
15  Q.  So, initially, their statements to law enforcement
16  were untrue, correct?
17  A.  That would be correct.
18  Q.  You testified that the family didn't have any
19  community support -- I'm paraphrasing here -- that they
20  were out there all by themselves, correct?  On direct
21  examination, that's what you testified, more or less?
22  A.  That they had no other family in New Mexico, is that
23  what you're asking?
24  Q.  Yes.
25  A.  To the best of my knowledge.

## Page 103

1  Q.  But they did have contact with neighbors, correct?
2  A.  Yes.
3  Q.  Okay.  And that -- in fact, they had support from
4  some of their neighbors by providing them with firewood in
5  the wintertime, water, helping with attaching the solar
6  panel, and electrical components, to get their house
7  running, correct?
8  A.  That is correct.
9      MS. SIRIGNANO:  That's all I have, Your Honor.
10
11         CROSS EXAMINATION
12  BY MR. IVES:
13  Q.  Good afternoon, Agent.
14  A.  Afternoon, sir.
15  Q.  Now, do you remember testifying when Mr. Kraehe was
16  asking you questions earlier, that Mr. Wahhaj believed
17  that A.G. was not alive, when in fact he was alive?
18  A.  I don't remember specifically saying Mr. Wahhaj.  I
19  remember saying that in Jany Leveille's book, that the
20  Quran said he was never alive, he was just being animated
21  through jinns and shaitans.
22  Q.  But you don't have any evidence today that Mr. Wahhaj
23  actually believed that, do you?
24  A.  I do not have any evidence to say that that was said
25  by him.

## Page 104

1  Q.  Said or believed, right?
2  A.  Correct.
3  Q.  He didn't write anything suggesting he agreed?
4  A.  Correct.
5  Q.  He never told anybody he agreed, to your knowledge?
6  A.  All I know, per the Haitian brother, is that the --
7  the defendants here believed in the ideology of Jany
8  Leveille.
9  Q.  You know that from whom?
10  A.  The Haitian brother of Jany Leveille and witness
11  statements from J.L. and F.L.
12  Q.  And when you say the ideology, what do you understand
13  that to mean?
14  A.  That she is the mahdi, the prophet, she translates
15  the messages from God and distributes them to the group.
16  Q.  But nothing specific to A.G.'s -- whether A.G. was
17  alive or not alive at any given point in time?
18  A.  Correct.
19  Q.  You testified earlier about the ruqya ritual,
20  correct?
21  A.  Yes.
22  Q.  And you described that as saying prayers and putting
23  a hand on the child's forehead, correct?
24  A.  In many occasions, that is what occurred.
25  Q.  You don't have any evidence sitting here today to

## Page 105

1  suggest that my client, Mr. Wahhaj, touched the child in a
2  violent manner at any time?
3  A.  Are you referring to A.G.?
4  Q.  Correct.
5  A.  As was described to me, he was holding him down and
6  put his hand on his forehead and cited different verses
7  from the Quran.
8  Q.  Okay.  So that's a "no," to my question?  You don't
9  have any evidence that my client acted in any violent
10  manner toward A.G.?
11  A.  I guess it would be -- (indiscernible) -- I'm trying
12  to interpret what you think is violent.  I'm describing
13  what witness -- witnesses told me what had occurred that
14  day.
15  Q.  Did any of the witnesses tell you that A.G. suffered
16  any (indiscernible, audio skips) by my client?
17  A.  He was only crying and screaming during those events,
18  and had white foam come out of his mouth during those
19  rituals.
20  Q.  Okay.  So is it your testimony today that my client's
21  saying prayers and touching a child's forehead caused him
22  to suffer from the symptoms that you just described?
23  A.  I'm not saying that.
24  Q.  All right.  Do you have any basis for saying what
25  caused A.G. to suffer from those symptoms?

27 (Pages 102 to 105)

1    A.  Per CYFD forensic pediatrician, that his denial of
2    the -- to medications would result in prolonged seizures
3    and eventually death.
4    **Q.  So -- so your testimony today is that -- that was**
5    **based on the seizures, not based on any physical harm that**
6    **my client caused as a result of touching the child during**
7    **this religious ritual?**
8         MR. KRAEHE:  Your Honor, I think he needs to
9    clarify whether it's his opinion or if he's recounting the
10   medical opinion of someone else.  He's not a physician.
11   He's not a forensic pathologist.  He can -- he's not
12   qualified to offer an opinion as to cause of death.
13        MR. IVES:  Sure, I can rephrase it.
14        THE COURT:  All right.  Go ahead and rephrase
15   it, sustained.
16   **Q.  (By Mr. Ives)  So you were just testifying that you**
17   **were relying on a physician for the information that**
18   **you're providing to the Court regarding the cause -- the**
19   **essential cause of A.G.'s symptoms during the ritual,**
20   **right?**
21   A.  Taos County had consulted their physician and that is
22   the information that they received from that physician.
23   **Q.  And that physician never provided any information to**
24   **suggest that the ritual itself, the touching of the**
25   **child's forehead and the saying of prayers in the presence**

1    of the child, caused any physical harm to the child.
2    A.  Correct.
3    **Q.  Now, you testified earlier that there was a search at**
4    **the Alabama residence.  Do you remember that testimony?**
5    A.  Yes.
6    **Q.  When was that search?**
7    A.  I don't recall the exact date.  It's -- it was
8    occurring in Mobile.
9    **Q.  Do you know whether there was a search warrant for**
10   **that search?**
11   A.  There was.
12   **Q.  And what was under investigation at that time?**
13   A.  I haven't seen what was written in the search
14   warrant, but I believe -- I haven't seen.  I would like to
15   see the search warrant myself before I make any statements
16   on exactly what they were -- put in their search warrant.
17   **Q.  Do you have any general understanding of what crimes**
18   **may have been under investigation at that time?**
19   A.  12-01.
20   **Q.  Do you know what evidence was seized at the residence**
21   **in Alabama?**
22   A.  I don't have the inventory.  I -- an official there,
23   an FBI official there told me that (indiscernible)
24   documents, records were found.
25   **Q.  Was there any evidence of criminal activity at the**

1    **Alabama residence?**
2    A.  Not to my knowledge.
3    **Q.  Any firearms?**
4    A.  I don't -- I haven't seen the inventory, so I can't
5    say if there was or was not.
6    **Q.  You testified earlier, if I understood correctly,**
7    **that my client, Mr. Wahhaj, had a belief that medications**
8    **(indiscernible, audio skips) used in general.  Is that**
9    **correct?**
10   A.  Correct.
11   **Q.  And is it your understanding that that belief was  a**
12   **religious belief?**
13   A.  All I know is that he didn't believe in giving
14   medication, that Siraj Wahhaj did not believe in
15   medication, from testimony from Hakima Ramzi.
16   **Q.  And your -- your testimony today is that you don't**
17   **know whether that belief had anything to do with his**
18   **religious beliefs?**
19   A.  For Siraj Wahhaj, correct.
20   **Q.  You testified earlier that there were some firearms**
21   **found in the tunnel.  Is that right?**
22   A.  Yes, sir.
23   **Q.  And were photographs taken of those firearms before**
24   **they were removed from the tunnel?**
25   A.  Yes, sir.

1    **Q.  And what about the firearms that you testified to,**
2    **that were found elsewhere on the property?  Were**
3    **photographs taken of those before they were moved?**
4    A.  I know at some point some of the weapons were moved
5    and taken photos of, I believe those were the ones in the
6    tunnel, to take a different set of photos.  I haven't seen
7    all 373 crime scene photos, but to my knowledge, all the
8    weapons had photos taken of them.
9    **Q.  Photos taken of them before anyone moved them from**
10   **where they were originally found?**
11   A.  I can't make a statement on that, because I wasn't
12   there the day that it occurred.
13   **Q.  So you just don't know one way or the other?**
14   A.  Correct.
15   **Q.  Are you aware that there were firearms that were left**
16   **behind at the residence by the Taos Police Department,**
17   **after the crime scene was released?  That were not seized?**
18   A.  On August 3rd is when these individuals were
19   arrested, and the weapons were there over -- I don't know
20   which weapons were taken or not taken, but I know weapons
21   were found on August 6th, during a search warrant
22   conducted by Taos County.
23   **Q.  So there were two searches, August 3rd and August**
24   **6th?**
25   A.  August 3rd, to my knowledge, was an arrest.  And I

## Page 110

1  know, to my knowledge, August 6th was a search warrant.
2  Q.  So you're not aware whether there were some firearms
3  that were left at the scene, after the crime scene was
4  released back to the property owner?
5  A.  On the 3rd or the 6th?
6  Q.  At either time, let's start with the 3rd.
7  A.  I know that weapons were found on the 6th, that
8  weren't found on the 3rd.  I do not know if weapons were
9  found on the 3rd or not, other than what was on the person
10  of Siraj and (indiscernible).
11  Q.  Thank you.  You've relied pretty heavily on the
12  testimony of the two children, J.L. and F.L., correct?
13  A.  Their testimony, along with additional others, yes.
14  Q.  I should say statements, right, because they haven't
15  given any testimony under oath, right?
16  A.  They have.
17  Q.  They have given testimony under oath?
18  A.  In -- in a grand jury.
19  Q.  Okay.
20       MR. KRAEHE:  Your Honor, I'm going to object,
21  it's subject to grand jury.
22       MR. IVES:  I wasn't attempting to elicit
23  anything about grand jury.
24       THE COURT:  Sustained.  Don't talk about the
25  grand jury proceeding, please.

## Page 111

1  Q.  (By Mr. Ives)  But the statements that you've been
2  relying on today, have largely been statements that were
3  taken -- that you were describing with Ms. Bhalla earlier,
4  when you interviewed the children, right?
5  A.  I didn't hear the last part, sir.
6  Q.  When you -- the statements that you've been relying
7  on today, are largely those that you described to Ms.
8  Bhalla earlier, when she was asking you about interviews?
9  A.  Bhalla?  Is that what you're saying?
10  Q.  Yes.
11  A.  Oh, sorry.  J.L., F.L., Hakima Ramzi, Jamella Jihad
12  and Jany's book, or a lot of the information has come
13  from.
14  Q.  And the children that you interviewed, confirmed in
15  their statements that there were no specific plans to
16  attack specific targets, correct?
17  A.  Correct.  They only knew certain institutions.
18  Q.  But there were no specific plans to attack certain
19  institutions even, were there?
20  A.  Can you -- are you asking if there wasn't a -- there
21  was a label of education, banking system, but as far as if
22  it was a certain police department, no there was not.  So
23  that kind of planning.
24  Q.  Was there any planning whatsoever about an attack?
25  A.  If (minor's name, A.G.) came back as Jesus, would

## Page 112

1  instruct them to go to these corrupt institutions and then
2  what would happen at these corrupt institutions is to the
3  extent of the plan, to my knowledge as of now.
4  Q.  Nothing more specific than that?
5  A.  That is correct.
6  Q.  And all contingent on the theory that the child would
7  rise from the dead, become Jesus and give instructions?
8  A.  That is correct.
9  Q.  On your -- in your direct testimony, you described a
10  letter and I think your testimony was that the word
11  "martyr" was in the letter, or "martyrdom."  Do you
12  remember that testimony?
13  A.  Today, yes, I do, yes.
14  Q.  Do you have any knowledge of who wrote that letter?
15  A.  I've been told it was Jany Leveille.
16  Q.  And what's your basis for that?
17  A.  Jamella Jihad stated that it was Jany Leveille that
18  wrote that letter.
19  Q.  The letter was unsigned?  Is that correct?
20  A.  I don't believe it was.
21  Q.  You testified earlier about (indiscernible, audio
22  skips) jihad?  Do you recall that?
23  A.  That is correct.
24  Q.  Did -- did F.L. ever tell you that there was a plan
25  for anyone at the residence to participate in acts of

## Page 113

1  jihad?
2  A.  The only mentions of jihad that I can remember, to
3  the best of my recollection, are about Siraj wanting to
4  train an army how to conduct jihad.
5  Q.  But there -- there was no specific plan about an army
6  or where it was -- who -- what kind of attack was going to
7  occur.  Nothing specific, correct?
8  A.  Nothing more than what I already talked about a few
9  questions back.
10  Q.  Are you -- you testified also on direct, about the
11  eight-year-old who you said felt she was having some
12  difficulty breathing during that ruqya ritual.  Do you
13  remember that?
14  A.  She said she was choking.  And then I asked her if
15  she felt like she could breathe.  She said, yes, but that
16  she was scared and felt like she was choking.
17  Q.  So she was frightened?
18  A.  Yes.
19  Q.  Did any of the children that you interviewed, say
20  that Mr. Wahhaj harmed them during a ruqya ritual?
21  A.  A.W. said that Siraj Wahhaj put his hand on her neck
22  and that is when she felt like she was choking and that
23  she was scared.
24  Q.  Was she physically injured by that touching?
25  A.  I don't know if there was any marks left or anything

## Page 114

1  like that, if that's what you're asking.
2  Q.  Just any kind of physical injury whatsoever?
3  A.  Not to my knowledge.
4  Q.  You have no knowledge of any physical injury to any
5  child as a result of the touching during the ruqya ritual?
6  A.  That is correct.
7  Q.  Now when you interviewed J.L. and F.L., you asked
8  them leading questions, correct?
9  A.  I don't believe I did, or I attempted not to.
10  Q.  Do you know whether you asked them any leading
11  questions?
12  A.  You have to tell me specifically what you're
13  referring to.
14  Q.  You can't testify today, based on your memory, one
15  way or another, whether you asked those boys leading
16  questions when you interviewed them?
17  A.  The purpose of my interview was to attempt not to ask
18  a leading question, so it would be their own words.
19  Q.  Did you pressure them by telling them that they were
20  the only ones who could help you with your investigation?
21  A.  I don't remember those exact words.  I remember
22  saying you wouldn't be in any trouble here today, talking
23  about how doing the right thing -- about doing the right
24  thing.  There was discussion on August 7th with F.L. about
25  -- talking about what movies he likes, he says he likes

## Page 115

1  Captain America, and we talked about some of the ideals of
2  Captain America and then he proceeded to tell us what he
3  -- he said he was telling us the truth after that.
4  Q.  When they -- when the children didn't give you the
5  answers that you wanted to give you, you would ask
6  them leading questions, wouldn't you?
7  A.  Can you refer to a specific time?
8  Q.  I'm just asking you.
9  A.  There was a time when they lied when they last saw
10  A.G., and we said we already knew the answers to the
11  questions we're asking you, and it would really
12  (indiscernible) for them to tell us the truth and then
13  (minor's name, F) began to cry and tell us what happened
14  to A.G. in detail.
15  Q.  And also when you weren't getting the answers that
16  you wanted, you told them that they were the only ones who
17  could help you, right?  You needed their help.
18  A.  I believe we asked for their help, yes.
19  Q.  Did you tell them they were the only ones who could
20  -- who could help you?
21  A.  I cannot recall the exact words they used.
22  Q.  All right.  Now you testified on direct about Mr.
23  Wahhaj's travel abroad.  Do you remember that?
24  A.  Yes.
25  Q.  And you testified that he traveled to Morocco, and

## Page 116

1  Haiti and Saudi Arabia and the United Kingdom.  Do you
2  remember that?
3  A.  Yes.
4  Q.  Do you have any information about the purposes of
5  those trips?
6       MR. KRAEHE:  Again, Your Honor, I'm going to
7  object on the grounds that we -- I objected earlier and
8  that we had the bench conference about.
9       THE COURT:  All right.  Why don't you all come
10  up here.
11  (BENCH CONFERENCE - Inaudible)
12  Q.  (By Mr. Ives)  Agent, you're aware that Mr. Wahhaj's
13  parents live in the United States, correct?
14  A.  Yes.
15  Q.  And they're U.S. citizens, correct?
16  A.  Yes.
17  Q.  And they live -- they live in New York.  Is that
18  right?
19  A.  To my knowledge, yes.
20  Q.  And his children are U.S. citizens as well, correct?
21  A.  Yes.
22  Q.  And they also live in the United States, right?
23  A.  Yes.
24  Q.  And to your knowledge, does he have any immediate or
25  extended family abroad?

## Page 117

1  A.  Siraj?
2  Q.  Yes.
3  A.  Not to my knowledge.
4  Q.  Do you recall testifying on direct that to the best
5  of your knowledge, Mr. Wahhaj was not employed while he
6  was living in New Mexico?
7  A.  That is correct.
8  Q.  What's your basis for that testimony?
9  A.  I haven't seen any employment records regarding Siraj
10  Wahhaj's employment in New Mexico.
11  Q.  Did you do any investigations to determine whether he
12  was employed while he was in New Mexico?
13  A.  I noticed that checks were run by the FBI, but I
14  specifically did not run those checks.
15  Q.  Did you know what the outcome of those checks was?
16  A.  I do not know specifically, no.
17  Q.  Mr. Wahhaj was not armed when he was arrested, was
18  he?
19  A.  Per Taos County, he was.
20  Q.  He was armed?  He had a -- he had a firearm in his
21  hands when he was arrested?
22  A.  The statement that I received from the law
23  enforcement official was that he was putting an AR-15 down
24  on the ground, and that when they searched him, there was
25  a revolver in his pocket.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

Page 118

1  Q.  So he was surrendering peacefully?
2  A.  Per testimony of either J.L. or F.L., I don't recall
3  exactly who it was, and Jany and Siraj were having -- Jany
4  ordered everyone to put their weapon down and Siraj was
5  having an argument, per testimony, about it and hesitated.
6  But then -- but then he did proceed to put his weapon
7  down.
8  Q.  He ultimately surrendered peacefully without
9  confronting officers with a firearm?
10  A.  That is correct.
11      MR. IVES:  I'll pass the witness.  Thank you.
12  Q.  Thank you.
13          CROSS EXAMINATION
14  BY MR. BLACKBURN:
15  Q.  Agent, I represent Subhanah.  You know that she --
16  you know that she is married to Lucas.  Is that correct?
17  A.  Yes, sir.
18  Q.  And you know that she was born and raised in New York
19  City.  Is that correct?
20  A.  Yes, sir.
21  Q.  And you know that her parents still live in New York
22  City.  Isn't that true?
23  A.  Yes, sir.
24  Q.  Okay.  And you know that Lucas and Subhanah have four
25  children.  Is that correct?

Page 119

1  A.  That is correct.
2  Q.  Eight, six, four and two, correct?
3  A.  I know the age of the eight-year-old.  I do not know
4  the exact age of the other three.
5  Q.  All right.  And there's been a lot of discussion
6  about the children that you interviewed, F.L. and J.L.,
7  the 13- and the 15-year-old.  Those are the children of
8  Jany.  Is that correct?
9  A.  Yes.
10  Q.  Okay.  Her children directly, not children that she
11  has with Siraj.  Is that right?
12  A.  They are children from a different individual, yes.
13  Q.  From a different individual, right.  So those are the
14  -- so when you interviewed those, a lot of your test -- a
15  lot of your questions dealt with what was happening with
16  their mother, biological mother, and Siraj.  Is that
17  correct.
18  A.  Can you repeat the question again?
19  Q.  A lot of your questions that you were dealing with
20  when you were talking to them, because their -- their
21  mother was Jany.  Is that correct?
22  A.  That is correct.
23  Q.  All right.  And they didn't give you a lot of
24  information at all, if any, concerning issues relating to
25  Subhanah.  Is that right?

Page 120

1  A.  They talked about Subhanah.
2  Q.  Okay.  Other than -- other than the fact that what
3  her role was was a -- was the caretaker for the family?
4  A.  They talked about her firing a weapon and --
5  Q.  The one time she fired the weapon and it scared her
6  to death and she thought she'd never wanted to touch
7  anything again like that, right?
8  A.  That's correct.
9  Q.  Okay.  All right.  You -- you talked about the fact
10  that she was -- her role was to be that of the housekeeper
11  or the -- to take care of the household and to do the
12  cleaning and things like that, right?
13  A.  Her -- either F.L. or J.L., because she did not take
14  care of the house previously in her past, it was part of
15  her punishment to be -- take care of the household in
16  Amalia.
17  Q.  So when they -- she -- because she'd never taken care
18  of households before, the testimony was from those
19  individuals, that she was, once they got to New Mexico,
20  that that was her job?
21  A.  Correct.
22  Q.  All right.  And you're aware, are you not, that
23  anything concerning the -- the child in Georgia, that --
24  when that child was with his father at a park or
25  something, that had nothing to do with Subhanah, did it?

Page 121

1  She had no role in that issue?
2  A.  On the day that A.G. was taken?
3  Q.  Right.
4  A.  Not to my knowledge, I do not know.
5  Q.  Okay.  Well, you talked to the kids, and the kids
6  knew what was going on.  They never mentioned that, did
7  they?
8  A.  They knew certain -- certain facts about certain
9  situations.  I wouldn't say they knew everything.
10  Q.  Okay.  But not as it related to Subhanah being there
11  and involved in any of that.  That's what I'm getting at.
12  A.  Correct.
13  Q.  Okay.  My focus is really truly just on Subhanah at
14  this point in time, because that's who I represent.  And
15  you also know that she was not present during any of the
16  rituals when they came to New Mexico on A.G.  Is that
17  correct?
18  A.  To my knowledge, I do not have any evidence to say
19  that she was in the room with A.G.
20  Q.  Well, you know, also that she was part of the
21  group -- that she lived with Lucas in the box truck.  Is
22  that right?
23  A.  That is correct.
24  Q.  And the issues that related to the rituals and where
25  A.G. was at was in the camper trailer that was sort of

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 122

1   buried in the ground.  Is that correct?
2   A.  That is correct.
3   Q.  And the box truck was not even in the ground, right?
4   It was outside -- you didn't -- that thing wasn't buried,
5   it was just outside on the property.  Is that correct?
6   A.  Yes, it was adjacent to the hole the trailer was in.
7   Q.  All right.  And none of the weapons that are involved
8   in this case belong to Subhanah, did they?
9   A.  No.
10  Q.  She never purchased any of them?
11  A.  No.
12  Q.  You talked to the people that sold the weapons to the
13  individuals involved and there was nothing irregular about
14  those particular purchases, were there?
15  A.  I did not talk to those individuals.  FBI in Atlanta
16  did.
17  Q.  Okay.
18  A.  But per the report, there was nothing in regards to
19  the purchases that were unusual, yeah.
20  Q.  These particular individuals have the right to -- at
21  least Subhanah had the right to own weapons, did she not?
22  A.  Correct.
23  Q.  There was no -- there was no prohibition on her was
24  there?
25  A.  Not to my knowledge.

## Page 123

1   Q.  And whenever they had the accident that's been
2   discussed earlier with the accident in Alabama, those
3   weapons were in plain view and display for the police
4   officers who saw those weapons and saw them being
5   transferred from one vehicle to another vehicle and
6   nothing was ever done about that, was there?
7   A.  Correct.
8   Q.  And you also know that during that particular
9   situation, from talking to your sources and the children
10  involved, that Subhanah was not even there at the accident
11  scene.  Is that correct?
12  A.  From what I know, I do not know where she was during
13  the time of the accident.
14  Q.  Okay.  And the people that were in the car, just so
15  we're clear, the people that were involved in the
16  accident, was Siraj, Jany and their children, correct?
17  A.  Correct.
18  Q.  All right.  And this happened in Alabama, right?
19  A.  Yes, sir.
20  Q.  And then from there, they got in the box truck and
21  came to New Mexico.  Is that correct?
22  A.  To Tennessee and through other such states first,
23  eventually to New Mexico, yes.
24  Q.  And you mentioned -- you mentioned that somehow in
25  your direct earlier, I think, some of the last questions

## Page 124

1   that Mr. Kraehe asked you was whether or not these
2   individuals had ties to New Mexico.  I think his question
3   was something to the effect of, if any of these
4   individuals had ties to New Mexico, and you just now
5   testified previously that for one, you knew that Lucas,
6   which is Subhanah's husband, came to New Mexico and
7   participated in a school here for over a month at the
8   earthship, right?
9   A.  I understood the question as family or friends,
10  connections to New Mexico, but Lucas Morton, with F.L.,
11  did come to New Mexico to do an earthship school.
12  Q.  And they paid, like, $2,000, $3,000, you've seen the
13  receipts for that, have you not?
14  A.  I do not know how much he paid for the school.
15  Q.  But there are documents that shows him coming to this
16  earthship school or something like that in New Mexico.  Is
17  that right?
18  A.  I have no reason to believe that they don't exist.
19  Q.  Okay.  And you also know that the property that when
20  -- when they left Georgia to Alabama to come to New
21  Mexico, they came here because of the property that Lucas
22  owned, right?
23  A.  That is what I understand, yes.
24  Q.  So he does have -- he and his wife, Subhanah, have
25  property in New Mexico, correct?

## Page 125

1   A.  I know that Lucas Morton does.  I do not know if
2   Subhanah is on there as well.
3   Q.  Okay.  Well, and whether they were on lot 29 or lot
4   30, they do -- they're lawful owners of property in New
5   Mexico.  Is that (indiscernible).
6   A.  That is correct.
7   Q.  And when the police officers came on August 3rd,
8   Subhanah was not involved in any type of being in the area
9   where the officers first came in and she was not in
10  possession of any guns or involved in any issues related
11  to the law enforcement officers taking custody of anybody,
12  was she?
13  A.  To my knowledge, she did not have any weapons on her
14  at the time.
15  Q.  You also mentioned that there was a search on August
16  3rd, where some items were located and then they came back
17  on August 6th, where maybe some other items were located.
18  Was the scene preserved between August 3rd and August the
19  6th?
20  A.  I wasn't at the scene.  I do know that a neighbor had
21  some of the items that were found at the compound and
22  turned those over to Taos County.  It was his property
23  that the compound was on, and several of the other items
24  were still remaining.  The items in the tunnel, to my
25  knowledge, were still remaining in the tunnel when they

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 126

1  were recovered on August 6th.
2  Q.  So because he was the owner of the property, even
3  though it wasn't his items, he was allowed to go in and
4  take some of those items and give them to the police, even
5  though it's not his -- even though he didn't own that
6  particular property, correct?
7  A.  I know that he took those.  I do not know if he gave
8  consent to Taos, or Taos served a search warrant for those
9  items --
10  Q.  Okay.
11  A.  -- the FBI (indiscernible) search warrant.
12  Q.  And finally, let me ask you, you are aware, are you
13  not, that Subhanah and Lucas were two of the individuals
14  that were actually released by the Judges up in Taos
15  County.  Is that correct?
16         MR. KRAEHE:  Objection, relevance, Your Honor.
17         THE COURT:  Overruled.
18  A.  Yes, they were released.
19  Q.  (By Mr. Blackburn)  And you were aware that they were
20  released and they were living in a residence in the Taos
21  area, correct?
22  A.  I do believe they were living in a residence in the
23  Tao area -- Taos area, left to Colorado for a short amount
24  of time.
25  Q.  Well, just across the border and come back.  I mean,

## Page 127

1  how far is Amelia from Colorado?
2  A.  They were in Taos, I believe, is where they were
3  staying after they were released, not Amalia.
4  Q.  But you also know that they were given a vehicle,
5  right, by some of the residents up there, so that they
6  could have the ability to get back and forth to town,
7  right?
8  A.  I don't remember if they were transported or they
9  were given a vehicle.
10  Q.  All right.  Well, you do know that for the two or
11  three days that they were released, when you went to
12  arrest them, they -- you arrested them at the Motor
13  Vehicle Department in Taos, did you not?
14  A.  I believe that's correct.  I was not there.
15  Q.  All right.  And they were the only two that were
16  basically the -- as I understand it and you understand,
17  were released by the Judge, right?
18  A.  Hujrah --
19  Q.  The Judge of --
20  A.  Hujrah was released as well.
21  Q.  Okay.
22         MR. BLACKBURN:  I have nothing further.  Thank
23  you.
24         THE COURT:  All right.  Do you have redirect?
25         MR. KRAEHE:  I'll be relatively brief, Your

## Page 128

1  Honor.
2
3         REDIRECT EXAMINATION
4  BY MR. KRAEHE:
5  Q.  When Subhanah and Lucas Morton were released, were
6  they subject to conditions?
7  A.  Per Subhanah's defense attorney, they would not leave
8  the County because of a trespassing misdemeanor that they
9  were being charged on, and that was part of the Order.
10  Q.  And did they leave the County?
11  A.  They left to Colorado.
12  Q.  And, so based on --
13  A.  Out of the County.
14  Q.  -- based on your knowledge, they were in violation
15  of their conditions of release?
16  A.  Based on the facts that I know, yes.
17  Q.  Did all the defendants know that Siraj and Jany
18  Leveille took A.G. from -- out of Georgia, across state
19  lines?
20  A.  They were all present in a vehicle at one point
21  during the travel.
22  Q.  And did they all know who A.G.'s real mother was?
23  A.  They are closely related to -- or they are -- have
24  close association to Jamella Jihad and Hakima Ramzi, and
25  per Jany's book, Hakima Ramzi is the mother who birthed

## Page 129

1  A.G.
2  Q.  And during the time that the rituals were performed
3  on A.G., were all the adults in the trailer when this was
4  being performed?
5  A.  Are you talking about the time of -- the day that
6  A.G. passed?
7  Q.  Well, let's start with that one, yeah.
8  A.  I know that Jany Leveille and Siraj were.  I know
9  that soon after A.G. passed, Jany Leveille told Hujrah
10  Wahhaj and Subhanah Wahhaj what had happened, and I don't
11  remember the exact words that they said, but they went
12  back to doing their tasks that they were already doing.
13  Q.  And can you say whether all the defendants were
14  present in the trailer at some time when this ritual was
15  being performed on A.G.?
16  A.  I can't exactly say what they were doing during --
17  where they were during the time of the several months that
18  they were there.
19  Q.  And these rituals lasted, again, how long?
20  A.  Several hours and every day until A.G. died.
21  Q.  And what would A.G. be doing for a lot of the time
22  during these rituals?
23  A.  Screaming, crying and many times had foam or white
24  slime come out of his mouth.
25  Q.  And based on your best information, how long has it

1   been since Jany Leveille has had lawful status in the
2   United States?
3   A.  Per immigration, it's been approximately 20 years.
4   Q.  Based on your investigation, do you have any evidence
5   whatsoever that any of the firearms you -- that were
6   located at the Amalia compound, were they ever used for
7   hunting?
8   A.  No.
9   Q.  What were they used for?
10   A.  Per witness testimony, they were used for training.
11   They had discussed hunting at one point, but never
12   actually hunted with any of the weapons there.
13   Q.  Did the children that you interviewed tell you that
14   they were going to attack educational institutions or
15   schools or teachers on -- when they were told to do so by
16   their mother?
17   A.  The education system was one of the corrupt
18   institutions and that teachers were an issue because --
19   I'm trying to remember the exact wording, but it would be
20   in the transcript in what they talked about.  But teacher
21   -- education system and then asked what about the
22   education system.  If I recall correctly, it was teachers
23   that were part of the corrupt education system.
24   Q.  When you first met the children to interview them,
25   were they scared?

1   A.  Yes.
2   Q.  When you first -- did you ever interview any of the
3   defendants, or were any of the defendants interviewed at
4   the time of their arrest?
5   A.  On August 3rd, I intended to interview Lucas Morton
6   and he repeated that he'd talked to the FBI in Georgia and
7   he had nothing further to say.  And I talked to Jany
8   Leveille, Hujrah Wahhaj and Subhanah Wahhaj on August 3rd.
9   They were not arrested on August 3rd, and they said that
10   -- Hujrah Wahhaj and Jany Leveille said that the last time
11   they saw A.G. was in Georgia.  Subhanah Wahhaj repeated
12   that she did not know when the last time she saw A.G. was.
13   Q.  And based on subsequent information, did you conclude
14   whether or not what they were telling you at the time was
15   the truth?
16       FEMALE SPEAKER:  (Inaudible.)
17       THE COURT:  Overruled.
18   A.  During the course of our investigation, we found out
19   that (minor's name) or A.G. was -- was not last seen in
20   Georgia because he was in the vehicle that all of them
21   drove here with and located on the Amalia compound as
22   well, that all five defendants were also located on.
23   Q.  And has the body that was found on the Amalia
24   compound been identified as the body of A.G.?
25   A.  Yes.

1   Q.  The statements that were made to you by the children,
2   would you say they were consistent with the statements
3   that were made in Jany Leveille's books?
4       MS. CONVERSE:  Objection, Your Honor.  It's
5   leading, it's -- it's an improper question to compare --
6   he's asking for a comparison as to the credibility of the
7   children.  Object to the form of the question and the fact
8   that (inaudible) conclusion and it's leading.
9       THE COURT:  All right.  Sustained.
10   Q.  (By Mr. Kraehe)  I will ask you this, can -- tell me
11   what about the statements that you were -- that you
12   received from the children was consistent with what you
13   found in Jany's journals?
14       MS. CONVERSE:  Same objection as to asking for
15   the comparison, Your Honor?
16       THE COURT:  Overruled.
17   A.  Per witness testimonies, they described Jany Leveille
18   getting a message from God and then ordering Siraj Wahhaj
19   to take A.G. and per her book, it says the same thing.
20   And per their witness testimonies, it talks about her
21   being the -- receiving messages from God and translating
22   that to the others and that she was the leader, and per
23   her book, it talks about her being the mahdi and receiving
24   messages from God and --
25   Q.  (By Mr. Kraehe)  Does she talk in her journal about

1   the death of A.G.?
2   A.  She does.
3   Q.  And does it -- did it match up with what the children
4   told you?
5   A.  J.L. talked about Siraj Wahhaj putting his head on
6   A.G.'s chest and eventually reporting that he didn't have
7   a heartbeat and that is also reported in Jany's journal.
8   Q.  And in talking about the death of A.G., did one of
9   the children say, "I think they said you're hold, I just
10   heard them say, you're holding his neck or something like
11   that."  Do you recall --
12   A.  Can you repeat that?
13   Q.  -- one of the children saying that?  "I think they
14   said you're hold, I just heard them say, you're holding
15   his neck or something like that."
16   A.  It's hard for me to remember where that exactly came
17   from.  I do remember one of the children talking about
18   Wahhaj -- Siraj Wahhaj holding A.G.'s neck up.
19   Q.  Did the children tell you about plans to attack the
20   FBI and CIA?
21   A.  Yes.
22   Q.  Are those specific governmental institutions?
23   A.  They are.
24       THE COURT:  Was there anything in Ms. Leveille's
25   journal about that?

## Page 134

1    A.  About the corrupt institutions?  No.  She did -- she

2    does talk about the hospital that she -- that treated her

3    poorly and I believe the words were, that Allah would

4    smite that hospital, but I'd have to go back to the

5    journal for the exact words.

6    **Q.  That hospital was what hospital?**

7    A.  Grady Hospital.

8    **Q.  Did the State Police officer who arrived at the scene**

9    **of the accident in Alabama, did he file a suspicious**

10   **activity report?**

11   A.  He did.

12   **Q.  And why did he do that?**

13   A.  False statements from Siraj and Jany gave different

14   statements on their purpose of going to New Mexico.

15   **Q.  Did the children tell you what "jihad" meant?**

16   A.  They did.

17   **Q.  What did it mean?**

18   A.  It means dying -- dying and fighting for Allah.

19   **Q.  Based on your interviews of the children and the**

20   **other evidence you collected in this investigation, is**

21   **that what they were preparing for?**

22   A.  Can you repeat the question?

23   **Q.  Is that what they were preparing for?**

24   FEMALE SPEAKER:  (Inaudible.)

25   MR. KRAEHE:  Based on the evidence and his

## Page 135

1    understanding of the evidence and his interviews of the

2    witnesses, Your Honor.

3    FEMALE SPEAKER:  (Inaudible.)

4    THE COURT:  Why don't you ask him whether the

5    children told him they were preparing for it?

6    **Q.  (By Mr. Kraehe)  Were the children -- did the**

7    **children tell you that they or anyone else were preparing**

8    **for jihad?**

9    A.  They were preparing to attack corrupt institutions

10   and that Siraj Wahhaj wanted to train an army to conduct a

11   jihad.

12   MR. KRAEHE:  Nothing further, Your Honor.

13

14   QUESTIONING BY THE COURT

15   THE COURT:  I have a few questions.  You talked

16   about three eight-year-old children and indicated that, I

17   think all three had fired weapons.  Was that your

18   testimony?

19   A.  Per what the -- F.L. and J.L. said, they said all

20   three-year-olds fired weapons with their hand on the

21   weapon and Siraj Wahhaj holding the gun over their hands.

22   THE COURT:  Was one of those three

23   eight-year-old children Hujrah Wahhaj's child?

24   A.  Yes.

25   THE COURT:  How far away was the firing range

## Page 136

1    from the trailer and box truck where the children and

2    defendants were living?

3    A.  I do not know the exact distance in feet, but per

4    photos, it's very close to the hole in which the trailer

5    was placed in.

6    THE COURT:  Where was the kitchen that -- where

7    food was prepared?

8    A.  From my understanding from a description that Taos

9    County, who were on the property during the day of the

10   arrest, it was adjacent to the bedroom.

11   THE COURT:  In the?

12   A.  In the trailer.

13   THE COURT:  In the trailer.  And that's where

14   A.G.'s body was stored until the warm season?

15   A.  A.G. was stored in the bed -- underneath the bed.  In

16   a camper trailer, there's often storage underneath the

17   bed.  And from the description of the children, that is

18   where he was stored, approximately until it got too warm

19   and started to smell and then they placed him in the

20   tunnel because it was much cooler in there.

21   THE COURT:  And you testified that A.G.'s body

22   was washed every other day.  Was that while he was in the

23   trailer, or when he had been moved to the tunnel or both?

24   A.  From what I remember from the testimony of the

25   children, it is when his body began to smell, and then

## Page 137

1    they washed his body every other day until they put him in

2    the tunnel, and I do not recall that they washed him once

3    he was in the tunnel.

4    THE COURT:  Were there spent casings found at

5    the firing range?

6    A.  From one of the crime scene photos, there was a spent

7    casing in the dirt on the firing range.

8    THE COURT:  Just one?

9    A.  I haven't reviewed all 373, so I can't make an

10   account of how many fire -- or how many spent casings were

11   on the -- on the gun range.

12   THE COURT:  So you know that there was one, but

13   you don't know if there was more than one?

14   A.  I skimmed through the photos prior to coming here

15   because I had been working on other investigative

16   activities.

17   THE COURT:  Did all of the defendants have

18   access to the tunnel?

19   A.  Per the children, all the defendants used the tunnel.

20   I would say that all the defendants, Subhanah, Lucas

21   Morton, Siraj Wahhaj, and Jany Leiveille accessed the

22   tunnel.  I do not know about Hujrah specifically.

23   THE COURT:  Well, you testified on direct that,

24   along with A.G.'s body, there was a journal titled "Phases

25   of a Terrorist Attack."  Did I hear you correctly?

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 138**

1  A.  That is correct.
2  THE COURT:  Can you describe to me what that
3  journal -- the information that was contained within that
4  journal?
5  A.  It was approximately 11 pages.  It talked about
6  different response -- I believe it talked about different
7  response times to a terrorist attack.  It talked about how
8  to do reconnaissance of a location.  It talked about doing
9  a dry run as well, I believe.  That terrorists would
10  conduct a dry run prior to conducting the actual terrorist
11  attack.  I believe that was in there.
12  THE COURT:  Was it an information manual about
13  terrorists?
14  A.  It was a handwritten -- it was hand-written in a
15  composition book.
16  MS. SIRIGNANO:  Your Honor, may I follow up with
17  a question regarding that after you're done?
18  THE COURT:  Sure, I'm going to let all of you
19  have a chance to follow-up with the questions that I've
20  asked.
21  MS. SIRIGNANO:  Thank you, Your Honor.
22  THE COURT:  Now, the Criminal Complaint listed a
23  number of weapons purchased by Mr. Wahhaj.  Do you have a
24  specific timeframe when these were purchased?  Were they
25  all purchased in a short period of time, or were they

**Page 139**

1  purchased over many years, if you know?
2  A.  There was an agent in Atlanta who talked to the
3  gun-range owner and has all that information, but I cannot
4  recall the exact dates of that 302 on the timeline of when
5  these weapons were purchased.
6  THE COURT:  Is it possible that some of them
7  were purchased many, many years ago?
8  A.  I'd have to review the report again, from Atlanta.
9  THE COURT:  All right.  Ms. Sirignano, you
10  wanted to ask a couple follow-up questions?
11  MS. SIRIGNANO:  Just one, Your Honor.
12
13  FOLLOW-UP QUESTIONING
14  BY MS. SIRIGNANO:
15  Q.  Agent, regarding that journal, isn't it true that Mr.
16  Wahhaj was a security guard or had some kind of employment
17  as -- in a security capacity?
18  A.  That is true.
19  Q.  Okay.  And part of the evidence that was taken from
20  that case, was there a book, some kind of an educational
21  manual or training on how security officers should deal
22  with specific types of terrorist acts?
23  A.  I believe the book -- one of the books that we found
24  was "Executive Protective Detail Manual."
25  Q.  One more time?

**Page 140**

1  A.  I believe the title of one of the books found, that
2  might be what you're referring to, was, like, "Executive
3  Protective Detail."
4  Q.  Correct.  And isn't it true that the handwritten
5  journal, that content came from that book which was part
6  of Mr. Wahhaj's training as a security guard?
7  A.  From what I've been told, that composition book that
8  was hand-written, came from Wikileaks and the State
9  Department document.  That's what I had been told.
10  Q.  Who told you that?
11  A.  Another FBI employee.
12  Q.  And have you had an opportunity to look at the
13  training book that you seized as evidence to see if that
14  -- there's similar text from that training manual?
15  A.  I have looked -- I skimmed through that book and it
16  talks about how to protect the -- person that you're
17  protecting, how to create a perimeter around them, certain
18  things about what gang symbols were, but I can't recall
19  every page that was in the book.
20  Q.  And so they were defending their property, correct,
21  with the use of that book and possibly that composition
22  book?
23  A.  I can't make that assumption.
24  MS. SIRIGNANO:  Thank you.  Thank you, Judge.
25  THE COURT:  Anybody else have any follow-up

**Page 141**

1  questions?
2  MR. KRAEHE:  Just one, Your Honor.
3
4  FOLLOW-UP QUESTIONING
5  BY MR. KRAEHE:
6  Q.  Were there reports of firing from -- that neighbors
7  provided?
8  A.  Yes.
9  Q.  And what were those reports?
10  A.  These reports talked about that there were -- that
11  there was a lot of gunshots being fired at the property,
12  but I'd have to look at the actual report exactly to see
13  what they were -- the call-ins were about.
14  Q.  Did the children tell you how often they used
15  firearms on the property?
16  A.  They said every day for approximately a month after
17  A.G. died.  I don't know exactly what month.
18  MR. KRAEHE:  Nothing further, Your Honor.
19
20  QUESTIONING BY THE COURT
21  THE COURT:  I actually have one other question
22  and then I'll let you ask it.  You mentioned on direct
23  that there was some evidence that there was a belief that
24  one of the defendant's unborn children was going to be
25  A.G. coming back as Jesus Christ.  Did I hear you

**Page 142**

1  correctly?
2  A.  That is correct.
3      THE COURT:  Where did you get that information?
4  A.  Jany Leveille's Haitian brother is located in Haiti, her
5  had been communicating with Jany Leveille throughout her
6  time in New Mexico, and he reported that to an individual
7  -- reported that through Facebook Messenger, I believe,
8  reported that to an individual who provided that
9  information to the FBI, and it talks in there that the --
10  that the individuals at the compound believe that A.G.
11  would be reincarnated through Subhanah's unborn child.
12      THE COURT:  The Facebook entry indicated that
13  all of the individuals believed that?
14  A.  It's -- I believe it states that the individuals
15  located at the compound, to that effect.  I'd have to
16  review the exact wording that was in the screen capture.
17      THE COURT:  Okay.  All right, Ms. Bhalla.
18
19      FOLLOW-UP QUESTIONING
20  BY MS. BHALLA:
21  Q.  Agent Taylor, the journal or the -- "The Phases of a
22  Terrorist Attack" composition book that you were
23  questioned about recently, that was discussed at a hearing
24  in State Court, was it not?
25  A.  I believe it was.

**Page 143**

1  Q.  Okay.  And if I understand correctly, that
2  composition notebook was excluded by the State Court.  Is
3  that correct?
4      MR. KRAEHE:  Objection, Your Honor, irrelevant.
5      MS. BHALLA:  He was present for the hearing,
6  Your Honor, and I think that it will become relevant when
7  I ask the next few questions.
8      THE COURT:  All right.  I'll ask -- I'll let you
9  ask the next few questions, but what a State Court Judge
10  does is not relevant, as far as I'm concerned, to the
11  information that I've considered and on direct testimony
12  there was testimony that was provided that went into the
13  record without objection.  So I'll let you ask a few
14  questions, but we're not going to go too far with that.
15      MS. BHALLA:  Thank you, Your Honor.
16  Q.  (By Ms. Bhalla)  Isn't it true, Agent Taylor, that it
17  was excluded because there was no chain of custody?
18  A.  That is not how I understand it to be excluded.
19  Q.  Okay.  Do you understand it was excluded because no
20  one could testify as to who the author was at the time?
21  A.  The reason that I remember it being excluded is
22  because it was provided 30 minutes prior to the detention
23  hearing.
24  Q.  Do you know whether or not Taos County could provide
25  a chain of custody for that journal?

**Page 144**

1      MR. KRAEHE:  Objection, Your Honor, irrelevant.
2      MS. BHALLA:  I think it's relevant to whether or
3  not they can establish where and when that composition
4  book was actually found and also whether or not they can
5  establish who authored it.
6      THE COURT:  Well, why don't you ask him about
7  his testimony?  His testimony was that that journal was
8  found in the tunnel, in the room with the deceased child's
9  body.  A room that all of these defendants had access to.
10  How does he know that?
11  A.  There's actually additional information I remember
12  that when the children told me about that journal.
13  Q.  (By Ms. Bhalla)  Okay.  Did you find the journal in
14  the tunnel?
15  A.  I was not present during the search.
16  Q.  Did Taos County tell you that that's where they found
17  the journal?
18  A.  Two members of FBI ERT were there, and they took
19  crime scene photos and I believe one of them told me that
20  the journal was located in the tunnel.
21  Q.  Okay.  You believe that's what someone told you?
22  A.  An FBI official, and I'd have to go back and look at
23  the 302 document and exactly where everything -- yes,
24  ma'am.
25  Q.  Okay.  And did anyone tell you whether or not that --

**Page 145**

1  they knew who the author of that was?
2  A.  It was -- I believe it was F.L. on August 7th, said
3  that that handwriting isn't that of Jany Leveille's, but
4  it looks very similar to that of Siraj Wahhaj's.
5      MS. BHALLA:  Okay.  Thank you, Your Honor.
6      THE COURT:  All right.  Ms. Converse.
7
8      FOLLOW-UP QUESTIONING
9  BY MS. CONVERSE:
10  Q.  I'd like to follow-up on the last question the Judge
11  asked you about Subhanah's baby supposedly being the
12  reincarnation.  Is that of A.B. or A.G., I'm sorry, or of
13  Jesus Christ.  What was the word the -- that you got on
14  that?
15  A.  I believe it was A.G.
16  Q.  Okay.  And the way that information reached you, if
17  I've got this correct.  Supposedly Jany Leveille told her
18  brother in Haiti, who then told someone else, who then put
19  it on Facebook Messenger, and you guys got it from there?
20  A.  Not quite.  The individual, Jany Leveille's brother,
21  was talking to a friend that's located in New York, who
22  once was told of this information, provided it to the FBI.
23  Q.  Okay.  So we're talking at least third-hand?
24  A.  Yes.
25  Q.  And speaking of people being reincarnated, suppose --

**37 (Pages 142 to 145)**

Page 146

1  or supernatural things around births, Jany Leveille also
2  has a three-year-old child, the same age as A.G.  Is that
3  right?
4  A.  To the best of my knowledge, yes.
5      MS. CONVERSE:  Thank you.
6      MR. BLACKBURN:  Briefly, Your Honor.
7
8          FOLLOW-UP QUESTIONING
9  BY MR. BLACKBURN:
10 Q.  I want to follow up on one of the questions that you
11 were talking with the Government on on redirect about
12 statements made by somebody and it was particular to
13 Subhanah.  When you talked with her, she told you that one
14 of the reasons why they moved to New Mexico was because
15 life was easier in New Mexico, to get out of Atlanta and
16 get out of the burden of city life, right?
17 A.  That was part of it.
18 Q.  Okay.  And she -- you asked her when the last -- so
19 this conversation occurs in August, and the -- you're
20 asking her questions about the last time she saw A.G.  And
21 you ask her, when was the last time she saw A.G. -- this
22 is one of your last questions -- and she said that she
23 couldn't remember the last time.  Correct?
24 A.  Yes.
25 Q.  And you didn't follow up on that, was it like a week

Page 147

1  ago, a month ago, six months ago, a year ago, because she
2  told you that she wasn't going to ask you -- she wasn't
3  going to answer any more of your questions without a
4  lawyer being present, right?
5  A.  I was not conducting the questioning at that time, I
6  was taking the notes.  Another agent was, I'd have to ask
7  her exactly what she asked, because that was approximately
8  over a month ago.
9  Q.  Do you want to look at this?  Do you want to --
10 A.  Sure.
11 Q.  -- look at the 302?
12     MR. BLACKBURN:  May I approach?
13     THE COURT:  Sure.
14 A.  Thank you.
15 Q.  This 302 is authored by you, is it not?
16 A.  I did write it.
17 Q.  And you stated that she could not remember the last
18 time that she saw A.G., right?
19 A.  That's correct.
20 Q.  And no one followed up on that, right?
21 A.  I cannot recall if the other agent asked follow-up
22 questions or not.
23 Q.  And finally, there was some questions, I think about
24 -- from the Judge about the dates that these guns were
25 purchased.  And you're aware that there's a 302 that

Page 148

1  relates to that, because you saw it earlier when one of
2  the other defense counsel gave it to you.  Would you like
3  to look at that?
4  A.  The 302 -- I was not shown a 302 earlier, it was the
5  Complaint with the list of gun owners, but I would
6  definitely look at the 302 you're talking about.
7  Q.  Well, I know she showed you (inaudible).
8  A.  Ah, yes, I do.
9  Q.  So, will you look at that, I think at the bottom of
10 the last -- first page -- I'm sorry, some of these
11 (inaudible, audio skips).
12 A.  '14, '15, '15, '17, '13, '17, '15, '15 and 2017.
13     MR. BLACKBURN:  (Inaudible.)
14     THE COURT:  All right.  Are we done with
15 questioning?
16     MR. KRAEHE:  I am, Your Honor.
17     THE COURT:  All right.  Agent, you may step
18 down.  Any other witnesses?
19     MR. KRAEHE:  Not from the United States, Your
20 Honor.
21     THE COURT:  All right.  Now we're going to move
22 individually to each of the defendants unless the
23 defendants -- any of the defendants or all of the
24 defendants jointly have a joint witness or witnesses to
25 present.

Page 149

1      MS. BHALLA:  Your Honor, I do have -- excuse me
2  -- one witness to present (inaudible).
3      THE COURT:  Of course, but as -- are you going
4  to be presenting that witness just on behalf of your
5  client?
6      MS. BHALLA:  Yes, Your Honor.
7      THE COURT:  Okay.  Yeah, you can have a restroom
8  break and, I guess, why don't we all take a short break.
9      COURTROOM DEPUTY:  All rise.
10 (Court in recess)
11 (Court in session)
12     THE COURT:  All right.  I'm not sure I got a
13 complete answer to my question regarding whether there's
14 going to be any witness jointly presented.  It sounds like
15 there won't be, and the only witness that I'm hearing
16 about is for Ms. Hujrah Wahhaj, correct?
17     MS. BHALLA:  That is correct, Your Honor, but I
18 did get the opportunity to meet with the Government and
19 we're going to stipulate to what (inaudible).
20     THE COURT:  Okay.  All right.  Then, let me
21 start with Siraj Wahhaj.  If you could please come up to
22 the podium with your attorney.
23     Mr. Ives, is there any witness, evidence or
24 argument that you want to make?
25     MR. IVES:  Yes, Your Honor, I have a few

**38 (Pages 146 to 149)**

1  documents and then I would like to present argument, if
2  that's acceptable to the Court.
3         THE COURT:  Yes.
4         MR. IVES:  One of the documents -- since the
5  Pre-Trial Services Report did say that there was no
6  verifiable employment, I did go to SJ Solutions Security &
7  Protection Services, which is where Mr. Wahhaj has been
8  working for the past several years, and I did get a letter
9  from them confirming his employment, so I'd like to
10 provide that if I might approach.
11        THE COURT:  Okay.  Has the Government --
12        MR. KRAEHE:  I've never seen it, Your Honor.
13        MR. IVES:  It's a very simple letter, Your
14 Honor, and it does have a link to the company's website,
15 it's on letterhead and that'll allow the Court to verify
16 that in fact he was -- he has been employed and the
17 website has further information about the company.  It has
18 corporate clients who's names the Court will recognize, as
19 well as some other individual clients who's names the
20 Court will recognize.  This is a legitimate business and
21 he's been employed there for several years providing
22 security services consistent with some of the evidence
23 that we heard today.
24        THE COURT:  All right.  I've reviewed that.
25        MR. IVES:  Thank you, Your Honor.  The only

1  matter -- it didn't come up in the Government's
2  presentation today, but it was in the Pre-Trial Services
3  Report was about the Georgia civil warrant.  And there was
4  a statement that it -- it was not a warrant that could be
5  served nation-wide, that it couldn't be executed outside
6  of Georgia.  I have some document to suggest that that's
7  not correct.  In fact, the warrant itself says that it can
8  be executed anywhere in the United States.  And so if the
9  United States will stipulate to that based on the
10 document, we don't have to present it.
11        MR. KRAEHE:  I would prefer that the document be
12 made part of the record, Your Honor.
13        MR. IVES:  Sure, it came out of the discovery we
14 received yesterday afternoon.
15        MR. KRAEHE:  Yeah, for the reason that I can't
16 stipulate that it's a warrant that was not subject to
17 being executed in New Mexico.  I'm not -- I just don't
18 know.
19        THE COURT:  Okay.
20        MR. KRAEHE:  It's my understanding that it could
21 be executed anywhere, but.
22        MR. IVES:  May I approach, Your Honor?
23        THE COURT:  Yes.  Mr. Kraehe, have you seen that
24 paperwork?
25        MR. KRAEHE:  I have seen that before, yes, Your

1  Honor.
2         MR. IVES:  Your Honor, just for the record, this
3  came out of the discovery we received last night.  It's
4  Bates labeled by the government with this case number and
5  the control number 689 in the lower right.  And the final
6  paragraph states clearly that the warrant may be executed
7  at any place in the United States.
8         And there's another document, Your Honor, that
9  tells the rest of the story about the warrant, which is
10 that the State of Georgia, as a matter of discretion, not
11 because it couldn't, but as a matter of discretion, did
12 not choose to execute that warrant, even when -- even
13 after learning that Mr. Wahhaj was in State custody.
14        May I approach with that document, Your Honor?
15        THE COURT:  You may.
16        MR. IVES:  And Your Honor, this is actually a
17 composite.  It has documents from State Court setting
18 conditions of release, but what I'm really -- I'm more
19 interested in is on the third page.  It's a fax from the
20 Clayton County Sheriff's Office.  And there's -- I didn't
21 circle this, but someone circled "Our D.A.'s office will
22 not extradite," in bold and it's been circled, indicating
23 that the Clayton County Sheriff's Office is not going to,
24 you know, extradite Mr. Wahhaj based on that warrant.
25        THE COURT:  All right.  Well, based on the

1  information provided, the -- I will strike from the
2  Pre-Trial Services Report the language that the warrant is
3  only extraditable within the State of Georgia.
4         MR. KRAEHE:  No objection, Your Honor.
5         MR. IVES:  Thank you, Your Honor.  And may I
6  present argument now?
7         THE COURT:  Yes.
8         MR. IVES:  Thank you.  Your Honor, under the
9  statute, 3142, the Government has the burden, as you know,
10 by -- of proving by clear and convincing evidence that Mr.
11 Wahhaj poses such a risk of flight or danger to the
12 community that no conditions at all could reasonably
13 assure his presence and the safety of the community.
14        There's no presumption of detention in this case
15 because of the nature of the charges, and, Your Honor, the
16 Government has not carried its burden as to Mr. Wahhaj and
17 for that reason, we would ask for release to the halfway
18 house, with electronic monitoring and whatever other
19 conditions the Court deems necessary.
20        Incarceration is definitely not -- not necessary
21 in this case for a variety of reasons.  Mr. Wahhaj is a
22 40-year-old man.  He's lived in the United States his
23 whole life.  He has a G.E.D. and has attended some college
24 courses.  We just provided evidence of his employment over
25 the last several years.

Page 154

1      He has absolutely no criminal history.  The only
2  thing that Pre-Trial Services came up with were the cases
3  that are related to this case in State Court in Taos,
4  which as the Court knows, have all been dismissed.  There
5  has been no -- there have been no new charges.  There has
6  been no target notice, which he would have a right to if
7  they were intending to present this case to the Grand Jury
8  in the near future.
9      So no convictions, no other even arrests, other
10  than those related to this particular case.  He had the
11  Georgia civil warrant that we just discussed.  That's not
12  an issue anymore, there's no detainer on him, because the
13  State of George has chosen not to execute that warrant or
14  extradite him.  So he has nothing holding him in
15  (inaudible, audio skips) agency or Government agency or
16  law enforcement or Court is seeking to hold him at this
17  time.
18      He has no history of drug use, no history of
19  alcohol use, no history of failures to appear for Court.
20  So, as we heard, you know, he ultimately surrendered
21  peacefully to law enforcement when they came to the
22  residence in Amalia.
23      He has no ties to a foreign country, contrary to
24  what the Pre-Trial Services Report stated.  We heard the
25  testimony today, no family in foreign countries, all his

Page 155

1  family's U.S. -- or family members are U.S. citizens.  He
2  has lived in the United States his whole life.  His
3  parents both live in New York.  His children are all here
4  in the U.S. and are all U.S. citizens.
5      His passport has been taken from him.  So, we
6  don't think there is any risk of international flight, but
7  even if there was, he's got no passport and the Court
8  could address any potential concerns about risk of flight
9  with electronic monitoring.
10      The Pre-Trial Services Report, without
11  explanation, says that he has unexplained assets.  I don't
12  know what that was referring to?  He's been appointed
13  counsel.  I saw no evidence in the discovery that there
14  were unexplained assets.  We just presented information to
15  the Court that he has been employed and there were not
16  large sums of cash or other assets found to my knowledge
17  in the search of the residence of anywhere else.
18      Pre-Trial Services Report also says that, as to
19  risk of flight, unstable and unsuitable living situation
20  and lack of ties to New Mexico would be a basis for
21  holding him.  But of course, this is a circumstance that
22  many, many defendants face in this Court, and they're not
23  held simply because they're poor and they don't have an
24  appropriate place to live or they don't have ties to New
25  Mexico.

Page 156

1      The Court, you know, often releases people to
2  the halfway house in those circumstances, and we think
3  that that's an appropriate outcome here as well.
4      The Pre-Trial Services Report also lists
5  possible additional charges.  As we just discussed, none
6  have been filed.  None have been noticed through a target
7  notice.  It's not reasonable, in our view, to detain
8  someone based on a theoretical, speculative belief that
9  maybe at some time in the unknown future, some charges may
10  be coming.
11      What we do know is that the charges that were
12  brought, are -- have been dismissed and are not pending.
13  So the only charges are the -- the gun -- the one gun
14  charge in this case, is the only charge against him, and
15  the only charge that we have any reasonable basis to
16  believe is coming, because he hasn't received any target
17  notice from the State authorities.
18      Turning to dangerousness, the nature of the
19  offense -- this is a little bit interesting in this case,
20  because the bulk of the testimony, really had very little
21  to do with the alleged offenses in the Indictment.  The
22  actual offenses alleged in the Indictment are non-violent
23  firearms offenses, and Mr. Wahhaj's alleged involvement in
24  that was that he -- who -- he had lawful possession of
25  firearms, that he lawfully purchased.  He's not a

Page 157

1  prohibited person.  He had a Second Amendment right to
2  possess those guns.
3      His involvement, supposedly, was that he allowed
4  his wife access to those weapons.  Now, the Indictment
5  says that they were preparing for a violent attacks on
6  various institutions.  We didn't hear anything about
7  specific plans to commit violent acts or offenses, no
8  institutions are identified in the Indictment.
9      We did not see any writings from Mr. Wahhaj or
10  anyone else expressing an intention or desire to use
11  violence or espousing a belief that terrorism is
12  appropriate or is something his religion calls for.  There
13  aren't manifestos, journals, emails, text messages, social
14  media posts, nothing that came from my client.
15      No communications from my client or writings
16  indicating any belief in extremism, the violence, jihad,
17  none of that.  We don't have intercepted phone
18  conversations.  We don't have evidence of meetings with
19  people who have been identified as terrorists or
20  sympathetic to terrorism.  We don't have evidence of
21  membership in a terrorist organization.  We don't have
22  evidence of any association, at all, with any terrorist
23  groups.
24      I -- the only activity that I noticed in the --
25  one of the 302s, was a reference to my client and his

**40  (Pages 154 to 157)**

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 158

1  brother attending a Black Lives Matter march in Atlanta.
2  That's -- that's the only group that I've seen any
3  reference to him having an association with. There's
4  nothing wrong with attending a Black Lives Matter march.
5  THE COURT: I agree. As I'm sure the Government
6  would agree, there's nothing wrong with that.
7  MR. IVES: It seemed an odd reference in the 302
8  is the reason that I brought it up. And the absence of
9  all this evidence, of my client ascribing to any of these
10  beliefs, maybe explains why the charges are what they are
11  today.
12  What we have are firearms charges. We don't
13  have any charges for conspiring to -- conspiring to plot a
14  terrorist attack or providing material support to a
15  designated terrorist. We don't have any of that.
16  So where -- what is the evidence here about
17  so-called jihad and violent attacks? It -- as we heard
18  today, it comes from -- almost exclusively from these two
19  minor children who have been questioned repeatedly without
20  their parents, without legal guardians present in the
21  room, and we would ask the Court to take that into
22  consideration.
23  Those statements have not been corroborated,
24  either by writings by Mr. Wahhaj or anything else. These
25  are uncorroborated statements by minor children in a --

## Page 159

1  what we believe is a -- is a fairly coercive environment.
2  As to the strength of the evidence, it seems
3  very revealing to me that we didn't hear anything about
4  Mr. Wahhaj's mens rea. This is -- this is a case about
5  possession of guns, and as I said, he had a Second
6  Amendment right to possess those guns (indiscernible,
7  audio skips) prohibited person or didn't have the right to
8  possess those guns.
9  What the Indictment alleges is that he was part
10  of a conspiracy to "knowingly provide Jany Leveille, an
11  alien, possession of firearms." So knowingly is a key
12  word there, because it applies, also, to her immigration
13  status.
14  In order to commit this crime, they have to have
15  some evidence that he was aware that she was in the
16  country illegally. It can't just be that he presented a
17  firearm -- or he allowed her to have access to a firearm,
18  but he didn't know anything about her immigration status
19  or he thought she was here legally. There must be some
20  evidence of knowledge, and that's clear, even for a
21  general intent crime, Your Honor.
22  In the Tenth Circuit, very recently, just this
23  year, said, even when specific intent is not required --
24  and actually conspiracy is a specific intent crime in the
25  Tenth Circuit -- but even where specific intent is not

## Page 160

1  required, criminal statutes are usually read to require
2  only that the defendant know the facts that make his
3  conduct illegal.
4  So one of the facts that makes it illegal, of course,
5  is that Ms. Leveille was here unlawfully during the time
6  period in question, which we heard no evidence of.
7  THE COURT: Well, but the Grand Jury's returned
8  an Indictment charging that, and the Grand Jury has found
9  probable cause to charge that. And so, certainly, I'm
10  taking judicial notice of that, but of course, probable
11  cause is not beyond a reasonable doubt, and these are
12  arguments that certainly are appropriate after today's
13  hearing.
14  MR. IVES: I understand, Your Honor, that we're
15  not in a trial, but I do think as to the strength of the
16  evidence, to have zero evidence of knowledge. No evidence
17  that there were conversations between them or notice that
18  came from Immigration or from any government agency or
19  anything to suggest that my client knew what her
20  immigration status was. (Indiscernible.)
21  THE COURT: What I have is the Grand Jury's
22  finding of probable cause to charge him with this
23  conspiracy.
24  MR. IVES: Correct. Correct. I understand that
25  and I understand that that is part of the weighing that

## Page 161

1  the Court has to do.
2  THE COURT: And that's at least with regard to
3  that element of the conspiracy. I've heard a lot more
4  testimony about other aspects of it, but go ahead.
5  MR. IVES: Yes, Your Honor. I think that the
6  other thing that the Government focused on -- the other
7  things that the Government focused on were, one, the death
8  of his son and the circumstances surrounding that.
9  And I think what is becoming clear is really
10  that the Government's theory is that there was a failure
11  to provide medication that they believe caused the child
12  to pass. And I think that what we heard was testimony
13  about that a religious ritual could be used in lieu of
14  medication and that that religious ritual was occurring
15  and that the child passed -- at least that coincided with
16  the child's passing, according to the Government's theory.
17  And we didn't hear evidence of violence towards
18  the child. We didn't hear evidence of violence toward any
19  child. No physical abuse or anything of that nature. No
20  evidence of malice towards any child.
21  The training, Your Honor, again, we have the --
22  the firearm training that the Government has relied on --
23  again, we have this based on the testimony of (inaudible,
24  audio skips) take into account the circumstances of that
25  questioning, repeated interviews, being isolated, being

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

**Page 162**

1  taken from the families in a foreign environment, an
2  intimidating environment where law enforcement are, you
3  know, putting pressure on them to provide information.
4  And these are, you know -- these are uncorroborated
5  statements regarding that -- what the training was and
6  what it's -- more importantly, what it's purpose was.
7        So we don't believe that there's any credible
8  evidence of a plan for, you know, jihad or any violent
9  attacks that the Government has presented today and we
10 would ask the Court to take that into account as well.
11       THE COURT:  Mr. Kraehe, is there anything that
12 you want to add to the question of release or detention on
13 Mr. Wahhaj?
14       MR. KRAEHE:  Your Honor, I believe that Mr.
15 Wahhaj is a flight risk.  They had a letter here of
16 employment.  There's actually no evidence that he's been
17 employed since he came to New Mexico or has any employment
18 here whatsoever.
19       There's no evidence that he has any ties to the
20 community here.  There's lots of evidence that he has ties
21 to other places, Georgia and New York.  There's evidence
22 of frequent foreign travel.  We believe that makes him a
23 flight risk.
24       Your Honor, there is more than sufficient
25 evidence to prove by clear and convincing evidence that

**Page 163**

1  Mr. Wahhaj is a danger to any person in the community.
2  There is more than ample evidence presented here today to
3  show that he engaged in the conspiracy, the objectives of
4  which were to establish a compound in Amalia, the purpose
5  of which was, among other things, to train children to
6  engage in some kind of prophetic, end-of-times occurrence
7  during which they would kill or detain persons associated
8  with governmental, educational, financial and military
9  organizations.
10       Witnesses describe this as "jihad."  They didn't
11 describe that as "jihad" at our prompting, they described
12 that as "jihad" completely on their own.  And they knew
13 what jihad was, and they described what it was, and they
14 described it as killing people.  Mr. Siraj -- Mr. Wahhaj
15 trained his children to kill people.
16       As part of this conspiracy, they took direction
17 from defendant Jany Leveille, who they considered a
18 prophet, who received messages from God.  They did what
19 they told her to do.
20       As part of this conspiracy, they recruited
21 persons and continued to attempt to recruit persons to
22 this cause, the cause of Jany Leveille and her prophetic
23 status and encouraged such persons to bring guns into that
24 and die as martyrs.
25       As part of this conspiracy, they transported 11

**Page 164**

1  firearms, including an AR-15 style assault rifle and scope
2  rifles and ammunition to New Mexico to carry out their
3  plan.  And I would add that they never used these rifles
4  for hunting or for any purpose other than the military
5  training that they were providing themselves and their
6  children.
7        As part of this conspiracy, they constructed a
8  compound that included a firing range, defenses,
9  fortifications and escape tunnels.  They placed firearms
10 in their escape tunnels and placed ammunition next to the
11 firearms, so that the firearms could be at the ready and
12 loaded, should they find it necessary, in accordance with
13 their plans.
14       As part of this conspiracy, they engaged in
15 firearms -- in military, tactical training and instructed
16 children to engage in such training.  They indoctrinated
17 the children to believe that they, too, would carry out
18 acts of violence as part of this coming end-of-times
19 occurrence or jihad.
20       As part of this conspiracy, they prepared for
21 unlawful violence in defense of their compound against
22 lawful process by law enforcement.  When they were raided
23 by the Taos Police -- by the Taos Sheriffs Office, they
24 armed themselves and they only stood down when it was
25 clear that they were outnumbered.

**Page 165**

1        As part of this conspiracy, the defendants
2  unlawfully took a young, disabled child from his mother.
3  They did this unlawful -- unlawfully, knowing it was
4  unlawful.  They instructed their children not tell anyone
5  that they had taken this child and they told them that
6  they knew if authorities found out they had this child,
7  they'd all be going to jail.
8        They knew that this child required medication.
9  They deprived this child of its medication and transported
10 him across the country.  Because of this child's
11 disabilities, they considered the child to be less than
12 human, to be possessed by demons.
13       As part of this conspiracy, the defendants
14 subjected a young, disabled child to rituals for up to ten
15 hours every day, until the child became exhausted and
16 distressed.  We heard evidence that the child suffered
17 seizures during these religious rituals.  Ten hours a day,
18 these rituals lasted.  To say that that's not child abuse
19 is ludicrous.
20       As part of this conspiracy, the defendants
21 subjected a young, disabled child to rituals, even after
22 the child apparently suffered epileptic seizures, frothed
23 at the mouth and choked.  They did this until the child
24 died.
25       As part of this conspiracy, Mr. Wahhaj subjected

**42 (Pages 162 to 165)**

1    other children to these rituals.  Notwithstanding the
2    obvious physical distress of the child and notwithstanding
3    the clear risk to his health and life, at no time did
4    anyone else intervene on his behalf.
5         Mr. Wahhaj never intervened on behalf of -- of
6    young A.G.  He never called medical personnel.  He never
7    called authorities, not even after the child died.
8         As part of the conspiracy, the defendants hid
9    the child's death from its -- his mother, his family and
10   from proper authorities.  They warned the children that if
11   anyone learned of the child's presence on the compound,
12   they would all go to jail.
13        As part of the conspiracy, the defendants kept a
14   deceased child under the bed, then in a storage shed, and
15   then in a tunnel.  They never buried him.  Rather, they
16   instructed a child to assist in washing the dead body
17   regularly for a period of several weeks -- months,
18   actually, until the child began to decompose.
19        Even after that, as punishment, they forced
20   children to wash this dead child's body.  They instructed
21   the children that the dead child would be resurrected as
22   Jesus Christ and direct them against whom to wage jihad.
23        Your Honor, this man is a danger to the
24   community.  He's a danger to other people.  He must be
25   detained.

1         THE COURT:  All right.  Mr. Wahhaj, I've
2    considered all of the factors set forth is 18 United
3    States Code Section 3142(g) and all of the information
4    that you provided to Pre-Trial Services in your interview,
5    as well as all of the information that's been presented
6    here in Court, the testimony that was provided, the
7    arguments of your counsel.
8         And I conclude that you must be detained pending
9    trial, because the Government has proven and I find by
10   clear and convincing evidence that no condition or
11   combination of conditions of release will reasonably
12   assure the safety of any other person in the community.
13        And I also find by a preponderance of the
14   evidence that no condition or combination of conditions of
15   release will reasonably assure your appearance as
16   required.  You are remanded to the custody of the Marshal
17   Service pending further proceedings.
18        United States of America versus Jany Leiveille.
19   Ms. Leiveille, please come up to the podium.  Ms.
20   Converse?
21        MS. CONVERSE:  Your Honor, I'm going to do my
22   best to avoid repeating what Mr. Ives said, but to the
23   extent that his general arguments about 3142 and the
24   burdens of proof are applicable, I incorporate them.
25        THE COURT:  Okay.

1         MS. CONVERSE:  We -- I did want to touch briefly
2    on the immigration, just because -- relevant to flight
3    risk.  We went through the chronology of all the times
4    that Ms. Leiveille yearly asked for an employment
5    authorization, yearly got it until this year when there
6    was a breakdown in communication and it was denied.  She
7    was constantly seeking maintaining some status.
8         Agent Taylor says in his opinion that doesn't
9    give her legal status.  Whether it does or doesn't, that's
10   actually not relevant to the charge, because the charge --
11   the Government has to prove she didn't have a hunting
12   license or she wasn't a lawful permanent resident or she
13   wasn't a U.S. citizen or she wasn't a diplomat.  Those are
14   the four exceptions to 922(g).  None of the statuses we're
15   talking about here, unfortunately for us, apply to that.
16        But what they do apply to is showing her
17   constant complying with immigration laws and seeking
18   statuses and keeping in touch with immigration.  And that
19   goes to flight risk, Your Honor.
20        Probation also thought there was a lack of
21   verifiable, legitimate employment, which is kind of a
22   scary argument when you've got a mother of one- and
23   three-year-olds working from home, and that proves you're
24   a flight risk or a danger to the community.
25        It might prove you're a good, caring mother,

1    actually, and you want to take care of your own babies.
2    That is not a legitimate factor, the fact she worked from
3    home and took care of her one- and three-year-old while
4    she did it.  That's not legitimate reason to deny.
5         Ties to a foreign country.  She has no valid
6    passport.  She has no -- unlike some of the other
7    defendants, she doesn't have any international travel.
8    She'd have no way to get Haiti.  She has a brother there,
9    but she'd have no way to get there.
10        Unstable, unsuitable living situation.  We're
11   proposing La Pasada Halfway House, Your Honor.  We're not
12   proposing the now raised trailer up there.  And there's
13   nothing unsuitable or unsafe about La Pasada Halfway
14   House.
15        As far as the danger, the -- this is a
16   non-presumption offense, like Mr. Ives pointed out.
17   They've not charged her with anything that is a crime of
18   violence, and, of course, drugs aren't an issue here.
19        And I'd like to talk a little bit about the
20   other things -- safety concerns for a specific individual.
21   CYFD custody -- the children are in CYFD custody.  Any
22   visitation between my client and her children be very
23   strictly supervised.  These -- she presents no danger to
24   her children.
25        As far as to the -- to any other specific

**Page 170**

1  people, I'm somewhat incredulous that the Government is
2  alleging that these -- that praying for a sick child is a
3  problem.  And also --
4         THE COURT:  That's not what the Government's
5  alleging.
6         MS. CONVERSE:  Well, they're calling it a
7  ritual.  They're saying praying over him, putting his head
8  on his forehead, or perhaps on the neck, is a problem.
9  And also, what the 13-year-old described sounds a bit like
10  a scene from The Exorcist.  Every time there would be
11  prayers over him, he would foam at the mouth, his eyes
12  would roll back.
13         If that were true, then that -- maybe that boy
14  really was possessed.  Otherwise, putting your hand on
15  someone's forehead and praying for them shouldn't provoke
16  foaming at the mouth and eyes rolling back.  And I suspect
17  that the Government doesn't really believe that that
18  happened every time someone put -- Siraj is the only one
19  who did the -- said these prayers.  I suspect the
20  Government doesn't really believe that that happened.  And
21  if they do really believe it, then the child was
22  apparently possessed.
23         As far as the community, I ran a quick word
24  check through the discovery that we were provided
25  yesterday, the 254 pages, which I believe includes the

**Page 171**

1  transcripts of the interviews with both J.L. and F.L., for
2  the word "jihad."
3         And while it is true that F.L. is the first one
4  in the interview to mention jihad, it's in the context of
5  his father had talked about there was jihad in Morocco.
6  Every other context in which it comes up, it talks only
7  about Siraj, and when specifically asked, "Is there a plan
8  to commit jihad?" his answer was "No."
9         So there's not a danger to the community because
10  this is not Siraj and there was no plan, according to the
11  children to commit jihad.
12         There are no other -- the Pre-Trial Services is
13  incorrect where it says there are other pending criminal
14  charges.  As far as weapons involved in the instant
15  offense, well, that's somewhat of a -- that's somewhat
16  obvious, since she's charged with possessing a weapon, but
17  she's the -- she's not the one who personally had them
18  when the officers arrived, and she's the one who convinced
19  the people who did have the weapons to put them down and
20  cooperate with law enforcement.
21         The Government has not met its burden of proving
22  that Jany Leveille is a flight risk or a danger to the
23  community and we're asking that she be released to the
24  custody of La Pasada Halfway House.  If Your Honor wants
25  further protect -- secure -- sense of security around her,

**Page 172**

1  then we'd ask that you order GPS monitoring, in addition
2  to residing at La Pasada Halfway House.
3         THE COURT:  Mr. Kraehe, do you have anything to
4  add to what you already stated?
5         MR. KRAEHE:  Your Honor, I believe that she's a
6  flight risk for all the same reasons that I believe that
7  Siraj Wahhaj is a flight risk.  No employment --
8         THE COURT:  I'm sorry -- I'm sorry, Mr. Kraehe.
9  All right.  Sorry, Ms. Converse, I was just informed that
10  Pre-Trial wants to add one bit of information that was
11  just learned regarding an ICE detainer.
12         PRE-TRIAL SERVICES OFFICER:  That's -- that's
13  correct, Your Honor.  Adalinda Ruiz from Pre-Trial.  We
14  did receive information from ICE that the defendant --
15  they did file a ICE detainer on her on September 4th of
16  2018, and she has a current immigration hearing on
17  September 18th (inaudible).
18         MS. CONVERSE:  Your Honor, under 8 CFR 215.2,
19  ICE cannot deport anyone who's departure would be
20  prejudicial to the interests of the United States under 8
21  CFR 215.3.  Under 8 CFR 215.3, anyone who is needed in the
22  United States as a witness in or as a party to any
23  criminal case or investigation, is deemed to -- that
24  person's departure is deemed to be prejudicial to the
25  United States.  And --

**Page 173**

1         THE COURT:  Let me just stop you for a minute.
2  I'm not going to consider anything with regard to this ICE
3  detainer that the Tenth Circuit case law instructs me not
4  to consider, so I'm just -- you don't need to make an
5  argument with regard to the Aylon-Aylon case.
6         MS. CONVERSE:  Aylon-Aylon was point number
7  three and I'll leave it at that, Your Honor.
8         THE COURT:  All right.  Mr. Kraehe?
9         MR. KRAEHE:  Yes, Your Honor, she has no ties to
10  the community, she has ties to foreign countries, she has
11  no employment, that's why she's a flight risk.
12         She's a danger to the community for all the
13  reasons that I set forth were dangers to the community for
14  Mr. Wahhaj.
15         In addition, I would add that she was the leader
16  of this organization.  She declared herself a prophet and
17  they believed that she was the prophet -- an end-of-times
18  prophet, the mahdi.  And she -- she also said she was
19  Mary, Mother of Jesus, and they believed her and they did
20  what they -- what she told them to do, including these
21  rituals on A.G.
22         And more than anyone else, she is responsible
23  for this -- this community and for the horrors that
24  occurred there.  And I believe she did this for her own
25  self-aggrandizement and to the detriment of the poor A.G.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

1   and the other children living on that compound.  And for
2   all those reasons, Your Honor, we believe she is a danger
3   to the community.
4        THE COURT:  All right.  Ms. Leveille, I've
5   considered all of the factors that I'm required to
6   consider under 18 United States Code Section 3142(g) and
7   all of the information that's been presented here in Court
8   today, and I find by a preponderance of the evidence that
9   you're a flight risk and by clear and convincing evidence
10  that you're a danger to the community and I find that
11  there are no conditions of release that will adequately
12  mitigate these risks that you pose.  And for these
13  reasons, I'm going to be remanding you to the custody of
14  the Marshal Service pending your trial.
15       Is there anything further?
16       MR. KRAEHE:  Nothing from the United -- Oh, Your
17  Honor, I would add, we do want a condition that she have
18  no contact with her children whatsoever.  They are
19  material witnesses and given the nature of her so-called
20  prophetic status and her past relationship with her
21  children, it is too much of a danger to allow any contact
22  between her and her children and we believe that the truth
23  and that justice would suffer as a result.
24       MS. CONVERSE:  Your Honor, we would obviously
25  object to that it (indiscernible) from her fundamental

1   Constitutional right to talk with her children, given the
2   fact that she -- you've ordered her detained, she will be
3   talking to them, if at all, through thick glass over a
4   phone, which will be recorded and promptly passed to the
5   FBI.
6        And I can speak from experience, working with
7   CYFD and children in jails, it -- it's frankly going to be
8   a real uphill battle for her.  CYF -- her respondent's
9   attorneys in the Children's Court case to convince CYFD to
10  bring children into a jail, really good chance the younger
11  ones won't be going and certainly strict prohibition
12  about, don't talk about this case with J.L. and F.L.  And
13  the Government will have the absolute assurance that that
14  will be the case because they will be getting the
15  recordings of those, I have no doubt, promptly after every
16  visit, assuming any visits occur.
17       MR. KRAEHE:  I -- Your Honor, we believe as
18  little as a glance between her and her children could
19  affect their testimony.  And for that reason, we are
20  asking that this Court, based on the evidence that's been
21  put before it, restrict her from any access whatsoever
22  with her children during the pendency of these
23  proceedings.
24       MS. CONVERSE:  Your Honor, I think we're back in
25  Hogwarts territory where she can control people with her

1   mind.  That's --
2        THE COURT:  That's not what the Government's
3   suggesting.  Have the children expressed, one way or the
4   other, the -- the two primary witnesses -- I guess there's
5   a third eight-year-old child who's provided test -- or
6   witness statements, but have any of those three children
7   indicated a desire not to have contact with their mother?
8        MR. KRAEHE:  Your Honor, I -- I would actually
9   defer to Special Agent Travis Taylor on that.  I think he
10  probably has the best sense of any of -- any person in
11  this courtroom now (inaudible).
12       THE COURT:  Agent Taylor?  Why don't you come
13  back up here to the podium.  Do you have any comments in
14  that regard or any knowledge in that regard?
15       SPECIAL AGENT TAYLOR:  (Inaudible.)
16       THE COURT:  I'm sorry?
17       SPECIAL AGENT TAYLOR:  To some degree, yes.
18       THE COURT:  Okay.  And although I excused you,
19  you took an oath before and do you promise to tell the
20  truth?
21       SPECIAL AGENT TAYLOR:  Yes, ma'am.
22       THE COURT:  All right.
23       MR. KRAEHE:  Special Agent Taylor, if you could
24  just briefly tell the Court the extent to which the
25  children have talked to you about their desire to have

1   further contact with their mother.
2        SPECIAL AGENT TAYLOR:  The three-year-old --
3   three eight-year-olds have not mentioned anything about
4   seeing their parents again.  (Minors' name - F.) said he
5   was -- sorry, F.L. said he was glad to be out of the
6   compound and would like to be adopted, and J.L. said that
7   he would like to see his mom before she's deported.
8        THE COURT:  And at present, do you have an
9   understanding of what the constraints with regard to
10  CYFD's rules regarding the children and supervised
11  visitation or if there's any (indiscernible, audio skips)
12  has issued with regard to limitations on contact?
13       SPECIAL AGENT TAYLOR:  I don't know of the State
14  Court.  I know that CYFD had been working to prevent
15  visitation, but I do not know the results of those
16  hearings.
17       MS. CONVERSE:  May I ask a follow-up question?
18       THE COURT:  Yes.
19       MS. CONVERSE:  You're aware that this -- the
20  Children's Court Judge ordered that my client be allowed
21  to see and breast-feed her one-year-old child, aren't you?
22       SPECIAL AGENT TAYLOR:  I had not heard about
23  those hearings.
24       MS. CONVERSE:  In fact, the interview at CYFD --
25  one of the interviews at CYFD with my client, was to do a

---

**Page 178**

1 quick mental status exam before engaging in that -- in
2 those visits.
3      SPECIAL AGENT TAYLOR:  I don't know about those
4 hearings or interviews.
5      MR. KRAEHE:  Your Honor, we have no objection to
6 the defendant having supervised visitation with a
7 one-year-old child.  We don't expect a one-year-old child
8 to be a witness in this case.
9      THE COURT:  Well, there are six children and
10 I've heard of three who are witnesses and three who you've
11 referenced either giving some indication or no indication
12 about preference.  Is the Government's request only as to
13 the three witnesses, the eight-year-old and the two
14 teenagers?
15      MR. KRAEHE:  Special Agent Taylor, how old are
16 the other ones?
17      THE COURT:  There's a six-year-old and a
18 three-year-old and a 15-month-old.
19      SPECIAL AGENT TAYLOR:  I believe that is
20 accurate.
21      MR. KRAEHE:  Your Honor, our request is -- is to
22 all the children except the one-year-old.  We believe all
23 other children are potentially witnesses or already
24 are witnesses.
25      THE COURT:  All right.  You -- you can step

---

**Page 179**

1 down.
2      MS. CONVERSE:  Your Honor, I do not believe the
3 three-year-old could possibly be a witness in the case and
4 under a multitude of Tenth Circuit authority, including,
5 but not limited to (indiscernible), the Government cannot
6 show a compelling need to prohibit any sort of contact
7 with the children.
8      I under -- it's almost -- I'll admit it's almost
9 a spectrum as far the two older ones who've given
10 statements.  I can see a greater -- it's still not a
11 compelling need in our position, but as far as the younger
12 three, no evidence of any statement by the eight-year-old
13 has been given.
14      And I have a suggestion -- I have to coordinate
15 with the State -- her State attorney.  She has two State
16 attorneys representing her in the custody matter.  These
17 things move as slow as molasses and it is 5:34 at night,
18 Your Honor.  Nothing could possibly get in place on
19 visitation on -- any time within the next week or two.
20      And why don't you pass on that issue and move on
21 to the other defendants and we can -- depending on what I
22 can learn from her State attorneys -- her respondent's
23 attorneys and there may not become even an issue that they
24 need to the call to the Court's attention.
25      THE COURT:  All right.  Well, I'm not going to

---

**Page 180**

1 pass on the issue.  I'm going to prohibit Ms. Leveille
2 from having contact at this point with her eight-year-old
3 child and the two teenagers who are witnesses.  I'm not
4 going to enter an Order prohibiting contact with the three
5 younger children, but before any contact with those three
6 younger children occurs, I want to have the government and
7 you, counsel, make me aware of what the arrangements are
8 with regard to the State proceedings and how such contact
9 would occur.
10      Ms. Leveille, you're prohibited from speaking to
11 the younger children about this case if you are at some
12 point able to correspond with or see them.  Any such
13 communications occur, you all need to come back and make
14 me aware of what arrangements are being made for that.
15      MS. CONVERSE:  Yes, Your Honor, may I have one
16 second to see if I need a clarification?  We -- we're
17 good, Your Honor, thank you.
18      THE COURT:  Okay.  And if there's any --
19 certainly as this case progresses, there's some reason to
20 re-approach the Court with regard to my Order prohibiting
21 contact with the eight-year-old and the two teenagers,
22 we'll come back and present that to me.
23      MS. CONVERSE:  Yes, Your Honor.  Thank you.
24      THE COURT:  All right.  Mr. Morton, please come
25 up.

---

**Page 181**

1      MS. SIRIGNANO:  Thank you, Your Honor.  Your
2 Honor, I do believe (indiscernible, audio skips) 42, there
3 are conditions or a combination of conditions that can be
4 fashioned to protect the community and assuage any
5 concerns that the Court or the Government may have
6 regarding risk of flight.
7      We'd like to ask that Mr. Morton be placed in
8 the third-party custody of the La Pasada Halfway House
9 with a GPS monitoring if the Court would require that.  As
10 my co-defendants' counsels have already said, the
11 presumption of detention does not apply, and detention,
12 Your Honor, is not necessary in this case.
13      From the Pre-Trial Services Report, we have a
14 couple little problems here, Your Honor, that all of
15 co-counsel have already addressed.  He has no felony
16 criminal history.  He had a petty misdemeanor from 1999 in
17 New York, and a petty driving while license suspended or
18 revoked and a misdemeanor possession of a forged
19 instrument, 2001, and these were all offenses that he got
20 probation for.
21      Right now, there is a pending Taos County
22 Sheriffs Office criminal trespass misdemeanor -- it's a
23 citation, I looked it up in the State system, and it
24 involves the property where he lived and the adjoining
25 land.  But he has counsel with the State on this case and

---

**46 (Pages 178 to 181)**

1  I've already talked to his Public Defender, Mr. Kostich,
2  up in Taos on this and we're going to try to get this
3  citation, or this, yeah, the citation, this case
4  dismissed. He was placed on conditions of release for
5  this and he's pending a hearing sometime in October on
6  this case. But it's just a citation, it's a petty
7  misdemeanor.
8       Going back to the Presentence Report, Judge, I
9  have -- the information was verified by his sister and the
10  one paragraph regarding his travel to Egypt is a little
11  bit problematic because he was living there and he was
12  working there and I don't believe that should raise any
13  suspicion about why my client was living and working in a
14  foreign country. His -- there's nothing nefarious about
15  living in Mexico or in Egypt. We see this all the time.
16      THE COURT: And counsel, as I stated at the
17  bench conference, I'm only considering that information
18  within the constraints of which I spoke about.
19      MS. SIRIGNANO: Yes, Your Honor. It's -- it's
20  -- I realize it was in the Pretrial Report and I just
21  wanted to make that clear for the record. The Probation
22  Department, speaking about flight, has two prongs, they
23  say that he has a lack of stable residence, lack of
24  community ties and lack of employment.
25      And we heard the evidence today is that he does

1  have property in Taos. He had a residence in Taos that he
2  was working on building an earthship. If he were to go to
3  the La Pasada Halfway House, he would be able to be
4  gainfully employed again. He's a Union carpenter and he
5  can easily find a job as a carpenter here in town and work
6  with me while he's preparing for trial.
7       The -- his passport's been seized by the
8  Government as all of his forms of identification. That's
9  what he was doing up at the Motor Vehicle, was trying to
10  get a license so he could have a form of identification
11  while he was released by the State of New Mexico from the
12  29th through the 31st of last month.
13      And he didn't flee, Your Honor. He did ask his
14  State Public Defender if he could go outside the County,
15  Mr. Kostich, when he did go to Colorado, which literally
16  was a short ride from where (indiscernible, audio skips).
17      He has extended family in New York. He's got a
18  sister in Denver. While his Dad does live in Egypt, he
19  comes back to the United States in New York for two months
20  every year to get medical treatment at the V.A., since
21  he's a veteran. As you know, his four children are in
22  CYFD custody right now in Taos County, and all of his
23  possessions right now are in Taos County.
24      And so, I just refute the idea that he has lack
25  of community ties. He had community ties up in Taos. If

1  he were to stay here at the halfway house, he would
2  develop community and get a job and try and work with CYFD
3  to get his children back while his wife is dealing with a
4  newborn, Your Honor.
5       Addressing dangerousness, the evidence showed
6  today that Mr. Morton didn't own any of those weapons that
7  were retrieved from the compound. He and his family
8  weren't living inside that compound, rather they were in
9  the truck, the vehicle that was there, and he was working
10  on collecting the materials and starting to build this
11  earthship as a permanent structure. He had the training,
12  he had the class to do this.
13      The evidence showed today that he wasn't accused
14  of the death of A.G. He wasn't part of any of the
15  rituals. He isn't part of any terrorist groups. There's
16  no evidence that he himself were -- was planning any kind
17  of jihad or any kind of attack at all.
18      Rather, the evidence and the discovery thus far
19  shows that he was trying to live a peaceful life. That he
20  and his family left New York, left Atlanta area, Alabama
21  wasn't working out. He had the property in New Mexico.
22  They came out to live a peaceful life in New Mexico and
23  the property was bought in the latter part of 2016, so he
24  could do that and start over and live a clean and healthy
25  life.

1       Your Honor, just briefly touching on the
2  strength of the evidence, I pointed out that the -- when
3  the FBI agent testified, that the stories, the interviews,
4  of the 13-year-old and the 15-year-old have changed. It's
5  varied. The statements in the co-defendant's book aren't
6  entirely accurate, too.
7       I also would like to adopt the statements that
8  Mr. Ives made. The Government presented no evidence of
9  mens rea of my client regarding Ms. Leveille's immigration
10  status. And I know the Grand Jury has already passed on
11  that, but I do believe it's important, at least for
12  detention here, to show that what my client is being
13  charged with, the conspiracy regarding the firearms and
14  Ms. Leveille's status, there wasn't one iota of evidence
15  today presented on that and that's the case.
16      There was no evidence presented that my client
17  knowingly provided weapons to her, or provided her access
18  to any weapons. There's -- there was no evidence
19  presented that -- of any allegation of aggression or
20  starting any violent acts against -- specifically against
21  Mr. Morton.
22      And as I brought out in cross-examination, the
23  evidence was the exact opposite, that they were trying to
24  defend themselves, that the tires were out there as a
25  permanent structure, as a barrier to defend themselves.

## Page 186

1    Furthermore, he wasn't violent when he was
2  arrested.  He wasn't dangerous.  He was unarmed, and at
3  this point, Your Honor, I don't believe that the Governor
4  -- or the Government has met its burden regarding
5  dangerousness and risk of flight, especially since he was
6  out for those few days and didn't flee the state at all.
7    He -- he's trying to get his children back.
8  He's trying to get to the halfway house, to start a job,
9  to support his children and to work with me on this case.
10  And I do believe that conditions, Your Honor, can be
11  fashioned to -- to award him this opportunity pending
12  trial.  Thank you.
13    MR. KRAEHE:  Your Honor, for all the reasons
14  stated before, we believe that Mr. Morton is a flight
15  risk.  He has foreign ties, he has no ties to the
16  community, he has no employment here.  His family is in
17  other states or in other countries.
18    We believe he is a danger to the community for
19  all the reasons set forth earlier.  He was part of the
20  conspiracy, the same as the others.  He joined in this
21  conspiracy willfully.  He knew its aims, its objectives.
22  He knew the actions of his co-conspirators.  Their conduct
23  is imputed under the law to him.
24    Not only that, he personally trained children to
25  -- in firearms and military tactics for the purposes we

## Page 187

1  described earlier.  And also, living on this compound, in
2  these small quarters, 22 foot trailer, several of which
3  you could probably fit in this courtroom.  There is no way
4  that this man didn't know exactly what was going on, out
5  in the middle of nowhere in that small trailer, for those
6  months with those children.  And especially with A.G.
7  screaming for ten hours a day while he was subject to the
8  -- these rituals.  So, he never did anything to protect
9  A.G.  Instead, he blindly followed Jany Leveille in this
10  conspiracy and in these actions.
11    And for those reasons, Your Honor, we believe he
12  is a danger to the community and should be detained.
13    MS. SIRIGNANO:  Your Honor, brief rebuttal,
14  please.  I don't remember hearing any evidence today that
15  -- or in the Indictment, that my client personally trained
16  children in firearms.  I might be wrong, but I don't
17  recall the Agent testifying to that.
18    Secondly, I don't believe that the Government in
19  its earlier arguments, raised any specific points about
20  Mr. Morton.  What the Government's trying to do here -- I
21  understand they're charged in a conspiracy, which has yet
22  to be proven, but what the Government's trying to do is
23  lump my client in with these other two co-defendants at
24  this point in time to keep him detained.
25    He has his own four children and one on the way,

## Page 188

1  so I submit to the Court that the safety and care of his
2  own children was his primary concern, because the other
3  children were being cared for by their parents.
4    And again, I haven't heard any evidence of
5  knowledge that Mr. Morton was at these rituals, present
6  during this rituals, aware of all of these rituals, aware
7  that A.G. was sick or dying.  Nothing was presented
8  regarding that.  He had -- he had his own family and his
9  own area and his own environment and he wasn't working --
10  excuse me, Your Honor, that's my phone.  Thank you.
11  Sorry, that's my alarm.  I apologize.
12    THE COURT:  It's okay.
13    MS. SIRIGNANO:  That means my time's up, that's
14  what they're saying.  Sorry, Your Honor.  I just lost my
15  train of thought.
16    Anyway, what I was saying was that he had his
17  own family, his own life, he was doing his own work --
18    THE COURT:  One of the eight-year-old children
19  is Mr. Morton's child?
20    MS. SIRIGNANO:  That's right.
21    THE COURT:  Okay.
22    MS. SIRIGNANO:  That's right, and he was
23  interviewed, that's right.  But his children are much --
24  that's the oldest child.
25    THE COURT:  Okay.

## Page 189

1    MS. SIRIGNANO:  So, Your Honor, I do believe
2  that there are conditions that can be fashioned instead of
3  detention in this case.  Thank you.
4    THE COURT:  All right.  Mr. Morton, I've
5  considered all of the factors I'm required to consider
6  under 18 United States Code Section 3142(g).  I've
7  considered all of the evidence presented in Court today,
8  and I've considered the information you provided to
9  Pre-Trial Services.
10    I find by clear and convincing evidence that
11  you're a danger to the community and that no conditions of
12  release will adequately mitigate your risk of
13  dangerousness and I'm detaining you pending your trial in
14  this case on that basis.
15    MS. SIRIGNANO:  Thank you, Your Honor.
16    THE COURT:  Ms. Subhanah Wahhaj, please come up
17  with your counsel.
18    MR. BLACKBURN:  Your Honor, I have a few
19  comments.  I would adopt all of the arguments that --
20  legal arguments by my colleagues that came before me
21  concerning the charges and matters I think the --
22    I would like to point out to the Court that
23  Subhanah was born and raised in Brooklyn, lived in New
24  York most of her life.  She got a degree.  She went --
25  graduated from a high school there in New York City and

**48 (Pages 186 to 189)**

**Page 190**

1  then went to college and got a degree there in -- in --
2  got a degree in English. She -- she lived in New York,
3  her -- most of her early life and childhood, and into her
4  adult --
5        THE COURT: Ms. Wahhaj, do you want to sit down?
6  Why don't you take a seat.
7        MR. BLACKBURN: Thank you, Judge, I didn't see.
8  She went to Medgar Evers College in 2008. She got a B.A.
9  in English. She wanted to be a journalist and she went to
10 work, at that time, for the Center for Black Literature
11 and worked for them for a couple years under a director by
12 the name of Brenda Green.
13       So she spent all of her -- so when the -- when
14 the Probation office says that -- that lack of stable
15 residence, she basically is in New York her early
16 adulthood life, gets a degree, works there for a couple
17 years and she meets her husband and they go to Egypt for
18 three years.
19       As the Court has already -- and has already
20 discussed, those particular issues and what did or did not
21 happen in Egypt, she came back in 2011. Her first child
22 was born. She had a eight-year-old, a six-year-old -- so
23 she's two, four, six and eight. The first child was born
24 in Egypt, so the child had a dual citizenship in Egypt.
25       They came back to the United States to live

**Page 191**

1  again in New York for another year until she went Atlanta,
2  Georgia. They were in Atlanta, Georgia, from --
3        THE COURT: Mr. Blackburn, I might be able to
4  make this a little bit shorter for you. Why don't you
5  focus on dangerousness, because I don't -- I'm not going
6  to find that your client's a flight risk.
7        MR. BLACKBURN: Okay. All right. Thank you,
8  Your Honor.
9        Your Honor, as you've heard from the testimony,
10 I think the -- the evidence in this case shows that she is
11 probably the least involved in any of these issues that
12 was going on. She had the two-year-old, the
13 four-year-old, the six-year-old, and the eight-year-old to
14 raise. They were somewhat secluded from -- from everybody
15 else.
16       There's not issue about her having guns,
17 participating in any activity with guns, other than the
18 one time that she shot the guns. The issue concerning the
19 matters in -- when the child was taken in Georgia to
20 Alabama and then to New Mexico. Those do not involve her
21 in any separate degree.
22       There was no testimony about her being involved
23 in the rituals and what was going on with the prayer over
24 this particular child. As I -- I think as the officer
25 sort of put it, is the testimony came that -- that her

**Page 192**

1  designation was to be in taking care of the house and she
2  was in charge of those particular issues.
3        You know, I adopt all the arguments everybody
4  else has made concerning the -- the guns and their science
5  of knowledge in this particular matter.
6        The other thing is, Judge, is the Court is aware
7  that -- oh, I would submit that under the circumstances,
8  that they were allowed -- the Court -- CYFD was allowing
9  her and Lucas to see the children. They were allowing
10 them to have visits, they just never could get it together
11 because they were in custody, but as it relates to the
12 ability to see her children, they were allowing that to
13 happen. It was -- it was allowed and then it was
14 supposed to happen, I think the day that they were -- they
15 were arrested up there.
16       I don't need to submit to the obvious, as the
17 Court knows, we went through this this morning, she's 38
18 weeks pregnant. You know, I even thought we're going to
19 have a baby here in the next couple of days and those
20 particular issues, I think, are prevalent. We would like
21 to be able to be in a situation that she would be
22 released.
23       We had made known to the Probation Office and I
24 would prefer not to mention the people's names in the
25 courtroom this morning, but I had talked to Anthony Galaz

**Page 193**

1  and gave him the names of people who had arranged for
2  their release before in Taos to stay at a place.
3        We were also told that -- that they could make
4  the same arrangements. People are willing to -- there's a
5  couple local lawyers here in Albuquerque who are willing
6  to help her get a residence and stay pending this
7  particular case. Again, I don't want to go through --
8  I've made those names known to the Probation Office, so I
9  don't have to -- there's enough activities going on
10 outside this courtroom, as we know, that I don't want to
11 put anybody in a wrong position.
12       But we do have those people available to help
13 provide for some type of housing in the event that the
14 Court believes that's appropriate. If not, then as a
15 minimum I would ask the Court to put her into a halfway
16 house, particularly pending the pregnancy, as the Court
17 well knows what's going on, I don't have to belabor that
18 anymore.
19       MR. KRAEHE: Your Honor, I reiterate all the
20 same arguments I made before. I know the Court has
21 already indicated its ruling on flight risk.
22       As to danger to the community, she was a part of
23 this conspiracy. She knew its objectives. She knew how
24 this conspiracy was being carried out at the compound.
25 She participated in the transportation of young A.G. from

## Page 194

1    Georgia to New Mexico, knowing that A.G. was not Jany's
2    child.
3          She was surely aware of the rituals being
4    performed on A.G., particularly as she was the designated
5    housekeeper and would have been in the trailer probably at
6    all times and I believe there was testimony that she was
7    in the trailer during these rituals.  She would have heard
8    the screams and would have otherwise witnesses --
9    witnessed the suffering that this child was enduring.
10   There's more than sufficient evidence for the Court to
11   infer that.
12         There's also more than -- and also, just under
13   the law, the acts that the other co-conspirators are --
14   can be imputed to her.  She did nothing to help this
15   child, neither -- made no calls to authorities or medical
16   personnel while this child was suffering and made no calls
17   to authorities after the child was suffering.
18         And then after -- she must have known that this
19   child was under the bed for several months.  She must have
20   known that this child was being taken out and cleaned by
21   the other children for several months.  All of this can be
22   imputed to her knowledge, based on the evidence, and that
23   makes her a danger to the community.
24         As to her current condition, Your Honor, we
25   believe that she can receive more than adequate care while

## Page 195

1    in detention.  In fact, probably receive better care there
2    than just about anywhere else right now.  So we do ask
3    that she be detained, Your Honor.
4          THE COURT:  Well, I wouldn't detain her based on
5    a provision of medical care in the Federal facility being
6    better than care than in the community.  That -- I'm not
7    considering that.
8          MR. BLACKBURN:  Your Honor, I -- I do not recall
9    the testimony of the Agent saying that she was in -- in
10   the area of when these -- and would hear the screaming
11   when the rituals was being done.  In fact, he said totally
12   the opposite.
13         THE COURT:  The Agent did testify that when the
14   child died, and it was made known, she went back to work
15   immediately.
16         MR. BLACKBURN:  Right, in the -- in the area.  I
17   just think -- how do I say this delicately.  There --
18   there was a specific religious ceremony going on that
19   relates to this child that his parents -- this father who
20   could not be charged with kidnapping because he is a
21   parent of him, under Federal law, and his other wife were
22   taking.
23         And maybe that was the wrong issue that was
24   going on, as we sit out there and look at this, in a
25   different light, in a different world, that their religion

## Page 196

1    and what they were hearing from the callings that were
2    supposedly being made by Jany, was what they were
3    following.  And they were praying over the -- and they
4    were doing all of these rituals and hearing from Gabriel
5    and getting the signs as to what they should do and how
6    that they should pray over the child and all this stuff.
7          And I think that this particular religious
8    aspect that they're going through and their faith that
9    they had is being used against them.  And whereas maybe
10   that's not what other people would do, because they would
11   -- well, maybe they would go get -- maybe go get medicine
12   or something to this -- this was not her child to take
13   care of and to be able to do -- they were in -- they were
14   practicing their faith to what they knew and what they
15   thought was happening from the calls that they were
16   getting from other religious matters that was going on.
17         And -- and to use that against them, that they
18   would not call somebody or not do that what they were
19   driven by their own faith under the circumstances, I think
20   is wrong.  And -- and, I'm just calling it like it is.
21         If it was somebody else -- if we -- if these
22   individuals wasn't of Muslim faith, I don't know that we
23   would be here under the circumstances, but I throw that as
24   my own personal effect and I think that the Court can find
25   a series of conditions of release that -- that will

## Page 197

1    satisfy the Court that she is not a danger to the
2    community.
3          THE COURT:  Mr. Kraehe, is there anything else
4    you want to say?
5          MR. KRAEHE:  I would just respond to that, Your
6    Honor, by saying that these defendants are here because of
7    their actions, not because of their faith.  If their faith
8    led them to their actions, so be it, but their actions
9    were deplorable, they were despicable, and they make them
10   a danger to the community.
11         THE COURT:  I don't have any information that
12   Pre-Trial Services has investigated or found any suitable
13   third-party custodian, including La Pasada Halfway House.
14         La Pasada Halfway House has certain
15   consideration when determining whether an individual's
16   eligible to be a resident at that facility and because
17   there's such a variety of people facing such a variety of
18   charges, one of the security concerns at La Pasada is that
19   defendants not know about other defendants charges.
20         And Pre-Trial Services has informed me that La
21   Pasada, because of the publicity that this case has
22   received, many residents in the La Pasada Halfway House
23   have been talking about this case and that -- they're
24   concerned that it would be an unsafe situation for any of
25   the defendants here to be released to La Pasada Halfway

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 198**

1  House.
2      MR. BLACKBURN:  That's really unfortunate,
3  because publicity driving the ability for someone to be --
4  I'm not saying that the Court is using that, but La Pasada
5  Halfway House or any other halfway house not -- because
6  publicity and what's going on outside this courtroom,
7  driving the ability to (indiscernible, audio skips).
8      THE COURT:  Well --
9      MR. BLACKBURN:  I understand that the --
10     THE COURT:  La Pasada Halfway House has many,
11 many residents and the security of the facility depends on
12 residents being orderly and unfortunately because of
13 discussions that -- about this case that have occurred, my
14 understanding is that La Pasada views release to their
15 third-party custody to be an untenable and not an option.
16     And so that brings us to any other third-party
17 custodians, which I have no information that Pre-Trial has
18 vetted or approved any other third-party custodians with
19 regard to Ms. Wahhaj.
20     MR. BLACKBURN:  And we provided that information
21 and I asked Mr. Galaz this morning and he said that the
22 individuals that we're talking about have not contacted
23 them yet.  I was hoping that they would be here this
24 afternoon, but they were not, and I think that's because
25 they thought it was supposed to be this morning, also, so

**Page 199**

1  that's another issue, but --
2      THE COURT:  Okay.
3      MR. BLACKBURN:  -- but I can continue to
4  research that, Your Honor, and get that back to them.
5      THE COURT:  And let me just make sure I'm clear.
6  Is -- does Pre-Trial have anything to add to the
7  information I understand with regard to La Pasada's
8  position about security concerns?
9      PRE-TRIAL SERVICES OFFICER:  Yes, Your Honor.
10 We did, in preparation of the hearings today, we did
11 contact Daryl Agnes, who's the director of the La Pasada
12 Halfway House, and he did express his unwillingness to
13 have any of the five co-defendants reside at the Halfway
14 House.
15     (Indiscernible, audio skips) the concerns for
16 the defendants, the other residents and also (inaudible)
17 halfway house staff.  Mr. Agnes believes that the
18 high-profile nature of these allegations and all of the
19 media attention which has gone on to -- that involves all
20 the Halfway House residents and staff, that it would
21 result in some safety concerns for the defendants.  And
22 Mr. Agnes also is concerned about the staff, you know,
23 treating their defendants fairly given all of the
24 information they have (inaudible) media reports regarding
25 this case.

**Page 200**

1      So, and if -- in regards the third party that we
2  were going to screen, Your Honor, Mr. -- Officer Galaz had
3  indicated that he never did -- he didn't have the number
4  or and that also, he hasn't been able to get in contact
5  with -- that nobody's called him back, also, with regards
6  to the other third-party custodians that we were going to
7  screen as possible third-party custodians.
8      MR. BLACKBURN:  I'm sorry.  I thought he had the
9  number and that he had contacted them and they had not
10 called him back, but I'm sorry.
11     THE COURT:  All right, well --
12     MR. BLACKBURN:  I provided the numbers, I don't
13 know what happened.
14     THE COURT:  Well, as of today, there is no
15 suitable third-party custody arrangement.  I've considered
16 all of the 3142(g) factors I'm required to do.  I've
17 considered all of the evidence here presented today, and I
18 find by clear and convincing evidence that Ms. Wahhaj is a
19 danger to the community.
20     At this point, I have no options that have been
21 made available by way of a vetted and approved third-party
22 custody arrangement, that would allow me to fashion
23 conditions of release or to make a finding that there are
24 conditions of release that would adequately mitigate the
25 risk of dangerousness that I've found that Ms. Wahhaj

**Page 201**

1  poses to the community.
2      And so at this time, Ms. Wahhaj, you're going to
3  be remanded to the custody of the Marshal Service.
4  Certainly, if additional information or a third-party
5  custodian possibilities come up that you want to work with
6  Pre-Trial --
7      MR. BLACKBURN:  We will, Judge.
8      THE COURT:  -- to vet, that might be new
9  information that could be presented to the Court and of
10 course I'll consider any new information and consider
11 whether there are any suitable third-party custody --
12 custodians that would adequately mitigate or allow for
13 release conditions to be fashioned in a way that would
14 adequately mitigate the risk that I find that you pose to
15 the community, Ms. Wahhaj.
16     But at this point, there are none that I've been
17 able to find.  So you're remanded to the custody of the
18 Marshal Service pending further proceedings.
19     All right.  United States of America versus
20 Hujrah Wahhaj.
21     MS. BHALLA:  Thank you, Your Honor.  Your Honor,
22 the witness that I was going to call today to testify is
23 Marie Legrand Miller, who was Hujrah's lawyer on the State
24 case and who continues to be her lawyer, should anything
25 get refiled with the State case.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

Page 202

1    The testimony that she was going to provide
2 today that the Government was going to stipulate to
3 centers around flight risk.  Essentially, what we were
4 going to present to the Court was that Ms. Wahhaj was
5 released on the State case and she was free to leave Taos.
6 She was allowed to reside at a hotel, extended-type stay
7 situation, in Albuquerque.  She remains in contact with
8 her attorney.
9    She was advised that there may be a Federal
10 charge when Agent Taylor contacted Ms. Legrand Miller, Ms.
11 Wahhaj self-surrendered immediately and provided all of
12 her driver's license and her passport and her social
13 security card to Ms. Legrand Miller upon her surrender.
14 And what's interesting about that, Your Honor, is that she
15 was in -- she had custody and control of her passport and
16 her driver's license when she was and had wanted to flee,
17 she could have, and she knew very well that a Federal
18 Indictment was probably going to happen.
19    So I think that one of the things that Ms. Marie
20 Legrand Miller, was also going to testify to, which I
21 didn't get the Stipulation from the Government about, and
22 I could make a brief proffer.  Given I didn't know about
23 La Pasada's stance and that would be something applicable
24 to my client, an attorney in the community had agreed to
25 sponsor her and did in fact sponsor her and set up her

Page 203

1 hotel room and was willing and was going to provide her--
2 or help provide her with an apartment in Albuquerque where
3 she could reside while this case was pending.
4    We did give that information to Pre-Trial
5 Services.  I don't know if they've had the opportunity to
6 speak to him.  They do have his contact information.  He
7 actually wanted to be here today, but he's in trial, so he
8 was unable to attend.  He's been in contact with Ms.
9 Wahhaj's family, in particular her father, who was willing
10 to sponsor her, as it were, financially to pay for her
11 apartment and to make sure that she has a residence here
12 while this case is pending.
13    I don't know how much more the Court wants me to
14 go on about flight risk.  I would just sort of incorporate
15 all the other charges -- I mean, all the other arguments
16 by the other attorneys.
17    The reality of the situation is that, you know,
18 trips to foreign -- the Court is not going to consider
19 that, so I won't belabor the point, but she is a United
20 States citizen.  All of her family lives in New York, and
21 she spent from birth until 2011 living in New York, and
22 she has had employment history prior to coming here.
23    In terms of danger to the community, Your Honor,
24 I understand the Government's argument, I think we've
25 heard it pretty well, but I think that it's important to

Page 204

1 note that, in terms of Ms. Hujrah Wahhaj, there was no
2 evidence that she knew A.G. was abducted, she wasn't in
3 the vehicle that traveled to Georgia with A.G.  She wasn't
4 involved in the accident in Alabama when all the weapons
5 were transferred.
6    And I believe Agent Taylor's testimony was he
7 didn't know when she even got there.  He didn't know where
8 she was necessarily residing in the compound.  He had no
9 evidence to suggest that she was present at the rituals.
10 He had no evidence to suggest that she participated in the
11 rituals.  He had no evidence to suggest that she was
12 participating in any sort of plan or attack or jihad.
13    He started to say that he thought she had fired
14 a weapon once, but when we showed the transcript, that
15 wasn't correct, she had never fired a weapon or
16 participated in tactical training.
17    And so, I think that when the Court considers
18 those things, I don't think she poses a danger to the
19 community.  You know, interestingly, Your Honor, the
20 Government did interview -- it appears that the Government
21 did not interview her daughter, but none of that was
22 presented in -- in any way, shape or form as evidence that
23 she presented a danger to the community or that anything
24 had been done to her daughter.
25    THE COURT:  Her eight-year-old daughter

Page 205

1 participated in firing weapons at the compound.
2    MS. BHALLA:  I think -- my understanding of that
3 testimony, Your Honor, was that someone else had her
4 daughter fire a weapon.  There was no testimony that she
5 was present, that she witnessed it, or that she was
6 consulted.
7    And I -- I think Mr. Blackburn makes a very
8 interesting point.  You know, even though there has been
9 some, you know, testimony that Ms. Hujrah Wahhaj was at
10 the compound for some period of time, A.G. wasn't her
11 child and while she -- you know, the Government certainly
12 didn't present evidence that authorities were called, but
13 there has been discovery about -- provided that my client
14 actually did seek assistance in terms of food and clothing
15 and shelter for the -- for the children on the compound.
16 And I think that's something for the Court to consider.
17    There's no indication that she was a leader,
18 that she planned anything, that she condoned anything.
19 And I think that when we're looking at -- when we're
20 assessing danger to the community, we can't lump everybody
21 in under this general conspiracy category without really
22 looking at each person's individual conduct.  This is a
23 person who has never been arrested in her life prior to
24 this incident, ever.  She has had several jobs.  She has
25 some college education, she never finished.

**52 (Pages 202 to 205)**

## Page 206

1     And I think that there are conditions of release
2   that this Court can fashion to secure her appearance at
3   trial and to ensure that she's not a danger to the
4   community.  I know that Ms. Hujrah Wahhaj is willing to
5   abide by whatever conditions this Court imposes upon her
6   to ensure that and to give the Court confidence in that.
7     And I can say with assurity that knowing that
8   this was going to happen, she turned herself in anyway,
9   and didn't pick up any new charges or, you know, get into
10  any trouble.
11     And there's no allegation that she was writing
12  letters or trying to recruit people.  There's just no
13  evidence to that effect, Your Honor, and I think that she
14  had to -- a very, very, minor in the sense that she was
15  there.  But there's no evidence that she had any control
16  over what was happening or that she wanted anything that
17  was happening.
18     And -- and so I ask the Court to -- to release
19  her under whatever circumstances the Court finds
20  appropriate.
21     MR. KRAEHE:  Your Honor, we reiterate all the
22  same arguments we made before.  Ms. Wahhaj was a member of
23  this conspiracy, the same as the others.  She knew its
24  purposes, its objectives, its needs.  I keep hearing about
25  how nobody seemed to know anything that was going on in

## Page 207

1   this 22-foot trailer in a hole out in the middle of the
2   prairie with these five defendants holed up there all by
3   themselves for eight months with their children.  Of
4   course they knew what -- it was going on.  It's like
5   saying that the people in this courtroom, sitting here for
6   the last five hours, don't know what's going on in this
7   courtroom.  Of course they do, they're here, just like she
8   was there the whole time.  She knew exactly what she --
9   was going on and she is as responsible for what happened
10  there as the other co-conspirators.  That makes her a
11  danger to the community and she should be detained.
12     THE COURT:  All right.  Ms. Wahhaj, I have
13  considered all of the factors in 18 United States Code
14  Section 3142(g), all of the information presented at the
15  detention hearing, of course the Grand Jury Indictment,
16  the Grand Jury's finding of probable cause as to all of
17  the overt acts that are set forth in this Indictment, and
18  the information that you provided to Pre-Trial Services
19  that's contained in the Pre-Trial Services Report.
20     And I find by clear and convincing evidence that
21  you're a danger to the community.  Now, there is no
22  suitable third-party custodianship and the only proposal
23  that's been offered here is that you live an apartment
24  with some financial assistance, presumably alone.  That
25  proposal I cannot find would adequately mitigate -- a

## Page 208

1   release under those types of conditions would not
2   adequately mitigate the risk of dangerousness that I find
3   that you pose to the community.
4     Certainly if you want to work with Pre-Trial
5   Services to see if you can get a third-party custodianship
6   vetted and approved, that would be new information that I
7   would be willing to consider.  I can't say that I would be
8   convinced under those circumstances, but it would
9   certainly be new information to consider and which I would
10  consider.
11     So, I'm going to remand you to the custody of
12  the Marshal Service pending further proceedings and
13  pending your trial in this matter.
14     Anything further that we have to take up?
15     MS. BHALLA:  No, Your Honor, thank you.
16     MR. KRAEHE:  Your Honor, the United States would
17  request a separation order, requesting that the defendants
18  have no communication with each other, except through
19  their attorneys.
20     MS. CONVERSE:  Your Honor, I can count the
21  colors while they were here -- no two men are in the same
22  facility, no three women -- and no two women are at the
23  same facility.  That's already been accomplished by the
24  Marshals.
25     THE COURT:  Okay.  All right.  Well, the Marshal

## Page 209

1   Service needs to keep the defendants in facilities
2   separate from one another, but if for some reason that's
3   not feasible, the Marshal Service can report that to
4   myself or Judge Johnson and we'll take it up at that point
5   in time.  Until then --
6     MR. BLACKBURN:  I think there's only one now
7   that -- that has that and I think the rest of them, you
8   know, are pretty much separate.  But two of them are in
9   Cibola, but in totally different areas.
10     THE COURT:  Okay.
11     DEPUTY MARSHAL:  In Cibola and Sandoval, there's
12  a male and female, but they don't have contact with
13  members of the opposite sex.
14     THE COURT:  Right.
15     MR. BLACKBURN:  (Inaudible.)
16     THE COURT:  Right.  Right.  At this point, it
17  sounds like they are separated by the Marshal Service and
18  if for some reason that separation is no longer feasible,
19  the Marshal Service can let me know, let counsel know for
20  the Government and let counsel for the particular
21  defendants involved know and we'll take up that issue if
22  it becomes one.
23     Okay, anything further?
24     MR. KRAEHE:  Nothing from the United States,
25  Your Honor.

**53 (Pages 206 to 209)**

**Page 210**

1    THE COURT:  All right.  We're in recess.

2    MS. BHALLA:  Thank you, Your Honor.

3    MS. SIRIGNANO:  Thank you, Your Honor.

4    COURTROOM DEPUTY:  All rise.

5  (Court in recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 211**

1

2    TRANSCRIPTIONIST'S CERTIFICATE

3

4    IT IS HEREBY CERTIFIED that the foregoing is a true

5  and correct transcript of the proceeding had in the within

6  titled and numbered cause on the date hereinbefore set

7  forth.

8    IT IS FURTHER CERTIFIED that Paul Baca Professional

9  Court Reporters is neither employed by nor related to any

10  of the parties or attorneys in this case, and that this

11  firm has no interest whatsoever in the final disposition

12  of this case in any court.

13

14

15  _____

     PAUL BACA PROFESSIONAL COURT REPORTERS

16

17

18

19

20

21

22

23

24

25

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**A**

**A.B** 145:12
**A.G** 22:25 23:16
23:18 24:8,10
25:8 26:14,17
26:22 27:16,23
30:9,11 31:4,6
31:9,23 32:5
32:22 33:15
34:2,7 36:24
40:4 42:24
43:3,13,17
44:7,11,13
47:13 51:6,25
52:4,12 54:9
55:21,25 56:19
56:20,25 57:3
57:14,15 58:2
58:16,21 59:1
59:13,17,20,22
61:3,13 62:14
65:10 75:23,25
76:2,15,19,19
77:7 79:16
81:2,11 89:14
89:23 93:17,21
94:1 100:5
102:13 103:17
104:16 105:3
105:10,15,25
111:25 115:10
115:14 121:2
121:16,19,25
128:18 129:1,3
129:6,9,15,20
129:21 131:11
131:12,19,24
132:19 133:1,8
136:15 141:17
141:25 142:10
145:12,15
146:2,20,21
147:18 166:6
173:21,25
184:14 187:6,9
188:7 193:25

194:1,4 204:2
204:3 205:10
**A.G.'s** 32:25
33:9 46:8
57:11,19,22
60:8 83:19
84:1 104:16
106:19 128:22
133:6,18
136:14,21
137:24
**A.L** 23:8 24:19
24:21,23 26:8
26:19 30:3,10
56:10
**A.L.'s** 25:21
**a.m** 20:4
**A.W** 70:23
71:16,18 96:20
96:21,23
113:21
**abducted** 204:2
**abide** 206:5
**ability** 127:6
192:12 198:3,7
**able** 16:20 18:14
99:13 180:12
183:3 191:3
192:21 196:13
200:4 201:17
**abroad** 115:23
116:25
**absence** 158:8
**absolute** 175:13
**absolutely** 19:1
154:1
**abuse** 161:19
165:18
**acceptable**
150:2
**access** 49:14
137:18 144:9
157:4 159:17
175:21 185:17
**accessed** 137:21
**accessible** 49:5
**accident** 39:23

39:25 40:3,6
41:5,23,24
56:7 76:23
77:2,3 79:20
81:7 88:2 94:8
94:8,12 98:9
98:20 123:1,2
123:10,13,16
134:9 204:4
**accompanied**
37:5
**accompanying**
72:8
**accomplished**
208:23
**account** 59:4,7
137:10 161:24
162:10
**accurate** 87:20
178:20 185:6
**accused** 184:13
**Act** 85:8
**acted** 105:9
**acting** 81:17
**actions** 186:22
187:10 197:7,8
197:8
**active** 88:25
**activities** 137:16
193:9
**activity** 107:25
134:10 157:24
191:17
**acts** 112:25
139:22 157:7
164:18 185:20
194:13 207:17
**actual** 138:10
141:12 156:22
**Adalinda** 172:13
**add** 162:12
164:3 172:4,10
173:15 174:17
199:6
**addition** 52:23
172:1 173:15
**additional** 12:7

17:11 18:20
20:5 51:17
57:23 78:8
110:13 144:11
156:5 201:4
**address** 155:8
**addressed**
181:15
**Addressing**
184:5
**adequate** 194:25
**adequately**
174:11 189:12
200:24 201:12
201:14 207:25
208:2
**adjacent** 46:6
58:22,23 97:4
122:6 136:10
**adjoining**
181:24
**adjustment**
86:17,21 87:4
**admit** 179:8
**admitted** 94:3
**adopt** 185:7
189:19 192:3
**adopted** 177:6
**adult** 69:11
190:4
**adulthood**
190:16
**adults** 26:24
38:12 44:12
52:11 58:19
62:23 67:10
70:5,8 72:23
73:22 129:3
**advised** 9:19
202:9
**affect** 175:19
**Affidavit** 76:9
78:12,15,19
85:15 101:3
**Affidavits** 74:8
74:17 75:12,13
75:17 77:14

78:8 80:9
**affirm** 21:10
**afield** 32:10
**afternoon** 5:4,9
5:10,12,12,14
5:16,16,18,21
5:21,25,25
8:18 15:11,25
18:9 66:14,15
95:18,19
103:13,14
151:14 198:24
**age** 119:3,4
146:2
**agency** 55:12
96:5,8 154:15
154:15 160:18
**agent** 4:6 21:7
21:13,16,19,25
66:7,14,16
67:7,8 74:23
80:24 82:15
84:14 95:18
96:16 103:13
116:12 118:15
139:2,15
142:21 143:16
147:6,21
148:17 168:8
176:9,12,15,17
176:21,23
177:2,13,22
178:3,15,19
185:3 187:17
195:9,13
202:10 204:6
**agents** 67:20
70:15
**ages** 70:22
**aggression**
185:19
**Agnes** 199:11,17
199:22
**ago** 85:2 139:7
147:1,1,1,8
**agree** 158:5,6
**agreed** 18:3

44:12 104:3,5
202:24
**agreement** 7:20
**Ah** 148:8
**ahead** 8:10 13:8
21:5 30:12
63:20 64:5
106:14 161:4
**aims** 186:21
**AK** 92:20
**al** 5:2
**Alabama** 26:15
26:16,20,22,24
31:9,12 34:4
36:25 37:5,15
38:21,22 39:8
39:9,12,15,19
39:22 41:4,9
41:16,18,24
42:14,21 56:8
56:8,13 75:22
76:13,20,23
79:17,21 81:2
81:7 87:13,24
88:5,7 89:5,10
89:24,24 90:1
94:9,12 97:25
98:2,9,12,13
98:23 100:13
107:4,21 108:1
123:2,18
124:20 134:9
184:20 191:20
204:4
**alarm** 188:11
**Albuquerque**
2:4,7,15,19,23
3:3,7 193:5
202:7 203:2
**alcohol** 154:19
**alien** 9:12 32:9
159:11
**alive** 33:5,6
62:15 103:17
103:17,20
104:17,17
**Allah** 54:4 134:3

134:18
**allegation** 92:23
185:19 206:11
**allegations**
32:12 199:18
**alleged** 79:23
81:17 100:5
156:21,22,23
**allegedly** 32:9
100:17
**alleges** 78:17
159:9
**alleging** 170:2,5
**allow** 64:3
150:15 174:21
200:22 201:12
**allowed** 126:3
157:3 159:17
177:20 192:8
192:13 202:6
**allowing** 192:8,9
192:12
**altogether** 37:11
**Amalia** 39:10
44:15 54:1,11
54:23 55:1,6
55:22 81:19
120:16 127:3
130:6 131:21
131:23 154:22
163:4
**Amelia** 127:1
**Amendment**
157:1 159:6
**America** 1:4 5:2
8:13 115:1,2
167:18 201:19
**ammunition**
9:12 35:10
49:10 164:2,10
**amount** 56:23
126:23
**ample** 163:2
**Amy** 3:6,6 5:18
**and/or** 80:12
**animate** 33:3
**animated**

103:20
**answer** 63:15
64:1,2 82:23
91:12,16,17,22
92:2,9,13,20
92:22 147:3
149:13 171:8
**answered** 49:21
69:20
**answering** 84:15
**answers** 115:5
115:10,15
**Anthony** 192:25
**anybody** 104:5
125:11 140:25
193:11
**anymore** 154:12
193:18
**anyway** 188:16
206:8
**apart** 14:23
**apartment**
203:2,11
207:23
**apologize** 188:11
**apparently**
165:22 170:22
**appear** 34:6,10
87:5 154:19
**appearance** 5:3
8:17 167:15
206:2
**appears** 204:20
**applicable**
167:24 202:23
**Application**
78:12,15 79:2
79:6,11 80:3
86:17
**applied** 85:6,12
85:16 86:2
**applies** 13:5
159:12
**apply** 12:20
168:15,16
181:11
**appointed**

155:12
**appreciate**
80:21
**approach** 15:2
74:20 82:12
83:5 96:10
100:25 101:10
147:12 150:10
151:22 152:14
**approached**
102:3
**appropriate**
155:24 156:3
157:12 160:12
193:14 206:20
**approved** 86:12
198:18 200:21
208:6
**approximately**
22:23 24:9
27:10 32:21
33:24 35:9,11
37:14 39:20
42:19 45:10
46:8 47:20
48:13,14 51:5
53:7 55:13,19
58:5 60:1,22
62:3 68:12,13
68:14 72:12
74:15 85:2
89:4,7 93:1
130:3 136:18
138:5 141:16
147:7
**April** 60:5 86:13
87:1
**AR** 92:20
**AR-15** 35:4,24
36:11 50:7
117:23 164:1
**Arabia** 65:2
116:1
**area** 41:12 97:4
125:8 126:21
126:23,23
184:20 188:9

195:10,16
**areas** 209:9
**argument** 118:5
149:24 150:1
153:6 168:22
173:5 203:24
**arguments**
160:12 167:7
167:23 187:19
189:19,20
192:3 193:20
203:15 206:22
**arm** 83:9
**armed** 77:20,23
102:1 117:17
117:20 164:24
**army** 53:18
113:4,5 135:10
**arraignment** 4:3
6:5 8:11 11:12
**arraignments**
6:2
**arranged** 193:1
**arrangement**
200:15,22
**arrangements**
180:7,14 193:4
**arrest** 85:19
109:25 127:12
131:4 136:10
**arrested** 101:25
102:9 109:19
117:17,21
127:12 131:9
186:2 192:15
205:23
**arrests** 154:9
**arrive** 42:20
48:3 89:11
**arrived** 42:17
43:1 44:15
48:2 55:22
56:16 95:1
134:8 171:18
**ascribing** 158:9
**asked** 22:22,24
58:11 82:4,19

91:12,24 92:7
92:12,19,25
113:14 114:7
114:10,15
115:18 124:1
130:21 138:20
145:11 146:18
147:7,21 168:4
171:7 198:21
**asking** 76:17,18
78:24 82:6,21
90:7 102:23
103:16 111:8
111:20 114:1
115:8,11 132:6
132:14 146:20
171:23 175:20
**aspect** 13:7
196:8
**aspects** 161:4
**assault** 164:1
**assessing** 205:20
**assets** 155:11,14
155:16
**assigned** 10:24
22:1
**assist** 166:16
**assistance** 22:22
22:24 23:8
205:14 207:24
**Assistant** 2:3,6
2:14
**associated** 163:7
**association**
128:24 157:22
158:3
**assuage** 181:4
**assume** 88:15,17
89:8
**assuming**
175:16
**assumption**
140:23
**assurance**
175:13
**assure** 153:13
167:12,15

**assurity** 206:7
**Atlanta** 122:15
139:2,8 146:15
158:1 184:20
191:1,2
**attaching** 103:5
**attack** 51:14
62:2 111:16,18
111:24 113:6
130:14 133:19
135:9 137:25
138:7,11
142:22 158:14
184:17 204:12
**attacks** 51:23
91:4 93:17
157:5 158:17
162:9
**attempt** 114:17
163:21
**attempted** 53:13
53:15 54:3
114:9
**attempting**
110:22
**attend** 203:8
**attended** 153:23
**attending** 158:1
158:4
**attention** 25:12
25:14 82:16
179:24 199:19
**attorney** 2:3,6
5:7 19:8 128:7
149:22 179:15
202:8,24
**attorneys** 10:3
175:9 179:16
179:22,23
203:16 208:19
211:10
**audio** 12:6 13:17
14:7,8 15:10
22:23 32:4
33:2,16 35:23
37:4 46:17,18
50:24 52:3

56:16 58:6
62:18 63:8,21
63:22 65:6
68:2 69:24,25
70:12 72:15,16
73:6,7 75:16
79:15 93:5
97:15 98:23
105:16 108:8
112:21 148:11
154:15 159:7
161:24 177:11
181:2 183:16
198:7 199:15
**audio-recorded**
74:1,2
**August** 28:21
48:19 65:16,17
66:22,22,24,24
66:25 67:1,4,6
67:7,13,20,24
68:3,12,13,14
68:19,23,23
69:4,4,7,15
70:1,2 71:19
72:19 73:15
74:11,24 75:1
75:4 77:15
78:5,13 79:3,7
82:2 90:17
92:3,4 96:22
101:14 109:18
109:21,23,23
109:25 110:1
114:24 125:7
125:15,17,18
125:18 126:1
131:5,8,9
145:2 146:19
**author** 143:20
145:1
**authored** 144:5
147:15
**authorities** 63:6
156:17 165:6
166:7,10
194:15,17

205:12
**authority** 179:4
**authorization**
85:17 86:3
87:2 168:5
**automobile** 88:2
**available** 7:25
7:25 13:15,16
15:1 20:18
49:8 193:12
200:21
**Avenue** 2:10
**avoid** 167:22
**await** 63:14
**award** 186:11
**aware** 31:11
81:19 86:2
90:24 97:12
100:13 109:15
110:2 116:12
120:22 126:12
126:19 147:25
159:15 177:19
180:7,14 188:6
188:6 192:6
194:3

**Aylon-Aylon**
173:5,6

_____
**B**
**B.A** 190:8
**babies** 169:1
**baby** 145:11
192:19
**Baca** 211:8,15
**back** 11:15
15:23 16:7,9
20:12 24:9
62:20 78:3
92:7 93:17,21
94:1 110:4
111:25 113:9
125:16 126:25
127:6 129:12
134:4 141:25
144:22 170:12
170:16 175:24

176:13 180:13
180:22 182:8
183:19 184:3
186:7 190:21
190:25 195:14
199:4 200:5,10
**banking** 51:19
111:21
**barrier** 47:7
185:25
**based** 8:6 19:20
20:20 24:7
31:16 42:17
48:6 59:3,6,7
81:14 96:5
106:5,5 114:14
128:12,14,16
129:25 130:4
131:13 134:19
134:25 151:9
152:24,25
156:8 161:23
175:20 194:22
195:4
**basically** 20:19
127:16 190:15
**basing** 27:6,7
**basis** 25:15
105:24 112:16
117:8 155:20
156:15 189:14
**Bates** 82:16
152:4
**bathroom** 88:22
89:9
**battle** 175:8
**becoming** 51:25
161:9
**bed** 48:18 59:18
60:9,11 136:15
136:15,17
166:14 194:19
**bedroom** 45:3
58:16,24 83:22
83:23 136:10
**bedrooms** 45:2
**began** 33:15,25

57:5 60:14,21
115:13 136:25
166:18
**behalf** 5:15,19
6:23 149:4
166:4,5
**belabor** 193:17
203:19
**belief** 27:15,18
32:4 38:19
43:16 56:9
108:7,11,12,17
141:23 156:8
157:11,16
**beliefs** 32:24
43:6,9 108:18
158:10
**believe** 17:21
20:9 28:10
38:1 41:10,25
43:10,11,16
45:16 47:2
52:4,24 54:18
60:1 61:25
65:12,14 66:19
70:24 71:19
72:12 73:2,24
74:11 77:14
79:3 81:6,16
82:3,4,16
84:18 85:4,24
86:18 94:10
95:22,23 98:4
99:3,3,10
102:12 107:14
108:13,14
109:5 112:20
114:9 115:18
124:18 126:22
127:2,14 134:3
138:6,9,11
139:23 140:1
142:7,10,14,25
144:19,21
145:2,15
156:16 159:1
161:11 162:7

162:14,22
164:17 170:17
170:20,21,25
172:5,6 173:24
174:2,22
175:17 178:19
178:22 179:2
181:2 182:12
185:11 186:3
186:10,14,18
187:11,18
189:1 194:6,25
204:6
**believed** 22:24
27:22 28:4
33:5,23 34:1
103:16,23
104:1,7 142:13
173:17,19
**believes** 56:5
65:8 193:14
199:17
**believing** 38:13
38:13
**bell** 42:2
**belong** 90:22
122:8
**belonged** 37:10
71:6
**belongs** 71:1,3
**bench** 15:6,8
16:8 20:13
96:15 116:8,11
182:17
**best** 7:22 28:8
36:14,22 38:9
39:20 41:17
42:18 54:5
58:5,6 63:10
64:9,12,15,19
64:21 65:13
74:5 76:11,18
77:1 80:24
83:7,11 84:22
86:5,5,24 87:3
87:7 95:10,13
97:11 98:4

102:25 113:3
117:4 129:25
146:4 167:22
176:10
**better** 99:24
195:1,6
**beyond** 14:17
20:7 160:11
**Bhalla** 2:22,22
4:7,13 5:23,23
6:9,25 10:16
11:25 66:9,10
66:13 71:5
74:22 80:7,19
80:21,24 82:15
83:7,12,14
84:9 111:3,8,9
142:17,20
143:5,15,16
144:2,13 145:5
149:1,6,17
201:21 205:2
208:15 210:2
**big** 44:25 45:9
91:15
**BILLY** 3:2
**binder** 14:13,14
14:21,24
**biological** 23:16
24:18 25:21
29:12 119:16
**birth** 25:9 33:20
203:21
**birthed** 128:25
**births** 146:1
**bit** 7:9,17 18:8
71:15 74:6
75:19,22 80:7
80:16 86:16
156:19 169:19
170:9 172:10
182:11 191:4
**black** 34:2 158:1
158:4 190:10
**Blackburn** 3:2
4:10,14 15:7
15:14,22 16:5

16:13 17:18,25
18:22 19:4,10
19:12,14,22,24
20:1,3 65:25
118:14 126:19
127:22 146:6,9
147:12 148:13
189:18 190:7
191:3,7 195:8
195:16 198:2,9
198:20 199:3
200:8,12 201:7
205:7 209:6,15
**blindly** 187:9
**Blvd** 2:15 3:2,7
**body** 14:5 27:24
30:15 32:2
33:1,4 46:8
52:1 60:8,14
60:21,22,23
61:3,4,12,16
61:18,21 83:19
84:1 131:23,24
136:14,21,25
137:1,24 144:9
166:16,20
**bold** 152:22
**book** 26:12 27:8
27:9,10,19
28:17,19 29:2
29:5,14,16,21
29:22 31:17
33:14,22 34:5
34:9 37:3,15
42:12 43:14
52:20 53:15
54:5 56:2,13
56:15 59:15
63:10 75:14
76:1,16,17
88:9,10,14
89:16 90:1,5
103:19 111:12
128:25 132:19
132:23 138:15
139:20,23
140:5,7,13,15

140:19,21,22
142:22 144:4
185:5
**books** 132:3
139:23 140:1
**border** 126:25
**born** 118:18
189:23 190:22
190:23
**bottom** 148:9
**bought** 184:23
**bouncy** 88:25
**box** 2:7,19 37:18
40:15,16 41:2
41:12,13 44:24
45:7,9,18
48:20 84:5
102:3,8 121:21
122:3 123:20
136:1
**boy** 33:10,11,17
33:18 34:13
170:13
**boys** 69:12
114:15
**Brawley** 2:6 5:6
**break** 20:12
149:8,8
**breakdown**
168:6
**breaks** 68:13
**breast-feed**
177:21
**breathe** 58:11
58:11 113:15
**breathing**
113:12
**Brenda** 190:12
**brief** 127:25
187:13 202:22
**briefly** 38:25
146:6 168:1
176:24 185:1
**bring** 15:23 17:7
19:15,16 53:6
163:23 175:10
**brings** 198:16

**Brooklyn** 189:23
**brother** 52:23
  53:4 65:7
  104:6,10 142:4
  145:18,20
  158:1 169:8
**brought** 15:11
  15:23 20:1
  66:24 67:1,2
  67:22 93:8
  156:12 158:8
  185:22
**broughten** 93:7
**build** 97:16,19
  97:24 184:10
**building** 97:13
  97:18 183:2
**built** 39:3,4 46:3
  97:3 98:1
**bulk** 156:20
**bunk** 45:3,6
**burden** 6:14
  18:21 146:16
  153:9,16
  171:21 186:4
**burdens** 167:24
**buried** 122:1,4
  166:15
**bury** 62:4,6
**business** 150:20
**bv** 206:5

       **C**

**C** 2:1,3,22
**cab** 41:3
**cabin** 41:11
**call** 6:20 12:24
  21:6 30:22
  52:14 62:23
  63:2,4,6
  179:24 196:18
  201:22
**call-ins** 141:13
**called** 8:15,16
  30:3 62:2
  66:18 166:6,7
  200:5,10

205:12
**calling** 170:6
  196:20
**callings** 196:1
**calls** 62:25 89:17
  157:12 194:15
  194:16 196:15
**camper** 39:3
  44:22,25 46:2
  46:5,7,15,16
  46:18 48:15
  58:18 60:10
  84:7 121:25
  136:16
**capacity** 139:17
**Captain** 115:1,2
**capture** 142:16
**car** 34:24 35:1
  39:23,25,25
  40:1,8,10
  76:14,15,19
  81:2 88:24
  94:8 123:14
**card** 202:13
**care** 54:21 55:4
  120:11,14,15
  120:17 169:1,3
  188:1 192:1
  194:25 195:1,5
  195:6 196:13
**cared** 188:3
**caretaker** 120:3
**Carey** 2:22,22
  5:23
**cargo** 41:12
**caring** 168:25
**carpenter** 98:3
  183:4,5
**carried** 31:19
  153:16 193:24
**carry** 164:2,17
**case** 1:6 11:3
  13:11,18 21:11
  22:23 32:8
  47:17 66:17
  74:4,9 81:15
  83:9,17 85:20

100:21 122:8
  139:20 152:4
  153:14,21
  154:3,7,10
  156:14,19
  159:4 172:23
  173:3,5 175:9
  175:12,14
  178:8 179:3
  180:11,19
  181:12,25
  182:3,6 185:15
  186:9 189:3,14
  191:10 193:7
  197:21,23
  198:13 199:25
  201:24,25
  202:5 203:3,12
  211:10,12
**cases** 154:2
**cash** 155:16
**casing** 137:7
**casings** 137:4,10
**category** 205:21
**cause** 12:16
  32:25 53:14
  80:11 106:12
  106:18,19
  160:9,11,22
  163:22,22
  207:16 211:6
**caused** 105:21
  105:25 106:6
  107:1 161:11
**caution** 23:2
**Center** 190:10
**centers** 202:3
**ceremony**
  195:18
**certain** 53:15
  56:12 80:5,15
  90:16 111:17
  111:18,22
  121:8,8,8
  140:17 197:14
**certainly** 14:21
  160:9,12

175:11 180:19
  201:4 205:11
  208:4,9
**CERTIFICATE**
  211:2
**CERTIFIED**
  211:4,8
**CFR** 172:18,21
  172:21
**chain** 143:17,25
**chance** 138:19
  175:10
**change** 79:13
**changed** 185:4
**changing** 86:21
**characteristics**
  24:24 32:17
**charge** 12:16
  156:14,14,15
  160:9,22
  168:10,10
  192:2 202:10
**charged** 9:6,7
  12:12 32:10
  128:9 169:17
  171:16 185:13
  187:21 195:20
**charges** 9:9,11
  9:14 10:2,12
  153:15 154:5
  156:5,9,11,13
  158:10,12,13
  171:14 189:21
  197:18,19
  203:15 206:9
**charging** 160:8
**check** 170:24
**checks** 117:13
  117:14,15
**chest** 57:7,11
  133:6
**chickens** 39:4
**chief** 10:25 44:5
**child** 30:8,9,10
  33:19,20 34:16
  34:19,21 57:23
  60:24 61:3

62:4,7,10 65:9
  70:25 71:1,3,6
  71:8,16,25
  72:8,24 73:14
  73:20,21 76:5
  93:22 105:1
  106:6 107:1,1
  112:6 114:5
  120:23,24
  135:23 142:11
  146:2 161:11
  161:15,18,19
  161:20 165:2,5
  165:6,8,9,11
  165:14,15,16
  165:18,21,22
  165:23 166:2,7
  166:14,16,18
  166:21 170:2
  170:21 176:5
  177:21 178:7,7
  180:3 188:19
  188:24 190:21
  190:23,24
  191:19,24
  194:2,9,15,16
  194:17,19,20
  195:14,19
  196:6,12
  205:11
**child's** 32:2
  104:23 105:21
  106:25 144:8
  161:16 165:10
  166:9,11,20
**childhood** 190:3
**children** 29:12
  29:21 37:8
  40:5 42:24,24
  44:10 51:7
  52:7,15,19
  58:2,4 62:11
  70:19,21 71:11
  73:11 74:4
  93:20,24 95:5
  96:17 102:11
  110:12 111:4

111:14 113:19
115:4 116:20
118:25 119:6,7
119:10,10,12
123:9,16
130:13,24
132:1,7,12
133:3,9,13,17
133:19 134:15
134:19 135:5,6
135:7,16,23
136:1,17,25
137:19 141:14
141:24 144:12
155:3 158:19
158:25 163:5
163:15 164:6
164:16,17
165:4 166:1,10
166:20,21
169:21,22,24
171:11 174:1
174:18,21,22
175:1,7,10,18
175:22 176:3,6
176:25 177:10
178:9,22,23
179:7 180:5,6
180:11 183:21
184:3 186:7,9
186:24 187:6
187:16,25
188:2,3,18,23
192:9,12
194:21 205:15
207:3
**Children's** 175:9
177:20
**choked** 165:23
**choking** 57:14
57:17,24 58:10
58:12 113:14
113:16,22
**choose** 7:1
152:12
**chosen** 154:13
**Christ** 27:24

33:18 51:25
52:12 54:9
59:23,25
141:25 145:13
166:22
**Christian** 30:23
**chronology**
89:15 90:3
168:3
**CIA** 133:20
**Cibola** 209:9,11
**circle** 2:23
152:21
**circled** 152:21
152:22
**Circuit** 159:22
159:25 173:3
179:4
**circumstance**
155:21
**circumstances**
50:23 56:25
73:18 156:2
161:8,24 192:7
196:19,23
206:19 208:8
**citation** 181:23
182:3,3,6
**cited** 105:6
**citizen** 168:13
203:20
**citizens** 116:15
116:20 155:1,4
**citizenship**
190:24
**city** 118:19,22
146:16 189:25
**civil** 151:3
154:11
**claimed** 28:2
**clarification**
6:25 30:8
180:16
**clarify** 80:19
106:9
**clarifying** 68:6
**class** 97:13

184:12
**Clayton** 23:13
25:10 152:20
152:23
**clean** 184:24
**cleaned** 194:20
**cleaning** 120:12
**clear** 58:1
123:15 153:10
159:20 161:9
162:25 164:25
166:3 167:10
174:9 182:21
189:10 199:5
200:18 207:20
**clearly** 152:6
**client** 15:16 16:4
16:14 17:3
18:15 19:5
84:15 94:3,18
95:25 96:7
105:1,9,16
106:6 108:7
149:5 157:14
157:15,25
158:9 160:19
169:22 177:20
177:25 182:13
185:9,12,16
187:15,23
202:24 205:13
**client's** 15:19
105:20 191:6
**clients** 6:4 16:24
18:13 95:12
150:18,19
**close** 128:24
136:4
**closely** 128:23
**closet** 36:6
**clothing** 205:14
**co-conspirators**
186:22 194:14
207:10
**co-counsel**
181:15
**co-defendant's**

185:5
**co-defendants**
187:23 199:13
**co-defendants'**
181:10
**Code** 9:10 167:3
174:6 189:6
207:13
**coercive** 159:1
**coincided**
161:15
**colleagues**
189:20
**collected** 13:12
13:24 14:1,4
20:21 36:7
134:20
**collecting**
184:10
**college** 153:23
190:1,8 205:25
**Colorado** 126:23
127:1 128:11
183:15
**colors** 208:21
**combination**
167:11,14
181:3
**come** 8:11 16:7
20:12 33:8
35:6 40:10
43:5 50:9
53:16 66:8
67:14 105:18
111:12 116:9
124:11,20
126:25 129:24
149:21 151:1
167:19 176:12
180:13,22,24
189:16 201:5
**comes** 158:18
171:6 183:19
**coming** 16:8
37:14 57:16
124:15 137:14
141:25 156:10

156:16 164:18
203:22
**comments**
176:13 189:19
**commit** 157:7
159:14 171:8
171:11
**commonly** 97:18
**communicating**
142:5
**communication**
168:6 208:18
**communicatio...**
157:15 180:13
**community** 55:6
64:13 102:19
153:12,13
162:20 163:1
166:24 167:12
168:24 170:23
171:9,23
173:10,12,13
173:23 174:3
174:10 181:4
182:24 183:25
183:25 184:2
186:16,18
187:12 189:11
193:22 194:23
195:6 197:2,10
200:19 201:1
201:15 202:24
203:23 204:19
204:23 205:20
206:4 207:11
207:21 208:3
**company** 150:17
**company's**
150:14
**compare** 132:5
**compared** 30:23
**comparison**
132:6,15
**compelling**
179:6,11
**Complaint** 9:8
85:15,19,20,21

86:9,12,19
101:3 138:22
148:5
**complete** 149:13
**completely**
87:20 163:12
**complex** 11:3
**complying**
168:17
**components**
103:6
**composite**
152:17
**composition**
138:15 140:7
140:21 142:22
143:2 144:3
**compound**
13:23 46:11
48:9 49:2,5,24
49:25 50:8,18
50:21 51:8,11
51:13 52:19
54:1,7 66:18
69:1 70:19
77:17 83:10
84:4 95:6
100:17 101:18
102:4 125:21
125:23 130:6
131:21,24
142:10,15
163:4 164:8,21
166:11 174:1
177:6 184:7,8
187:1 193:24
204:8 205:1,10
205:15
**computer** 28:23
29:24 90:19
**concern** 24:25
80:8 188:2
**concerned** 80:8
143:10 197:24
199:22
**concerning**
119:24 120:23

189:21 191:18
192:4
**concerns** 155:8
169:20 181:5
197:18 199:8
199:15,21
**conclude** 29:2
29:19 131:13
167:8
**concluded** 90:15
**conclusion**
33:13 34:6
132:8
**conclusions** 35:6
**condition** 25:9
25:12 32:6,17
32:25 44:7
167:10,14
174:17 194:24
**conditions** 24:24
95:8 128:6,15
152:18 153:12
153:19 167:11
167:14 174:11
181:3,3 182:4
186:10 189:2
189:11 196:25
200:23,24
201:13 206:1,5
208:1
**condoned**
205:18
**conduct** 52:4
53:18,19 78:17
93:15 113:4
135:10 138:10
160:3 186:22
205:22
**conducted** 13:13
13:21 39:14
55:2 57:24
80:25 81:11
99:7 102:7
109:22
**conducting**
59:16,16 83:8
138:10 147:5

**confer** 15:15
16:4 19:7
65:21,23
**conference** 15:6
15:8 20:13
96:15 116:8,11
182:17
**conferred** 6:11
**confidence**
206:6
**confirmed**
111:14
**confirming**
150:9
**conflicting** 56:3
**confronting**
118:9
**connected** 28:24
63:11 90:20
**connections**
124:10
**consent** 126:8
**consequence**
61:7
**consider** 21:2
32:15 173:2,4
174:6 189:5
201:10,10
203:18 205:16
208:7,9,10
**considerable**
7:18 13:11
17:20 20:21
**consideration**
13:8 14:19
20:14 158:22
197:15
**considered**
143:11 163:17
165:11 167:2
174:5 189:5,7
189:8 200:15
200:17 207:13
**considering**
182:17 195:7
**considers** 204:17
**consistent** 132:2

132:12 150:22
**conspiracy** 9:9
12:12,16 79:23
81:17 159:10
159:24 160:23
161:3 163:3,16
163:20,25
164:7,14,20
165:1,13,20,25
166:8,13
185:13 186:20
186:21 187:10
187:21 193:23
193:24 205:21
206:23
**conspiring**
158:13,13
**constant** 168:17
**constantly** 168:7
**Constitutional**
175:1
**constraints**
177:9 182:18
**constructed**
46:5 97:5
164:7
**consulted** 11:6
16:16 85:22
106:21 205:6
**consulting** 16:13
**contact** 103:1
174:18,21
176:7 177:1,12
179:6 180:2,4
180:5,8,21
199:11 200:4
202:7 203:6,8
209:12
**contacted**
198:22 200:9
202:10
**contained** 79:16
90:21 138:3
207:19
**container** 60:10
**contains** 12:5
**content** 140:5

**context** 171:4,6
**contingent**
112:6
**continual** 25:15
**continuance**
7:18 14:18
**continue** 17:9
18:18 43:2
55:22,24 57:8
64:1 199:3
**continued** 14:17
33:25 56:19
61:12 88:8
163:21
**continues**
201:24
**continuing**
17:11 19:21
**contrary** 154:23
**control** 152:5
175:25 202:15
206:15
**convene** 16:18
**convenience**
17:1
**conversation**
146:19
**conversations**
157:18 160:17
**Converse** 2:14
4:8,13 5:10,11
6:6 10:10
11:13 12:1
63:13,17,22
84:13 90:11,12
95:14 132:4,14
145:6,9 146:5
167:20,21
168:1 170:6
172:9,18 173:6
174:24 175:24
177:17,19,24
179:2 180:15
180:23 208:20
**converting**
78:23
**convey** 52:13

convictions
    154:9
convince 175:9
convinced
    171:18 208:8
convincing
    153:10 162:25
    167:10 174:9
    189:10 200:18
    207:20
cooler 61:20
    136:20
cooperate
    171:20
coordinate
    65:23 179:14
copy 8:25 99:5,6
    99:13,14,17
CORLEW 2:22
corporate
    150:18
correct 18:25
    26:1 37:25
    38:15 42:6
    50:22 51:22
    59:12 67:21,25
    68:9,10 69:1
    70:14,16 72:8
    72:22,25 74:12
    75:1,4 76:10
    76:15,24 77:4
    77:12,13,24
    78:2,5,9,13,25
    79:1,8,11,17
    79:18,21,22
    81:3,4,7,8,12
    81:13,18 82:4
    83:4,5 86:18
    90:18 91:8
    92:11,15 93:10
    93:19 94:2,19
    94:21 95:4,21
    97:4,9,18,25
    98:3,5,11,15
    98:16,17,18,20
    98:21,24 99:13
    100:5,10,17

101:21,22,23
101:24 102:1,9
102:10,13,14
102:16,17,20
103:1,7,8
104:2,4,18,20
104:23 105:4
107:2 108:9,10
108:19 109:14
110:12 111:16
111:17 112:5,8
112:19,23
113:7 114:6,8
116:13,15,20
117:7 118:10
118:16,19,25
119:1,2,8,17
119:21,22
120:8,21
121:12,17,23
122:1,2,5,22
123:7,11,16,17
123:21 124:25
125:6 126:6,15
126:21 127:14
138:1 140:4,20
142:2 143:3
145:17 146:23
147:19 149:16
149:17 151:7
160:24,24
172:13 204:15
211:5
correctly 69:16
108:6 130:22
137:25 142:1
143:1
correspond 60:3
180:12
corroborated
29:23 158:23
corrupt 51:14
51:16,18 91:21
112:1,2 130:17
130:23 134:1
135:9
counsel 6:3 8:15

11:7,15 14:9
15:9 17:2 66:6
148:2 155:13
167:7 180:7
181:25 182:16
189:17 209:19
209:20
counsels 181:10
count 9:9,10
10:14,15,21
12:12 208:20
Counter-Terr...
5:7
countries 65:3
154:25 173:10
186:17
country 84:16
154:23 159:16
165:10 169:5
182:14
Counts 10:23
County 22:22
23:8,14 25:11
48:8,19 62:25
102:2,8 106:21
109:22 117:19
125:22 126:15
128:8,10,13
136:9 143:24
144:16 152:20
152:23 181:21
183:14,22,23
County's 35:8
couple 45:23
139:10 181:14
190:11,16
192:19 193:5
course 7:12
12:13,15 13:24
14:1 131:18
149:3 155:21
160:4,10
169:18 201:10
207:4,7,15
courses 153:24
court 1:1 4:8,11
4:12 5:1,9,12

5:16,21,25
6:10,17,22 7:5
8:1,2,9,25 9:6
9:19 10:1,8,9
10:22 11:8,14
11:22 12:2,15
12:17 13:4,17
14:8,10,12,16
15:1,4,7,15
16:1,6,11,12
16:25 17:4,6
17:23 18:17,23
19:2,5,9,11,13
19:19,23,25
20:11,22 21:1
21:5,8 24:2
30:7,12 32:14
32:15 49:20
63:12,16,20,24
64:2,5 65:19
66:1,4,5,6
74:21 80:7,16
80:20,22,23
82:13 83:6,13
83:16,25 84:8
84:10 89:21
90:3,10 96:9
96:12 99:24
100:3 101:1,11
106:14,18
110:24 116:9
126:17 127:24
131:17 132:9
132:16 133:24
135:4,14,15,22
135:25 136:6
136:11,13,21
137:4,8,12,17
137:23 138:2
138:12,18,22
139:6,9 140:25
141:20,21
142:3,12,17,24
143:2,8,9
144:6 145:6
147:13 148:14
148:17,21

149:3,7,10,11
149:12,20
150:2,3,11,15
150:18,20,24
151:19,23
152:15,17,25
153:7,19 154:3
154:4,16,19
155:7,15,22
156:1 158:5,21
160:7,21 161:1
161:2 162:10
162:11 167:1,6
167:25 170:4
172:3,8 173:1
173:8 174:4,7
175:9,20 176:2
176:12,16,18
176:22,24
177:8,14,18,20
178:9,17,25
179:25 180:18
180:20,24
181:5,9 182:16
188:1,12,18,21
188:25 189:4,7
189:16,22
190:5,19 191:3
192:6,8,17
193:14,15,16
193:20 194:10
195:4,13
196:24 197:1,3
197:11 198:4,8
198:10 199:2,5
200:11,14
201:8,9 202:4
203:13,18
204:17,25
205:16 206:2,5
206:6,18,19
207:12 208:25
209:10,14,16
210:1,5 211:9
211:12,15
Court's 7:8
20:14,18

179:24
courtroom 1:16
  15:11 16:10
  21:9,14 66:3
  149:9 176:11
  187:3 192:25
  193:10 198:6
  207:5,7 210:4
covered 46:4
create 140:17
credibility 132:6
credible 162:7
crime 109:7,17
  110:3 137:6
  144:19 159:14
  159:21,24
  169:17
crimes 9:7
  107:17
criminal 9:8
  32:12 85:20
  101:3 107:25
  138:22 154:1
  160:1 171:13
  172:23 181:16
  181:22
cross 4:7,8,9,9
  4:10 66:12
  80:14 84:12
  95:16 103:11
  118:13
cross-examina...
  65:22 66:7
  185:22
cross-examine
  6:21 7:13 8:5
  19:20 65:20
cry 33:16 115:13
crying 57:3
  62:17 105:17
  129:23
current 172:16
  194:24
currently 21:22
  22:1 23:4
custodian
  197:13 201:5

custodians
  198:17,18
  200:6,7 201:12
custodianship
  207:22 208:5
custody 5:15,20
  75:24 95:6
  125:11 143:17
  143:25 152:13
  167:16 169:21
  169:21 171:24
  174:13 179:16
  181:8 183:22
  192:11 198:15
  200:15,22
  201:3,11,17
  202:15 208:11
CYF 175:8
CYFD 66:24
  67:1,1,2,3,4,22
  67:23 68:1,23
  68:24 69:9
  70:4,7,15
  71:23 72:1,9
  73:8 93:5 95:6
  95:8 97:2
  106:1 169:21
  169:21 175:7,9
  177:14,24,25
  183:22 184:2
  192:8
CYFD's 44:5
  177:10

D
D 4:1
D.A.'s 152:21
Dad 183:18
danger 153:11
  163:1 166:23
  166:24 168:24
  169:15,23
  171:9,22
  173:12 174:2
  174:10,21
  186:18 187:12
  189:11 193:22

194:23 197:1
  197:10 200:19
  203:23 204:18
  204:23 205:20
  206:3 207:11
  207:21
dangerous 186:2
dangerousness
  156:18 184:5
  186:5 189:13
  191:5 200:25
  208:2
dangers 173:13
Daryl 199:11
date 11:1 13:13
  13:15 41:23,25
  60:4 71:19
  74:19 79:3
  84:25 85:1,4
  86:8,9,14,15
  88:1 90:16
  96:21 99:1
  107:7 211:6
dated 101:14
dates 66:20 69:3
  74:13 139:4
  147:24
daughter 204:21
  204:24,25
  205:4
day 27:17 31:22
  31:23 32:22
  51:5 56:20,20
  57:3 59:8
  60:23 62:22
  73:16 89:11
  94:23 101:25
  105:14 109:12
  121:2 129:5,20
  136:9,22 137:1
  141:16 165:15
  165:17 187:7
  192:14
days 34:18
  42:13,15 56:22
  56:23 99:4
  127:11 186:6

192:19
DC 2:10
dead 112:7
  166:16,20,21
deal 139:21
dealing 119:19
  184:3
dealt 119:15
death 27:16 44:8
  58:25 106:3,12
  120:6 133:1,8
  161:7 166:9
  184:14
decaying 84:1
deceased 23:3
  144:8 166:14
December 23:21
  23:22,23,23
  24:4 42:1,2,19
  56:2,13,14
  59:8,10 87:24
  88:3 89:4,6,7
  91:20 98:9
decision 11:6
declare 11:3
declared 173:16
decompose
  61:16 166:18
decomposing
  61:21
deemed 172:23
  172:24
deems 153:19
deep 46:12
defend 185:24
  185:25
defendant 2:13
  2:17,21 3:1,5
  4:15 12:18
  78:17 160:2
  163:17 172:14
  178:6
defendant's
  32:16 141:24
defendants 1:10
  4:3,4 7:25
  10:23 11:18

12:21 18:24
  20:10 22:4,7
  27:22 42:25
  50:1 52:17,19
  52:25 53:2,13
  54:1,6,8 64:7
  64:22,24 65:11
  74:7 75:21,23
  76:12,14 77:20
  79:24 104:7
  128:17 129:13
  131:3,3,22
  136:2 137:17
  137:19,20
  144:9 148:22
  148:23,23,24
  155:22 165:1
  165:13,20
  166:8,13 169:7
  179:21 197:6
  197:19,19,25
  199:16,21,23
  207:2 208:17
  209:1,21
Defender 2:14
  182:1 183:14
defending
  140:20
defense 6:18 7:7
  7:10,13 8:3
  11:7 13:16,19
  14:8,18 32:7
  51:12 99:17,20
  128:7 148:2
  164:21
defenses 164:8
defer 11:6 176:9
definitely 148:9
  153:20
degree 85:23
  91:17 92:3
  176:17 189:24
  190:1,2,16
  191:21
delaying 16:25
delicately
  195:17

**deliver** 54:18
**delivered** 52:3
**demons** 27:23
  165:12
**demonstrated**
  89:23
**denial** 106:1
**denied** 87:5
  93:12,14 94:6
  97:11,12
  102:13 168:6
**Denver** 183:18
**deny** 169:4
**department** 5:8
  25:11 109:16
  111:22 127:13
  140:9 182:22
**departure**
  172:19,24
**depending** 7:2
  179:21
**depends** 198:11
**deplorable**
  197:9
**deport** 172:19
**deported** 177:7
**deprived** 165:9
**Dept** 2:9
**depth** 46:14
**DEPUTY** 16:10
  21:9,14 66:3
  149:9 209:11
  210:4
**describe** 25:7
  26:13 27:9
  31:21 38:12,17
  38:25 40:16
  41:7 45:21
  46:1 51:7 57:2
  77:7 138:2
  163:10,11
**described** 31:18
  36:5 41:9 43:3
  50:16,23,24
  52:16 57:21
  58:7,9 59:9
  61:15 84:6

104:22 105:5
  105:22 111:7
  112:9 132:17
  163:11,13,14
  170:9 187:1
**describes** 43:14
**describing** 29:22
  41:4 43:5
  78:18 105:12
  111:3
**description**
  56:24 59:3
  136:8,17
**designated**
  158:15 194:4
**designation**
  192:1
**desire** 157:10
  176:7,25
**despicable** 197:9
**detail** 101:17
  115:14 139:24
  140:3
**detain** 52:5
  54:19 156:7
  163:7 195:4
**detained** 166:25
  167:8 175:2
  187:12,24
  195:3 207:11
**detainer** 154:12
  172:11,15
  173:3
**detaining**
  189:13
**Detective** 72:5,6
  72:20 73:18
**detention** 1:19
  4:4,15,16,17
  4:18,19 6:1,11
  7:19 8:10
  11:16 12:18,24
  14:16 16:2
  17:8 18:18
  20:4 143:22
  153:14 162:12
  181:11,11

185:12 189:3
  195:1 207:15
**determination**
  12:17
**determine** 56:11
  117:11
**determined**
  28:25 29:25
  57:7,11
**determining**
  197:15
**detriment**
  173:25
**develop** 184:2
**die** 91:15 163:24
**died** 31:24 32:22
  55:25 56:10,21
  56:25 57:4
  59:13 60:8
  61:13 89:15
  129:20 141:17
  165:24 166:7
  195:14
**different** 17:19
  18:8,11 46:10
  54:6 55:3
  105:6 109:6
  119:12,13
  134:13 138:6,6
  195:25,25
  209:9
**difficult** 25:5
**difficulty** 113:12
**dig** 62:6
**diplomat** 168:13
**direct** 4:7 21:20
  81:25 82:15
  87:23 94:3
  96:2 102:20
  112:9 113:10
  115:22 117:4
  123:25 137:23
  141:22 143:11
  166:22
**directing** 38:7
**direction** 163:16
**directly** 119:10

**director** 190:11
  199:11
**dirt** 137:7
**disabilities**
  165:11
**disability** 98:6
**disabled** 165:2
  165:14,21
**disclosures** 7:21
  13:11
**discovery** 11:1
  11:10 17:20,22
  18:8,14 151:13
  152:3 155:13
  170:24 184:18
  205:13
**discretion**
  152:10,11
**discuss** 10:2
**discussed** 6:24
  123:2 130:11
  142:23 154:11
  156:5 190:20
**discussing** 23:3
**discussion** 91:4
  114:24 119:5
**discussions**
  198:13
**dismissed** 154:4
  156:12 182:4
**display** 123:3
**disposition**
  211:11
**dispute** 86:10,14
  86:15,20
**disseminate**
  38:5
**distance** 136:3
**distress** 62:15
  166:2
**distressed**
  165:16
**distributes**
  104:15
**DISTRICT** 1:1
  1:2
**divine** 30:2

**division** 2:9 99:7
**document** 27:14
  85:20 100:23
  101:17,22,23
  140:9 144:23
  151:6,10,11
  152:8,14
**documents**
  13:25 27:11,15
  27:16 107:24
  124:15 150:1,4
  152:8
**doing** 94:10
  114:23,23
  129:12,12,16
  129:21 138:8
  183:9 188:17
  196:4
**donated** 37:15
  37:19
**doorway** 47:23
**doubt** 75:6
  160:11 175:15
**drive** 28:20,24
  42:16 88:20
**driven** 196:19
**driver's** 202:12
  202:16
**driving** 88:15
  181:17 198:3,7
**drove** 42:7 88:14
  131:21
**drug** 154:18
**drugs** 169:18
**dry** 138:9,10
**dual** 190:24
**due** 11:9 25:8
**dug** 45:13 46:2,6
  47:22
**duplicative**
  65:21
**dwelling** 44:19
  44:21
**dwellings** 45:12
**dying** 134:18,18
  188:7

**E**

**E** 2:1,1 4:1
**earlier** 54:17
  55:20 96:5
  103:16 104:19
  107:3 108:6,20
  111:3,8 112:21
  116:7 123:2,25
  148:1,4 186:19
  187:1,19
**early** 190:3,15
**earthship** 93:8
  97:13,20,24
  124:8,11,16
  183:2 184:11
**earthships** 97:16
  97:18
**easier** 146:15
**easily** 183:5
**Easter** 60:7
**education** 51:19
  111:21 130:17
  130:21,22,23
  205:25
**educational**
  51:21 91:4
  130:14 139:20
  163:8
**Edwards** 2:9 5:6
**effect** 50:5 124:3
  142:15 196:24
  206:13
**Egypt** 64:20,22
  182:10,15
  183:18 190:17
  190:21,24,24
**eight** 70:23,24
  71:9 96:23
  119:2 190:23
  207:3
**eight-year-old**
  57:23 58:9
  70:23 72:8
  73:14 113:11
  119:3 135:16
  135:23 176:5

178:13 179:12
  180:2,21
  188:18 190:22
  191:13 204:25
**eight-year-olds**
  49:25 51:9
  71:13,14
  135:20 177:3
**either** 67:11
  110:6 118:2
  120:13 158:24
  178:11
**electrical** 103:6
**electronic**
  153:18 155:9
**element** 161:3
**elicit** 110:22
**eligible** 197:16
**else's** 11:22 59:7
**emails** 157:13
**emergency**
  94:16
**emit** 60:21
**employed** 21:22
  117:5,12
  150:16,21
  155:15 162:17
  183:4 211:9
**employee** 140:11
**employment**
  64:7 85:16
  86:3 87:1 98:7
  117:9,10
  139:16 150:6,9
  153:24 162:16
  162:17 168:4
  168:21 172:7
  173:11 182:24
  186:16 203:22
**EMS** 63:4
**en** 26:22
**encephalopathy**
  25:3
**encompass** 74:3
**encounter** 72:13
  73:4 77:23
  78:1

**encouraged**
  163:23
**end-of-times**
  163:6 164:18
  173:17
**enduring** 194:9
**enforcement**
  39:1,11 47:17
  47:25 49:14
  51:14,20 55:12
  62:24 77:16
  83:10 95:3
  96:5,6 102:15
  117:23 125:11
  154:16,21
  162:2 164:22
  171:20
**enforcer** 54:12
  54:17
**engage** 163:6
  164:16
**engaged** 163:3
  164:14
**engaging** 178:1
**English** 190:2,9
**ensure** 206:3,6
**enter** 10:11,14
  10:17,20 11:1
  11:10 180:4
**entered** 10:23
  84:16,20
**entire** 46:17
  95:24
**entirely** 185:6
**entirety** 13:22
**entities** 96:6
**entries** 5:3 8:17
**entry** 142:12
**environment**
  159:1 162:1,2
  188:9
**epileptic** 165:22
**ERT** 144:18
**escape** 47:17,24
  48:1 164:9,10
**especially** 186:5
  187:6

**espousing**
  157:11
**essential** 106:19
**Essentially**
  202:3
**establish** 44:16
  80:11 144:3,5
  163:4
**established**
  45:22
**establishes**
  13:18
**estimate** 42:18
**et** 5:2
**event** 40:25
  48:17,19 59:21
  193:13
**events** 13:22
  27:11,12 59:9
  105:17
**eventually** 26:14
  46:9 60:13
  106:3 123:23
  133:6
**Evers** 190:8
**everybody** 11:22
  12:7 16:22
  18:12 191:14
  192:3 205:20
**evidence** 7:7,22
  7:24 8:4,7
  12:13 13:7
  14:5,9,20,23
  18:20 32:11
  33:21 36:7
  80:14 87:21
  89:23 100:14
  100:15 103:22
  103:24 104:25
  105:9 107:20
  107:25 121:18
  130:4 134:20
  134:25 135:1
  139:19 140:13
  141:23 149:23
  150:22 153:10
  153:24 155:13

157:18,20,22
  158:9,16 159:2
  159:15,20
  160:6,16,16,16
  161:17,18,20
  162:8,16,19,20
  162:21,25,25
  163:2 165:16
  167:10,14
  174:8,9 175:20
  179:12 182:25
  184:5,13,16,18
  185:2,8,14,16
  185:18,23
  187:14 188:4
  189:7,10
  191:10 194:10
  194:22 200:17
  200:18 204:2,9
  204:10,11,22
  205:12 206:13
  206:15 207:20
**exact** 34:9 41:25
  45:10 46:14
  56:23 73:25
  74:13 78:20
  84:25 85:9
  86:8 99:1
  107:7 114:21
  115:21 119:4
  129:11 130:19
  134:5 136:3
  139:4 142:16
  185:23
**exactly** 46:24
  47:2 73:2,12
  82:7 83:21,23
  84:4 85:13
  86:25 88:1
  89:19 93:22
  94:21,23 96:7
  97:19 100:18
  100:22 107:16
  118:3 129:16
  133:16 141:12
  141:17 144:23
  147:7 187:4

207:8
**exam** 178:1
**examination** 4:7
4:7,8,9,9,10,10
21:20 66:12
84:12 95:16
96:3 102:21
103:11 118:13
128:3
**exceeds** 96:2
**exceptions**
168:14
**excluded** 143:2
143:17,18,19
143:21
**exclusively**
158:18
**excrete** 57:5
**excuse** 96:25
149:1 188:10
**excused** 176:18
**execute** 23:11,12
152:12 154:13
**executed** 151:5,8
151:17,21
152:6
**Executive**
139:24 140:2
**exhausted**
165:15
**exhibit** 14:21,24
21:3 62:15
**exhibited** 57:17
**exhibits** 20:14
20:17,24
**exist** 124:18
**exorcism** 30:22
30:24
**Exorcist** 170:10
**expect** 15:24
178:7
**expediency** 12:5
15:21
**expeditiously**
42:16
**expel** 30:15 32:2
**expensive** 13:12

**experience**
61:10,11 175:6
**expired** 87:2
**explain** 33:13
**explains** 158:10
**explanation**
155:11
**express** 199:12
**expressed** 176:3
**expressing**
157:10
**extended** 116:25
183:17
**extended-type**
202:6
**extent** 12:7,19
13:5 15:18
17:9 65:22
96:2 112:3
167:23 176:24
**extraditable**
153:3
**extradite** 152:22
152:24 154:14
**extremism**
157:16
**eye-witness**
58:25
**eye-witnesses**
13:22
**eyes** 62:19
170:11,16

─────────
**F**

**F** 115:13 177:4
**F.L** 29:9,15 40:4
47:25 50:1,13
50:19 52:5
53:24 54:13,16
54:18,19 55:2
56:5 58:22
60:22,24 61:6
66:19,21,24
67:2,16,20,22
69:12,16 75:11
78:3,5 79:7
80:4 81:1,10

81:14 82:3,4
91:8 92:16,23
104:11 110:12
111:11 112:24
114:7,24 118:2
119:6 120:13
124:10 135:19
145:2 171:1,3
175:12 177:5
**F.L.'s** 66:25
92:20
**face** 155:22
**Facebook** 79:4
142:7,12
145:19
**facilities** 209:1
**facility** 195:5
197:16 198:11
208:22,23
**facing** 9:20 10:3
197:17
**fact** 24:8 33:3,11
77:25 85:9
90:5 93:6
103:3,17 120:2
120:9 132:7
150:16 151:7
169:2 175:2
177:24 195:1
195:11 202:25
**factor** 169:2
**factors** 32:15
167:2 174:5
189:5 200:16
207:13
**facts** 13:18
79:11 80:10,10
121:8 128:16
160:2,4
**factual** 78:22
101:8
**fade** 33:25
**failed** 87:5
**failure** 161:10
**failures** 154:19
**faint** 57:7
**fair** 75:10,15

101:20
**fairly** 159:1
199:23
**faith** 196:8,14
196:19,22
197:7,7
**False** 134:13
**families** 162:1
**family** 38:11
45:8 64:10,16
75:20 84:5,7
98:10 102:18
102:22 116:25
120:3 124:9
154:25 155:1
166:9 183:17
184:7,20
186:16 188:8
188:17 203:9
203:20
**family's** 155:1
**far** 13:18 14:2,5
17:8 20:21
32:5,10 111:21
127:1 135:25
143:10,14
169:15,25
170:23 171:14
179:9,11
184:18
**fashion** 200:22
206:2
**fashioned** 181:4
186:11 189:2
201:13
**father** 25:21
64:19 88:18
120:24 171:5
195:19 203:9
**fax** 152:19
**FBI** 21:23,24,25
51:20 68:19,20
68:21 94:25
95:3,24 101:14
101:23 107:23
117:13 122:15
126:11 131:6

133:20 140:11
142:9 144:18
144:22 145:22
175:5 185:3
**Fe** 22:2 68:19,21
**feared** 38:9
**feasible** 209:3,18
**February** 56:5
**Federal** 2:14
195:5,21 202:9
202:17
**feel** 19:20
**feeling** 15:12
**feet** 45:1,10,11
46:20 136:3
**felony** 181:15
**felt** 57:23 58:7
58:10,12
113:11,15,16
113:22
**female** 131:16
134:24 135:3
209:12
**fend** 47:25
**field** 95:11
**fight** 91:15
**fighting** 134:18
**file** 100:21 134:9
172:15
**filed** 9:1 11:2
23:21,22 24:5
24:11 74:11
75:3,7 77:15
78:13 86:16
87:25 156:6
**filled** 46:23,25
46:25 47:1,3
56:12
**final** 152:5
211:11
**finally** 95:5
126:12 147:23
**financial** 163:8
207:24
**financially**
203:10
**find** 24:10 32:17

144:13 164:12
167:9,13 174:8
174:10 183:5
189:10 191:6
196:24 200:18
201:14,17
207:20,25
208:2
**finding** 160:22
200:23 207:16
**finds** 206:19
**fine** 18:7
**finished** 205:25
**fire** 36:10 81:23
137:10 205:4
**firearm** 9:11
32:8,9 36:2,4,4
36:9,12 117:20
118:9 159:17
159:17 161:22
**firearms** 35:1,3
35:7,11 36:18
41:1,1 48:3,22
49:2,9 50:5
98:15 108:3,20
108:23 109:1
109:15 110:2
130:5 141:15
156:23,25
158:12 159:11
164:1,9,11,11
164:15 185:13
186:25 187:16
**fired** 36:15,22
50:1,7,19 51:9
81:25 82:1
120:5 135:17
135:20 141:11
204:13,15
**firewood** 103:4
**firing** 46:10
120:4 135:25
137:5,7 141:6
164:8 205:1
**firm** 2:18 211:11
**first** 12:25 18:2
65:20 67:19

68:5 123:22
125:9 130:24
131:2 148:10
171:3 190:21
190:23
**fit** 187:3
**five** 16:9 31:23
32:21 42:25
46:20 48:14
53:2 54:8
56:20 131:22
199:13 207:2,6
**five-day** 14:17
**flee** 183:13
186:6 202:16
**flight** 153:11
155:6,8,19
162:15,23
168:2,19,24
171:22 172:6,7
173:11 174:9
181:6 182:22
186:5,14 191:6
193:21 202:3
203:14
**fly** 88:13
**foam** 57:6
105:18 129:23
170:11
**foaming** 170:16
**focus** 121:13
191:5
**focused** 161:6,7
**follow** 65:14
138:16 146:10
146:25
**follow-up** 4:11
4:12,13,13,14
83:18 84:8
138:19 139:10
139:13 140:25
141:4 142:19
145:8,10 146:8
147:21 177:17
**followed** 38:18
41:21 91:19
147:20 187:9

**followers** 38:16
**following** 90:3
196:3
**food** 136:7
205:14
**foot** 45:13,18
46:6 187:2
**Force** 70:8,9,13
**forced** 61:3
166:19
**foregoing** 211:4
**forehead** 57:5
57:5 104:23
105:6,21
106:25 170:8
170:15
**foreign** 154:23
154:25 162:1
162:22 169:5
173:10 182:14
186:15 203:18
**forensic** 28:23
44:5 71:25,25
73:21 90:19
106:1,11
**forged** 181:18
**forget** 48:22
**form** 132:7
183:10 204:22
**formal** 10:9,11
10:17,19
**forms** 183:8
**forth** 127:6
167:2 173:13
186:19 207:17
211:7
**fortifications**
164:9
**Fortunately**
82:1
**forward** 74:6
**foster** 66:25
67:11,14 68:3
68:8 69:11,15
69:18 93:5
**found** 12:16
28:15,19 29:24

44:11 90:12,18
101:18 107:24
108:21 109:2
109:10,21
110:7,8,9
125:21 131:18
131:23 132:13
137:4 139:23
140:1 144:4,8
144:16 155:16
160:8 165:6
197:12 200:25
**four** 16:23 18:13
40:5 47:20
48:13 52:16
53:7 60:1
118:24 119:2
168:14 183:21
187:25 190:23
**four-year-old**
191:13
**frame** 14:18
46:3
**frankly** 175:7
**free** 202:5
**freely** 49:5
**frequent** 162:22
**frequently** 51:4
**friend** 145:21
**friends** 124:9
**frightened**
113:17
**front** 62:2
**frothed** 165:22
**full** 18:4
**fun** 82:24
**functions** 54:25
**fundamental**
174:25
**further** 61:21
127:22 131:7
135:12 141:18
150:17 167:18
171:25 174:15
177:1 201:18
208:12,14
209:23 211:8

**Furthermore**
186:1
**future** 154:8
156:9

---
**G**
---

**G.E.D** 153:23
**Gabriel** 196:4
**gainfully** 183:4
**Galaz** 192:25
198:21 200:2
**gang** 140:18
**gaps** 56:12
**gather** 53:18
**general** 107:17
108:8 159:21
167:23 205:21
**gentlemen** 11:14
**George** 2:3 5:4
154:13
**Georgia** 23:14
26:14,20,23
27:12 31:3,10
31:13 34:3,17
34:19 35:12,17
35:19,21 36:2
36:4,12,21,25
38:7 43:22
52:21 56:14
64:17 74:7
75:21 76:13,20
79:17 81:2
87:23 88:1
89:4,24 94:4
98:17 100:13
120:23 124:20
128:18 131:6
131:11,20
151:3,6 152:10
153:3 154:11
162:21 191:2,2
191:19 194:1
204:3
**getting** 63:15
80:13 115:15
121:11 132:18
175:14 196:5

196:16
**Gihad** 24:14,15
**give** 7:12 21:11
  33:20 34:5
  70:21 99:2
  112:7 115:4,5
  119:23 126:4
  168:9 203:4
  206:6
**given** 17:20,21
  24:9 81:16
  104:17 110:15
  110:17 127:4,9
  174:19 175:1
  179:9,13
  199:23 202:22
**giving** 43:10
  108:13 178:11
**glad** 177:5
**glance** 175:18
**glass** 175:3
**go** 6:4 7:4 8:10
  13:3,8 14:20
  15:23 16:15,23
  18:14,15 19:10
  19:14,18 21:5
  26:24 30:12
  33:25 34:4
  36:25 41:20
  42:13 44:14
  52:2 54:17
  63:20 64:5
  75:9 78:3 91:5
  91:20 92:21,22
  93:12,15
  106:14 112:1
  126:3 134:4
  143:14 144:22
  150:6 161:4
  166:12 183:2
  183:14,15
  190:17 193:7
  196:11,11
  203:14
**goats** 39:3
**God** 26:17 27:4
  27:20 28:9

33:11 37:24
38:2,4,7,20,20
41:19 57:9
104:15 132:18
132:21,24
163:18
**goes** 168:19
**going** 6:12,13,17
  7:4,8 8:11 11:6
  15:18,19 16:19
  18:1 19:2 21:1
  21:6 32:5 66:6
  80:5,8 82:11
  92:8 96:1
  110:20 113:6
  116:6 121:6
  130:14 134:14
  138:18 141:24
  143:14 147:2,3
  148:21 149:3
  149:14,19
  152:23 165:7
  167:21 173:2
  174:13 175:7
  175:11 179:25
  180:1,4 182:2
  182:8 187:4
  191:5,12,23
  192:18 193:9
  193:17 195:18
  195:24 196:8
  196:16 198:6
  200:2,6 201:2
  201:22 202:1,2
  202:4,18,20
  203:1,18 206:8
  206:25 207:4,6
  207:9 208:11
**good** 5:4,9,10,12
  5:12,14,16,16
  5:18,21,21,25
  5:25 8:18
  15:11 65:24
  66:14,15 91:14
  103:13 168:25
  175:10 180:17
**Google** 78:12

**government** 4:5
  7:5 8:3 11:2
  16:16 71:2
  78:17 82:11
  99:23 146:11
  149:18 150:11
  152:4 153:9,16
  154:15 158:5
  160:18 161:6,7
  161:22 162:9
  167:9 168:11
  170:1,17,20
  171:21 175:13
  179:5 180:6
  181:5 183:8
  185:8 186:4
  187:18 202:2
  202:21 204:20
  204:20 205:11
  209:20
**Government's**
  6:14,21 7:3
  12:4 17:19
  18:19,21,23
  151:1 161:10
  161:16 170:4
  176:2 178:12
  187:20,22
  203:24
**governmental**
  133:22 163:8
**Governor** 186:3
**GPS** 172:1
  181:9
**graduated**
  189:25
**Grady** 134:7
**grand** 6:2 9:6
  10:2 12:15
  18:2 110:18,21
  110:23,25
  154:7 160:7,8
  160:21 185:10
  207:15,16
**Grande** 1:16
**greater** 179:10
**Green** 190:12

**ground** 45:14
  46:2 47:13
  117:24 122:1,3
**grounds** 116:7
**group** 12:9
  15:18 38:5
  52:1 55:22
  65:8 104:15
  121:21 158:2
**groups** 157:23
  184:15
**guard** 139:16
  140:6
**guardian** 67:11
  67:21,23 70:16
  72:7,10 96:25
  97:1
**guardians** 66:24
  158:20
**guess** 13:3 17:1
  105:11 149:8
  176:4
**guilty** 10:11,14
  10:17,20,22
**gun** 36:14,21
  92:24 93:7
  94:4,6 135:21
  137:11 148:5
  156:13,13
**gun-range** 139:3
**guns** 93:13 94:9
  95:1 98:17,19
  125:10 147:24
  157:2 159:5,6
  159:8 163:23
  191:16,17,18
  192:4
**gunshots** 141:11
**guys** 145:19

——————
**H**
**H.I.E** 25:3,9
**Haiti** 52:23 55:9
  65:2,7 116:1
  142:4 145:18
  169:8
**Haitian** 104:6

104:10 142:4
**Hakima** 24:6,11
  24:14,20 25:23
  33:22,25 34:1
  43:12,12,24
  76:2 108:15
  111:11 128:24
  128:25
**halfway** 153:17
  156:2 169:11
  169:13 171:24
  172:2 181:8
  183:3 184:1
  186:8 193:15
  197:13,14,22
  197:25 198:5,5
  198:10 199:12
  199:13,17,20
**hand** 21:9 30:17
  57:5,22 104:23
  105:6 113:21
  135:20 170:14
**hand-written**
  138:14 140:8
**handed** 74:16
**handing** 101:2
**handle** 11:18
  12:4
**handled** 11:21
**hands** 57:19
  117:21 135:21
**handwriting**
  145:3
**handwritten**
  29:16 138:14
  140:4
**happen** 26:11
  44:10 59:19
  62:19 93:21
  112:2 190:21
  192:13,14
  202:18 206:8
**happened** 26:13
  27:11,12,16
  44:13 59:13,15
  76:23 77:16
  115:13 123:18

129:10 170:18
170:20 200:13
207:9
**happening**
119:15 196:15
206:16,17
**happy** 18:18
**hard** 56:11
133:16
**harm** 106:5
107:1
**harmed** 113:20
**Hartman** 67:9
**He'll** 10:25
**head** 57:6,11,22
133:5 170:7
**health** 32:5
166:3
**healthy** 184:24
**hear** 13:4 111:5
137:25 141:25
157:6 159:3
161:17,18
195:10
**heard** 16:8
63:24 92:25
93:3 133:10,14
150:23 154:20
154:24 158:17
160:6 161:3,12
165:16 177:22
178:10 182:25
188:4 191:9
194:7 203:25
**hearing** 1:19
7:19 14:16
15:13 16:2
17:6,8 18:3,5
18:18 19:3,9
20:4 87:6,8
142:23 143:5
143:23 149:15
160:13 172:16
182:5 187:14
196:1,4 206:24
207:15
**hearings** 6:1

**home** 24:8 97:3
168:23 169:3
**honestly** 97:19
**Honor** 5:4,10,14
5:18 6:6,7,15
6:19 7:1,16 8:8
9:15,22 10:4
10:10,13,16,19
11:5,13,20,24
11:25 12:1,11
13:2,9 14:25
15:2 17:3 19:1
19:18 20:2,16
21:4,6 32:7,13
49:18 63:13,19
65:18,25 66:10
74:20 80:19
82:11,14 83:5
83:12,14 84:9
89:17 90:8
96:1,4,11,14
99:21 100:2,25
101:10,12
103:9 106:8
110:20 116:6
126:16 128:1
132:4,15 135:2
135:12 138:16
138:21 139:11
141:2,18 143:4
143:6,15 144:1
145:5 146:6
148:16,20
149:1,6,17,25
150:12,14,25
151:12,22
152:1,2,8,14
152:16 153:4,5
153:8,15
159:21 160:14
161:5,21
162:14,24
166:23 167:21
168:19 169:11
171:24 172:5
172:13,18
173:7,9 174:2

174:17,24
175:17,24
176:8 178:5,21
179:2,18
180:15,17,23
181:1,2,12,14
182:19 183:13
184:4 185:1
186:3,10,13
187:11,13
188:10,14
189:1,15,18
191:8,9 193:19
194:24 195:3,8
197:6 199:4,9
200:2 201:21
201:21 202:14
203:23 204:19
205:3 206:13
206:21 208:15
208:16,20
209:25 210:2,3
**HONORABLE**
1:22
**hoping** 198:23
**horrors** 173:23
**hospital** 94:22
94:23 134:2,4
134:6,6,7
**hotel** 202:6
203:1
**hour** 73:3
**hours** 16:23
18:13 20:5
31:23 32:21
56:20 57:9
62:22 68:12,14
68:15 129:20
165:15,17
187:7 207:6
**house** 39:3
103:6 120:14
153:18 156:2
169:11,14
171:24 172:2
181:8 183:3
184:1 186:8

**home** 24:8 97:3

192:1 193:16
197:13,14,22
198:1,5,5,10
199:12,14,17
199:20
**household** 54:21
55:4,5 120:11
120:15
**households**
120:18
**housekeeper**
120:10 194:5
**housing** 193:13
**Hujrah** 1:8 2:21
4:19 8:14,23
22:13 24:17
27:2 37:5,17
54:11 59:14
65:1,4 75:24
76:1,13,19
77:1,10,22
78:21 79:19,25
81:1,5,6,11,16
82:20 83:9,18
127:18,20
129:9 131:8,10
135:23 137:22
149:16 201:20
204:1 205:9
206:4
**Hujrah's** 201:23
**human** 51:2
165:12
**hundred** 13:20
27:11 45:13
46:6
**hunted** 130:12
**hunting** 92:22
130:7,11 164:4
168:11
**husband** 124:6
190:17
**hypoxic** 25:3

──────────
**I**
──────────
**Ibn** 1:7 22:11
**ICE** 172:11,14

Column 2 (continued):
177:16,23
178:4 199:10
**heart** 57:12
**heartbeat** 57:7
133:7
**heavily** 75:10
110:11
**height** 46:15
**held** 57:4 155:23
**help** 74:16
114:20 115:17
115:17,18,20
193:6,12
194:14 203:2
**helpful** 80:16
**helping** 103:5
**her--** 203:1
**hereinbefore**
211:6
**hesitated** 118:5
**hid** 166:8
**high** 39:6,8
46:19 189:25
**high-capacity**
35:23
**high-profile**
199:18
**history** 32:16
154:1,18,18,19
181:16 203:22
**Hogwarts**
175:25
**hold** 16:3 49:20
50:14 63:12
133:9,14
154:16
**holding** 50:16
105:5 133:10
133:14,18
135:21 154:14
155:21
**hole** 41:12 46:2
46:3,4,5,6,12
47:22 62:6
122:6 136:4
207:1
**holed** 207:2

172:15,19
173:2
**idea** 65:24 93:21
183:24
**ideals** 115:1
**identical** 9:7
**identification**
183:8,10
**identified** 66:19
131:24 157:8
157:19
**identify** 22:7
71:5 74:19
**identifying** 29:8
71:2
**ideology** 27:15
52:24 104:7,12
**illegal** 32:9
98:17 160:3,4
**illegally** 9:12
55:15,17
159:16
**immediate**
116:24
**immediately**
195:15 202:11
**immigration**
55:11,12 85:8
86:3,13,25
130:3 159:12
159:18 160:18
160:20 168:2
168:17,18
172:16 185:9
**important**
185:11 203:25
**importantly**
162:6
**imposes** 206:5
**impossible** 89:14
89:20 90:4
**improper** 132:5
**imputed** 186:23
194:14,22
**inaccurate**
85:25
**inaudible** 5:23

5:24 15:1,6,14
44:4,23 45:15
49:18 50:6
96:15 101:13
116:11 131:16
132:8 134:24
135:3 148:7,11
148:13 149:2
149:19 154:15
161:23 172:17
176:11,15
199:16,24
209:15
**Incarceration**
153:20
**incident** 93:7
205:24
**include** 14:4
41:1 51:13
52:24 53:16
**included** 42:23
164:8
**includes** 170:25
**including** 13:21
18:24 23:3
32:16 62:1
164:1 173:20
179:4 197:13
**incorporate**
167:24 203:14
**incorrect** 8:7
78:4 171:13
**incredulous**
170:1
**indefinitely**
17:12
**indicate** 80:15
88:10
**indicated** 81:1
135:16 142:12
176:7 193:21
200:3
**indicating**
152:22 157:16
**indication**
178:11,11
205:17

**Indictment** 6:3
6:4 9:1 10:2,9
10:20 22:20
32:11,12
156:21,22
157:4,8 159:9
160:8 187:15
202:18 207:15
207:17
**indiscernible**
5:11 12:6
13:17 14:6
15:10 17:17,24
20:25 22:23
26:22 32:4
33:2,16 34:16
35:23 36:7
37:4 46:17,18
50:24 52:3
56:16 58:6
62:17 63:8,21
63:22 65:6
68:2 70:12
75:16 79:15
84:23 88:23
89:7 91:18
93:5 97:15
98:22 105:11
105:16 107:23
108:8 110:10
112:21 115:12
125:5 126:11
159:6 160:20
174:25 177:11
179:5 181:2
183:16 198:7
199:15
**individual** 12:18
12:22 30:18
41:13 119:12
119:13 142:6,8
145:20 150:19
169:20 205:22
**individual's**
197:15
**individualized**
12:17

**individually**
11:19,21 12:4
12:10,24,25
148:22
**individuals**
39:11 52:6
53:16,17
109:18 120:19
122:13,15,20
124:2,4 126:13
142:10,13,14
196:22 198:22
**indoctrinated**
164:16
**infer** 194:11
**inflammatory**
63:23
**information** 7:6
7:11,15 12:5,8
17:13 24:7
29:2,18 32:3
35:10 36:1
43:5 48:6 50:4
51:17 52:7
56:3 77:19
81:9,16 83:8
85:24 91:7
106:17,22,23
111:12 116:4
119:24 129:25
131:13 138:3
138:12 139:3
142:3,9 143:11
144:11 145:16
145:22 150:17
153:1 155:14
162:3 167:3,5
172:10,14
174:7 182:9,17
189:8 197:11
198:17,20
199:7,24 201:4
201:9,10 203:4
203:6 207:14
207:18 208:6,9
**informed** 172:9
197:20

**inhabited** 33:1
**initially** 95:20
102:12,15
**initials** 23:7
70:21
**injured** 94:15
113:24
**injury** 98:6,7
114:2,4
**inside** 45:5
72:10 184:8
**instant** 171:14
**institutions**
51:15,16,18,21
78:23 80:5
91:4,21 111:17
111:19 112:1,2
130:14,18
133:22 134:1
135:9 157:6,8
**instruct** 52:1
112:1
**instructed** 55:4
63:14 164:15
165:4 166:16
166:20
**instruction** 30:2
**instructions**
93:18 112:7
**instructs** 173:3
**instrument**
181:19
**intended** 131:5
**intending** 154:7
**intent** 20:16,17
159:21,23,24
159:25
**intention** 157:10
**interaction**
69:22
**intercepted**
157:17
**interest** 211:11
**interested**
152:19
**interesting**
156:19 202:14

205:8
**interestingly**
204:19
**interests** 172:20
**international**
155:6 169:7
**interpret** 105:12
**interval** 7:19
**intervene** 166:4
**intervened**
166:5
**interview** 28:21
67:3,15,19,24
68:4,7,9 69:3,7
69:10,13,15
70:1,2,6,18
71:22,24 72:6
72:11,17 73:1
73:8,11,13,23
82:2 83:2,3
90:17 92:4
97:1 114:17
130:24 131:2,5
167:4 171:4
177:24 204:20
204:21
**interviewed**
66:21 67:20
68:25 70:22
71:11 78:3,4,7
93:23 96:16
102:11 111:4
111:14 113:19
114:7,16 119:6
119:14 130:13
131:3 188:23
**interviewer** 72:1
73:21
**interviewing**
79:7
**interviews** 13:20
24:14 66:17,23
68:11,16,18
71:16,17 74:3
80:25 81:14
83:8 91:7
111:8 134:19

135:1 161:25
171:1 177:25
178:4 185:3
**intimate** 52:18
**intimidating**
162:2
**inventory** 35:8
107:22 108:4
**investigated**
197:12
**investigation**
13:13,14,25
14:1,4 22:4,20
36:8 62:25
81:10,15 95:21
95:25 96:5,6,8
107:12,18
114:20 130:4
131:18 134:20
172:23
**investigations**
117:11
**investigative**
137:15
**involve** 191:20
**involved** 22:3,19
39:23,25 79:24
80:15 81:21
82:20 88:16
95:22 121:11
122:7,13
123:10,15
125:8,10
171:14 191:11
191:22 204:4
209:21
**involvement**
156:23 157:3
**involves** 181:24
199:19
**involving** 22:4
**iota** 185:14
**irregular** 122:13
**irrelevant** 143:4
144:1
**ischemic** 25:3
**Islamic** 26:3

**isolated** 161:25
**issue** 15:3 121:1
130:18 154:12
169:18 179:20
179:23 180:1
191:16,18
195:23 199:1
209:21
**issued** 23:13,20
24:2 177:12
**issues** 119:24
121:24 125:10
190:20 191:11
192:2,20
**item** 80:12
**items** 13:24
80:12 99:9
125:16,17,21
125:23,24
126:3,4,9
**Ives** 2:18,18 4:9
5:14,14 6:7
10:13 11:20
49:18 103:12
106:13,16
110:22 111:1
116:12 118:11
149:23,25
150:4,13,25
151:13,22
152:2,16 153:5
153:8 158:7
160:14,24
161:5 167:22
169:16 185:8

――――――――
**J**
**J.L** 29:9,15 40:4
50:1,16,19
54:14 59:2
61:4 66:25
69:1,3,5,12,17
75:11,16 78:5
79:7 80:25
81:10,14 91:7
91:10,12,25
92:4 104:11

110:12 111:11
114:7 118:2
119:6 120:13
133:5 135:19
171:1 175:12
177:6
**J.L.'s** 91:22 92:9
92:13
**jail** 44:14 165:7
166:12 175:10
**jails** 175:7
**Jamella** 24:14
24:15 111:11
112:17 128:24
**Jane** 59:14
**Jany** 1:7 2:13
4:16 5:2 8:13
8:21 22:9 26:7
26:12,17,21
27:3,20 28:2
28:21,25 29:3
29:4,11,12,19
30:1 32:24
33:8,10,20
34:16,21,25
36:1,16,24
37:23 38:6
40:1,4 41:1,19
42:12 43:6,14
43:21 44:9
48:18 50:5
52:3,9,13 53:1
53:3,12,25
54:13 55:7,8
57:8 58:21
59:8,19 65:6
65:12 71:7,16
73:13 76:2
80:4 90:22
103:19 104:7
104:10 112:15
112:17 118:3,3
119:8,21
123:16 128:17
129:8,9 130:1
131:7,10 132:3
132:17 134:13

137:21 142:4,5
145:3,17,20
146:1 159:10
163:17,22
167:18 171:22
187:9 196:2
**Jany's** 53:15
54:5 56:2
63:10 75:14
76:16,17 88:9
89:16 90:1
111:12 128:25
132:13 133:7
194:1
**Jesus** 27:24
28:12 33:18
51:25 52:12
53:7 54:9
59:22,24 91:20
111:25 112:7
141:25 145:13
166:22 173:19
**jihad** 53:19,20
78:18 79:24
81:17 111:11
112:17,22
113:1,2,4
128:24 134:15
135:8,11
157:16 158:17
162:8 163:10
163:11,12,13
164:19 166:22
171:2,4,5,8,11
184:17 204:12
**jinns** 30:15 32:2
33:1,4 103:21
**job** 99:19,20
120:20 183:5
184:2 186:8
**jobs** 205:24
**Johnson** 10:25
10:25 209:4
**joined** 186:20
**joint** 148:24
**jointly** 11:18
148:24 149:14

journal 28:14
62:1 87:19,20
87:22 90:12
132:25 133:7
133:25 134:5
137:24 138:3,4
139:15 140:5
142:21 143:25
144:7,12,13,17
144:20
journalist 190:9
journals 14:15
132:13 157:13
journey 27:12
88:8
JR 2:9
Judge 1:23
10:24,25 15:22
16:13 95:12
127:17,19
140:24 143:9
145:10 147:24
177:20 182:8
190:7 192:6
201:7 209:4
Judges 126:14
judicial 160:10
June 22:23
95:22,24
jury 6:2 9:6 10:2
12:15 18:2
110:18,21,23
110:25 154:7
160:8 185:10
207:15
Jury's 160:7,21
207:16
justice 5:8
174:23
Justice-Natio...
2:9

___ K ___
Kari 2:14 5:10
keep 187:24
206:24 209:1
keeping 168:18

kept 36:5 60:15
61:22 166:13
key 159:11
Khalsa 1:22
95:12
kid 37:10
kidnapping
99:16 195:20
kids 37:7,9
88:15,20,22
89:1 121:5,5
kill 38:10 52:5
54:19 163:7,15
killing 163:14
Kim 5:5 70:10
71:25
KIMBERLY
2:6
kind 24:2 25:11
28:2 30:2 35:3
35:23 40:14
44:18,19 97:8
111:23 113:6
114:2 139:16
139:20 163:6
168:21 184:16
184:17
kinds 35:16
Kingdom 65:4,5
116:1
KIRTAN 1:22
kitchen 58:22
136:6
knew 52:11
85:10 111:17
115:10 121:6,8
121:9 124:5
145:1 160:19
163:12 165:6,8
186:21,22
193:23,23
196:14 202:17
204:2 206:23
207:4,8
know 15:16 16:4
16:7,14,17
19:16 23:19

24:5 30:5 31:2
31:8 36:8 39:8
40:24 41:15,18
42:9,11,13
46:14 47:4,9
53:12,25,25
55:2,3 59:11
64:24 65:6
84:4,22,25
85:9,12 86:8
86:25 87:8,11
88:1,2 89:9,13
89:19 90:25
91:2 92:12
94:21,22,23
96:7 97:5,10
97:19 98:1,8
99:6 100:6,7
104:6,9 107:9
107:20 108:13
108:17 109:4
109:13,19,20
110:1,7,8
113:25 114:10
117:15,16
118:15,16,18
118:21,24
119:3,3 121:4
121:15,20
123:8,12,12
124:14,19
125:1,1,20
126:7,7 127:4
127:10 128:16
128:17,22
129:8,8 131:12
136:3 137:12
137:13,22
139:1 141:17
143:24 144:10
148:7 151:18
152:24 153:9
154:20 155:12
156:1,11
159:18 160:2
162:3,4,8
177:13,14,15

178:3 183:21
185:10 187:4
192:3,18
193:10,20
196:22 197:19
199:22 200:13
202:22 203:5
203:13,17
204:7,7,19
205:8,9,11
206:4,9,25
207:6 209:8,19
209:19,21
knowing 165:3
194:1 206:7
knowingly
159:10,11
185:17
knowledge 24:3
24:18 31:10,14
36:13,14,23
38:9 39:21
40:9 41:17
43:17 47:9
48:3 53:1 54:5
55:10,14 58:5
58:6,19 62:23
63:10 64:6,9
64:12,15,19,21
65:11,13 74:5
76:7,8,11,18
77:1 80:25
83:11 86:1,5
86:24 87:3,7
87:15,17 95:10
95:13 97:11
98:4 102:25
104:5 108:2
109:7,25 110:1
112:3,14 114:3
114:4 116:19
116:24 117:3,5
121:4,18
122:25 125:13
125:25 128:14
146:4 155:16
159:20 160:16

176:14 188:5
192:5 194:22
known 17:22
18:1 192:23
193:8 194:18
194:20 195:14
knows 154:4
192:17 193:17
Kostich 182:1
183:15
Kraehe 2:3 4:7
4:10,12 5:4,5
6:15 7:16 11:5
12:11 13:2,9
14:10,14,25
16:18 19:1
20:2,11,16,23
21:4,6,21 30:7
30:11,14 32:19
49:23 63:18
64:6 65:18
71:4 82:14
89:17 90:7
96:1,10 99:19
99:25 101:12
103:15 106:8
110:20 116:6
124:1 126:16
127:25 128:4
132:10,25
134:25 135:6
135:12 141:2,5
141:18 143:4
144:1 148:16
148:19 150:12
151:11,15,20
151:23,25
153:4 162:11
162:14 172:3,5
172:8 173:8,9
174:15 175:17
176:8,23 178:5
178:15,21
186:13 193:19
197:3,5 206:21
208:16 209:24
Kraehe's 84:15

## L

**La** 169:11,13
171:24 172:2
181:8 183:3
197:13,14,18
197:20,22,25
198:4,10,14
199:7,11
202:23
**Lab** 28:23 90:19
**label** 111:21
**labeled** 152:4
**lack** 155:20
168:20 182:23
182:23,24
183:24 190:14
**ladies** 11:14
**laid** 89:16
**land** 97:8 181:25
**landowner** 97:8
**language** 153:2
**laptop** 28:24
90:18,21,22,23
91:1
**large** 155:16
**largely** 59:3
111:2,7
**lasted** 31:19
32:20 129:19
165:18
**law** 2:18,22 3:6
39:1,11 47:17
47:25 49:14
51:13,20 62:24
77:16 83:10
95:3 96:4,6
102:15 117:22
125:11 154:16
154:21 162:2
164:22 171:20
173:3 186:23
194:13 195:21
**lawful** 25:25
26:4 125:4
130:1 156:24
164:22 168:12

**lawfully** 156:25
**laws** 168:17
**lawyer** 147:4
201:23,24
**lawyers** 193:5
**laying** 47:21
**lead** 49:20
**leader** 55:5
132:22 173:15
205:17
**leading** 49:19
114:8,10,15,18
115:6 132:5,8
**learn** 24:11
25:20 26:8
29:1 44:3 47:4
48:9 179:22
**learned** 87:19
166:11 172:11
**learning** 61:10
61:11 152:13
**leave** 34:17,22
40:20 54:4
128:7,10 173:7
202:5
**leaving** 37:22
56:12 75:21
**led** 29:19 197:8
**left** 34:3,24 38:6
41:18 42:20
56:13,14 74:7
87:23 88:1
89:3,12,19
109:15 110:3
113:25 124:20
126:23 128:11
184:20,20
**legal** 25:25
67:11,21,23
72:7 158:20
168:9 189:20
**legally** 159:19
**legitimate**
150:20 168:21
169:2,4
**Legrand** 201:23
202:10,13,20

**legs** 88:25
**length** 77:6
**lengthy** 17:15
**let's** 12:2 19:9
81:24 100:9
110:6 129:7
**letter** 14:14 53:2
53:3,5 112:10
112:11,14,18
112:19 150:8
150:13 162:15
**letterhead**
150:15
**letters** 206:12
**Leveille** 1:7 2:13
4:16 5:2 8:13
8:20,21,21 9:2
9:11,15,22
10:4 22:9 26:7
26:17,21 27:3
27:20 28:2,22
29:3,4,11,12
29:19 30:1
32:24 33:8,10
33:21 34:21
36:2,17,24
37:23 38:6
40:4 41:19
43:6,14,21
44:9 50:5 52:3
52:9,13 53:1,3
53:12 55:7,8
57:8 58:21
59:8,14,19
65:12 71:7
76:2 90:22
104:8,10
112:15,17
128:18 129:8,9
130:1 131:8,10
132:17 137:21
142:5 145:17
146:1 159:10
160:5 163:17
163:22 167:18
167:19 168:4
171:22 174:4

180:1,10 187:9
**Leveille's** 26:12
28:25 34:16,25
40:1 41:2
42:12 48:18
71:16 73:13
90:13 103:19
132:3 133:24
142:4 145:3,20
185:9,14
**license** 168:12
181:17 183:10
202:12,16
**lied** 115:9
**lieu** 7:22 161:13
**life** 51:2 93:17
93:21 94:1
146:15,16
153:23 155:2
166:3 184:19
184:22,25
188:17 189:24
190:3,16
205:23
**life-like** 51:3
**lift** 57:22
**light** 195:25
**likes** 114:25,25
**limitations**
177:12
**limited** 179:5
**line** 32:13
**lines** 82:17
128:19
**link** 150:14
**list** 148:5
**listed** 77:22,25
101:9 138:22
**lists** 156:4
**literally** 183:15
**Literature**
190:10
**little** 7:8,17 18:8
71:15 74:6
75:19,22 80:7
86:16 156:19
156:20 169:19

175:18 181:14
182:10 191:4
**live** 7:9,12,14
45:15 116:13
116:17,17,22
118:21 155:3
155:24 183:18
184:19,22,24
190:25 207:23
**lived** 45:7,17
121:21 153:22
155:2 181:24
189:23 190:2
**lives** 158:1,4
203:20
**living** 58:22,23
83:18,25 84:4
84:6 117:6
126:20,22
136:2 155:19
169:10 174:1
182:11,13,15
184:8 187:1
203:21
**LLC** 2:22
**loaded** 49:15
98:19,20
164:12
**local** 193:5
**locate** 23:10
**located** 22:25
28:20,20 39:17
48:20 64:20
102:7 125:16
125:17 130:6
131:21,22
142:4,15
144:20 145:21
**location** 138:8
**locked** 49:3
**Lomas** 2:15 3:2
**long** 19:5 31:19
32:20 34:15
39:18 55:24
56:1,8 60:15
61:12 62:21
68:11 72:11

73:1,23 88:10
89:19 129:19
129:25
**longer** 209:18
**look** 101:3,13
140:12 141:12
144:22 147:9
147:11 148:3,6
148:9 195:24
**looked** 140:15
181:23
**looking** 56:7
101:16 205:19
205:22
**looks** 46:15,20
145:4
**lost** 18:4 188:14
**lot** 13:11 79:10
88:16 91:15
97:5,6 111:12
119:5,14,15,19
119:23 125:3,3
129:21 141:11
161:3
**lots** 162:20
**lower** 152:5
**Lucas** 1:9 3:5
4:17 5:19 8:14
8:24 22:17
27:2 37:3,18
39:2 40:19
45:8 47:24
54:13 64:19,23
84:5,7 94:11
100:16 102:3,4
118:16,24
121:21 124:5
124:10,21
125:1 126:13
128:5 131:5
137:20 192:9
**ludicrous** 165:19
**lump** 187:23
205:20
**Luna** 2:23

———————
**M**
———————

**ma'am** 5:13
15:11 21:13
64:4 69:2 73:5
73:10,17 74:10
74:24 75:8,18
76:25 77:9,18
78:6,10,14
88:4,19 91:9
91:11 92:18
94:17 95:7
96:24 144:24
176:21
**magazines** 35:21
35:25 47:21
**magic** 34:2
**Magistrate** 1:23
**mahdi** 28:4,5,7
52:21 104:14
132:23 173:18
**maintaining**
168:7
**majority** 90:21
**making** 14:25
47:23
**male** 209:12
**malice** 161:20
**man** 153:22
166:23 187:4
**manifestos**
157:13
**manner** 12:9
105:2,10
**manual** 138:12
139:21,24
140:14
**march** 86:6
158:1,4
**Mariam** 28:11
**Marie** 201:23
202:19
**marks** 113:25
**marriage** 25:25
**married** 25:23
118:16
**Marshal** 167:16
174:14 201:3
201:18 208:12

208:25 209:3
209:11,17,19
**Marshals** 208:24
**martyr** 112:11
**martyrdom** 53:8
112:11
**martyrs** 163:24
**Mary** 28:11,12
173:19
**masjid** 37:16,20
**match** 133:3
**material** 17:7
158:14 174:19
**materials** 13:12
13:25 20:6,7,9
20:21 28:24
39:17 61:25
90:21 97:17,21
97:23 184:10
**matter** 10:24
81:10 151:1
152:10,11
158:1,4 179:16
192:5 208:13
**matters** 189:21
191:19 196:16
**mean** 16:2 18:7
100:11 104:13
126:25 134:17
203:15
**means** 134:18
188:13
**meant** 134:15
**Medgar** 190:8
**media** 157:14
199:19,24
**medical** 24:24
25:12 44:5
63:2 106:10
166:6 183:20
194:15 195:5
**medication**
25:12 43:7,10
43:11,13,13,15
43:18,23,25
44:1 108:14,15
161:11,14

165:8,9
**medications**
44:6 106:2
108:7
**medicine** 196:11
**meet** 14:6 18:13
149:18
**meeting** 18:2
**meetings** 157:18
**meets** 190:17
**member** 206:22
**members** 144:18
155:1 209:13
**membership**
157:21
**memory** 74:16
114:14
**men** 54:14
208:21
**mens** 159:4
185:9
**mental** 32:17
178:1
**mention** 53:8,10
80:9,10 171:4
192:24
**mentioned** 29:4
30:1 35:18
66:16 68:25
78:22 79:19,25
80:6,18 91:25
101:8 121:6
123:24,24
125:15 141:22
177:3
**mentions** 85:15
113:2
**mentor** 54:14
**mercenaries**
38:10
**message** 26:16
27:4 33:11,17
38:7 41:19
52:2,2,5,22
54:18 59:22
132:18
**messages** 27:20

27:21,22 30:2
38:2,3,5,14,19
104:15 132:21
132:24 157:13
163:18
**messenger** 28:8
142:7 145:19
**met** 70:15
130:24 171:21
186:4
**Mexico** 1:2 26:9
27:13 28:23
29:6 31:11,13
31:22 32:21
34:4 36:11
39:10,13 41:20
42:7,14,17
43:1,14,19
44:15 48:3
50:18 52:21
53:6 56:17
62:22 64:8,10
87:11 88:8,11
89:10,11 90:4
90:19 92:22
93:1 94:6 98:7
100:6,9,10
102:13,22
117:6,10,12
120:19 121:16
123:21,23
124:2,4,6,10
124:11,16,21
124:25 125:5
134:14 142:6
146:14,15
151:17 155:20
155:25 162:17
164:2 182:15
183:11 184:21
184:22 191:20
194:1
**middle** 187:5
207:1
**military** 51:20
163:8 164:4,15
186:25

**Miller** 201:23
  202:10,13,20
**mind** 176:1
**minimal** 16:14
**minimum**
  193:15
**minor** 47:6
  72:24 73:19
  74:4 158:19,25
  206:14
**minor's** 22:25
  55:21 111:25
  115:13 131:19
**minors** 23:3,3,3
**Minors's** 177:4
**minute** 15:3
  173:1
**minutes** 16:9,15
  65:25 72:12
  91:5 143:22
**mirror** 67:5 70:7
  72:2,9 97:2
**miscommunic...**
  93:4
**misdemeanor**
  128:8 181:16
  181:18,22
  182:7
**missing** 23:21
  24:5,12,13,21
  24:23 25:17
  87:25
**misunderstood**
  89:21
**mitigate** 174:12
  189:12 200:24
  201:12,14
  207:25 208:2
**Mm-hmm** 76:6
**Mobile** 99:7
  107:8
**Mohammed**
  53:4
**molasses** 179:17
**mom** 67:14
  69:11,19 93:5
  177:7

**moment** 82:17
  83:12 96:13
**Monday** 18:3
**monitoring**
  153:18 155:9
  172:1 181:9
**month** 51:6 99:2
  99:3 124:7
  141:16,17
  147:1,8 183:12
**months** 45:23
  53:7 60:1,16
  61:14,19 87:4
  129:17 147:1
  166:17 183:19
  187:6 194:19
  194:21 207:3
**Morgan** 54:13
**morning** 15:24
  16:15,17,24
  18:12,13 20:4
  192:17,25
  198:21,25
**Morocco** 65:1
  115:25 171:5
**Morton** 1:9 3:5
  4:17 5:19,22
  8:14,24,24 9:5
  9:18,25 10:7
  22:17 27:2
  37:4 40:19
  47:25 64:23
  94:11 95:20
  97:3,12,24
  100:4,16 101:7
  101:17,25
  102:3,4 124:10
  125:1 128:5
  131:5 137:21
  180:24 181:7
  184:6 185:21
  186:14 187:20
  188:5 189:4
**Morton's** 37:18
  39:2 45:8
  64:19 84:5,7
  96:17 188:19

**mosque** 37:20
**mother** 23:16
  24:18 25:10
  28:12 33:9
  75:25 84:20
  119:16,16,21
  128:22,25
  130:16 165:2
  166:9 168:22
  168:25 173:19
  176:7 177:1
**mother's** 75:24
**motion** 11:2,9
  93:25
**motions** 11:9
**Motor** 127:12
  183:9
**mouth** 57:6
  105:18 129:24
  165:23 170:11
  170:16
**move** 12:22 74:6
  148:21 179:17
  179:20
**moved** 60:13
  62:8 83:20
  109:3,4,9
  136:23 146:14
**movies** 114:25
**moving** 40:17
  51:1
**multiple** 93:23
**multitude** 179:4
**Muslim** 43:15
  196:22

---

### N

**N** 2:1 4:1
**N.E** 3:7
**N.L** 75:16
**N.W** 2:4,10,15
  2:23 3:2 70:23
  71:16 72:17
**name** 8:12,19
  21:15,15 22:25
  55:21 70:11,24
  70:25 101:8,19

111:25 115:13
  131:19 177:4
  190:12
**named** 76:14
**names** 23:5
  150:18,19
  192:24 193:1,8
**nation-wide**
  151:5
**nature** 12:13
  153:15 156:18
  161:19 174:19
  199:18
**near** 154:8
**nearby** 49:10
**necessarily**
  204:8
**necessary** 6:21
  43:18 80:11
  153:19,20
  164:12 181:12
**neck** 57:19,22
  113:21 133:10
  133:15,18
  170:8
**need** 11:11
  15:22 16:15
  17:10,10 23:12
  88:22,24,24
  96:13 173:4
  179:6,11,24
  180:13,16
  192:16
**needed** 23:8,10
  26:17 41:20
  49:15 115:17
  172:21
**needs** 106:8
  206:24 209:1
**nefarious** 182:14
**negotiated** 97:10
**negotiating** 97:7
**neighbor** 125:20
**neighbors** 103:1
  103:4 141:6
**neither** 194:15
  211:9

**never** 43:12
  78:21 81:1
  93:21 103:20
  104:5 106:23
  120:6,17 121:6
  122:10 130:11
  150:12 164:3
  166:5,6,6,15
  187:8 192:10
  200:3 204:15
  205:23,25
**new** 1:2 17:1
  26:8 27:13
  28:23 29:5
  31:11,13,22
  32:21 34:4
  36:10 39:10,13
  41:20 42:7,14
  42:17 43:1,14
  43:18 44:15
  48:3 50:18
  52:21 53:6
  56:17 62:22
  64:7,10,17
  70:10 87:11
  88:8,11 89:10
  89:11 90:4,19
  92:22 93:1
  94:6 98:7
  100:6,9,10
  102:13,22
  116:17 117:6
  117:10,12
  118:18,21
  120:19 121:16
  123:21,23
  124:2,4,6,10
  124:11,16,20
  124:25 125:4
  134:14 142:6
  145:21 146:14
  146:15 151:17
  154:5 155:3,20
  155:24 162:17
  162:21 164:2
  181:17 183:11
  183:17,19

184:20,21,22
189:23,25
190:2,15 191:1
191:20 194:1
201:8,10
203:20,21
206:9 208:6,9
newborn 184:4
night 152:3
179:17
nine 85:6
NM 2:4,7,15,19
2:23 3:3,7
nobody's 200:5
non-immigrant
86:22
non-presumpt...
169:16
non-violent
156:22
note 12:11 15:10
20:3 204:1
notebook 143:2
noted 98:13
notepad 19:23
notes 19:17,17
78:4 147:6
notice 23:17
154:6 156:7,17
160:10,17
noticed 117:13
156:6 157:24
notices 87:8
notify 10:25
notwithstandi...
166:1,2
November 24:9
93:2 97:16
number 32:15
35:14 66:17
74:8 82:16
138:23 152:4,5
173:6 200:3,9
numbered 211:6
numbers 200:12

O

oath 66:8 110:15
110:17 176:19
object 7:10 8:3
32:13 33:3
49:18 89:17
96:1 110:20
116:7 132:7
174:25
objected 116:7
objection 6:18
7:6 11:17 12:8
16:25 32:8,14
63:14,25 64:1
64:2 71:2,4
82:14 99:19
101:12 126:16
132:4,14 143:4
143:13 144:1
153:4 178:5
objectionable
89:20
objectives 163:3
186:21 193:23
206:24
obligated 17:23
17:25
observing 67:4
68:1 70:7 72:1
72:9
obvious 166:2
171:16 192:16
obviously
174:24
occasions
104:24
occur 51:23
113:7 175:16
180:9,13
occurred 7:12
13:22 15:9
31:12,22 41:5
56:4,5,25
59:10,21 100:6
104:24 105:13
109:12 173:24
198:13
occurrence

163:6 164:19
occurring 58:20
107:8 161:14
occurs 146:19
180:6
October 11:9
182:5
odd 158:7
odor 60:21
offense 99:9,15
99:16 156:19
169:16 171:15
offenses 156:21
156:22,23
157:7 181:19
offer 106:12
offered 207:23
office 2:22 3:6
5:6 17:7 22:2
68:21 152:20
152:21,23
164:23 181:22
190:14 192:23
193:8
officer 70:8,9,13
72:4 134:8
172:12 191:24
199:9 200:2
officers 118:9
123:4 125:7,9
125:11 139:21
171:18
official 86:25
107:22,23
117:23 144:22
officials 39:2
95:4
oh 14:16 16:1
18:22 34:15
91:22 111:11
174:16 192:7
okay 6:17,22 8:9
8:17,25 11:22
13:4 15:12,12
15:15 19:11,18
19:25 22:7
23:2,7,23

26:13,19,23
27:3,6 28:10
28:14 29:13
30:12 31:2,13
31:25 32:23
37:2,10 38:1
40:2,14 42:17
44:18,25 45:2
45:17,21 47:4
50:4,19 56:18
56:24 63:20
64:3 65:19
67:6,16,19,23
68:8,11,18,22
68:25 69:3,5
69:22 70:1,13
70:18 71:10,15
71:20,22 72:15
73:8,13,18,23
74:3,6,11,19
74:25 75:3,6
75:15,19 76:22
77:1,6,14,22
77:25 78:7,11
78:15,21 79:2
79:10,13,15,19
79:23 80:20,23
81:5,9,14
82:19 83:16
84:10 85:3,22
86:9 89:3,8
91:24 92:6
94:8 95:5
96:25 97:12,17
99:13,17 100:9
100:16 103:3
105:8,20
110:19 118:24
119:10 120:2,9
121:5,10,13
122:17 123:14
124:19 125:3
126:10 127:21
139:19 142:17
143:1,19
144:13,21,25
145:5,16,23

146:18 149:7
149:20 150:11
151:19 167:25
176:18 180:18
188:12,21,25
191:7 199:2
208:25 209:10
209:23
old 24:21 61:1
67:16 69:5
70:23,24 71:8
91:10 96:23
178:15
older 179:9
oldest 188:24
on-going 13:15
once 27:23
31:22 32:21
33:10 36:15,22
60:13 91:20
120:19 137:2
145:22 204:14
one- 168:22
169:3
one-year-old
177:21 178:7,7
178:22
ones 91:25,25
100:6 109:5
114:20 115:16
115:19 175:11
178:16 179:9
opinion 106:9
106:10,12
168:8
opportunity 6:3
7:13 10:1
16:21 18:4
65:16 140:12
149:18 186:11
203:5
opposite 185:23
195:12 209:13
option 198:15
options 200:20
order 8:15 11:1
11:10 23:11,13

23:15,19,22
25:18 128:9
159:14 172:1
180:4,20
208:17
**ordered** 34:21
42:16 57:8
61:6 118:4
175:2 177:20
**ordering** 132:18
**orderly** 198:12
**Orders** 24:1,1
**organization**
157:21 173:16
**organizations**
163:9
**originally** 7:19
47:12 67:14
109:10
**outcome** 117:15
156:3
**outnumbered**
164:25
**outset** 13:10
**outside** 61:14
64:25 122:4,5
151:5 183:14
193:10 198:6
**overall** 81:20
**overlapping**
12:5,14
**overnight** 45:16
**overruled** 32:18
49:21 90:10
126:17 131:17
132:16
**overruling** 32:14
**overt** 207:17
**owned** 101:7
124:22
**owner** 110:4
126:2 139:3
**owners** 125:4
148:5
**owning** 101:9,17

—————————
**P**
—————————

**P** 2:1,1
**P.D** 23:14
**p.m** 1:16
**P.O** 2:7,19
**page** 4:2 62:2
91:13 101:2,9
140:19 148:10
152:19
**pages** 13:20
27:11 62:3
138:5 170:25
**paid** 124:12,14
**pallets** 97:21
**panel** 103:6
**paperwork**
151:24
**paragraph**
152:6 182:10
**paraphrasing**
102:19
**parent** 66:25
67:11 68:3,8
69:15 72:7
96:25 195:21
**parental** 70:16
**parents** 116:13
118:21 155:3
158:20 177:4
188:3 195:19
**park** 120:24
**part** 11:12 20:18
54:19 69:13,14
91:20 111:5
120:14 121:20
128:9 130:23
139:19 140:5
146:17 151:12
159:9 160:25
163:16,20,25
164:7,14,18,20
165:1,13,20,25
166:8,13
184:14,15,23
186:19 193:22
**participate** 83:1
112:25
**participated**

124:7 193:25
204:10,16
205:1
**participating**
191:17 204:12
**particular** 58:9
80:11,18
122:14,20
123:8 126:6
146:12 154:10
190:20 191:24
192:2,5,20
193:7 196:7
203:9 209:20
**particularly**
193:16 194:4
**parties** 7:20
211:10
**parts** 29:14
**party** 172:22
200:1
**Pasada** 169:11
169:13 171:24
172:2 181:8
183:3 197:13
197:14,18,21
197:22,25
198:4,10,14
199:11
**Pasada's** 199:7
202:23
**pass** 65:18 83:14
118:11 161:12
179:20 180:1
**passages** 30:16
**passed** 31:23
41:2,10 42:9
51:6 61:19
129:6,9 161:15
175:4 185:10
**passenger** 48:20
102:5,8
**passing** 41:11
161:16
**passport** 155:5,7
169:6 202:12
202:15

**passport's** 183:7
**password-pro...**
90:23
**pathologist**
106:11
**Paul** 211:8,15
**pay** 203:10
**PC** 3:6
**peaceful** 184:19
184:22
**peacefully** 95:2
118:1,8 154:21
**pediatrician**
44:5 106:1
**penalties** 9:20
9:21 10:3
**pendency**
175:22
**pending** 11:8
156:12 167:8
167:17 171:13
174:14 181:21
182:5 186:11
189:13 193:6
193:16 201:18
203:3,12
208:12,13
**Pennsylvania**
2:10
**people** 37:11,22
42:20 52:4,20
53:14 62:9
79:20 91:15,16
94:10,15 95:1
122:12 123:14
123:15 145:25
156:1 157:19
163:14,15
166:24 170:1
171:19 175:25
193:1,4,12
196:10 197:17
206:12 207:5
**people's** 192:24
**perform** 26:18
30:3 33:15
54:25 56:19

**performed** 31:4
31:6,8 32:20
55:21 57:16
58:1,8,13,15
62:14 77:7,11
129:2,4,15
194:4
**performing** 43:2
**perimeter**
140:17
**period** 17:15
56:18 61:16
63:1 83:19
85:5 138:25
160:6 166:17
205:10
**periodically**
60:17
**permanent**
86:22 188:12
184:11 185:25
**person** 24:12
77:22 110:9
140:16 157:1
159:7 163:1
167:12 176:10
205:23
**person's** 172:24
205:22
**personal** 32:16
36:4 62:1
98:14 196:24
**personally** 75:24
171:17 186:24
187:15
**personations**
28:3
**personnel** 63:2
166:6 194:16
**persons** 23:21
24:5,13 25:17
87:25 163:7,21
163:21,23
**pertain** 17:14
**pertaining** 10:24
**pertains** 32:11
**pertinent** 80:10

petty 181:16,17
  182:6
phase 8:10
Phases 62:2
  137:24 142:21
phone 157:17
  175:4 188:10
photographs
  13:23 14:15
  108:23 109:3
photos 109:5,6,7
  109:8,9 136:4
  137:6,14
  144:19
physical 32:5,16
  106:5 107:1
  114:2,4 161:19
  166:2
physically 17:5
  17:15 19:6,8
  113:24
physician
  106:10,17,21
  106:22,23
pick 40:10 98:10
  206:9
pick-up 23:13
  23:15,19,22
  24:1 25:18
picked 65:15
picture 45:6
pictures 39:12
  45:5 46:14,20
pistol 36:5,10
  48:20 50:8
  102:7
pistols 35:4,5,18
place 61:18
  68:18 69:8
  70:3 71:17,22
  72:18 73:8
  82:2 152:7
  155:24 179:18
  193:2
placed 46:3,7
  57:5 59:18
  60:9 62:7 63:1

83:19 136:5,19
  164:9,10 181:7
  182:4
places 162:21
placing 30:17
plain 123:3
Plaintiff 1:5 2:2
plan 52:12 54:20
  78:16 79:25
  81:20 91:20
  93:12,14 112:3
  112:24 113:5
  162:8 164:3
  171:7,10
  204:12
planned 92:24
  205:18
planning 11:3
  14:9 111:23,24
  184:16
plans 52:13,16
  52:18 111:15
  111:18 133:19
  157:7 164:13
play 54:22 62:11
  62:12
plea 10:11,14,17
  10:20
pleas 10:22
please 5:3 8:15
  8:19 11:14
  19:6 21:9,14
  23:4 27:9
  31:21 51:17
  57:2 64:1 66:8
  66:20 70:11,21
  71:5,17 110:25
  149:21 167:19
  180:24 187:14
  189:16
plot 78:18
  158:13
Plus 17:23
pocket 117:25
podium 8:12
  149:22 167:19
  176:13

point 22:3 30:7
  34:7 50:2 54:3
  60:21 61:4,9
  61:10 85:10
  87:21 94:20
  104:17 109:4
  121:14 128:20
  130:11 173:6
  180:2,12 186:3
  187:24 189:22
  200:20 201:16
  203:19 205:8
  209:4,16
pointed 169:16
  185:2
points 187:19
police 25:11
  41:4,9 98:12
  98:13,14,19
  109:16 111:22
  123:3 125:7
  126:4 134:8
  164:23
poor 155:23
  173:25
poorly 134:3
portion 67:15
  68:4,5,5
portions 41:7
  46:24
pose 174:12
  201:14 208:3
poses 153:11
  201:1 204:18
position 17:19
  17:19 18:8,11
  179:11 193:11
  199:8
possess 157:2
  159:6,8
possessed
  165:12 170:14
  170:22
possessing
  171:16
possession 9:11
  28:22 32:8,9

36:17 125:10
  156:24 159:5
  159:11 181:18
possessions
  40:22,24
  183:23
possibilities
  201:5
possible 42:16
  139:6 156:5
  200:7
possibly 140:21
  179:3,18
postpone 14:19
  16:3
posts 157:14
potential 155:8
potentially 42:3
  178:23
pour 57:22
practice 30:15
practicing
  196:14
prairie 207:2
pray 196:6
prayer 191:23
prayers 104:22
  105:21 106:25
  170:11,19
praying 170:2,7
  170:15 196:3
Pre-Trial 150:5
  151:2 153:2
  154:2,24
  155:10,18
  156:4 167:4
  171:12 172:10
  172:12,13
  181:13 189:9
  197:12,20
  198:17 199:6,9
  201:6 203:4
  207:18,19
  208:4
prefer 11:18,20
  151:11 192:24
preference

11:23 17:5
  178:12
pregnancy
  33:22,24,24
  34:1 193:16
pregnant 33:23
  192:18
prejudicial
  172:20,24
preliminary
  18:5
preparation
  17:10 199:10
prepare 16:21
  20:5 75:17
prepared 12:3
  12:23 13:16
  15:12,19 16:2
  18:23 19:20
  20:3 74:8,25
  75:3 78:7 79:2
  79:6 136:7
  164:20
preparing 75:12
  134:21,23
  135:5,7,9
  157:5 183:6
preponderance
  167:13 174:8
presence 106:25
  153:13 166:11
present 5:15,19
  5:24 8:6 17:6
  20:17 52:2
  58:20 66:23
  67:8,10,21,24
  68:3,8 69:10
  69:11 70:5,16
  71:24 72:6,23
  73:22 75:25
  76:4,19 77:2
  77:11 81:1,6
  81:11 82:5
  97:1,22 100:4
  100:7,8,10
  121:15 128:20
  129:14 143:5

144:15 147:4
148:25 149:2
150:1 151:10
153:6 154:7
158:20 177:8
180:22 188:5
202:4 204:9
205:5,12
**presentation**
151:2
**presented** 21:2
149:14 155:14
159:16 162:9
163:2 167:5
174:7 185:8,15
185:16,19
188:7 189:7
200:17 201:9
204:22,23
207:14
**Presentence**
182:8
**presenting** 8:3
20:23 149:4
**presents** 169:23
**preserved**
125:18
**pressure** 114:19
162:3
**presumably**
99:22 207:24
**presumption**
153:14 181:11
**Pretrial** 182:20
**pretty** 110:11
203:25 209:8
**prevalent**
192:20
**prevent** 61:21
177:14
**previously** 30:1
43:3 59:9
120:14 124:5
**primary** 176:4
188:2
**prior** 48:17
137:14 138:10

143:22 203:22
205:23
**probable** 12:16
80:11 160:9,10
160:22 207:16
**probably** 89:10
89:11 176:10
187:3 191:11
194:5 195:1
202:18
**probation**
168:20 181:20
182:21 190:14
192:23 193:8
**problem** 170:3,8
**problematic**
182:11
**problems** 181:14
**procedure** 31:3
**proceed** 6:5
15:12,16,19
18:24 20:4,10
66:7,9 118:6
**proceeded** 37:16
115:2
**proceeding** 4:15
4:16,17,18,19
6:13,15 15:18
110:25 211:5
**proceedings**
1:14 4:3,4 7:17
167:17 175:23
180:8 201:18
208:12
**process** 97:7,10
164:22
**professional**
44:6 211:8,15
**proffer** 4:5 6:13
6:16,18,20 7:2
7:3,8,11 8:4,5
11:17 12:5,6,8
12:19,23 13:2
13:5 14:9,10
14:13,21,22
15:19 18:19
19:21 20:19,20

21:5 202:22
**proffered** 7:6,11
7:15
**proffers** 7:6
12:22
**progresses**
180:19
**prohibit** 179:6
180:1
**prohibited**
157:1 159:7
180:10
**prohibiting**
180:4,20
**prohibition**
122:23 175:11
**prolonged** 25:8
44:2,7 106:2
**promise** 176:19
**prompting**
163:11
**promptly** 175:4
175:15
**prongs** 182:22
**pronounce** 25:4
25:5
**pronouncing**
30:5
**proof** 6:14
167:24
**prop** 98:1
**proper** 18:7
166:10
**property** 23:1
23:11 26:15
38:24,25 39:14
39:18 97:3,4,6
97:14 98:14,23
109:2 110:4
122:5 124:19
124:21,25
125:4,22 126:2
126:6 136:9
140:20 141:11
141:15 181:24
183:1 184:21
184:23

**prophesies**
52:13 65:12
**prophet** 28:9
104:14 163:18
173:16,17,18
**prophetic** 28:2
163:6,22
174:20
**proposal** 207:22
207:25
**proposing** 20:13
169:11,12
**protect** 140:16
171:25 181:4
187:8
**protecting**
140:17
**protection** 85:7
150:7
**Protective**
139:24 140:3
**protector** 54:13
**prove** 162:25
168:11,25
**proven** 167:9
187:22
**proves** 168:23
**provide** 99:17
99:20 143:24
150:10 159:10
161:11 162:3
193:13 202:1
203:1,2
**provided** 7:14
7:21 13:19
20:7 77:15
106:23 141:7
142:8 143:12
143:22 145:22
153:1,24 167:4
167:6 170:24
176:5 185:17
185:17 189:8
198:20 200:12
202:11 205:13
207:18
**providing** 20:24

77:19 103:4
106:18 150:21
158:14 164:5
**proving** 153:10
171:21
**provision** 195:5
**provoke** 170:15
**Public** 2:14
182:1 183:14
**publicity** 197:21
198:3,6
**pull** 17:10
**punishment**
61:9 120:15
166:19
**purchased**
122:10 138:23
138:24,25
139:1,5,7
147:25 156:25
**purchases**
122:14,19
**purpose** 31:25
47:5,8,10,11
47:14,19,23
49:12 51:10,12
114:17 134:14
162:6 163:4
164:4
**purposes** 46:10
116:4 186:25
206:24
**purse** 28:21,22
90:13,15,16
**put** 18:7,15
19:19 57:6,11
57:19 95:1
105:6 107:16
113:21 118:4,6
137:1 145:18
170:18 171:19
175:21 191:25
193:11,15
**puts** 18:11
**putting** 57:21
104:22 117:23
133:5 162:3

170:7,14

**Q**

**qualified** 106:12
**quarters** 187:2
**question** 30:13
  34:15 54:24
  63:18 80:17
  82:6,21 83:16
  90:8 91:19
  92:19,25 99:25
  100:12 105:8
  114:18 119:18
  124:2,9 132:5
  132:7 134:22
  138:17 141:21
  145:10 149:13
  160:6 162:12
  177:17
**questioned**
  142:23 158:19
**questioning**
  32:13 135:14
  139:13 141:4
  141:20 142:19
  145:8 146:8
  147:5 148:15
  161:25
**questions** 4:8,11
  4:12 49:19
  68:6 69:20
  84:8,15 87:18
  103:16 113:9
  114:8,11,16
  115:6,11
  119:15,19
  123:25 135:15
  138:19 139:10
  141:1 143:7,9
  143:14 146:10
  146:20,22
  147:3,22,23
**quick** 83:17
  170:23 178:1
**quickly** 49:15
**quite** 17:15
  89:10 145:20

**Quran** 30:17
  33:10,16 52:22
  59:21 103:20
  105:7

**R**

**R** 2:1 3:2
**R-A-F-E-L-L-A**
  70:12
**raided** 164:22
**raise** 21:9
  182:12 191:14
**raised** 118:18
  169:12 187:19
  189:23
**Ramzi** 24:6,11
  24:14,20,25
  25:23 33:23,25
  34:1 43:12,12
  43:24 76:3
  108:15 111:11
  128:24,25
**ran** 102:4
  170:23
**range** 36:15,21
  46:10 135:25
  137:5,7,11
  164:8
**rate** 89:14
**re-approach**
  180:20
**rea** 159:4 185:9
**reach** 88:10
  102:5
**reached** 145:16
**read** 10:8 29:13
  29:15,22 32:3
  34:10 52:22
  76:1 160:1
**readily** 49:7
**reading** 10:9,11
  10:13,17,20
  20:8 30:16
**ready** 6:5 16:7
  19:10 164:11
**real** 83:16
  128:22 175:8

**reality** 203:17
**realization**
  34:16
**realize** 182:20
**really** 7:21
  115:11 121:13
  152:18 156:20
  161:9 170:14
  170:17,20,21
  175:10 198:2
  205:21
**rear** 46:11
**reason** 75:6 81:5
  124:18 143:21
  151:15 153:17
  158:8 169:4
  175:19 180:19
  209:2,18
**reasonable**
  156:7,15
  160:11
**reasonably**
  153:12 167:11
  167:15
**reasons** 146:14
  153:21 172:6
  173:13 174:2
  174:13 186:13
  186:19 187:11
**rebuttal** 187:13
**recall** 41:25
  46:24 47:2
  56:23 70:25
  73:2 74:9,13
  77:8,17,19
  78:18,21 79:4
  82:6,7,21
  83:21,23 84:3
  85:5,9,13
  93:22 99:1
  100:18,22
  107:7 112:22
  115:21 117:4
  118:2 130:22
  133:11 137:2
  139:4 140:18
  147:21 187:17

195:8
**receipts** 124:13
**receive** 29:18
  32:3 36:16
  38:2 43:17,23
  44:1 51:17
  56:3 81:9
  172:14 194:25
  195:1
**received** 8:25
  23:18 25:9
  26:16 27:4
  30:2 33:11
  35:10 38:7,19
  41:19 50:25
  51:11 59:22
  85:7,10,12
  87:16 106:22
  117:22 132:12
  151:14 152:3
  156:16 163:18
  197:22
**receives** 27:20
**receiving** 41:13
  43:11 132:21
  132:23
**recess** 15:17
  16:6,11 65:21
  66:2,4 149:10
  210:1,5
**recitation** 78:22
**recognize**
  150:18,20
**recollection**
  74:22 82:8
  84:22 100:23
  101:6 113:3
**reconnaissance**
  138:8
**record** 5:1 8:19
  15:10 18:10,16
  20:3 21:15
  143:13 151:12
  152:2 182:21
**recorded** 68:16
  69:22 72:13
  73:4 175:4

**recordings**
  175:15
**records** 62:1
  107:24 117:9
**recount** 79:10
**recounted** 59:8
  79:23
**recounting**
  106:9
**recovered** 126:1
**recruit** 53:13,15
  163:21 206:12
**recruited** 163:20
**recycled** 97:21
**redirect** 4:10
  127:24 128:3
  146:11
**refer** 76:17
  115:7
**reference** 92:23
  157:25 158:3,7
**referenced**
  178:11
**referred** 30:8,9
  30:24,25 31:1
  99:18
**referring** 91:13
  105:3 114:13
  140:2 155:12
**refiled** 201:25
**reflect** 100:23
  101:6
**reflected** 76:9
**refrain** 23:4
**refresh** 74:16,22
  82:8
**refute** 183:24
**refuted** 87:21
**regard** 6:11,23
  11:16 13:6
  18:24 161:2
  173:2,5 176:14
  176:14 177:9
  177:12 180:8
  180:20 198:19
  199:7
**regarding** 12:18

43:7 55:10
94:8 101:14
106:18 117:9
138:17 139:15
149:13 162:5
172:11 177:10
181:6 182:10
185:9,13 186:4
188:8 199:24
**regards** 79:20
122:18 200:1,5
**Regional** 28:23
90:19
**regularly** 166:17
**reincarnated**
142:11 145:25
**reincarnation**
65:10 145:12
**reiterate** 193:19
206:21
**related** 99:9
121:10,24
125:10 128:23
154:3,10 211:9
**relates** 148:1
192:11 195:19
**relating** 119:24
**relationship**
29:11 174:20
**relatively** 127:25
**relayed** 52:7
**release** 95:12
128:15 152:18
153:17 162:12
167:11,15
174:11 182:4
189:12 193:2
196:25 198:14
200:23,24
201:13 206:1
206:18 208:1
**released** 109:17
110:4 126:14
126:18,20
127:3,11,17,20
128:5 171:23
183:11 192:22

197:25 202:5
**releases** 156:1
**relevance**
126:16
**relevant** 32:18
41:7 143:6,10
144:2 168:2,10
**relied** 75:10
110:11 161:22
**religion** 157:12
195:25
**religious** 28:3,11
30:19 38:16
43:2 106:7
108:12,18
161:13,14
165:17 195:18
196:7,16
**reloading** 51:1
**reluctant** 14:19
**Reluctantly**
19:12
**relying** 106:17
111:2,6
**remained** 83:19
89:24
**remaining**
125:24,25
**remains** 202:7
**remand** 208:11
**remanded**
167:16 201:3
201:17
**remanding**
174:13
**remember** 73:25
91:16,17,22
92:2,22 94:11
99:10 103:15
103:18,19
107:4 112:12
113:2,13
114:21,21
115:23 116:2
127:8 129:11
130:19 133:16
133:17 136:24

143:21 144:11
146:23 147:17
187:14
**remind** 67:16
**removed** 27:23
52:1 75:25
108:24
**removing** 75:23
**renewal** 85:16
**renewals** 86:2
**renewed** 85:18
**reopen** 17:9
**repeat** 30:13
54:24 119:18
133:12 134:22
**repeated** 131:6
131:11 161:25
**repeatedly** 86:4
158:19
**repeating**
167:22
**rephrase** 106:13
106:14
**report** 23:21
24:5,12,13
25:17 41:4,9
87:25 98:12,13
122:18 134:10
139:8 141:12
150:5 151:3
153:2 154:24
155:10,18
156:4 181:13
182:8,20
207:19 209:3
**reported** 24:21
24:23 25:10
133:7 142:6,7
142:8
**Reporters** 211:9
211:15
**reporting** 133:6
**reports** 141:6,9
141:10 199:24
**represent** 95:20
118:15 121:14
**representing**

179:16
**request** 17:2,3
178:12,21
208:17
**requested** 14:18
**requesting**
208:17
**require** 25:11
160:1 181:9
**required** 20:8
25:14 159:23
160:1 165:8
167:16 174:5
189:5 200:16
**research** 199:4
**resemble** 39:9
**reserve** 6:20 7:1
**reserves** 8:4
**reside** 199:13
202:6 203:3
**residence** 39:9
39:10 44:16,18
45:21 58:13
107:4,20 108:1
109:16 112:25
126:20,22
154:22 155:17
182:23 183:1
190:15 193:6
203:11
**resident** 86:22
168:12 197:16
**residents** 127:5
197:22 198:11
198:12 199:16
199:20
**residing** 172:2
204:8
**respond** 18:19
77:3 197:5
**responded** 79:21
81:6
**respondent's**
175:8 179:22
**response** 138:6,7
**responses** 23:18
**responsible**

75:23 173:22
207:9
**rest** 75:9 152:9
209:7
**resting** 47:13
**restrict** 175:21
**restroom** 149:7
**result** 44:8 106:2
106:6 114:5
174:23 199:21
**resulted** 22:20
**results** 44:4
177:15
**resurrected**
59:22,24
166:21
**retrieved** 184:7
**returned** 6:2
160:7
**revealed** 33:17
**revealing** 159:3
**review** 20:18
82:8,17 139:8
142:16
**reviewed** 82:18
101:5 137:9
150:24
**revoked** 181:18
**revolver** 117:25
**rid** 37:17 91:21
**ride** 183:16
**rifle** 92:20 164:1
**rifles** 35:4,18
164:2,3
**right** 5:1 6:1,10
6:20 7:2 8:2,4
8:9 10:22 11:8
12:2 14:11
18:17 19:13
20:6,11 21:1,8
21:9 25:18
26:19 29:1,10
30:6 31:6 33:8
34:24 37:6
40:16 42:7
44:21 46:1
47:14 53:23

59:3 64:5 66:1
66:6 74:14
77:5 83:1 86:7
86:17,23 87:6
87:24 89:3,16
92:17 93:16,18
94:4,16 95:9
98:13 104:1
105:24 106:14
106:20 108:21
110:14,15
111:4 114:23
114:23 115:17
115:22 116:9
116:18,22
119:5,11,13,23
119:25 120:7,9
120:12,22
121:3,22 122:3
122:7,20,21
123:18,18
124:8,17,22
127:5,7,10,15
127:17,24
132:9 139:9
142:17 143:8
145:6 146:3,16
147:4,18,20
148:14,17,21
149:12,20
150:24 152:5
152:25 154:6
157:1 159:6,7
167:1 172:9
173:8 174:4
175:1 176:22
178:25 179:25
180:24 181:21
183:22,23
188:20,22,23
189:4 191:7
195:2,16
200:11 201:19
207:12 208:25
209:14,16,16
210:1
**righteous** 53:10

**ring** 42:2
**Rio** 1:16
**rise** 16:10 66:3
112:7 149:9
210:4
**risk** 153:11
155:6,8,19
162:15,23
166:3 168:3,19
168:24 171:22
172:6,7 173:11
174:9 181:6
186:5,15
189:12 191:6
193:21 200:25
201:14 202:3
203:14 208:2
**risks** 174:12
**ritual** 30:18,19
31:1,3,6,8,10
31:18,22,25
43:2 56:19
57:3,8,10,24
58:1,8,13,15
59:17 104:19
106:7,19,24
113:12,20
114:5 129:14
161:13,14
170:7
**rituals** 32:20
55:20 57:10,15
57:20 58:20
62:14,21 77:7
77:11,12 81:11
100:5,8,10
105:19 121:16
121:24 129:2
129:19,22
165:14,17,18
165:21 166:1
173:21 184:15
187:8 188:5,6
188:6 191:23
194:3,7 195:11
196:4 204:9,11
**rode** 26:22 37:18

**role** 54:8 81:17
81:19 120:3,10
121:1
**roles** 54:6,10,22
**roll** 62:20
170:12
**roll-over** 40:6
**rolling** 170:16
**room** 45:3,6
46:9 58:21,22
58:23 61:20
67:10,22 70:5
70:16 71:24
72:7,10,21,23
73:19,22 94:16
121:19 144:8,9
158:21 203:1
**room-clearing**
51:2
**rooms** 46:8
**route** 26:22
47:17 52:21
**Ruiz** 172:13
**rules** 20:8 64:2
177:10
**ruling** 63:15
193:21
**run** 117:13,14
138:9,10
**running** 103:7
**ruqya** 26:18
30:3,3,14,15
30:25 33:15
43:3 55:20
104:19 113:12
113:20 114:5

---

**S**

**S** 2:1
**safety** 153:13
167:12 169:20
188:1 199:21
**Sam** 67:9
**Sandoval** 209:11
**Santa** 22:2
68:19,21
**sat** 82:24

**satisfy** 197:1
**Saudi** 65:1
116:1
**saw** 115:9 123:4
123:4 131:11
131:12 146:20
146:21 147:18
148:1 155:13
**saying** 20:20
93:6 103:18,19
104:22 105:21
105:23,24
106:25 111:9
114:22 133:13
170:7 188:14
188:16 195:9
197:6 198:4
207:5
**says** 56:2 58:11
74:24 75:5
92:1,2 114:25
132:19 151:7
155:11,18
157:5 168:8
171:13 190:14
**scared** 58:10
113:16,23
120:5 130:25
**scary** 168:22
**scene** 77:2,3
79:21 81:7
98:20 109:7,17
110:3,3 123:11
125:18,20
134:8 137:6
144:19 170:10
**scheduled** 6:1
**scholar** 54:15
**school** 91:21
92:9,21,24
93:9,15,15
124:7,11,14,16
189:25
**schools** 91:12,14
91:15 92:1,2
93:13 130:15
**science** 192:4

**scope** 96:2 164:1
**scratch** 39:18
**screaming** 62:16
105:17 129:23
187:7 195:10
**screams** 194:8
**screen** 142:16
200:2,7
**search** 39:14
74:8,17,25
75:17 76:9
78:8,11,12,16
79:2 80:3,9,12
80:18 98:22
99:11 102:6
107:3,6,9,10
107:13,15,16
109:21 110:1
125:15 126:8
126:11 144:15
155:17
**searched** 117:24
**searches** 109:23
**searching** 99:8
**season** 136:14
**seat** 11:15 21:14
48:20 102:8
190:6
**seated** 22:4
**secluded** 191:14
**second** 8:16 26:2
68:5 157:1
159:5 180:16
**Secondly** 187:18
**Section** 5:7 9:10
167:3 174:6
189:6 207:14
**secure** 171:25
206:2
**secured** 49:3
**security** 2:9
139:16,17,21
140:6 150:6,22
171:25 197:18
198:11 199:8
202:13
**see** 17:8 22:9

40:17 53:7
107:15 140:13
141:12 157:9
177:7,21
179:10 180:12
180:16 182:15
190:7 192:9,12
208:5
**seeing** 102:13
177:4
**seek** 205:14
**seeking** 80:12
154:16 168:7
168:17
**seen** 24:3 30:24
30:25,25 39:12
45:4,5,6 99:11
107:13,14
108:4 109:6
117:9 124:12
131:19 150:12
151:23,25
158:2
**seize** 80:12
**seized** 48:7
107:20 109:17
140:13 183:7
**seizure** 35:8
**seizures** 25:8
44:2,8 106:2,5
165:17,22
**self-aggrandiz...**
173:25
**self-surrender...**
202:11
**semi-automatic**
36:5 50:8
**sense** 30:23
38:16 62:5
171:25 176:10
206:14
**sent** 38:10 76:2
87:9,11
**separate** 14:23
191:21 209:2,8
**separated**
209:17

**separation**
208:17 209:18
**September** 1:15
172:15,17
**series** 196:25
**serve** 7:21 47:8
**served** 126:8
151:5
**Service** 86:3,13
167:17 174:14
201:3,18
208:12 209:1,3
209:17,19
**services** 150:5,7
150:22 151:2
153:2 154:2,24
155:10,18
156:4 167:4
171:12 172:12
181:13 189:9
197:12,20
199:9 203:5
207:18,19
208:5
**session** 16:12
66:5 149:11
**set** 7:19 45:23
46:13 73:18
93:25 109:6
167:2 173:13
186:19 202:25
207:17 211:6
**sets** 17:1
**setting** 12:9
152:17
**sex** 209:13
**shaitans** 27:23
30:16 32:2
33:1,4 51:25
103:21
**shape** 204:22
**she'd** 120:6,17
169:8,9
**she'll** 19:12
**shed** 39:3
166:14
**sheet** 59:18 60:9

**shelter** 205:15
**Sheriff's** 62:25
152:20,23
**Sheriffs** 22:22
48:8,14,16
102:2 164:23
181:22
**shoot** 92:21
**shooting** 51:1
93:15 94:4,6
**short** 15:17 16:6
65:20 126:23
138:25 149:8
183:16
**shorter** 191:4
**shortly** 34:3
**shot** 51:2 191:18
**shotgun** 48:19
102:7
**shotguns** 35:18
**show** 20:19
82:11 163:3
179:6 185:12
**showed** 77:16
83:10 148:7
184:5,13
204:14
**showing** 168:16
**shown** 148:4
**shows** 124:15
184:19 191:10
**sick** 170:2 188:7
**side** 6:18 102:5
**signs** 57:17
62:15 196:5
**similar** 39:13
40:17 98:1,1
140:14 145:4
**simple** 150:13
**simply** 155:23
**sir** 21:22 22:6,8
22:10,12,14,16
22:18 23:6
25:1,13,16,19
26:5,10 30:4
37:1 40:13
43:4,8 45:25

53:11 54:3
55:16 103:14
108:22,25
111:5 118:17
118:20,23
123:19
**Siraj** 1:7 2:17
4:15 8:13,22
22:11,25 24:16
25:22,23 26:2
26:15,21 31:7
32:24 34:21
36:3,22,24
37:15 38:24
40:4 41:10
43:6,10,21
44:9 47:24
48:18 52:5
53:4,12,18
54:12,19 55:2
57:4,6,10,18
57:21 58:21
59:1 60:21
65:5 76:14
80:4 94:10
102:3,4 108:14
108:19 110:10
113:3,21 117:1
117:9 118:3,4
119:11,16
123:16 128:17
129:8 132:18
134:13 135:10
135:21 137:21
145:4 149:21
163:14 170:18
171:7,10 172:7
**Sirignano** 3:6,6
4:9,11 5:18,19
6:8,19,24 8:9
10:19 11:24
15:2,5 32:7
95:17 96:4,13
96:16 99:22
100:2,4,25
101:2,10,13

103:9 138:16
138:21 139:9
139:11,14
140:24 181:1
182:19 187:13
188:13,20,22
189:1,15 210:3
**sister** 182:9
183:18
**sit** 19:8 67:3
190:5 195:24
**sitting** 104:25
207:5
**situation** 72:20
123:9 155:19
169:10 192:21
197:24 202:7
203:17
**situations** 121:9
**six** 46:20 62:22
119:2 147:1
178:9 190:23
**six-year-old**
178:17 190:22
191:13
**sizeable** 14:5
**SJ** 150:6
**skimmed** 137:14
140:15
**skips** 12:6 13:17
14:7,8 15:10
22:24 32:4
33:2,16 35:23
37:4 46:17,18
50:24 52:3
56:16 58:6
62:18 63:9,21
63:22 65:6
68:2 70:12
75:16 79:15
93:5 97:15
98:23 105:16
108:8 112:22
148:11 154:15
159:7 161:24
177:11 181:2
183:16 198:7

199:15
slept 45:16
slime 57:6,16
  129:24
slow 179:17
small 47:22 55:6
  187:2,5
smaller 45:11
smell 60:14
  136:19,25
smite 54:4 134:4
so-called 26:3
  158:17 174:19
social 157:13
  202:12
soft 63:25
solar 103:5
sold 122:12
solemnly 21:10
Solutions 150:6
somebody 16:20
  93:3 146:12
  196:18,21
someone's
  170:15
somewhat 170:1
  171:15,15
  191:14
son 161:8
soon 129:9
sorry 30:11
  34:15 49:22
  68:20 111:11
  145:12 148:10
  172:8,8,9
  176:16 177:5
  188:11,14
  200:8,10
sort 13:3 17:18
  30:20 78:17
  79:10,24
  121:25 179:6
  191:25 203:14
  204:12
sound 74:14
sounds 149:14
  170:9 209:17

sources 29:1
  123:9
space 68:19
speak 65:16
  175:6 203:6
SPEAKER
  131:16 134:24
  135:3
speaking 6:22
  145:25 180:10
  182:22
Special 4:6 21:7
  21:13,16,19,25
  176:9,15,17,21
  176:23 177:2
  177:13,22
  178:3,15,19
specific 34:5
  52:22 104:16
  111:15,16,18
  112:4 113:5,7
  115:7 133:22
  138:24 139:22
  157:7 159:23
  159:24,25
  169:20,25
  187:19 195:18
specifically
  14:12 103:18
  114:12 117:14
  117:16 137:22
  171:7 185:20
specificity 78:23
spectrum 179:9
speculation
  89:18
speculative
  156:8
speed-loading
  51:1
spell 21:15 70:11
spent 137:4,6,10
  190:13 203:21
spirits 30:16
spoke 37:24
  182:18
sponsor 202:25

202:25 203:10
stable 182:23
  190:14
stack 74:17
stacked 46:21
staff 15:23 19:14
  199:17,20,22
staged 49:9
stance 202:23
stand 8:14 100:1
standard 11:1
  11:10
start 12:2,21
  17:16 95:25
  100:9 110:6
  129:7 149:21
  184:24 186:8
started 6:11
  31:10,11 33:15
  95:21 96:8
  136:19 204:13
starting 8:19
  184:10 185:20
state 7:17 8:12
  8:19 13:6,9,14
  21:14 34:20
  41:4 42:15
  53:5 57:18
  128:18 134:8
  140:8 142:24
  143:2,9 152:10
  152:13,17
  153:3 154:3,13
  156:17 177:13
  179:15,15,15
  179:22 180:8
  181:23,25
  183:11,14
  186:6 201:23
  201:25 202:5
stated 35:15
  43:12 53:6
  56:5 92:25
  112:17 147:17
  154:24 172:4
  182:16 186:14
statement 27:6

57:13 77:16
  109:11 117:22
  151:4 179:12
statements
  26:12 27:7,19
  32:22 35:17
  36:3,10,16
  37:3,25 38:15
  38:18 39:5,11
  40:25 44:12
  47:6,16,22,24
  48:17 51:12
  52:11 53:3,17
  55:7 57:15,21
  58:14,15 62:12
  65:7,8 75:11
  75:16 90:5
  102:15 104:11
  107:15 110:14
  111:1,2,6,15
  132:1,2,11
  134:13,14
  146:12 158:23
  158:25 162:5
  176:6 179:10
  185:5,7
states 1:1,4,23
  5:2,5 7:20 8:13
  9:10,13 41:10
  42:9 55:15,18
  64:18,25 76:16
  116:13,22
  123:22 130:2
  142:14 148:19
  151:8,9 152:6
  152:7 153:22
  155:2 167:3,18
  172:20,22,25
  174:6 183:19
  186:17 189:6
  190:25 201:19
  203:20 207:13
  208:16 209:24
status 28:3
  55:11,13 84:17
  84:18 85:8
  86:17,21,22,22

87:5 130:1
  159:13,18
  160:20 163:23
  168:7,9 174:20
  178:1 185:10
  185:14
statuses 168:14
  168:18
statute 153:9
statutes 160:1
stay 38:21 83:17
  184:1 193:2,6
  202:6
stayed 56:8
staying 127:3
step 148:17
  178:25
step-mother
  24:16
stepped 69:16
stipulate 149:19
  151:9,16 202:2
Stipulation
  202:21
stole 34:1
stood 164:24
stop 26:19 88:24
  173:1
stopped 57:12
stops 88:16 89:9
storage 47:12
  60:10 136:16
  166:14
stored 46:9
  47:15 48:12,13
  48:17 136:14
  136:15,18
stories 185:3
story 29:5,22,23
  79:13 93:2,4
  152:9
Strafella 70:10
  71:25 72:4,5,6
  72:21 73:19,21
Street 2:4
strength 14:23
  159:2 160:15

185:2
**stretch** 88:25
**strict** 175:11
**strictly** 95:8
169:23
**strike** 153:1
**structure** 98:2
184:11 185:25
**stuff** 16:16,22
19:15 196:6
**style** 164:1
**Subhanah** 1:8
3:1 4:18 18:25
22:15 24:16
27:2 37:4 54:3
54:20 55:3
59:14 64:23
65:9 118:15,24
119:25 120:1
120:25 121:10
121:13 122:8
122:21 123:10
124:24 125:2,8
126:13 128:5
129:10 131:8
131:11 137:20
146:13 189:16
189:23
**Subhanah's**
124:6 128:7
142:11 145:11
**subject** 110:21
128:6 151:16
187:7
**subjected**
165:14,21,25
**submit** 20:13
188:1 192:7,16
**submitted** 7:7
**subsequent** 24:1
131:13
**substance** 23:15
**substantial** 7:21
**suffer** 25:8 44:7
105:22,25
174:23
**suffered** 105:15

165:16,22
**suffering** 194:9
194:16,17
**sufficient** 14:6
20:7,9 162:24
194:10
**suggest** 65:22
105:1 106:24
151:6 160:19
204:9,10,11
**suggested** 47:19
**suggesting** 104:3
176:3
**suggestion**
179:14
**suitable** 197:12
200:15 201:11
207:22
**Suite** 3:7
**summarize**
27:18
**sums** 155:16
**supernatural**
146:1
**supervised**
169:23 177:10
178:6
**supervises** 95:8
**supervisor** 54:11
**support** 102:19
103:3 158:14
186:9
**suppose** 145:25
**supposed** 47:16
51:23 54:11,12
54:13,14,16,20
192:14 198:25
**supposedly** 38:3
145:11,17
157:3 196:2
**suppress** 43:15
**sure** 7:3 11:2
16:5 72:3
73:12 74:18
82:10 91:6
100:24 106:13
138:18 147:10

147:13 149:12
151:13 158:5
199:5 203:11
**surely** 194:3
**surrender**
202:13
**surrendered**
95:2 118:8
154:20
**surrendering**
118:1
**surround** 46:17
**surrounding**
161:8
**suspect** 170:16
170:19
**suspended**
181:17
**suspicion** 182:13
**suspicious** 134:9
**sustained** 100:3
106:15 110:24
132:9
**swap** 97:8
**swear** 21:10
85:21
**sworn** 77:15
**symbols** 140:18
**sympathetic**
157:20
**symptoms**
105:22,25
106:19
**system** 27:15,18
38:19 51:19,19
111:21 130:17
130:21,22,23
181:23

**T**

**T-A-Y-L-O-R**
21:17
**table** 11:15 22:5
48:16
**tactical** 51:1
81:21 82:20
83:3 164:15

204:16
**tactics** 186:25
**take** 11:11 12:10
14:11 15:17
16:6 17:18
26:17 34:21
35:19,21 37:2
40:22 54:20
55:4 60:12,22
65:20 66:1
68:18 69:7
70:2,2 71:22
72:18 76:2
82:17 92:21,24
98:14 101:3,13
109:6 120:11
120:13,15
126:4 132:19
149:8 158:21
161:24 162:10
169:1 190:6
196:12 208:14
209:4,21
**taken** 23:16,17
23:18 24:8,10
26:14,16 33:10
34:7 35:7,11
35:17 60:17,20
74:4 76:5
89:23 92:24
94:15,22 95:6
97:13 108:23
109:3,5,8,9,20
109:20 111:3
120:17 121:2
139:19 155:5
162:1 165:5
191:19 194:20
**talk** 15:9 18:12
19:21 67:2
71:15 75:19
81:24 92:8
110:24 122:15
132:25 134:2
169:19 175:1
175:12
**talked** 16:17,19

51:24 55:20
78:16 92:16
113:8 115:1
120:1,4,9
121:5 122:12
130:20 131:6,7
133:5 135:15
138:5,6,7,8
139:2 141:10
146:13 171:5
176:25 182:1
192:25
**talking** 30:10
80:2,4 85:19
93:3,6,11
114:22,25
119:20 123:9
129:5 133:8,17
145:21,23
146:11 148:6
168:15 175:3
197:23 198:22
**talks** 34:14
83:22 132:20
132:23 140:16
142:9 171:6
**Tao** 126:23
**Taos** 22:22 23:8
35:8 48:7,19
62:25 68:23,24
69:9 73:9
102:2,8 106:21
109:16,22
117:19 125:22
126:8,8,14,20
126:23 127:2
127:13 136:8
143:24 144:16
154:3 164:23
164:23 181:21
182:1 183:1,1
183:22,23,25
193:2 202:5
**target** 154:6
156:6,16
**targets** 51:3
111:16

**tarp** 46:4
**Task** 70:8,9,13
**tasks** 59:16
  129:12
**Taylor** 4:6 21:7
  21:13,16,16,19
  66:14,16 74:23
  80:24 82:15
  84:14 142:21
  143:16 168:8
  176:9,12,15,17
  176:21,23
  177:2,13,22
  178:3,15,19
  202:10
**Taylor's** 204:6
**teacher** 130:20
**teachers** 130:15
  130:18,22
**techniques** 51:2
**teenagers**
  178:14 180:3
  180:21
**tell** 22:19 26:11
  27:25 28:1
  29:7 30:14
  43:24 44:10
  51:10,16 52:20
  66:20 70:1
  71:17 93:24
  105:15 112:24
  114:12 115:2
  115:12,13,19
  130:13 132:10
  133:19 134:15
  135:7 141:14
  144:16,25
  165:4 176:19
  176:24
**telling** 32:19,23
  114:19 115:3
  131:14
**tells** 27:21 152:9
**temporary** 85:8
**ten** 16:15 65:25
  165:14,17
  187:7

**ten-minute** 66:1
**Tennessee** 37:16
  37:18 123:22
**Tenth** 159:22,25
  173:3 179:4
**terms** 203:23
  204:1 205:14
**territory** 175:25
**terrorism** 78:18
  157:11,20
**terrorist** 62:2
  137:25 138:7
  138:10 139:22
  142:22 157:21
  157:22 158:14
  158:15 184:15
**terrorists** 138:9
  138:13 157:19
**test** 57:9 119:14
  176:5
**testified** 75:20
  75:22 76:12,22
  77:6 81:24
  87:23 89:18
  91:3 94:9
  98:10,22
  102:18,21
  104:19 107:3
  108:6,20 109:1
  112:21 113:10
  115:22,25
  124:5 136:21
  137:23 185:3
**testify** 77:10
  114:14 143:20
  195:13 201:22
  202:20
**testifying** 7:24
  81:25 103:15
  106:16 117:4
  187:17
**testimonies**
  31:17 75:13
  132:17,20
**testimony** 6:12
  7:9,12,14,22
  14:22 21:10

32:18 35:2
48:7 49:4,7,11
49:13,17 50:3
50:3,7,9,25
51:3,4,5 54:8
57:13 60:5,16
60:19 62:16,20
66:16 74:7
75:20 76:1
77:8 80:14
81:19 83:22
84:14 89:22,22
93:16 94:11
97:16 100:11
102:2 105:20
106:4 107:4
108:15,16
110:12,13,15
110:17 112:9
112:10,12
117:8 118:2,5
120:18 130:10
135:18 136:24
143:11,12
144:7,7 154:25
156:20 161:4
161:12,23
167:6 175:19
191:9,22,25
194:6 195:9
202:1 204:6
205:3,4,9
**tests** 33:24
**text** 140:14
  157:13
**texts** 28:11
**thank** 15:5
  66:10 68:22
  76:8 80:20
  83:5,14 84:9
  90:11 95:14
  100:2 101:20
  110:11 118:11
  118:12 127:22
  138:21 140:24
  140:24 143:15
  145:5 146:5

147:14 150:25
153:5,8 180:17
180:23 181:1
186:12 188:10
189:3,15 190:7
191:7 201:21
208:15 210:2,3
**theoretical**
  156:8
**theory** 112:6
  161:10,16
**they'd** 165:7
**thick** 14:20
  175:3
**thing** 33:2 92:17
  114:23,24
  122:4 132:19
  154:2 161:6
  192:6
**things** 27:14
  28:14 80:16
  87:19 120:12
  140:18 146:1
  161:7 163:5
  169:20 179:17
  202:19 204:18
**think** 14:6 16:19
  16:24 17:13
  23:7 25:3
  32:19 89:20
  105:12 106:8
  112:10 123:25
  124:2 133:9,13
  135:17 143:6
  144:2 147:23
  148:9 155:6
  156:2 160:15
  161:5,9,12
  175:24 176:9
  189:21 191:10
  191:24 192:14
  192:20 195:17
  196:7,19,24
  198:24 202:19
  203:24,25
  204:17,18
  205:2,7,16,19

206:1,13 209:6
  209:7
**third** 2:4 70:25
  152:19 176:5
  200:1
**third-hand**
  145:23
**third-party**
  181:8 197:13
  198:15,16,18
  200:6,7,15,21
  201:4,11
  207:22 208:5
**thought** 30:9
  93:8 120:6
  159:19 168:20
  188:15 192:18
  196:15 198:25
  200:8 204:13
**three** 18:13
  24:22 34:13
  37:14 39:20
  41:16 49:25
  51:9 56:14,15
  71:13,14 82:17
  88:7 89:5,5,24
  90:1 119:4
  127:11 135:16
  135:17,20,22
  173:7 176:6
  177:3 178:10
  178:10,13
  179:12 180:4,5
  190:18 208:22
**three-volume**
  27:10
**three-way** 35:4
**three-year-old**
  146:2 169:3
  177:2 178:18
  179:3
**three-year-olds**
  168:23
**throw** 196:23
**thumb** 28:20,23
**thumb-drive**
  90:13,20

**ties** 64:13,16
124:2,4 154:23
155:20,24
162:19,20
169:5 173:9,10
182:24 183:25
183:25 186:15
186:15
**time** 10:18 14:17
14:20 16:18
17:1,10,15
18:12 24:23
34:13 39:22
40:2 41:5 42:4
43:18,21 48:2
48:14,15 49:6
49:23 50:6,17
50:20 54:22,25
56:19 57:19
62:9,14 63:1
65:15,24 71:20
73:25 76:5
77:10 82:24
83:20 84:2
85:5,13,16
93:1 94:4,23
97:8 100:15
104:17 105:2
107:12,18
110:6 115:7,9
120:5 121:14
123:13 125:14
126:24 129:2,5
129:14,17,21
131:4,10,12,14
138:25 139:25
142:6 143:20
146:20,21,23
147:5,18
154:17 156:9
160:5 166:3
170:10,18
179:19 182:15
187:24 190:10
191:18 201:2
205:10 207:8
209:5

**time's** 188:13
**timeframe** 73:24
138:24
**timeline** 34:5,9
56:7,11 60:2
139:4
**times** 85:17 86:6
93:23 129:23
138:7 168:3
194:6
**tire** 39:4 46:4,16
47:5
**tires** 46:21,23,24
97:21 185:24
**title** 140:1
**titled** 137:24
211:6
**today** 5:20 8:1
17:6 22:9
75:20 77:6
103:22 104:25
105:20 106:4
108:16 111:2,7
112:13 114:14
114:22 150:23
151:2 154:25
158:11,18
162:9 163:2
174:8 182:25
184:6,13
185:15 187:14
189:7 199:10
200:14,17
201:22 202:2
203:7
**today's** 160:12
**told** 27:3 35:24
38:20 39:1
44:13 54:4
59:14 61:11
90:20 93:2,20
104:5 105:13
107:23 112:15
115:16 129:9
130:15 133:4
135:5 140:7,9
140:10 144:12

144:19,21
145:17,18,22
146:13 147:2
163:19 165:5
173:20 193:3
**tool** 43:15
**top** 82:16
**total** 37:9
**totaled** 40:8
**totality** 100:7
**totally** 195:11
209:9
**touch** 120:6
168:1,18
**touched** 105:1
**touching** 105:21
106:6,24
113:24 114:5
185:1
**town** 127:6
183:5
**traced** 100:20
**trade** 98:3
**traffic** 79:20
**trailer** 39:2,3,4,6
44:22,25 45:5
45:18 46:2,5,7
46:12,15,16,18
48:15 58:17,18
60:15 62:8
83:18,24,25
84:1,7 121:25
122:6 129:3,14
136:1,4,12,13
136:16,23
169:12 187:2,5
194:5,7 207:1
**trailer's** 60:10
**train** 53:19
113:4 135:10
163:5 188:15
**trained** 163:15
186:24 187:15
**training** 50:25
51:11 81:21
82:5,20 83:1,4
130:10 139:21

140:6,13,14
161:21,22
162:5 164:5,15
164:16 184:11
204:16
**trainings** 55:3
**transcript** 1:14
14:15 82:9
91:14 130:20
204:14 211:5
**TRANSCRIP...**
211:2
**transcripts**
13:20 82:2
171:1
**transferred** 94:9
94:24 123:5
204:5
**transferring**
94:10
**translate** 27:21
38:4
**translates**
104:14
**translating**
132:21
**transportation**
193:25
**transported**
26:15 73:11
79:17 81:2
127:8 163:25
165:9
**travel** 115:23
128:21 162:22
169:7 182:10
**traveled** 64:22
64:25 65:1,5
76:13,20
115:25 204:3
**traveling** 75:21
**Travis** 4:6 21:7
21:16,19 176:9
**treated** 134:2
**treating** 199:23
**treatment**
183:20

**trespass** 181:22
**trespassing**
128:8
**trial** 5:7 11:1
160:15 167:9
174:14 183:6
186:12 189:13
203:7 206:3
208:13
**trip** 89:19
**trips** 95:11
116:5 203:18
**trouble** 114:22
206:10
**Troy** 2:9 5:6
**truck** 37:18
40:15,16,18,20
41:2,2,12,13
44:24 45:7,9
45:18 48:21
84:5 98:11
102:4,8 121:21
122:3 123:20
136:1 184:9
**true** 17:21 59:11
82:19 87:2
90:5 118:22
139:15,18
140:4 143:16
170:13 171:3
211:4
**truly** 121:13
**truth** 21:11,11
21:12 115:3,12
131:15 174:22
176:20
**try** 49:20 182:2
184:2
**trying** 97:24
102:5 105:11
130:19 183:9
184:19 185:23
186:7,8 187:20
187:22 206:12
**Tuesday** 18:2
**tunnel** 45:13
46:6 47:11,11

47:15,18,21,23
48:1,13,23,25
49:1 60:13
61:20,22 62:7
62:9,11,12
83:20 108:21
108:24 109:6
125:24,25
136:20,23
137:2,3,18,19
137:22 144:8
144:14,20
166:15
**tunnels** 164:9,10
**turned** 125:22
206:8
**turning** 98:9
156:18
**twelve** 31:23
**two** 29:4 33:24
44:6 46:8
52:24 67:20
68:13,14 69:12
70:15 87:4
93:20 94:10
99:3 109:23
110:12 119:2
126:13 127:10
127:15 144:18
158:18 176:4
178:13 179:9
179:15,19
180:3,21
182:22 183:19
187:23 190:23
208:21,22
209:8
**two-way** 67:4
68:1 70:7 72:1
72:9 97:2
**two-year-old**
191:12
**type** 125:8
193:13
**typed** 29:16,17
29:19
**types** 139:22

208:1
**typical** 14:17
**typically** 7:5

_____
**U**
**U-Haul** 40:17
**U.S** 2:3,6,9
116:15,20
155:1,1,4,4
168:13
**ultimately** 118:8
154:20
**unable** 203:8
**unarmed** 102:6
102:9 186:2
**unborn** 65:9
141:24 142:11
**uncorroborated**
158:25 162:4
**underneath**
48:15,18 59:18
136:15,16
**understand** 9:14
9:20 18:22
19:4,22 20:5
33:21 37:23
72:3 90:8
104:12 124:23
127:16,16
143:1,18,19
160:14,24,25
187:21 198:9
199:7 203:24
**understanding**
8:2,7 28:7,8
33:6,7,9 38:6
39:7 42:5
45:19,24 49:16
49:17 69:16
83:7 89:22
107:17 108:11
135:1 136:8
151:20 177:9
198:14 205:2
**understandings**
32:25
**understood**

108:6 124:9
**unexplained**
155:11,14
**unfortunate**
198:2
**unfortunately**
168:15 198:12
**union** 98:3
183:4
**United** 1:1,4,23
5:2,5 7:20 8:13
9:10,13 55:15
55:18 64:18,25
65:4,5 116:1
116:13,22
130:2 148:19
151:8,9 152:7
153:22 155:2
167:2,18
172:20,22,25
174:6,16
183:19 189:6
190:25 201:19
203:19 207:13
208:16 209:24
**unknown** 156:9
**unlawful** 164:21
165:3,4
**unlawfully** 9:12
55:14,17 160:5
165:2,3
**unsafe** 169:13
197:24
**unsigned** 112:19
**unstable** 155:19
169:10
**unsuitable**
155:19 169:10
169:13
**unsupervised**
95:11
**untenable**
198:15
**untrue** 102:16
**unusual** 7:17
122:19
**unwillingness**

199:12
**uphill** 175:8
**use** 23:7 36:12
44:21 53:20
62:9,12 88:22
140:21 154:18
154:19 157:10
196:17
**usually** 62:16,17
160:1

_____
**V**
**v** 1:6 8:13
**V.A** 183:20
**valid** 169:5
**van** 40:17
**varied** 185:5
**variety** 153:21
197:17,17
**various** 59:16
157:6
**vehicle** 37:16,17
40:2,12,14
79:16 102:5
123:5,5 127:4
127:9,13
128:20 131:20
183:9 184:9
204:3
**vehicles** 37:13
37:19
**verifiable** 150:6
168:21
**verified** 182:9
**verify** 150:15
**verses** 105:6
**version** 91:13
**versus** 5:2
167:18 201:19
**vet** 201:8
**veteran** 183:21
**vetted** 198:18
200:21 208:6
**victims** 23:4
**video** 69:24
72:15 73:6
**view** 123:3

156:7
**views** 198:14
**violation** 9:10
128:14
**violence** 85:7
157:11,16
161:17,18
168:18,21
169:18
**violent** 105:2,9
105:12 157:5,7
158:17 162:8
185:20 186:1
**visa** 84:16
**visas** 85:13
**visit** 175:16
**visitation** 95:9
169:22 177:11
177:15 178:6
179:19
**visitor** 84:16
**visits** 175:16
178:2 192:10
**voluntarily** 54:2

_____
**W**
**W** 70:24
**wage** 166:22
**Wahhaj** 1:7,8,8
2:17,21 3:1
4:15,18,19
5:15,17 6:1
8:14,14,16,22
8:22,23,23 9:3
9:4,16,17,23
9:24 10:5,6,15
17:5 18:25
19:7 22:11,13
22:15,25 24:16
24:16,17 25:22
25:23 26:2,21
27:2,2 31:7
32:24 34:21
36:3,22,24
37:4,5,15 40:4
41:10 43:10,21
44:9 47:24

48:18 52:5
53:4,12,18
54:3,12,19,20
55:2,3 57:4,6
57:10,18,21
58:21 59:1,14
59:14 60:22
64:23 65:1,4,5
75:24 76:2,13
76:19 77:2,10
77:22 78:21
79:15,19,25
80:15 81:1,5,6
81:11,16 83:9
83:18 94:11
98:15 103:16
103:18,22
105:1 108:7,14
108:19 113:20
113:21 117:5
117:17 129:10
129:10 131:8,8
131:10,11
132:18 133:5
133:18,18
135:10,21
137:21 138:23
139:16 149:16
149:21 150:7
152:13,24
153:11,16,21
157:9 158:24
162:13,15
163:1,14
165:25 166:5
167:1 172:7
173:14 189:16
190:5 198:19
200:18,25
201:2,15,20
202:4,11 204:1
205:9 206:4,22
207:12
**Wahhaj's** 26:15
32:4 38:24
43:6 53:4 65:9
98:23 115:23

116:12 117:10
135:23 140:6
145:4 156:23
159:4 203:9
**Wait** 64:1
**waiting** 19:16
**waive** 10:9,10,13
10:16,19
**wall** 39:4,6 46:4
46:16 47:5
**want** 10:8 12:3
12:20,25 13:4
13:9 15:16
16:1,3 18:19
30:7 52:14
65:20,21,24
71:15 74:6
75:19 92:12
146:10 147:9,9
149:24 162:12
168:1 169:1
174:17 180:6
190:5 193:7,10
197:4 201:5
208:4
**wanted** 18:2
53:18 115:5,16
120:6 135:10
139:10 182:21
190:9 202:16
203:7 206:16
**wanting** 14:12
113:3
**wants** 15:1
171:24 172:10
203:13
**warm** 136:14,18
**warmer** 61:14
**warned** 166:10
**warrant** 23:11
23:12 76:9
78:11,12,16
79:3 80:3,9,18
98:22 99:5,6
99:11 107:9,14
107:15,16
109:21 110:1

126:8,11 151:3
151:4,7,16
152:6,9,12,24
153:2 154:11
154:13
**warrants** 74:8
74:17,25 75:17
78:8
**wash** 60:23 61:3
61:12 166:20
**washed** 61:4
136:22 137:1,2
**washing** 166:16
**Washington**
2:10
**wasn't** 77:25
82:23 94:20
95:3 100:4,9
109:11 110:22
111:20 122:4
125:20 126:3
147:2,2 168:12
168:13,13
184:13,14,21
185:14 186:1,2
188:9 196:22
204:2,3,15
205:10
**watching** 97:2
**water** 103:5
**way** 6:13,16 7:3
7:7 8:4 32:10
39:9 49:3
53:16 80:17
83:9 90:9
109:13 114:15
145:16 169:8,9
176:3 187:3,25
200:21 201:13
204:22
**we'll** 6:15 10:10
10:13 19:19,21
28:1 66:1
180:22 209:4
209:21
**we're** 5:1 6:1 7:3
7:3 11:5 14:25

15:18 21:6
32:10 115:11
123:15 143:14
145:23 148:21
149:19 160:14
168:14 169:10
169:11 171:23
175:24 180:16
182:2 192:18
198:22 205:19
205:19 210:1
**we've** 6:24 17:14
18:4 203:24
**weapon** 36:15
36:22 50:1,2
50:14,16 51:9
81:23,25 82:1
118:4,6 120:4
120:5 135:21
171:16 204:14
204:15 205:4
**weapons** 13:24
35:16 41:9,11
41:14 47:15,20
48:10 49:24
50:20,24 53:6
61:23 94:24
100:16,19,20
100:22 101:7,9
101:15,18,21
109:4,8,19,20
109:20 110:7,8
122:7,12,21
123:3,4 125:13
130:12 135:17
135:20 138:23
139:5 157:4
171:14,19
184:6 185:17
185:18 204:4
205:1
**website** 150:14
150:17
**wedded** 26:4
**Wednesday** 18:4
**week** 9:8,19
146:25 179:19

**weeks** 39:20
41:16 56:14,15
88:7 89:5,5,25
90:2 166:17
192:18
**weigh** 7:8,11
14:22
**weighing** 160:25
**weight** 7:9 13:7
14:19
**went** 9:8 26:23
36:14 37:13,14
59:15,21
127:11 129:11
143:12 168:3
189:24 190:1,8
190:9 191:1
192:17 195:14
**weren't** 15:7
110:8 115:15
184:8
**whatsoever** 63:6
111:24 114:2
130:5 162:18
174:18 175:21
211:11
**white** 57:5,16
62:17 105:18
129:23
**who've** 179:9
**wife** 26:3,3,4
124:24 157:4
184:3 195:21
**Wikileaks** 140:8
**willfully** 186:21
**willing** 14:11
193:4,5 203:1
203:9 206:4
208:7
**willingly** 61:5
**wind** 47:7
**window** 68:1
**wintertime**
103:5
**withdraw** 63:18
**withdrawing**
20:15

**witness** 4:6 6:20
6:21 7:14,22
7:23 8:5 26:12
27:7,19 30:8
31:17 32:22
35:2,17 36:3
36:10 37:3,25
38:15,18 39:5
40:25 44:12
47:6,16,22,24
48:7,16 49:4,7
49:11,12,17
50:3,7,9,15
51:3,5,12
52:11 53:3,21
53:23 54:8
55:7 57:14,15
57:21 58:14,15
60:5,16,19
62:16,20 63:13
65:18 66:7
69:1 83:15
97:15 99:25
100:11 104:10
105:13 118:11
130:10 132:17
132:20 148:24
149:2,4,14,15
149:23 172:22
176:6 178:8
179:3 201:22
**witnessed** 39:12
194:9 205:5
**witnesses** 8:6
13:21 17:11
18:20 29:4,7
29:10,24 35:10
51:10,24 53:17
56:4,18 57:18
66:18,19 70:18
105:13,15
135:2 148:18
148:24 163:10
174:19 176:4
178:10,13,23
178:24 180:3
194:8

**wives** 52:24
**womb** 34:2
**women** 85:7
208:22,22
**wood** 97:21
**wooden** 46:3
**word** 37:20
53:20,21
112:10 145:13
159:12 170:23
171:2
**worded** 43:16
**wording** 130:19
142:16
**words** 78:20
114:18,21
115:21 129:11
134:3,5
**work** 183:5
184:2 186:9
188:17 190:10
195:14 201:5
208:4
**worked** 169:2
190:11
**working** 137:15
150:8 168:23
175:6 177:14
182:12,13
183:2 184:9,21
188:9
**works** 86:25
190:16
**world** 195:25
**wouldn't** 86:14
95:11 114:22
115:6 121:9
195:4
**wrapped** 59:17
60:9
**write** 53:2 104:3
147:16
**writing** 206:11
**writings** 157:9
157:15 158:24
**written** 28:14
29:3,5,15,21

107:13
**wrong** 158:4,6
187:16 193:11
195:23 196:20
**wrote** 53:3 85:1
112:14,18
**Wyoming** 3:7
_____

**X**

**X** 4:1
_____

**Y**

**yeah** 15:22
17:18 50:12
91:19 92:1,20
122:19 129:7
149:7 151:15
182:3
**year** 23:24 87:1
87:24 88:5
101:14 147:1
159:23 168:5
183:20 191:1
**yearly** 168:4,5
**years** 34:6,8,11
34:12 55:13,19
70:23,24 84:17
84:19 85:2,6
91:10 96:23
130:3 139:1,7
150:8,21
153:25 190:11
190:17,18
**yesterday** 6:3
9:1 18:9
151:14 170:25
**York** 64:17
70:10 116:17
118:18,21
145:21 155:3
162:21 181:17
183:17,19
184:20 189:24
189:25 190:2
190:15 191:1
203:20,21
**young** 54:14

89:2 165:2,14
165:21 166:6
193:25
**younger** 175:10
179:11 180:5,6
180:11
_____

**Z**

**Zach** 2:18 5:14
**ZACHARY**
2:18
**zero** 160:16
_____

**0**
_____

**1**

**1** 9:9 10:14,21
85:20
**1:03** 1:16
**1:18-CR-0294...**
1:6
**10** 35:15
**1011** 3:2
**103** 4:9
**10th** 23:21,23
56:13,15 87:24
89:4,6
**11** 4:4 35:9,15
41:1 42:24
62:3 138:5
163:25
**111** 2:15
**118** 4:10
**12** 1:15 32:21
37:9 56:20
62:22 88:15
**12-01** 99:10,15
99:16 107:19
**128** 4:10
**13** 69:6,7 71:14
91:10 98:9
148:12
**13-** 119:7
**13-year-old**
70:15 102:12
170:9 185:4
**135** 4:11

**139** 4:11
**13th** 42:2 88:3
**14** 148:12
**141** 4:12,12
**142** 4:13
**145** 4:13
**146** 4:14
**149** 4:15
**15** 61:2 67:18,19
71:14 148:12
148:12,12,12
**15-month-old**
178:18
**15-year-old**
84:20 92:16
102:12 119:7
185:4
**167** 4:16
**16th** 74:11,24
75:1 77:15
87:1
**17** 22:23 37:12
45:17 148:12
148:12
**18** 9:10 167:2
174:6 189:6
207:13
**181** 4:17
**189** 4:18
**18th** 172:17
**1998** 84:24
**1999** 181:16
**1st** 60:5 86:19
_____

**2**

**2** 9:11
**2,000** 124:12
**20** 45:10 55:13
55:19 84:17,18
85:2 130:3
**2001** 181:19
**2007** 85:6,11
**2008** 190:8
**201** 2:4 4:19
**2011** 190:21
203:21
**2016** 184:23

**2017** 23:25 42:1
  42:19 86:6,13
  93:2 95:21
  97:16 148:12
**2018** 1:15 56:6
  60:5 78:13
  79:3 95:22,24
  172:16
**202** 2:11
**20530** 2:10
**20th** 23:22,23
  24:4 86:13
**21** 4:5,7
**215.2** 172:18
**215.3** 172:21,21
**21st** 66:22 67:1
  67:1,4,24
  68:14,24 69:4
  70:2,2 78:5
  79:7 82:3
  101:14
**22** 45:1,17 187:2
**22-foot** 207:1
**224-1472** 2:5
**22nd** 71:19
  72:19 73:15
  96:22
**24** 45:1
**242-1600** 3:3
**242-2770** 3:8
**24th** 56:2,16
  59:8,10 89:15
**250** 3:7
**254** 170:25
**257-3787** 2:20
**27** 78:13
**27469** 2:19
**27th** 24:9 75:4
  79:3
**28** 97:6
**29** 97:5 125:3
**29th** 183:12
**2nd** 11:9

―――――――
**3**
―――――――
**3,000** 124:12
**30** 99:4 125:4

143:22
**30-aught-6** 35:4
**30-round** 35:24
**302** 101:14
  139:4 144:23
  147:11,15,25
  148:4,4,6
  158:7
**302's** 13:20
**302s** 14:14 83:22
  157:25
**305-1601** 2:11
**3142** 13:7 153:9
  167:23
**3142(g)** 32:15
  167:3 174:6
  189:6 200:16
  207:14
**31st** 89:7 183:12
**346-2489** 2:16
**371** 9:10
**373** 109:7 137:9
**38** 192:17
**3rd** 28:21 48:19
  65:16,17 86:6
  90:17 109:18
  109:23,25
  110:5,6,8,9
  125:7,16,18
  131:5,8,9

―――――――
**4**
―――――――
**4:00** 18:9
**40** 72:12
**40-year-old**
  153:22
**42** 181:2
**47** 92:20
**4th** 172:15

―――――――
**5**
―――――――
**5:34** 179:17
**50** 91:13
**505** 2:5,16,20,24
  3:3,8
**508-5589** 2:24
**53** 82:16

**5901J** 3:7

―――――――
**6**
―――――――
**607** 2:7
**66** 4:7
**689** 152:5
**6th** 109:21,24
  110:1,5,7
  125:17,19
  126:1

―――――――
**7**
―――――――
**7th** 66:22,24
  67:6,7,20
  68:12,19 92:3
  114:24 145:2

―――――――
**8**
―――――――
**8** 4:3 20:4 101:2
  101:9 172:18
  172:20,21
**83** 4:8
**84** 4:8
**87102** 2:4,15,23
  3:3
**87103** 2:7
**87109** 3:7
**87125-7469** 2:19

―――――――
**9**
―――――――
**911** 62:25
**922(g)** 168:14
**925** 2:23
**95** 4:9
**950** 2:10
**9th** 66:22,25
  67:13 68:3,13
  68:23 69:4,7
  69:15 92:4