IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 18-CR-02945 WJ |
| vs. | ) | |
| | ) | |
| JANY LEVEILLE, | ) | |
| SIRAJ WAHHAJ, | ) | |
| HUJRAH WAHHAJ, | ) | |
| SUBHANAH WAHHAJ, and | ) | |
| LUCAS MORTON | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE GOVERNMENT EXPERT WITNESS TESTIMONY**

The United States of America, through its undersigned counsel, files this Opposition to Defendants' Motion to Exclude Government Expert Witness Testimony. (Doc. 467). The Defendants specifically move to exclude in its entirety the testimony of Dr. John Phillips, a board-certified pediatrician and neurologist (with special competence in child neurology) who has nearly thirty years' experience in the field of child neurology. Dr. Phillips is expected to provide testimony relevant to the death of the kidnapping victim in this case, identified as "JOHN DOE."[1] JOHN DOE at the time of his kidnapping and death was a three-year-old toddler who suffered from neonatal encephalopathy, a serious medical condition treatment for which included required prescription medications. JOHN DOE was reported missing in early December 2017. He died in late December 2017, and his mummified remains were found in a tunnel at the compound on which the Defendants were living in northern New Mexico. Dr. Phillips has reviewed evidence and

---

[1] The Defendants refer to JOHN DOE as "A.G." Department of Justice rules require the United States to refer to him as JOHN DOE.

1

investigative materials collected and generated by law enforcement and others, including, among

other things, transcripts of eyewitness statements describing JOHN DOE's treatment at the hands

of the Defendants prior to and at the time of his death, JOHN DOE's general behavior and reactions

to the exorcism rituals he was subjected to by the Defendants, and JOHN DOE's behavior and

actions specifically during the exorcism ritual during which he died.  *See* Def. Mot. Ex. 1 (Dr.

Phillips's report).

In his report, Dr. Phillips opines on several matters within his expertise, including the

nature of JOHN DOE's medical conditions, his medical treatment history and needs, reasonable

probable outcomes to JOHN DOE's health if denied proper healthcare and medication, and the

most likely contributing factors of JOHN DOE's death in light of the evidence.  At no point does

Dr. Phillips conclude with certainty the actual cause of JOHN DOE's death.  *See id.* at 8 (beginning

discussion on the subject of JOHN DOE's cause of death with "While it is of course impossible to

state with certainty . . ." before discussing reasonable probabilities based on the evidence and his

extensive expertise in the types of medical conditions from which JOHN DOE suffered).

Nevertheless, the Defendants argue that Dr. Phillips should not be allowed to testify at all because

Dr. Phillips is not qualified to give expert testimony on the cause of JOHN DOE's death, and

because his opinion on the possible causes of death (which the Defendants mischaracterize as a

conclusion on JOHN DOE's cause of death) does not meet the reliability requirements for expert

opinions.  Doc. 467 at 2.

Because Dr. Phillips is more than qualified to provide expert testimony on the subjects

noticed by the United States, including that of JOHN DOE's medical conditions and the expected

health impacts (to include potential death) on a child with these conditions when denied medication

and when subjected to the rigorous physical circumstances and treatment the Defendants forced

upon JOHN DOE, Dr. Phillips should be allowed to testify.  Dr. Phillips also reliably applied the facts in this case to his own exceptionally relevant expert medical knowledge and understanding about JOHN DOE's medical conditions, such that his opinions on JOHN DOE's physical health and the consequences of a lack of medication, nutrition, and mistreatment are reliable and admissible under Federal Rule of Evidence 702.

Accordingly, Dr. Phillips should not be excluded from testifying on the matters provided in the United States' expert notice, and the Defense motion should be denied on the filings alone. At the very most, the Court should conduct a *Daubert* hearing so that it may exercise its gatekeeping function by determining for itself Dr. Phillips's qualifications and application of the facts in this case to his knowledge and experience in coming to his expert opinions.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The United States initiated this case by complaint filed on August 31, 2018, charging the five Defendants with a violation of 18 U.S.C. § 371, conspiracy to provide firearms to a person unlawfully in the United States. (Doc. 1.)  This was followed by an indictment charging the same offense. (Doc. 25.)  The Defendants were arraigned on September 12, 2018, and the detention hearing was concluded with an order detaining Defendants pending trial. (Docs. 32, 33, 38.)  On March 14, 2019, the Grand Jury returned a superseding indictment against the Defendants, alleging violations of 18 U.S.C. §§ 371 (conspiracy), 922(g)(5) (possession of firearms by person unlawfully in the United States), 1117 (conspiracy to murder a federal employee), 1201 (kidnapping—not charged against Defendant Siraj Wahhaj), and 2339A (providing material support to terrorists). (Doc. 85.)

The charges in this case were brought following an investigation in which it was discovered, among other things, that Defendant Leveille conspired with the other Defendants to

kidnap JOHN DOE, a disabled three-year-old boy, from his caregiving mother and transport him from Georgia to New Mexico, all as part of a larger conspiracy to prepare for and wage jihad.  In the course of these crimes, the Defendants deprived the small child of his necessary prescription medication and stood by while Defendant Siraj Wahhaj, at Defendant Jany Leveille's encouragement, subjected JOHN DOE to near-daily physically tormenting, hours-long, exorcism-type rituals until, within approximately a month's time, the little boy died.

Adding to the factual context is that the deceased child's body was stored under a bed, and later in a tunnel or cave that some of Defendants and the other children were forced to help dig. Some of the children were also required to wash JOHN DOE's decaying corpse, in an effort to preserve it, until it smelled too bad to continue.  JOHN DOE's body was not discovered until after the Defendants' eventual arrest in August 2018, approximately seven or eight months after his death in December 2017.  As a result, his body was significantly decomposed and essentially mummified.  *See* Def. Mot. Ex. 2 (OMI autopsy report).

After the issuance of the superseding indictment, the United States sought expert consultancy on the issue of JOHN DOE's medical conditions, his medical treatment needs, and their potential relation to his death during the time of his abduction by the Defendants.  The United States was ultimately able to obtain consultancy from Dr. John Phillips, who is currently a Professor with Tenure in Neurology, Pediatrics, and Orthopedics at the University of New Mexico Health Science Center ("UNMHSC"), and is the Medical Director of The Mind Research Network at the UNMHSC.  *See* Gov. Ex. 1 (Dr. Phillips's CV).

An extensively published medical doctor with over 30 years of experience as a pediatrician, Dr. Phillips also has nearly 30 years' experience as a specialist in neurology generally and child neurology specifically.  *Id.*  As such, Dr. Phillips has developed extensive expertise in studying

and treating children with, *inter alia*, neonatal encephalopathy, epilepsy, and cerebral palsy.  *See* Def. Mot. Ex. 1 at 1 (Dr. Phillips Report).   As evidenced by JOHN DOE's medical records, JOHN DOE was diagnosed with neonatal encephalopathy resulting in cerebral palsy, epilepsy, poor weight gain, and developmental delay.  In other words, JOHN DOE was diagnosed with the exact types of conditions about which Dr. Phillips is extensively qualified to review, discuss, and opine. On July 19, 2019, the United States provided notice of its intent to offer expert testimony by Dr. Phillips.  Doc. 127, and again in a supplemental notice on September 28, 2020, Doc. 267.

Given Dr. Phillips's specific and appropriate medical expertise, the United States provided Dr. Phillips with JOHN DOE's medical and treatment records, his autopsy report issued by OMI, and transcripts of interviews of two witnesses to JOHN DOE's general treatment after his abduction and death.  Counsel for the United States also provided Dr. Phillips additional factual background, much of which was based directly on Defendant Leveille's own journaled statements and descriptions of JOHN DOE's exorcism rituals and his death during one of those rituals. According to Defendant Leveille's own statements and descriptions by other witnesses who were there, JOHN DOE died in the middle of one of the exorcism rituals—with foam and spit coming out of his mouth while being held down by Defendant Siraj Wahhaj (the boy's own father)—until suddenly going silent, when, according to Jany Leveille's written account, his heart stopped.

The United States requested that Dr. Phillips provide his expert medical opinion on several matters, including JOHN DOE's medical history and diagnosis, JOHN DOE's medical treatment and care provided to him by doctors and his mother in Georgia before his abduction by the Defendants, the reasonable probable outcomes to JOHN DOE's health if his medical care and treatment were cut off, and potential causes of death that may have resulted from the lack of medical care and descriptions of JOHN DOE's behavior at the time of his death.  Dr. Phillips

considered the facts and evidence above in his review of JOHN DOE's medical records and in

writing his report.  *See* Def. Mot. Ex. 1 (Dr. Phillips's report) at 1, 4-5.  On September 13, 2019,

Dr. Phillips provided his report discussing these topics and outlining his expert medical opinions

on them.  *See id.*

Largely as a result of the decomposed state of JOHN DOE's body, as well as the general

lack of a forensic trail seizures leave even if they are a cause of death, the New Mexico Office of

the Medical Investigator ("OMI") team performing the autopsy was unable to conclusively

determine the manner and cause of JOHN DOE's death.  Def. Mot. Ex. 2 at 2; Ex. 3 at 4-5, 8.  The

autopsy team decided that an "undetermined" conclusion as to the cause of death was the "safest"

conclusion, given the nature of JOHN DOE's decomposed body and the lack of apparent physical

trauma or injury.  Def. Mot. Ex. 3 at 8.  However, the OMI report listed "possibilities" of JOHN

DOE's cause of death, including infection, dehydration, starvation, JOHN DOE's underlying

seizure disorder, and/or toxicity of an undetected medication or substance.  Def. Mot. Ex. 2 at 2.

Based on the evidence known about the conditions under which JOHN DOE was being held around

the time of his death, JOHN DOE's behavior at the time of his death, and his extensively

documented underlying medical conditions, Dr. Phillips also considered many of these factors as

contributing factors or probable causes of JOHN DOE's death in his report.  *See* Def. Mot. Ex. 1

at 5, 7-9.

## II.    LAW AND ARGUMENT

The reason why Dr. Phillips's opinions are relevant in this case, and the reason why

the United States will call him to testify, is that the kidnapping charge in the superseding

indictment (Count 7) includes the allegation that JOHN DOE's kidnapping "result[ed] in his

death," which triggers a mandatory minimum sentence of life imprisonment upon conviction.

*See* Doc. 85; 18 U.S.C. § 1201(a).  To prove this element[2] of the charge, the United States must prove beyond a reasonable doubt only that the Defendants' kidnapping of JOHN DOE "resulted in" his death; the United States need not prove the ultimate medical cause of his death, nor does the United States need to prove the Defendants voluntarily or intentionally killed JOHN DOE.  *See, e.g.*, *United States v. Barraza*, 576 F.3d 798, 807 (8th Cir. 2009) ("The statute does not require proof that [the defendant] voluntarily and intentionally caused the resulting deaths" during a kidnapping); *United States v. Lujan*, 2011 U.S. Dist. LEXIS 169651 at *10–*11 (explaining that intent to kill is not required to prove the "death results" aspect of the 18 U.S.C. § 1201(a)).

Whether any of the potential causes discussed by Dr. Phillips was in fact the cause of death, or whether the Defendants brought about a specific, conclusive cause of death, is not part of Dr. Phillips's expert opinions.  This is because a conclusive cause of death is unnecessary for the jury to make its determination of whether the Defendants' kidnapping of JOHN DOE "resulted in" his death.  In other words, the Court could grant the Defense's motion insofar as restricting Dr. Phillips from concluding that a certain event or condition was in fact the cause of JOHN DOE's, and it would not change Dr. Phillips's report, his expert opinion, or his expected testimony in any way.

---

[2] There is some question as to whether the "resulting in death" aspect of the kidnapping statute is an element of the offense or is a sentencing factor that enhances the minimum sentence.  *See United States v. Nichols*, 38 Fed. App'x. 534, 538–39 (10th Cir. 2002) (discussing whether similar "death results" language in another statute constitutes a sentencing enhancement or element of offense, but finding even if an element it does not require any *mens rea* to prove); *United States v. Ross*, 969 F.3d 829, 837 (8th Cir. 2020) (finding "death results" is an element of the offense because it is a statutory alternative with a different punishment, but that the element does not require any *mens rea* to prove).  This question does not need to be answered here, however, as the United States will prove the "resulting in death" aspect beyond a reasonable doubt and will request the Court instruct the jury accordingly.

To sidestep this reality, the Defendants premise their entire motion on a straw-man argument that Dr. Phillips opined, and if called to testify would so opine, that he was able to determine JOHN DOE's cause of death conclusively, and that his cause of death was in fact some sort of a seizure combined with asphyxiation caused by the Defendants performing an exorcism ritual on JOHN DOE.  Doc. 476 at 2.  Adding to this straw-man argument, the Defense characterizes the report by Dr. Kastenbaum, the OMI doctor who performed the autopsy on JOHN DOE's body, as somehow in direct contradiction with Dr. Phillips's defense-constructed conclusions about JOHN DOE's death, even though both reports mostly describe the same possible causes of or contributions to JOHN DOE's death without making a conclusive determination.  *Id.* at 3.

In contrast to the Defense motion's characterization, Dr. Phillips's report speaks for itself in articulating his expert opinions on the various medical topics relevant to this case. One need only read the report to realize that Dr. Phillips's actual expert opinions expressed in his report range across several issues—including JOHN DOE's medical history and conditions, the types of treatment he had received most of his life, the likely outcomes if that treatment were suddenly discontinued, and the probable factors contributing to his death—all of which are well within Dr. Phillips's realm of expertise and are reliably based on his application of the facts to his personal experience and expertise.  As such, the Defendants' motion should be denied.

### a.  Dr. Phillips Is Qualified to Give Expert Testimony on the Subject Matter

Federal Rule of Evidence 702 provides that an expert "by knowledge, skill, experience, training, or education" may give an opinion if the expert's "scientific, technical, or other specialized knowledge" will help the trier of fact.  Fed. R. Evid. 702(a).  The "touchstone of

admissibility" under Rule 702 is helpfulness to the trier of fact. *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1518 (10th Cir. 1996) (internal quotations and citations omitted). Moreover, the Supreme Court has emphasized the "flexible" nature of Rule 702, *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), and a district court has discretion in how it performs its gatekeeping function under Rule 702, *see Goebel v. Denver & Rio Grande W.R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000). Accordingly, "'as long as a logical basis exists for an expert's opinion, the weaknesses in the underpinnings of the opinion go to the weight and not the admissibility of the testimony.'" *Compton*, 82 F.3d at 1518 (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988)). Here, however, because Dr. Phillips is clearly qualified, his opinions are enormously helpful to any trier of fact, and his opinions are almost nothing but logical explanations of medical conditions and outcomes squarely within his area of expertise, Dr. Phillips's testimony does not come close to the line of exclusion sought by the Defense.

Neonatal hypoxic ischemic encephalopathy ("NHIE") is a rare[3] type of brain damage caused by the limited flow of oxygenated blood to the brain during pregnancy or birth. The causes of NHIE are several, treatment is complicated and of varying degrees of success, and the health effects are complex and evolve over time. Most infants afflicted will either die or have severe disabilities by age two, which may include mental retardation, epilepsy, and cerebral palsy (conditions which themselves may require intensive and complex medical care or monitoring).[4] In other words, NHIE is self-evidently a topic on which expert testimony would be extremely helpful, if not absolutely critical, in assisting any trier of fact in any type of case in any court.

---

[3] Neonatal HIE is estimated to occur in about 1.5–2.5 per 1,000 live births. Kimberly A. Allen and Debra H. Brandon, *Hypoxic Ischemic Encephalopathy: Pathophysiology and Experimental Treatments*, Newborn Infant Nurs. Rev. Sept. 1, 2011, National Library of Medicine, National Institute of Health, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3171747/.

[4] *Id.*

Here, Dr. Phillips's qualifications as a medical expert are obvious. As noted above, Dr. Phillips has over 30 years of experience as a pediatrician, and nearly 30 years' experience as a specialist in neurology generally, and child neurology specifically. Gov. Ex. 1. He published his first peer-reviewed article on HIE in 1996, has published over 100 articles, book chapters, abstracts, and platform presentations, and given several hundred lectures or presentations on subjects such as NHIE, brain injuries, cerebral palsy, spasticity and epilepsy, and related neurological conditions in small children. *Id.* JOHN DOE was diagnosed with NHIE resulting in cerebral palsy, epilepsy, poor weight gain, and developmental delay. Indeed, the quintessential medical expert contemplated by Rule 702, it is hard to imagine a more qualified expert to opine, as Dr. Phillips does in his report, on the relevant matters of JOHN DOE's medical conditions, treatment needs, likely health outcomes with a lack of treatment, and possible medical events underlying the descriptions of JOHN DOE's behavior before and at the time of his death.

The Defense attempts to get around this seemingly unavoidable conclusion by claiming that "Dr. Phillips is board certified in pediatrics and neurology, not pathology," and therefore he "does not have the knowledge and experience in pathology to accurately testify to the cause of death of JOHN DOE." Doc. 467 at 6. To the contrary, Dr. Phillips is eminently qualified to opine on the relevant factual questions, including whether the Defendants' abduction, treatment, and withholding of JOHN DOE's medication contributed to his death, or whether, if he had not been kidnapped and had stayed with his mother and provided his medication and appropriate care, there would be any reason to believe JOHN DOE would have died in December 2017. Dr. Phillips's opinions are about NHIE and JOHN DOE's resulting (and extensively documented) epilepsy and cerebral palsy, which inhabit Dr. Phillips's bona fide area of expertise. The closest Dr. Phillips gets in his report (and would get in his testimony) to JOHN DOE's cause of death is, based on his

extremely qualified medical knowledge, to opine on what was likely happening medically to JOHN DOE based on the descriptions of his death provided in other evidence, and if and how those descriptions are consistent with possible expected causes of death in a small child in JOHN DOE's medical and physical situation.

To be clear, the United States does not need to prove a conclusive determination as to exactly what medical event caused JOHN DOE's death. Dr. Phillips's expert opinions on JOHN DOE's medical conditions generally, the medical care he had received up until the time of his abduction, the medical care that children with his condition would normally require, probable health outcomes for children with JOHN DOE's condition who are denied such medical care, and what was likely happening to JOHN DOE medically when he died (based on other evidence known to him from witnesses and Defendant Leveille's own statements), are all opinions to which Dr. Phillips is highly qualified to provide, and that will be extremely helpful for the trier of fact to understand when determining whether the Defendants' kidnapping of JOHN DOE "resulted" in his death. This is true even if Dr. Phillips's opinions embrace some aspect of the ultimate issue of whether JOHN DOE's death "resulted" from his kidnapping by the Defendants. The Defense's requested relief of the exclusion of Dr. Phillips is therefore wholly unjustified. *See O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 921–22 (D. Colo. 2017) (stating that, though expert testimony may not usurp the jury's fact-finding function, "it is well settled that 'an opinion is not objectionable just because it embraces an ultimate issue'" (quoting Fed. R. Evid. 704(a) and citing *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988))).

### b.  Dr. Phillips's Opinions Are Reliably Based on Accepted Scientific Knowledge and Will Assist Any Trier of Fact

The Defense also claims Dr. Phillips must be entirely excluded from testifying because, according to the Defense, Dr. Phillips's recitation of the facts of the case—i.e., that witness

transcripts indicate that JOHN DOE died during one of the many exorcism rituals to which he was subjected—somehow constitutes "an unsupported and speculative theory that is not backed by data or science," and is therefore not reliable and must be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Doc. 467 at 3. This argument is nonsensical, and its own irrationality demonstrates how this line of argument is also legally meritless. Dr. Phillips has expertise that would assist the trier of fact in understanding whether a child with JOHN DOE's medical conditions would be likely to die as a result of being deprived of certain medication for a certain period of time under certain environmental circumstances and subject to certain physical and emotional treatment.

First, as the Supreme Court has made clear, the "standard of evidentiary reliability" in Rule 702 is based on an expert's *knowledge*, because not every expert opinion is based on some sort of scientific test or experiment. *See Kumho Tire Co.*, 526 U.S. at 147 (quoting *Daubert*, 509 U.S. at 590). Because "[e]xperts of all kinds tie observations to conclusions through . . . general truths derived from specialized experience," many of the *Daubert* factors may not be pertinent in assessing reliability. *Id.* at 149–150. Thus, the "flexible" inquiry under Rule 702 provides this Court "considerable leeway" in deciding how to determine an expert opinion's reliability as well as the reliability of the opinion itself. *Id.* at 152–53.

For example, where expert testimony is based solely upon experience or training, application of many *Daubert* factors may be "unwarranted" because there are no tests or experiments which have methods to be challenged or the results of which are even offered as evidence. *Compton*, 82 F.3d at 1518 (citing *United States v. Rice*, 52 F.3d 843, 847 (10th Cir. 1995)). Accordingly, the threshold for trial courts to apply is "merely . . . [whether] proffered expert testimony is both relevant and reliable while taking into account 'the inquiry envisioned by

Rule 702 is a flexible one.'"  *Id.* at 1519 (quoting *Daubert*, 509 U.S. at 594).  *See Kumho Tire Co.*, 526 U.S. at 152 ("The objective of that [gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

Here, Dr. Phillips's expert opinions are based on his training, experience, and knowledge, and his opinions are both relevant and reliable.  His opinions are based on his vast knowledge and experience in studying, practicing, treating, and teaching others about brain injuries and neurological conditions in small children, to include NHIE, epilepsy, cerebral palsy, and their related effects and treatments.  In addition, Dr. Phillips cites JOHN DOE's documented medical records and published articles in the relevant medical field for his conclusions whenever appropriate.  *See, e.g.*, Def. Ex. 1. at 6 (citing "Brooks, Recent Trends in Cerebral Palsy Survival, DMCN (2014) 56:1065-1071" and JOHN DOE's medical records showing improvement and developmental progress by 32 months of age for opinion that one could "reasonably assume that with continued appropriate care, [JOHN DOE's] life expectancy would have been well into adulthood"); *id.* at 7 (citing multiple published articles in discussing ways in which patients with untreated epilepsy can die).

Naturally, Dr. Phillips did not perform any tests, experiments, or scientific data collection in coming to his opinions—and he did not need to.  Rather, he reviewed JOHN DOE's medical records, much as he surely has done thousands of times in his career, to understand JOHN DOE's pre-existing medical conditions and his past treatments and medical care.  Dr. Phillips's transparent description in his report of his review of this information is self-evidently reliable, as it is the type of task he and medical doctors like him perform as a routine matter of their profession.

In addition, Dr. Phillips's opinions in his report about probable health outcomes and possible medical events taking place during JOHN DOE's death during the exorcism ritual are also based on training, experience, and knowledge, and are also self-evidently reliable.  In Dr. Phillips's thirty years of studying and treating children with NHIE resulting in follow-on conditions such as cerebral palsy, developmental delay, and epilepsy, Dr. Phillips has the knowledge and experience to form reliable opinions as to what might happen to a child with a demonstrated history of seizures requiring medication to both resolve and prevent them, and who is suddenly deprived of that medication.  He similarly has the knowledge and experience to form reliable opinions as to how stressful situations and lack of proper care and nourishment might affect a child with cerebral palsy and epilepsy like JOHN DOE.  And he has the medical knowledge and experience in studying children just like JOHN DOE in forming opinions as to what may have been happening medically to him when he died, based on the descriptions of JOHN DOE's behavior and Dr. Phillips's knowledge of JOHN DOE's underlying medical conditions.

In a feeble attempt to contrast Dr. Phillips's so-called lack of "scientific evidence" or "data" stemming from the witness statements about JOHN DOE's behavior at the time of his death with the noted unavailability of certain physical evidence in JOHN DOE's decomposed corpse examined by OMI in the autopsy, the Defense also mischaracterizes the autopsy's findings.  The Defense takes liberties with the autopsy report's findings in order to make the incredible assertions that there is "no evidence" that JOHN DOE died during an exorcism ritual, that he was lying down at the time, that he was spitting or foaming out of his mouth, that he was crying, physically exhausted, likely malnourished, and without seizure medication or other proper care for a young child with his conditions.  Doc. 467 at 3, 4, 9, 10.  The Defense makes these assertions of "no evidence" despite acknowledging that Dr. Phillips reviewed JOHN DOE's medical records (this

is evidence), the witness statements of those who heard or saw JOHN DOE's death (these are evidence), the autopsy report (also evidence), and information provided to him based on Defendant Leveille's own contemporaneous descriptions of JOHN DOE's death (i.e., evidence).

What the Defense apparently means by "no evidence" is actually that the OMI autopsy was unable to measure or forensically trace certain things, such as whether any drugs were in JOHN DOE's system or whether he was having a seizure at the time he died, and therefore "there is no data on which to base any scientific inference." Doc. 467 at 9–10. On this ground, the Defense repeats the strange claims that Dr. Phillips "totally contradicts" the autopsy report, *id.* at 4, that he "disregarded" the autopsy, histology, and toxicology results, *id.* at 8, that his opinion on possible causes of JOHN DOE's death "differs greatly" from the "undetermined" cause of death in the OMI report, *id.* at 7, and, most bizarrely, that the OMI report (which found "no hint" of any anti-seizure medication in JOHN DOE's body, Def. Mot. Ex. 2 at 8) "finds differently" than Dr. Phillips's statement that it "seems likely" that JOHN DOE was not given his anti-seizure medication, *id.* at 4.[5]

Ultimately, the Defense takes exception to the witness descriptions and other factual information considered by Dr. Phillips regarding JOHN DOE's death. However, whether JOHN DOE really did behave in the way described by witnesses and considered by Dr. Phillips, or whether he really did die during an exorcism ritual as described by witnesses and Defendant

---

[5] Beyond the lack of any medical records showing the prescription medication was filled or provided to JOHN DOE at any time after his abduction by the Defendants, which Dr. Phillips noted, there is also evidence from Defendant Leveille's own contemporaneous accounts that JOHN DOE was no longer being given his medication after his abduction, and there are no records in any of the national pharmacy chains' databases where JOHN DOE's prescriptions usually were filled of any medication being issued for JOHN DOE after his abduction. This is evidence that the Defense has been provided and well knows to exist, and would be available for the trier of fact to consider in evaluating whether JOHN DOE's death resulted from his kidnapping.

Leveille's contemporaneous descriptions, or whether JOHN DOE really was living in a stressful environment with deficient nutrition and a lack of medication on the filthy and disheveled Amalia compound—these are conclusions for the jury to ultimately draw in deciding whether JOHN DOE's death resulted from his kidnapping.  At most, challenging these factual predicates may be cross examination material for the Defense to ask Dr. Phillips during his testimony.

If the Defendants want to argue that, when he died, JOHN DOE was actually happy, well cared for, well fed, well medicated, enjoyed his exorcisms, and died mysteriously (but in no way connected to his kidnapping), they may.  If the Defendants choose to make these arguments because an autopsy performed on JOHN DOE's decomposed and mummified corpse eight months after his death could not conclusively tell if JOHN DOE was having a seizure when he died or whether he had vomit or saliva choking his airway, they can.  And if the Defendants want to argue to the jury that JOHN DOE actually *was* being given his anti-seizure medication, despite substantial evidence to the contrary, merely because the toxicology report under the same decomposition limitations (which found "no hint" of anti-seizure medication) could not conclusively rule out that anti-seizure medication had been present but disappeared with the decomposition of JOHN DOE's body, they are certainly free to do so.  But such arguments go to the weight of the evidence and, to the extent the Defendants believe they contradict Dr. Phillips's expert medical testimony, to attack the weight of Dr. Phillips's testimony.  *Compton*, 82 F.3d at 1518.  But Dr. Phillips's opinions based on his expertise and review of these evidentiary materials are both relevant and reliable, as well as helpful, and should not be excluded.

Contrary to the Defense's assertions, Dr. Phillips's report and the OMI report agree in almost every respect.  But whereas OMI could not conclusively determine the cause of JOHN DOE's death with medical certainty—which is the point of an autopsy and the OMI investigators'

16

job, as Dr. Kastenbaum herself explained, *see* Def. Mot. Ex. 3 at 3-7, Dr. Phillips was not performing an autopsy or required to establish a final conclusive cause of death.   In fulfilling OMI's purpose, if medical certainty cannot be reached, such as where a body is so decomposed that it inhibits observation or physical testing, or where a person dies from a seizure (which, as an electrical event in the brain, does not leave a forensic trail and could never be forensically determined as the cause of death), her job is to note that lack of certainty.   *Id.* at 5.   In other words, the purpose of an autopsy is not to review witness testimony or other evidence to offer opinions on what may have caused someone's death, or the likelihood of certain events or causes being the ultimate cause of death, but rather to sign a death certificate with a cause of death, if possible.   *Id.* at 4, 6-7.[6]

This is not Dr. Phillips's purpose, nor is it the subject of his expert opinions.   As noted above, it's actually unnecessary for a conclusive cause of death for JOHN DOE to be established, as the "death results" aspect of the kidnapping charges can be proven simply by showing that JOHN DOE died as a result of his kidnapping—whatever the cause or combination of causes.   In any event, Dr. Phillips's opinion merely suggested the most likely possibilities of JOHN DOE's cause of death based on the evidence of his behavior at the time he died and JOHN DOE's known medical conditions.   Nothing in the OMI report or Dr. Kastenbaum's statements contradicts any aspect of Dr. Phillips's report.   Seizures leave no forensic trace, and therefore cannot be deduced

---

[6] In pursuit of the claim that Dr. Phillips had "no evidence" to opine on JOHN DOE's possible causes of death, the Defense relies on *United States v. McCluskey*, 2013 WL 12330062 (D.N.M. June 21, 2013).   This reliance, like the rest of the Defense motion, is premised on the straw-man that Dr. Phillips's opinion testimony consists of or intends itself to be a pathologically certain conclusion on JOHN DOE's cause of death.   As explained above, no such opinion is at issue here.   *McCluskey* is thus inapposite, as it dealt with an expert performing an autopsy and expressing a final medical conclusion as to the cause of death of a homicide victim.   *Id.* at *1.

as a medical cause of death from the body alone (Def. Mot. Ex. 3 at 4–5); vomit or secretions that could have choked JOHN DOE would have long dried up and dissolved by the time JOHN DOE's body was recovered (*id.* at 5–6).

A lack of conclusive evidence of the cause of JOHN DOE's death drawn strictly from his mummified, decomposed body is quite obviously not the same thing as a lack of evidence about the circumstances and context of JOHN DOE's death.  And Dr. Phillips, as a qualified expert, is permitted to consider additional evidence beyond whatever scientific data was or was not retrievable from JOHN DOE's autopsy.  Doing so has nothing to do with the reliability of Dr. Phillips's opinions on the matter of the most likely potential causes of JOHN DOE's death. Notwithstanding the Defendants' disingenuous characterizations of OMI's autopsy and toxicology reports and Dr. Phillips's opinions as in conflict, Dr. Phillips's opinions acknowledge the same decomposition- and time-based limitations on JOHN DOE's cause of death, while Dr. Phillips reliably applies other known evidence about JOHN DOE's death to inform his reliable training, knowledge, and experience-based opinions.  As such, the Defense motion should be denied.

### c.  The Danger of Unfair Prejudice to the Defendants Does Not Substantially Outweigh the Probative Value of Dr. Phillips's Expert Testimony

Perhaps anticipating the failure of the straw-man argument advanced in the attempt to exclude Dr. Phillips from testifying entirely, the Defendants also include an objection to his testimony under Federal Rule of Evidence 403.  Doc. 467 at 10–11.  This argument also fails, as Dr. Phillips's expert testimony regarding JOHN DOE's medical diagnosis, treatment history, medication and treatment needs, and likely outcomes (to include death) is directly relevant and highly probative to proving whether JOHN DOE's death "resulted" from his kidnapping by the Defendants, which would then trigger a mandatory minimum life sentence upon conviction.  Any theoretical risk of prejudice to the Defendants related to Dr. Phillips's

expert medical opinions stems directly from the Defendants' own roles and actions in JOHN DOE's kidnapping and death, and thus is neither unfair nor does it substantially outweigh the probative value of Dr. Phillips's potential opinion testimony.

Tenth Circuit law "*favors* admission of all relevant evidence not otherwise proscribed; thus, exclusion under this rule [403] is 'an extraordinary remedy [that] should be used sparingly.'" *United States v. Irving*, 665 F.3d 1184, 1213 (10th Cir. 2011) (emphasis original) (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)).  Evidence is not unfairly prejudicial simply because it is damaging to the defendant's case.  *United States v. Martinez*, 938 F. 2d 1078, 1082 (10th Cir. 1991).  "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocence of the crime charged."  *Rodriguez*, 192 F.3d at 951 (emphasis added) (internal citations omitted).

Furthermore, in conducting the Rule 403 balancing test, this Court "must give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Murry*, 31 F.4th 1274, 1291 (10th Cir. 2022) (internal quotation and citations omitted).  Even if Dr. Phillips's testimony were to adversely affect the jury's attitude toward the Defendants, such prejudice does not itself "substantially" outweigh its probative value. *See Irving*, 665 F.3d at 1213–14.  Finally, whatever prejudice stems from the relevant testimony can be moderated by cautionary instructions from the Court at the time of the admission of the evidence and, if requested, again in the final charge to the jury at the close of the case. *United States v. Record*, 873 F.2d 1363, 1376 (10th Cir. 1989).

Here, the Defendants claim that "Dr. Phillip's [sic] testimony would unfairly prejudice the Defendants by risking conviction based on the belief that they were to blame for the death of JOHN DOE" Doc. 467 at 10.  This is because, according to the Defendants, "Dr. Phillips' [sic] unsubstantiated claims that JOHN DOE was deprived of his medication and likely died seizing while forced down during the prayer rituals in the supine position, crying against his will would surely provoke an emotional response from the jury." *Id.*  Again, these arguments are both factually disingenuous and legally meritless.

First, as explained above, the facts that JOHN DOE was being deprived of his medication by the Defendants, that he likely died during a seizure, and that he was forced down during his many exorcism rituals in the supine position, crying against his will, are far from "unsubstantiated."  The United States will present evidence (reviewed by Dr. Phillips) substantiating these very facts from witnesses who personally observed JOHN DOE's exorcism rituals, his reactions to them, and his seizure-like behavior during the one in which he died.  The United States will present other evidence consisting of Defendant Leveille's own written account describing the events in question, as well as the facts that JOHN DOE was indeed denied his anti-seizure medication and that withholding JOHN DOE's medication was a deliberate and willful choice of the Defendants spanning the several weeks from his abduction until his death.  The United States will also present evidence that there is no record from any pharmacy where JOHN DOE's anti-seizure medication was normally filled, or affiliated pharmacy nationwide, that any prescriptions for his medication were filled after the date of his abduction by the Defendants.  And, of course, there are JOHN DOE's medical records showing no medical treatment or care was provided for JOHN DOE after his abduction, and the OMI toxicology report showing "no hint" of anti-seizure medication in his

body.  Again, the Defense is free to challenge this evidence or attack the weight Dr. Phillips or the jury should give to it, but it is factually incorrect to base an argument seeking the wholesale exclusion of Dr. Phillips on a claim that his opinions about JOHN DOE's medical conditions and possible causes of death are "unsubstantiated."

Second, just because evidence may arguably make a conviction more likely because it "adversely affects the jury's attitude towards the defendant separate from its judgment as to his guilt" (which is not even clear to be the case here), "the risk of prejudice must *substantially* outweigh the probative value of the evidence for a court to exclude it," giving the evidence its maximum probative value and its minimum prejudicial value.  *Murry*, 31 F.4th at 1291 (emphasis in original) (citations and quotations omitted).  As articulated above, Dr. Phillips's expert medical opinions are extremely probative, as they will inform the jury the types of medical conditions JOHN DOE suffered from, the types of treatment he needed and was receiving from his mother in his first three years of life, and the types of health outcomes that could be expected for JOHN DOE if he was put in the sort of conditions or contexts suggested by the evidence that he was, including his behavior at the time of his death.

This is the type of medical information and understanding no lay juror could be expected to have regarding neonatal hypoxic ischemic encephalopathy, cerebral palsy, epilepsy, and their associated developmental outcomes and treatment needs.  Nothing about these opinions is unfair to the Defendants; this was JOHN DOE's condition—known to the Defendants and his father—at the time they took JOHN DOE from his caregiving mother and concealed him from her until his death.  And, nothing that may be arguably unfairly prejudicial to the Defendants in Dr. Phillips's opinions *substantially* outweighs their extremely high probative

value—especially when giving the evidence its maximum probative value and the claimed prejudice its minimum value.

Finally, contrary to the Defendants' claim, Dr. Phillips is not "cloak[ing]" his opinions "in the authority of the medical examiner's expert conclusion," Doc. 467 at 11, and his opinions do not invade the province of the jury.  All of Dr. Phillips's opinions are based on the available and admissible evidence to be heard and considered by the jury, and he never purports to act as a "medical examiner" giving a conclusive cause of death determination. While the last of his opinions on *likely* causes of death may embrace some aspect of the ultimate issue of whether JOHN DOE's death "resulted" from his kidnapping, this does not render the opinion inadmissible, as the jury will still decide whether and how much weight to give the underlying evidence about JOHN DOE's conditions and behavior at the Amalia compound and whether Dr. Phillips's offered possibilities of the case of death are consistent with that evidence.  *See O'Sullivan*, 233 F. Supp. 3d at 921–22.  Based on those determinations, the jury alone will decide whether JOHN DOE's death resulted from his kidnapping.

## III.   <u>CONCLUSION</u>

Dr. Phillips is plainly qualified to give expert medical opinions on the topics of JOHN DOE's medical conditions, his medical treatment history and medical care needs, the likely health effects for a boy with his medical conditions if not provided such treatment and care, and the likely medical events underlying the evidence describing his death.  Dr. Phillips also reliably applied the facts and evidence known in this case to his expert training, knowledge, and experience, and his resulting opinions are reliable.  Finally, the probative value of Dr. Phillips's opinions is not substantially outweighed by any unfair prejudice they may cause the Defendants, and Dr. Phillips's

opinions do not assert a conclusion of an ultimate issue of fact, and thus do not invade the province of the jury.  Therefore, the United States respectfully requests that this Honorable Court deny the Defendant's motion to exclude Dr. Phillips's expert testimony.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*/s/*_____
TAVO HALL
KIM BRAWLEY
Assistant United States Attorneys
P.O. Box 607
Albuquerque, NM 87102
(505) 346-7274

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon defense counsel.

*/s/*_____
Tavo Hall
Assistant United States Attorney