IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 18-CR-02945 WJ |
| vs. | ) | |
| | ) | |
| JANY LEVEILLE, | ) | |
| SIRAJ IBN WAHHAJ, | ) | |
| HUJRAH WAHHAJ, | ) | |
| SUBHANAH WAHHAJ, and | ) | |
| LUCAS MORTON | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE TO DEFENDANTS JOINT MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT AND VIOLATIONS OF DEFENDANTS' FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS

The United States is in receipt of Defendants' Joint Motion to Dismiss for Outrageous Government Conduct and Violations of Defendants' Fifth and Fourteenth Amendment Rights of Due Process, in which they assert that the United States' investigation of Defendants "directly resulted in the death of a child and the exploitation of other minors." (Doc. 476, at 1.) The Defendants appear to take the position that, had the Government intervened sooner, JOHN DOE could have been rescued from Defendants, and Defendants would not have had the opportunity to further engage in the conduct forming the basis of the kidnapping and terrorism charges later brought against them.

The Defendants' motion is without factual or legal merit and should be denied.

## I.    FACTUAL BACKGROUND

If this matter were to proceed to a hearing, the United States expects it would adduce evidence of the following facts:

1.      JOHN DOE was the biological child of Defendant Siraj Ibn Wahhaj (Wahhaj) and his wife by lawful marriage, Hakima Ramzi (Hakima).

2.      JOHN DOE was born with Hypoxic Ischemic Encephalopathy (HIE) resulting in cerebral palsy and epilepsy, among other disabilities.  As a result of this condition, JOHN DOE was developmentally delayed and required heightened care and medication to prevent his seizures.

3.      Defendant Wahhaj has two sisters, Defendants Subhanah Wahhaj (Subhanah) and Hujrah Wahhaj (Hujrah).  Hujrah has one child.  Subhanah has four children and is married to Defendant Lucas Morton (Morton).

4.      Wahhaj was involved in a relationship with Defendant Jany Leveille (Leveille).  Leveille is a citizen of Haiti currently residing in the United States without a current immigration status.  According to the U.S. Immigration and Customs Enforcement, Department of Homeland Security, Leveille is an alien and has been living in the United States unlawfully since in or about December 1998.  According to Hakima and others, Wahhaj considers Leveille to be his second, "Islamic" wife.  Leveille has six children.

5.      Wahhaj traveled to London in October 2017 in order learn how to do an exorcism, or "ruqyah."  Pursuant to a federal search warrant, a physical search of Wahhaj's mobile phone showed that Wahhaj viewed content on the practice of ruqyah, including a link to one YouTube video titled: "Ruqyah For Illness, Evil Eye, Magic, Envy."

6.      Leveille became pregnant around the same time that Hakima became pregnant with JOHN DOE.  Leveille's pregnancy soon failed.  In or about November and December 2017, in Georgia, Leveille formed the belief that Hakima became pregnant only by engaging in "black magic" that resulted in Leveille's baby being transferred from Leveille into Hakima's womb.  Leveille understood Hakima to be barren and claimed that JOHN DOE was her child.

7.      Leveille later formed the belief that JOHN DOE was actually born dead but, through "black magic," Hakima caused demons to enter JOHN DOE's body.  These demons caused JOHN DOE to move such that he appeared to be alive.

8.      Leveille believed she received messages and directions from God.  Leveille received these messages in Georgia and after she left Georgia in December 2017 en route to New Mexico.  Wahhaj, Subhanah, Hujrah, Morton, and others also received messages from God but Leveille alone claimed to be able to translate them.  According to Leveille, the messages came from God to the Archangel Gabriel and the Archangel Gabriel communicated them to Leveille, who then communicated the messages to other members of the group.  These messages sometimes took the form of orders and directives.  Leveille recorded these messages, including in journals that she kept with her. These journals were found on a thumb drive which was located in what was believed to be Leveille's purse.  They were also on a computer believed to be Leveille's computer.

9.      In or about November and December 2017, before Leveille and the others left Georgia, Leveille directed Wahhaj to take JOHN DOE and bring him to her.  During this period, Leveille also "ordered" Wahhaj to "recite the Quran on [JOHN DOE]."  Hakima called every day to have JOHN DOE returned and Leveille planned to have JOHN DOE returned, but each day God told her to keep JOHN DOE one more day.  Leveille asked God whether she could return JOHN DOE and God said "no."  According to Leveille's written account, Leveille received messages from God that JOHN DOE was her child and convinced Wahhaj that this was the case.  During this period, Leveille also asked JOHN DOE whether she was his mother, and, according to Leveille's written account, he indicated she was.  It was at or about this time that Leveille received a message from God ordering her and the others to leave Georgia with JOHN DOE.  Leveille had no prior relationship with JOHN DOE.

10.     In early December 2017, Leveille, together with her children, Wahhaj, Subhanah, and Hujrah, took JOHN DOE in her vehicle and drove from Georgia to Alabama.  Leveille explained that she wanted to take JOHN DOE to Alabama and later to New Mexico to perform exorcisms on him and to cast the demons from his body.  Leveille and Wahhaj intentionally deprived JOHN DOE of his anti-seizure medication based on their conviction that the medication caused demons to enter JOHN DOE's body.

11.     Leveille, Wahhaj, Morton, Hujrah, Subhanah, and their respective children, including JOHN DOE, stayed in Alabama for approximately two weeks before leaving Alabama to go to New Mexico.

12.     During the first week of December 2017, Wahhaj's family and others made numerous social media communications pleading for the return of JOHN DOE and advertising his disappearance on public platforms.  These communications stressed that JOHN DOE was in danger without his mother and daily medication.

13.     On December 5, 2017, Cameron Jackson sent Wahhaj a SMS message.  Mr. Jackson identified himself as being from the Department of Family and Children's Services.  He stated, "We received a concern concerning your child and are looking to meet with you and see the child if possible."

14.     On December 12, 2017, an FBI agent was notified that a police report was made with the Clayton County (Georgia) Police Department (CCPD) listing JOHN DOE as a missing person.  The missing person report had been filed on December 10, 2017, and it reported that Hakima's husband Wahhaj and their three-year-old son were missing.  It further reported that Wahhaj took their son to a park on or about November 28, 2018, at 9:00 am and did not return.

15.     On or about the evening of December 17-18, Leveille, Wahhaj, Morton, Hujrah, Subhanah, and their respective children, including JOHN DOE, arrived in New Mexico in the vicinity of Amalia, north of Taos.  They initially lived in a truck and a camper.  After some weeks, they established a compound that included dirt-filled berms constructed from rubber tires, a system of underground tunnels and caves, and a firing range and tactical training area.

16.     On December 18, 2017, a pick-up order was entered in the Juvenile Court of Clayton County, Georgia, in Case No. 053118-00-01, reporting that Wahhaj had absconded with JOHN DOE.

17.     Throughout December 2017, Leveille instructed Wahhaj to recite the Quran over JOHN DOE, and Wahhaj did so on a regular basis.  Leveille explained that the purpose of these recitations was to cast the demons from JOHN DOE's body.  Wahhaj would preside over JOHN DOE's exorcism sessions, reciting from the Quran, which would last hours and sometimes all day. According to eyewitnesses, Wahhaj held JOHN DOE down, at some points putting his hands around JOHN DOE's neck and, at other times, placing a hand on JOHN DOE's forehead. Wahhaj would place his hand on JOHN DOE's forehead, and recite the al-Faloq (Dawn) and al-Nas (Mankind) surats, or chapters, of the Koran.  During the course of these rituals, JOHN DOE would often cry and sometimes froth at the mouth and choke.

18.     Videos found on cell phones seized pursuant to search warrants show Wahhaj and Leveille performing prayer rituals on at least two of the children (not JOHN DOE).  One of the children complained that she was scared and was choked during one of these rituals.

19.     According to eyewitness testimony, in late December 2017, during the performance of an exorcism session by Wahhaj, JOHN DOE choked and "white slime" came out of his mouth and then JOHN DOE's heart stopped and JOHN DOE died.  At Leveille's insistence, everyone

accepted his death without concern and expected JOHN DOE to come back to life as Isa (Jesus Christ), and they were surprised when he did not.  Leveille explained that JOHN DOE would come back to life on Easter.

20.     According to Leveille's written account, JOHN DOE died on or about December 24, 2017, under circumstances similar to those described by eyewitnesses.[1]

21.     After JOHN DOE's death, Wahhaj cleaned the body and wrapped it in a sheet and placed the body on his bed.  Leveille's children were responsible for washing the body every other day by hand.  JOHN DOE's body was kept on his bed for a period of time.  One of Leveille's children stated that the body did not change in appearance.  After about four months, when the weather became warmer, the body began to smell bad, and it was moved to a storage shed and later was placed at the back of one of the underground tunnels, where the air was cooler.

22.     Leveille told her children and others at the compound not to talk to anyone about JOHN DOE ever being at the compound because they would "all go to jail."

23.     On January 5, 2018, Subhanah received a text message from a friend, which reported: "Subhanah everyone is looking for you guys.  You [sic] dad put up a post yesterday asking anyone who knows about you and you siblings, spouses and children whereabouts to contact authorities."

24.     On January 9, 2018, an Adult Warrant was issued by the Juvenile Court of Clayton County, Georgia, in Case No. 053118-00-01, that stated Wahhaj absconded with JOHN DOE on or about December 1, 2017, and that the whereabouts of the child were unknown.  The warrant

_____

[1] Critically, the narrative in the Defendants' motion is written to suggest that JOHN DOE's death occurred months later, in May 2018, *see e.g.,* Doc. 476 at 7, which of course, is integral to the Defendants' false premise that "the FBI's outrageous conduct cost [JOHN DOE] his life."  *Id.* at 2.

further stated that Hakima stated that JOHN DOE had medical conditions and required constant attention and that Wahhaj made it known before absconding that he wanted to perform an exorcism on JOHN DOE because he believed JOHN DOE was possessed by the devil.  The warrant also directed any law enforcement to take Wahhaj into custody and place him in the common jail of Clayton County, Georgia.

25.     The same day, January 9, 2018, another pick-up order was entered in the Juvenile Court of Clayton County, Georgia, in Case No. 053118-00-01, noting that exigent circumstances existed requiring immediate action to protect the welfare of JOHN DOE.

26.     Leveille told her children and others that JOHN DOE would come to life as Isa (Jesus Christ).  Leveille explained that Isa would then instruct her children and the others on what corrupt institutions they needed to get rid of, i.e., kill or imprison, and that these institutions were teachers, military, law enforcement, and financial institutions.  Wahhaj characterized this as jihad.

27.     Wahhaj was well trained in firearms and military tactics and instructed Leveille's children and others in firearms and military tactics, including tactical reloads, disarmament techniques, clearing buildings, rapid reloads, and hand-to-hand combat.  Numerous videos of these training sessions were found on cell phones recovered from the defendants.  At least one of these videos shows a child firing a pistol at a target from a moving motorcycle.  During this period, Leveille wrote in her journal, "Wahhaj has been instructing a lot and he was not there for the snow, so brother Luqman has to do it . . . for Wahhaj, Allah is referring to already sending the message that the boys are in training . . . ."  A text message dated March 29, 2018, and found on one of the cell phones indicates that Leveille prohibited hunting of animals, indicating that the firearms were not intended for hunting.

28.     According to a witness, Wahhaj wanted to get an army together and train them to conduct "jihad."  This witness explained that Jihad meant to kill people for Allah.  According to this witness, when JOHN DOE eventually came back as Isa, Leveille's instructions were that Leveille, Wahhaj, and this witness would go to visit corrupt institutions or individuals to talk to them. If Leveille interpreted any of them as non-believers, Wahhaj and this witness would be instructed to kill them. During their training, this witness saw Leveille train with a gun once and fire it at the compound.

29.     Sometime in early January 2018, the Clayton County Police Department obtained a letter Leveille wrote to Wahhaj's brother Muhammad.  Morton drove from New Mexico on or about December 31, 2017, arriving in Georgia sometime after the new year to invite Muhammad to join the group in Amalia and to deliver Leveille's letter in person.  The letter states, in part:

> Allah says also he forgives you for how you plotted with the other . . . [Hakima] because you didn't know and He and I also forgive you for thinking I was doing magic . . . . Allah says He will protect you always, so follow, until He makes you a martyr as you wanted and the only way is by joining the righteous [us].  You will meet Isa also here in about 4 months in sha Alla. So hurry, do NOT drag your feet, leave whatever we told you to leave and follow what brother Luqman is telling you.  Take all your money out the bank and bring your guns . . . .

30.     On February 15, 2018, Leveille texted her brother, stating, among other things, "He [Allah] will throw fear into the heart of the shayateen [demons] who will want to say no n will smite their necks n their fingers . . . . He will kill the kaffir [infidels] in the people u will ask for permission because they do that only to oppose Allah and I.  And Allah is severe in punishment. They will taste it n will have the torment of the Fire."

31.     On February 15, 2018, Leveille texted her brother, stating, "Wahhaj just washed Isa."  Leveille's brother responded, "still same?"  Leveille replied, "He is getting whiter skin." Leveille's brother wrote back, "more nice."  Leveille wrote, "He was kokobe [mentally disabled]

and only 3.  He will speak like a grown man.  He will make miracles.  N he will no longer be kokobe."  Leveille's brother wrote, "he was kokobe . . . ah like some old Isa story . . ."  Leveille wrote back, "Rire [LOL].  U killing me rofl [rolling on the floor laughing].  That is one big sign. He will walk and talk n no longer kokobe.  He will raise dead n kill shayateens.  He will talk as a grown man."

32.     On February 18, 2018, Leveille texted her brother, stating, "I was chosen. I am the ot[h]her Maryam [Mary] mother of Jesus coming back.  He coming back as a child like the last one n will grow up.  He will raise dead while a child likr mom n dad."

33.     In late July 2018, the group had run out of food and money and were becoming desperate.  They sold belongings, including a PlayStation and other items, to neighbors to raise money for food.  They then started to reach out to others for support.  They also began speaking of and preparing for the imminent resurrection of Isa.

34.     Social media communications between Leveille and her brother indicate that Leveille and Wahhaj continued even until late July 2018 to wash and view JOHN DOE's body. On July 20, 2018, Leveille's brother sent Leveille a chat message asking, "How was [JOHN DOE's] bath?" Leveille wrote her brother on July 26, 2018, "This is like really walking dead movie."  She writes, "Not that long . . . Its 26th today . . . He said he didn't alter a bit . . . Meaning that he is not turning to dust . . . since December . . . .  Its a miracle . . .  He has ski[n] . . . skin . . . Alllll his skin . . . No skin gone . . . His muscles r there . . . . He onlys looks ugly . . . Miracle."

35.     On August 2, 2018, the Clayton County Police Department sent an email to the FBI that contained screen shots of cell-phone texts exchanged between Subhanah and her sister and in which Subhanah claimed she needed assistance to be saved from starvation.  The Clayton County Police Department received these texts from Subhanah's sister.

36.     On August 2, 2018, Leveille texted her brother, "7 more days."

37.     On August 4, 2018, Leveille texted her brother, "IA [in sha'allah [God willing]] JOHN DOE comes on Monday n it's all over . . . I think Monday may be the day iA."

38.     According to a witness's account, the people at the compound were supposed to shoot the police when they came but did not because the police were already pointing their weapons at them.  The witness stated the men were practicing shooting because they were going to go to war.  Wahhaj said he really wanted to go to war.  Leveille said they should practice shooting because God will definitely help them in war.  The men would go to war after JOHN DOE woke up.

39.     On or about Monday, August 6, 2018, the Taos County Sheriff's Office executed search warrants at the compound and seized several weapons, hundreds of rounds of ammunition, and other items.  In addition, they found JOHN DOE's body.  The Defendants were taken into custody.  Child protective services took the children into custody and law enforcement subsequently interviewed them before they were placed in foster homes.

## II.     LAW AND ARGUMENT

### I.     The Outrageous Government Conduct Defense Does Not Legally Exist Outside Entrapment Scenarios, Which Are Not Present in this Case

#### A.  To the Extent the Defense Is Even Viable Today, It Is Not Available in This Case Where There Is No Government Participation

The Defendants assert that the charges against them should be dismissed, and the Defendants allowed to go free, not because they are not guilty of the charged offenses, but because the FBI and "other law enforcement officers" did not act quickly enough to arrest the Defendants after they kidnapped JOHN DOE and therefore did not save JOHN DOE from being killed by the Defendants and did not prevent the "exploitation of other minors" by the Defendants.  Doc. 476 at 1.  Notwithstanding the absurdity of the Defense motion's basic premise, the Defendants offer a

misleading and legally incorrect presentation of the law of "outrageous government conduct" to support the motion.  Left unsaid in the Defendants' motion is that courts across the country have roundly rejected the doctrine of outrageous government conduct outside the realm of entrapment scenarios where government agents participate in illegal activity to such an extreme level that is shocking to the conscience, and that, even then, the defense is "moribund."  *See United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993).

Entrapment is not in issue in this case.  No government employee, agent, or cooperator was even in communication with the Defendants prior to or during the commission of the charged offenses in any way, let alone participated in the commission of any of the charged offenses.  Thus, even taking at face value the Defendants' claim that law enforcement did not stop the Defendants from committing their crimes fast enough to prevent JOHN DOE's death at their hands, and that this (and not the Defendants' conduct) was "immoral, outrageous, and shocking to the conscience," *id*., the Defense motion fails.

The Due Process Clause of the Fifth Amendment "contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (internal quotations omitted).  "When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct," *United States v. Mosley*, 965 F.2d 906, 908 (10th Cir. 1992), because prosecution in such a case would offend the Due Process Clause.  *See United States v. Sneed*, 34 F.3d 1570, 1576 (10th Cir. 1994).

However, it "is an extraordinary defense reserved for only the most egregious circumstances."  *Mosley*, 965 F.2d at 910.  As such, the defense has either been rejected by courts

outright or strictly limited to situations where participation in illegal activity by the government is taken to extreme and extraordinary levels. *See, e.g.*, *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) (Posner, C.J.) ("[T]he doctrine of outrageous governmental misconduct . . . certainly has no support in the decisions of this court, which go out of their way to criticize the doctrine . . . . Today we let the other shoe drop, and hold that the doctrine does not exist in this circuit.") (quotations, citations, and alterations omitted); *United States v. Tucker*, 28 F.3d 1420, 1422–27 (6th Cir. 1994) (concluding that "such a defense simply does not exist"); *cf. United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993) ("[T]he doctrine is moribund; in practice, courts have rejected its application with almost monotonous regularity."); *United States v. Boone*, 437 F.3d 829, 842 (8th Cir. 2006) ("[T]he rule that outrageous government conduct can foreclose criminal charges has been applied by our court almost exclusively to situations involving entrapment, where law enforcement officers have sought to create crimes in order to lure a defendant into illegal activity that she was not otherwise ready and willing to commit.") (internal quotation marks omitted) (quoting *United States v. Lard*, 734 F.2d 1290, 1297 (8th Cir. 1984)); *United States v. Pedraza*, 27 F.3d 1515, 1522 (10th Cir. 1994) ("No matter how outrageous the government's conduct, due process is not offended unless the government's actions 'had a role in inducing the defendant to become involved in the crime.'" (quoting *United States v. Gamble*, 737 F.2d 853, 858 (10th Cir. 1984))); *United States v. Padilla*, 2007 U.S. Dist. LEXIS 26077 at *11-13 (S.D. Fla. Apr. 9, 2007) (citing cases and explaining that the "*only* instance where the [outrageous government conduct] claim may be properly invoked is within this governmental participation context").

Thus, in cases where courts have accepted the possibility of an outrageous government conduct defense, it is exclusively a species of the entrapment defense, with the difference being that the outrageous government conduct defense looks at the government's actions or behavior

regardless of the defendant's predisposition, whereas the entrapment defense focuses on the defendant's state of mind to determine his predisposition. *Mosley*, 965 F.2d at 909. Even then, the outrageous government conduct defense hangs on by a thread, as the Due Process-based idea conceptualized by Justice Rehnquist in *United States v. Russell*, 411 U.S. 423 (1973) (which the Defendants cite as the doctrine's "first" judicial recognition, Doc. 476 at 11) was quickly repudiated by Justice Rehnquist himself a mere three years later in the plurality opinion in *Hampton v. United States*, 425 U.S. 484 (1976). *See United States v. Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998) (describing the outrageous government conduct defense as "hanging by a thread").

In *Hampton*, Justice Rehnquist explained that "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the defendant . . . If the result of the governmental activity is to implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission, the defendant is protected by the defense of entrapment." 425 U.S. at 490. Otherwise, Justice Rehnquist clarified, "[i]f the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law." *Id.* This is because, as the Court explained in *Russell*, the "defense of entrapment is not intended 'to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve.'" *Id.* (quoting *Russell*, 411 U.S. at 435).

Lower courts have since noted *Hampton's* recantations of the dicta in *Russell* that has nevertheless spawned the outrageous government conduct defense, often concluding that the defense either legally does not exist or, to the extent it does, it is limited to the "objective" version

of an entrapment defense, i.e., looking outside the question of the defendant's predisposition. *See Tucker*, 28 F.3d at 1422-24 (noting Justice Rehnquist's effort to "recant [*Russell's*] 'maybe someday' dicta" about offensive government conduct alone warranting an entrapment defense-type dismissal of charges but concluding that *Hampton*, through "five Justices, two in dicta and three in dissent, left open the 'objective' [entrapment] defense door which Justice Rehnquist had unlocked in *Russell*"); *United States v. Dyke*, 718 F.3d 1282, 1285 (10th Cir. 2013) (Gorsuch, J.) (describing in detail the myriad criticisms of the outrageous government conduct defense causing it to be "never granted" by courts and questioning the defense's viability in the Tenth Circuit, but recognizing Justice Rehnquist's efforts to "put the genie back in the bottle" in *Hampton* had failed to close the door to all theoretical possibilities growing out of *Russell*'s dicta of applying the defense in future cases). Unsurprisingly, every case cited in the Defense motion purporting to recognize the outrageous government conduct doctrine does so within the context of entrapment scenarios where the government participated in the illegal conduct, and are therefore inapposite here.[2]

Hence, while it is legally correct to state that the doctrine of outrageous government conduct is recognized, it is not correct to suggest that the doctrine is viable to seek dismissal of charges for post-offense conduct by the government. Nor is the doctrine available in situations

---

[2] This is not to mention that, in addition to being limited to entrapment scenarios where the government or its agents acted illegally or participated in committing crimes, every case cited by the Defendants for the proposition that the doctrine exists actually emphasizes how extraordinary and rare such instances are, to the point that the doctrine remains mostly theoretical, and in each cited case the court found no outrageous government conduct and rejected the claim at hand. *See, e.g.*, *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013); *United States v. Johnson*, 130 F.3d 1420, 1430 (10th Cir. 1997); *United States v. Lacey*, 86 F.3d 956, 965 (10th Cir. 1996); *United States v. Pedraza*, 27 F.3d 1515, 1522 (10th Cir. 1994); *United States v. Harris*, 997 F.2d 812, 818 (10th Cir. 1993); *United States v. Mosley*, 965 F.2d 906, 908 (10th Cir. 1992); *United States v. Spivey*, 508 F.2d 146, 149 (10th Cir. 1975); *United States v. Chavis*, 880 F.2d 788, 793-94 (4th Cir. 1989); *United States v. Edenfield*, 995 F.2d 197, 200 (11th Cir. 1993);

where, as is alleged here, a defendant has complaints about the efficiency of an investigation (of which the defendant is not even witting at the time of his illegal conduct) during or after his commission of the offenses.  Accordingly, the Defense motion should be denied outright.

### B. Even If the Defendants Could Demonstrate Some Manner of Government Participation in Their Crimes, the Outrageous Government Conduct Defense Fails in this Case

Even if there were some indication that the government participated in some way in the Defendants' crimes in this case, the Defense motion would still fail to satisfy the extraordinary requirements to warrant dismissal for outrageous government conduct.  This is because dismissal of charges is essentially "never granted" even where the defense is recognized as theoretically viable.  *See Dyke*, 718 F.3d at 1288.  To establish outrageous conduct, "the defendant must show either (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime."  *United States v. Garcia*, 411 F.3d 1173, 1181 (10th Cir. 2005) (internal quotation marks and citation omitted).  In assessing the claims, "the relevant inquiry is whether, considering the totality of the circumstances in any given case, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice."  *See United States v. Lacey*, 86 F.3d 956, 964 (10th Cir. 1996) (internal quotations omitted). The defense is "not to be invoked each time the government acts deceptively or participates in a crime that it is investigating.  Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense."  *Mosley*, 965 F.2d at 910.

Under the first factor of the defense, government creation of a crime occurs when "there has been excessive governmental involvement in generating a new crime solely to prosecute it."  *See Sneed*, 34 F.3d at 1577.  Government creation also occurs when the Government induces a defendant "to become involved in the crime for the first time, rather than merely interposing itself in an ongoing criminal enterprise."  *Id.*  Thus, "[e]xcessive governmental involvement occurs when

the government engineers and directs the criminal enterprise from start to finish and the defendant contributes nothing more than his presence and enthusiasm." *Id*. However, it is not excessive governmental involvement "to infiltrate an ongoing criminal enterprise [or] to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *Id.* (internal quotations omitted) (quoting *Mosley*, 965 F.2d at 911).

Under the second factor, a defendant may prevail on the outrageous conduct defense by showing substantial governmental coercion. However, "[o]nly governmental coercion that is particularly egregious rises to the level of outrageous conduct." *Pedraza*, 27 F.3d at 1521. Thus, for example, "government agents may employ appropriate artifice and deception in their investigation…[and] may even utilize threats or intimidation if not exceeding permissible bounds." *Mosley*, 965 F.2d at 912 (internal citations and alterations omitted). In sum, a "high degree of government involvement or coercion" is required before a defendant can prevail on the outrageous conduct defense. *See Mosley*, 965 F.2d at 912. This standard has never actually been met in the Tenth Circuit, but the Circuit maintains the possibility that some day it might justify a dismissal of charges. *See Dyke*, 718 F.3d at 1287 (placing the Tenth Circuit in the "never-say-never camp" of circuits that have "recognized the doctrine's potential viability in the immediate aftermath of *Russell* . . . even while they have yet to find a single case where the defense applies").

### a. The United States Neither Created this Crime Nor Coerced Defendants

As Judge Ebel explained on behalf of the *Mosely* court, the two primary factors in a successful use of the outrageous government conduct defense are "government creation of the crime and substantial coercion." *Id*. Here, we have neither. In that case, Bobby Ray Mosley approached an undercover police officer and tried to buy marijuana. *Id*. at 908. The officer said he could not find any, but that he would sell a pound of cocaine for $10,000. *Id*. Mosely said he

did not want that much, but rather only wanted four ounces.  *Id*.  The officer agreed, but then offered to "front" Mosley an additional four ounces, and Mosely agreed.  *Id*.  The Government then prosecuted Mosley for eight ounces of cocaine, though he had originally only attempted to buy marijuana.  The Tenth Circuit held that none of that conduct, nor all of that conduct taken together, "so created the crime as to support an outrageous conduct defense" nor "constituted coercion sufficient to establish outrageous conduct."  *Id*. at 913.

**1.  The Government Did Not Create the Crime; the Defendants Did with No Government Involvement Whatsoever.**

Here, the Defendants allege that the FBI's outrageous conduct was "exploiting the search for [JOHN DOE], a three-year-old boy, to support their pretentious fantasies of outing alleged terrorist activity," and that this "resulted in [JOHN DOE's] death and in the trumped-up charges against Defendants for which they each face mandatory life sentences in violation of their rights to due process under the Fifth Amendment."  (Doc. 476 at 11.)   Defendants, however, do not allege that the complained-of conduct produced any evidence the Government now seeks to use against them, meaning they have not alleged "government creation of the crime."  Indeed, there is no clear allegation as to what criminal conduct the Government allegedly created.  Was it the kidnapping or the terrorism offenses?  It could not be the former, because that crime was committed before the Government even knew about it, so the Government could not possibly have involved itself or participated in it, let alone prevented it.[3]  As to the terrorism offenses, there is

---

[3] As is frequently the case, the criminal is one step ahead of the law enforcement, which is why the Government did not learn about JOHN DOE's early December 2017 kidnapping until after it happened, nor about JOHN DOE's tragic December 24, 2017, death until August 2018. Criminals, however, usually know about the crimes they commit as they are committing them, and often even know in advance that they are going to commit crimes.  Certainly, in this case, the Defendants knew when JOHN DOE was kidnapped and when he died well before the Government did.  It hardly needs to be said that they were in a far better position than the Government to prevent both from occurring.

no allegation of Government involvement in that crime, let alone excessive involvement, participation, or entrapment.  According to the Defendants, the Government merely executed a search warrant in Alabama without the Defendants' knowledge long after they vacated the premises, surveilled them from afar, and conducted other ordinary investigatory measures that in no way interposed the Government in the criminal conduct or even resulted in any direct interaction with Defendants.  Up until the time of the arrest, Defendants could only guess whether the Government was investigating them.

Instead of complaining that the Government created, involved itself in, or participated in the crime, Defendants seem rather to complain that the Government did not take action sooner before Defendants were able to engage in the conduct that the Government later alleged as the basis for criminal charges.  In essence, Defendants are asking the Court to dismiss the indictment because the Government did not prevent the Defendants from committing the crimes with which they are charged, which were indeed outrageous and unconscionable.  Such an argument does not support an outrageous government conduct defense.  This is particularly true, where, as here, the Defendants committed kidnapping resulting in death before the Government reasonably could have stopped it, and where the Government sought to charge the terrorism offenses only after it had sufficient evidence to do so.

Again, as to either the kidnapping or terrorism offenses, there is no allegation that the Government did anything more than investigate the crimes through search warrants, surveillance, and the like.  There is no allegation, for example, that the Government engaged with the Defendants in any manner, other than to observe them, while Defendants completely of their own accord engaged in the conduct entirely free of Government involvement.  To put it simply: the Defendants here created the crimes, not the Government, and if anyone should have stopped them

from doing so, it was the Defendants, not the Government.  In any event, for any government conduct to possibly be considered under the outrageous government conduct defense, it would first have to affect a protected right of the Defendants.  *See Hampton*, 425 U.S. at 489; *United States v. Payner*, 447 U.S. 727, 737 n.9 (1980).  As far as the United States is aware, there is no protected right for a person to be thwarted by the Government before committing any crimes that person has decided to commit, and, unsurprisingly, the Defense has also not articulated such a protected right.

> **2.  The Government Did Not Coerce or Induce Defendants to Commit the Crime or Engage with Them in Any Manner Whatsoever Prior to Their Arrest.**

As to the second factor of an outrageous government conduct defense—substantial coercion—the Defendants do not even make an attempt to argue they were coerced.  They simply cannot explain how the Government's failure to rescue JOHN DOE from them in time to save his life amounted to coercion of the Defendants' commission of kidnapping resulting in death.  The Defendants do not allege the Government engaged in coercive conduct "short of physically forcing a defendant to commit a crime," nor have they alleged any sort of inducement at all.   Rather, Defendants allege that the Government simply failed to act.  Failing to act, however, cannot amount to coercion.

Even when reading the Defendants' motion in the light most favorable to their absurd premise, one might be able to discern an allegation of coercion from Defendants' complaint that law enforcement interviewed them without parental consent.  But this, too, would be nowhere near sufficient to support an outrageous government conduct defense.  Where, as here, the children were in protective custody following their parents' arrest and detention for, among other things, child abuse and neglect, there is self-evidently a legitimate governmental objective in interviewing the children without parental consent.  *See*, *e.g.*, *W.B. v. Washington County*, 127 F.3d 919, 928

(10th Cir. 1997).[4]  More to the point, the Government's interviews of the children could not have coerced the Defendants to engage in the crimes for which they are charged, because the Defendants were already arrested and in detention—the crimes had already been committed.  As noted above, the United States is aware of no case where the outrageous government conduct defense has yielded a dismissal of charges for post-offense conduct by the government, and the Defense cites none.

## II.       Dismissal Is Not Warranted Pursuant to the Court's Supervisory Power

Defendants also ask the Court to dismiss the indictment under its supervisory power in order to censure the egregious and outrageous conduct by the Government in pursuing its investigation instead of acting sooner to save JOHN DOE.  (Doc. 476, at 24.)  The Court must reject this argument.

A court may dismiss an indictment by relying on its supervisory powers.  *United States v. Kilpatrick*, 821 F.2d 1456, 1465 (10th Cir. 1987), *aff'd sub nom. Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988).  "The supervisory powers theory is premised on the federal courts' inherent ability to 'formulate procedural rules not specifically required by the Constitution or the

---

[4] In *Santosky v. Kramer*, the Supreme Court made clear that termination of parental rights impinges upon a liberty interest of which a citizen may not be deprived without due process of law.  455 U.S. 745, 753–54 (1982).  *Santosky* dealt only with the proper standard of review and arose within the context of a permanent termination of parental rights.  The Tenth Circuit, however, has applied *Santosky's* holding to the temporary seizures of children and has held that notice and a hearing are required before a child is removed "'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Spielman v. Hildebrand*, 873 F.2d 1377, 1385 (10th Cir. 1989) (quoting *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 848, (1977)).  "Valid governmental interests" include "emergency circumstances which pose an immediate threat to the safety of a child." *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997).

In this case, law enforcement acted properly and consistent with a legitimate government interest once the corpse of JOHN DOE was found and the other children were discovered to be living in deplorable and harmful conditions that posed an immediate threat to the children's safety.

Congress.'" *Id.* (*quoting United States v. Hasting*, 461 U.S. 499, 505 (1983)).  The supervisory powers theory also "focuses on deterring illegality and protecting judicial integrity." *Id.*

Under the cases cited by Defendants, if the complained-of government conduct does not rise to the level of a due process violation (which it does not), the court may nonetheless dismiss an indictment under its supervisory powers: "[1] to remedy a constitutional or statutory violation; [2] to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or [3] to deter future illegal conduct." *See United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991); *see also Hasting*, 461 U.S. at 505.  However, dismissal of an indictment on supervisory grounds "is a drastic remedy, plainly inappropriate without full consideration and rejection of more narrowly tailored measures to deter improper prosecutorial [or Government] conduct." *United States v. Bolain*, 933 F.2d 1019 (10th Cir. 1991).

Here, Defendants have failed to show that dismissal is warranted under the Court's supervisory powers.  First, as discussed above, there is no basis for the Court to conclude that the Government's conduct is outrageous in violation of the Fifth Amendment Due Process Clause; nor have Defendants asserted any other constitutional or statutory violation.  Second, Defendants have not presented any facts showing that the Government's conduct impaired this Court's integrity as an independent body.  Finally, there are no allegations of illegal conduct by the Government or its agent—because there were none.  Thus, the Court should reasonably conclude that the sum of the Government's conduct and its decision to charge the Defendants in this case is not "flagrant and unconscionable," *United States v. Hogan*, 712 F.2d 757, 762 (2d Cir. 1983), and does not require the "extreme measure" of dismissing the indictment.  *Barrera-Moreno*, 951 F.2d at 1093.

The United States submits that, even if all of the Defendants' allegations are taken at face value, they would still be woefully insufficient to trigger the outrageous government conduct

defense or warrant dismissal of the indictment pursuant to the Court's supervisory power.  As a result, the Court should deny this motion without a hearing.

Respectfully submitted,
ALEXANDER M.M. UBALLEZ
United States Attorney


_Electronically Signed_
KIMBERLY A. BRAWLEY and
TAVO HALL
Assistant United States Attorneys
P.O. Box 607
Albuquerque, NM 87102
(505) 346-7274


CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon defense counsel. A hard copy will be mailed to Defendant Lucas Morton at his address of record.

_Electronically Signed_
Kimberly A. Brawley
Assistant United States Attorney