**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

vs.                                                                               **No. 1:18-CR-02945-WJ**

**JANY LEVEILLE, et al.,**

      **Defendants.**

## MOTION TO DISMISS COUNT FIVE

Defendants Subhanah Wahhaj, through counsel, The Law Office of Ryan J. Villa, by Ryan J. Villa, and Justine Fox-Young, PC, by Justine Fox-Young, and Hujrah Wajjah, through her counsel, joined by Defendants Jany Leveille, Siraj Wahhaj, and Lucas Morton, respectfully moves the Court to dismiss count five of the Superseding Indictment [Doc. 85] pursuant to *New York Rifle & Pistol Assn.' Inc. v. Bruen*, 597 U.S. --, 142 S. Ct. 2111 (2022), since the restriction prohibiting an illegal alien's possession of a firearm violates the plain text of the Second Amendment and is not consistent with this Nation's historic tradition of legitimate, non-discriminatory firearm regulation, which prioritizes the right to armed self-defense, as codified by the Second Amendment in 1791.

**I.    RELEVANT FACTUAL BACKGROUND**

Count Five of the Superseding Indictment charges Subhanah Wahhaj, Hujrah Wahhaj, Siraj Wahhaj, and Lucas Morton with knowingly aiding and abetting alleged illegal alien Jany Leveille's possession of firearms and ammunition in violation of 18 U.S.C. §§ 922(g)(5) and 2. *See* [Doc. 85] at 7-8. It also charges Ms. Leveille with unlawful possession. This charge, like the others alleged in the Superseding Indictment, stems from the government's decision to target and investigate a Black Muslim family and their associates as terrorists. The government

systematically surveilled the Wahhaj family and those that came into their orbit for years, including by installing pole cameras outside their home in Georgia. Despite years of invasive around-the-clock surveillance, no terroristic activities were revealed. When several members of the Wahhaj family and their relatives moved to New Mexico in 2017, the suspicious eye of the government followed them.

On August 3, 2018, months of the government's fruitless terrorism investigation culminated in a raid on the family's homestead in Taos County, New Mexico. The affidavit used to secure the search warrant of the property was riddled with false statements and material omissions. *See generally* Motion to Suppress [Doc. 471]. During the raid, Subhanah Wahhaj and her co-defendants were arrested and subsequently indicted by a federal grand jury with conspiracy to provide co-defendant Jany Leveille, "an alien who was illegally and unlawfully in the United States" possession of firearms in violation of § 922(g)(5). *See* Indictment [Doc. 25], Count 1.

The indictment was later superseded to further conform to the government's terrorism theory, and Subhanah Wahhaj and her co-defendants, Siraj Ibn Wahhaj, Hujrah Wahhaj, and Lucas Morton, were charged with knowingly aiding and abetting Jany Leveille's possession of firearms and ammunition in violation of 18 U.S.C. §§ 922(g)(5) and 2. *See* Superseding Indictment [Doc. 85] at Count 5.

## II. INTRODUCTION

In *Bruen*, the United States Supreme Court struck down the State of New York's concealed handgun licensing regime and held that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home. *See* 142 S. Ct. at 2122. The Court's decision extends beyond New York's regulatory scheme, however, and acknowledges that the plain text of the Second Amendment protects the rights of "the people" across the country

to possess firearms and marked a shift in how Second Amendment challenges are analyzed by the courts. *Bruen*, 142 S. Ct. at 2122. "[A]s with most controversies in the great American gun debate, the restriction and interpretation are important because of the symbolic and legal values they vindicate," and such "emblematic and philosophical debates are an inherent part of Second Amendment controversies." Pratheepan Gulasekaram, Guns and Membership in the American Polity, 21 Wm & Mary Bill Rts. J 619, 625 (2012). Before *Bruen*, courts decided Second Amendment challenges by balancing the importance of the government's interest in firearm regulation against the degree of infringement on the individual's right to keep and bear arms. *See e.g.*, *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) (adopting *Heller's* two-pronged approach to Second Amendment challenges"); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125, 1128 (10th Cir. 2015) (holding that due to safety interests, the "Second Amendment right to carry firearms does not apply to federal buildings, such as post offices"); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012) (ultimately holding that because the "bottom line is that crime control and public safety are indisputably 'important' interests," the Second Amendment does not apply to unlawful aliens under §922(g)(5)).

However, in *Bruen,* the Supreme Court expressly rejected the interest-balancing approach. 142 S. Ct. at 2128-29. Instead, it instructed lower courts to only consider "constitutional text and history." *Id*. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen*, "the Constitution *presumptively* protects that conduct." *Id*. at 2129-30 (emphasis added). To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2129-30. Because the right to self-defense is "the central component of the Second Amendment," the test for historical consistency considers

"whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and whether that burden is comparably justified[.]" *Id.* at 2133 (citations omitted). Put another way, a modern-day firearm regulation "is consistent with the Nation's historical tradition" only if similar regulations were widespread and commonly accepted when the Second Amendment was adopted. *See id.* at 2126, 1239 (explaining that "[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*[.]") (citations omitted) (emphasis in original). As a result, because "the Second Amendment was adopted in 1791, only those regulations that would have been considered constitutional *then* can be constitutional *now*." *United States v. Price*, 2022 WL 6968457, at *1 (S.D.W. Va. Oct. 12, 2022) (emphasis added).

In this case, the Court should dismiss Count 5 of the Superseding Indictment against Subhanah Wahhaj and Hujrah Wahhaj, which charges them with knowingly aiding and abetting Jany Leveille's possession of firearms and ammunition in violation of §§ 922(g)(5) and 2 because § 922(g)(5) prohibits conduct (possession of firearms and ammunition by an "illegal alien") that is protected by the plain text of the Second Amendment and the regulation is not consistent with the Nation's historical tradition prioritizing self-defense, including when the right was codified in 1791.

### III.   LAW AND ARGUMENT REGARDING THE SECOND AMENDMENT

Following the Court's decision in *Bruen*, only those firearm regulations that would have been considered constitutional at the time the Second Amendment was adopted can be considered constitutional now. *Price*, 2022 WL 6968457, at *1. After all, the Second Amendment recognized and "codified a *pre-existing* right" for an individual to possess and carry weapons. *D.C. v. Heller*, 554 U.S. 570, 592-95 (2008) (discussing the importance of the individual right to self-defense)

(emphasis in original). The "textual elements" of the Second Amendment's operative clause — "the right of the people to keep and bear Arms" — further guaranteed that the right "shall not be infringed." *Bruen*, at 2134 (quoted authority omitted).

In so holding, the *Bruen* Court rejected the previous two-step approach to Second Amendment challenges to firearms regulation. *Id*. at 2126. Under the prior approach, "[a]t the first step, the government [could] justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood." *Id*. (quoted authority and quotation marks omitted). To make this determination, the court would "ascertain the original scope of the right based on its historical meaning." *Id*. If the government could prove that the regulated conduct falls outside the Second Amendment's original scope, then the analysis stops there, and the regulated activity is categorically not protected by the Second Amendment. *Id*. (cited authority omitted). However, "if the historical evidence at this step is inconclusive or suggests that the regulated activity is not categorically unprotected," then the courts were to proceed to the second step. *Id*. (quoted authority and quotation marks omitted).

"At the second step," the courts would analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id*. (quoted authority and internal quotation marks omitted). Courts would generally accept "that the core Second Amendment right is limited to self-defense *in the home*." *Id*. (cited authority omitted) (emphasis in original). "If a 'core' Second Amendment right" were "burdened, courts apply 'strict scrutiny' and ask whether the Government" could show that the law in question was "narrowly tailored to achieve a compelling governmental interest." *Id*. (quoted authority and internal quotation marks omitted). If the law did not burden a 'core' Second Amendment right, the courts were to "apply intermediate scrutiny and consider whether the Government can show that the regulation is

substantially related to the achievement of an important governmental interest." *Id*. (quoted authority and internal quotation marks omitted). *Bruen* rejected this "means-end scrutiny" and held that this second interest-balancing step was "one step too many." *Id*. at 2127.

In *Bruen*, the Court went on to explain that its holding was not a wholesale rejection of its earlier decisions and recognized that:

> [s]tep one [of the two-step framework was] broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

*Id*. at 2127. As a result, *Bruen* did not invalidate or overturn the legal principles and analysis previously outlined by the Supreme Court in *Heller* and *McDonald*, and the legal reasoning anchored to the fundamental right to self-defense remains intact. In fact, the Court took great effort in *Bruen* to "not undermine its prior decisions in *Heller* and *McDonald* and to repeatedly underscore the continued validity of those decisions." *United States, v. David Dasilva*, 2022 WL 17242870, at *4 (M.D. Pa. Nov. 23, 2022); *see e.g., Bruen*, 142 S.Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."). The Court also noted that "*Heller* and *McDonald* point toward at least two metrics" to assess whether a historical regulation is a proper analogue for a modern firearm regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-2133.

In *Heller*, the Court struck down the District of Columbia's regulations banning handgun possession in the home and held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). In distinguishing the right to bear arms as independent from involvement in a militia, the Court

explained that early "Americans valued the ancient right [and] most undoubtedly thought it even more important for self-defense and hunting." *Id*. at 599. Justice Scalia, writing for the *Heller* majority, even went so far as to describe the dissent's "assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms [is] profoundly mistaken." *Id*.

In *McDonald*, the Court struck down municipal ordinances similar to those in *Heller* and held "that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791 (2010). In doing so, the *McDonald* Court explained that after all, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller*, [the Court] held that individual self-defense is 'the *central component*' of the Second Amendment right." *Id*. at 767 (citation omitted) (emphasis in original). Commenting on the importance of self-defense, the Court further explained that if the safety of "members of the community would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials." *Id*. at 790.

Writing in a concurrence in *Bruen*, Justice Alito continued this theme and emphasized the importance of the individual's right to self-defense being effectuated by the right to carry arms, when he wrote that "[s]ome are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury." 142 S. Ct. at 2158 (J. Alito concurrence).

However, § 922(g), "a part of the amended Gun Control Act of 1968," forbids gun possession by certain categories or classes of individuals deemed prohibited persons. *Huitron-*

*Guizar*, 678 F.3d at 1166. In passing the Gun Control Act (the "Act"), "Congress did not intend merely to restrict interstate sales but sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). These prohibited persons were then "comprehensively barred by the Act from acquiring firearms by any means." *Id*. This reflected the Act's "broadly stated principal purpose [which] was 'to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Id*. at 220 (quoting S.Rep.No. 1501, 90th Cong., 2d Sess., 22 (1968)). In 1986, Congress amended the Act to prohibit "aliens" unlawfully present in the United States from possessing a firearm or ammunition. *See* § 922(g)(5); *see also* PL 99–308 (S 49), PL 99–308, May 19, 1986, 100 Stat 449. When applying *Bruen* to 922(g)(5), the prohibition violates the Second Amendment.

### A. Section 922(g)(5) prohibits conduct protected by the Second Amendment's plain text.

Under 18 U.S.C. § 922(g)(5), "[i]t shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce," Under 18 U.S.C. § 2, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." "The term alien means "[a]ny person not a citizen or national of the United States." 27 C.F.R. § 478.11; *see also* 8 U.S.C. § 1101(a)(5). Who qualifies as an illegal alien is determined by regulations "enacted by the Bureau of Alcohol, Tobacco and Firearms (ATF), which had been delegated authority to implement § 922(g)." *See United States v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004) (citing 18

U.S.C. § 926(a) (authorizing "such rules and regulations as are necessary to carry out the provisions of this chapter")). According to the ATF, illegal aliens are those:

> who are unlawfully in the United States [and] are not in valid immigrant, nonimmigrant or parole status. [And] [t]he term includes any alien—
>
> (a) Who unlawfully entered the United States without inspection and authorization by an immigration officer and who has not been paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act (INA);
> (b) Who is a nonimmigrant and whose authorized period of stay has expired or who has violated the terms of the nonimmigrant category in which he or she was admitted;
> (c) Paroled under INA section 212(d)(5) whose authorized period of parole has expired or whose parole status has been terminated; or
> (d) Under an order of deportation, exclusion, or removal, or under an order to depart the United States voluntarily, whether or not he or she has left the United States.

27 C.F.R. § 478.11. An individual's "status as an alien 'illegally or unlawfully in the United States' refers to a legal matter" on a "'collateral' question of law." *Rehaif v. United States*, 139 S. Ct. 2191, 2198 (2019) (holding that "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm.").

In this case, the government alleges that Subhanah Wahhaj and Hujrah Wahhaj knowingly aided or abetted co-defendant and illegal alien Jany Leveille's possession of firearms and ammunition. *See* Superseding Indictment [Doc. 85] at Count 5. It is unclear whether the United States can prove beyond a reasonable doubt that Jany Leveille was in fact an illegal alien. It is even less clear whether the government can prove she knew she belonged to the relevant category of persons barred from possessing firearms and ammunition or that any of her co-defendants knew her status as required under *Rehaif*, but *assuming* that the government can prove such knowledge - Section 922(g)(5) remains unconstitutional under *Bruen*.

While the Second Amendment codifies a "pre-existing" right to defend oneself that "shall not be infringed," it is "not unlimited." *Heller*, 544 U.S. at 592, 595, 262. Accordingly, the question of whether § 922(g)(5) unlawfully prohibits conduct protected by the Second Amendment turns on whether the prohibition is inconsistent with "this Nation's historic tradition" that "delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2126-27. Put more simply, would § 922(g)(5)'s prohibitions be considered constitutional in 1791? *See Price*, 2022 WL 6968457, at *1 (explaining that because "the Second Amendment was adopted in 1791, only those regulations that would have been considered constitutional *then* can be constitutional *now*."). So, did the Second Amendment's guarantee of the right to self-defense through possessing firearms and ammunition apply to "illegal aliens" in 1791 or not?

### B. The Second Amendment's Reference to "the Right of the People" Includes Illegal Aliens.

In *Huitron-Guizar*, the Tenth Circuit rejected a defendant's Second Amendment challenge to § 922(g)(5) based on the now-rejected second step or "means-end scrutiny" test. 678 F.3d 1164, 1170 (10th Cir. 2012) (explaining that its decision rested on the "bottom line [] that crime control and public safety are indisputably 'important' interests"). The Tenth Circuit struggled, however, to find a clear answer to the "historic tradition" question among the contradictory lattice of immigration and constitutional law, inquiring:

> [h]ow, historically, has this country regulated weapon possession by foreigners? Are we to understand gun ownership as among the private rights not generally denied aliens, like printing newspapers or tending a farm, or one of the rights tied to self-government, like voting and jury service, largely limited to citizens? Is there a distinction between a "national" community *(Verdugo–Urquidez)* and a "political" one *(Heller)*? Is it significant that *McDonald* [], declared the right "fundamental"?

*Id*. at 1169. The circuit court ultimately avoided the historical traditional question by assuming "that the Second Amendment, as a 'right of the people,' could very well include … at least some

- 10 -

aliens unlawfully here" and held that "that crime control and public safety are indisputably 'important' interests" that justified § 922(g)(5)'s prohibition. *Id*. The circuit court refused to hold, however, that an illegal alien did not have a Second Amendment right, explaining that illegal aliens are entitled to many of the same constitutional protections as non-aliens:

> [w]e know that the Fifth Amendment applies to illegal aliens within our territory because it provides that "No person shall be...." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596–98 [] (1953). So does the Sixth Amendment, which protects the "accused," who could be a citizen—or not. *Wong Wing v. United States*, 163 U.S. 228, 238 [] (1896). We also know that the Fourteenth Amendment's Due Process and Equal Protection Clauses apply to "any person." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 [] (1886); *Plyler v. Doe*, 457 U.S. 202, 210 [] (1982).

*Id*. at 1167.

The Tenth Circuit also relied on the Supreme Court's analysis of the phrase "the people" in *United States v. Verdugo–Urquidez*, 494 U.S. 259 (1990), which considered whether aliens (lawful or not) were "the people" the Fourth Amendment was intended to protect. *Id*. In *Verdugo-Urquidez*, the Supreme Court explained that:

> '[T]he people' seems to have been a term of art employed in select parts of the Constitution....[Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id*. at 265. The circuit court noted that *Verdugo–Urquidez* "seemed unwilling to say that illegal aliens, who reside here voluntarily and who accept some social obligations, have *no* rights the government is bound to respect when, say, they protest a raid or detention." *Id*. at 1168 (emphasis in original). "Instead, *Verdugo–Urquidez* teaches that 'People' is a word of broader content than 'citizens'[.]" *Huitron-Guizar*, 678 F.3d at 1168.

It goes without saying that alienage did not exist in 1791 in the same form as it exists today. The same is true for citizenship, which in 1791 was only conferred to a "free white person" who

had lived in the United States for two years and could prove that "*he* [was] a person of good character." An Act to Establish an Uniform Rule of Naturalization, ch. 3, § 1, 1 Stat. 103 (1790) (emphasis added). Many classes of people were excluded from citizenship in 1791 that today's modern standards of decency would deem appalling. In 1791, slavery was lawful, a number of early laws prevented blacks from owning guns, and slaveowners used firearms in order to maintain coercive control over the slave population. Pratheepan Gulasekaram, *Guns and Membership in the American Polity*, 21 Wm & Mary Bill Rts. J 619, 621. It would take decades to outlaw slavery and hundreds of years for women and many racial minorities to be considered citizens. *See* Const. Amend. XIII (ratified in 1865, the Thirteenth Amendment abolished slavery); Const. Amend. XIV (ratification of the Fourteenth Amendment in 1868 made African Americans citizens); Const. Amend. XIX (ratified in 1920, the Nineteenth Amendment to the Constitution provided women the right to vote and declared, for the first time, that they, like men, deserved all the rights and responsibilities of citizenship); The Indian Citizenship Act of 1924, 43 Stat. 253, 8 U.S.C.A. § 3 (granted citizenship to American Indians who had not previously been recognized as citizens by reason of treaty or special statute).

Consequently, many of these classes of people and other classes identified by their religious beliefs or political ideologies were prohibited from owning firearms at various times in American history. Accordingly, the "story of citizenship and guns is, in large part, one of racial prejudice and xenophobic paranoia[.]" Pratheepan Gulasekaram, *"the People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U.L. Rev. 1521, 1543 (2010) (discussing the history of the right to firearms possession in America, including the selective prohibition on various groups throughout history from possessing firearms including British loyalist, Catholics, African Americans, members of Indian tribes, Irish, Asian, Latino, and Italian

immigrants, and anarchist). And "[l]inking guns to citizenship status . . . strengthens the historic tie between firearms rights and violent oppression on the basis of alienage, racial background, and national origin that has been a recurring theme in American history." Pratheepan Gulasekaram, *Guns and Membership in the American Polity*, 21 Wm & Mary Bill Rts. J 619, 649.

It also makes little sense to read a citizenship requirement into the Second Amendment in 2022. If in 1791, the framers wanted to limit the protections of the Second Amendment to "citizens," as known to them at the time as a free white male of good character, they could have substituted "citizens" for "the people." *See Verdugo–Urquidez*, 494 U.S. at 265; *see also Fitisemanu v. United States*, 1 F.4th 862, 867 (10th Cir. 2021) (cert. denied) (explaining that the Constitution utilized the term "citizen" repeatedly without necessarily defining the term). They did not. It makes even less sense and would amount to taking a step backward in the march for greater equality under the law to replace "the people" with "citizens," given the "racial prejudice and xenophobic paranoia" that has historically justified race-based firearms restrictions. Instead, the court must look to legitimate regulations on firearms that existed in 1791, not those based on invidious discrimination.

This principle finds support in *Heller*, which applied the historic test and concluded that specific and individualized conduct (being a person convicted of a felony, being a person with mental illness, being an individual in a "sensitive area") was a justifiable basis for limiting the Second Amendment's protections - *Heller* left out generalized categories of individuals (illegal aliens). *See Heller*, 554 U.S. at 626-27 (explaining that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places"). It is also problematic to leave

it to the ATF to define who is or is not entitled to the fundamental right to armed self-defense. *See McDonald*, 561 U.S. at 778; 27 C.F.R. § 478.11.

Because the plain language of the Second Amendment applies to illegal aliens, so too does the Second Amendment's guarantee of the right to armed self-defense. When "the Second Amendment's plain text covers an individual's conduct," then "the Constitution *presumptively* protects that conduct." *Bruen*, 142 S. Ct. at 2129-30 (emphasis added). The question then becomes whether the government can prove that Section 922(g)(5)'s prohibition is consistent with the Nation's historic tradition of firearms regulation, which prioritizes an individual's right to self-defense. It cannot. As such, the statute must be declared unconstitutional.

### C. Section 922(g)(5)'s prohibition is not consistent with the Nation's historic tradition of firearm regulation that protects the right to self-defense.

The overriding principle from *Heller, McDonald*, and *Bruen*, is that the people have the right to armed self-defense. *See Heller*, 554 U.S. 570, 628, (2008) (explaining that "the inherent right of self-defense has been central to the Second Amendment right"); *McDonald v. City of Chicago, Ill.*, 561 U.S. at 778 (acknowledging that the "Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty"); *Bruen*, 142 S. Ct. at 2156 (recognizing a "constitutional right to bear arms in public for self-defense"). To determine if the right to armed self-defense existed in 1791, the court must consider that certain norms that existed at the time were patently discriminatory. *Breun* certainly did not mean to imply that discrimination that existed in 1791 should be carried into the analysis of the constitutionality of laws that exist today that prohibit a class of people from possessing firearms.

### D. The Right to Self-Defense – NOT Xenophobia and Racism – Properly Inform the Historic Tradition of Firearms Regulation.

The American tradition of firearm regulation should turn on whether the regulation promotes and accomplishes the central component of the Second Amendment – armed self-defense. *See Bruen*, 142 S. Ct. at 2133. Regulations rooted in xenophobia and racism should not be relied on to continue the historic tradition of prohibiting certain, largely racial classes, of people from possessing firearms. It follows that if self-defense is truly the "central component" of the Second Amendment, then it is incongruous to withhold the inherent right of self-protection from an entire class of individuals defined by ATF's regulatory scheme and subject to evolving and politicized immigration policies. This is especially true where illegal aliens can lawfully own property, are required to pay taxes, *see* Francine J. Lipman, *The Taxation of Undocumented Immigrants: Separate, Unequal, and Without Representation*, 9 Harv. Latino L. Rev. 2, 4-5 (2006), and are entitled to receive a public education. *Plyler v. Doe*, 457 U.S. 202, 205, 210, 230 (1982) (holding that Texas law effectively denying public education to children who were illegal aliens was unconstitutional, and reasoning that while illegal aliens and their children are not citizens of the United States or Texas, they were people "in any ordinary sense of the term" and, therefore, were afforded Fourteenth Amendment protections.).

As reflected throughout history, aliens (*i.e.*, immigrants or non-citizens) require self-defense just as much, if not more, than citizens. This holds true today. In fact, immigration advocates cite fear of deportation as one of the reasons people are not coming forward to report crimes. *See* Prevention of Anti-Immigrant Violence Act of 2021, H.R. 2536, 117th Cong. § 2. In the last two years the number of violent hate crimes against immigrants and perceived foreigners

has increased dramatically.[1] As reflected in recently proposed legislative findings, "[a]nti-immigrant violence is on the rise, with the Federal Bureau of Investigation (FBI) reporting an 0.95-percent increase in hate crimes against individuals for 2019 compared to 2018 *and an observed shift in crimes against individuals as opposed to property*." *Id* (emphasis added). Recent "data shows that 57.6 percent of hate crimes reported were motivated by race, ethnicity, or ancestry" and "the 51 hate crime murders recorded in 2019 are the highest ever reported by the FBI since it began tracking hate crimes in 1991." *Id*. While the data does distinguish between "illegal aliens" and "legal aliens" it is impossible to ignore the fact that crimes "motivated by race, ethnicity, or ancestry" will be perpetuated against many of those that in the latter category.

If the Second Amendment "is neither shackled to state defense nor to arms bearing in a military-related sense but is instead animated by concerns over armed self-protection, then robbing the most vulnerable in our society of that right makes little sense." Pratheepan Gulasekaram, *"the People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U.L. Rev. at 1577. After all, "[s]ome are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury." *Bruen*, 142 S. Ct. at 2158 (Alito, J., concurring).

In addition, aliens, illegal or otherwise, are not categorically lawless or violent.  A study completed in 2020, "observe[d] considerably lower felony arrest rates among undocumented immigrants compared to legal immigrants and native-born US citizens and [found] no evidence

---

[1] *See* Fact Sheet, *Anti-Asian Prejudice March 2020 – Center for the Study for of Hate and Extremism.* Last accessed 11/29/22. Available at https://www.csusb.edu/sites/default/files/FACT%20SHEET-%20Anti-Asian%20Hate%202020%203.2.21.pdf (reporting that Anti-Asian hate crime in 16 of America's largest cities increased 149% in 2020).

that undocumented criminality has increased in recent years."[2] Some illegal aliens arrived in the United States as children, and many "are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community" that defines "the people" entitled to the protections of the Second Amendment. *See Verdugo-Urquidez*, 494 U.S. at 265. Generally, it is not a crime for a removable alien to remain in the United States. *Arizona v. United States*, 567 U.S. 387, 407 (2012). For example, "[i]f the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Id*. Instead, "[w]hen an alien is suspected of being removable, a federal official issues an administrative document called a 'Notice to Appear.' *Id*. (citing 8 U.S.C. § 1229(a); 8 CFR § 239.1(a)). "The form does not authorize an arrest" rather "it gives the alien information about the proceedings, including the time and date of the removal hearing." *Id*. (cited authority omitted).

The historical record – which prioritizes self-defense – provides no support for denying illegal aliens Second Amendment rights. The only arguments favoring Section 922(g)(5)'s prohibition against illegal aliens possessing firearms are those rooted in a legacy of xenophobia and racism. This Court should reject any argument from the government that racist or xenophobic national historic traditions support withholding Second Amendment rights to illegal aliens. The government cannot meet its burden to show that there was any legitimate regulation limiting the possession of firearms by illegal aliens in 1791. Section 922(g)(5) is flatly inconsistent with the Nation's historical tradition of regulations, which have historically emphasized the right to self-defense. *See id*. at 2126, 1239.

---

[2] Michael T. Light et al., *Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas*, PNAS, 117:51. Last accessed 12/02/22. Available at https://doi.org/10.1073/pnas.2014704117.

## IV.    CONCLUSION

Because § 922(g)(5) violates the Second Amendment as it was understood at the time of its adoption, this Court should dismiss Count 5 of the indictment against all Defendants.

Respectfully submitted,

<u>/s/ *Ryan J. Villa*</u>
Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave NW Ste. C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

<u>*/s/ Justine Fox-Young*</u>
Justine Fox-Young
Justine Fox-Young, PC
5501 Eagle Rock Ave NE Ste C2
Albuquerque, NM 87113
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Defendant Subhanah Wahhaj*

-and-

<u>*/s/ Marshall J. Ray*</u>
Marshall J. Ray
Law Offices of Marshall J. Ray, LLC
514 Marble Ave, NW
Albuquerque, NM 87111
(505) 312-2748
mray@mraylaw.com

<u>*/s/ Donald F. Kochersberger III*</u>
Donald F. Kochersberger III
Business Law Southwest
320 Gold Ave. SW, Suite 610
Albuquerque, NM 87102
(505) 848-8581
Donald@BusinessLawSW.com

*Attorneys for Defendant Hujrah Wahhaj*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2022 a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

/s/*Ryan J. Villa*
RYAN J. VILLA