IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 18-2945 WJ |
| | ) | |
| vs. | ) | |
| | ) | |
| **JANY LEVEILLE**, | ) | |
| **SIRAJ WAHHAJ,** | ) | |
| **SUBHANAH WAHHAJ,** | ) | |
| **HUJRAH WAHHAJ, and** | ) | |
| **LUCAS MORTON,** | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
TO SUPRESS EVIDENCE DERIVED AS A RESULT OF SEARCH WARRANT
FOR UNIT 2, LOT 28 IN COSTILLA MEADOWS, TAOS COUNTY, NM**

The United States respectfully submits this response in opposition to Defendants' Motion to Suppress Evidence Derived As a Result of Search Warrant for Unit 2, Lot 28 in Costilla Meadows, Taos County, New Mexico.   Doc. 471.   In their motion, the Defendants ask the Court to suppress "all evidence derived from" the August 3, 2018, search of the compound on which the Defendants were residing based on the contention that the state search warrant contained false statements, omissions, and lacked probable cause.   *Id.*   The Defendants also seek suppression of the firearm evidence as outside the scope of the warrant.   *Id.*   For the reasons stated in this filing, the Defendants have not made and cannot make the threshold showing under *Franks v. Delaware*, 438 U.S. 154 (1978), to even warrant an evidentiary hearing, and they fail to justify any of the other relief requested in their motion.   As such, the Defendants' motion should be denied.

**FACTUAL BACKGROUND**

1.      JOHN DOE was the biological child of Defendant Siraj Ibn Wahhaj ("Wahhaj") and his wife by lawful marriage, Hakima Ramzi ("Hakima").

2.      JOHN DOE was born with Hypoxic Ischemic Encephalopathy (HIE) resulting in cerebral palsy and epilepsy, among other disabilities.   As a result, he was developmentally delayed and required heightened care and medication to prevent life-threatening seizures.

3.      For the first three years of his life, JOHN DOE lived with his mother, Hakima, who was his primary caregiver and who ensured JOHN DOE received his anti-seizure medication and the constant medical and home care needed to keep JOHN DOE alive and well.

4.      Defendant Wahhaj has two sisters, Defendants Subhanah Wahhaj ("Subhanah") and Hujrah Wahhaj ("Hujrah").   Hujrah has one child.   Subhanah has four children and is married to Defendant Lucas Morton ("Morton").

5.      Wahhaj was involved in a relationship with Defendant Jany Leveille ("Leveille"). Leveille is a citizen of Haiti residing in the United States without a current immigration status. According to the U.S. Immigration and Customs Enforcement, Leveille is an alien and has been living in the United States unlawfully since in or about December 1998.   According to Hakima and others, Wahhaj considers Leveille to be his second, "Islamic" wife.   Leveille was unhappy with Wahhaj's legal marriage to Hakima because it complicated her immigration situation, as she was unable to be legally married to Wahhaj.   Leveille has six children, four of whom are Wahhaj's.

**A.  JOHN DOE is taken from his mother by the Defendants and initial attempts by law enforcement to locate him, Wahhaj, and the other Defendants are unsuccessful.**

6.      In or about November and December 2017, Leveille and the other Defendants lived in the Atlanta, Georgia area.   Hakima also lived in the area, but at the time was required by Wahhaj to live alone with JOHN DOE in an extended stay motel room, while Wahhaj lived separately with Leveille and the six children in another house.   Around that time, Leveille directed Wahhaj to take JOHN DOE and bring him to her because Leveille had become convinced that JOHN DOE was actually her child, and Hakima had actually used black magic to transplant him from Leveille's womb into Hakima's before his birth.   Wahhaj did this by telling Hakima

that he wanted to take JOHN DOE to the park.   When he did not return JOHN DOE to her care, Hakima called Wahhaj every day to have JOHN DOE returned.   Hakima even went, accompanied by a local police officer, to the house where Wahhaj lived with Leveille in order to ask them to return JOHN DOE to her.   Supportive of Leveille's contention that JOHN DOE was actually her child, Wahhaj refused to give JOHN DOE back and closed the door on Hakima and the Georgia police officer.

7.      In early December 2017, Leveille, together with the children and Wahhaj, took JOHN DOE and drove from Georgia to Alabama.   Hujrah, Subhanah, Morton, and their children also left Georgia to join Leveille and Wahhaj in Alabama.   Leveille explained that she and Wahhaj wanted to take JOHN DOE to Alabama and later to New Mexico to perform exorcisms on him and to cast the demons from his body.   Leveille and Wahhaj intentionally deprived JOHN DOE of his anti-seizure medication based on their conviction that the medication caused demons to enter JOHN DOE's body.

8.      Leveille, Wahhaj, Morton, Hujrah, Subhanah, and their respective 12 children, including JOHN DOE, stayed on land owned by Wahhaj in Alabama for approximately two weeks before leaving Alabama to go to New Mexico.

9.      During the first week of December 2017, Wahhaj's extended family and others made numerous social media communications pleading for the return of JOHN DOE and advertised his disappearance on public platforms.   These communications stressed that JOHN DOE was in danger without his mother and his daily medication.   The Defendants were aware of these communications and pleadings from their families, friends, and community members.

10.     On December 12, 2017, an FBI agent was notified that a police report was made with the Clayton County (Georgia) Police Department ("CCPD") listing JOHN DOE as a missing person.   The missing person report had been filed on December 10, 2017, and it reported that Wahhaj had absconded with JOHN DOE and both were missing.   It further reported that Wahhaj took the child to a park on or about November 28, 2018, at 9:00 am and did not return.

11.     On December 13, 2017, while en route from Alabama to New Mexico, the Defendants crashed a silver 2004 Ford Explorer bearing Georgia license plate RGE8599 in Alabama.   The vehicle was registered to Leveille.   There were nine people in the vehicle at the time of the accident; two adults and seven juveniles, including JOHN DOE.   At the time of the accident, Wahhaj was in possession of five firearms, including handguns and a semi-automatic AR-15 rifle, a bullet-proof vest, a tactical vest filled with rifle magazines in magazine pouches, and a bag of ammunition.   Wahhaj was extremely worried about retaining possession of his firearms and gear when first responders came to help clear the wreckage from the highway. Wahhaj also provided several false statements to the responding Alabama State Trooper about his address, his employment, and his employer's website.   Morton arrived in a large white box truck and helped Wahhaj remove the firearms and tactical gear from the crashed vehicle.   Wahhaj told the Alabama State Trooper that he was traveling from Georgia to New Mexico to go camping. Leveille told the Alabama State Trooper that they were traveling from Georgia to New Mexico to see land owned by Wahhaj's brother-in-law.   The Alabama State Trooper was suspicious due to Leveille's and Wahhaj's vague and conflicting stories, the lack of any camping equipment in the vehicle, and Wahhaj's false or unverifiable statements about his address and employment.   *See* Ex. 3.   Leveille and the children were transported to a local hospital to treat various minor injuries.   However, before local authorities learned that the group included missing persons out of Georgia, the group was discharged that night from the hospital.   Thereafter, the group's whereabouts were unknown.

12.     After the crash, Morton drove the entire group of the Defendants and their children, as well as the missing JOHN DOE, from Alabama to New Mexico in his distinctive white Ford box truck.   On or about the evening of December 17 or 18, the group arrived in New Mexico in the vicinity of Amalia, approximately an hour north of Taos in Taos County.   They initially lived in the back of the white box truck and in an old camper trailer partially dug into the ground and covered with plastic tarps.   After some weeks, they established a compound that included dirt-

filled berms constructed from rubber tires, a system of underground tunnels and caves, and a firing range and tactical training area.   Morton's white box truck was also consistently parked near the front of the compound.   Doc. 471-2.

13.    The compound was on a high plateau with an open field of view in all directions, including miles of the only road leading to the only entrance to the property.   It would take between five and ten minutes for any approaching vehicle to reach the compound from the point of first visible detection from the compound.   Dirt-filled tire barriers blocked vehicle access to the compound from approximately 30 yards down the road leading to the compound.   The compound was almost entirely surrounded by five- or six-foot dirt-filled tire walls, which would be impervious to handgun and rifle ammunition.   At the front of the compound were additional one-foot-thick mud or dirt walls of various heights that were topped with broken glass to prevent breaching of the compound over the walls.   Access to the compound required switchbacks through gaps in the tire walls, which were narrow such that any entrance to the compound would be slow and cumbersome.   Within the compound were additional interior walls that created an inner defendable perimeter.   These walls also had narrow alley-type walkways that made quick entrance from the outside difficult.   Large mounds of dirt were also constructed at various locations around the compound as additional obstructions.   A large plastic covering concealed from above the main living area, which consisted of a sunken-in camper trailer.   *See* Ex. 9.

14.    In short, from the perspective of law enforcement authorities prior to service of the search warrant, nearly every aspect of the compound, from the choice of geographic location to its construction characteristics, was specifically researched and designed to minimize detection by authorities and maximize a defensible position of advantage in the event the occupants chose to violently resist the service of legal process.   *See* Ex. 9.   This perspective was only confirmed and reinforced after service of the search warrant when the underground tunnel system and "spider hole" escape routes were discovered.   *Id.*

15.     The Defendants believed they were living on land owned by Morton, although they had actually occupied the wrong lot and were instead living on land owned by another person, Jason Badger.   Doc. 471-2.

16.     On December 18, 2017, a Pick-Up Order was entered in the Juvenile Court of Clayton County, Georgia, reporting that Wahhaj had absconded with JOHN DOE.

17.     On December 20, 2017, Wahhaj was named as a defendant in a Petition for Divorce and Emergency Motion for Custody, which Hakima filed in Clayton County, Georgia.

18.     Also on December 20, 2017, CCPD authorities entered a missing child alert with the National Center for Missing and Exploited Children (NCMEC) as case number 1316115.   On December 22, 2017, NCMEC released a missing person flier for JOHN DOE that identified Wahhaj as the person JOHN DOE was likely with.   The flyer cautioned that Wahhaj should not be approached and that law enforcement should be contacted.   *See* Ex. 1.

19.     According to eyewitness testimony, in late December 2017, during the performance of an exorcism session by Wahhaj, JOHN DOE choked and "white slime" came out of his mouth, and then JOHN DOE's heart stopped and JOHN DOE died.   According to Leveille's own written account, JOHN DOE died on or about December 24, 2017, under circumstances similar to those described by eyewitnesses.   Leveille and other Defendants instructed the children not to talk to anyone about JOHN DOE ever being at the compound because they would all go to jail.   Upon their arrests, Defendants Morton, Hujrah, Subhanah, and Leveille all denied having ever seen JOHN DOE since they moved to New Mexico.   Authorities were unaware of JOHN DOE's death throughout the group's time at the Amalia compound (and were unable to confirm his death until his remains were found in a tunnel during a second search that began on August 6, 2018).

20.     On December 31, 2017, Morton appeared in Forest Park, Georgia, to attempt to convince Wahhaj's brother Muhammad to join the group in New Mexico.   Morton gave Muhammad a letter written by Leveille that stated, in part, "take all your money out the bank and bring your guns," that he could "die as a martyr . . . by joining the righteous (us)," and that he

6

could "meet Isa also here in about 4 months."[1]   Clayton County Police then arrived to speak with Morton about Wahhaj or JOHN DOE's location, but Morton denied any knowledge of their whereabouts.   Although Morton was warned that withholding information about the missing JOHN DOE could be punishable by law, he refused to provide any information about where JOHN DOE might be and soon after left the premises in Georgia.   Ex. 2.

21.     On January 2, 2018, Detective Rick Porter of the CCPD contacted Detective Marvin Armijo of the Taos County Sheriff's Office (TCSO) to inform him that Wahhaj and JOHN DOE were likely somewhere in Taos County on land owned by or associated with Morton.   Doc. 471-6.

22.     The same day, Det. Armijo informed Det. Porter that he was able to locate a parcel of land owned by Morton, but that this lot was vacant and had no address.   *Id.*

23.     Also on January 2, 2018, TCSO Sgt. Jason Rael received an email from TCSO Sheriff Jerry Hogrefe in regard to the missing JOHN DOE.   The email had attached a flyer from NCMEC, which was dated December 22, 2017, *see* Ex. 1, and the existing Clayton County pick-up order for JOHN DOE.   Presumably, Sgt. Rael received this email as a result of Det. Porter's communication with Det. Armijo that day.   The email from Sheriff Hogrefe to Sgt. Rael stated that JOHN DOE and his father, Wahhaj, may have been residing in either Costilla, New Mexico, or Carson, New Mexico, and did not provide a specific address.   Doc. 471-2.

24.     Costilla and Carson are not near each other; Costilla is at the far northern edge of Taos County, approximately one mile from the Colorado border (near Amalia), and approximately 60 miles north of Carson—which is near the southwestern border of Taos County.   As a result of the uncertain location, TCSO authorities seemed to view the information as something to generally be aware of, but not specific enough to take any action.   Doc. 471-2 at 3.

---

[1] "Isa" is the Islamic name for Jesus, and approximately four months from that time was Easter. Essentially, Leveille was predicting JOHN DOE's rising as Jesus on Easter, after which, according to other evidence discovered after the Defendants' arrest, JOHN DOE (as the risen Isa) would direct jihad to be waged by the Defendants and some of their children.

7

25.     Sometime between January 2, 2018, and February 6, 2018, Det. Armijo provided the GPS coordinates of Morton's parcel to Det. Porter, who also emailed a missing persons flyer to Det. Armijo with photos of Wahhaj and JOHN DOE.   Det. Armijo placed the flyer in several locations at the TCSO facility.   Det. Porter concluded that if any additional information arose about Wahhaj or JOHN DOE, he would let TCSO know.   Doc. 471-6; Ex. 2.

26.     On January 5, 2018, Subhanah received a text message from a friend, which reported: "Subhanah everyone is looking for you guys.   You [sic] dad put up a post yesterday asking anyone who knows about you and you siblings, spouses and children whereabouts to contact authorities."

27.     On January 7, 2018, Subhanah responded on her Facebook page to several similar posts from various family members, including Siraj Wahhaj, Sr. (Defendants Subhanah, Hujrah, and Siraj Jr.'s father), who had been pleading for the Defendants to bring JOHN DOE back and for anyone with information as to JOHN DOE's whereabouts to contact authorities.   In her post, Subhanah rejected the posts, calling the statements that JOHN DOE was missing "lies" and claiming there was "no need to worry."   JOHN DOE had been dead for approximately two weeks.

28.     On January 9, 2018, an Adult Warrant for Wahhaj was issued by the Juvenile Court of Clayton County, Georgia in Case No. 053118-00-01, that stated Wahhaj absconded with JOHN DOE on or about December 1, 2017, and the whereabouts of the child were unknown.   The warrant further included that Hakima stated that JOHN DOE had medical conditions and required constant attention and that Wahhaj made it known before absconding that he wanted to perform an exorcism on JOHN DOE because he believed JOHN DOE was possessed by the devil.   The warrant also directed any and all law enforcement to take Wahhaj into custody and place him in the common jail of Clayton County, Georgia.

29.     Also on January 9, 2018, another Pick-Up Order was entered in the Juvenile Court of Clayton County, Georgia in Case No. 053118-00-01, noting that exigent circumstances existed requiring immediate action to protect the welfare of JOHN DOE.

8

30.     Between January 2, 2018, and May 15, 2018, authorities in Georgia continued to take steps to locate exactly where Wahhaj and JOHN DOE were.   Ex. 2.   This included tracking Morton's mailing address, subpoenaing Morton's cell phone records, and executing a search warrant of Leveille's car in Alabama that was involved in the December crash.   *Id.*

31.     On February 1, 2018, Clayton County Police provided FBI Atlanta the letter Morton had given Muhammad Wahhaj on December 31, 2018.   *See* Ex. 5.

**B. An anonymous tip spurs law enforcement to find and focus on the Defendants' compound and ramp up investigation efforts to locate the missing JOHN DOE, though safety concerns related to the compound's military-style construction, Wahhaj's known possession of weapons, and multiple reports of shooting at the compound slow progress.**

32.     On May 14, 2018, an anonymous tip was reported on the NCMEC case related to JOHN DOE, which broke open the investigation into JOHN DOE's and Wahhaj's whereabouts and focused law enforcement on the compound built on a lot neighboring Morton's tract in Amalia. The tipster stated that he was looking on Fox5Atlanta.com and saw a posting for JOHN DOE as missing with Morton and Wahhaj.   The caller, who was a neighbor to Morton and Wahhaj in New Mexico, stated that Morton and Wahhaj actually lived at Unit 2, Lot 28.   Ex. 4.

33.     The same day, May 14, 2018, TCSO Deputy Flores received a request for assistance from FBI Atlanta Special Agent Denis Suta.   Special Agent (SA) Suta advised Deputy Flores of the specific address or location where Wahhaj and Morton were likely located; that Wahhaj was known to have several firearms and ammunition and was to be considered armed and dangerous; that Morton had picked up Wahhaj, JOHN DOE, and other family members in a white Ford box truck; and that there was a warrant for Wahhaj's arrest out of Georgia.   Docs. 471-3; 471-2. Deputy Flores and TCSO Sgt. Rael immediately drove to Amalia to personally surveil the reported location of Morton and Wahhaj.   Once in the area, they saw the white Ford box truck and the Defendants' compound near 55 Panorama Rd (or Blvd) in Amalia, NM.   *Id*.

34.     As the tip provided law enforcement a specific location on which to focus, it led TCSO Sgt. Rael to begin investigation of that property.    During the trip to surveil the address provided by SA Suta, Sgt. Rael and Deputy Flores also stopped at a gas station in nearby Costilla, NM, and asked local residents there about Morton.    They learned that Morton and two females had recently been to the gas station along with eight children, that they were traveling in a white box truck, and that they lived in the area of Panorama Road.    Doc. 471-2.

35.     Also on May 14, 2018, Sgt. Rael and Deputy Flores spoke with a neighboring property owner who allowed them to surveil the Defendants' compound from his land.    This neighbor requested anonymity, but stated he knew Morton and knew that there was a training camp on the property for shooting guns.    This local resident stated there was so much shooting going on at the compound that the neighbors had to ask the Defendants to stop.    Doc. 471-2.

36.     Also on May 14, 2018, Sheriff Hogrefe relayed to Sgt. Rael that a local resident named Jason Badger had called the TCSO office to provide information about this case.    Sgt. Rael then interviewed Mr. Badger via cell phone.    Among other things, Mr. Badger stated a woman in Questa, NM, had told him the sheriffs were looking for Morton, which surprised Mr. Badger because he had been dealing with Morton a lot recently due to a land dispute.    Mr. Badger knew that Morton and Wahhaj were living at the compound, but the compound was mistakenly built on Mr. Badger's tract of land rather than Morton's parcel.

37.     Still on May 14, 2018, Sgt. Rael then went to Mr. Badger's house to continue the interview in person.    Mr. Badger confirmed he and his wife had seen Wahhaj and JOHN DOE at the property and that the residents also included several other children, adult females, and Morton, and that they had recently begun to shoot guns, including AR-15 rifles, regularly.    Morton told Mr. Badger that Wahhaj was the one who shoots the guns, indicating Wahhaj was still at the compound.    Mr. Badger's wife also stated Morton paid close attention to anyone who approached the compound and that JOHN DOE had always stayed with Wahhaj when she saw them previously, which had been around the time the Defendants first arrived in December 2017.    Doc. 471-2.

10

38.     Because Mr. Badger owned the property the Defendants were occupying, Mr. Badger provided TCSO consent to search the property.   *See* Ex. 6.   Mr. Badger also described that he had been negotiating for several months with Morton about a property swap because Mr. Badger initially was reluctant to evict the Defendants from his property due to the many children the Defendants had with them.   Doc. 471-2.

39.     On May 16, 2018, Sgt. Rael and Deputy Flores reported their findings from their trip to TCSO leadership, New Mexico State Police (NMSP), and New Mexico FBI agents at a meeting.   FBI Albuquerque created a profile of Wahhaj with known information, including his location on Panorama Road in Amalia.   *See* Ex. 5.   Reports of their findings were also provided to FBI SA Suta in Georgia, who passed along the information to the Clayton County, Georgia, investigating agents.   SA Suta relayed that, based on the information learned by Sgt. Rael and Deputy Flores on their trip to Costilla and Amalia on May 14, 2018, Wahhaj and the rest of the group were "almost definitely" at the compound identified in the NCMEC tip.   *See* Ex. 7.   This was echoed in a TCSO report from the time, which stated "[t]he sighting of the [box] truck and confirmation with another individual who has had personal contact with Wahhaj reaffirms that these individual [*sic*] are residing on the property."   Ex. 10 (Deputy Flores Statement).

40.     On May 17, 2018, SA Suta followed up with the CCPD investigators after speaking with the New Mexico authorities.   SA Suta stated that the New Mexico authorities intended to arrest Wahhaj, potentially through use of a SWAT team, but that the "local reports and the circumstances around Wahhaj has them all concerned," so the New Mexico authorities intended to gather additional intelligence about the compound and the residents before moving forward. The New Mexico authorities also wanted to take further steps to confirm JOHN DOE and Wahhaj were there and to draw Wahhaj from the compound to arrest him.   *See* Ex. 7.

41.     On May 23, 2018, Sgt. Rael had learned from another neighbor that Morton and Morton's wife received weekly rides from another local resident named "John" to a nearby dollar store.   John learned of Morton's group's connection to the missing JOHN DOE and confronted

Morton about it, causing Morton to become very quiet and deny involvement.   After John's confrontation of Morton, Morton set up a large pair of binoculars on a tripod at the compound and cut off all communication with anyone.   Sgt. Rael assessed that Morton was now on "high alert" and was aware that the authorities were watching him and the property.   By this time, the white box truck had not moved in 15 days and a flyover surveillance had only observed one person outside the covered area of the compound.   Sgt. Rael also assessed at this time that JOHN DOE was still on the property.   *See* Doc. 471-2; Ex. 8.

42.     For the next two to three months, TCSO, NMSP, and FBI-NM authorities worked to gather more information about the compound and its occupants, including trying to learn exactly how many people were living there and whether JOHN DOE could be seen alive or confirmed present at the compound.   These efforts included gathering aerial photos and videos and surveilling the comings and goings of residents.   The authorities also brainstormed possible ways to gather more information or gain entry to the property but did not act on many of the ideas, often due to concerns for the safety of those involved.   *See* Doc. 471-2; Ex. 8.

43.     On June 11, 2018, authorities had sent an image of a small boy observed through overhead drone footage who appeared to walk with a limp (possibly caused by having wrong-sized footwear) to Hakima to see if she could identify the boy as JOHN DOE.   Hakima responded through investigators that the boy was not JOHN DOE.   However, the FBI was going to try to find better images to facilitate another potential attempt to identify JOHN DOE.   Doc. 471-2; 471-4.

44.     Beginning from May 14, 2018—the time law enforcement had located the compound occupied by Morton, Wahhaj, the other Defendants, their children, and where the most recent (in December 2017) confirmed sighting of JOHN DOE had been—through the date of the execution of the search warrant on August 3, 2018, law enforcement authorities in New Mexico maintained regular surveillance of the compound and heard from many local residents with any knowledge of the goings on at the compound.   At no time did any law enforcement official in

New Mexico, Georgia, or anywhere else receive any credible information that Wahhaj or JOHN DOE had ever left the compound or had ever been seen anywhere other than at the compound.

**C. Another tip provides authorities the impetus to seek a search warrant to enter the property to check on the welfare of the occupants and to locate Wahhaj and JOHN DOE.**

45.     In late July 2018, possibly because they knew authorities were watching them and the compound, the Defendants had run out of food and money and were becoming desperate. They sold belongings, including a PlayStation and other items, to neighbors to raise money for food.   They then started to reach out to others for support.

46.     On July 31, 2018, CCPD Det. Porter received information that a family friend had received a Facebook Messenger communication from Subhanah.   *See* Ex. 2.

47.     On August 1, 2018, Det. Porter received screen shots of these messages.

48.     On August 2, 2018, Det. Porter spoke with TCSO Sgt. Rael, who stated TCSO had been working for the last two months to collect information to support a search warrant of the compound thought to house Wahhaj and JOHN DOE.   Det. Porter relayed the information about the messages coming from Subhanah (or possibly Hujrah via Subhanah's profile), which stated she was starving and desperately needed food and money.   Det. Porter informed Sgt. Rael that Morton was married to Subhanah, and that she and Hujrah were Wahhaj's sisters and were known to be with Morton and Wahhaj, all of which Sgt. Rael indicated he apparently had not previously known.   This additional information indicating that Wahhaj was on the property with his sisters, along with another copy of the outstanding warrant for Wahhaj's arrest, was forwarded immediately to Undersheriff Miera and Sheriff Hogrefe.   Doc. 471-2; Ex. 2.

49.     Also on August 2, 2018, CCPD investigators sent an email to the FBI that contained screen shots of the messages sent by Subhanah in which Subhanah stated she needed assistance to be saved from starvation and asked for $400.   Doc. 471-5.

13

50.     On August 2, 2018, based on the new information that persons inside the compound known to house several small children were starving, Sheriff Hogrefe drafted the search warrant now at issue.

51.     On August 3, 2018, law enforcement from the TCSO executed a search warrant on the compound in order to check on the welfare of the residents, including the many small children known to be living there, and based on probable cause to believe that Wahhaj and/or JOHN DOE were present at the compound.   As law enforcement agents first encountered Morton above ground and outside the compound near the white box truck, Morton told the agents that they should not be there and that they were "all going to get hurt, big time, I promise you."   At the time of the search warrant execution, Wahhaj and at least one of the older male children whom Wahhaj had been training in firearms tactics and skills at the compound armed themselves and were ready to defend the compound.   Doc. 471-2.   It was later learned that, before any shots were fired, Leveille instructed Wahhaj and the others to surrender.   After refusing to identify himself, Wahhaj was eventually identified, including by Hakima, and arrested on the Georgia warrant.

## **ARGUMENT**

As an initial matter, at the time of the search, the Defendants were illegally and knowingly occupying land owned by another person, Mr. Badger.   Completely lacking any property rights or the consent of the true owner of the land on which the Defendants had built their makeshift, military-style compound, the Defendants had no reasonable expectation of privacy in that compound.   Accordingly, the Defendants do not have standing to assert Fourth Amendment rights over the property of another, as they do here.   Because the true owner provided consent for the search, there is no violation of the Fourth Amendment, and the Defendants' motion fails as a matter of standing.

Even if the Court were to consider the merits of the motion, the Defendants ask the Court to take the extreme measure of invoking the exclusionary rule, pursuant to *Franks,* based on their unsupported, speculative, and trivial contentions that the search warrant affidavit contained

deliberate or reckless false statements.   The Defendants fall far short of making the threshold showing for a hearing, as required under *Franks,* and they do not even approach the high bar for exclusion of evidence.   The warrant affidavit articulated probable cause to search the premises for Wahhaj and JOHN DOE as well as to perform a welfare check on the many residents known to be residing there.   Because the vast majority of the defense-identified statements are not incorrect and should not be excluded from the probable cause determination, the warrant was properly issued.

Secondarily, Sheriff Hogrefe did not deliberately or recklessly make false or misleading statements in his search warrant affidavit.   However, to the extent any isolated statement in the affidavit could even arguably be considered inaccurate, no such statement was material to the probable cause determination.   Thus, even if every single purportedly false statement identified by the Defendants were removed, and every single omission claimed by the Defendants were included, the warrant application still easily demonstrated probable cause to search the compound for Wahhaj and JOHN DOE and to check the welfare of all of the occupants.   As such, the Defendants' motion should be denied.

Finally, the Defendants' claim that the first search warrant was overbroad and led to the illegal seizure of the firearms, ammunition, and tactical gear also fails.   The guns, ammunition, and tactical vest found on or within reach of Wahhaj at the execution of the search warrant were initially inventoried for safe keeping.   Only pursuant to a second search warrant executed three days later, which specifically authorized the search for, and seizure of, the guns and ammunition, were these items actually seized as evidence.   In addition, the guns were in plain view during the second search warrant execution and were recognizable as evidence of the crimes of kidnapping and terrorism offenses.   Accordingly, the motion fails on these grounds as well.

**I.   The Defendants Lack Standing to Challenge the Search, As They Did Not Have a Reasonable Expectation of Privacy at the Compound**

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted," such that "a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (internal citations and quotations omitted). Irrespective of the merits of the challenged search warrant, the burden is on the Defendants to establish that their own Fourth Amendment rights were violated by the search. *Id.* at 130 n.1.; *United States v. Johnson*, 584 F.3d 995, 998 (10th Cir. 2008). The Defendants do not meet that burden here.

Fourth Amendment rights rest upon a reasonable expectation of privacy in the place or thing searched, and a reasonable expectation of privacy only exists where a defendant can show (1) he had a subjective expectation of privacy in the searched property or premises, and (2) that society is prepared to recognize that expectation as reasonable or legitimate. *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *Johnson*, 584 F.3d at 999. As courts around the country have consistently made clear, the Defendants fail the second prong of this test because they had neither the legal right nor the permission of the true owner to occupy and construct their compound on the Mr. Badger's land in Amalia.

The claim that a person who has "no legal right to occupy the land and build structures on it" has a reasonable expectation of privacy there is "ludicrous," even if the structures could be construed as their "home." *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11–12 (1st Cir. 1986). For this reason, courts, including the Tenth Circuit, have made clear that illegal, unwanted, or unapproved occupants of the property of others do not have a reasonable expectation of privacy in that property, and therefore do not have standing to challenge searches of that property under the Fourth Amendment. *See, e.g.*, *United States v. Carr*, 939 F.2d 1442, 1445–46 (10th Cir. 1991) (occupant of hotel room, registered to someone else, who paid no rent and had no permission from registrant); *United States v. Ruckman*, 806 F.2d 1471, 1473–74 (10th Cir. 1986) (man who illegally lived and improved upon a cave on federal land for several months); *Amezquita*, 518 F.2d at 11–

12 (squatters who illegally set up a community on public land); *United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011) (occupant who had been evicted despite having legitimately occupied the property previously); *United States v. Whitehead*, 415 F.3d 583, 587–88 (6th Cir. 2005) (guests of squatters); *United States v. Gale*, 136 F.3d 192, 195 (D.C. Cir. 1998) (occupier of apartment without permission of its true tenant or other legal authority); *Zimmerman v. Bishop Estate*, 25 F.3d 784, 787–88 (9th Cir. 1994) (squatters and their guests).   Improvement on another's land, to include building living quarters, does not change the analysis.   *See, e.g.*, *Zimmerman*, 25 F.3d at 787–88 (explaining "improvement of the property does not give rise to a reasonable expectation of privacy when they had no legal right to occupy the land").   This the case even where a court finds a search warrant both invalid and not saved by the *Leon* good-faith exception.   *United States v. Pitshou Yunga Kafuku*, 357 F. Supp. 3d 1164, 1180–81 (D. Utah 2018).

Here, although Morton owned other land in the area, he and his codefendants occupied, and built their compound on, the wrong property.   This was well-known to the Defendants, who were told of this fact very early on by the true property owner, Mr. Badger.   Months of negotiations about possible land swaps then followed, but failed.   At no point did Mr. Badger accept rent or any other consideration for the Defendants' occupation, and there was no legal agreement of any sort that permitted the Defendants to remain on his property at the time of the search.   At most, Mr. Badger temporarily tolerated their presence because he did not want to put the many small children with the Defendants out on the street with nowhere to go.   Despite this, the Defendants continued to build upon and expand their compound.   After Mr. Badger learned in May 2018 that JOHN DOE was missing and that Wahhaj was wanted out of Georgia, Mr. Badger unequivocally revoked any semblance of permission for the Defendants to occupy his land. By June 12, 2018, Mr. Badger had already filed a civil eviction lawsuit against the Defendants, and continued to repeatedly ask TSCO and NMSP for assistance in removing the Defendants from his property.   *See* Doc. 471-2 at 6.   The Defendants were aware of these proceedings and efforts,

as Morton had spoken with law enforcement about the eviction issue and had been involved in the land title discussions with Mr. Badger.   *Id.* at 4.

Thus, at the time the search warrant was executed on August 3, 2018, the Defendants were well-aware of their lack of legal occupation at their compound, but had chosen to remain anyway. They were, in effect, squatters on someone else's property, and they knew this.   The true owner, Mr. Badger, consented to the search of his property.   *See* Ex. 6.   As in *Amezquita*, the Defendants "knew they had no colorable claim to occupy the land," and had been subject to eviction efforts by the true owner.   518 F. 2d at 11.   That they had built something resembling a home is immaterial to their lack of reasonable expectation of privacy in that home or its quasi-curtilage.   *Zimmerman*, 25 F.3d at 787–88 ("[I]mprovement of the property does not give rise to a reasonable expectation of privacy when they had no legal right to occupy the land.").   Because "society is not prepared to recognize as reasonable the expectation of privacy of an individual who unlawfully occupies a piece of property, regardless of whether it is the person's home," the Defendants' Fourth Amendment rights were not violated by the search and they do not have standing to challenge the search warrant.   *Pitshou Yunga Kafuku*, 357 F. Supp. 3d at 1181.   As such, the motion should be denied without even reaching its merits.

## II.  The State Search Warrant Sufficiently Articulated Probable Cause

The Fourth Amendment to the Constitution protects persons against unreasonable searches and seizures in their persons, houses, papers, and effects.   U.S. Const. amend IV.   To that end, a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."   *United States v. Danhauer,* 229 F.3d 1002, 1006 (10th Cir. 2000).   The determination of probable cause involves a totality of the circumstances test.   *Illinois v. Gates,* 462 U.S. 213, 238 (1983).   The review of the approving judge's issuance of a search warrant is deferential; it is to ensure that the judge had a "substantial basis" for concluding that the affidavit in support of the warrant established probable cause.   *Id.* at 236; *Massachusetts v. Upton,* 466 U.S. 727, 728 (1984) (the reviewing court should "determine

whether there is substantial evidence in the record supporting the magistrate's decision to issue a warrant."). Additionally, an issuing judge "may draw reasonable inferences from the material provided in the warrant application." *United States v. Rowland,* 145 F.3d 1194, 1205 (10th Cir. 1998).

The Supreme Court has cautioned that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." *Herring v. United States*, 555 U.S. 135, 143 (2009). Exclusion should be a court's "last resort[,]" not its "first impulse[.]" *Id.* at 140. The "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *United States v. Davis,* 564 U.S. 229, 236 (2011). While deterrence is an obvious goal of the exclusionary rule, "the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." *Id.* at 238. In order "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 147; *see also United States v. Otero,* 563 F.3d 1127, 1134 (10th Cir. 2009) (the exclusionary rule is meant to deter a "flagrant or deliberate violation of rights") (internal citations omitted).

Additionally, the Court must consider and balance the "substantial social costs" implicated by the exclusionary rule. *Davis,* 564 U.S. at 237. As the Supreme Court stated:

> Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Id.* (internal citations omitted). Therefore, application of the exclusionary rule is improper "when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements[.]" *Id.*

19

Here, Sheriff Hogrefe received reliable information through the course of a months-long joint investigation by his office, the NMSP, the Clayton County (Georgia) Police, and the FBI in both Georgia and New Mexico.   Sheriff Hogrefe's office possessed information extending back to December 2017 that Wahhaj took JOHN DOE from his mother in Georgia, went to Alabama, wrecked his car, was picked up by and was traveling with Morton in a white box truck, and that they were headed to and likely were in northern New Mexico.   By May 14, 2018, TCSO had identified the specific location where Wahhaj and JOHN DOE likely were, based in part on credible statements of neighbors who had personally seen Wahhaj and JOHN DOE there. Morton's unique white box truck, known to have driven Wahhaj withJOHN DOE to New Mexico, was conspicuously parked at that location.

All evidence, including statements from local residents about shooting of guns (which was linked specifically to Wahhaj) at the compound, and multiple identifications of a group of family members known to be with Wahhaj living at the compound, pointed to Wahhaj and JOHN DOE being located there.   Conversely, no evidence suggested Wahhaj or JOHN DOE had left or had been seen or suspected to be anywhere else.   Finally, the evidence received by TCSO on August 2, 2018, confirmed persons other than Morton, but known to be family members traveling with Wahhaj and JOHN DOE, were at the compound, and were starving.   Contrary to the Defendants' hyperbolic argument that Sheriff Hogrefe's affidavit "*provides no evidence*" of a nexus between the compound in Amalia and Wahhaj and JOHN DOE, and thus does not state probable cause for the warrant, *see* Doc. 471 at 9, a plethora of evidence, and the inferences reasonably drawn from it, firmly established a nexus between the evidence sought (the persons of JOHN DOE and Wahhaj or evidence of their location) and the compound in Amalia.

Indeed, far from "no evidence," the affidavit describes: (1) eyewitness statements obtained by TCSO Sgt. Rael and Deputy Flores that Wahhaj and JOHN DOE were in fact both seen residing at the compound; (2) descriptions by different area residents to TCSO at the gas station in Costilla of seeing Morton, two females, and eight children (all known in August 2018 by Sheriff Hogrefe

to be family travel companions of Wahhaj and JOHN DOE, *see, e.g.*, Ex. 5); (3) multiple descriptions by local residents to Sgt. Rael and Deputy Flores of compound residents driving the white box truck (4) aerial footage of the white box truck parked at the compound, where officers had consistently seen it through on-ground and aerial surveillance from May-August 2018; (5) known intentions of Wahhaj to go to New Mexico from Georgia and Alabama, provided to TCSO by FBI and State of Georgia investigations; (6) reports provided to TCSO that Wahhaj was in possession of several firearms and body armor when contacted by law enforcement at the scene of his crash in Alabama; (7) TCSO confirmation that known family member and travel companion Morton owned property adjacent to the compound and was involved in a property dispute with neighbor Jason Badger (who owned the property on which the compound was built); (8) the local resident descriptions to TCSO of regular gunfire at the compound and that Wahhaj was the one doing the shooting in the Spring of 2018; (9) reasonable concern, based on Wahhaj's known possession of firearms and body armor, that Wahhaj should not be contacted by civilians or by law enforcement alone; (10) aerial footage of a homemade shooting range at the compound; and (11) a known family member and travel companion sending messages from inside the compound pleading for help to be saved from starvation, provided to TCSO by Georgia investigators.[2]

In addition, though not explicitly stated in the affidavit, obvious reasonable inferences from the affidavit include that (1) Sheriff Hogrefe was working with many other law enforcement agencies, including the FBI and Clayton County, Georgia, authorities to collect information about Wahhaj, JOHN DOE, and the other occupants of the compound, and (2) no information was known to any of these other agencies or to TCSO that Wahhaj and/or JOHN DOE had ever been seen or

---

[2] Notably, none of this evidence includes any reference to, or reliance on, any description of JOHN DOE walking with a limp or Wahhaj being a felon.   As discussed below, these are the only two statements identified as grounds for the Defendants' *Franks* argument that may be arguably inaccurate (though certainly not deliberately or recklessly made).   However, regardless of their accuracy or the deliberateness (or lack thereof) in their inclusion in the affidavit, neither statement is material, and if excised from the affidavit the remaining evidence described above still easily satisfies the low standard of probable cause.

reported leaving the compound or sighted anywhere else besides the compound since the group's known arrival in December 2017.

The evidence in the affidavit, and the reasonable inferences that follow, also gut the Defendants' claims that the information in the affidavit was "stale" because it was not entirely learned the day before the warrant issued.   Doc. 471 at 11.   "Whether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized."   *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986).   Where an affidavit "recites facts indicating ongoing, continuous criminal activity, the passage of time becomes less critical."   *Id.* (internal quotations and citations omitted).   Indeed, contrary to the Defendants' argument, "[t]he determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant."   *United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir. 1990).

The affidavit challenged here describes investigation of ongoing criminal activity. Specifically, the kidnapping of JOHN DOE and concealment of him from his mother, extended family, and from law enforcement, the nature of which is self-evidently to lay low and not draw attention.   However, Wahhaj and JOHN DOE were both personally seen at the compound by witnesses—the only known sightings of the two since the group left the crash in Alabama. Moreover, once TCSO received the tip about the Defendants' specific location at the compound, they confirmed that information through several investigative steps the very same day—May 14, 2018.   After that date, TCSO, FBI, and NMSP authorities kept the compound under regular, multi-faceted surveillance while gathering additional information from area residents and brainstorming operational and tactical options.   *See* Exs. 7, 8; Docs. 471-2, 471-4.

There was *no evidence* or reason to believe Wahhaj or the handicapped JOHN DOE had ever left the isolated desert compound, or that they had ever gone somewhere else (in a vehicle they did not have) and inexplicably leaving the rest of the family group that had travelled together from Georgia behind.   Nobody ever had reason to think Wahhaj or JOHN DOE ever left the area.

To the contrary, TCSO knew shooting was ongoing at the compound and that Wahhaj was involved in that activity.   Doc. 471-2 at 3.   They also knew that Morton knew, due to local resident "John's" confrontation of him about the missing JOHN DOE and Morton's telling reaction, that the group was being watched.   The authorities were thus attuned to the fact that daytime activity at the compound and comings-and-goings became significantly reduced, while Morton had mounted large binoculars on a tripod to keep watch.   *Id.* at 5; Ex. 8.   Finally, authorities knew Wahhaj had fled Georgia and Alabama with Morton, and learned Wahhaj's traveling companion (and sister) was at the compound when she reached out for food or money to ward off starvation. Again, the nature of the crime being investigated, in addition to the factual context of this particular case, suggested that, where Subhanah and Morton were, so was Wahhaj; and where Wahhaj was, so was JOHN DOE.

Based on the evidence they had in May, TCSO certainly could have acted sooner, but was obviously concerned with officer safety based on Wahhaj's known possession of firearms and the military-style set up of the compound.   *See, e.g.*, Doc. 471-2; Exs. 7, 8, 9.   Although reasonable minds may differ as to the prudence of TCSO's concerns and speed of action,[3] their preparing for and trying to reduce risk in an eventual search, and their passively keeping close watch on the target location, TCSO's approach in no way renders the probable cause in the affidavit stale, especially where there is no reason to believe there had been any material change in circumstances. The law presumes common sense related to the specific factual setting to be part of the analysis of probable cause.   *Rowland*, 145 F.3d at 1205; *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972).   Conversely, the law does not require, as the Defendants wrongly suggest, a confirmed sighting of hidden contraband or evidence (such as JOHN DOE's long-dead, hidden remains) the day before a warrant application is submitted to avoid being stale.   *Williams*, 897 F.2d at 1039.

Importantly, the Defendants knew they were being watched; they knew that JOHN DOE

---

[3] Such concerns ultimately proved to be wholly warranted where Wahhaj was arrested in possession of loaded firearms, and evidence shows that he was ready to engage in a shootout with law enforcement before co-defendant Leveille instructed him not to fire.

was reported as missing and that people were trying to find him and get him back to his mother; they knew that JOHN DOE was dead and had died in their custody; and they almost certainly knew that Wahhaj was wanted in Georgia with regard to JOHN DOE's disappearance.   That Wahhaj did not openly walk about and present himself in the weeks preceding the search warrant, or that he or any other person at the compound did not openly display JOHN DOE's corpse, does not render stale the large amount of evidence of Wahhaj and JOHN DOE's presence at the compound, as articulated in the search warrant affidavit.

As described in Sheriff Hogrefe's affidavit, JOHN DOE's kidnapping, and Wahhaj and his codefendants' concealing of him at the compound, were ongoing offenses, and were of a nature that the Defendants could, and in fact did, try to hide.   As a matter of "practical considerations of everyday life" and "common sense," the probable cause for the search warrant only *increased* with each new piece of information gained between January 2 and August 2, 2018, culminating in Wahhaj's sister and known travel companion pleading for help from starvation while at the compound with several small children.   *Johnson*, 461 F.2d at 287.   Moreover, an obvious inference could have been made by the reviewing judge that, knowing through the affidavit and its attached warrant out of Georgia that Wahhaj's intent was to perform exorcisms on JOHN DOE and deny him his HIE-cause seizure medication, JOHN DOE had died, and hence would not be expected to be seen.   *Rowland*, 145 F.3d at 1205.   Accordingly, the Defendants' cited "nexus" cases and "staleness" cases are inapposite here.   Similarly, the Defendants' claims that Sheriff Hogrefe's affidavit "makes no credible effort" (Doc. 471 at 10) to establish that Wahhaj or JOHN DOE would probably be found at the compound in Amalia is quickly exposed as utterly meritless.

By August 2, 2018, Sheriff Hogrefe had more than enough probable cause to support his request to search the compound.   Although Sheriff Hogrefe likely had probable cause to seek an arrest warrant for Wahhaj, he adopted a conservative approach and limited his request to only a search warrant of the premises in combination with a welfare check on the occupants due to the evidence of starvation and the known fact that several small children were at the compound.   Of

course, the extraditable arrest warrant out of Georgia for Wahhaj, and the parallel pick-up order for JOHN DOE, attached to Sheriff Hogrefe's affidavit, made an arrest warrant unnecessary. Hence, the search warrant to seek evidence about the location of JOHN DOE and Wahhaj, based on all of the existing evidence showing that they were likely at the compound and evidence of their whereabouts would be located at the compound, easily satisfied the probable cause standard. Nothing about Sheriff Hogrefe's conduct represented a deliberate or flagrant violation of Defendant's constitutional rights.[4]   In consideration of the totality of the circumstances, the issuing state judge had abundant reason to "believe that a search would uncover contraband or evidence of criminal activity."   *Danhauer*, 229 F.3d at 1006.

## III.   Defendants Have Not Met the Threshold to Warrant a *Franks* Hearing.

The Defendants argue that the search warrant affidavit for the Defendants' compound contained recklessly false or misleading statements that warrant suppression of all evidence obtained from that search, as well as secondary searches of the compound, pursuant to *Franks*. Doc. 471.   However, under *Franks,* a defendant is only entitled to a hearing "if he makes a substantial preliminary showing that a 'false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and *if the allegedly false statement is necessary to the finding of probable cause*.' " *United States v. Small*, 299 F. Supp. 2d 1166, 1189-90 (D.Co. Oct. 22, 2002) (remanded on other grounds) (citing *Franks*, 438 U.S. at 155–56) (emphasis added); *see also United States v. Lewis*, 594 F.3d 1270, 1286–87 (10th Cir. 2010) (*Franks* hearing improper when defendant has not made requisite showing of an intentional and material false statement).   Stated another way, a defendant must demonstrate that

---

[4]   Indeed, the incongruence between the Defendants' argument in their motion to dismiss for outrageous government conduct (Doc. 476) (in which the Defendants argue the charges must be dismissed due to the claimed outrageous government conduct of taking too long in investigating and stopping the Defendants' kidnapping of JOHN DOE before it could result in his death), and the Defendants' argument in the instant motion (essentially arguing that the government moved too quickly in executing the search warrant without establishing with certainty that Wahhaj and JOHN DOE were at the compound), demonstrates the lack of merit in both defense motions.

the affidavit, "purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) (*citing United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997)).

As this Court is aware, a search warrant is presumed valid. *Franks*, 438 U.S. at 171. To overcome this presumption—indeed, merely to even secure an evidentiary hearing—"the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id.* More specifically, a defendant must make specific "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.*; *United States v. Artez*, 389 F.3d 1106, 1116 (10th Cir. 2004).

Here, the Defendants have not made a substantial preliminary showing to warrant a hearing. In an effort to meet the high standard for a *Franks* hearing, the Defendants point to nine statements in Sheriff Hogrefe's affidavit that range from speculative, to actually true, to wholly immaterial. Each of the Defendants' allegations is addressed in turn. The Defendants also identify two alleged omissions, but these too are speculative and immaterial.

Importantly, however, even if every single statement identified could survive to the third prong (materiality) and was removed (or added), the affidavit would still easily establish probable cause. This is especially the case when considering the deferential view this Court must take of the approving judge's decision and the presumption of validity, as there would still exist a "fair probability" that Wahhaj and JOHN DOE were at the compound at the time the warrant was sought. *Gates*, 462 U.S. at 238. As a result, the Defendants cannot demonstrate the affidavit "would not be sufficient to support a finding of probable cause." *Cooper*, 654 F.3d at 1128. Thus, the Defendants have not made a "substantial preliminary showing" sufficient to even trigger a *Franks* hearing, and the motion should be denied. *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).

1. <u>The Statement That Sheriff Hogrefe Became Aware of the Missing Child Bulletin on May 15, 2018.</u>

The Defendants misstate and mischaracterize the first line of the affidavit, which states "On about May 15, 2018, affiant became aware of a missing child bulletin from Clayton County, Georgia and that the child may be residing in NM with his father."   This misstating of the facts to argue something else is exactly the type of argument proscribed by *Franks*.   *Franks,* 438 U.S. at 171 (an attack on an affiant's credibility must be more than conclusory, must be accompanied by an offer of proof, and must provide affidavits or otherwise reliable statements of witnesses to support the assertion.); *see also Artez,* 389 F.3d at 1116.   To be clear, Defendants' attacks on Sheriff Hogrefe's credibility are not accompanied by an offer of proof, affidavits, or witness statements, reliable or otherwise, to support their claims.

By the plain language of this statement, it is objectively true, not misleading, and this allegation should be disregarded by the Court.   On May 14, 2018, an anonymous tip to NCMEC resulted in a lead report bulletin identifying JOHN DOE as having been seen along with his abductor, Wahhaj, and an associate, Morton, in Costilla, New Mexico.   *See* Ex. 4.

This was the first time anyone at TCSO, including Sheriff Hogrefe, had a specific address or location associated with JOHN DOE, and the first time in receiving non-speculative, actual identification of the missing boy in New Mexico.   The previous NCMEC flyer from December 2017 did not provide any location information, and the closest the information received by Sheriff Hogrefe and TCSO from CCPD or FBI Atlanta was to identifying a location was to ask TCSO to check on property owned by Morton—which TCSO did, and which was discovered to be vacant desert land (unbeknownst to investigators that the Defendants were actually residing on Mr. Badger's adjacent land).   Finally, regardless of Sheriff Hogrefe's partial knowledge of JOHN DOE's possible location in Taos County, the statement in the affidavit does not represent May 2018 was the first time Sheriff Hogrefe had ever heard of JOHN DOE's case (which, even if it did, would be completely irrelevant to probable cause on August 2, 2018, anyway).   It merely states

that, on about May 15, 2018, he "became aware of a missing child bulletin" related to JOHN DOE and Wahhaj, which is entirely accurate.   This statement does nothing for the Defendants' *Franks* claim.

2. The Statement that Area Residents Told Sgt. Rael and Deputy Flores That Persons Who Resemble Wahhaj and JOHN DOE Lived at the Compound and Drive a White Box Van.

As with the first statement, the Defendants misstate and mischaracterize this statement. The statement provides: "FLORES and Sergeant Jason Rael traveled to Costilla, NM and spoke with area residents learning that the property, while not uniquely addressed, is located on Juniper Rd near the Monte Vista Road intersection and is occupied by persons that resemble the WAHHAJ adult and child and further described they occasionally drive a white box van."

As is clear from Sgt. Rael's own report, Sheriff Hogrefe's statement is, again, entirely true and accurate.   In describing his May 14, 2018, trip to Costilla to try to locate the property referenced in the NCMEC tip, Sgt. Rael reports talking with three sets of area residents.   First, area residents at the Costilla gas station told Sgt. Rael and Deputy Flores where the compound was ("in the area of Panorama Road"), that Wahhaj associate Morton, two females, and eight children came to the gas station, and that they were traveling in a box truck.   Doc. 471-2 at 1.   Second, Sgt. Rael spoke with an area resident from whose property Sgt. Rael first observed the Defendants' compound.   This neighbor, who wished to remain anonymous, stated he was familiar with the individuals at the compound, to include Morton, whom he had personally met; that there was lots of shooting and some kind of training camp on the property; and that the occupants generally only came out of the compound at night due to "religious beliefs."   *Id.* at 2.

Finally, on May 14, 2018, Sgt. Rael also spoke on the phone and in person with Jason Badger and his wife.   Jason Badger *and* his wife are undeniably "area residents" as well, and they told Sgt. Rael where the compound was and that they had personally seen Wahhaj and JOHN DOE at the compound.   Because Mr. Badger actually owned the land the Defendants were occupying,

he was able to corroborate what the residents at the gas station had said about the white box truck, Morton, and other occupants of the compound, and to tell Sgt. Rael exactly where the property was despite it not being uniquely addressed.   *Id.* at 2–3.

Although this statement is a clear and simple summary of several investigatory acts by Sgt. Rael and Deputy Flores on May 14, 2018, the Defendants attempt to read the statement in a skewed manner to imply a nefarious purpose.   This type of purposeful misreading does not meet the threshold for a *Franks* hearing.

3. The Alleged Omission that Mr. Badger Stated He Saw Wahhaj and JOHN DOE When They First Moved to the Compound and Had Not Seem Them in a Long Time.

The Defendants quibble with another accurate statement in the affidavit stating that Mr. Badger told Sgt. Rael that Wahaj and Morton (erroneously named as "Mortensen" in the affidavit) mistakenly built their compound on the Badgers' land "around the first part of 2018."   The Defendants claim Sheriff Hogrefe "recklessly omitted" that Mr. Badger had not seen Mr. Wahhaj or JOHN DOE "in a long time."   Doc. 471 at 18.   As an initial matter, the Defendants provide nothing more than the conclusory statement that such omission was intentionally or recklessly omitted to mislead the reviewing judge.   This is far short of the required "substantial showing." *United States v. Avery*, 295 F.3d 1158, 1166 (10th Cir. 2002).   Moreover, the affidavit does reference "around the first part of 2018" as the time that the Badgers saw Wahhaj living on the compound, and the statement as a whole accurately describes the facts known to the affiant supporting probable cause.

Second, the complained-of omission is immaterial because, even if the exact information was included in the exact way the Defendants argue, the warrant would still establish probable cause.   As stated above, the nature of the offense (kidnapping and concealing of JOHN DOE) is one that does not become stale merely by the passage of time.[5]   However, as death resulting from

---

[5]  This is borne out, tragically, by the fact that JOHN DOE died shortly after the Badgers had seen him at the compound and after this, unsurprisingly, that Wahhaj likely made efforts to avoid detection and JOHN DOE was obviously never going to be seen alive by anyone ever again.

kidnapping and efforts to avoid being caught after committing a kidnapping resulting in death are, by their nature, likely aspects of such an offense, evidence such as that provided by Mr. Badger does not go stale simply because Wahhaj was able to avoid other people and the group was able to conceal JOHN DOE for a few months.   Moreover, it was known at least to Sgt. Rael that Lucas Morton had reacted suspiciously to being confronted about JOHN DOE by Morton's friend and neighbor "John," and that after that confrontation, Morton was on "high alert."   Doc. 471-2 at 5. Though not in the affidavit, Sheriff Hogrefe likely knew this information and, if so, would reasonably have considered it unremarkable and unsurprising that Wahhaj did not expose himself once Morton would have told the group that people were asking about JOHN DOE.

In any event, the fact that Mr. Badger had seen both Wahhaj and JOHN DOE at the compound, and knew Morton to be living there together with several children, was already the newest and best confirmation of Wahhaj and JOHN DOE's location that authorities had had for months in the search for the two.   Combined with all of the other evidence described in the affidavit, there was more than probable cause to be believe evidence of Wahhaj's kidnapping would be found at the compound.

Far from "vitiating" probable cause and "rendering the warrant stale," as the Defendants claim, the additional information they complain of would have had a marginal, if any, overall effect on the well-established probable cause described in the affidavit underlying the presumed-valid warrant.   *See United States v. Cordova*, 2010 U.S. Dist. LEXIS 165596 at *10-11 (D.N.M. Mar. 25, 2010) (rejecting *Franks* claim regarding omission because "perhaps [] marginally beneficial to Defendant, the omission was not vital to the judge's probable-cause determination" and Defendant had not made a substantial showing that the omission was intentional or reckless).

4. The Phrase "Documented Adult Males, Females, and Children" in Describing Surveillance of the Compound.

Next, the Defendants seize on a statement in the affidavit that the FBI's aerial surveillance "documented adult males, females, and children."   Doc. 471 at 18.   Again, the Defendants'

quibble is immaterial.   The remainder of the complained-of statement provides "none of these persons are yet identified."   Doc. 471-1 at 3.   Thus, any speculation that Sheriff Hogrefe was attempting to intentionally mislead the court is immediately dispelled, as the affidavit makes clear that it was unknown who all of the people at the compound were.

Moreover, because none of the individuals could be identified through aerial surveillance, it is not clear if Sheriff Hogrefe could have known to a certainty that all adult males observed were in fact the same person.   Given the substantial other evidence showing at least one other adult male was there (the sighting of Wahhaj, the training area and shooting complaints, connection of guns and ammunition to Wahhaj, the white box truck known to have transported Wahhaj and family), it would certainly explain Sheriff Hogrefe's statement.   Or, this other substantial evidence would erase any claim by the Defendants that Sheriff Hogrefe knew there was only one adult male at the compound but lied to say there was at least one other.   In any event, Sheriff Hogrefe's use of the plural "males" would be, at most, an insignificant, immaterial, and negligent mistake.   As such, this statement does not even warrant a *Franks* hearing, let alone suppression of any evidence.   *Franks*, 438 U.S. at 170; *United States v. Sanchez*, 725 F.3d 1243, 1247 (10th Cir. 2013) ("Not every fact recited in the warrant affidavit must necessarily be correct.") (internal quotations omitted).

### 5.   The Statement That JOHN DOE Was "Described as Having a Limp".

The Defendants next take issue with the statement in the affidavit Sheriff Hogrefe stated that JOHN DOE "is described as having a limp."   Doc. 471 at 19.   However, although it is true that JOHN DOE generally could not walk on his own, the statement in question is that JOHN DOE was "*described* as having a limp."   There is no evidence that suggests it is false that JOHN DOE was at some point described as having a limp; in fact, the opposite is true.   Although it is unclear where exactly the description came from, what is clear is that the idea that JOHN DOE was described with having a limp was part of the parlance among many investigators during the time of the investigation, as evidenced by other statements by other law enforcement officers that also

31

state that JOHN DOE was described as walking with a limp.   *See, e.g.*, Ex. 11 at 3, 7 (FBI warrant affidavits describing JOHN DOE as walking with "a limp").

This misunderstanding about JOHN DOE appears to be traceable back to December 2017. Based on FBI warrant affidavits filed in this Court in August 2018 (some of which are attached here as Exhibit 11 to illustrate), it seems that the FBI mistakenly believed Hakima described JOHN DOE as having a limp during one of her interviews with the FBI in Atlanta in December 2017. *See* Ex. 11 ("According to a statement HAKIMA provided to the FBI on December 14, 2017, . . . [JOHN DOE] was developmentally delayed, and he walked with a limp and had frequent seizures.").[6]   Although it is difficult to discern five years later where the inception of this misunderstanding was, it appears that someone in the FBI may have misconstrued from their interview with Hakima in December 2017 that JOHN DOE's many handicaps included walking with a limp.   That being the case, this idea may have been verbally passed between officers and agents at the many meetings or discussions between the Atlanta FBI, Albuquerque FBI, and the New Mexico agencies between December 2017 and August 2018.   Likewise, it also appears that JOHN DOE's "limp" remained in the vernacular used by investigators throughout this time. Indeed, Sgt. Rael noted it and made a point to describe seeing a child with a limp while watching the aerial surveillance in May or June 2018, and the description of JOHN DOE walking with a limp remained in several FBI warrant affidavits in August 2018, in addition to Sheriff Hogrefe's. *See* Ex. 11.

Regardless of the origin, the evidence shows that the "limp" was a simple mistake, maintained in the parlance of the investigation, and was not a calculated, purposeful attempt by Sheriff Hogrefe to mislead the reviewing judge to intentionally obtain an unconstitutional search warrant.   Even though the underlying fact of JOHN DOE walking with a limp was inaccurate, Sheriff Hogrefe's statement that JOHN DOE was "described" as having a limp is likely actually

---

[6] The FBI 302 documenting that December interview with Hakima does not mention Hakima stating JOHN DOE walked with a limp.

true.   The Defendants do not offer any evidence to the contrary, and certainly do not make a substantial showing that Sheriff Hogrefe intentionally or recklessly made the statement knowing it was false.   Thus, the Defendants are not entitled to a *Franks* hearing.

Finally, notwithstanding the above, even if this statement was removed from the affidavit, the remainder of the affidavit would still demonstrate probable cause.   Whether or not JOHN DOE had a limp, or whether any reference to his ability to walk was made, there were still credible reports of JOHN DOE being at the compound with Wahhaj, clear evidence that Morton and his white box truck were at the compound, and, as described above, several reasonable inferences from that evidence to be made that JOHN DOE was either dead or being concealed at the compound.   Removing the statement about JOHN DOE being described as having a limp does not affect the probable cause for the search warrant, and for this reason as well, the Defendants are not entitled to a *Franks* hearing.

     6.   <u>The Omission that JOHN DOE's Mother Had Stated the Child Seen on Aerial Surveillance Was Not JOHN DOE.</u>

The Defendants next take issue with a purported omission that Hakima had told the FBI that the limping boy seen in the aerial surveillance was not JOHN DOE.   However, this is not an omission because it is not material to the overall probable cause demonstrated in the affidavit.   As described above, whether JOHN DOE had a limp or did not, and whether the boy seen in the surveillance in early summer 2018 (months after JOHN DOE had died) was not JOHN DOE, is immaterial to whether there was probable cause to believe, based on all of the other evidence provided, that evidence of the kidnapping of JOHN DOE and Wahhaj's whereabouts would be found at the Amalia compound.

TCSO and Sheriff Hogrefe in particular knew that many small children were living at the compound, that JOHN DOE had been seen at the compound along with Wahhaj, that he was likely being denied his medication and was being concealed, and that Wahhaj's family and travel companions were also known to be at the compound.   Indeed, adding in the fact that Hakima said

the surveillance photo of the boy was not JOHN DOE makes no difference to the overall review of the affidavit.

Nor have the Defendants made a substantial showing that the omission was intentionally or recklessly taken to mislead the reviewing judge.   As explained above, based on the mistaken understanding of JOHN DOE's disability at the time, Sheriff Hogrefe may have honestly and in good faith believed that JOHN DOE may have been alive and may have been able to walk with a limp.   This is evident in Sgt. Rael's recounting that, in response to Hakima's negative identification, the FBI was going to try to "find better video" for her to review.   Doc. 471-2 at 5. Though possibly a mistake in matching streams of information regarding JOHN DOE's disability from various sources, this does not amount to an intentional and material omission warranting the extraordinary relief sought by the Defendants.   *Franks*, 438 U.S. at 170.   Thus, for these failures to meet the *Franks* requirements of materiality and substantial showing of intentional or reckless misleading, the Defendants are not entitled to a *Franks* hearing on this ground either.   *Cordova*, 2010 U.S. Dist. LEXIS 165596 at *10-11.

7.   The Statement that a Female Inside the Compound Was Asking for Help Because the Family Was Starving.

The Defendants further argue that Sheriff Hogrefe intentionally or recklessly misled the reviewing judge by stating that, on August 2, 2018 (the day Sheriff Hogrefe submitted the search warrant request and affidavit), CCPD Detective Porter "stated he was provided photographs of what appeared to be text or instant messages regarding one of the females asking for help, stating the family was starving and needed money and food."   Doc. 471-1.   Apparently, the Defendants believe this was a material and intentionally false statement because the text messages themselves—sent from Subhanah's Facebook account to a friend—say "I am desperately in need of $400 in order to save myself from starvation," rather than "we" and "us."   Doc. 471 at 22.

This argument fails for several reasons.   First, Sheriff Hogrefe's statement in the affidavit is very likely correct, as it says, "Det. Porter stated he was provided photographs of . . . messages,"

and does not say "I looked at text messages."   It is entirely reasonable that Det. Porter relayed what is an obvious inference that Subhanah, while asking her own friend for money, was really operating for the benefit, if not entirely on behalf, of the whole family.   Indeed, Det. Porter's own notes suggest as much, as he himself uses the exact same wording in characterizing the messages as stating in part that "the family was starving."   *Compare* Ex. 2 at 6 *to* Doc. 471-1 at 3 (describing the messages as stating "the family was starving"); *see also* Doc. 471-2 at 7 (Sgt. Rael reporting that "through social media" Det. Porter "found out the kids were starving" and that Det. Porter stated the messages showed "the family is in danger" and "they are starving").   Thus, the most likely course of events is that Det. Porter informed TCSO Sgt. Rael and Det. Armijo about the messages—likely including the reasonable inference that the family was starving, and not just Subhanah while the rest of the family feasted on a bounty of food at the ramshackle compound—and those officers relayed that information in this way to Sheriff Hogrefe, who was immediately acting on the information by drafting the search warrant request and affidavit.

Second, and regardless of whether the information was passed to Sheriff Hogrefe with the inference already made, Sheriff Hogrefe's statement in the affidavit is, on its own, a reasonable inference.   Had the statement read as the Defendants claim it should have, a reviewing judge would have been able to, and surely would, make the same obvious inference.   Such an inference is proper, and in no way renders the statement false, let alone intentionally false and material to the overall probable cause determination.   *Rowland,* 145 F.3d at 1205.

The Defendants' contention that the truth was that *only* Subhanah was starving at the tire, dirt, and trash-built compound in the desolate empty shrubland, while the rest of the family was fine (and apparently keeping food from her), *and* that Sheriff Hogrefe knew this but instead intentionally changed the statement to mislead the reviewing judge into believing probable cause existed when he knew it did not, is absurd.   The Defendants have made no showing that this is the case, let alone a substantial showing, and this (actually true) statement utterly fails to warrant a *Franks* hearing.

8.   The Omission that the Search Warrant Was Sought After Hakima Ramzi Stated an
     Intention to Travel to New Mexico.

The Defendants next claim that Sheriff Hogrefe intentionally or recklessly omitted that he

only began drafting the search warrant request after learning Hakima was coming to New Mexico

and was frustrated with the authorities' investigation of her missing son.   Broken down, the

Defendants' contention appears to be that: (1) Sheriff Hogrefe knew he did not have probable

cause to search the compound, (2) he lied about the meaning of Subhanah's text messages pleading

for money and food in his sworn affidavit, (3) so he could mislead the state court into issuing an

unconstitutional warrant, (4) all because someone must have told him Hakima was mad about

TCSO's investigation (despite no evidence Sheriff Hogrefe actually was told this), and (5) he was

so scared of her that he requested the warrant to preemptively appease her, knowing it was an

unconstitutional warrant.

The facial absurdity of this argument scarcely requires a response.   Suffice it to say, there

is no evidence that Sheriff Hogrefe was even aware of Hakima's feelings or travel plans.   The

Defendants simply imagine that Sgt. Rael or another TCSO agent told Sheriff Hogrefe this fact

(and further imagine that this fact alone truly stood out and motivated Sheriff Hogrefe's drafting

of the warrant application, rather than the inside reports of starvation and desperation at the

compound).   The Defendants base this imagined conversation on Sgt. Rael's indication in his

report that he briefed Undersheriff Miera about his in-depth conversation with Det. Porter, which

included reference to Hakima's travel plans.   However, that conversation was mainly about

Subhanah's messages pleading for help, Wahhaj's active warrant out of Georgia, and whether the

reports of starvation at the compound supported a welfare-check as an additional basis for a search

warrant.   Doc. 471-2 at 7.   This level of abstract speculation by the Defendants is far from a

substantial showing of intentional and material omission by Sheriff Hogrefe.

In addition, the allegedly omitted "fact" of Hakima's possible travel intentions (she never

did actually travel to New Mexico at that time) is facially irrelevant to the probable cause otherwise

demonstrated in the affidavit; adding the statement has no impact on the affidavit's probable cause showing.   Even if, hypothetically, Sheriff Hogrefe requested the search warrant solely because he was afraid of Hakima traveling to New Mexico to be upset with him, this still would not change the outcome of the warrant application, as the affidavit establishes probable cause regardless of the motivation for filing it.   As such, the "omission" is not material, even if it was a true fact known to Sheriff Hogrefe that he intentionally left out (which there is no evidence to support). Thus, this omission in no way warrants a *Franks* hearing, let alone exclusionary relief.   *Cordova*, 2010 U.S. Dist. LEXIS 165596 at *10-11.

> 9.   The Statement Referring to Wahhaj as a Wanted "Felon" Rather than "Fugitive."

Finally, the Defendants take issue with the statement in the affidavit that there was cause for "law enforcement to enter and search the property for the missing child, the wanted felon, and to check the welfare of any persons/children that may be present."   Doc. 471-1 at 3.   This description of Wahhaj as a wanted "felon," unlike the previous allegedly false statements and alleged omissions, is indeed factually incorrect.   However, like the other allegedly false statements and omissions, this statement is immaterial to a probable cause determination.

The Defendants' repetitive conclusory statements that Sheriff Hogrefe made this statement with knowledge and reckless disregard do not substitute for credible or evidence-based allegations. Indeed, there is no evidence that Sheriff Hogrefe intentionally misstated Wahhaj's status.   Rather, he refers to Wahhaj as the person wanted out of Georgia, and most likely meant to refer to him as a "wanted fugitive," rather than "felon."   The affidavit first refers to Wahhaj (correctly) as "a wanted fugitive from Georgia."   *Id.* at 2.   The affidavit also describes Wahhaj's background and characteristics without referencing any felony convictions.   *Id.*

Quite clearly, the "felon" reference constitutes an accidental, negligent misstatement, not an intentional or recklessly misleading one.   However, even if the word "felon" is removed, the fact remains that Wahhaj was indeed "wanted."   There is no evidence that Sheriff Hogrefe intentionally once misstated Wahhaj's status as a "wanted felon" instead of a "wanted fugitive."

Indeed, there is no good reason why he would do so, since it makes no difference to the ultimate determination of probable cause.   Sheriff Hogrefe included the active Georgia arrest warrant as an attachment to his search warrant application.   *See* Doc. 471-1 at 6-7.   There is no dispute that the arrest warrant was active and valid.   In the end, it makes no difference whether Wahhaj was a "wanted felon," a "wanted fugitive," or was simply "wanted."   "Not every fact recited in the warrant affidavit must necessarily be correct," *Sanchez*, 725 F.3d at 1247, and "negligence or innocent mistakes are insufficient to justify the exclusion of evidence," *United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010).   Thus, this immaterial statement, though incorrect, also does not warrant a *Franks* hearing, let alone exclusion of evidence.

## IV.   In Any Event, the Good Faith Doctrine Applies.

Even if the Court finds that the state district court judge somehow erred in her determination of probable cause on the TCSO search warrant, which she did not, the evidence obtained as a result of the warrant would still be admissible under the good faith exception to the warrant clause.   When an officer acts in good faith in reliance on a warrant issued by a magistrate, the exclusionary rule does not apply since its application would not serve the rule's purpose of deterring police from conducting searches without probable cause.   *United States v. Leon,* 468 U.S. 897, 913 (1984).   In determining whether to apply the good faith exception, "the 'inquiry is confined to the objectively ascertainable question of whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Corral-Corral,* 899 F.2d 927, 932 (10th Cir. 1990) (*quoting Leon*, 468 U.S. at 922 n.23). In *Corral-Corral*, the court held "[a]lthough [the officer's] affidavit was not a model of specificity, we do not believe it was so lacking in probable cause as to render official belief in its existence entirely unreasonable."   899 F.2d at 934.   "In reviewing suppression motions, courts have the discretion to proceed directly to an analysis of the good-faith exception without first addressing the underlying Fourth Amendment question."   *Danhauer,* 229 F.3d at 1005.

Ultimately, without even considering the underlying Fourth Amendment questions here, the affidavit at issue is "not so lacking in indicia of probable cause that the executing officer should have known the search was illegal despite the state magistrate's authorization."   *Danhauer,* 229 F.3d at 1007 (*citing Leon,* 468 U.S. at 922 n.23).   This is true even if every statement complained of by the Defendants is excised, and every omission claimed by the Defendants is added (which, to be clear, is absolutely not warranted).

Thus, any error that may have occurred here by the New Mexico district judge in her approval of the warrant should not result in suppression, as it does not meet the high bar for exclusion and Sheriff Hogrefe reasonably relied on the issuance of the warrant.   That is, a natural reading of the affidavit provides sufficient indicators of probable cause that a crime was either occurring, evidence of a crime would be found, or a welfare check was required at the target premises.   *See Gates*, 462 U.S. at 236 (*quoting United States v. Ventresca*, 380 U.S. 102, 109 (1965) (holding that in a probable cause review, "courts should not invalidate . . . warrants [by interpreting affidavits] in a hyper technical, rather than a commonsense, manner.')).   Here, Sheriff Hogrefe received information of varying specificity over the course of many months from multiple sources within and without TCSO, conducted a reasonable (if arguably slow or burdened by the threat of danger to officers posed by Wahhaj (*but see* note 2, above)) investigation that corroborated and supplemented the information received, documented his office's findings in an affidavit, and presented the information to a neutral judicial officer.

By all accounts, the obvious trigger to Sheriff Hogrefe's application was the credible reports received from CCPD Det. Porter that people inside the compound were starving and desperate, combined with the well-known facts that several children were at the compound (regardless of whether one of them was JOHN DOE or not, though certainly buttressed by belief at the time that JOHN DOE was at the compound and could possibly have still been alive).   Not only did this new information create separate adequate grounds for the search warrant—to perform a welfare check on the woman who was starving and the children known to be with her—but it

added a new sense of urgency to TCSO's actions.   As with any investigation, reasonable minds may differ about the adequacy, quality, or expediency of TCSO's investigation into the missing JOHN DOE and the wanted Wahhaj up to that point, but nothing about the investigation suggests that exclusion of all evidence found at the compound (including JOHN DOE's remains) would serve any deterrent value.

As explained in detail above, most of the complained-of statements or omissions by Sheriff Hogrefe were actually true or were correct or reasonable recitations of what Sheriff Hogrefe learned from others and reasonably relied upon, while the remainder (such as once referring to Wahhaj as a "felon") were immaterial mistakes made during what was by all accounts a swift drafting of the warrant request after learning of starvation on the compound on August 2, 2018. Suppressing the evidence would not further the purposes of the exclusionary rule because Sheriff Hogrefe had no reason to believe that the warrant should not have been issued.   The exclusionary rule is not meant to discourage law enforcement from truthfully obtaining warrants from a reviewing judge; rather, it is to encourage the use of the warrant process so that the determination is made by the judge.   Here, the affidavit was not lacking in probable cause so as to render the officer's belief in its validity objectively unreasonable.

**V.    The Firearms Were Initially Stored for Inventory and Safekeeping and Were Not Seized Pursuant to the First Warrant, May Have Been Seized Pursuant to the Second Warrant, and Were Plain View Evidence of a Crime**

The Defendants also contest the seizure of the many firearms and hundreds of rounds of ammunition from the compound, essentially on the grounds that the August 3, 2018, warrant did not authorize such seizure, or, if it did, was not sufficiently particularized.   Doc. 471 at 31–38. The Defendants' arguments attacking the search warrant are misplaced and do not even need to be addressed on the merits, as the Defendants wrongly assert that the guns and ammunition were seized pursuant to the challenged search warrant.   In fact, the firearms and ammunition were not "seized" pursuant to the first warrant.

The Defendants conspicuously excise the return for the warrant they claim in their motion was overbroad.   This return makes clear that the guns and ammunition discovered on Wahhaj's person and in his presence at the time of his arrest (on a valid outstanding arrest warrant) were held for inventory and "for safe keeping."   Ex. 12 (TCSO "Return and Inventory").   These guns, ammunition, and the tactical vest stuffed with loaded AR-15 rifle magazines were not discovered as part of an improper "investigative, rather than administrative" motive; they were on Wahhaj's person or in his presence when he was arrested while obviously preparing and intending to violently resist that arrest.   *United States v. Tueller*, 349 F.3d 1239, 1242 (10th Cir. 2003) (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)); *see also, e.g.*, Doc. 471-6 at 3 (describing weapons and ammunition found on or near Wahhaj at arrest); Ex. 13.   Collection of the guns for safe keeping was thus entirely proper and does not implicate the Fourth Amendment.   *Wells*, 495 U.S. at 4 ("Inventory procedures serve to protect an owner's property while it is in the custody or the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.") (quotations and citations omitted).

Moreover, two days later, a New Mexico district judge approved a second, particularized search warrant (the "second search warrant").   *See* Ex. 13.   This warrant was executed on August 6, 2018, after authorities were unable to find JOHN DOE or his remains during the execution of the first search warrant.   It was based on new information obtained from several sources, including interviews of most of the compound residents suggesting JOHN DOE was at the compound and that something had happened to him.   *Id.*   The warrant specifically sought evidence related to the crimes of "child abuse and/or neglect, homicide, or death by natural cause or another cause of death," particularly including "[a]ny weapons capable of causing death or great bodily injury likely to cause death or dismemberment."   *Id.*   Sheriff Hogrefe's affidavit for the second search warrant shows that TCSO knew JOHN DOE was dead at the compound somewhere, that a cause of death was unclear and required investigation, and that the well-armed Wahhaj had at least played a role in the continued concealment of JOHN DOE from law enforcement, if not some role in his death.

41

*Id.*   Several additional guns and ammunition were found and seized pursuant to the second search warrant.   *See* Ex. 13.   Thus, seizure of all weapons and ammunition from the compound, including the items initially kept for inventory and safe keeping, was clearly and properly authorized by the second search warrant.   This should be the end of the analysis with regard to the firearm and ammunition evidence, and the Defendants' motion should be denied.[7]

Finally, even if the second warrant did not exist, the firearms and ammunition were properly seized as evidence in plain view of the Defendants' commission of the offenses of kidnapping resulting in death of JOHN DOE and, when combined with additional evidence in plain view and gathered from other occupants of the compound, material support for terrorism and conspiracy to murder an officer or employee of the United States.   For months, the many agencies involved in investigating JOHN DOE's abduction were aware of, and concerned with, Wahhaj and his known possession of several weapons and tactical gear.   This knowledge buttressed the already-reasonable assumption that kidnapping resulting in death is an offense that often involves weapons to further the concealment of the victim (which was indeed the case here, as TCSO was aware), keep a victim in the custody and control of the kidnapper(s), or do harm to a kidnaped victim.

Moreover, during the second search warrant execution, law enforcement discovered the full extent to which the compound was built to military-style specifications for armed defense, what amounted to 580 rounds of various types of ammunition, and a notebook in plain view describing "Phases of a Terrorist Attack."   Exs. 9, 14.   Thus, the firearm evidence was "plain view" evidence, the "incriminating character" of which was "immediately apparent" to offenses like material support for terrorism, and could have reasonably been seized even without a warrant.   *See*

---

[7] For the same reasons articulated above with regard to the first search warrant, even if for some reason the second search warrant was insufficient and improperly issued by the state district judge, the evidence obtained pursuant to the second search warrant would also not be excludable because TCSO's execution of that search was based on a good-faith reliance on the warrant.   In addition, the evidence would also not be excludable because the weapons and ammunition would have inevitably been discovered through the TCSO's warranted search for JOHN DOE.

*United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014).

## **CONCLUSION**

For the foregoing reasons, the Court should find that a *Franks* hearing is unwarranted, and it should deny Defendants' motion to suppress evidence in its entirety.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

***Electronically filed December 30, 2022***
TAVO HALL
KIM BRAWLEY
Assistant United States Attorneys
P. O. Box 607
Albuquerque, NM 87103
(505) 224-1484

I HEREBY CERTIFY that the foregoing pleading was electronically filed, which caused counsel of record to be served by electronic means.   A copy of this pleading was also mailed to Lucas Morton at his address of record.

*/s/*
TAVO HALL