IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18-CR-02945 WJ |
| vs. | ) | |
| | ) | |
| **JANY LEVEILLE, ET AL.,** | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' RESPONSE
TO DEFENDANTS' MOTION TO DISMISS COUNT FIVE**

The United States submits this response in opposition to Defendants' Motion to Dismiss Count Five (Doc. 555). Defendants' motion is without merit and should be denied.

I. **Factual and Procedural Background.**

On March 13, 2019, the Grand Jury returned a seven-count superseding indictment against all five Defendants. Count Five of this indictment alleges that Defendant Jany Leveille, being an alien illegal and unlawfully in the United States, knowingly possessed, in and affecting commerce, firearms and ammunition, and that Defendants Siraj Ibn Wahhaj, Hujrah Wahhaj, Subhanah Wahhaj, and Lucas Morton aided and abetted her in doing so, all in violation of violation of 18 U.S.C. § 922(g)(5). (Doc. 85 at 7-8.) Count Five incorporates allegations that, among other things:

- The Defendants traveled from the State of Georgia to the State of New Mexico with firearms and ammunition, (Doc. 85 at 3);

- Subhanah Wahhaj provided financial support to her co-conspirators, (Doc. 85 at 4);

- The Defendants built and maintained a compound comprised of materials such as a wooden frame, a trailer, plastic tarp, and a tire wall and that they stored firearms and ammunition in the compound, (Doc. 85 at 4);

- The Defendants built a firing range on the compound and dug an underground tunnel leading away from the compound, (Doc. 85 at 4);

- The Defendants possessed and shot firearms on the compound, (Doc. 85 at 4-5);

- Jany Leveille and Lucas Morton solicited one of the Wahhajes' relatives to join the group in New Mexico, bring money and firearms, and to die as a martyr, (Doc. 85 at 5); and

- Siraj Wahhaj and Lucas Morton trained persons, including other occupants of the compound, in firearms use and tactical maneuvers and instructed them to be prepared to engage in jihad, to die as martyrs, and to engage in violent acts, including the killing of federal employees, officials, and military personnel, (Doc. 85 at 5).

## II. Discussion

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008) (*Heller*), the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. at 635.  The Court cautioned, however, that the right to keep and bear arms "is not unlimited" and the right remains subject to "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, ___ U.S. ____, 142 S.Ct. 2111 (2002) (*Bruen*), the Court again considered the meaning of the Second Amendment, this time in connection with a New York licensing scheme which allowed authorities to deny concealed carry permits even to those who met threshold criteria.  In so doing, the Court directed lower courts to ask two questions when evaluating what limitations Congress can impose on citizens' Second Amendment rights.  First, a court must consider whether "the Second Amendment's plain text covers an individual's conduct," and if it does, then whether "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30.  In that scenario, "the government must then justify its regulation by demonstrating that it is consistent with this

Nation's historical tradition of firearm regulation." *Id.* "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

Here, under the avenues of inquiry outlined in *Bruen*, Section 922(g)(5) remains a permissible restriction on firearms possession unencumbered by the Second Amendment. As discussed below, under *Bruen*'s first line of inquiry, unlawful noncitizens do not fall within the textual purview of the Second Amendment, and, even if they did, Section 922(g)(5) would still be constitutionally permissible because, under *Bruen*'s second line of inquiry, the statute is consistent with historical regulation of firearms in the United States.

    **A.**    **Following *Bruen*, the Possession of Firearms by Unlawful Non-Citizens Is Not Protected Under the Plain Text of the Second Amendment.**

The first step of *Bruen*'s two-step framework—an analysis of whether the challenged law regulates activity falling within the text of the Second Amendment—is "broadly consistent with *Heller*." 142 S. Ct. at 2127. To date, every court of appeals to consider Section 922(g)(5)'s constitutionality under *Heller* has held the statute to be constitutional. *See*, *e.g.*, *United States v. Perez*, 6 F.4th 448 (2d Cir. 2021); *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015); *United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012); *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011). Thus, to the extent that the Court can find Section 922(g)(5) consistent with *Heller*, it can do so under *Bruen* as well. More specifically, under binding Tenth Circuit precedent, this Court should find that the plain text of the Second Amendment does not invalidate Section 922(g)(5), given Jany Leveille's status as an unlawful non-citizen, and, citizenship questions aside, given her non-law-abiding conduct.

3

First, under the reasoning of *Bruen*, the Second Amendment's plain text does not cover the conduct of unlawful non-citizens like Jany Leveille. The Second Amendment, by its terms, protects "the right of the people to keep and bear Arms." U.S. Const. amend. II.  In *Bruen*, the Supreme Court repeatedly interpreted the phrase "the people" as limited to protecting of the rights of "Americans," or even more precisely—in a phrase the *Bruen* majority used at least a half-dozen times—the rights of "law-abiding citizens."  *See Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.") (*citing Heller*, 554 U.S. at 581); *see also id*. at 2122 (explaining that in *Heller*, the Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id*. at 2131 ("The Second Amendment . . . surely elevates above all other interests the right of law-abiding, responsible citizens to use arms"); *id*. at 2133 (describing historical inquiry called for under *Bruen* as a consideration of "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id*. at 2134 ("It is undisputed that petitioners —two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."); *id.* at 2138 ("law-abiding citizens"); *id.* at 2156 (characterizing the right to bear arms as belonging to "law-abiding, responsible citizens"); *id.* at 2161 (Alito, J., concurring) ("*Heller* correctly recognized that the Second Amendment codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun.").

As alleged in the Superseding Indictment, Jany Leveille is not an American citizen and, by virtue of her undocumented status, is also not law-abiding.  Under *Bruen*'s definition of the Second Amendment's plain text—and as numerous other federal courts of appeal have

4

recognized—defendant's possession of a firearm is therefore constitutionally unprotected. *See, e.g., United States v. Jimenez-Shilon*, 34 F.4th 1042, 1043-47 (11th Cir. 2022) (holding that illegal aliens are not among "the people" protected by the Second Amendment); *Perez*, 6 F.4th at 456 (rejecting Second Amendment challenge to Section 922(g)(5)(A) and noting that "Perez does not dispute that he has continuously failed to be 'law abiding' by remaining in this country without authorization"); *Carpio-Leon*, 701 F.3d at 978 (noting *Heller*'s use of the term "Americans" frequently connects arms-bearing and "citizenship"); *Huitron-Guizar*, 678 F.3d at 1168 (stating that "although the [*Heller*] Court did not face the question before us, it is not exactly reading between the lines to note how frequently the opinion connected arms-bearing and citizenship" and noting the reference to "Americans" is a "signal example" of "connecting citizenship and the right to bear arms."); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) ("the protections of the Second Amendment do not extend to aliens illegally present in this country"); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States."); *cf. United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) (rejecting challenge to Section 922(g)(5)(B) and noting that "those unlawfully present . . . are neither citizens nor members of the political community").

Other courts, including the Tenth Circuit, have assumed, without deciding, that "the people" in the Second Amendment includes non-citizens. *See United States v. Perez*, 6 F.4th 448 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1133 (2022); *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012); *United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022). Only the Seventh Circuit, in *United States v. Meza-Rodriguez*, 798 F.3d at 672, has held that the Second Amendment protects a right of the

5

nation's undocumented residents to bear arms. However, like every other circuit that has considered the issue, even it ultimately held that the government may permissibly restrict that right. Win, lose, or draw, all of these cases were decided before *Bruen*. As noted, *Bruen* emphasized again and again that the scope of the Second Amendment extended only to "Americans" and "law-abiding citizens," a clear indication that the Second Amendment's use of the phrase "the people" excludes unlawful non-citizens like Leveille.

Further, even if "the people" to which the Second Amendment affords rights included non-citizens, *Bruen*'s emphasis that the Second Amendment protects only the rights of "law-abiding" and "responsible" individuals makes clear that the Second Amendment does not afford rights to non-citizens who are not in the country legally. *See Bruen*, 142 S. Ct. at 2122, 2131, 2133-34, 2138, 2156, 2161. Where Jany Leveille has been neither "law-abiding" nor "responsible"—as reflected both her undocumented status and her leadership in a kidnapping and a jihadist conspiracy—*Bruen* provides her no Second Amendment refuge.

No Tenth Circuit opinion post-*Bruen* addresses the rights of foreign nationals unlawfully in the United States. In *Huitron-Guizar*, however, the Tenth Circuit addressed a Second Amendment challenge under guidance provided by *Heller*. Without deciding whether aliens were among "the people" for Second Amendment purposes, the Tenth Circuit rejected the defendant's Second Amendment challenge, instead deferring to Congress in its

> . . . determination that illegal aliens, already in probable present violation of the law, simply do not receive the full panoply of constitutional rights enjoyed by law-abiding citizens. Or that such individuals, largely outside the formal system of registration, employment, and identification, are harder to trace and more likely to assume a false identity. Or Congress may have concluded that those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them.

*Huitron-Guizar*, 678 F.3d at 1170; *see also Meza-Rodriguez*, 798 F.3d at 673 (while non-citizens are among "the people" the Second Amendment covers, "aliens who . . . are illegally or unlawfully in the United States" are "presumptively risky" and may be prohibited from possessing firearms). This reasoning is consistent with *Bruen*'s emphasis that the Second Amendment only extends its protections to those who are "law-abiding."

Ultimately, Defendants' motion simply ignores the fact that under Supreme Court and Tenth Circuit precedent, the Second Amendment does not presumptively protect the possession of firearms by the unlawful. Defendants focus instead on whether illegal aliens come within the purview of "the people," as that phrase is used in the Second Amendment. But in doing so, Defendants evade entirely the question as to whether "the people" includes aliens who are not "law abiding." Jany Leveille clearly was not "law abiding" in that she was not in the United States lawfully, was not lawfully in possession of a firearm, and was part of a kidnapping and a jihadist conspiracy. As *Heller* and *Bruen* make clear, the Second Amendment is not absolute. *See Heller*, 554 U.S. at 595 (recognizing limits on the Second Amendment and stating, "we do not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation"); *Bruen*, 142 S. Ct. at 2157 (explaining *Bruen* did not "disturb[] anything that we said in *Heller* . . . about restrictions that may be imposed on the possession or carrying of guns") ( Alito, J. concurring); *Bruen*, 142 S. Ct. at 2157, 2162 (explaining *Bruen* does not disturb "presumptively lawful regulatory measures and "longstanding prohibitions on the possession of firearms by felons and the mentally ill[,]" classes given as examples) (Roberts, C.J., Kavanaugh, J., concurring).

Because Jany Leveille was not a law-abiding citizen, her conduct (and the statutes that criminalize it) falls outside the scope of the plain text of the Second Amendment. On that basis,

7

this Court should join every other court to have considered the Defendants' argument and deny the motion to dismiss Count Five.

### B. Section 922(g)(5)(A) Is Consistent with Historical Precedent.

Even if this Court were to conclude that the Second Amendment covers Jany Leveille's conduct, Defendants still cannot prevail on their *Bruen*-based argument. Under *Bruen*, even where the plain text of the Second Amendment applies, the government may justify a challenged restriction by showing "that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. Where Section 922(g)(5) is in keeping with this nation's historical traditions, this Court should not declare it unconstitutional.

*Bruen* contemplated two avenues of historical inquiry. The first, applied in *Bruen* itself, is what the Supreme Court described as a "straightforward historical inquiry" which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." 142 S. Ct. at 2131. The second avenue of inquiry *Bruen* directed, is by "historical analogy." *Id*. at 2132. *Bruen* recognized that "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Where there is no such straightforward correspondence (as was the case with the blanket restrictions on gun possession by law-abiding citizens at issue in *Heller* and *Bruen*), *Bruen* directed courts to consider "historical analogies" to the challenged law to determine whether it resembles constitutionally accepted restrictions. *Id.* Under either avenue of inquiry, Defendants' challenge to Section 922(g)(5) fails.

### 1. Section 922(g)(5)(A) is consistent with the relevant historical practice around firearms regulation.

Section 922(g)(5)(A) is consistent with and similar to relevant historical practice around firearms regulation. The historical record supports the conclusion that the Second Amendment was understood to extend the right to bear arms only to citizens—and, indeed, only to specific categories of citizens—at the time of its ratification.

Under the English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," the right to keep and bear arms was expressly limited to "Subjects." *Heller*, 554 U.S. at 593 (quoting Bill of Rights 1689, 1 W. & M., ch. 2, § 7, Eng. Stat. at Large 441); *see id*. ("By the time of the founding, the right to keep and bear arms had become fundamental for English subjects."). And in colonial America,

> [T]he right to keep and bear arms "did not extend to all New World residents." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1996). While "[a]lien men . . . could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998).

*Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (footnotes omitted). The Eleventh Circuit in *Jimenez-Shilon*, 34 F.4th at 1047-48, looked to the English Declaration of Rights and English Common Law in assessing the pre-constitutional history of the right to bear arms, similarly concluding that aliens enjoyed no such right:

> The individual right to bear arms enshrined in the English Declaration of Rights—which "has long been understood to be the predecessor to our Second Amendment"—was not made "available to the whole population." *Heller*, 554 U.S. at 593, 128 S.Ct. 2783. Instead, it was limited to the "Subjects which are Protestants, ... suitable to their Conditions, and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689). We have found no historical evidence indicating that aliens shared this fundamental right with either natural-born Brits or denizens (who might be thought of as naturalized British subjects), both of whose

9

>relationships to the sovereign mirrored that of American "citizens." Indeed, the right to own guns in eighteenth-century England was statutorily restricted to the landed gentry. *See*, *e.g.*, Patrick J. Charles, *Armed in America* 51, 58 (2018); Giles Jacob, *A New Law Dictionary* (1750) (unpaginated), reprinted in *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 300 (Neil H. Cogan ed., 2d ed. 2015). And the English common law simultaneously made it such that "aliens [were] incapacitated to hold lands." *Bayard v. Singleton*, 1 N.C. 5, 9 (1787) *1047 (emphasis omitted); *see Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321, 323–24, 2 L.Ed. 634 (1808); *Blackstone*, *supra*, at *372.

*See also Carpio-Leon*, 701 F.3d at 980 ("In England, the right to bear arms allowed the government to disarm those it considered disloyal or dangerous."). Accordingly, colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the citizenry who swore allegiance to the United States. For instance, Massachusetts and Virginia forbade the arming of Native Americans, *see Malcolm*, *supra*, at 140, and Virginia also prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession," *see* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007).

Similarly, during the American Revolution, colonial governments disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); *see id*. at 506 nn.128-129 (collecting statutes); *see generally* Churchill, *supra* at 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance."). And during the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion," while delegates urged

the Massachusetts convention to propose a similar amendment guaranteeing "peaceable citizens" the right to keep arms. 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681, 761 (1971); *see Heller*, 554 U.S. at 604 (considering ratification conventions' proposals). Accordingly, "State constitutions in the early republic continued a similar practice by restricting the right to keep and bear arms to citizens." *Perez*, 6 F.4th at 462-63, *citing Churchill*, *supra*, at 159-60.  There is no question but that illegal immigrants have not taken any oath of allegiance.

The Founding era sources on which courts have relied in defining the contours of Second Amendment, such as the Bill of Rights, make clear that the Founders understood the right to bear arms as being connected with citizenship and membership in and preservation of the political community.  *See McDonald*, 561 U.S. at 769-70 ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them.") (*quoting* 3 J. Story, 3038 Commentaries on the Constitution of the United States § 1890, p. 746 (1833)).

In addition, the Second Amendment is connected to the concept of "a well organized militia."  However, "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service."  *Heller*, 554 U.S. at 628. *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining the history that "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia" (quotation marks omitted)); *Jimenez-Shilon*, 34 F.4th at 1047-48 (describing history of "disarmament of groups associated with foreign elements," including "on the ground of alienage" (quotation marks omitted)). There was no suggestion that any states were viewed at the time as lacking the authority to exclude non-citizens from the right to bear arms.

*See Bruen*, 142 S. Ct. at 2133 (where there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can assume it settled" that those prohibitions are "consistent with the Second Amendment").

In sum, Section 922(g)(5)(A) disarms non-citizens who are unlawfully present in the United States. It does not "burden a law-abiding citizen's right to armed self-defense" in a manner inconsistent with historical precedent. *Bruen*, 142 S. Ct. at 2133 (emphasis added). Instead, the statute fits squarely within a historical tradition that limited Second Amendment rights to particular classes of law-abiding citizens. Jany Leveille is not part of this class.

### 2. Section 922(g)(5)(A) is sufficiently analogous to historic exclusions to firearms possession.

Defendants also argue that the government cannot meet its burden to establish the requisite historical tradition because "the federal government did not have laws restricting entry into the country until the late 19th Century." Doc. 555 at 8. This argument ignores *Bruen*'s direction to apply analogous historical precedents. Even if Section 922(g)(5) were not expressly derivative of the historic exclusions described above (and the government maintains that it is), the statute is still sufficiently analogous to early gun restrictions to support the conclusion that the possession of firearms by unlawful non-citizens is not part of this country's historical tradition and is therefore unprotected under the Second Amendment.

*Bruen*'s call for analogical reasoning requires only that the government identify a well-established and representative historical analogue, not "a historical twin." 142 S. Ct. at 2133. So even if a modern-day regulation is not identical to historical precursors, it still may be analogous enough to pass constitutional muster. While immigration is hardly a new phenomenon, illegal immigration is essentially a phenomenon that began in the late 19th century. *See United States v. Muñoz-De La O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892, at *1 (E.D. Wash. Feb. 18, 2022)

12

("The federal government first forayed into the realm of immigration legislation during the 1870s. One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years.") (citing Supreme Court cases that upheld the exclusion law on the basis that illegal immigrants could be removed at any time); *see also* U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/overview-of-inshistory/early-american-immigration-policies (July 30, 2020) ("Americans encouraged relatively free and open immigration during the 18th and early 19th centuries, and rarely questioned that policy until the late 1800s."). When viewed in light of the colonial restrictions on firearms, the laws prohibiting illegal immigrants from bearing arms that followed close on the heels of the existence of illegal immigrants suggest a long-standing understanding that the Second Amendment does not extend to such individuals.

Defendant's argument also poses the issue in a misleading and inflammatory manner. Section 922(g)(5)(A) plainly does not prohibit firearm possession by all immigrants, nor is to be construed as rooted in racism or xenophobia. Rather, it simply prohibits immigrants "illegally or unlawfully in the United States" from shipping, transporting, possessing, or receiving any firearm or ammunition in or affecting interstate or foreign commerce. 18 U.S.C. § 922(g)(5)(A). While immigration was present in the 18th century, the relevant phenomenon of illegal immigration is one of more recent provenance than the Second Amendment, such that a restriction geared to illegal immigrants in the 18th century would not exist. Therefore, courts must look to analogous firearms restrictions during the time of the Second Amendment.

The *Bruen* Court recognized that courts should be mindful of changing societal conditions in evaluating how closely a challenged regulation must conform to historical precedent. "While the historical analogies here and in *Heller* are relatively simple to draw, other

cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132.  Given that illegal immigration is an issue that substantially postdates the Second Amendment, the Government need not identify "a dead ringer for historical precursors," but rather must identify only "a well-established and representative historical analogue." *Id.*  The Government has done precisely that here, pointing to laws barring Native Americans, Catholics, and Loyalists, as well as others who did not take an oath of allegiance, from bearing arms.  While many of these classifications may be abhorrent and of course would be unconstitutional today under other constitutional provisions, *see Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d Cir. 2021) (quotation marks omitted), they nevertheless show that the right to bear arms was understood to be subject to the government's limitation of that right to those within the political community, i.e., law-abiding citizens.  Defendant Jany Leveille, whether judged against contemporary norms or the norms prevailing at the time of the Founders, is clearly not a law-abiding citizen.

In sum, even if this Court were to find that Defendant Jany Leveille, as a non-law-abiding and undocumented non-citizen, is among "the people" to whom the Second Amendment guarantees the right to bear arms, Section 922(g)(5)(A)'s prohibition on the possession of firearms by undocumented immigrants like her is consistent with, and analogous to, this Nation's historical practice of denying the right to possess firearms by those deemed outside the political community.  As such, Section 922(g)(5)(A) is not an unconstitutional violation of the Second Amendment, and the Defendants' arguments fail.

## CONCLUSION

WHEREFORE, the government respectfully requests that this Court deny Defendants' Motion to Dismiss Count Five.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically filed January 17, 2023*
KIMBERLY A. BRAWLEY and
TAVO HALL
Assistant United States Attorneys
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

CERTIFICATE OF SERVICE

I certify the foregoing was filed via CM/ECF on January 17, 2023, causing a copy to be served on counsel for the Defendants, and that a copy was mailed to Defendant Lucas Morton.

*Electronically filed*
KIMBERLY A. BRAWLEY
Assistant United States Attorney