IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 18-CR-02945 WJ |
| vs. | ) | |
| | ) | |
| JANY LEVEILLE, | ) | |
| SIRAJ IBN WAHHAJ, | ) | |
| HUJRAH WAHHAJ, | ) | |
| SUBHANAH WAHHAJ, and | ) | |
| LUCAS MORTON | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' COMBINED RESPONSE TO DEFENDANTS SIRAJ, HUJRAH, AND SUBHANAH WAHHAJ'S MOTIONS TO SEVER CASES AND SUBHANAH WAHHAJ'S MOTION TO SEVER COUNT 3**

Defendants Siraj Wahhaj, Subhanah Wahhaj, and Hujrah Wahhaj ("the Defendants") have separately filed motions to sever their cases from their codefendants.  Docs. 598, 609, 635.  In addition, Defendant Subhanah Wahhaj has filed a motion to sever Count 3 of the indictment for a separate trial.  Doc. 608.  Because all of these motions involve essentially the same legal considerations of judicial efficiency and resources, risks of inconsistent verdicts, harm to certain witnesses that would come from having to testify about the same facts multiple times, a common set of operative facts, a lack of prejudice to any of the Defendants for being tried together, and other, similar considerations implicated by Federal Rule of Criminal Procedure 14, the United States combines its response to these four motions into a single response.

Applying the applicable law regarding severance of defendants or counts for separate trials, the Defendants' motions are without merit and should be denied.

# I.    FACTUAL BACKGROUND

The following facts are contained in the discovery provided to the Defendants and/or in expected testimony of witnesses.

1.      JOHN DOE was the biological child of Defendant Siraj Ibn Wahhaj and his wife by lawful marriage, Hakima Ramzi.

2.      JOHN DOE was born with Hypoxic Ischemic Encephalopathy (HIE) resulting in cerebral palsy and epilepsy, among other disabilities.  As a result of this condition, JOHN DOE was developmentally delayed and required heightened care and medication to prevent his seizures.

3.      For the first three years of his life, JOHN DOE lived with his mother, Hakima, who was his primary caregiver and who ensured JOHN DOE received his anti-seizure medication and the constant medical and home care needed to keep JOHN DOE alive and well.

3.      Defendant Siraj Wahhaj has two sisters, Defendants Subhanah Wahhaj and Hujrah Wahhaj.  Hujrah Wahhaj has one child.  Subhanah Wahhaj has four children and is married to Defendant Lucas Morton.

4.      Siraj Wahhaj was involved in a relationship with Defendant Jany Leveille.  Leveille is a citizen of Haiti currently residing in the United States without a current immigration status.  According to the U.S. Immigration and Customs Enforcement, Department of Homeland Security, Leveille is an alien and has been living in the United States unlawfully since in or about December 1998.  According to Hakima and others, Siraj Wahhaj considers Leveille to be his second, "Islamic" wife.  Leveille has six children, the youngest four being with Siraj Wahhaj.

5.      Both Hujrah Wahhaj and Siraj Wahhaj traveled to London in October 2017 in order learn how to do an exorcism, or "ruqyah."  Pursuant to a federal search warrant, a physical search

of Siraj Wahhaj's mobile phone showed that he viewed content on the practice of ruqyah, including a link to one YouTube video titled: "Ruqyah For Illness, Evil Eye, Magic, Envy."

6.      Leveille became pregnant around the same time that Hakima became pregnant with JOHN DOE.  Leveille's pregnancy soon failed.  In or about November and December 2017, in Georgia, Leveille formed the belief that Hakima became pregnant only by engaging in "black magic" that resulted in Leveille's baby being transferred from Leveille into Hakima's womb. Leveille understood Hakima to be barren and claimed that JOHN DOE was her child.

7.      Leveille later formed the belief that JOHN DOE was actually born dead but, through "black magic," Hakima caused demons to enter JOHN DOE's body.  These demons caused JOHN DOE to move such that he appeared to be alive.  Leveille also claimed that her step-mother-in-law, Jamila Jihad (Siraj, Hujrah, and Subhanah's stepmother), was also practicing black magic and trying to injure or harm Leveille, Siraj, Subhanah, and Hujrah.

8.      Due to Siraj's legal marriage to Hakima, and Jamila Jihad's support of that marriage, Siraj could not legally marry Leveille.  As a result, Leveille was unable to use a marriage to Siraj as a means to adjust her immigration status as long as Siraj remained legally married to Hakima.  Leveille resented Hakima and Jamila Jihad for this.

9.       Hujrah, Subhanah, and Siraj Wahhaj believed, claimed to believe, or went along with Leveille's claims, including, among others, her claims about JOHN DOE, black magic, and the demons in his body.  They reinforced these ideas amongst each other and to their children.  As a group, they used Leveille's claims, including among others, the narrative of black magic and demons, as an excuse to conduct JOHN DOE's kidnapping, to conduct the exorcisms that killed JOHN DOE, and to go disappear to New Mexico.

10.     Hujrah Wahhaj and Subhanah Wahhaj lived in the Atlanta, Georgia, area in late 2017, along with Siraj Wahhaj and Jany Leveille, who lived together in a house.  Hakima Ramzi, Siraj Wahhaj's wife, also lived in the Atlanta area, but lived separately in an extended stay motel room with JOHN DOE.

11.     Leveille claimed she received messages and directions from God.  Leveille claimed she received these messages in Georgia and after she left Georgia in December 2017 en route to New Mexico.  Siraj, Subhanah, Hujrah, and Lucas Morton, and others also claimed to receive messages from God but Leveille alone claimed to be able to translate them.  According to Leveille, the messages came from God to the Archangel Gabriel and the Archangel Gabriel communicated them to Leveille, who then communicated the messages to other members of the group.

10.     These messages sometimes took the form of orders and directives, which Leveille relayed to Siraj, Subhanah, Hujrah, and Morton, and which Leveille expected them to follow lest they suffer the wrath of Allah.  Leveille recorded these messages, including in handwritten letters to Subhanah, Siraj, Morton, and Hujrah, as well as in journals, books, or testaments that she drafted along with the help of Subhanah and Hujrah, who edited the writings.  Several letters were addressed to Subhanah and Morton and expressed encouragement to follow Leveille's orders and directives, as well as threats of damnation for them not taking Leveille's commandments seriously.

11.     The testamentary journals or books were intended in part to be scripture or guidebooks for her co-conspirators, including the other Defendants in this case, to read and follow. The journals or books, divided into three volumes, were found on a thumb drive which was located in what was believed to be Leveille's purse.  They were also on a computer used by Leveille, Hujrah and Subhanah.  The Defendants attempted to follow all of the commands and laws in

Leveille's journals or books and considered them religious testaments with descriptions of miracles and acts of God, with Leveille as the prophet delivering Allah's messages.

12.     Also on this computer were memoir-type books written by Hujrah and Subhanah. Evidence obtained in the investigation of this case indicates that Hujrah and Subhanah helped edit Leveille's testament books.  Hujrah and Subhanah also had written their own memoir-type books, which were saved on this computer, and Subhanah had established an LLC in Georgia to provide editing and self-publishing advice to aspiring authors.  Also on this computer were remnants of videos of concealed handgun shooting techniques and sniper positioning and tactics, photos of mass shooting victims or massacred bodies, as well as parts of the "Phases of a Terrorist Attack" instructions that were also found handwritten in a notebook in one of the tunnels below the compound.

13.     In or about November and December 2017, before Leveille and the others left Georgia, Leveille directed Siraj to take JOHN DOE and bring him to her.  Siraj did this by telling Hakima that he wanted to take JOHN DOE to the park.  When he did not return JOHN DOE to her care, Hakima called Siraj every day to have JOHN DOE returned.  Hakima even went, accompanied by a local police officer, to the house where Siraj lived with Leveille in order to ask them to return JOHN DOE to her.

14.     During this period, Leveille also "ordered" Siraj to "recite the Quran on [JOHN DOE]."  Though Hakima called every day to have JOHN DOE returned and Leveille planned to have JOHN DOE returned, each day God told her to keep JOHN DOE one more day. According to Leveille, Leveille asked God whether she could return JOHN DOE and God said "no."  Leveille had no prior caregiving relationship with JOHN DOE, which Siraj, Subhanah, and Hujrah knew. Consistent with and in support of Leveille's contention that JOHN DOE was actually her child,

Siraj refused to give JOHN DOE back and closed the door on Hakima and the Georgia police officer.  Hujrah was aware of this and observed Hakima's attempt to retrieve her disabled son. Believing, or claiming to believe, the proclaimation that JOHN DOE was Leveille's son stolen through Hakima's black magic, Hujrah and Siraj agreed to steal away to land Siraj owned in Alabama, where Subhanah and Morton had recently gone, and to conceal and take JOHN DOE with them.

15.     In early December 2017, Leveille, Siraj, and Hujrah took JOHN DOE along with their other children in Leveille's vehicle and drove from Georgia to Alabama.  Although the group left many of their personal belongings behind as they made their getaway, Siraj also packed several handguns, rifles, tactical gear, and several hundred rounds of ammunition in the car with Leveille and the children.  Hujrah separately packed and brought a handgun of her own;  Subhanah provided a large amount of money to support the group's plans once they arrived in Alabama and left for New Mexico.

16.     Leveille explained that she wanted to take JOHN DOE to Alabama and later to New Mexico to perform exorcisms on him and to cast the demons from his body.  Leveille and Siraj intentionally deprived JOHN DOE of his anti-seizure medication based on their conviction that the medication caused demons to enter JOHN DOE's body.  Hujrah, Subhanah, and Morton observed these exorcisms, the effects they had on JOHN DOE, and the deprivation of JOHN DOE's life-saving medication.  Hujrah, Subhanah, and Morton received or were aware of repeated desperate requests by Hakima and others to return JOHN DOE to them.  At no point in the approximately ten months' time that JOHN DOE's mother and extended family desperately searched for him until authorities found his decaying body buried in a tunnel underneath the

Defendants' compound in New Mexico did Leveille, Hujrah, Subhanah, Siraj, or Morton provide any information on JOHN DOE's location to anyone searching for him.

17.     Leveille, Wahhaj, Morton, Hujrah, Subhanah, and their respective children, including JOHN DOE, stayed in Alabama for approximately two weeks before leaving Alabama to go to New Mexico.

18.     During the first week of December 2017, Siraj, Hujrah, and Subhanah's family and others made numerous social media communications pleading for the return of JOHN DOE and advertising his disappearance on public platforms.  These communications stressed that JOHN DOE was in danger without his mother and daily medication.  The Defendants, including Hujrah and Subhanah Wahhaj, were aware of these communications and pleadings from their families, friends, and community members.

19.     On December 5, 2017, Cameron Jackson sent Siraj Wahhaj a SMS message.  Mr. Jackson identified himself as being from the Department of Family and Children's Services.  He stated, "We received a concern concerning your child and are looking to meet with you and see the child if possible."

20.     On December 13, 2017, while en route from Alabama to New Mexico, the Defendants crashed a silver 2004 Ford Explorer bearing Georgia license plate RGE8599 in Alabama.  The vehicle was registered to Leveille.  There were nine people in the vehicle at the time of the accident: two adults and seven juveniles, including JOHN DOE.  At the time of the accident, Siraj Wahhaj was in possession of five firearms, including handguns and a semi-automatic AR-15 rifle, a bullet-proof vest, a tactical vest filled with rifle magazines in magazine pouches, and a bag of ammunition.  Siraj Wahhaj was extremely worried about retaining possession of his firearms and gear when first responders came to help clear the wreckage from

the highway.  Siraj Wahhaj also provided several false statements to the responding Alabama State

Trooper about his address, his employment, and his employer's website.  Morton arrived in a large

white box truck and helped Siraj Wahhaj remove the firearms and tactical gear from the crashed

vehicle.

21.     After the crash, Morton drove the entire group of the Defendants and their children,

as well as the missing JOHN DOE, from Alabama to New Mexico in his distinctive white Ford

box truck.  They established in New Mexico a compound that included dirt-filled berms

constructed from rubber tires, a system of underground tunnels and caves, and a firing range and

tactical training area.

22.     In late December 2017, during the performance of an exorcism session by Siraj

Wahhaj, JOHN DOE choked and "white slime" came out of his mouth, and then JOHN DOE's

heart stopped and JOHN DOE died.  According to Leveille's own written account, JOHN DOE

died on or about December 24, 2017, under circumstances similar to those described by

eyewitnesses.  At least some of the Defendants instructed the children not to talk to anyone about

JOHN DOE ever being at the compound because they would all go to jail.  Upon their arrests,

Defendants Morton, Hujrah, Subhanah, and Leveille all denied having ever seen JOHN DOE since

they moved to New Mexico and gave other false and misleading accounts of JOHN DOE's

whereabouts.

23.     Videos found on cell phones seized pursuant to search warrants show Siraj Wahhaj

and Leveille performing prayer rituals on at least two of the other children (not JOHN DOE).  One

of the children complained that she was scared and was choked during one of these rituals.

24.      On December 31, 2017, Morton appeared in Forest Park, Georgia, to attempt to

convince Wahhaj's brother Muhammad to join the group in New Mexico.   Morton gave

Muhammad a letter written by Leveille that stated, in part, "take all your money out the bank and bring your guns," that he could "die as a martyr . . . by joining the righteous (us)," and that he could "meet Isa also here in about 4 months."[1]  Clayton County Police then arrived to speak with Morton about Wahhaj or JOHN DOE's location, but Morton denied any knowledge of their whereabouts.  Although Morton was warned that withholding information about the missing JOHN DOE could be punishable by law, he refused to provide any information about where JOHN DOE might be and soon after left the premises in Georgia.

25.     On January 5, 2018, Subhanah received a text message from a friend, which reported: "Subhanah everyone is looking for you guys.  You [sic] dad put up a post yesterday asking anyone who knows about you and you siblings, spouses and children whereabouts to contact authorities."

26.     After JOHN DOE's death, Leveille told the group that, as Isa, he would direct the group to corrupt institutions, including FBI, military, and United States Government offices, to confront them with their interpretation of Islam and Leveille's status as a prophet.  If those confronted rejected Allah or did not do whatever the group and Isa told them to do, Siraj and Morton, along with the eldest male children in the group who had been training for such occasions at their compound, would shoot or kill those people or imprison them.  Siraj Wahhaj and some of the children referred to this plan as jihad.

27.     On January 7, 2018, Subhanah responded on her Facebook page to several similar posts from various family members, including Siraj Wahhaj, Sr. (Defendants Subhanah, Hujrah, and Siraj Jr.'s father), who had been pleading for the Defendants to bring JOHN DOE back and

---

[1] "Isa" is the Islamic name for Jesus, and approximately four months from that time was Easter. Essentially, Leveille was predicting JOHN DOE's rising as Jesus on Easter, after which, according to other evidence discovered after the Defendants' arrest, JOHN DOE (as the risen Isa) would direct jihad to be waged by the Defendants and some of their children.

for anyone with information as to JOHN DOE's whereabouts to contact authorities.  In her post, Subhanah rejected the posts, calling the statements that JOHN DOE was missing "lies" and claiming there was "no need to worry."  Subhanah foreshadowed, "Inshah Allah, Allah will bring all this to light soon."  According to Leveille and others, JOHN DOE had been dead for approximately two weeks.

28.     Wahhaj was well-trained in firearms and military tactics and instructed Leveille's children and others in firearms and military tactics, including tactical reloads, disarmament techniques, clearing buildings, rapid reloads, and hand-to-hand combat.  Numerous videos of these training sessions were found on cell phones recovered from the defendants.  At least one of these videos shows a child firing a pistol at a target from a moving motorcycle.  At least one local resident stated to law enforcement in May of 2017 that there was so much shooting going on at the compound that the neighbors had to ask the Defendants to stop because it was disturbing.

29.     During this period, Leveille wrote in her testament edited by Subhanah and Hujrah, "Wahhaj has been instructing a lot and he was not there for the snow, so brother Luqman has to do it . . . for Wahhaj, Allah is referring to already sending the message that the boys are in training . . . ."  A text message dated March 29, 2018, and found on one of the cell phones indicates that Leveille prohibited hunting of animals, indicating that the firearms were not intended for hunting.

30.     According to a witness, Siraj Wahhaj wanted to get an army together and train them to conduct "jihad."  This witness explained that jihad meant to kill people for Allah.  During their training, this witness saw Leveille, Subhanah, and Hujrah train with a gun once and each fire a gun at least once at the compound.  Another witness stated that after "Isa" woke up, the men would "go to war."

31.     All of the Defendants worked together to build up their compound in the form of a defensive stronghold.  The compound was on a high plateau with an open field of view in all directions, including miles of the only road leading to the only entrance to the property.  It would take between five and ten minutes for any approaching vehicle to reach the compound from the point of first visible detection from the compound.  Dirt-filled tire barriers blocked vehicle access to the compound from approximately 30 yards down the road leading to the compound.  The compound was almost entirely surrounded by five- or six-foot dirt-filled tire walls, which would be impervious to handgun and rifle ammunition.  At the front of the compound were additional one-foot-thick mud or dirt walls of various heights that were topped with broken glass to prevent breaching of the compound over the walls.  Access to the compound required switchbacks through gaps in the tire walls, which were narrow such that any entrance to the compound would be slow and cumbersome.  Within the compound were additional interior walls that created an inner defensible perimeter.  These walls also had narrow alley-type walkways that made quick entrance from the outside difficult.  Large mounds of dirt were also constructed at various locations around the compound as additional obstructions.  A large plastic covering concealed from above the main living area, which consisted of a sunken-in camper trailer.  A system of underground tunnels, which included underground rooms and storage areas, lead from the central living area to "spider hole" escape routes at which firearms and ammunition were positioned.  In short, nearly every aspect of the compound, from the choice of geographic location to its construction characteristics and the underground tunnel system and "spider hole" escape routes, was specifically researched and designed to minimize detection by authorities and maximize a defensible position of advantage and escape.

32.     On February 15, 2018, Leveille texted her brother, stating, among other things, "He [Allah] will throw fear into the heart of the shayateen [demons] who will want to say no n will smite their necks n their fingers . . . . He will kill the kaffir [infidels] in the people u will ask for permission because they do that only to oppose Allah and I.  And Allah is severe in punishment. They will taste it n will have the torment of the Fire."

33.     On February 18, 2018, Leveille texted her brother, stating, "I was chosen. I am the ot[h]er Maryam [Mary] mother of Jesus coming back.  He coming back as a child like the last one n will grow up.  He will raise dead while a child likr mom n dad."

34.     In late July 2018, the group had run out of food and money and were becoming desperate.  They sold belongings, including a PlayStation and other items, to neighbors to raise money for food.  However, every Defendant remained committed to keeping their location hidden from anyone, such as family, friends, and law enforcement, that they knew were looking for them. They also began speaking of and preparing for the imminent resurrection of Isa.

35.     On August 2, 2018, Leveille texted her brother, "7 more days."

36.     On August 4, 2018, Leveille texted her brother, "IA [in sha'allah [God willing]] JOHN DOE comes on Monday n it's all over . . . I think Monday may be the day iA."

37.     Also on August 2, 2018, CCPD investigators sent an email to the FBI that contained screen shots of messages sent by Subhanah Wahhaj in which Subhanah asked for $400 from a friend.  In these messages, Subhanah implored the friend that it was "extremely important that you DO NOT by any means contact anyone, especially my family members in regards to me contacting you."

38.     According to a witness's account, the people at the compound were supposed to shoot the police when they came.  The witness stated the men were practicing shooting because

they were going to go to war.  Wahhaj said he really wanted to go to war.  Leveille said they should practice shooting because God will definitely help them in war.  The men would go to war after JOHN DOE woke up.

39.    On August 3, 2018, the Taos County Sheriff's Office executed a search warrant at the Defendants' compound.  As law enforcement agents first encountered Morton above ground and outside the compound near the white box truck, Morton told the agents that they should not be there and that they were "all going to get hurt, big time, I promise you."  At the time of the search warrant execution, Siraj Wahhaj and at least one of the older male children whom Siraj Wahhaj had been training in firearms tactics and skills at the compound armed themselves and were ready to defend the compound.  It was later learned that, before any shots were fired, Leveille instructed Siraj Wahhaj and the others to surrender, and the others obeyed her instructions.

## II.    LAW AND ARGUMENT

### I.    Neither Severance of Defendants Nor Severance of Charges Are Appropriate in This Case

#### A. All of the Considerations Under *Zafiro* and Rule 14(a) Lean Strongly in Favor of Continued Joinder, as this Court Has Already Concluded in this Case

The Defendants seek severance of their cases or counts pursuant to *Zafiro v. United States*, 506 U.S. 534 (1993) and Federal Rule of Criminal Procedure 14(a).  *See* Docs. 598 at 1; 608 at 1; 609 at 1; 635 at 1, 3.  However, under *Zafiro*, its progeny, and the considerations required by Rule 14(a), the balance weighs heavily against any severance of any Defendant or any Count of the Indictment.

As a starting point, a joint trial in this case, with its single set of facts and witnesses applicable to all five Defendants' charges in the shared indictment, is the "strong[ly] presum[ed]" default.  *United States v. Zar*, 790 F.3d 1036, 1043 (10th Cir. 2015).  Joint trials of defendants who are indicted together are preferred, because "they promote efficiency and serve the interests of

justice by avoiding the scandal and inequity of inconsistent verdicts*." United States v. Hall*, 473 F.3d 1295, 1301-02 (10th Cir. 2007) (quoting *Zafiro*, 506 U.S. at 537).   Joint trials are also preferred where, as is the case here, "the government plans to recite a single factual history, put on a single array of evidence, and call a single group of witnesses." *United States v. Cortes-Gomez*, 926 F.3d 699, 705 (10th Cir. 2019) (internal quotations and citations omitted).   However, under Fed. R. Crim. P. 14(a), a court may order separate trials if joinder appears to prejudice a defendant. *See Zafiro*, 506 U.S. at 538 (using Rule 14 as the standard for a severance); *United States v. Cox*, 934 F.2d 1114, 1119 (10th Cir. 1991) (applying Rule 14 to set the standard for severance).

The decision to sever is "within the sound discretion of the trial court," *Cox*, 934 F.2d at 1119, and thus a defendant "must bear a heavy burden of showing real prejudice to his case." *United States v. McConnell*, 749 F.2d 1441, 1444 (10th Cir. 1984). ]Given this heavy burden, a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by a joint trial. *Cummings v. Evans*, 161 F.3d, 610, 619 (10th Cir. 1998).   As a result, the prejudice standard envisioned by Rule 14 requires a showing of actual prejudice, not merely a showing that a defendant "may have a better chance of acquittal in separate trials." *United States v. Pursley*, 474 F.3d 757, 766 (10th Cir. 2007).

To establish prejudice, a defendant must show that there is a serious risk that a joint trial would compromise a specific trial right of a properly joined defendant or prevent the jury from making a reliable judgment about guilt or innocence.   *Pursley*, 474 F.3d at 766 (quoting *Zafiro*, 506 U.S. at 539).   Importantly, Rule 14 does not require severance even if prejudice is shown; rather, the rule "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39.   Thus, even if a defendant can show some actual prejudice, the trial court may "weigh the prejudice to a particular defendant caused by joinder against the

obviously important considerations of economy and expedition in judicial administration." *United States v. Peveto*, 881 F.2d 884, 857 (10th Cir. 1989).

Ultimately, a trial court that denies a request for severance will be reversed only where a defendant demonstrates an abuse of discretion. *See Pursley*, 474 F.3d at 765. Here, no Defendant has shown any such prejudice, as the "obviously important considerations of economy and expedition in judicial administration" are buttressed by the similarly clear and weighty facts that the government will call a single group of witnesses to describe a single factual history through a single array of evidence to prove overlapping conspiracies in which all five Defendants participated with each other, even if they were not all charged with all conspiracies. *See United States v. Tranakos*, 911 F.2d 1422, 1426 (10th Cir. 1990) (explaining joint trials are preferred where defendants are charged in same conspiracy).

Yet another important reason to try the Defendants jointly in this case is the fact that the trial will require testimony from the same witnesses to prove each Defendant's charges. Included in this single group of witnesses are children who experienced traumatic and upsetting treatment and events at the hands of the Defendants (who also happen to be members of their own family). Also included is JOHN DOE's mother, who would be forced to recount her months of terror and desperate searching for her only child and her tragic discovery of his death, again and again and again. *See Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (warning against the impairment of "both the efficiency and the fairness of the criminal justice system" in holding separate trials "presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying").

Importantly, this Court has already analyzed this law and applied it to this case when previously denying severance of Siraj Wahhaj's case. *See* Doc. 250 at 6, 13-15. There, the Court

analyzed *Zafiro* and its progeny and Rule 14(a) in construing Siraj Wahhaj's motion to lift the stay of proceedings as speedy trial and severance requests.   On the question of severance, this Court explained:

> At the very least, holding a separate trial for Defendant would be enormously inefficient.  Defendant was involved in the conspiracy alleged in the Superseding Indictment from start to finish. Critically, his involvement in the conspiracy was inextricably intertwined with the involvement of the other co-conspirators.   Severing Defendant from trials of his co-defendants would result in two virtually identical trials in terms of witnesses and evidence, would amount to a waste of judicial resources, and could even lead to the possibility of conflicting and irreconcilable verdicts."

Doc. 250 at 6.  In analyzing severance of Siraj Wahhaj's under Rule 14, this Court went on to find that he and his co-Defendants have been properly joined and that a trial in this case "will involve a common set of operative facts relevant to the defendants' conspiracy with respect to those facts." Accordingly, the Court found that a "[j]oint trial of the defendants in this case is both proper and necessary, and will promote economy and efficiency and avoid multiplicity of trials without causing substantial prejudice to the right of the defendants to a fair trial.  *Id.* at 14-15 (quotations and citations omitted).

Nothing has changed with respect for Siraj Wahhaj in his renewed motion.  *See* Doc. 635. As such, his motion appears to be an unwarranted motion for reconsideration, as it does not identify any new facts, new law, or clear error in the Court's previous ruling.  Rather, it raises an argument claiming prejudice for being tried alongside his co-conspirators facing additional kidnapping charges—an argument that could have been raised in the first severance motion but was not.  Thus, it should be denied.  Regardless, his motion, like that of his co-Defendants Subhanah and Hujrah Wahhaj, again fails in the face of the many weighty reasons for proceeding in this case as a joint trial—a conclusion this Court has already made in detail.

In their several motions for severance, the Defendants mostly take issue with their own characterizations of the weight of evidence against them as grounds for why they should not be tried jointly with their co-Defendants. *See, e.g.*, Docs. 598 at 2-3; 608 at 2; 609 at 3. The Defendants then take positions that, because some of them are charged with offenses that others are not, they are per se prejudiced by a joint trial. *See, e.g.*, Doc. 635 at 5 (claiming that Siraj Wahhaj would be prejudiced by having to "sit while evidence of the alleged kidnapping of AG and his eventual death was introduced"). Neither of these lines of argument approaches the required showing of actual prejudice such that it would overcome the strong presumption of joint trials and the myriad factual reasons why severance of any of the Defendants or charges would, as this Court previously put it, be "enormously inefficient" and "a waste of judicial resources" with the possibility of "conflicting and irreconcilable verdicts." Doc. 250 at 6.

As this Court has already noted, the factual narrative of the events giving rise to the charges in this case involve the same five Defendants performing acts that are part of the same conspiracies and the substantive offenses they are charged with. Siraj Wahhaj's participation in the kidnapping and killing of JOHN DOE, for example, is a necessary part of the factual underpinning of the material support for terrorism and gun possession charges, regardless of whether federal law provides him with immunity from being charged with kidnapping. That is why this Court previously noted that his conduct is "inextricably intertwined" with that of his co-Defendants in the overlapping charged conspiracies.

The same is true for Subhanah and Hujrah Wahhaj's arguments. They, too, were knowingly and willfully involved in taking JOHN DOE from Georgia to New Mexico and concealing him in New Mexico from his mother. Tthey too participated extensively and knowingly in the scheme to steal and conceal JOHN DOE and to support the group's training and

plans for jihad after JOHN DOE was resurrected.  They were intimately involved in the construction of the idea of Jany Leveille as the "prophet" leader of their group.  In addition, the firearms and tactical training was so extensive that neighbors in the rural area had to ask them to stop.  If even the young children in the group knew the purpose of the tactical training and the plan when JOHN DOE resurrected, Subhanah and Hujrah certainly knew.  The idea that they alone were sitting, unaware of what was going on, helping Leveille with her testament but oblivious to what it said and meant, is absurd—but ultimately that is for the jury to decide.  Suffice it to say, they are not actually prejudiced by not being charged with the end goal of the jihad training, as reflected in Count 3 of the indictment.  Their financial and other material support of and participation in the same underlying set of facts, up to and including the training and material support for terrorist attacks reflected in Counts 1 and 2, is also "inextricably intertwined" with their co-Defendants' cases and charges.  A separate trial just on Count 3 or severance of Hujrah and Subhanah Wahhaj would inevitably lead to an incredibly wasteful, repetitive, and taxing second, or even third, trial on exactly the same evidence as their co-Defendants will face.

Moreover, the Defendants' various claims that being tried jointly in this case would cause them prejudice because they are (according to them) less culpable for the joint offenses or conspiracies in which they participated is unavailing, and the Supreme Court has found the opposite to be the case.  *See Richardson*, 481 U.S. at 210 (stating that joint trials "enabl[e] more accurate assessments of relative culpability—advantages which sometimes operate to the defendant's benefit.").  Moreover, the interests of justice in this case are further served by a joint trial because it will avoid the situation where the "last tried defendant" has an unjust advantage by observing the government's case and hearing a witness's testimony in advance.  *Id*.; *see also*

*United States v. Gambino*, 729 F. Supp. 954, 971 (S.D.N.Y. 1990) (*aff'd* 968 F.2d 227 (2d Cir.

1992)).

Finally, far from leading to an unreliable result, as the Defendants argue, a joint trial here

actually will enhance the reliability of the trial.  This is because it will give the jury a complete

picture of the single factual narrative, from Siraj Wahhaj's stealing of JOHN DOE in Georgia all

the way through Subhanah and Hujrah Wahhaj's continued insistence that they did not know where

JOHN DOE was when law enforcement arrived with a search warrant at their compound in New

Mexico.  *See Buchanan v. Kentucky*, 483 U.S. 402, 418 (1987) ("In joint trials, the jury obtains a

more complete view of all facts underlying the charges than would be possible in separate trials.

From such perspective, it may be able to arrive more reliably at its conclusions.").

Thus, for the plethora of reasons described here, many of which this Court has already

noted in this case, there simply is no justification for the severance of any of the Defendants cases,

or to hold separate joint trials for one or two of the charged offenses after being severed from a

different joint trial on the other charges.  Whatever small amount, if any, of possible prejudice any

Defendant might identify here pales in comparison to the many compelling reasons to continue

with the strongly preferred, factually indistinguishable joint trial.  All of the Defendants' severance

motions should be denied.

> **B.  Any Difference in Application of Certain Charges to Certain Defendants Can
> and Should Be Handled Through Limiting Instructions**

The Defendants do not face any meaningful prejudice for having their joint offenses and

conspiracies tried in a joint trial.  However, even if the fact that some Defendants are not identically

charged with all seven Counts, this Court can issue limiting instructions to ensure the jury is clear

that evidence of one offense is not improperly used in consideration of his guilt or innocence of

the other offenses with which he is charged.  This is a tried and true method of ensuring that all of

the compelling reasons for joint trials are satisfied while also ensuring co-defendants are not prejudiced by their joinder.

The Defendants present no real argument against this option within the Court's discretion, and instead offer only speculation that the "complexity" of this case "may" make limiting instructions insufficient. Doc. 608 at 4; *see also* Doc. 609 at 11. However, the factual narrative in this case is not overly complex; bizarre and frightening, yes, tragic, certainly, but not very complex. There is no reason to assume a properly instructed jury will not be able to hear the evidence—unified and intertwined with respect to each Defendant as it is—and apply it only to the specific counts and Defendants as charged.

Moreover, there is no evidence that is inadmissible against Hujrah or Subhanah Wahhaj that will improperly come in against them in a joint trial. The main concern of these Defendants in this regard is the journals or testaments of Jany Leveille. *See* Doc. 608 at 5-6; Doc. 609 at 11. In expressing this concern, the Defendants claim, incorrectly, that "there is no evidence that Hujrah or Subhanah read the diary or were meant to read it. Nor were they influenced by it in any way." *Id.* at 6. This overtly conclusory declaration is something for the jury to decide, but suffice it to say Leveille's book was literally written to influence the members of the group, including Hujrah and Subhanah. The book contains a list of laws that the group was expected to follow, and dictated even the most intimate aspects of their lives, including how to have sex and when. The group all practiced following these commandments, and held each other accountable to them. Lucas Morton referred to the books as part of his religious guidance. Indeed, there is evidence that Hujrah and Subhanah even helped write or edit their prophet's living testament.

The same goes for the "phases of a terrorist attack" writings in the notebook found at the compound. *See* Doc. 608 at 7-8. This evidence goes directly to prove the conspiracy to provide

material support charge in Count 1, with which Hujrah and Subhanah are both charged, and represents a statement by a co-conspirator in furtherance of the conspiracy.  Parts of the same terrorist attack instructions were also found on the computer used by Hujrah and Subhanah, in addition to other terrorism-related evidence, including remnant video instructions on sniper positioning and tactics, concealed firearm usage and tactics video remnants, and photos of massacred bodies.  Thus, all of this evidence is admissible against all of the Defendants, including Hujrah and Subhanah, and severing Count 3 is in no way warranted to protect them from this evidence of their roles in the group's conspiracy to carry out jihadist attacks upon the resurrection of JOHN DOE.  To the extent that this evidence may also go towards proving Count 3's charge of conspiracy to murder an officer or employee of the United States, a simple limiting instruction can make any necessary distinctions for the jury.  However, the evidence pointed to by Subhanah and Hujrah Wahhaj is directly probative to charges they are facing as well.

Accordingly, the Court may note that it will, to the extent necessary in its own discretion, include limiting instructions to address the few charges that to not apply to Siraj, Hujrah, or Subhanah Wahhaj.  With that, the Court should deny all of the Defendants' severance motions.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically Signed*
KIMBERLY A. BRAWLEY
TAVO HALL
Assistant United States Attorneys
P.O. Box 607
Albuquerque, NM 87102
(505) 346-7274

CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon defense counsel. A copy will be mailed to Defendant Lucas Morton.

> *Electronically Signed*
> Kimberly A. Brawley
> Assistant United States Attorney