IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 18-CR-02945 WJ |
| vs. | ) | |
| | ) | |
| JANY LEVEILLE, | ) | |
| SIRAJ IBN WAHHAJ, | ) | |
| HUJRAH WAHHAJ, | ) | |
| SUBHANAH WAHHAJ, and | ) | |
| LUCAS MORTON | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE TO DEFENDANTS LUCAS MORTON, SIRAJ WAHHAJ, HUJRAH WAHHAJ, AND SUBHANAH WAHHAJ'S MOTION TO SEVER COUNTS 6 AND 7 FOR TRIAL

Defendants Lucas Morton, Siraj Wahhaj, Subhanah Wahhaj, and Hujrah Wahhaj ("the Defendants") filed a motion to sever their cases from their codefendant Jany Leveille on Counts 6 and 7 of their joint superseding indictment.[1]  Doc. 648.  By apparently acknowledging that their cases should indeed be tried together while attempting to heap blame on Defendant Leveille, the four Defendants' motion essentially operates as a severance motion for Defendant Leveille, who did not herself file a motion to sever.  However, as set forth below, severance of Counts 6 and 7 would result in a redundant trial of Defendant Leveille, undermine judicial efficiency and resources, create unjustifiable risks of inconsistent verdicts, and cause harm to witnesses by forcing them to testify about the same traumatic facts multiple times.  Applying the applicable law

---

[1] Defendant Siraj Wahhaj joined this motion despite not being charged with Counts 6 and 7.  His joining of this motion thus operates as a motion to sever his case for trial on Counts 6 and 7. Siraj Wahhaj has already filed such a motion, *see* Doc. 635, and the United States has responded, *see* Doc. 663.

regarding severance of defendants or counts for separate trials, the Defendants' motion is without merit and should be denied.

## I.   FACTUAL BACKGROUND

The Government expects to adduce the following evidence at trial:

1.      JOHN DOE was the biological child of Defendant Siraj Ibn Wahhaj and his wife by lawful marriage, Hakima Ramzi.

2.      JOHN DOE was born with Hypoxic Ischemic Encephalopathy (HIE) resulting in cerebral palsy and epilepsy, among other disabilities.  As a result of this condition, JOHN DOE was developmentally delayed and required heightened care and medication to prevent his seizures.

3.      For the first three years of his life, JOHN DOE lived with his mother, Hakima, who was his primary caregiver and who ensured JOHN DOE received his anti-seizure medication and the constant medical and home care needed to keep JOHN DOE alive and well.

4.      Defendant Siraj Wahhaj has two sisters, Defendants Subhanah Wahhaj and Hujrah Wahhaj.  Hujrah Wahhaj has one child.  Subhanah Wahhaj has four children and is married to Defendant Lucas Morton.

5.      Siraj Wahhaj was involved in a relationship with Defendant Jany Leveille.  Leveille is a citizen of Haiti currently residing in the United States without a current immigration status. According to the U.S. Immigration and Customs Enforcement, Department of Homeland Security, Leveille is an alien and has been living in the United States unlawfully since in or about December 1998.  According to Hakima and others, Siraj Wahhaj considers Leveille to be his second, "Islamic" wife.  Leveille has six children, the youngest four being with Siraj Wahhaj.

6.      Both Hujrah Wahhaj and Siraj Wahhaj traveled to London in October 2017 in order learn how to do an exorcism, or "ruqyah."  Pursuant to a federal search warrant, a physical search

of Siraj Wahhaj's mobile phone showed that he viewed content on the practice of ruqyah, including a link to one YouTube video titled: "Ruqyah For Illness, Evil Eye, Magic, Envy."

7.     Leveille became pregnant around the same time that Hakima became pregnant with JOHN DOE.  Leveille's pregnancy soon failed.  In or about November and December 2017, in Georgia, Leveille formed the belief that Hakima became pregnant only by engaging in "black magic" that resulted in Leveille's baby being transferred from Leveille into Hakima's womb. Leveille understood Hakima to be barren and claimed that JOHN DOE was her child.

8.     Leveille later formed the belief that JOHN DOE was actually born dead but, through "black magic," Hakima caused demons to enter JOHN DOE's body.  These demons caused JOHN DOE to move such that he appeared to be alive.  Leveille also claimed that her step-mother-in-law, Jamila Jihad (Siraj, Hujrah, and Subhanah's step-mother), was also practicing black magic and trying to injure or harm Leveille, Siraj, Subhanah, and Hujrah.

9.     Due to Siraj's legal marriage to Hakima, and Jamila Jihad's support of that marriage, Siraj could not legally marry Leveille.  As a result, Leveille was unable to use a marriage to Siraj as a means to adjust her immigration status as long as Siraj remained legally married to Hakima.  Leveille resented Hakima and Jamila Jihad for this.

10.     Hujrah, Subhanah, and Siraj Wahhaj believed, claimed to believe, or went along with Leveille's claims, including, among others, her claims about JOHN DOE, black magic, and the demons in his body.  They reinforced these ideas amongst each other and to their children.  As a group, they used Leveille's claims, including, among others, the narrative of black magic and demons as an excuse to conduct JOHN DOE's kidnapping, to conduct the exorcisms that killed JOHN DOE, and to go disappear to New Mexico.

11.     Hujrah Wahhaj and Subhanah Wahhaj lived in the Atlanta, Georgia, area in late 2017, along with Siraj Wahhaj and Jany Leveille, who lived together in a house.  Hakima Ramzi, Siraj Wahhaj's wife, also lived in the Atlanta area, but lived separately in an extended stay motel room with JOHN DOE.

12.     Leveille claimed she received messages and directions from God.  Leveille claimed she received these messages in Georgia and after she left Georgia in December 2017 en route to New Mexico.  Siraj, Subhanah, Hujrah, and Lucas Morton, and others also claimed to receive messages from God but Leveille alone claimed to be able to translate them.  According to Leveille, the messages came from God to the Archangel Gabriel and the Archangel Gabriel communicated them to Leveille, who then communicated the messages to other members of the group.

13.     These messages sometimes took the form of orders and directives, which Leveille relayed to Siraj, Subhanah, Hujrah, and Morton, and which Leveille expected them to follow lest they suffer the wrath of Allah.  Leveille recorded these messages, including in handwritten letters to Subhanah, Siraj, Morton, and Hujrah, as well as in journals, books, or testaments that she drafted along with the help of Subhanah and Hujrah.  Several letters were addressed to Subhanah and Morton and expressed encouragement to follow Leveille's orders and directives, as well as threats of damnation for them not taking Leveille's commandments seriously.

14.     The testamentary journals or books were intended, in part, to be scripture or guidebooks for her co-conspirators, including the other Defendants in this case, to read and follow. The journals or books, divided into three volumes, were found on a thumb drive which was located in what was believed to be Leveille's purse.  They were also on a computer used by Leveille, Hujrah and Subhanah.  The Defendants attempted to follow all of the commands and laws in

Leveille's journals or books and considered them religious testaments with descriptions of miracles and acts of God, with Leveille as the prophet delivering Allah's messages.

15.    Also on this computer were memoir-type books written by Hujrah and Subhanah. Evidence obtained in the investigation of this case indicates that Hujrah and Subhanah helped edit Leveille's testament books.  Hujrah and Subhanah also had written their own memoir-type books, which were saved on this computer, and Subhanah had established an LLC in Georgia to provide editing and self-publishing advice to aspiring authors.  Also on this computer were remnants of videos of concealed handgun shooting techniques and sniper positioning and tactics, photos of mass shooting victims or massacred bodies, as well as parts of the "Phases of a Terrorist Attack" instructions that were also found handwritten in a notebook in one of the tunnels below the compound.

16.    In or about November and December 2017, before Leveille and the others left Georgia, Leveille directed Siraj to take JOHN DOE and bring him to her.  Siraj did this by telling Hakima that he wanted to take JOHN DOE to the park.  When he did not return JOHN DOE to her care, Hakima called Siraj every day to have JOHN DOE returned.  Hakima even went, accompanied by a local police officer, to the house where Siraj lived with Leveille in order to ask them to return JOHN DOE to her.

17.    During this period, Leveille also "ordered" Siraj to "recite the Quran on [JOHN DOE]."  Though Hakima called every day to have JOHN DOE returned and Leveille planned to have JOHN DOE returned, each day God told her to keep JOHN DOE one more day.  According to Leveille, she asked God whether she could return JOHN DOE and God said "no."  Leveille had no prior caregiving relationship with JOHN DOE, which Siraj, Subhanah, and Hujrah knew. Consistent with and in support of Leveille's contention that JOHN DOE was actually her child,

Siraj refused to give JOHN DOE back and closed the door on Hakima and the Georgia police officer.  Hujrah was aware of this and observed Hakima's attempt to retrieve her disabled son. Believing, or claiming to believe, the proclaimation that JOHN DOE was Leveille's son stolen through Hakima's black magic, Hujrah and Siraj agreed to steal away to land Siraj owned in Alabama, where Subhanah and Morton had recently gone, and to conceal and take JOHN DOE with them.

18.    In early December 2017, Leveille, Siraj, and Hujrah took JOHN DOE along with their other children in Leveille's vehicle and drove from Georgia to Alabama.  Although the group left many of their personal belongings behind as they made their getaway, Siraj also packed several handguns, rifles, tactical gear, and several hundred rounds of ammunition in the car with Leveille and the children.  Hujrah separately packed and brought a handgun of her own;  Subhanah provided a large amount of money to support the group's plans once they arrived in Alabama and left for New Mexico.

19.    Leveille explained that she wanted to take JOHN DOE to Alabama and later to New Mexico to perform exorcisms on him and to cast the demons from his body.  Leveille and Siraj intentionally deprived JOHN DOE of his anti-seizure medication based on their conviction that the medication caused demons to enter JOHN DOE's body.  Hujrah, Subhanah, and Morton observed these exorcisms, the effects they had on JOHN DOE, and the deprivation of JOHN DOE's life-saving medication.  Hujrah, Subhanah, and Morton received or were aware of repeated desperate requests by Hakima and others to return JOHN DOE to them.  At no point in the approximately ten months' time that JOHN DOE's mother and extended family desperately searched for him until authorities found his decaying body buried in a tunnel underneath the

Defendants' compound in New Mexico did Hujrah, Subhanah, Siraj, Morton, or Leveille provide any information on JOHN DOE's location to anyone searching for him.

20.     Leveille, Wahhaj, Morton, Hujrah, Subhanah, and their respective children, including JOHN DOE, stayed in Alabama for approximately two weeks before leaving Alabama to go to New Mexico.

21.     During the first week of December 2017, Siraj, Hujrah, and Subhanah's family and others made numerous social media communications pleading for the return of JOHN DOE and advertising his disappearance on public platforms.  These communications stressed that JOHN DOE was in danger without his mother and daily medication.  The Defendants, including Hujrah and Subhanah Wahhaj, were aware of these communications and pleadings from their families, friends, and community members.

22.     On December 5, 2017, Cameron Jackson sent Siraj Wahhaj a SMS message.  Mr. Jackson identified himself as being from the Department of Family and Children's Services.  He stated, "We received a concern concerning your child and are looking to meet with you and see the child if possible."

23.     On December 13, 2017, while en route from Alabama to New Mexico, the Defendants crashed a silver 2004 Ford Explorer bearing Georgia license plate RGE8599 in Alabama.  The vehicle was registered to Leveille.  There were nine people in the vehicle at the time of the accident: two adults and seven juveniles, including JOHN DOE.  At the time of the accident, Siraj Wahhaj was in possession of five firearms, including handguns and a semi-automatic AR-15 rifle, a bullet-proof vest, a tactical vest filled with rifle magazines in magazine pouches, and a bag of ammunition.  Siraj Wahhaj was extremely worried about retaining possession of his firearms and gear when first responders came to help clear the wreckage from

the highway.  Siraj Wahhaj also provided several false statements to the responding Alabama State Trooper about his address, his employment, and his employer's website.  Morton arrived in a large white box truck and helped Siraj Wahhaj remove the firearms and tactical gear from the crashed vehicle.

24.     After the crash, Morton drove the entire group of the Defendants and their children, as well as the missing JOHN DOE, from Alabama to New Mexico in his distinctive white Ford box truck.  They established in New Mexico a compound that included dirt-filled berms constructed from rubber tires, a system of underground tunnels and caves, and a firing range and tactical training area.

25.     In late December 2017, during the performance of an exorcism session by Siraj Wahhaj, JOHN DOE choked and "white slime" came out of his mouth, and then JOHN DOE's heart stopped and JOHN DOE died.  According to Leveille's own written account, JOHN DOE died on or about December 24, 2017, under circumstances similar to those described by eyewitnesses.  At least one of the Defendants instructed the children not to talk to anyone about JOHN DOE ever being at the compound because they would all go to jail.  Consistent with this, upon their arrests, Defendants Morton, Hujrah, Subhanah, and Leveille all denied having ever seen JOHN DOE since they moved to New Mexico and gave other false and misleading accounts of JOHN DOE's whereabouts; Siraj refused to say anything, to include even his name.

26.     Videos found on cell phones seized pursuant to search warrants show Siraj Wahhaj and Leveille performing prayer rituals on at least two of the other children (not JOHN DOE).  One of the children complained that she was scared and was choked during one of these rituals.

27.      On December 31, 2017, Morton appeared in Forest Park, Georgia, to attempt to convince Wahhaj's brother Muhammad to join the group in New Mexico.   Morton gave

Muhammad a letter written by Leveille that stated, in part, "take all your money out the bank and bring your guns," that he could "die as a martyr . . . by joining the righteous (us)," and that he could "meet Isa also here in about 4 months."[2] Clayton County Police then arrived to speak with Morton about Wahhaj or JOHN DOE's location, but Morton denied any knowledge of their whereabouts. Although Morton was warned that withholding information about the missing JOHN DOE could be punishable by law, he refused to provide any information about where JOHN DOE might be and soon after left the premises in Georgia.

28.     On January 5, 2018, Subhanah received a text message from a friend, which reported: "Subhanah everyone is looking for you guys. You [sic] dad put up a post yesterday asking anyone who knows about you and you siblings, spouses and children whereabouts to contact authorities."

29.     After JOHN DOE's death, Leveille told the group that, as Isa, he would direct the group to corrupt institutions, including FBI, military, and United States Government offices, to confront them with their interpretation of Islam and Leveille's status as a prophet. If those confronted rejected Allah or did not do whatever the group and Isa told them to do, Siraj and Morton, along with the eldest male children in the group who had been training for such occasions at their compound, would shoot or kill those people or imprison them. Siraj Wahhaj and some of the children referred to this plan as jihad.

30.     On January 7, 2018, Subhanah responded on her Facebook page to several similar posts from various family members, including Siraj Wahhaj, Sr. (Defendants Subhanah, Hujrah, and Siraj Jr.'s father), who had been pleading for the Defendants to bring JOHN DOE back and

---

[2] "Isa" is the Islamic name for Jesus, and approximately four months from that time was Easter. Essentially, Leveille was predicting JOHN DOE's rising as Jesus on Easter, after which, according to other evidence discovered after the Defendants' arrest, JOHN DOE (as the risen Isa) would direct jihad to be waged by the Defendants and some of their children.

for anyone with information as to JOHN DOE's whereabouts to contact authorities.  In her post, Subhanah rejected the posts, calling the statements that JOHN DOE was missing "lies" and claiming there was "no need to worry."  Subhanah foreshadowed, "Inshah Allah, Allah will bring all this to light soon."  JOHN DOE had been dead for approximately two weeks.

31.     Wahhaj was well-trained in firearms and military tactics and instructed Leveille's children and others in firearms and military tactics, including tactical reloads, disarmament techniques, clearing buildings, rapid reloads, and hand-to-hand combat.  Numerous videos of these training sessions were found on cell phones recovered from the defendants.  At least one of these videos shows a child firing a pistol at a target from a moving motorcycle.  At least one local resident stated to law enforcement in May of 2017 that there was so much shooting going on at the compound that the neighbors had to ask the Defendants to stop because it was disturbing.

32.     During this period, Leveille wrote in her testament edited by Subhanah and Hujrah, "Wahhaj has been instructing a lot and he was not there for the snow, so brother Luqman has to do it . . . for Wahhaj, Allah is referring to already sending the message that the boys are in training . . . ."  A text message dated March 29, 2018, and found on one of the cell phones indicates that Leveille prohibited hunting of animals, indicating that the firearms were not intended for hunting.

33.     According to a witness, Siraj Wahhaj wanted to get an army together and train them to conduct "jihad."  This witness explained that jihad meant to kill people for Allah.  During their training, this witness saw Leveille, Subhanah, and Hujrah train with a gun once and each fire a gun at least once at the compound.  Another witness stated that after "Isa" woke up, the men would "go to war."

34.     All of the Defendants worked together to build up their compound in the form of a defensive stronghold.  The compound was on a high plateau with an open field of view in all

directions, including miles of the only road leading to the only entrance to the property.  It would take between five and ten minutes for any approaching vehicle to reach the compound from the point of first visible detection from the compound.  Dirt-filled tire barriers blocked vehicle access to the compound from approximately 30 yards down the road leading to the compound.  The compound was almost entirely surrounded by five- or six-foot dirt-filled tire walls, which would be impervious to handgun and rifle ammunition.  At the front of the compound were additional one-foot-thick mud or dirt walls of various heights that were topped with broken glass to prevent breaching of the compound over the walls.  Access to the compound required switchbacks through gaps in the tire walls, which were narrow such that any entrance to the compound would be slow and cumbersome.  Within the compound were additional interior walls that created an inner defensible perimeter.  These walls also had narrow alley-type walkways that made quick entrance from the outside difficult.  Large mounds of dirt were also constructed at various locations around the compound as additional obstructions.  A large plastic covering concealed from above the main living area, which consisted of a sunken-in camper trailer.  A system of underground tunnels, which included underground rooms and storage areas, lead from the central living area to "spider hole" escape routes at which firearms and ammunition were positioned.  In short, nearly every aspect of the compound, from the choice of geographic location to its construction characteristics and the underground tunnel system and "spider hole" escape routes, was specifically researched and designed to minimize detection by authorities and maximize a defensible position of advantage and escape.

35.     On February 15, 2018, Leveille texted her brother, stating, among other things, "He [Allah] will throw fear into the heart of the shayateen [demons] who will want to say no n will smite their necks n their fingers . . . . He will kill the kaffir [infidels] in the people u will ask for

permission because they do that only to oppose Allah and I.  And Allah is severe in punishment. They will taste it n will have the torment of the Fire."

36.     On February 18, 2018, Leveille texted her brother, stating, "I was chosen. I am the ot[h]her Maryam [Mary] mother of Jesus coming back.  He coming back as a child like the last one n will grow up.  He will raise dead while a child likr mom n dad."

37.     In late July 2018, the group had run out of food and money and were becoming desperate.  They sold belongings, including a PlayStation and other items, to neighbors to raise money for food.  However, every Defendant remained committed to keeping their location hidden from anyone, such as family, friends, and law enforcement, that they knew were looking for them. They also began speaking of and preparing for the imminent resurrection of Isa.

38.     On August 2, 2018, Leveille texted her brother, "7 more days."

39.     On August 4, 2018, Leveille texted her brother, "IA [in sha'allah [God willing]] JOHN DOE comes on Monday n it's all over . . . I think Monday may be the day iA."

40.     Also on August 2, 2018, CCPD investigators sent an email to the FBI that contained screen shots of messages sent by Subhanah Wahhaj in which Subhanah asked for $400 from a friend.  In these messages, Subhanah implored the friend that it was "extremely important that you DO NOT by any means contact anyone, especially my family members in regards to me contacting you."

41.     According to a witness's account, the people at the compound were supposed to shoot the police when they came.  The witness stated the men were practicing shooting because they were going to go to war.  Wahhaj said he really wanted to go to war.  Leveille said they should practice shooting because God will definitely help them in war.  The men would go to war after JOHN DOE woke up.

42.     On August 3, 2018, the Taos County Sheriff's Office executed a search warrant at the Defendants' compound.  As law enforcement agents first encountered Morton above ground and outside the compound near the white box truck, Morton told the agents that they should not be there and that they were "all going to get hurt, big time, I promise you."  At the time of the search warrant execution, Siraj Wahhaj and at least one of the older male children whom Siraj Wahhaj had been training in firearms tactics and skills at the compound armed themselves and were ready to defend the compound.  It was later learned that, before any shots were fired, Leveille instructed Siraj Wahhaj and the others to surrender, and the others obeyed her instructions.

## II.     LAW AND ARGUMENT

### I.     Neither Severance of Defendants Nor Severance of Charges IS Appropriate in This Case

#### A. The Defendants' Charges Are Properly Joined Under Rule 8 Because All of the Charges Arise from the Same Course of Conduct and are Inextricably Intertwined

The Defendants claim that Charges 6 and 7 of their common indictment should not have been joined with the rest of their charges because these charges relate to kidnapping, which is not "of the same or similar character" as the other charges and because they are not "connected to or based on the same acts or transactions" as the other charges.  Doc. 648 at 9.  In fact, the opposite is true, as the kidnapping evidence constitutes part of and is inextricably intertwined with the same acts and transactions underlying the Defendants' material support for terrorism and conspiracies to murder officers of the United States and for Defendant Leveille to possess firearms.  Indeed, the evidence for all of these charges will be much the same, from beginning to end of the Government's case-in-chief.  The Defendants' argument therefore fails.

Rule 8(b) of the Federal Rules of Criminal Procedure provides that charges may be joined in a single indictment when they "are based on the same series of acts or transactions, or are

connected with or constitute parts of a common scheme or plan."  Joinder is "encouraged" by Rule 8, and the rule is to be "construe[d] broadly 'to allow liberal joinder to enhance the efficiency of the judicial system.'"  *United States v. Caldwell*, 560 F.3d 1202, 1212 (10th Cir. 2009) (quoting *United States v. Morales*, 108 F.3d 1213, 1219 (10th Cir. 1997)).  "Ultimately, 'the test for a proper joinder is a common thread to each of the defendants,' which 'may be established by common evidence as to various counts.'"  *Id.* (quoting *United States v. Rogers*, 921 F.2d 975, 984 (10th Cir. 1990)).

Here, the joint indictment fits securely within the Tenth Circuit's test, as there are numerous "common threads" and a plethora of "common evidence" underlying all counts of the indictment, making joinder here "undoubtedly proper."  *Id.*  The ongoing kidnapping of JOHN DOE constitutes not just common evidence and common threads amongst the five Defendants to the rest of the charges, but it constitutes the very heart of the material support for terrorism and conspiracy to murder charges.  The evidence establishes that JOHN DOE's kidnapping and Defendants' movement from Georgia to New Mexico was motivated by Leveille's assertion that JOHN DOE was her biological child, that JOHN DOE was possessed by demons, that Leveille was Mary mother of Jesus, and that JOHN DOE was Jesus.  The evidence further establishes that Defendants' material support was motivated by JOHN DOE's death and Leveille's assertion that JOHN DOE would be resurrected and lead them in jihad, to include the murder of federal employees and others.  The Defendants spent nine months preparing for this war.  They mummified JOHN DOE'S body in anticipation of his resurrection; established a compound that included, among other features, a firing range and tactical training ground; engaged in weapons and tactical training; provided weapons and tactical training to some of the children; attempted to recruit another and to obtain his financial support and additional weapons for purposes of

becoming a "martyr" upon JOHN DOE's resurrection.  All of this was done according to the community structure and doctrine articulated in Leveille's journals or testaments which were centered on JOHN DOE's resurrection.  JOHN DOE, both when he lived and after he died, was just a prop in Defendants' scheme to prepare for and engage in jihad.  There is thus no way to separate the kidnapping from the material support charges—they arise from a common series of intertwined facts.

Far from the Defendants' curious assertion that "[t]here is no evidence that [JOHN DOE]'s alleged transportation to New Mexico constituted anything other than an aspect of a domestic or custody dispute or was related in any way to the alleged terrorism charges," there is actually no evidence that JOHN DOE's kidnapping was a custody dispute at all.  Rather, Defendants kidnapped JOHN DOE purportedly because he was Leveille's biological son,  to rid JOHN DOE's body of demons and to follow him as Isa (the Islamic name for Jesus), the true son of Defendant Leveille (called "Maryam" by the Defendants).  This eventually included the Defendants' plan to follow Isa into war with the corrupt institutions the group was targeting.  Although Defendant Siraj Wahhaj was being observed for potential terrorism-related reasons based on a tip from a local resident in Georgia prior to JOHN DOE's kidnapping, the conspiracy and material support charges against Defendants are based on JOHN DOE's kidnapping and transport to New Mexico.[3]

---

[3] The Defendants continue to mischaracterize the surveillance footage of Siraj Wahhaj in Georgia as exculpatory, not known to them, and being withheld pursuant to CIPA.  Doc. 648 n.2. None of this is true.  The footage, from pole cameras set at a couple of addresses in Georgia associated with Siraj Wahhaj, is not exculpatory just because it may show Mr. Wahhaj on many occasions not committing crimes. (In fact, the footage mostly shows nothing at all, as the cameras were largely at addresses Mr. Wahhaj no longer frequented.)  All of the times in life that a person did not commit a crime is not exculpatory to the occasions where the commission of a crime is alleged.  The Defendants also know what is on this footage, as the United States produced the FBI's surveillance logs for all of the surveillance in Georgia years ago.  The footage merely shows what is described in those logs.  Finally, the footage is not classified and not being withheld under CIPA.  Despite not being discoverable due to its immateriality, the United States produced the footage previously.  After a technical defect in the footage was

JOHN DOE's kidnapping was not some one-minute offense, completed at the time Defendant Siraj Wahhaj lied to his wife to take JOHN DOE in order to bring him to Leveille.  The kidnapping offense was ongoing throughout the Defendants' concealment of JOHN DOE, almost the entire time during which the Defendants' material support offenses and conspiracy were ongoing and directly tied to JOHN DOE.  At the same time the Defendants planned and trained for the coming war on their homemade firing range, they were washing and observing JOHN DOE's corpse and hiding from all who would betray their location to the authorities.  Both lines of actions were for the same end: to keep JOHN DOE with them so he could wake up and lead their jihad on what they deemed to be corrupt institutions, including federal agencies and the military.

Thus, the kidnapping charges involve and include the same series of act or transaction, and their joinder is "undoubtedly" proper under Rule 8's broad construction aimed at liberally joining charges.  *Caldwell*, 560 F.3d at 1212.  The Defendants' motion for severance of Counts 6 and 7 on the ground that they are improperly joined fails.

### B. All of the Considerations Under *Zafiro* and Rule 14(a) Lean Strongly in Favor of Continued Joinder, as this Court Has Already Concluded in this Case, and the Defendants Are Not Prejudiced by Joinder

The Defendants seek severance of their cases or counts pursuant to *Zafiro v. United States*, 506 U.S. 534 (1993), and Federal Rule of Criminal Procedure 14(a).  Doc. 648 at 1.  Largely repeating arguments in the several previously filed motions for severance, the Defendants claim they are prejudiced by joinder in this case because the jury will hear the continuous story of JOHN DOE's kidnapping and his central role in the material support for terrorism acts and conspiracy. However, the charges describe one continuous course of conduct encompassing all of the charged

---

discovered, the United States re-imaged the footage and provided it to the Defense discovery coordinator in mid-February.

offenses involving all five of the Defendants acting together in space and time.  Thus, there can be no prejudice to their joint trial, and under controlling lawand the considerations required by Rule 14(a), the balance weighs heavily against any severance of any Defendant or any Count of the Superseding Indictment.

As a starting point, a joint trial in this case, with its single set of facts and witnesses applicable to all five Defendants' charges in the shared indictment, is the "strong[ly] presum[ed]" default.  *United States v. Zar*, 790 F.3d 1036, 1043 (10th Cir. 2015).  Joint trials of defendants who are indicted together are preferred, because "they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts*." United States v. Hall*, 473 F.3d 1295, 1301-02 (10th Cir. 2007) (quoting *Zafiro*, 506 U.S. at 537).  Joint trials are also preferred where, as is the case here, "the government plans to recite a single factual history, put on a single array of evidence, and call a single group of witnesses."  *United States v. Cortes-Gomez*, 926 F.3d 699, 705 (10th Cir. 2019) (internal quotations and citations omitted).  However, under Fed. R. Crim. P. 14(a), a court may order separate trials if joinder appears to prejudice a defendant. *See Zafiro*, 506 U.S. at 538 (using Rule 14 as the standard for a severance); *United States v. Cox*, 934 F.2d 1114, 1119 (10th Cir. 1991) (applying Rule 14 to set the standard for severance).

The decision to sever is "within the sound discretion of the trial court," *Cox*, 934 F.2d at 1119, and thus a defendant "must bear a heavy burden of showing real prejudice to his case." *United States v. McConnell*, 749 F.2d 1441, 1444 (10th Cir. 1984). Given this heavy burden, a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by a joint trial.  *Cummings v. Evans*, 161 F.3d, 610, 619 (10th Cir. 1998).  As a result, the prejudice standard envisioned by Rule 14 requires a showing of actual prejudice, not

merely a showing that a defendant "may have a better chance of acquittal in separate trials." *United States v. Pursley*, 474 F.3d 757, 766 (10th Cir. 2007).

To establish prejudice, a defendant must show that there is a serious risk that a joint trial would compromise a specific trial right of a properly joined defendant or prevent the jury from making a reliable judgment about guilt or innocence. *Pursley*, 474 F.3d at 766 (quoting *Zafiro*, 506 U.S. at 539). Importantly, Rule 14 does not require severance even if prejudice is shown; rather, the rule "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39. Thus, even if a defendant can show some actual prejudice, the trial court may "weigh the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." *United States v. Peveto*, 881 F.2d 884, 857 (10th Cir. 1989).

Ultimately, a trial court that denies a request for severance will be reversed only where a defendant demonstrates an abuse of discretion. *See Pursley*, 474 F.3d at 765. Here, no Defendant has shown any such prejudice, as the "obviously important considerations of economy and expedition in judicial administration" are buttressed by the similarly clear and weighty facts that the government will call a single group of witnesses to describe a single factual history through a single array of evidence to prove overlapping conspiracies in which all five Defendants participated with each other, even if they were not all charged with all conspiracies. *See United States v. Tranakos*, 911 F.2d 1422, 1426 (10th Cir. 1990) (explaining joint trials are preferred where defendants are charged in same conspiracy).

Yet another important reason to try the Defendants jointly in this case is the fact that the trial will require testimony from the same witnesses to prove each Defendant's charges. Included in this single group of witnesses are children who experienced traumatic and upsetting treatment

and events at the hands of the Defendants (who also happen to be members of their own family).

Also included is JOHN DOE's mother, who would be forced to recount her months of terror and

desperate searching for her only child and her tragic discovery of his death, again and again and

again. *See Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (warning against the impairment of

"both the efficiency and the fairness of the criminal justice system" in holding separate trials

"presenting the same evidence again and again, requiring victims and witnesses to repeat the

inconvenience (and sometimes trauma) of testifying").

Importantly, this Court has already analyzed this law and applied it to this case when

previously denying severance of Siraj Wahhaj's case. *See* Doc. 250 at 6, 13-15.  There, the Court

analyzed *Zafiro* and its progeny and Rule 14(a) in construing Siraj Wahhaj's motion to lift the stay

of proceedings as speedy trial and severance requests.  On the question of severance, this Court

explained:

> At the very least, holding a separate trial for Defendant would be enormously inefficient. Defendant was involved in the conspiracy alleged in the Superseding Indictment from start to finish. Critically, his involvement in the conspiracy was inextricably intertwined with the involvement of the other co-conspirators.  Severing Defendant from trials of his co-defendants would result in two virtually identical trials in terms of witnesses and evidence, would amount to a waste of judicial resources, and could even lead to the possibility of conflicting and irreconcilable verdicts."

Doc. 250 at 6.  In analyzing severance of Siraj Wahhaj under Rule 14, this Court went on to find

that he and his co-Defendants have been properly joined and that a trial in this case "will involve

a common set of operative facts relevant to the defendants' conspiracy with respect to those facts."

Accordingly, the Court found that a "[j]oint trial of the defendants in this case is both proper and

necessary, and will promote economy and efficiency and avoid multiplicity of trials without

causing substantial prejudice to the right of the defendants to a fair trial." *Id.* at 14-15 (quotations

and citations omitted).

Here, nothing has changed with respect to Siraj Wahhaj in what amounts to his third motion for severance.  This motion, like that of his co-Defendants Subhanah and Hujrah Wahhaj, again fails in the face of the many weighty reasons for proceeding in this case as a joint trial—a conclusion this Court has already made in detail.

In this motion for severance, the Defendants repeat complaints that they will be prejudiced by the presentation of evidence on all counts.  *See* Doc. 648 at 12.  In support, the Defendants cite a 1968 case out of the D.C. Circuit to claim that evidence of the kidnapping offenses will create a criminal disposition in the minds of the jurors with regard to the other offenses.  Of course, as articulated in more detail below, such concerns are routinely handled by instructions from the Court, and this case is no different.  Moreover, even assuming theoretical prejudice can incur merely by the presentation of evidence of a continuing course of conduct by the Defendants, it does not approach actual prejudice such that it would overcome the strong presumption of joint trials and the myriad factual reasons why severance of any of the Defendants or charges would, as this Court previously put it, be "enormously inefficient" and "a waste of judicial resources" with the possibility of "conflicting and irreconcilable verdicts."  Doc. 250 at 6.

As this Court has already noted, the factual narrative of the events giving rise to the charges in this case involve the same five Defendants performing acts that are part of the same conspiracies and the substantive offenses they are charged with.  Siraj Wahhaj's participation in the kidnapping and death of JOHN DOE, for example, is a necessary part of the factual underpinning of the material support for terrorism and gun possession charges, regardless of whether federal law provides him with immunity for being charged with the kidnapping of his son.  That is why this Court previously noted that his conduct is "inextricably intertwined" with that of his co-Defendants in the overlapping charged conspiracies.

The same is true for Subhanah and Hujrah Wahhaj's arguments.  They, too, were knowingly and willfully involved in taking JOHN DOE from Georgia to New Mexico and concealing him in New Mexico from his mother.  They too participated extensively and knowingly in the scheme to steal and conceal JOHN DOE and to support the group's training and plans for jihad after JOHN DOE was resurrected.  And at the very same time, they were intimately involved in the construction of the idea of Jany Leveille as the "prophet" leader of their group and the divine instructions and demands of the group coming from Allah through her.  In addition, the firearms and tactical training was so extensive that neighbors in the rural area had to ask them to stop.  If even the young children in the group, including Hujrah Wahhaj's young daughter, knew the purpose of the tactical training and the plan when JOHN DOE resurrected, which was to "go to war," Subhanah and Hujrah certainly knew, and they supported these plans by supporting the group's activities and training.

The idea that Subhanah and Hujrah alone were sitting, unaware of what was going on, helping Leveille with her testament but oblivious to what it said and meant, is absurd—but ultimately that is for the jury to decide.  Suffice it to say, they are not actually prejudiced by also having played a critical role in the kidnapping and concealment of JOHN DOE.  Their financial and other material support of, and participation in, the same underlying set of facts, up to and including the training and material support for terrorist attacks reflected in Counts 1 and 2, is also "inextricably intertwined" with their co-Defendants' cases and charges.  A separate trial just on Counts 6 and 7 would undoubtedly lead to an enormously wasteful, repetitive, and taxing second, or even third, trial on almost exactly the same evidence as will be presented in their trial on the other charges.

Moreover, the Defendants' various claims that being tried jointly in this case would cause them prejudice because they are (according to them) less culpable for the joint offenses or conspiracies in which they participated is unavailing.  Indeed, the Supreme Court has found the opposite to be the case.  *See Richardson*, 481 U.S. at 210 (stating that joint trials "enabl[e] more accurate assessments of relative culpability—advantages which sometimes operate to the defendant's benefit.").  Moreover, the interests of justice in this case are further served by a joint trial because it will avoid the situation where the "last tried defendant" has an unjust advantage by observing the government's case and hearing a witness's testimony in advance.  *Id.*; *see also United States v. Gambino*, 729 F. Supp. 954, 971 (S.D.N.Y. 1990) (*aff'd* 968 F.2d 227 (2d Cir. 1992)).

Finally, far from leading to an unreliable result, as the Defendants argue, a joint trial here actually will enhance the reliability of the trial.  This is because it will give the jury a complete picture of the single factual narrative, from Siraj Wahhaj's stealing of JOHN DOE in Georgia all the way through Subhanah and Hujrah Wahhaj's continued insistence that they did not know where JOHN DOE was when law enforcement arrived with a search warrant at their compound in New Mexico.  *See Buchanan v. Kentucky*, 483 U.S. 402, 418 (1987) ("In joint trials, the jury obtains a more complete view of all facts underlying the charges than would be possible in separate trials. From such perspective, it may be able to arrive more reliably at its conclusions.").

Thus, for the plethora of reasons described here, many of which this Court has already noted in this case, there simply is no justification for the severance of any of the Defendants' cases, or to hold separate joint trials for one or two of the charged offenses.  Whatever small amount, if any, of possible prejudice any Defendant might identify here pales in comparison to the many

compelling reasons to continue with the strongly preferred, factually indistinguishable joint trial. All of the Defendants' severance motions should be denied.

### C.  The Defendants Are Not Prevented from Making a Defense

The Defendants also claim that their joint trial prevents them from making a complete defense.  Doc. 648 at 14.  However, beyond boilerplate case law about the general principle, the only authority the Defendants provide to support the contention that their joint trial on their joint offenses in this case violates their constitutional right to put on a defense are three non-Tenth Circuit cases, two of which are over 50 years old.  *Id.* at 15, 17.  In *United States v. Shuford*, 454 F.2d 772, (4th Cir. 1971), the Fourth Circuit felt compelled to require severance only because a co-defendant made clear to the court not only that he would testify, but exactly what he would testify to, and this information was vital or pivotal to the other defendant's defense.  *Id.* at 779. Here, there is no such situation.  The Defendants offer nothing but vague speculation that some Defendants could call other Defendants to testify that the other Defendants did not know or participate in some or all of the charged offenses.  Doc. 648 at 15.  Even under *Shuford*, this is not nearly enough to overcome all of the strong reasons for joinder in this case.

The other two cases, *United States v. Sampson*, 385 F.3d 183 (2d Cir. 2004), and *United States v. Cross*, 335 F.2d 987 (D.C. Cir. 1964), are similarly unhelpful to the Defendants, as they stand for the proposition that prejudice sufficient to overcome the "heavy burden" in favor of joinder can accrue "'when an accused wishes to testify on one but not the other of two joined offenses *which are clearly distinct in time, place, and evidence*.'"  *Sampson*, 385 F.3d at 191 (quoting *Cross*, 335 F.2d at 989) (emphasis added).  Even in such a situation, "a mere unexplicated assertion of the desire to testify on only one count is not enough to require severance."  *Id.* (quotations omitted).

Here, there is nothing of the sort that the courts in *Sampson* and *Cross* viewed as necessitating severance.  There is no break in time for the charges against the Defendants, let alone the two years in *Sampson*.  Nor are the offenses distinct in place.  And, as described in detail above, the offenses are not distinct in terms of the evidence on which they are based.  Thus, this case meets *none* of the criteria that might produce the kind of prejudice to a Defendant's purported inability to testify in defense of one charge but not another.  In addition, the Defendants come nowhere near the specific assertions of testimony on certain charges that they will forego, and why, that the court in *Sampson* required.  Instead, the Defendants provide "unexplicated" suggestions of things they might or could do in testifying that even the cases they cite make clear is not enough.  The Defendants have not demonstrated the depth and specificity of prejudice required to overcome the heavy burden of severance from a properly joined trial.

### D.  Any Difference in Application of Certain Charges to Certain Defendants Can and Should Be Handled Through Limiting Instructions

The Defendants do not face any meaningful prejudice for having their joint offenses and conspiracies tried in a joint trial.  However, even if the fact that a full presentation of the facts behind all charges in this case could cause prejudice, this Court can issue limiting instructions to ensure the jury is clear that evidence of one offense is not improperly used in consideration of guilt or innocence of the other offenses with which the Defendants are charged.  This is a tried-and-true method of ensuring that all of the compelling reasons for joint trials are satisfied while also ensuring co-defendants are not prejudiced by their joinder.

The factual narrative in this case is not overly complex; bizarre and frightening, yes, tragic, certainly, but not very complex.  There is no reason to assume a properly instructed jury will not be able to hear the evidence—unified and intertwined with respect to each Defendant as it is—and apply it only to the specific counts and Defendants as charged.  The Defendants all raised the same

argument in their other motions to sever, and for the same reasons provided in the United States'
response, the Defendants' claims that limiting instructions cannot cure any potential prejudice
caused by joinder fail.  *See* Doc. 663.  Accordingly, the Court may note that it will, to the extent
necessary in its own discretion, include limiting instructions to address the concern that evidence
of one offense is not to be used as criminal disposition evidence of another offense.  With that, the
Court should deny all of the Defendants' severance motions.

### E.  Speedy Trial Concerns Do Not Warrant Severance

Finally, the Defendants throw in a speedy trial argument for severance.  Doc. 648 at 18.
However, the Court has already considered this exact motion from Siraj Wahhaj, and denied it.
*See* Doc. 260.  The Defendants here suggest that CIPA litigation related to the terrorism counts
has contributed to delay in this case, but this is utterly incorrect.  Doc. 648 at 18.  CIPA litigation
in this case will consist of an *ex parte* filing that the Defendants will not see.  The United States
anticipates that there is no discovery the Defendants will receive after the United States files its
CIPA brief.  Therefore, there can be no delay attributable to CIPA, and this entire issue is a
Defense-created red herring.

For all the foregoing reasons, the Defendants' Motion to Sever Counts 6 and 7 should be
denied.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically Signed*
KIMBERLY A. BRAWLEY
TAVO HALL
Assistant United States Attorneys
P.O. Box 607
Albuquerque, NM 87102
(505) 346-7274

CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon defense counsel.

_Electronically Signed_
Kimberly A. Brawley
Assistant United States Attorney