IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　vs.　　　　　　　　　　　　　)　　　Cr. No. 18-CR-2945 WJ
　　　　　　　　　　　　　　　　　)
JANY LEVEILLE,　　　　　　　　　)
SIRAJ WAHHAJ,　　　　　　　　　 )
SUBHANAH WAHHAJ,　　　　　　　 )
HUJRAH WAHHAJ, and　　　　　　　)
LUCAS MORTON,　　　　　　　　　 )
　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　 )

## UNITED STATES' SEALED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The United States respectfully submits these proposed findings of fact and conclusions of law, and requests that the Court find that the Defendants lack standing to challenge the search warrant for Unit 2, Lot 28, in the Costilla Meadows Subdivision, Taos County, New Mexico, executed by the Taos County Sheriff's Office ("TCSO") on August 3, 2018. As a result, the Court should deny the Defendants' motion to suppress the evidence obtained from that search, Doc. 471, without need to reach the merits. This pleading is submitted pursuant to the Court's order following the hearing on this issue held on February 9, 2023, which also set an evidentiary hearing at the Defendants' request for March 28, 2023. Doc. 624.

## I. FINDINGS OF FACT

### A. Procedural Background

1.　　　The United States initiated this case by complaint filed on August 31, 2018,

1

charging the Defendant and the four other Defendants with a violating 18 U.S.C. § 371, conspiracy to provide firearms to a person unlawfully in the United States.  Doc. 1.  This was followed by an indictment charging the same offenses.  Doc. 25.

2.      On March 13, 2019, the Grand Jury returned a seven-count superseding indictment against all five Defendants, alleging violations of 18 U.S.C. §§ 371 (Conspiracy to Commit an Offense Against the United States), 922(g)(5) (Possession of Firearms by a Person Unlawfully in the United States), 1117 (Conspiracy to Murder an Officer or Employee of the United States), 1201 (Kidnapping), 2339A (Providing Material Support to Terrorists), and 2339A (Conspiracy to Provide Material Support to Terrorists).  Doc. 85.  The conspiracy counts allege common facts, namely, among other things, that Defendants sought to accomplish their conspiracies by gathering firearms and ammunition; by transporting personnel, firearms, and ammunition across state lines; by constructing and maintaining a training compound; by storing firearms and ammunition in the training compound; and by constructing and maintaining a firing range and engaging in firearms and tactical training with other members of the compound.  *Id*.

3.      On October 20, 2022, the Defendants filed a motion to suppress all evidence from TCSO's August 3, 2018, execution of a search warrant at the compound the Defendants had constructed on a parcel of land identified as Unit 2, Lot 28, within the Costilla Meadows Subdivision in Costilla, New Mexico, which is within Taos County.  Doc. 471.  The United States filed its response on December 30, 2022, (Doc. 566) and the Defendants filed a joint reply on January 23, 2023 (Doc. 586).

4.      On February 2, 2023, this Court issued an order bifurcating the Defendants' requested hearing on the motion to suppress in order to first address the issue of whether the

2

Defendants have standing to challenge the search warrant.  Doc. 596.  The Court set a hearing on the matter for February 9, 2023.  *Id.*

5.      At the hearing on February 9, the parties presented argument on the standing issue.  The Defendants, bearing the burden to demonstrate standing, did not offer any evidence.

6.      At the hearing on February 9, the United States offered two exhibits into evidence, both of which were already in the record as having previously been filed by Defendant Lucas Morton.  *See* Doc. 565 at 8–11.  These exhibits were (1) a Taos County Magistrate Court filed-stamped copy, dated June 12, 2018, of a Petition by Owner for Restitution, filed by Jason and Tanya Badger against Defendant Lucas Morton, seeking eviction of the Defendants from Lot 28, Unit 2, Costilla Meadows Subdivision, which was owned by Jason and Tanya Badger, along with a "Termination Agreement," dated June 11, 2018, providing that an existing signed (but never filed) purchase agreement between Mr. Badger and Defendant Morton for Lot 29, Unit 2, Costilla Meadows Subdivision, was terminated and (2) a Taos County Clerk and Recorder's Office filed-stamped, notarized copy of a warranty deed conveying the property located at Lot 28, Unit 2, Costilla Meadows Subdivision, from previous owner James Kohlmann to new owners Jason Badger and Tanya Badger, dated October 24, 2017.

7.      At the same hearing, the United States also referred the Court to, but did not separately offer into evidence, an additional document previously filed on the record in this case by Defendant Lucas Morton, which consists of a "Real Estate Sale and Purchase Agreement." *See* Doc. 565 at 4–7; Doc. 617 at 3.  This four-page document evinces an agreement in April 2018 between Jason and Tanya Badger and Lucas Morton for Mr. Morton to "sell" his ownership of Lot Number 29, Unit # 2, Costilla Meadows Subdivision, to Jason and Tanya Badger for the

consideration of the Badgers' ownership of Lot Number 28, Unit #2, Costilla Meadows

Subdivision.  *Id.* at ¶ 1.  Pursuant to the agreement, closing on the real estate transaction was to

take place on June 3, 2018, at First New Mexico Title.  *Id.* at ¶ 4.  The document contains

signatures by Jason Badger, dated April 5, 2018, Tanya Badger, dated April 12, 2018, and Lucas

Morton, dated what appears to be April 18, 2018.  *Id.*

8.      The "Real Estate Sale and Purchase Agreement" (Doc. 565 at 4–7) was the

"agreement" referenced in the Petition by Owner for Restitution (Doc. 565 at 8, the eviction

lawsuit filed by Jason Badger) and related Termination Agreement (Doc. 565 at 9), described

above.

9.      As grounds for termination of the "Real Estate Sale and Purchase Agreement,"

the Termination Agreement provided that Section 4 of the Purchase Agreement, setting the

closing date for the agreement as June 3, 2018, had expired without the parties having

successfully closed on the agreement.  *See* Doc. 565 at 5, ¶ 4; Doc. 565 at 9.  The Termination

Agreement was signed by Christopher John Stachura as the "Attorney for the Transaction."  Doc.

565 at 9.  According to open source information, Christopher John Stachura is an attorney in

Taos, New Mexico, who is currently serving as the Taos Town Attorney.  *See, e.g.*, Town of

Taos Comprehensive Plan, June 14, 2022, *available at*

https://taoscompplan.org/pub/Town_of_Taos_Comp_Plan_2022.pdf.

10.      At the conclusion of the hearing on February 9, 2023, the Defendants requested

another hearing on the standing issue in order to further develop the record.  *See* Doc. 617.

**B.  Facts Regarding Actual Ownership of Lots 28 and 29, Unit 2, Costilla Meadows
      Subdivision Show Defendant Morton Does Not Own Any Interest in Any
      Property in the Costilla Meadows Subdivision, but if He Does, Only in Lot 29.**

11.     The Costilla Meadows Subdivision is a parcel of land at the far north of Taos County, New Mexico, consisting of four subdivided "units," within which many smaller "lots" (generally consisting of around 10 acres) are further subdivided and available for private individual ownership.  *See* Ex. 1 (Taos County Recorder's Records of "Unit 2 of Costilla Meadows"); Ex. 9 (Costilla Meadows Protective Covenants).

12.     The Costilla Meadows Subdivision was originally created in 1972 by The Manchester Trust corporation.  "Unit 2" of the Costilla Meadows Subdivision contains 42 subdivided lots, and was originally owned and filed in the records of Taos County in 1972 by The Manchester Trust, Inc.  The Manchester Trust corporation is now dissolved, and individual property owners own the majority of the land within the Costilla Meadows Subdivision.  *See* Ex. 1 (Taos County Recorder's Records of "Unit 2 of Costilla Meadows"); Ex. 9 (Costilla Meadows Protective Covenants).

13.     On November 12, 1999, the Costilla Meadows Land Owners Association ("CMLOA") was established with the New Mexico Office of Public Regulation Commission to manage the Costilla Meadows Subdivision.  On August 8, 2000, the CMLOA filed a list of covenants superseding previous covenants established by the Manchester Trust in 1972, which are to run with the land for all changes in title to land within the Costilla Meadows Subdivision after August 8, 2000.  Ex. 9.

### a.  *Records for Lot 29, Unit 2, Costilla Meadows Subdivision*

14.     On May 17, 2002, a Quit Claim Deed was recorded in the records of the Taos County Clerk Recorder's Office for a parcel of real estate defined as "Lot Number 29, Unit Two, Costilla Meadows Subdivision" in Taos County, New Mexico.  The deed provides that Alice

Hartigan, a single person, quit claimed Lot 29, Unit 2, to Alice Hartigan and James J. Kohlmann

as joint tenants with right of survivorship, not as tenants in common.  *See* Ex. 3 (Taos Co.

Recorder's Record of Quit Claim Deed for Lot 29, Unit 2, Costilla Meadows Subdivision).  This

is the most recently filed ownership deed for Lot 29, Unit 2, Costilla Meadows Subdivision in

the records of the Taos County Recorder's Office.

15.     On April 25, 2016, James J. Kohlmann and Lucas Allen Morton signed a

"memorandum of contract" for the purpose of "giving notice of the execution of a Real Estate

Contract with an effective date of April 21, 2016," which was purportedly for Lucas Morton to

purchase Lot 29, Unit 2, Costilla Meadows Subdivision.  *See* Ex. 8.  This "memorandum of

contract" was filed with the Taos County Recorder's Office.  *Id.*  However, the actual real estate

contract referenced in the  "memorandum" was never filed with the Taos County Recorder's

Office, and no official record of it exists.

16.     An unrecorded, unfiled copy of the real estate contract between Lucas Morton and

James Kohlmann, obtained from the records of the real estate agent who handled both sides of

the transaction between Mr. Kohlmann and Mr. Morton, shows that Lucas Morton was to make a

down payment $4000 of the $7000 purchase price for Lot 29, Unit 2, and then finance the

remaining $3000 through the seller, James Kohlmann.  *See* Ex. 11 (Purchase Agreement and

Real Estate Contract).  According to this purchase agreement and real estate contract, Lucas

Morton was required to re-pay seller James Kohlmann the seller-financed $3000 within six

months, at which time seller James Kohlmann would convey a general warranty deed for Lot 29,

Unit 2, to buyer Lucas Morton.  *Id.* at 6, 9, 20.

17.     Also part of the purchase agreement and real estate contract between Mr. Morton

and Mr. Kohlmann was an "Improvement Location Report" ("ILR") that described in detail the location and boundaries of Lot 29, Unit 2, and included a map of the parcel of land. *See* Ex. 7. The location and delineation of Lot 29, as distinct from Lot 28, was clearly provided in writing to Lucas Morton at the time of his attempted purchase in April 2016. *Id.*

18.     No general warranty deed conveying title to Lucas Morton from James Kohlmann has been recorded in the records of Taos County. There is also no recorded evidence that Lucas Morton completed the re-payment of the $3000 owed to seller James Kohlmann required by the real estate contract. Thus, according to the land and real estate records existing in the Taos County Recorder's Office, the owners of Lot 29, Unit 2, Costilla Meadows Subdivision are James J. Kohlmann and Alice Hartigan, as joint tenants. At the time of the search warrant execution at issue in this case (August 3, 2018), and currently, Lucas Morton did not and does not have a legally recorded possessory interest in Lot 29, Unit 2.

19.     Separately, according to the Taos County Assessor's Office, which bases its land assessments on property records filed in the Taos County Recorder's Office, the current owner of Lot 29, Unit 2, Costilla Meadows Subdivision is James J. Kohlmann with an undetermined percentage interest to Lucas Allen Morton. *See* Ex. 6 (Taos Co. Assessor's Office Records for Lot 29, Unit 2 of Costilla Meadows Subdivision); Ex. 2 (Taos Co. Assessor's Office Interactive Map images). Based on the information used by the Assessor's Office, this reflection of ownership is likely due to the recording of the "Memorandum of Contract" between James Kohlmann and Lucas Morton in the records of the Taos County Recorder's Office.

### b.   *Records for Lot 28, Unit 2, Costilla Meadows Subdivision*

20.     On October 24, 2017, James Kohlmann, a single man, conveyed by warranty deed

to Jason and Tanya Badger, husband and wife, as joint tenants with right of survivorship,

ownership of a parcel of real estate defined as "Lot 28, Unit #2, Costilla Meadows Subdivision,"

as recorded in the records of the Taos County Recorder's Office. *See* Doc. 565 at 10–11

(attached here as Ex. 10).

21.     On June 17, 2021, Jason Badger and Tanya Badger, husband and wife, conveyed

by warranty deed to David Van Epps and Wendy Van Epps, husband and wife, as joint tenants

with right of survivorship, ownership of a parcel of land described as "Lot Number 28, Unit #2,

Costilla Meadows Subdivision," as recorded in the records of the Taos County Recorder's

Office. *See* Ex. 4 (Taos Co. Recorder's Record of Warranty Deed for Lot 28, Unit 2, Costilla

Meadows Subdivision). Around this same time, the Badgers moved to Texas and no longer live

in New Mexico. According to the Taos County Assessor's Office, Mr. and Mrs. Van Epps are

the current owners of Lot 28, Unit 2, in the Costilla Meadows Subdivision. *See* Ex. 5 (Taos Co.

Assessor's Office Records of Lot 28, Unit 2 of Costilla Meadows Subdivision); Ex. 2 (Taos Co.

Assessor's Office Interactive Map images).

22.     Both Lot 28 and Lot 29 have been surveyed as encompassing 9.62 acres, with Lot

28 directly adjacent to Lot 29 along the eastern boundary of Lot 29. *See* Ex. 1 (Taos Co.

Recorder's Office Records of Unit 2 of Costilla Meadows); Ex. 2 (Taos Co. Assessor's Office

Interactive Map still images).

23.     Based on official, recorded records in the Taos County Recorder's Office, Lucas

Morton does not have any property ownership of Lot 29, Unit 2, Costilla Meadows Subdivision.

There is also no evidence that any other Defendant has or ever had an ownership interest in Lot

29, Unit 2.

24.    Based on official, recorded records in the Taos County Recorder's Office, the owners of Lot 28, Unit 2, Costilla Meadows Subdivision, beginning in October 2017 and throughout 2018, were Jason and Tanya Badger.  In 2021, Mr. and Mrs. Badger conveyed title of ownership of Lot 28, Unit 2, to David and Wendy Van Epps, who are the current owners of Lot 28, Unit 2.  Neither Lucas Morton nor any other Defendant in this case has ever had any property ownership of Lot 28, Unit 2, Costilla Meadows Subdivision.

25.    Based on photos taken by law enforcement sometime around the Defendants' arrests in August 2018, and on satellite images created by the Taos County Assessor's Office sometime after that date (which are publicly available online), the Defendants cleared vegetation, built a firing range, built a compound surrounded by various defense walls and berms, and occupied structures on Lot 28, Unit 2, Costilla Meadows.  *See* Ex. 2, Doc. 566-9.  This is where the Defendants were located at the time of the August 3, 2018, execution of the search warrant at issue in the Defendants' motion to suppress.  Doc. 471.

### C.  The Defendants' Wrongful, Unlawful, and Unwanted Presence on Unit 2, Lot 28, in the Costilla Meadows Subdivision

26.    On or about the evening of December 17 or 18, the Defendants and their 12 children arrived in New Mexico in the vicinity of Amalia, intending to stay on land they believed to be owned by Lucas Morton (Lot 29, Unit 2, Costilla Meadows Subdivision).  Instead, the Defendants occupied Lot 28, Unit 2, Costilla Meadows Subdivision, which was owned by Jason and Tanya Badger.  The Defendants and their children initially lived in the back of the white box truck and in an old camper trailer partially dug into the ground and covered with plastic tarps. After some weeks, they established a compound that included dirt-filled berms constructed from rubber tires, a system of underground tunnels and caves, and a firing range and tactical training

9

area.  Morton's white box truck was also consistently parked near the front of the compound.
*See* Doc. 471-2.

27.     Both Jason and Tanya Badger are veterans of the United States Army.  The
Badgers purchased Lot 28, Unit 2 with the original intent of building a cabin or other dwelling as
a retreat for themselves and to eventually establish a fishing and nature retreat center for other
veterans who might benefit from an opportunity to spend time in the peace and quiet of Northern
New Mexico.  As excited purchasers of their new 10-acre parcel of land, Jason and Tanya
Badger would take regular trips up to see their property and plan for its future in the weeks after
purchasing the land in October 2017.

28.     During one of these trips to see their new land sometime in December 2017, Jason
and Tanya Badger arrived to find that a group of people had taken up occupation of their land on
Lot 28, Unit 2.  The Badgers immediately approached the group, which turned out to be the
Defendants and their children, first making contact with Siraj Wahhaj and then Lucas Morton.
Mr. Badger notified Siraj Wahhaj and Lucas Morton that the Badgers were the owners of the
property the Defendants were occupying.  Because the Badgers' acquisition of Lot 28, Unit 2
was relatively recent, Mr. Badger happened to have to paperwork for his purchase of the land in
his truck, which he showed to Lucas Morton and Siraj Wahhaj.  Mr. Badger even took one of the
teenage boys with the Defendants to the property stake to show him where Lot 28 and Lot 29
were demarcated.  The boy acknowledged to Siraj Wahhaj and Lucas Morton that they were
indeed on the Badgers' property.

29.     During this interaction, Mr. Badger noticed some of the dozen small children
accompanying the Defendants.  Because it was the beginning of winter and the Defendants

10

appeared to have nowhere else to shelter with their children, Mr. Badger was reluctant to evict the Defendants or insist that they leave his property immediately.  Doc. 471-2.  Jason Badger and Lucas Morton then began several months of discussions about possibly swapping lots of land as a solution to the Defendants' occupation of the Badgers' property.  This idea was Mr. Badger's as an act of generosity.  Mr. Morton agreed to pay the fees and court costs of any transaction.

30.     In early April 2018, Lucas Morton and Jason Badger had agreed in principle to buy and sell each other's lots to one another: Lot 28 (Badgers) in exchange for Lot 29 (Morton, purportedly).  The agreement was signed by each party and called for a closing date of June 3, 2018.  Doc. 565 at 4–7.  At no point did Lucas Morton actually present Mr. Badger with any documentation showing proof of ownership of Lot 29.

31.     On May 14, 2018, Jason Badger called the Taos County Sheriff's Office ("TCSO") to provide information that Lucas Morton, Siraj Wahhaj, and JOHN DOE were on his property in Costilla Meadows after Mr. Badger became aware through reading news of JOHN DOE's abduction and Lucas Morton's association with the missing and wanted persons.  Doc. 471-2.

32.     Also on May 14, 2018, TSCO Sgt Jason Rael visited the Badgers in person to interview them in relation to TCSO's ongoing search for Siraj Wahhaj, Lucas Morton, and JOHN DOE. Mr. Badger confirmed he and his wife had seen Wahhaj and JOHN DOE at the property and that the residents also included several other children, adult females, and Morton, and that they had recently begun to shoot guns, including AR-15 rifles, regularly.  Doc. 471-2. Sgt Rael knew of several reports that Siraj Wahhaj was to be considered armed and dangerous,

and warned the Badgers not to go out to the property anymore and to avoid drawing attention from the Defendants to themselves.  *Id.*

33.     Because Mr. Badger owned the property the Defendants were occupying, Mr. Badger provided TCSO signed consent to search the property on May 14, 2018.  *See* Doc. 566-6.

34.     Leading up to this time, Mr. Badger had become increasingly frustrated because Lucas Morton made no efforts to work with Mr. Badger on the land swap, and would not leave the compound on Mr. Badger's land to accomplish any of the tasks related to their agreement prior to closing.  This included Mr. Morton not showing up to the scheduled closing on June 3, 2018.  As a result, the real estate sale and purchase agreement between the Badgers and Lucas Morton never closed, and never took effect.  At no point did the Badgers' legal status as the owners of Lot 28, Unit 2 change as a result of the agreement with Lucas Morton.

35.     On at least one occasion in the spring of 2018, after Jason Badger learned Lucas Morton and Siraj Wahhaj were wanted in connection with JOHN DOE's abduction, Jason Badger directly and in no uncertain terms commanded to Lucas Morton that the Defendants get off his land.

36.     In response to Mr. Badger's demands that the Defendants leave his land, one of the Defendants told Mr. Badger statements to the effect that the Defendants' "beliefs" meant that they could live anywhere and on any land that they chose.

37.     On June 11, 2018, Mr. Badger caused to be executed a "Termination Agreement" terminating the land sale and purchase agreement between the Badgers and Lucas Morton.  The Termination Agreement noted the unfulfilled expiration of the closing date in the purchase

agreement as grounds for terminating the purchase agreement and was signed by local attorney Christopher Stachura.  *See* Doc. 565 at 9.

38.     Having failed to rid his property of the Defendants on his own, on June 12, 2018, Mr. Badger filed a "Petition for Restitution" in the Taos County Magistrate Court seeking the eviction of the Defendants from his property.  *See* Doc. 565 at 8–9.  TCSO Deputy Adam Fernandez served Lucas Morton with Mr. Badger's eviction lawsuit in person at 3:47 pm on June 18, 2018.  *See* Ex. 12.  The service of process notified Mr. Morton that a trial date on the matter was set for June 27, 2018.  *Id.*

39.     On June 27, 2018, the Taos County Magistrate Court heard the petition for eviction.  Lucas Morton did not show up to the court date.  After quickly reviewing the action, the court dismissed the petition for lack of jurisdiction, stating only that Mr. Badger's petition was filed in the wrong court.

40.     After the dismissal of the petition, Mr. Badger planned to follow the correct legal mechanism or re-file the eviction suit in the correct court to remove the Defendants from his property.  However, by this time, TCSO and other law enforcement agencies were well into their investigative efforts related to the missing JOHN DOE, Siraj Wahhaj, and Lucas Morton.  As a result, the Badgers did not re-file the suit in the hopes that the criminal investigation would soon resolve the ongoing trespass of the Badgers' property.

41.     In July 2018, TCSO Sgt Rael contacted Jason Badger to ask if he would consider assisting law enforcement gather more information about the number of people living at the compound on Mr. Badger's land.  Mr. Badger complained that he had also asked New Mexico State Police (NMSP) to help him evict the Defendants, and that a NMSP officer went to the

property to talk to Lucas Morton, but nothing had come of it.  At the time Sgt Rael called Mr.

Badger, Mr. Badger said he was watching Lucas Morton get water onto the property and it did

not look like the Defendants were showing any signs of leaving despite being told to and despite

the service of the eviction lawsuit.  As Mr. Badger and Sgt Rael discussed Mr. Badger's

assistance in the investigation, there were concerns on both sides of Mr. Badger's safety in doing

so, due to the Defendants' heavily armed presence and military-defensive construction of the

compound.  Ultimately, TCSO did not use Mr. Badger's assistance due to safety concerns for all

involved.  Throughout this conversation in July, Mr. Badger's main concern was getting the

Defendants off his property and getting access to his land back.  Doc. 471-2.

42.     By the time TCSO executed the August 3, 2018, search warrant on the Badgers'

property, there was no possible way in Jason Badger's mind that Lucas Morton and the other

Defendants would not have known that they were trespassing on the Badgers' property and that

they were not authorized or permitted to do so.  During the search warrant execution, August 3,

2018, TCSO Sgt Rael issued Lucas Morton a citation for criminal trespass, in violation of N.M.

Stat. Ann. 30-14-1, which required Mr. Morton to appear in local court.  *See* Ex. 13.

43.     The Badgers learned from TCSO soon after the execution of the search warrant

on August 3, 2018, that the Defendants were no longer on their land.  The Badgers also learned

at this time that the mummified remains of JOHN DOE were found in a tunnel on the land.

44.     After the Badgers were able to reclaim their land, they no longer had the same

excitement or interest in the ownership of their land.  The ordeal, to include the months-long

efforts of trying to get the Defendants off of their property, and capped off with the death and

14

concealment of JOHN DOE on their land, greatly upset the Badgers and tainted the property in their eyes.

45.     After the Defendants were removed from the Badgers' property and TCSO had collected the items of evidentiary value, the Badgers were stuck with the cleanup of their once-pristine land.  Only the RV trailer, which was reported as stolen, was removed by other authorities.  The Badgers were left with a massive hole to fill in where the trailer had been, several mounds of trash and junk, over 300 tires, tunnels filled with trash and junk to fill in, and Lucas Morton's white box truck, which Mr. Badger had to have towed away.  The Badgers bore all of the expenses of this clean-up effort, including equipment rental.

46.     Having lost its appeal to them, the Badgers never did build their veteran's retreat on their property at Lot 28, Unit 2, in Costilla Meadows.  The Badgers eventually decided to sell the property and move to Texas.  In June 2021, the Badgers sold their property interests in Lot 28, Unit 2, to David and Wendy Van Epps at a significant loss.

47.     On October 31, 2018, the criminal trespass charge against Lucas Morton was dismissed for lack of prosecution.  *See* Ex. 13.  The dismissal did not explain the reason for the lack of prosecution, but it was likely due to procedural defects in the criminal trespass charge, such as the filing of a uniform traffic citation instead of a criminal complaint as is required for such criminal charges.  *Id.*  There is no indication the criminal trespass case was dismissed due to the merits of the trespass charge being insufficient.

## II. CONCLUSIONS OF LAW

### A.  Legal Standard

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted," such that "a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (internal citations and quotations omitted). In other words, the Defendants "may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *United States v. Jarvi*, 537 F.3d 1256, 1259 (10th Cir. 2008) (quotations omitted).

The "classic two-part Fourth Amendment test" for whether a person possesses the right to be secure against unreasonable searches or seizures is: (1) whether the defendant manifested a subjective expectation of privacy in the area searched and (2) whether society is prepared to recognize that expectation as objectively reasonable. *United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2008) (quoting *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000)). A defendant must prove both conditions were true at the time of the search; a defendant's failure to establish either of these conditions results in a lack of standing to challenge a violation of his or her personal Fourth Amendment rights. *Id.*; *Rakas*, 439 U.S. at 143 n.12 ("Obviously . . . a 'legitimate' expectation of privacy means more than a subjective expectation of not being discovered."). The question in this case centers on the second condition, namely whether the Defendants' claimed expectation of privacy in the compound they built and continued to occupy on Lot 28, Unit 2 of the Costilla Meadows Subdivision, which they knew was owned by Jason and Tanya Badger, is one that society is prepared to accept as reasonable.

There is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987).  However, one well-established approach to determine objective reasonableness in the eyes of society is to apply positive law, such as property and contract law.  *See Rakas*, 439 U.S. at 143 n.12, 148 ("Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."); *Johnson*, 584 F.3d at 999, 1004 (applying property and contract law principles, such as trespass and the right to exclude, to find fraudulent possession of storage unit did not create an expectation of privacy society is prepared to accept as reasonable); *United States v. Pitshou Yunga Kafuku*, 357 F. Supp. 3d 1164, 1179–81 (D. Utah 2018) (same, but for unauthorized occupation of an apartment under another's name).  This approach can be termed the "property theory" of the Fourth Amendment, and it includes trespass on another's property as a clear indication of a lack of a reasonable expectation of privacy.

"One of the main rights attaching to property is the right to exclude others."  *Rakas*, 439 U.S. at 143 n.12.  Just as lacking such a property right is a strong indication that a person would not have an expectation of privacy that society is prepared to recognize as reasonable, so is the claimed usurpation of another's rights where recognition by a court of reasonableness would make the court a "party" to the usurpation.  *See, e.g.*, *Johnson*, 584 F.3d at 1004 (refusing to recognize as objectively reasonable a defendant's expectation of privacy in a storage unit obtained through identity theft in part because it would make the court a party to the fraudulent renting of the storage unit); *Pitshou Yunga Kafuku*, 357 F. Supp. 3d at 1181.

Similar to using fraud to take or obtain possession of property, trespassing is a crime that violates a property owner's rights to enjoyment of the property and to exclude others from it, and it can also result in the usurpation of those rights by the offender.  In New Mexico, criminal trespass is defined as either "knowingly entering or remaining upon posted private property without possessing written permission from the owner or person in control of the land," or "knowingly entering or remaining upon the unposted lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof."  N.M. Stat. Ann. § 30-14-1(A)-(B).

"Because a person can have no reasonable expectation of privacy in premises on which they are wrongfully present, the Tenth Circuit has consistently held that one's status as a trespasser or squatter excludes that person from the protection of the Fourth Amendment." *United States v. Gutierrez-Casada*, 553 F. Supp. 2d 1259, 1269 (D. Kan. 2008).  Thus, under the positive law or "the property theory [of the Fourth Amendment], trespassers do not have the lawful property right they need to trigger Fourth Amendment protection."  *Carmen Auto Sales III, Inc. v. City of Detroit*, 2018 U.S. Dist. LEXIS 42298 at *14 (E.D. Mich. Mar. 15, 2018).  *See also United States v. Stuckman*, 603 F.3d 731, 747 (9th Cir. 2010) (a trespasser in another's backyard "would not be able to claim the protections of the Fourth Amendment"); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (stating a "mere trespasser has no Fourth Amendment protection in premises occupied wrongfully").

A related theory for determination of Fourth Amendment rights is the "consent" theory. This theory holds that the ability or authority to consent to a search of a place can define where an expectation of privacy is objectively reasonable.  The power to consent flows from ownership

of the place to be searched, which includes ownership of property wrongfully occupied by

another.  *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 12 n.7 (1st Cir. 1986).  Trespassers,

therefore, remain subject to any searches properly consented to by the property owners.  *See*

*Gov. of Virgin Islands v. Gereau*, 502 F.2d 914, 926-27 (3d Cir. 1974) ("[A]s a general matter, a

trespasser must be deemed to assume the risk that the owner of the property will consent to its

search."); *United States v. Phifer*, 400 F. Supp. 719, 732 (E.D. Pa. 1975).

      Regardless of the "theory" or "model" of determining the reasonableness of a claimed

expectation of privacy, the claim that a person who has "no legal right to occupy the land and

build structures on it" has a reasonable expectation of privacy is "ludicrous." *Amezquita*, 518

F.2d at 11–12.  This is true even where the person's illegal presence or occupancy is construed as

the person's "home."  Since *Amezquita*'s unambiguous holding that groups of squatters who had

illegally built structures used as homes on public land did not have an expectation of privacy in

those structures that society was prepared to recognize as reasonable, courts around the country

have consistently held that the status of a location as a "home" does not create a reasonable

expectation of privacy where that home is located where the person has no legal right to be.  *See,*

*e.g.*, *United States v. Carr*, 939 F.2d 1442, 1445–46 (10th Cir. 1991) (occupant of hotel room,

registered to someone else, who paid no rent and had no permission from registrant); *United*

*States v. Ruckman*, 806 F.2d 1471, 1473–74 (10th Cir. 1986) (man who illegally lived and

improved upon a cave on federal land for several months); *Woodward v. City of Tucson*, 870

F.3d 1154, 1160 (9th Cir. 2017) (previously evicted apartment tenant was now a "trespasser" and

therefore had no reasonable expectation of privacy there); *United States v. Curlin*, 638 F.3d 562,

565 (7th Cir. 2011) (occupant who had been evicted despite having legitimately occupied the

property previously as a paying tenant); *United States v. Whitehead*, 415 F.3d 583, 587–88 (6th Cir. 2005) (guest of squatter illegally living in abandoned house); *United States v. Gale*, 136 F.3d 192, 195 (D.C. Cir. 1998) (occupier of apartment without permission of its true tenant or other legal authority); *Zimmerman v. Bishop Estate*, 25 F.3d 784, 787–88 (9th Cir. 1994) (squatters who built a home on another's property without permission and their guests); *Pitshou Yunga Kafuku*, 357 F. Supp. 3d at 1181 (concluding "society is not prepared to recognize as reasonable the expectation of privacy of an individual who unlawfully occupies a piece of property, regardless of whether it is the person's home").

Improvement by a wrongful occupant of the land or property, just like the status of the location as a person's "home," does not create a reasonable expectation of privacy because it cannot defeat the wrongfulness in the eyes of society of the occupants' presence in the first place. *Zimmerman*, 25 F.3d at 787–88 (explaining "improvement of the property does not give rise to a reasonable expectation of privacy when they had no legal right to occupy the land"); *Ruckman*, 806 F.2d at 1472 (finding construction of entrance wall and door to enclose a cave on federal land lived in for eight months by defendant did not overcome lack of reasonable expectation of privacy stemming from wrongfulness of occupancy).

As with trespass generally, direct knowledge that a person is not welcome or authorized to occupy another's property further delegitimizes any claim to an expectation of privacy by the wrongful occupier. Courts have made clear that a finalized eviction or other court order is not required; mere communication of the wrongfulness of an occupant's presence or a request or demand that they leave provides more than enough for courts to find any claim of an expectation of privacy to be unreasonable. This can take the form of the filing of an eviction lawsuit or other

legal process, personal communication to the occupiers that their presence is not authorized or welcome, or merely just signage communicating such a message.  *See, e.g.*, *Amezquita*, 518 F.2d at 11 (having been "asked twice" by the landowner to depart voluntarily rendered any claim to an expectation of privacy of squatters living in self-constructed housing "ludicrous"); *Gutierrez-Casada*, 553 F. Supp. 2d at 1270 ("The trespass rule is applied even more stringently where the occupant has received notice to depart").  *Cf. United States v. Rambo*, 789 F.2d 1289, 1295-96 (8th Cir. 1986) (holding hotel occupant told to leave by hotel manager had been "justifiably expelled" from property, returning authority over room to hotel and eliminating standing for occupant to contest law enforcement's search of the hotel room).

With regard to real property ownership in New Mexico, ownership is documented through the filing of a deed, mortgage, or other ownership instrument in the office of the county clerk where the real estate is.  N.M. Stat. Ann. § 14-9-1.  An unrecorded deed or instrument results in no effect on the true ownership of real property, and is largely a nullity under New Mexico law.  N.M. Stat. Ann. § 14-9-3.

Finally, as the proponents of the motion to suppress the evidence obtained through the search warrant, the burden is on the Defendants to establish that their own Fourth Amendment rights were violated by the search.  *Rakas*, 439 U.S. at 130 n.1.; *Johnson*, 584 F.3d at 998.  This includes proving that they had a reasonable expectation of privacy in the area searched—here, the Defendants' compound built on and into Jason and Tanya Badgers' property at Lot 28, Unit 2, Costilla Meadows Subdivision.  *Johnson*, 584 F.3d at 998; *United States v. Rascon*, 922 F.2d 584, 586 (10th Cir. 1990).

**B.  As Trespassers Knowingly Occupying the Badgers' Property After Being Told to Leave and Being Served with An Eviction Lawsuit, the Defendants Had No**

**Expectation of Privacy that Society Is Prepared to Accept as Reasonable and Were Subject to A Search Consented to by the Badgers**

After considering the facts and the applicable law articulated above, the simple question this Court must answer on this matter is whether society would be prepared to recognize as "reasonable" an expectation of privacy by a group of criminal trespassers that: knowingly remains and occupies another's property after being told by the true owner that they are on the wrong land, destroys the land's natural vegetation, fills it with trash and junk, builds a tactical training camp and defensive fortress on the land, is armed to the teeth and trains with those arms to such an extent that law enforcement tells the true owner to keep away for safety, conceals for months a decomposing dead child inside tunnels they dug into the land, refuses to leave when told by the owners, when sued by the owners, and when confronted by police at the behest of the owners, and claims a right to trespass on the land because of their own purported religious "beliefs."  The answer is clearly, overwhelmingly, no.

    a. **The Defendants Had No Property Interest in Lot 28, Unit 2, and were Criminal Trespassers on the Property While Usurping the True Owners' Right to Exclude**

In this case, the Defendants were trespassing on Lot 28, Unit 2, in the Costilla Meadows Subdivision.  The true owners, as established by the records in the Taos County Recorder's Office, were Jason and Tanya Badger.  The Badgers immediately informed the Defendants that they were occupying the Badger's land the moment the Badgers discovered the Defendants' presence.  When the Defendants did not immediately vacate, the Defendants were committing criminal trespass under New Mexico law.[1]  At this point, the Defendants' expectation of privacy

---

[1] *See* N.M. Stat. Ann. § 30-14-1(A) ("Criminal trespass consists of knowingly entering or remaining upon posted private property without possessing written permission from the owner or

on that land was already eviscerated and not recognized by society as reasonable. *Ruckman*, 806 F.2d at 1473–74; *see also id.* at 1474 (McKay, J., dissenting) (stating *Ruckman*'s holding as "failing, presumably even on technical grounds, to have a 'legal right' to occupy land prevents any reasonable expectation of privacy in a dwelling on such land from arising, even if one owns the structure searched on the illegally occupied land").

However, because the Badgers saw the many small children with the Defendants when first informing them they were on the Badgers' land, and knowing the Northern New Mexico winter was coming and that the Defendants obviously were not in a position to go to their own purported property and start again with building shelter, the Badgers suggested an act of charity that would allow the Defendants' children to remain as safe as possible for the time being: a land swap.

Without even determining whether this could have created a reasonable expectation of privacy, there were two problems with this, unbeknownst to the Badgers at the time. First, Lucas Morton was not have a deed to the adjacent Lot 29, and thus had no legal ability to barter Lot 29 to the Badgers in exchange for Lot 28. This was likely known to Lucas Morton, as he would have known that he did not finish repaying James Kohlmann to satisfy their contractual contingency, or that a general warranty deed in his name was never issued or filed with the Taos County Recorder. Thus, his agreement to sell Lot 29 in exchange for the Badgers' Lot 28 was probably fraudulent from the beginning. However, even if not fraudulent, this lack of bona fide bargaining power hollowed out the reasonableness of any expectation of privacy the Defendants

person in control of the land."), and (B) ("Criminal trespass also consists of knowingly entering or remaining upon the unposted lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof.").

might have had for the few months of their land swap negotiations while they were on the

Badgers' property. *See Johnson*, 584 F.3d at 1004; *Pitshou Yunga Kafuku*, 357 F. Supp. 3d at

1181 (noting a court's interest in not being a "party" to the fraud underlying occupation of

property by recognizing any reasonableness of an expectation of privacy therein). Second,

perhaps knowing that he did not legally own Lot 29 to be able to convey ownership of it, Lucas

Morton had no intention of taking the steps necessary to complete the land swap. As such, he

continually frustrated the Badgers' efforts to complete the land swap (which the Badgers were

only pursuing as an act of generosity), including not showing up for the closing of their land

swap agreement, leading to its termination by the Badgers a few weeks later.

Thus, though still greatly diminished compared to a legitimate owner or tenant of the

property (or even someone with a bona fide ownership interest in the adjacent lot), the time

period of the Spring of 2018 when the Defendants and the Badgers had an agreement in principle

to swap land was the zenith of any reasonableness of an expectation of privacy for the

Defendants on Lot 28, Unit 2.[2] However, by June 2018, and certainly by the time the search

---

[2] It is unclear what, if any, property or occupancy right the uncompleted contract between the Badgers and Lucas Morton may have given the Defendants, especially given that Mr. Morton did not even own Lot 29 to bargain away, as the contract makes no mention of the status of the parties in the interim period prior to closing (which never happened). If anything, the contract may have created a "license" for the Defendants to temporarily remain on Lot 28 or, at most, a tenancy at sufferance or at will. *See Quantum Corp. v. State Taxation & Revenue Dept.*, 956 P.2d 848, 851 (N.M. Ct. App. 1998) (noting a "license" to use property is not defined in New Mexico statutes, but holding a "license does not create an interest in land; it is similar to a tenancy at will"); *N.M. Sheriffs & Police Ass'n. v. Bureau of Revenue*, 514 P.2d 616, 617 (N.M. Ct. App. 1973) (defining "license" as a "permission, by a competent authority to do some act which without such authorization would be illegal, or would be a trespass or a tort") (quotations and citations omitted). Regardless, whether a "license" or a "tenancy at will" was even arguably created under the pending land swap contract, it evaporated the moment the true landowners (the Badgers) gave notice to the Defendants of the termination of the contract and the rescission of all authorization for the Defendants to remain. This happened long before the search of Lot 28 on

warrant was executed on August 3, 2018, nothing about the Defendants' expectation of privacy on that land remained anything society could be prepared to accept as reasonable. Once the Badgers realized Morton and Siraj Wahhaj's wanted status, and completely withdrew all notion of tolerance of the Defendants' occupation of Lot 28, any conception of the Defendants' expectation of privacy on Lot 28 was not reasonable in the eyes of society. *See Amezquita*, 518 F.2d at 11–12 (calling the claim that a person who has "no legal right to occupy the land and build structures on it" has a reasonable expectation of privacy "ludicrous"); *Ruckman*, 806 F. 2d at 1474 (citing *Amezquita*'s "ludicrous" characterization with approval with regard to trespasser living in cave on government land); N.M. Stat. Ann. 30-14-1(B) ("Criminal trespass also consists of knowingly entering or remaining upon the unposted lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof.").

As if to highlight the ludicrousness of the Defendants' claim to a reasonable expectation of privacy on the Badgers' land, the Defendants' response to Mr. Badger's withdrawal of consent to remain and demand that the Defendants leave his property was to not only ignore Mr. Badger's demand, but to claim that the Defendants' "beliefs" permitted them to stay on whatever land they wanted, including the Badgers' land. Yet, regardless of their "beliefs," as soon as the Badgers told the Defendants to get off the Badgers' land—at the latest sometime around May 2018—the Defendants became trespassers with no reasonable expectation of privacy under the law. N.M. Stat. Ann. 30-14-1(A)-(B); *Amezquita*, 518 F.2d at 11; *Zimmerman*, 25 F.3d at 787–

---

August 3, 2018, at which time the Defendants had clearly reverted to being criminal trespassers. *See, e.g.*, *Chavez v. Torlina*, 99 P.690, 694 (N.M. 1909) (holding adjacent property owner encroaching on neighbor's land adversely "was not a licensee or tenant at will, or at sufferance, but a trespasser, without right of notice to quit by the real owner").

88; *Stuckman*, 603 F.3d at 747; *Sanchez*, 635 F.2d at 64; *Rambo*, 789 F.2d at 1295-96.  This would still be true even if the Defendants had previously been actual legal tenants, which they were not, or had paid some consideration to the Badgers for occupying their property before being told to leave, which they did not.  *City of Tucson*, 870 F.3d at 1160; *Curlin*, 638 F.3d at 565; *Rambo*, 789 F.2d at 1295-96; *Gutierrez-Casada*, 553 F. Supp. 2d at 1270.

The well-established rule against trespassers maintaining Fourth Amendment rights was further reinforced when Lucas Morton was personally served with the Badgers' eviction lawsuit. *Amezquita*, 518 F.2d at 11; *Zimmerman*, 25 F.3d at 787–88; *Gutierrez-Casada*, 553 F. Supp. 2d at 1270.  That the lawsuit was later dismissed for being filed in the wrong court is irrelevant to the legal effect it has on the Defendants' expectation of privacy while occupying the Badgers' land, as it served as more confirmation, if any was needed, that the Defendants were criminal trespassers wrongfully occupying Lot 28, Unit 2 of Costilla Meadows Subdivision.  Similarly, the dismissal of the criminal trespass citation against Lucas Morton on its face was, like the eviction lawsuit, a procedural defect in the filing of the charge.  Again, its filing highlights the unreasonableness of the Defendants' claimed expectation of privacy, while its dismissal on procedural grounds has no effect on the question of reasonableness.

### b.  The Characterization of the Badgers' Property as a "Home" Does Not Give Defendants Any Expectation of Privacy Society Is Prepared to Recognize as Reasonable

From this baseline, there are no arguments the Defendants can make that would establish a reasonable expectation of privacy to overcome their criminal-trespassers-who-have-been-ordered-to-leave status on August 3, 2018.  The fact that the Defendants had built something of a "home" in the white box truck, plastic tarp-covered (stolen) RV trailer, and underground tunnel

system on the Badgers' land does not negate their trespass and bestow on them a reasonable

expectation of privacy. While it is true that, all things being equal, a person's home has been

recognized as having especially clear expectation of privacy, courts have repeatedly rejected this

"home" argument as creating a reasonable expectation of privacy in circumstances like this

where the person is wrongfully maintaining a home on property in which they have no right to

be. *Amezquita*, 518 F.2d at 11–12; *Zimmerman*, 25 F.3d at 787–88; *Ruckman*, 806 F.2d at 1473–

74; *City of Tucson*, 870 F.3d at 1160; *Curlin*, 638 F.3d at 565; *Gale*, 136 F.3d at 195; *Pitshou*

*Yunga Kafuku*, 357 F. Supp. 3d at 1181 (reviewing cases and concluding "society is not prepared

to recognize as reasonable the expectation of privacy of an individual who unlawfully occupies a

piece of property, regardless of whether it is the person's home").

### c. The Characterization of the Defendants' Actions on the Badgers' Property as "Improvements" on the Land Also Does Not Give Defendants Any Expectation of Privacy Society Is Prepared to Recognize as Reasonable

The fact that the Defendants had made "improvements" on the Badgers' land is equally

hollow. First of all, the things the Defendants did to the Badgers' land can hardly be called

"improvements." They destroyed the natural vegetation, cleared out a wide area for their firing

and training range, built dirt berms, dug tunnels, and excavated a hole to put a dilapidated stolen

RV trailer into, brought several hundred tires to build defensive walls around the compound,

covered the walls with shattered glass, and covered the trailer and tunnels with white plastic.

The heavily armed Defendants caused such safety wariness by authorities that the Badgers were

essentially held off their land for several months longer than it could have been otherwise.[3]

---

[3] Such concerns ultimately proved to be wholly warranted when Wahhaj was arrested in possession of loaded firearms, and evidence shows that he and others were ready to engage in a shootout with law enforcement before co-defendant Leveille instructed him not to fire.

When the Defendants were finally removed from his property, Mr. Badger was stuck with the cleanup costs himself to fill in the holes and tunnels, remove the trash, junk, and tires, and otherwise try to restore some semblance of the natural land.  The scarring to the land is still visible in the publicly available Taos County Assessor's satellite images of Lot 28, Unit 2.  *See* Ex. 2 at 8.  Under New Mexico law, the Defendants remain liable to the Badgers for this damage caused during their criminal trespass of Lot 28.[4]

In the end, the Badgers were no longer able to enjoy their land, gave up on their dream of building a retreat there, and sold Unit 28, Lot 2 at a financial and emotional loss.  This fact pattern should make clear that society is not prepared to accept as reasonable the Defendants' claim to an expectation of privacy on the Badgers' property, as condoning such invasive violations of another's property rights under the guise of "improvements" would only serve to sow societal chaos.  Courts have long recognized as much, consistently ruling that "improvements" such as building living quarters on wrongfully occupied land, do not bestow the occupiers with a reasonable expectation of privacy on that land.  *Zimmerman*, 25 F.3d at 787–88 ("[I]mprovement of the property does not give rise to a reasonable expectation of privacy when [the squatters] had no legal right to occupy the land"); *Ruckman*, 806 F.2d at 1473–74; *Amezquita*, 518 F.2d at 11–12.

> **d.   Even if Lucas Morton Legally Owned Lot 29, This Would Not Give Defendants Any Expectation of Privacy that Society Is Prepared to Recognize as Reasonable by the Time of the Search Warrant in August 2018**

---

[4] *See* N.M. Stat. Ann. 30-14-1(D) ("Any person who enters upon the lands of another without prior permission and injures, damages or destroys any part of the realty or its improvements, including buildings, structures, trees, shrubs or other natural features, is guilty of a misdemeanor, and he shall be liable to the owner, lessee or person in lawful possession for civil damages in an amount equal to double the value of the damage to the property injured or destroyed.").

Nor can any argument that Lucas Morton owned the lot adjacent to the Badgers' lot somehow alter the Defendants' legal standing on the Badgers' property.  In fact, under New Mexico law, Lucas Morton cannot demonstrate ownership to the adjacent Lot 29, as no recorded deed or instrument establishes his ownership beyond a future ownership based on a contingency that appears to never have been satisfied.  *See* N.M. Stat. Ann. § 14-9-3.  Therefore ownership of Lot 29 appears to be in James Kohlmann and Alice Hartigan, per the current deed on file in the Taos County records.

Given that the contingency in the real estate contract between Lucas Morton and James Kohlmann was one for Mr. Morton himself to fulfill, it strains credulity that he would not have been aware that he did not receive or cause to be recorded a general warranty deed to Lot 29 and therefore did not actually own Lot 29.  This being the case, Mr. Morton did not even have a property interest with which to bargain with Jason Badger, making the land swap arrangement (the only blip in the Defendants' nine-month occupation of the Badgers' property where the Defendants may have been something less than unwanted, unauthorized trespassers) even less pertinent to the analysis of the Defendants' Fourth Amendment standing on August 3, 2018.

However, even if he did legally own Lot 29, or had some bona fide property interest in Lot 29, all of the Defendants knew through a multitude of communications that they were not welcome or authorized to occupy Lot 28 by the time of the search warrant's execution on August 3, 2018.  The Defendants cannot reasonably argue that some sort of property interest in Lot 29 allowed them to maintain their occupation of Lot 28 in August 2018.  There is no "mistake in parcel" exception to the laws of trespass and Fourth Amendment rights that might flow from

mistaken possession—especially where the trespassers continue to remain after they are made aware of their mistake, are asked to leave by the owners, and are sued to leave by the owners.

Here, the Defendants' claimed basis for remaining on the Badgers' land was that their "beliefs" allowed them to.  Based on their professed "beliefs" that they could occupy whatever land they chose, the Defendants never participated in closing the generous agreement by the Badgers to swap title to Lots 28 and 29.  The Defendants took no actions whatsoever to remove to their "own" land on Lot 29 after being asked repeatedly by the Badgers to do so.  The Defendants did not show up to court on June 27, 2018, pursuant to the Badgers' eviction lawsuit, despite Lucas Morton being personally served the lawsuit with that date by TCSO.  Thus, regardless of the status of Lucas Morton's property interest in Lot 29, nothing about the Defendants' actions while illegally occupying Lot 28 was reasonable under the normal operation of law in the United States.  As such, the Defendants had no reasonable expectation of privacy on Lot 28 on August 3, 2018.

> **e.  The True Owners of Lot 28 Consented to Law Enforcement's Entry into the Property to Search for Siraj Wahhaj and JOHN DOE and to Check on the Welfare of the Others, a Risk to Which the Defendants Were Subject as a Result of their Continued Trespass on Lot 28**

Finally, in addition to all of the other reasons the Defendants did not have a reasonable expectation of privacy on Lot 28, Unit 2, at the time of the search warrant execution, the search was itself authorized by the consent of the landowners—i.e., the people who had the legal authority to consent to law enforcement's entry onto the property.  The right to consent to entry and search flows from the ownership of the property and was properly given by Jason Badger on May 14, 2018.  *See* Doc. 566-6; *Amezquita*, 518 F.2d at 12 n.7.  The Defendants, as criminal trespassers, were subject to any and all searches or law enforcement entries of Lot 28 properly

consented to by the property owners.  *See Gereau*, 502 F.2d at 926–27 ("[A]s a general matter, a trespasser must be deemed to assume the risk that the owner of the property will consent to its search."); *Amezquita*, 518 F.2d at 12 n.7; *Phifer*, 400 F. Supp. at 732.  Thus, the Defendants also lack standing to challenge the August 3, 2018, search of Lot 28, Unit 2, because the search was consented to by the true owner of the land, Jason Badger.

## III. CONCLUSION

The Defendants, trespassers on Lot 28, Unit 2, Costilla Meadows Subdivision, who refused to leave despite being asked, told, and sued by the true owners of the property, had no expectation of privacy that society is prepared to deem as reasonable at the time of the search warrant's execution and therefore lack standing to challenge the warrant.  The Defendants' heavily armed occupation, their usurpation of the Badgers' rights to enjoy their property and to exclude others from it, their insistence that their "beliefs" allowed them to occupy whatever land they chose, the clear lack of any ownership in the lot they were occupying, their lack of recorded ownership interest even in the lot adjacent to the Badgers' property, their knowledge that the Badgers did not want them or authorize them to remain on the property by, at the latest, June 2018, and Mr. Badger's signed consent for TCSO to enter his property all demonstrate that this was not a situation where society is prepared to as reasonable an expectation of privacy in the self-constructed "housing" on Lot 28.  Accordingly, the Defendants' Fourth Amendment rights were not, and could not have been, violated by TCSO's execution of the search warrant on that property on August 3, 2018.  It is the Defendants' burden to establish the contrary, and the Defendants cannot meet that burden.  The Defendants' motion to suppress evidence from that search must therefore be denied for lack of standing.

Respectfully submitted,

ALEXANDER M. M. UBALLEZ
United States Attorney

*Electronically Filed*

KIMBERLY A. BRAWLEY
TAVO HALL
Assistant United States Attorneys
201 Third St. NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274

I HEREBY CERTIFY that on March 21, 2023,
I filed the foregoing pleading electronically through
the CM/ECF system, which caused counsel of
record for defendant to be served by electronic means.

***/s/ Filed Electronically***
TAVO HALL
Assistant U.S. Attorney