IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

          **Plaintiff,**

vs.                                       **No. 1:18-CR-02945-WJ**

JANY LEVEILLE, et al.,

          **Defendants.**

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Defendant Subhanah Wahhaj, through counsel, Ryan J. Villa and Justine Fox-Young, joined by Defendants Jany Leveille, through counsel Aric Elsenheimer and Angelica Hall, Siraj Wahhaj, through counsel Marc H. Robert and Thomas Clark, Hujrah Wahhaj, through counsel Marshall J. Ray and Donald Kochersberger, and Lucas Morton, pro se, submit the following proposed findings of fact and conclusions of law with respect to Defendants' standing to assert Fourth Amendment violations as a result of the search of their home, as follows:

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Background

On August 2, 2018, then Taos County Sheriff Jerry Hogrefe sought a warrant to search Defendants' home. The search warrant affidavit contained significant misstatements of fact and also omitted many material facts and failed to establish the probable cause necessary to support the search of Defendants' home. As such, on October 20, 2022, Defendants' filed a joint motion to suppress the evidence seized in the search, and on December 30, 2022, the Government responded,

arguing that Defendants had no legitimate expectation of privacy in their home in Amalia and therefore lacked standing to assert a Fourth Amendment violation.

Defendants urge the Court to make the following proposed findings of fact and conclusions of law and to rule that Defendants' had a subjective expectation of privacy in the Property where they lived in Amalia, and that society is prepared to recognize that expectation as reasonable or legitimate. Defendants respectfully request that the Court find they have standing to move to suppress the evidence seized during the search, grant a hearing on the motion to suppress, including a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) and suppress all evidence seized pursuant to subsequent warrants based on information obtained during the first unconstitutional search.

### B. Findings of Fact

1. In April of 2016, Lucas Allen Morton purchased Lot 29, Unit 2, Costilla Meadows Subdivision in Taos County from James Kohlmann under the terms of a Real Estate Contract. *See* Exhibit A ("Morton Purchase Agreement")

2. This agreement was recorded in the office of the Taos County Clerk on April 28, 2016. *Id.*

3. While Mr. Morton was paying off the land, the warranty deed was held in escrow.

4. The purchase was subject to the building setbacks around the perimeter in the Improvement Location Report for the property, dated April 8, 2016. *See* Exhibit B. ("Fidelity National Title Improvement Location Report for Lot 29").

5. Soon after, Mr. Morton paid off the balance and received a warranty deed, which he did not record with the Taos County Clerk.

6. Lot 29 is a 9.621 acre parcel. *See* Exhibit C ("Costilla Meadows Unit 2 Map")

7. Lot #29 is located directly west of Lot #28, which is also a 9.621 acre parcel. *Id.*

8.  In October, 2017, Jason Badger Purchased Lot #28 from James Kohlmann, also subject to building setbacks around the perimeter in the Improvement Location report for the property. *See* Exhibit D ("Warranty Deed from Kohlmann to Badger")

9.  When they arrived in New Mexico in December, 2017 to occupy the land owned by Lucas Morton, Morton and his family mistakenly took possession of Lot #28 ("the Property"), a lot identical in size and directly adjacent to Lot #29.  *See* Exhibit E ("Photos of Lot 28")

10. None of the surrounding properties were developed at the time.

11. Soon after Mr. Morton and his family arrived at the property, they began the hard labor of clearing the sagebrush from the lot in order to begin building their home.

12. Mr. Morton and his family also began excavating the land in order to erect living quarters on the land.

13. Not long after they had cleared the lot, Mr. Jason Badger was in the area checking on his property and informed some of the Defendants that he and his wife owned the Property and that Defendants were therefore building in the wrong location.

14. When the parties realized that Mr. Morton and his family possessed and were improving Lot #28 and not Lot #29, Mr. Morton offered that he and his family could relocate to Lot #29.

15. Mr. Badger insisted that it was not necessary that Mr. Morton and his family relocate and instead offered that they could simply "swap" lots.

16. Mr. Morton and Mr. Badger then agreed orally that Mr. Morton would become the owner of Lot #28 and that the Badgers would become the owners of Lot #29.

17. Mr. and Mrs. Badger agreed to permit Mr. Morton and his family to remain on the Property and continue their improvements to the Property.

18. Mr. Morton, in exchange, agreed to permit Mr. and Mrs. Badger to occupy and improve Lot 29.

19. Between December, 2017 and January, 2018, Mr. Morton paid approximately $1900 for equipment to install a solar power system on the Property. *See* Exhibit F ("Invoices for Solar Purchase").

20. Subsequently, Mr. Morton purchased and acquired other building materials including reinforced plastic, insulation, power tools, tires and a propane tank. *See* Exhibit J. ("J. Badger Photos – Bates 2240")

21. Mr. Morton continued to work to construct their home and improve the land while living on the Property.

22. On January 17, 2018, in furtherance of his continuing efforts to improve the Property, Lucas Morton submitted an application to Randall Lumber for a credit line to obtain additional construction materials. *See* Exhibit G ("Randall Lumber Credit Application and Invoices")

23. By January of 2018, the Property was clearly home to Lucas Morton and his family.

24. Soon after agreeing to swap properties, Mr. Badger and Mr. Morton engaged First New Mexico Title and Christopher Stachura of the Dogasa Law Offices in order to effectuate the land swap.

25. On January 26, 2018, Mr. Stachura wrote a letter to James Kohlmann, who had sold Mr. Morton Lot #29. The letter explained that Mr. Morton had paid off the amount owed on Lot #29 pursuant to the Real Estate Contract and that the Warranty Deed held in escrow had been released to him but that he had not filed

the Deed with the County and had lost it. *See* Exhibit H ("Letter from Christopher Stachura to James Kohlmann").

26. Mr. Stachura enclosed a replacement deed for Mr. Kohlmann's signature. *Id.*

27. Mr. Kohlmann signed the replacement deed before a notary and mailed it to Mr. Stachura.

28. Neither Mr. Stachura nor Mr. Morton had this replacement deed recorded with the County.

29. To effectuate their previously agreed upon land swap, Mr. Badger and Mr. Morton entered into a real estate purchase agreement in April 2018.  *See* Exhibit I ("Real Estate Sale and Purchase Agreement")

30. In April, 2018, Mr. Badger photographed the property for the title company in advance of the land swap. *See* Exhibit J ("J. Badger Photos – Bates 2238-2242")

31. In April or May of 2018, Mr. Badger began the work to erect fencing around the perimeter of Lot #29, the property he and his wife were to receive in the land swap. *See* Exhibit K ("Excerpt of Home Interview of Mr. Badger")

32. On May 8, 2018, Mr. Badger sent a message intended for Mr. Morton to inform him that he had learned from the title company that there would be $1,057.17 due at the closing of their land swap.

33. On May 11, 2018, Mr. Badger sent a message intended for Mr. Morton to inform him that the closing would occur on May 31, 2018.

34. Three days later, on May 14, 2018, Mr. Badger provided the Taos County Sheriff's Office with a signed form purporting to give the agency consent to search the Property.

35. On May 31, 2018, Mr. Badger received a message indicating that Mr. Morton was unable to afford the closing costs for the land swap and suggesting that they instead perform the swap without using the title company in order to save costs.

36. Mr. Badger responded and rejected that suggestion.

37. On June 7, 2018, Mr. Badger sent another message intended for Mr. Morton: "you have to be off by next week."

38. On June 11, 2018, Mr. Badger sent another message intended for Mr. Morton: "were you able to start moving your stuff off?"

39. The New Mexico Uniform Owner-Resident Relations Act, NMSA 1978, §§ 47-8-1 through 47-8-48 ("UORRA"), governs certain aspects of the relationship between residential tenants and owners.

40. The Act "applies to, regulates and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit located [in New Mexico.]" *Id.* § 47-8-8.

41. Moreover, the Act contemplates the applicability of other principles of law and equity unless expressly displaced by the Act. *See id.* § 47-8-4 ("Unless displaced by the provisions of the Uniform Owner-Resident Relations Act [47-8-1 NMSA 1978], the principles of law and equity, including the law relating to capacity to contract, mutuality of obligations, equitable abatement, principal and agent, real property, public health, safety and fire prevention, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause supplement its provisions.") (brackets in original).

42. A written lease is not required to create a tenancy, and the UORRA clearly contemplates unwritten lease agreements. *See, e.g.*, NMRA 1978, § 47-8-15.

(discussing rent amounts due in the event that no rental agreement exists, the UORRA provides, "[i]n the absence of an agreement, the resident shall pay as rent the fair rental value for the use of the premises and occupancy of the dwelling unit.")

43. Long standing precedents that predate the UORRA also recognize oral tenancies (*i.e.,* tenancies created by "parol"). *See, e.g., Dees v. Dismuke*, 1925-NMSC-033, ¶ 8, 30 N.M. 528, 240 P. 198, 199 (noting that a certain statutory provision related to a landlord's lien "shall not apply to tenancies created by parol" but would instead be predicated upon a written lease with a certain term of years).

44. Furthermore, the conduct and expectations of the parties may lead to the creation of a tenancy. *See Collins v. Storment*, 1993 U.S. Dist. LEXIS 20156, Civ. No. 91-1010-HB (D.N.M. Apr. 23, 1993).

45. Once a tenancy is created, an owner may not evict a tenant without following the procedures set forth in UORRA. *See Collins v. Storment*, 1993 U.S. Dist. LEXIS 20156.

46. Here, Lucas Morton was unquestionably, at a minimum, a tenant on the Property.

47. Sometime in the summer of 2018, Mr. Badger had a change of heart and attempted to back out of the parties' agreement and attempted to evict Mr. Morton and his family from the Property.

48. To that end, Mr. Badger filed a lawsuit in New Mexico Magistrate Court seeking a writ of restitution.  *See* Exhibit L ("Badger Petition for Restitution")

49. On June 27, 2018, the magistrate judge presiding over the case dismissed the petition for restitution with prejudice. *See* Exhibit L ("Order of Dismissal")

50. Mr. Badger also made several attempts to persuade law enforcement to charge Mr. Morton with criminal trespass.

51. After the search warrant was executed at the property and after Mr. Morton was arrested, Taos County Sheriff's Officer Rael issued Mr. Morton a citation for criminal trespass which Mr. Morton was unavailable to sign as he had already been "booked." *See* Exhibit M ("Pleadings *in State v. Morton*; M-53-MR-2018-00378")

52. This citation was dismissed with prejudice on October 31, 2018. *See id.*

53. Mr. Badger thus initiated, but never completed, the legal process necessary for a proper eviction under the circumstances.

54. While Mr. Badger may have been attempting to evict Mr. Morton and/or had a subjective desire to terminate Mr. Morton's residency on the Property, Mr. Badger had no legal right to override Mr. Morton's possessory interest in the Property without due process.

55. Mr. Morton's status as a residential tenant means that he and his family had a lawful possessory right in the Property and that right could not be extinguished unilaterally by Mr. Badger or without due process of law and pursuant to the UORRA.

56. On August 3, 2018, after receiving a fresh tip regarding activity at the Property, Sheriff's deputies executed a warrant at Defendants' home.

57. Three weeks later, on August 24, 2018, Taos County Sheriff Jerry Hogrefe was quoted by CNN as to why deputies hadn't raided the property earlier, stating: "Had we have gone on that property based on a consent from an owner [Badger] that

was not an occupant of that property, we would not have valid right to be there . . . ."[1]

58. For approximately seven months prior to this raid, Mr. Morton and his family had exclusively occupied the property, all the while continuing to make improvements to the land and building their home, consistent with their agreement with the Badgers. *See* Exhibit N ("Aerial Surveillance Stills")

59. By the time of Mr. Morton's arrest, Mr. Morton still had possession and no lawful judicial process had been completed to terminate his and his family's lawful possession of the Property.

60. Mr. Morton and his family therefore had a reasonable expectation of privacy in the residence at the time of the execution of the search warrant at issue.

## C. Conclusions of Law

61. Mr. Morton was the lawful owner of Lot 29, Unit #2, Costilla Meadows Subdivision.

62. Mr. Morton and Mr. Badger entered into a lawful and valid contract for good consideration to exchange Lot 29 for Lot 28.

63. Mr. Morton's agreement to permit the Badgers to possess and improve Lot #29 constituted rent and consideration in exchange for Mr. Morton's possession and improvement of Lot #28.

64. Mr. Morton and his family therefore paid for and could legitimately expect privacy in his home on Lot #29. "Likewise in *Katz*, the defendant occupied the telephone booth, shut the door behind him to exclude all others and paid the toll, which 'entitled [him] to assume that the words he utter[ed] into the mouthpiece [would]

---

[1] https://www.cnn.com/2018/08/14/us/new-mexico-compound-timeline/index.html

not be broadcast to the world.'" Katz . . . could legitimately expect privacy in the areas which were the subject of the search and seizure (he) sought to contest." *Rakas v. Illinois*, 439 U.S. 128, 149 (citing *Katz v. United States*, 389 U.S. 347, 352)(internal citation omitted).

65. Both Mr. Morton and the Badgers began improvements to the lots they were to receive in the swap, and each had a property interest in each other's lot.

66. Mr. Morton's and Mr. Badger's agreement that Mr. Morton and his family were permitted to remain on the Property is properly construed as a rental agreement, meaning that the tenets of the UORRA apply.

67. Mr. Morton was a lawful tenant on the Property, and the Badgers were required to follow established state law eviction procedures in order to terminate Mr. Morton's lawful residency on the Property once he decided to terminate the agreement to exchange lots.

68. The Badgers could not properly consent to a search of the Property, as Defendants were not trespassers on the Property.

69. Mr. Badger did not lawfully terminate Mr. Morton's lawful residency on the Property, pursuant to New Mexico law, prior to the execution of the search warrant.

70. Defendants need not "come forward with legal documentation establishing that [they] lawfully possessed the area searched" in order to establish standing but have met their burden to "at least state that [they] gained possession from the owner or someone with the authority to grant possession." *United States v. Arango*, 912 F.2d 441 445 (10th Cir. 1990)

71. Defendants have shown that they maintained "one of the main rights attaching to property" that being "the right to exclude others" from Lot 29 by virtue of their extended tenancy. *See Rakas*, 439 U.S. at 143, n.12.

72. Defendants therefore had "a legitimate expectation of privacy by virtue of this right to exclude." *Id.*

73. Defendants have demonstrated that (1) they had a subjective expectation of privacy in the searched property or premises, and (2) that society is prepared to recognize that expectation as reasonable or legitimate. *See California v. Ciraolo*, 476 U.S. 207, 211 (1986).

<div style="margin-left:50%">

Respectfully submitted,

*/s/ Ryan J. Villa*
Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave NW Ste. C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

&

*/s/ Justine Fox-Young*
Justine Fox-Young
Justine Fox-Young, PC
5501 Eagle Rock Ave NE Ste C2
Albuquerque, NM 87113
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Defendant Subhanah Wahhaj*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2023, a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

/s/*Justine Fox-Young*
JUSTINE FOX-YOUNG