# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.**                                                              **CR 18-2945 WJ**

**SUBHANAH WAHHAJ**,

**Defendant.**

## JOINT MOTION TO COMPEL THE GOVERNMENT TO PRODUCE RULE 16 AND *BRADY-GIGLIO* DISCOVERY AND DISCOVERY GOVERNED BY CIPA

Defendant Subhanah Wahhaj, by counsel Ryan J. Villa and Justine Fox-Young, moves the Court to enter an order compelling the Government to produce the discovery indicated herein as required under Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S.150 (1972). To the extent the government claims any of the material is classified, Defendant requests the Court require the United States to submit [CIPA section 4] and then conduct an ex parte conference with defense counsel to determine what information should be disclosed to Defendants.  All Defendants join in this Motion.

## BACKGROUND

The Superseding Indictment alleges Defendants provided material support to terrorism and states: "From a date unknown to the Grand Jury, but at least from in or about October, 2017, up to and including in or about August 2018, in the District of New Mexico and elsewhere, [the Defendants], and others known and unknown to the Grand Jury, knowingly did conspire, combine, confederate, agree, and act interdependently with each other to provide material support and resources, including currency, training, weapons, and personnel, knowing and intending that they were to be used in preparation for and in carrying out attacks to kill officers and employees of the

United States." Doc. 85 at 2. Prior to filing the Superseding Indictment, the United States filed a

Motion to declare the case complex. *See* Doc. 47. In this Motion the government stated:

> The charges in this case result from an investigation that was largely classified. As a result, discovery in this matter will either be classified in accordance with the Classified Information Procedures Act (CIPA), *see* 18 U.S.C. App III, or will involve the declassification of numerous FBI serials. Declassification of classified materials is a lengthy process that can take months.

*See* Motion, ¶ 10 [Doc. 47]. The sum total of information produced that appears to have been

declassified consists of 25 pages of discovery.

On October 31, 2022 the United States filed a Motion for a Pretrial Conference Pursuant

to the Classified Information Procedures Act, 18 U.S.C. App. II § 2. *See* Motion [Doc. 489]. In the

Motion the United States indicated:

> Discovery has been substantially completed in this matter since approximately July 2019. The United States has even disclosed certain materials in this case that fall outside its discovery obligations in order to avoid unnecessary and wasteful discovery litigation. In addition, the United States conducted an exhaustive examination of all potentially discoverable classified information and sought declassification of all such information in order that it could be disclosed to Defendants. Since July 2019, the *defense has sought additional materials in disclosure, including many hours of video recordings and drone aerial footage. The United States took the position that these materials were not discoverable*. Nonetheless, the United States disclosed these materials, again in an effort to avoid unnecessary and wasteful discovery litigation.

Motion at 2. The United States' assertions that the video recordings, which were recorded using

pole cameras set up outside some of Defendants' homes in Georgia, are not exculpatory,

demonstrates that the government is either consciously attempting to avoid disclosing exculpatory

information from the Georgia investigation or is incapable of recognizing that information from

that investigation is exculpatory. Indeed, the United States' response to the motion to sever counts

(Doc. 676) contains the refrain that camera footage showing Defendants not engaging in crime is

not exculpatory.  In this fashion, the United States unconvincingly maintains that the Defendants

could be involved in an ongoing terrorist plot, but that extended video footage of them conducting themselves lawfully somehow does not undermine the notion that such an ongoing plot exists.

Despite the defense's request, the United States has not disclosed any materials or information concerning the factual or legal basis for such surveillance, which is highly intrusive and unquestionably invades the privacy of the Defendants and their family members. The government claims that Defendants were providing material support to terrorism by planning to kill officers and employees of the United States. *See* Superseding Indictment, Count 1, at 2. There is no other act alleged in the indictment that Defendants intended which constitutes providing material support other than the alleged plan to kill officers and employees of the United States. Upon receiving portions of the pole camera and drone footage requested, Defendants determined that they were highly exculpatory. Indeed, they show absolutely no activity consistent with any plan to kill officers or employees of the United States. On the contrary, they simply revealed normal lawful activity by Defendants and their families. While not all evidence demonstrating the lack of inculpatory evidence is per se exculpatory, in this circumstance it is.

The Superseding Indictment suggests there may have been criminal activity supportive of terrorism when it alleges the time frame for Count 1 and Count 2 as beginning "[f]rom a date unknown to the Grand Jury, but at least from in or about October 2017." *See* Doc. 85, Count 1, ¶ 1, and Count 2, ¶ 25. Thus, the government is suggesting the alleged acts of terrorism occurred before Defendants left Georgia and the pole camera footage produced thus far and pending disclosure captures the household activities during that time frame. Moreover, if the FBI suspected Defendants of terrorism to the point they activated surveillance teams and installed pole cameras, yet found nothing, that is highly exculpatory. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (stating evidence must be viewed collectively to determine materiality for *Brady* purposes).

Accordingly, upon determining the Georgia surveillance revealed no inculpatory information, Defendants requested that the United States produce the other material that precipitated this surveillance or was created during this time, which in turn sparked the government's Motion for a CIPA pretrial conference. *See* Motion at 2 ("More recently, Defendant Siraj Wahhaj has sought disclosure of additional materials.").

The Court granted the government's motion and held a hearing on February 9, 2023. *See* Order [Doc. 571]; Clerk's Minutes [Doc. 617]. At the hearing the United States identified three areas of classified information that may be subject to CIPA in this case. This included 1) information concerning an investigation occurring in 2009 or 2010, 2) information that precipitated the investigation and subsequent surveillance of Defendants in Georgia which began in July of 2015 and concluded in December of 2017 (Georgia investigation), and 3) materials concerning the government's post-arrest investigation of Defendants. With respect to the first and third category, Defendants had not previously been informed that any classified discovery existed in these categories. Had the government disclosed this fact, Defendants would have sought this information far earlier.

As is true of the pole camera and drone footage, which reveals the activities of a peaceful family not engaged in any acts of terrorism during the time period alleged in the indictment, Defendants believe the discovery related to the Georgia investigation which remains classified will likely reveal the same thing. In so far as what little declassified discovery has been produced, there is nothing in it that suggests Defendants were providing material support or planning to kill or hurt anyone. Indeed, this is supported by recent testimony from the case agent, Agent Taylor. At the recent evidentiary hearing on standing, when Agent Taylor was asked what information there was concerning terrorism before the August 3, 2018 raid on Defendants' home in Amalia, the only

answer he could provide was that someone from the FBI wanted agents to interview Defendant Siraj Wahhaj.[1]

The post-raid information also demonstrated absolutely no evidence of any terrorist plots or plans to kill anyone. What was disclosed in discovery reveals that Defendants had some firearms and ammunition, which they all were entitled to possess save for allegedly Ms. Leveille, and they were practicing shooting, something many people in this country do consistent with the Second Amendment right to armed self-defense. There were also some writings by Ms. Leveille, who was apparently suffering from schizophrenia-induced hallucinations, about hypothetical scenarios in which the end of days arrives, and A.G. may come back as Jesus Christ and direct defendants to defend themselves against attack by the government. Finally, there was a copy of a writing created by a United States governmental agency discovered, which appears to be published on the internet, about the phases of a terrorist attack. Despite the paucity of evidence of terrorism, the government charged Defendants anyway. Accordingly, given the government's inability to recognize what evidence constitutes providing material support and what evidence might exculpate Defendants from said charges, Defendants submit that the classified discovery from the post-arrest investigation almost certainly contains exculpatory information or information that is otherwise helpful to Defendants' defenses.

Accordingly, Defendants request that the Court compel the government to disclose the following materials:

1. All documents and information concerning the 2009/2010 investigation of any Defendant and/or their immediate family members, including parents and siblings;

2. All documents and information precipitating the FBI's surveillance of Defendants and their children in Georgia; and

---

[1] An exact quote can be provided when the transcript becomes available, as Defendants have requested it.

3.   All documents and information from any post-arrest investigation, whether determined to be classified or otherwise.

This information should include reports, cooperating informant statements and information, affidavits and applications for any type of surveillance, warrants, wiretapping, pen registers, trap and trace or any other method of investigation including those submitted pursuant to the Foreign Intelligence Surveillance Act, 15 U.S.C. § 1801 (FISA). It should also include any information concerning any Defendant being placed on or considered for the no-fly list, or any similar security measure.

With respect to the pole camera and aerial footage already produced, some of that material may be corrupted or has been reproduced many times over in duplicate format to the defense. It is unclear when the corrupted material became unviewable and whether there are uncorrupted originals. Given the manner of production, Defendants are unable to determine precisely what periods of surveillance are allegedly unviewable. Defendants have determined that the period of time in mid-December 2017, perhaps the most critical time period in this case, has not been provided or is unviewable. The United States should be compelled to produce a listing of all video files in its possession specifying the location of the original recording, classified or otherwise, of any surveillance conducted on any Defendant at any time. As for those materials that have been identified as corrupted, the defense requests access to the original files so that a defense expert can conduct an independent examination.

## THE LAW ON THE GOVERNMENT'S DUTY TO PRODUCE DISCOVERY

### A.  The Government Is Obligated to Produce Rule 16 Materials.

Rule 16 of the Federal Rules of Criminal Procedure imposes a duty on the government to produce documents and objects that are material to the preparation of Defendants' defenses or will

be used as part of the government's case-in-chief at trial. *See* Fed. R. Crim. Pro. 16(a)(1)(E).

Evidence is "material" under Rule 16 if "there is a strong indication that it will play an important

role in uncovering admissible evidence, aiding witness preparation . . . or assisting impeachment

or rebuttal." *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (internal quotation

marks omitted) (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)) (internal

quotation marks omitted). The materiality standard is not a heavy burden, and the government

must disclose Rule 16 material if it would enable Defendants to alter the quantum of proof in their

favor. *Graham*, 83 F.3d at 1474.  Rule 16(d)(2) "gives the district court broad discretion in

imposing sanctions on a party who fails to comply with" Rule 16. *United States v. Wicker*, 848

F.2d 1059, 1060 (10th Cir. 1988).

### B.  The Government Is Further Obliged to Produce Materials Under *Brady v. Maryland.*

The Due Process Clause of the Constitution requires that the government disclose to

Defendants any evidence that "is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In *Giglio v. United States*, the Supreme

Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in

impeaching government witnesses, even if the evidence is not inherently exculpatory. *See* 405 U.S.

150, 153 (1972); *Douglas v. Workman*, 560 F.3d 1156, 1172-73 (10th Cir. 2009) ("[N]o distinction

is recognized between evidence that exculpates a defendant and 'evidence that the defense might

have used to impeach the [government's] witnesses by showing bias and interest.'") (quoting

*United States v. Bagley*, 473 U.S. 667, 676 (1985)).

A defendant need not ask for exculpatory evidence as "regardless of request, favorable

evidence is material, and constitutional error results from its suppression by the government if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different." *Whitley*, 514 U.S. 433; *see also Workman*, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); *United States v. Summers*, 414 F.3d 1287, 1304 (10th Cir. 2005) ("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

Under *Brady,* the government must produce evidence that is favorable to the accused and "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. at 682. *See United States v. Allen*, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit notes that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard," *United States v. Fleming*, 19 F.3d 1325, 1331, and that evidence only becomes material where it "might meaningfully alter a defendant's choices before and during trial . . . including whether the defendant should testify," *Case v. Hatch*, 731 F.3d 1015 (10th Cir. 2013) (quoting *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009)) (internal quotation marks omitted). *Brady* also requires that "[a] prosecutor must disclose information of which it has knowledge and access." *United States v. Padilla*, 2011 WL 1103876, at *7 (citing *United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir. 1989)). "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" *United States v. Padilla*, 2011 WL 1103876, at *7 (quoting *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).

In *Cone v. Bell*, 556 U.S. 449 (2009), the Supreme Court noted that while the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the government's obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995). *See also* ABA Model Rules of Professional Conduct 3.8(d) (2008) ("The prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense…").

The government has an affirmative duty to produce exculpatory material regardless of whether the defendant notifies them that such materials exist. *See Kyles*, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973) (granting a mistrial for failure to produce personnel files of government witnesses), *overruled on other grounds by United States v. Henry*, 749 F.2d 203 (5th Cir. 1984); *United States v. Padilla*, 2011 WL 1103876, at *6 (D.N.M. 2011) (Browning, J.). Under this affirmative duty, the government must "volunteer exculpatory evidence never requested, or requested only in a general way." *Kyles*, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder *Brady*, the good or bad faith of government agents is irrelevant." *United States v. Quintana*, 673 F.2d 296, 299 (10th Cir. 1982). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." *Kyles*, 514 U.S. at 439. Furthermore, "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or by compartmentalizing information

about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). By the same token, the prosecutor cannot determine that information is not discoverable, simply because it does not show any criminal activity, as the government is doing here with the aerial and pole camera footage.

### C. The Requested Materials are Within the Government's Control and are Material to Defendants' Defenses.

The requested items are within the government's control, as this case was investigated by federal authorities, including the Federal Bureau of Investigation. Accordingly, while the government does not have an affirmative duty to seek out and produce information that it does not possess or to create discovery for the defense, in this case the prosecution team already possesses the requested discovery, and it must be produced to Defendants. In addition to being in the government's possession or control, each requested item of discovery is material and will facilitate their continued defense investigation and trial preparation. Put simply, the outstanding discovery identified above will either (1) uncover admissible evidence, (2) help prepare a witness, or (3) assist in impeaching or rebuttal. *See Graham*, 83 F.3d at 1474. The evidence is also relevant to sentencing.

### ARGUMENT

### I. The Court Should Enter an Order Compelling the Government to Immediately Produce the Listed Items of Outstanding Discovery

The Court has broad discretion to regulate discovery under Rule 16, which provides in relevant part that:

> [I]f a party fails to comply with [the] rule, the court may:
>
> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
> (B) grant a continuance;
> (C) prohibit that party from introducing the undisclosed evidence; or

(D) enter any other order that is just under the circumstances.

*See* Rule 16 Fed. R. Crim. P. In the event the Court is unconvinced as to whether an item of discovery falls squarely into Rule 16, the Court should still compel its production because Rule 16 is only "intended to prescribe the minimum amount of discovery to which the parties are entitled, and leaves intact a court's discretion to grant or deny the broader discovery requests of a criminal defendant." *United States v. Richards*, 659 F.3d 527, 543 (6th Cir. 2011).

The immediate production of *Brady* and *Giglio* discovery is likewise warranted. The Court of course has discretion to order other remedies should it conclude that the government failed to properly comply with *Brady*, to the prejudice of Defendants, as the "district court has discretion to determine an appropriate remedy, whether it be the exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial." *United States v. Burke*, 571 F.3d at 1054. Accordingly, at this stage, Defendants respectfully ask the Court to exercise its discretion to order the government to produce the listed discovery.

**II.   To the Extent the Government Claims Any of the Material Sought is Classified and Subject to CIPA, the Court Should Order the Government to File an Application Pursuant to Section 4 of CIPA and Permit an Ex Parte Conference with Defendants.**

The parties agree that if information is subject to CIPA, the Court should follow Section 4 and require the government to file an application. *See United States v. Lustyik*, 833 F.3d 1263, 1271 (10th Cir. 2016) ("CIPA provides guidance to trial judges applying Federal Rule of Criminal Procedure 16(d) (discovery) where confidential information is involved."). As detailed below, Defendants respectfully request that the Court deny the government's request to file its § 4 application *ex parte*, and compel disclosure thereof to cleared defense counsel. Contrary to the government's suggestion, Section 4 does not require an *ex parte* submission because (a) the statute's explicit language does not require the Court to accept the

11

government's motion *ex parte*, but merely permits it to do so;  and (b)  each case presents its own facts and circumstances that apply to such motions.

In the alternative, Defendants respectfully submit that the Court should (a)  require the government to disclose its legal arguments (in support of its § 4 application) to cleared defense counsel;  and/or (b)  provide defense counsel an opportunity at an *ex parte* conference consistent with the practice in other courts in the CIPA § 4 context, to present to the Court *ex parte* information that will significantly assist the Court in evaluating the government's § 4 submission, and whether it includes discoverable material or material that is helpful to the defense.

## A.        Principles Governing CIPA § 4

Section 4 of CIPA permits the government to delete, summarize, or substitute specified items of classified information before providing the items in discovery, but only "upon a sufficient showing" that full production would pose a reasonable danger to national security. 18 U.S.C. App.3 § 4.  *See also United States* v. *Abu-Jihaad,* 630 F.3d 102, 141 (2d Cir. 2010) (the "state secrets" privilege to withhold information applies under CIPA Section 4 only if "there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged"). In that context, the Second Circuit has developed the following four-step test for evaluating a government application to delete or substitute information pursuant to § 4.  *See United States v. Aref*, 533 F.3d 72, 80 (2d Cir. 2008). Research reveals that the Tenth Circuit, while not expressly adopting the four-step test, has not departed from it in any way. Accordingly, the Court should follow the same test here.

### 1.        Determining Whether the Information or Material Is Classified

The first step is determining whether the information is, in fact, classified.  "Classified information" is defined as "information or material that has been determined by the United

States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security."  18 U.S.C. app. 3 §1(a). Classification may be established by the affidavit of a government official, as long as the affidavit "adequately describes the reasons for the information's classification and the harm that would result from disclosure."  *United States* v. *Juma Khan,* 2010 WL 330241, at *1 (S.D.N.Y. Jan. 20, 2010).

### 2.    Determining Whether the Material or Information Is Discoverable

If the material or information is deemed classified, the Court must next determine whether it is discoverable.  CIPA was not intended to, and does not, change the government's discovery obligations under *Brady* v. *Maryland,* 373 U.S. 83 (1963) or the Federal Rules of Criminal Procedure.  *See, e.g., United States v. Libby*, 429 F. Supp. 2d 1, 7 (D.D.C. 2006) ("[CIPA] creates no new rights or limits on discovery of a specific area of classified information. . . [,] it contemplates an application of the general law of discovery in criminal cases to the classified information based on the sensitive nature of the classified information"), *quoting United States v. Yunis*, 867 F.2d 617, 621 (D.C. Cir. 1989).  Nor does CIPA alter the Federal Rules of Evidence.

Rather, the purpose of CIPA is to protect sensitive national security information, not to impede a defendant's fair trial rights.  *See United States* v. *Stewart,* 590 F.3d 93, 130 (2d Cir. 2009); *Aref*, 533 F.3d at 80 (government's privilege under CIPA "must give way" when classified information is helpful or material to the defense).  *See also United States v. Dumeisi*, 424 F.3d 566, 578 (7th Cir. 2005) (citation omitted).  In fact, in enacting CIPA, Congress warned that "the defendant should not stand in a worse position, because of the fact that classified information is involved, than he would without the Act."  S. Rep. No. 96-823, at 9

(1980).  *See, e.g., United States v. Poindexter*, 698 F. Supp. 316, 320 (D.D.C. 1988).

### 3.     Determining Whether the "State Secrets" Privilege Applies

When classified information is discoverable, the third step involves deciding whether the "state secrets" privilege applies because (1)  exposure of the evidence would present a "reasonable danger" to national security;  and (2)  the privilege has been "lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *Aref*, 533 F.3d at 80 (citation and internal quotation marks omitted). *See also United States v. Zubaydah,* 142 S. Ct. 959, 961 (2022) ("To assert the privilege, the Government must submit to the court a formal claim of privilege, lodged by the head of the department which has control over the matter.) (internal quotes and quoted authority omitted).

### 4.     Determining Whether the Information Is Helpful or Material to the Defense

If the Court decides the "state secrets" privilege applies, the final step is to determine whether the information is "helpful or material" to the defense, meaning it would be "useful to counter the government's case or to bolster a defense." *Id*. (citation and internal quotation marks omitted).  In *Aref*, the Second Circuit explained that "to be helpful or material to the defense, evidence need not rise to the level that would trigger the Government's obligation under *Brady v. Maryland,* to disclose exculpatory information." *Id*.  Rather, "[i]nformation can be helpful without being 'favorable' in the *Brady* sense." *Id*. (citations and internal quotation marks omitted).

Thus, when information may be helpful or material to the defense, the classified material or information must be provided, but the Court may permit the government to make appropriate deletions or substitutions. 18 U.S.C. App. 3 § 4.  Section 4 authorizes a court to accept government pleadings – and by implication to conduct the entire four-step analysis set

forth above – *ex parte.* 18 U.S.C. App. 3 §4. However, because § 4 states only that "[t]he court *may* permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone[,]" *id.* (emphasis added), there exists no categorical impediment to disclosure or adversary proceedings.  Nothing in the statute permits the government to make such *ex parte* submissions as a matter of right.  Rather, the use of the permissive "may" in the plain text of CIPA § 4, rather than the mandatory "shall," makes clear that courts retain discretion to reject *ex parte* submissions on a case-by-case basis.

Also, Congress patterned the *ex parte* provision of CIPA § 4 on a similar provision in Federal Rule of Criminal Procedure 16(d)(l), which governs protective orders in criminal cases. Rule 16(d)(1), too, does not use the words "must" or "shall."  Instead, Rule 16(d)(l) states that a court "may" permit a party to show good cause for a protective order through an *ex parte* statement.  Congress amended the language of proposed Rule 16(d)(l) from requiring *ex parte* proceedings at the request of a party to permitting such proceedings. The House Judiciary Committee observed that in determining whether to proceed *ex parte,* a court should "bear[] in mind that ex parte proceedings are disfavored and not to be encouraged."  Rule 16, Fed.R.Crim.P., Advisory Committee Notes.

In contrast, when Congress intends to require *ex parte* procedures in the national security setting, it knows how to articulate that mandate.  For example, in the Foreign Intelligence Surveillance Act, Congress declared that the Court "shall" review FISA applications, orders, and related materials *ex parte* if the Attorney General submits an affidavit asserting that an adversarial proceeding would harm national security.  *See* 50 U.S.C. §1806(f) (2000).

**B.    The Court Should Deny the Government's Request for Ex Parte Treatment of Its § 4 Application Absent a Demonstration of Exceptional Circumstances.**

As a result of the foregoing analysis, rooted in the Fifth Amendment's Due Process Clause, coupled with the discussion below, it is respectfully submitted that, absent exceptional circumstances, the government should *not* be permitted to file its § 4 application *ex parte*.[2] In addition to the discretion § 4 explicitly vests in the Court – discretion that is meaningless if exercised only in one direction – the traditions of and experience in the adversary system justify requiring disclosure of the § 4 application to cleared defense counsel.

**1.    *Ex Parte* Proceedings Are Exceedingly Disfavored**

As a threshold matter, *ex parte* proceedings are exceedingly disfavored.  As the Sixth Circuit has cautioned, "[d]emocracies die behind closed doors."  *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002).  As the Ninth Circuit has observed, "ex parte proceedings are anathema in our system of justice." *Guenther v. Commissioner of Internal Revenue*, 889 F.2d 882, 884 (9th Cir. 1989), *appeal after remand*, 939 F.2d 758 (9th Cir. 1991).

By their very nature, *ex parte* proceedings impair the integrity of the adversary process and the criminal justice system.  As the Supreme Court has recognized, "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of right….No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the

---

[2] *See also* S. REP. No. 96-823, at 6 (1980) (discussing the relation between CIPA §4 and Federal Rule of Criminal Procedure 16(d)(l));  *United States v. Pringle*, 751 F.2d 419, 427 (1st Cir. 1984) (stating the purpose of CIPA §4: "[t]he legislative history clearly establishes that  these sections [CIPA §§4 and 5] were intended to make explicit the protective orders allowed for limitation of discovery of classified information pursuant to Federal Rule of Criminal Procedure 16"), (*citing* S.REP. No. 96-823)) *vacated and remanded on other grounds sub nom, United States v. McAfee*, 479 US. 805 (1986).  Because CIPA §4 affords at least as much protection for classified information (more, according to the government) as Rule 16(d)(l), discussion of §4 necessarily subsumes Rule 16(d)(l).

case against him and opportunity to meet it.'" *United States* v. *James Daniel Good Real Prop.,* 510 U.S. 43, 55 (1993) (in absence of exigent circumstances, due process clause requires government to provide notice and meaningful opportunity to be heard before seizing real property subject to civil forfeiture), *quoting Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 170-72 (1951) (Frankfurter, J., *concurring*).

Similarly, in *United States* v. *Abuhamra,* 389 F.3d 309 (2d Cir. 2004), the Second Circuit reemphasized the importance of open, adversary proceedings, declaring that "[p]articularly where liberty is at stake, due process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other." *Id.* at 321. *See also id.* ("[*e*]*x parte* submissions may generally *not* be received in opposition to bail release because such submissions compromise both a defendant's due process right to a fair hearing and the public's interest in open criminal proceedings").

As the Ninth Circuit observed in the closely analogous context of a secret evidence case, "[o]ne would be hard pressed to design a procedure more likely to result in erroneous deprivations….[T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1969 (9th Cir. 1995) (internal quotation marks and citation omitted).

> ### 2.     The Court Is Not Sufficiently Equipped to Act as Surrogate Defense Counsel

To ensure both the appearance and the reality of fairness, it is respectfully submitted that the Court should not permit the government to proceed *ex parte* without first making an adequate showing of the need for such drastic measures. Given the ease in which Ms. Wahhaj's counsel can

obtain a security clearance,[3] the government cannot plausibly contend that sharing its § 4 submission under the protections of a CIPA protective order would endanger national security. *See United States v. Libby*, 429 F. Supp.2d at 4 (recognizing that "there are fewer threats to national security in disclosing classified documents to a defendant and his attorney who have obtained security clearances, than when disclosure is made to someone who has not received security clearances"). In fact, there is no distinction between the type of clearance granted to defense counsel, and to judicial personnel or even prosecutors generally. Indeed, cleared defense counsel regularly review extremely sensitive classified information (via CIPA discovery) in the context of national security cases.

Nor are defense counsel clairvoyant, and able to predict and blindly challenge the government's position. Without access to either the classified evidence or the government's arguments for non-production, Defendants will be deprived of their right to counsel at this stage, and of the other fair trial rights to which they are constitutionally entitled. Yet without defense counsel's participation in the process of evaluating the material, and even crafting substitutions, how can the defendants be said to have been placed in the same position as they would if he enjoyed unrestricted access to either witnesses or the specific classified information?

Also, *ex parte* proceedings with respect to discovery also present an overwhelming danger of erroneous decisions. Despite what defense counsel knows will be the Court's best efforts, the Court cannot properly function as Defendants' surrogate advocate. The Court cannot possess sufficient appreciation for defense theories in a particular case, particularly at

---

[3] As counsel for Ms. Subhanah Wahhaj informed the Court at the February 9, 2023 CIPA pretrial conference, he had a security clearance in 2010, and nothing has occurred in the intervening years that would prevent the issuance of another.

this phase of the case, at which the Court would not have sufficient knowledge and understanding of critical facts, factual issues, or contentions, or knowledge of impeachment issues, the nature of government and defense exhibits, and perhaps even the defendant's testimony.

In addition, this case is considerably more complicated than an ordinary case both factually and legally, thus irremediably impairing further a court's ability to play the role of defense counsel. Thus, the relevance or materiality, or the exculpatory character of evidence, is not readily apparent except to those with intimate knowledge of the factual details as well as the full scope of discovery. Thus, adherence to the adversary process would have considerable salutary effects on the accuracy of decision-making in this instance. It is not the Court's function, but defense counsel's, to be the vigorous advocate on behalf of the defendant and point out any deficiencies in the government's response.

Indeed, given the variety and complexity of the charges in the Superseding Indictment, the language and geographic diversity of the evidence and witnesses, it would be impossible for the Court to make the appropriate determination regarding the government's motion to preclude production of material absent a meaningful and substantive contribution from defense counsel. That cannot occur if the government's entire application is *ex parte*.

In *United States v. Marzook*, 412 F. Supp.2d 913 (N.D. Ill. 2006), in deciding whether to close a hearing to the public because of potential classified information, the District Court explained that

> [i]t is a matter of conjecture whether the court performs any real judicial function when it reviews classified documents in camera. Without the illumination provided by adversarial challenge and with no expertness in the field of national security, the court has no basis on which to test the accuracy of the government's claims.

*Id.* at 921 (internal citation and quotation omitted). Likewise, in *Alderman v. United States*, 394 U.S. 165 (1969), the Court addressed the procedures to be followed in determining whether government eavesdropping in violation of the Fourth Amendment contributed to its case against the defendants. The Court rejected the government's suggestion that the district court make that determination *ex parte*, observing that

> [a]n apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances.

*Id.* at 182.

For the reasons outlined above, courts necessarily lack familiarity with "the information contained in and suggested by the materials[,]" *see id.* at 184, that the government seeks to withhold. The Court, which has not had opportunity to review the discovery, consult with the defense, or otherwise investigate the facts of this case, cannot be expected to surmise the factual nuances of the defense. As the Supreme Court has recognized, "[i]n our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." *Dennis v. United States*, 384 U.S. 855, 875 (1966). Accordingly, it is respectfully submitted that the government should not be permitted to file its §4 application *ex parte*, and that it should instead be disclosed to cleared defense counsel.

**C.    In the Alternative, the Government Should Be Compelled to Disclose to Cleared Defense Counsel Its Legal Arguments In Support of Its § 4 Application**

In the alternative, should the Court determine a need to review the government's § 4

submission *in camera* in whole or in part, it is respectfully requested that the government be compelled to disclose to cleared defense counsel its arguments in support of non-production, and an adversarial hearing addressing those arguments should be conducted.  There is no sensible reason why disclosure of the government's arguments would implicate national security, especially when they could be provided to defense counsel subject to an appropriate protective order.

Such practice is not inconsistent with the Second Circuit's opinion in *Abu-Jihaad*. While in that case the Court noted that "where the government moves to withhold classified information from the defense, an adversarial hearing with defense knowledge would defeat the very purpose of the discovery rules[,]" 630 F.3d at 143, *citing Aref*, 533 F.3d at 81 (internal quotation marks omitted), the Court nevertheless acknowledged that trial judges retain discretion to reject *ex parte* filings under § 4.  Indeed, in *Abu-Jihaad* the Court characterized the defense's opposition as a "challenge to the district court's exercise of *discretion* to proceed *ex parte*," and reviewed the district court's decision to accept an *ex parte* filing under an abuse of *discretion* standard.  *Id*. (emphasis added).

In *United States* v. *Libby*, 429 F.Supp. 2d 18 (D.D.C. 2006), *amended by* 429 F. Supp.2d 46 (D.D.C. 2006), the district court also recognized its discretion to reject *ex parte* § 4 filings. In *Libby*, the Court established a procedure for evaluating the necessity of an *ex parte* § 4 filing, requiring that any government submission under § 4 must necessarily include a declaration or affidavit, executed by an intelligence community official with the requisite classification authority, that (1)  describes the reasons for the classification of the information at issue;   (2) sets forth the potential harm to national security that could result from its disclosure;  and (3) explains why the defense, based upon appropriate classification guidelines,

does not have 'need-to-know' the information in its unaltered form." *Id*. at 25.

The Court in *Libby* added that, "[u]pon receipt of such a filing, the Court will review it and determine whether the filing should remain ex parte, or whether all or some portion of it should [be] provided to the defendant." *Id*. Similarly, in *Bostan v. Obama*, 674 F.Supp.2d 9,27 (D.D.C. 2009), a Guantanamo Bay *habeas* case, the Court adopted the same procedure for evaluating *ex parte* submissions under § 4.

In addition, defense counsel are at enough of a disadvantage not being privy to the facts relevant to the government's CIPA § 4 submission. In the past few years, though, it has been revealed that the Foreign Intelligence Surveillance Court ("FISC") has issued a number of opinions that have not been published, but to which the government (and not defense counsel) have access. Thus, a process by which the defense is deprived of not only of the relevant facts, but also potentially relevant case law, is hollow indeed, and entirely irreconcilable with the adversary system.

**D. Defense Counsel Should Also Be Permitted to Make an *Ex Parte* Presentation to the Court Regarding How Classified Material May Be Helpful and Material to the Defense**

If, assuming *arguendo*, the Court accepts the government's § 4 application, including the government's legal arguments, *ex parte* (under an appropriate protective order, if necessary), it is respectfully requested that defense counsel, at the very least and in order to assist the Court in making its § 4 determination(s), be permitted an *in camera* and *ex parte* opportunity, at a conference with the Court, to make a presentation to the Court as to the reasons why categories of potentially classified evidence may be relevant, material, and/or helpful to the defense in this case, to answer questions from the Court in a contemporaneous fashion, and to permit dialogue to flesh out the issues.

Indeed, in *United States v. Mostafa*, 04 Cr. 356 (KBF) (Docket 233) (S.D.N.Y. 2014) the Court granted that request and conducted such a conference – and did so prior to ruling on the government's Section 4 motion. *See Mostafa*, at 6-7. In addition, such *ex parte* presentations by defense counsel have been conducted in other cases besides *Mostafa*. *See, e.g., United States v. Sulaiman Abu Ghayth,* 98 Cr. 1023 (LAK) (S.D.N.Y. August 19, 2013), Docket # 1285 (ordering in the context of a CIPA § 4 submission by the government that "to permit the Court to be better informed to make the judgments called for by the government's CIPA motion . . . the Court will meet . . . *ex parte* with the defense to be better informed of the defenses they plan to present" in addition to meeting with the government as to the same);  *United States v. Khaled Al Fawwaz* & *Adel Abdel Bary*, 98 Cr. 1023 (LAK) (S.D.N.Y. August 19, 2013), Docket # 1284 (same);  *United States v. Babar Ahmad*, 04 Cr. 301 (JCH) (D. Conn. April 15, 2013), Docket # 72 (calendering an *ex parte* hearing regarding the government's CIPA § 4 filing, at which the Court would also "hear an *ex parte* presentation from the defense, as per their request, to assist the court in making its Section 4 determination").  *See also Libby*, 429 F.Supp.2d at 26 (allowing the defendant to submit an *ex parte* affidavit detailing the defense) Defense counsel was also involved in this process in the Northern District of Texas, in*United States v. Mohammad El-Mezain*, 04 Cr. 240-G (AJF) (N.D. Texas 2004) (court held an *ex parte* defense conference).

## CONCLUSION

The discovery requested by the Defendants is material to the preparation of their defenses and almost certain to be exculpatory and/or useful for impeachment. The government's possession and control of the requested materials is not in question, and they should be produced immediately. If any discovery is classified, the Court should order the parties to proceed pursuant to Section 4.

Respectfully submitted,

/s/ *Ryan J. Villa*
Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave NW Ste. C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

/s/ *Justine Fox-Young*
Justine Fox-Young
5501 Eagle Rock Ave NE Ste C2
Albuquerque, NM 87113
(505) 796-8268
justine@foxyounglaw.com

Attorneys for Defendant *Subhanah Wahhaj*

/s/ *Donald F. Kochersberger III*
Donald F. Kochersberger III
Business Law Southwest
320 Gold Ave. SW, Suite 610
Albuquerque, NM 87102
(505) 848-8581
Donald@BusinessLawSW.com

/s/ *Marshall J. Ray*
Marshall J. Ray
Law Offices of Marshall J. Ray, LLC
514 Marble Ave, NW
Albuquerque, NM 87111
(505) 312-2748
mray@mraylaw.com

*Attorneys for Defendant Hujrah Wahhaj*

FEDERAL PUBLIC DEFENDER
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
Fax:  (505) 346-2494

/s/ *Angelica Hall*
ARIC ELSENHEIMER, AFPD
ANGELICA HALL, AFPD

Attorney for Defendant Jany Leveille

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2023, I filed the foregoing electronically through the CM/ECF system, which caused counsel for the United States to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

 /s/ Ryan J. Villa
RYAN J. VILLA