IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____
                                )
UNITED STATES OF AMERICA,        )    No. 1:18-CR-02945-WJ
                                )
         Plaintiff,              )
                                )    Pete V. Domenici U.S. Courthouse
    vs.                          )    Cimarron Courtroom
                                )    Albuquerque, New Mexico
JANY LEVEILLE, SIRAJ IBN         )    Tuesday, March 28, 2023
WAHHAJ, HUJRAH WAHHAJ,           )
SUBHANAH WAHHAJ, and             )
LUCAS MORTON,                    )
                                )
         Defendants.             )
_____)


               TRANSCRIPT OF PROCEEDINGS
                 EVIDENTIARY HEARING re:
         STANDING TO BRING MOTION(s) TO SUPPRESS
       BEFORE THE HONORABLE WILLIAM P. JOHNSON
          CHIEF UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:   TAVO HALL
                     KIMBERLY BRAWLEY
                     UNITED STATES ATTORNEY'S OFFICE
                     District of New Mexico
                     Post Office Box 607
                     Albuquerque, New Mexico   87103


For Defendant        ARIC ELSENHEIMER
Jany Leveille:       ANGELICA M. HALL
                     FEDERAL PUBLIC DEFENDER
                     District of New Mexico
                     111 Lomas Blvd., N.W., Suite 501
                     Albuquerque, New Mexico  87102

```
 1  APPEARANCES (Continued):

 2  For Defendant        MARC H. ROBERT
    Siraj Ibn Wahhaj:    MARC H. ROBERT, ATTORNEY
 3                       Post Office Box 25271
                         Albuquerque, New Mexico 87125
 4
                         THOMAS CLARK
 5                       CLARK AND JONES, LLC
                         432 Galisteo Street
 6                       Santa Fe, New Mexico 87501

 7  For Defendant        MARSHALL J. RAY
    Hujrah Wahhaj:       LAW OFFICES OF MARSHALL J. RAY, LLC
 8                       201 12th Street, N.W.
                         Albuquerque, New Mexico  87102
 9
                         DONALD KOCHERSBERGER
10                       BUSINESS LAW SOUTHWEST, LLC
                         320 Gold Avenue, S.W., Suite 610
11                       Albuquerque, New Mexico 87102

12  For Defendant        JUSTINE FOX-YOUNG
    Subhanah Wahhaj:     JUSTINE FOX-YOUNG, P.C.
13                       5501 Eagle Rock Avenue, N.E., Suite C2
                         Albuquerque, New Mexico  87104
14
                         RYAN J. VILLA
15                       THE LAW OFFICES OF RYAN J. VILLA
                         5501 Eagle Rock Avenue, N.E., Suite C2
16                       Albuquerque, New Mexico  87104

17  For Defendant        PRO SE
    Lucas Morton:
18
    Defendant Morton's   JOSEPH SHATTUCK
19  Standby Counsel:     JOSEPH E. SHATTUCK, ESQ.
                         8748 E. Belleview St.
20                       Scottsdale, Arizona 85257

21  Also Present:        CYNTHIA GILBERT

22  Reported by:         MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                         United States Court Reporter
23                       Phone:  (505)348-2334
                         Email:  Mary_Loughran@nmd.uscourts.gov
24
        Proceedings reported by machine shorthand and transcript
25  produced by computer-aided transcription.
```

```
 1                          I N D E X

 2   WITNESSES                                          Page

 3   CRAIG MARTIN
         DIRECT EXAMINATION BY MR. MARC ROBERT .............8
 4       CROSS-EXAMINATION BY MR. TAVO HALL ...............15
         REDIRECT EXAMINATION BY MR. ROBERT ...............19
 5       QUESTIONS BY THE COURT ...........................19
         REDIRECT EXAMINATION BY MR. MARSHALL RAY .........21
 6
     JASON DOUGLAS BADGER
 7       DIRECT EXAMINATION BY MS. JUSTINE FOX-YOUNG .......26
         CROSS-EXAMINATION BY MR. TAVO HALL ...............76
 8       REDIRECT EXAMINATION BY MS. FOX-YOUNG .............98

 9   CHRISTOPHER JOHN STACHURA
         DIRECT EXAMINATION BY MR. RYAN VILLA .............103
10       CROSS-EXAMINATION BY MS. KIMBERLY BRAWLEY ........117
         REDIRECT EXAMINATION BY MR. RYAN VILLA ...........126
11
     SERGEANT JASON RAEL
12       DIRECT EXAMINATION BY MR. MARSHALL RAY ...........128
         CROSS-EXAMINATION BY MS. KIMBERLY BRAWLEY ........151
13       REDIRECT EXAMINATION BY MR. MARSHALL RAY .........166

14   UNDERSHERIFF JERRY LYNN HOGREFE
         DIRECT EXAMINATION BY MR. RYAN VILLA .............174
15       CROSS-EXAMINATION BY MR. TAVO HALL ...............186

16   LUCAS MORTON
         DIRECT EXAMINATION BY MS. JUSTINE FOX-YOUNG ......192
17       CROSS-EXAMINATION BY MS. KIMBERLY BRAWLEY ........193

18   SPECIAL AGENT TRAVIS TAYLOR
         DIRECT EXAMINATION BY MR. TAVO HALL ..............208
19       CROSS-EXAMINATION BY MR. RYAN VILLA ..............218
         REDIRECT EXAMINATION BY MR. TAVO HALL ............220
20

21   EXHIBITS                       FORMALLY MARKED/IDENTIFIED

22   Government's Exhibits 1 through 16                  7

23   Defendants' Exhibits A through P                    7
     Defendants' Exhibit C-1                            15
24   Defendants' Exhibit L-1                            72
     Defendants' Exhibit L-2                            73
25                        * * * * *
```

USA v. Leveille, et al.                        3/28/2023
18-cr-2945                   Evidentiary Hearing re: Standing

```
 1              USA v. LEVEILLE, et al. - 1:18-CR-02945-WJ

 2                         EVIDENTIARY HEARING

 3                            *  *  *  *  *

 4  (In Open Court at 9:07 A.M.)

 5          THE COURT:  All right, we're in session this morning

 6  in the case of the United States vs. Jany Leveille, Siraj Ibn

 7  Wahhaj, Hujrah Wahhaj, Subhanah Wahhaj, and Lucas Morton, Case

 8  No. 18-CR-2945.

 9          Beginning with the United States, would counsel enter

10  their appearances, please.

11          MR. HALL:  Good morning, Your Honor.  Tavo Hall and

12  Kimberly Brawley on behalf of the United States.  And also at

13  counsel table is Travis Taylor of the FBI.

14          THE COURT:  Beginning with defense counsel.

15          MR. ELSENHEIMER:  Good morning, Your Honor.  Aric

16  Elsenheimer and Angelica Hall on behalf of Jany Leveille.

17          MR. ROBERT:  Good morning, Your Honor.  Mark Robert

18  and Tom Clark on behalf of Siraj Wahhaj.

19          MR. RAY:  Good morning, Your Honor.  Marshall Ray and

20  Don Kochersberger on behalf of Hujrah Wahhaj.

21          MS. FOX-YOUNG:  Good morning, Your Honor.  Justine

22  Fox-Young and Ryan Villa on behalf of Subhanah Wahhaj.

23          MR. VILLA:  Good morning, Judge.

24          DEFENDANT MORTON:  Good morning.

25          THE COURT:  And I was just going to say, Mr. Morton,
```

1    you're here representing yourself?

2              DEFENDANT MORTON:  Yes, good morning.  Thank you.

3              THE COURT:  Good morning.

4              It would seem to me -- I'm familiar with the legal

5    issues that have been raised, so it would make sense to move

6    into witness testimony.

7              MR. HALL:  Yes, Your Honor.

8              THE COURT:  Does the United States have a witness to

9    call?

10             MR. HALL:  We do, Your Honor, although we thought

11   since it was the defense's burden, they would go first.  But

12   whatever the Court pleases.

13             THE COURT:  Mr. Ray?

14             MR. RAY:  Well, Judge, it might make things flow

15   smoother if we did a small item of housekeeping before we start

16   with the witness testimony.

17             THE COURT:  All right, that's fine.

18             MR. RAY:  The parties have been discussing the

19   exhibits, and based on a discussion with all of defense counsel

20   and Mr. Morton and with the Government, we have agreed to

21   stipulate to the admissibility, for the purposes of this

22   hearing, of both parties' exhibits, all that have been

23   proffered.

24             The Court has copies of all the defense exhibits.

25   They are designated A through P.  And just as a matter, also,

1   of clarity in the record, our proposed findings of fact and

2   conclusions of law, they reference through Exhibit L, but there

3   are Exhibits M, N, O, and P, which are going to be a part of

4   the evidence here today.  So we wanted to make sure those are

5   in the record, even though they are not referenced in our

6   earlier submission.  And then the Defendants have stipulated to

7   the Government's exhibits, as well.

8           THE COURT:  All right.  Then at this time, for

9   purposes of this hearing, I'll admit Defendants' proposed -- or

10  Defendants' Exhibits A through P, and I will admit Government's

11  Exhibits 1 through 14.  Is that right?

12          MR. HALL:  Yes, Your Honor.  And -- well, so 14 is

13  what's in the binder that you have, I believe.

14          THE COURT:  Does that include the recordings?

15          MR. HALL:  No.  So there is actually an Exhibit 15,

16  as well.  It's in the binder.  It was not attached to our

17  findings of fact and conclusions of law.  It's 11 pages of text

18  messages.  And then the recording, the only one that the

19  Government would be putting in, is the -- one of the defense

20  exhibits, I don't the number off the top of my head, I think

21  it's K, is like an eight second snippet.  So Government's

22  Exhibit 16 would just be the full video recording, the thirty

23  minute video of that.

24          THE COURT:  No objection to those coming in?

25          MR. RAY:  No.

1        THE COURT:  So I'll also admit Exhibits 15 and 16,

2   which is the recording.  I've got a CD up here that says,

3   "Badger Home Interview."  Is that Exhibit 16?

4        MR. HALL:  Yes, Your Honor, that's right.

5        MR. RAY:  Yes, Judge, no objection.  And we didn't

6   make that whole interview available to the Court, so we'll

7   trust that the Government did.

8        (Government Exhibits No. 1 through 16 admitted.)

9        (Defendants' Exhibits No. A THROUGH P admitted.)

10       THE COURT:  Now, in terms of -- I mean, I agree, in

11  terms of the standing issue, Defendants have the burden of

12  establishing standing to assert a motion to suppress.

13  Logistically, from the standpoint of Mr. Badger's testimony,

14  would it make sense for the Government to call him first, or do

15  you want to call him?

16       MR. RAY:  Your Honor, we want to call him.

17       THE COURT:  All right, that's fine.

18       MR. RAY:  That's what we anticipated.

19       THE COURT:  All right.  Then is he going to be the

20  first witness?

21       MR. RAY:  Actually, Judge, I have a witness order

22  that the Defendants were going to propose for our witnesses,

23  and we have him as the second witness.  We were going to call

24  one of our investigators first for some brief testimony.

25       THE COURT:  All right.  Go ahead, then.

1        MR. RAY:  So the defense, Judge, calls Craig Martin.

2   And by the way, Judge, I'm going to invoke the rule of

3   exclusion.  I don't know if there are any witnesses in the

4   room.  It doesn't look like it, other than ours.

5        MR. ROBERT:  Mr. Badger is in the waiting room.

6        MR. RAY:  Okay, there we go.

7        (CRAIG MARTIN, DEFENSE WITNESS, SWORN)

8        CRD RICHARD GARCIA:  Please have a seat and state

9   your full name for the record.

10        THE WITNESS:  Craig Martin.

11                   TESTIMONY OF CRAIG MARTIN

12                      DIRECT EXAMINATION

13   BY MR. MARC ROBERT:

14   Q.   Good morning, Mr. Martin.

15   A.   Good morning.

16   Q.   What do you do for a living?

17   A.   I'm a private investigator, sir.

18   Q.   How are you connected to this case?

19   A.   I was initially retained by Hujrah's attorneys, Carey

20   Bhalla and Teri Duncan.

21   Q.   Tell us what has taken you to the property that's one of

22   the central elements of this case.

23   A.   Myself and another investigator were asked to go out and

24   confirm where the location of the scene was and just kind of

25   review it.

1  Q.    How many times have you been up to that scene?

2  A.    Twice now.

3  Q.    Once in February, once in March?

4  A.    Yes, sir.

5  Q.    Last time was last Wednesday?

6  A.    Yes, sir, the 23rd -- I'm sorry; the 22nd.

7  Q.    Describe for the Court the difficulties you had in trying

8  to locate the two parcels that are at issue in this case.

9  A.    The first time we went up, we had the initial search

10  warrant.  The GPS locations that I was -- or GPS site I was

11  using on my phone did not take those numbers, that format, so I

12  did a conversion online.  That conversion took us to a

13  different part of the neighborhood, probably a few hundred

14  yards off.

15  Q.    Okay.  What did you do when you ran into that difficulty?

16  A.    At that point, we just kind of started driving around

17  looking at different parts of the neighborhood, because there's

18  no street signs.  Nothing's marked as far as lot numbers that

19  are readily visible anywhere.  We did ultimately locate the

20  housing location.

21  Q.    Okay.  Now, separate the things that you're describing

22  between the February and the March visits.  It sounds like when

23  you went up in February, that's when the GPS conversion failed

24  and didn't take you to the right place.

25  A.    Yes, sir.

1  Q.   What did you do at that time to try to resolve that

2  problem?

3  A.   We did find the location then, we just didn't realize,

4  100 percent sure, that we were there at the right location.

5  Q.   Okay.  Then when you went back up in March, last week,

6  last Wednesday, what did you do to try to narrow your search

7  down?

8  A.   Once we found the location, we kind of had an idea in our

9  head where it was at.  I went back home, reconverted it using

10  an actual government website, I believe the FCC site does a

11  conversion, and it took me to that location.  It was more

12  better.  Something changed, I don't know.  It was better than

13  Google.

14  Q.   Okay.  So you are fairly confident now that what you found

15  last Wednesday was the correct place?

16  A.   Yes, sir.  After that, I was in Taos for another case and

17  stopped at the Assessor's office.

18  Q.   What did you do there?

19  A.   They provided me with the transactions showing who

20  purchased which lot and who they purchased it from.

21  Q.   And what did you find?

22  A.   I found that Mr. Morton had purchased the lot from a

23  Mr. Kohlmann, I believe is how you say it.  Using that

24  information, I was able to verify that the lot where the house

25  site was at was Badger's.  It had been built on the lot

1  directly, I want to say, west of the one that Mr. Morton had

2  purchased from Mr. Kohlmann.  And I was able to actually use a

3  hunting app to pull it up and find Mr. Morton listed as a

4  secondary owner, just not as a primary.

5  Q.   All right.  So you were pretty sure last Wednesday that

6  you found the two lots that you wanted to find?

7  A.   Yes, sir.

8            MR. ROBERT:  Could we run Exhibit O, please?

9  BY MR. ROBERT:

10 Q.   Did you take video when you were there?

11 A.   Yes, sir.

12 Q.   How did you do that?

13 A.   I stood on top of a tool box in somebody's pickup and then

14 used a phone.

15 Q.   Okay.  This is, it looks like, the beginning of a video.

16 Does this look like the place that you were taking that video?

17 A.   Yes, sir.

18 Q.   All right.

19            MR. ROBERT:  Would you go ahead and run that, please?

20            (Whereupon Exhibit O, video recording, played)

21 BY MR. ROBERT:

22 Q.   All right, we're looking right now at what looks like a

23 pathway between the sage there on this scrub.  What is that?

24 Can you tell us what that is, if you know?

25 A.   It runs right along the property lines.  It looks like

1   somebody used probably some kind of a beam or something and

2   just dragged it behind, or a plow, and cleaned out the brush to

3   make a path in between the lots.

4   Q.   Okay.  Can you tell us which lot is on the right and left

5   of this path?

6   A.   As you're looking at it right now, that's the southwest

7   corner of Lot 29.  It rotates from my left to the right, and

8   Lot 28 is on my right.

9   Q.   All right.  Did you look for markers, survey markers,

10  delineating the corners of these lots?

11  A.   We weren't really looking for them, but we did find two,

12  yes, sir.

13  Q.   Okay.  Tell us how that search proceeded, how you found

14  them.

15  A.   As we were turning off of what is an actual road, but is

16  not really a road -- it's hard to describe -- on to that trail

17  that I was taking the video from, there was a stake marker that

18  was sticking up just enough above the sage so that we could see

19  it.

20  Q.   All right.

21  A.   And there was a rebar land marker in the corner right

22  there.

23  Q.   Was there more than one stake marker, wooden stake?

24  A.   On that one, there was two, yes, sir.

25  Q.   Describe those, please.

1  A.   The one next to the rebar, or directly closest to it, was

2  only about six inches to a foot high, rotted, and it basically

3  broke off when we touched it.

4  Q.   Okay.  And the other one?

5  A.   The other one was taller, about three feet tall.  Kind of

6  the size of a stir stick from a paint can, something like that.

7  Q.   Newer, do you think, than the broken one?

8  A.   From what it looked like, yes, sir.  It was in better

9  shape.

10  Q.   How tall was the rebar that you found?

11  A.   Six, eight inches.

12  Q.   Did you find another rebar marking another corner?

13  A.   Yes, sir.

14  Q.   And was it essentially the same in terms of shape and

15  size?

16  A.   The rebar, yes.  There were no stakes next to it, if I

17  remember right.

18  Q.   All right.  How difficult would that have been, do you

19  think, to find just looking, walking that ten acres, twenty

20  acres combined?

21  A.   If you don't know where that lot is at with some kind of a

22  map or a GPS, you're going to be doing a lot of walking trying

23  to find those stakes.

24  Q.   All right.

25        MR. ROBERT:  Can you put up Exhibit C, please?

1   BY MR. ROBERT:

2   Q.   Could you tell us, looking at this diagram of these lots

3   in that part of the county, could you identify where you were

4   standing when you took that video?

5   A.   Yes, sir.  On the bottom part of Lot 29, kind of where the

6   cursor is at.  There's a number along the properly line.

7            THE COURT:  You can draw on the screen.

8   A.   It would have been approximately right there, maybe a

9   little bit to the left.

10  Q.   Okay, very good.  Thank you, Mr. Martin.

11           MR. ROBERT:  Pass the witness.

12           Could we mark the drawing with the dot on it as

13  Exhibit Q?

14           THE COURT:  Do you want to make it C-1?

15           MR. ROBERT:  That's fine.  C-1 would be fine, Your

16  Honor.  Thank you.

17           THE COURT:  All right.  Does that need to be printed

18  out?

19           MR. ROBERT:  Probably.  In order to make it a part of

20  the record, I think, yes.  And we can get it here, Your Honor.

21           THE COURT:  That's fine.

22           Before the Government -- well, any other questions

23  from Defendants?

24           MR. RAY:  No, Judge.

25           THE COURT:  Mr. Morton, do you have any questions?

 1              DEFENDANT MORTON:  No, sir.

 2              MR. ROBERT:  Excuse me, Your Honor.  Is there any

 3  objection to the admission of C-1?

 4              MR. HALL:  No.

 5              THE COURT:  I should have asked that; thanks.  All

 6  right, it's admitted as part of Defendants' exhibits.

 7              (Defendants' Exhibit No. C-1 admitted.)

 8              THE COURT:  Mr. Hall.

 9                       CROSS-EXAMINATION

10  BY MR. TAVO HALL:

11  Q.   Good morning, Mr. Martin.

12  A.   Good morning, sir.

13  Q.   Just a few points of clarification.  So to state the

14  obvious, you're an investigator, right?

15  A.   Yes, sir.

16  Q.   So your job is to go find things?

17  A.   Yes, sir.

18  Q.   You did look into land titles or land records for Lot 29,

19  right?

20  A.   Yes, sir.

21  Q.   And you mentioned that you found something saying that

22  Lucas Morton had purchased the lot?

23  A.   Yes, sir.

24  Q.   But he didn't actually record a deed, right?

25  A.   To be honest with you, I don't know what -- I don't know

1    one page from the other.  I'm not a ...

2    Q.   Sure.  You didn't find a deed saying Lucas Morton was the

3    owner of Lot 29?

4    A.   I don't know if I did or not.  I don't believe so.  I

5    wouldn't -- I don't remember seeing one.

6    Q.   And the thing you did find from the Assessor's office, it

7    listed him as a secondary owner, you said?

8    A.   Actually, the Assessor mentioned him as a secondary.  What

9    I found him listed on was a hunting app.

10   Q.   A hunting app?

11   A.   Yes, sir.

12   Q.   A hunting app is not an official government property

13   record, I assume?

14   A.   No, sir.

15   Q.   Now, you mentioned you went out to this land.  And you

16   went out there in 2023; is that right?

17   A.   Yes, sir.

18   Q.   Both times were this year?

19   A.   Yes, sir.

20   Q.   And that's five years after 2018?

21   A.   Yes, sir.

22   Q.   And you were able to find property stakes in the ground,

23   you testified?

24   A.   Yes, sir.

25   Q.   They weren't in the best condition, but you found them; is

1   that right?

2   A.   The rebar was still there.  There was probably sticks

3   around one corner, yes, sir.

4   Q.   And the strips that we saw in that video, you testified

5   those were property boundaries?

6   A.   Not exactly, no.  It looked like somebody just plowed

7   through to kind of mark the rough area.  The property line is

8   actually just a little bit off of that.

9   Q.   But the idea of the strip was to sort of mark a boundary

10  there, though?

11  A.   I don't know if it was to mark a boundary or to give

12  someone access to it.  I don't know.

13  Q.   Sure.  When you went to the Assessor's office, you were

14  able to find a map?  This is Exhibit C here.  You had seen that

15  before?

16  A.   No, sir.

17  Q.   So this is the first time you've seen that?

18  A.   No.  I saw it afterwards.

19  Q.   Okay.  And you are aware -- so you're an investigator in

20  this case, generally, right?

21  A.   Yes, sir.

22  Q.   Are you aware of the facts and circumstances of the case,

23  generally?

24  A.   Yes, sir.

25  Q.   Are you aware that Jason Badger explained the property

1    boundaries of Lots 28 and 29 to Lucas Morton back in 2018 when

2    they first appeared on his land?

3    A.    That's the way I understand it, yes, sir.

4    Q.    And you're aware that Jason Badger showed either

5    Mr. Morton or someone else in the group the property stakes?

6    A.    I believe so, yes, sir.

7    Q.    And so Mr. Badger was able to find his lot and knew which

8    lot he was the owner of?

9         MR. ROBERT:  Objection, calls for speculation.

10        THE COURT:  Rephrase the question.  It does call for

11   the witness to speculate.

12        MR. HALL:  Yes, Your Honor.

13   BY MR. HALL:

14   Q.    So based on that conversation that you just testified

15   you're aware of, it would seem to you that Mr. Badger was able

16   to explain the property boundaries to Mr. Morton?

17   A.    After they had already moved on and started working on it,

18   yes, sir, I believe he did.  That's what I read in the

19   discovery.

20   Q.    Sure.  And when you were out there driving around, there

21   are other owners, there are other landowners or, I should say,

22   people who live out there, right?

23   A.    There's a handful of houses, yes, sir.  I don't know how

24   many lots are sold or owned or what.

25   Q.    Right.  But some people do live out there?

1  A.   There's buildings out there.  Only one appeared occupied,

2  honestly.

3          MR. HALL:  No further questions, Your Honor.

4          THE COURT:  Is there redirect?

5          MR. ROBERT:  Just briefly, Your Honor.

6                      REDIRECT EXAMINATION

7  BY MR. ROBERT:

8  Q.   Mr. Martin, those pathways that we saw in the video, do

9  you have any idea when those were created?

10 A.   No, sir.

11 Q.   Do you know for sure that they were there back in

12 2017-2018?

13 A.   I have no idea, sir.

14          MR. ROBERT:  Thank you.

15          THE COURT:  I've got just a couple of questions.

16          On the screen, the red dot that you put there --

17          THE WITNESS:  Yes, sir.

18          THE COURT:  -- what does that, again, represent?

19          THE WITNESS:  That's approximately where I was

20 standing on top of the pickup to take the video, sir.

21          THE COURT:  Okay.  Now, in part of Exhibit O, you

22 testified about something that appeared to be what maybe a

23 tractor or something had cleared, a straight line.

24          THE WITNESS:  Yes, sir.  That's where we drove the

25 truck to, where I stopped and climbed out on top.

1          THE COURT:  Okay.  Would that have been -- okay, so

2    that roadway or pathway, whatever you want to call it, it was

3    wide enough for your pickup truck to get through?

4          THE WITNESS:  We drove down as far as about where the

5    red dot is at and stopped, because it was very narrow and the

6    road -- we didn't want to get stuck.  It was very muddy at that

7    point.

8          THE COURT:  Would that roadway be -- I'm not sure how

9    this diagram is oriented in terms of north-south.  But would it

10   represent -- the horizontal line where the red dot is, is that

11   the roadway that was in Exhibit O that you videoed, or pathway?

12         THE WITNESS:  If I'm remembering correctly, based on

13   what the hunting app showed, the road or little path we were on

14   was actually just to the south, which would be right below the

15   red dot in Lot 32, but just by a few feet.

16         THE COURT:  Okay.  From this diagram, it looks like

17   to the left of the red dot there appears to be some kind of a

18   roadway or pathway.

19         THE WITNESS:  Yes, sir.

20         THE COURT:  The roadway that you videoed in

21   Exhibit O, would that be the way that whoever owns Lot 28 would

22   access the lot from what appears to be a roadway on the left?

23         THE WITNESS:  No, sir.  Lot 28 is accessed by a

24   road --

25         THE COURT:  Oh, I see.  Over on the right-hand side.

```
 1              THE WITNESS:  Right-hand side, yes, sir.
 2              THE COURT:  All right.  Do counsel have any questions
 3   in light of my questions?
 4              MR. HALL:  No, Your Honor.
 5              MR. ROBERT:  No, Your Honor.  Thank you.
 6              MR. RAY:  Judge, on behalf of Hujrah Wahhaj, I just
 7   have a very brief redirect.
 8              THE COURT:  Sure.
 9                      REDIRECT EXAMINATION
10   BY MR. MARSHALL RAY:
11   Q.   Mr. Martin, when you were learning about the conversations
12   between Mr. Badger and Mr. Morton about these lots, did you
13   also learn that Mr. Badger had agreed with Mr. Morton to a
14   transaction to swap ownership of those lots?
15   A.   Yes, sir.
16              MR. RAY:  Thank you.
17              THE COURT:  Anything further?
18              MR. HALL:  No, Your Honor.
19              THE COURT:  May the witness be excused or step down?
20              MR. ROBERT:  Yes, Your Honor.
21              THE COURT:  All right.  Thank you.
22              Who is going to be the next witness?
23              MR. RAY:  Judge, the defense would call Jason Badger.
24              MS. FOX-YOUNG:  And Your Honor, we just have a
25   preliminary matter.  We told the Government that if the Court
```

1  would indulge us, we would agree to do this very brief portion

2  in a sealed setting.  Would you like us to approach just to

3  give the Court a little bit of background?

4          THE COURT:  Sure.

5  (Sealed discussion at bench as follows:)

6                          * * * * *

7                  (This portion of the transcript from

8              Page 22, Line 6 through Page 23, Line 6,

9                      is filed under seal)

10                          * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        * * * * *
 2              (This portion of the transcript from
 3            Page 22, Line 6 through Page 23, Line 6,
 4                    is filed under seal)
 5                        * * * * *
 6                        * * * * *
 7  (End of discussion at bench.)
 8            THE COURT:  A very preliminary part of the next
 9  witness' testimony is going to be under seal.  It shouldn't be
10  more than two or three minutes.  So I'm going to clear the
11  courtroom -- well, do you want the witness to come in?  Let's
12  have him placed under oath, and then I'll clear the courtroom.
13            MR. VILLA:  Your Honor, Ms. Anderson here in the
14  front row is with my office, just so you know.
15            THE COURT:  Okay.
16            CRD RICHARD GARCIA:  Mr. Badger, this is Richard
17  Garcia with Judge Johnson's chambers.  Can you hear me?
18            THE WITNESS:  Yes, sir, I can hear you.  Can you hear
19  me?
20            THE COURT:  I'm sorry, I thought he was -- who's
21  outside?
22            MS. FOX-YOUNG:  Your Honor, I don't know.  Mr. Badger
23  is on Zoom, appearing from Texas.
24            THE COURT:  Oh, okay.
25            MS. FOX-YOUNG:  We agreed that he didn't have to
```

 1   travel here.

 2          THE COURT:  Right, that's what I thought, but

 3   somebody's -- Mr. Kochersberger stepped out.

 4          MR. KOCHERSBERGER:  There's two guys out there, but

 5   neither of them claim to be Mr. Badger.

 6          MS. FOX-YOUNG:  He's on Zoom.

 7          MR. KOCHERSBERGER:  Oh, he's on Zoom?  So how am I

 8   going to bring him in?

 9          MS. FOX-YOUNG:  That's virtually impossible.

10          THE COURT:  We're going to bring him in by Zoom.

11          MS. FOX-YOUNG:  Richard is bringing him in.

12          THE COURT:  Let's do this.  Mr. Badger, can you turn

13   on your video screen, sir?

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  While he's doing that, for the record,

16   there's no objection to Mr. Badger testifying via video

17   conferencing using Zoom technology?

18          MS. FOX-YOUNG:  That's correct on the part of the

19   defense, Judge.

20          MR. HALL:  That's correct, Your Honor.

21          THE COURT:  Okay.

22          MS. FOX-YOUNG:  And Your Honor, our next witness will

23   also be testifying by Zoom.  We can put that on the record,

24   too.

25   (A discussion was held off the record.)

USA v. Leveille, et al.                                    3/28/2023
18-cr-2945                        Evidentiary Hearing re: Standing

 1          THE COURT:  We can see you now.  Are you able to hear
 2  us?
 3          THE WITNESS:  Yes, Your Honor.
 4          THE COURT:  All right.  Is everyone able to hear
 5  Mr. Badger?
 6          MS. FOX-YOUNG:  I can, Judge.
 7          THE COURT:  Okay.  I'll have the Clerk of the Court
 8  administer the oath to you at this time.
 9          CRD RICHARD GARCIA:  Please raise your right hand,
10  sir.
11          (JASON DOUGLAS BADGER, DEFENSE WITNESS, SWORN)
12          CRD RICHARD GARCIA:  Please state your full name for
13  the record.
14          THE WITNESS:  Jason Douglas Badger.
15          THE COURT:  You can lower your hand, sir.
16          When do you want to put that --
17          MS. FOX-YOUNG:  I'll just do it right at the outset,
18  Judge, so that you can let everybody back in the courtroom.
19          THE COURT:  Okay.  Let me go ahead and I'm going to
20  seal this part of the record, and I'm going to ask those who
21  aren't specifically involved in this case to just step outside
22  for just a minute.
23          Mr. Fooks, I know you're with the Federal Defender's
24  office, but you're not representing anybody in this case?
25          MR. FOOKS:  No, but I operate in a quasi-supervisory

1   category.

2          THE COURT:  Is there objection?

3          MS. BRAWLEY:  We have no objection to Mr. Fooks

4   remaining.

5          THE COURT:  All right.

6          MR. FOOKS:  Thank you.

7   (Whereupon the courtroom was cleared)

8   (Whereupon the Court moved into sealed session)

9                    * * * * *

10              (This portion of the transcript from

11           Page 26, Line 9 through Page 27, Line 23,

12                   is filed under seal)

13                    * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1                          * * * * *

2                 (This portion of the transcript from

3            Page 26, Line 9 through Page 27, Line 23,

4                      is filed under seal)

5                          * * * * * *

6                          * * * * * *

7                          * * * * * *

8                          * * * * * *

9                          * * * * * *

10                         * * * * * *

11                         * * * * * *

12                         * * * * * *

13                         * * * * * *

14                         * * * * * *

15                         * * * * * *

16                         * * * * * *

17                         * * * * * *

18                         * * * * * *

19                         * * * * * *

20                         * * * * * *

21                         * * * * * *

22                         * * * * * *

23                         * * * * * *

24    (Whereupon the Court ended sealed session)

25    (In Open Court)

1      MS. FOX-YOUNG:  May I begin, Your Honor?

2      THE COURT:  You may proceed.

3      TESTIMONY OF JASON DOUGLAS BADGER

4      DIRECT EXAMINATION (Continued)

5   BY MS. JUSTINE FOX-YOUNG:

6   Q.   Mr. Badger, where are you from?  Where were you born?

7   A.   Here in Pasadena, Texas.

8   Q.   In Pasadena?

9   A.   Yes, ma'am.

10  Q.   Texas?

11  A.   Yes, ma'am.

12  Q.   And did you, for a period of time, live in the area of

13  Taos, New Mexico?

14  A.   Yes, ma'am.

15  Q.   When did you live in Taos?

16  A.   It was 2016, or '17, to 2021.

17  Q.   Did you live in the town of Taos?

18  A.   No.  We lived a little -- a little farther north, next to

19  Questa in a place called Cerro.  I mean, they're so close,

20  they're kind of the same place.

21  Q.   Okay.  Did you purchase, at some point, a property in an

22  area called Amalia?

23  A.   Yes, ma'am.

24  Q.   How did you come to learn about that property?

25  A.   Just by going online and looking for land for sale.

1  Q.   And how did you go about purchasing it?

2  A.   We paid cash for it.

3  Q.   Did you contact a Realtor?

4  A.   Yes, ma'am.

5  Q.   Who did you contact?

6  A.   His name was Mike, I believe.  I don't remember his real

7  estate company name.

8  Q.   Was it Mike Archuleta?

9  A.   That sounds familiar, yeah.

10  Q.   Okay.  Do you remember the sales price of the property?

11  A.   It was $8,500 or $9,000, somewhere around there.

12  Q.   And do you remember the property description?

13  A.   Actually listed on the selling?

14  Q.   Yes.  Do you remember what lot it was?

15  A.   Unit 2, Lot 28, I think it was.

16  Q.   Okay.  Mr. Badger, I'd like to show you an exhibit that's

17  already been admitted.  It's marked as Exhibit C.  You should

18  be able to see it on your screen shortly.

19      Mr. Badger, can you see this document?

20  A.   (Inaudible)

21  Q.   Mr. Badger, could you repeat that?  Are you able to see

22  this document, Exhibit C?

23  A.   No, ma'am, I'm not.

24  Q.   Okay.  We're working on it.

25  A.   Okay, I can see it now.

1   Q.   Okay, great.  Thank you.

2        All right.  Do you see where Lot 28 is marked on this

3   document?

4   A.   Yes.

5   Q.   Have you ever seen this document before?

6   A.   Yeah.  I used to have, like, a plot and lot map from up

7   there.  Not --

8   Q.   Did it look like this?

9   A.   I don't know if I've seen this specific one you're showing

10  me, but I've seen a map similar to that of the lots up there.

11  Q.   Okay.  When you purchased the property, did you receive a

12  map from Mr. Archuleta?

13  A.   Yeah, I'm sure we did.  I think that's what I'm referring

14  to.

15  Q.   Okay.

16  A.   Not this map, but, yeah.

17  Q.   Under Number 28 of this map, do you see where it says

18  9.621 acres?

19  A.   No.  It's real blurry.  I can see the 28, and that's it.

20  Q.   Okay.  We're going to try to improve how that looks.

21       All right, are you able to see that now?

22  A.   Okay.  Yeah, that looks like, yeah, 9.621 acres.

23  Q.   And there's an adjacent Lot 29.  Do you see that?

24  A.   Yes.

25  Q.   Which also reads 9.621 acres.  Do you see that?

1       Sir, are you able to see Lot 29 and the acreage?

2   A.    Oh, yes.  Yes, ma'am.

3   Q.    Okay.  All right, do you recall that Lot 28 and Lot 29

4   were exactly the same size?

5   A.    I didn't recall they were the exact same size, I just knew

6   they were roughly the same size, just like most of the lots up

7   there.

8   Q.    Okay.  Did you go take a look at Lot 28 before you

9   purchased it?

10  A.    I think so.  I could have.  I could have not, either.

11  Q.    Okay, you don't recall specifically?

12  A.    No, not --

13  Q.    Do you know when you purchased Lot 28?

14  A.    Not off the top of my head.  I can't recall the date.

15  Q.    Okay.  Do you recall it being in late 2017, maybe

16  November 2017?

17  A.    I don't know.  I don't recall the dates specifically.

18  Q.    Okay.  When is the first time that you recall going to

19  visit Lot 28?

20  A.    It was shortly after I bought it.  More than likely it was

21  probably the same day I bought it that I went up there, if I

22  didn't look at it before.

23  Q.    Okay.  And you and your wife purchased this property

24  together; is that right?

25  A.    Yes.

1  Q.   When you went up to see it, how did you verify that you

2  were actually looking at Lot 28?

3  A.   There was wooden pegs staked at the corners, at all four

4  corners, and it had written on there Unit 2, Lot 28.  Like

5  whenever they do the property lines and stuff like that.

6  Q.   Okay.  Mr. Badger, I'd like to show you another exhibit.

7  It's one that we've premarked as Exhibit D, and it'll just take

8  a minute to pull it up.  Can you see this exhibit on your

9  screen yet?

10 A.   I can just see -- it's blurry.  There you go.

11 Q.   Okay.  This exhibit reads Warranty Deed.  Have you seen

12 this document before?

13 A.   Probably.  I'm sure I have.

14 Q.   It's a deed from James Kohlmann.  It says, "For

15 consideration paid, grants to Jason Badger and Tanya Badger

16 Lot Number 28, Unit 2, Costilla Meadows Subdivision."  Do you

17 see that?

18 A.   Uh-huh.

19 Q.   Is this the Warranty Deed for the transfer of this Lot 28

20 to you and your wife?

21 A.   You're asking me if it's the Warranty Deed?

22 Q.   I'm asking you if this is the Warranty Deed --

23 A.   I guess that's what it is.  That's what it says.

24 Q.   -- that you received when you purchased Lot 28 from James

25 Kohlmann.

1  A.    I'm sure we did.  I mean, if --

2            MS. FOX-YOUNG:  Can you scroll down to the bottom?

3  Are you able to?  Okay, thank you.

4  BY MS. FOX-YOUNG:

5  Q.    Mr. Badger, do you see at the bottom of this document,

6  it's dated October 24, 2017, and signed by James Kohlmann?

7  A.    Yeah, I can see that.

8  Q.    Okay.  I'll represent to you that we received this

9  Warranty Deed from the Government.  We also collected it from

10 the County Clerk's Office up in Taos, and it references the

11 property that you purchased.  Do you have any dispute with the

12 notion that you purchased this in October 2017?

13 A.    No.  If that's the date that's on there, then that must be

14 the date.

15 Q.    Did you actually record this deed with the Clerk, or did

16 somebody else do that, if you know?

17 A.    I don't know.

18 Q.    Okay.  It was recorded, as you can see in the top right

19 corner of the document, on October 26, 2017, at 3:00 in the

20 afternoon.  Do you remember recording it?

21 A.    I don't recall if I did that.

22 Q.    Okay.  In any event, you remember going up to see Lot 28

23 close in time to the purchase, right?

24 A.    Close in time to the purchase, going to see it?

25 Q.    Yeah.  I think you testified that it might have been that

1    same day, or soon after.  Is that right?

2    A.    Yes.  Yes, ma'am.

3    Q.    Okay.  So when you went up there in October of 2017, or

4    close to it, was there any development around Lot 28, any other

5    building?

6    A.    No.

7    Q.    Did you use a GPS unit to find the property?

8    A.    No.

9    Q.    Did you refer to a map to find it?

10   A.    Uh-huh.

11   Q.    Which map did you refer to?

12   A.    It was probably the map that I got of the units and lots

13   whenever we bought it.

14   Q.    Okay, which may have been Exhibit C, right?

15   A.    Uh-huh.

16   Q.    The map that you and I looked at, it may have been this

17   map?

18   A.    A map like it, yeah, because I remember it had, like, road

19   names on it and stuff like that.

20   Q.    Okay.  And when you arrived at Lot 28, had any sagebrush

21   been cleared from that property?

22   A.    No, huh-uh.

23   Q.    Was it pretty much entirely covered with sagebrush?

24   A.    Oh, yeah.

25   Q.    Was there a road on that lot at all?

1   A.    No.

2   Q.    Did you go up there with your wife the first time you went

3   to see it?

4   A.    Say that one more time.

5   Q.    The first time you went to see Lot 28, did you go with

6   your wife, Tanya Badger?

7   A.    She could have been with me.  Maybe she was.

8   Q.    Okay.  And did you, on that day, did you do anything to

9   the land?  Did you put any stakes in, or clear any sagebrush,

10  or anything else?

11  A.    On that day, no.

12  Q.    Okay.  When was the next time you went up there?

13  A.    I went up there periodically, like every week to three

14  weeks, just to go check on it and see it and, I don't know,

15  just kind of sit there and think of, you know, future plans for

16  it or what have you.  I would just kind of go often.

17  Q.    What were your future plans for that property?

18  A.    Just make it a little getaway kind of, even though we

19  don't live very far.  And I was going to kind of use it as a

20  veteran's retreat for a lot of guys that I served with, give

21  them a chance to kind of get away from the hustle and bustle of

22  city life and truly relax.  Just keep it as off grid as

23  possible.  Kind of like a little therapy, if you will.

24  Q.    Okay.  And did you, at any point, clear any sagebrush off

25  of Lot 28?

1   A.    No.

2   Q.    Did you, at any point, put in work to make a road on

3   Lot 28?

4   A.    28?  No, huh-uh.

5   Q.    Did you put in any stakes around the border of Lot 28?

6   A.    I don't recall doing that, because it currently did have

7   the wooden stakes from whenever they did the property lines.

8   There's a chance I might have put a stake at the corners,

9   especially maybe the front two, but I don't remember doing it.

10  There's a chance I could have.  Sounds like something I might

11  have done.

12  Q.    And when you say there were already stakes there, you mean

13  that there were four stakes at each of the corners; is that

14  right?

15  A.    Yeah.  Yeah, the little wooden stakes.  I don't know,

16  they're like a foot and a half, two feet long.

17  Q.    Did you put any signage at the property?

18  A.    No, huh-uh.

19  Q.    I'm sorry, could you repeat your answer?

20  A.    I said, no, I didn't.

21  Q.    Okay.  Did you do any -- did you bring in any building

22  materials to the property?

23  A.    No -- at what time?

24  Q.    At any time on Lot 28 prior to the end of 2017, the year

25  you bought it.

1  A.    No.

2  Q.    Okay.  At some point, did you -- and so let me ask you,

3  from Lot 28, in October, November, December of 2017, could you

4  see anybody building any structures out there?

5  A.    No, not that I recall.

6  Q.    Okay.  Was there any building -- when you purchased it, or

7  close in time to when you purchased Lot 28, was there any

8  development on any of the adjacent lots?  Was there any

9  development at all?  And I mean, clearing of sagebrush or

10  building of structures.

11  A.    Not directly next to me, no.

12  Q.    Okay.  Do you recall where there was development at the

13  time, or close in time to your purchase of Lot 28?

14  A.    There's a house at the end of the road that Lot 28 is on.

15  There's a couple establishments on the main road that comes

16  into Costilla Meadows, and then there's, like, four -- there

17  was two or three, maybe, scattered out randomly in the whole

18  Costilla Meadows Subdivision.

19  Q.    Okay.  And given your familiarity with the area and with

20  the map, can you identify by lot number or area of the map

21  where that development was back in late 2017?

22  A.    Oh, no.  I would have no idea.

23  Q.    Do you know the names of any neighbors who were living up

24  there?

25  A.    I used to know one of the guys that had a lot up there.  I

1   can't recall -- I can't recall his name anymore now.  I haven't

2   talked to him in so long.

3   Q.   All right.  Was there an occasion on which you went up to

4   Costilla Meadows and you saw anybody on Lot 28, after you

5   purchased it?

6   A.   Yes, there was a point when I saw somebody.

7   Q.   Okay, tell me about that.  Who did you find on your

8   property?

9   A.   It was Siraj, Lucas, and there was a couple kids.  I

10  remember one specifically was like a teenage years boy, because

11  I took him to show him their actual lot, which was 29.

12  Q.   On this occasion that you recall, were you up there with

13  Tanya?

14  A.   Yes.  Yes, I was.

15  Q.   Okay.  What were you guys doing up there?

16  A.   Just taking a cruise to just go check it out, just like I

17  mentioned before.  Just to kind of see it and ...

18  Q.   Do you remember what day of the week it was?  Was it a

19  weekend or a weekday?

20  A.   More than likely, it was probably a weekend considering

21  she was with me.  She obviously wasn't at work, so it was

22  probably a Saturday or a Sunday, I think.

23  Q.   And when you pulled up, did you see people immediately on

24  the property?

25  A.   No, I don't recall seeing anybody immediately.  I pulled

1  into like the entrance area where it was cleared, and then that

2  was when Siraj come out and greeted me.

3  Q.   Okay.  You said that the entrance area was cleared?

4  A.   Uh-huh.

5  Q.   Was that right at the property line, or where was that

6  clearing of sagebrush?

7  A.   It was right off the main road.

8  Q.   Okay.  But it was on Lot 28?

9  A.   Yeah.  Yeah, it was just a little entrance, like on the

10 lot.  You know, like where they had, you know, moved in and

11 started clearing.

12 Q.   Can you estimate how large an area had been cleared?

13 A.   If I had to guess, maybe close to somewhere around two and

14 a half acres.

15 Q.   Okay.

16 A.   That's a total guess.  I'm not a land size expert or

17 anything.

18 Q.   I understand.  Thank you, Mr. Badger.

19     And was this an area that was densely packed with

20 sagebrush?

21 A.   Was the area that they cleared out densely packed with

22 sagebrush?

23 Q.   Prior to it being cleared out.  I mean, had they cleared

24 out a lot of sagebrush in two and a half acres?

25 A.   Oh, yeah, yeah.  There was -- the area that they cleared

1  out, there was no sagebrush.  It was just dirt ground.

2  Q.   Okay.  And before it had been cleared, was it full of

3  sagebrush?

4  A.   Oh, yeah, huh-uh.

5  Q.   Okay.  So you pulled into the clearing; is that right?

6  A.   Yeah.

7  Q.   And what did you see there?  Were there vehicles parked?

8  A.   There was a big white box van, kind of like a U-Haul, but

9  with a van area on it, and there was the trailer that they had

10 in the ground, or partially halfway in the ground, and then

11 there was that plastic ceiling that they had over it.

12 Q.   Mr. Badger, I don't mean to interrupt you, but could you

13 try to get a little closer to your microphone?  We're having a

14 hard time hearing you.  The court reporter needs to be able to

15 pick up everything you say.

16 A.   Sure, sure.  Is this better?

17 Q.   That's better, Mr. Badger.

18 A.   Okay.  Did you catch everything that I just said

19 previously?

20 Q.   Could you repeat it?  I think after -- you said you saw a

21 white box truck.  Can you repeat from there?

22 A.   After that, I could see their camper that they had, like,

23 halfway buried in the ground, and it had the plastic canopy

24 over that.  And there was one other little, small structure off

25 to the side, and then just random things throughout.

1  Q.    Okay.  How deeply was the camper buried in the ground?

2  You said halfway.  Can you estimate how many feet the hole was

3  that it was in below the surface?

4  A.    Five to six.

5  Q.    Okay.  And you said you saw next to the camper another

6  structure.  Can you tell me what you saw?

7  A.    Exactly what, I'm not really sure.

8  Q.    What was it made of?

9  A.    If I recall, it was, like, two-by-fours and plastic,

10  similar to what they had over the camper.

11  Q.    Try to stay close to your microphone.  Okay, Mr. Badger?

12  A.    Okay.

13  Q.    And how large was that structure?

14  A.    Like maybe five by five feet, maybe a tad bit bigger.  I'm

15  not really sure.  I can't recall too specifically.

16  Q.    And it was covered in plastic; is that right?  How tall

17  was it?

18  A.    I couldn't tell you exact height.  Big enough for somebody

19  to walk into.

20  Q.    Okay.  Was there a foundation built around it?

21  A.    No.  Not that I recall, no.

22  Q.    Okay.  And what else did you observe on the property?

23  A.    I saw Siraj.  He was the one that greeted me first.

24  Q.    Did he introduce himself to you?

25  A.    Yes, ma'am.

1   Q.    Okay.  Who else did you see?

2   A.    There was a teenage boy that I took over to their original

3   lot to show him where it was.  Then there was a couple other

4   small children.  I can't remember specific amount, or male or

5   female.  I just remember that teenage boy for sure.

6   Q.    Okay.  Did you talk to Mr. Morton that day in person or on

7   the phone?

8   A.    I don't recall meeting Lucas, too.  But definitely Siraj,

9   for sure.

10  Q.    Okay.  And did you have a map with you?

11  A.    Yeah.  I had, actually, all of the paperwork at the time,

12  because we had just recently bought it.  So I still had it in

13  my truck.

14  Q.    Okay.  And so you remember walking, you said, with the

15  teenage boy over to Lot 29; is that right?

16  A.    Yeah, I took him over there.  Actually, I drove my truck,

17  and he followed me on a little dirt bike he had.

18  Q.    Okay.  And did you show him where you thought the boundary

19  was between Lot 28 and Lot 29?

20  A.    Yes.  I took him over to their original lot, which was 29,

21  and I showed him the stakes in the ground over there that said

22  Unit 2, Lot 29, showing him that this was actually their plot

23  of land.

24  Q.    Okay.  Were those stakes numbered 28 on one side and 29 on

25  the other side, if you remember?

1    A.    The stakes that divided our lots?

2    Q.    The ones that you showed the teenage boy.

3    A.    No.  I remember it said Unit 2, Lot 29 on them.

4    Q.    Okay.  And what happened after that?

5    A.    We rode back over to Lot 28, and he said -- he told Siraj,

6    yeah.  Like, it's over there.

7    Q.    He told Siraj that he had seen the Number 29 that you had

8    shown him; is that right?

9    A.    Yeah.  Yes, ma'am.

10   Q.    Do you know if that's the first time that he had seen

11   those numbers?

12   A.    I have no idea.

13   Q.    And so did you actually talk to Siraj?

14   A.    Yeah.

15   Q.    Do you remember if Siraj, or anybody else, offered to go

16   ahead and move over to Lot 29?

17   A.    I don't recall that exact conversation from everything

18   that was said.

19   Q.    What do you recall in terms of the conversations that you

20   had?

21   A.    I recall that we came back over there and he told Siraj

22   that, yeah, the Lot 29 was over there.  I'm not really sure

23   about the small, like, small talk, if you will, that was said

24   after that, I just do remember we had come to an agreement to

25   swap lots since they were right next to each other and they

1    were similar in size.

2         And it was about to become winter, so it was going to be

3    really cold out there and I could tell, you know, they didn't

4    have the best of conditions to stay warm, you know, and dry in.

5    And I saw the kids and didn't really want to throw them out in

6    the cold.  That would have been kind of wrong to do to small

7    children, especially.  So I remember we had just agreed to swap

8    lots, and that was pretty much the sum of the meeting.  It was

9    cordial and normal, and nothing too out of the ordinary, except

10   that they were on my land.  That was about it.

11   Q.    Do you remember talking to Mr. Morton to formalize that

12   agreement to swap lots?

13   A.    Not specifically.  I'm sure we had the conversation.

14   Q.    Okay.  As part of the agreement, did you permit this

15   family to remain on Lot 28?

16   A.    Yeah, during -- while we were going through this agreement

17   and the process.  I mean, yeah.  I mean, why would they try to

18   move if we were going to swap.

19   Q.    Sure.  And did Mr. Morton also agree to give you the use

20   and possession of Lot 29?

21   A.    I don't -- I don't know.  I can't answer that question,

22   honestly.

23   Q.    Well, let me ask you this.  After you made this

24   agreement -- when do you remember you first talked to

25   Mr. Morton?

1   A.   I don't.

2   Q.   Do you remember that you had a phone number that you could

3   reach him at, at some point?

4   A.   Yeah.

5   Q.   When was that?

6   A.   Yeah, I had his phone number.  When was that?

7   Q.   When did you get his phone number?

8   A.   I have no idea.  I don't remember the exact time of day.

9   Q.   Okay.  At some point after you agreed to this land swap,

10  did you and Mr. Morton execute an agreement on paper to do the

11  swap?

12  A.   Yes.  I contacted -- because I didn't know how to go about

13  the process of just, you know, directly swapping land, I think

14  I got ahold of probably the Realtor that I bought the land

15  from, and then he pointed me in the direction of a -- I can't

16  remember the guy's name, but he was somebody that, like, calls

17  himself an esquire, which is kind of like a -- I don't really

18  know.  But he just helped us draft up the paperwork to do this

19  whole process.

20  Q.   So is it accurate to say that Mr. Archuleta connected you

21  with a lawyer who did this sort of work?

22  A.   I'm assuming he did, because I wouldn't have -- I don't

23  know where else I would have come across the guy.  So I'm

24  assuming he's the one that probably pointed me to him.  And he

25  helped us draft up paperwork.  I don't remember all the

1  paperwork that was involved specifically, but I'm assuming

2  there was some kind of agreement that probably came with that.

3  Q.   Do you remember if that lawyer was named Christopher

4  Stachura?

5  A.   Chris Stachura?  To me, that kind of sounds familiar.  It

6  might have been him.

7  Q.   Okay.  Mr. Badger, I'd like to show you a document we've

8  marked as Exhibit I.  Is this document coming up on your

9  screen, Mr. Badger?

10  A.   Yes.

11  Q.   Okay.  It's titled Real Estate Sale and Purchase

12  Agreement.  The first paragraph is zoomed in on so that you can

13  read it, and it references raw land sold as is, that being

14  Lot Number 29, Unit 2.  Do you see that?

15  A.   Yes.

16  Q.   And then if you scroll down on the property, it says that

17  the purchase price shall be a signed Warranty Deed for

18  Lot Number 28, and that Mr. Morton would convey title to the

19  property of Lot 29 to you and your wife.  Do you see that?

20  A.   I see the part about Lot 28.  You have to scroll down a

21  little bit for me to see the 29.

22  Q.   Sure.  Take your time to review it.

23  A.   Yeah, I don't see the Lot 29 part.

24  Q.   Okay.  Up at the beginning, the document says that Lot 29,

25  raw land, would be sold as is, and it would be exchanged for a

1  Warranty Deed for Lot 28, meaning Mr. Morton would sell you

2  Lot 29 and you'd give him the deed for Lot 28.  Do you see

3  that?

4  A.    Yeah.

5  Q.    And it goes on to say that the parties would close on this

6  on or before June 3rd, 2018, at First New Mexico Title, and

7  we'll get there.  That's in Paragraph 4.  Is this one of the

8  documents that the attorney that you mentioned put together for

9  you?

10 A.    I don't know.

11 Q.    Okay.  Let's go down to the bottom, and if you look at the

12 very last page, the signature page, there's a signature above

13 the line for Lucas Allen Morton on April 18, 2018, and then for

14 you and your wife, also in April.  Is that your signature,

15 Mr. Badger?

16 A.    Yes, ma'am, that is.

17 Q.    Is that your wife's signature?

18 A.    Yes, ma'am, it looks like it.

19 Q.    Okay.  Do you remember executing this Purchase Agreement

20 with Mr. Morton?

21 A.    I do.  That looks familiar.

22 Q.    Okay.  Did you go to the lawyer's office to sign this, if

23 you remember?

24 A.    I don't recall where I signed it.

25 Q.    Okay.  Did this document formalize in part your agreement

```
 1  with Mr. Morton to swap these properties?

 2  A.   Formalize the agreement?

 3  Q.   Yeah.  You put it on paper, right?

 4  A.   I mean, I don't -- yeah.

 5  Q.   Okay.  So you signed this in April, but you guys agreed

 6  much earlier to do the swap; is that right?

 7  A.   Yes.  That's what started this paperwork.

 8  Q.   Okay.  It sounds like the agreement to do the swap was

 9  reached the first day that you went up there and met Siraj

10  wahhaj, right?

11  A.   I don't know when exactly.  I don't know.  I couldn't tell

12  you.

13  Q.   Did you make the agreement in the winter?

14  A.   Like I said, I don't know specifically the time and date.

15  Q.   Well, you testified earlier that it was cold and it was

16  going to be getting colder, and I don't want to put words in

17  your mouth, but I think you said you didn't want to make this

18  family and these kids move, and that was in the wintertime,

19  right?

20  A.   I knew it was going to get cold.  I don't remember the

21  specific month.

22  Q.   Okay.  Now, in the spring, did you actually start doing

23  things to Lot 29 in terms of clearing sagebrush and creating a

24  road?

25  A.   I don't remember the specific month and time, but, yes,
```

1   there was a point that I did start to do that.

2   Q.   Okay.  Did you actually borrow a tractor tire from

3   somebody to clear Lot 29?

4   A.   Yeah.

5   Q.   And did you tow that tire behind your truck in order to

6   clear it?

7   A.   Yes.

8   Q.   Did you and your wife also put in fence posts around

9   Lot 29?

10  A.   Yes, four of them.  They're the green T-posts, one at each

11  corner.

12  Q.   Okay.  Did you also run stakes around what you thought was

13  the boundary of the property of Lot 29?

14  A.   Just the T-post at each corner.

15  Q.   But in addition to those corner posts, did you also stake

16  out the property line, itself?

17  A.   No, not that I recall.  Just four T-posts.

18  Q.   Okay.  And I know you didn't remember exactly when you did

19  this work out there, but do you remember if you did it before

20  you signed this document, Exhibit I, which is the Real Estate

21  Sale and Purchase Agreement, in April?

22  A.   I don't know if it was before or after.  More than likely,

23  it was after we had the agreement, but I mean, I couldn't give

24  you a 100 percent positive answer.

25  Q.   Did you bring any building materials out to Lot 29?

1   A.   No, just those four T-posts, I believe.

2   Q.   What were your plans to obtain water on Lot 29 when you

3   did build?

4   A.   I didn't build on Lot 29.

5   Q.   I understand, but you had planned to build on Lot 29; is

6   that right?

7   A.   Well, yeah, at some point after it became mine.

8   Q.   And what were your plans to get water out there?

9   A.   I don't remember the specific name of them, but it's like

10  a big plastic square container that sits inside of a metal

11  cage.  I don't know what they're called, but they're roughly,

12  like -- I think 250 gallons is what they hold, or something

13  like that.  And that's what I would use to get water back and

14  forth.

15  Q.   Okay.  But you had not yet brought that out there; is that

16  right?

17  A.   No.

18  Q.   Did you at some point reach out to a title company to

19  execute this land swap with Mr. Morton?

20  A.   I'm sure we did, yeah.

21  Q.   Okay.  Do you remember if you're the person who contacted

22  the title company?

23  A.   I don't remember if I was or not.  I'm sure I probably

24  was.

25  Q.   Okay.  While you were working on Lot 29, as we've already

1  discussed, clearing it with a tractor tire and putting in fence

2  posts, was Mr. Morton also working on building out the home on

3  Lot 28?

4  A.   He was pretty much done with everything, as far as I could

5  tell, that they were doing.  Yeah, everything was already

6  there.  I think over time, they brought in more tires.

7  Q.   Would you characterize what he was building as an

8  earthship style home?

9  A.   No.

10 Q.   How would you characterize it?

11 A.   Just a camper trailer in the ground with plastic over it.

12 I wouldn't --

13 Q.   You don't remember ever calling it an earthship style

14 home?

15 A.   Say again?

16 Q.   You don't remember ever calling it an earthship style

17 home?

18 A.   Not that I recall.  I mean, earthship style homes are kind

19 of partially in the ground.  I mean, I guess if you want to

20 consider it that, I guess maybe technically you could.  I don't

21 know.

22 Q.   Okay.  Now, at some point, did you learn whether the

23 Warranty Deed reflecting Mr. Morton's purchase of Lot 29 had

24 ever been recorded?

25 A.   I'm sorry, say that one more time, ma'am.

1   Q.   So Mr. Morton, he bought Lot 29 from the same individual

2   you bought Lot 28 from, right, James Kohlmann?

3   A.   I don't know.  I have no idea who he bought it from.

4   Q.   Okay.  At some point, as you were working through the

5   details of this land swap, did you learn whether or not that

6   deed had been recorded?

7   A.   Not that I recall.

8   Q.   Okay.

9   A.   No.

10  Q.   And do you remember having any other in-person

11  conversations, or ever having in-person conversations with

12  Lucas Morton about the land swap?

13  A.   Yes, I do.

14  Q.   Okay.  Did you come to see him at Lot 28?

15  A.   I remember coming up there at one point because the --

16  somebody, whether it was the title company or somebody else,

17  needed pictures to verify that the structure they had built,

18  which is in reference to the tarp that goes over the camper

19  that was in the hole, they needed verification that that wasn't

20  a permanent structure.  So I had to go up there and take

21  pictures of just a couple of spots where the four-by-fours

22  just -- or the two-by-fours just rested on the ground.  They

23  weren't permanently attached in any shape or form by a

24  foundation or something similar.  I remember that specifically.

25  Q.   All right.  Mr. Badger, I'd like to show you an exhibit

1  that we've marked as Exhibit J.  Can you see this photograph?

2  A.   Yeah.  Yes, ma'am.

3  Q.   Okay.  Is this one of the photographs that you took when

4  you went out to the property to record what it looked like for

5  the title company?

6  A.   I don't recall taking that specific picture.

7  Q.   Okay.  We're going to flip through these.  There are five

8  of them, Mr. Badger, and so we'll just go through them so you

9  can take a look at all of them.

10  A.   Sure.

11  Q.   All right.  Do you see this second one showing some lumber

12  coming out of the ground with the plastic over it?  Do you

13  remember if you took that photo?

14  A.   I remember taking a picture similar to that.  I think the

15  majority of the pictures that I took were similar to pictures

16  like that, just showing two-by-fours and whether they're

17  sitting on top of the ground or going into the ground.

18  Q.   Okay.  And somebody is holding those two-by-fours up for

19  you to get a better look at them in this picture; is that

20  right?

21  A.   Yeah, uh-huh.

22  Q.   Is that Mr. Morton, if you know?

23  A.   Yes, that was Lucas that day.

24  Q.   Okay.  We're going to show you the next one in just a

25  minute, once we can load it.

1    Do you remember if Mr. Morton had solar panels out at the

2  property?

3  A.   I think he did.  I think he had two.

4  Q.   Okay.

5  A.   Or I guess I can't say a specific number, but I remember

6  there being a few.

7  Q.   Okay.  And that's how they were getting power out there;

8  is that right?

9  A.   I don't know how they were getting power.  I don't know.

10  Maybe.

11  Q.   And do you remember that they had a propane tank on the

12  property?

13  A.   Yes, they did.

14  Q.   Do you remember photographing that, as well, for the title

15  company with the solar panels?

16  A.   No, I do not.

17  Q.   Do you remember that the panels and the propane tank were

18  nearby the earthship-like structure?

19  A.   I think I remember the propane tank being near the

20  structure, but I don't know about the solar panels.

21  Q.   Can you just stay close to your microphone, Mr. Badger?

22  A.   I said I think I remember the propane tank being close to

23  the trailer, but I don't recall the location of the solar

24  panels.

25  Q.   Okay.  And do you recall that the propane tank was hooked

1   up in order to deliver gas to that property?

2   A.   I have no clue.

3   Q.   Do you remember that there was some insulation partially

4   buried in the lower part of the earthship?

5   A.   I don't know.  He didn't invite me down in there.

6   Q.   Okay.  Well, we'll try to get your photographs up and take

7   a closer look, but I'll move on, Mr. Badger.

8        At some point, did you start communicating with Mr. Morton

9   by text message about the details of the land swap?

10  A.   I'm sure we probably did.  As far as I recall, most of our

11  conversations were through text, if I remember correctly.

12  Q.   But you communicated with somebody who was on the other

13  end of a phone, right?  I mean, maybe you don't know who you

14  were talking to, but you were talking to somebody at that

15  property about the land swap, right?

16  A.   As far as I understood, it was Lucas.

17  Q.   Okay.  And you turned those text messages over to the

18  Government at some point, didn't you?

19  A.   I do not recall if I did or not.

20  Q.   Mr. Badger, I'm just still trying to pull up a couple of

21  pictures for you to see, and we're going to try a different way

22  to do it.

23  A.   Okay.

24  Q.   We'll do it the old-fashioned way.  Can you still hear me?

25  A.   Yes, ma'am.

1  Q.    Okay.  Mr. Badger, can you see this photograph?

2  A.    Yes, ma'am.

3  Q.    Okay.  Do you see the solar panels and the propane tank in

4  front of the earthship-like structure?

5  A.    Yes, ma'am.

6  Q.    Do you know if this is one of the photographs that you

7  took for the title company?

8  A.    No, I don't recall if that was one of them.

9  Q.    Okay.  Is this the way the property looked, in your

10  recollection or to your recollection, in the spring of 2018

11  before you were to close on it, to close on the swap?

12  A.    I don't -- I don't know.  I mean, yeah, I don't know.

13  Q.    I'm going to show you one more photograph from Exhibit J.

14  This is a photograph that shows some materials peeking out of

15  the ground, sticking up out of the ground.  It looks to be

16  insulation.  Do you see that in front of the tires?

17  A.    Oh, yeah, I can see a material.  I can't quite tell what

18  it is.

19  Q.    Okay.  Now, from your inspection of the property and

20  photographing it, did you determine that part of the structure

21  was, in fact, built underground?

22  A.    Did I determine that a portion of it was underground?

23  Q.    Yeah, that there was insulation going underground and part

24  of the earthship structure was actually subterranean.

25  A.    I don't recall when I actually knew it was a trailer down

1  there.  The only thing I recall doing is just taking a few

2  pictures, similar to the ones where Lucas was holding up the

3  tarp, just verifying that nothing was, like, actually attached

4  in the ground.

5  Q.   All right.  And these photos that we've just looked at,

6  are these -- I know you can't say for sure whether you took

7  them.  Are these similar to the photographs that you took for

8  the title company?

9  A.   Probably similar, yeah.

10  Q.   Okay.  So Mr. Badger, we were talking about your texts

11  with who you believed to be Lucas Morton regarding the land

12  swap.  Do you remember exchanging information with Mr. Morton

13  about how much the closing costs would be?

14  A.   I'm sure we did, yeah.

15  Q.   Okay.  And do you remember Mr. Morton suggesting at some

16  point, or somebody suggesting through text message to you that

17  maybe the swap could be executed without using a title company?

18  A.   Yes.

19  Q.   Okay.  And did you reject that proposal?

20  A.   Yes, I did.

21  Q.   Okay.  Now, at some point, you actually did some internet

22  research on Mr. Morton and the other occupants of Lot 28, did

23  you not?

24  A.   Yes, I did.

25  Q.   What did you research on them?

1   A.   As far as I recall, just who they were.

2   Q.   Okay.  Well, did you learn something that caused you to

3   contact law enforcement in the spring of 2018?

4   A.   Yes.  That they were wanted.

5   Q.   Could you repeat your answer?  I couldn't hear you.

6   A.   That they were wanted.

7   Q.   That who was wanted?

8   A.   Lucas and Siraj.

9   Q.   You learned online that Lucas and Siraj were wanted; is

10  that right?

11  A.   As far as I recall, yes.

12  Q.   What did you actually find online that gave you that

13  information or that idea?

14  A.   I don't recall exactly what it was I found.  I'm assuming

15  it was -- yeah, I'm not going to say.  I don't know exactly

16  what it was.

17  Q.   Do you know if it was a media story, a press coverage?

18  A.   No, I don't remember.

19  Q.   Okay.  But at some point, did you call the Sheriff's

20  Department to tell them the information that you'd learned?

21  A.   I remember going down there to the actual office in

22  person.  I can't recall whether or not I called first.

23  Q.   When you went down to their office in person, who did you

24  meet with?

25  A.   I don't recall who they were.  It was whoever they have

1  sitting in the little -- in the desk by the front where you --

2  front entrance, whoever that officer was.

3  Q.   Could you just speak up a little bit, sir?

4  A.   Whoever the officer was that was at the table when you

5  first go in the entrance, kind of like a receptionist, if you

6  will, I talked to that officer.  I don't remember who it was

7  specifically at that time.

8  Q.   What did you tell that officer?

9  A.   That they were both up on my land.

10 Q.   You told the officer that Siraj Wahhaj and Lucas Morton

11 were on your land in Costilla?

12 A.   Yes.

13 Q.   And what did the officer say to you?

14 A.   I don't remember specifically the conversation that we had

15 after that.  I just remember telling them.

16 Q.   Okay.  At some point, did Sergeant Rael actually come out

17 to your house and talk to you and your wife about the

18 information you'd given?

19 A.   Yeah, uh-huh.

20 Q.   Okay.  And did your wife know Sergeant Rael before that?

21 A.   I'm not sure if she did or not.  I think she might have.

22 I mean, it's a small town.  Everybody kind of knows everybody.

23 Q.   You don't remember if they were friends?

24 A.   No, not that I recall.

25 Q.   And you had a relatively lengthy conversation with

1   Mr. Rael at your home, you and your wife did; is that right?

2   A.   We had a conversation.  I don't know whether it was long

3   or short.

4   Q.   Okay.  And that conversation happened while you were still

5   in negotiations to work out the details of the land swap with

6   Mr. Morton, right?

7   A.   I don't recall when that exact transition came about, when

8   we had basically cancelled the contract to swap land.  That

9   time-line transition is a little blurry, so I don't know when

10  that conversation could have happened, whether it was before

11  that or after.

12  Q.   At the time that you had that conversation Mr. Rael at

13  your house, do you know if you had already filed a petition to

14  evict Mr. Morton?

15  A.   Like I said, I don't recall the exact time-lines of all

16  that.  It could have been any time before or after or during.

17  Q.   Mr. Badger, do you remember when you were supposed to

18  close on the property?

19  A.   I don't recall the exact date, but I remember there was

20  one that was set as an actual closing date.

21  Q.   Okay.  The document that we looked at earlier, the Real

22  Estate Sale and Purchase Agreement, said that you were to close

23  by June 3rd.  Do you remember that?

24  A.   I remember seeing it when you just showed me.

25  Q.   Okay.  Do you have any dispute that that was the date that

1  you had anticipated closing by?

2  A.   Yeah.  Yeah, if it was on the document, then that's when I

3  would expect it to close, on or before that date like it says.

4  Yeah, I would have.

5  Q.   Okay.  And do you remember having any other conversations

6  with Sergeant Rael, other than the one you had at your house?

7  A.   Yeah.  We had several.

8  Q.   Were there any other in-person conversations?

9  A.   Not that I recall.  There might have been.  I don't know.

10  I think most of our conversations were on the phone.

11  Q.   Okay.  Do you remember Mr. Rael asking you to wear a

12  camera and participate actively in the investigation of the

13  residents of Lot 28?

14  A.   Yes.  Yes, ma'am.

15  Q.   Okay.  Do you remember agreeing to do that?

16  A.   No, I did not agree to do that.

17  Q.   What's your recollection of what you told Sergeant Rael

18  about wearing a camera?

19  A.   He had brought up the idea and was curious if I was open

20  to it.  I recall asking him if I was able to go up there armed,

21  and then how I was going to be protected law enforcement wise

22  should I, unfortunately, have to protect myself.  As far as I

23  remember, the answer was, basically, no.  So yeah, that's when

24  I was kind of not so apt to do it.

25  Q.   Well, he told you if he were going up, he'd take a gun,

1  right?

2  A.   He what?

3  Q.   Do you remember him telling you that if he were going up

4  there, he would take a gun?

5  A.   He might have.

6  Q.   Okay.  So there are some text messages that you remember

7  and we talked about.  This is, I'm going to represent to you --

8         MS. FOX-YOUNG:  Did you guys mark this as an exhibit

9  already, the texts?

10         MR. HALL:  We have it marked as 15, yes.

11         MS. FOX-YOUNG:  So it's already in?

12         MR. HALL:  Yes.

13  BY MS. FOX-YOUNG:

14  Q.   All right.  Mr. Badger, I'm going to show you something

15  that's been previously admitted as Exhibit 15, and I'll

16  represent to you that the Government produced these to us as

17  text messages from and to Lucas Morton's LG cell phone, number

18  575-425-5791.  I'm going to show you this document, and I'll

19  turn to May of 2018.

20     Mr. Badger, do you remember what your phone number was

21  back in May 2018 in Taos?

22  A.   Yeah.

23  Q.   Was it 575-779-6519?

24  A.   Yes.

25  Q.   Okay.  And do you see how -- this is a format that doesn't

1  look exactly like it would on a phone, but do you see at the

2  bottom where it says, "Body:  We will be closing May 31"?  And

3  that's a text message from your phone number to this phone.  Do

4  you see that?

5  A.   Yes, ma'am.

6  Q.   Do you have any dispute that you told Mr. Morton that the

7  closing would be on May 31st?

8  A.   No.  If that's a recorded text, then I'm sure I -- I mean,

9  I guess I must have sent it.

10 Q.   Okay.  Subsequent to that, do you recall getting a

11 response that money had fallen short, and we talked about this

12 a little bit earlier, but a proposal that the closing be done

13 without a middleman for less than $50?  And that's on

14 May 31st.

15 A.   Yeah.

16 Q.   Okay.  And then you rejected that, correct?

17 A.   Uh-huh, as far as I recall.

18 Q.   You said:  "No, we can't do that.  We need to go through

19 the title company."  Is that right?

20 A.   Uh-huh.

21 Q.   Okay.  That was on May 31st, and there were additional

22 text messages.  Now, you did at some point text:  "You need to

23 be off by end of next week."  Is that right?

24 A.   Yeah.  If that's what you have recorded, then, yeah.

25 Q.   Okay.  Do you have any reason to dispute that you sent

1   that text on June 8, 2018, as reflected in this document that

2   the Government produced to us?

3   A.   No, if that's what it says.

4   Q.   Okay.  Did you ever give -- did you ever go out to the

5   property to talk to Mr. Morton about you wanting him to be off?

6   A.   I don't recall going up there and telling him that.  More

7   than likely, I did not.  It doesn't sound like something I

8   would do.  Basically, because I didn't want any unfortunate

9   situation to escalate.

10  Q.   Had he ever made any threats to you about anything, or had

11  it been cordial?

12  A.   Did he make any threats to me?

13  Q.   Yeah.  You said you didn't want an unfortunate situation

14  to happen.  Had there been any threats, or had it been anything

15  but cordial?

16  A.   Yeah.  No, he actually hadn't threatened me or anything.

17  It's just when two people become not necessarily cooperative

18  and start to disagree with each other, there's always a

19  possibility of an escalated situation and, you know, if that

20  can be avoided, then there's no reason not to.

21  Q.   Okay.  And then you texted him, "By June 15th."  That was

22  on June 8th.  Were you saying you wanted him to leave by

23  June 15th?

24  A.   I don't know exactly what I was trying to say by giving

25  him that date.

1  Q.   Okay.  And then on June 11th, 2018, did you text him to

2  say, "Were you able to start moving your stuff off"?

3  A.   If that's what it says, I did.

4  Q.   Okay.  Well, that's from your phone number, right, on

5  June 11th, 2018, at 2:10.

6  A.   Yeah, that's what it says.

7  Q.   Okay.  Did you ever mail Mr. Morton anything telling him

8  that you wanted him to leave your property?

9  A.   I don't recall mailing him anything, no.

10  Q.   Okay.  Now, the day after you sent this message on

11  June 11th, you actually did file a petition in court; is that

12  right?

13  A.   I don't remember the date we did it, but we did file.  We

14  did file one.

15  Q.   Okay.  Mr. Badger, I'm going to show you an exhibit that's

16  been marked as Exhibit L.  We're going to switch our mode of

17  Technology to show this to you.

18       Can you see this document on the screen?

19  A.   Yes.

20  Q.   Okay.  It says it was filed June 12, 2018, in the Taos

21  County Magistrate Court.  Do you recall filing something

22  against Mr. Morton on June 12, 2018?

23  A.   We did file something against him, but like I said, I

24  don't remember the exact date.  But if that's the date that's

25  on the paper, then, yeah, I guess it was June 12th.

1  Q.    Okay.  Whose handwriting is on this document, filling in

2  the blanks?

3  A.    It's much nicer than mine, so I'm assuming -- I don't

4  know.  I just can tell that it's not my writing.

5  Q.    Do you think it's your wife's writing?

6  A.    I can't tell whose writing it is.  I can't say that.

7  Q.    Do you remember filing this document entitled, Petition by

8  Owner for Restitution?

9  A.    Like I said, I don't -- do I remember filing it?  Is that

10 what you said?

11 Q.    Do you remember going to the courthouse and -- well, let's

12 scroll down to the bottom.

13     Okay, do you see -- right next to where it says this is

14 Defendants' Motion Exhibit L, do you see a signature above your

15 name, and a signature above Tanya's name?

16 A.    Yeah.  That's my signature, and that looks like her

17 signature.

18 Q.    Okay.  Whose handwriting is the address written in?

19 A.    Like I said, I'm not for sure whose handwriting that is.

20 I mean, that looks like that could have been my wife's, but I'm

21 saying, possibly.  I don't remember specifically seeing

22 somebody fill that out.

23 Q.    I understand.  So after the text message that I showed

24 you, the June 11th one that said, "Were you able to start

25 moving your stuff off," do you recall somebody telling you that

1   the closing costs were a little higher than they expected them

2   to be, by text?

3   A.   Being higher?  Yeah.  I mean, I guess that sounds like

4   something Lucas would have said.

5   Q.   Okay.  And after that series of text messages, did you

6   have any other communication with Lucas Morton or anybody at

7   the property?

8   A.   After that conversation?

9   Q.   After those texts, did you have any phone communication or

10   in-person communication or other communication with anybody

11   there?

12   A.   Not that I recall.  The only person I talked to was Lucas.

13   I don't quite remember when we stopped communicating

14   personally.

15   Q.   What do you recall about that?

16   A.   I don't recall when we stopped communicating, like,

17   between me and him.

18   Q.   Okay.  Do you recall ever giving anybody at the property

19   any notice to vacate the property?  You told me you didn't mail

20   anything or you didn't go out there.  Did you give them any

21   kind of notice to vacate?

22   A.   Like an official notice?

23   Q.   Any kind of notice.  Did you tell them to vacate, other

24   than the text messages that you and I have looked at.

25   A.   Not that I recall, other than there was the court date,

1  because we actually did have a set court date.  So I know he

2  received paperwork to appear in court for the eviction.

3  Q.    Okay.  And that was the Petition for Restitution that we

4  looked at, right, Mr. Badger?

5  A.    (Inaudible)

6  Q.    I can't hear you at all, sir.

7  A.    I said, we -- because we actually went to court over the

8  eviction.

9  Q.    Okay.  Now, before you filed that document, the Petition

10  for Restitution, which we looked at, Exhibit L -- and we can

11  pull that back up -- did you give any notice to anybody at the

12  property to vacate?  A three-day notice, or a seven-day notice,

13  or a thirty-day notice?

14  A.    It was just the text messages that we went over.

15  Q.    Okay.  And so it's accurate to say that you filed that

16  Petition for Restitution in order to evict Mr. Morton; is that

17  right?

18  A.    Yeah, that sounds right, as I recall.

19  Q.    Okay.  Now, let's go back to the document, Exhibit L.  In

20  Paragraph Number 3, you say:  "Plaintiff gave written notice of

21  termination" -- I'm sorry, back up again.

22      "Plaintiff gave written notice of termination."  In what

23  manner did you give written notice of termination to Mr. Morton

24  or anybody else at the property?

25  A.    "Gave written notice"?  I don't -- I don't know what that

1   is.

2   Q.   Okay.  But you can't tell me any time that you gave, other

3   than those text messages that we looked at, that you gave

4   Mr. Morton or anybody else at the property a notice of eviction

5   or termination of an agreement, right?

6   A.   I think we had -- if I recall, I think we had some kind of

7   termination document written up for us.

8   Q.   Did you give Mr. Morton notice of termination?  And how?

9   A.   I don't recall if we did, or how, to be honest with you.

10  Q.   Okay.  Now, do you see on Number 3, after those checked

11  boxes, where it says, "A copy of the written notice is attached

12  as Exhibit A"?  You didn't attach any written notice to this

13  petition, did you?

14  A.   I don't know.

15  Q.   Okay.  Well, let's scroll through the document.

16       All right, I'd like to go to Page 8 of this document.  So

17  here's the Warranty Deed, and here's a document entitled

18  Termination Agreement, which says that, "By process of

19  expiration of the Real Estate and Purchase Agreement, this

20  agreement is hereby terminated."  And it's signed by

21  Christopher John Stachura, Esquire.  Do you see that?

22  A.   Yeah, uh-huh.

23  Q.   And that's on June 11, 2018, right?

24  A.   That's the date that's written there.

25  Q.   Okay.  And that's the day before you filed your petition

1  to evict Mr. Morton; is that right?

2  A.   On there is June 12th, so yeah.

3  Q.   Okay.  Who prepared this document, if you know, the

4  Termination Agreement?

5  A.   Who prepared it?

6  Q.   Yeah.  Do you know?

7  A.   No.  Not exactly, no.

8  Q.   Now, you did not sign it, did you?

9  A.   I don't see my name right there.

10  Q.   Okay.  Do you know if this document was ever served on

11  Mr. Morton?

12  A.   I have no idea.

13  Q.   Do you have any record demonstrating that it was served on

14  Mr. Morton?

15  A.   I don't have records, no.  I don't have any record of it,

16  huh-uh.

17  Q.   Okay.  And then let's scroll through to the last page.

18      You were telling me that you had a court date on this,

19  right?

20  A.   Yeah, there was a day we went to court.

21  Q.   And you made arrangements to have not notice served on

22  Mr. Morton, but to have this petition taken to Mr. Morton; is

23  that right?

24  A.   Say that one more time.

25  Q.   Did you make arrangements for this petition to be taken to

1   Mr. Morton?

2   A.   I don't know how they present these documents.

3   Q.   Okay.  You don't know if it was ever served on him?

4   A.   I don't recall whether it was or not.  No, I don't --

5   yeah, as far as I know, that's not my job to do.

6   Q.   Okay.  Do you remember giving directions to somebody at

7   the Sheriff's Department as to how to get to Lot 28 to bring

8   this out there?

9   A.   Not that I recall.

10  Q.   All right.  This action was ultimately dismissed in late

11  June; is that right?

12  A.   I don't know the date of it.

13  Q.   But you remember that it was dismissed?  You were not able

14  to get an order evicting Mr. Morton, right?

15  A.   Yes, I remember it was dismissed by the Judge because he

16  had told us we were in the wrong court.  We had to be -- this

17  was Magistrate, so we had to be in -- I can't remember what

18  court he said.

19       Did you hear that?  Did you hear me?

20  Q.   Yes.  Thank you, Mr. Badger.

21       Okay.  Do you remember writing out instructions -- I'm

22  going to switch to the Elmo -- for somebody to deliver this

23  petition, which was ultimately dismissed, and describing the

24  property as an earthship style home covered in plastic?

25  A.   I could have.  That looks a little bit like my writing,

1   and I notice my name is at the bottom, so ...

2   Q.   Do you think you wrote your name and phone number at the

3   bottom?

4   A.   Probably.  I must have if you've got a paper sitting

5   there.

6           MS. FOX-YOUNG:  All right, I'm going to mark this

7   page as Exhibit L-1, and I'd move L-1 for admission.

8           THE COURT:  Any objection?

9           MR. HALL:  No objection, Your Honor.

10          THE COURT:  It's admitted.

11          (Defendants' Exhibit No. L-1 admitted.)

12  BY MS. FOX-YOUNG:

13  Q.   Mr. Badger, do you see this document entitled Order

14  Dismissing Action?

15  A.   Yes.

16  Q.   Okay.  It's signed by Judge Ortega, filed June 27th, 2018,

17  dismissing the Badger vs. Morton case with prejudice.  Do you

18  see that?

19  A.   Yes.

20  Q.   And you received this document by mail?

21  A.   I don't know how I received it.

22  Q.   Okay.  But you knew that the eviction case was dismissed,

23  correct?

24  A.   Yeah, that's what he told us in court.

25          MS. FOX-YOUNG:  Okay.  I'm going to mark this as

1  Defendants' Exhibit L-2, and move its admission.

2          THE COURT:  Any objection?

3          MR. HALL:  No objection.

4          THE COURT:  It's admitted for purposes of this

5  hearing.

6          MS. FOX-YOUNG:  Thank you, Your Honor.

7          (Defendants' Exhibit No. L-2 admitted.)

8  BY MS. FOX-YOUNG:

9  Q.   Mr. Badger, after the eviction case was dismissed, did you

10 again reach out to law enforcement in order to ask for their

11 help in evicting the folks at Lot 28?

12 A.   I'm sure I probably did, yeah.

13 Q.   Okay.  Do you remember initiating a trespass action, or

14 asking that Mr. Morton be charged with trespass?

15 A.   I remember us trying to do something through the state

16 troopers office.  I don't remember specifically.  I just

17 remember we had a state trooper go up there --

18 Q.   Okay.

19 A.   -- at one point.

20 Q.   So you asked a State Police officer to go up there and

21 talk to Mr. Morton?

22 A.   Yeah.

23 Q.   And do you know what happened?

24 A.   He went up there.  I remember him coming back.  He came

25 back to our house.  He said he needed to see some kind of

1  documents proving, I think it was, that we owned the land and

2  whatnot.  So we showed him, and then he was going to go back up

3  there, but somebody told him not to.

4  Q.    Do you know who told him not to go up there?

5  A.    I don't know.  Beats me.

6  Q.    But the State Police officer told you that he was

7  instructed not to go out there?

8  A.    Yeah.

9  Q.    Who was that officer?

10  A.    I don't remember who he was.  I don't remember his name.

11  Q.    Okay.  And that was after the eviction case had been

12  dismissed, right?

13  A.    I don't know whether it was before or after.

14  Q.    Now, did you ask Sergeant Rael to charge Mr. Morton with

15  trespass?

16  A.    I don't know whether we did or not.

17  Q.    You don't remember one way or another?

18  A.    I mean, I'm sure we did.  I mean, I basically asked them

19  numerous times over, I don't know how long, to get them off my

20  land.

21  Q.    Okay.  Are you aware that Sergeant Rael subsequently cited

22  Mr. Morton in August with trespass and that that was dismissed?

23  A.    He was cited with trespass in August?

24  Q.    Yeah.  Do you know anything about Mr. Morton getting a

25  citation for trespass in August after he had been arrested?

```
1   A.    I think I remember that being done.

2   Q.    Okay.  Are you aware that that case was also dismissed?

3   A.    Yeah.

4           THE COURT:  Would this be a good time to take a short

5   break?

6           MS. FOX-YOUNG:  Your Honor, I think I am -- I'm going

7   to check with everybody, but I think I'm about done.  So it

8   probably would be a good time, and we can pass the witness.

9   Let me check if that's okay, Judge.

10          THE COURT:  Sure.

11          MS. FOX-YOUNG:  All right, Your Honor, we'll pass the

12  witness.

13          THE COURT:  Mr. Badger, we're going to take about a

14  10 or 15 minute break, and then come back and let the attorney

15  for the United States question you, unless -- were there any

16  other questions from defense?  Okay.

17          All right, let's take about a 10-15 minute break.

18  (Recess was held at 11:01 A.M.)

19  (In Open Court at 11:20 A.M.)

20          THE COURT:  Please be seated, and we are back on

21  record.  Do I understand there's no further questioning at this

22  time on direct examination of Mr. Badger from Defendants?

23          Okay.  Mr. Hall.

24          MR. HALL:  Thank you, Your Honor.

25
```

1                          CROSS-EXAMINATION

2   BY MR. TAVO HALL:

3   Q.   Good morning, Mr. Badger.  Can you hear me all right?

4   A.   Yes, sir, I can hear you.

5   Q.   So you've covered a lot already in your answers to the

6   defense attorney, so I'm going to try to just clarify a few

7   things.  Let's just start out with some of the basics, before

8   we get into the specific time-line that you just went through.

9        In August of 2018, you finally got your land back when

10  Lucas Morton and the other Defendants were arrested, right?

11  A.   Yeah.  Yes, sir.

12  Q.   And at the time that the Taos County Sheriff's Office went

13  on to your land and arrested some of them, removed the others,

14  whose land were they on?

15  A.   They were on mine.

16  Q.   And that land was Lot 28, Unit 2 in the Costilla Meadows

17  Subdivision, right?

18  A.   Right.

19  Q.   Now, you and Tanya, your wife, owned that land, right?

20  A.   Correct.

21  Q.   Now, several months before that, you had terminated an

22  agreement with Lucas Morton that would have swapped land with

23  Lot 29, correct?

24  A.   Yeah.  Yeah, we did the Termination Agreement, yeah.

25  Q.   You never actually swapped land with him?

```
 1  A.   Oh, no, no.

 2  Q.   You never gave up your ownership of Lot 28?

 3  A.   No.

 4  Q.   And after you terminated the land swap agreement, or

 5  around that time, you told Lucas Morton to get off your land?

 6  A.   Yeah.  Yeah, as I recall, I did.

 7  Q.   And you did that by texting him, and we just looked at

 8  those text messages; is that right?

 9  A.   Yeah.

10  Q.   You actually told him he had to be off in a week, correct?

11  A.   Yeah, I believe that's what that text said.

12  Q.   Now, after you told him to get off your land, he did not

13  get off your land, correct?

14  A.   No.

15  Q.   So another step that you took was you filed an eviction

16  suit to try to get him off your land; is that right?

17  A.   Yeah.  Yeah, that's what we filed in court, in Magistrate

18  Court.

19  Q.   Lucas Morton did not show up to court for the day of the

20  hearing on your eviction suit, right?

21  A.   No, sir, he did not.

22  Q.   None of the people who were living on your land showed up

23  that day, right?

24  A.   No.

25  Q.   Now, the suit did get dismissed, as you testified, but not
```

1    because of anything that Lucas Morton did or any evidence he

2    presented?

3            MS. FOX-YOUNG:  Objection, foundation.

4    A.   No, it was --

5            THE COURT:  Just a second.  If the witness knows or

6    can answer the question, he can.  If you don't know,

7    Mr. Badger, just indicate you don't know.

8            Restate the question.

9    BY MR. HALL:

10   Q.   Was there any evidence presented from Lucas Morton or any

11   of the others living on your land that day in court when you

12   showed up?

13   A.   No.  They weren't there, so I don't know how they would

14   have, no.

15   Q.   And when the Judge dismissed it, he told you you were in

16   the wrong court?

17   A.   Yeah.  Yes, sir.

18   Q.   Now, you also asked law enforcement, I believe you said a

19   New Mexico State Police officer, to help you get Lucas Morton

20   off your land, right?

21   A.   Yes, sir.

22   Q.   You requested him to go up to your land and talk to him?

23   A.   Yes, sir.

24   Q.   But that didn't work either, right?

25   A.   No, huh-uh.

1  Q.   Now, throughout all of your efforts -- and let's just be

2  clear, that's texting him to get off your land, suing him to

3  get off your land, asking law enforcement to have them get off

4  your land -- did Lucas Morton or any of the Defendants make any

5  efforts to actually leave your land?

6  A.   No, sir, not that I'm aware of.

7  Q.   And they never asked you to let them stay for a little

8  while, while they continued to move their stuff off your land?

9  A.   No.  They never even started to.

10 Q.   I'm sorry, can you speak up just a little bit?  I don't

11 think we were able to hear that one.

12 A.   I said, no, they never even started to move their stuff

13 off.

14 Q.   They never came to you and said, hey, Jason, we have an

15 oral lease in place?

16 A.   Not that I'm -- not that I can recall.  They just plain

17 didn't move.

18 Q.   And you didn't have a written lease with them to be your

19 tenants, did you?

20 A.   No.

21 Q.   You weren't their landlord, right?

22 A.   No.

23 Q.   At the time that they were arrested and removed from your

24 land in August, had you heard any reason that they thought they

25 were allowed to stay on your land, any basis that you had heard

1   from anyone?

2   A.   No.  There's, yeah, no reason they should have thought

3   they could have been there.

4   Q.   Now, did you hear anything about their having beliefs that

5   meant that they could stay on your land?

6   A.   Yeah.  Yes, I do recall -- I don't remember, like, who I

7   heard it from, or where I heard it, or read it, but it was in

8   reference to something about their beliefs.  They felt they had

9   the right to be, basically, be wherever they wanted as far as,

10  like, land goes and stuff like that.

11  Q.   Did you agree with that at all in terms of them being on

12  your land?

13  A.   No, not at all.

14  Q.   Now, you said you stayed away from personally going and

15  confronting them.  Was that on the advice, partially, of law

16  enforcement telling you to stay away?

17  A.   Not that I recall.  I just -- I mean, that's just always

18  better to do.

19  Q.   Now, you testified that you had spoken with Sergeant Jason

20  Rael from the Taos County Sheriff's Office at your house.  Do

21  you remember that?

22  A.   Yeah, uh-huh.

23  Q.   Do you remember him telling you to just stay clear of them

24  due to them being armed and potentially dangerous, at least in

25  terms of what the Sheriff's Office thought?

1  A.   I don't recall him specifically saying that.  He could

2  have.  He could not have.

3  Q.   Now, at the time that --

4  A.   I don't --

5  Q.   I'm sorry, go ahead.

6  A.   My bad.  I just don't remember the entirety of the

7  conversation.

8  Q.   But in your own estimation, you thought it was better and

9  safer to not personally confront those --

10          MS. FOX-YOUNG:  Objection, Your Honor.  Counsel's

11  testifying.

12  A.   Yes.

13          THE COURT:  I'm sorry, what's the objection?

14          MS. FOX-YOUNG:  Counsel's testifying.

15          THE COURT:  Rephrase the question.

16          MR. HALL:  Yes, Your Honor.

17  BY MR. HALL:

18  Q.   Was it your personal decision that it would be better to

19  not go and confront personally Lucas Morton and the others when

20  you wanted to get them off your land?

21  A.   Yes.  Yeah, yes, sir.

22  Q.   Were you aware that they had several firearms on the

23  property?

24  A.   Yes.  Somebody had told me that they would hear them shoot

25  sometimes up there, so it was known that they had firearms.

1  Q.   And just to be very clear now, at the time that they were

2  arrested, which is August, again, we're talking about, you had

3  withdrawn all permission for Lucas Morton and the others to

4  remain on your land; is that right?

5  A.   Yeah.

6  Q.   And they knew that you had withdrawn all permission for

7  them to remain on your land; is that right?

8        MS. FOX-YOUNG:  Objection, foundation.

9  A.   Yeah --

10       THE COURT:  Overruled.

11 A.   -- because I had told them in that --

12 BY MR. HALL:

13 Q.   Go ahead.  You can finish your answer.

14 A.   Oh.  Because I had told them in that text message.

15 Q.   And at the time that they were arrested, did you view them

16 as trespassers on your land?

17 A.   Yes.

18 Q.   Okay.  So those are the very important parts, and now

19 there are a few things that I just want to cover in some of the

20 other time-line parts of the eight or nine months that you had

21 to deal with this.

22      So let's go back to when you first discovered the

23 Defendants on your land, or Mr. Morton on your land.  Now, it

24 is a rural area out there.  That land is fairly isolated; is

25 that right?

1   A.    Yes.  It's completely off grid.

2   Q.    But those property lots, they are privately owned, right?

3   A.    Yeah.

4   Q.    And you can find them on a map?

5   A.    Yeah, you can find them on a map if you have one of the

6   specific Costilla Meadows.

7   Q.    And when you become an owner of one of those lots, you do

8   know which lot you're buying, right?

9          MS. FOX-YOUNG:  Foundation.

10  A.    Yeah.

11         THE COURT:  Well, if you know the answer to the

12  question, you can answer it.

13  A.    Yeah.  I mean, you do know the lot you're buying.  You see

14  it.  I mean, you go out there and look where it's at.  And then

15  especially when they do the survey, they put the stakes.

16  BY MR. HALL:

17  Q.    And that's what I was going to ask you.  You saw wooden

18  stakes out there, yourself?

19  A.    Yeah.  Yes, sir.

20  Q.    So you were able to find your lot, 28?

21  A.    Yeah.

22  Q.    There were also stakes that showed Unit 2, Lot 29, right?

23  A.    Yes.

24  Q.    Now, you mentioned about your plan with the land.  Did you

25  ever get a chance to start building the veteran's retreat, or

1  your little personal retreat out there on your land?

2  A.   I was able to, yeah.  Yeah, I was able to, at one point.

3  Q.   What did you do to get started on building on Lot 28?

4  A.   I had -- well, first, I cleaned up all their stuff that

5  they had there, and then I moved a mobile home out there.  It

6  was pretty much just a gutted mobile home.  But then I started

7  working on that.

8  Q.   Are you talking about after the Defendants were off your

9  land?

10 A.   Oh, yes, sir.  Yeah, yeah.

11 Q.   I'm sorry, before you found them on your land.  We're just

12 focusing on that point in time right now.

13 A.   Oh, I'm sorry.

14 Q.   No worries.

15 A.   Oh, no.

16 Q.   Okay.  So you hadn't been able to start building anything

17 that you had hoped to build yet?

18 A.   No, no.

19 Q.   And you had only owned it a few months before you found

20 the Defendants on your land, right?

21 A.   Roughly.  I can't recall exactly how long, but it was

22 shortly after.

23 Q.   And were you and your wife, were you excited about this

24 land when you bought it?

25 A.   Oh, yeah, for sure.

1  Q.   You had big dreams for what you were going to do with it?

2  A.   Yeah, uh-huh.

3  Q.   So when you first discovered them on your land, I think

4  you said in the cold -- it was cold, but you don't know the

5  exact month; is that right?

6  A.   No, I don't remember exactly when it was.

7  Q.   But was it on one of your trips, your regular trips to

8  kind of go look at your land and just think about what you

9  wanted to do with it with your wife?

10 A.   Yes, it was.

11 Q.   Now, when you found the folks there, did you have any

12 paperwork with you to show them what property they were on?

13 A.   Yeah.  I had -- yeah, I believe I had pretty much all the

14 paperwork, luckily, and that's what I showed him during our

15 conversation where we had, you know, initially met.

16 Q.   So you were able to actually show them your land ownership

17 documents and, like, the survey or something like that?

18 A.   Uh-huh.  Yeah, the survey, and then also the lot map.  So

19 I could show him, basically, kind of how he got it wrong.

20 Q.   And you also testified you were able to show one of the

21 boundary stakes to one of the teenage boys?

22 A.   Yes, sir.

23 Q.   And he was able to see the writing that was on those

24 stakes with you?

25 A.   Yeah, uh-huh.

1  Q.   And he agreed with you that they were on your land?

2  A.   The boy?

3  Q.   Yeah, the boy.

4  A.   I mean, it's just an assumption, but I would assume he

5  would.  I don't recall him specifically saying it.  But I mean,

6  if you see it, I would assume he did.

7  Q.   Well, I think you testified that he acknowledged that

8  Lot 29 was written over on the other side, the other parcel of

9  land; is that right?

10 A.   Yeah.  I mean, he had come back and told Siraj something.

11 But I mean, I would assume, yeah, if you see it.  I don't know

12 how else you would take that.

13 Q.   Now, you testified about this land swap agreement, and

14 we'll talk a little bit more about that, but you testified

15 earlier that while it was in flux, while you were waiting for

16 it to go through, you did a little bit of preparatory work.

17 You put four boundary stakes around the corners of Lot 29; is

18 that right?

19 A.   Yeah.

20 Q.   But you didn't build anything on Lot 29, right?

21 A.   No.

22 Q.   And you testified this morning, you didn't build anything

23 because you didn't own Lot 29; is that right?

24 A.   Yeah.

25 Q.   Would you agree that when showing up to some land, before

1  you start building, it's an important thing to make sure you're

2  on the right land?

3  A.   Yeah, it would be a good idea.

4  Q.   Is that why you didn't start building anything on Lot 29

5  until the contract went through?

6  A.   Yeah.

7  Q.   Now, just to be clear, the same day that you found Lucas

8  Morton and the others living on your property was the same day

9  that you told them they were on the wrong property?

10 A.   Yes.

11 Q.   There was no break in time in between?

12 A.   No.  Actually, as far as I recall, those were pretty much

13 like the first words out of my mouth.

14 Q.   Now, as the owner, you could have asked them, or told them

15 to leave your land.  Was that your understanding right then?

16 A.   Yeah, of course.

17 Q.   But you saw small children on the property?

18 A.   Yes, sir.

19 Q.   And you didn't want to just send them out with nowhere to

20 go when it's about to be cold and winter in northern New

21 Mexico; is that right?

22 A.   Yes.

23 Q.   Did Lucas Morton offer that day to just move right over to

24 Lot 29?

25 A.   No.  Not that I recall, no.

1   Q.   And so you didn't say, no, stay right here, you don't have

2   to move?

3   A.   Not that I recall, no.

4   Q.   In fact, if they had offered to move right then, is it

5   fair to say you probably would have taken them up on that?

6           MS. FOX-YOUNG:  Objection.  Counsel's testifying.

7   A.   Well, maybe, maybe not.

8           THE COURT:  Just a second, Mr. Badger.  That's close.

9   Just rephrase the question.

10  BY MR. HALL:

11  Q.   If they had offered to move over to Lot 29 right there on

12  that day, what do you think your reaction would have been?

13  A.   I probably would have taken them up on it.  I mean, I

14  still would have had a little worry about the kids potentially

15  being put in the cold if they couldn't get something done in

16  time, but, yeah, I probably would have agreed to it.  Sounds

17  like something I probably would have agreed to.

18  Q.   Is it fair to say you didn't want to do the land swap, but

19  it seemed like a solution?

20  A.   Yeah, it seemed like the best one.

21  Q.   If it were up to you, you would have just been able to

22  have your land free and clear; is that fair?

23  A.   Yeah.

24  Q.   Now, when you started talking about swapping land, did

25  Lucas Morton ever show you a deed to Lot 29?

1   A.   I can't recall him doing it.

2   Q.   You just, is it fair to say -- I'm sorry.

3       Is it fair to say that you just took it on his word that

4   he was the actual owner of Lot 29?

5   A.   Yeah.  Yes.

6   Q.   Now, as you talked about this land swap, did Lucas agree

7   to pay all the title fees and the court fees that would come

8   along with this real estate transaction?

9   A.   Yes.  Just simply the cost of the whole process, not the

10  actual value for the land.

11  Q.   Now, you talked on direct about the written agreement that

12  you had with him that a lawyer in town had drawn up for you.

13  Do you remember that?

14  A.   Yeah, uh-huh.

15  Q.   Now, in that agreement, there was nothing in there that

16  said while the agreement was pending, Lucas Morton was a tenant

17  of yours; is that right?

18  A.   I don't recall it saying that, no.

19  Q.   Do you recall discussing with either Lucas Morton or the

20  attorney that drew it up that Lucas Morton would get to own

21  your property before the contract closed?  That wouldn't make

22  sense in the normal way of doing property transactions that

23  you've done, right?

24  A.   No, that would not.

25  Q.   Now, Lucas Morton never paid you any rent?

1   A.   No.

2   Q.   Now, is it fair to say that you had basically just granted

3   him the license to remain on your property while the contract

4   was pending?

5          MS. FOX-YOUNG:   Objection.   Calls for a legal

6   conclusion.

7          THE COURT:   Sustained.

8   BY MR. HALL:

9   Q.   Is it fair to say that you were permitting Lucas Morton to

10  remain on your property while the contract was pending?

11  A.   Yeah.   Yes.

12  Q.   Now, that contract never closed, right?

13  A.   No.

14  Q.   And Lucas Morton never paid the court fees and the costs,

15  the filing costs, right?

16  A.   No.   Not that I'm aware of.

17  Q.   And Lucas Morton did not show up to the closing?

18  A.   No.

19  Q.   And it wasn't an easy process leading up to the closing

20  with him either, was it?

21  A.   No.   It was a little difficult with communication and

22  stuff like that, yeah.

23  Q.   And throughout this time, none of them paid you anything

24  for remaining on your land?

25  A.   No, sir.

1  Q.   Now, you did still expect throughout some of this process

2  that it would go through and that you would actually get Lot 29

3  eventually; is that right?

4  A.   Yeah.  I didn't see, at the time of us going through this

5  process, I didn't see a reason for it not going through.  I

6  mean, it was just a simple swap, you know.  It's not like a

7  substantial amount of money was being exchanged, yeah.

8  Q.   Now, you testified earlier that at some point, you had

9  done some research and realized that Siraj and Lucas were

10  wanted, right?

11  A.   Yes.

12  Q.   Did that change your perception of the likelihood of

13  succeeding in your land swap?

14  A.   Yeah.

15  Q.   And after that had happened, you sent the text messages.

16  We looked at them earlier.  And I can bring them up again if

17  you want to see them, but I mostly just want to ask you, was

18  your intent with these text messages to provide Lucas Morton

19  notice that he had to leave your property?

20  A.   Yeah.  The ones where I told him he had to be off, yeah.

21  Q.   And was your intent with filing the eviction lawsuit to

22  try another way to get the group off your property?

23  A.   Yes.

24  Q.   Do you remember why you chose the eviction form that was

25  filed that we looked at earlier?

1  A.   I probably thought that that was just how you did it.  I

2  mean, I just assumed.

3  Q.   Sure.  You didn't choose that form because you viewed

4  Lucas Morton and the others as your tenants?

5           MS. FOX-YOUNG:  Objection, foundation.  He said he

6  doesn't remember.

7  A.   No --

8           THE COURT:  Well, yes, rephrase the question.  The

9  witness said he didn't remember.  Rephrase the question.

10  BY MR. HALL:

11  Q.   You don't remember why you chose the eviction form.  Do

12  you know what you thought about the group that was on your

13  property at the time?

14  A.   They were illegal trespassers on my land, and what I

15  thought was the right thing to do would be an eviction process.

16  Q.   Thank you.

17     Do you remember a conversation -- you talked about this on

18  direct -- with Taos County Sheriff's Sergeant Jason Rael about

19  the possibility of wearing a button camera?

20  A.   I remember the conversation of that, yeah.

21  Q.   Do you remember actually where you were when you were

22  having that discussion with him on the phone?

23  A.   As I recall, I think I was up there.

24  Q.   Do you remember telling Sergeant Rael that you were

25  watching Lucas Morton get water?

1   A.    Yeah.

2   Q.    And do you recall expressing your frustration to Sergeant

3   Rael that none of the folks on your land had made any efforts

4   to get off your land?

5   A.    I'm sure I probably did.

6   Q.    Do you remember why you didn't end up doing the button

7   camera plan?

8   A.    Because I wasn't going to be protected at all.  Basically,

9   just kind of left out to the wind, so ...

10  Q.    Sure.  After you had your eviction lawsuit dismissed for

11  being in the wrong court, did you have any plan to try again in

12  the right court?

13  A.    Yeah.

14  Q.    And why didn't you go forward with the process in the

15  right court?

16  A.    To be honest with you, I don't know why we didn't.  I

17  don't remember what was going on at that time.

18  Q.    Was it because you thought, you know what, I'm going to

19  let them stay on my land, I don't mind?

20  A.    Most certainly not.

21  Q.    So you didn't have a change of heart?

22  A.    No.

23  Q.    Now, let's just talk a little bit about when you did

24  finally get your property back.

25  A.    Okay.

1   Q.   So you didn't know beforehand that the Taos County

2   Sheriffs were going to go in and serve the search warrant; is

3   that right?

4   A.   No.

5   Q.   You didn't find out that it had happened until it was

6   over; is that right?

7   A.   Yeah.  Yes, sir.

8   Q.   What did you find when you were actually able to get back

9   on your land in August of 2018?

10  A.   Everything that was, you know, currently there, just

11  random stuff.  I did end up finding -- we found a shotgun.  We

12  found a bulletproof vest.  We found this little bag that was

13  full of ammo, just randomly misplaced ammo all compiled in a

14  bag.  We found a pistol, too, a Glock, and that also came with

15  -- it had a bunch of mags with it, a bunch of extended 30 round

16  mags or 32 round mags, whatever it was, which I thought was

17  really odd that that was left behind after a raid.  It was

18  clearly hanging up in the van, in the back area where the box

19  is.  I didn't find anything more alarming than that.

20  Q.   Did you turn those items over to law enforcement?

21  A.   Yes.  I immediately called the Taos County Sheriff's

22  Office.  I told them that we were up there and I told them what

23  we'd found, and I told them that, you know, clearly somebody

24  needed to come get that.

25       We waited -- I don't remember the specific amount of time

1   that we waited, but we waited several hours.  Finally I just

2   left them in the back of that box van and then shut the door,

3   and just told them where they were, because I wasn't about to

4   sit up there for God knows how long until they got there.

5   Q.   Okay.  And it was on you to clean up the land after

6   everyone had been removed; is that right?

7   A.   Yes.

8   Q.   It was your time and your expense; is that right?

9   A.   Yes.

10  Q.   And what did you have to remove, if you recall?

11  A.   Just all the trash that was there.  There was a bunch of

12  tires, two-by-fours, plastic, and then all the other stuff that

13  was left behind.  Just a bunch of randomness.

14  Q.   Did you have to get the box truck towed?

15  A.   Yes.

16  Q.   Did you have to fill in the --

17  A.   And that, too.

18  Q.   Did you have to fill in the big hole where the RV had been

19  dug into the ground?

20  A.   Oh, yeah.  Yeah, and then we leveled back out all the dirt

21  that was taken out of the hole where the RV was.  There was

22  another large hole behind the trailer, and then there was like

23  a little area that -- I'm assuming it was like a burn pit or

24  something like that.  So we had to fill all that back in, as

25  well.  And we got some roll-off dumpsters and stuff.

1  Q.   And all the vegetation that was destroyed remains

2  destroyed; is that right?  Or at least it did when you were

3  there?

4  A.   Yeah.

5  Q.   Did you ever find out about the body of a little boy that

6  was found on your land?

7  A.   Yes, I did.

8  Q.   But you didn't find that yourself?

9  A.   No, sir, fortunately.  Fortunately not, no.

10 Q.   Now, it took you, fair to say, several weeks to clean up

11 your property?

12 A.   Yeah, sure.  I mean, I guess you could say that.  I don't

13 remember the specific time it took.

14 Q.   And at the end of this whole ordeal, did you still have

15 the same excitement and interest in your land?

16 A.   A little bit.  I wanted, you know, to try and salvage

17 everything.  I mean, at one point we just kind of didn't have

18 it no more, so we ended up selling it and getting rid of it

19 before we moved away.  It just kind of was an issue with

20 finding the small boy on the property.  That really 100 percent

21 ruined it for my wife.  That kind of tore her up pretty bad.

22 She was, yeah, really saddened by that.  So, you know, if my

23 wife can't enjoy it, then I can't enjoy it.

24 Q.   So you never built anything on the land?

25 A.   Other than, you know, bringing a mobile home on there, no.

1  Q.   And you never ended up getting your veteran's retreat?

2  A.   No, huh-uh.

3  Q.   Now, you ended up selling it to some other buyers; is that

4  right?

5  A.   Yes, sir.

6  Q.   And did you sell it at a loss, the land?

7  A.   Yes, unfortunately.

8  Q.   And do you recall about how much of a loss?

9  A.   It was about half.  I think I sold it for -- I believe it

10 was around $4,500, I believe.  Yeah, so we bought it at like

11 $8,500 or $9,000, so it was roughly half.

12 Q.   Is this how you expect property ownership to operate in

13 the United States?

14        MS. FOX-YOUNG:  Objection, relevance.

15 A.   No, sir.  Most certainly not.

16        THE COURT:  It's not relevant.  Sustained.

17 BY MR. HALL:

18 Q.   Do you feel like the folks that were remaining on your

19 land took advantage of you for letting them stay there?

20 A.   Yeah.  Yeah, I do.  I think my kindness was definitely

21 taken advantage of by letting them stay there while we were

22 doing the land swap, because of the small children.  So, yeah.

23        MR. HALL:  One second, Your Honor.

24        THE COURT:  Sure.

25

1  BY MR. HALL:

2  Q.   Mr. Badger, do you recall the RV that was on the property

3  and how you got rid of that?

4  A.   The actual camper?

5  Q.   Yes.

6  A.   As far as I know, that was retrieved by some kind of

7  company, because it was stolen somehow.  So I don't know who

8  came and got that.  I guess like a repo, some kind of repo

9  company came and got it.

10 Q.   So was that the one part of the property that you didn't

11 actually have to deal with yourself?

12 A.   Yeah.  Yes.

13          MR. HALL:  That's all I have, Your Honor.

14          THE COURT:  Is there redirect?

15          MS. FOX-YOUNG:  Just briefly, Your Honor.

16                     REDIRECT EXAMINATION

17 BY MS. FOX-YOUNG:

18 Q.   Mr. Badger, you testified about going out to Lot 28 after

19 the raid had been completed and finding some materials out

20 there.  Do you remember that?

21 A.   Yeah.  Yes, ma'am.

22 Q.   Who did you call to come pick those up?

23 A.   I don't remember specifically who it was.  I would imagine

24 I would have called Jason Rael.  I mean, since he's the one

25 that I talked to the most from the Sheriff's Department, I'm

1  assuming I called him.

2  Q.   And did he or somebody else from the Sheriff's Department

3  come while you were still there?  It was unclear.

4  A.   No.  No, they did not.

5  Q.   Did you touch anything out there?

6  A.   Say again.

7  Q.   Did you touch the weapons that you described and the ammo?

8  A.   Yes, I did.

9  Q.   Did you dig through the property?

10  A.   Yes, I did.

11  Q.   Did you move anything around?

12  A.   No.  I mean, not other than just when we found it.  You

13  know, put it to where I can take a picture and send it to Jason

14  and say, like, hey, we found this.

15  Q.   You photographed it?

16  A.   I mean, I think I did.  I might not have.  I don't exactly

17  recall.

18  Q.   It's your recollection that you photographed some evidence

19  out there?

20  A.   I might have and I might not have.  I can't exactly

21  remember.

22  Q.   How long after the raid did you go out there?

23  A.   It was probably as soon as possible, whether it was the

24  day of, if I had time, or the day after.

25  Q.   Do you know one way or another whether anybody else had

1  been out there on the property since the raid had been done by

2  the time you got there?  Let me rephrase that.  It's kind of

3  confusing.

4      Between the time of the raid and the time that you went

5  out there and looked through what was on the property, do you

6  know if anybody else had been out there?

7  A.   No, not that I know of.  I wasn't there.

8  Q.   Are you aware of whether other individuals actually came

9  and took things from Lot 28 after the raid?

10 A.   Am I aware that they did?

11 Q.   Yeah.  Do you know if anybody took any materials from the

12 property after the raid?

13 A.   Not that I'm aware of.  I don't know if they -- I mean, I

14 guess somebody could have.  I don't know.

15 Q.   Okay.  You testified earlier that you took a big tractor

16 tire and you towed it with your pickup truck around Lot 29; is

17 that right?

18 A.   Yeah, uh-huh.

19 Q.   Now, Lucas Morton never stopped you from doing that, did

20 he?

21 A.   No.

22 Q.   In fact, he expressly permitted you to do whatever you

23 wanted on Lot 29, right?

24 A.   I don't know if he exactly did or not.

25 Q.   What, if anything, did Lucas Morton --

Case 1:18-cr-02945-WJ  Document 708  Filed 04/03/23  Page 101 of 224

```
 1  A.   (Inaudible)

 2  Q.   I'm sorry, I couldn't hear that last part.  You said you

 3  don't know if he did or not, and then you didn't come through

 4  clearly.  Could you repeat that?

 5  A.   I might have asked him.  I don't know.

 6  Q.   Did Lucas Morton ever tell you that you couldn't do any

 7  improvements or make any changes to Lot 29?

 8  A.   Not that I recall.  I mean, I was there, so ...

 9  Q.   Okay.  And you actually -- I'm sorry.  You actually did

10  clear out a substantial amount of sagebrush on that lot, right?

11  A.   I don't know if you would call it substantial.  I mean, it

12  was just a little, like, path around the property.

13  Q.   It was a road around the property, right?

14  A.   Yeah, you can call it that, sure.  Road, path, whatever.

15  Q.   Okay.  I mean, that's what you told Sergeant Rael.  You

16  told him that you made a road, right?

17  A.   Yeah.  I mean, big enough for a vehicle to drive on,

18  obviously.

19  Q.   Okay.  And did you ever restore the sagebrush out there or

20  replant that area?

21  A.   No, huh-uh.

22       MS. FOX-YOUNG:  Your Honor, I don't have any further

23  questions.

24       THE COURT:  Does that conclude the questioning of

25  Mr. Badger?
```

1          MR. HALL:  Yes, Your Honor.

2          THE COURT:  May the witness be excused at this time?

3          MR. HALL:  Yes, Your Honor.

4          MS. FOX-YOUNG:  Yes, Judge.

5          THE COURT:  Okay.  Mr. Badger, this will conclude the

6  questioning, so thank you for being available.  You're welcome

7  to exit the screen, and again, thank you for being available.

8          THE WITNESS:  Thank you, Your Honor.  You're welcome.

9          THE COURT:  In terms of witnesses, it's noontime.

10  Maybe it would make sense to break.  How much time do you all

11  need for lunch?

12          MR. RAY:  An hour is probably fine.

13          THE COURT:  Is an hour enough time?

14          MR. HALL:  Yes, Your Honor.

15          THE COURT:  Okay, let's try to resume at one o'clock.

16          And by the way, Ms. Hall and Mr. Shattuck, if you all

17  would like a more comfortable chair, we can roll some in, so

18  you don't have to sit on a wood bench.

19          MR. SHATTUCK:  I'm numb now anyway.

20          THE COURT:  Well, if you want some chairs, we can

21  have some more brought over.  Just let Mr. Garcia know.

22          MR. SHATTUCK:  I will.  Thank you.

23          THE COURT:  All right, we'll break for lunch and plan

24  on resuming around 1:00.

25  (Recess was held at 12:00 noon)

1    (In Open Court at 1:04 P.M.)

2            THE COURT:  All right, defense may call the next

3    witness.

4            MR. RAY:  Your Honor, we call Mr. Stachura,

5    Christopher Stachura.

6            MR. VILLA:  And he's on Zoom, Your Honor.  This will

7    be the final Zoom witness.  The others are here.

8            THE COURT:  Okay.

9    (A discussion was held off the record.)

10           THE COURT:  I'll ask the Clerk to place the witness

11   under oath.

12           CRD RICHARD GARCIA:  Please raise your right hand,

13   sir.

14           (CHRISTOPHER JOHN STACHURA, DEFENSE WITNESS, SWORN)

15           CRD RICHARD GARCIA:  Please state your full name for

16   the record.

17           THE WITNESS:  Christopher John Stachura.

18               TESTIMONY OF CHRISTOPHER JOHN STACHURA

19                        DIRECT EXAMINATION

20   BY MR. RYAN VILLA:

21   Q.   Mr. Stachura, this is Ryan Villa.  I am an attorney who

22   represents Subhanah Wahhaj.  We'll just ask you to speak real

23   loud.  I think it partly has to do with our connection, that we

24   can hear you, but just not quite as crisply as we would like

25   to.

1        Will you tell the Court how you're employed?

2   A.   Currently I'm employed as the attorney for the town of

3   Taos.

4   Q.   And are you a licensed attorney in the state of New

5   Mexico?

6   A.   Yes, I am.

7   Q.   How long have you been licensed?

8   A.   Since 2003, I think, or maybe early 2004.  So about 20

9   years.

10  Q.   In 2018, how were you employed?

11  A.   I had a private practice that focused on transactional

12  real estate in Taos, New Mexico.

13  Q.   And in approximately the spring of 2018, were you

14  contacted regarding a real estate transaction between Jason and

15  Tanya Badger and Lucas Morton.

16  A.   Yes.

17  Q.   Who contacted you?

18  A.   I don't recall offhand if it was Mr. Morton or the title

19  company that was attempting to take care of the transaction on

20  their behalf.

21  Q.   Who was your client ultimately?

22  A.   The way that my practice worked, because of the emphasis

23  on the transaction, I more or less represented the transaction.

24  As I recall, it was Mr. Morton that had agreed to pay my bill.

25  Q.   Understood.  Do you happen to recall when you were first

1  contacted?

2  A.   I believe it was actually late 2017, and I'm just guessing

3  that based on the dates of some of the documents that I did.  I

4  don't recall in particular.

5  Q.   That's fine.  What, just briefly for the Court, what

6  ultimately did you do after you were contacted about this

7  transaction?

8  A.   There was an issue regarding a Warranty Deed that had not

9  been recorded, and I created that document and attempted to get

10  that problem with the title resolved.  That was on behalf of

11  Mr. Morton and the transaction.  I did create a sort of basic

12  purchase agreement for the two parties that were engaged in the

13  transaction.

14  Q.   All right.  Let me show you what we've marked and admitted

15  already as Exhibit I, and it'll appear on your screen

16  momentarily.  Let us know when you see it.

17  A.   Yes.

18  Q.   Did you prepare this document?

19  A.   Yes.  It's not particularly clear on the screen, but I

20  know what it is.

21         THE COURT:  Can you make it a little bigger?

22         MR. VILLA:  Yes, Judge.

23  BY MR. VILLA:

24  Q.   So we can do pieces at a time, Mr. Stachura, of the

25  agreement to show it to you.  This is Page 1 of Exhibit I, and

1  it indicates that it's an agreement made on -- and it's blank,

2  but April 2018 between Lucas Morton and the Badgers.  Is that

3  correct?

4  A.   Yes, that is correct.

5  Q.   And it's for a property sale, raw land, sold as is, for --

6  it's probably safe to refer to it as Lot 29.  Do you agree?

7  A.   It is for a swap of property.

8  Q.   Got it.  And Paragraph 1 below that indicates the purchase

9  price is a signed Warranty Deed for Lot Number 28?

10  A.   Yes.

11  Q.   You indicated that it's a swap.  What was being swapped?

12  A.   Lot Number 29 and Lot Number 28.

13  Q.   Who was the owner, as you understood it when you drafted

14  this Purchase Agreement, of Lot 28?

15  A.   You know, I don't remember offhand what lot was in each

16  person's title, or titled in each person's name.  I just

17  remember that they wanted to swap the two lots that they had.

18  So whoever had 29 was on 28 and vice versa.

19  Q.   Okay.  Well, I'll represent to you that we've heard

20  evidence and testimony that Lot 29 was Mr. Morton's and Lot 28

21  was Mr. Badger's.  Does that sound correct?

22  A.   Yes.

23  Q.   And this Purchase Agreement that you drafted, the idea was

24  that each person would swap so that Mr. Morton would now become

25  the owner of Lot 28 and Mr. Badger the owner of Lot 29; is that

1  right?

2  A.   That's correct.

3  Q.   I'm going to take you to the last page.  I believe it's

4  Page 3, with the signatures on it.  And we'll blow it up so you

5  can see it a little bit better.  It indicates that the seller

6  in this purchase agreement is Lucas Morton, correct?

7  A.   Yes.

8  Q.   And it's signed by Mr. Morton?

9  A.   As far as I know.  It was not signed in front of me, but

10  that appears to be what is here.

11  Q.   Do you know when the document was signed by each party --

12  or excuse me, where?  Not when.

13  A.   Where?

14  Q.   Yes, sir.

15  A.   I would guess at the title company, but I don't actually

16  know that.

17  Q.   All right.  And then the purchasers are the Badgers, and

18  it appears that their signatures are there, as well?

19  A.   Yes.

20  Q.   Okay.  So I want to back up a little bit.  And we can put

21  this exhibit off the screen.  You had to do some research with

22  respect to the title for each of the lots; is that correct?

23  A.   Yes.

24  Q.   Let me show you what we've marked as Exhibit A.  It's

25  already been admitted.  And we'll just start with the top.

1   This document is entitled a Memorandum of Contract.  We'll blow

2   it up so you can see it a little bit better.  Do you see that

3   on your screen now?

4   A.   I do.

5   Q.   So in the top right corner, you can see the recording

6   stamp from the County Clerk.  This was obtained from there.

7   And it's a Memorandum of Contract from 2016 between a James

8   Kohlmann and Mr. Morton.  Have you seen this document before?

9   A.   Yes.

10  Q.   And just generally, what does this document purport to

11  convey?

12  A.   The document, itself, doesn't purport to convey anything.

13  It says that there is a real estate contract in place between

14  the parties.  This would be to alert anyone who is interested

15  in that property as to who had the interests that they needed

16  to deal with.

17  Q.   What is a real estate contract?

18  A.   A real estate contract would be a purchase of real estate

19  over time.

20  Q.   And if we can go to the middle of this page, I'll show you

21  the lot information.  It indicates this is Lot Number 29.  So

22  it's a real estate contract for Lot 29; is that correct?

23  A.   That is correct.  Well, it is a reference to the fact that

24  a real estate contract for Lot 29 exists.

25  Q.   Okay, thank you.  And I would like to skip to Page 3 of

1  this document, and we'll show the top half here to you.  It

2  appears that it indicates that the buyer of this particular

3  property is Lucas Morton; is that correct?

4  A.    That is correct.

5  Q.    And then we'll go to the third page, the last page -- oh,

6  there should be one more page.  Okay, so this is the last page.

7  I just wanted to show you the seller's name and signature, that

8  being James Kohlmann, correct?

9  A.    Yes.

10 Q.    So you indicated that there was an issue with a Warranty

11 Deed.  Was that a Warranty Deed in connection with this

12 transaction that's memorialized by this Memorandum of Contract?

13 A.    Yes.

14 Q.    Will you explain that to the Court?

15 A.    Sorry?

16 Q.    Will you explain what the issue was with the Warranty Deed

17 to the Court?

18 A.    Generally speaking, when a real estate contract is in

19 place, there's a Warranty Deed that is created that is held in

20 escrow by any number of parties.  Usually a third party.  That

21 Warranty Deed will be released upon the contract being paid off

22 in full.

23     In this case, there was no Warranty Deed that had been

24 recorded to demonstrate that the contract had been paid off.

25 Q.    Did you learn whether, in fact, the contract had been paid

1  off?

2  A.   My understanding was that it had been paid off and that

3  the Warranty Deed in question had, indeed, been released, but

4  for one reason or another it was not recorded by Mr. Morton.

5  Q.   So let me just unpack that a little bit.  Your

6  understanding was that it had been paid off, so paid off by

7  Mr. Morton, meaning he paid Mr. Kohlmann?

8  A.   Correct.

9  Q.   And how did you come to that understanding that Mr. Morton

10  had paid off Mr. Kohlmann?

11  A.   I believe that was a discussion with the title company.

12  I don't recall entirely, but it probably would have gone back

13  to the title company.

14  Q.   What was the title company for this transaction?

15  A.   This was First -- well, the title company for the

16  transaction between Mr. Morton and Mr. Kohlmann, I believe, was

17  Taos Title.  The title company for the transaction between

18  Mr. Morton and the Badgers was First New Mexico Title Company.

19  Q.   So you testified a minute ago that you learned the deed

20  was ultimately released after payment was made in full.  So was

21  it the title company that released the deed?

22  A.   No.  I don't know who released the real estate contract.

23  Usually that would be an escrow company that would be

24  independent of the title company.

25  Q.   How did you learn that the deed was released?

1  A.   I believe, if I recall, it was a discussion with the title

2  company who had been in contact with the parties and probably

3  been in contact with the escrow company, as well.

4  Q.   All right.  Let me show you -- well, you said for one

5  reason or another that deed did not get recorded.  How did you

6  learn that?

7  A.   Again, I think the discussion would have been through the

8  title company.  They would have -- and I'm not -- I don't

9  remember this clearly, but usually what would happen is the

10 parties would have spoken to the title company, they would have

11 explained the situation, and the title company would have

12 explained that situation to me.

13 Q.   So having been the drafter of this Purchase Agreement and

14 knowing that there was this issue with the deed, did that mean

15 that Mr. Morton didn't own the land and couldn't swap it with

16 Mr. Badger?

17 A.   No.  It meant that there was not evidence of that

18 ownership in the county record.

19 Q.   Okay.  So what needed to be done to resolve that issue in

20 order to consummate this land swap?

21 A.   We would need a Warranty Deed that was recorded in the

22 county record to formalize Mr. Morton's ownership of the

23 property.

24 Q.   And that being just a formality.  It didn't mean

25 Mr. Morton was not the owner of the property that was intended

1  to be swapped with Mr. Badger; is that right?

2  A.   That's correct.

3  Q.   Let me show you Exhibit H, which has already been

4  admitted, and we'll just blow up the top half so you can see

5  it.  Now, I'll represent to you, Mr. Stachura, that this is a

6  letter that I received from you that you prepared; is that

7  correct?

8  A.   That is correct.

9  Q.   And I'll just show you the bottom half so we can see your

10  salutation on there, and signature.

11  A.   Yes.

12  Q.   What was the purpose of this letter that you sent to

13  Mr. Kohlmann?

14  A.   The idea was that we could get a replacement Warranty Deed

15  that could then be recorded in the county record that would

16  perfect evidence of Mr. Morton's ownership.

17  Q.   Okay.  And if we jump down to the second paragraph, it

18  says there that in April of 2016, that Mr. Kohlmann had sold

19  Lot 29 to Mr. Morton under a real estate contract, correct?

20  A.   Yes.

21  Q.   And it says, "The Memorandum for which was duly filed in

22  the records of Taos County."  That Memorandum is the exhibit I

23  showed you, Exhibit A, correct?

24  A.   That is correct.

25  Q.   Okay.  And then if we look at the third paragraph, it says

1  Mr. Morton had paid off the contract and the Warranty Deed held

2  in escrow was released, but that Mr. Morton ultimately failed

3  to file it, correct?

4  A.   That is correct.

5  Q.   Prior to sending this letter, had you talked to

6  Mr. Kohlmann about this?

7  A.   No, not to Mr. Kohlmann.  The information I think at this

8  point was all through the title company.  It's possible that I

9  had spoken to Mr. Morton about it briefly, but mostly it would

10 be through the title company that I would have gotten this

11 information.

12 Q.   Okay.  And then the next paragraph there says that you

13 prepared a replacement document, and we'll look at Page 2 of

14 this exhibit, which I believe is the document you prepared.

15 A.   Yes.

16 Q.   And we'll blow it up for you there.  So Page 2 of this

17 exhibit is a Warranty Deed from James Kohlmann to Lucas Morton,

18 correct?

19 A.   Yes.

20 Q.   For Lot 29?

21 A.   Yes.

22 Q.   So this was the deed that you were asking in your letter

23 for Mr. Kohlmann to sign so Mr. Morton could then record it and

24 formalize the ownership of Lot Number 29?

25 A.   That's correct.

1  Q.   Did Mr. Kohlmann ultimately sign it and return it to you?

2  A.   Yes, he did.

3          MR. VILLA:  Thank you.  We can take that exhibit

4  down.

5  BY MR. VILLA:

6  Q.   Do you recall when you received the signed Warranty Deed

7  from Mr. Kohlmann?

8  A.   I do not.  I don't believe that it was very long after

9  that letter was sent, but I don't recall.

10 Q.   Before you received the Warranty Deed from Mr. Kohlmann,

11 did you learn of any dispute by him that Mr. Morton was the

12 lawful owner of Lot 29?

13 A.   No.

14 Q.   Was the Warranty Deed signed before a notary, as you asked

15 Mr. Kohlmann to do?

16 A.   Yes.

17 Q.   What did you do with that notarized and signed Warranty

18 Deed?

19 A.   I notified Mr. Morton, and he came by my office to pick it

20 up.

21 Q.   And you just handed him a copy?

22 A.   No, I handed him the original.  That would have been -- a

23 copy would not be useful for recording, so he needed the

24 original document.

25 Q.   So you handed him the original document.  Did you give him

1  instructions to record it?

2  A.   I don't recall.  I would have -- in a transaction like

3  this, it would have been important that it was recorded.  I

4  don't know if the intent was for him to record it, or if the

5  intent was for it to be delivered to the title company that

6  would then record it in relation to the additional transaction

7  with Mr. Badger.

8  Q.   I see.  So the latter option would be the title company

9  would record it as part of the closing of this transaction?

10  A.   It's possible.

11  Q.   Okay, understood.  Do you know if this agreement -- or

12  excuse me, this transaction did close?

13  A.   The transaction between Mr. Morton and the Badgers?

14  Q.   Yes; thank you.

15  A.   No.  My understanding is that it did not close.

16  Q.   Let me show you what's already been admitted as Exhibit L.

17  Actually, we might have to -- excuse me, Page 8 of Exhibit L.

18  Do you recognize what I'm showing you, which is Page 8 of

19  Exhibit L?

20  A.   I do.

21  Q.   What is that?

22  A.   This is a document that's labeled a Termination Agreement.

23  It is a third-party verification of the fact that the Purchase

24  Agreement between Mr. Morton and the Badgers was defunct.

25  Q.   It's entitled Termination Agreement, but were you aware of

1  an actual agreement between Mr. Morton and the Badgers to

2  terminate?

3  A.   No.  I was -- no.

4  Q.   So why was this document prepared and signed by you?

5  A.   As I recall, the Purchase Agreement had lapsed due to

6  expiration.

7  Q.   And how did you learn that information?

8  A.   I don't know that it would have mattered -- well, I knew

9  what date was listed as the expiration date on the Purchase

10 Agreement.  I had not been asked to prepare any addendum or

11 extension of that date.  Probably in this case, the title

12 company requested that something be created to memorialize

13 that.

14 Q.   Okay.  And after preparing and signing this agreement, who

15 did you provide it to?

16 A.   That was to the title company.

17 Q.   Did you provide it to anyone else?

18 A.   No.

19 Q.   Do you have any knowledge, personal knowledge, that the

20 title company provided this Termination Agreement to anyone

21 else?

22 A.   Not -- no, I do not.

23 Q.   Did you have any further interactions with Lucas Morton

24 after sending this Termination Agreement to the title company?

25 A.   No.

1          MR. VILLA:  May I have just a moment, Your Honor?

2          THE COURT:  Sure.

3          MR. VILLA:  Your Honor, I'll pass the witness.

4          THE COURT:  Any further questioning by the Defendants

5   of this witness?

6          MR. RAY:  No, Your Honor.

7          THE COURT:  Does the United States have questions?

8          MS. BRAWLEY:  Yes, Your Honor.

9                        CROSS-EXAMINATION

10  BY MS. KIMBERLY BRAWLEY:

11  Q.   Good afternoon, Mr. Stachura.  I'm Kimberly Brawley.  I'm

12  from the U.S. Attorney's Office, and I want to make sure I'm

13  clear.  You said you were hired at the end of 2017 by Lucas

14  Morton; is that correct?

15  A.   I was engaged in the -- for the transaction, I think

16  around that time.  And again, I'm just guessing based on the

17  dates that certain documents -- the dates that are on certain

18  documents.

19  Q.   Okay.  And you were engaged for the transaction by

20  Mr. Morton, correct?

21  A.   As I recall, Mr. Morton had offered to pay my bill for the

22  transaction.  I think it was the title company that contacted

23  me first.

24  Q.   Okay.  So is it fair to say the title company knew you,

25  was familiar with your work, and referred you to Mr. Morton?

1    A.    Yes, or would refer Mr. Morton and the transaction to me.

2    Q.    Okay.  And Mr. Morton did agree to pay your bill; is that

3    right?

4    A.    Yes.

5    Q.    Did you ever give him a bill?

6    A.    No.

7    Q.    And why not?

8    A.    Because the transaction terminated, and in my practice, it

9    was more of a volume business.  If a transaction terminated,

10   there just was no use in tracking someone down for a minimal

11   payment.

12   Q.    When you were originally engaged to represent the

13   transaction, did you ascertain who the real owners of Lots 28

14   and 29 were there in the Costilla Meadows Subdivision?

15   A.    As far as I was able, yes.

16   Q.    And were you able to confirm that Jason and Tanya Badger

17   were the owners of Lot 28 within Unit 2 of this subdivision?

18   A.    That was the information that was in the public record.

19   Q.    And it's fair to say there was some difficulty at first

20   confirming that Mr. Morton was the owner of Lot 29, correct?

21   A.    Yes.  The presumption would have been that he was in the

22   process of becoming the owner based on the Memorandum of

23   Contract.  So the fact that he had an interest was clear.  That

24   that interest had been finalized was not clear.

25   Q.    Okay.  Because he had never filed the deed, correct?

1   A.    That is correct.

2   Q.    And so you had to do additional work that you weren't

3   anticipating when you were first contacted, correct?

4   A.    That is correct.

5   Q.    You had to reach out to Mr. Kohlmann, the man who had sold

6   the land to Mr. Morton, correct?

7   A.    That is correct.

8   Q.    And you had to draft another Warranty Deed for Lot 29,

9   correct?

10   A.    That is correct.

11   Q.    And this would have been Mr. Morton's responsibility to

12   pay you for these additional services, wouldn't it?

13   A.    That would be correct.

14   Q.    And did he ever pay you for these additional services?

15   A.    No, he did not.

16   Q.    Okay.  Did you send him a bill?

17   A.    No, I did not.

18   Q.    You could have sent him a bill, though, correct?

19   A.    Yes.

20   Q.    And did he ever offer to pay you for these additional

21   services?

22   A.    Not that I recall.

23   Q.    And it was important for you to get this second Warranty

24   Deed from Mr. Kohlmann, wasn't it?

25   A.    Yes.

1   Q.   And it was important that that deed be filed before any

2   further transaction with Mr. Morton and Mr. Badger could

3   continue, correct?

4   A.   Yes.

5   Q.   In fact, that deed absolutely needed to be filed to

6   perfect the evidence of Mr. Morton's ownership of Lot 29,

7   didn't it?

8   A.   Something needed to be there.  This would have been the

9   best way to get that done.

10   Q.   And you, in fact, did everything you could so that it

11   could be done, didn't you?

12   A.   Yes.

13   Q.   And Mr. Morton was provided with a deed, to your

14   understanding, for the second time, wasn't he, a deed for

15   Lot 29?

16   A.   Yes.

17   Q.   And are you aware, sitting here today, that even that

18   second deed has never been filed?

19   A.   I am aware as -- the last time that I checked the public

20   record, it had not been filed.

21   Q.   And when was that?

22   A.   Friday.

23   Q.   Last Friday?

24   A.   Yes.

25   Q.   In March of 2023?

1  A.   Yes.  My database tends to be a few months behind the

2  county, itself, so it would be safe to say that as of the end

3  of 2022, it had not been filed.

4  Q.   Okay.  I'm going to show you what's been admitted as

5  Defendants' Exhibit H.  You may recognize this.  Is this the

6  letter you wrote to Mr. Kohlmann in January of 2018?

7  A.   Yes.

8  Q.   And with it is the Warranty Deed that you drafted for

9  Lot 29 to perfect Mr. Morton's ownership?

10  A.   Yes.

11  Q.   And so was it sometime after January of 2018 that you did

12  get the Warranty Deed from Mr. Kohlmann?

13  A.   Yes.

14  Q.   And did you make sure that Mr. Morton had that Warranty

15  Deed before you proceeded with the real estate contract?

16  A.   With the Purchase Agreement?

17  Q.   Or Purchase Agreement, yes.  Thank you.

18  A.   I don't recall.  Ultimately, that deed would have needed

19  to be there for the transaction between Mr. Morton and the

20  Badgers to take place.  If the presumption was that we were

21  going to get it, or that the parties wanted to memorialize

22  their transaction ahead of time, it wouldn't necessarily have

23  been required.

24  Q.   But it is fair to say, something would have been required

25  to be filed showing Mr. Morton owned Lot 29 before the land

1  swap between Morton and Badger could have happened, correct?

2  A.    Yes.

3  Q.    And is it your testimony that as of last Friday, there's

4  still nothing filed to show Mr. Morton owned Lot 29?

5  A.    As of last Friday, give or take the delay between the

6  county updating their records and me receiving it, I was not

7  able to find any evidence that that deed had been filed.

8  Q.    I'm going to show you what you've already seen.  It was

9  admitted as Defendants' Exhibit I.  It will come up in just a

10  moment.  Do you recognize this as the Real Estate Sale and

11  Purchase Agreement you drafted?

12  A.    Yes.

13  Q.    And is this the agreement where Mr. Morton, as the seller,

14  was going to exchange Lot 29 to Mr. Badger and Mrs. Badger for

15  Lot 28?

16  A.    Yes.

17  Q.    To be clear, in your review of the records, was it

18  confirmed that it was Jason and Tanya Badger, and no one else,

19  who owned Lot 28 in 2017 -- well, I should say 2018?

20  A.    As I recall, yes.

21  Q.    Okay.  I'm going to bring your attention to this area

22  right here, Paragraph 4, in bold capital font.  Can you read

23  what that says?

24  A.    "Closing date shall be on or before June 3, 2018, at First

25  New Mexico Title.  Either party may close by mail (Fed-Ex).

1  Seller agrees to give possession of the premises to purchasers

2  on the date of closing."

3  Q.   Do you know if that closing ever occurred?

4  A.   My understanding is that it did not.

5  Q.   Do you know why it didn't occur?

6  A.   I don't recall specifically.  I think that there was, and

7  this is -- I believe that there were disagreements about the

8  seller's production of an Improvement Location Report on the

9  sale, but that was just information that I got through the

10  title company.

11  Q.   Okay.  What is an Improvement Location Report?

12  A.   An Improvement Location Report is a visual depiction of a

13  property and various improvements on that property that

14  presumes an underlying survey to be correct.  Is that clear?

15  Q.   Yes, I think it is.  Thank you.

16       Did you understand that it was Mr. Morton's obligation to

17  provide that and he did not?

18  A.   That was my understanding.

19  Q.   Okay.  Let me ask you, you have been an attorney for, I

20  guess -- were you licensed in New Mexico only, or have you been

21  licensed elsewhere?

22  A.   New Mexico only.

23  Q.   Okay.  And you've been licensed for approximately 20

24  years?

25  A.   About, yes.

1   Q.   And you do transactional work, including real estate

2   transactions; is that right?

3   A.   At that time, that's what I was focusing on.

4   Q.   Okay.  And based on all of your experience, when an

5   agreement such as the one you drafted is pending, does that

6   confer rights?  In other words, let me put it this way.  While

7   that agreement was pending for Mr. Badger and Mr. Morton to

8   swap lots, did they each have rights to the other person's lot

9   while it was pending?

10  A.   No.  In the general understanding of that term, no.

11  Q.   And if one of them -- let me ask you this.  Have you ever

12  been in a situation where a contract's pending and someone is

13  maybe living in the house that they're hoping to buy while it's

14  still pending?  Have you ever had a case like that?

15  A.   When you say contract --

16  Q.   I should say sale agreement, maybe.  Is that better?

17  A.   Sure.  Yes.  Yes, where someone is renting or staying in

18  the house prior to actual purchasing.

19  Q.   Okay.  And if someone is staying in a house while a sale

20  agreement is pending and they start moving in furniture and

21  painting the walls, does that give the person a right to the

22  property if the agreement falls through?

23  A.   Again, in the general sense of the term, no.

24  Q.   And you agreed a few minutes ago that the agreement

25  specified closing had to occur by June 3rd, 2018, correct?

1  A.   Yes.

2  Q.   I want to show you what is, I think, Page 8 of Defendants'

3  Exhibit L.  And again, do you recognize this document?

4  A.   I do.

5  Q.   Is this the Termination Agreement you drafted?

6  A.   This document says Termination Agreement.  I did draft it.

7  Q.   Okay.  And is this your handwriting at the bottom?  Are

8  you the person who signed and dated this document?

9  A.   I am.

10  Q.   And, in fact, did you date this document eight days after

11  the sale agreement should have gone to closing if it was really

12  going to happen?

13  A.   Yes.

14  Q.   And did you draft this document because the closing did

15  not occur eight days earlier as was required?

16  A.   I drafted this document because the title company

17  requested that I do so.

18  Q.   And they requested it because the closing date had already

19  expired, correct?

20  A.   Yes.

21  Q.   And it's fair to say, then, once this document's drafted

22  and once that closing date has come and gone, that sale

23  agreement is over, correct?

24  A.   When the Purchase Agreement expired, on its face that

25  transaction would have been defunct.

1   Q.    Okay.

2           MS. BRAWLEY:  May I have a moment, Your Honor?

3           THE COURT:  Sure.

4           MS. BRAWLEY:  We will pass the witness.  Thank you.

5           THE COURT:  Is there any redirect of the witness?

6           MR. VILLA:  Yes, Your Honor.

7                        REDIRECT EXAMINATION

8   BY MR. RYAN VILLA:

9   Q.    Mr. Stachura, this is Ryan Villa again.  Paragraph 4 of

10  Exhibit I that you were shown just a minute ago by Ms. Brawley

11  about taking possession of the premises after the transaction

12  occurred -- do you recall that paragraph?  You just have to

13  answer out loud for me.

14  A.    Yes.

15  Q.    Thanks.  That taking possession of the premises did not

16  preclude either party from agreeing to give possession of the

17  premises or use of the premises prior to the agreement,

18  correct?

19  A.    Correct.

20  Q.    And when Ms. Brawley asked you, did it convey rights to

21  the property, and you said, in the general sense of the term,

22  no, what do you mean by that?

23  A.    There may be -- if you look at a standard transaction,

24  when parties are engaged in a Purchase Agreement, there may be

25  either presumes if not explicit rights to examine the property,

1   to conduct inspections, to have a surveyor come on to the

2   property.  In the general sense, because we're under an

3   agreement, can I then move in?  No.  But there are possibly

4   rights that would be recognized.

5   Q.   Ms. Brawley asked you about a hypothetical situation where

6   someone's, say, leasing a property or renting a property, and

7   they later want to own the property.  In that situation, before

8   the purchase occurs, that person is a tenant, correct?

9   A.   That would be one situation.  There are many situations

10   where someone may, for one reason or another, be on the

11   property or have a certain interest in the property, or simply

12   be utilizing it before the transaction is finalized.

13   Q.   The Purchase Agreement that you drafted did not address or

14   speak to any tenancy or termination of any tenancy, correct?

15   A.   Correct.

16   Q.   And the Termination Agreement that we've been talking

17   about, that terminated the Purchase Agreement that you drafted

18   that we looked at a little while ago, correct?

19   A.   I believe that the Purchase Agreement expired on its own.

20   That termination agreement actually simply said, it has expired

21   on its own.

22   Q.   And the Termination Agreement did not terminate any

23   pre-existing tenancy, did it?

24   A.   No, it did not.

25         MR. VILLA:  No further questions, Your Honor.

1        THE COURT:  Any other questions of this witness?

2        MS. BRAWLEY:  No, thank you, Your Honor.

3        THE COURT:  Mr. Stachura, thank you for being

4  available.  You may exit your screen monitor now.

5        THE WITNESS:  Thank you, Your Honor.

6        MR. RAY:  Judge, the next witness for the defense is

7  Sergeant Rael, and we're bringing him in right now.

8        THE COURT:  Okay.

9        MR. RAY:  He is live and in person, so we shouldn't

10  have audio problems.

11        THE COURT:  Well, all things considered, it's gone

12  fairly smoothly in the grand scheme of things.

13        CRD RICHARD GARCIA:  Please raise your right hand,

14  sir.

15        (SERGEANT JASON RAEL, DEFENSE WITNESS, SWORN)

16        CRD RICHARD GARCIA:  Please have a seat and state

17  your full name for the record.

18                TESTIMONY OF SERGEANT JASON RAEL

19                        DIRECT EXAMINATION

20  BY MR. MARSHALL RAY:

21  Q.   How are you doing, sir?

22  A.   Good, sir.

23  Q.   Well, we appreciate you being here today.

24        Now, what do you do for a living?

25        THE COURT:  Can we do this?  Would the witness state

1   his name?  I don't think we have it for the record.

2          MR. RAY:  Oh, I thought I heard him say his name.

3   BY MR. RAY:

4   Q.   Yes, go ahead and state your name.

5   A.   Jason Rael.

6   Q.   Okay.  My apologies.  I thought you did it during the

7   oath.

8        All right, so I'll go back to the question.  Mr. Rael,

9   what do you do for a living?

10  A.   I'm a deputy sheriff.

11  Q.   Okay.  Now, I have heard you referred to as Sergeant Rael

12  from time to time.  Are you or were you a Sergeant at one time?

13  A.   That's my current title, is Sergeant.

14  Q.   Okay.  So is it appropriate to call you Sergeant Rael,

15  then?

16  A.   Yes.

17  Q.   Okay.  Now, how long have you been a deputy sheriff?

18  A.   About 17 years.

19  Q.   Always in the same county?

20  A.   Yes.

21  Q.   And what county is that?

22  A.   Taos County.

23  Q.   So in 2018, 2017-2018, you were also a deputy sheriff in

24  Taos County?

25  A.   Yes.

1  Q.   All right.  Now, how did you come in contact with Lucas

2  Morton?

3  A.   We -- one of the deputies that's assigned to my squad got

4  a call from an FBI agent, I believe in Georgia, and gave him

5  some information about a missing child, and the father had a

6  felony warrant out of the state of Georgia.  The other

7  information they shared with him was the man was in Amalia, New

8  Mexico.

9  Q.   When did this call come in?

10 A.   I'd have to look at my report to be accurate.

11 Q.   All right.  Do you think that it was sometime in 2018?

12 A.   I believe so.

13 Q.   Okay.  Do you remember who from the FBI made the call?

14 A.   It was an Agent Suta.

15 Q.   It was an Agent Suta.  And Agent Suta spoke to another

16 deputy in your office, but not to you?

17 A.   It was Deputy Teodoro Flores.

18 Q.   Did you ever speak to anyone from the FBI at that time?

19 A.   No.

20 Q.   All right.  So what did you do with that information that

21 came in from Agent Suta?

22 A.   We had more or less the general location in Amalia, New

23 Mexico, so myself and Deputy Flores drove out to the area to

24 kind of look around and see if we could spot anything.

25 Apparently he was driving a white box truck.

1  Q.   Who was driving a white box truck?

2  A.   Mr. Morton.

3  Q.   Was that information you had received from Agent Suta?

4  A.   Yes.

5  Q.   All right.  So you go driving around in Amalia.  What do

6  you see?

7  A.   Well, it's not very big, and that general area is kind of

8  flat, so we parked up on a hill and used binoculars and just

9  looked around.  And we did see a while box truck in the area.

10 Q.   And where was the white box truck parked as far as

11 property wise, if you remember?

12 A.   I guess it would be towards the east of the main little

13 structure there.

14 Q.   Did you approach that property where the white box was

15 parked at that time?

16 A.   No, we didn't.

17 Q.   Did you just observe?

18 A.   Yes.

19 Q.   Did you see people?

20 A.   I don't recall if we did.

21 Q.   All right.  Did you make note of whose property that was,

22 or what the lot was where that white box truck was parked?

23 A.   No.  I couldn't see from where I was.  There's nothing

24 marked there.

25 Q.   Okay.  Is it fair to say that it was undeveloped property?

1   A.    Yes.

2   Q.    Okay.  Sagebrush and weeds and dirt?

3   A.    Yes.

4   Q.    Okay.  No structures?

5   A.    It's a subdivision, and towards the Colorado -- north part

6   of it, there are a few structures, yeah.

7   Q.    But there weren't any near where the truck was?

8   A.    No.

9   Q.    All right.  And so how long did you all observe that day?

10  A.    Not very long.  We just kind of wanted to get a lay of the

11  land and see if we could see the box truck, or if there was

12  anything that kind of matched the description that was given to

13  us even in the area.

14  Q.    All right.  So then did you report back to Agent Suta or

15  anybody else from the FBI?

16          MS. BRAWLEY:  Your Honor, I'm going to object to the

17  extent that this line of questioning goes more to the merits of

18  the suppression motion as opposed to the standing issue.

19          THE COURT:  How is this relevant to the standing?

20          MR. RAY:  Well, Judge, we're asking how he started

21  making contact, seeing people on the property, where they were

22  on the property, and the Government has offered as an exhibit

23  his interview with Mr. Badger where they talk about getting

24  information from the FBI and how that led them out there.  I'm

25  going to be contending, Judge, that he was interfering with the

1   contractual relationship that existed between Mr. Morton and

2   Mr. Badger, and that he was feeding information to Mr. Badger

3   to make him want to back out of his contract, Judge.  So it's

4   all relevant.

5           THE COURT:  I'm not sure it's totally relevant, but

6   I'll allow the record and then I'll reserve ruling on the

7   relevance of what I consider appropriate to consider on the

8   standing issue.

9           MR. RAY:  Thank you, Judge.

10  BY MR. RAY:

11  Q.   Go ahead.  Do you need me to repeat the question?

12  A.   Yes.

13  Q.   So did you report back to Agent Suta after that visit down

14  to the property?

15  A.   I don't believe that I did.

16  Q.   Okay.  Well, let me ask you this, then.  When was the

17  first time that you actually made contact with somebody down

18  there, Mr. Morton or somebody else from the group?

19  A.   On the property?

20  Q.   Sure.

21  A.   The day we executed a search warrant.

22  Q.   All right.  And that was in August, I believe, of 2018; is

23  that correct?

24  A.   Yes.

25  Q.   All right.  So leading up to that, did you conduct some

1  surveillance on the property before that time?

2  A.   We did.

3  Q.   For how long?

4  A.   It took a while.  I would say, like, July for like a

5  month, month and a half, maybe, until August.

6  Q.   And how often were you going out there to do the

7  surveillance?

8  A.   I wouldn't say we were going every day.  We went and flew

9  a -- there was a drone that flew at that time.  That's kind of

10  the extent of the extra surveillance that I did.

11  Q.   Okay.  Now, do you remember talking to Jason Badger?

12  A.   Yes.

13  Q.   Okay.  Now, how many conversations did you have to Jason

14  Badger about these folks?

15  A.   I believe he called.  He called our dispatch to let us

16  know that he had some information regarding the people we were

17  looking into.  How he -- where that info -- how he got that

18  info, I have no idea.

19  Q.   Did he call you or somebody in your Sheriff's Office?

20  A.   Our dispatch, and asked for a call back, and that's kind

21  of how I -- I called him back and we spoke.  So I told him, you

22  know, I'll come visit you at your house, and that's when I

23  spoke to him and his wife.

24  Q.   His wife is Tanya, right?

25  A.   Yes.

1  Q.   Now, did you have a previous friendship or relationship

2  with Jason or with his wife, Tanya?

3  A.   I had never met Jason until that day.  His wife is related

4  to me.

5  Q.   Okay.  How is that?

6  A.   Through my mom's side.  I would say we're probably, like,

7  fourth cousins or somewhere in that neighborhood, something

8  like that.

9  Q.   Okay.  But what you're telling me is that you got this

10  call in from dispatch.  And so did that -- so what did you do

11  with that information from dispatch?

12  A.   I called him back and we spoke on the phone, and he said

13  to me that he had heard that we were looking for -- well, Lucas

14  Morton.  And that he had done some research on the internet and

15  found out that Siraj Wahhaj was wanted, and a child had been

16  kidnapped out of Georgia, and all this other stuff that he

17  found on the internet.  And he said, I know he's there, because

18  it's my property.  I had no idea about that.  So I said, well,

19  I'll come and visit you and we can talk a little bit more.  So

20  that's when I went to his house.

21  Q.   All right.  So you go and visit Mr. Badger, and you had

22  about a half hour conversation with him.  Does that sound about

23  right?

24  A.   Yes.

25  Q.   And that was recorded on your lapel camera?

1   A.    Yes.

2   Q.    Do you have any other interactions with Mr. Badger that

3   were recorded on your lapel camera related to Mr. Morton?

4   A.    I don't remember if I did or didn't record them.

5   Q.    Were any of the phone calls you had recorded?

6   A.    I think so.

7   Q.    Okay.  Do you recall telling Mr. Badger that you had

8   received a tip related to Mr. Morton in January?

9   A.    In January?

10  Q.    Yeah.  And I don't mean you said this to Mr. Badger in

11  January.  I should clarify that.  I'm trying to think of a

12  better way to ask this question.

13        When you're talking to Mr. Badger and you're recording

14  that interview -- you've told us that's around May of 2018.  Do

15  you remember during that conversation telling Badger that you

16  had gotten a tip in January related to Mr. Morton?

17  A.    I believe some of the information that was given from

18  Agent Suta -- he had some information about them, like, in

19  January, I believe.

20  Q.    Is that the tip you were referring to when you were

21  talking to Jason Badger?

22  A.    Yes.  Apparently they had been in a crash, and the -- I

23  can't even remember exactly now what state it was in.  But they

24  were coming to camp in Amalia, is what they told the trooper or

25  deputy who handled the crash.  And what they had learned is

1  that they had firearms and body armor and that they were coming

2  to camp in Amalia.  So I guess that would be kind of the same

3  tip, what you're saying.

4  Q.   Okay, I understand.

5       Now, I want to go back to when you were discussing sending

6  an aerial type surveillance over the property, and I want to

7  show you a couple of exhibits.  I can put them on the overhead

8  right here.  Can you see that on your display, Sergeant Rael?

9  A.   Yes.

10 Q.   Okay.  Do you recognize that?  And just for the record,

11 this is marked as Defendants' Motion Exhibit M.

12 A.   That's the property where we executed the search warrant.

13 Q.   Okay.  And this is the property that you said was the

14 subject of the surveillance in the months leading up to the

15 search warrant?

16 A.   Yes.

17 Q.   All right.  And were you personally participating in that

18 surveillance?

19 A.   I did when they flew the drone, yeah, one time.

20 Q.   And was this photograph here, which is Motion Exhibit M,

21 taken by that drone that you're talking about?

22 A.   I think it was.

23 Q.   And then this is the second page to that same exhibit.

24 Does that look like the same property, just from a slightly

25 different angle?

1    A.    Yes.

2    Q.    Okay.  And you're saying that you did not visit that

3    property again until the execution of the search warrant in

4    August?

5    A.    I believe so.

6    Q.    But you did participate in the search warrant?

7    A.    Yes.

8    Q.    All right.  When you get there to execute the search

9    warrant, how do you distinguish between the different

10   properties out there?  You know, which one is the correct one

11   and which one is the one subsequent to the warrant?

12   A.    I believe Badger said he owned the property, so he gave us

13   the address for it.

14   Q.    Okay.  Well, that's interesting, right.  So let's go back

15   to that.  You're talking about back on May 14, 2018, when you

16   interviewed Badger, you had asked him -- do you remember asking

17   him for permission to search on that property?

18   A.    I do.

19   Q.    And is the reason that you sought permission from him

20   because he told you he owned that lot?

21   A.    Yes.

22   Q.    Okay.  Now, did you believe that that consent document

23   that Badger signed to search that lot was sufficient to give

24   you the right to do a search warrant?

25   A.    No.

1  Q.   Did you know that Badger and Mr. Morton were at that time

2  in the middle of a land swap transaction?

3  A.   Yes.

4  Q.   Okay.  Did you get much in the way of details from

5  Mr. Badger about that transaction?

6  A.   Badger told me that he went up one time to check on his

7  property -- because I said, well, how did that happen?  He

8  said, I went to go look at my property, and lo and behold

9  there's this whole family there, and they'd already started

10 building, something to that extent.  So he says that they

11 decided to do a swap of ten acres.  It's a ten acre plot.  So

12 Mr. Morton had bought ten acres and inadvertently built on the

13 wrong ten acres.  So that area of ten acres is ten acres.  So

14 he said they were going to do a deal to just swap the land, and

15 then I think May 31st, probably, something like that, that

16 they were supposed to meet at the title company and do the

17 transaction.

18 Q.   Okay.  And this is all information you got from Jason

19 Badger?

20 A.   Yes.

21 Q.   Did you review any documents about that, or is this just

22 based on what he told you?

23 A.   That's based on what he told me.

24 Q.   Okay.  So on 5-14-2018 -- that's when the conversation is

25 happening, right?

1   A.   Yes.

2   Q.   Okay.  So why, then, did you not think that the consent

3   form signed by Jason Badger was sufficient to move forward with

4   entering that property by law enforcement?

5   A.   At this point, with a consent to search form, you have to

6   bring the owner of the property, at least in state court.  They

7   have to be able to withdraw consent, and they have to be

8   present when you're executing a search.  So bringing Badger

9   there and knowing that, hey, they may not be friendly with the

10  cops, I don't want to put him in danger.  That's number one.

11        Second of all, when I talked to the sheriff, he says, no,

12  we're getting a search warrant.  I said, okay.

13  Q.   And by the sheriff, who was the sheriff at the time that

14  you're talking about?

15  A.   Sheriff Jerry Hogrefe.

16  Q.   Okay.  Did he tell you why he wanted to move ahead with

17  getting a search warrant rather than relying on the consent?

18  A.   Well, at least in my point of view, the consent form would

19  have been okay, but being that they were in a contract of

20  sorts, that would be a civil -- they were already basically

21  making a deal.  So at least in my point of view, I believed

22  that Mr. Morton and his family had a reasonable expectation of

23  privacy, because they were already doing a contract to be on

24  that property.  That's why the reason.

25  Q.   Okay.  And did the sheriff agree with you on that?

1  A.   Yes.

2  Q.   You said the sheriff said, let's get a warrant, right?

3  A.   Yes.

4  Q.   And was that his rationale, as well, as far as you

5  understood it?

6  A.   Yes, sir.

7  Q.   Okay.  So do you remember asking Mr. Badger for any other

8  assistance with respect to investigating Lucas Morton?

9  A.   I did.

10  Q.   Okay.  Tell us about that.

11  A.   Well, with the aerial surveillance, we did see a little

12  child with somebody that probably would fit the description of

13  Mr. Wahhaj.  But when we gave that to the mother to look at,

14  she said, no way, that can't be my son, because he can't even

15  walk.  So we said, okay, well, then that's a strike there.

16      So then it was suggested to me by one of the FBI agents,

17  hey, let's talk to Badger and let's see if he would be willing

18  to wear a button camera, and since he has a rapport with

19  Mr. Morton, you could recognize the faces off the video.  So I

20  talked to Mr. Badger to see if he would be willing to do that.

21  Q.   And was he willing to do it?

22  A.   He said, yes, but towards the end of it, then he said,

23  okay, well, if I have to defend myself, who's going to cover

24  me?  And I said, oh, I don't have an answer for you about that,

25  let me check back with the rest of the guys and see what they

1  have to say, and I'll get back with you.

2  Q.   And did nothing ever develop after that?

3  A.   No.

4  Q.   Did you not get back with him?

5  A.   No.  I figured at this point, it's probably not a great

6  idea.

7  Q.   All right.  Was there any point where you told him

8  something along the lines of, well, if it was me going in, I'd

9  go in armed?

10  A.   I may have said that.

11  Q.   Okay.  Now, when we were talking about these drone

12  photographs -- I want to put them back up again.  Okay?  I'm

13  just going to put Page 1 of Defendants' Exhibit N to this

14  motion --

15          THE COURT:  I think it's M, isn't it?

16          MR. RAY:  Is it M?  My apologies.  M, like Marshall,

17  my name.

18  BY MR. RAY:

19  Q.   So I've got Exhibit M up here again.  Can you see it?

20  A.   Yes.

21  Q.   All right.  Now, when you were looking at this through the

22  drone surveillance, did it look to you like people were living

23  there?

24  A.   Yes.

25  Q.   Okay.  Now, was there any drone video created from this

1    surveillance?

2    A.   I believe so.

3    Q.   Did you see it?

4    A.   I don't think they ever gave it to me, honestly.

5    Q.   Okay.  But your understanding is that it was created?

6    A.   Yes.

7    Q.   All right.  I'm removing that exhibit back down again.

8         Do you know who was creating that video with the drone?

9    A.   I believe they were with the FBI.

10   Q.   Is that who the drone belonged to?

11   A.   Yes.

12   Q.   All right.  You don't remember the name of the agents?

13   A.   I don't remember if I wrote them down in my report, but

14   right offhand, no, I don't.

15   Q.   Okay.  Oh, yeah.  When you told me earlier that you had

16   some telephone conversations with Jason Badger, do you all in

17   the Taos County Sheriff's Office have a policy with respect to

18   recording calls or encounters that you have with civilians

19   during an investigation?

20   A.   I believe we do.

21   Q.   Okay.  And do you know what that policy is?

22   A.   It's pretty much that when we have encounters with the

23   public, we have to record them with our body cameras.

24   Q.   Okay.  So under your policy, then, if you had telephone

25   calls with Jason Badger about the Lucas Morton and Siraj Wahhaj

1  property, the policy would say that you made recordings of

2  those conversations?

3  A.   Yes.

4  Q.   Do you remember if you made such recordings during your

5  conversations?

6  A.   I'm pretty sure I did.

7  Q.   Okay.  And do you remember how many times you all sent the

8  drone up, that you were there at least?

9        MS. BRAWLEY:  Your Honor, I'm going to just object

10  again to the extent this doesn't have to do with standing.

11        THE COURT:  I'll allow it, but I'll take the

12  objection under advisement.

13  A.   I believe it was at least twice, because they had to

14  change the battery.

15  BY MR. RAY:

16  Q.   Do you remember the date?

17  A.   Not right offhand, no.

18  Q.   Do you remember roughly the month or so?

19  A.   No.

20  Q.   Okay.  Just sometime before the search warrant?

21  A.   I looked at my report yesterday, but I don't remember that

22  specific time, no.

23  Q.   All right.  Now, going back to your conversation with

24  Jason Badger, do you remember telling Mr. Badger that

25  Mr. Morton and the people with him were radicalized?

```
 1   A.    Yes.

 2   Q.    What did you mean by that?

 3   A.    Well, let me tell you, I believe that was a poor choice of

 4   words on my part, no doubt.

 5   Q.    Okay.  What were you trying to convey, if you could have

 6   chosen your words more carefully?

 7   A.    More carefully?  Anti-government, maybe, would be better.

 8   Q.    Okay.  Was it at all in reference to their religious

 9   beliefs?

10   A.    No.

11   Q.    Okay.  Do you know -- I don't want you to speculate, but

12   based on your conversations with Mr. Badger about it, did he

13   give any indication that he thought that the radicalization had

14   to do with their religion?

15   A.    I couldn't tell you.

16   Q.    Okay, fair enough.

17         Now, you told me before that you understood that they were

18   supposed to complete this land swap by May 31st.

19   A.    Yes.

20   Q.    And you got that from talking to Jason Badger, but not

21   from documents?

22   A.    No.

23   Q.    After May 31st, did you have any conversation with Jason

24   Badger about the status of that land swap?

25   A.    I do know that he, at one point, filed paperwork in
```

1  Magistrate Court to have them evicted from the property.

2  Q.   Now, did you see that paperwork, or were you just relying

3  on something that Mr. Badger told you?

4  A.   No, I believe some civil process came through the office,

5  to have it served.  But being that we were still in the

6  investigation, I turned it over to our undersheriff at the

7  time, Steve Miera.

8  Q.   Did you actually personally look at that paperwork?

9  A.   If it was the -- what came is just the face sheet.

10  Q.   All right.  Do you know if your office actually did

11  participate in, or facilitate serving any of that paperwork to

12  Lucas Morton?

13  A.   I don't believe they did.

14  Q.   Okay.  And do you know why that service didn't happen?

15  A.   I'm not sure, but I understood that the Magistrate Court

16  dismissed it.  I don't know why.

17  Q.   Okay.  How did you find out that the Magistrate Court

18  dismissed that matter?

19  A.   I think that's just part of the investigation.  When it

20  came to what happened, well, it got dismissed.

21  Q.   Somebody had to make it a part of the investigation,

22  right?  Does somebody go out and ask questions about it, or

23  does paperwork come into your office saying it's been

24  dismissed?  Do you know how you would have gotten that into

25  your investigation?

1   A.   I don't remember.

2   Q.   Okay.  Do you remember trying to -- do you remember

3   whether Mr. Badger spoke to you about trying to take any other

4   legal process with respect to that property after the search

5   warrant?

6   A.   I don't remember.

7   Q.   Okay.  For example, do you remember if Jason Badger asked

8   you about charging Lucas Morton with trespass?

9   A.   He may have.

10  Q.   Okay.  But you don't specifically remember it happening?

11  A.   I don't remember.

12  Q.   Were you contemplating charging Lucas Morton or his family

13  with trespassing on that property?

14  A.   Not until after we served the search warrant did I do

15  that.

16  Q.   Okay.  All right, so after the search warrant, then, what

17  process did you follow to charge trespassing?

18  A.   I wrote him a non-traffic citation for trespassing.

19  Q.   Did you serve it to him?

20  A.   Yes.

21  Q.   And you said that was after the search warrant?

22  A.   Yes.

23  Q.   And after he'd been arrested?

24  A.   Yes.

25  Q.   Okay.  And at that time, then, had every occupant of that

1  property already been removed?

2  A.    I believe so.

3  Q.    All right.  And again, you said you participated in the

4  execution of the search warrant?

5  A.    Yes.

6  Q.    Do you recall Mr. Badger telling you, after the execution

7  of the search warrant and after law enforcement left the

8  property, whether there had been items, such as firearms or any

9  other type things related to firearms or body armor, left

10  behind after the search warrant?

11  A.    Yes.

12  Q.    Tell me about that.

13  A.    He told me he went out to the property and he found all

14  kinds of things.  And I said, well, okay, I believe you, but

15  the search warrant wasn't to collect any of that stuff, it was

16  only for, I believe, Mr. Wahhaj, his child, and -- there was

17  like three things.  The children.  The welfare of the children,

18  I believe.

19  Q.    Okay.  But your understanding is that there were some

20  firearms and other ammunition and things like that that were

21  collected with the search warrant?  You were there.  Do you

22  know or not?

23  A.    I can't remember if what was collected was what was in

24  plain view.

25  Q.    Okay.  Now, going back to when you were discussing not

1  radicalized, but anti-government sentiments, what information

2  did you have that made you believe they might have had those

3  sentiments?

4  A.   I believe that some of the reports, from what I had

5  learned, was that they had had a compound in Georgia sometime

6  before they came out to New Mexico.  And then, plus, having --

7  and it's not illegal to have firearms or anything like that,

8  but I don't travel around with my family with bulletproof vests

9  or anything else.

10       The other kind of thing is, I have property and I don't

11  have a shooting range on my property, either.  So some of the

12  information, I guess, was basically that they'd be

13  anti-government, yeah.

14  Q.   Okay.  And was that based on your own observations or just

15  based on what you had gathered from the agents, the federal

16  agents that were speaking to you?

17  A.   From the information that was relayed to me.

18  Q.   All right.  Now, I've put an item up on your screen again,

19  and I'm showing you the bottom of it only right now, and I'm

20  going to show you the whole page, but I wanted you to see the

21  exhibit number.  It's Defendants' Motion Exhibit N.  Can you

22  see it?

23  A.   Yes.

24  Q.   All right.  Now, do you recognize what that is?

25  A.   That's the non-traffic citation that I believe I gave to

1  Mr. Morton.

2  Q.   Is that the citation that's related to trespass?

3  A.   Yep.

4  Q.   Okay.  Do you remember what the disposition of this

5  trespass action was?

6  A.   I believe it was dismissed.

7  Q.   All right.  Just one second.

8        MR. RAY:  Judge, I was just checking with the defense

9  teams to see if we had any other questions, and we have a

10 couple more and then I think we'll be done.

11 BY MR. RAY:

12 Q.   And I appreciate your patience with me, Sergeant Rael.

13      Now, as far as you understood, was this investigation --

14 what was the purpose of this investigation?

15 A.   To, like, find Mr. -- not Morton, but Mr. Wahhaj, and

16 locate the child that had been abducted.

17 Q.   Was there any suggestion that you were investigating

18 terrorism or radicalism?

19 A.   No.

20      MR. RAY:  Okay.  No more questions from the defense,

21 Judge.

22      THE COURT:  Okay.  Ms. Brawley.

23      MS. BRAWLEY:  Yes.  Thank you, Your Honor.

24

25

CROSS-EXAMINATION

BY MS. KIMBERLY BRAWLEY:

Q.   Good afternoon, Sergeant Rael.

A.   Hello.

Q.   So Mr. Badger called the Taos County Sheriff's Office in May of 2018, correct?

A.   Yes.

Q.   And he called to provide information that Lucas Morton, Siraj Wahhaj, and a missing child were on his property, correct?

A.   Yes.

Q.   And he called to say where his property was located in Costilla Meadows, correct?

A.   Yep.

Q.   And he said he had become aware of this through other people and then by checking the internet to confirm, correct?

A.   Yes.

Q.   And so you actually spoke to Mr. Badger after he made this report, didn't you?

A.   Yes.

Q.   And you spoke to him on May 14th of 2018, correct?

A.   Yes.

Q.   You first spoke to him on the phone, right?

A.   Yes.

Q.   And then you went to his house and met him in person?

1   A.    Yes.

2   Q.    And his wife, Tanya Badger, was also present, correct?

3   A.    Yes.

4   Q.    And when you met with the Badgers in person, Mr. Badger

5   confirmed that he and his wife had seen Siraj Wahhaj and the

6   child on the property, correct?

7   A.    Yes.

8   Q.    They also confirmed other children and other adults,

9   including Lucas Morton, were present, correct?

10  A.    Yes.

11  Q.    And you also received information, didn't you, that there

12  had been shooting happening on the Badgers' property by these

13  people who were on the property?

14  A.    Yes.

15  Q.    And, in fact, you knew of reports, didn't you, that Siraj

16  Wahhaj was considered to be armed and dangerous?

17  A.    Yes.

18  Q.    And is it fair to say it was a concern in your mind, here

19  in May of 2018, that it could be dangerous for the Badgers to

20  go to their property?

21  A.    Yes.

22  Q.    But fully believing the Badgers were the rightful owners,

23  you asked for their consent to search the property, correct?

24  A.    Yes.

25  Q.    And they readily gave it to you, correct?

A.    Yes.

Q.    Now, you didn't search the property records to confirm
that the Badgers owned the property, right?

A.    No.

Q.    And you didn't need to, because the decision was made by
your boss to not rely on the consent, but to get a warrant,
correct?

A.    Yes.

Q.    And that decision was made in part because if you had
relied on the consent, I think you testified Mr. Badger would
have had to be with you the whole time the search was
occurring, correct?

A.    Yes.

Q.    And one of the worries in your mind was, this is
dangerous?

A.    Yes.

Q.    And again, why was it dangerous?

A.    Because of the report that they had multiple firearms and
body armor when they got into the crash.

Q.    Okay.  Now, you were aware from the information the
Badgers provided you that there was some kind of land swap
agreement that they were trying to effectuate with Mr. Morton,
correct?

A.    Yes.

Q.    But you never saw any of that paperwork, did you?

1  A.    No, I didn't.

2  Q.    You never checked the county records, did you?

3  A.    No.

4  Q.    And is it fair to say your expertise is not in civil real

5  estate law?

6  A.    Yes.

7  Q.    In fact, you didn't know the specifics, did you, about

8  what was in any proposed sale agreement?

9  A.    No.

10  Q.    Okay.  And so is it fair to say, regardless, once your

11  bosses were getting a warrant, the consent issue is moot and

12  who owns the land is kind of, in your mind, as far as executing

13  a warrant, not the most important thing?

14  A.    Yes.

15  Q.    Now, you mentioned -- so you had these conversations with

16  Mr. Badger in May, and you mentioned you knew later that he had

17  filed something in the Magistrate Court to try to get these

18  people off his land; is that correct?

19  A.    Yes.

20  Q.    I'm going to show you what has been admitted as

21  Government's Exhibit 12.  I'll show you maybe just the first

22  page, or the first and second pages, and the third.

23      Okay, I'm showing you, first, this first page.  Do you

24  recognize what this document is?

25  A.    That's a worksheet for civil process in our office.

```
 1  Q.   What does that mean?

 2  A.   When we get stuff from the courts to be served, this is

 3  kind of how we keep track of --

 4  Q.   Okay.

 5  A.   -- the job number, I guess.

 6  Q.   I don't know if you can read this, but right here, what

 7  does it say in "Person to be Served"?

 8  A.   Lucas Morton.

 9           THE COURT:  Can you make it larger?

10  BY MS. BRAWLEY:

11  Q.   Sorry.  What does it say in this "Person to be Served"

12  block?

13  A.   Lucas -- it says, Morton, Lucas Allen.

14  Q.   And what address is listed as where he's supposed to be

15  served?

16  A.   Lot Number 28, Unit Number 2, Costilla Meadows.

17  Q.   And does it say here that the plaintiff in this action is

18  Jason Badger?

19  A.   Yes.

20  Q.   Now, I'm going to bring your attention to the bottom

21  portion of this form.  Please describe what all of this is that

22  I've kind of indicated with a green line.

23  A.   It says date served, June 18th of '18.  Time is at 3:47.

24  Served by Adam Fernandez.

25  Q.   Who is Adam Fernandez?
```

1   A.   He probably would have been assigned to Civil Process at

2   that time.

3   Q.   Does he work for the Taos County Sheriff's Office?

4   A.   Not anymore.

5   Q.   But he did at that time?

6   A.   Yes.

7   Q.   Okay.  And who does it indicate was served?

8   A.   Lucas Morton.

9   Q.   I'm going to bring your attention to the second page.  Can

10  you see what the second page of Exhibit 12 is?

11  A.   It's a summons.

12  Q.   And is it a summons on a Petition for Writ of Restitution

13  or Forcible Entry or Unlawful Detainer?

14  A.   Yes.

15  Q.   And is it to Lucas Morton at Lot Number 28, Unit 2 in

16  Costilla Meadows in Amalia, New Mexico?  Above that.

17  A.   Oh, yeah, I see it now.

18  Q.   Is that what it is?

19  A.   Yes.

20  Q.   And bringing your attention to the top of the page, is

21  this lawsuit Jason and Tanya Badger vs. Lucas Allen Morton?

22  A.   Yes.

23  Q.   So based on these documents, is it fair to say that

24  Mr. Morton was served notice of this lawsuit, this eviction

25  lawsuit?

1  A.   Yes.

2  Q.   And he was served by Adam Fernandez on June 18th of 2018,

3  correct?

4  A.   Yes.

5  Q.   And in June, after you get this information in May from

6  the Badgers, and while this is being served in June, is it fair

7  to say that the Taos County Sheriff's Office was continuing its

8  investigation?

9  A.   Yes.

10  Q.   And were officers working to establish what they believed

11  to be sufficient probable cause to execute a warrant?

12  A.   Yes.

13  Q.   In July of 2018, was the Taos County Sheriff's Office

14  still working this investigation?

15  A.   Yes.

16  Q.   And at that point, in July, did you contact Jason Badger?

17  A.   Yes.

18  Q.   And did you ask him if he would consider assisting law

19  enforcement to gather more information?

20  A.   I did.

21  Q.   And again, July of 2018, is this a month and a half to two

22  months after Mr. Badger first contacted the Taos County

23  Sheriff's Office?

24  A.   Yes.

25  Q.   And is this a half a month to a month after Lucas Morton

1   has been served his eviction lawsuit?

2   A.   Yes.

3   Q.   And I think you testified earlier there were some concerns

4   about who would protect Mr. Badger if he were to help, correct?

5   A.   Yes.

6   Q.   And you thought those were valid concerns, didn't you?

7   A.   Yes.

8   Q.   And Mr. Badger, he expressed to you at this time, didn't

9   he, his frustration with these people being on his land,

10  correct?

11  A.   Yes, he did.

12  Q.   Tell us about that.

13  A.   I tried to reason with Mr. Badger, because we were still

14  conducting our investigation.  He, at least in my mind, was

15  like, well, why don't you just go over there and kick them out,

16  and then you'll find what you're looking for and that kind of

17  thing.  And I told him, well, it's just not that easy, at least

18  not for us, and at least from a safety point of view, either.

19  So he was pretty frustrated with us.

20  Q.   And he told you he had already reached out to New Mexico

21  State Police to try to get help getting all these people off

22  his land, correct?

23  A.   Yes.

24  Q.   And, in fact, when you're having this call with him, where

25  you're asking if he would assist, he was watching them on his

1   land, watching the Defendants on his land at that time?

2   A.   Yes.

3   Q.   That's what he told you anyway, right?

4   A.   Yes.

5   Q.   And he told you, didn't he, that he's watching Lucas

6   Morton get water?

7   A.   Yes.

8   Q.   And he told you that it did not look like they were

9   showing any signs of leaving?

10  A.   Yes.

11  Q.   And this is even after Mr. Morton has been served with the

12  eviction lawsuit?

13  A.   Yes.

14  Q.   And to be clear, the help you were wanting, you were

15  wanting him to go in and wear a button camera, correct?

16  A.   Yes.

17  Q.   And you both agreed it was too dangerous, correct?

18  A.   Yes.

19  Q.   And would you agree that Mr. Badger was also concerned

20  with getting his land back?

21  A.   Yes.

22  Q.   And is it fair to say Mr. Badger could not safely access

23  his land until after the Taos County Sheriff's Office served

24  the search warrant in August of 2018?

25  A.   Yes.

1  Q.   And was it only after the Taos County Sheriff's Office

2  served the search warrant that Mr. Badger had access and a

3  right to be on his land safely again?

4  A.   I would agree with you, yes.

5  Q.   Now, did you participate in executing that search warrant?

6  A.   Yes.

7  Q.   And that was in August?

8  A.   Yes.

9  Q.   And to be clear, this is August 3rd; is that right?

10  A.   I believe so.

11  Q.   So is it more than two and a half months since Mr. Badger

12  first contacted the Taos County Sheriff's Office?

13  A.   Yes.

14  Q.   And is it approximately a month and a half after

15  Mr. Badger filed his eviction lawsuit?

16  A.   Yes.

17  Q.   And when you went and executed this warrant, you were able

18  to see for yourself, weren't you, the state of the land?

19  A.   Yes.

20  Q.   And is it fair to say that all of these lots that are

21  undeveloped in Costilla Meadows are pristine?

22  A.   Yes.

23  Q.   Except Lot 28, correct?

24  A.   Yes.

25  Q.   And that's because a large portion of that land had been

1   completely cleared of all the vegetation, correct?

2   A.   Yep.

3   Q.   And in addition to that, gigantic pits had been dug,

4   correct?

5   A.   Yes.

6   Q.   Pits big enough to hold a large trailer?

7   A.   Yeah, a camping trailer was in one.

8   Q.   And there were tires, correct?

9   A.   Yes.

10  Q.   How many tires would you estimate were there?

11  A.   Oh, I don't know.  Maybe over a hundred in that -- there

12  were quite a bit.

13  Q.   And did you see what you considered to be a shooting

14  range?

15  A.   Yes.

16  Q.   Tell us what else you saw there.

17  A.   There were tunnels dug in on the side of the trailer, and

18  like pits where they would burn the trash.  Just kind of

19  disarray, I would say.

20  Q.   Were you aware of whether there was any running water or

21  electricity hooked up to this land?

22  A.   There's no utilities to that property.

23  Q.   And yet, was it your understanding that people were living

24  there?

25  A.   Yes.

1   Q.    People with small children?

2   A.    Yes.

3   Q.    How would you describe the living conditions?

4   A.    That whole place is off grid, and in Taos, people like to

5   live off grid.  You know, that's kind of just -- they buy a

6   piece of property and they come, and they want to have solar

7   and all that kind of stuff.  But they have to haul their water.

8   And if there's power, you have to have a generator or solar or

9   something.

10  Q.    Did it appear to be very habitable?

11  A.    I guess to what standard, is what you're getting at.  I

12  would say, for me and my children, absolutely not.  But if they

13  have shelter, heat, food and water, that kind of stuff, where

14  they could bathe, well, I guess it met those.

15  Q.    Is it fair to say, even if it met those baseline, low

16  criteria, there was some significant cleanup that had to happen

17  on this lot after the search warrant was executed?

18  A.    Absolutely.

19  Q.    And that was primarily Mr. Badger's responsibility,

20  correct?

21  A.    Yes.

22  Q.    Now, did the Taos County Sheriff's Office help remove the

23  stolen trailer, or was that someone else?

24  A.    I think we assisted, yes, with that.

25  Q.    Okay.  And aside from that, was everything else

1   Mr. Badger's sole responsibility to deal with?

2   A.   Yes.

3   Q.   And if you were Mr. Badger and this was your land, and you

4   had to clean this up, how would you have felt?

5   A.   I'd be pretty angry.

6   Q.   And why is that?

7   A.   Because for one, these guys came and built on my property,

8   and then they left all this garbage here and now it's going to

9   come out of my pocket to clean it.  I don't have ten grand or

10  whatever it cost to take all this stuff to the dump.  So I'd be

11  mad.  I'd be like, why am I left with the bill?

12  Q.   Let me ask you this.  You mentioned that they built stuff,

13  and you also mentioned garbage.  Did they build structures that

14  were worth something from your observation of them, or how

15  would you describe what was left on this property?

16  A.   They built walls with the tires and dug holes in the

17  ground, and tunnels, and it was covered with a big thing of --

18  well, you've seen the picture that they put up.  So I would say

19  if this was my property, I'd be upset if I was left holding the

20  bag and everybody takes off.  They're all happy, and I'm

21  left -- what am I supposed to do with this?

22  Q.   In your 17 years of experience as a law enforcement

23  officer, you've probably become familiar with the trespass

24  statute; is that correct?

25  A.   Yes.

1   Q.   And based on your understanding of that statute and your

2   knowledge of the facts of this case, at what point in time

3   would you have considered Mr. Morton and his other family

4   members to be trespassers?

5   A.   When the property owner revoked permission for them to be

6   there.

7   Q.   So would you say that when they were served this notice in

8   June, they should have known they had no permission to be

9   there?

10  A.   Well, again, that's a civil issue, so the Judge decides at

11  that point.  It's not for me to say, this is how I feel, it's

12  what the Judge tells them.

13  Q.   Okay.  Well, let me ask you this.  You did actually issue

14  a trespass citation to Mr. Morton, correct?

15  A.   I did.

16  Q.   And you did it after the search warrant was executed,

17  correct?

18  A.   Yes.

19  Q.   And was the timing of that because that's when it was safe

20  to give him the citation?

21  A.   Yes.

22  Q.   So it's fair to say he was a trespasser before you

23  executed the warrant, correct?

24  A.   Yes.

25  Q.   But you just couldn't safely serve him until after you

 1  executed the warrant; is that correct?

 2  A.   Yes.

 3          MS. BRAWLEY:  Your Honor, may I have a moment?

 4          THE COURT:  Sure.

 5  BY MS. BRAWLEY:

 6  Q.   A couple of things.  First, we talked about how habitable

 7  the property was or wasn't, and you mentioned if there's

 8  shelter, some food, some of those basic necessities everyone

 9  should have -- do you remember that?

10  A.   Yes.

11  Q.   But isn't it true that you also received information

12  before you executed this warrant that Mr. Morton and his family

13  were running out of food and were asking other family members

14  in Georgia for assistance?

15  A.   Yeah, and that's kind of, in part, why the warrant was

16  probable cause to get on the property, for the welfare of the

17  children, yes.

18  Q.   And I think I asked a bad question earlier.  I want to be

19  clear.  Was it your understanding that Mr. Badger was always

20  the owner of Lot 28 where Mr. Morton and his family were found?

21  A.   Aside from the civil deal that they made, yes.

22  Q.   Let's talk about that for a minute.  Do you know if that

23  civil deal even came to pass, if it even got finalized?

24  A.   I don't know that it did.

25  Q.   So you don't know anything about the civil deal, other

1  than there was something that was trying to happen, correct?

2  A.   In the beginning, yes.

3  Q.   So is it fair to say Mr. Badger was the owner of Lot 28?

4  A.   Aside from that, yes.

5  Q.   Okay.  And let me say this.  Mr. Badger as the owner, or

6  any owner, he should have always had the right to be on his

7  land, correct?

8  A.   Yes.

9  Q.   But because of the dangerous circumstance, he couldn't go

10 on his own land even though he had the legal right as the owner

11 to be there, correct?

12 A.   I just advised him that I didn't think it was safe for him

13 to go.  I guess he could have went if he wanted to.

14        MS. BRAWLEY:  Okay.  No further questions.  Thank

15 you, Your Honor.

16        THE COURT:  Is there any redirect?

17        MR. RAY:  Yes, Judge, a little bit.

18                    REDIRECT EXAMINATION

19 BY MR. MARSHALL RAY:

20 Q.   It's very cliché and maybe not totally believable when

21 lawyers say "I'll be brief," but I do have some questions.

22      Sergeant Rael, let's talk a little bit more about that

23 eviction or restitution lawsuit which you described as a civil

24 matter, right?

25 A.   Yes.

1  Q.   Okay.  Do you remember seeing or participating in service

2  of any three-day notices?

3  A.   No.

4  Q.   Seven-day?

5  A.   No.

6  Q.   Thirty-day?

7  A.   No.

8  Q.   Okay.  Do you know what those are?

9  A.   Yes.

10  Q.   You're pretty familiar, is it fair to say, with these

11  eviction actions by landlords against tenants?

12  A.   Yes.

13  Q.   The Sheriff's Office sometimes has to facilitate those,

14  right?

15  A.   Yes.

16  Q.   Okay.  Now, you did acknowledge on your cross-examination

17  that there was this sort of eviction action that was brought

18  against Lucas Morton.  That's what you told Ms. Brawley, right?

19  A.   Yes.

20  Q.   Okay.  And then you also discussed during my questions

21  with you, and also a little bit with Ms. Brawley, that you had

22  served this citation for trespass, right?

23  A.   Yes.

24  Q.   And the fact is that both the eviction action and the

25  trespass citation were dismissed, correct?

1    A.    Yes.

2    Q.    Okay.  So to the extent that there's some legal process

3    for eviction that an owner can go through to get somebody

4    thrown off their land, that was not completed in this case with

5    respect to Mr. Badger and Mr. Morton, right?

6    A.    Not that I'm aware of.

7    Q.    You know it was dismissed, right?

8    A.    Yes.

9    Q.    Okay.  And I guess what you're saying is, you didn't see

10   anything that revived that eviction lawsuit after the

11   dismissal.  Is that what you mean?

12   A.    Yes.

13   Q.    Okay.  Now, going back to this idea of -- on

14   cross-examination, you testified that the idea of the button

15   camera was jettisoned because you both decided it was too

16   dangerous, right?

17   A.    Yes.

18          MS. BRAWLEY:  Your Honor, I'm going to object to the

19   extent that Mr. Ray keeps asking leading questions.

20          MR. RAY:  It's redirect.

21          THE COURT:  Well, the question has been asked and

22   answered.

23          MR. RAY:  Yeah, it's redirect.

24          THE COURT:  I mean, it's been asked and answered, so

25   let's move on and get this witness concluded.

1          MR. RAY:  Okay.

2    BY MR. RAY:

3    Q.   So is your reason for believing they were too dangerous

4    because they had a shooting range?

5    A.   Yes.

6    Q.   Was it illegal for them to have a shooting range?

7    A.   No.

8    Q.   Are they the only people up there in your jurisdiction to

9    have shooting ranges on their open property?

10   A.   I don't know.  I couldn't answer.  I don't know.  I don't

11   know that -- you probably have to get a permit to have a

12   shooting range on your property, or something to that extent,

13   for safety reasons, but I don't know.

14   Q.   You're the sheriff up there.  If I wanted to get a

15   shooting range on my Taos property up there, do you think I'd

16   need a permit?

17   A.   I'd say check with the land use regs and go from there.

18   That would be my advice.

19   Q.   Okay.  But it wouldn't be something that the Sheriff's

20   Office would come out and enforce against me?

21   A.   Not unless we got a reason from the Court to go out there.

22   Q.   Okay.  Did you ever see Lucas Morton or anybody else in

23   his family threaten anybody during the time that you were

24   surveilling them?

25   A.   No.

1  Q.   Did Badger ever tell you that they threatened him?

2  A.   I don't think he did, no.

3  Q.   Did he ever even tell you that there were negative or

4  scary interactions with them?

5  A.   I don't believe so.

6  Q.   Okay.  And didn't you say earlier on direct examination

7  that the reason that you thought you needed a search warrant

8  was because there wasn't -- because there was a reasonable

9  expectation of privacy, right?

10 A.   Yes.

11 Q.   Okay.  And your boss agreed with you about that?

12 A.   Yes.

13 Q.   Okay.  And when it comes to cleaning up the property after

14 the search warrant, wasn't the reason why there was such a

15 cleanup necessary because a large family had been living there

16 for an extended period of time?

17 A.   There was a lot of stuff there, yeah.

18 Q.   I mean, if they built a nice house that was up to finer

19 standards, there would still have been a lot of things to

20 remove, wouldn't there?

21 A.   Yes.

22 Q.   Okay.  And you talked about them leaving a bunch of stuff

23 behind for others to clean up.  But isn't the reason why they

24 couldn't clean up and move their stuff off to the other lot

25 because you guys went in and arrested them and hauled them off

1  to jail?

2  A.   Yes.

3  Q.   So they couldn't have cleaned up or taken any remedial

4  action to get their property off of that lot, right?

5  A.   They were held.  So, no.

6  Q.   I'm sorry, what's that?

7         THE COURT:  Let me ask, you didn't object when the

8  questions were asked by Ms. Brawley, but in terms of whatever

9  cleanup happened, what does that have to do with standing?

10         MR. RAY:  Judge, I just think that Ms. Brawley opened

11  the door to it.

12         THE COURT:  Well, if you had objected on relevance, I

13  would have sustained it.  It's really not relevant, so let's

14  move on.

15         MR. RAY:  All right.

16         THE COURT:  And I'm not going to consider it, insofar

17  as the Government raised it, either, because it's not relevant

18  on the issue of standing.

19         MS. BRAWLEY:  Your Honor, if I may real quickly, we

20  believe it is relevant on the issue of standing just to show

21  that it is Mr. Badger's land.  If he wasn't the owner, he

22  wouldn't have been the one responsible for the cleanup.  That's

23  all.  Thank you.

24         THE COURT:  All right.  Do you have any other

25  questions on that particular issue?

1          MR. RAY:  I don't.  I was moving on anyway, Judge.

2          THE COURT:  All right.

3    BY MR. RAY:

4    Q.   Now, when it comes down to -- you were asked, Mr. Badger

5    is the owner of this lot and, therefore, he has a legal right

6    to unilaterally enter the property.  Do you understand that

7    when an owner is letting somebody else stay on their property,

8    say as part of a transaction or part of a lease, or a

9    landlord-tenant relationship, that the owner doesn't just have

10   the right to walk onto the property whenever they want?

11         MS. BRAWLEY:  Objection, calls for a legal

12   conclusion.

13         THE COURT:  If the witness knows, he can answer the

14   question.  If not, then he can indicate he doesn't know.

15         MR. RAY:  And Judge, just for the record, the

16   Government asked him, since Mr. Badger was the owner, if he

17   could have gone onto the property whenever he wanted to.

18         THE COURT:  Well, the witness answered some questions

19   relating to landlord-tenant, so that's why I'm saying if he

20   knows the answer based on his training and experience, he can

21   answer it.  If he doesn't, then he can just indicate he doesn't

22   know.

23   A.   Yes, that was -- what was your question again?

24   BY MR. RAY:

25   Q.   There are situations where because of a landlord-tenant

1  relationship, that the owner can't just unilaterally walk onto

2  the property even though they own it.  Do you understand that

3  to be the case?

4  A.   Yes.

5          MR. RAY:  No further questions, Your Honor.  And I do

6  appreciate your indulgence.

7          THE COURT:  May the within be excused?

8          MS. BRAWLEY:  Yes, Your Honor.

9          THE COURT:  All right.  Thank you, Sergeant.  You're

10  free to leave.

11          THE WITNESS:  Thank you, Your Honor.

12          MR. RAY:  Your Honor, the next witness is going to be

13  Sheriff Jerry Hogrefe, and they're bringing him in right now.

14          THE COURT:  How do you spell his last name?

15          MR. VILLA:  Your Honor, I believe it's H-o-g-r-e-f-e.

16  We can certainly ask him.

17          THE COURT:  All right.

18          CRD RICHARD GARCIA:  Please raise your right hand,

19  sir.

20      (UNDERSHERIFF JERRY LYNN HOGREFE, DEFENSE WITNESS, SWORN)

21          CRD RICHARD GARCIA:  Please have a seat and state

22  your full name for the record.

23          THE WITNESS:  Good afternoon.  My name is Jerry Lynn

24  Hogrefe.

25

1        TESTIMONY OF UNDERSHERIFF JERRY LYNN HOGREFE

2                    DIRECT EXAMINATION

3    BY MR. RYAN VILLA:

4    Q.    Sheriff Hogrefe, how do you spell your last name?

5    A.    H-o-g-r-e-f-e.

6    Q.    Will you tell the Court how you're employed?

7    A.    I am currently the appointed Undersheriff of Taos County,

8    New Mexico.

9    Q.    At one point in time, were you the Sheriff?

10   A.    Yes.

11   Q.    When was that?

12   A.    From 2015 until December 31st of 2022.  I served two

13   terms as elected Sheriff.

14   Q.    And there's term limits, right?  You can only do it twice?

15   A.    That is correct.

16   Q.    Undersheriff is second in command, right below the

17   Sheriff?

18   A.    Yes.

19   Q.    Did you have occasion to draft an affidavit for a search

20   warrant for a property in Amalia, New Mexico?

21   A.    I did.

22   Q.    And specifically --

23        MR. VILLA:  Your Honor, for the record, it's been

24   filed on the docket as Document 47-1.

25

1  BY MR. VILLA:

2  Q.   Specifically, Undersheriff Hogrefe, that's an affidavit

3  for a search warrant on a property in which you believed Siraj

4  Wahhaj might be found?

5  A.   Yes.  That's a brief synopsis of what that search warrant

6  is.

7  Q.   Okay.  I just want to make sure we're talking about the

8  same search warrant.  I understand there's other information in

9  that affidavit, but that's the one we're talking about today.

10 A.   The first one.

11 Q.   Correct, the first search warrant affidavit that you

12 drafted and I believe was filed August 16, 2018, with the

13 District Court in Taos.

14 A.   That date doesn't sound correct.  I thought I presented

15 that on the 2nd of August.

16 Q.   Well, I'm just looking at the filing date.  I do think it

17 was subscribed and sworn before a Judge on August 2nd, 2018.

18 A.   That is the first one.

19 Q.   Okay.  You identified the property in the Amalia area, but

20 you described it as not uniquely addressed, correct?

21 A.   Correct.  I described it the best I could.

22 Q.   Why did you describe it that way?

23 A.   Because it's not uniquely addressed.

24 Q.   What does that mean?

25 A.   It means that it doesn't have a posted street number or

1  house number, or a unique identifier readily visible to a

2  person on that property.

3  Q.    How did you learn that information?

4  A.    By viewing it and by asking others.

5  Q.    Did you determine when you prepared the affidavit who the

6  owner of the property was?

7  A.    That was questionable in lingo -- limbo, if you will, but

8  reasonably I believed that property still belonged to Jason

9  Badger.

10  Q.    What about it made it questionable?

11  A.    The fact that there was a pending land exchange and court

12  proceedings in Magistrate Court for eviction, things of that

13  nature.

14  Q.    So you learned that there was going to be potentially a

15  land swap between Mr. Badger and the occupants of the property?

16  A.    That was one of the things.

17  Q.    As well as an eviction lawsuit that Mr. Badger had filed

18  in connection with the property that was dismissed?

19  A.    That was another thing, yes.

20  Q.    You also were aware that Mr. Badger had signed a consent

21  to search the property and given that to Sergeant Rael?

22  A.    Correct, during the earlier stages of the investigation.

23  Q.    But when you drafted the affidavit for the search warrant,

24  you didn't believe Mr. Badger's consent was sufficient, did

25  you?

1   A.   There were some questions that I couldn't get clear

2   guidance on, and I went off of my heart and what I know from my

3   training and experience in state court.

4   Q.   So you felt like you needed the affidavit and search

5   warrant from a Judge to enter the property?

6          MR. HALL:   Your Honor, I'm just going to object to

7   the leading questions at this point.

8          MR. VILLA:   Well, Your Honor, if we want to go

9   through the process of declaring him a hostile witness, we can,

10  or I can do it open-ended.

11         THE COURT:   Technically, it is, but I didn't consider

12  it overly leading, so I'll allow it.   Go ahead.

13  BY MR. VILLA:

14  Q.   Undersheriff Hogrefe, I just want to clear up, you didn't

15  believe that the consent was enough, you thought you needed an

16  affidavit to be prepared and to get a search warrant from a

17  Judge?

18  A.   On August 2nd, for the information that was in that search

19  warrant, to look for a wanted fugitive, a missing child, and

20  hungry children, I don't see how Mr. Badger's consent would

21  have gotten us to that, although it might have.

22  Q.   The wanted fugitive, that being Siraj Wahhaj?

23  A.   Correct.

24  Q.   You first learned about Siraj Wahhaj and the missing child

25  back on January 2nd of 2018; is that correct?

1  A.    A little bulletin that came from Georgia, yes.

2  Q.    And you sent an e-mail to Sergeant Rael concerning that

3  bulletin?

4  A.    Yes.  It said, basically, be on the lookout for this

5  person.  There was no description of where to look, just that

6  perhaps he was in Taos County.

7  Q.    I understand.  And when did you learn that he may be

8  residing on this property for which you prepared the affidavit

9  for the search warrant?

10  A.    It was later during the investigation.  I believe May or

11  June.  There was information relayed to me by Sergeant Rael, by

12  Deputy Flores, that he might have been seen on the Badger

13  property in Amalia or in that area.

14  Q.    So in or around approximately May -- and I'm not going to

15  hold you to an exact time frame, but May of 2018?

16  A.    That sounds pretty close.  Around there, yes.

17  Q.    And you knew in January that there was a pick-up order for

18  Mr. Siraj Wahhaj, correct, or his child?

19  A.    Yes.

20  Q.    But you didn't submit an affidavit for a search warrant in

21  May 2018, correct?

22  A.    No.

23  Q.    You waited until August?

24  A.    I waited for investigating efforts to take place to try to

25  confirm that loose information that he might be in that area.

1  Q.    Okay.  And in the course of those investigative efforts is

2  when you learned about this sort of gray information about who

3  owned the property, or whether they were lawfully residing on

4  the property, all that sort of stuff?  That's when you learned

5  about that, correct?

6  A.    Yes.  Yes, during that May, June, July, August, when other

7  efforts, investigative efforts, were taking place, yes.

8  Q.    Had you ever been to that property prior to the execution

9  of the search warrant?

10  A.    I had been near it.

11  Q.    Tell me about that.

12  A.    I was near the property.  I looked at it from a distance,

13  or what I think was that property.

14  Q.    What did you see?

15  A.    I actually thought from where I was at that maybe I was

16  looking at a junk yard.

17  Q.    Explain that.  Why did you feel like you were looking at a

18  junk yard?

19  A.    Tires, debris, berms, earthen berms.  I didn't see any

20  people, couldn't identify vehicles from where I was at, and I

21  felt like if I tried to drive closer, I would probably be seen

22  and I didn't want that to happen.

23  Q.    Why didn't you want to be seen?

24  A.    Because we were doing an investigation.

25  Q.    You said you didn't see any people?

1  A.   I didn't see any people from where I was at on that day in

2  June or July when I drove up into that area.

3  Q.   From what you could see from a distance, you saw what you

4  described as maybe a junk yard.  Did it look like a place where

5  people were living?

6  A.   I couldn't tell from how far away I was.

7  Q.   And was there a point in time when deputies did contact

8  the residents at that location?

9  A.   Yes, there was.

10  Q.   When was that?

11  A.   I don't recall.  You're asking me to recall something from

12  nearly five years ago.  I don't recall.

13  Q.   You don't have a specific recollection?

14  A.   I wasn't there for that part of it, no, sir.

15  Q.   But you were aware, and you don't remember the precise

16  dates or that sort of thing, but you were aware that twice

17  prior to the execution of the search warrant, deputies met with

18  residents?

19  A.   Met with residents, or met with occupants of this

20  property?

21  Q.   Occupants of the property.

22  A.   I know of one.  I don't recall the date.  It was -- a

23  civil process was served by one of the special deputies that

24  was assigned to that division of the Sheriff's Office.

25  Q.   And how was that process served?

1   A.    I wasn't there.  I couldn't answer as to how he did it.

2   Q.    Were you told where the deputy met with the occupant of

3   the property?

4   A.    Not until much later on.

5   Q.    What were you told?

6   A.    That he went to the property and was met out in the

7   driveway, and handed a document to someone.

8   Q.    So there was a driveway to the property?

9   A.    Makeshift, but yes, sir, I would call it a driveway.

10  Q.    And you, yourself, did see the property on August 2nd,

11  correct?

12  A.    On August 3rd.

13  Q.    Excuse me; August 3rd.

14  A.    Yes.

15  Q.    Okay.  And the property did appear to be a place where

16  people were living, right?

17  A.    Yes, although somewhat concealed.  But yes.

18  Q.    Okay.  Back to the driveway situation, when process was

19  served, somebody, according to the information you received,

20  walked out onto the driveway and received the paperwork?

21  A.    That's my understanding, yes.

22  Q.    They didn't try to threaten your deputy or commit any

23  harm, or anything like that?

24  A.    Not that was brought to my attention, no, sir.

25  Q.    You learned at some point that the FBI was also involved

1   in investigating the group on this property?

2   A.   Yes.

3   Q.   Did you learn it before you executed the search warrant?

4   A.   Yes.

5   Q.   Did you consult with the FBI about whether there were

6   grounds to enter the property to search it?

7   A.   Sergeant Rael and at the time Undersheriff Steve Miera

8   did.

9   Q.   Did they brief you on what they were told?

10  A.   They were still -- yes, I was briefed.

11  Q.   What were you told?

12  A.   They were told that they had an open investigation and

13  that they were going to do some surveillance of the area and

14  try to identify an occupant, the fugitive, Mr. Siraj Wahhaj,

15  and try to identify the missing child, and get current nonstale

16  information that we could act on.

17  Q.   Okay.  Do you know if the FBI was informed at the point in

18  time when Mr. Badger gave consent to search the property?

19  A.   I believe they were.  They weren't by me, but yes, there

20  were meetings at the Sheriff's office with then Undersheriff

21  Steve Miera.  And an agent from either the FBI or attached to

22  the Fugitive Division of the FBI, an agent of the New Mexico

23  State Police, participated in those meetings.  I did not.

24  Q.   Were you briefed about those meetings?

25  A.   Afterwards.

1   Q.   And do you know whether the FBI agreed with the assessment

2   that consent was not sufficient to enter the property?

3   A.   I do not.

4   Q.   Do you know whether they were told -- well, I think you

5   already testified --

6   A.   Actually --

7   Q.   -- they were told.  I'm sorry, did you want to revise the

8   answer?

9   A.   I do, sir.

10  Q.   Okay.  Go ahead.

11  A.   Actually, I do recall being told that third-party from

12  then Undersheriff Steve Miera, that's probably enough to get us

13  on that property.  But at the time, the information that was

14  seen on the targets was stale information.

15  Q.   Okay.  So your Undersheriff Miera told you that the FBI

16  thought that the consent was sufficient?

17  A.   He told me that in the meeting, that was stated.  Now,

18  whether that came from the FBI or whether it came from the

19  State Police, I wasn't there, I don't know, sir.

20  Q.   Okay.  Did you learn more information from the FBI after

21  the search was conducted?

22  A.   Yes.

23  Q.   And did you learn that the FBI didn't feel there was

24  enough probable cause to get on the property, did you learn

25  that after the warrant had been executed?

1          THE COURT:  Just a second.  What's the objection?

2          MR. HALL:  Your Honor, it's similar.  Basically, it's

3 not relevant.

4          THE COURT:  How is this relevant to standing?

5          MR. VILLA:  Well, Your Honor, I think it goes to the

6 same issue.  I mean, I want to clarify with him about the

7 statement that I'm relying on that he made, whether that

8 included permission to be on the property.

9          THE COURT:  Right.  He's testified that he felt that

10 he needed more than just permission to be on the property.

11 That's why he got the search warrant.  So that's not in issue.

12          MR. VILLA:  Sure.  This is a statement that I'm

13 trying to elicit that the FBI, I believe, made to Sheriff

14 Hogrefe, or somebody related to Sheriff Hogrefe, after the fact

15 about whether they had enough grounds to enter the property.

16          THE COURT:  But they got a search warrant.

17          MR. VILLA:  Sure, but I think this is relevant,

18 because it's the FBI's, if you will, reflection on the state of

19 affairs.

20          THE COURT:  I don't consider it relevant.  Let's move

21 on.  It's not relevant for the purposes of standing.

22 BY MR. VILLA:

23 Q.   Okay.  Did the FBI believe that you were unable to legally

24 enter the compound prior to obtaining the warrant?

25 A.   That would be a question to ask them, sir.

1  Q.    Did they tell you that after the warrant was done?

2  A.    There were discussions about the legalities and what might

3  come up later.

4  Q.    Okay.  But I mean, did anybody from the FBI ever tell you

5  that they didn't think you were legally able to enter the

6  property without the warrant?

7  A.    There were discussions about that.  I don't recall those

8  exact words, but there were discussions about the legality of

9  this would probably come up later.

10 Q.    Okay.  And then, do you recall a time when after all this

11 happened, myself and an investigator came to talk to you about

12 these issues?

13 A.    Now that you mention that, I might recognize you as being

14 one of the hundreds of thousands of people that came to the

15 Sheriff's Office wanting to talk to me.

16 Q.    Okay.  And during that interaction, did I inform you that

17 I represented Subhanah Wahhaj?

18 A.    Again, you're asking me to recall something from four

19 years ago.  I recall a lot of people coming to my office and

20 wanting to talk to me about this case, some saying that they

21 were attorneys when they were actually media, some media that

22 were very pushy.  I got very tired of all of them.

23 Q.    Do you recall telling me that the federal government told

24 you that you couldn't talk to me?

25          MR. HALL:  Your Honor, this is still not relevant to

1    standing.

2           MR. VILLA:  It goes to his credibility, Judge.

3           THE COURT:  I'll allow this question, and then let's

4    move on to what's really relevant.

5           MR. VILLA:  Sure.

6    BY MR. VILLA:

7    Q.   Do you recall telling me that?

8    A.   Well, I don't recall exactly what our conversation was.

9    As I recall, I told you, or whomever was there, and others,

10   that without permission from the U.S. Attorney's Office, I was

11   not going to discuss this case unless I received a subpoena or

12   an order to give a deposition.

13          MR. VILLA:  May I have just a moment, Your Honor?

14          THE COURT:  Sure.

15          MR. VILLA:  I'll pass the witness.

16          THE COURT:  Go ahead, Mr. Hall.

17                       CROSS-EXAMINATION

18   BY MR. TAVO HALL:

19   Q.   Good afternoon, Sheriff.  Is it still appropriate to call

20   you Sheriff?

21   A.   Undersheriff is probably the appropriate title at this

22   point in my career.

23   Q.   It's a little longer, but okay.  Undersheriff, I

24   appreciate you being here.

25   A.   Jerry works as well, sir.

1   Q.   I just have a few points of clarification.

2        So you've been in law enforcement for quite a while,

3   right?

4   A.   Yes, sir.

5   Q.   And one thing you've learned throughout your experience is

6   that it's always better to get a warrant when you're going to

7   go into someone's property?

8   A.   Yes, I think that's an accurate statement.

9   Q.   And is that generally your approach when you're describing

10  these meetings where people were saying the legality of this

11  might come up later or, you know, some people have opinions,

12  like Sheriff Miera might be saying it's worth -- you know, the

13  consent will be good enough, and some people are saying, maybe

14  not.  Is it your testimony that you can wipe all that out if

15  you just get a search warrant?

16  A.   Generally speaking, yes, a paper is better than consent,

17  and there's other reasons for that, as well.

18  Q.   Is another reason for that that you would have had to take

19  the person giving consent with you if you were just going out

20  on a consent search?

21  A.   We would.  The person giving consent has to be in the

22  immediate presence of an officer or the officer conducting the

23  search so they can withdraw their consent at any time, at least

24  under state law.  I'm beginning to learn that federal is

25  perhaps different from that.

1  Q.   Well, of course, this was not a situation where you wanted

2  to bring Jason Badger into the property, right?

3  A.   Absolutely not.

4  Q.   And why would that be?

5  A.   For the dangers to himself and the liability on myself.

6  Q.   Now, you testified a little bit about there being what you

7  called a gray area, or there was something about a land

8  exchange agreement.  I just want to ask you, did you ever

9  become aware that that was terminated?

10 A.   Later I did.

11 Q.   And by later, do you mean after the search warrant was

12 executed?

13 A.   It was actually brought to my attention after the search

14 warrant was executed.

15 Q.   Were you ever made aware at any point that Mr. Badger had

16 also engaged the New Mexico State Police to go out and talk to

17 the people on his property to see if they could get them off?

18 A.   Yes.

19 Q.   Were you aware of that before the search warrant or after?

20 A.   Before.  During the investigation phase of June, July,

21 August, yes.

22 Q.   Were you aware that Mr. Badger had personally told

23 Mr. Morton to get off of his property?

24 A.   I never heard those words from him.  I only spoke with him

25 one time on the phone, and one time in person where I did an

1   introduction of Sergeant Jason Rael and told Mr. Badger that he

2   would be his point of contact on this.  So no, that was never

3   spoken to me by Mr. Badger.

4   Q.   Okay.  So understanding your testimony is that there was

5   maybe some question leading up to the search warrant about this

6   land swap and perhaps who owned the land, is it fair to say

7   that you did understand that Jason Badger was likely the owner

8   of the property?

9   A.   I believed that Mr. Badger was the recorded owner of the

10  property, for lack of a better term.

11  Q.   Sure.  And is it also fair to say that you understood that

12  Jason Badger wanted those folks off of his property?

13  A.   That I knew, yes.  He was growing very impatient, and I

14  believe that's why he solicited assistance from State Police,

15  who were already working on the investigation, or at least a

16  member was attached to the Fugitive Task Force of the FBI.

17          MR. HALL:  Your Honor, that's all the questions that

18  I have.

19          THE COURT:  Is there any redirect?

20          MR. VILLA:  No, Your Honor.

21          THE COURT:  May the witness be excused?

22          MR. VILLA:  He may.

23          THE COURT:  Thank you, Undersheriff.

24          THE WITNESS:  Thank you.

25          THE COURT:  You may step down.

1          MR. RAY:  Judge, what are your thoughts about a

2   break?

3          THE COURT:  I'm trying to figure out when.  How much

4   more have we got today?

5          MR. RAY:  Not much.  One more witness is it, Judge.

6          THE COURT:  How long is that witness going to take?

7          MR. RAY:  Twenty minutes.

8          THE COURT:  All right.  Let's take a real short

9   break.  And then does the Government have a witness?

10          MR. HALL:  Yes, Your Honor.  We have one, and --

11          THE COURT:  I'm sorry.  Go ahead, sir.

12          THE WITNESS:  Your Honor, am I allowed to stay now?

13          THE COURT:  Do you object to the witness staying?

14   Yes, you may sit in the back of the courtroom, if you wish.

15          THE WITNESS:  Thank you, sir.

16          MR. HALL:  We just have one witness, and it should be

17   20 minutes or so.

18          THE COURT:  Okay.  All right, let's take a short

19   break.

20   (Recess was held at 3:14 P.M.)

21   (In Open Court at 3:28 P.M.)

22          THE COURT:  Defense may call the next witness.

23          MR. RAY:  Your Honor, the defense calls Lucas Morton.

24          THE COURT:  What's counsels' preference?  Does he

25   want to take the witness box?

1       MS. FOX-YOUNG:  This is going to be pretty brief,

2   Judge, to the extent that that affects your decision.

3       THE COURT:  Does the United States object?

4       MS. BRAWLEY:  We can't see his face at all, is the

5   problem.

6       THE COURT:  Let me just ask the Marshals to undue his

7   hands so he can come up and take the witness stand.

8       CRD RICHARD GARCIA:  Mr. Morton, please raise your

9   right hand.

10       (LUCAS MORTON, DEFENSE WITNESS, SWORN)

11       CRD RICHARD GARCIA:  Please have a seat and state

12   your full name for the record.

13       DEFENDANT MORTON:  Lucas Morton.

14       THE COURT:  Just real quickly, Mr. Morton, you

15   understand that by taking the witness stand, you're doing this

16   voluntarily?

17       DEFENDANT MORTON:  Yes, I do.

18       THE COURT:  Okay.  And you understand you're subject

19   to cross-examination by the Assistant United States Attorney

20   after being asked questions on direct examination?

21       DEFENDANT MORTON:  Yes, I am.

22       THE COURT:  Okay.

23       MS. FOX-YOUNG:  Your Honor, may I proceed?

24       THE COURT:  You may.

25

1     TESTIMONY OF LUCAS MORTON

2     DIRECT EXAMINATION

3  BY MS. JUSTINE FOX-YOUNG:

4  Q.   Mr. Morton, did you purchase Lot 29, Unit 2, of Costilla

5  Meadows?

6  A.   Yes, I did.

7  Q.   And did you pay off what was owed on that Purchase

8  Agreement?

9  A.   Yes, I did.

10 Q.   Did you ever receive a Warranty Deed after you paid it

11 off?

12 A.   Yes, I did.

13 Q.   Did you record that deed?

14 A.   No, I did not.

15 Q.   You didn't record it.  Did you believe you owned the

16 property?

17 A.   Yes, I did.

18 Q.   Why didn't you record it?

19 A.   I was out of state when I finalized the deal, and I didn't

20 return back until -- well, when I returned back, it was under

21 an emergency reason, so I didn't bring it with me at the time.

22 I didn't have access to it to do so.

23 Q.   Did you ever, while you were living on Lot 28, receive a

24 three-day notice that you were to be evicted?

25 A.   No, I didn't.

1  Q.   Did you ever receive a seven-day notice of eviction?

2  A.   No, I did not.

3  Q.   Or a thirty-day notice?

4  A.   No, I did not.

5  Q.   Now, you saw earlier today there was testimony regarding a

6  Termination Agreement that was signed by Mr. Stachura.  Do you

7  recall that?

8  A.   Yes.

9  Q.   Did you ever receive that termination agreement before

10 coming into court on this issue?

11 A.   No, I did not.

12 Q.   Did you ever see it?

13 A.   No.

14         MS. FOX-YOUNG:  Your Honor, I'll pass the witness.

15                    CROSS-EXAMINATION

16 BY MS. KIMBERLY BRAWLEY:

17 Q.   Good afternoon, Mr. Morton.

18 A.   Good afternoon.

19 Q.   You purchased Lot 29 of Unit 2 in April of 2016 from

20 Mr. Kohlmann, correct?

21 A.   Yes.

22 Q.   And when you finished paying it off, you got a Warranty

23 Deed, correct?

24 A.   Yes.

25 Q.   But it's your testimony you couldn't file it, correct?

1   A.   No, I didn't file it.

2   Q.   Or did not file it.  Okay, thank you for confirming that.

3        And you did not file it because you were out of state,

4   correct?

5   A.   Yes.

6   Q.   Let me show you what's been admitted as Government's

7   Exhibit 14.  Do you recognize this document?

8            THE COURT:  You may need to zoom it in, because it's

9   hard to see some of the -- okay, that's good.

10  BY MS. BRAWLEY:

11  Q.   Do you recognize this as the Sole and Separate Agreement

12  and Conveyance that you and your wife, Subhanah Wahhaj, signed?

13  A.   Yeah, I believe so.

14  Q.   Okay.  And, in fact, you each signed it in the presence of

15  a notary, correct?

16  A.   That I don't recall.

17  Q.   You don't recall?  Okay, I'll bring your attention to the

18  bottom of Page 1.  What we see here is a notary for Subhanah

19  Wahhaj only signed this document on April 9th, 2016, correct?

20  A.   Yes.

21  Q.   And we also see your wife Subhanah's signature, don't we?

22  A.   Yes.

23  Q.   And this was notarized in Georgia, correct?

24  A.   Yes.

25  Q.   And on the second page, that's your signature, correct?

1   A.    Yes.

2   Q.    And it was notarized on April 25, 2016, correct?

3   A.    It says '15 -- oh, '16.  Yes.

4   Q.    And you signed this in Iowa, correct?

5   A.    Hold on.

6   Q.    Oh, you need to see it?  Sorry.

7   A.    It says 25th of 2015?

8   Q.    Do you see where the handwritten part -- I'm putting a

9   green line.  That says April 25th, 2016.

10  A.    Oh, okay, yes.  Yes; I'm sorry.

11  Q.    And let me bring your attention back to the first page.

12  Do you see what we see right up here that I circled in green,

13  in the top right-hand corner?

14  A.    Yes.

15  Q.    That indicates this document was filed in Taos County on

16  April 28th, 2016, correct?

17  A.    Yes.

18  Q.    So even though you were in Iowa and your wife,

19  Ms. Subhanah Wahhaj, was in Georgia, this document still

20  managed to be filed in Taos County, New Mexico, correct?

21  A.    Yes.

22  Q.    And to be clear, this is the document that says Lot 29

23  belongs to you and not your wife, correct?  I can move it so

24  perhaps you can see it.  I'm not the best on this machine, so I

25  apologize.

1      This is the Sole and Separate Agreement stating that

2  Lot Number 29, that we've been talking about, "is hereby

3  designated as the separate property of Lucas Allen Morton,"

4  correct?

5  A.   Yes.

6  Q.   Not Subhanah.  And Subhanah, it says, "further expressly

7  waives, relinquishes and releases any and all right, title,

8  claim or interest" in this property, correct?

9  A.   Yes.

10  Q.   So even though you were out of state and couldn't file the

11  warranty deed, you were able to file Exhibit 14, weren't you?

12  A.   Yes.

13  Q.   And then sometime in November or December of 2017, you

14  moved to New Mexico, didn't you?

15  A.   Yes.

16  Q.   And you said it was because of an emergency?

17  A.   Yes.

18  Q.   What was that emergency?

19  A.   There was a threat on our family back in Georgia.

20  Q.   And who was threatening you?

21  A.   I don't know the names, offhand, but they were the owners

22  of Siraj's rental house.

23  Q.   And what was the threat?

24          MS. FOX-YOUNG:  Your Honor, I object to the

25  relevance, and under 104(d), Mr. Morton is not subject to

1  anything beyond the preliminary questioning.

2          THE COURT:  Well, it is exceeding -- well, arguably,

3  it exceeds the scope of direct.

4          MS. BRAWLEY:  He said on direct he fled for an

5  emergency, so I'm trying to flesh that out.

6          MS. FOX-YOUNG:  Your Honor, he has answered the

7  question.  He has described the emergency.  To go on further

8  goes beyond the scope of direct and beyond 104(d).

9          THE COURT:  If he can answer the question, I'll allow

10  it, and then let's move on.

11          MS. BRAWLEY:  That's fair.

12  BY MS. BRAWLEY:

13  Q.   What was the threat, Mr. Morton, from the people who you

14  don't know their names?

15  A.   So the threat was that they were, I guess, mercenaries

16  sent to kill Siraj and his family.

17  Q.   And this is what you heard?

18  A.   No, I witnessed the mercenaries.

19  Q.   Okay.  We'll move on today?

20  A.   Okay.

21  Q.   So in November or December of 2017, you moved to New

22  Mexico, correct?

23  A.   Yes.

24  Q.   And you go to what you now know is Lot 28, instead of your

25  lot, Lot 29, correct?

1   A.    By mistake, yes.

2   Q.    And it was a mistake.  Okay.  And when you went there, it

3   was covered with sagebrush and vegetation and everything,

4   correct?

5            MS. FOX-YOUNG:  Your Honor, this is outside the scope

6   of direct.

7            THE COURT:  What's your response?

8            MS. BRAWLEY:  I think -- I guess it probably is

9   outside the scope for him, but it is relevant to --

10           THE COURT:  He is representing himself pro se, but

11  again, I have some concerns, so I'd like to keep it within the

12  scope of the direct testimony.

13           MS. BRAWLEY:  Okay.

14  BY MS. BRAWLEY:

15  Q.   Well, Mr. Morton, let me ask you this.  You said it was a

16  mistake.  And you were advised of that mistake pretty quickly

17  by Mr. Badger, correct?

18           MS. FOX-YOUNG:  Same objection, Your Honor.

19           THE COURT:  Well, he can answer that, and then let's

20  move on.

21  A.   Yes.

22  BY MS. BRAWLEY:

23  Q.   And Mr. Badger offered to help remedy this mistake by

24  trying to swap land, correct?

25           MS. FOX-YOUNG:  Your Honor, this is all outside the

1   scope.

2          MS. BRAWLEY:  It's not, Your Honor, to the extent

3   that Ms. Fox-Young was asking questions about the Warranty Deed

4   and why he never filed it.

5          MS. FOX-YOUNG:  All I asked, Judge, is if he received

6   it.

7          THE COURT:  Yes, I'll sustain the objection.

8          MS. BRAWLEY:  Okay.

9   BY MS. BRAWLEY:

10  Q.   Mr. Morton, let me ask you this.  You received a second

11  Warranty Deed once you lived in New Mexico, correct?

12  A.   Yes.

13  Q.   And you did that once you knew you were mistakenly on

14  someone else's land, correct?

15  A.   Did I receive it once I knew?

16  Q.   Yes.  You received a second Warranty Deed to Lot 29 once

17  you were already living in New Mexico, correct?

18  A.   I believe so.

19  Q.   And you got it from Mr. Stachura, the lawyer who testified

20  today, correct?

21  A.   Yes.

22  Q.   And even though you were living in New Mexico, you didn't

23  file it, did you?

24  A.   I didn't know I had to.

25  Q.   You didn't know you had to?

```
 1  A.   Yes.

 2  Q.   Even though you were advised that that was something that

 3  had to happen before the land swap could occur?

 4        MS. FOX-YOUNG:  Your Honor, this is beyond the scope,

 5  and it also misstates prior testimony.  Mr. Stachura was clear

 6  that he wasn't sure if he said that.

 7        THE COURT:  I'll sustain the objection.

 8  BY MS. BRAWLEY:

 9  Q.   Mr. Morton, you testified you were never given a three or

10  seven or thirty-day notice to leave Mr. Badger's land, correct?

11  A.   Yes.

12  Q.   But he did send you text messages telling you to leave,

13  didn't he?

14  A.   Yes.

15  Q.   And you saw those text messages, didn't you?

16  A.   Yes.  But I believed we had an agreement, so I was trying

17  to work it out.

18  Q.   You believed that --

19  A.   Yes.

20  Q.   -- and you were trying to work it out?  And the agreement

21  was you'd swap land and go to closing by June 3rd, correct?

22  A.   Right.

23        MS. FOX-YOUNG:  Your Honor, objection.

24        THE COURT:  That I'm going to overrule, because

25  that's within the scope of direct.
```

1  BY MS. BRAWLEY:

2  Q.   And June 3rd came and went, and you didn't go to

3  closing, did you?

4  A.   No.

5  Q.   And, in fact, before that, you told Mr. Badger you didn't

6  have the money for the closing costs, correct?

7         MS. FOX-YOUNG:  Same objection, Your Honor.

8         THE COURT:  Overruled.

9  A.   Did I tell him that I didn't have the money?

10 BY MS. BRAWLEY:

11 Q.   Let's see, maybe we'll do it this way to keep it simple.

12 Let's look at Exhibit 15.

13    So the agreement you were trying to work out with

14 Mr. Badger would have expired on June 3rd, 2018, correct?

15 A.   I believe so.

16 Q.   And before that date, right here on May 8th, 2018,

17 Mr. Badger tells you, "We are ready to close and $1,057.17 will

18 be due at signing.  He discounted all that he could he said."

19 He said that to you, correct?

20 A.   Yes.

21 Q.   And going to the next page, the next day you responded and

22 wrote, "Good morning Jason.  That's a bit higher than expected.

23 Won't have that on hand until month's end, June 1st the

24 latest," correct?

25 A.   Yes.

1  Q.   And to be clear, you didn't have a job at this time, did

2  you?

3  A.   No.

4           MS. FOX-YOUNG:  Your Honor, it's outside the scope.

5           THE COURT:  Well --

6           MS. BRAWLEY:  It goes to the ability for him to

7  complete his end of the bargain under the contract.

8           MS. FOX-YOUNG:  And it's also contrary to 401(d),

9  Judge.  He's not subject to questioning on anything beyond the

10 preliminary questions.

11          THE COURT:  What's your response to the 104(d)?

12          MS. BRAWLEY:  Your Honor, when he's saying, I never

13 got a three-day notice, a seven-day notice, a thirty-day

14 notice, this is absolutely relevant and ties in directly,

15 because here he is getting notice from Mr. Badger.  All their

16 communications occurred by text.  Mr. Morton, these show, knew

17 darn well he wasn't supposed to be on that property.

18          MS. FOX-YOUNG:  And Judge, he's answered those

19 questions, but we didn't go beyond asking if he received

20 notice.

21          THE COURT:  Right, but you raised the issue of

22 notice.

23          MS. FOX-YOUNG:  Okay, and he's answered the question

24 about the texts.  But now she's asking about his employment and

25 going well beyond --

1    THE COURT:  In terms of employment, I would agree,

2    that's not relevant.  But in terms of the notice and these

3    texts, I'll allow that specific area, and then let's finish

4    this up.

5    MS. BRAWLEY:  Thank you, Your Honor.

6    BY MS. BRAWLEY:

7    Q.   Okay.  On May 11th, Mr. Badger texted you and said --

8    MS. FOX-YOUNG:  Your Honor, I would just move to

9    strike the answer, because you did sustain the objection.

10   THE COURT:  All right, I'll strike the answer.

11   BY MS. BRAWLEY:

12   Q.   On May 11th, 2018, Mr. Badger texted you, "We will be

13   closing May 31st," correct?

14   A.   Yes.

15   Q.   And you didn't respond again for 20 days until May 31st,

16   correct?

17   A.   Yes.

18   Q.   And when you responded, you wrote, "Hey neighbor!  I

19   apologize for contacting you at the last minute.  My phone has

20   been out of service for a few.  Money fell short.  After

21   finding out how easy it is to go around those $1150 from a

22   paralegal friend, I have no choice but to go that route.  We

23   can do this without a middle man for less than $50, which will

24   be given to the court to record it.  I have all the

25   instructions.  I will take care of everything.  As soon as the

1   papers are ready, can you come sign them?"

2       That's what you wrote on May 31st, correct?  Is that

3   correct?

4   A.   Yes.

5   Q.   And on that same day, Mr. Badger responded to you:  "No,

6   we can't do that.  We need to go through the title company.

7   They already have my title insurance ready and everything else.

8   You still would have to pay."  Correct?

9   A.   Yes.

10  Q.   And that's what the deal had been all along, correct?

11  A.   Yes.  I just needed more time is all.

12  Q.   And still on May 31st, "For my title insurance from them

13  anyway," and he wrote "it's been long enough."  That's what he

14  told you, correct?

15  A.   Right.

16  Q.   Because at this point, you'd been on his land since

17  November or December of 2017, correct?

18          MS. FOX-YOUNG:  Your Honor, this is outside the

19  scope, and counsel is testifying.

20          MS. BRAWLEY:  Sustained.

21  BY MS. BRAWLEY:

22  Q.   And then, you didn't respond again until June 7th, 2018,

23  correct?  Or I'm sorry, you didn't write this at all.

24  Mr. Badger reached out to you -- I said that wrong; I'm

25  sorry -- on June 7th, 2018, correct?

1   A.   Yes.

2   Q.   Because you had not responded to his last message, had

3   you?

4   A.   No.

5   Q.   And he wrote, "Did you receive my last three texts"?

6   A.   Yes.

7   Q.   And at this point, the agreement period to close had

8   passed, correct?

9   A.   Yes.

10  Q.   And you told him on June 7th that, yes, you had received

11  the texts, correct?

12  A.   Yes.

13  Q.   And you wrote, "I was expecting money (tax money) and it

14  didn't go through.  But I understand your concern.  However,

15  I'll need more time if you won't consider doing it straight

16  through court.  As that's what I can afford right now.  Sorry

17  for the delay and any inconveniences.  And thanks again."

18  Correct.

19  A.   Yes.

20  Q.   And the very next day, June 8th, Mr. Badger said, "You

21  need to be off by end of next week," correct?

22  A.   Yes.

23  Q.   And then he confirmed that same day, June 8th, that next

24  week meant June 15th, correct?

25  A.   Yes.

1   Q.   And you didn't respond to him, did you?

2   A.   I don't recall.

3   Q.   Well, according to these texts, the next message is

4   June 11th, correct?

5   A.   Yes.

6   Q.   And it's Mr. Badger asking if you were able to start

7   moving your stuff off; is that correct?

8   A.   Yes.

9   Q.   And you didn't ever respond to him, did you?

10  A.   I don't recall.

11  Q.   You didn't start moving your stuff off, did you?

12  A.   No.

13         MS. FOX-YOUNG:  Your Honor, this is beyond the scope.

14  BY MS. BRAWLEY:

15  Q.   You were on the property on August --

16         THE COURT:  Just a second.  How much more have you

17  got?

18         MS. BRAWLEY:  Maybe one or two questions, Your Honor.

19         MS. FOX-YOUNG:  Your Honor, she's going into

20  questions about the search warrant on August 2nd.  We didn't

21  get into any of that on direct.

22         THE COURT:  I would agree, she didn't get into

23  anything about August the 2nd or the search warrant, so I'm not

24  going to allow that.

25         MS. BRAWLEY:  Okay.  And I'll ask, will the Court

1  allow any questions about if he was served the eviction lawsuit

2  in June?

3         THE COURT:  Well, it goes to notice, so I'll allow

4  that.

5         MS. BRAWLEY:  I think so, too.  Thank you.

6  BY MS. BRAWLEY:

7  Q.   Mr. Morton, after these text messages that we just

8  reviewed were received by you and you were told to be off by

9  June 15th, you were served notice that Mr. Badger had filed a

10 lawsuit, essentially, trying to get you off his land, correct?

11 A.   I don't recall.

12 Q.   You don't recall?

13 A.   Yes.

14 Q.   You don't recall a Sheriff's deputy coming and --

15 A.   I remember he came up there, but I don't remember

16 receiving any papers is what I'm saying.

17 Q.   Well, how do you remember he came there?

18 A.   Because I know that officer.

19 Q.   How do you know him?

20 A.   From Sandoval County.  He's a -- he was a corrections, or

21 detention officer over there.

22 Q.   Oh, you know him from events afterwards?

23 A.   Right.

24 Q.   So you remember he was there, but you don't remember being

25 served?

1  A.   Yes.

2  Q.   And you saw documents in court today, didn't you, showing

3  that you were served?

4  A.   Yes.

5          MS. BRAWLEY:  No further questions, Your Honor.

6          THE COURT:  Is there any redirect of the witness?

7          MS. FOX-YOUNG:  No, Judge.

8          THE COURT:  All right.  Thank you, Mr. Morton.  You

9  may step down, sir.

10          Any other defense witnesses?

11          MR. RAY:  No, Judge, that's it for our witnesses.

12          THE COURT:  Okay.  The United States may call its

13  witness.

14          MR. HALL:  Your Honor, the United States calls

15  Special Agent Travis Taylor.

16      (SPECIAL AGENT TRAVIS TAYLOR, GOVERNMENT WITNESS, SWORN)

17          CRD RICHARD GARCIA:  Please have a seat and state

18  your full name for the record, sir.

19          THE WITNESS:  My name is Travis Taylor.  I'm a

20  Special Agent with the FBI.

21              TESTIMONY OF SPECIAL AGENT TRAVIS TAYLOR

22                        DIRECT EXAMINATION

23  BY MR. TAVO HALL:

24  Q.   Good afternoon, Agent Taylor.  Can you just provide a

25  quick background on where you're employed and how long you've

1  been employed there?

2  A.   I'm employed with the FBI, the Santa Fe RA.  I've been

3  working at the Santa Fe RA since, I think it was April of 2018.

4  Q.   Now, you're the case agent in this case?

5  A.   Yes.

6  Q.   How long have you been the case agent on this case?

7  A.   I believe August 3rd, maybe shortly after, is when I

8  became the case agent -- of 2018 -- is when I became the

9  official case agent on the case.

10  Q.   As part of your duties as the case agent, did you have

11  occasion to investigate property ownership records related to

12  land in this case?

13  A.   Yes.

14  Q.   And what land or property, specifically?

15  A.   Unit 2, Lots 28 and 29 in Costilla Meadows.

16  Q.   And what makes those parcels significant that you went to

17  look for property records?

18  A.   Jason Badger having property on Lot 28, Lucas Morton

19  having property on Lot 29.

20  Q.   And as part of your investigation, did you look at any

21  online maps or records for this land?

22  A.   Yes.

23  Q.   I'd like to show you, if it comes up on the HDMI, what's

24  been marked and admitted as Government's Exhibit 2.  Do you

25  recognize this?

1   A.    I do.

2   Q.    Can you describe what we're looking at on this page?

3   A.    This is, I believe, a Taos County Assessor's map of

4   northern New Mexico, to include Costilla Meadows.

5   Q.    And based on the legend over there on the side, can you

6   tell what the areas that are with red borders mean?

7   A.    Are you referring to this area right here?

8   Q.    Well, first just looking at the legend over on the left

9   side, what are the parts that are lined in red?

10   A.    Land Ownership, private.

11   Q.    Okay.  And where you just circled there, what is that?

12   A.    Costilla Meadows.

13   Q.    If we go to the next page, what are we looking at here?

14   A.    Zoomed in, a map of Costilla Meadows.

15   Q.    And is that -- can you draw a circle around that, again?

16   A.    (The witness complied).

17   Q.    So the next page, what's this page?

18   A.    This is where if you click on the units, you can find

19   property ownership.

20   Q.    Okay.  So on this one, when you click on one of the units,

21   this little white box pops up?  Is that what you're saying?

22   A.    Sure, yes.

23   Q.    And what does the little white box say as far as the

24   owners?

25   A.    Owners being James Kohlmann and Lucas Morton, with a

1  percentage sign next to Lucas Morton.

2  Q.   And what happens if you click the little blue link that

3  says, "More Info"?

4  A.   You get more info.

5  Q.   Good answer.  Can you describe this page?  What's

6  different about this page?

7  A.   This is Lot 28, the current owners of Lot 28.

8  Q.   And who are the owners currently listed as?

9  A.   David and Wendy Van Epps.

10 Q.   Do you know who they are?

11 A.   They are the people who bought Jason and Tanya Badger's

12 land.

13 Q.   How do you know that?

14 A.   Per County Clerk records, Taos County Clerk records.

15 Q.   All right.  So is this Page 5 just another closer zoom in?

16 A.   Yes.

17 Q.   Page 6, the same?

18 A.   Yes.

19 Q.   Is the little blue -- what does the little blue around the

20 box, or the parcel, mean?

21 A.   That's the boundary of the property.

22 Q.   Is that the one you clicked on to bring this box up?

23 A.   Yes.

24 Q.   And finally, Page 7, is this just a further zoom in?

25 A.   Yes.  The blue box is Lot 29, and then Lot 28 is adjacent

1   to the right with the structure that Lucas Morton and his

2   family had built, or a part of the structure.

3   Q.   So on Page 8 here, what you're describing is that the blue

4   box is around Lot 28?  Is that what you're saying?

5   A.   Correct.

6   Q.   Which is owned by Wendy and David Van Epps right now?

7   A.   Yes, correct.

8   Q.   Do you recognize what that brown scarring is on Lot 28?

9   A.   Yes.  This appears to be the tarp and trailer area.

10  Q.   And how do you recognize that?

11  A.   I've done aerial -- the FBI has conducted aerial

12  surveillance of the area, so I'm familiar with it.

13  Q.   I'm just showing you now what's been admitted as

14  Government's Exhibit 3.  Do you recognize this?  As it's

15  pulling up, you can see a preview of it.

16  A.   Quit Claim Deed.

17  Q.   And who is the Quit Claim Deed for?

18  A.   Alice Hartigan and James Kohlmann.

19  Q.   And what is the date on that, if you can read it?

20  A.   May 8, 2002.

21  Q.   Now, how do you recognize this Quit Claim Deed?  Where did

22  you get it from?

23  A.   Taos County Clerk's Office.

24  Q.   Is this the most recent deed that is on file with the Taos

25  County Clerk's Office for Lot 29?

1   A.    Yes.

2   Q.    Is that why they provided it for you?

3   A.    Yes.  I was trying to identify the ownership, and they

4   said that James Kohlmann was the only owner of Lot 29.

5   Q.    Is there anything else that the Taos County records office

6   provided you with regard to Lot 29?

7   A.    They provided all the records that they had in their

8   system for Lot 29, which I think might have included a

9   Memorandum of Contract.

10   Q.    And was the Memorandum of Contract -- I'll show you

11   Exhibit 8.  Is that what we're looking at here?

12   A.    Yes.

13   Q.    When you reviewed this Memorandum of Contract, did it

14   actually convey any property to anyone?

15          MR. VILLA:  Objection, Your Honor.  Calls for a legal

16   conclusion.

17          THE COURT:  What was the question, again?

18          MR. HALL:  Whether the face of the document purports

19   to convey any ownership of property, as you read the document.

20          THE COURT:  Yes, I'll sustain it.  I think the way

21   the question is worded, it's asking for a legal conclusion.  So

22   I'll sustain the objection.

23   BY MR. HALL:

24   Q.    You were here for the testimony of Mr. Stachura, right?

25   A.    Yes.

1  Q.   You heard him testify that this Memorandum of Contract

2  basically is just a placeholder saying that somewhere else out

3  there, there's a --

4         MR. VILLA:  Objection.  The Court can recall the

5  testimony itself.

6         THE COURT:  Essentially, that's the testimony, but I

7  think he's right, I can make that determination.  So I'll

8  sustain the objection.

9  BY MR. HALL:

10  Q.   Was that all that was on the Lot 29 records from Taos

11  County?

12  A.   That I can recall at this time.

13  Q.   Did they also send you this, Government Exhibit 11?

14  A.   Yes, I do remember seeing this.

15  Q.   And is that all the documents that Taos County gave you

16  for Lot 29?

17  A.   That I can recall, yes.

18  Q.   Now, you also looked into, or you asked for records -- did

19  you also ask for records for Lot 28?

20  A.   I did.

21  Q.   And do you recognize Government Exhibit 4?

22  A.   I do.

23  Q.   What is that?

24  A.   A Warranty Deed for joint tenants.

25  Q.   Between?

1  A.    Transferring property from Jason and Tanya Badger to David

2  and Wendy Epps.

3  Q.    So is this the most recent ownership deed on file in Taos

4  County for Lot 28?

5  A.    Yes.

6  Q.    So moving on -- just a few more questions, Agent Taylor.

7  Did you ever see a general Warranty Deed from James Kohlmann to

8  Lucas Morton conveying property, the property ownership for

9  Lot 29, to Lucas Morton?

10 A.    No, and I specifically asked the Clerk's Office if they

11 had anything else or as to why that might be the case.

12 Q.    Do you recall their answer?

13 A.    I think the Assessor, when I spoke to the Assessor's

14 office, was saying that there might have been a Memorandum of

15 Contract where there's a -- I believe the right term is a Real

16 Estate Contract, where Morton might have had to pay off the

17 land in order for a deed to be released, but didn't have any

18 more information to say that that had occurred.

19 Q.    And just to circle back real fast, you answered my

20 question earlier about what happens if you click on the blue

21 link that says "More Information," that you get more

22 information.

23 A.    Yes.

24 Q.    Do you recognize this document, Government Exhibit 5?

25 A.    This is what brings -- this is what comes up when you

 1  click on that blue link.

 2  Q.   And does it describe the actual unit and lot number for

 3  the property?

 4  A.   Yes.

 5  Q.   Just shifting gears a little bit, so you're the case agent

 6  in this case, right?

 7  A.   Yes.

 8  Q.   Do the charges in this case include kidnapping?

 9  A.   They do.

10  Q.   Do you know who was allegedly kidnapped, based on the

11  charges?

12          MR. VILLA:   Objection, relevance.

13          THE COURT:   What's the relevance on the standing

14  issue?

15          MR. HALL:   Your Honor, there's going to be just a few

16  questions discussing what was going on on Mr. Badger's

17  property, and that goes to the rightfulness and wrongfulness of

18  possession or being on someone else's property, which includes

19  committing crimes, for example, in addition to trespassing.

20          MR. VILLA:   Judge, people commit crimes on their

21  property all the time.  They still have standing.

22          THE COURT:   Well, I know, but I gave a lot of leeway

23  regarding the Taos County Sheriff's deputy.  I'm drawing a

24  blank on his name.  So I'm not sure at this point of the

25  relevance, so I'll allow you to make the record.

1            MR. HALL:  Yes, Your Honor.  It'll be brief.

2    BY MR. HALL:

3    Q.    Do you know who was allegedly kidnapped?

4    A.    Yes, I do.  Siraj Wahhaj's son, John Doe.

5    Q.    Was he still missing at the time that the search warrant

6    was executed on Lot 28 on August 3rd?

7    A.    Correct.

8    Q.    And in your investigation, did you become aware of any

9    efforts by any of the Defendants to keep the little boy missing

10   or unfound?

11           MR. VILLA:  Objection, relevance.

12           THE COURT:  What's the relevance.

13           MR. HALL:  Again, Your Honor, the commission of the

14   kidnapping offense was ongoing while occupying Mr. Badger's

15   property, which goes to the rightfulness of being on the

16   property.

17           THE COURT:  Right, but I think he's already answered

18   the question, so I'll sustain the objection at this point.  In

19   other words, at the time the warrant was executed, there was

20   still an ongoing kidnapping investigation.

21   BY MR. HALL:

22   Q.    And similarly, based on the charges in this case, did you

23   become aware in your investigation of any actions by the

24   Defendants that suggest or support the material support to

25   terrorism charges that were ongoing on the property on

1   August 3rd?

2   A.   Yes.

3   Q.   I don't think we need to describe those, as long as your

4   testimony is that you were aware of those.

5              MR. HALL:   That's all the questions that I have, Your

6   Honor.

7              THE COURT:   Counsel may cross.

8                         CROSS-EXAMINATION

9   BY MR. RYAN VILLA:

10  Q.   Good afternoon, Agent Taylor.

11  A.   Good afternoon.

12  Q.   So you just testified that, yes, you did learn about

13  information that there was potentially this crime of material

14  support to terrorism going on on the property?

15  A.   Post the search warrant, yes.

16  Q.   But not before the search warrant?

17  A.   Correct.

18  Q.   Okay.  Can you tell us what that is?  Because we're five

19  years into the case, and I haven't figured it out yet.

20  A.   So I reported to the office in April 2018.  At that point,

21  I think there was some communications going on between Taos

22  County and the FBI, but I wasn't part of that at the time.

23  There was a lead sent to us by Atlanta to interview Siraj

24  Wahhaj, and that was the extent of the FBI's request to the

25  Santa Fe office.

1   Q.   So that's the extent of what you know?

2   A.   At the time, yes, until August 3rd.  Taos County had

3   asked us for assistance with surveillance.

4   Q.   And you said that John Doe was allegedly kidnapped, and

5   you said that John Doe was Siraj Wahhaj's biological child.

6   A.   Correct.

7   Q.   So who kidnapped him?

8   A.   Well, Siraj is not charged with kidnapping.  The other

9   four are.

10  Q.   My question to you is, who kidnapped him?

11          MR. HALL:  Objection, Your Honor.  This is outside

12  the scope.

13          THE COURT:  Sustained.

14          MR. VILLA:  They opened the door, Judge.

15          THE COURT:  It's really -- I question the relevancy

16  of it.  Obviously if it's relevant, before trial you can bring

17  it up in the context of another motion.  But for the standing

18  issue, it is not.  So the objection is sustained.

19          MR. VILLA:  I understand, Judge.

20  BY MR. VILLA:

21  Q.   In the course of your investigation of the standing issue,

22  the property records, those sorts of things, did you come

23  across any documented evidence that Lucas Morton or anyone else

24  on the property was served with a three-day, seven-day, or

25  thirty-day notice?

1   A.    Other than text messages from Jason Badger, no.

2   Q.    Okay.  And you investigated the Uniform Resident Relations

3   Act in New Mexico, the landlord-tenant law?

4   A.    No.

5   Q.    Are you aware of the proper form in which a three-day,

6   seven-day, or thirty-day notice must be provided?

7   A.    No.

8   Q.    Do you have any knowledge whether a text message is

9   sufficient to establish notice under the Uniform Resident

10  Relations Act?

11  A.    No.

12          MR. VILLA:  No further questions.

13          THE COURT:  All right.  Any redirect?

14          MR. HALL:  Just a couple of questions.  I'll be

15  brief.

16                    REDIRECT EXAMINATION

17  BY MR. TAVO HALL:

18  Q.    Agent Taylor, did you also, in this investigation, did you

19  discover any documentation of a tenancy between Lucas Morton

20  and Jason Badger?

21          MR. VILLA:  Objection, calls for a legal conclusion.

22          THE COURT:  Well, you asked him questions on the

23  landlord-tenant act, so I'll allow it.

24  BY MR. HALL:

25  Q.    Any documents of a lease?

1    A.    No documents of a lease.

2    Q.    Any documents showing Lucas Morton paying rent?

3    A.    No.

4    Q.    Any documents showing the amount of time Lucas Morton was

5    going to be on the property, allowed?

6    A.    Not that I can recall, no.

7              MR. HALL:  That's all, Your Honor.

8              THE COURT:  All right.  Thank you, you may step down.

9              THE WITNESS:  Thank you, sir.

10             THE COURT:  This concludes all the evidence, right?

11             MR. HALL:  Yes, sir.

12             THE COURT:  Do you want to have argument tomorrow?

13             MR. RAY:  Well, Judge, I think what we had discussed

14   at the previous phase of this hearing was that you were going

15   to have findings of fact and conclusions of law.

16             THE COURT:  Which you did submit, right.

17             MR. RAY:  And then I think what we discussed was that

18   the parties could supplement those when the transcript was

19   prepared for this.

20             THE COURT:  That's fair enough.  Is that what you

21   would like to do?

22             MS. FOX-YOUNG:  I mean, Your Honor, we could quickly

23   supplement them.  It's not much that wasn't stated.  And I'm

24   not going to argue tomorrow morning, unless that's what the

25   Court would like.

1        THE COURT:  Well, how do you want to make the record?

2   Because this is an important issue.

3        MS. FOX-YOUNG:  I think we ought to brief it and

4   supplement the findings.

5        THE COURT:  All right.  And you want to treat that as

6   the closings arguments?

7        MS. FOX-YOUNG:  Would that be okay with -- yes.

8        THE COURT:  Is that acceptable to the United States?

9        MR. HALL:  Your Honor, we would prefer to argue and

10  be done with it.  But, of course, if --

11       THE COURT:  Well, in other words, you don't have to.

12  You submitted your requested findings and conclusions, so

13  there's no obligation for you to submit anything additional.

14       So I'll do this.  And again, I don't want to commit

15  my court reporter, because she not only reports for me, but she

16  has to cover some other judges.  So how many days, if you

17  ordered a transcript or whatever you want from today, how much

18  time do you want to supplement?

19       MS. FOX-YOUNG:  Fourteen days, Judge.

20       THE COURT:  Fourteen days, all right.  And what I'll

21  do is, I'll give both parties the opportunity -- I'm not

22  requiring it, but both parties have the opportunity to

23  supplement if they want.

24       MR. HALL:  Your Honor, just so I understand, that

25  means we won't be doing oral argument, or we will after the

1   filings?  You said they will be treated as the closing

2   arguments.  Just so I know how to format the written --

3            THE COURT:  Do you object to doing like a written

4   closing?

5            MR. HALL:  No, that's fine.

6            THE COURT:  Then let's do that.  Let's treat the

7   supplemental -- in other words, submit your supplemental

8   findings and any closing written argument you want.  I'm not

9   requiring additional findings, because you requested

10  supplemental findings.  But if you would, submit written

11  closings within 14 days, and let me have them -- basically,

12  file them at the same time.  Then that way, I'll go ahead and

13  get a decision out.

14           MR. RAY:  Thank you.  I think that's a good way to

15  make a clean record, Judge.

16           THE COURT:  All right.  Then with that, we'll be in

17  recess.  Thank you.

18  (Proceedings adjourned at 4:07 P.M.)

19                       *  *  *  *  *

20

21

22

23

24

25

```
1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEW MEXICO

3  _____
                              )
4  UNITED STATES OF AMERICA,  )
                              )
5            Plaintiff,        )
                              )
6       vs.                   )   No. 1:18-CR-02945-WJ
                              )
7  JANY LEVEILLE, SIRAJ IBN   )
   WAHHAJ, HUJRAH WAHHAJ,     )
8  SUBHANAH WAHHAJ, and       )
   LUCAS MORTON,              )   EVIDENTIARY HEARING re: STANDING
9                              )
            Defendants.        )
10 _____)
```

11              CERTIFICATE OF OFFICIAL COURT REPORTER

12       I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

13  Realtime Official Court Reporter, in and for the United States

14  District Court for the District of New Mexico, do hereby

15  certify that pursuant to Section 753, Title 28, United States

16  Code, that the foregoing is a true and correct transcript of

17  the stenographically reported proceedings held in the

18  above-entitled matter on Tuesday, March 28, 2023, and that the

19  transcript page format is in conformance with the regulations

20  of the Judicial Conference of the United States.

21  Dated this 3rd day of April, 2023.

22  _____
    MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23  UNITED STATES COURT REPORTER
    333 Lomas Boulevard, Northwest
24  Albuquerque, New Mexico  87102
    Phone:  (505)348-2334
25  Email:  Mary_Loughran@nmd.uscourts.gov