IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cr. No. 18-CR-2945 WJ |
| | ) | |
| JANY LEVEILLE, | ) | |
| SIRAJ WAHHAJ, | ) | |
| SUBHANAH WAHHAJ, | ) | |
| HUJRAH WAHHAJ, and | ) | |
| LUCAS MORTON, | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE ISSUE OF WHETHER THE DEFENDANTS HAVE STANDING TO SEEK TO SUPPRESS THE EVIDENCE SEIZED AT THE COMPOUND**

The United States respectfully submits these supplemental proposed findings of fact and

conclusions of law, and requests that the Court find that the Defendants lack standing to

challenge the search warrant for Unit 2, Lot 28, in the Costilla Meadows Subdivision, Taos

County, New Mexico, executed by the Taos County Sheriff's Office ("TCSO") on August 3,

2018.  As a result, the Court should deny the Defendants' motion to suppress the evidence

obtained from that search, Doc. 471, without need to reach the merits.  This pleading is

submitted pursuant to the Court's order following the hearing on this issue held on March 28,

2023.  Doc. 696.

## I.  SUPPLEMENTAL FINDINGS OF FACT

The United States provides the below supplemental proposed findings of fact based on

the testimony and exhibits presented to the Court at the hearing held on March 28, 2023.  The

United States hereby incorporates by reference its previous proposed findings of fact submitted to the Court.  *See* Doc. 688.

### A.   Testimony of the Owner of Lot 28, Unit 2, Costilla Meadows Subdivision, Mr. Jason Badger

#### a.   <u>Evidence about the Defendants' License from the Badgers to be Occupty Lot 28 in the Winter and Spring of 2018.</u>

1. Jason Badger and his wife Tanya bought Lot 28, Unit 2, in the Costilla Meadows Subdivision in October 2017 for somewhere around $8,500–$9,000.  Transcript of Proceedings of Hearing, March 28, 2023, Doc. 707 at 28:16-29:15 (hereinafter "Tr.").  On October 26, 2017, Jason and Tanya Badger recorded a general warranty deed with their names in the Taos County records as owners of Lot 28.  Gov. Ex. 10.  He and his wife were excited to purchase the land and had dreams of building a retreat for veterans to spend time in the quiet natural surroundings of Costilla Meadows, New Mexico.  Tr. at 35:13-23; 84:23-85:2.

2. After the Badgers bought Lot 28, they would drive up from their house in Cerro, NM, every two or three weeks just to look at the land and imagine future plans and possibilities for their new land.  Tr. at 35:13-16.  He and his wife were excited to purchase the land and had dreams of building a retreat for veterans to spend time in the quiet natural surroundings of Costilla Meadows, New Mexico.  *Id.* at 35:13-23; 84:23-85:2.

3. Mr. Badger had no trouble finding his land at Lot 28 in Unit 2 of the Costilla Meadows Subdivision.  He did not need a GPS to find it after he bought the land.  *Id.* at 34:7-8.  He was able to simply use the map of the units and lots he got when purchasing the land, which had road names and directions on it.  *Id.* at 34:9-19; Gov. Ex. 1.  Wooden stakes marking the property boundaries of the lots were already in place at the corners, clearly showing which

lots were which.  *Id.* at 36:6-16; 42:20-43:9.  There were also other houses in the Costilla

Meadows Subdivision on the same road as Lot 28.  *Id.* at 37:14-18.  Mr. Badger had also

gotten to know one of the neighbors in the subdivision.  *Id.* at 37:25-38:2.

4.   Shortly after the Badgers purchased the land, within a couple of months, the Defendants and

their 12 children arrived in New Mexico in the vicinity of Amalia, and moved onto Lot 28,

Unit 2, in the Costilla Meadows Subdivision, where Jason Badger discovered them on one of

his trips to check the land and imagine its future in his and his wife's life.  *Id.* at 84:19-85:19.

5.   Immediately upon discovering the Defendants on his property, with the first words out of his

mouth, Jason Badger informed Siraj Wahhaj and Lucas Morton that they were on the wrong

land.  *Id.* at 87:7-13.

6.   Mr. Badger happened to still have the land survey, the land plat maps, and other real estate

purchase paperwork with him from his recent purchase, so he also showed these documents

to Mr. Morton and Mr. Wahhaj to show them that they were on the wrong property.  *Id.* at

85:13-19.

7.   Mr. Badger also took one of the older teenage boys that was with the Defendants to show

him the boundary stakes to Lot 28 and Lot 29.  "Lot 29" is clearly marked on the property

markers for the property on the other side of where the Defendants had set up their

occupation.  *Id.* at 85:20-86:12.  The teenage boy returned and confirmed to Siraj that they

were, in fact, on the wrong property, and that Lot 29 was "back over there."  *Id.* at 43:21-23.

8.   As the owner of the property, Mr. Badger understood that he could have asked the

Defendants to leave his property right then.  *Id.* at 87:14-16.  However, Mr. Badger saw

several small children with the Defendants, saw the extremely primitive living conditions the

Defendants had set up, and knew that the weather was soon going to become very cold, and he did not want to be responsible for sending these small children out to suffer in the cold with nowhere to shelter.  *Id.* at 87:17-22; 44:2-10.

9. Lucas Morton did not offer to move his and the Defendants' stuff over to Lot 29, and Jason Badger did not stop them or tell them not to move.  In fact, if the Defendants had offered to gather their stuff and move to Lot 29, Mr. Badger would have gladly taken them up on that. *Id.* at 87:23-88:17.

10. Instead, knowing the lots were all about the same 10-acre size in that subdivision, Mr. Badger agreed with Lucas Morton, who purported to own Lot 29, that they would swap ownership of Lots 28 and 29, and that Lucas Morton would pay all of the court costs, filing fees, and transaction fees for that real estate transaction.  *Id.* at 89:6-10; 44:7-10.

11. Mr. Badger did not want to let the Defendants stay on his property, and did not want to swap property lots with Lucas Morton.  But, given the situation he was put in with the Defendants' occupation of his property in primitive living conditions with many small children, Mr. Badger felt it was a solution to the situation.  *Id.* at 88:18-23.

12. During the pendency of the land swap agreement, Mr. Badger permitted Lucas Morton, who was going to be the "buyer" of Lot 28—the property he and the Defendants were occupying—to remain on Mr. Badger's property until the closing of the real estate contract. 44:14-18; 90:9-11.

13. Lucas Morton never showed Mr. Badger a deed or any other documentation that he was, in fact, the owner of Lot 29 and had the right and ability to transfer it to Mr. Badger.  Mr.

Badger just assumed in good faith that Mr. Morton was the true owner of Lot 29.  *Id.* at 88:24-89:5.

14. At some point, the Badgers and Lucas Morton obtained the services of a real estate agent, a real estate attorney, and a title company, which resulted in the land swap agreement being put in writing as a real estate purchase agreement.  *Id.* at 45:9-46-6.

15. The real estate contract contemplated the purchase of Lot 28 by Lucas Morton for the consideration of title and ownership of Lot 29 conveyed to Jason and Tanya Badger.  *Id.* at 46:16-25; Def. Ex. I.  This contract provided that the purchase and sale agreement would expire if the parties did not close on or before June 3, 2018, and was signed by the parties on different dates in mid-April 2018.  *Id.* at 47:5-21; Def. Ex. I.

16. After the land swap contract was signed, Mr. Badger used a tractor tire to clear a small strip on Lot 29 to be an entry road into the lot, and put in 4 green T-posts, one at each corner of Lot 29.  *Id.* at 48:22-49:17.  However, Mr. Badger did not do any other work or improvements to Lot 29 because Mr. Badger knew that he did not own Lot 29, and he knew that before building anything on any land it was important to be sure that he was the owner of that land, and therefore he was waiting until the real estate contract successful closed before building anything on Lot 29.  *Id.* at 86:20-87:6.

17. The Defendants were living in a trailer that was dug into the ground and covered by plastic tarps.  *Id.* at 51:11.  Nothing the Defendants built on Lot 28 were permanent structures.  *Id.* at 52:15-24.

18. The real estate contract for the land swap had no provision for the payment of rent by the Defendants to the Badgers while they were on the Badgers' property.  *Id.* at 90:23-25.

19. Nothing in the real estate contract identified or contemplated Lucas Morton or the Defendants to be "tenants" of the Badgers. *Id.* at 89:15-18.

20. Nothing in the real estate contract contemplated Lucas Morton gaining any ownership rights of Lot 28 before the contract closed. *Id.* at 89:19-24.

21. During that time that the real estate contract was pending before closing, and Mr. Badger permitted the Defendants to remain on the land pending closing, neither Lucas Morton nor any other Defendant paid any rent to the Badgers. *Id.* at 89:25-90:1.

22. At no point did the Badgers or the Defendants discuss or have a written lease in place for the Defendants to remain on Lot 28. *Id.* at 79:18-20.

23. At no point did Jason Badger consider himself a landlord of the Defendants. *Id.* at 79:21-22.

24. At no point did Lucas Morton or any other Defendant make any statement that they believed they had an oral lease in place to be tenants on Lot 28. *Id.* at 79:14-17.

25. At no point after the real estate contract failed did any Defendant ask Mr. Badger to allow them to stay on the land for a little while so that they could get their stuff moved off of his land. *Id.* at 79:7-9.

        **b.**  <u>**Evidence Regarding the Failure of the Real Estate Contract and the Badgers' Withdrawal of Permission for the Defendants' Occupation of Their Property**</u>

26. During much of the pendency of the real estate contract, Mr. Badger expected the contract to go through and to close on time. *Id.* at 91:1-7. However, Mr. Badger heard from a friend that the sheriff's office was looking for Lucas Morton, so Mr. Badger looked on the internet and discovered news articles about Morton and Siraj Wahhaj being wanted out of Georgia. *Id.* at 57:21-52:18; 91:8-11.

27. Mr. Badger went in person to the Taos County Sheriff's Office (TCSO) and explained that he knew where Lucas Morton and Siraj Wahhaj were, and that they were on his property. *Id*. at 58:21-59:12.

28. TSCO Sergeant Jason Rael then came to the Badgers' home in Cerro, NM, to talk about the Defendants' location on Mr. Badger's property. *Id.* at 59:16-19; 80:19-22.

29. Mr. Badger's discovery about Mr. Morton and Siraj Wahhaj's wanted status changed Mr. Badger's perception of the likelihood of success in the land swap agreement. 91:12-14.

30. On May 8, 2018, Mr. Badger sent a text message to Lucas Morton informing him of the final costs to close on their real estate transaction, which was going to be $1,057.17. Gov. Ex. 15. Lucas Morton responded the next morning that he would not have that money on hand until June 1, 2018. *Id.* Mr. Badger responded two days later that the closing on the contract was set for May 31, 2018. *Id.*; Tr. at 63:2-8.

31. Twenty days later, on May 31—the day of closing—Lucas Morton responded to Jason Badger, stating that he did not have the money due for the closing and asking to somehow file the real estate records with the court for $50 without any title company, title insurance, or other real estate service fees. *Id.*; Tr. at 63:10-20. Mr. Badger rejected this idea, and told Mr. Morton that the title company had already performed the work that Mr. Morton had agreed to pay for, and that it had been long enough waiting for this process to complete. *Id.*; Tr. at 63:10-20.

32. Lucas Morton did not respond to this message, did not pay the costs of the attorney or title company's work, and did not show up to the closing that day. The closing never happened, and the contract expired under its own terms on June 3, 2018. Tr. at 90:12-18.

33. At no point did any transfer of property rights or ownership between Lucas Morton and the Badgers take place; the Badgers's ownership of Lot 28 was unchanged from before the Defendants arrived in late 2017 until after they were removed from Lot 28 on August 3, 2018.  *Id.* at 76:25-77:3.

34. On June 7, 2018, a week after the closing date and four days after the contract had expired on its own terms, Mr. Badger sent a message to Mr. Morton asking whether he'd received Mr. Badger's previous messages about having to pay for the closing costs to the title company. Gov. Ex. 15.  Mr. Morton responded the same day saying that he did, and that he would need more time to get the money for closing.  Gov. Ex. 15.

35. The next day, June 8, Mr. Badger responded to Mr. Morton's message and stated "You need to be off by end of next week."  A subsequent message clarified that this meant "By June 15th."  *Id.*; Tr. at 63:21-24; 64:21-23; 77:4-11.

36. After no response from Mr. Morton, Mr. Badger followed up with another message on June 11, asking "Were you able to start moving your stuff off" to Lucas Morton.  Again, Mr. Morton did not respond.  *Id.*; Tr. at 65:1-3.

37. For the next two months, Mr. Badger watched, waited, and tried every way of getting the Defendants off of his property that he knew to be available to him, but the Defendants never made any effort or gave any indication that they would be moving their stuff off of his land. Tr. at 77:12-14; 79:1-17; 92:21-93:5.

38. Mr. Badger communicated directly to Mr. Morton that he and the Defendants were no longer permitted to occupy his property on Lot 28 on June 8, 2018.  Mr. Badger gave the Defendants one week to vacate his property, with a deadline of June 15.  *Id.* at 63:21-24;

8

64:21-23; 77:4-11.  Mr. Badger's intent in sending these messages was to provide Lucas

Morton notice that he had to leave Mr. Badger's property.  *Id.* at 91:15-20.

39. When Mr. Morton made no response and gave no indication that they were going to leave

Lot 28, Mr. Badger considered the Defendants "illegal trespassers" on his land.  *Id.* at 92:14-

15.

40. Mr. Badger was aware that the Defendants felt they had a right to live wherever they wanted

on the land in New Mexico because of their "beliefs."  *Id.* at 80:4-10.  Mr. Badger did not at

all agree with that approach or interpretation of the rightfulness of the Defendants' presence

on his property.  *Id.* at 80:11-13.

41. Due to the failure of his revoked permission to get the Defendants to leave his land, Mr.

Badger believed another option was to have them evicted through a court order, so he found

and filed an eviction lawsuit form, believing it to be the correct form to use for seeking

removal of trespassers.  *Id.* at 77:15-18; 91:21-2.  Mr. Badger did not choose the particular

eviction suit form that he used because he viewed the Defendants as his tenants; he just

thought it was the form to use for an eviction of any kind.  *Id.* at 92:3-15.

42. The eviction lawsuit filed by the Badgers included as attachments the "Termination

Agreement" terminating the land swap contract between the Badgers and Lucas Morton, the

Badgers' recorded warranty deed showing their ownership of Lot 28, and the land swap

agreement that had expired and been terminated.  Def. Ex. L.

43. Lucas Morton was personally served with the lawsuit on June 18, 2018.  *Id.*

44. Neither Lucas Morton nor any other of the Defendants showed up on the trial date set in the

eviction lawsuit, June 27, 2018.  Tr. at 77:19-24.

9

45. The eviction suit was dismissed because the Badgers filed it in the wrong court—magistrate instead of district court—and not because of any determination that the Defendants had any right to continue to occupy the Badgers' property.  *Id.* at 77:25-78:17.

46. After the dismissal for being in the wrong court, Mr. Badger planned to re-file in the right court, but for reasons he cannot remember, he did not do so.  However, the reason for not re-filing in the correct court was "most certainly not" because he had a change of heart and wanted to let the Defendants remain on his property.  *Id.* at 93:10-22.

47. At some point after the eviction suit's dismissal, Mr. Badger asked the New Mexico State Police (NMSP) for assistance in getting the Defendants off his property.  A NMSP officer did go to Mr. Badger's property and did talk to Lucas Morton, but that too was unsuccessful in extracting the Defendants from Lot 28.  *Id.* at 78:18-25.

48. Jason Badger was aware that the Defendants had several firearms and shot the firearms on the property.  *Id.* at 81:22-25.  Mr. Badger was also aware that the Defendants had built a firing range or training area on his property.

49. After Mr. Badger told the Defendants that they were no longer permitted to occupy his property, and after he filed the eviction lawsuit to remove the Defendants from his property, TCSO Sgt. Jason Rael asked Mr. Badger if he would be willing to wear a button camera and go onto his property to talk to the Defendants as part of TCSO's investigation into the wanted Siraj Wahhaj and missing JOHN DOE.  *Id.* at 92:17-23.

50. Mr. Badger expressed willingness to wear the button camera, but wanted to be able to be armed when he went to talk to the Defendants, and he wanted to be sure law enforcement

would be on standby to protect him if there was a dangerous altercation.  *Id.* at 93:6-9; 61:17-24.

51. Mr. Badger did not personally confront Mr. Morton to tell him to get off his property because he did not want any dangerous or unfortunate situation to escalate.  *Id.* at 64:6-9; 81:8-21.

### c.  Evidence about the Defendants' Destruction of Lot 28 and Costs Incurred to the Badgers as a Result of the Defendants' Wrongful Occupation of Lot 28

52. The Defendants cleared approximately 2.5 acres of the Badgers' Lot 28 of all sagebrush and natural flora in order to build their compound and shooting range before Mr. Badger discovered the Defendants on his property.  Tr. at 39:8-40-4.

53. The Badgers were unaware that the TCSO officers were going to serve a search warrant and remove the Defendants until after it had happened.  *Id.* at 94:1-7.

54. Shortly after the Defendants were removed from the Badgers' property on August 3, 2018, Mr. Badger finally re-took possession of his property, and found, among other things, a shotgun, a bulletproof vest, a bag of ammunition, and a Glock pistol with several extended 30 or 32 round magazines that had not been collected by law enforcement after the first search warrant was served.  *Id.* at 94:8-17.  Mr. Badger immediately called TCSO to let them know what he had found and closed those weapons and other items in the back of the box truck parked on the property until TCSO officers came to retrieve them.

55. All of the expenses and clean-up efforts to remove the tires, trash, plastic, and other stuff left behind by the Defendants were born by the Badgers.  *Id.* at 95:5-13.  This included having to get the white box truck towed, and having to fill in the large holes dug into the property and level the ground back out.  *Id.* at 95:14-25.  The only thing the Badgers did not have to

11

dispose of themselves was the sunken in RV trailer, since it was stolen and a repo company came to take it away. *Id.* at 98:4-12. The clean-up efforts took several weeks. *Id.* at 96:10-13.

56. The scarring and clearing of natural vegetation was still visible on the land when the Badgers eventually decided to sell the land. *See* Gov. Ex. 2 at 8: Tr. at 96:1-4.

57. The Badgers did learn that the body of the missing little boy was found on their property, but they did not find the body themselves. *Id.* at 96:5-9.

58. At the end of the whole ordeal of the Defendants on their property, the Badgers no longer had the same excitement and interest in the property that they had once dreamed of using to build a veteran's retreat. The fact that the little boy's body was found on the property "100 percent ruined it" for Tanya Badger. *Id.* at 96:14-23.

59. As a result, the Badgers never built their veteran's retreat or any thing else on their land, and ended up selling the property and moving to Texas. *Id.* at 97:1-5.

60. The Badgers were only able to sell the scarred property for about half of what they bought it for—approximately $4,500 after having purchased it for $8,500 or $9,000. *Id.* at 97:6-11.

61. Mr. Badger felt that the Defendants took advantage of his kindness in letting the Defendants stay on his land and trying to work out a land swap agreement for the benefit of the small children when the Defendants refused to leave his property. *Id.* at 97:18-22.

### d. <u>Conclusive Evidence About the Defendants' Wrongful Presence on Lot 28 at the Time of the Search Warrant</u>

62. At the time of the execution of the search warrant on August 3, 2018, the Defendants were occupying Lot 28, Unit 2, of the Costilla Meadows Subdivision, which was, for the entirety of the Defendants' occupation, owned outright by Jason and Tanya Badger. *Id.* at 76:12-20.

63. At the time of the execution of the search warrant on August 3, 2018, the land swap real

     estate contract between Lucas Morton and the Badgers had been terminated for almost two

     months.  *Id.* at 76:21-24.

64. At the time of the execution of the search warrant on August 3, 2018, Jason Badger had

     unequivocally withdrawn all permission or license for the Defendants to occupy his property.

     *Id.* at 82:1-5.  He did this by directly telling Lucas Morton through text messages to get off

     his land within one week; by filing an eviction lawsuit in Taos County Magistrate Court that

     was personally served on Lucas Morton; and by sending a NMSP officer to the property to

     tell Lucas Morton that he was not allowed to be on the Badgers' property.  *Id.* at 76:4-78:25.

65. At the time of the execution of the search warrant on August 3, 2018, there was no basis for

     any of the Defendants to believe they had any legitimate right to remain on the Badgers'

     land.  *Id.* at 79:23-80:3.

66. At the time of the execution of the search warrant on August 3, 2018, the Defendants knew

     that Jason Badger has revoked his permission for them to remain on Lot 28.  *Id.* at 82:6-14.

67. At the time of the execution of the search warrant on August 3, 2018, the Defendants were, in

     the eyes of the true property owner, wrongfully present on Lot 28 as illegal trespassers. Tr. at

     82:15-17; 92:14.

      **B.  Testimony of the Attorney Who Documented the Termination of the Real Estate**
      **Transaction to Swap Ownership of Lots 28 and 29, Mr. Christopher Stachura.**

68. Christopher Stachura, who has been practicing law for approximately 20 years, is currently

     employed as the attorney for the Town of Taos, but he previously had a private practice that

     focused on transactional real estate law in Taos, New Mexico.  Doc. 707, Tr. at 104:1-12.

69. In late 2017, he was contacted because Lucas Morton and the Badgers were seeking to swap their parcels of land. *Id*. at 104:25-105:4; 106:23-107:2. Rather than representing one of the parties, Mr. Stachura represented the transaction, and Mr. Morton agreed to pay his bill. *Id*. at 104:22-24; 117:15-23.

70. Mr. Stachura did some research with respect to the title for each of the lots and confirmed that the Badgers owned Lot 28. *Id*. at 107:21-23; 118:12-18; 122:17-20. He also learned that in 2016, Mr. Morton signed a real estate contract to eventually purchase Lot 29 from James Kohlmann. *Id*. at 108:5-9, 20-24; 109:1-9.

71. However, Mr. Stachura discovered there was an issue with the warranty deed for Lot 29 in that no warranty deed had been recorded to demonstrate that Mr. Morton had satisfied the real estate contract in full. *Id*. at 105:8-9; 109:23-24; 118:25-119:1. Because the warranty deed was not filed, there was no evidence in the county record that Mr. Morton owned Lot 29. *Id*. at 111:17-18.

72. Mr. Stachura worked to rectify the situation by drafting a new warranty deed, communicating with the title company, and sending a letter to Mr. Kohlmann, asking him to sign the new warranty deed so it could be recorded. *Id*. at 112:12-16; 113:5-25; 119:5-10; *see also* Exhibit H. Mr. Kohlmann signed the warranty deed and returned it to Mr. Stachura, who gave the original copy to Mr. Morton with instruction to file the deed in the county record. Doc. 707 at 114:1-2, 19-24. This occurred sometime after January 2018. *Id*. at 121:11-13.

73. Mr. Stachura understood that this was the second time Mr. Kohlmann provided Mr. Morton with a warranty deed for Lot 29. *Id*. at 120:13-16. The warranty deed needed to perfect his

ownership by filing a deed showing his ownership of Lot 29 in the recorder's office before Mr. Morton and the Badgers could complete their land swap. *Id*. at 121:14-122:2.

74. Mr. Stachura also drafted a Purchase Agreement to effectuate the land swap between the Badgers and Mr. Morton (once Lucas Morton filed his warranty deed) and Mr. Morton signed the Purchase Agreement. *Id*. at 106:23-107:10; *see also* Exhibit I. The Purchase Agreement explicitly stated, "Closing date shall be on or before June 3, 2018, at First New Mexico Title." Doc. 707 at 122:24-25; Exhibit I at 2. The Purchase Agreement was signed by Jason Badger on April 5, 2018, Tanya Badger on April 12, 2018, and Lucas Morton in April of 2018, although the specific date is not legible. Exhibit I at 3.

75. Under normal operation of law, the draft Purchase Agreement conveyed neither Mr. Morton nor the Badgers any rights to the others' lots while the contract was pending. Doc. 707 at 124:6-10. Moreover, the Purchase Agreement did not make any reference to a tenancy for either party, including the Defendants on Lot 28. *Id*. at 127:13-15; *see also* Exhibit I.

76. After Lucas Morton did not show up to the closing and the expiration date in the Purchase Agreement lapsed, Mr. Stachura drafted a Termination Agreement, which operated as a third-party verification of the fact that the Purchase Agreement between Mr. Morton and the Badgers was defunct, and he provided it to the title company. *Id*. at 115:22-24; 116:4-6, 14-16; 124:24-125:1, 5-9. The Termination Agreement was dated June 11, 2018. *Id*. at 125:10-20; *see also* Exhibit L at 8. Even if the Termination Agreement had not been drafted, the Purchase Agreement expired on its own terms when the closing did not happen by the deadline. Doc. 707 at 125:21-25; 127:19-21.

77. Moreover, on Friday, March 24, 2023, Mr. Stachura checked the public records and confirmed that Mr. Morton had never filed the warranty deed for Lot 29. *Id*. at 120:19-121:3; 122:3-7. Mr. Stachura could not find any evidence that the deed had been filed, *id*., and there was no evidence presented at the hearing to establish that Mr. Morton ever filed the warranty deed for Lot 29. *See* Doc. 707.

C. **Testimony of TCSO Officer Who Cited Defendant Lucas Morton for Trespassing on the Badgers' Land, Sergeant Jason Rael.**

78. Sergeant Jason Rael has served as a deputy sheriff in Taos County for approximately 17 years, including in 2017 and 2018. Doc. 707 at 129:13, 17-25.

79. In January 2018, an FBI agent in Georgia advised the TCSO that the Defendants had been in a motor vehicle accident while heading to camp in Amalia and that they possessed firearms and body armor. *Id*. at 136:13-137:2.

80. On May 14, 2018, one of the deputies assigned to Sergeant Rael's squad received a call from the FBI agent, who advised that there was a missing child, and the child and father were believed to be in Amalia, New Mexico. Doc. 707 at 130:3-8; Doc. 566 at 9 (¶ 33). The agent also advised that there was a felony arrest warrant for the father and that he was believed to be driving a white box truck. Doc. 707 at 130:3-8, 22-25.

81. Sergeant Rael and a deputy parked and surveyed the area with binoculars, and they saw what appeared to be a white box truck. *Id*. at 131:7-9; Doc. 566 at 9 (¶ 33). The area was a subdivision with some structures, but there were no structures close to where the box truck was parked. Doc. 707 at 132:5-8.

82. Also on May 14, 2018, Sergeant Rael recalled that Jason Badger called dispatch to report that he had information about the whereabouts of Siraj Wahhaj, Lucas Morton, and John Doe,

16

and Sergeant Rael subsequently spoke with Mr. Badger about the information.  *Id*. at 134:13-23; 135:9-20; 151:5-152:3.   Mr. Badger said that he knew from internet research that Mr. Wahhaj was wanted and that a child had been kidnapped from Georgia, and he said that Mr. Morton and Mr. Wahhaj were on his property.  *Id*. at 135:12-20; 139:24-140:1; 151:12-152:7.

83. Mr. Badger said he had gone to check on his property one day and found a family living there, and both he and his wife confirmed to Sergeant Rael that they saw Mr. Wahhaj and John Doe, as well as other children and adults.  *Id*. at 139:6-17; 152:8-10.  Mr. Badger explained that Mr. Morton owned the adjacent lot but mistakenly began building on the ten acres that belonged to the Badgers.  *Id*. at 139:6-17.  He also explained that he and Mr. Morton had agreed to swap lots and were supposed to meet at the title company to close the transaction on May 31, 2018.  *Id*. at 139:6-17; 153:20-24.

84. Mr. Badger also informed Sergeant Rael that the people on his land had been shooting on his property, and Sergeant Rael was aware of reports that Mr. Wahhaj was considered to be armed and dangerous.  *Id*. at 152:11-17.  Sergeant Rael was aware that the group of people on the Badgers' land were in possession of multiple firearms and body armor when they were in the motor vehicle accident.  *Id*. at 153:18-19.  Sergeant Rael was concerned that it could be dangerous for the Badgers to go to their property.  *Id*. at 152:18-21.

85. Fully believing the Badgers were the rightful owners of Lot 28, Sergeant Rael obtained Mr. Badger's written consent for the TCSO to search his property.  *Id*. at 152:22-153:4.

86. However, the TCSO ultimately decided not to rely solely on Mr. Badger's consent because it would have required that Mr. Badger be present when they searched the property, which

could have been dangerous, would have meant Mr. Badger could withdraw consent at any time, and because Sheriff Hogrefe made the executive decision to obtain a warrant. *Id*. at 140:2-15; 153:5-19.  Given the decision to seek a warrant, verifying ownership of the property was not necessary. *Id*. at 153:2-8, 25-154:1-14.

87. Sergeant Rael was aware that, in June of 2018, Mr. Badger filed paperwork in the magistrate court to have the Defendants evicted from his property. *Id*. at 145:23-146:7; 154:15-19, 25; 156:23-157:4; Exhibit 12.

88. The focus of the TCSO investigation was to find Mr. Wahhaj and JOHN DOE, and throughout the summer of 2018, the TCSO continued its investigation in order to gather sufficient evidence to obtain a search warrant. Doc. 707 at 150:13-19;157:10-15.  Sergeant Rael and other officers conducted surveillance for approximately a month to a month a half, up until the time a search warrant was executed in August of 2021. *Id*. at 133:25-134:5.

89. In July of 2018, Sergeant Rael asked Mr. Badger if he would be willing to wear a button camera and go to the property to gather more information, but Mr. Badger asked who was going to cover him, and this option was not pursued. *Id*. at 141:16-142:6; 157:13-20; 158:3-7; 159:14-16.  Sergeant Rael thought Mr. Badger's concerns were valid and agreed it was too dangerous. *Id*. at 158:3-7; 159:17-18.

90. During that same conversation in July, Mr. Badger communicated to Sergeant Rael that he was frustrated that the Defendants were still on his land, and he advised Sergeant Rael that he had contacted the NMSP for help. *Id*. at 158:8-23.  As the men spoke, Mr. Badger stated he was observing Mr. Morton, from a distance, and there were no signs that the Defendants were doing anything to get off of his property. *Id*. at 158:24-159:10.

18

91. Sergeant Rael testified that it was too dangerous for Mr. Badger to safely access his land until after the TCSO executed a search warrant. *Id*. at 159:22-25; 166:3-13.

92. Also in late July, the TCSO received information that the Defendants were running out of food and were asking other family members for assistance. *Id*. at 165:11-17; Doc. 566 at 13 (¶ 45).

93. On August 3, 2018, the TCSO executed a search warrant. Doc. 707 at 160:1-10. This was the first time Sergeant Rael made contact with the occupants of Lot 28. *Id*. at 133:16-24; 160:5-6. By the time the warrant was executed, more than two and a half months had elapsed since Mr. Badger first contacted the TCSO about the Defendants being on his land, and nearly two months had elapsed since Mr. Badger filed the eviction lawsuit. *Id*. at 159:11-16.

94. When the warrant was executed, Sergeant Rael noticed the condition of the land where the Defendants had been living; a large portion of the land had been completely cleared of all vegetation, and there was a gigantic pit with a large camping trailer inside. *Id*. at 160:20-161:7. Sergeant Rael estimated there were over a hundred tires, and there was a shooting range and tunnels. *Id*. at 161:10-19; 163:16-21. The land, which was not hooked up to utilities, was in disarray. *Id*. at 161:20-22.

95. Sergeant Rael is familiar with the New Mexico criminal trespass statute. *Id*. at 163:22-25. Based on his knowledge and experience, it is his opinion that the Defendants were trespassers once Mr. Badger revoked permission for them to be on the property. *Id*. at 164:1-6.

96. When the search warrant was executed and Mr. Morton was arrested, Sergeant Rael issued a trespassing citation to Mr. Morton. *Id*. at 147:12-24; 164:13-18. He waited until that time to issue the citation because that is when it was safe for him to approach Mr. Morton and issue the citation. *Id*. at 164:19-165:2. Sgt. Rael used a non-traffic citation form to charge Mr. Morton with criminal trespassing on Lot 28. *Id.* at 147:16-18.

97. Mr. Badger did not have access to his land until after the warrant was executed on August 3, 2018. *Id*. at 160:1-10. After the search warrant was executed, Mr. Badger bore the burden of cleaning up his property. *Id*. at 162:19-21. The TCSO only helped remove a trailer, and that was because the trailer had been reported stolen. *Id*. at 162:22-24.

### D. Testimony of TCSO Officer Who Sought the Search Warrant Executed on the Badgers' Land, Undersheriff Jerry Hogrefe.

98. Jerry Hogrefe is the appointed undersheriff of Taos County, although he served two terms as the elected sheriff from 2015 through December 31, 2022. Doc. 707 at 174:7-13.[1]

99. Although he learned in January 2018 of a pick-up order for JOHN DOE, it was not until May or June of 2018 that Sheriff Hogrefe first became aware that Siraj Wahhaj, a wanted fugitive, and John Doe were on Lot 28. *Id*. at 177:24-178:1, 7-19.

100. Sheriff Hogrefe and other officers spent the next few months taking investigative steps to confirm this information. *Id*. at 178:23-179:7. Sheriff Hogrefe looked at the property from a distance, and he testified the property looked like a junk yard with tires, debris, and earthen berms. *Id*. at 179:8-19. He testified the FBI was also conducting surveillance to try to

---

[1] Jerry Hogrefe is referred to as Sheriff Hogrefe in this filing because that was his title at the time of the facts in question.

identify Siraj Wahhaj and John Doe in order to obtain "current non-stale information that we could act on." *Id*. at 181:25-182:2, 12-16.

101.    Sheriff Hogrefe's experience in law enforcement had taught him that it is preferable to get a warrant before searching someone's property and that a search warrant is better than consent. *Id*. at 187:2-17.  For example, if he and his deputies were to conduct a search based on consent, they would have to ensure that the person giving consent is in the immediate presence of the officers during the search so that the person who gave consent would have the opportunity to withdraw the consent at any time. *Id*. at 187:18-24.

102.    He knew that if he relied on the consent previously provided by Mr. Badger to search the property, Mr. Badger would have to be present. *Id*.  Sheriff Hogrefe did not want Mr. Badger present during the search because of the potential danger to Mr. Badger and because Sheriff Hogrefe would potentially be liable. *Id*. at 188:1-5.

103.    On August 2, 2018, Sheriff Hogrefe sought and obtained a search warrant to search Lot 28 for Siraj Wahhaj, JOHN DOE, and "any person whose welfare may be comprised as supported in the affidavit below." Doc. 471-1 at 1; *see also* Doc. 707 at 177:18-23.

104.    When Sheriff Hogrefe sought the warrant for Lot 28, he knew that Jason Badger was the true owner of the property, that Mr. Morton may have owned the adjacent property, that Mr. Morton was believed to be residing on the property after mistakenly building on it, and that Mr. Badger provided consent to search the property. Doc. 471-1 at 1; Doc. 707 at 176:5-9; 189:9-10.

105.    Sheriff Hogrefe believed the land was still owned by Mr. Badger, and he was aware, at the time he sought the warrant, that there had been a pending land exchange and an eviction

lawsuit; one of his deputies had served civil process for the lawsuit on Mr. Morton.  Doc. 707

at 176:5-13; 180:15-24; 181:5-9; *see also* Exhibit 12 (Deputy Adam Fernandez served Mr.

Morton with the eviction lawsuit on June 18, 2018).  He was also aware that Mr. Badger had

approached the New Mexico State Police for assistance in removing Mr. Morton and the

others from his property.  Doc. 707 at 188:15-21; 189:11-16.

### E.   Testimony of Defendant Lucas Morton.

106.    Mr. Morton testified that he purchased Lot 29, Unit 2, of Costilla Meadows from Mr.

Kohlmann in April of 2016, but did not file the warranty deed at that time.  *Id*. at 192:4-14;

193:19-194:1.

107.    Mr. Morton did not file the warranty deed because he was not in New Mexico when the

deal was finalized.  *Id*. at 192:18-22; 194:3-5.  When he did return to New Mexico, it was

due to an emergency, and he could not file the warranty deed because he did not bring it with

him or have access to it.  *Id*. at 192:18-22.  The emergency that made him return to New

Mexico and not bring or file his property deed was unnamed, unknown mercenaries had been

sent to kill Siraj Wahhaj and his family.  *Id.* at 197:13-16.

108.    However, on April 28, 2016, Mr. Morton filed a signed and notarized Sole and Separate

Agreement and Conveyance with the Taos County Clerk, even though he was in Iowa and his

wife, Subhanah Wahhaj who also signed the document before a notary, was in Georgia at the

time they each signed the document.  *Id*. at 194:6-195:1-21; *see also* Exhibit 14.

109.    Mr. Morton moved to New Mexico in November or December of 2017.  Doc. 707 at

196:13-15.  He mistakenly moved onto Lot 28 instead of Lot 29, and he quickly learned of

his mistake from Mr. Badger.  *Id*. at 197:24-198:1, 15-17, 21.

110.    After Mr. Morton learned he was on the wrong lot, Mr. Stachura helped him obtain a

second warranty deed for Lot 29.  *Id*. at 199:10-21.  Despite living in New Mexico, and

despite knowing the warranty deed was necessary to complete the land swap agreement with

the Badgers, Mr. Morton did not file this warranty deed either.  Mr. Morton stated that he did

not know he had to file it.  *Id*. at 199:22-24.  This warranty deed was not presented or entered

into evidence or shown in court, and it has never been seen by anyone involved in this case

other than, apparently, Mr. Stachura.

111.    At no time did Mr. Morton state or suggest that he was a tenant of Mr. Badger, or that he

had every paid any rent to the Badgers for remaining on their property.  *Id*. at 192-208.

112.    Mr. Morton agreed that Mr. Badger sent him text messages telling him to leave, and he

acknowledged that he received the messages.  *Id*. at 200:12-17; *see also* Exhibit 15.  Mr.

Morton claimed that, despite receiving the text messages telling him to be off the land in one

week, he believed he and the Badgers had an agreement, and Mr. Morton was "trying to

work it out."  Doc.707 at 200:15-17.

113.    However, he acknowledged that the agreement was they would proceed to closing by

June 3, 2018, and he did not go to the closing but instead told Mr. Badger that he did not

have the money for the closing costs.  *Id*. at 200:18-22; 201:2-6, 13-25; 203:12-204:4;

Exhibit 15 at 1-4.

114.    Despite being advised on May 11, 2018, that the closing was scheduled for May 31,

2018, Mr. Morton waited 20 days (until the day of closing) to inform Mr. Badger that he did

not have the money and to suggest they not use a title company.  Doc. 707 at 203:12-204:4;

Exhibit 15 at 3-4.  Mr. Badger replied on May 31, 2018, that they needed to use the title

company and that "it's been long enough."  Doc. 707 at 204:5-15; Exhibit 15 at 5-6.

115.    Mr. Morton did not respond to Mr. Badger's text, and on June 7, 2018, four days after the

deadline in the Purchase Agreement had passed, Mr. Badger texted again to ask if Mr.

Morton had received the last three texts.  Doc. 707 at 204:24-205:9; Exhibit 15 at 7.  Mr.

Morton stated he had received the texts, but he would need more time to get the money.

Doc. 707 at 205:10-19; Exhibit 15 at 8.

116.    On June 8, 2018, Mr. Badger texted Mr. Morton, "You need to be off by end of next

week" and specified a deadline of June 15, 2018.  Doc. 707 at 205:20-25; Exhibit 15 at 9-10.

Mr. Morton did not respond.  Doc. 707 at 206:1-8; Exhibit 15 at 9-12.

117.    Three days later, on June 11, 2018, Mr. Badger again texted Mr. Morton and asked if Mr.

Morton had started moving his belongings off of the property.  Doc. 707 at 206:3-10; Exhibit

15 at 11.  Mr. Morton again did not respond, and neither he nor any of the other Defendants

began moving off of the Badgers' land.  Doc. 707 at 9-12; Exhibit 15 at 11.

118.    On June 18, 2018, Mr. Morton was served with the eviction lawsuit that specified the

Badgers were suing him to get off the land, but, despite seeing the exhibit that showed he

was served, he testified that he only recalled a sheriff's deputy coming to the land and did not

remember receiving any papers.  Doc. 707 at 207:7-16; 208:2-4; Exhibit 12.

### F.  Testimony of Special Agent Travis Taylor

119.    FBI Special Agent Travis Taylor has been the case agent since August 2018, and he was

assigned this case soon after the TCSO search warrant was executed.  Doc. 707 at 209:6-9.

At that time, there was still an ongoing investigation into the kidnapping of JOHN DOE, and

Special Agent Taylor learned during his investigation of actions taken by the Defendants on Lot 28 that supported the subsequent material support to terrorism charges. *Id*. at 217:3-7, 22-218:2.

120. JOHN DOE remained missing throughout the entirety of the Defendants' occupation of Lot 28, up through the service of the search warrant on August 3, 2018. *Id.* at 217:5-7. At the time of the service of the search warrant, all of the Defendants continued to conceal JOHN DOE by lying or claiming to have no recollection about JOHN DOE's presence on Lot 28, and had instructed the children to do the same. *See* Doc. 566 at 6. The Defendants also became extra security conscious and almost completely stopped going outside during the day once they learned that law enforcement was looking for them in New Mexico. Docs. 566 at 12; 566-8; 471-2.

121. As the case agent, Special Agent Taylor investigated property ownership records related to the land parcels at issue in this case, those being Lots 28 and 29 of Unit 2 in the Costilla Meadows subdivision. Tr. at 209:10-15. In doing so, he reviewed online maps and property records. *Id*. at 209:20-22; *see also* Exhibits 2-11.

122. Lot 28 is currently owned by David and Wendy Van Epps, who purchased the property from the Badgers in June of 2021. Doc. 707 at 211:7-12; Exhibit 4.

123. Special Agent Taylor reviewed an online map that depicts the various lots and is available on the Taos County Assessor's website, and he recognized the area on Lot 28 where the Defendants set up their trailer and tarp area. Doc. 707 at 209:23-210:4; Exhibit 2. The area has brown scarring where the vegetation was removed, which Special Agent Taylor

recognized as the area where the Defendants had occupied Lot 28.  Doc. 707 at 212:8-13;

Exhibit 2 at 8.

124.    With regard to Lot 29, Special Agent Taylor found a quitclaim deed, which was filed in

2002, for Alice Hartigan and James Kohlmann, but he never saw a warranty deed conveying

Lot 29 to Mr. Morton in the Taos County records.  Doc. 707 at 212:13-213:9; *see also*

Exhibit 3.  Special Agent Taylor specifically asked the county assessor's office about the

matter and was advised there may have been a real estate contract that required Mr. Morton

to pay off the land before the warranty deed would be released.  Doc. 707 at 215:6-18.

125.    Special Agent Taylor has never, throughout the investigation of this case, discovered any

documentation of a tenancy between Mr. Morton and the Badgers.  Doc. 707 at 220:18-20,

25-221:1.  He has also not found any documents showing Mr. Morton paid rent to the

Badgers or any documents showing how long Mr. Morton was allowed to be on the property.

*Id*. at 221:2-6.

126.    Indeed, at the hearing, the Defense did not present any evidence that Mr. Morton or any

of the other Defendants paid rent or entered into, either knowingly or accidentally, a

landlord-tenant relationship with the Badgers.  *See* Doc. 707.

## II. SUPPLEMENTAL CONCLUSIONS OF LAW

The United States incorporates here its proposed conclusions of law provided to the

Court on March 21, 2023.  *See* Doc 688.  Specifically, the United States reiterates that, under all

of the applicable case law cited in Doc. 688, the Defendants could not have had a reasonable

expectation of privacy on Lot 28, Unit 2, of the Costilla Meadows Subdivision on August 3,

2018, because the Defendants were knowingly and wrongfully trespassing and squatting on

Jason Badger's land.  As the relevant case law makes clear, the basic question of standing requires reasonableness in the eyes of society.  Persons with no property rights who are wrongfully present at a location searched, as well as persons who were present at a location for the purpose of furthering criminal activity or because of the criminal activity being committed, both of which are true for the Defendants here, do not have an expectation of privacy society is prepared to recognize as reasonable.

As articulated in Doc. 688, the question before the Court is whether society is prepared to accept as reasonable an expectation of privacy by persons who wrongfully and knowingly remain on and occupy another person's land after being told to leave and otherwise knowing they had no permission from the property owner to be on the land.  At the very core, the only operative facts for making this legal determination are (1) whose property were the Defendants on when the TCSO served the search warrant on August 3, 2018; (2) did the Defendants know that they were occupying another person's property; and (3) did the Defendants have the permission or license to remain on the property from the true owner of that property at the time of the search warrant.

The answer to each of these core questions demonstrates clearly that the Defendants could not have had a legitimate expectation of privacy that society is prepared to recognize as reasonable.  All of the additional facts and testimony from the March 28, 2023, hearing support the same conclusion as first articulated in the Government's response to the Defendants' motion to suppress the search warrant evidence.  The Defendants' arguments have shifted over the course of the litigation in an attempt to find some sticking point that would give them a reasonable expectation of privacy at the time of the search warrant on Lot 28, but all of their

27

arguments continue to be red herrings and dead ends, as they cannot and do not change the answers to the core questions on this issue.  Accordingly, the Defendants have failed to meet their burden to establish standing under the Fourth Amendment to challenge the search warrant executed on August 3, 2018.

### A. By the Letter of the Law, the Defendants were Trespassers on the Badgers' Property at the Time of the Search Warrant Execution.

As articulated in the United States' initial proposed conclusions of law, there is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987).  One well-established approach to determine objective reasonableness in the eyes of society is to apply positive law, such as property and contract law.  *See Rakas*, 439 U.S. at 143 n.12, 148 ("Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."); *United States v. Johnson*, 584 F.3d 995 at 999, 1004 (10th Cir. 2008) (applying property and contract law principles, such as trespass and the right to exclude, to find fraudulent possession of storage unit did not create an expectation of privacy society is prepared to accept as reasonable); *United States v. Pitshou Yunga Kafuku*, 357 F. Supp. 3d 1164, 1179–81 (D. Utah 2018) (same, but for unauthorized occupation of an apartment under another's name).

Similar to using fraud to take or obtain possession of property, trespassing is a crime that violates the real property owner's rights to enjoyment of the property and exclusion of others from it.  In New Mexico, criminal trespass is defined as either "knowingly entering or remaining upon posted private property without possessing written permission from the owner or person in

control of the land," or "knowingly entering or remaining upon the unposted lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof."  N.M. Stat. Ann. § 30-14-1(A)-(B).

Both Jason Badger—the undisputed property owner for Lot 28—and TCSO Sergeant Jason Rael made clear in their testimony that the Defendants were trespassers on August 3, 2018. Through both the subjective eyes of the owner (a relevant consideration since the question turns on the owner's consent to the occupation of his property) and the objective eyes of the law, the Defendants cannot, and have not, overcome the clear conclusion that they were trespassing on Lot 28 when the search warrant was served on August 3, 2018.  Jason Badger stated that he was "sure" he must have asked TCSO to charge Lucas Morton with trespassing on his land, as he "basically asked them numerous times over, I don't know how long, to get them off my land." Tr. at 74:14-75:1.  Mr. Badger directly told Lucas Morton in June 2018 that his consent for the Defendants to remain on his private property was withdrawn, and he considered the Defendants to be trespassers at the time they were arrested.  Tr. at 82:1-17; Gov. Ex. 15.  *See also* Tr. at 92:14-15 ("They were illegal trespassers on my land, and what I thought was the right thing to do would be an eviction process.").

Similarly, TCSO Sgt Rael, who has plenty of experience enforcing New Mexico's trespass law, succinctly and accurately described in his testimony why the Defendants were violating that law, stating the Defendants became trespassers under the New Mexico criminal trespass law "when the property owner revoked permission for them to be there."  Tr. at 164:5-6. This revocation was done for Lucas Morton on June 8, 2018, at 12:07pm, nearly two full months before the execution of the search warrant.  Gov. Ex. 15; Tr. at 82:1-17; 91:15-20; *see also id.* at

29

200:12-16 (Lucas Morton acknowledging he received and understood Jason Badger's text messages telling him to leave the property).

"Because a person can have no reasonable expectation of privacy in premises on which they are wrongfully present, the Tenth Circuit has consistently held that one's status as a trespasser or squatter excludes that person from the protection of the Fourth Amendment." *United States v. Gutierrez-Casada*, 553 F. Supp. 2d 1259, 1269 (D. Kan. 2008).  Thus, under the positive law or "the property theory [of the Fourth Amendment], trespassers do not have the lawful property right they need to trigger Fourth Amendment protection."  *Carmen Auto Sales III, Inc. v. City of Detroit*, 2018 U.S. Dist. LEXIS 42298 at *14 (E.D. Mich. Mar. 15, 2018).  *See also United States v. Stuckman*, 603 F.3d 731, 747 (9th Cir. 2010) (a trespasser in another's backyard "would not be able to claim the protections of the Fourth Amendment"); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (stating a "mere trespasser has no Fourth Amendment protection in premises occupied wrongfully").

The Defendants elicited testimony during the March hearing implying, and will no doubt try to argue, that because the criminal trespass citation issued to Lucas Morton was eventually dismissed in the local court for lack of prosecution, Morton and the other Defendants were actually innocent of trespassing, which in turn means they had a legitimate right to be occupying Lot 28 on August 3, 2018.  This argument fails on every level.  First, like the Badgers' eviction suit, the criminal trespass violation was not dismissed because Lucas Morton was not guilty of trespassing, it was dismissed on procedural grounds when the local prosecutor did not appear in court to prosecute the case, likely due to procedural defects in the manner of charging Mr. Morton with a misdemeanor criminal offense through a traffic citation form.  *See* Defense Ex. M.

30

Second, as provided in more detail in Subsection C below, there is no authority for the proposition underlying many of the Defense's arguments that a final judicial determination, or final conviction for an offense, is required for a court to separately determine someone's legal status for Fourth Amendment standing purposes.  Obviously, a burglar's lack of Fourth Amendment standing in the house he is burglarizing is something a court can determine, regardless of whether he has already been or eventually is convicted of the crime of burglary. *See Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978).

Regardless of whether Mr. Morton was or was not charged or finally prosecuted for criminal trespass in state court, the fact remains that on August 3, 2018, the Defendants met every element of the New Mexico criminal trespass statute.  *See* N.M. Stat. Ann. 30-14-1(B) ("Criminal trespass also consists of ***knowingly*** entering or ***remaining*** upon the unposted lands of another ***knowing that such consent*** to enter or ***remain*** is denied or ***withdrawn by the owner*** or occupant thereof.") (emphasis added).  Indeed, by June 15, 2018, let alone by the time the search warrant was executed on August 3, 2018, nothing about the Defendants' expectation of privacy on that land remained anything society would be prepared to accept as reasonable, and the Defendants do not have Fourth Amendment standing to contest the search warrant.

**B. As Squatters Who Knew Their Permission to Remain on the Land Had Been Unequivocally Revoked, Lucas Morton and the Other Defendants Were Trespassers, Not Tenants of the Badgers, and the Uniform Owner-Resident Relations Act (UORRA) Is Both Expressly and Implicitly Inapplicable**

The Defendants' initial motion to suppress evidence obtained from the TCSO search warrant executed on August 3, 2018, omitted any mention of their standing to challenge the warrant.  Since being forced to confront the fact that they were wrongfully occupying the property where the search was completed, the Defendants have wriggled from dead-end

argument to dead-end argument.  The Defendants have argued that they had a reasonable expectation of privacy on Lot 28, despite their wrongful occupation of that property, because they had built a "home," which gave them special consideration; because they had made "improvements" to Lot 28, despite have no ownership of the property or right to do so; because they had made a mistake in first occupying the wrong lot, despite clear boundary stakes showing the lot number and the true owner correcting their mistake shortly after their arrival[2]; and because they had pending agreement to swap land ownership with the true owner, despite not perfecting their own ownership title to Lot 29 and despite that agreement being unequivocally terminated and them being ordered to vacate the property by the true owner months before the search warrant was executed.  The United States has largely addressed these arguments in its prior briefings, especially the "home" and "improvements" arguments.  *See* Docs. 688, 566.

Now, the Defendants appear to be pursuing still more, differing arguments in grasping at establishing a reasonable expectation of privacy on Lot 28 on August 3, 2018.  One is that the

---

[2] Any argument based on evidence that the Defendants had occupied the Badgers' land by mistake, perhaps because the Defendants failed to take care in studying their property boundary maps that would have come with the land purchase Lucas Morton claims to have completed, or failed to observe the clearly visible property boundary markers on the lots when they arrived in 2017, is ultimately a red-herring and irrelevant.  The Defendants' trespass on Lot 28 almost certainly was a mistake initially.  But this is no matter.  The true owner, Jason Badger, corrected this mistake shortly after the Defendants arrived and immediately upon his discovery of them. He personally showed Siraj Wahhaj and Lucas Morton the property map, description, and deed for his ownership of Lot 28 (Tr. 42:2-13), and took one of the teenage boys with the Defendants to show him the property boundary markers clearly marking where Lot 29 and Lot 28 were (Tr. at 42:14-43:3).  Yet the Defendants never left the property, despite several demands and efforts by the Badgers to get them off their property beginning in early June 2018.  Whether the initial occupation was a mistake or whether the property boundaries were hard for the Defendants to understand when they arrived in New Mexico are irrelevant to society's acceptance as reasonable their claimed expectation of privacy eight months later on August 3, 2018—two months after being told several times and in several ways that their permission to remain was withdrawn.

Defendants were actually constructive tenants of some kind under the New Mexico Uniform Owner-Resident Relations Act (UORRA), which somehow endowed them with a legitimate property interest in Lot 28 even in August 2018, because of a failed land swap contract that was terminated in June 2018 around the same time the Badgers ordered the Defendants off the property and served Lucas Morton with an eviction lawsuit.  Yet another argument is that the Badgers did not perfectly follow the UORRA process for landlord/tenant disputes in seeking judicial aid in forcing the Defendants from their property after the Defendants refused to leave upon demand of the property owners—a procedural defect the Defendants claim again somehow not only defeated the Badgers' efforts, but actually endowed the wrongfully present Defendants with an undefined property right.  Still another argument appears to be that, since the Badgers' eviction lawsuit was dismissed for being filed in the wrong court, this somehow transforms society's objective view of the Defendants' continued occupation of the Badgers' property against the Badgers' will to be reasonable.  As articulated below, these arguments are similarly all dead ends and red herrings, as they are supported by neither the facts nor the law.

1. Because There is No Evidence of a Landlord/Tenant Relationship, by Its Own Terms UORRA Is Inapplicable in This Case Where Neither Party Envisioned or Intended a Lease or a Landlord-Tenant Relationship

Perhaps seizing on the fact that the eviction lawsuit filed by the Badgers in one of their several attempts to get the Defendants off their property was titled "Petition By Owner For Restitution (Uniform Owner-Resident Relations Act), the Defendants claim that the unexecuted land swap arrangement between Lucas Morton and Jason and Tanya Badger was actually a lease that brought the two parties into a landlord-tenancy agreement covered by the UORRA.  This argument fails from every angle.  As an initial matter, Jason Badger testified that he filed this

particular petition himself, he just assumed that was what he was supposed to do to get the Defendants off his land, and he did so without knowing whether the particular form he used was the correct legal document to use to accomplish his goal of removing the Defendants from his property.  Tr. at 92:1-15.

The fact that Mr. Badger happened to come across and use an eviction form meant for the landlord/tenant eviction process for a dwelling unit rental agreement covered by the UORRA does not somehow transform the Defendants' trespassing into a UORRA-covered lease agreement between the two parties.  This is especially the case where Mr. Badger made very clear that the Defendants were not his tenants, he was not their landlord, and they did not have a lease in place at any point in time, let alone in August 2018.  Tr. at 79:14-80:3. [3]  In fact, although Mr. Badger did not remember why he used that particular form for his eviction lawsuit, Mr. Badger did remember that he did not view the Defendants as tenants of his, but rather he viewed them as "illegal trespassers on my land."  *Id.* at 92:14.

---

[3] Because there was no lease, oral, parol, or otherwise, between the Badgers and Mr. Morton, the most that the unexecuted real estate contract concerning the sale of Lot 28 in exchange for Lot 29 could have created between the parties was a "license" for the Defendants to temporarily remain on Lot 28 or a tenancy at sufferance or at will.  A license would give the Defendants no right whatsoever to remain on Lot 28 once Mr. Badger revoked his consent for them to be there. *See Quantum Corp. v. State Taxation & Revenue Dept.*, 956 P.2d 848, 851 (N.M. Ct. App. 1998) (noting a "license" to use property is not defined in New Mexico statutes, but holding a "license does not create an interest in land; it is similar to a tenancy at will"); *N.M. Sheriffs & Police Ass'n. v. Bureau of Revenue*, 514 P.2d 616, 617 (N.M. Ct. App. 1973) (defining "license" as a "permission, by a competent authority to do some act which without such authorization would be illegal, or would be a trespass or a tort") (quotations and citations omitted).  The revocation of the Defendants' license happened long before the search of Lot 28 on August 3, 2018, at which time the Defendants had clearly reverted to being criminal trespassers. *See, e.g.*, *Chavez v. Torlina*, 99 P.690, 694 (N.M. 1909) (holding adjacent property owner encroaching on neighbor's land adversely "was not a licensee or tenant at will, or at sufferance, but a trespasser, without right of notice to quit by the real owner"); *Hunyady*, 284 F. Supp. 2d at 759 ("there is no middle ground between a rightful and a wrongful occupancy").

Further, the UORRA does not create or provide any property rights.  Rather, the act simply provides for procedural rules and requirements and remedies to be applied in civil disputes between landlords and tenants.  By its own terms, the purpose of the Act is "to simplify, clarify, modernize and revise the law governing the rental of dwelling units and the rights and obligations of owner and resident, and to encourage the owners and the residents to maintain and improve the quality of housing in New Mexico."  N.M. Stat. Ann. § 47-8-2 (entitled "Purpose").

As described in more detail in Subsection C below, the law is clear that civil eviction processes are separate legal operations that do not define or control this Court's analysis of standing to challenge a search under the Fourth Amendment.  Rather, wrongful occupation for standing purposes begins at the "moment after" the right to remain terminates, and not after a final judicial adjudication of some civil suit or citation, as "there is no middle ground between a rightful and a wrongful occupancy."  *United States v. Hunyady*, 284 F. Supp. 2d 755, 759 (E.D. Mich. 2003) (quotations omitted).  Here, the moment the right to remain was terminated was on June 8, 2018, when Jason Badger, the undisputed property owner, revoked his license for the Defendants' occupation of his land and told Lucas Morton that the Defendants needed to be off his property by June 15.  Ex. 15; Tr. at 91:15-20.  Perhaps the Defendants' right to remain extended to June 15, but certainly no longer, and certainly not through all of the other efforts to remove the Defendants from Lot 28 by the Badgers prior to the search on August 3, 2018.

Finally, even if the UORRA did create, on its own, some sort of property right that would endow an actual tenant with a reasonable expectation of privacy while knowingly occupying an owner's property without that owner's permission, there is no evidence of any sort of rental lease in this case that would make the UORRA applicable.  The Defendants never paid the Badgers

35

anything, let alone monthly rent—payment which the UORRA requires when there is no rental agreement.  *See* N.M. Stat. Ann. § 47-8-15; Tr. at 89:25-90:1.  The Defendants never asked the Badgers for any term of permission to stay on the land, never asked for a certain amount of time to get their stuff off the Badgers' land, never made a statement about an oral lease being created, and the parties never considered their relationship as one of landlord/tenant character.  Tr. at 79:1-22.  Simply put, on August 3, 2018, for the Defendants to call themselves tenants at all, let alone tenants covered by procedural protections of UORRA, is to drown the reality of the situation in a cascade post-hoc imagination and wishful thinking.  In truth, the Defendants were not tenants, the Badgers were not landlords, and the Defendants had no legitimate right to remain on Lot 28 at the time of the search warrant.

2. <u>Even During the Time the Defendants Occupied the Badgers' Land With the Badgers' Permission (Which Was Revoked Two Months Before the Search Warrant), the Defendants Were Doing So As Licensed Occupants Pending A Contract of Sale, Which UORRA Expressly Exempts from Its Requirements</u>

The Defendants point to the failed real estate purchase agreement between Lucas Morton and the Badgers as the proof that the Defendants were actually tenants under the UORRA (a tenancy that somehow managed to maintain a right of occupation for two months between the agreement's termination and the search warrant execution).  However, not only does the UORRA fail to endow the Defendants with any legitimate property rights on Lot 28, and therefore cannot create an objectively reasonable expectation of privacy there, but the Act itself specifically exempts the very agreement the Defendants claim provided them with a legitimate right to occupy Lot 28 on August 3, 2018 through the UORRA.

Within the subsection of the UORRA entitled "Exemptions," section 47-8-9 provides that "the following arrangements are exempted" from UORRA's provisions: "occupancy under a

contract of sale of a dwelling unit or the property of which it is part, if the occupant is the purchaser or a person who succeeds to his interest." This was exactly the type of agreement that the Badgers and Lucas Morton had in place through its termination in early June 2018. Jason Badger testified that occupancy *pending the contract of sale* by the "purchaser," Lucas Morton (who agreed to pay all of the court costs and title fees as part of the arrangement), was indeed the intent of his permission for the Defendants to remain on Lot 28 for the time that the land swap agreement was pending. Tr. 90:9-11. Thus, even if the UORRA could give the Defendants some claim to a property interest and reasonable expectation of privacy on Lot 28, the land swap agreement the Defendants rely on to trigger UORRA is expressly exempted from UORRA. Accordingly, any claimed deviations from UORRA requirements in an eviction process are irrelevant, and this is yet another dead end for the Defendants' claim of standing to challenge the search warrant.

3. <u>Even if the UORRA Applied to the Defendants' Wrongful, Unwanted Occupation of the Badgers' Land After Their Permission to Remain Was Revoked, the UORRA Would Have Required the Defendants to Deliver Possession to the Badgers Immediately</u>

Finally, even if the Defendants' occupation pursuant to a pending contract of sale was not exempted from UORRA, and even if UORRA covered the Defendants' occupancy as tenants after the contract of sale was terminated, and even if UORRA could have given the Defendants a legitimate property interest in Lot 28 two months after Jason Badger revoked his permission for the Defendants to be there, the most that any "tenancy" interest could have been was as a tenant at sufferance or a holdover tenant.[4]

---

[4] As noted above, the Defendants' permittance to remain on Lot 28 during the land swap contract's pendency is most accurately described as a "license" from the Badgers—which New

But, as a matter law, a tenant at sufferance is, by definition, a wrongful occupant that merely has not yet been removed from the property.  As such, a tenant at sufferance cannot have a reasonable expectation of privacy, regardless of whether Jason Badger was supposed to provide some specific number of days' notice or follow some other process under the UORRA.  *United States v. Ross*, 43 Fed. App'x. 751, 757–58 (6th Cir. 2002) ("Even if [landlord] was obligated under Kentucky law to institute formal eviction proceedings before he, as the landlord, could regain full possession of the apartment, that does not change the fact that [holdover tenant defendant] had no reasonable expectation of privacy in an apartment to which he had no legal claim."); *see also Hunyady*, 284 F. Supp. 2d at 759 (ruling that defendant living in late father's vacant home may have been considered a "tenant at sufferance" under state law, but therefore by definition was wrongfully occupying property and had no reasonable expectation of privacy). Any and all of the Defendants' arguments about whether or not Jason Badger followed some procedural aspect of UORRA are inapposite, because the Defendants' wrongful presence on Lot 28 is legally unchanged regardless of what procedural defects under UORRA the Defendants can think up.

Moreover, even under UORRA's own terms, a tenant who wrongfully holds over occupation once the landlord gives notice to terminate the occupancy (such as through failure to pay rent required by a lease agreement or by UORRA's gap-filling terms), the tenant "shall immediately deliver possession" of the property.  Of course, the Defendants did not immediately

---

Mexico law makes clear is not a property right.  This construct is consistent with UORRA's explicit exemption of occupancy pending a contract of sale, as those situations would also likely constitute licenses for the occupiers to be there unless and until the contract either closes successfully or is terminated and the license to remain is revoked by the owners.

deliver possession of the property to the Badgers.  Indeed, they "never even started to move their stuff off" Lot 28, despite notice by Jason Badger that they had to leave, Jason Badger's service of an eviction lawsuit to get them to leave, and Jason Badger's sending of a NMSP officer to try to get them to leave.  Tr. at 79:1-13; 158:24-159:13.

Yet again, the Defendants' attempt to invoke the UORRA fails on its own terms, even if the UORRA somehow applied here.  Yet again, the Defendants do not meet their burden to show a reasonable expectation of privacy on Lot 28.

### C. A Successful or Completed Judicial Order of Eviction, or Any Other Court Adjudication, Is Not Required for the Court to Determine that the Defendants Lack Standing by Their Continued Wrongful Occupation of the Badgers' Property Months After Being Ordered to Leave by the Owners

The Defendants have solicited evidence and argued that, because Jason Badger's self-started eviction lawsuit was filed in the wrong court (state magistrate court as opposed to district court) and was therefore unadjudicated at the time of the search warrant, the Defendants' occupation of Mr. Badger's property was somehow legitimized.  They have made similar efforts regarding the ultimately dismissed trespass citation given to Lucas Morton.  This is essentially an extension of the Defendants' other defective argument that the Defendants had transformed into UORRA-covered tenants while the land swap agreement with Mr. Badger was pending.

This argument goes even further in its legally unsupported claims, however, by asserting that once the Defendants gained their purported "tenant" status through the failed land swap contract, they then maintained legitimate, unshakeable legal rights to occupy Lot 28 beyond revocation of permission to be there by the owners—apparently into the infinite future—unless and until the Badgers succeeded in a court-ordered eviction or the Defendants were convicted and sentenced for trespass.  Thus, according to the Defense, only upon the adjudication by a

local court finding that the unwritten, undefined, non-existent "lease" was breached by the Defendants, to be followed by the issuance of an eviction order from that court, could the Defendants be said to no longer have a reasonable expectation of privacy on the Badgers' land.

Notably, the Defense offers no authority to support such an argument, which is no surprise because there seems to be none.  As even Sgt. Jason Rael understood and explained during his testimony, the civil dispute and adjudication process between the Badgers and Lucas Morton is an entirely separate and distinct issue with separate laws and remedies from whether the Defendants were rightfully occupying the Badgers' property.  Tr. at 163:22-164:12.  Whether that civil relief process is completed or not does not define whether the Defendants had a reasonable expectation of privacy on the Badgers' property on August 3, 2018.

This legal principle is made clear in *Amezquita*, where that court called the idea that persons in the Defendants' positions had a reasonable expectation of privacy on land they did not own and on which they knew they did not have permission to remain "ludicrous."  *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11–12 (1st Cir. 1986) (noting, but not considering, separate causes of action for the destruction of squatters' self-constructed homes, and describing the claim to a reasonable expectation of privacy by the squatters—who had been "asked twice" by the landowner to depart voluntarily, as "ludicrous").  *See also Zimmerman v. Bishop Estate*, 25 F.3d 784, 786–87 (9th Cir. 1994) (holding no reasonable expectation of privacy for guest of squatters based on repeated demands by owner to squatters to leave, despite "dropped" criminal trespass proceedings and apparently uncompleted "ejectment" suit); *Hunyady*, 284 F. Supp. 2d at 759 (explaining that defendant living in late father's vacant home served with a notice to quit by estate representative landlord may have been considered a "tenant at sufferance" under state law

due to the served notice, but therefore by definition was wrongfully occupying property and had no reasonable expectation of privacy).

Indeed, courts have long deemed as unreasonable arguments that a person who has stolen a car, or burglarized a home, has a reasonable expectation of privacy in the car or home simply because the person has not yet been convicted and sentenced for the car theft or burglary.  A separate judicial determination of wrongful presence may be sufficient, but it is certainly not necessary, to indicate an absence of an objectively reasonable expectation of privacy in a place. *See Rakas*, 439 U.S. at 143 n.12 (explaining a "burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate,'" without reference to any requirement for a conviction or civil lawsuit ruling for the court to determine the burglar's status); *United States v. Arango*, 912 F.2d 441, 446 (10th Cir. 1990) (holding driver of pickup truck registered to someone else, who could not demonstrate permission from the owner to be driving the truck, had no Fourth Amendment standing to challenge a search of the vehicle, without need for the court to resort to a separate judicial determination of ownership or stolen status of the car); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (same); *Amezquita*, 518 F.2d at 11–12 (finding fact that squatters had been "told to leave" to be sufficient to eviscerate any reasonable expectation of privacy, while noting as "further proof" the outcome of local civil eviction suits finding wrongful occupation for some of the squatters); *Zimmerman*, 25 F.3d at 786–87 (holding no reasonable expectation of privacy for guest of squatters based on repeated demands by owner to squatters to leave, despite "dropped" criminal trespass proceedings).

Society's interests, and therefore what society would deem reasonable, lie with this country's treasured legal protections for, and recognition of, private property ownership. "To conclude otherwise would encourage the wrongful possession of property," which society is self-evidently not prepared to recognize as reasonable. *Hunyady*, 284 F. Supp. 2d at 759. This is why even in cases of real landlords and tenants, with real leases in place, setting forth real rental periods and real payments of rent (none of which are present here), the New Mexico law cited by the Defendants (UORRA) would have *still* required them to deliver possession of Lot 28 to the Badgers once their "tenancy" was ended by the failure of the land swap contract's closing, the termination agreement (attached to the eviction lawsuit served on Mr. Morton), Mr. Badger's several text message notices to Lucas Morton to quit the property, and the filing of the eviction lawsuit. *See* N.M. Stat. Ann. § 47-8-33(D); *see also Ross*, 43 Fed. App'x. at 757–58 ("Even if [landlord] was obligated under Kentucky law to institute formal eviction proceedings before he, as the landlord, could regain full possession of the apartment, that does not change the fact that [holdover tenant defendant] had no reasonable expectation of privacy in an apartment to which he had no legal claim.").

The Defendants' argument that a final, UORRA-compliant eviction order had to be issued by a judge before the Defendants' occupancy of Lot 28 could be deemed wrongful is contrary to the slew of standing cases finding no reasonable expectation of privacy in instances where no judicial ruling of trespass, eviction, or any other wrongful presence status, such as hotel occupants after being told to leave. *See, e.g., United States v. Carr*, 939 F.2d 1442, 1445–46 (10th Cir. 1991) (holding occupant of hotel room, registered to someone else, who paid no rent and had no permission from registrant had no reasonable expectation of privacy, without judicial

ruling of trespass or eviction); *United States v. Croft*, 429 F.2d 884, 887 (10th Cir. 1970)

(holding no standing to challenge search of hotel room after rental period has elapsed, after

which "a guest has completely lost his right to use the room" and with it any expectation of

privacy); *United States v. Rambo*, 789 F.2d 1289, 1295–96 (8th Cir. 1986) (holding no standing

to challenge police entry into defendant's hotel room because hotel manager had "asked"

defendant to leave, which "terminated" the rental period and extinguished the defendant's

reasonable expectation of privacy in the room); *United States v. Gale*, 136 F.3d 192, 195 (D.C.

Cir. 1998) (ruling occupier of apartment without permission of its true tenant or owner had no

reasonable expectation of privacy, with no mention of need for court eviction order); *Pitshou

Yunga Kafuku*, 357 F. Supp. 3d at 1179–81 (same); *Hunyady*, 284 F. Supp. 2d at 759 (ruling

squatter who had been given notice to quit late father's house, even if deemed a "tenant" per the

notice to quit, would be a tenant at sufferance and therefore wrongful in occupation of the house,

without need to resort to civil court on notice to quit or any other judicial process).

There is no authority to suggest the reasoning in all of these cases is faulty; to the

contrary, these opinions constitute the law, and the law quite clearly does not require final civil

or criminal adjudications of a person's status in order to determine standing under the Fourth

Amendment.  Far from successful civil suits being required, mere "requests" to leave a hotel by a

hotel manager, a "ban" or "forbidding" persons from property by landlords, or a mere

unadjudicated notice to quit the property are all sufficient.  *See United States v. Gutierrez-

Casada*, 553 F. Supp. 2d 1259, 1270–72 (D. Kan. 2008) (citing cases).

Directly contrary to the Defendants' novel claim that a UORRA-compliant eviction was

the only way the Badgers could ever get their land back from the trespassing Defendants, courts

have made clear that even where the local landlord/tenant civil statutes were not complied with, wrongful occupants have no Fourth Amendment standing. *Hunyady*, 284 F. Supp. 2d at 759 (finding wrongful possession and no standing even where police entry was one day after service of notice to quit, despite non-conformance with state landlord/tenant law allowing seven days to vacate after a notice to quit). *See also id.* (explaining because "a tenant at sufferance[] wrongfully possesse[s] the premises, his expectation of privacy [is] illegitimate" regardless of landlord/tenant procedural requirements).

Even a mere failure to pay rent on a holdover lease of an apartment, despite no communication of any kind to leave by the landlord, suffices to extinguish an expectation of privacy that society is prepared to find as reasonable. *Ross*, 43 Fed. App'x. at 757–58 ("Even if [landlord] was obligated under Kentucky law to institute formal eviction proceedings before he, as the landlord, could regain full possession of the apartment, that does not change the fact that [holdover tenant defendant] had no reasonable expectation of privacy in an apartment to which he had no legal claim.").

As a matter of logic, if a person living in a hotel room loses a reasonable expectation of privacy merely upon the expiration of the rental period, as do persons living in an apartment or squatting in an unoccupied house without knowledge of the true owner, occupants whose permission to remain is revoked by their late father/homeowner's estate, and formerly legitimate tenants who have merely stopped paying rent, irrespective of an eventual eviction order that could have obtained for the owner to regain the property, then persons like the Defendants, who know they are on another person's property and are *actually told* to leave in many different ways by the owner and refuse to do so, similarly do not have a reasonable expectation of privacy. This

is true also irrespective of an eventual civil eviction order that could have been obtained as a way for the Badgers to get possession of their property back. The Defendants asserted to some who would listen that it was their "beliefs," not some law, that allowed them to remain on whatever property they chose. Tr. at 80:4-10. Like any objectively rational member of society, Mr. Badger did not at all agree with that approach or interpretation of the rightfulness of the Defendants' presence on his property. *Id.* at 80:11-13. This is the sort of claim to a reasonable expectation of privacy that the court in *Amezquita* characterized as "ludicrous." 518 F.2d at 11.

Thus, for standing purposes, the facts are clear: the Defendants were trespassers, knowingly squatting on the Badgers' land despite being told to leave on multiple occasions by August 3, 2018. This is the case regardless of whether they had been convicted of trespassing, regardless of whether the Badgers' eviction lawsuit was filed in the right court, regardless of whether the Badgers had given the Defendants whatever days' notice to vacate under the inapplicable UORRA statute, and regardless of whether the misfiled civil eviction lawsuit had or had not been finally adjudicated in a state court. The law is clear that, in the situation here, the Defendants had no reasonable expectation of privacy at Lot 28 on August 3, 2018.

**D.  In Addition to Being Trespassers, the Defendants' Presence on the Badgers' Property Was Also Wrongful Because the Purpose of Remaining There Was to Facilitate the Commission of Criminal Offenses and to Avoid Being Discovered**

In this case, not only were the Defendants trespassing on Lot 28, Unit 2, in the Costilla Meadows Subdivision on August 3, 2018, they were attempting to "not be discovered" by law enforcement for their ongoing commission of the charged kidnapping and material support for terrorism offenses. The Supreme Court long ago made the "obvious" point that such a basis for a subjective expectation of privacy is not enough to make that expectation reasonable under the

Fourth Amendment. *Rakas*, 439 U.S. at 143 n.12 ("Obviously, however, a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered.").

Here, the kidnapping and concealment of JOHN DOE was not only ongoing, but directly tied to the Defendants' refusal to move from the Badgers' land. As the Defendants learned that law enforcement was looking for them and for JOHN DOE, they took measures to stay out of sight and became extremely security conscious. All of the Defendants lied to or refused to answer law enforcement questions about JOHN DOE's location at the time of the search warrant execution, and they instructed their many children to do the same.

Why? Why did the Defendants not just pick up and move their temporary, moveable living quarters a couple of acres over to land they knew they could occupy (Lot 29)? Why did Lucas Morton continue to string Jason Badger along in the pending land swap agreement when he knew he had not filed his own warranty deed for Lot 29, and he knew he never had the money too complete the closing? The answer is because the property the Defendants were wrongfully occupying was central to the ongoing concealment of the kidnapped JOHN DOE, and was central to the material support for terrorism offense. JOHN DOE was buried in one of the tunnels and could not be moved without risk of being caught. Besides, it was only a matter of time, in the Defendants' minds, before he was resurrected as Isa and it would all be over, as the Defendants would go with him to the corrupt institutions and begin their "war." The property also constituted the Defendants' defensive base, complete with arms, defensive walls, shooting positions, and escape tunnels.

Thus, the Defendants' presence on the property was not only wrongful because it constituted trespassing, but it was also wrongful because it was the place where the Defendants held their "subjective expectation of not being discovered" for their ongoing criminal actions. *Rakas*, 439 U.S. at 143 n.12.

**E. The Characterization of the Defendants' Actions on the Badgers' Property as "Improvements" on the Land Also Does Not Give Defendants Any Expectation of Privacy that Society Is Prepared to Recognize as Reasonable**

Finally, as a somewhat rhetorical point, placing the Defendants' presence on the property under the scrutiny of United States' societal view of how private property ownership works in this country, the Defendants' conduct is shocking, and is not something society would view as legitimate or endowing a reasonable expectation of privacy. The Defendants' presence, to include building things, digging holes and tunnels, and destroying natural vegetation for a shooting and firearms training range (all before making certain they were not on someone else's property), concealing a kidnapped child, training for a coming war where they would kill those who did not join them or were members of the government or military, was rendered wrongful when Mr. Badger withdrew his permission for them to remain on his land.

The fact that the Defendants claim to have made "improvements" on the Badgers' land or to have bought things like a solar panel and some lumber to build structures on the Badgers' land makes no difference under the Fourth Amendment standing analysis. The heavily armed Defendants caused such safety wariness by authorities that the Badgers were essentially held off their land for several months longer than it could have been otherwise.

47

When the Defendants were finally removed from his property, Mr. Badger was stuck with the cleanup costs himself to fill in the holes and tunnels, remove the trash, junk, and tires, and otherwise try to restore some semblance of the natural land.  The scarring to the land is still visible in the publicly available Taos County Assessor's satellite images of Lot 28, Unit 2.  *See* Ex. 2 at 8.  Under New Mexico law, the Defendants remain liable to the Badgers for this damage caused during their criminal trespass of Lot 28.[5]

In the end, the Badgers were no longer able to enjoy their land, gave up on their dream of building a retreat there, and sold Unit 28, Lot 2 at both a financial and emotional loss.  This fact pattern is not something that society is prepared to accept as reasonable; condoning such invasive violations of another's property rights under the guise of "improvements" or an initial mistake would only serve to sow societal chaos.  *Hunyady*, 284 F. Supp. 2d at 759 (explaining tenant at sufferance had no reasonable expectation of privacy because "[t]o conclude otherwise would encourage the wrongful possession of property," which society not prepared to recognize as reasonable).

This Court can, and should, take into consideration the wider message that the Defendants' claims of legitimacy of their occupation of the Badgers' property on August 3, 2018, seeks to assert about society's view on property ownership and rights.  This Court should reject such a message.  *See, e.g.*, *Johnson*, 584 F.3d at 1004 (refusing to recognize as objectively reasonable a defendant's expectation of privacy in a storage unit obtained through identity theft

---

[5] *See* N.M. Stat. Ann. 30-14-1(D) ("Any person who enters upon the lands of another without prior permission and injures, damages or destroys any part of the realty or its improvements, including buildings, structures, trees, shrubs or other natural features, is guilty of a misdemeanor, and he shall be liable to the owner, lessee or person in lawful possession for civil damages in an amount equal to double the value of the damage to the property injured or destroyed.").

in part because it would make the court a "party" to the fraudulent renting of the storage unit); *Pitshou Yunga Kafuku*, 357 F. Supp. 3d at 1181.

### III. CONCLUSION

The Defendants, trespassers on Lot 28, Unit 2, Costilla Meadows Subdivision, who refused to leave despite being asked, told, and sued by the true owners of the property, had no expectation of privacy that society is prepared to deem as reasonable at the time of the search warrant's execution and therefore lack standing to challenge the warrant. The Defendants' heavily armed occupation, their usurpation of the Badgers' rights to enjoy their property and to exclude others from it, their claims that their "beliefs" allowed them to occupy whatever land they chose, the clear lack of any ownership in the lot they were occupying, their lack of property rights obtained through the failed and terminated land swap agreement, the non-existence of any lease or tenancy between the Defendants and the Badgers, and the express inapplicability of UORRA (and the non-existence of positive property right endowment in that statute, and UORRA's would-be requirement for the Defendants to immediately surrender possession of the property upon notice of the Badgers' eviction lawsuit even if UORRA applied), all demonstrate that this was not a situation where society is prepared to accept as reasonable an expectation of privacy for the Defendants on Lot 28. Accordingly, the Defendants' Fourth Amendment rights were not, and could not have been, violated by TCSO's execution of the search warrant on that property on August 3, 2018. It is the Defendants' burden to establish the contrary, and the Defendants cannot meet that burden. The Defendants' motion to suppress evidence from that search must therefore be denied for lack of standing.

Respectfully submitted,

ALEXANDER M. M. UBALLEZ
United States Attorney

*Electronically Filed*

KIMBERLY A. BRAWLEY
TAVO HALL
Assistant United States Attorneys
201 Third St. NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274

I HEREBY CERTIFY that on April 14, 2023,
I filed the foregoing pleading electronically through
the CM/ECF system, which caused counsel of
record for defendant to be served by electronic means.

***/s/ Filed Electronically***
TAVO HALL
Assistant U.S. Attorney