## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**vs.**                               **No. 1:18-CR-02945-WJ**

**JANY LEVEILLE, et al.,**

       **Defendants.**

## DEFENDANTS' CLOSING ARGUMENT AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE ISSUE OF STANDING TO ASSERT FOURTH AMENDMENT VIOLATIONS

Defendant Subhanah Wahhaj, through counsel, Ryan J. Villa and Justine Fox-Young, joined by Defendants Jany Leveille, through counsel Aric Elsenheimer and Angelica Hall, Siraj Wahhaj, through counsel Marc H. Robert and Thomas Clark, Hujrah Wahhaj, through counsel Marshall J. Ray and Donald Kochersberger, and Lucas Morton, *pro se*, submit the following closing argument and proposed findings of fact and conclusions of law in support of Defendants' argument that they have standing to assert Fourth Amendment violations as a result of the search of their home, as follows:

### I.    INTRODUCTION

The factual findings elicited at the Court's March 28, 2023 hearing and detailed below, *see* section III(A) *infra*, demonstrate that Defendants were the legal occupants of Lot 28 of the Costilla Meadows subdivision in Amalia, New Mexico ("the Property") for more than seven months, from the time the Badgers agreed to permit them to reside on the Property in exchange for the Badgers' occupancy of Lot 29 up until August 3, 2018 when law enforcement arrested them at the Property. The parties' real estate transaction, which was unusual and far from straightforward, finds few close correlates in the case

law, but the evidence adduced by the parties clearly demonstrates that Defendants were the lawful residents of Lot 28 by virtue of the parties' mutual understanding that Mr. Morton would occupy the Property and would subsequently become the legal owner of the Property (while at the same time Mr. Morton relinquished to Mr. Badger his rights to occupy Lot 29). This entitlement, which was created by virtue of Defendants' tenancy on the Property and which was never extinguished through a proper eviction proceeding, provides that Defendants absolutely had a reasonable expectation of privacy, both subjectively and objectively, in their home and curtilage. Considering the totality of the circumstances, this expectation of privacy was never extinguished because the Badgers did not follow the proper legal process in attempting to evict Defendants and because it is unlikely that a properly filed suit would have resulted in their eviction.

On August 2, 2018, then Taos County Sheriff Jerry Hogrefe sought a warrant to search Defendants' home located on Lot 28 of Costilla Meadows in Amalia, New Mexico. The search warrant affidavit contained significant misstatements of fact and also omitted many material facts and failed to establish the probable cause necessary to support the search of Defendants' home. As such, on October 20, 2022, Defendants' filed a joint motion to suppress the evidence seized in the search, and on December 30, 2022, the Government responded, arguing that Defendants had no legitimate expectation of privacy in their home in Amalia and therefore lacked standing to assert a Fourth Amendment violation.

Defendants urge the Court to rule that Defendants had a subjective expectation of privacy in the Property where they lived in Amalia, and that society is prepared to recognize that expectation as reasonable or legitimate. Defendants respectfully request that the Court find they have standing to move to suppress the evidence seized during the

search, grant a hearing on the motion to suppress, including a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) and suppress all evidence seized pursuant to subsequent warrants based on information obtained during the first unconstitutional search.

## II. ARGUMENT

### A. Applicable Law

The framework for assessing whether an investigatory technique is a search, and therefore subject to the requirements of the Fourth Amendment, is the reasonable-expectation-of-privacy test first announced in Justice Harlan's concurring opinion in the landmark case of *Katz v. United States*: "There is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" 389 U.S. 347, 361 (1967). *See also United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990)

Katz involved the surreptitious recording of the defendant's conversations, made in a public phone booth. In rejecting the government's argument that the Fourth Amendment did not protect those activities in a public phone booth where the defendant had no property rights, the Court explained that the Fourth Amendment "protects people, not places" for "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351. *See also Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("[A]rcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control . . . the protection of the Fourth Amendment . . . ."); *Warden v. Hayden*, 387 U.S. 294, 304 (1967) ("The premise that property interests control the right of the Government to search and seize has been discredited. Searches and seizures may be 'unreasonable' within the Fourth Amendment

even though the Government asserts a superior property interest at common law. We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts."); *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980)("*Rakas* emphatically rejected the notion that 'arcane' concepts of property law ought to control the ability to claim the protections of the Fourth Amendment.")

"Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas*, 439 U.S. 128, 143 n. 12. The Supreme Court has also long recognized that property ownership is also a "factor to be considered in determining whether an individual's Fourth Amendment rights have been violated." *United States v. Salvucci*, 448 U.S. 83, 91 (1980); *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980) ("[P]etitioner's ownership of the drugs is undoubtedly one fact to be considered in [determining whether he has standing]"); *see also United States v Benitez-Arreguin*, 973 F.2d 823, 827 (10th Cir. 1992) ("In analyzing the case of a bailee, we consider the factors that generally might give any defendant a legitimate expectation of privacy, including ownership, lawful possession, or lawful control of the property or place searched.")

### B.  Defendants Had a Legitimate Expectation of Privacy in the Property

The Government argues, in summary, that the Badgers granted Mr. Morton and the other defendants only a limited license to occupy Lot 28, which the Badgers then unilaterally withdrew in mid-June 2018 after the parties' land swap failed to close as scheduled on May 31. The Government further argues that subsequent to the Badgers' withdrawal of the license to occupy Lot 28, Defendants became trespassers who could

have been immediately ejected from the property at any time, meaning that any expectation of privacy they had in the Property was therefore unreasonable. The testimony at the evidentiary hearing and the evidence propounded by both parties clearly demonstrates quite the opposite, Defendants lawfully occupied Lot 28, not as owners but as tenants, while the parties ironed out the details of a formal land swap that they anticipated would occur at some point in the future. The tenancy was never dissolved, and on August 3, 2018, Defendants remained lawful occupants of the Property with standing to assert their constitutional right to freedom from unlawful searches and seizures under the Fourth Amendment.

First, the evidence clearly demonstrates that the Badgers gave Mr. Morton and the other defendants permission to reside on Lot 28 and that in exchange, Mr. Morton granted physical possession of Lot 29, the lot he owned, which was identical in size and character to Lot 28, to the Badgers.[1] As Mr. Badger testified, because he was concerned that Defendants' children would be without necessary heat and shelter in the coldest part of winter if they were forced to move to Lot 29, he permitted the Defendants to remain on Lot 28 where they were living in their partially completed home. In essence, Mr. Morton

---

[1] In its briefing and at the hearing, the Government focused significant attention on its extensive research determining that the warranty deed, demonstrating proof of Mr. Morton's ownership of Lot 29, had never been recorded in Taos County. Defendants do not dispute this fact but assert that it is entirely irrelevant to the Court's analysis of Defendants' standing to assert Fourth Amendment violations. The Government does not clearly state the import of its discovery that the deed was never recorded but seems to imply that Mr. Morton fraudulently asserted his ownership to the Badgers. This implication is entirely unsupported. It is undisputed that Mr. Morton had an ownership interest in the property, and Mr. Stachura's sworn testimony clearly established that Mr. Morton had in fact paid in full for the plot which he purchased on a real estate contract and that the prior owner had deeded it over to him. Transcript at 121:4-13. Mr. Stachura, as counsel for the transaction, and the title company were satisfied that Mr. Morton was the rightful owner of Lot 29.

and the Badgers had an unwritten rental agreement providing for the parties to lawfully occupy, possess and enjoy each other's properties. That agreement was made in December, 2017 or January, 2018 at the latest.

The evidence further demonstrates that, in April, 2018, the parties' entered into a written real estate sale and purchase agreement that contemplated that Lucas Morton would sell Lot 29 to the Badgers, with the purchase price being the Badgers' signed warranty deed for Lot 28. *See* Exhibit I.[2]

Next, Defendants, having been permitted to remain on Lot 28 by the owners of the property, clearly maintained the right to occupy, develop, enjoy and exclude others from the residence and curtilage on Lot 28 and believed they had the right to do so. Defendants clearly had a subjective expectation of privacy in the Property.

Contrary to the Government's implications, Defendants did not employ fraudulent tactics to acquire the property nor were they ever found to have trespassed there. *See* Doc. 719 at 28.   Instead, Mr. Badger testified that, immediately upon discovering the Defendants there, he had his own altruistic motivations to immediately permit them to remain on Lot 28. And he was influenced not by any fraud or deception on the part of Defendants, but exclusively by indisputable facts, such as the apparent efforts made Defendants to erect shelter for the family, the clothing worn by the family and the impending winter temperatures.

It is undisputed that Mr. Morton and the Badgers were engaged in negotiations to exchange the two lots for months, and that each party had granted exclusive occupancy to the other in good faith and were very close to finalizing the land swap when Mr.

---

[2] Defense exhibits referenced herein were filed as attachments to document 690, filed March 22, 2023.

Badger's discovery of news articles regarding Lucas Morton and Siraj Wahhaj caused him to reconsider his decision to permit the family to live on Lot 28. *See* Doc. 719 at 6-7.

Ultimately, when the land swap did not close on May 31, 2018, the Badgers made the unilateral decision to force the Defendants off of Lot 28. If they were unwilling to continue to pursue the land swap because they had waited "long enough," doc. 719 at 7, then they had to either persuade the Defendants to leave or initiate an eviction suit to in order to obtain a resolution. The Badgers knew that the termination of the real estate agreement had no effect on the tenancy, and the law enforcement officers they spoke to apparently advised them of this as well.

Under New Mexico law, the Badgers were required to serve Mr. Morton with notice specifying any acts and omissions constituting breach of the parties' agreement and stating when the agreement would terminate. *See* 47-8-33 NMSA 1978. The Badgers failed to do so and could have only evicted defendants (i.e. extinguished their possessory rights) on the grounds set forth in such a notice. *See* 47-8-22(G) NMSA 1978.

Next, as is abundantly clear from the testimony at the evidentiary hearing, Mr. Morton also never received notice that the real estate contract had been terminated, meaning that the status of the land swap was ambiguous as of early June. After May 31, 2018 came and went and the deal did not close, the Government's submissions reflect that the sum total of communication from the Badgers to Mr. Morton, was as follows:

> June 8, 2018: "you need to be off by end of next week"
> June 11, 2018: "were you able to start moving your stuff off"[3]

---

[3] A subsequent message, which is not captured in Government Exhibit 15, apparently stated "by June 15th." Mr. Badger testified that could not specify what he meant by giving Mr. Morton that date and did not say he asked Mr. Morton to leave by that date. Transcript at 64:21-25.

*See* Government's Exhibit 15. These text messages do not constitute proper notice under New Mexico law. Mr. Morton was ultimately served with an eviction suit which was subsequently dismissed, meaning that the status quo of the parties' agreement to occupy each other's respective lots was left undisturbed.

According to Mr. Badger, the couple apparently intended to file another eviction lawsuit but never did, perhaps given information that law enforcement would soon raid the property. If they had properly filed for eviction, it is highly unlikely that the Defendants would have ultimately been evicted because they were not squatters, holdover tenants or trespassers. Instead, they were tenants who had given valid consideration in exchange for their occupancy of the lot in the form of occupancy of a property virtually identical in almost every respect. The Badgers never tendered Lot 29 back to Mr. Morton. Mr. Morton intended to sell Lot 29 to the Badgers in exchange for the deed to Lot 28, and as of June 15, 2018, only approximately $1,000 in title fees stood in the way of that sale.

### C. Society Is Prepared to Recognize Defendants' Expectation of Privacy as Reasonable Because They Were Not Trespassers or Squatters

#### 1. The UORRA Applies Because Defendants Occupied Lot 28 Pursuant to a Residential Lease and Not Pursuant to a Contract for the Sale of Real Property

The Government argues that, on June 8, 2018, upon receipt of Mr. Badger's text message telling them to leave, Defendants were essentially trespassers or squatters on the Property and had no reasonable expectation of privacy. The Government wrongly asserts that Defendants were not tenants, had no written lease agreement, did not pay rent and

were only permitted to remain on Lot 28 for a limited time subject to a "license" granted by the Badgers.[4]

The Government overlooks a number of significant facts in asserting that Defendants were not tenants with rights under the New Mexico Uniform Owner–Resident Relations Act ("the UORRA"), NMSA 1978, §§47-8-1 to -52. The most glaring of these is the Government's refusal to concede that Mr. Morton actually gave valuable consideration to the Badgers, including the rights to possess, control, exclude and enjoy Lot 29, in exchange for receiving the same from the Badgers as to Lot 28. Repeatedly, the Government repeats the false refrain that the "Defendants never paid the Badgers anything." *See* Doc. 719 at 35-36. To the contrary, nothing could have been closer to the fair rental value for Lot 28 than the use and occupancy of Lot 29 which Mr. Morton granted the Badgers. *See* § 47-8-15(A) NMSA 1978 ("The resident shall pay rent in accordance with the rental agreement.  In the absence of an agreement, the resident shall pay as rent the fair rental value for the use of the premises and occupancy of the dwelling unit."). Tendering possession of a functionally identical piece of property is indisputably "fair rental value."

---

[4] The Government's argument that the Badgers granted Mr. Morton a license and not a lease is based solely on Mr. Badger's subjective and self-serving opinion as to the character of the interest and is unavailing. *See* Doc. 719 at 34, n. 3. In fact, *Quantum Corp. v. State Taxation & Revenue Dept.*, 1998-NMCA-050, which the Government cites in support of the proposition that Mr. Morton had, at most, a license to use Lot 28, supports the notion that the Badgers leased Lot 28 to Mr. Morton:

> Generally speaking, this Court has defined a lease as "'an agreement under which the owner gives up the possession and use of his property for a valuable consideration and for a definite term.' " . . . .The tenant must acquire some definite control and dominion of the premises.

*Quantum Corp.*, 1998-NMCA-050 at ¶9 (internal citations and quotations omitted)

Because a tenancy was created, the UORRA clearly governs here as it "applies to, regulates[,] and determines rights, obligations [,] and remedies [of owners and residents] under a rental agreement . . . for a [residence] located within this state." Section 47–8–8. A "rental agreement," as defined by the Act, is an agreement "between an owner and resident . . . embodying the terms and conditions concerning the use and occupancy of a dwelling unit or premises[.]" Section 47–8–3(P); *see also White v. Farris*, 2021-NMCA-14, ¶17. Put simply, "the UORRA applies to the extent that the parties' agreement was a [rental agreement] and does not apply to the extent it was a sale." *Hedicke v. Gunville*, 2003-NMCA-032, ¶ 6.

The Badgers had permitted Mr. Morton to occupy Lot 28 for approximately four months prior to the parties' entering into their real estate agreement, and Defendants' occupancy of the Property was not pursuant to this contract. § 47-8-9(B) ("Unless created to avoid the application of the [UORRA], . . . occupancy under a contract of sale of a dwelling unit or the property of which it is part, if the occupant is the purchaser or a person who succeeds to his interest" "[is] exempted by that act[.]") The agreement was silent as to any tenancy, did not govern the terms and conditions of Mr. Morton's occupancy of Lot 28, instead only providing that the land swap was set to close on or before June 3, 2018 with no penalties other than contract termination if the transaction did not close by that date. *Id.*

That the parties contemplated that a formal land swap would occur does not take the parties' agreement concerning Mr. Morton's use and occupancy of Lot 28 out of the province of the UORRA. The real estate agreement memorialized the parties' intent to purchase each other's lots and did not define or preclude an agreement to grant occupancy to the parties' respective lots in advance of any sale. *See* Exhibit I. As a result, in order to

lawfully terminate the tenancy they had created with Mr. Morton, the Badgers were not permitted to use "self-help" measures but instead were required to seek an eviction order in state court and to provide Mr. Morton with proper notice pursuant to the Act. The Badgers did not comply with UORRA and the tenancy remained in force at the time of the raid on August 3, 2018.

### 2. Without An Eviction Order and Proper Notice, the Defendants Necessarily Maintained Fourth Amendment Standing

New Mexico's statutory requirements for eviction, coupled with the separate substantive entitlement of Defendants' tenancy, gave rise to a constitutionally protected interest in the Property. The litany of cases the Government cites for the proposition that squatters, holdover tenants and trespassers have no reasonable expectation of privacy in properties in which they have no legal claim are therefore inapposite.

In order to proceed with an eviction suit, the Badgers were required to give Mr. Morton a three, seven or thirty-day notice of noncompliance with the parties' rental agreement and/or any separate agreement, specifying the acts and omissions constituting the breach of the agreement. *See* NMSA § 47-8-33. Mr. Badger admits that they did not comply with this provision of the UORRA, and it is undisputed that the eviction suit he filed was dismissed for procedural reasons. Critically, given that the Defendants never received notice that their continued occupancy of Lot 28 had been adjudged to be unlawful (because no such adjudication has ever taken place), their reasonable expectation of privacy in the premises was never destroyed. *See, e.g., Ryan v. Mary Immaculate Queen Center,* 188 F.3d 857, 859 (7th Cir. 1999) (officers attempting to serve tenants with a summons in landlord's eviction action conducted a warrantless search, tenants could maintain Fourth Amendment claim because landlord had not yet obtained

a valid order granting him exclusive possession of the premises); *United States v. Washington*, 573 F. 3d 279, 284 (6th Cir. 2009)(until landlord takes legal action to evict, tenant retains objectively reasonable expectation of privacy despite being in technical violation of lease); *United States v. Young*, 573 F.3d 711, 720 (9th Cir. 2009) (defendant had reasonable expectation of privacy in hotel room from which he had not been evicted at the time of the warrantless search).

The Government argues that, as squatters or trespassers who were wrongfully present on the Property for the seven weeks prior to the raid, Defendants can have no protected property interest in it. While there is some support for the proposition that even squatters may gain a property interest in the right to continued occupancy where an owner encourages or acquiesces to the occupancy and state law affords it, *see Walls v. Giuliani*, 916 F. Supp. 214, 220 (E.D.N.Y. 1996), it is a generally accepted principal of law that squatters lack a property interest and cannot garner one by virtue of statutory notice provisions, *id.* at 220, 222-23 ("Although the Constitution has been much trivialized, it has not progressed to the point where every notice provision of state property law has become a matter of constitutional right.")

However, as delineated above, Defendants were not squatters but were lawful occupants of the Property (the Government concedes that this was true for some period), and critically under the relevant precedents, New Mexico law did serve, if not to vest them with a property interest, to protect the possessory interest they had. *See Amezquita v. Hernandez-Colon*, 518 F.2d 8, 13 (1st Cir. 1975), *cert. denied*, 424 U.S. 916 (1976). They had a substantive entitlement to occupy the land, which was created by virtue of Defendants' tenancy on the Property and which was never extinguished through a proper eviction proceeding. As a result, because the Badgers did not follow the proper legal

process to evict the Defendants and no eviction order was ever obtained, the Defendants' expectation of privacy in the Property was also never extinguished.

Given the proffered evidence, much of which is undisputed, the precise question before the Court is whether a hearing in an eviction case, had the Badgers actually properly filed one, would have made a difference in Defendants' property rights other than to delay the outcome. On this point, the precedents all align, meaning that the procedural protections are of no consequence in a given case and do not confer standing if they will only serve to extend an individual's wrongful possession of a property. *See Amezquita*, 518 F.2d 8, 13 ("the important question in determining whether procedural protection defines a property right is whether the protection amounts to a substantive restriction on the ultimate action being challenged.") The *Amezquita* court properly focused on the question of whether a hearing could have somehow resulted in the conclusion that the "squatters" had the right to remain or return. Determining that a hearing would have made no difference whatsoever other than to delay the outcome, the court held that the plaintiffs had no property right under the Fourteenth Amendment. *Id. See also United States v. Hunyady*, 284 F. Supp. 2d 755, 759 (E.D. Mich. 2003) (ruling that defendant living in late father's vacant home may have been considered a "tenant at sufferance" under state law, but therefore by definition was wrongfully occupying property and had no reasonable expectation of privacy). The *Hunyady* court explained, "as to Michigan's notice to quit procedures on which Defendant so heavily relies, these provisions do not create a legitimate expectation of privacy; rather, they merely allow a tenant at sufferance to temporarily maintain his wrongful possession of the property. These procedural provisions do not legitimatize the wrongfulness of the possession." 284 F. Supp at 759.

In the instant case, had the Badgers properly filed their eviction case, the outcome would certainly not have been preordained. That is to say, had the Badgers employed the proper legal process, the outcome would almost certainly not have been merely to allow Mr. Morton to temporarily maintain his possession of the property pending an eviction. In response to the suit, Mr. Morton would have been permitted to assert any legal or equitable defense, see § 47–8–45 NMSA, and to proffer evidence regarding the context and history of the parties' agreement including (but not limited to) that the Badgers had agreed to Defendants' occupancy on the Property from the outset (and accepted occupancy of Lot 29 in return) and that Defendants had undertaken significant efforts to improve the property in reliance of this agreement. "Equitable principles may be applied to prevent eviction." *City of Albuquerque v. Brooks*, 1992-NMSC-069, ¶9 (citing *Navajo Academy Inc. v. Navajo United Methodist Mission Sch., Inc.,* 109 N.M. 324 (1990) (it was not an abuse of discretion to enter order which had the effect of terminating a tenancy but which allowed the tenant to remain in possession of the property for three years after termination); *Hilburn v. Brodhead*, 79 N.M. 460 (1968) (court of equity has power to meet the problem presented and to fashion a proper remedy to accomplish a just and proper result).

It is plausible and overwhelmingly likely that an eviction suit would have resulted in an agreement between the parties, particularly given that they were quite close to a resolution already and Defendants' had made an obvious investment in Lot 28, and with only a small quantum of money in dispute. See § 47-8-7 ("A claim or right arising under the Uniform Owner-Resident Relations Act or on a rental agreement may be settled by agreement.") Alternatively, the court may have fashioned a remedy providing for Mr. Morton's payment of title fees in conformity with the parties' agreement while allowing

him to remain on Lot 28 so as to protect his interest and substantial investment in the Defendants' home. Unlike the defendants in the "squatter" and "trespasser" cases, Mr. Morton had given ample consideration in exchange for his use of Lot 28, and the parties would have closed on the land swap but for a dispute centering on less than $1,000 in costs. The most likely outcome of an eviction case here would have been an agreement on the part of the parties or a court order that Mr. Morton pay the closing costs on the land transaction by a date certain or otherwise be evicted from Lot 28.  What was entirely unlikely was that the court would treat Defendants as mere "squatters" or "trespassers" to be summarily removed from the property, which is the only outcome that could have supported the United States' contentions here.

### III.    Conclusion

For all of the reasons detailed above and in Defendants' reply in support of the Motion to Suppress, Defendants respectfully request that the Court find that Defendants' have standing to assert Fourth Amendment violations as a result of the search of their home and in so doing adopt the following proposed findings of fact and conclusions of law.

### IV. PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### A.  Findings of Fact

1.  In April of 2016, Lucas Allen Morton purchased Lot 29, Unit 2, Costilla Meadows Subdivision in Taos County from James Kohlmann under the terms of a Real Estate Contract. *See* Exhibit A ("Morton Purchase Agreement")

2.  This agreement was recorded in the office of the Taos County Clerk on April 28, 2016. *Id.*

3.  While Mr. Morton was paying off the land, the warranty deed was held in escrow.

4. The purchase was subject to the building setbacks around the perimeter in the Improvement Location Report for the property, dated April 8, 2016. *See* Exhibit B. ("Fidelity National Title Improvement Location Report for Lot 29").

5. Soon after, Mr. Morton paid off the balance, came to own Lot 29 outright, and received a warranty deed, which he did not record with the Taos County Clerk. Transcript of March 28, 2023 Hearing ("Transcript") at 110:2-4; 111:13-18; 113:22-114:2; 192:4-17.

6. Lot 29 is a 9.621 acre parcel. *See* Exhibit C ("Costilla Meadows Unit 2 Map")

7. Lot #29 is located directly west of Lot #28, which is also a 9.621 acre parcel. *Id*.

8. In October, 2017, Jason Badger Purchased Lot #28 from James Kohlmann, also subject to building setbacks around the perimeter in the Improvement Location report for the property. *See* Exhibit D ("Warranty Deed from Kohlmann to Badger")

9. When they arrived in New Mexico in December, 2017 to occupy the land owned by Lucas Morton, Morton and his family mistakenly took possession of Lot #28, a lot identical in size and directly adjacent to Lot #29. *See* Exhibit E ("Photos of Lot 28")

10. There were no street signs, and the lots did not have readily identifiable lot numbers marking them. Transcript at 9:16-19.

11. Prior to Morton's arrival, both lots 28 and 29 were nearly entirely covered with sagebrush. Transcript at 34:20-24.

12. At the time, Lot 28 was totally undeveloped and unfenced and was only marked by one and a half to two foot long wooden stakes at the corners. Transcript at 36:2-6; 12-16; 37:6-11.

13. None of the surrounding properties were developed at the time. *See* Transcript at 34:3-6.

14. Soon after Mr. Morton and his family arrived at the property, they began the hard labor of clearing approximately two and a half acres of the land of sagebrush in order to begin building their home. Transcript at 39:12-15.

15. Mr. Morton and his family also began excavating the land and building living quarters on it using lumber, thick plastic sheeting and installing a camp trailer in the ground. Transcript at 40:7-11; 42:2-10.

16. Not long after they had cleared the lot, Mr. Jason Badger was in the area checking on his property and informed some of the Defendants that he and his wife owned the Property and that Defendants were therefore building in the wrong location.

17. When the parties realized that Mr. Morton and his family possessed and were improving Lot #28 and not Lot #29, Mr. Badger discussed possible solutions with the Defendants. Transcript at 43:15-44:18.

18. Mr. Badger did not recall whether Defendants offered to move to Lot 29, but he did recall that the parties agreed to swap lots given that the lots were adjacent and similar in size. *Id*.

19. Mr. Badger further recalled that he agreed to let Defendants remain on Lot 28 because it was going to be getting very cold out there and he didn't want to throw Defendants' children out into the cold. Transcript at 44:2-7.

20. Mr. Morton and Mr. Badger then agreed orally that Mr. Morton would become the owner of Lot #28 and that the Badgers would become the owners of Lot #29.

21. Mr. Badger agreed to permit Mr. Morton and his family to remain on the Property and continue their improvements to the Property, and they proceeded to negotiate the details of the swap. Transcript at 44:14-18; 51:2-6.

22. Mr. Morton, in exchange, agreed to permit Mr. and Mrs. Badger to occupy and improve Lot 29, and the Badgers cleared sagebrush from the lot and formed a road at the perimeter of the property. Transcript at 48:22-49:11; 101:6-14.

23. The parties fully intended for the land swap to go through, and as such, the Badgers developed and made plans to further develop Lot 29 and Mr. Morton developed and made plans to further develop Lot 28. Transcript at 91:1-7.

24. Between December, 2017 and January, 2018, Mr. Morton paid approximately $1900 for equipment to install a solar power system on the Property. *See* Exhibit F ("Invoices for Solar Purchase"). Transcript at 54:1-3.

25. Subsequently, Mr. Morton purchased and acquired other building materials including reinforced plastic, insulation, power tools, tires and a propane tank. *See* Exhibit J ("J. Badger Photos – Bates 2240"); Transcript at 54:11-13.

26. Mr. Morton continued to work to construct the home and improve the land while living on the Property.

27. Mr. Morton and the other residents excluded Mr. Badger and others from the property at will. Transcript at 55:3-5.

28. On January 17, 2018, in furtherance of his continuing efforts to improve the Property, Lucas Morton submitted an application to Randall Lumber for a credit line to obtain additional construction materials. *See* Exhibit G ("Randall Lumber Credit Application and Invoices")

29. By January of 2018, the Property was clearly home to Lucas Morton and his family.

30. Soon after agreeing to swap properties, Mr. Badger and Mr. Morton engaged First New Mexico Title and Christopher Stachura of the Dogasa Law Offices in order to effectuate the land swap.

31. On January 26, 2018, Mr. Stachura wrote a letter to James Kohlmann, who had sold Mr. Morton Lot #29. The letter explained that Mr. Morton had paid off the amount owed on Lot #29 pursuant to the Real Estate Contract and that the Warranty Deed held in escrow had been released to him but that he had not filed the Deed with the County and had lost it. *See* Exhibit H ("Letter from Christopher Stachura to James Kohlmann"); Transcript at 121:4-13.

32. Mr. Stachura enclosed a replacement deed for Mr. Kohlmann's signature. *Id.*

33. Mr. Kohlmann signed the replacement deed before a notary and mailed it to Mr. Stachura.

34. Neither Mr. Stachura nor Mr. Morton had this replacement deed recorded with the County.

35. To effectuate their previously agreed upon land swap, Mr. Badger and Mr. Morton entered into a real estate purchase agreement in April 2018. *See* Exhibit I ("Real Estate Sale and Purchase Agreement")

36. This agreement did not govern or otherwise preclude the parties' arrangement to occupy each others' properties prior to the closing on the land swap. Transcript at 126:15-19; 127:13-15.

37. In April, 2018, Mr. Badger photographed the property for the title company in advance of the land swap. *See* Exhibit J ("J. Badger Photos – Bates 2238-2242")

38. In April or May of 2018, Mr. Badger installed large fence posts at the corners of Lot #29, the property he and his wife were to receive in the land swap. *See* Exhibit K ("Excerpt of Home Interview of Mr. Badger")

39. On May 8, 2018, Mr. Badger sent a message intended for Mr. Morton to inform him that he had learned from the title company that there would be $1,057.17 due at the closing of their land swap.

40. On May 11, 2018, Mr. Badger sent a message intended for Mr. Morton to inform him that the closing would occur on May 31, 2018.

41. Three days later, on May 14, 2018, Mr. Badger provided the Taos County Sheriff's Office with a signed form purporting to give the agency consent to search the Property.

42. The Taos County Sheriffs Office did not consider the consent form signed by Mr. Badger to be sufficient to enter Lot 28. Transcript at 140:21-24; 170:6-12.

43. On May 31, 2018, Mr. Badger received a message in response indicating that Mr. Morton was unable to afford the closing costs for the land swap and suggesting that they instead perform the swap without using the title company in order to save costs. Transcript at 205:10-18.

44. Despite the consent form signed by Mr. Badger, the Taos County Sheriff's office believed the Defendants had a reasonable expectation of privacy. Transcript at 140:21-24; 170:6-12.

45. Mr. Badger responded and rejected that suggestion. Transcript at 205:20-22.

46. On June 3, 2018, the real estate agreement expired on its own terms and was not extended, and the agreement's termination was memorialized in a document

drafted at the request of the title company and by the attorney for the transaction. Transcript at 115:22-116:22.

47. Mr. Morton was never provided with the termination agreement. Transcript at 193:9-11.

48. On June 7, 2018, Mr. Badger sent another message intended for Mr. Morton: "you have to be off by next week."

49. Mr. Badger texted "by June 15th;" however, when questioned about the meaning of his text at the hearing, could not specify what he meant by giving Mr. Morton that date and did not say he asked Mr. Morton to leave by that date. Transcript at 64:21-25.

50. On June 11, 2018, Mr. Badger sent another message intended for Mr. Morton: "were you able to start moving your stuff off?"

51. Mr. Badger never tendered Lot 29 back to Mr. Morton.

52. At no time did Mr. Morton or any other resident make any threats to the Badgers, and their relationship and communications were always cordial. Transcript at 64:10-16.

53. The New Mexico Uniform Owner-Resident Relations Act, NMSA 1978, §§ 47-8-1 through 47-8-48 ("UORRA"), governs certain aspects of the relationship between residential tenants and owners.

54. The Act "applies to, regulates and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit located [in New Mexico.]" *Id.* § 47-8-8.

55. Moreover, the Act contemplates the applicability of other principles of law and equity unless expressly displaced by the Act. *See id.* § 47-8-4 ("Unless displaced by

the provisions of the Uniform Owner-Resident Relations Act [47-8-1 NMSA 1978], the principles of law and equity, including the law relating to capacity to contract, mutuality of obligations, equitable abatement, principal and agent, real property, public health, safety and fire prevention, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause supplement its provisions.") (brackets in original).

56. A written lease is not required to create a tenancy, and the UORRA clearly contemplates unwritten lease agreements. *See, e.g.*, NMRA 1978, § 47-8-15. (discussing rent amounts due in the event that no rental agreement exists, the UORRA provides, "[i]n the absence of an agreement, the resident shall pay as rent the fair rental value for the use of the premises and occupancy of the dwelling unit.")

57. Long standing precedents that predate the UORRA also recognize oral tenancies (*i.e.,* tenancies created by "parol"). *See, e.g., Dees v. Dismuke*, 1925-NMSC-033, ¶ 8, 30 N.M. 528, 240 P. 198, 199 (noting that a certain statutory provision related to a landlord's lien "shall not apply to tenancies created by parol" but would instead be predicated upon a written lease with a certain term of years).

58. Furthermore, the conduct and expectations of the parties may lead to the creation of a tenancy. *See Collins v. Storment*, 1993 U.S. Dist. LEXIS 20156, Civ. No. 91-1010-HB (D.N.M. Apr. 23, 1993).

59. Once a tenancy is created, an owner may not evict a tenant without following the procedures set forth in UORRA. *See Collins v. Storment*, 1993 U.S. Dist. LEXIS 20156.

60. Here, Mr. Morton was unquestionably, at a minimum, a tenant on the Property.

61. Sometime in the summer of 2018, after law enforcement officials spoke to him, Mr. Badger had a change of heart and attempted to back out of the parties' agreement and attempted to evict Mr. Morton and his family from the Property.

62. To that end, the Badgers filed a lawsuit in New Mexico Magistrate Court seeking a writ of restitution in order to evict their tenants, Mr. Morton and his family members. *See* Exhibit L ("Badger Petition for Restitution"); Transcript at 68:15-18.

63. In the paperwork seeking the eviction, the Badgers informed the Court that they had given written notice to Mr. Morton that their agreement to swap properties had been terminated; however, they never provided him with any such notice. Transcript at 68:19-70:16.

64. The Badgers never gave Mr. Morton legal notice, either in person or in writing, that he had breached the parties' agreement and that the Badgers were requiring him to vacate Lot 28. Transcript at 64:4-7; 65:7-9; 67:18-25; 68:11-14; 192:23-193:4.

65. Mr. Morton was served with the petition on June 18, 2023. Transcript at 157:2-4.

66. On June 27, 2018, the magistrate judge presiding over the case dismissed the petition for restitution with prejudice. *See* Exhibit L ("Order of Dismissal"); Transcript at 71:10-16.

67. The Badgers recognized that they would need to file another suit in order to try to obtain an eviction order; however, they never filed one. Transcript at 93:10-16.

68. Mr. Badger also asked New Mexico State Police to attempt to remove Mr. Morton from the Property and succeeded in getting an officer to go to the Property; however, the officer did not have an eviction order and did not attempt to remove Mr. Morton. Transcript at 73:20-74:3.

69. After the search warrant was executed at the property and after Mr. Morton was arrested, Mr. Morton was charged with criminal trespass; however, the criminal trespass charge was dismissed with prejudice on October 31, 2018. *See* Exhibit M ("Pleadings *in State v. Morton*; M-53-MR-2018-00378")

70. This trespass citation was dismissed with prejudice on October 31, 2018. *See id.*

71. Mr. Badger thus initiated, but never completed, the legal process necessary for a proper eviction under the circumstances.

72. While Mr. Badger may have been attempting to evict Mr. Morton and/or had a subjective desire to terminate Mr. Morton's residency on the Property, Mr. Badger had no legal right to override Mr. Morton's possessory interest in the Property without due process.

73. Mr. Morton's status as a residential tenant means that he and his family had a lawful possessory right in the Property and that right could not be extinguished unilaterally by Mr. Badger or without due process of law and pursuant to the UORRA.

74. On August 3, 2018, Sheriff's deputies executed a warrant at Mr. Morton's home.

75. Three weeks later, on August 24, 2018, Taos County Sheriff Jerry Hogrefe was quoted by CNN as to why deputies hadn't raided the property earlier, stating: "Had we have gone on that property based on a consent from an owner [Badger] that was not an occupant of that property, we would not have valid right to be there . . . ."[5]

---

[5] https://www.cnn.com/2018/08/14/us/new-mexico-compound-timeline/index.html

76. For approximately seven months prior to this raid, Mr. Morton and his family had exclusively occupied the property, all the while continuing to make improvements to the land and building their home, consistent with their agreement with the Badgers. *See* Exhibit N ("Aerial Surveillance Stills")

77. By the time of Mr. Morton's arrest, Mr. Morton still had possession and no lawful judicial process had been completed to terminate his and his family's lawful possession of the Property.

78. Mr. Morton and his family therefore had a reasonable expectation of privacy in the residence at the time of the execution of the search warrant at issue.

## B. Conclusions of Law

79. Mr. Morton was the lawful owner of Lot 29, Unit #2, Costilla Meadows Subdivision.

80. Mr. Morton and Mr. Badger entered into a lawful and valid contract for good consideration to exchange Lot 29 for Lot 28.

81. For approximately six months, until mid-June 2018, the Badgers also agreed to permit Mr. Morton and his family to live on the Property, granting them the rights to possess, control, exclude others from and enjoy the Property.

82. Mr. Morton's agreement to permit the Badgers to possess and improve Lot #29 constituted rent and consideration in exchange for Mr. Morton's possession and improvement of Lot #28.

83. Mr. Morton and his family therefore paid for and could legitimately expect privacy in their home on Lot #28. "Likewise in *Katz*, the defendant occupied the telephone booth, shut the door behind him to exclude all others and paid the toll, which 'entitled [him] to assume that the words he utter[ed] into the mouthpiece [would]

not be broadcast to the world.'" Katz . . . could legitimately expect privacy in the areas which were the subject of the search and seizure (he) sought to contest." *Rakas v. Illinois*, 439 U.S. 128, 149 (citing *Katz v. United States*, 389 U.S. 347, 352)(internal citation omitted).

84. Both Mr. Morton and the Badgers made improvements to the lots they were to receive in the swap, and each had a property interest in each other's lot. Transcript at 101:6-18.

85. Mr. Morton's and Mr. Badger's agreement that Mr. Morton and his family were permitted to remain on the Property is properly construed as a rental agreement, meaning that the tenets of the UORRA apply.

86. Defendants were never found to have trespassed on Lot 28 in violation of N.M. Stat. Ann. § 30-14-1(A)-(B).

87. Mr. Morton was a lawful tenant on the Property, and the Badgers were required to follow established state law eviction procedures in order to terminate Mr. Morton's lawful residency on the Property once he decided to terminate the agreement to exchange lots.

88. In order to proceed with an eviction suit, the Badgers were required to give Mr. Morton a three, seven or thirty-day notice of noncompliance with the parties' rental agreement and/or any separate agreement, specifying the acts and omissions constituting the breach of the agreement. *See* NMSA § 47-8-33.

89. The Badgers failed to provide the requisite notice under New Mexico Law.

90. Though they were the owners of Lot 28 in August 2018, the Badgers could not properly consent to a search of the Property, as Defendants were legal occupants and not trespassers on the Property.

91. Mr. Badger did not lawfully terminate Mr. Morton's lawful occupancy of the Property, pursuant to New Mexico law, prior to the execution of the search warrant.

92. The Badgers did not tender Lot 29 back to Lucas Morton before August 3, 2018.

93. Defendants retained an objectively reasonable expectation of privacy in their home on the Property from the time of their agreement with the Badgers, in late 2017 or early 2018, until they were arrested and taken into custody on August 3, 2018.

94. Defendants need not "come forward with legal documentation establishing that [they] lawfully possessed the area searched" in order to establish standing but have met their burden to "at least state that [they] gained possession from the owner or someone with the authority to grant possession." *United States v. Arango*, 912 F.2d 441 445 (10th Cir. 1990)

95. Defendants have shown that they occupied, possessed, enjoyed and improved the Property for more than six months as well as exercising the right to exclude others from the Property, "one of the main rights attaching to property" by virtue of their tenancy. *See Rakas*, 439 U.S. at 143, n.12.

96. Defendants therefore had a "legitimate expectation of privacy [in part] by virtue of this right to exclude." *Id.*

97. Defendants have shown that (1) they had a subjective expectation of privacy in the searched property or premises, and (2) that society is prepared to recognize that expectation as reasonable or legitimate. *See California v. Ciraolo*, 476 U.S. 207, 211 (1986).

Respectfully submitted,

*/s/ Ryan J. Villa*
Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave NW Ste. C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

*/s/ Justine Fox-Young*
Justine Fox-Young
Justine Fox-Young, PC
5501 Eagle Rock Ave NE Ste C2
Albuquerque, NM 87113
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Defendant Subhanah Wahhaj*

*/s/ Donald F. Kochersberger III*
Donald F. Kochersberger III
Business Law Southwest
6801 Jefferson St. NE, Suite 210
Albuquerque, NM 87109
(505) 848-8581
Donald@BusinessLawSW.com

*/s/ Marshall J. Ray*
Marshall J. Ray
Law Offices of Marshall J. Ray, LLC
514 Marble Ave, NW
Albuquerque, NM 87111
(505) 312-2748
mray@mraylaw.com

*Attorneys for Defendant Hujrah Wahhaj*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/Justine Fox-Young*
JUSTINE FOX-YOUNG

- 28 -