IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA          )
                                  )
             Plaintiff,           )          Cr. No. 18-2945-WJ
                                  )
     vs.                          )
                                  )
SUBHANAH WAHHAJ,                  )
                                  )
             Defendant.           )

**UNITED STATES' RESPONSE TO DEFENDANTS' JOINT MOTION TO COMPEL THE
GOVERNMENT TO PRODUCE RULE 16 AND BRADY-GIGLIO DISCOVERY AND
DISCOVERY GOVERNED BY CIPA**

The United States provides this response to the Defendants' Joint Motion to Compel
Discovery, Doc. 702, and Defendant Siraj Wahhaj's Notice of Joinder and Request for Additional
Information, Doc. 733.  The motions broadly seek to compel discovery that the Defendants either
already have or that the Government has reviewed and determined is not discoverable, irrespective of
the classification of that material.  To the extent that the Defendants are seeking the production of any
discovery which may be classified, the United States will properly address any such issues regarding
classified information in a motion pursuant to Section 4 of the Classified Information Procedures Act
("CIPA"), 18 U.S.C. App. 3.

To the extent that the Defendants argue here that the United States' CIPA Section 4 motion
should not be allowed to be filed *ex parte*, or that defense counsel should be allowed to access
classified information, without a requisite need to know, by seeking to obtain a security clearance,
these arguments are routinely made and routinely denied in CIPA cases across the country, and they
must similarly fail here.

Notwithstanding the United States' disagreement with the Defense's position regarding
discoverability of items such as surveillance that captured non-criminal conduct (and the

inadmissibility of this type of evidence as a matter of law), the United States has performed another wholesale review of the FBI case files in light of recently filed defense expert notices, legal motions, and statements to the court that have shed more light on what the Defendants believe might be material to their cases at this point in the litigation.  In doing this wholesale review, the United States has identified a small number of items that may arguably be relevant to certain pretrial motion issues or areas of defense expert witness notices,[1] and has encountered five additional items that may be relevant and material under the United States' continuing discovery obligations.   Thus, the United States has produced, or will produce, a small amount of additional material, including several aerial surveillance videos from Georgia during the time period of 2015–2017 (described more fully below), as well as some older FBI materials from the pre-offense, Georgia portion of the investigation in this case.

The United States has complied – and will continue to comply – with its obligations under Rule 16, *Brady* and its progeny, and the Jencks Act.  Moreover, the United States will continue to err on the side of discoverability of such material, regardless of its position that such material is not legally required.  The Defendants' continued insistence that it is entitled to "all documents and information" concerning old investigations, administrative documents, and classified materials is simply not supported by any credible legal or factual basis.  As such, the Government requests that this Court deny the Defendants' motion to compel.

Finally, the Government does not oppose the Defendants' request to provide an *ex parte* submission to the Court prior to the Court's review of the Government's CIPA § 4 motion.  This

---

[1] The United States' production of any material arguably relevant to those topics (for example, production of a report that Defendant Siraj Wahhaj sold a house in summer 2017 and earned over $100,000 in profit, in light of notice that the Defendants intend to use an expert forensic accountant to argue the Defendants did not have the financial means to commit the charged offenses) does not constitute concession by the United States that any such defense expert testimony is relevant or admissible.

would allow the Court to hear the Defendants' anticipated defenses prior to reviewing the United States' *ex parte* CIPA § 4 motion.

## FACTUAL AND PROCEDURAL BACKGROUND

The United States initiated this case by complaint filed on August 31, 2018, charging the five Defendants with a violation of 18 U.S.C. § 371, conspiracy to provide firearms to a person unlawfully in the United States.  Doc. 1.  This was followed by an indictment charging the same offense.  Doc. 25.  On March 14, 2019, the Grand Jury returned a superseding indictment against the Defendants, alleging violations of 18 U.S.C. §§ 2339A and 2 (providing material support to terrorists); 371 (conspiracy), 922(g)(5) (possession of firearms by person unlawfully in the United States), 1117 (conspiracy to murder a federal employee) (not charged against Subhanah and Hujrah Wahhaj), and 1201 (kidnapping—not charged against Defendant Siraj Wahhaj).  Doc. 85.

### A.  Context for the FBI's Georgia/New Mexico Investigation and Case File at Issue

The charges in this case were brought following an investigation in which it was discovered, among other things, that the Defendants conspired to kidnap JOHN DOE, a disabled three-year-old boy who was the biological son of Defendant Siraj Wahhaj, from his caregiving mother and transport him from Georgia to New Mexico, which overlapped with another conspiracy to prepare for and attack federal employees.  In the course of these crimes, the Defendants deprived the small child of his necessary prescription medication and care from his mother and other family members, and stood by while Defendant Siraj Wahhaj, at Defendant Jany Leveille's encouragement, subjected JOHN DOE to near-daily physically tormenting, hours-long, exorcism-type rituals until, within approximately a month's time, the little boy died in December 2017.  When the Defendants were arrested in August 2018, investigators discovered JOHN DOE's body, which the Defendants had mummified and used as a central prop in their conspiracy to "go to war" against corrupt institutions and attack federal employees.  According to witnesses interviewed after the Defendants' arrests, the

Defendants and others planned to attack "corrupt" institutions" and kill government officials and military members upon JOHN DOE's expected resurrection.

Coincidentally, beginning in 2015—well before any of the conduct underlying the charges in this case took place—the FBI's Atlanta office opened an investigation of Defendant Siraj Wahhaj predicated on a tip from a local resident and firearms business owner in the Atlanta area who was concerned about Siraj Wahhaj's firearms training at his business. *See* Ex. 1.[2]  Thus, when he and the other Defendants took JOHN DOE from his mother and transported him, along with multiple weapons, hundreds of rounds of ammunition, and body armor to New Mexico, the open and ongoing FBI Atlanta investigation's main efforts were providing support to local law enforcement agencies in Georgia and New Mexico in their efforts to find Siraj Wahhaj, the other Defendants, and JOHN DOE.

However, throughout the eight or nine months while the Defendants were living in New Mexico, the FBI's investigation slowly continued through routine steps in Georgia, still based on the suspicious firearms training tip from the local gun store owner.  At that time, the FBI's involvement in the kidnapping case was limited to providing support to local agencies in their search for Lucas Morton, Siraj Wahhaj, and JOHN DOE by providing background information on the group and assistance in certain local investigatory steps in New Mexico, such as the aerial surveillance conducted of the compound in the spring or summer of 2018.

In fact, at the time of Siraj Wahhaj's arrest on August 3, 2018, the FBI's remaining investigatory tasks out of Atlanta were little more than having one of the local FBI special agents in New Mexico to attempt to interview Siraj Wahhaj about the firearms training issue from Georgia. Depending on the results of that interview, charges were not anticipated for Siraj Wahhaj's firearms training there.  It would likely have been just another routine investigation where the FBI performed its due diligence based on a tip from the public and its assessment of investigatory merit based on

---

[2] The exhibits here are more redacted to protect PII information than those produced to the Defense.

other information known about the subject, resulting in a closed file and no charges (noting, of course, the state investigations and charges related to the kidnapping of JOHN DOE and child abuse of him and the other children).

Only after the Defendants were arrested in New Mexico did the center of the FBI's efforts shift from supporting local law enforcement in New Mexico while wrapping up the Georgia investigation, to actually investigating the Defendants for federal offenses in New Mexico. This shift was based on what was found at the compound and learned through interviews of several of the older children living there. As a result, the FBI administratively transferred the case file from the Atlanta office to the Albuquerque office. However, the same open case file continued to be used by the FBI in the New Mexico investigation, thus combining with the Atlanta records.

Accordingly, when the prosecution team reviewed the FBI case file to assess and produce discoverable information in this case, it reviewed atypical information in that there are entries spanning multiple years and related to uncharged Georgia firearms training in the case file. It should come as no surprise, then, that much of the FBI information in the case file for this case is logically irrelevant to any prospective defense in this case, and therefore not discoverable.

**B. Production of Additional Material**

As the case has progressed and the defense theories have evolved or become more apparent, the United States has continued to review material collected in the early parts of the investigation. Recently, the United States has identified and produced (or is in the process of producing) additional disclosures consisting of (1) several items that the United States asserts are not discoverable, but continue to be requested by the defense (largely, approximately 11 aerial surveillance events and reports from 2015-2017[3]), (2) a small number of items based on an updated understanding of possible

---

[3] Although the Government asserts that this footage in Georgia, obtained beginning some two years before any of the charged conduct took place in New Mexico, is in no way exculpatory or otherwise discoverable, the Government will provide these videos and the FBI records so as to complete its

defenses in this case gleaned from defense motions and expert notices (for example, a report that Defendant Siraj Wahhaj earned a $100,000 profit selling a house in Georgia in 2017), (3) a small number of potentially discoverable items recently added to the case file since the Government's previous review that may be Jencks material, which the Government will produce early, and (4) five items that the Government had marked for discovery in 2019 and believed had been produced, but were inadvertently not produced at that time (three of which were created prior to the charged conduct and well before the Defendants' arrests in this case).

### C.  Nothing Remaining in the FBI Case File is Discoverable

The remainder of the items in the Georgia/New Mexico case file are simply not discoverable under any conception of Rule 16, the Jencks Act, *Brady*, or its progeny.  Also not discoverable, and not provided, are FBI memoranda documenting the deployment of FBI resources.  As explained below, such administrative requests require no court approval and constitute internal FBI investigatory memoranda, which are no way material to the preparation of the Defendants' defense and in this case and are expressly not discoverable pursuant to Rule 16(a)(2).

Fully aware of its continuing discovery obligations, the United States requests this Court issue a ruling that these remnant items in the case file are not discoverable, irrespective of their classification, and deny the Defendants' motion with regard to this material.

### LAW AND ARGUMENT

The Defendants seek to compel three categories of information through the instant motion: (1) "All documents and information concerning the 2009/2010 investigation of any Defendant and/or their immediate family members, including parents and siblings"; (2) "All documents and information

---

production of all surveillance documentation in Georgia (pole camera, physical, and aerial).  The Government attaches here as an exemplar one of these records of aerial surveillance so the Court can see just how irrelevant and non-exculpatory these documents are to this case.  *See* Ex. 2 (sample of previously produced FBI record of aerial surveillance in Georgia).

precipitating the FBI's surveillance of the Defendants and their children in Georgia"; and (3) "All documents and information from any post-arrest investigation, whether determined to be classified or otherwise."  Doc. 702 at 6.  Defendant Siraj Wahhaj separately expands the first request to include information dating back to 2003.  Doc. 733 at 1.  The Defendants' requests for wholesale disclosure of investigatory material is unsupported by law or credible claims of materiality.

"There is no general constitutional right to discovery in a criminal case."  *Weatherford v. Busey*, 429 U.S. 545, 559 (1977).  Instead, the government's discovery obligations are limited to those commanded by *Brady v. Maryland, Giglio v. United States*, and the federal rules of criminal procedure.  *See United States v. Chief*, 487 F. Supp. 3d 1162, 1166 (D.N.M. 2020); Fed. R. Crim. P. 16, 26.2; *see also* 18 U.S.C. § 3500.  These obligations, though broad, are not limitless.  *See United States v. Agurs*, 427 U.S. 97, 106 (1976) (noting that the government is under "no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor"); *United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir. 1973) (reasoning that the purpose of *Brady* "is not to provide the defendant with complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory information known to the government but unknown to him").

Importantly, there is no rule of discovery that requires the government to provide a defendant with a narrative regarding the criminal investigation that led to his arrest. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) ("[D]efendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files"); *United States v. Bagley*, 473 U.S. 667, 675 (1985) ("[T]he prosecutor is not required to deliver his entire file to defense counsel").  The undisclosed materials and documents sought by the Defendants, presumably to create a narrative of the criminal investigation that led to their arrests, are not covered by *Brady, Giglio*, or the federal rules.

### A.  The Defendants' Requests Are Overbroad and Immaterial.

As an initial matter, the Defendants' request for "all documents and information" in their first and third of the three requested categories is overbroad.  The Defendants' request to compel production of whatever might fall into these broad, vague requests amount to improper fishing expeditions and carry no reasonable connection to either the rules governing discovery or the Defendants' defense in this case.  "Rule 16 does not entitle a criminal defendant to a broad and blind fishing expedition among items possessed by the Government on the chance that something impeaching might turn up." *United States v. Scully*, 108 F. Supp. 3d 59, 123 (E.D.N.Y. 2015).  The Defendants make no effort to articulate what actual materials to which they claim entitlement (other than historic pole camera videos and "drone footage"), nor do they explain how or why they would legally use or need such "documents and information."

In addition, all three of the Defendants' categorical requests lack a foundation of materiality to the Defendants' defense in this case.  A defendant must make a *prima facia* showing of materiality in order to obtain discovery.  *See United States v. Simpson*, 845 F.3d 1039, 1056 (10th Cir. 2017). "Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the government is in possession of information helpful to the defense." *United States v. Lucas*, 841 F.3d 796, 804 (9th Cir. 2016).  As set forth below, at no point do the Defendants articulate how any of the requested materials would "significantly alter the quantum of proof" in their favor.   *United States v. Burton*, 81 F. Supp. 3d 1229, 1244 (D.N.M. 2018) ("Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor.") (quoting *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996).

### B.  Information Concerning An Investigation From Over A Decade Ago Is Neither Relevant Nor Discoverable.

The United States will not use any documents, witnesses, or evidence from over a decade ago. As a matter of law, such remote information on other topics is not exculpatory, favorable, or helpful to any of the Defendants in this case, and especially so with respect to the three Defendants who are joined in the instant motion.  At that time, the Defendants were not living together; indeed, some had yet to even meet each other.  JOHN DOE, the eventual center of gravity to all of the charges in this case—was years from even being born.  Plainly, the requested information cannot logically form a part of "the defendant's defense" to the charges in this case, which the Supreme Court has clarified as only pertaining to "the defendant's response to the Government's case in chief."  *United States v. Armstrong*, 517 U.S. 456, 462 (1996).

The vague argument that the federal government is unfairly or selectively prosecuting the Defendants, as the Defense has both implied and directly asserted throughout this case, is not a defense to the actual evidence in the Government's case in chief.  Rule 16 "materiality" is limited to "shield" claims by a defendant against the government's evidence, not to press offensive "sword" claims seeking to obtain any and all information about any theory a defendant can imagine to broadly attack the government.  *Armstrong*, 517 U.S. at 462.  Indeed, the Supreme Court was discussing the same sort of selective prosecution argument when it held in *Armstrong* that material claimed to support such an argument is not the sort of material that is subject to disclosure under Rule 16.  *Id.*

Similarly, such remote information is not exculpatory under *Brady*.  *Brady* evidence is that "favorable to an accused" that is "material either to guilt or to punishment."  *United States v. Burke*, 571 F.3d 1048, 1053 (10th Cir. 2009).  Evidence is "material" under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.*  Here, there is zero probability that any documents from a 2003 or 2009–2010 investigation would change the outcome of this case to the Defendants' benefit, because it is necessarily completely disconnected from the players, the evidence, the locations, and

the charged acts and crimes in this case.  Moreover, to the extent that the basic fact that a 2003 or a 2009–2010 investigation was closed without charges being brought could arguably be considered exculpatory to any Defendant in this case, the Defendants already know this fact.  As a result, the specific case materials from this decade-old investigation are not *Brady* material in this case just to establish that no charges resulted.  Nothing about the lack of relevance and discoverability changes whether the Defendants' original 2009/2010 timeframe or Siraj Wahhaj's joinder's 2003 timeframe is used.  If anything, the reach back to 2003 only adds to the irrelevance of any such information.

The same goes for the Defendants' request for information related to "any Defendant being placed on or considered for the no-fly list, or any similar security measure," Doc. 702 at 6, and "any information that led to classified or other restrictions on Mr. Wahhaj's travel from 2003 forward," Doc. 733 at 2.  The Defendants are not charged with any conduct or offenses involving air travel.  Separate information from up to twenty years ago that may exist, if any, in the customs and border inspection realm are categorically irrelevant and immaterial to the defense against the charges in this case.  An exemplar of a fishing expedition, the Defendants' requests provide no articulation of how any such no-fly list-type information, if it even existed, would be material to their defense, or how it could significantly alter the quantum of proof in their favor.  Indeed, such information could only support a broad, overarching conspiracy argument that the United States is unfairly targeting or prosecuting the Defendants in this case.  As such, this information is not discoverable in this criminal prosecution.  *Armstrong*, 517 U.S. at 462.

Notably, this request appears to be based upon a point of personal contention by Siraj Wahhaj, as he and another person filed a pro se lawsuit against the Director and several employees of the U.S. Customs and Border Patrol agency in 2005, alleging (as the Defendants have alleged in this case) violations of their First and Fourth Amendment rights and rights under the Religious Freedom Restoration Act ("RFRA") for being temporarily detained at JFK Airport for a few hours and having

their luggage searched when returning from respective overseas trips in 2005.  *See Muhammad et al.,*
*v. Bonner, et al.*, Case No. 05-cv-01851-RJD, ECF No. 1 (E.D.N.Y. Apr. 14, 2005).  The suit was
dismissed on summary judgment, which was subsequently affirmed after a pro se appeal by Siraj
Wahhaj and the other person.  *See id.* at Docs. 37, 71, 77.  Apparently, Siraj Wahhaj and the
Defendants in this case now seek to obtain additional information—beyond discovery provided in the
litigation of this 2005 civil suit related to a temporary detention at the border—in this criminal
prosecution related to offenses committed in 2017 and 2018.  The lack of relevance and materiality
of the "no-fly" list information sought by the Defendants to this case is self-apparent, but is enhanced
when viewed in the context of the apparent motive for the request.

Accordingly, the Court should deny the instant motion to compel "all material and information
concerning the 2009/2010 investigation of any Defendant and/or their immediate family members,"
as well as Siraj Wahhaj's request for "disclosure of the information . . . beginning in 2003, rather than
just for 2009."  The Court should similarly deny the Defendants' requests for information related to
"no-fly" lists or unspecified "restrictions" on travel of Siraj Wahhaj.

### C. Although Surveillance of One of the Defendants in Georgia Is Not Exculpatory, It Has Been Disclosed

Despite the continued insistence of the Defendants, the surveillance videos from pole cameras
and aircraft in Georgia (mostly months, if not years, before the charged offense conduct) are not
exculpatory to the charges in this case, and to contend otherwise strains credulity.  Not surprisingly,
the Defendants have never provided—and still do not provide—any legal support for the admissibility
of such evidence.  To the contrary, it is well-established that "[a] defendant may not seek to establish
his innocence . . . through proof of the absence of criminal acts on specific occasions."  *United States*
*v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990).  Indeed, this Court has itself recognized that this sort
of "absence of criminal conduct on other occasions" evidence is not exculpatory.  *See United States*

*v. Real*, 2018 U.S. Dist. LEXIS 106675, 2018 WL 3118287, at *4 (D.N.M. June 25, 2018) (Johnson, C.J.) (citing cases).

In *Scarpa*, the Second Circuit affirmed the exclusion of evidence that an eavesdropping device had intercepted only "innocuous" conversations by the defendants, and explained that criminal defendants "cannot hope to use a process of elimination to defend themselves by presenting evidence of their noncriminal activities." *Id.* Indeed, evidence of noncriminal activities "would only be relevant if the indictment charged the defendants with ceaseless criminal conduct." *United States v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990). *See also Unite States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2014) (affirming exclusion of "prior good act" evidence where defendants charged with terrorism offenses sought to introduce classified evidence of their non-criminal contacts with Spanish intelligence officials); *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (rejecting defense argument that "evidence of innocent travel [to Jamaica] was necessary to rebut the government's allegation that [the defendant] had been involved in other cocaine importations from Jamaica"); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming, in case involving fraudulent asylum applications, exclusion of evidence that defendant had "prepared other, non-fraudulent applications" because that evidence "was simply irrelevant to whether the applications charged as false statements were fraudulent"); *United States v. Dobbs*, 506 F.2d 445, 447 (5th Cir. 1975) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant").

Here, contrary to the Defendants' strained reading of the indictment, they are not charged with "ceaseless criminal conduct." *Scarpa*, 913 F.2d at 1011. The Defendants are charged with offenses and overlapping conspiracies that depended on and revolved around the kidnapping and eventual death and anticipated resurrection of JOHN DOE in New Mexico. Footage of parked cars and rooftops from Georgia in 2015–2017, well before any of the charged offenses took place, is simply

12

not relevant.  Nor is footage captured from a static pole camera in Georgia in December 2017, as this is after the Defendants had left the state with JOHN DOE.  The Defendants state that "mid-December 2017" is "the most critical time period in the case," and that they have not been provided footage from that time period.  Doc. 702 at 6.  But, in mid-December 2017, the Defendants were in New Mexico. Jany Leveille's own book documents the death of JOHN DOE on the compound around December 24, 2017.  The Defendants' well-documented crash in the middle of the night in Alabama took place on December 13, 2017, several days after the Defendants left Georgia.  In any event, the Government has provided the pole camera footage it has for all of November and December 2017.

In addition, if surveillance footage from one of the hundreds of hours captured over the course of two years showed the Defendants getting in a car in early December 2017 and driving away with JOHN DOE, that would be inculpatory evidence of the kidnapping, not exculpatory evidence.  And, if footage from any other day necessarily does not capture such activity, that other footage does not exculpate the Defendants.  Like nearly all of the Georgia portion of the investigation in this case, this footage is irrelevant to the charges and it is not discoverable.

Nevertheless, the Defendants' request for the Georgia surveillance footage is moot, as it has all been provided.  In reviewing the entire case file again for purposes of responding to the instant motion to compel, the Government discovered that some, but not all, of the dozen or so records of aerial surveillance beginning in 2015 in Georgia had been produced, in addition to all of the pole camera footage that has been produced.  *See, e.g.*, Ex. 2.  All of the aerial surveillance records have now been produced.  Thus, there is no additional surveillance material to provide to the Defense from either Georgia, Alabama, or New Mexico.  This aspect of the Defendants' motion should be denied as moot.

### D.  There Is No Discoverable "Factual or Legal Basis" for Observing Publicly Viewable Areas.

In addition to seeking to compel pole camera and aerial surveillance footage that is not

relevant or exculpatory, the Defendants ask the Court to compel production of all "materials or information concerning the factual or legal basis for such surveillance" because it is "highly intrusive" and "unquestionably invades the privacy of the Defendants and their family members." Doc. 702 at 3. Yet courts disagree, and the Defendants provide no law or authority to support their claim that some "factual or legal basis" for law enforcement observation of publicly viewable areas is required in the first place, let alone is then required to be provided in discovery.

To the contrary, the "use of video equipment and cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment." *United States v. Jackson*, 213 F.3d 1269, 1280 (10th Cir. 2000), *vacated and remanded on other grounds by Jackson v. United States*, 531 U.S. 1033 (2000). This includes aerial observation or photography, *see Dow Chem. Co. v. United States*, 476 U.S. 227 (1986); *California v. Ciraolo*, 476 U.S. 207, 213 (1986), as well as stationary pole cameras, *Jackson*, 213 F.3d at 1281. Thus, "long-term warrantless surveillance via a stationary pole camera does not violate a defendant's Fourth Amendment rights when it was possible for any member of the public to have observed the defendant's activities during the surveillance period." *United States v. Houston*, 813 F.3d 282, 290 (6th Cir. 2016). As a result, the FBI in Atlanta "did not need to get a search warrant to utilize the pole camera and the evidence derived from it." *Thomas v. Robinson*, 2021 U.S. Dist. LEXIS 252771 at *37–38 (N.D. Ohio Oct. 20, 2021).

Here, the pole camera and aerial surveillance only captured activity that any stranger standing on the public street could have observed or that was in public view. The surveillance videos could not see into anyone's home. The collection of such footage was a routine, non-invasive investigatory method used to establish patterns of life or verify simple facts such as vehicle use or home address. Thus, no warrant was required, and no warrant was obtained. *See Jackson*, 213 F.3d at 1280-81; *United States v. Cantu*, 684 Fed. App'x. 703, 704-05 (10th Cir. 2017). Administrative FBI documents are not discoverable under any rule of discovery, and are expressly excluded from discovery by Rule

14

16(a)(2).  Accordingly, this aspect of the Defendants' motion should be denied.

Finally, the Defendants' demand that the United States create a "listing of all video files in its possession . . . classified or otherwise, of any surveillance conducted on any Defendant at any time" is again overbroad, factually unwarranted, and legally baseless.  Doc. 702 at 6.  *See United States v. Warshak*, 631 F.3d 266, 296 (6th Cir. 2010) (noting the "dearth of precedent" and Rule 16 being "entirely silent" with "no indication" that the government must organize or index discovery provided to a criminal defendant); *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 454 (S.D.N.Y. 2011) (denying defense motion to compel the government to organize and label discovery because "*Brady* and its progeny impose no obligation on the Government to organize for Defendants in the format they design material already produced to them").

The United States has provided the entirety of the pole camera video footage in its possession, as well as all viewable[4] aerial surveillance from Georgia, Alabama, and New Mexico. The file names and the footage itself provides the location and the dates and times of the footage.  And, again, the Georgia video footage is not exculpatory or discoverable anyway.  The United States is not required to further organize these irrelevant materials for the Defense.

### E. Post-Arrest Investigation Information Has Already Been Disclosed or Will Be Addressed in the CIPA Section 4 Motion

Finally, the Defendants seek to compel production of "all documents and information from any post-arrest investigation, whether determined to be classified or otherwise." Doc. 702 at 6.  This request is largely moot, as all "post-arrest" information that the Government has deemed discoverable has been (or, for two items, will be) disclosed.

---

[4] One of the SD cards used to record the aerial surveillance flights over the Defendants' compound in New Mexico in the summer of 2018 was damaged or corrupted around the time of the recording, and the United States has never been able to extract or view any footage that may have been captured on that SD card.  Nevertheless, this damaged SD card remains in evidence, and the United States has invited the Defense to visit the FBI to attempt to make a copy of the data on the card if they would like.

As an initial matter, as described above, the FBI was not investigating the Defendants in relation to the charges in this case until after the vast majority of the evidence of the charged offenses was discovered "post-arrest."  To the extent that the FBI had other information due to the separate, ongoing investigation of Siraj Wahhaj stemming from the tip in Atlanta, much of the documentation of the Defendants' actions, beginning with the kidnapping of JOHN DOE, did not make sense until put into the context of everything that was discovered at the compound in New Mexico.  Again, all "post-arrest investigation" that is discoverable has been produced (or, for the two items created post arrest thought to have been produced earlier but were not, will be produced imminently).

### F. The Defendants' Requests for This Court to Misapply CIPA in Several Ways Are Misplaced and Should Be Denied

Beyond requesting broad categories of information, the Defense also asks this Court to "order the Government to file" a CIPA Section 4 motion and either forbidding the United States from filing such a motion containing classified information *ex parte* or by allowing defense counsel to obtain a security clearance and then to participate in the Section 4 process.  Doc. 702 at 11, 17–18, 20–22.  Such arguments have no basis in law, have been roundly and consistently rejected by courts across the country for the over 40 years of CIPA's existence, and do not warrant this Court blazing a new trail in the opposite direction.

First, by their express terms, both CIPA and Rule 16 allow a court to consider *ex parte* filings when needed to protect classified information, as would be the case here.  *Compare* 18 U.S.C. App. 3 *with* Rule 16(d)(1).  CIPA's provisions complement and clarify the Court's power under Rule 16(d).  *See United States v. Moussaoui*, 591 F.3d 263, 281–82 (4th Cir. 2010).  And under the Rule, "good cause" "includes the protection of information vital to the national security." *Id*. (citation omitted).

In fact, "every court that has considered this issue has held that CIPA permits *ex parte* hearings." *United States v. Amawi*, 695 F.3d 457, 472 (6th Cir. 2012).  *See also United States v. Sedaghaty*, 728 F.3d 885, 908 (9th Cir. 2013) (describing challenges "to the *in camera* and *ex parte*

16

proceedings required by CIPA as "a battle already lost in the federal courts" regardless of whether such proceedings are otherwise "generally disfavored" in areas of litigation apart from the discovery and use of classified information); *In re Terrorist Bombings*, 552 F.3d 93, 121–22 (2d Cir. 2008) (explaining that one of the reasons Congress passed CIPA was to encourage trial judges to exercise their ability to restrict or limit the discovery of classified information to the defense in criminal prosecutions, which Congress perceived was necessary because some judges were reluctant to use their authority to do so under Federal Rule of Criminal Procedure 16(d)).

The Defendants seek to invert the purpose of CIPA, asking this Court to compel the government to "disclose to cleared defense counsel its arguments in support of non-production" in its CIPA § 4 motion, and to hold "an adversarial hearing addressing those arguments."  Doc. 702 at 21. The Defense provides no authority for this request, and there is no precedent for it.  This is unsurprising because it would defeat the very aim of the statute, which is "to provide a means for the courts to oversee the government's authority to delete evidence from discovery.  To permit defense counsel to participate in such a hearing would frustrate the aim of CIPA." *Amawi*, 695 F.3d at 472; *see also United States v. Campa*, 529 F.3d 980, 995 (11th Cir. 2008) ("The right that [CIPA] section four confers on the government would be illusory if defense counsel were allowed to participate in section four proceedings because defense counsel would be able to see the information that the government asks the district court to keep from defense counsel's view.");  *United States v. Mejia*, 448 F.3d 436, 457 (D.C. Cir. 2006) ("[A]n adversary hearing with defense knowledge would defeat the very purpose of the discovery rules.").

The Defendants' citations of non-CIPA, civil case opinions, and their discussion of the state secrets privilege in this criminal case (which involves CIPA and the classified information privilege), *see* Doc. 702 at 16–17, 22, to suggest this Court should not allow the Government to file its CIPA § 4 motion *ex parte* are, to say the least, inapposite.  Regardless of what civil case rulings dealing with

an entirely different privilege may ponder, there simply is no applicable CIPA case supporting the Defendants' argument, and a plethora rejecting it. *Ex parte* filings and proceedings under Section 4 of CIPA are well-established as "part of the process" when classified information is potentially at issue in discovery in criminal cases. *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998) (holding that while "[e]x *parte* hearings are generally disfavored . . . [i]n a case involving classified documents, . . . *ex parte, in camera* hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information," and that when the "government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules").

Second, and relatedly, the Defendants' suggestion that defense counsel could simply obtain a security clearance in order to then be permitted to participate in the Court's consideration of the Government's *ex parte* CIPA § 4 motion has been equally widely rejected by courts applying CIPA across the country.[5]  In short, "the simple fact that defense counsel [holds a] security clearance[] does not mean that the attorneys [are] entitled to access the government's classified filings." *Sedaghaty*, 728 F.3d at 909.  Two recent cases illustrate why.[6]

---

[5] Practically speaking, even if it made a difference for purposes of CIPA § 4, which it does not, no defense counsel in this case holds an active security clearance.  The months of time and resources it would take to seek a clearance for any defense counsel would extend beyond the current trial date in this case, making the Defendants' suggestion directly at odds with their previous statements asserting speedy trial interests.

[6] Every court of appeals to have considered the argument has held that merely possessing a security clearance does not entitle defense counsel to classified information, often in the FISA context. *See, e.g.*, *United States v. Dhirane*, 896 F.3d 295, 301 (4th Cir. 2018) ("[W]e reject the defendants' challenge to the FISA framework and thus to the district court's decision not to disclose the classified FISA materials to the defendants' counsel under that framework, even though, as the defendants repeatedly noted, their counsel had the requisite security clearance."); *United States v. Daoud*, 755 F.3d 479, 484 (7th Cir. 2014) ("It's also a mistake to think that simple possession of a security clearance automatically entitles its possessor to access to classified information that he is cleared to see."); *United States v. El–Mezain*, 664 F.3d 467, 568 (5th Cir. 2011) ("[W]e are unpersuaded by the

In *United States v. Al-Farekh*, the Second Circuit rejected the claim that "where a defense counsel has an appropriate security clearance, the District Court may not adjudicate the CIPA motions *ex parte* and must give defense counsel access to the classified information." 956 F.3d 99, 107 (2d Cir. 2020). The court noted that "notwithstanding the rarity of *ex parte* proceedings in criminal matters, there can be no question that a district court's *ex parte*, *in camera* adjudication of CIPA motions falls squarely within the authority granted by Congress." *Id*. Thus, because "[n]othing in the text of § 4 limits the District Court's authority to review classified information *ex parte* only where defense counsel lacks a security clearance[,]" the defendant's "proposed rule cannot be reconciled with CIPA as enacted by Congress and interpreted by our Court." *Id*.

Ultimately, the Second Circuit rejected the same argument the Defendants make here, concluding that, "because it may well be that the information in a § 4 motion is not discoverable at all, [the defendant's] theory would permit a defendant represented by counsel with a security clearance to gain access to classified information that would otherwise be unavailable to the defendant. That possibility could result in the improper disclosure of information that, by its very nature, may put the national security of the United States at risk." *Id*. at 108.

The year before *Al-Farekh*, the Sixth Circuit held similarly. In *United States v. Asgari*, the government filed a CIPA § 4 motion seeking to withhold irrelevant classified information. 940 F.3d 188, 189 (6th Cir. 2019). The district court initially granted the motion but, at the insistence of the defense counsel, reconsidered its decision after learning that defense counsel possessed a top-secret security clearance. *Id*. Having reconsidered the matter, the district court ordered the government to disclose to defense counsel the classified material it had previously declared irrelevant. The government filed an interlocutory appeal under CIPA § 7.

---

defendants' argument that the Government's interest is diminished because defense counsel possess security clearance to review classified material.").

The Sixth Circuit reversed, explaining that "the existence of a security clearance by itself does not change the equation or offer a legitimate basis for changing course, and above all it does not alter the directive of [CIPA] that the district court make these decisions on an ex parte basis." *Id*. at 191. The court held that "[n]othing in § 4 suggests that defense counsel has a role to play when the district court assesses the relevance or helpfulness of the classified information. Just the opposite. The statute refers to the district court's assessment of these factors through an ex parte hearing ('a written statement to be inspected by the court alone') that occurs without the defendant's knowledge ('If the court [grants relief] following such an ex parte showing, the entire text of the statement of the United States shall be sealed.')." *Id*. at 192 (quoting CIPA § 4).

The court in *Asgari* also explained that "[d]efense counsel's security clearance becomes relevant if and only if the court determines the material should be disclosed." *Id*. at 191. The court concluded, "[w]hether defense counsel has a security clearance or not, top secret or not, are considerations that do not explain why we can read defense counsel's involvement into the § 4 relevance inquiry." *Id*. at 192. Of course, this is the touchstone of classified information: even with a security clearance, the reviewing party must have a "need to know." *See Al-Farekh*, 956 F.3d at 108–09 (providing non-discoverable information to cleared counsel "could result in the improper disclosure of information that, by its very nature, may put the national security of the United States at risk").

Thus, defense counsel's possession, willingness, or ability to seek or obtain a security clearance is an often-made argument in CIPA cases, but it remains just as legally groundless in this case as courts have found it throughout CIPA's history. As in *Asgari*, even if defense counsel had the highest security clearance available, it would not give them a need-to-know for non-discoverable classified information. And a need-to-know is one of the inseparable requirements for any person to receive or view classified information. *See* Exec. Order 13526, § 4.1(a). Indeed, just last week the

Southern District of New York—one of the preeminent federal districts for CIPA litigation—again considered the argument that defense counsel with a security clearance should be allowed to participate in CIPA § 4 proceedings because *ex parte* filings are "disfavored." *See United States v. Hossain*, 2023 U.S. Dist. LEXIS 68599 at *5–9, (S.D.N.Y. Apr. 19, 2023). The court in *Hossain* quickly dispatched this argument, and this Court should do the same to the Defense's regurgitation of the same argument here. *Id.*

## CONCLUSION

The Defendants' motion to compel, and Siraj Wahhaj's separate joinder, are overbroad, unsupported by a showing of materiality, and inconsistent with rules and statutes governing discovery. The request for "all documents and information concerning the 2009/2010 investigation of any Defendant and/or their immediate family members, including parents and siblings," expanded by Siraj Wahhaj's joinder to include as far back as 2003, apart from being overbroad, is not exculpatory, favorable, or helpful to any of the Defendants in this case, and should be denied as a matter of law. Apart from lacking merit, the Defendants' other requests are moot, as the United States is aware of its continuing discovery responsibilities and continues to provide the Defendants with discovery that has the potential of being material to the preparation of the defense in this case. Any requests that implicate classified material will be addressed in the United States' CIPA § 4 motion, which should be heard *ex parte*, and decided after the Court has considered whether an *ex parte* defense proffer would assist it in its analysis.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*/s/ electronically filed May 5, 2023*
TAVO HALL
KIMBERLY A. BRAWLEY

21

Assistant U.S. Attorneys
201 Third St. NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274

I hereby certify that a copy of this motion was
delivered via CM/ECF to counsel for the
defendants and a copy was mailed to Defendant
Lucas Morton.
//s//
Electronically filed
TAVO HALL