IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cr. No. 18-2945 WJ |
| | ) |
| JANY LEVEILLE, et al, | ) |
| | ) |
| Defendants. | ) |

**UNITED STATES' MOTION TO EXCLUDE THE
TESTIMONY OF DR. CHITRA RAGHAVAN**

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702, 703, and 704, the United States moves to exclude Defendant Subhanah Wahhaj's proposed expert testimony of Dr. Chitra Raghavan. The United States also moves to exclude the proffered testimony pursuant to Fed. R. Evid. 401, 402, and 403. For the reasons discussed below, the purposes for which Defendant Subhanah Wahhaj (Subhanah) proposes to offer Dr. Raghavan's testimony are not appropriate because the testimony would be of so little probative value that it would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and a waste of time.

I.   Introduction

Fed. R. Crim. P. 16(b)(1)(C) governs a defendant's disclosure regarding expert witnesses and provides that a defendant must, at the government's request, provide, amongst other things, a written summary of all opinions the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial. The complete statement of the expert witness's opinion must also include the bases and reasons for the expert's opinion. *Id*.

The Supreme Court in *Daubert* interpreted Federal Rule of Evidence 702 to require district courts to ensure that an expert's scientific testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 508 U.S. at 597. The Court suggested a nonexclusive list of factors for courts to consider in determining whether the proposed scientific expert testimony is "reliable," including whether the theories or techniques (1) have been or can be tested; (2) have been subjected to peer review and publication; (3) have a known or potential error rate; (4) are subject to standards governing their application; and (5) enjoy widespread acceptance.

Following the decision in *Daubert* and other cases, including *Kumho Tire Co. v. Carmichael,* 119 S.Ct. 1167, 1171 (1999), the gate-keeping responsibilities of district courts were expanded through an amendment to Rule 702 in 2000, which changed the rule to include all expert testimony, not just testimony based in science, and the rule was again amended in 2011. Rule 702 now states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Notwithstanding Amended Rule 702, the admissibility of proposed expert testimony continues to depend upon the reliability and helpfulness to the trier of fact. Indeed, the Court in *Kumho* held that *Daubert*'s non-exclusive factors to aid trial courts in assessing the reliability of scientific expert testimony might also be applicable in assessing the reliability of non-scientific testimony, depending upon the particular circumstances of each case. *Id.* at 1175. The trial court has the responsibility to ensure that the scientific evidence satisfies the relevance standard for

2

admissibility. If evidence has no grounding in fact, then it cannot in any meaningful way be relevant to resolving a disputed issue. The application of the factors set forth in *Daubert* and *Kumho* requires an analysis of the evidence to determine the extent to which the theory in question relies on the expert's own interpretations, or on subjective rather than on objectively verifiable criteria.

## II. The Charges in the Superseding Indictment

On March 14, 2019, a federal grand jury returned a seven-count superseding indictment against Subhanah and her co-defendants, alleging violations of 18 U.S.C. §§ 2339A and 2 (Providing Material Support to Terrorists and Conspiracy to do the same), 1117 (Conspiracy to Murder an Officer or Employee of the United States), 371 (Conspiracy to Commit an Offense Against the United States), 922(g)(5) (Possession of Firearms by a Person Unlawfully in the United States), and 1201 (Kidnapping and Conspiracy to do the same). Doc. 85. Subhanah is charged in every count except Count 3 (18 U.S.C. § 1117).

To convict the Defendants of Count 1, Conspiracy to Provide Material Support to Terrorists, in violation of § 2339A, the United States must prove the following elements beyond a reasonable doubt:

1. The Defendants entered into a conspiracy;
2. The objective of the conspiracy was to provide material support or resources; and
3. The Defendants knew and intended that the provision of such material support or resources would be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 1114.

*United States v. Hassan*, 742 F.3d 104, 111-12 (4th Cir. 2014) (internal citation omitted); *United States v. Khan*, 309 F. Supp. 2d 789, 821 (E.D. Va. Mar. 4, 2004); Doc. 85 at 2. For purposes of § 2339A, "'material support or resources' . . . includes currency and other property, training,

weapons, expert advice or assistance and personnel." *Hassan*, 742 F.3d at 112 (citing 18 U.S.C. § 2339A(b)(1)). "Material support or resources" is broadly defined to include:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

*Id.* at § 2339A(b)(1). Section 1114 criminalizes killing or attempting to kill any officer or employee of the United States while the person is engaged in or on account of the performance of official duties. Notably, however, the government does not need to satisfy the elements of the predicate offense to secure a conviction under § 2339A. The Eleventh Circuit has explained:

> [T]he government need not prove all the elements of … the object offense, in order to satisfy the elements of the substantive § 2339A charge. By its elements, § 2339A criminalizes material support given "in preparation for" the object offense – clearly, the object offense need not even have been completed yet, let alone proven as an element of the material support offense.

*United States v. Hassoun*, 476 F.3d 1181, 1188 (11th Cir. 2007). In sum, it is sufficient to prove that the Defendants provided material support or resources knowing that they would be used in preparation for a predicate offense. *Id*.

Count 2 is a substantive § 2339A charge. Thus, to convict the Defendants of Count 2, the United States must prove beyond a reasonable doubt the third element of Count 1, listed above. Count 2 includes an aiding and abetting theory, and the elements of this theory are as follows:

1. Every element of the charged crime was committed by someone other than the Defendant(s); and
2. The Defendant(s) intentionally associated him/herself in some way with the crime and intentionally participated in it as he/she would in something he/she wished to bring about.

*See* 10th Cir. Pattern Jury Instr. 2.06 (2021) (modified).

Subhanah is not charged in Count 3, but to convict her codefendants of this charge, Conspiracy to Murder an Officer or Employee of the United States, in violation of 18 U.S.C. § 1117, the government to prove beyond a reasonable doubt:

1. The Defendants entered into a conspiracy;
2. The object of the conspiracy was to kill or attempt to kill officers and employees of the United States government (here, Federal Bureau of Investigation employees, government officials, and military personnel), on account of—or while such officers and employees were engaged in—the performance of their official duties; and
3. At least one overt act was committed in furtherance of the conspiracy.

*Hassan*, 742 F.3d at 113 (upholding defendant's convictions for both 18 U.S.C. §§ 2339A and 1117).

To convict the Defendants of Count 4, Conspiracy to Commit an Offense Against the United States, the United States must prove the following elements beyond a reasonable doubt:

1. The Defendants agreed with at least one other person to violate the law, i.e., to assist Leveille in unlawfully possessing a firearm;
2. One of the conspirators engaged in at least one overt act furthering the conspiracy's objective;
3. The Defendants knew the essential objective of the conspiracy;
4. The Defendants knowingly and voluntary participated in the conspiracy; and
5. There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

*See* 10th Cir. Pattern Jury Instr. 2.19 (2021) (modified).

To convict the Defendants of Count 5, Possessing a Firearm While Unlawfully in the United States, in violation of 18 U.S.C. §§ 922(g)(5) and 2, the United States must prove the following elements beyond a reasonable doubt:

1. Leveille knowingly possessed a firearm or ammunition;
2. At the time of the possession, Leveille was illegally or unlawfully in the United States;
3. Leveille knew she was illegally or unlawfully in the United States; and
4. Before Leveille possessed the firearm or ammunition, the firearm or ammunition moved at some time in interstate or foreign commerce.

*See* 10th Cir. Pattern Jury Instr. No. 2.44 (2021) (modified).  The aiding and abetting instructions

included above apply to the remaining Defendants.

To convict the Defendants of Kidnapping, in violation of 18 U.S.C. § 1201, as charged in Counts 6 and 7, the United States must prove the following elements beyond a reasonable doubt:

1. The Defendants, knowingly acting contrary to law, kidnapped John Doe by seizing, confining, inveigling, decoying, abducting, or carrying him away as charged;
2. The Defendants kidnapped John Doe for some purpose or benefit;
3. The Defendants willfully transported John Doe; and
4. The transportation was in interstate commerce.

To "kidnap" a person means to unlawfully hold, keep, detain, and confine the person against the person's will. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense.

*See* 10th Cir. Pattern Jury Instr. 2.55 (2021) (modified); *see also United States v. Walker*, 137 F.3d 1217, 1220 (10th Cir. 1998) (setting forth the requirements for conviction under § 1201(a)(1)); *United States v. Toledo*, 985 F.2d 1462, 1467 (10th Cir.1993). Again, because Count 6 is a conspiracy charge and because Count 7 includes an aiding and abetting theory, the aforementioned elements pertaining to conspiracy and aiding and abetting also apply.

In this case, Subhanah is alleged to have committed a number of overt acts, including: traveling across state lines while armed with firearms and ammunition; constructing and maintaining a training compound; storing firearms and ammunition on the training compound; and possessing and shooting a firearm at the compound's firing range. Doc. 85 at 1-5. Subhanah is also alleged to have provided financial support to her coconspirators. *Id*. at 4.

### III. The Proposed Testimony of Dr. Chitra Raghavan

Subhanah has provided notice that she intends to call Dr. Chitra Raghavan, whom she identifies as a clinical psychologist, to testify at trial. Doc. 735 at 2. Subhanah's Amended Notice of Expert Testimony states:

> [Dr. Raghavan] is an expert in trauma bonding, coercive control, and mental illness. Her opinions are outlined in her report which was produced to the government along

6

>with her CV . . . . She will opine that the beliefs and actions of the defendants are consistent with cult behavior, and Ms. Wahhaj's actions in following her husband and brother from their home in Georgia to New Mexico are consistent with certain mental illnesses.

*Id*. Dr. Raghavan's curriculum vitae appears to associate her with the theory of "coercive control" and trauma, particularly in the context of sex trafficking and domestic violence. *See* Dr. Raghavan's Curriculum Vitae, attached hereto as Exhibit 1. Dr. Raghavan said she "conducts research on power dynamics known as coercive control across intimate partner abuse, sexual assault, sex trafficking, cult context and their related traumatic outcomes." *See* Dr. Raghavan's Report, attached hereto as Exhibit 2 at 9. She has been "deemed an expert by the courts in intimate partner violence, sex trafficking, coercive control, trauma, and trauma bonding." *Id*.

Dr. Raghavan prepared a written report that is intended to summarize her opinions and the bases for those opinions. *See* Exhibit 2. The first sentence of her report begins by explicitly stating that she did not examine Subhanah and hence "is not providing a diagnosis or opining on a mental disorder." *See id*.

Rather, Dr. Raghavan is expecting to "explain the complex intersection of two rare mental conditions and the conditions that produce them (i.e. coercive control) that may be applicable" to Subhanah, despite never having examined or evaluated Subhanah. *Id*. at 1. The "rare" mental conditions are "Identity Disturbance due to Prolonged and Intense Coercive Persuasion" and "Other Specified Schizophrenia Spectrum and Other Psychotic Disorder, Delusional Symptoms in the context of a relationship with an individual with prominent delusions." *Id*. Subhanah proffers Dr. Raghavan to testify about these mental health conditions and trauma bonds, which, according to Dr. Raghavan, may exist where there is an abusive and harmful leader whose "perspective dominates and replaces the victim's own beliefs" and when the person afflicted with these conditions is subjected to a "chronically abusive and inescapable environment." *See id*. at 2-3. Indeed, Dr.

7

Raghavan's report is replete with references to a coercive relationship, which is a seeming precursor for trauma bonding and these specific mental health conditions to arise. *See* Exhibit 2.

Despite the seriousness and rarity of these mental health conditions, Dr. Raghavan does not even identify in her report the abusive relationship that would have given rise to these mental health conditions, nor does she identify the evidence that indicates Subhanah was subjected to such an immersive, abusive, and coercive environment. *See id*. Instead, the report states that Dr. Raghavan's testimony:

> . . . will explore any and all data and reports that help explain whether Ms. Subhanah Wahhaj's beliefs are consistent or contradictory with this definition of brainwashing. Because Ms. Subhanah Wahhaj declined to be interviewed by Dr. Raghavan because God had required her to resist, Dr. Raghavan will rely on the evidence demonstrating when she began to adopt these views, why she began to adopt these views, and if the persuasion was through her husband Mr. Lucas Morton, Ms. Leveille, and/or through communal group punishment and pressure. These possibilities will be explored hypothetically.

*Id*. at 5.

In addition to this statement, Dr. Raghavan's proposed testimony will include explanations of the following:

1. "[H]ow in traditional interpretation of Muslim values (even if these values may have little to do with other progressive/contemporary Muslims), ultimately require group cohesion and group loyalty." *Id*. at 5. She will also testify that "[s]eparately from Islam, in high control groups (such as cults and unhealthy religious orders) any divergence in thinking is seen as a threat and those who refuse to comply are pressured until they change." *Id*. at 6.

2. How Subhanah "describes her ideas of power and subservience to men" in her self-published book, "How I Found Myself in Egypt." *Id*. at 6. Dr. Raghavan opined that perhaps Subhanah was clinically depressed, and Dr. Raghavan recounts some of Subhanah's feelings as recorded in the journal-like entries. *Id*. at 6-7.

3. "[H]ow an initial trauma bond and its associated changes in identity and perspective can be shared by multiple group members." *Id*. at 7. She states, "there is little doubt that the group shared the same set of irrational beliefs and at times were found to be incompetent or difficult to diagnose although currently both are competent." *Id*.

   Dr. Raghavan concedes that "as a field, forensic psychology has neglected brainwashing and

has failed to appreciate how cults and religious groups produce disordered thinking—although this knowledge is widely accepted and a focus of research in those who study cults and coercive persuasion." *Id*. at 8. Regardless, Subhanah seeks to put Dr. Raghavan before the jury to testify that "many aspects of a trauma bond can manifest as 'brainwashing' that originally emanated from a powerful, charismatic leader." *Id*. at 2. Her testimony is intended to imply to the jury that, at the time of the charged acts in the superseding indictment, Subhanah was brainwashed by her codefendants and suffering from the aforementioned rare mental conditions. Notably, Subhanah did not provide notice of intent to assert the defense of insanity, as required by Fed. R. Crim. Pro. 12.2.

IV.     Discussion

A. The United States does not object to Dr. Raghavan's qualifications with regard to the abstract coercive control concept.

In order to determine whether the expert opinions of Dr. Raghavan are admissible, the district court must first determine whether she is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *See* Fed. R. Evid. 702. The United States does not dispute that Dr. Raghavan is knowledgeable about coercive control, trauma, and trauma bonding, particularly in the context of partner violence and sex trafficking. *See, e.g.*, Exhibit 1. The United States' contention is that Dr. Raghavan's proposed testimony is irrelevant in this particular case, as more fully discussed below.

B. The proposed testimony of Dr. Raghavan is not relevant.

The superseding indictment alleges, among other things, that Subhanah conspired with and aided and abetted her coconspirators in: providing material support or resources knowing and intending that the provision of such material support or resources would be used in preparation for, or in carrying out, a violation of § 1114; helping Leveille possess firearms and ammunition; and kidnapping John Doe. Doc. 85. Without pointing to any evidence indicative

9

of coercive control that made Subhanah victim to brainwashing and adverse psychological conditions, Dr. Raghavan's proposed testimony would merely raise the possibility that Subhanah may have been suffering from two rare, complex mental health conditions as a result of being amongst the Defendants. The proposed testimony is improper, especially when there is no evidence to explain how this testimony is relevant to any of the elements to be decided by the jury. In short, Subhanah is attempting to smuggle improper mental health evidence into a coercion or justification defense, in a case where none of these issues are legally implicated.

With respect to guilt, the only proper purpose for which mental health evidence can be offered is to an insanity defense or to negate specific intent. If a defendant wishes to pursue an insanity defense or provide evidence of a mental condition bearing on guilt, he/she must file an appropriate notice as demanded by the Federal Rules of Criminal Procedure. Absent such a notice, which has not been filed in this case by Subhanah, her attempts to adduce testimony by Dr. Raghavan, who has not even evaluated Subhanah, about speculative mental health conditions are, at best, an opinion comment on her possible mental state as an element of the crime or a defense to the crime, which is explicitly prohibited by Fed. R. Evid. 704(b).

The opinion evidence proffered has no link to either an insanity defense or to negate an element of specific intent. Instead, it is linked to a coercion or justification defense. Mental health evidence is not admissible as to that issue. *United States v. Dixon*, 901 F.3d 1170, 1176 (10th Cir. 2018).

It is well-established that the Insanity Defense Reform Act of 1984 (IDRA) significantly limits the role played by mental disease evidence in criminal trials. 18 U.S.C. § 17(a). As the Tenth Circuit has recounted, apart from the insanity defense codified in 18 U.S.C. § 17(a), "IDRA eliminated all other affirmative defenses or excuses based upon mental

disease or defect." *United States v. Brown*, 326 F.3d 1143, 1146 (10th Cir. 2003) (emphasis omitted); 18 U.S.C. § 17(a) ("Mental disease or defect does not otherwise constitute a defense."). As such, "IDRA bars the introduction of evidence of a defendant's mental disease or defect to demonstrate that he lacked substantial capacity to control his actions or reflect upon the consequences or nature of his actions." *Brown*, 326 F.3d at 1146.

Similarly, mental health evidence is irrelevant and inadmissible with respect to a coercion, justification, or duress affirmative defense.[1] A duress defense is a very narrow affirmative defense which excuses criminal conduct where the defendant has "no reasonable, legal alternative to violating the law" because the defendant was then "under an unlawful and present, imminent and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury." *Dixon*, 901 F.3d at 1176 (citing 10th Cir. Pattern Jury Instr. § 1.36; *United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990)). The test "makes clear that a particular defendant's subjective beliefs or perspectives are not controlling; they must be objectively reasonable." *Dixon*, 901 F.3d at 1181. As an objective inquiry, "non-tangible psychological conditions that ostensibly alter the defendant's subjective beliefs or perceptions" have no place in it. *Id*. at 1183. Thus, for example, the Tenth Circuit considered and rejected an argument that PTSD-mental health evidence was admissible to a duress defense. *Id*. at 1180-84. ("[T]he guidepost of our pattern instruction is not what is reasonable only through the PTSD-distorted lens of Ms. Dixon, but, rather, what is objectively reasonable.").

Apart from proving the insanity defense IDRA codifies, the only other recognized

---

1 The Tenth Circuit uses the terms duress, justification, and coercion interchangeably with respect to this defense. *See* 10th Cir. Pattern Jury Inst. § 1.36 (2021); *United States v. Butler*, 485 F.3d 569, 572 n.1 (10th Cir. 2007).

relevant purpose for mental health evidence is if the evidence proffered tends to negate specific intent. *Brown*, 326 F.3d at 1147. While mental health evidence "can be admissible" for such a purpose, the Tenth Circuit has warned "such cases will be rare," and that "district courts must carefully scrutinize proposed psychiatric evidence to determine whether the evidence rests upon a legally acceptable theory for negating intent." *Id*. Indeed, "admission of such evidence will depend upon whether a defendant clearly demonstrates how such evidence would negate intent" rather than "merely present a dangerously confusing theory of defense more akin to justification or excuse." *Id*.

The particularities of *Brown* illustrate the high hurdle a defendant faces when proffering psychiatric evidence to negate specific intent. In that case, the defendant attempted to introduce expert psychiatric testimony from a Dr. Lindberg that the defendant suffered from chemical dependency and post-traumatic stress disorder (PTSD) and, as such, lacked "the capacity to conform his conduct to the requirements of the law" and was also "unable to make correct choices because of his mental conditions." *Id*. at 1148.

The Tenth Circuit affirmed the district court's decision to bar such evidence. As the Tenth Circuit explained, there was no link between the mental health evidence proffered and the specific intent element: Dr. Lindberg's testimony concerning capacity to conform conduct according to law "did not address [the defendant]'s intent or lack thereof." *Id*. The doctor also "did not opine on how [the defendant]'s post-traumatic stress disorder, coupled with chemical dependency, was either related to or tended to negate the requisite specific intent element." *Id*. As such, there was no "link" between the mental health evidence and the United States' "proof of specific intent." *Id*. Accordingly, the Tenth Circuit affirmed the district court's ruling that the evidence was inadmissible because the defendant "fail[ed] to connect his mental condition

12

with any legally acceptable theory that he lacked specific intent." *Id*.

In this case, Subhanah wants Dr. Raghavan to tell the jury that the broadly articulated beliefs of all the defendants are "consistent with cult behavior" and that Subhanah's "actions in following her husband and brother from their home in Georgia to New Mexico are consistent with certain mental illnesses." Doc. 735 at 2. There is no demonstrated link, however, between the proffered mental health evidence and specific intent—the only proper purpose for which the evidence could be offered.[2] As such, the Court should bar the proffered testimony.

Not only is there no apparent link, but even Dr. Raghavan herself seems to struggle with forming a concrete opinion that applies to this case. Dr. Raghavan has never evaluated Subhanah or any of Subhanah's codefendants, and despite emphasizing throughout her report that trauma bonds exist as an "intense response[] to prolonged captivity and/or psychological violence," her report never once specifies any evidence indicating Subhanah lived in this type of environment. *See* Exhibit 2.

Rather than stating an opinion that relates to this case, Dr. Raghavan has offered to take the jury along so that she may "explore any and all data and reports that help explain whether [Subhanah]'s beliefs are consistent or contradictory with this definition of brainwashing." *Id*. at 5. She also offers to "hypothetically" explore whether Subhanah was influenced by Morton or Leveille. While the advisory committee notes to Fed. R. Evid. 703 describe why asking expert witnesses hypothetical questions can be proper, all questions asked to adduce evidence from a witness must still satisfy Fed. R. Evid. 402, which clearly states that evidence is not admissible if it is not relevant. Here, where Dr. Raghavan's proposed testimony does not have a tendency to make a material fact more or less probable than it would be without the evidence, the testimony is irrelevant, and

---

[2] Leveille is the only defendant who has filed notice of an insanity defense.

Subhanah has failed to demonstrate how the proposed testimony is relevant. *See* Fed. R. Evid. 401.

An "exploration" of "hypotheticals" related to coercion-linked mental health evidence in an unevaluated defendant is a far cry from an expert opinion, and at a minimum Dr. Raghavan should have identified in her report the specific data and reports that lead her to believe Subhanah was subjected to the intense violence, prolonged captivity, and any of the other precursors that precede trauma bonds before any such testimony can be considered; the fact that she did not is telling. Dr. Raghavan should also have identified in her report what causes her to believe Morton or Leveille are to blame. She did not, and any testimony about whether Subhanah suffered from trauma bonds would be speculative at best.

Similarly, Dr. Raghavan wants to testify about her interpretation of Subhanah's book, despite not being able to form any opinions and conclusions from the text. *See* Exhibit 2 at 6. Subhanah's book, written and self-published in May 2014, several years before the charged offenses took place, summarizes certain of her feelings and opinions a decade ago and causes Dr. Raghavan to further speculate that Subhanah's earlier experiences:

> . . . may have sowed seeds of distrust and disenchantment with mainstream U.S. society. Her inability to fit easily in to U.S. society may have provided the crack in the armor or the vulnerability necessary for her to accept Ms. Leveille's alternative universe built along the lines of US vs. THEM. And, possibly (as referenced during the interview with J.F.J), Ms. Wahhaj was asked to repent her lack of interest in housework and cooking (which she describes in despairing language in her book) by committing more zealously to these activities and therefore, ultimately, the larger belief system.

*Id*. at 7. Given that Dr. Raghavan could not make any conclusions from Subhanah's writings, the testimony should be excluded, especially where Subhanah is seeking to admit through Dr. Raghavan inadmissible hearsay by having Dr. Raghavan testify about Subhanah's statements in her book. Although the Federal Rules of Evidence permit some leeway for experts to testify to hearsay evidence, Fed. R. Evid. 703 does not permit a party to "call an expert simply as a conduit for introducing hearsay

under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013); *see also Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) ("Rule 703 was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.").

Dr. Raghavan's proposed testimony is not linked to Subhanah's specific intent (to the extent some of the charges are specific intent crimes), but instead explicitly invokes coercion and is crafted to imply that Subhanah was subjected to coercive control, was brainwashed, and thus likely suffered a mental illness. As already established, however, mental health evidence is inadmissible to a coercion defense. *Dixon*, 901 F.3d at 1183. Dr. Raghavan's speculation about Subhanah's subjective experiences have no place in the objective inquiry found in the elements of coercion: "the touchstone is . . . what is objectively reasonable—not what is reasonable only through the . . . distorted lens" of the defendant. *Id*. at 1182.[3]

Based on the report's totality, there is simply no connection between Dr. Raghavan's opinions, to the extent she formed any that are applicable to this case, and specific intent. As such, the mental health evidence she would testify to is simply not relevant, much like the evidence the district court and ultimately the Tenth Circuit barred in *Brown*. As in that case, Dr. Raghavan has not opined on how Subhanah's mental health "is either related to or tended to negate the requisite specific intent element." *Brown*, 326 F.3d at 1148. This is particularly true given that Dr. Raghavan has offered no opinions specific to Subhanah, but instead offers to testify about trauma bonds and how, hypothetically, they may apply in this case. Even if Dr.

---

[3] The other areas Dr. Raghavan's proposed testimony would cover, traditional Muslim values and how trauma bonds can be shared among a group, are also not relevant.

Raghavan had offered concrete opinions, those would be inadmissible to a coercion defense. *Dixon*, 901 F.3d at 1182.

Given the lack of evidence to indicate Subhanah was under coercive control and suffered from trauma bonds and rare psychological disorders that undercut her ability to form a specific intent, Dr. Raghavan's proffered testimony is irrelevant, especially when such evidence, even if the factual predicates could be established, is improper. The Court should, accordingly, exclude Dr. Raghavan's testimony in its entirety.

      C.      <u>Dr. Raghavan's testimony is not reliable</u>.

Before admitting expert testimony, the Court must also determine whether the expert's opinions are "reliable" under the principles set forth under *Daubert* and *Kumho*. In this regard, the trial court is required to ensure that the expert's opinion is supported by more than the expert's word and that there are "good grounds based on what is known." *See Daubert*, 509 U.S. at 590. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997); *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir.2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion."). It is an abuse of discretion to allow expert testimony which lacks factual support in the record. *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

Crucially absent from Dr. Raghavan's report is any discussion of the evidence necessary to support the theory that Subhanah was subjected to coercive control and that this condition amounted to her suffering from rare mental health conditions and developing trauma bonds. Because Dr. Raghavan does not state with clarity any opinions she has formed that pertain

16

specifically to Subhanah and this case, nor does she state the bases of those opinions, it is difficult to ascertain how any aspect of her testimony is trustworthy given the facts of this case. At a minimum, if she is going to testify about coercive control and trauma bonds, Dr. Raghavan must be able to establish when and where Subhanah was subjected to the coercive control, and by whom. She has not done so, nor can she.

In sum, the Amended Notice of Expert Testimony and Dr. Raghavan's report provide insufficient information for the Court to be assured that Dr. Raghavan's proposed testimony is reliable. Although Dr. Raghavan is familiar with theories of coercive control and the psychological conditions that can arise as a result of coercive control, whether or not Subhanah was subjected to actual coercive control or suffered from any rare mental illnesses is pure speculation.[4] Dr. Raghavan has not, and cannot, provide any meaningful data, methodology, or analysis necessary to establish the reliability of her proposed testimony. Subhanah, as the proponent of Dr. Raghavan's testimony, has not met her burden of establishing any admissibility requirements by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171 (1987).

    D.    <u>Dr. Raghavan's testimony is inadmissible under Rule 403</u>.

The Court should also exclude Dr. Raghavan's proffered testimony under Fed. R. Evid. 403. That rule provides, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. While exclusion is an extraordinary remedy, the

---

4 As the Court is aware, Subhanah was evaluated for competency over an extended period of time. At the conclusion of the testing and evaluation, she was not diagnosed with any mental diseases or defects. *See* Doc. 210.

Tenth Circuit holds mental evidence in special esteem with respect to Rule 403. "[P]sychiatric evidence . . . presents an inherent danger that will distract the jury [] from focusing on the actual presence or absence" of an element at issue. *United States v. Martinez*, 923 F.3d 806, 815 (10th Cir. 2019) (internal citations omitted). The Supreme Court has expressed the same concern: "[e]vidence of mental disease . . . can easily mislead." *Clark v. Arizona*, 548 U.S. 735, 776 (2006). Thus, as the above discussion establishes, except in limited circumstances not applicable here, evidence purporting to relate to Subhanah's mental health has no probative value.

The dangers of introducing such evidence are high. As the Tenth Circuit has recognized, even when mental health evidence is "marginally relevant," district courts "must be cautious about admitting [such] evidence because the jury may think that it provides an 'excuse' for misconduct or it may otherwise generate sympathy for the defendant." *Martinez*, 923 F.3d at 815. Allowing a defendant to inject evidence about her mental health diagnosis into a trial unavoidably risks the jury returning a verdict based on prejudice or sympathy for the defendant and not on the elements of the offense. This is particularly true in a situation like the one before the Court, where the defendant does not even have a mental health diagnosis and the opinion as to her mental health is speculative at best.

The dangers presented by Subhanah's proffered expert testimony of Dr. Raghavan are clear. They concern a speculative mental health condition as it relates to purported coercive control possibly inflicted by one of two of Subhanah's codefendants. This evidence simply is not reliable or relevant, and the risk that this evidence would impermissibly generate sympathy for Subhanah or distract the jury from the relevant issues is apparent. Thus, even if there was marginal probative value to the proffered testimony, which there is not, that value is

substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, and wasting time. The Court should bar the evidence under Rule 403.

V.  Conclusion

For the foregoing reasons, pursuant to Fed. R. Crim. P. 16(b)(1)(C), the United States respectfully requests this Court exclude the testimony of Dr. Chitra Raghavan pursuant to Fed. R. Evid. 401, 402 and 403 because the proffered testimony is not relevant, reliable, or proper. To the extent Dr. Raghavan's testimony is relevant, it presents a risk of unfair prejudice, confusing the issues, misleading the jury, and wasting time. If the Court is not prepared to exclude Dr. Raghavan's testimony on the papers, the United States respectfully requests a *Daubert* hearing.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically filed*
KIMBERLY A. BRAWLEY and
TAVO HALL
Assistant United States Attorneys
P.O. Box 607
Albuquerque, NM 87102
(505) 346-7274

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system which will send
notification to counsel for the Defendants. A
copy was also mailed to Defendant Lucas Morton.

   *Filed Electronically*
KIMBERLY A. BRAWLEY
Assistant United States Attorney