Dr. Raghavan has not examined Subhanah Wahhaj and therefore, is not providing a diagnosis or opining on a mental disorder. Rather, she will explain the complex intersections of two rare mental conditions and the conditions that produce them (i.e. coercive control), that may be applicable to the defendant Ms. Subhanah Wahhaj. Both mental conditions are in The *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., text rev.; DSM-5-TR; American Psychiatric Association, 2022). The first is "Identity Disturbance due to Prolonged and Intense Coercive Persuasion" under its Other Specified Dissociative Disorder (OSDD) category. This specification explains intense responses to prolonged captivity and/or psychological violence which are well-documented in the literature by both scholars and clinicians. Dr. Raghavan has examined extensive discovery on this case; listed in Appendix A.

Using the shorter-term **trauma bond**, Dr. Raghavan will explain how potential consequences of such captivity have been utilized in the legal system to explain seemingly paradoxical behaviors exhibited by victims of this type of violence (e.g., *People v. Abdur-Razzaq,* 2018). The second mental illness is generally referred to as "folie a la famille" included in the "Other Specified Schizophrenia Spectrum and Other Psychotic Disorder, Delusional Symptoms in the context of a relationship with an individual with prominent delusions" category in the DSM-5. She will explain how these two conditions may affect individuals in such a way that they act, think, and behave in ways that are injurious to their own survival while stubbornly clinging onto to what the outside viewer experiences as delusional or false beliefs.

Identity Disturbance due to Prolonged and Intense Coercive Persuasion under its Other Specified Dissociative Disorder (OSDD) category is defined in the DSM as:

> *Individuals who have been subjected to intense coercive persuasion (e.g., brainwashing, thought reform, indoctrination while captive, torture, long-term political imprisonment, recruitment by sects/cults or by terror organizations),*

> *[who] may present with prolonged changes in, or conscious questioning of, their identity (p. 306).*

Aligning explicitly with the DSM, Dr. Raghavan will explain three important elements, that of coercive control, dissociation, and identity disturbance which results and maintains a trauma bond or aspects of trauma bonds and which can help explain irrational or even delusional thinking, actions, and self-destructive behaviors that serve to protect an abusive/harmful leader or partner. In the absence of an actual bond, many aspects of a trauma bond can manifest as "brainwashing" that originally emanated from a powerful, charismatic leader.

First, on discussing trauma bonds, Dr. Raghavan will provide empirical historical data. Specifically, early mentions of trauma bonding were referred to as "identification with the aggressor." In mainstream media, this phenomenon has been popularized as "Stockholm Syndrome." In the scientific literature, this phenomenon has most often been referred to as "trauma bonds."[1] More recent research on trauma bonding by Dr. Raghavan and her colleagues has offered the term "trauma-coerced attachment" to highlight the abuser's or leader's deliberate use of coercive tactics and underscore the lack of reciprocity in the relationship dynamic (sometimes implied by use of the term "bond").

Dr. Raghavan and her colleagues define trauma bond as a powerful coerced affiliation that manifests as a dependency on the leader/abuser and a significant shift in world- and self-view to take on that of the abuser's or leader's. This results in an idolization of the leader/abuser and feelings of love, loyalty, or gratitude toward the primary leaders. Those who form these attachments may deny the abuse, minimize the abuse, take responsibility or blame for the abuse, and protect their leaders/abuser(s) from social or legal repercussions.

---

[1] Researchers have also partially captured the complex processes, dynamics, and outcomes of traumatic attachment through concepts such as Battered Women's Syndrome, learned helplessness, and Complex-PTSD.

000016

Dr. Raghavan will define and explain coercive control and the relationship of coercive control to trauma bonds. Trauma bonds develops as a result of a chronically abusive and inescapable environment, which is comprised of myriad micro and macro forms of aggression, degradation, intimidation, and manipulation—tactics which are efficiently captured by the psychological concept of coercive control. Physical abuse is not required to develop trauma bonds. Trauma bonds persist, even strengthen, as long the conditions that produced it are aversive enough to sustain severe levels of dissociation. This functions to keep the victim from integrating different pieces of information that would otherwise challenge their harmful affiliation with the abuser. Core to the identity disturbance in brainwashing and trauma bonds is when the abuser's perspective dominates and replaces the victim's own beliefs. The resulting idealization and protection of the abuser when the emotional-cognitive systems are dissociated from each other and reality which maintains the harmful relationship as well as the brainwashed thinking.

Dr. Raghavan will rely on trauma and attachment literature to explain how fundamental attachment needs are perverted and exploited through coercive control or coercive persuasion. Reactions to chronic coercive control have evolved for adaption and survival in the face of potential harm. Reactions such as fear and anxiety are necessary for survival due to the biological and behavioral responses associated with these feeling states. Typically, "fight, flight, or freeze" are offered as common and adaptive responses to a threat. Aggressive defense (fight), withdrawal or escape (flight), and tonic or attentive immobility (freeze) are evolutionarily adaptive responses unless defense is futile, escape is impossible, and exposure to the threat is prolonged, therefore making immobility unrealistic.

For victims of captive violence, the situation of captivity often begins with a forced affiliation (e.g., terrorist captivity, forced marriage) and or a cultic message (cult leader promised

eternal salvation). When the situation becomes harmful, continuing the affiliation (attachment need) is often presented as the only real option by the leader. Aggressive defense (fight) has typically failed or is not possible. Withdrawal or escape (flight) has numerous barriers—whether structural or psychological—making it impossible or implausible. Accordingly, the victim relies on appeasement (prolonged freeze) as a means of surviving the abusive and coercive environment.

In relationships marked by coercive persuasion, appeasement takes the form of an initial trauma bond and is the primary attachment during a moment of threat. Research has found that appeasement can take many forms, but functions to convey submission, decrease conflict, assuage anxiety, re-establish connection, and minimize the impact of the threat. Over time, the need to appease increases alongside the chronicity of the 'threat," which necessitates the beginning of a split from reality and consciousness (i.e., dissociative mechanisms begin to operate). The stronger the beliefs around the coerced affiliation and the more the victim's identity becomes fused with the perpetrator's worldview, the stronger the dissociative mechanisms need to be to maintain these contradictory realities. An alternative pathway that exists is when an idealized/relationship of obedience exists but when faced with clear dissenting information, the target's idealized relationship begins to alter and take the form of a trauma bond to cope with the unattractive reality. In this scenario, coercive persuasion is still used but the basis of the relationship between the coercer and the target may have initially been non-coerced.

Coercive tactics not only restrict the victims' external world but operate in tandem to invade the victim's privacy and attack her identity, making the victim question reality and feel responsible for her circumstances. Both the dependency and identity disruption inherent to trauma bonds worsen when the abuser succeeds in becoming the sole attachment figure and occupying the victim's mind until he/she/they lose previous alternative perspectives. In sum, trauma bonds

marked by a brainwashed perspective is a dissociative syndrome produced by coercive control—situated at the nexus of evolutionary responses to this captivity—characterized by an intense dependency and maintained by a particular identity disturbance that allows the victim to temporarily exist in an otherwise unbearable and dangerous reality.

In the absence of an actual bond with an individual abuser, many aspects of a trauma bond can manifest as "brainwashing" that originally emanated from a powerful, charismatic leader. Brainwashing is a psychological concept rather than a legal one and not a diagnosis in and of itself; brainwashing itself does not require that the belief qualified as a delusion—the core of brainwashing is that the believing individual adopts a perspective that is not theirs, that is harmful to them, and that benefits the emotional or material needs of the person originating the belief and that appears difficult to shake. Dr. Raghavan will explore any and all data and reports that help explain whether Ms. Subhanah Wahhaj's beliefs are consistent or contradictory with this definition of brainwashing. Because Ms. Subhanah Wahhaj declined to be interviewed by Dr. Raghavan because God had required her to resist,[2] Dr. Raghavan will rely on the evidence demonstrating when she began to adopt these views, why she began to adopt these views, and if the persuasion was through her husband Mr. Lucas Morton, Ms. Leveille, and/or through communal group punishment and pressure.[3] These possibilities will be explored hypothetically.

In describing the possible sources of pressure, Dr. Raghavan will explain how in traditional interpretation of Muslim values (even if these values may have little to do with other progressive/contemporary Muslims), ultimately require group cohesion and group loyalty. Such

---

[2] Summary of telephone conversation 8-16-2019 indicating refusal to meet this evaluator.
[3] Competency evaluations for Ms. Leveille, Mr. Lucas Morton, Ms. Hujrah Wahhaj, and Ms. Subhanah Wahhaj independently indicated a commitment to a mix of religious and supernatural beliefs largely unrelated to accepted doctrines and practice of Islam, as noted throughout the documents by experts on Islam. Transcripts of FLJ and JLJ (minor children present in the compound) indicated same religious and supernatural beliefs. Government response to sever counts 6 and 7 from trial (CRIMINAL NO. 18-CR-02945 WJ) indicates the shared beliefs. In sum, multiple sources of information document that the group endorsed the same beliefs.

loyalty may be dictated by male pressure from male relatives including fathers, brothers, and husbands, but often involve all-powerful leaders who ally with each other. Group cohesion and loyalty has existed historically in the spread of Islam and in the punishment of those who refuse to ally with the primary doctrine of the group. Separately from Islam, in high control groups (such as cults and unhealthy religious orders) any divergence in thinking is seen as a threat and those who refuse to comply are pressured until they change. Pressure becomes particularly unbearable when escape or leaving is not a possibility. Once the dissenting member agrees to the beliefs, the group's cohesion is strengthened and the outside world becomes dimmer, in a feedback loop. Finally, dissenting individuals in cult or cult-like settings often feel obligated to embrace the views of those closest to them to not lose their families. Once the views are embraced, they may eventually harden into "brainwashed" truths.

Additionally, while Dr. Raghavan did not interview Ms. Wahhaj and therefore is not opining on her psychology based on an evaluation, she will describe how Ms. Wahhaj describes her ideas of power and subservience to men, as written by Ms. Wahhaj herself in her self-published book, "How I found Myself in Egypt.[4]" Ms. Wahhaj argues that men should be the visible leaders but that women are just as valuable because they provide support domestically. Ms. Wahhaj also describes in contradiction—how she felt failed as a good wife because she could not take care of her husband and children in the way she desired, perhaps because she was clinically depressed.

Pressure and persuasion in high-control groups work most effectively when existing beliefs and experiences are validated or, when invalidating experiences are soothed. In her book, Ms. Wahhaj describes her perceptions and experiences of racism and anti-Islam sentiment, as well as the difficulties she endured in college, at externships, and in general, when interacting with the

---

[4] Ms. Wahhaj discusses women's leadership roles on pages 29-31.

American world. These repeatedly conflictual interactions including feeling rejected for wearing a hijab, mistrusted because of her religion, and endorsing conservative Islamic beliefs around family and dating may have sowed seeds of distrust and disenchantment with mainstream U.S. society. Her inability to fit easily in to U.S. society may have provided the crack in the armor or the vulnerability necessary for her to accept Ms. Leveille's alternative universe built along the lines of US vs. THEM. And, possibly (as referenced during the interview with J.F.J), Ms. Wahhaj was asked to repent her lack of interest in housework and cooking (which she describes in despairing language in her book) by committing more zealously to these activities and therefore, ultimately, the larger belief system.

Finally, Dr. Raghavan will also explain how an initial trauma bond and its associated changes in identity and perspective can be shared by multiple group members—a phenomenon seen rarely in the general public but frequently in tight knit communities, cult groups, and other hermetic groups. It is likely that her husband and brother's devotion and belief in Ms. Leveille would have been a compelling factor to internalize these same beliefs. The previously referenced "folie a la famille" condition emphasizes shared delusional/irrational beliefs that are first held by one individual and then spread to others in close relationships; this particular mental disturbance is equally marked by the delusion/irrational belief and the relationships that produce and maintain it. One could not exist without the other. This condition is included in the "Other Specified Schizophrenia Spectrum and Other Psychotic Disorder" category in the DSM-5. As noted earlier, there is little doubt that the group strongly shared the same set of irrational beliefs and at various times were found to be incompetent or difficult to diagnose although currently both are competent. Dr. Raghavan will explore evidence regarding the genesis and development of a number of specific beliefs allegedly held by members of the group, including that Ms. Leveille

was Mary, mother of Jesus, that A.G. was her child, and that A.G. would be resurrected after his death.

Forensic psychology has paid much attention to delusional thinking and how this differs from overvalued beliefs. These distinctions are important in establishing if a defendant is competent. However, this framework is not the only explanation for behaviors such as those exhibited by Ms. Wahhaj. However, as a field, forensic psychology has neglected brainwashing and has failed to appreciate how cults and religious groups produce disordered thinking—although this knowledge is widely accepted and a focus of research in those who study cults and coercive persuasion, as does Dr. Raghavan. As such, if beliefs do not meet psychological standards of delusions, they may be overlooked as products of brainwashing or group folie.

The bases and reasons for this testimony are drawn from Dr. Raghavan's extensive research on coercive control and identity disturbances and trauma bonds, as well as her clinical work in cult and similar high control settings. Her publications and testimonies are provided; however, she has also worked on multiple forensic evaluations for cases that have resolved without the need for trial testimony, and these are not offered here.

Dr. Raghavan's broad qualifications are further outlined here and provided in her C.V. Dr. Chitra Raghavan obtained her BA in French and Psychology at Smith College and her doctorate in Clinical and Community Psychology at the University of Illinois at Urbana-Champaign. She furthered her post-doctorate training at Yale University where she began her earliest research in intimate partner violence before continuing this work at Columbia University. She is currently a full professor of psychology at the John Jay College of Criminal Justice, City University of New York and the Director of the Forensic Mental Health Counseling Program. She created and

oversees the Advanced Certificate of Victim Studies and the Victim Track specialization contained within the Forensic Mental Health Counseling degree.

Dr. Raghavan conducts research on power dynamics known as coercive control across intimate partner abuse, sexual assault, sex trafficking, cult contexts and their related traumatic outcomes. She has written over fifty scientific articles and authored two books; **Raghavan, C**. & Levine, J. (Eds.). (2012). *Self Determination and Women's Rights in the Muslim World*. HBI Series on Gender, Culture Religion, and Law. Boston: Brandeis University Press and **Raghavan C**. & Cohen, S.J. (Eds.) (2013). *Domestic Violence: Methodologies in Dialogue*. Northeastern Series on Gender, Crime, and Law, Northeastern University Press.

Dr. Raghavan is a practicing psychologist and deemed an expert by the courts in intimate partner violence, sex trafficking, coercive control, trauma, and trauma bonding. Her research and testimony has created case law in New York State (https://law.justia.com/cases/new-york/other-courts/2018/2018-ny-slip-op-28161.html).