**Report:**

**Synopsis of the Allegations**:

Jany Leveille is an immigrant from Haiti whose legal status in the country had lapsed in the recent years.

Leveille considers herself married under Islamic tradition to Siraj Ibn Wahhaj. Leveille believes she can receive and interpret messages from Allah. As such, she usually uses the Quran and will open it to random passages to receive guidance on how to proceed when faced with a decision. Based on the above, it appears she practices a version of Islam which sometimes depart from more mainstream Islamic beliefs. According to Dr. Cook's analysis of Jany's writings, there are indications of non-Islamic and Haitian spirit-beliefs in her religious philosophy.

Siraj Ibn Wahhaj was at the time of the incident still legally married to Hakima Ramzi the mother of his 3-year-old son, Abdul-Ghani Wahhaj. Traveling with the 5 adults were 12 children including Abdul.

Abdul suffered from HIE (hypoxic ischemic encephalopathy), associated with a risk of seizures. The seizures were minimized through medication. Leveille convinced Wahhaj that Abdul was actually her child even though he was birthed by Hakima. She stated that Hakima had stolen the child through magic while still in Leveille's womb. With Leveille's encouragement, Wahhaj removed the child, Abdul from his mother and the group traveled together, eventually settling in Amalia, New Mexico.

Leveille believed that prayer and reading of the Quran to Abdul in a ritual would heal him; however, ultimately the child died. After the child's death, his body was washed and cared for daily for by the members of the group including the children. Leveille prophesied that Abdul would raise to life again in 40 days. Abduls' body was initially kept in the trailer but was later moved to the tunnel to keep it cool.

Wahhaj was a licensed private investigator in the state of Georgia. He had worked as a security guard and had intentions of starting an Executive Protection Company. He was raised in the Islamic faith and his father was previously the Imam of a mosque in New York.

Part of the group were Wahhaj's two sisters, Hujrah and Subhanah. Subhanah is married to Lucas Morton whose property they eventually settled on. Morton had an interest in earthship construction. Earthships are homes that are built into the ground and are made of dirt and other recyclable materials. Morton purchased land in New Mexico with plans to build his own earthship home and start a business building these homes for others.

**Document Review and Supporting Activities:**

I have reviewed and analyzed all the case related documents provided to me by defense attorney Ryan Villa through Perfectly Legal, Inc.  My opinions are based on my experience, education and training in firearms, tactics, counter terrorism and intelligence gathering.

I have also reviewed several books, videos, and other reference materials in formulating my opinion.

Peter Bergen (2017).  United States of Jihad.  Broadway Books.

Wendy Joan Biddlecombe Agsar (2018).  Cults That Kill.  Ulysses Press.

Michael Reynolds (1990).  Earthship Vol. 1, 2 &3.  Solar Survival Architecture.

U.S. Army Command and General Staff College (2014).  Homegrown Terrorism Inside of Democratic States.  CreateSpace Independent Publishing Platform.

**Opinion**

My opinion is based on my education, experience, and all of the above-mentioned sources.  Leveille and the group of 4 other adults and 12 children, did not form a homegrown, or any other form of terrorist organization.  Leveille and her peers do not meet the criteria to be identified as a terrorist group.  This is further detailed below in the Department of Homeland Security 8 Signs of Terrorism section.

The group did not, at any time, have communications with any known terrorists or terrorist organizations.  They did not raise money or other resources for the purpose of terrorism.  Any firearms or tactical training conducted on the property although dynamic, was defensive in nature.  Any improvements done to the property were consistent with the local earthship style of construction.   Morton had received training in this style of building.  Terror training camps generally focus on constructing facilities for housing recruits, building mockup structures, and expanding training areas.  There was no indication that the group utilized their efforts and resources in that nature.  The documents related to the Phases of a Terrorist Attack, that were handwritten by Wahhaj are consistent with notes related to his training as a private investigator and bodyguard, for use in his executive protection business.  The original source of the written notes is not similar to anything that would be written by a terrorist organization, but rather from a training program to prevent and stop terrorism.  There were also no signs of a recon of any target of attack.  A group interested in conducting terrorism, would spend considerable time researching and investigating suitable targets.

Leveille's belief system is consistent with cult like behavior.  Departing from mainstream Islam, she made herself a messenger, the sole person in the group who could interpret messages from Allah.  There is reason to believe she manipulated these revelations to further her own agenda, including having her husband Wahhaj removed from his legal wife and to have him for herself.  All of these points are analyzed and reviewed below.

**Points in Support of Opinion**

**Phases of Terrorist Attack document**

During the second search of the property, a handwritten notebook was found with a passage of several pages titled, "Phases of a Terrorist Attack."  This appears to be copied from either a training manual or the internet.  The video interview of the two older sons indicated that the handwriting is consistent with that of Wahhaj.

Below is a quote from the official website from the Office of the Director of National Intelligence.  "Terrorist Attack Planning Cycle: Understanding the terrorist attack planning cycle can help first responders and public safety personnel recognize preoperational activities.  Terrorists generally plan attacks in observable stages, although specific details, sequencing and timing can vary greatly and change over time.  Preattack surveillance, training, and rehearsals are the stages of the planning cycle that are often observable and can offer opportunities to identify plots and prevent attacks."

Wahhaj is a licensed private investigator in the state of Georgia.  He has worked as a bodyguard at both a strip club and a mosque in New York.  He has also expressed the desire to start his own executive protection business for wealthy clients.  It would be completely normal to take these kinds of notes while acquiring his certifications.  For someone in Wahhaj's position, this is crucial knowledge necessary to effectively do his job.  From personal experience, even the most basic level security guard training includes learning the phases of a terrorist attack.

**Weapons and Ammunition**

In the course of the search of the New Mexico property, weapons and ammunition were found on the property. One shotgun, three rifles, and seven pistols were recovered.  Along with the weapons, just under 700 rounds of various caliber ammunition was seized.

Wahhaj maintained his firearms training.   He would often train with his 13 and 15-year-old stepsons, Farroll and Jamil.

The number of weapons and ammunition found on the property are consistent with self-defense and the maintenance of shooting competencies.  The ammunition quantity is far less than what would be considered a stockpile.  Conducting an hour of basic maintenance training would use at least 100 rounds per person.   A few sessions of training would completely deplete their supply. Given that there were five adults and two teenage children in the group, eleven weapons are not excessive by any means, especially if intended to be used for self-defense purposes in the remote location where they lived.

There were no attempts to modify the weapons to fire in a fully automatic manner.

Terrorists tend to seek out explosives, as well as other weapons that cause widespread casualties, fear and panic.  There were no signs that the group attempted to acquire any materials associated with bomb making or with any other weapon known to be used for terrorism.

When the group was involved in a traffic accident while traveling to New Mexico, the police gathered up the weapons, and returned them to Wahhaj after their investigation.  The weapons and ammunition did not alarm the police who responded to and investigated the accident.

**Weapons Training**

Wahhaj regularly taught his two stepsons the safe and effective use of the weapons.  Morton would often join the training as well.  Given his background in executive protection and security, Siraj taught the others on the property.   He used makeshift targets in an attempt to make the training as realistic as possible.

People often use weapons in a static nature when they first learn firearms basics and safety procedures.  Standing on a yard line and firing into a static paper target does not prepare you to use a weapon in real life self-defense situation.   To prepare oneself to use firearms properly, stress and realism needs to be incorporated into the training.  This requires fire and movement, reloading, communication with others, barricaded movement and the use of cover and concealment.

Wahhaj attempted to teach his stepsons in an organized realistic manner.  He incorporated small dirt bikes into the firearms training. Seeing that they lived on a large property that cannot be effectively defended without mobility, the utilization of dirt bikes for mobility makes practical sense.

**Construction of the Living Space**

Morton owned the property in New Mexico before and the group arrived.  It had been his vision to build an earth ship style home there.  He also hoped to start a business building earthship homes.  This area of New Mexico is popular for this style of construction.  In a recorded interview with the FBI, 15-year-old Farroll stated that he and Lucas had attended a special school for the instruction of building earth ship homes.  It appears that Morton incorporated his knowledge into projects on the compound.

The most popular material and technique used in this construction are used tires filled with dirt.  It is a cheap readily available resource that helps the occupants stay cool in the hot summer months.  Another technique is to build below ground as much as possible.  These techniques were effectively incorporated in the structures on the property.

**Use of Social Media**

Terrorist groups use social media platforms like Twitter, Facebook, YouTube, and internet forums to research, spread their messages, recruit members, and gather intelligence.

The groups' computers and phones were searched for any signs of either production or consumption of terrorist related content.  No communications were found with any known terrorist organizations or individuals linked to terrorism.  There was no consumption of Jihad or other terror related content discovered.

**DHS Signs of Terrorism**

Below are eight signs of a terrorism for the Office of Homeland Security and Preparedness.  These eight signs are used across various United States government training materials and, I have considered them with respect to the materials produced in discovery.

1. Surveillance

*Terrorists will likely observe a chosen target during the planning phase of an operation. They do this to determine the strengths, weaknesses and number of emergency personnel that may respond to an incident. Suspicious actions during this phase may include someone recording or monitoring activities, drawing diagrams or making notes on maps, using vision-enhancing devices, or having possession of floor plans or blue prints of places such as high-tech firms, financial institutions, or government facilities, including military installations. Routes to and from the target are also usually established during the surveillance phase.*

I have not seen any evidence of any surveillance or mention of any target in any of the discovery material.

2. Inquiries

*A second sign, inquiries, entails attempting to gain information about a place, person, or operation pertaining to the target.  Terrorists may attempt to elicit information about a critical infrastructure such as a power plant, water reservoir, maritime port, military base, bridge or tunnel by making unusual inquiries. They may inquire about usage and operations.  Additionally, they may attempt to place people in legitimate employment at key locations to monitor day-to-day activities and gather detailed knowledge in order to make their mission or scheme more effective.*

No attempt was made to position someone in the group to work or infiltrate any business or organization.  No phone or electronic evidence shows that anyone from the group sought information about any target.

3. Tests of Security

*Terrorists may also test a target's security in order to gather data.  To do this, they may drive by the target, moving into sensitive areas and observing security or law enforcement response.  They are likely assessing how long before personnel respond to a security breech or the routes responders take to a specific location. Terrorists may also attempt to penetrate physical security barriers or procedures in order to assess strengths and weaknesses.*

There was no target identified and no tests were conducted on the security of any facility.

4. Fundraising

*Although this is a tough sign to pick up on, it is one of the most important. Without funding, terrorist activity will come to a dramatic halt.  Terrorists are very creative in raising, transferring, and spending money they come in contact with.  Some scenarios to look for include: (1) credit card fraud, (2) defrauding the elderly, (3) people asking for donations to legitimate organizations but in peculiar ways, and (4) very large amounts of cash used in business transactions.*

*Terrorists and terrorist organizations often use any resource of money they can have access to in order to fund themselves. This can range from the distribution of narcotics, black market oil, operating businesses such as car dealerships, taxi companies to name a few.*

During the investigation there was no evidence of monetary instruments being transferred to or from any person or organization associated with terrorism.  There is also no evidence of business ventures being utilized to fund the acquisition of explosives, weapons, or ammunition.

5. Acquiring Supplies

*Terrorists may purchase or steal explosives, weapons, ammunition, or attempt to store harmful chemical equipment. In order to gain easier entrance to a secured area, they may also try to acquire uniforms, equipment or identification of first responders, including military personnel. Other items they may try to obtain include flight passes, flight manuals, passports or other pieces of identification. If they are unable to steal these types of things, they may attempt to create counterfeit copies.*

As noted in the weapons section, this group had firearms and ammunition to defend themselves and their own property.  There is no indication that they were in the process of acquiring supplies for the purpose of terrorism.

6. Suspicious/Out-Of-Place Behavior

*Profiling individuals is wrong; however, profiling behaviors may indicate suspicious behavior. Sometimes suspicious people just "don't belong" or a behavior seems out of place. This may include a person in a workplace, building, neighborhood or business establishment that does not fit in because of demeanor, language usage or unusual questions they ask.*

This group did appear out of place.  As noted in Dr. David Cook's opinion, they followed what appears to be an Islamic based religion with beliefs that are not common in US culture.  Their religious practices may have caused their behavior to seem unusual, but this was not at any time consistent with them planning a terrorism event.

 The Department of Homeland Security states the following;

Factors such as race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity are not suspicious. A cornerstone of the DHS mission is ensuring that people's civil rights and civil liberties are not diminished by our security efforts, activities, and programs.

Terrorism is the unlawful use of force or violence against persons or property to intimidate or coerce a government or its citizens to further certain political or social objectives.  Profiling certain behaviors, is one way to screen for potential future terrorist attacks.  However, racial profiling or profiling on the basis of religion and national origin should not be considered an

indication or link to terrorism.  Leveille and her followers, did not at any time exhibit behaviors that would indicate any plans or desire to participate in terrorist activities.

7. Dry Runs

*Before executing the final operation or plan, terrorists may engage in a practice session, or "dry run," to work out flaws or unanticipated problems. Although they normal conduct multiple practice sessions at or near the target area, a "dry run" may be the heart of the planning stage of a terrorist act. During a "dry run," terrorists may monitor police radio frequencies and record emergency response times.*

If and her group had been planning an attack, there would have been evidence of intelligence gathering and dry runs in and around their target.  This was not the case.  The majority of the group seldom left the property.

8. Deploying Assets/Getting Into Position

*The deploying assets or getting into position stage is an individual's last chance to alert authorities before the terrorist act occurs.*

This does not apply in this case because there was no target or any plan to conduct a terror attack at all.

 The group went into custody peacefully without a fight.  No information was included in the discovery that indicated any deployment of assets, readying a position for an attack, or even an attack once the authorities arrived on the property.

I summary, it is my opinion that the behavior of the group is not consistent with terrorist ideology, but rather an ideology of religion, self-sufficiency and privacy.

| | |
|---|---|
| _____ | _____7 April 2023_____ |
| Joost Janssen | Date: |

<u>Joost Janssen – Resume/Bio</u>

| | |
|---|---|
| Date of Birth: | ███████ |
| Place of Birth: | Strampory, Netherlands |
| Citizenship: | USA |
| Sex: | Male |
| Address: | ███████████ |
| | Bonita, CA, 91902 |
| Email: | ███████ |

<u>Current and Past Occupations:</u>

| | |
|---|---|
| Occupation: | Military Advisor, Stunts, and Cast in Film Productions |
| Company: | GSGI |
| Address: | 6026 Panorama Dr. |
| | Huntington Beach, CA, 92648 |
| Dates: | 2009-present |

| | |
|---|---|
| Occupation: | Business Owner |
| Company: | Bodie International |
| Address: | 8835 Kenwood dr. |
| | Spring Valley, CA, 91977 |
| Incorporated: | 2009 |

| | |
|---|---|
| Occupation: | Business Owner |
| Company: | Embark Wholesale |
| Address: | 8835 Kenwood dr. |
| | Spring Valley, CA, 91977 |

| | |
|---|---|
| Incorporated: | 2011 |
| Occupation: | Global Response Staff (GRS) |
| Company: | Central Intelligence Agency |
| Address: | 1000 Colonial Farm Rd. |
| | Langley, McLean, VA, 22101 |

| | |
|---|---|
| Occupation: | Chief Petty Officer - SEAL |
| Company: | US Navy |
| Address: | 2000 Trident Way |
| | San Diego, CA, 92155 |
| Dates: | 1995 – 2008 |

| | |
|---|---|
| Occupation: | Paramedic – Field Training Officer |
| Company: | Life EMS |
| Address: | 1275 Cedar St NE |
| | Grand Rapids, MI, 49503 |
| Dates: | 1991 - 1995 |

| | |
|---|---|
| Occupation: | Emergency Medical Technician - Basic |
| Company: | Bartlett's Ambulance |
| Address: | 203 Wade Rd. |
| | Truro, NS, B2N 0C7 |
| Dates: | 1989 – 1991 |

Qualifications and Education:

Medical/Military Medical:

1990:  Emergency Medical Technician - Basic

1991: Davenport College - Paramedic diploma 1992:

Nationally Registered EMT-Paramedic license

1992:  Advanced Cardiac Life Support.

1992:  Basic Trauma Life Support

1994: Licensed Paramedic Instructor – State of Michigan

1998: Special Operations Combat Medic Course (18-Delta)

1999: Advanced Battlefield Trauma Course

2005: Tactical Combat Casualty Care (TCCC)

2011: Bachelor of Science- Clinical Health Sciences – Trident University.

US Military – Navy:

1995: US Navy Boot Camp

1996: Hospital Corpsman 'A' School

1996:  Class 211 – Basic Underwater Demolition / SEAL Training

1997: Swimmer Weapons System Course

1997: Basic Airborne Course

1998: SEAL Tactical Training Course

1998: Survival, Evasion, Resistance and Escape (SERE)

1999: Close Quarters Defense Level 1 (Hand-to-hand combat)

1999: Cold Weather Tactical Training Course – Kodiak Alaska

1999: Diving Equipment & Maintenance Repair Course

1999: LAR-V Repair Course

1999: Rope Master Course

2000: Close Quarters Defense Level 2 (Hand-to-hand combat)

2001: High Altitude Parachutist (HALO) School

2001: Tactical Pistol / Carbine Blackwater Course

2001: SEAL Scuba Diving Supervisor

2001: Desert Warfare Training Course

2001: Range Safety Officer Qualification

Military Specialties:

Small Arms Marksman Instructor (NEC-0812)

Military Instructor (NEC-9502)

Master Training Specialist

Special Operations Medical Technician (NEC-8492)

Master Naval Parachutist (NEC-5392)

Combat Swimmer – SEAL (NEC-5326)

Military Awards:

Navy and Marine Corps Commendation Medal

Joint Service Achievement Medal

Navy and Marine Corps Achievement Medal (5)

Global War on Terrorism Expeditionary Medal

Global War on Terrorism Service Medal

M4 Expert Rifleman Medal

M23 Expert Pistol Medal

National Defense Medal

Good Conduct Medal (4)

Special Warfare Insignia (SEAL)

Military Freefall Insignia

Central Intelligence Agency Training:

2009 Global Response Staff (GRS) Selection Course (TDC)

Tactical Mobility Driving School

Rick Seaman Stunt Driving School

Defensive and Evasive Driving Course

TDCS Weapons and Tactical Training Course

Bio:

Joost Janssen has spent 13 years of weapons and combat experience in the US Navy. He served as a Navy SEAL operator with SEAL Team 5 from 1998 to 2003 performing 3 complete workups and deployments as well as augmenting NSW group 1 as an augment on 2 other deployments.

Janssen spent three years from 2004 to 2008 as a NSWC BUD/S Instructor. There he taught both in the BUD/s selection course, the SEAL Tactical training course and in Advanced Training courses.

Janssen attained the rank of Chief Petty Officer (E-7) and has filled several leadership positions including Leading Petty officer (LPO). He achieved qualifications as an Instructor, a Master Training Specialist and as a Military Small Arms Instructor.

DD214 available upon request.

In 2009 Janssen was recruited into the CIA as a special operations Agency Direct Hire Contractor. This program is only open to special operations veterans with 8 or more years of combat experience. There is a rigorous 6-week selection process and additional tactical training if selected. He spent 5 years deploying to war zones around the world.

Between the Seal Teams and the CIA, Chief Petty Officer (CPO) Joost Janssen has completed a total of 18 overseas combat deployments from 1995 to 2014. He has conducted operations in Iraq, Afghanistan, Yemen, Libya, Egypt and the West Bank.

Starting in 2010 Janssen deployed to Afghanistan three times. He was part of a team dedicated to stopping the Haqqani terrorist network from conducting operations in the southeast parts of the country.

US v. Jany Leveille et al

During the Egyptian revolution of 2011, Janssen was on the ground in Cairo facilitating the extraction of US citizens during that very volatile and hostile environment.

In 2012 while with the CIA in Yemen, Janssen was an integral part of thwarting an Al Qaeda plot to smuggle an experimental bomb aboard an airliner bound for the United States. This was the first bomb of its kind as it contained no metal parts and would have been very difficult to detect by airport security technology at the time.

While on this operation the team found the location of the USS Cole bomber Fahd al Quso and was able to be part of eliminating him via drone strike. Quso was facing over 50 counts of terrorism and the FBI had offered a five-million-dollar reward for information leading to his capture.

Janssen has continued a career as a Military and CIA Advisor to Hollywood. Military advisors do everything from teach actors how to perform close quarters battle scenes, to helping recreate the look of actual combat. Their primary function is to keep the project accurate and realistic.

Janssen has performed as a trainer, advisor, stunt performer, and cast on several productions including American Assassin, 13 Hours (Benghazi), The Mummy (2017), Jack Ryan (2018), Transformers, Ironman, John Hancock, Red, Unlocked, and the Last Ship.
https://www.imdb.com/name/nm7425457/