IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,            )
                                     )
             Plaintiff,              )
                                     )
vs.                                  )          Cr. No. 18-2945 WJ
                                     )
JANY LEVEILLE, ET AL,                )
                                     )
             Defendants.             )

## UNITED STATES' MOTION TO EXCLUDE THE TESTIMONY OF DR. SHUKI COHEN

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702, 703, and 704, the United States moves to exclude Defendant Subhanah Wahhaj's proposed expert testimony of Dr. Shuki Cohen.  The United States also moves to exclude the proffered testimony pursuant to Fed. R. Evid. 401, 402, and 403.  For the reasons discussed below, the purposes for which Defendant Subhanah Wahhaj (Subhanah) proposes to offer Dr. Cohen's testimony are not appropriate because the testimony would be of so little probative value that it would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and a waste of time.

I.       Introduction

Fed. R. Crim. P. 16(b)(1)(C) governs a defendant's disclosure regarding expert witnesses and provides that a defendant must, at the government's request, provide, amongst other things, a written summary of all opinions the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial.  The complete statement of the expert witness's opinion must also include the bases and reasons for the expert's opinion.  *Id*.

1

The Supreme Court in *Daubert* interpreted Federal Rule of Evidence 702 to require district courts to ensure that an expert's scientific testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 508 U.S. at 597. The Court suggested a nonexclusive list of factors for courts to consider in determining whether the proposed scientific expert testimony is "reliable," including whether the theories or techniques (1) have been or can be tested; (2) have been subjected to peer review and publication; (3) have a known or potential error rate; (4) are subject to standards governing their application; and (5) enjoy widespread acceptance.

Following the decision in *Daubert* and other cases, including *Kumho Tire Co. v. Carmichael,* 119 S.Ct. 1167, 1171 (1999), the gate-keeping responsibilities of district courts were expanded through an amendment to Rule 702 in 2000, which changed the rule to include all expert testimony, not just testimony based in science, and the rule was again amended in 2011. Rule 702 now states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Notwithstanding Amended Rule 702, the admissibility of proposed expert testimony continues to depend upon the reliability and helpfulness to the trier of fact. Indeed, the Court in *Kumho* held that *Daubert*'s non-exclusive factors to aid trial courts in assessing the reliability of scientific expert testimony might also be applicable in assessing the reliability of non-scientific testimony, depending upon the particular circumstances of each case. *Id.* at 1175. The trial court has the responsibility to ensure that the scientific evidence satisfies the relevance standard for

2

admissibility. If evidence has no grounding in fact, then it cannot in any meaningful way be relevant to resolving a disputed issue. The application of the factors set forth in *Daubert* and *Kumho* requires an analysis of the evidence to determine the extent to which the theory in question relies on the expert's own interpretations, or on subjective rather than on objectively verifiable criteria.

II.    <u>The Charges in the Superseding Indictment</u>

On March 14, 2019, a federal grand jury returned a seven-count superseding indictment, alleging violations of 18 U.S.C. §§ 2339A and 2 (Providing Material Support to Terrorists and Conspiracy to do the same), 1117 (Conspiracy to Murder an Officer or Employee of the United States), 371 (Conspiracy to Commit an Offense Against the United States), 922(g)(5) (Possession of Firearms by a Person Unlawfully in the United States), and 1201 (Kidnapping and Conspiracy to do the same). Doc. 85. Jany Leveille (Leveille) and Lucas Morton (Morton) are charged with each count, but Siraj Wahhaj (Siraj) is not charged with Counts 6 and 7 (18 U.S.C. § 1201), and Subhanah and Hujrah Wahhaj (Hujrah) are not charged with Count 3 (18 U.S.C. § 1117).

To convict the Defendants of Count 1, Conspiracy to Provide Material Support to Terrorists, in violation of § 2339A, the United States must prove the following elements beyond a reasonable doubt:

1. The Defendants entered into a conspiracy;
2. The objective of the conspiracy was to provide material support or resources; and
3. The Defendants knew and intended that the provision of such material support or resources would be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 1114.

*United States v. Hassan*, 742 F.3d 104, 111-12 (4th Cir. 2014) (internal citation omitted); *United States v. Khan*, 309 F. Supp. 2d 789, 821 (E.D. Va. Mar. 4, 2004); Doc. 85 at 2. For purposes of § 2339A, "'material support or resources' . . . includes currency and other property, training,

3

weapons, expert advice or assistance and personnel." *Hassan*, 742 F.3d at 112 (citing 18 U.S.C.

§ 2339A(b)(1)).  "Material support or resources" is broadly defined to include:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

*Id.* at § 2339A(b)(1).   Section 1114 criminalizes killing or attempting to kill any officer or

employee of the United States while the person is engaged in or on account of the performance of

official duties.  Notably, however, the government does not need to satisfy the elements of the

predicate offense to secure a conviction under § 2339A.  The Eleventh Circuit has explained:

> [T]he government need not prove all the elements of … the object offense, in order to satisfy the elements of the substantive § 2339A charge.  By its elements, § 2339A criminalizes material support given "in preparation for" the object offense – clearly, the object offense need not even have been completed yet, let alone proven as an element of the material support offense.

*United States v. Hassoun*, 476 F.3d 1181, 1188 (11th Cir. 2007).  In sum, it is sufficient to prove

that the Defendants provided material support or resources knowing that they would be used in

preparation for a predicate offense.  *Id.*

Count 2 is a substantive § 2339A charge.  Thus, to convict the Defendants of Count 2, the

United States must prove the third element of Count 1, listed above, beyond a reasonable doubt.

Count 2 includes an aiding and abetting theory, and the elements of this theory are as follows:

1. Every element of the charged crime was committed by someone other than the Defendant(s); and
2. The Defendant(s) intentionally associated him/herself in some way with the crime and intentionally participated in it as he/she would in something he/she wished to bring about.

*See* 10th Cir. Pattern Jury Instr. 2.06 (2021) (modified).

4

To convict the Defendants of Count 3, Conspiracy to Murder an Officer or Employee of the United States, in violation of 18 U.S.C. § 1117, the government to prove beyond a reasonable doubt:

1. The Defendants entered into a conspiracy;
2. The object of the conspiracy was to kill or attempt to kill officers and employees of the United States government (here, Federal Bureau of Investigation employees, government officials, and military personnel), on account of—or while such officers and employees were engaged in—the performance of their official duties; and
3. That at least one overt act was committed in furtherance of the conspiracy.

*Hassan*, 742 F.3d at 113 (upholding defendant's convictions for both 18 U.S.C. §§ 2339A and 1117).

To convict the Defendants of Count 4, Conspiracy to Commit an Offense Against the United States, the United States must prove the following elements beyond a reasonable doubt:

1. The Defendants agreed with at least one other person to violate the law, i.e., to assist Leveille in unlawfully possessing a firearm;
2. One of the conspirators engaged in at least one overt act furthering the conspiracy's objective;
3. The Defendants knew the essential objective of the conspiracy;
4. The Defendants knowingly and voluntary participated in the conspiracy; and
5. There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

*See* 10th Cir. Pattern Jury Instr. 2.19 (2021) (modified).

To convict the Defendants of Count 5, Possessing a Firearm While Unlawfully in the United States, in violation of 18 U.S.C. §§ 922(g)(5) and 2, the United States must prove the following elements beyond a reasonable doubt:

1. Leveille knowingly possessed a firearm or ammunition;
2. At the time of the possession, Leveille was illegally or unlawfully in the United States;
3. Leveille knew she was illegally or unlawfully in the United States; and
4. Before Leveille possessed the firearm or ammunition, the firearm or ammunition moved at some time in interstate or foreign commerce.

*See* 10th Cir. Pattern Jury Instr. No. 2.44 (2021) (modified).  The aiding and abetting instructions

included above apply to the remaining Defendants.

To convict the Defendants of Kidnapping in violation of 18 U.S.C. § 1201, as charged in

Counts 6 and 7, the United States must prove the following elements beyond a reasonable doubt:

1. The Defendants, knowingly acting contrary to law, kidnapped John Doe by seizing, confining, inveigling, decoying, abducting, or carrying him away as charged;
2. The Defendants kidnapped John Doe for some purpose or benefit;
3. The Defendants willfully transported John Doe; and
4. The transportation was in interstate commerce.

To "kidnap" a person means to unlawfully hold, keep, detain, and confine the person against the person's will. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense.

*See* 10th Cir. Pattern Jury Instr. 2.55 (2021) (modified); *see also United States v. Walker*, 137 F.3d

1217, 1220 (10th Cir. 1998) (setting forth the requirements for conviction under § 1201(a)(1));

*United States v. Toledo*, 985 F.2d 1462, 1467 (10th Cir.1993). Again, because Count 6 is a

conspiracy charge and because Count 7 includes an aiding and abetting theory, the aforementioned

elements pertaining to conspiracy and aiding and abetting also apply.

In this case, the Defendants are alleged to have worked together to commit these various

crimes. Indeed, they are each charged in the specific overt acts that further describe their criminal

conduct. Doc. 85.

### III.     The Proposed Testimony of Dr. Shuki Cohen

The Defendants have provided notice that they intend to call Dr. Shuki Cohen, whom they

identify as a clinical psychologist, to testify at trial. Doc. 723 at 2. The Defendants' notice of his

testimony states that Dr. Cohen:

. . . will opine that the actions and the worldview of the defendants, in their totality, are inconsistent with Jihadi homegrown terrorism and that, from the ideological and doctrinal standpoint, the group of defendants share very little in common with most characteristics of homegrown violent Jihad with which they were charged.

*Id*. Dr. Cohen's curriculum vitae appears to substantiate his familiarity and expertise in clinical

psychology, particularly in the area of "early diagnosis of psychotic spectrum syndromes." *See* Dr. Cohen's Curriculum Vitae, attached hereto as Exhibit 1. Dr. Cohen has authored or contributed to scholarly research on terrorist ideology, linguistics, and psychology. *See*, *e.g.*, Cohen, S. J., Kruglanski, A. W., Gelfand, M., Webber, D., Gunaratna, R. & Katz, R. (2018). *Al-Qaeda's Propaganda Decoded: A Psycholinguistic System for Detecting Variations in Terrorism Ideology. Terrorism and Political Violence*, 30(1): 142–171; Cohen, S. J. (2016). *Mapping the Minds of Suicide Bombers using Linguistic Methods: The Corpus of Palestinian Suicide Bombers Farewell Letters* (CoPSBFL). Studies in Conflict & Terrorism, 39, 7-8, 749-780; Cohen, S. (November, 2016) (Grand Rounds): *Clinical and Sub-Clinical Psychopathology in Perpetrators of Political Violence and Terrorism*. State University of New York at Stonybrook Department of Psychiatry, Stonybrook, NY.

Dr. Cohen prepared a written report that is intended to summarize his opinions and the bases for those opinions. *See* Dr. Cohen's Report, attached hereto as Exhibit 2. In summary, Dr. Cohen opines that the Defendants' "actions, motives, and ideology are inconsistent with those of homegrown Jihadi terrorism." Exhibit 2 at 9. In support of this conclusion, Dr. Cohen opines that "[t]here is no universal definition to terrorism, yet expanding the definition to include the group of defendants is hardly consistent, empirically sound, or socially responsible." Ex. 2 at 1. Referencing Jany Leveille, he also opines that "the lack of coherence in her 'ideology' and in her designated enemies, and the fact that both are tightly linked to her own individual fears and grievances rather than to any known social group (whether in political Islam or outside it), is a strong sign for the primacy of her paranoid delusion over any political ideology she might appear to endorse." Exhibit 2 at 3. Dr. Cohen further opines that "the intensity and quality of the theoretical and tactical training that Siraj Ibn Wahhaj allegedly gave to the young adults in the Taos compound were haphazard,

feckless and ineffectual compared to many other religiously-inspired youth training programs," and that "the mental issues of Siraj and Jany may have also contributed to the haphazard and disorganized nature of the training."  Exhibit 2 at 6.  He goes on to opine that "from the ideological and doctrinal standpoint, the group of defendants share very little in common with most characteristics of homegrown violent Jihad with which they were charged [and] . . . in some important respects their actions, beliefs and attitudes go squarely against violent Jihadi doctrine."  Exhibit 2 at 7.

       Dr. Cohen's report goes beyond review and analysis of the evidence at issue in this case.  In this regard, Dr. Cohen's report advocates for adoption of new policies and legal standards.  For instance, Dr. Cohen writes:

> Ideally, a definition of 'terrorism' should be socially useful on top of being consistent. Lowering the bar of the definition of terrorism to include every clandestine group that might potentially engage in criminal activity has often backfired and resulted in greater mistrust of authorities, as in the famous fable of the kid who 'cried wolf'. One of the most famous and well-studied examples for which is the Siege of the Mount Carmel compound of the Branch Davidians, led by David Koresh, in Waco, Texas. However, similar instances of the 'boomerang effect' from disproportionate and hysterical use of force were made in numerous other cases. Taken together, many of the cases that were investigated for bringing forth terrorism charges in a careless or inconsistent manner often led to the misallocation of resources (common examples include complaints of the steep price tag – and diminishing returns thereof – associated with surveillance, weaponry and human resources by intelligence services, law enforcement and /or the legal system). They also tend to be disproportionally forceful. Together, inconsistent and prejudicial definitions of 'terrorism' may make for an exciting 'drama' (e.g. in the press), but contributes little to our understanding of violent radicalization to terrorism, nor does it help our abilities to counter its ideologies, and diminishes our credibility and legitimacy needed to successfully prosecute it.

Exhibit 2 at 1.  He also argues that " 'terrorism' should not be solely identified by its tactics, since the same tactics, when employed by a member of a feared minority and/or in times when the populace is more prone to fear, may well have a 'terrorizing' effect that goes above and beyond the aims of the perpetrator(s). . . .  For example, a group of black citizens asserting their constitutional right to bear arms might (regrettably) have a stronger 'terrorizing' effect on quite a few communities

in the U. S. than an equal size group of white citizens.  However, calling it 'terrorism' (as some actually did back in the 60s) would be socially irresponsible – at least in my, and many of my colleagues', opinion." Exhibit 2 at 3.

IV.    <u>Discussion</u>

   A.  <u>The proposed testimony of Dr. Cohen is not relevant</u>.

Dr. Cohen would offer testimony that the Defendants' "actions, motives, and ideology are inconsistent with those of homegrown Jihadi terrorism." Exhibit 2 at 9.  He explains that the Defendants' actions and motives are better explained by mental illness, new religious movement ideology, and the group's "cultish belief in the mystical powers of the leader," Jany Leveille.  Exhibit 2 at 9.

The Superseding Indictment alleges, among other things, that the Defendants engaged in a conspiracy to provide material support or resources knowing and intending that the provision of such material support or resources would be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 1114.  The Superseding Indictment further alleges that the Defendants entered into a conspiracy to kill and attempted to kill officers and employees of the United States Government, in violation of 18 U.S.C. §§ 1114 and 1117.   Proof of these offenses does not require proof that the Defendants were terrorists, "Jihadis," or part of a foreign or homegrown terrorist or "Jihadi" organization.  The Superseding Indictment contains no allegations that the Defendants were terrorists or that they provided, conspired, or attempted to provide material support to a foreign or homegrown terrorist organization.  Because involvement in a terrorist organization is not an element of any charged offense, any expert testimony regarding terrorism is irrelevant.

9

B.     <u>The opinions of Dr. Cohen are not reliable and would be misleading and confusing to the jury</u>.

The Court must determine whether Dr. Cohen's opinions are "reliable" under the principles set forth under *Daubert* and *Kumho*.  In this regard, the trial court is required to ensure that the expert's opinion is supported by more than the expert's word and that there are "good grounds based on what is known."  *See Daubert*, 509 U.S. at 590.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997); *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir.2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion.").  It is an abuse of discretion to allow expert testimony which lacks factual support in the record.  *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

As alleged in the Superseding Indictment, the Defendants spoke of waging jihad and dying as martyrs.  The Government anticipates introduction of such evidence to prove necessary elements of the charged offenses including, among other things, the existence of an agreement, the purpose of the conspiracy, and the Defendants' statement of mind at the time of the offense conduct.  Apparently to rebut this evidence, Dr. Cohen proposes to testify that the Defendants' motives were not consistent with the motives and ideologies of homegrown terrorist groups.  Dr. Cohen's proposed testimony, however, is irrelevant, because the motives and ideologies of actors other than the Defendants are not probative of the Defendants' motives and ideologies.   In essence, Dr. Cohen's proposed testimony conflates evidence offered to prove necessary elements of the charged offenses, e.g., evidence that the Defendants sought to wage jihad and die as martyrs, with the elements themselves.  The Government is not required to prove that the

10

Defendants sought to wage jihad and die as martyrs or that the Defendants were terrorists or "Jihadis" or formed, supported, or associated with terrorist or "Jihadi" organizations.

Dr. Cohen's attempted conflation of evidence and necessary offense elements is also misleading. Dr. Cohen's report is based on the faulty assumption that the Government must prove that the Defendants sought to engage in jihad and die as martyrs, or that they were terrorists, that their actions were motivated by a Jihadi ideology or that they provided material support to a homegrown Jihadi terrorist organization or to a "foreign terrorist organization." Granted, evidence of the Defendants' intention to engage in "jihad" and their invitation to family members to oppose "infidels" and die a "martyr" are probative of elements of the charged offenses, e.g., their state of mind and the existence of a conspiracy to kill federal employees and officials. But the jury can make of this evidence what it may and needs no expert to determine whether such evidence is probative of a culpable state of mind—the evidence speaks for itself, and it makes no difference and is thus potentially misleading if the Defendants' ideology and motive differed from the ideologies and motives of known terrorist organizations.

Moreover, evidence of the Defendants' state of mind is distinguishable from opinion evidence regarding the characteristics and practices of a terrorist, homegrown terrorist organization, a Jihadi, or a foreign terrorist organization; such opinion evidence would only serve to confuse the jury, because none of these things need be proved to prove the offenses with which the Defendants have been charged. The Government has not alleged and is not burdened with proving that the Defendants were terrorists, nor that they formed or provided material support to a homegrown terrorist organization, nor that they provided material support to a foreign terrorist organization. Whether the Defendants ascribed to jihadi or terrorist ideology, as Dr. Cohen defines it, or had other motivations to commit their crimes, is neither here nor there. Introducing

Dr. Cohen's definitions of terrorist ideology into evidence would unnecessarily mislead and confuse the jury as to the Government's allegations and burden.

In sum, the Defendants have failed to provide sufficient information for the Court to determine whether the proposed testimony is reliable.    In essence, Dr. Cohen's proposed testimony suggests that the Defendants' actions are not probative of guilt, because their "actions, motives, and ideology are inconsistent with those of homegrown Jihadi terrorism."  Exhibit 2 at 9.   These opinions, however, have nothing to do with any elements of the offenses with which the Defendants are charged.  The Defendants are not charged with being terrorists or Jihadis, nor with providing material support to a foreign terrorist organization, nor with forming a homegrown Jihadi terrorist organization.  Allowing Dr. Cohen to testify would inevitably mislead and confuse the jury.   Dr. Cohen's proposed testimony further fails to provide any meaningful data, methodology, or analysis necessary to establish the reliability of the opinions rendered.   The Defendants, as proponent of their experts' testimony, have not met their burden of establishing any admissibility requirements by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171 (1987).

## V.   Conclusion

For the foregoing reasons, pursuant to Fed. R. Crim. P. 16(b)(1)(C), the United States respectfully requests this Court exclude the testimony of Dr. Shuki Cohen pursuant to Fed. R. Evid. 401, 402 and 403 because the proffered testimony is not relevant, reliable, or proper.  To the extent Dr. Cohen's testimony is relevant, it presents a risk of unfair prejudice, confusing the issues, misleading the jury, and wasting time.  If the Court is not prepared to exclude Dr. Cohen's testimony on the papers, the United States respectfully requests a *Daubert* hearing.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically filed*
KIMBERLY A. BRAWLEY and
TAVO HALL
Assistant United States Attorneys
P.O. Box 607
Albuquerque, NM 87102
(505) 346-7274

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system which will send
notification to counsel for the Defendants. A
copy was also mailed to Defendant Lucas Morton.

 *Filed Electronically*
KIMBERLY A. BRAWLEY
Assistant United States Attorney

13