Expert Opinion in the case of USA vs. Leveille et al.
Shuki Cohen, MSc, PhD.

Opinion

It is my opinion that the actions and the worldview of the defendants, in their totality, are *inconsistent* with Jihadi homegrown terrorism, of the kind that my colleagues and I in the terrorism research communities are committed to studying, countering and combatting.

Listed below are the propositions that comprise my rationale for this opinion.

### *There is no universal definition to terrorism, yet expanding the definition to include the group of defendants is hardly consistent, empirically sound, or socially responsible.*

Terrorism is notoriously hard to define, both internationally and domestically. For example, studies found that over half of the 109 states represented in the United Nations did not consider 'fear and terror' or 'threat' to be essential to the definition of terrorism. Domestically, the United States Code, the FBI and the Department of Defense definitions of the term all differ in meaningful and substantive ways. Recently, lawmakers are taking action against this confusing state of affairs, and are now pushing for more consistency in terrorism indictments regardless of whether they were motivated by an ideology that was 'imported' from a Foreign Terrorism Organization (FTO) or from a domestically grown right-wing/ white supremacist groups.

This lack of clarity among governments and courts as regards the definition of 'terrorism' is also shared by social scientists. The social sciences have repeatedly pointed out the need for a consistent and reproducible definition that – in accord with scientific principles – would minimize the interference of political and emotional biases often found in the way the term is used in common parlance and in the media.

Ideally, a definition of 'terrorism' should be socially useful on top of being consistent. Lowering the bar of the definition of terrorism to include every clandestine group that might potentially engage in criminal activity has often backfired and resulted in greater mistrust of authorities, as in the famous fable of the kid who 'cried wolf'. One of the most famous and well-studied examples for which is the Siege of the Mount Carmel compound of the Branch Davidians, led by David Koresh, in Waco, Texas. However, similar instances of the 'boomerang effect' from disproportionate and hysterical use of force were made in numerous other cases. Taken together, many of the cases that were investigated for bringing forth terrorism charges in a careless or inconsistent manner often led to the misallocation of resources (common examples include complaints of the steep price tag – and diminishing returns thereof – associated with surveillance, weaponry and human resources by intelligence services, law enforcement and /or the legal system). They also tend to be disproportionally forceful. Together, inconsistent and prejudicial definitions of 'terrorism' may make for an exciting 'drama' (e.g. in the press), but contributes little to our understanding of violent radicalization to terrorism, nor does it help our abilities to counter its ideologies, and diminishes our credibility and legitimacy needed to successfully prosecute it.

Lowering the threshold of the 'terrorism' definition selectively for a certain group of people (in this case Muslims) plays right into the hands of propagandists for political violence. Most terrorist ideologies seek to construct an all-explaining narrative rooted in a presumed grand conspiracy that explains away the social distress and grievances of individuals and the groups they identity with at large. By doing so they offer both 1) relief from personal responsibility by projecting the blame indiscriminately to the society around them and 2) camaraderie based on a (false) sense of 'collective grievance'. This basic structure of hate ideology hasn't significantly changed in millennia of human history, and has been employed across the political gamut to serve extremism on the far-right, the far-left, along with a plethora of idiosyncratic causes. For example, Timothy McVeigh perceived the disproportionate force in which the Waco siege was handled by the ATF as the final proof that he needed for his budding anti-government extremist ideology. This ideology, in turn, took root in his mind by linking his own feelings of 'emptiness' after coming back from the Gulf War to the supposed betrayal of American citizens by a government that controls gun ownership and prosecutes heavily armed clandestine cults (as in Ruby Ridge and Waco). Similarly, the terrorism cell that perpetrated the Madrid subway bombing in 2004 saw the disconnect between 9/11 and the 2003 invasion of Iraq as a definitive proof for the validity of Al-Qaeda's narrative of a 'grand conspiracy' of the West (headed by the US as the 'Great Satan'), hellbent on using whatever excuse it can to decimate Muslims and Islam – a conspiracy that dates back to the Crusades in the 11th century. Indeed, in Al-Qaeda's propaganda literature (as in most subsequent violent Jihadi groups), Westerners are referred to as 'crusaders.' It should be

noted in this context that neither this term nor the sentiment behind it, which are both markers of endorsement of violent Jihadi indoctrination were not expressed in any of the material that I have reviewed. (see more below in the section that contrasts their 'ideology' to that of homegrown Jihadi terrorists)

Biased and selective use of the term 'terrorism' is not only socially irresponsible and potentially illegal, but it also might hinder the social or political scientists from having a consistent and reproducible yardstick with which to study this phenomenon. Further, lowering the definitional threshold to the level that the prosecution had done in this case might similarly hinder scientific research of the term, as the saying goes: 'when everything is terrorism then nothing is terrorism'. In all, the scientific research of terrorism relies crucially on gauging shades and variance of the phenomenon, in addition to the reproducibility and consistency that a solid definition confers.

Therefore, in my (and many of my colleagues in the social sciences) opinion, 'terrorism' should not be solely identified by its tactics, since the same tactics, when employed by a member of a feared minority and/or in times when the populace is more prone to fear, may well have a 'terrorizing' effect that goes above and beyond the aims of the perpetrator(s). Such an act cannot be compared to (or confused with) an act of violence that was deliberately conceived to coerce a socio-political change through spreading fear. For example, a group of black citizens asserting their constitutional right to bear arms might (regrettably) have a stronger 'terrorizing' effects on quite a few communities in the U. S. than an equal size group of white citizens. However, calling it 'terrorism' (as some actually did back in the 60s) would be socially irresponsible – at least in my, and many of my colleagues', opinion.

Instead, a more socially responsible criterion to identify terrorism would be to match the motivations, aims and drives of the perpetrator(s), along with their ideological underpinning and affiliations with the current state of knowledge on violent radicalization. To do otherwise would mean running the risk of 'tainting' terrorism research with too many 'false positives' due to the lower and inconsistent definitional bar. As such, a socially responsible definition must address the differences between terrorism and other sentiments of indiscriminate violence borne by mental illness and/or cult dynamics. The major developments in the current knowledge of those differences are summarized below.

*Distinguishing Terrorism from Mental Illness*

Naturally, few scientists truly believe in a clear-cut distinction between the risk factors that make individuals susceptible (or suggestible) to violent propaganda and 'pure' political grievance. As violent propaganda makes itself attractive to people through relating and explaining their personal plight as part of a more general 'rigged game' aimed at their social group (see above), it should come as no surprise that research has increasingly found evidence for mental health issues as a risk factor for committing ideologically-motivated violence and terrorism. Indeed, a substantial proportion of terrorists (especially in the most recent waves of terrorism, including ISIS and mass shooters) exhibit mental illness symptoms.

These mental health risks, however, become less apparent when we only consider formal mental health diagnoses. The is most likely due to the arbitrary threshold to formal mental health diagnosis, driven mainly by pressure by insurance companies and Big Pharma, combined with the fact that people who are at risk of committing ideologically motivated violence (be they terrorist, hate criminals or mass shooters) often do not seek (and often actively avert) mental health examinations.

Recent studies have also highlighted conditions where mental illness may masquerade as ideologically-bound violence. This line of research aims to differentiate between ideological violence that is primarily-political and primarily-mental. The importance of this research lies in its implications: When the 'ideology' serves to normalize longstanding mental health issues (for example, in the case of paranoid individuals who become 'conspiracy theorists', delusional individuals who become 'prophets' or cult leaders, and so on) it would be more appropriate (not to mention more humane and less prone to illegal tactics as mentioned above) to treat the fanatic extremism of the individual by treating their underlying mental illness. Unfortunately, while this practice has become increasingly popular in Europe, it is a 'harder sell' in the US, where long incarcerations are more commonly practiced.

So far, the evidence seems to suggest that, unlike terrorists, delusional individuals pursue their own quirky version of an existing ideology (or, if the ideology is based on a religion – consider themselves 'prophets' and impose their own interpretation of the religion and its scriptures). Further, the 'ideology' of mentally ill individuals seems to change with their mood, distress level, threat perception and with their wishful thinking, while rejecting more established terrorism ideology and ideologues (whom they often perceive as misleading and as unworthy contenders).

In the case at hand, for example, Jany Leveille blamed her miscarriage on 'shayateen' (evil entities that may masquerade as or possess humans). She often identifies those 'shayateen' as an incoherent mishmash of Big Tech companies (e.g. Google), government officials (e.g. Child Protective Service agents) and others. In her words:

"O you People of Color, the Children of Israel! Remember Allah's favor to you, how the shayateens, and secret services, such as C.I.A. (Central Intelligence Agency), Mossad, K.K.K. (Klu Klux Klan) formed a design to stretch out their hands against you and wipe all of you off the earth".

In this, as in most of her writings, the lack of coherence in her 'ideology' and in her designated enemies, and the fact that both are tightly linked to her own individual fears and grievances rather than to any known social group (whether in political Islam or outside it), is a strong sign for the primacy of her paranoid delusion over any political ideology she might appear to endorse.

Another distinction between mental illness and bona fide terrorism leadership is that, unlike radicalized individuals, who often seek similarly radicalized comrades, delusional individuals often avoid 'mainstream' extremists. Presumably, their grandiosity compels them to only seek the company of those who may obey them unquestionably. In contrast, terrorism leaders and ideologues (even the non-conventional or maverick ones) often go to a great length to justify their version of the ideology by presenting it as consistent with the 'true' original religion. A related distinction between mentally-ill and terrorist leaders is the impulsivity and erratic behavior that characterizes people with mental illness (especially those with delusional symptoms and/or narcissistic traits), which renders them less organized and planful (both in thoughts and in deeds) than terrorism leaders/ideologues. One may simplistically summarize it thus: for bona fide terrorists, the personal is secondary to the ideological, while for the mentally ill (even those sporting quasi-ideological justifications for their actions) the ideological motives are secondary to the personal ones.

To take an example from my clinical experience, an individual with unmedicated paranoid schizophrenia may believe that the FBI had implanted a device in their tooth that probes his brain and may explode if it detects inappropriate thoughts. Such a patient may exhibit generalized suspicion and even hostility to anybody whom they suspect of working for, or collaborating with, the FBI (this includes just about everybody, with slight bias against authorities and/or uniformed individuals. The similarity to Jany's list of enemies is high, but not unexpected). Upon questioning, such patients often express generalized, indiscriminate hostility to law-abiding citizens in general and to the federal government in particular. However, charging such individuals with 'terrorism' (or conspiracy to commit terrorism) would be counterproductive since:

1) Medication and support will be more socially responsible, more cost-effective and could eliminate any 'terrorism-like' aggressive intents, threats or actions better than the lengthy sentences that such charges often carry (paranoid schizophrenia patients rarely instigate violent acts);

2) Delegating the case to mental health professionals would free counter-terrorism resources to focus on other, potentially more viable terrorism plots; and

3) Terrorism charges against mentally ill individuals are usually a boon to terrorist organizations, who often 'spin' it as 'evidence' for the 'rigged political game' with which the government conspires against innocent civilians. Additionally, terrorist organizations use these cases to mock the government and its officials for their ignorance in charging the wrong people. This mockery of the government is not for entertainment only, but often serves to embolden terrorist recruits to act through highlighting the incompetence of law enforcement. Thus, when the defendant belongs to a group whose grievance is weaponized (e.g. Muslims in the case of violent Jihadi groups, Caucasians for white supremacist groups, etc.) the case will most likely be counted as an example of the presumed 'grand conspiracy' against the group, on which the violent ideology is predicated.

A pertinent case for differentiating terrorism from mental illness could be found in Sahara Tabriz Fakhir, who, on September 29, 2014 was sentenced in Douglas County, GA to life without the possibility of parole for stabbing to death her neighbor, a deputy sheriff's father. Ms. Fakhir, a 32 year-old devout Muslim with an untreated paranoid schizophrenia, likely projected her shame and guilt over transgressions she felt went against Islam (most notably her binge-eating disorder and body dysphoria) to law enforcement in general (but also to freemasons, the illuminati and others – note, again, the private and arbitrary list of enemies, similarly to Ms. Leveille's style as demonstrated above), and wrote

thousands of journals entries expressing hatred for them (but also for her own body and uncontrollable mind), culminating in pre-meditated murder of the Douglas County Deputy Sheriff's father "in the name of Allah". Targeting the father and not the law enforcement agent himself was determined to be most likely due to mistaken identity, borne by the disorganized nature of her thinking. The case, correctly in my opinion, was not tried as terrorism despite the generalized anti-law-enforcement prejudice and the premeditated murder of an agent solely for being a member of the law enforcement community (and living in close proximity), and despite her belief (albeit wavering at times) that Allah would condone the deed (in her sentencing session she said to the judge: "Allah is my lawyer and if you do not release me, Allah will have his vengeance on you like he did in 2009 when he sent the flood"). Consistent with the emerging insights into the differential between terrorism and mental illness (e.g. Cunningham, 2018; Cotti & Meloy, 2019), the grandiosity and idiosyncrasy of Ms. Leveille's interpretation of Islam, compounded by her isolation from other (even radical) Muslims suggest that the prosecutors in this case were right NOT to charge her with terrorism, consistent with the emerging evidence on the differences between terrorism and mental illness. Later developments in the case, including Ms. Leveille's recanting of her 'prophecies' and gaining gradual insight as her mental treatment (which included anti-psychotic medications) progresses further corroborates this conclusion.

### *Distinguishing Terrorism from Religious Cults or New Religious Movements (NRMs):*

Religious beliefs, arguably by definition, defy tangible reality, logic and empirical validation, and accept the existence of unseen entities and un-testable tenets as a fact. As such, the distinction between mass delusion, sects, cults and New Religious Movements (NRMs) and established religions is often criticized for its arbitrariness. Notable examples include Freud calling Obsessive-Compulsive Disorder 'a private religion' and Karl Marx calling religion "Opium for the masses".

In the previous section, I reviewed the distinction between 'ideologies' borne out of mental illness and those considered as bona fide terrorism. In a similar vein, it is important to examine the religious practices and beliefs of the group of defendants, to determine whether their group 'faith' was maverick and cult-like or whether it is more consistent with the faith practiced in violent Jihadi cells. The distinction is important because both faith-based cults and religious terrorism cells often share elements from the religion they proclaim to represent.

In my experience, the most important religious tenet to explore in this context is the group's belief in the apocalypse or the 'End of Times'. In every religion, such a belief is often associated with a higher sense of urgency, disinhibition and virulence. The belief is also experienced by the believer as their last chance to 'curry favors' with God. This often leads to a variety non-normative (and sometimes downright bizarre and aberrant) behaviors or rituals, often as a result of an attempt to follow the scriptures to the letter, under the assumption that the common religious doctrine is mistaken and would not prevail in the coming 'End of Times'. Since most apocalyptic accounts throughout history involve an all-out 'war-to-end-all-wars' final battle with non-adherents (whether from the same religion or from other religions), the apocalyptic mindset is often accompanied with anti-social attitudes and fantasies. However, it should be noted that extremely few of these groups have initiated mass-violence or terrorism. Sadly, the habitual victims of the group's apocalyptic mindset are the group members themselves, whose lot ranges from mere dehumanization & exploitation, through sanctions and punishment, to mass-suicide and/or murder.

Over millennia, the major religions have instituted a myriad of stopgaps and roadblocks to prevent people from declaring themselves Messiahs or prophets, and usurping power by interpreting the scriptures in a self-serving and divisive ways. In contrast, other (oftentimes the less established, splinter groups) place eschatological ('End of Times') sentiments at the forefront of their doctrine, arguably to benefit from the higher level of cohesion, obedience and mobilization incurred by the heightened sense of urgency. In its mild form, the North American reader may recognize these behavioral sequelae of the heightened emphasis on the 'end of days' or 'second coming' apocalypse in some of the newer churches of Christian Protestantism, including: The Pentecostal and Destiny churches; The Latter-Day Saints churches (comprising of Mormons, Seventh-Day Adventists and Jehovah's Witnesses), among others. More extreme and violent cases that exploited the apocalyptic elements in the Judeo-Christian tradition include the Christian Patriot Movement, Aum Shinrikyo in Japan, the Branch Davidians in the Mount Carmel Compound in Waco, TX, and Charles Manson's 'family' in California. In Islam, violent Jihadi groups (most notably Al-Qaeda and ISIS) are an example of modern-day splinter religious groups that used cult-dynamics to maximally exploit the apocalyptic elements in Islam to inspire acts of despicable depravity and atrocity, which were repugnant even for Salafi Islam from which they ostensibly originated.

This historical background should facilitate our next goal, namely to determine whether the actions of this group of defendants are consistent with violent Jihadi terrorism, or whether their actions are better explained as the behavior of a

cult-like group who used several (arbitrary) Islamic elements to achieve group cohesion and obedience. Here, again, it should be noted that – unlike religious cults – for all their unprecedented savagery and brutality, violent Jihadi terrorist groups invest considerable resources in studying Islam with the sole purpose of justifying their actions as the closest to the original intent of the Quran, Hadith, and Fiqh (jurisprudence) interpretive bent.

In contrast, the Leveille group, like many religious cults, seemed quite content with their own interpretation of the scriptures. I found little to no evidence – be it in their book collection, their writings, or their interviews – to any attempt that resembles those of other Jihadi terrorism cells to 1) Cherry-pick justifications (or even half-justifications) for their 'ideology' or actions from across the Islamic literature; 2) Become hesitant, vague, or 'hedge their bets' when it comes to Islamic ideas that are either highly controversial or easily disputed. This is unlike Jihadi detainees, who are more often than not all too happy to talk your ear off and lecture ad nauseum why their doctrine is the right one, with all the obsession-compulsion splitting of hairs and amassing heaps of obscure minutiae in support (sometimes imaginary) of their conspiratorial worldview.

Granted, in their 1) extremist beliefs, 2) clandestine practices and 3) preparation – though mostly mental, fantastical and hypothetical – for ultimately engaging in a major violent conflict with the rest of the world, religious and/or apocalyptic cults might appear at first blush similar to terrorism cells. However, not recognizing their fundamental difference concerning passive (or 'eschatological') and active (also dubbed 'accelerationist') notions of violence, and bringing charges of terrorism against religious cults for merely engaging in clandestine (and only potentially criminal) activity or internal low-level coercive control of their members (but <u>not</u> plotting indiscriminate terrorist violence out in the world) has proven ill-advised and counter-productive. Experience shows that sometimes terrorism charges were brought against cults merely because there seemed to be no other legal means by which to expose or disrupt their potentially criminal activity. This is understandable, considering that most cults are a tightly-knit group of consenting adults whose self-righteousness and extremist beliefs make them suspicious and resistant to law enforcement (or even the general populace for that matter) scrutiny. However, that experience also suggests that the serious nature of the terrorism charges has its own self-fulfilling effect in the form of excessive harshness of measures taken to investigate and prosecute those groups. In turn, unnecessarily excessive force (granted, sometimes excessive force is essential) may even push a criminal group into committing terror actions or inspire others to engage in bona fide terrorist acts in retaliation, and/or serve as a case-in-point to 'confirm' the terrorist propaganda or conspiracy theories. Famous examples in which the federal government's own post-hoc investigations found evidence for such a 'ripple effect' include the 1992 siege in Ruby Ridge, Idaho and the 1993 siege in Waco, Texas. It should be noted in this context that similar criticism was raised in the case of several detainees in Guantanamo Bay and Iraq, who did not have any demonstrable ties to terrorist organizations before incarceration but inadvertently became revered as terrorists upon their release or martyrs upon their death – in which case their family members were encouraged to join the terrorist groups. Another example is the official investigation into the now-debunked brainwashing theory behind 'deprogramming' and the heavy-handed, biased interventions it commanded by the Maryland State Task Force to Study the Effects of Cult Activities on Public Senior Higher Education Institutions (1999).

It may be useful – if only as a thought experiment – to contrast the terrorism offenses as regards to firearms acquisition and training with gun-centric Evangelical youth summer camps (e.g. Sheepdog Security Ministry, Jerry Falwell's Thomas Road Church summer camp, the 'kids' workshops' in the annual 'God and County Festival' at the Marble Country Compound in Washington State, etc.). These organizations combine literal understanding of evangelical apocalyptic terms such as 'rapture', 'second coming' and 'Armageddon' with no less literal and fundamentalist attitude towards the constitution of the United States, especially in regard to the 2nd amendment, whereby the right to bear arm is largely taken to be a <u>God-given right</u> rather than merely a constitutional one. Using carefully selected biblical verses (often out of context) such as:

- "*He that hath no sword, let him sell his garment and buy one*" (Luke 22:36); or
- "*All men will hate you because of me, but he who stands firm to the end will be saved*." (Matthew 10:22); or
- "*Who rises up for me against the wicked? Who stands up for me against evildoers?*" (Psalm 94:16); or
- "*Neither I, my brothers, my servants, nor the men of the guard who followed me, none of us removed our clothes, each took his weapon even to the water*" (Nehemiah 4:24),

such organizations inculcate a seamless ideological package of Militancy, Christianity, and Nationalism that often comfortably belies white supremacist sentiments. For example, in the 2016 God and Country festival, Washington state Representative Matt Shea gave a workshop for kids that featured "An exercise in field skills for youth, including (but not

limited to): field strip and reassemble assigned weapon; orienteering, field dressing wounds, following orders, PT, shooting skill, etc." (as reported by the Rolling Stone on 10/23/2018).

Interviews with (or testimonials of) attendees of such camps often mention many of the 'apocalyptic' themes that were found in interviews of the children in this case, namely a vague vision of a future armed conflict sanctioned in the name of keeping their domain pure from hostile 'others' who follow misguided beliefs. However, Christian youth who graduated such training are often far more confident, grandiose and militant than anything I could find in the interviews in this case. In fact, this phenomenon is not limited Evangelical Christianity or to the US. In my experience, Israeli 'Hilltop' youth settlers ('Noar Gvaot') who are indoctrinated with a similar ideological mix of militancy, religiousness and nationalism show similarly high level of grandiose militarism.

The lack of ideological indoctrination and passion evident in the interviews of the children in the case at hand is also in sharp contrast to interviews of children of Jihadi terrorism groups, who usually demonstrate a thorough knowledge and identification with the doctrine of militant Islam.

Based on the above, I conclude that the intensity and quality of the theoretical and tactical training that Siraj Ibn Wahhaj allegedly gave to the young adults in the Taos compound are were haphazard, feckless and ineffectual compared to many other religiously-inspired youth training programs. As mentioned above, the mental issues of Siraj and Jany may have also contributed to the haphazard and disorganized nature of the training. As such, it is incomparably inferior to any tactical training programs that culminate in a viable (or potentially viable) terror plot.

Additionally, for the abovementioned sakes of definitional consistency (for social scientists studying terrorism) and preserving counter-terrorism resources, we should differentiate an armed standoff (or intention thereof) due to the group's effort to conceal a potential crime and that which is conceived and instigated to fulfil anti-law-enforcement ideology. Otherwise we risk muddying the terrorism charges, appearing inconsistent to both social scientists and the public and deprive counter-terrorism forces from having clear guidelines and appropriate resource allocation.

Another useful analogy is to compare he case at hand to the Christian Scientist movement. Although this movement's flouting of scientific and consensual reality is sometimes treated in mental health circles as mass delusion, I find it more respectful and ecological to examine it as a religious sect whose ideology is highly conducive to criminal offenses– most commonly child endangerment, abuse or neglect. Akin to Christian Scientists, the case at hand shows how literal, fundamentalist and non-normative interpretation of religious scriptures (Islamic in this case) may lead to allegedly fatal level of criminal child endangerment and/or neglect with horrifically tragic results. A useful hypothetical is to imagine what would have happened had Church of Christ, Scientist not had the seniority and clout it enjoys in the United States and did not enjoy religious/philosophical exemptions built into the Code of Federal Regulations (in some states going as far as to protect against manslaughter charges). One can easily imagine a community of Christian Scientists obstructing and resisting warrants and/or arrests after the death of a child from suspected neglect or abuse. Such community may even preemptively brace or arm themselves against law enforcement personnel (whom Christian Scientists habitually vilify). However, one would be hard pressed to deem such actions – however unlawful – as constituting 'terrorism', despite their generalized ideological animus to the government, law enforcement, and to the secular law-abiding citizenry at large.

Further, bringing undue terrorism charges against this laughable compound, on its shambles of tire 'barricades', haphazardly constructed 'firing range', and patchy 'training program', might inadvertently undermine the hard-earned credibility of the federal government among the public in general and the Muslim community in particular. Research shows that the Muslim community is still the Number One source of alerts concerning homegrown radicalization – despite the breathtaking capabilities of the U.S. intelligence. The proactive attitude of Imam Siraj Wahhaj against his son Siraj Ibn Wahhaj and his companions in the case at hand are no exception. Additionally, terrorism charges may unduly inflate the clout of an otherwise undeservedly puny and disorganized (see pictures) gun training initiative, and might paradoxically (as was the case with other domestic terrorism charges) fuel terrorist propaganda by overestimating the hysteria and 'terrorizability' of the American public (when in fact the data shows that the U.S. public is quite resilient to terrorism). It might also serve) as a 'confirmation' of the grand anti-Islamic conspiracy of the West at the center of current propaganda for violent Jihad. Lastly, though ethical and legal considerations are outside my expertise as a social scientist, the apparent proclivity to apply terrorism charges preferentially to Muslim defendants is nonetheless consistent with the Supreme Court decision in Smith v Oregon, where Justice Scalia (who wrote the majority opinion) held that there is nothing inherently wrong with restricting the activities of religious groups so long as religion in general or a specific religious group are not singled out for special action. Since then, this prejudicial trend has been the subject of critique and calls for

reforms by both legal scholars (Bradley-Engen et al., 2009; McCann, 2017), and legislators in their call for a unified domestic terrorism law (H.R. 5602, the Domestic Terrorism Prevention Act of 2020).

*Distinguishing the Leveille Group from Violent Jihadi Ideology:*

Ideology is arguably one of the most consistent indicators for whether an act is deemed terrorism, and the most essential (and best-studied) motive for terrorism acts. As mentioned above, one of the emerging differences between terrorism and coercive cults that follow a narcissistic-delusional leader(s) is that radicalization to terrorism almost always involves a search for an existing and vetted ideology that explain the individual's distress in a self-serving manner, as grievance against powerful political entities. The radicalized individual thus gains a powerful (i.e. hard to disconfirm) narrative that explains away their lifelong plight while conveniently minimizing their personal responsibility. Terrorist propaganda also dictates both the target selection and the instigation of indiscriminate violence. Further, by subscribing to a particular terrorist ideology, the disenfranchised individual gains a supporting group of like-minded individuals (if only in their own mind, as in the case with lone terrorists), to serve as an echo chamber that would cement the conviction in the terrorism ideology by repeatedly confirming and stroking the sense of self-righteousness, innocence and competence of the radicalizing individual.

In my opinion, from the ideological and doctrinal standpoint, the group of defendants share very little in common with most characteristics of homegrown violent Jihad with which they were charged. In fact, in some important respects their actions, beliefs and attitudes go squarely against violent Jihadi doctrine. Considering ISIS ideology in particular, which is the most popular in homegrown radicalization, these doctrinal differences are grave, and would most likely be considered offenses that are punishable by death (see below for detailed examples).

Overall, there is very little reference in the evidence to the ideological leanings of the group. This, too, is in stark contrast to the copious, almost compulsive, consumption of terrorism propaganda that we invariably find in homegrown terrorism cases and is more consistent with religious cults that form around a charismatic, narcissistic and/or delusional leader, whereby the ideology is constructed 'on the go'. As mentioned above, one of the emerging differentials between ideological extremism and delusional conviction are 1) information-seeking behavior and 2) peer-seeking behavior. While the delusional narcissist is often quite content with their version of the doctrine, most terrorists spend considerable time and effort (both intellectual and physical or monetary) on legitimizing their personal grievances through alignments with the version of ideology that is practiced in their circles (or 'echo chambers' if their radicalization is strictly online). In turn, religious terror groups cater to this need by carefully constructing their propaganda to appear as the 'true' and seamless extension of the established religion.

The numerous searches of the Taos household yielded very few items that might be related to the 'ideology' of the group. Not only is the content of these items at odds with homegrown jihadi terrorism ideology and doctrine (more on that below), but its very dearth is also highly informative. Any known homegrown terrorist of the type that the group is alleged to be would have spent considerable time and efforts in either writing about it (e.g. Chesser, Aldawsari, etc.), downloading relevant materials (e.g. Syed Rizwan Farook, the Tsarnayev Brothers, Aldawsari, Melaku, etc.) and/or spending hours upon hours watching jihadi videos (e.g. Tsarnayev Brothers, Omar Mateen, Rahami, Zale Thompson, Elton Simpson, Soofi, etc.). I found no indication for this telltale pattern in the material at hand. The one-page diary entry re terrorism is too generic to suggest much beyond morbid curiosity (to which Muslims should be entitled, too). In fact, the page seems consistent with Siraj Ibn Wahhaj's longstanding aspirations for combat competency (e.g. his preference to associate with Moroccans that had martial arts background like Luqman rather than violent Jihadi background – of which there is no shortage in Morocco) and swashbuckling (e.g. his application for private investigator license). In contrast, it is highly unlikely that a person who 1) harbors explicit terrorist sentiments and 2) travels to Muslim countries who are known for radical Islam presence (e.g. Morocco, Saudi Arabia) and 3) has access to the internet won't possess, at the very minimum, the widely accessible manuals for the kind of terrorism acts that the group was charged with. Examples for such widely accessible manuals include 'The Anarchist Cookbook', 'The Mini-manual of the Urban Guerilla', 'Poor Man's James Bond', etc.

Considering the popularity of training guides of urban terrorism (sometimes referred to as 'cellular terrorism' in criminology) on the internet in general and among homegrown Jihadists in particular, the absence of any reference to them – neither physical (e.g. books), not digital (e.g. PDFs), nor any mention of them interviews I reviewed strongly suggests that the defendants have not so much as cursorily searched for them. This may be another contributing factor to

the disorganized and ineffectual manner in which the 'barricades' in the Taos household were constructed (see above how this disorganization is consistent with cognitive disorganization and mental illness).

Specifically in the violent Jihadi context, Siraj would have been hard pressed (had he put his mind to it) to avoid coming across the highly popular Jihadi propaganda publications in English, such as 'Inspire', 'Dabiq' or 'Rumia' magazines. In those publications, too, many of the tactical aims that he is charged with planning are covered in great detail, written in clear English and containing illustrations with high resolution and production value. Thus, although Siraj's interest in both Islam and militancy were longstanding, there is nevertheless no evidence that they ever coalesced in the form of a coherent interest in violent Jihadi affiliation or indoctrination.

In addition to the uncharacteristic near-absence of doctrine-relevant items, the content of the few ideology-relevant items that *were* recovered through the various search warrants is also inconsistent with homegrown terrorism and violent Jihadi doctrine. In fact, it is not even consistent with mainstream Islam. From my studies of the radicalization trajectories of violent and non-violent Salafists, the group would be hard pressed to find allies neither among mainstream Muslims (most of whom would likely be offended, like Siraj Ibn Wahhaj's uncle Muhammad Abdullah Wahhaj and father Imam Siraj Wahhaj) nor among violent Jihadi Muslims (most of whom are obligated – at least in theory – to kill individuals like the defendants on sight for apostasy, as will be detailed below).

*Deviations of the Leveille Group from mainstream Islamic Doctrine:*

The deviations of the group's – and especially those of its presumed leader, Jany Leveille – beliefs and actions from mainstream Islamic doctrine are too numerous for the scope of this report. Instead, I will include only the most egregious ones, with preference to those that were not mentioned in Dr. Cook's excellent analysis of Jany's autobiographical novel 'Isa Ibn Maryam'.

Firstly, Jany declares herself a prophet who gets messages directly from God and/or through Gibril (aka Jibril or Gabriel), the angel that dictated the Quran to the prophet Muhammad in the Islamic religion. This is heresy of the highest caliber in Islam (as it is in the 3 Abrahamic religions). The prophet Muhammad is considered the 'seal of the prophets' ('Khatamu A(l)-Nabiyyīn') and no other after him can receive direct messages from Allah or Gibril. Unlike terrorism ideologues, who make every effort to appear consistent with the 'original' or 'true' religion and to present themselves as a legitimate 'chip from the old block' by mimicking the language of the sacred scriptures, Jany does not seem to make any effort to that effect. For example, her 'pet' enemies are the 'shayateen' ('evil ones'; see also above), a word that appears no less than 70 times in her biographical trilogy – but only *once* in the entire Quran. It should be noted, however, that, in contrast to many other forms of evil doers, the Quran actually commands the believer to leave the 'shayateen' alone and not fight them (Quran 6:112). This may explain why, despite her obsessive disdain and suspicion for the agents of the corrupt world, her modus operandi was consistently that of retreat rather than offense. This MO, too, is more consistent with a cult led by a delusional narcissist with only a faint and flimsy veneer of religion, rather than terrorism-prone religious cults. In fact, when push came to shove and the Taos household was raided, she self-servingly ordered the group to surrender, (though she attributed the decision to Allah). This, too, is in accord with the Quran's instructions concerning the 'shayateen': "If thy lord has so willed, they would not have done it: so leave them and their fabrications alone" (Quran 6:112; I made minor changes to the translation to fit North American English readers- SC).

Another tell-tale indicator of delusional grandiosity and narcissism, against which Islam (as many other religions) had developed comprehensive doctrinal barriers -- but Ms. Leveille consistently disregarded -- is the solipsistic confidence in her religious interpretations and injunctions. Islamic jurisprudence and behavioral code ('Shari'a'), like the Jewish 'Halakha', requires religious authorities to demonstrate thorough knowledge of all relevant precedents when forming an opinion or issuing a religious edict ('fatwa'). Moreover, they must consider alternative schools of interpretation ('madhaheb' in Islam) for the sake of the broadest consensus possible (ijma'). Finally, to demonstrate that their motives are purely religious and not self-serving, any such opinion or edict ends with a formula that expresses humility, to dispel any suspicion of grandiosity in the author. The two most common formulae are 'and Allah knows best' ('wa'allahu alam') or 'God is the one who ultimately will ratify this' ('wabi'allah al-tawfiq'). These essential elements (along with other signals of humility and pro-social concerns) are glaringly missing in Jany's writings. Lastly, of the numerous indicators of narcissistic grandiosity vis-à-vis Jany's attitude toward Islam (or to fellow humans for that matter), one of the most shocking is her attacks on who may well be the most respected Sunni Imam of all times, Imam (Muḥammad ibn Ismā'īl al-) Bukhari. In my studies of terrorism ideologues and ideologies I am yet to find anybody who will beg to differ with

him, let alone disparage him, as Ms. Leveille did. Here, too, the totality of Jany's behavior and mindset is more consistent with that of a delusional narcissist faux-religious cult leader than an ideologue for homegrown Jihadi terrorism.

*Deviations of the Leveille Group from Volent Jihadi Doctrine and Practice:*

Not only do the practices of the defendants deviate from mainstream Islam, they also deviate significantly from Jihadi terrorism – whether homegrown or abroad. In fact, the group's deviations from the common denominator doctrinal elements of the Global Jihadi Movement (as practiced or professed by virtually all known violent Jihadi groups worldwide) are just as egregious as their deviations from mainstream Islam, and would, in my experience with homegrown Jihadi terrorism, likely *preclude* the group from being supported (through training, monies, and/or endorsement) from most – if not all – known Jihadi terrorism groups. This is consistent with the above-mentioned lack of any credible evidence for a viable connection between any of the defendants and known violent Jihadi groups, recruiters or operatives.

As demonstrated above, the principal driver for the group's actions and mindset is most likely not a homegrown Jihadi terrorist ideology, but rather a cultish belief in the mystical powers of the leader, to which a thin garnish of Islamic jargon was added, presumably to fit the existing identity of the majority membership and confer context and structure (but with little regard to legitimacy – as befitting a group led by a person with clear delusional, narcissist and self-serving characteristics).

Of the many deviations of the group from anything resembling a known homegrown terrorism cell, perhaps none is more egregious than their strong emphasis on occult, magic and sorcery. Just as mainstream Islam identified self-declared 'prophets' post-Muhammad as a cardinal threat, most Jihadi groups consider practitioners of fortunetelling, sorcery, and in particular witchcraft and 'black magic' as a direct threat to their religious authority, their own interpretation of the Shari'a law and the scriptures, and therefore a threat to their control over their people. Generally speaking, Islam differentiates between 'passive' (or 'defensive') sorcery, such as fortunetelling, fending off evil eyes and afflictions by incantations ('ruqiyah'), which is merely 'haram' – meaning it's technically forbidden and yet there is no obligation to punish it, and 'proactive' or 'black' magic, which is invoked to harm people. Reviewing the evidence, it appears that the group, by and large, have dabbled in 'defensive' magic, which modern mainstream Islam often condones. However, violent Jihadi groups of the sort that is responsible for virtually all known homegrown terrorism plots (e.g. ISIS) have no tolerance for it, and have conveniently elevated it to the level of Islamic offense that requires public execution in order to deter others from engaging in it ('hadd'). This obsession with persecuting 'sorcerers' is one of the unique signs of modern-day violent Jihad (though Saudi Arabia still executes people suspected of 'black' sorcery, conviction can only be secured by demonstrating a direct tort or harm – which is harder and rarer). Evidence for the disproportionate primacy that ISIS had put on sorcery, for example, we can find in the fact that in mid-March 2014, when the city of Idlib was almost entirely free of ISIS operatives, a remnant ISIS cell still kidnapped and murdered a 'sorcerer' as one of their last acts of terror on Idlib's Muslim population. Similarly, in November 2017, when ISIS was left with only 3% of their 'Caliphate', the only 2 executions they performed were on charges of 'sorcery', in the Deir Ezzor province.

Thus, the core beliefs and actions of the groups are highly incompatible with violent Jihadi doctrine. One of the very few books that was found in the Taos 'compound' was written by Wahid Abdessalam Bali, a moderate Salafi Imam who is much vilified online by groups that espouse Al-Qaeda and ISIS ideologies both for his tolerance for (and extensive use and teaching of) Sufi Islam in general and defensive incantations in particular.

For all the reasons listed above, the group's actions, motives, and ideology are inconsistent with those of homegrown Jihadi terrorism.