IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 18-CR-2945 WJ |
| vs. | ) | |
| | ) | |
| JANY LEVEILLE, | ) | |
| SIRAJ WAHHAJ, | ) | |
| HUJRAH WAHHAJ, | ) | |
| SUBHANAH WAHHAJ, and | ) | |
| LUCAS MORTON, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE GOVERNMENT EXPERT WITNESS TESTIMONY

The United States of America, through its undersigned counsel, files this Opposition to Defendants' Motion to Exclude or Limit Testimony of Government's Witness.  Doc. 742.[1]  The Defendants specifically move to exclude or limit the testimony of Colonel (Ret.) Randy Watt (hereinafter "COL Watt"), a nationally recognized expert in the field of law enforcement special operations and counter-terrorism who is, among other things a retired Army Colonel and highly decorated special operations commander with 34 years of military service as well as a retired chief of the Ogden, Utah, Police Department.  COL Watt is expected to provide testimony relevant to the nature of the construction of the Defendants' compound in New Mexico, the tactical purpose of the evidence of the male Defendants' and teenage boys' firearms training and practice on the home-made shooting range at the Defendants' compound, and the significance of evidence of the study of terrorist methodology found at the Defendants' compound in connection with the

---

[1] The Defendants will be individually referenced throughout this document as follows:  Jany Leveille (Leveille), Siraj Wahhaj (Siraj), Hujrah Wahhaj (Hujrah), Subhanah Wahhaj (Subhanah), and Lucas Morton (Morton).

espoused goals of the Defendants' religious and socio-political ideologies and plans. COL Watt has reviewed video and documentary evidence and witness statements collected by law enforcement and others.

In his report, COL Watt opines on several matters within his expertise, including the nature of Siraj's firearms and military-type tactical training of other members of the Defendants' group at the New Mexico compound, to include tactical reloads, disarmament techniques, clearing buildings, rapid reloads, and hand-to-hand combat, as well as mounted (motorcycle) attacks and direct support techniques. Doc. 742-2 at 4, 6. COL Watt also opines on the nature and tactical function of various aspects of the construction of the Defendants' compound, to include the construction of fighting positions among small-arms-proof barricades topped with broken glass built in a channelizing formation, tunnels leading away from the main compound with pre-positioned firearms and ammunition, and spider holes to escape or ambush persons near the compound. *Id.* at 5, 6. Altogether, COL Watt opines that the nature of all of the firearms and tactical training and construction of all parts of the compound were offensive or oriented towards the group's espoused plan of attacking members of corrupt institutions who did not recognize Leveille's prophet status and convert to Islam, rather than merely defensive or peaceful home-defense oriented. *Id.* at 6. Finally, COL Watt opines on the contextual relationship between the above physical evidence, documentary evidence of terrorist methodology, and the espoused religious and grievance-based ideology and plans of the group. *Id.* at 6.

At no point does COL Watt conclude or opine on the legal determination of whether the Defendants provided material support to terrorism as defined by statute. Nor does COL Watt opine that the Defendants acted with a mental state or condition constituting an element of the offense. Nevertheless, the Defendants argue that COL Watt should not be allowed to testify because COL

Watt is not qualified to give expert testimony on "terrorism or terroristic activities," Doc. 742 at 6, because his proposed testimony is not reliable, *id.* at 7, and because his proposed testimony would "invade the province of the jury by opining on the Defendants' intent and state of mind," *id.* at 9.

None of these arguments are convincing. Underlying each of these arguments are the Defendants' mischaracterizations of COL Watt's qualifications, his expected testimony, and the helpfulness of the testimony to a jury of laypersons. It is to be expected that the jury may know little to nothing about: what a tactical or rapid reload is, let alone what it would be used for; the sorts of purposes training in drive-by shootings from the back of a motorbike support; what a channelizing set of bullet-proof barriers are; or what a spider hole is, etc. These are specific facts of this case, explained by a person with four-decades' worth of specialized knowledge in the particular fields of these facts (i.e., firearms tactics, military tactics, and uses of them by small, civilian, ideologically motivated groups such as terrorists). Such an explanation will "assist the jurors in deciding the particular issues in the case," *Kumho Tire Co. v. Carmichael*, 536 U.S. 137, 156 (1999), and "will assist the trier of fact to understand or determine a fact in issue," such as the nature of the firearms training or compound construction. Fed R. Evid. 702.

The Defendants frame COL Watt's testimony as an uninformed, religiously biased indictment of "an impoverished extended family in the high deserts of Northern New Mexico," about whose aims and purposes COL Watt is not qualified to understand. Doc. 742 at 6. Yet, COL Watt is eminently qualified to opine on the significance of certain evidence in this case— types of firearms training, what it is used for, where such training comes from or is often seen around the world, types of building construction, and, overall, why this evidence is noteworthy in light of certain statements and ideologies espoused by the Defendants. However, the ultimate

weight of this evidence, just like the credibility of COL Watt's opinions on what the evidence signifies, is properly left to the sole discretion of the jury. Thus, the Court should not exclude COL Watt's testimony.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The United States initiated this case by complaint filed on August 31, 2018, charging the five Defendants with a violation of 18 U.S.C. § 371, conspiracy to provide firearms to a person unlawfully in the United States. (Doc. 1.)  This was followed by an indictment charging the same offense. (Doc. 25.)  The Defendants were arraigned on September 12, 2018, and the detention hearing was concluded with an order detaining Defendants pending trial. (Docs. 32, 33, 38.)  On March 14, 2019, the Grand Jury returned a superseding indictment against the Defendants, alleging violations of 18 U.S.C. §§ 371 (conspiracy), 922(g)(5) (possession of firearms by person unlawfully in the United States), 1117 (conspiracy to murder a federal employee—not charged against Subhanah and Hujrah), 1201 (kidnapping—not charged against Siraj), and 2339A (providing material support to terrorists). (Doc. 85.)

In or about November and December 2017, the Defendants lived in the Atlanta, Georgia area.  Hakima Ramzi, the wife of Siraj and mother of JOHN DOE, also lived in the area, but at the time was required by Siraj to live alone with JOHN DOE—who was approximately three years old and suffered from Hypoxic Ischemic Encephalopathy (HIE) resulting in cerebral palsy and epilepsy, among other disabilities, in an extended stay motel room—while Siraj lived separately with Leveille and their children in another house.  Around that time, Leveille directed Siraj to take JOHN DOE and bring him to her because Leveille had become convinced that JOHN DOE was actually her child and that Hakima had used black magic to transplant him from Leveille's womb into Hakima's womb before his birth.  Siraj did this by telling Hakima that he wanted to take JOHN

DOE to the park.  When he did not return JOHN DOE to her care, Hakima called Siraj every day to have JOHN DOE returned.

In early December 2017, Leveille, together with the children and Siraj, took JOHN DOE and drove from Georgia to Alabama.  Defendants Leveille, Siraj, Morton, Hujrah, Subhanah, and their respective 12 children, including JOHN DOE, stayed on land owned by Siraj in Alabama for approximately two weeks before leaving Alabama to go to New Mexico.  Separately, but concurrently, the FBI in Atlanta had opened an investigation of Siraj after receiving a tip from a local gun store owner who was concerned about Siraj's unusually excessive firearms training efforts at his store.

On December 13, 2017, while en route from Alabama to New Mexico, the Defendants crashed a silver 2004 Ford Explorer bearing Georgia license plate RGE8599 in Alabama.  The vehicle was registered to Leveille.  There were nine people in the vehicle at the time of the accident; two adults and seven juveniles, including JOHN DOE.  At the time of the accident, Siraj was in possession of five firearms, including handguns and a semi-automatic AR-15 rifle, a bullet-proof vest, a tactical vest filled with rifle magazines in magazine pouches, and a bag of ammunition.  Siraj was extremely worried about retaining possession of his firearms and gear when first responders came to help clear the wreckage from the highway.  Siraj also provided several false statements to the responding Alabama State Trooper about his address, his employment, and his employer's website.  Morton arrived in a large white box truck and helped Siraj remove the firearms and tactical gear from the crashed vehicle.  Siraj told the Alabama State Trooper that he was traveling from Georgia to New Mexico to go camping.  Leveille told the Alabama State Trooper that they were traveling from Georgia to New Mexico to see land owned by Siraj's brother-in-law.  The Alabama State Trooper was suspicious due to Leveille's and Siraj's vague

and conflicting stories, the lack of any camping equipment in the vehicle, and Siraj's false or unverifiable statements about his address and employment. *See* Ex. 3. Leveille and the children were transported to a local hospital to treat various minor injuries. However, before local authorities learned that the group included missing persons out of Georgia, the group was discharged that night from the hospital. Thereafter, the group's whereabouts were unknown.

After the crash, Morton drove the entire group of the Defendants and their children, as well as the missing JOHN DOE, from Alabama to New Mexico in his distinctive white Ford box truck. On or about the evening of December 17 or 18, the group arrived in New Mexico in the vicinity of Amalia, approximately an hour north of Taos in Taos County. They initially lived in the back of the white box truck and in an old camper trailer partially dug into the ground and covered with plastic tarps. After some weeks, they established a compound that included dirt-filled berms constructed from rubber tires, a system of underground tunnels and caves, and a firing range and tactical training area. While living at the compound, the Defendants had carried on such excessive firearms shooting that neighbors in the rural area had asked them to stop. Doc. 471-2.

After local authorities executed a search warrant at the compound on August 3, 2018, law enforcement officials were able to get a good look at the compound where the Defendants had been holed up for months. As described in reports of the warrant execution, the compound was on a high plateau with an open field of view in all directions, including miles of the only road leading to the only entrance to the property. It would take between five and ten minutes for any approaching vehicle to reach the compound from the point of first visible detection from the compound. Dirt-filled tire barriers blocked vehicle access to the compound from approximately 30 yards down the road leading to the compound. The compound was almost entirely surrounded by five- or six-foot dirt-filled tire walls, which would be impervious to handgun and rifle

ammunition.  At the front of the compound were additional one-foot-thick mud or dirt walls of various heights that were topped with broken glass to prevent breaching of the compound over the walls.  Access to the compound required switchbacks through gaps in the tire walls, which were narrow such that any entrance to the compound would be slow and cumbersome.  Within the compound were additional interior walls that created an inner defendable perimeter.  These walls also had narrow alley-type walkways that made quick entrance from the outside difficult.  Large mounds of dirt were also constructed at various locations around the compound as additional obstructions.  A large plastic covering concealed from above the main living area, which consisted of a sunken-in camper trailer.  *See* Doc. 566-9.  There was also a system of tunnels under the compound, with one leading dozens of yards from the compound and including a "spider hole" from the tunnel to the surface.

Among the evidence found at the compound were multiple rifles and handguns, nearly 600 rounds of ammunition, and body armor.  Firearms and ammunition were stored in strategic locations, including at the end of one of the tunnels near the spider hole.  Also found were several videos showing Siraj conducting various firearms training drills and sessions with Morton and the two oldest teenage boys, who were Leveille's children, at the compound.  The videos included tactical maneuvers and reloads while firing at human-shaped targets on the homemade firing range and the boys firing while driving by on the back of a motorbike.  Also found was a notebook with a handwritten entry entitled "Phases of a Terrorist Attack."  *See* Doc. 566-14.  At the time of the search warrant execution, Siraj and at least one of the older male children whom Siraj had been training in firearms tactics and skills at the compound armed themselves and were ready to shoot law enforcement officers who entered the compound pursuant to a valid warrant.  It was later learned that, before any shots were fired, Leveille instructed Siraj and the others to surrender.

After the Defendants' arrests in early August 2018, several of the children witnesses from the compound described the group's plan as involving confronting "corrupt institutions" such as the FBI, the military, and other government agencies. Those confronted would be offered the chance to convert to Islam and recognize Leveille as a prophet, and if they refused they would be killed. This plan was to take effect once JOHN DOE, whom Leveille had declared was a reincarnated Jesus, or "Isa," was resurrected, which the Defendants believed was going to happen within days of the execution of the search warrant in August 2018.

After the issuance of the superseding indictment, the United States sought expert consultancy on the issues of firearm tactics and training, the tactical structure of the compound, and whether the Defendants' activities at the compound and statements surrounding them constituted innocuous self-defense or offensive planning of terrorist-type activities. The United States obtained consultancy from COL Randy Watt, who is currently the president of a training and consulting group that provides firearms and tactical safety and security training, as well as special operations training and services. Prior to this, COL Watt served over 30 years in the Utah Army National Guard, with multiple deployments to Afghanistan and Iraq, and over 35 years with the Ogden, Utah, Police Department, including as Assistant Chief and Chief of Police. *See* Doc. 742-2 (COL Watt's curriculum vitae).

In addition to his military and law enforcement careers, which include multitudes of firearms, S.W.A.T., military tactics certifications, educational accomplishments, and instruction, COL Watt is a nationally recognized expert in the fields of law enforcement special operations and counter-terrorism. COL Watt wrote the tactical response plan for protection of the 2002 Winter Olympic Games in Salt Lake City, Utah, and has been retained as an expert in multiple cases on subjects including use of force and firearms tactics. On July 19, 2019, the United States provided

notice of its intent to offer expert testimony by COL Watt, Doc. 127, and again in supplemental

notices on September 28, 2020, Doc. 267, and April 3, 2023, Doc. 706.

## II.   <u>LAW AND ARGUMENT</u>

### a.   **COL Watt Is Qualified to Give Expert Testimony on the Subject Matter**

Federal Rule of Evidence 702 provides that an expert "by knowledge, skill, experience,

training, or education" may give an opinion if the expert's "scientific, technical, or other

specialized knowledge" will help the trier of fact.  Fed. R. Evid. 702(a).  The "touchstone of

admissibility" under Rule 702 is helpfulness to the trier of fact.  *Compton v. Subaru of America,

Inc.*, 82 F.3d 1513, 1518 (10th Cir. 1996) (internal quotations and citations omitted).  Moreover,

the Supreme Court has emphasized the "flexible" nature of Rule 702, *see Kumho*, 526 U.S. at 141,

and a district court has discretion in how it performs its gatekeeping function under Rule 702, *see

Goebel v. Denver & Rio Grande W.R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).  Accordingly,

"'as long as a logical basis exists for an expert's opinion, the weaknesses in the underpinnings of

the opinion go to the weight and not the admissibility of the testimony.'"  *Compton*, 82 F.3d at

1518 (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988)).

Here, COL Watt is qualified in every manner noted by Rule 702.  Through his knowledge,

skill, experience, and training over the course of his career, COL Watt's opinions will be helpful

to any trier of fact on the issues of firearms tactics and training, military tactics and construction

of the Defendants' compound, and on the terroristic purpose or usefulness of such tactics and

training in support of the ideas and plans espoused by the Defendants.  Even through his education,

which includes practical education in firearms and military techniques and tactics, but also a

master's degree in Strategic Studies from the U.S. Army War College, COL Watt is qualified to

opine on the noticed issues in this case.  Indeed, there is clearly a "logical basis" for COL Watt's

opinions, and his specialized knowledge in the fields of firearms and terrorist training and tactics will be helpful to a jury of civilians who will likely know very little about these subjects.

Perhaps if this were a court-martial, and the entire jury panel was comprised of senior military members with combat experience against terrorist groups, advanced professional studies and degrees on terrorism generally, and decades of firearms training and experience, COL Watt's opinions would not be helpful in this case. That is, of course, not the case here.

Despite the Defendants' efforts to discredit COL Watt's qualifications, they in fact line up exactly with his opinions in this case. As noted above, COL Watt has studied, trained, taught, and lived in real life the areas of his proposed expert testimony. The Defense attempts to get around this seemingly unavoidable conclusion by claiming that COL Watt's military education, training, or experience does not contain "any" training "regarding terrorism." Doc. 742 at 6. Despite being just facially wrong, the Defense's contentions are based on a straw man position that COL Watt's expert testimony is to explain "terrorism" and whether the Defendants are "terrorists." As much as the Defendants want to make this case about a larger policy debate or criticisms of connections between "terrorism" and "Muslims," that is not what this case is about.

To be clear, the United States does not need to prove a conclusive determination as to whether the Defendants meet some amorphous definition of "terrorism." As explored in depth in the Court's denial of the Defendants' constitutional challenge to 18 U.S.C. § 2339A, nothing about that statute or that charge in this case requires proof of "terrorism." Rather, the United States need only prove that the Defendants provided material support for a predicate offense, here a conspiracy to murder officers or employees of the United States. COL Watt's testimony, like the charges to which they relate, are terrorism-related, and the tactics and techniques used to carry out attacks such as those planned by the Defendants here are similar to and explainable as tactics and

techniques used by terrorist cells or groups, but none of these facts are reliant on a conclusion or opinion that the Defendants were "terrorists."

It is worth noting that evidence such as the "Phases of a Terrorist Attack" writing, and not the § 2339A charge, is what creates a connection between the Defendants' conduct and the kinds of tactics and techniques used to carry out the terrorist attacks.  COL Watt is offering an opinion as to whether the conduct the Defendants engaged in is consistent with the kinds of tactics, techniques, and procedures terrorists engaged in because the Defendants themselves, by describing in writing such tactics, techniques, and procedures, suggested this was the case.  Evidence of such is relevant to their knowledge, intent, and motives in connection with the §§ 1114 and 1117 offenses, even though proof that they were "terrorists" is not a necessary element of any charged offense.

COL Watt's expert opinions on the types of firearms trainings and techniques practiced by the Defendants, the offensive or violent purpose of such trainings within the context of their espoused plans and beliefs, and the tactical purposes behind the Defendants' construction of their compound, are all opinions to which COL Watt is highly qualified to provide, and that will be helpful for the trier of fact to understand when determining whether the Defendants' provided material support to a conspiracy to murder officers or employees of the United States.  The Defense's requested relief of the exclusion of COL Watt due to lack of qualification is therefore unjustified.

> **b.  COL Watt's Opinions Are Reliably Based on His Specialized Knowledge and Will Assist Any Trier of Fact**

The Defense also argues COL Watt should be excluded from testifying because his opinions based on his specialized experience are not reliable.  Doc. 742 at 7.  However, COL Watt has expertise that would assist the trier of fact in understanding the types of firearms and tactical

training being conducted by the Defendants, why small groups with a certain declared ideological view and plans of action would engage in such training, and how and why the compound the Defendants built was constructed in the way that it was.

First, as the Supreme Court has made clear, the "standard of evidentiary reliability" in Rule 702 is based on an expert's *knowledge*, because not every expert opinion is based on some sort of scientific test or experiment. *See Kumho Tire Co.*, 526 U.S. at 147 (quoting *Daubert*, 509 U.S. at 590). Because "[e]xperts of all kinds tie observations to conclusions through . . . general truths derived from specialized experience," many of the *Daubert* factors may not be pertinent in assessing reliability. *Id.* at 149–150. Thus, the "flexible" inquiry under Rule 702 provides this Court "considerable leeway" in deciding how to determine an expert opinion's reliability as well as the reliability of the opinion itself. *Id.* at 152–53.

For example, where expert testimony is based solely upon experience or training, application of many *Daubert* factors may be "unwarranted" because there are no tests or experiments which have methods to be challenged or the results of which are even offered as evidence. *Compton*, 82 F.3d at 1518 (citing *United States v. Rice*, 52 F.3d 843, 847 (10th Cir. 1995)). Accordingly, the threshold for trial courts to apply is "merely . . . [whether] proffered expert testimony is both relevant and reliable while taking into account 'the inquiry envisioned by Rule 702 is a flexible one.'" *Id.* at 1519 (quoting *Daubert*, 509 U.S. at 594).

Here, COL Watt's expert opinions are based on his extensive training, experience, and knowledge, and his opinions are both relevant and reliable. His opinions are based on his vast knowledge and experience in studying, training, leading, teaching others, and employing in real-world situations firearms training, urban combat tactics, military construction tactics, and both counter-terrorism and law enforcement actions against small armed groups or cells. In addition,

COL Watt's opinions were formed from reviewing specific, articulable evidence in this case, to include video evidence of the Defendants' firearms training, photographic and documentary descriptions of the Defendants' compound (to include the tunnels and where weapons were staged when law enforcement entered the compound), statements made by the Defendants through their own writings as well as to witnesses at the compound, and the actual physical evidence of the many firearms, hundreds of rounds of ammunition, and body armor found at the compound.

At most, challenging these factual predicates may be cross examination material for the Defense to ask COL Watt during his testimony.  As noted above, it is actually unnecessary for the United States to prove—or for COL Watt to opine on—whether the Defendants were definitionally "terrorists" or whether their training, tactics, and procedures met some definition of "terrorism." Rather, COL Watt's expertise can help explain to lay fact-finders what those training, tactics, and procedures mean when employed by a small group with a certain ideology or self-espoused plan.

While COL Watt has extensive experience in encountering what would colloquially be known as "terrorists" during his several overseas combat deployments in Afghanistan and Iraq, the label of "terrorists" is irrelevant to COL Watt's experience during those combat deployments. The reality is that the small group, irregular, guerilla forces and combat tactics COL Watt studied and encountered during his military career are similar to what the Defendants were engaged in here, regardless of the label used to describe any of them.  Indeed, at the time COL Watt engaged with the tactics employed by enemy groups overseas, the textbook definition of "terrorist" would not generally fit those groups, as they would more accurately be described as guerilla or irregular combatants.  That some of these combatants may have aligned politically with a broader organization or ideology does not change the training, tactics, and procedures employed by them. Nor does it change the clear similarities in the training, tactics, and procedures being employed by

the Defendants—to include their own writings describing those training, tactics, and procedures found at the compound.

COL Watt's opinions are reliably based on his own extensive training, knowledge, and experience, as applied to specific evidence in this case.  Thus, his opinions about the types of firearms and tactical training employed by the Defendants, the construction specifics of the Defendants' compound, and the likely reasons for that training and compound construction (based on the Defendants' own statements and the similarities in that training to other irregular combat entities), are reliable conclusions "tied to" specific observations of the evidence in this case, and constitute "general truths derived from specialized experience." *Kumho Tire Co.*, 526 U.S. at 149-50.  As such, COL Watt meets the "flexible" reliability standard under *Daubert*/*Kumho Tires* and Rule 702, and the Defense motion should be denied.

### c.   COL Watt's Opinions Do Not Invade the Province of the Jury

The Defendants also claim that COL Watt should not be allowed to testify because his opinion "invades the province of the jury" by opining on the Defendants' state of mind, contrary to Federal Rule of Evidence 704(b).  Doc. 742 at 9.  Yet, far from offering an expert conclusion on what the Defendants' state of mind was, as the Defendants claim, COL Watt's opinions merely articulate the observable acts and statements of the Defendants and describe their correlative purpose based on his extensive specialized knowledge, training, and experience.  For example, COL Watt's opinion on whether training in drive-by motorcycle assassination tactics is consistent with techniques used in small group guerilla attacks or in offensive uses of force, or whether it is consistent with innocent "self-defensive purposes," is based on objective observations and his personal expertise.  Such an opinion does not purport to tell the jury the Defendants' mental state and is expressly permitted under Rule 704(a).

14

In any event, the rule cited by the Defendants as requiring exclusion is not even applicable to COL Watt's proposed testimony.  Rule 704(b) is specifically qualified to cover expert witnesses "testifying with respect to the mental state or condition of a defendant," and only precludes such testimony where it deals with "whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto."  Fed. R. Evid. 704(b). Here, there is no mental state or condition that constitutes any element of the crimes charged, and COL Watt is not testifying to the mental state or condition of any defendant.  Rule 704(b) has no role in the analysis of COL Watt's expert testimony.

Like expert witnesses who routinely testify, based on specialized knowledge, training, and experience, that a certain amount of narcotics is consistent with distribution and not personal use, COL Watt will testify, based on his specialized knowledge, training, and experience, that a certain set of weapons training and tactics, compound construction, and professed ideology and plans are consistent with offensive or criminal uses of force.  Even if such opinions may touch on an ultimate issue of the material support for terrorism charges, COL Watt's proffered opinions are not objectionable on this ground.  *See O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 921–22 (D. Colo. 2017) (stating that, though expert testimony may not usurp the jury's fact-finding function, "it is well settled that 'an opinion is not objectionable just because it embraces an ultimate issue'" (quoting Fed. R. Evid. 704(a) and citing *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988))).

### d.  The Danger of Unfair Prejudice to the Defendants Does Not Substantially Outweigh the Probative Value of COL Watt's Expert Testimony

Anticipating the inapplicability of Rule 704(b), the Defendants assert an objection to COL Watt's testimony under Federal Rule of Evidence 403.  Doc. 742 at 9-10.  This argument also fails, as COL Watt's expert testimony is directly relevant and highly probative to proving whether the Defendants' firearms training and compound construction constitutes "material

support" as charged.  Any theoretical risk of prejudice to the Defendants related to COL Watt's expert opinions stems directly from the Defendants' own roles, statements, and actions, and thus is neither unfair nor does it substantially outweigh the probative value of COL Watt's opinion testimony.

Tenth Circuit law "*favors* admission of all relevant evidence not otherwise proscribed; thus, exclusion under this rule [403] is 'an extraordinary remedy [that] should be used sparingly.'" *United States v. Irving*, 665 F.3d 1184, 1213 (10th Cir. 2011) (emphasis original) (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)).  Evidence is not unfairly prejudicial simply because it is damaging to the defendant's case.  *United States v. Martinez*, 938 F. 2d 1078, 1082 (10th Cir. 1991).  "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocence of the crime charged."  *Rodriguez*, 192 F.3d at 951 (emphasis added) (internal citations omitted).

Furthermore, in conducting the Rule 403 balancing test, this Court "must give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Murry*, 31 F.4th 1274, 1291 (10th Cir. 2022) (internal quotation and citations omitted).  Even if COL Watt's testimony were to adversely affect the jury's attitude toward the Defendants, such prejudice does not itself "substantially" outweigh its probative value.  *See Irving*, 665 F.3d at 1213–14.  Finally, whatever prejudice stems from the relevant testimony can be moderated by cautionary instructions from the Court at the time of the admission of the evidence and, if requested, again in the final charge to the jury at the close of the case.  *United States v. Record*, 873 F.2d 1363, 1376 (10th Cir. 1989).

As articulated above, COL Watt's expert opinions are highly probative, as they will inform the jury the types of firearms tactics being practiced by the Defendants, such as tactical reloads, rapid reloads, clearing buildings, and motorcycle mounted firing techniques, and what types of actions are consistent with these types of trainings.  This is the type of specialized knowledge and understanding that lay jurors cannot be expected to have.  Nothing about these opinions is unfair to the Defendants, no potential prejudice to the Defendants by these opinions *substantially* outweighs their high probative value—especially when giving the evidence its maximum probative value and the claimed prejudice its minimum value.

### III.   <u>CONCLUSION</u>

COL Watt is plainly qualified to give expert opinions on the topics of the types of training and tactics used by the Defendants, the uses and reasons for the Defendants' compound construction, and the likely purposes of these actions in light of the Defendants' professed ideologies and plans.  COL Watt reliably applied the facts and evidence known in this case to his expert training, knowledge, and experience, and his resulting opinions are reliable.  Finally, the probative value of COL Watt's opinions is not substantially outweighed by any unfair prejudice they may cause the Defendants, and COL Watt's opinions do not invade the province of the jury.  Therefore, the United States respectfully requests that this Honorable Court deny the Defendant's motion to exclude COL Watt's expert testimony.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

/s/_____
TAVO HALL
KIM BRAWLEY
Assistant United States Attorneys
P.O. Box 607
Albuquerque, NM 87102
(505) 346-7274

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon defense counsel.  A copy of the filed document was also mailed to Lucas Morton.

/s/_____
Tavo Hall
Assistant United States Attorney