```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEW MEXICO

 3   _____
                                    )
 4   UNITED STATES OF AMERICA,      )   No. 1:18-CR-02945-WJ
                                    )
 5            Plaintiff,            )
                                    )   Pete V. Domenici U.S. Courthouse
 6        vs.                       )   Cimarron Courtroom
                                    )   Albuquerque, New Mexico
 7   JANY LEVEILLE, SIRAJ IBN       )   Thursday, February 9, 2023
     WAHHAJ, HUJRAH WAHHAJ,         )
 8   SUBHANAH WAHHAJ, and           )
     LUCAS MORTON,                  )
 9                                  )
              Defendants.           )
10   _____)


11

12                    TRANSCRIPT OF PROCEEDINGS
     MOTION HEARING re: JOINT MOTION TO SUPPRESS EVIDENCE (Doc. 471)
13      and MOTION FOR ORDER OF PRETRIAL CONFERENCE (Doc. 489)
             BEFORE THE HONORABLE WILLIAM P. JOHNSON
14             CHIEF UNITED STATES DISTRICT JUDGE

15   APPEARANCES:

16   For the Plaintiff:   TAVO HALL
                          KIMBERLY BRAWLEY
17                        UNITED STATES ATTORNEY'S OFFICE
                          District of New Mexico
18                        Post Office Box 607
                          Albuquerque, New Mexico   87103
19
                          GEORGE C. KRAEHE
20                        FRANK RUSSO
                          USDOJ-NATIONAL SECURITY DIVISION
21                        950 Pennsylvania Ave, NW
                          Washington, D.C. 20530
22
     For Defendant        ARIC ELSENHEIMER
23   Jany Leveille:       ANGELICA M. HALL
                          FEDERAL PUBLIC DEFENDER
24                        District of New Mexico
                          111 Lomas Boulevard, N.W., Suite 501
25                        Albuquerque, New Mexico  87102
```

```
 1   APPEARANCES (Continued):

 2   For Defendant          MARC H. ROBERT
     Siraj Ibn Wahhaj:      MARC H. ROBERT, ATTORNEY
 3                          Post Office Box 25271
                           Albuquerque, New Mexico 87125
 4
                           THOMAS CLARK
 5                          CLARK AND JONES, LLC
                           432 Galisteo Street
 6                          Santa Fe, New Mexico 87501

 7   For Defendant          MARSHALL J. RAY
     Hujrah Wahhaj:         LAW OFFICES OF MARSHALL J. RAY, LLC
 8                          201 12th Street, N.W.
                           Albuquerque's, New Mexico  87102
 9
                           DONALD KOCHERSBERGER
10                          BUSINESS LAW SOUTHWEST, LLC
                           320 Gold Avenue, S.W., Suite 610
11                          Albuquerque, New Mexico 87102

12   For Defendant          JUSTINE FOX-YOUNG
     Subhanah Wahhaj:       JUSTINE FOX-YOUNG, P.C.
13                          5501 Eagle Rock Avenue, N.E., Suite C2
                           Albuquerque, New Mexico  87104
14
                           RYAN J. VILLA
15                          THE LAW OFFICES OF RYAN J. VILLA
                           5501 Eagle Rock Avenue, N.E., Suite C2
16                          Albuquerque, New Mexico  87104

17   For Defendant          PRO SE
     Lucas Morton:
18
     Defendant Morton's     JOSEPH SHATTUCK
19   Standby Counsel:       JOSEPH E. SHATTUCK, ESQ.
                           8748 E. Belleview St.
20                          Scottsdale, Arizona 85257

21   Also Present:          CYNTHIA GILBERT, Perfectly Legal, Inc.
                           TRAVIS TAYLOR, FBI
22
     Reported by:           MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23                          United States Court Reporter
                           Phone:  (505)348-2334
24
          Proceedings reported by machine shorthand and transcript
25   produced by computer-aided transcription.
```

1                        I N D E X

2                                                    Page

3   MOTION FOR ORDER OF PRETRIAL CONFERENCE (Doc. 489) ....6

4   JOINT MOTION TO SUPPRESS EVIDENCE (Doc. 471) .........30

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                USA v. LEVEILLE, et al. - 1:18-CR-02945-WJ

 2              MOTION HEARING re: DOC. 471 AND DOC. 489

 3          HEARING re: STANDING TO BRING MOTION(S) TO SUPPRESS

 4                            * * * * *

 5  (In Open Court at 9:40 A.M.)

 6              THE COURT:  Good morning.

 7              MR. SHATTUCK:  Your Honor, Joe Shattuck on behalf of

 8  Mr. Lucas Morton.  Before we start, can we unhandcuff his right

 9  hand so he can take notes, since he represents himself?

10              THE COURT:  Sure, that's fine.

11              We're in session today in the case of the United

12  States vs. Jany Leveille, Siraj Ibn Wahhaj, Hujrah Wahhaj,

13  Subhanah Wahhaj, and Lucas Morton, Case No. 18-CR-2945.

14              First, would the attorneys for the United States

15  enter their appearances, please.

16              MR. HALL:  Good morning, Your Honor.  Tavo Hall on

17  behalf of the United States alongside Kimberly Brawley, and

18  then Travis Taylor from the Federal Bureau of Investigation.

19              THE COURT:  And do we have counsel also appearing by

20  either Zoom or phone?

21              MR. HALL:  Yes, Your Honor.  Thank you.  Also

22  appearing by telephone is Frank Russo from the National

23  Security Division of the Department of Justice, and then I

24  believe Mr. George Kraehe is also going to be calling in from

25  the same National Security Division of the Department of
```

1   Justice.

2         THE COURT:  All right.  And then Mr. Morton

3   represents himself pro se.  Mr. Shattuck is here as standby

4   counsel.  I'll ask the other attorneys to enter their

5   appearances at this time.

6         MR. ELSENHEIMER:  Good morning, Your Honor.  Aric

7   Elsenheimer and Angelica Hall on behalf of Ms. Leveille.

8         MR. ROBERT:  Good morning, Your Honor.  Marc Robert

9   and Tom Clark on behalf of Siraj Wahhaj.

10         MR. VILLA:  Good morning, Your Honor.  Ryan Villa and

11   Justine Fox-Young on behalf of Subhanah Wahhaj, who is present

12   and in custody.

13         MR. KOCHERSBERGER:  And good morning, Your Honor.

14   Don Kochersberger and Marshal Ray on behalf of Hujrah Wahhaj,

15   who is also present and in custody of the Marshals Service.

16         THE COURT:  Good morning.

17         The first matter on the docket this morning is

18   Doc. 489, which is the United States' Motion for Pretrial

19   Conference Pursuant to Section 2 of 18 U.S.C. APP III regarding

20   the Classified Information Procedures Act.  There was also a

21   Motion to Designate a Classified Information Security Officer,

22   or CISO.  I've already granted that portion of the motion, and

23   the CISO and alternate CISOs have already been designated.

24         So Mr. Hall, what's left from your perspective on the

25   pretrial conference regarding CIPA?

1          MR. HALL:  Your Honor, not that much is left.  We

2     also discussed this a little bit at the pretrial scheduling

3     conference that we had back in, I think, October or November.

4          But just to make sure that it's clear, the goal here

5     is -- to just make sure the Court is aware, there's a bucket of

6     information related to an old investigation that has been

7     closed since 2009 that we've looked at before and we did not

8     think it was discoverable.  But there was a request from one of

9     the prior counsel for Siraj Wahhaj, which she is no longer on

10    the case, so I think if the defense still wants that

11    information, if they could clarify, that would help us.

12         But I think generally speaking, for the Court's

13    information, we intend to take another look at that.  We still

14    don't see anything in there that's discoverable, but just to be

15    safe.  We intend to file a Section 4 motion to delete that from

16    discovery, so the Court will be aware of the details regarding

17    that information when we file that motion.

18         One other wrinkle related to classified information

19    is the current investigation, the current case file, actually

20    started in this case in Georgia before really any of the -- it

21    was unrelated and before any of the kidnapping or anything like

22    that took place.  So any of the events that eventually had to

23    transfer to New Mexico.  But because of the nature of that

24    investigation when it began, the information in the case file

25    starts out as classified, or started out as classified.  All of

1   the information that's discoverable has been declassified and

2   provided to the defense from that.

3           That being said, to the extent that there are things,

4   like in any case, that are not discoverable that haven't been

5   turned over, they would be still technically classified,

6   because they were not declassified and they were not going to

7   be turned over.  They would probably be mentioned in the

8   Section 4 motion, as well, just so the Court is aware of that.

9           And then the last thing is, there is one final sort

10  of loose thread that the United States has been trying to get

11  to the end of recently.  It stems from a post-arrest entry into

12  the current case file and it does involve classified

13  information.  So there might be one or two or a handful of

14  additional items of discovery that would come out of that that

15  would start out as classified.  Again, the intent would be to

16  declassify all of it in terms of anything that's discoverable.

17          And then to the extent that there's something related

18  to those -- you know, there might be a 302 or something that

19  comes out of it.  We don't know yet.  We're still looking into

20  it.  But if that's the case, that would be described in the

21  Section 4 brief, as well, in terms of the background, the parts

22  that are not discoverable, and then the actual 302 or whatever

23  it is that would be turned over in a declassified format.

24          So the bottom line is, we don't think there's going

25  to be any classified discovery, and we don't think there's a

1   need for security clearances for defense counsel, but we do

2   intend to file a Section 4 brief or motion.  I think right now,

3   the scheduling order has it set with a deadline in April, and

4   at this point there's no reason to think that we can't satisfy

5   that.

6          THE COURT:  So as I understand it, there's going to

7   be an initial effort to determine, regarding I guess requested

8   discovery information, whether it can be declassified, and if

9   it's declassified, it totally takes it out of the realm of

10  CIPA, correct?

11         MR. HALL:  Yes, Your Honor, unless there's some

12  argument to be made that -- you know, when it's declassified,

13  things get redacted.  A lot of times it's unrelated, it's

14  irrelevant.  But if there's a fight about what's underneath

15  those redactions, then maybe we'd have to go into it more.  But

16  otherwise, you're right, it should just be regular discovery.

17         THE COURT:  Now, isn't the standard for -- if the

18  Government objects to CIPA information, the standard is the

19  information has to be relevant and helpful to the defense?

20         MR. HALL:  Yes, Your Honor.  Relevant and helpful,

21  which comes from the Yunis case, and then all the CIPA cases

22  that go from Yunis.

23         THE COURT:  Now, based on your experience dealing

24  with CIPA material, at that point is there typically an in

25  camera review that's done, and that's under the -- is it the

1  Section 4 motion?

2          MR. HALL:  Yes, Your Honor.  So when we file the

3  Section 4, depending on the nature of the items, it can go one

4  of two ways.  It could just be a very obvious set of documents

5  that are of a category that we can describe to the Court in the

6  Section 4, and then it would be up to the Court to decide

7  whether it wants to actually look at any of the document.  But

8  in a case where there's thousands and thousands of documents,

9  it might be more efficient to not look at every single one.

10          But if there are documents that are kind of closer on

11  the call, or if we're looking for a substitution rather than

12  just a deletion, where the Court needs to approve what it is

13  that's being substituted out, there would be an in camera

14  review by the Court ex parte, and there could even be an

15  ex parte conference if we needed to talk about it.

16          THE COURT:  Right, I saw that in the case law, and

17  also your motion.

18          Now, in terms of -- some of the initial discovery has

19  already been declassified.

20          MR. HALL:  Yes, Your Honor.

21          THE COURT:  I take it if we get into where we're

22  dealing with classified information, we're not talking about

23  thousands and thousands of documents?

24          MR. HALL:  No, Your Honor.  I think the -- so the

25  2003 to 2009 bucket is somewhere around 180, maybe 200

1  documents.

2          THE COURT:  So it's a very manageable volume?

3          MR. HALL:  Very manageable, yes, Your Honor.

4          THE COURT:  Okay.  And then the other thing is, from

5  my review of your motion and some of the statute, itself, and

6  some of the case law, typically the CIPA conferences, you know,

7  establish timing of discovery requests, timing of the United

8  States' motion under Section 4, timing of pretrial notice under

9  Section 5, timing of the Section 6 hearing.  Do we need to set

10 any dates now, or are certain dates already set?

11         MR. HALL:  So I think the April date that's set --

12 and the way it's phrased in the scheduling order is

13 substantially complete -- we imagine that as being the

14 Section 4 filing on our part.  There shouldn't be any Section 5

15 or Section 6 if there's no classified information being

16 provided to defense counsel, so we don't need dates for those.

17         THE COURT:  So to the extent we need any dates right

18 now, it's already set?

19         MR. HALL:  I think so.  And if there's a need to go

20 beyond that date, we will certainly let the Court know as soon

21 as possible and we'll go from there.  But at this point, we

22 should be good.

23         THE COURT:  Okay.  At this point, do any of the

24 defense counsel wish to respond?

25         MR. ROBERT:  Thank you, Your Honor.  Marc Robert on

1   behalf of Siraj Wahhaj.

2          The problem, of course, in this kind of a situation

3   is that we don't know what we don't know.  We are generally

4   aware that there was an investigation, I believe, of Siraj

5   Wahhaj started in 2003, ending in 2009.  whether or not that

6   investigation had anything to do with the things that developed

7   into this case are things that we don't know.

8          Counsel mentioned that there were things that were

9   going on in Georgia that generated classified information.

10  Again, we don't know whether the information that was obtained

11  during those processes informed the investigation or the

12  prosecution that we're now dealing with.  Without knowing those

13  things, it's impossible for me, at least, to say to you that,

14  yes, we know that there are things in there that we need to

15  look at or at least have you look at, or no, there aren't.

16         The problem, I think, with timing is, here we are in

17  early February, and April is a couple of months from now and

18  five months before the scheduled trial date.  I'm concerned

19  that if we end up with a bunch of classified information, or

20  disputes about whether it's relevant and helpful, that we could

21  end up in a timing crunch with respect to the trial date.  I

22  guess --

23         THE COURT:  I mean, the concerns you've raised are

24  legitimate from your standpoint, but the statute and the

25  provision, they are what they are.  The U.S. Supreme Court --

1   the constitutionality of the statutes, to my knowledge, it's

2   been challenged, but I think it's been upheld.  I mean, I guess

3   I'm encouraged that there may not be any if it's declassified.

4           MR. ROBERT:  Yes, that would be great.

5           THE COURT:  That's a win-win for everybody.  If

6   there's something that comes in pursuant to Section 4, that's

7   one of those statutes -- I mean, as you know, you and I have

8   had discussions in terms of your former job where the Criminal

9   Justice Act allows defense counsel to bring ex parte matters

10  that I've never really -- I thought it sometimes put the Judge

11  in a difficult position.  That's why the CJA managing attorney,

12  I was like, yes, that really helps.  But this is a statute

13  where it allows the Government to submit an ex parte, and even

14  though I'm not a big fan of those kind of ex parte hearings,

15  again, the language is what it is.

16          And even if there are certain limited areas where

17  when you're dealing with classified information it would allow

18  an interlocutory appeal, which would really -- I mean, I don't

19  see that happening, because honestly, we're not talking about a

20  large volume.  I don't mean to minimize the concerns you raise,

21  but I don't know how to deal with it other than just moving

22  forward based, at this point, on there may be a Section 4

23  motion, there may not.  If there is no classified information,

24  then the whole thing is moot.

25          MR. ROBERT:  Right, Your Honor.  I just wanted to let

1   you know that those are concerns that I have.

2        THE COURT:  And they're valid concerns, and I

3   appreciate that.

4        MR. ROBERT:  Thank you.

5        THE COURT:  Mr. Villa.

6        MR. VILLA:  Thank you, Judge.

7        I think it's important to point out that the

8   Government started this case saying there's classified

9   information, we're going to have to invoke CIPA and go through

10  the CIPA process.  This was in their motion to declare the case

11  complex filed way back in the beginning of the case, Doc. 47.

12  The Government has sort of backtracked, in my view, since then.

13  They have declassified a small number of materials, which I

14  basically have here, Judge, and it's clear from that

15  information that there are things missing.  And the Government

16  has taken the position today, and in their motion, essentially

17  that the stuff that's still classified isn't relevant and

18  helpful.

19       So first, relevant and helpful is not the same as the

20  Brady standard.  There's a lower threshold for the Court to

21  determine whether something is relevant and helpful.  But by

22  their own admission, there's at least two buckets of evidence

23  that's likely relevant and helpful.

24       The Georgia investigation, why is that relevant and

25  helpful, Judge?  Because the FBI was surveilling some of the

1  Defendants in Georgia for suspicions of terrorist activity.

2  The Government has produced some of those surveillance reports,

3  pole camera footage and things along those lines, that showed

4  no such activity.  So exculpatory on its face.  And the

5  Government took the position, and still takes the position,

6  that that stuff is not even relevant, even though it's clearly

7  exculpatory.

8           I mean, if these Defendants are terrorists, or

9  supporting terrorists, or were planning some terrorist activity

10 in the months before they allegedly moved from Georgia to Taos,

11 yet nothing has been seen by these FBI investigators, that

12 stuff is very relevant.  And what's in that Georgia

13 investigation that's classified we believe is everything that

14 led up to why they were surveilling the Defendants.  Why were

15 they putting up pole cameras?  Why were they watching them,

16 their travel patterns?  Why were they doing all that?  We have

17 none of the why.  We have no information in any of that

18 material.

19          So our fear is that the Government is saying, well,

20 there's nothing here, and they don't think that's exculpatory

21 when it clearly is.  And I think something that was post-arrest

22 has to be relevant in some way.  I mean, I don't know what it

23 is, but if it's post-arrest, we're talking August 2018.  We're

24 almost four and a half years later and the Government is saying

25 it's still in the process of declassification, which is what

1  they said was happening back in 2018 when they filed their

2  motion to declare the case complex.  They said, we're going

3  through the process.

4         I think there's a way, another approach that the

5  Court ought to consider, and that is this.  I don't know about

6  the 2009 info.  I mean, that might be something that's more of

7  a Section 4 issue, right, where the Court has to look at the

8  Government's submission, look at the defense's submission,

9  which we are entitled to provide to you sort of our defense

10 theories so you can determine what's relevant and helpful.

11 That might be something that the 2009 information is right for.

12 You see the Government's submission, you see what the defense

13 submits, and you make a call, because the Georgia investigation

14 and the post-arrest information is clearly relevant.

15        And I think there's another way around it rather than

16 waiting until the end of April for the Government to do their

17 Section 4 and the defense to submit their, you know,

18 information to you, to help you decipher whether the stuff is

19 relevant and helpful.  You know, we've got a CISO, you've got

20 defense counsel that can get cleared.  I've been cleared.  I

21 was cleared in the Mascheroni case back in 2010.  Since then,

22 I've picked up no new criminal charges, thank goodness, so I

23 think I could get another clearance.  So, you know, I don't

24 mean you have to clear everybody, right, but for instance, if I

25 got a clearance and maybe one other, we could get a SCIF and we

1   could put that information in there right now to let us review

2   it.  Rather than waiting until the end of April to argue

3   whether it's relevant and helpful, we can deal with Section 5

4   and Section 6 to determine if we even care about that

5   information.  I mean, we might look at it and say, nah, this

6   doesn't matter, and that's the end of it.  So instead of delay,

7   we do that as sort of a hybrid approach, right, with those two

8   buckets of information.

9           Clearly, I mean, we can brief this, Your Honor, but

10  you can read these reports and they talk about pole camera

11  surveillance of the Defendants in Georgia, and there's nothing

12  there.  And you and I both know that the first report is not,

13  "I saw Defendant So-and-So doing such-and-such at their home in

14  Georgia."  The first report is before that, right.  This is why

15  we want a pole camera, and this is why we're interested in

16  these folks.  That's what's in the Georgia investigation.  And

17  if that's material the Government doesn't want to use, then

18  it's not necessarily something that the jury would hear, but it

19  might be exculpatory, just like the surveillance and pole

20  cameras are exculpatory, because these are just people living

21  their lives, they're not doing anything wrong.

22          This is an extraordinary case.  If we were in 2018,

23  you might say, okay, we'll go along with what Mr. Hall has

24  suggested.  But we're four and a half years later.  There are

25  speedy trial concerns.  We're trying to meet this September

1  trial date.  It's not -- there's no harm done to national

2  security interests by having cleared counsel review documents

3  in a SCIF and going through that process.  And like I said, we

4  might decide we don't need this, or it's not worth the risk of

5  an interlocutory appeal.  But it would certainly be much more

6  efficient and much faster than waiting until the end of April

7  just so you can make that threshold determination about, should

8  we even have a SCIF, when we know by the Government's own

9  admission that at least two of the buckets are clearly related

10 to these Defendants in this case.

11       THE COURT:  I had forgotten that you were in the

12 Mascheroni case.

13       MR. VILLA:  I try to forget, too, Judge.

14       THE COURT:  A challenging client.

15       MR. VILLA:  Yes, he was.

16       THE COURT:  Are those backgrounds -- they're good for

17 five years, right?

18       MR. VILLA:  You know, that's a good question.  It was

19 a DOE clearance, not a DOD clearance, so it would probably -- I

20 mean, it's the same folks doing the clearance, I guess, the

21 FBI.  I think it was good for ten years, which has lapsed,

22 right, but I do think re-application is much faster than an

23 initial application.  And like I said, I've just been sitting

24 at home and staying out of trouble, so hopefully my

25 re-application will be a little faster than my initial

1   application.

2           THE COURT:  Let me -- is the CISO on the phone?

3           MR. HALL:  I don't believe so, Your Honor, no.

4           THE COURT:  In terms of a background investigation to

5   clear, or to get -- I mean, it may not come to pass in this

6   case, but certainly this isn't the only case I've got on my

7   docket right now involving classified information.  Have any --

8   no defense counsel in this case yet has gone through either an

9   updated background investigation or an investigation that's

10  required, right?

11          MR. VILLA:  Certainly not for this case, and I don't

12  think so with respect to any other cases.  So we would have to

13  get the ball rolling, and that's another concern.  If you

14  decide that Georgia and the post-arrest conduct is something

15  that we're at least entitled to review in the SCIF, if you

16  don't make that decision until the end of April, we're starting

17  the process then, and even a re-application is going to take,

18  you know, some time.

19          So that's why I make this other suggestion, is we get

20  the ball rolling now.  I'm willing to be at least one of the

21  folks to go through it right now and sit in the SCIF and look

22  at that.  I think that could short-circuit some things and

23  certainly change the speedy trial analysis if we're talking

24  about interlocutory appeals or delaying the September trial

25  date.

1          THE COURT:  Sure.  Can you confer with your

2    colleagues and then file a motion requesting the background

3    investigation?

4          MR. VILLA:  Yes.  I do think the Court would probably

5    have to order that.  I think all of my colleagues will agree,

6    but we can file something for the record, and then if the Court

7    would issue an order that a background needs to start on me

8    now, I think that would save a lot of time.

9          THE COURT:  Okay.  I may get the United States to

10   respond, but do it in a short notice setting.

11         MR. VILLA:  Thank you, Judge.

12         MR. HALL:  Your Honor, if I may, to perhaps save

13   everyone some time, hopefully, for one thing, I'd point out all

14   of the Georgia investigation was classified, and all of it has

15   been turned over declassified.  There is no more classified

16   discovery in the Georgia investigation.  The reason I mention

17   it is because the thing is -- just think of it as a normal

18   case, not classified.  The Government turns over everything

19   that's discoverable, it doesn't turn over the handful of things

20   that aren't discoverable.

21         I only raise that to say, the things that weren't

22   discoverable that aren't turned over, they remain classified

23   just because of the nature of the case.  But if there was

24   something in there that was discoverable, it's going to be

25   declassified and turned over.  So there is nothing left from

1  the Georgia investigation to turn over that would be

2  classified.  So that's number one.

3          Number two, there is no -- so the argument that if a

4  defense counsel has a clearance, they can look at the

5  classified discovery documents and then decide, that's like the

6  oldest argument in the CIPA book and it's been denied by every

7  Circuit that's ever looked at it.  That's not how it works.

8  It's almost irrelevant.  Whether they have a clearance or not

9  doesn't change the process under Section 4.

10          Again, we do not anticipate anything that's going to

11  be classified to be discovered.  It might be discoverable, and

12  that would only be those little, like maybe two or three things

13  that we are currently trying to get to the end of in this

14  current case.

15          The 2003-2009 case from New York, nothing

16  discoverable there.  What we are going to show the Court in our

17  Section 4 motion is, this is what's here, none of it has really

18  been helpful, so clearances are irrelevant in that case because

19  there's nothing to turn over.  It's the same with the Georgia

20  investigation.  That's actually already been done.  We've

21  already provided everything discoverable there in a

22  declassified format.

23          And then like I said, with those last couple of

24  things that may be coming, they may start as classified because

25  it's a part of this investigation, but they will be

1    declassified and then provided, if it's discoverable.  And if

2    it's not, the Court will see it and know about it in our

3    Section 4 motion describing and showing what it is.  So I don't

4    think we need to do the briefing and to start the clearance

5    process at this point, because there's just no -- it would be a

6    waste of everyone's time.

7           THE COURT:  What's your response to that, Mr. Villa?

8    If everything in the Georgia file has been declassified, then

9    to the extent that -- I guess if there's any issues you have to

10   complain about, it's to the extent something has been redacted.

11          MR. VILLA:  Well, I mean, what I heard Mr. Hall say

12   is that everything that's discoverable has been declassified.

13   So the Government is getting to decide what's discoverable.

14   And the Government is also taking the position that none of

15   this surveillance that took place in Georgia is discoverable,

16   and we clearly think it's exculpatory, so we disagree.

17          THE COURT:  Right, but CIPA -- in other words, if

18   they made their assessment under Brady and made those

19   disclosures, CIPA doesn't change the Government's obligation

20   under Brady.  It doesn't expand it.  So if they represent that

21   they have fulfilled their obligations under Brady, how is that

22   different than any other case?

23          MR. VILLA:  Well, because if there's classified

24   material that's relevant and helpful, which is a lower standard

25   than Brady, then the Court is entitled to decide whether a

1   cleared attorney gets to look at it.  And so if the Government

2   is taking the position that there's nothing here to see, no big

3   deal, the stuff that's discoverable has been declassified,

4   everything else stayed classified, it's not discoverable, trust

5   us, that's what Section 4 is about, right.  And so I think,

6   then, the Court could still have me cleared.  Maybe it is a

7   waste of time just to have me cleared, but it could then

8   expedite the Section 4 process.  So rather than the Government

9   submitting their Section 4 submissions at the end of April, you

10  know, give them two weeks to do it, or three weeks, whatever

11  they need, on Georgia and the post-arrest stuff.

12          And then what CIPA also allows for, Your Honor, is we

13  can have a conference with you, the defense can, ex parte.  I

14  mean, it could be brief, but it could also be in person, where

15  we just tell you, hey, Judge, these are our defense theories,

16  and this is what we think is in there that's relevant and

17  helpful to us.  So you've got the Government's submissions in a

18  few weeks, you sit down with us and we tell you what we want

19  you to look at, you look at that and you decide, yeah, this

20  needs to go in the SCIF and let cleared counsel look at it, or

21  you decide we don't.  But I think that process needs to happen

22  a lot faster than the end of April.

23          And the Court's scheduling order says substantially

24  complete by the end of April, and Section 4 could just be the

25  beginning, because you could decide we're entitled to look at

1   these things in the SCIF, and then we've got to do Section 5

2   and Section 6.  That part ought to get done closer to the end

3   of April, or as soon as practicable under the circumstances.

4           THE COURT:  Well, I'm reluctant to move that April

5   date, because in this case, your co-counsel, Mr. Elsenheimer,

6   is going to be in front of me on a complex case that's going to

7   trial in April, and I've got to schedule a lot of the pretrial

8   motions.  So even if we were to move the dates up to what

9   you're talking about, I can't get to it.

10          MR. VILLA:  No, I understand that, Your Honor, and I

11  think what I'm suggesting is if you could do the initial

12  Section 4 part before the end of April, that might save a lot

13  of folks some time.

14          THE COURT:  What's the initial -- what part are you

15  talking about?

16          MR. VILLA:  So the Government files their Section 4

17  submission to you and says, here's the classified material that

18  we don't think is discoverable, and then we sit down with you

19  and say, here's our defense theory, here's what we think might

20  be in there that's relevant and helpful, and you make that

21  initial determination about whether they should have to

22  disclose it or not, because the next parts of CIPA come after

23  that, and so the Court's deadline is to finish all of CIPA by

24  the end of April.

25          Now, I understand trials and things like that might

USA v. Leveille, et al.                                    2/9/2023
18-cr-2945           Motion Hearing re: Doc. 471 and Doc. 489

1  get in our way, but if we move that up a little bit more, in

2  the event that there is discoverable information -- and like I

3  said, I take issue with the Government's representation that

4  the stuff that's still classified from Georgia is not

5  discoverable when we know there's material that led to

6  surveillance.  You don't just start with surveillance.  So

7  there's clearly classified information that led to these guys

8  doing surveillance, and the question is, what is in there?  And

9  whether that's exculpatory, whether that's consistent with what

10 the surveillance showed, which is zero terrorist activity, is

11 very relevant to the question of whether these folks left

12 Georgia to come to New Mexico to provide material support to

13 terrorists, as they have been accused of.  What they were doing

14 in the months and weeks before that is very relevant, and

15 that's what we think is in there.

16       THE COURT:  All right.  Well, here's what I'll do.

17 To the extent that the Government can get its Section 4 motion

18 before the April deadline, I'll go ahead and ask you to do

19 that.  But I'm not going to bump that deadline, because it's

20 just not practical, if for no other reason than based on what

21 I've got set.

22       MR. VILLA:  Yes, and I think -- Judge, I understand.

23 I understand your schedule.  I think what we would ask that the

24 Court order the Government to do with that submission is, you

25 know, we're looking for the precipatory material, what led up

1  to the installation of the pole camera, what led up to the FBI

2  surveillance of these folks for a very long period of time.

3  That's the information that the Government ought to be

4  describing, in addition to whatever's in this post-arrest

5  material and the 2009 information.

6       But I think that we're very concerned that the

7  Georgia stuff that's classified is exculpatory, and while we

8  respect the Government saying they've conducted their Brady

9  obligation, we don't necessarily -- they can't be in our shoes,

10 right.  They don't know what our strategy is.  They don't know

11 what our theory is.  And they've told us over and over, we

12 don't think the surveillance and the pole cameras are relevant

13 at all, because it doesn't show anything, but that is very

14 relevant.  You know, terrorists don't sit around living their

15 lives, doing normal family things like these folks were doing.

16 So to the extent that the pole cameras show they weren't doing

17 those things, it's very exculpatory.

18       So I think that's -- to the extent the Court can

19 order the Government to expedite that process, we'd ask it to.

20 If it happens that whenever they submit that, you're in trial

21 and you can't sit down with the defense, that's okay, we

22 understand that.  But sometimes trials get moved or bumped.

23 And the ex parte conference that I'm talking about, that the

24 defense would have with you, should happen before you rule on

25 the Section 4 motion.

1          So the Government submits their motion, we sit down

2   and tell you, Judge, this is what you should look for, this is

3   what our defense theories and strategies are, and then you make

4   a ruling.  So to the extent that can happen faster, that's what

5   we're asking for.  If it turns out you're in this big trial and

6   we've got to do it after April, we'll live that.

7          THE COURT:  Fair enough.  So again, with the ultimate

8   goal that we're going to adhere to the September trial date, to

9   the extent that the Section 4 filing can occur before the April

10  deadline, I'll request that the Government strive to do that.

11          MR. HALL:  Yes, Your Honor, we will strive to do

12  that.  And the other thing to note here is, we don't have to do

13  all of this in the CIPA context.  So if there's something that

14  the defense believes has not been turned over, they can ask for

15  it and we can look for it, just like any other situation.  And

16  if we find, oh, there is something that they're mentioning that

17  we somehow missed, we can declassify it and turn it over

18  without doing any CIPA stuff at all.

19          And regarding the surveillance video and all that, I

20  think there's a misunderstanding, because we have turned all of

21  that over.  We do think that some of the surveillance video and

22  that stuff isn't actually discoverable, but as we normally do

23  when there's a close call, or when the defense has asked for

24  it, we have turned all of it over.  So there isn't any more to

25  turn over.

1          THE COURT:  Of the surveillance?

2          MR. HALL:  Of the surveillance stuff, nor anything

3  preceding that.  I'll go back and check, but I know that the

4  things that led up to the surveillance have also been turned

5  over, declassified and turned over.

6          But I do believe that the parties can handle this in

7  a normal discovery fashion, even with a Motion to Compel on the

8  unclassified side, because like I said, everything in that

9  Georgia case that's been turned over has been declassified.

10  There's no reason that the rest of it couldn't be, if there's

11  anything, which, again, there really isn't.

12          Relevant and helpful is actually not lower than

13  Brady.  Brady is a lower standard.  So if we've done our Brady

14  review, we've already covered the relevant and helpful stuff,

15  as well.

16          THE COURT:  Well, that's interesting.  File a Motion

17  to Compel.  I mean, if it's not classified, you don't even need

18  to get -- CIPA is irrelevant if it's not classified.

19          MR. VILLA:  Certainly, Judge.  If they say, we've got

20  this stuff and we'll declassify it, or it's already

21  declassified and we'll give it to you, that's fine.  But, you

22  know, the FBI does not just show up --

23          THE COURT:  I get what you're saying.

24          MR. VILLA:  -- to do counterterrorism surveillance,

25  you know, out of the blue.  There's got to be more there.  And

1  if the Government tells us they can give us that and we don't

2  have to go through CIPA, great.  But we know from the

3  Government's representations there's post-arrest information,

4  there's other stuff, and so we want to just get this process

5  going.

6         THE COURT:  If he files a Motion to Compel, again,

7  assuming nothing is classified, then you would respond, as you

8  said, in the normal context, like any other criminal case.  If

9  you determine there is something there and it's classified,

10  then that kicks in CIPA.

11         MR. HALL:  If they file a Motion to Compel and

12  actually identify something, and we agree that we should turn

13  it over and for some reason we haven't yet, which I don't think

14  is the case, but if that were to be the case, we would just

15  move to -- in the Government's side, we would just declassify

16  whatever it is that's been identified and asked for, and we'd

17  turn it over.

18         If we think that -- there are reasons why we wouldn't

19  turn something over.  If it's classified and if there's some

20  equity there and it's not discoverable, we would stand on the

21  not discoverable portion and that would kick in the Section 4.

22  But it doesn't even have to get to that point if we can just

23  declassify it and turn it over.  Or if it doesn't exist, or

24  we've already turned it over, in which case we can just

25  respond, it's already been turned over or it doesn't exist, and

 1 | then we're done.

 2 |         THE COURT:  All right.

 3 |         MR. VILLA:  Your Honor, I totally understand.  I

 4 | guess the last thing I'll say is, the concern is that the

 5 | Government has represented that there's post-arrest information

 6 | that's classified and going through the declassification

 7 | process.  Well, post-arrest was almost five years ago, so we're

 8 | concerned about delay.  If that's going through the

 9 | declassification process, you know, with respect to issues

10 | related to speedy trial, the Government needs to decide now,

11 | are they going to declassify it.  And if not, put it in their

12 | Section 4 submission.

13 |         THE COURT:  All right.  Is there anything else on

14 | this?

15 |         MR. SHATTUCK:  May I speak for Mr. Morton --

16 |         THE COURT:  Sure.

17 |         MR. SHATTUCK:  -- understanding the change in our

18 | status?

19 |         THE COURT:  Absolutely.

20 |         MR. SHATTUCK:  It's a little premature, but we're

21 | going to have to consider this.  If there's an issue where

22 | there's a SCIF, because Mr. Morton represents himself, we're

23 | going to have to consider how he gets in there.

24 |         THE COURT:  Well, my thought on that is, that's one

25 | of the roles of standby counsel.

1    MR. SHATTUCK:  No, I understand that.  But since he's

2   representing himself, me looking at it doesn't help him.  So we

3   need to set up a way where both of us can go in --

4          THE COURT:  There's no way he's going to get a

5   security clearance.

6          MR. SHATTUCK:  Oh, absolutely not.  I think in the

7   Mascheroni case, he was allowed -- that defendant was allowed

8   to enter the SCIF.  But I just wanted to bring it up now so we

9   can deal with it when the time comes.  It's clearly premature,

10  but when it comes up, we're going to have to deal with it.

11         THE COURT:  Okay, if we get there.

12         MR. SHATTUCK:  Yes, sir.

13         THE COURT:  You're right.  That's one of the things

14  that occurred to me.

15         All right, anything else on this?

16         MR. HALL:  Not unless you have any questions.

17         THE COURT:  No.  All right, so let's shift gears and

18  go to the next matter.  That's regarding a Motion to Suppress.

19         When I started reviewing the various submissions made

20  by the parties and looking at the governing law by the United

21  States Supreme Court and Tenth Circuit precedent, you've got

22  Tenth Circuit cases out there.  You've got U.S. Supreme Court

23  case Rakas v. Illinois, 439 U.S. 128.  United States v. Rascon,

24  922 F.2nd 584, a 1990 Tenth Circuit case.  You've got United

25  States v. Soto, 988 F.2nd 1548, a 1993 Tenth Circuit case.

1  That stands for the proposition that the proponent of a Motion

2  to Suppress bears the burden of demonstrating his or her

3  standing to challenge the search.

4          And you've got -- this is a quote from Smith v.

5  Maryland, a U.S. Supreme Court case, 442 U.S. 735.  It says:

6  "Standing is analyzed based on two factors, whether the

7  individual by his or her conduct has exhibited an actual or

8  subjective expectation of privacy" -- that's given, in my view

9  here.  But then the other factor is:  "And, whether the

10 individual's subjective expectation of privacy is one that

11 society is prepared to recognize as reasonable."

12         Now, the Defendants' Motion to Suppress, I believe

13 it's Doc. 471, didn't address standing at all, but oftentimes

14 in suppression cases, standing is assumed or standing isn't

15 contested.  The United States filed its response, I believe

16 it's Doc. 566, and the Government raised the challenge to

17 standing, and then the Defendant replied.

18         So with that kind of background, I think I'll hear

19 from defense counsel first.  So whoever is going to go first on

20 this may respond.

21         MR. ROBERT:  Thank you, Your Honor.  Marc Robert for

22 Siraj Wahhaj and also for remaining Defendants who joined the

23 motion and may have some things to say, as well.

24         Your Honor, the first thing that I would say is that

25 the second question -- I agree with you, the first question

1   seems to be without question.  Whether something is a thing

2   that society is prepared to accept as reasonable strikes me as

3   being an evidence-driven thing, and we think testimony is

4   probably required in order to establish that, given the

5   circumstances of this situation, not the least of which is the

6   fact that although it's undisputed, I think, that the compound,

7   the home for these Defendants and their families, was built on

8   the wrong parcel, which is not strictly contiguous with

9   Mr. Badger's -- Mr. Morton's parcel, but it was similar in

10  size, similar in character, and very close geographically.

11          The fact of the matter is, and this is even reflected

12  pretty clearly in the affidavit that's the subject of the

13  Franks motion, and it's Bates 23617 for those scoring at home,

14  the affiant says that there was clearly a discussion between or

15  among the Badgers and the Defendants and their family members

16  about the mistake and what to do about it.  So for a time, a

17  substantial amount of time, there was essentially an agreement

18  between the parties to try to work things out.  For example,

19  maybe we just swap titles.  We give you what we now know is

20  ours, and you'll give us what was then yours.  It seemed to be

21  a reasonable solution.  It didn't happen for whatever reason.

22          Eventually what did happen, after law enforcement

23  contacted the Badgers in May of 2018, is there seemed to be a

24  change in attitude by the Badgers, to the point of which an

25  action was apparently filed in state court, an objection of

1  some sort, which was dismissed on June 27th.  And as far as

2  we know, there's been nothing further beyond that.

3          The fact that there was apparently a collegial

4  relationship among the parties to discuss how to manage this

5  issue is something that I think society would look at and say,

6  yeah, of course.  The Defendants' home was built on this piece

7  of property.  They lived on that piece of property in their

8  home for a number of months, and then law enforcement got

9  involved and the Badgers' attitude changed.  But the fact

10  remains that there was an agreement that allowed them to remain

11  on the property for a fairly long period of time.  There was

12  never a judicial finding that they should be ejected or

13  removed.  And that, I think, provides, under New Mexico law, a

14  due process interest in the Defendants and their family members

15  to stay on the property until such time as due process has told

16  them they must leave.

17          So I think that in order for you to make a proper

18  determination about standing, you kind of need to know what the

19  ins and outs of those -- what the evolution of those

20  relationships was.

21          THE COURT:  Well, who do you want to call as

22  witnesses?

23          MR. ROBERT:  I would say Mr. Badger, certainly.  I'd

24  like to know what interactions there were between the Badgers

25  and law enforcement, as to what were the Badgers told and what

1   generated the change in the Badgers' attitude about their

2   willingness to allow Mr. Morton, Mr. Wahhaj, and the rest to

3   remain on that property.  And I think that informs,

4   significantly, whether or not there is a reasonable expectation

5   of privacy that society would recognize as such.

6           And it seems clear to me.  I mean, it is their home,

7   and that's a significant word in this context, obviously.  The

8   case law makes it so.  And there's no question that that's

9   where they were living for months, from, I guess, December on

10  through August when they were arrested, and apparently the

11  place has been bulldozed.  But it seems to me clear that

12  standing exists because of those facts, even as they're

13  related by the affiant in the affidavit that was submitted to

14  Judge Backus.

15          But if there's a question about that, if we're not

16  sure whether that relationship as it evolved over time and as

17  it ended, at least at the time at which the arrest was made on

18  the 3rd of August 2018, then we need to hear evidence about

19  what transpired over that period of time and whether or not

20  that vitiated the expectation of privacy that I think everybody

21  would have recognized up until the point at least at which the

22  Badgers said, no, we're not doing this anymore.  We don't know

23  enough about how that happened in order to make that

24  determination.

25          I do think, from my own perspective and I think from

1   the rest of the defense perspective, that the fact that those

2   things had occurred, had been allowed to evolve from the time

3   at which the Defendants and their families moved into their

4   home on the wrong piece of property, to the time at which the

5   Badgers said, no more --

6          THE COURT:  As I understand it, this was vacant land

7   when they moved onto it, and they then erected some kind of a

8   structure.

9          MR. ROBERT:  Yes, that's right.  And that structure

10  became their home, and was their home for months and months

11  until they were evicted, basically, by the warrant and the

12  arrests and all that happened after August 3rd.

13         And again, to my mind, there's not really much

14  question about standing.  It seems like those facts, just as

15  they stand, would support a finding, your finding, that

16  standing exists.  If there's a question about that, though, and

17  we've discussed this, I think that there's a need to hear more

18  about the ins and outs of what happened over the course of

19  those months between December of 2017 and August 3rd of 2018.

20         THE COURT:  There is a case, I think the Government

21  may have cited, and it's a Tenth Circuit case -- I'm drawing a

22  blank on the name of it.  But it was a -- I guess it was on BLM

23  land.  A gentleman kind of made his home in a cave on BLM land.

24         MR. ROBERT:  Yes, Your Honor.

25         THE COURT:  I think it was determined ultimately that

1    that defendant didn't have standing.  And I was thinking, well,

2    somebody who's homeless here in Albuquerque, they can put up,

3    like, a tent along the street or on somebody's property, be it

4    Government or personal property, and that may be their home in

5    their mind, but is there a reasonable expectation of privacy

6    there?  If the authorities came to clear the tent -- just like

7    that park right there at the Big I.  Ultimately the City made a

8    determination, we're going to clear the park.  I mean, if

9    someone felt that the tent that they had erected on there was

10   their home, they may have a subjective expectation of privacy,

11   but I don't think it would be a reasonable expectation of

12   privacy.

13           And then certainly Mr. Badger, it's his property.  He

14   signed the consent, which certainly he's -- to allow the

15   search.  Anyway, those are the issues that come to my mind.

16           So in terms of developing -- because that was another

17   thing.  What's in dispute?  It's not in dispute that Badger

18   owned the lot where the compound, or whatever, the structure

19   where the Defendants were living was erected.  It's also not

20   disputed that Mr. Morton owned another piece of property and

21   that ultimately it was discovered that the compound or the

22   structure was erected on the wrong piece of property.  It's not

23   disputed that there was an effort to talk about or negotiate a

24   land swap, as I read these submissions, and then ultimately

25   that fell through and Mr. Badger wanted the Defendants off, as

1  evidenced by the eviction proceeding that was initiated in, I

2  don't know, state magistrate court, probably, or maybe state

3  district court.

4        So what, in terms of on the standing, what

5  factually -- what record needs to be developed other than

6  hearing from Badger?

7        MR. ROBERT:  Well, for one thing, in looking at the

8  Ruckman case, which is that Tenth Circuit case that you were

9  referring to, the fellow in the cave on BLM land, there was

10  never any real idea that that person was actually on land that

11  he could make a claim to, certainly.  And I think there is a

12  really significant difference, and also in talking about the

13  tents under the interchange, what distinguishes that, as well,

14  is the fact that there were discussions between the Defendants

15  and the Badgers about what to do about this.  And for a

16  significant period of time, there was an agreement.  All right,

17  you guys can stay there, there's no problem, let's work this

18  out, let's try to figure out a way around it.

19        That's, I think, a large difference that society

20  would look at as providing a basis for a reasonable expectation

21  of privacy, because there they were, the mistake was

22  discovered, and then the parties worked for a time, a

23  significant time, I think, to try to resolve the mistake and

24  what to do about it.  And again, as you pointed out, these were

25  undeveloped pieces of land.  There were no structures on them,

1   until the Defendants built their home on the wrong one.

2        The fact that there was a sufferance by the Badgers,

3   that they allowed them to stay pending resolution of the issue,

4   is the significant difference, I think, between the Ruckman

5   case and other cases in which somebody parked on land that

6   didn't belong to them.  In none of those cases, I think, was

7   there any agreement between whoever it is that owned that land

8   and the people that were there; okay, you can stay, let's

9   figure this out.  That, I think, is a large lever in favor of

10  determining that standing exists.  But I think it's impossible

11  to know the nuances of that whole thing without hearing from

12  the people that were involved in it.

13       And I think the fact -- there's a couple of things.

14  One, yes, Mr. Badger at some point, after law enforcement got

15  to him and said, look, these are terrorists, you need to get

16  them off your land, he goes to court and he tries to get an

17  order from the court, and the court says, no, and dismisses the

18  case.  The fact that the earlier agreement existed, I think,

19  provides not only a support for the idea that there was a

20  reasonable expectation of privacy, but also provided some due

21  process and even property rights for the Defendants on that

22  piece of land, until a court, a proper authority, told them,

23  no, sorry, you're done, you've got to leave now.  And that

24  never happened.

25       THE COURT:  In terms of the various submissions on

1  this, is the state court record of what -- I think it's been

2  characterized as an eviction suit.  Is that within the --

3          MR. CLARK:  May I confer with my co-counsel?

4          THE COURT:  Sure.

5          (A discussion was held off the record between

6          Mr. Clark and Mr. Robert)

7          MR. ROBERT:  There are documents that are in our

8  possession that were not included in any of the -- in either

9  the motion response or the reply, but they're available.

10 They're a part of our vast body of information that we have.

11         THE COURT:  Okay.  Anything else --

12         MR. ROBERT:  I don't think so, but I may --

13         THE COURT:  -- before I hear from the United States?

14         MS. FOX-YOUNG:  Your Honor, for Ms. Wahhaj, I'd like

15 to make a few brief points.

16         THE COURT:  Sure.

17         MR. ROBERT:  I would finally point out that the fact

18 that the Defendants made improvements on the property is also a

19 factor of relevance.

20         MS. FOX-YOUNG:  Thank you, Your Honor.

21         So the Defendants don't concede that the Badgers had

22 a right to evict them, and I think where there is factual

23 agreement is that an eviction never did take place.  The cases

24 bear out sort of a bright line rule, and the Court's inquiry

25 can end there.

USA v. Leveille, et al.                                2/9/2023
18-cr-2945          Motion Hearing re: Doc. 471 and Doc. 489

1    THE COURT:  But see, I'm not -- in other words, I'm

2   not seeing where there's a requirement that there be a court

3   order of eviction.  The fact that Mr. Badger initiated the

4   eviction indicates he wants these people off his property.  So

5   at that point, then is there a reasonable expectation of

6   privacy since the landowner wants -- in other words, at that

7   point, I think legally, aren't they tress passers?

8    MS. FOX-YOUNG:  No, Your Honor.  And I think --

9    THE COURT:  They didn't sign a lease.  They didn't

10  pay any kind of rent for this property.

11   MS. FOX-YOUNG:  Well, Judge, it's not like Tanoan.  I

12  mean, if you go out to this earthship community, it's open

13  land.

14   THE COURT:  No, I understand.

15   MS. FOX-YOUNG:  So going back to -- if the Court

16  wants to go deeper beyond that sort of bright line rule and

17  consider the subtilties, which is totally reasonable, and I

18  think which Rakas supports -- I mean, the case is going back

19  20, 30 years, and the Supreme Court says, this is not an

20  independent standing inquiry, you have to look at the whole

21  Gestalt of is there an expectation of privacy.  And to do that,

22  Judge, we would put on in evidence --

23   THE COURT:  Again, subjectively, I don't -- that's

24  not at issue here.  It's whether, again, that second factor

25  that the Supreme Court talked about, that society is -- what is

1    it exactly?  It's out of Smith v. Maryland.  Whether the

2    individual's subjective expectation -- I mean, I concede, and I

3    think you all have established, there was a subjective

4    expectation of privacy of the five Defendants there.  But then

5    you get to that second factor and whether the individual's

6    subjective expectation of privacy is one that society is

7    prepared to recognize as reasonable.

8            MS. FOX-YOUNG:  And certainly I think the Court's

9    inquiry is right on, Judge.  And to further answer your

10   question about what evidence we would put on, not only would we

11   put on Mr. Badger's testimony, but the officers he talked to,

12   all the documents in the case, whether it's an eviction case or

13   trespassing case, those pleadings, maybe the County Court, the

14   deeds, evidence of building and construction at the site, etc.

15   You need the full panoply of information if you're going to

16   make an inquiry about really what was reasonable.

17           You know, another case that I don't think was cited

18   in the briefing, but the Court may consider, is United States

19   v. Johnson, which is 584 F.3d 995.  That's a 2009 Tenth Circuit

20   case.  That case talks about, you know, considering what social

21   customs and norms are reasonable, and this is with guests in

22   homes, the motel cases.  I mean, it's all essentially the same

23   analysis.

24           It shouldn't be forgotten or ignored that ultimately

25   you're considering what is the aim of the exclusionary rule.

1  We're not only talking about these Defendants, but should

2  police be able to go into any property that's the subject of a

3  quiet title action or an eviction action.  Does that really

4  put --

5          THE COURT:  Well, see, the title of the property

6  isn't in dispute, as far as who's the legal owner, as I read

7  these pleadings.

8          MS. FOX-YOUNG:  Your Honor, we don't concede that.

9  We don't concede that point.

10          THE COURT:  You didn't put it in your reply, I guess.

11  So it sounds to me like --

12          MS. FOX-YOUNG:  Well, there's no evidence presented

13  to the Court on that, but we don't --

14          THE COURT:  But you've got the burden.

15          MS. FOX-YOUNG:  Well, that's why we need to have an

16  evidentiary hearing, Judge, so you can actually make factual

17  findings with regard to whether -- and that's what we

18  anticipated.  We didn't know the Court would bifurcate, but we

19  need an opportunity to give you the evidence as to ownership,

20  as to the history of the development of that property, and what

21  outsiders would see.

22          THE COURT:  Well, fair enough.  That's what I'm

23  trying to figure out, then, in terms of development of this

24  record.  Like, for example, I've gathered this is in a remote

25  part of Taos County, but I'm looking at Doc. 566-6, this is the

1  Consent to Search form, and it says Unit 2, Lot 28, Castillo

2  Meadows Subdivision.  Now obviously, as you said, this is not

3  Tanoan, but how big are these lots?  When you talk about

4  erecting -- or making improvements, I've seen some pictures

5  where there are spare tires.  Certainly it wasn't done to code,

6  if there are any codes that are applicable to this.

7          MS. FOX-YOUNG:  It's the wild west out there, Judge.

8  And that is important for your determination.  It's very

9  confusing.  It's not even Placitas, where you go out and

10 everything is flagged and posted.  It's not uniform in that

11 manner.

12          I think the Court needs to consider that, which is

13 why there were these ongoing negotiations with the Badgers as

14 to a swap.  It's easily confused out there, and you need to

15 hear that testimony and the evidence of that, because we posit

16 that any reasonable person would think, yeah, you move to a

17 place, you think you have ownership, you start building, and

18 you learn that there's a mistake.  This happens, you know.  The

19 technicalities of property law should not take center stage and

20 eviscerate the Fourth Amendment right that these individuals

21 have.

22          So that background of how these negotiations

23 developed and were ongoing -- the Badgers did not take action

24 for some time, legal action, and ultimately there was no

25 eviction.  And so we think this isn't like the car thief cases,

1   or the Johnson case I cited to you, Judge.  That's a case where

2   the defendant's girlfriend used a false identity to rent a

3   storage unit.  I mean, there was no fraud, there was no bad

4   faith.  These individuals went out, Mr. Morton acquired this

5   property, and they built on it.  These things happen.  This is

6   why we have this body of property law to suss it out.

7        But in terms of their expectation of privacy and what

8   anybody would think was reasonable, they were building their

9   home.  And it was their home.  You know, Mr. Robert cites in

10  his reply Florida v. Jardines and that body of law.  The Court

11  still has to consider this under the umbrella of the fact that

12  the home is sacrosanct.  You know, this isn't an off-premises

13  shed or a telephone booth.  I mean, this is their home.

14       THE COURT:  Right, but if you go back to the case --

15  is it Ruckman, the gentleman in the cave?  Subjectively, that

16  might have been his home.  That's where he was living.  So he

17  satisfied that first prong.  He didn't satisfy the second prong

18  on whether he had a reasonable -- looking at it objectively,

19  whether his expectation of privacy was reasonable.

20       MS. FOX-YOUNG:  Sure, and I see that the Court is

21  putting a lot of stock in the consent from Mr. Badger.  But

22  please consider that landowners, hotel owners, the BLM, the

23  City, the rightful owner of a property -- and we don't concede

24  that the Badgers are the rightful owners -- they can't consent.

25  They can't override a one-night guest's expectation of privacy

1   and Fourth Amendment right in a property.

2          THE COURT:  Right, but again, you mentioned the hotel

3   context.  If someone is staying past whatever time that they

4   have paid for, to where they no longer have a right to be

5   there, then I think there's some case law that says you don't

6   have a reasonable expectation of privacy if you're not paying

7   for the room.

8          MS. FOX-YOUNG:  And if an eviction has been

9   instituted, you know, and it's ten minutes later, yes, they can

10  take you out, they can take your stuff out.  But that's why

11  it's so fact specific, Judge, and you've really got to hear the

12  evidence rather than our proffer.

13         THE COURT:  Then that's what we need to do.  Who do

14  we need -- you mentioned Mr. Badger.  Again, since the

15  Defendants have got to establish standing, I think you've got

16  to make a factual record.

17         MS. FOX-YOUNG:  Well, does the Court anticipate

18  bifurcating that evidentiary hearing?

19         THE COURT:  Yes.  I mean, to the extent that there's

20  law enforcement officers communicating with Mr. Badger.  I mean

21  I think that's -- I want the record developed.  Because if

22  there's not standing, then you don't get to anything else.

23         MS. FOX-YOUNG:  We agree, Judge.  We just want to put

24  the evidence on so that you can make those findings.

25         THE COURT:  Okay.  Anybody else before I hear from

1    the United States?

2              MR. RAY:  Judge, if you wouldn't mind.

3              THE COURT:  Sure, go ahead.

4              MR. RAY:  Because I appreciate that you are trying to

5    get past this subjective expectation of privacy and to an

6    objective one, and since we're going to take evidence on that

7    and have the opportunity to develop the record, which we

8    appreciate, I do want to put something else out there for the

9    Court to consider as a distinction from being in a BLM cave or

10   being a homeless person that sets up a tent under the bridge.

11             Your Honor, under New Mexico state law, there's a

12   regime called the Uniform Residential Relations Act, and it's a

13   statutory scheme that's under NMSA 47-8-1 through -- I think

14   there's about 40 sections.  It's going to lay out and provide a

15   lot of the parameters of the relationship between what is a

16   landlord and a tenant, and what constitutes a landlord and a

17   tenant.

18             Our contention is also, Judge, that there are

19   situations where someone suffers -- and I believe that's what

20   Mr. Robert was trying to articulate, but I wanted to kind of

21   put it out there more explicitly.  That when someone suffers

22   another to be on their property, living there, even if there

23   isn't necessarily a written lease, the surrounding facts can

24   create a tenancy that cannot be unilaterally exterminated

25   without the judicial processes that are outlined in the Uniform

1  Residential Relations Act.

2         Judge, it's something that -- you know, I come from

3  western New Mexico, a rural area, Ramah, New Mexico, which

4  unfortunately this Court sees a lot of cases originating out of

5  there.  But in my home town of Ramah, there are constantly

6  quiet title suits pending because there's disputes between

7  property lines and whether this lot was the correct one that

8  this house was supposed to be built on.  And people don't -- it

9  would be kind of strange to think that people lose their

10  expectation of privacy because a legal dispute arises about

11  whether they should be there.

12         It's true, you're talking about title issues, but all

13  I'm trying to focus in on is that while they're having a --

14  what the record will develop in the evidentiary hearing, I

15  believe, is that while they're having this discussion about

16  swapping titles and trying to remedy the situation with where

17  they have erected their homes, that they're being permitted to

18  live there and some sort of a tenancy is created.  That's why,

19  Your Honor, you have this case that's filed in magistrate

20  court.  It's Case No. M-53-CV-2018-00076.  This was what's

21  called a Petition for Writ of Restitution, which is the

22  procedure that you go through to try to evict a tenant.  And as

23  has been proffered by counsel, the judge in that case, Judge

24  Ernest Ortega, filed a motion that dismissed it with prejudice

25  on June 27, 2018.

1          So those are things that I think justify Your Honor

2    permitting an evidentiary hearing, keeping in mind the

3    significant distinctions that you're going to see between this

4    and squatting in a BLM cave.  And that's just all I wanted to

5    say.

6          THE COURT:  All right, I understand.

7          MR. RAY:  I appreciate that, Judge.

8          THE COURT:  Anybody else from the defense?

9          Mr. Hall.

10         MR. HALL:  Thank you, Your Honor.

11         So I think the Court has zeroed in correctly right to

12   where we need to be in terms of standing, the second prong,

13   being whether something is an expectation of privacy that

14   society would be prepared to recognize as legitimate.  But this

15   case is not an edge case, it is not a difficult case, it is

16   squarely within all of the case law that the United States

17   cited in its brief.

18         There's some minimization going on, understandably,

19   because factually from that perspective, you would want to try

20   to make this case seem not like those cases.  But this case is

21   actually exactly like some of the other cases.  The cave case

22   isn't even really the best case.  The cave case, Ruckman, is a

23   good case, but all of the other cases that the Government cited

24   have a couple of things in common.

25         First of all, whether the property, or whether the

1   place that the person who doesn't have standing is trying to

2   raise a Fourth Amendment claim over is their home is not

3   dispositive, and actually, every single case that the United

4   States cited dealt with this.  I think every single one.  Maybe

5   hotel rooms wouldn't be considered a home, even though the

6   people there were actually living there, so I would argue it

7   does.  So not just the cave.

8          If you look at the Bishop Estate case, Zimmerman, out

9   of California, there's a lot of similarities there.  The folks

10  in that case were squatters that had shown up on to another

11  person's property.  They improved and built a shack or a

12  structure to live in.  They had negotiations with the property

13  owners to stay there and to be the caretakers of the property,

14  which were rejected by the property owners.  They were there

15  for seven months before the eventual arrest of these

16  defendants.

17         In that case, the Ninth Circuit said, it doesn't

18  matter if you built property, it doesn't matter if you improved

19  and built something to live in, if you don't have a righteous

20  claim, a legal claim to the property, you don't have standing.

21  And in that case, they were told by the property owners, you're

22  trespassing, and they stayed.  They were told again, you're

23  trespassing, and they stayed, and so then a police officer came

24  with the owners and removed them, and then eventually it gets

25  to the Ninth Circuit about a wrongful -- I think that was a pro

1   se claim by Zimmerman, who was a guest of the squatters.  But

2   his rights were just as nonreasonable, in terms of standing, as

3   the actual squatters.  That's how the Ninth Circuit came out

4   there.

5           The Johnson case that was referenced, we did talk

6   about that case in here, and I would urge the Court to look

7   closely at the Johnson case, as well, because what's

8   interesting about the Johnson case is that the Court there

9   looked to property law.  And it was also interesting that

10  defense counsel kept referencing property law.  That's how the

11  Johnson case actually looked at it, because the Court said and

12  the Tenth Circuit said that in order to determine if an

13  expectation of privacy is reasonable, you have to look at all

14  these factors.  And you have to ground it in something.  So you

15  have to ground it in either societal norms, or you ground it

16  into something that we recognize as already reasonable, which

17  would be the law.  And in that case of property law, the Court

18  mentioned the right to eject someone who is using your

19  property.

20          In that case, it was a storage unit, but the Court

21  went out of its way to recognize how high an expectation of

22  privacy subjectively would be in a storage unit, locked.  But

23  it was a storage unit that someone had rented in the name of an

24  identity theft victim.  So they stole the ID of someone and

25  opened it in their name.  And the Court thought two things in

1   that analysis.

2          The Court said, first of all, when someone illegally

3   occupies someone else's property, they essentially take the

4   property right of that person, which includes the right to

5   eject away from them.  And secondly, the Court noted that in

6   that case, when the renting of the storage unit was done

7   fraudulently, that was harm.  That was a crime.  That was a

8   harm done to the real person, who would have had standing to

9   object to a search of their storage unit, because he stole

10  their identity.

11         In this case, it's the same deal.  First of all, the

12  Defendants living and improving and building upon someone

13  else's property, Jason Badger's property, and then not leaving

14  when they were told by Jason Badger and had the idea they were

15  on the wrong property, again, they took away Jason Badger's

16  property rights to the exclusion of others from his property.

17  So they had violated that property right.

18         As then, B, like the Court said, they were

19  trespassers.  They were trespassers, which like identify theft,

20  maybe not as serious on the scale of crimes, but is a crime,

21  and it harms the property owner.

22         So again, the Court in Johnson said it could not

23  recognize an expectation of privacy that society would deem

24  reasonable in that sort of situation because it would make the

25  Court party to the fraud, and this would be the same situation

1   here.  Recognizing a reasonable expectation of privacy by

2   essentially an armed group who comes and takes over your

3   property and then doesn't leave would be recognizing, and then

4   the Court would be participating in the trespass.  And I think

5   it's pretty obvious that society would not be in a position to

6   recognize as reasonable or legitimate the armed takeover of

7   someone else's property as long as you get to live there long

8   enough.

9          And the truth is, Jason Badger -- you know, these are

10  in the reports that are attached to the Motion to Suppress, the

11  Taos County Sheriff's Report by Jason Rael and others, and then

12  also attached to our motion and response, in terms of the

13  consent.  But Jason Badger didn't, you know, suffer the

14  Defendants to be on his property.  He wanted them gone as soon

15  as he found out that Mr. Wahhaj was wanted out of Georgia and

16  that the missing child was there.  And he knew that, because he

17  had seen them when they first showed up at his property.  So

18  he, on his own, was trying to eject them from his property.  He

19  went to law enforcement.  He initiated, basically, all of this.

20         In fact, he is one of the reasons why law enforcement

21  even learned where the group was, because until that, they

22  didn't actually know specifically where in Taos County they

23  were.  So law enforcement did not encourage or do anything to

24  change Jason Badger's mind.  The property owner wanted them

25  gone as soon as he learned who they were.

1          Now, in terms of the question as to whether Jason

2   Badger was the rightful owner and whether this is going to be

3   contested, Your Honor -- well, I'll just hand these exhibits

4   in.  These were actually attached to Lucas Morton's pro se

5   Motion to Dismiss that was filed, I think in November, and then

6   again in December.  But we are going to just go ahead and

7   submit them here.

8          THE COURT:  They were originally submitted under

9   Doc. 565, correct?

10          MR. HALL:  Correct.

11          THE COURT:  Page 10 of 14?

12          MR. HALL:  Yes, Your Honor, that's right.  They were

13   an attachment to the supplement motion that Mr. Morton filed.

14          MS. FOX-YOUNG:  Your Honor, just for the record, we

15   object to the foundation, because we need to have a hearing on

16   it.

17          THE COURT:  Well, I can take -- it's a document in

18   the record.  I mean, I'm not going to decide the issue today,

19   but I can take judicial notice of what the parties have filed

20   in this case.

21          MS. FOX-YOUNG:  Yes, Your Honor.

22          THE COURT:  Okay.  So that's what I'm going to do,

23   I'll take judicial notice of Doc. 565, Page 10 of 14, and then

24   Page 11 of 14.  Go ahead.

25          MR. HALL:  Yes, Your Honor.  And to be clear, this

1  document has markings on it to show that it was actually filed

2  in Taos County and it's an official record.  So the foundation

3  sort of speaks for itself.  But since we're at a hearing here,

4  the point of offering this is just to show that Jason Badger

5  did, in fact, have the warranty deed transferred to him in

6  October of 2017 by the previous owner.

7           And then separately to that, Your Honor, similar --

8  and I apologize for the markings on the bottom.  We started

9  with Government's Exhibit 3.  This is marked Government's

10  Exhibit 2.  Probably should have waited before marking the

11  numbers.  But this one is the actual lawsuit that was filed and

12  served on Lucas Morton.  Again, you can see the markings on

13  there that it was filed in Taos County Magistrate Court.

14           The reason that the lawsuit was dismissed was that it

15  was filed in the wrong court.  So I understand that the Judge

16  may want to hear from Jason Badger on that, and the United

17  States is fine with that, but I would submit that we do not

18  need any more evidentiary hearing at this point because the law

19  is so clear.

20           And I do want to just point out the Kafuku case.  I'm

21  not going to try to say the whole thing, but the Kafuku case

22  out of the District of Utah.  It covers kind of all of these

23  arguments, in addition to the Zimmerman v. Bishop Estate case

24  and all the other cases, really.  But this Kafuku case covers

25  all of these things, because in that case, again, the person

1    was living in an apartment.  It really was his home.  And the

2    Court summed it up about as good.

3            So two things about that case.  First of all, it

4    makes clear -- this is from 2018, and I think it's probably the

5    most recent case that we have.  It's a District case from the

6    Tenth Circuit, so it's not exactly binding, but it does take

7    into account all these other cases that we are citing.  They

8    all start with this Amezquita case from the First Circuit in

9    1975, and then as courts considered these cases.  So I think

10   the Kafuku case kind of takes all that case law into

11   consideration as it goes through, and there's a couple of

12   really important things about Kafuku.

13           First, the Court actually found in that case that the

14   warrant was invalid and that the good faith exception didn't

15   save it.  So essentially, the Motion to Suppress in a criminal

16   case would have been granted, but the Court found that the

17   defendant did not have standing, so it denied the motion.  So

18   again, we get to the idea that there's no, as the Court

19   mentioned, there's no reason to go forward on this motion now

20   that it's been bifurcated, which was a smart move, because

21   there's no reason to go forward with the rest of the

22   consideration of the warrant if there's no standing.

23           Another important thing about Kafuku is that it made

24   clear, after looking at all of these other cases coming before

25   it, that there's no, as I said, there's no talismanic test,

1  meaning there's no eviction requirement, or eviction judgment

2  required.  And I believe in none of the cases that were cited

3  by the Government was an eviction judgment ever actually

4  obtained, except for in the Carr case -- no, the Curlin, the

5  Curlin case.  That was the only one where an actual eviction

6  order was obtained, and that was only relevant there because

7  that person was living as a tenant, paying rent in a leased

8  apartment.  So he was there legally for a long period of time,

9  and then he stopped paying rent, and then he did not vacate.

10          So the Court was looking, again, at the totality of

11  the circumstances, and one thing to note there was that an

12  eviction judgment was obtained.  But that would make sense in

13  that case, because the person was a legal occupant of the

14  property leading up to that point.

15          In the Gale case out of the D.C. Circuit, it

16  mentioned similarly that paying rent going forward -- paying

17  rent at some point in the past doesn't mean at the time of the

18  search that you had standing.  So in this case, even if there

19  was an agreement with the Defendants and Mr. Badger, or

20  discussions, even if they had paid rent, even if they had

21  signed a lease to occupy that property in April of 2018, it

22  doesn't matter, because by May of 2018 and certainly by August

23  of 2018, there's no more reasonable expectation of privacy that

24  society would recognize as reasonable because Mr. Badger had

25  made clear that he was trying to get them off of his property.

 1           And then finally, from Kafuku, there's a quote I just
 2    want to highlight from there:  "Society is not prepared to
 3    recognize as reasonable the expectation of privacy of an
 4    individual who unlawfully occupies a piece of property
 5    regardless of whether it's the person's home."  And I think
 6    that sums up, basically, what we're doing here, the
 7    reasonableness of being on someone else's property illegally,
 8    not leaving, and whether society would recognize that as
 9    something that we want to uphold and view as reasonable.

 10           Again, someone who -- Mr. Badger had wanted them off
 11   his property earlier.  He tried everything he could.  He tried
 12   a lawsuit, but filed it in the wrong court.  He then was told
 13   by law enforcement, and this is in the statements from the
 14   Sheriff's Department of Taos County, he basically was told to
 15   stop going near them, let them alone, because it was dangerous.
 16   There was lots of shooting going on, there was known to be
 17   armed people on that property.

 18           So what we're talking about is an armed takeover of
 19   this person's property.  He's being prevented from doing more
 20   than what he already did, which was everything he could do
 21   under his power to get them off.  There's just no way that
 22   society would recognize that as reasonable.  And if that's the
 23   case, there's no reason to have an evidentiary hearing, because
 24   we know that those facts really shouldn't be in dispute.  We
 25   know Jason Badger was the owner.

1      That being said, if the Court does want to hear from

2  Jason Badger, I think the United States would be more than

3  happy to make sure that --

4      THE COURT:  Well, it's not so much -- I mean, would

5  you agree, first, the Defendants have the burden of

6  establishing standing?

7      MR. HALL:  Yes, sir.  That's another point, yes, sir.

8      THE COURT:  And as I understand it, would you agree

9  it's a preponderance of the evidence standard?

10      MR. HALL:  Yes, I would agree, Your Honor.

11      THE COURT:  Now, again, I thought Ms. Fox-Young aptly

12  made the point that we're not talking about lots in Tanoan.  So

13  this is a remote area of Taos County, but it did, like on the

14  consent, it referenced a lot of a subdivision.  So that

15  suggests some kind of plat of something.

16      MR. HALL:  Absolutely.

17      THE COURT:  Do you know?

18      MR. HALL:  So I know that they exchanged, when they

19  were going through the process, the Badgers and Mr. Morton,

20  they were -- and I believe Mr. Badger even showed one of the

21  older sons at the property, when he first realized this, when

22  he first went out to his property and he saw that there were

23  people there and they were building things, he had a map and he

24  showed them, this is the wrong property.  And I think there's

25  no dispute about that.  That's why they were looking to

1   exchange.  And the lots were 28 and 29 in this Costilla Meadows

2   Subdivision.

3          But another point, too, in terms of whether something

4   is reasonable and whether society would recognize it as

5   reasonable, a person's property rights don't change because you

6   live in Tanoan or you have property out in a remote area.  It's

7   a subdivision.  It's got boundaries.  It's recorded.  He has

8   the deed.  His property rights are his property rights, it

9   doesn't change because he doesn't live in Tanoan.  So the

10  expectation of privacy, based on reasonableness, doesn't

11  change, either.  It's the same.

12          THE COURT:  Now, in terms of the Government -- again,

13  on a suppression hearing, we're talking about a preponderance

14  of the evidence standard.  I don't believe -- the rules of

15  evidence typically don't apply.  As far as what the Government,

16  in other words, what you've submitted, I can take judicial

17  notice of it.  I'll take judicial notice of the file stampings

18  of the Taos County Clerk.  Also, the document number in which

19  it was filed in this case.  Is there any -- and you cited the

20  case law, I believe, in your response.  In terms of the record

21  that the United States has developed, is there anything more

22  that you wish to submit on this?

23          MR. HALL:  So if we were to have a hearing --

24          THE COURT:  Because next I'm going to ask what they

25  want to do.

1          MR. HALL:  Sure.  At this point, I would say, no.  I

2    think that the law is absolutely clear, and the facts, the

3    undisputed facts, and even the disputed facts, they're

4    essentially quibbles about whether this case is exactly like

5    some of the other cases in the case law.

6          I think as our brief shows, and if you really dig

7    into the cases, the quibbles are, they were building a home,

8    the home is sacrosanct.  That's been rejected by all these

9    cases, Kafuku most recently and very bluntly.  And whether they

10   were having some discussions or maybe they had been there in

11   some way at the sufferings of the property owner at some point,

12   again, the case law makes clear -- we can quibble about that

13   fact, but by August, there should be no dispute that the

14   property owner didn't want them there.

15         So at this point, there's nothing that we would

16   really need to put forward, we don't think, but if we did have

17   witnesses, what we would have is Jason Badger.  He would talk

18   about why his lawsuit was dismissed for being filed in the

19   wrong court, not because he changed his mind.  We would talk

20   about him texting Lucas Morton and saying, this is the

21   time-line that you need to get off the property, which didn't

22   happen.  Talking about how law enforcement basically told him

23   to stop going, not have a confrontation, that they're armed and

24   they may be dangerous.

25         So those sorts of things which I've proffered here

1  would be what we would bring out, but all that would really do

2  is bolster the already clear point, which is they didn't have

3  an expectation of privacy that society would view as legitimate

4  or reasonable, because the real property owner had made that

5  clear and the case law is clear.

6          THE COURT:  Let me ask either Mr. Ray or

7  Ms. Fox-Young, do you want to -- I think at this point -- I

8  mean, you did a reply to the Government, but I think there

9  needs to be additional briefing where you set forth the facts

10 in your pleading that support this.  And then I guess my

11 question at this point is, since it's Defendants' burden, what

12 evidence at an evidentiary hearing do you want to present?

13         Actually, do you all want to confer a minute and I'll

14 step out?

15         MS. FOX-YOUNG:  If we could, that would be helpful.

16         THE COURT:  And would it be easier, so you all could

17 talk, if the United States leaves?

18         MS. FOX-YOUNG:  Yes, Your Honor.

19         THE COURT:  Would you all mind doing that?  So let's

20 go ahead and take about a 15-minute break, and then I'll come

21 back.

22         And what I'd like is to know from defense counsel and

23 Defendants what you want to do in terms of obviously some kind

24 of a supplemental briefing where you go through your factual

25 narrative and the legal authorities, and then the Government

1   would be able to respond to it.  But also, what you want in the

2   form of an evidentiary hearing.

3              All right, we'll take a break.

4   (Recess was held at 11:07 A.M.)

5   (In Open Court at 11:35 A.M.)

6              THE COURT:  Ms. Fox-Young.

7              MS. FOX-YOUNG:  Thank you, Your Honor.  I'm prepared

8   to address the Court's question from before the break.

9              It would be our strong preference, and we think it

10  would be far more efficient, if the Court would proceed to let

11  us put on evidence, and I'm going to describe for the Court the

12  areas in which we think it's really critical that you make

13  findings, Judge.

14             First, with respect to Mr. Morton's possessory

15  interest, and he had one, there was no judicial determination

16  on that.  We have looked at the case docket.  I mean, the

17  Government has been testifying and putting on all this hearsay

18  as to what happened.  Well, the Court's got to look at it.

19             The case was dismissed for lack of prosecution on

20  June 27, 2018.  I don't know if Mr. Badger didn't show up to

21  court or what happened, but the Court's got to look at all

22  those pleadings and the history in that case and what happened,

23  and then it has to make a determination about the evidentiary

24  value of that and what it all means.

25             There's also, Judge, in this exhibit the Government

1 drew to your attention, this petition by owner for restitution

2 and the attached termination agreement, there's reference to

3 this contract between Mr. Morton and the Badgers, and there's a

4 whole bunch of evidence related to that, Judge, because it was

5 entered, and it was apparently terminated.  There is somebody

6 on this termination.  We don't have the agreement, itself,

7 okay, in evidence, but the Court needs to consider it.

8         Christopher John Stachura, Esquire, this lawyer,

9 terminated it.  We don't know if it was terminated O properly,

10 or what the effect was of the termination under New Mexico law,

11 and that, Judge, is where we're going to need to make argument

12 for the Court as to the effect of New Mexico law.  Did a

13 tenancy remain?  What is the effect of the Owner-Resident

14 Relations Act on all of this?  You've got to consider that.

15 And we acknowledge that we need to provide the Court with that

16 legal authority.

17         In terms of witnesses, Judge, with respect to all

18 these events, we need to put on Mr. Badger.  It's our burden,

19 we'll put him on.  This is a witness who will not talk to us.

20 We have to Subpoena him under the compulsory process.  We've

21 got to bring him here.  The officers he talked to --

22         THE COURT:  Let me ask just one question.  Is he in

23 New Mexico, or is he in Taos County?

24         MS. FOX-YOUNG:  He was at the time that Mr. Villa

25 talked to him, which was -- I don't have anything recent -- in

1   2019.  We presume that he is, but I can't tell the Court --

2           THE COURT:  In other words, if he were out of state,

3   what's your position there?

4           MS. FOX-YOUNG:  We need to bring him.  We'll have to

5   address --

6           THE COURT:  In other words, if he's out of state and

7   he gets served with a Subpoena and wants to do this by Zoom, I

8   guess I'm trying to get a sense of --

9           MS. FOX-YOUNG:  Well, we'll be flexible to get it

10  done.  We'd like to have him here, and I think he is in state.

11  And it sounds like the Government is going to facilitate

12  getting him here, so I think that shouldn't be an issue.

13          THE COURT:  Okay.

14          MS. FOX-YOUNG:  We've got to put on the escrow agent,

15  the title agent, the officers who talked to him.  And Judge,

16  you pointed out something really important, and clearly you've

17  looked closely at the record that's been provided to you.  But

18  that pile of tires out there on the property, that's the result

19  of the Sheriff's Department bulldozing the property two days

20  prior.  We've got to show you video of the inside of the house.

21  We have to show you the improvements that were made.  We need

22  to show you the aerial photography.  We need to show you what

23  it looks like out there and what a reasonable person, what any

24  member of society would think is reasonable in terms of drawing

25  conclusions about where property lines are, etc.

1          So all of the evidence as to the ongoing

2  conversations between the Badgers and Mr. Morton, that all

3  needs to come in, and Mr. Morton, certainly, needs to be

4  available and will be available to testify, you know, to rebut

5  any response from the Government.  There are going to be, we

6  think, disputed facts as to the understanding of what the

7  agreement between those parties provided and where they were

8  all left.

9          So we would like, Judge, to have a day to put on

10  evidence and to make oral argument and to brief you, as

11  necessary.  But we think the briefing should come after we put

12  on the evidence so it can be tailored and we can make this

13  process efficient for the Court.

14          THE COURT:  One of the things that's going to help,

15  then, is requested findings, and I'd like that in -- I mean, I

16  will let you supplement, but I'd like them in advance so at

17  least I've got a roadmap of where you want to go in terms of

18  your evidentiary proceedings.

19          MS. FOX-YOUNG:  Okay.  You know, you can also put us

20  on a tight leash to do it really close to the hearing, and we

21  can be prepared to do that.  But I think we're going to have to

22  supplement and modify if we do it in advance, because many of

23  these witnesses won't talk to us.

24          THE COURT:  Well, no, and I understand that.  I

25  think -- I would ask this.  To the extent the Government can

1   facilitate getting Mr. Badger here, that would help smooth

2   things along.

3           In terms of -- why do you need somebody from the

4   title company?

5           MS. FOX-YOUNG:  Well, there are questions about the

6   termination of this agreement, the real estate sale and

7   purchase agreement.  There are a lot of unknowns there.  We

8   need to recover all those documents, and we need somebody who

9   can put them on.

10          We need somebody, Judge, to testify as to where the

11  building was that the Sheriff's Office decimated.  Was it even

12  on the property described in this deed?  So we will tailor it,

13  we will make it as efficient as we can, but I think we need a

14  day, Judge.

15          THE COURT:  No, I think that's reasonable.  What I

16  would suggest is we do something, like, we pick a day where

17  then the following morning -- in other words, if we need to

18  spill over, then we go the very next day, too.

19          MS. FOX-YOUNG:  Well, we were hoping to chopper you

20  up there in a helicopter the following morning so we could

21  actually make a site visit, but we'll be flexible.

22          THE COURT:  Okay.  Do you have a sense of when you

23  would be ready to do the hearing?

24          MS. FOX-YOUNG:  Let me confer really quickly.

25          Judge, we know that you have a tough trial schedule,

1    so I guess if we could get ahead of your April --

2            THE COURT:  That's what I would like.  Maybe

3    Mr. Garcia can pull up some dates.  What's the earliest you'd

4    want to do it?  In other words, is this a situation where

5    you're going to take the lead, Ms. Fox-Young, and then others

6    would either join in and supplement whatever you submit?

7            MS. FOX-YOUNG:  We might divide up the subject

8    matter.  We'll need to work that out.  I think all the teams

9    are going to have areas to contribute in.  And of course,

10   Mr. Morton is representing himself, and I don't want to speak

11   for him, but we'll figure out a way to put it on without

12   duplication for the Court.

13           THE COURT:  Okay.

14           MS. FOX-YOUNG:  I think 30 days would be the

15   earliest.  The first week in March, I mean.  Three to four

16   weeks from now is about the earliest we could probably get

17   witnesses subpoenaed.

18           And Judge, I don't know how many people here have

19   tiny kids.  I have little kids, and I'm taking them to Carlsbad

20   Caverns the 19th to the 24th.  I know that's sort of

21   everybody's spring break, and so a lot of us have to do child

22   care that week.

23           THE COURT:  Sure.

24   (A discussion was held off the record.)

25           THE COURT:  I've got the 7th of March and the 9th

1   of March open.  The thing about March the 9th is, we'd have

2   to finish that day because I'm not available the 10th.

3          MS. FOX-YOUNG:  Looks like we can do either for the

4   defense, the Court's preference.

5          MR. HALL:  So to just throw a little wrench in there,

6   I will be on military orders until March 10th, from the end

7   of February until March 10th, so I would not be -- and Kraehe

8   would still be on military orders.  So it'd be preferable --

9          THE COURT:  Okay.

10          MS. FOX-YOUNG:  Well, they just had a trial vacated

11   for --

12          MR. HALL:  That's next week.

13          MS. FOX-YOUNG:  Oh, that's next week?

14          THE COURT:  All right, then the next available dates

15   would be Monday and Tuesday, March 27 and March 28.

16          MR. CLARK:  Judge, I've got a murder trial in

17   Carlsbad going for sure.  I guess counsel can stand in for me,

18   if that's okay.

19          THE COURT:  Would that be okay, Mr. Robert?

20          MR. ROBERT:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MS. FOX-YOUNG:  Yes, Judge, for the defense, we're

23   okay.

24          THE COURT:  Why don't we do this.  Just in terms of

25   getting ready for this, let's say Tuesday, March the 28th.  Do

1    you want to start at 9:00?

2          MS. FOX-YOUNG:  Sure.

3          THE COURT:  Okay.  And then if we need to spill over,

4    we can spill over into the morning of the 29th.

5          MS. FOX-YOUNG:  Thank you, Your Honor.

6          THE COURT:  And then in terms of the requested -- I

7    think the easiest thing to do, in terms of requested findings

8    and conclusions, is just have both sides submit them at the

9    same time.  When would you propose that they be submitted?

10         MS. FOX-YOUNG:  Your Honor, seven days prior.

11         THE COURT:  Yes, that's -- does that work?  Okay.

12   So seven days before this.  So the Tuesday before, the close of

13   business Tuesday the 21st, the parties submit requested

14   findings of fact and conclusions of law.

15         And in terms of -- you mentioned possibly people from

16   the title company.  If it's just -- I mean, witnesses that

17   aren't major fact witnesses, if it's convenient for them to do

18   it by Zoom, that may make a little sense.

19         MS. FOX-YOUNG:  Sure.  And Judge, we'll seek

20   stipulations where we can.

21         THE COURT:  Yes, that's true, stipulations would be

22   -- and then, other than as a major fact witness, is there

23   anybody else besides Mr. Badger?

24         MS. FOX-YOUNG:  The officers who interviewed

25   Mr. Badger, certainly, and I don't know if that's two or three.

1        THE COURT:  Okay.  Are they Taos County Sheriff's

2  deputies?

3        MS. FOX-YOUNG:  Yes, they all are.

4        THE COURT:  Okay.  Then we'll go ahead and get a

5  notice out on that.

6        Mr. Hall.

7        MR. HALL:  Your Honor, just to add, Mr. Badger is out

8  of state.  He's in Texas.  We had spoken to him about possibly

9  being available today for Zoom, but he works construction, so

10  it's really hard for him to just take a bunch of time off.  So

11  I know he would prefer to do it by Zoom, if that works.  But,

12  yes, he's in Texas.  And I'm not sure about the Taos County

13  officers, if they're still employed.

14        THE COURT:  If you could provide that information --

15  I guess you'll have to make a call.  I mean, if you Subpoena

16  him, then we'll see what happens.

17        MS. FOX-YOUNG:  Yeah, if the Government can work with

18  us on giving us his contact information, we'll figure out the

19  best way to do it.

20        THE COURT:  Well, I'll say this.  I think it's

21  important for both sides to have the factual record developed.

22        So with that, we've got a date for the evidentiary

23  hearing.  There's going to be requested findings and

24  conclusions submitted.  Is there anything else that we need to

25  take up today?

1      MR. HALL:  Your Honor, I just wanted to call your

2 attention -- there was reference to this property agreement,

3 the contract.  That's in the record, too.  It's in the same

4 exact filing, 565, by Mr. Morton, so it's there.

5      THE COURT:  Okay.

6      MR. HALL:  I have it here, but it would probably be

7 easier to just pull it up from the --

8      THE COURT:  And I would say this in terms of, like,

9 foundational.  If a document has the stamp on it, it's not --

10 to me, in a suppression hearing, it's not laying like a

11 foundation that you would for admission in a jury trial.

12      All right, from Defendants' perspective, is there

13 anything else that we need to take up today, that you want to

14 raise?

15      MS. FOX-YOUNG:  Not for Ms. Subbhanah Wahhaj, Your

16 Honor.

17      MR. CLARK:  Not for Siraj Wahhaj, Your Honor.

18      MR. RAY:  Not for Hujrah Wahhaj, Your Honor.

19      MR. ELSENHEIMER:  Not for Ms. Leveille.

20      MR. SHATTUCK:  Not for Mr. Morton.

21      THE COURT:  Okay.  And not from the United States?

22 All right.  Then we'll be in recess, and that will conclude

23 this hearing.  Thank you.

24 (Proceedings adjourned at 11:50 A.M.)

25                    *  *  *  *  *

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW MEXICO

 3   _____
                                )
 4   UNITED STATES OF AMERICA,  )
                                )
 5             Plaintiff,        )
                                )
 6       vs.                    )    No. 1:18-CR-02945-WJ
                                )
 7   JANY LEVEILLE, SIRAJ IBN   )
     WAHHAJ, HUJRAH WAHHAJ,     )
 8   SUBHANAH WAHHAJ, and       )
     LUCAS MORTON,              )    HEARING re: STANDING
 9                              )
              Defendants.        )
10   _____)

11           CERTIFICATE OF OFFICIAL COURT REPORTER

12       I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

13   Realtime Official Court Reporter, in and for the United States

14   District Court for the District of New Mexico, do hereby

15   certify that pursuant to Section 753, Title 28, United States

16   Code, that the foregoing is a true and correct transcript of

17   the stenographically reported proceedings held in the

18   above-entitled matter on Thursday, February 9, 2023, and that

19   the transcript page format is in conformance with the

20   regulations of the Judicial Conference of the United States.

21   Dated this 16th day of June, 2023.

22   _____
     MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23   UNITED STATES COURT REPORTER
     333 Lomas Boulevard, Northwest
24   Albuquerque, New Mexico  87102
     Phone:  (505)348-2334
25   Email:  Mary_Loughran@nmd.uscourts.gov
```