**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**vs.**                                                                          **No. 1:18-CR-02945-WJ**

**JANY LEVEILLE, et al.,**

       **Defendants.**

## RESPONSE IN OPPOSITION TO UNITED STATES' MOTION TO EXCLUDE THE TESTIMONY OF DR. CHITRA RAGHAVAN [DOC. 759]

Defendant Subhanah Wahhaj, through counsel, The Law Office of Ryan J. Villa, by Ryan J. Villa, and Justine Fox-Young, PC, by Justine Fox-Young, submits this Response in Opposition to the Government's Motion to Exclude Dr. Raghavan's Testimony [Doc. 759]. Dr. Raghavan's proposed testimony is reliable, probative and highly relevant to Ms. Subhanah Wahhaj's defense that her actions and conduct while she was living in Amalia were not consistent with a conspiracy to provide and providing material support to terrorists to carry out a plan to kill federal employees and agents as charged in Counts 1 and 2, with conspiracy to commit an offense against the United States as charged in Count 4,  with aiding and abetting the unlawful possession of a firearm by a person unlawfully in the United States as charged in Count 5, or with kidnapping and conspiracy to commit kidnapping as charged in Counts 6 and 7. In further support, Ms. Wahhaj argues as follows:

### *Legal Standard*

"Since the Supreme Court of the United States decided *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining

the factual issues it must decide." *United States v. Gutierrez-Castro*, 805 F.Supp.2d 1218, 1224 (D.N.M. 2011)(Browning, J.). The Court must decide whether the expert is qualified to testify, whether the opinion testimony is the product of a reliable methodology and must also assess the proffered expert's reasoning to determine if that reasoning is sound." *Id.*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The rule requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *United States v. Muldrow*, 19 F.3d 1332, 1337 (10th Cir. 1994). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3dd 917, 928 (10th Cir. 2004).

The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See

*Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." *Gardner v. Gen. Motors Corp.*, 507 F.2d 525, 528 (10th Cir. 1974). Courts should liberally admit expert testimony. *See United States v. Gomez*, 67 F.3d 1515, 1526 (10th Cir. 1995) (noting the "liberal standard").

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. *See Daubert*, 509 U.S. at 594-95. A non-exclusive list of factors weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. *See id.* Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting *Daubert*, 509 U.S. at 589). "[A] district court must [first] determine if the expert's proffered testimony ... has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" *Id.* (quoting *Daubert*, 509 U.S. at 592). In considering the proffered testimony, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid...." *Id.* (quoting Daubert, 509 U.S. at 592-93). Next, the district court must further inquire

into whether proposed testimony is sufficiently "relevant to the task at hand." *Daubert*, 509 U.S. at 597.

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert to non-scientific expert testimony. *See* 526 U.S. at 141. ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.") In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." *Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC*, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006).

Once reliability is established, it remains within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact, and in making that determination, the court should consider the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence. *United States v. Rodriguez-Feliz*, 450 F.3d 1117, 1123 (10th Cir. 2006).

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert ...." *Att'y Gen. of Okla. V. Tyson Foods, Inc.*, 565 F.3d at 780. "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." *Id.* Whether courts have previously accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. *Id.* ("The case law indicates that the

courts are not unfamiliar with the PCR methodology, and in fact some courts have indicated their acceptance of it.").

### I. Dr. Raghavan's Testimony Will Contextualize Ms. Wahhaj's Conduct, Intent and Motive

Dr. Raghavan's testimony, in sum, with regard to the phenomenon of coercive control, the trauma bonding which may manifest as "brainwashing" at the hands of a powerful and charismatic leader, and the likely effects of the development of one or more related psychological conditions, is highly relevant to contextualize Ms. Wahhaj's conduct at the defendants' homestead in Amalia.

As an initial matter, the Government concedes that Dr. Raghavan has the qualifications to present expert testimony in the above-described areas, as it must given that the Government itself has many times retained Dr. Raghavan and experts with comparable if less extensive training and experience, to opine on like matters in federal court. *See, e.g., United States v. Torres*, 2021 WL 1947503 (S.D.N.Y. May 13, 2021)("Dr. Raghavan's curriculum vitae. . . indicates extensive academic and professional experience related to domestic abuse and coercive control. In sum, Dr. Raghavan's experience is more than sufficient to qualify her as an expert on domestic violence and coercive control.")

The Government objects to her testimony, however, on the basis that her opinions are not relevant because they do not implicate any elements of the charged offenses and do not serve to negate Ms. Wahhaj's specific intent to commit any of the charged crimes, arguing that Ms. Wahhaj is instead "attempting to smuggle improper mental health evidence into a coercion or justification defense, in a case where none of these issues are legally implicated." Motion at 10.  To the contrary, Dr. Raghavan's testimony will serve to

contextualize Ms. Wahhaj's behavior, to negate Ms. Wahhaj's specific intent to commit the crimes charged and to elucidate her actual motives.

That Dr. Raghavan has not performed a psychological examination on Ms. Wahhaj or the other defendants is immaterial to the Court's analysis as to the relevance of her testimony. *See, e.g., Torres*, 2021 WL 1947503 at *7 (explaining that the government's expert, "Dr. Raghavan[,] ha[d] not interviewed Victim-1," but that "her testimony w[ould] focus on the generalized dynamics of coercive control rather than the specifics of the relationship between Torres and Victim-1.") This ensures, by the way, that Dr. Raghavan will not improperly testify that Ms. Wahhaj lacked the specific intent to commit the charged crimes or even that she was certainly subjected to coercive control. *See id*. Though the Government complains that Dr. Raghavan does not offer specific diagnoses of Ms. Wahhaj or opine that she did form a trauma bond, and with whom it was formed, if the defense in fact proffered such opinions, the Government would unquestionably argue that this testimony goes to ultimate issues and invades the province of the jury. The ultimate issues in the case remain with the jury, and Dr. Raghavan has deliberately avoided offering "concrete opinion[s]" as to Ms. Wahhaj's intent or as to whether Defendant Leveille or others certainly subjected her to coercive control. *See* Motion at 13 (misguidedly asserting that "Dr. Raghavan herself seems to struggle with forming a concrete opinion that applies to this case.")

Instead, Dr. Raghavan will testify with a great degree of specificity as to the dynamics of coercive control, and the ways in which coercive control and the related psychological dynamics, including the development of "folie a la famille," a mental disturbance that Dr. Raghavan explains "emphasizes shared delusional/irrational beliefs that are first held by one individual and then spread to others in close relationships," Doc.

735, can produce disordered thinking and paradoxical behaviors, much like the jury will observe as to Ms. Wahhaj.

Ms. Wahhaj's behavior in traveling to a remote outpost in New Mexico with her young children, in the belief that Defendant Leveille was Mary, mother of Jesus, that A.G. was her child, and that A.G. would be resurrected after his death, is certainly atypical behavior which is not commonly understood and which would be nearly impossible for most jurors to understand in the absence of expert testimony regarding coercive control and its psychological effects. Dr. Raghavan's explanation as to how an initial trauma bond and its associated changes in identity and perspective can be shared by multiple group members, in the phenomenon called "folie a la famille," would assist the jury in understanding how the Defendants likely came to share and internalize the very same irrational and internal beliefs, a phenomenon which Dr. Raghavan notes is seen rarely in the general public.

The *Torres* court clearly and cogently explained the value of expert testimony (there proffered by the government) in elucidating the effects of coercive control, ruling Dr. Raghavan's testimony admissible under Daubert and its progeny:

> The proposed testimony is also likely to assist the jury. The Government avers that Dr. Raghavan will testify about coercive control, which is a psychological dynamic often seen in abusive relationships that leads an abuse victim to behave in counterintuitive ways, such as by declining to take opportunities to leave an abusive situation or by expressing gratitude to an abuser. The Government intends to present evidence that, on several occasions, Torres left Victim-1 alone in the apartment, but that Victim-1 did not use those opportunities to flee. The Government also intends to present evidence that Victim-1 sent Torres romantic text messages during the events at issue in this case. Dr. Raghavan's testimony will help the jury contextualize that seemingly counterintuitive behavior and assess whether Victim-1 was held against her will, an element of the kidnapping statute. As the Second Circuit has noted, courts regularly uphold the "admission of expert testimony to explain conduct not normally familiar to most jurors."

*Torres*, 2021 WL 1947503 at *6. *See also United States v. Ray*, 2022 WL 101911 (S.D.N.Y. January 11, 2022)(collecting cases and noting that "[m]ultiple courts in this District and elsewhere have admitted similar testimony where, as here, [expert testimony on coercive control] is not offered as evidence of the defendant's intent but to help a jury understand a common set of conduct . . . and to explain "seemingly counterintuitive behavior" of victims or "conduct not normally familiar to most jurors . . . ."). *See also United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991) ("[Rule] 702 instructs [the Court] to admit specialized knowledge if it will assist the trier of fact in understanding the evidence. [The Rule] thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject."); Batton ("We do not find the trial court abused its discretion in concluding the jurors would benefit from learning of the modus operandi of sex offenders. The methods sex offenders use are not necessarily common knowledge . . . . the trial court was careful to limit Dr. Heineke's testimony to only the correction of possible juror misconceptions regarding how sex offenders behave and what they look like. With those limitations in place, the trial court was well within its discretion to allow Dr. Heineke's testimony.")

Ms. Wahhaj's belief that Ms. Leveille had received revelations from God and that Ms. Wahhaj unflinchingly believed Ms. Leveille in this regard and could not accept a reality where it was not true is corroborated by the competency evaluation performed by the Bureau of Prisons:

> She thus believes this is proof Jany received revelations from God. Jany also claimed in the future they will all be free and with Jesus. This psychologist attempted to present a hypothetical situation of Jany retracting these claims, but Ms. Wahhaj could not accept this.

Doc. 210 at 14. And, as noted in Dr. Raghavan's report, multiple sources of information confirm that the religious and supernatural beliefs held by Subhanah Wahhaj were also endorsed by her co-defendants. Dr. Raghavan's testimony will provide the jury with a scientific understanding of how and why the defendants came to hold the same supernatural and delusional beliefs. Given this context, the jury will be able to properly assess their behavior.

## II. Dr. Raghavan's Testimony is Relevant to Ms. Wahhaj's Intent and Motive

The proferred testimony is relevant to Ms. Wahhaaj's intent as well as her ability to form an agreement with respect to each conspiracy charge. Defendants are charged pursuant to 18 U.S.C. 2339A, which proscribes providing material support to terrorists. The government claims Defendants' motives to kill federal agents were, in part, to prepare for a war against government institutions, engage in jihad and die as martyrs. Dr. Raghavan's expert testimony directly refutes these claims, as it contextualizes Defendants' behavior with a background understanding of coercive control in the context of cult dynamics and offers a scenario whereby Ms. Wahhaj and others did not have the intent to provide material support to terrorists but rather to further their delusional and supernatural beliefs. This testimony will assist the jury in ascertaining whether Ms. Wahhaj and others actually formed the requisite intent for each charge or rather exhibited the kind of delusional, or barring that, disordered thinking that comes from brainwashing, i.e., beliefs that actually negate intent.

The Superseding Indictment specifically alleges that Defendants conspired to provide material support and resources, including currency, training, weapons and personnel knowing and intending that they were to be used to prepare for and carry out

attacks to kill federal employees and officers. *See* Doc. 85 at 2. No federal employees or officers were killed, and no actual attempt to kill occurred; however, the Government theorizes that the plot to kill federal officials was premised on A.G., who was deceased, coming back to life as Jesus Christ during the end of days and potentially directing Defendants to attack government entities. *See* U.S. Response to Motion for Severance, at 15 [Doc. 718] ("The evidence further establishes that Defendants' material support was motivated by [A.G.]'s death and Leveille's assertion that [A.G.] would be resurrected and lead them in jihad, to include the murder of federal employees and others.").

At trial, the Government will be asking the jury to draw inferences from evidence about what Defendants planned to do during the course of their time in Amalia, making the motives for any of Defendants plans and actions highly relevant. *See, e.g., id.* at 15 ("The Defendants spent nine months preparing for this war....[A.G.] was just a prop in Defendants' scheme to prepare for and engage in jihad."). Directly contradicting the Government's theory, Dr. Raghavan will opine that the beliefs and actions of the Defendants were strongly consistent with cult behavior, emblematic of an environment of coercive control, and that Ms. Wahhaj's actions in following her husband and brother from their home in Georgia to New Mexico and in remaining there are entirely consistent with certain mental illnesses, on which she expounds. In essence, that there is an entirely different way to understand her motives that is far more consistent with the evidence that Ms. Wahhaj found herself unable to break away from the other Defendants and that she was having delusional beliefs characteristic of certain mental defects.

This defense theory is in no way contradicted by the Bureau of Prisons' ("BOP") determination that Ms. Wahhaj, having been subjected to a battery of tests as part of her competency evaluation, was not ultimately diagnosed with any mental diseases or defects

while at the BOP. Motion at 17, n. 4. In actuality, BOP evaluators concluded that Ms. Wahhaj's clinical profile was "invalid and uninterpretable," meaning that they could not rule out any mental diseases but reported that, on the basis of the available information, her diagnosis was "No Diagnosis." Doc. 210 at 11. While she also will not offer a mental health diagnosis per se, Dr. Raghavan should be permitted to testify as to background information in her field that explains why Ms. Wahhaj may have clung to her delusional and false beliefs and continued to do so and stayed in Amalia even as conditions declined at the Defendants' remote home.

Dr. Raghavan's testimony will provide critical context for the jury in understanding Ms. Wahhaj's motives to please the other Defendants and the related irrational and delusional thinking and self-destructive behaviors that she developed in order to protect the others. The trauma bonds, resulting from the coercive control exerted on Ms. Wahhaj, are well delineated in the literature and Dr. Raghavan's application of the concept to Ms. Wahhaj is based on her knowledge and experience and is therefore a proper subject for trial testimony. *See, e.g., United States v. Chaco*, 801 F. Supp. 2d 1200, 1216 (D.N.M. 2011)(Browning, J.) (permitting a physician to testify that an examination of a sexual assault victim, which resulted in no evidence of sexual abuse, was still consistent with the victim having been sexual abuse because the majority of physical examinations on sexually assaulted prepubescent girls result in normal findings.)

In short, Dr. Raghavan's testimony will explain the various mental health aspects likely at play where a group of individuals isolate themselves in a challenging and remote environment and wait around for a deceased child to be resurrected. Her explanation of the psychological dynamics which can occur and for which there is evidence, bears directly on the question of Ms. Wahhaj's motive in remaining in Amalia, in failing to seek

substantial help from outsiders, in failing to intervene in the transport of A.G. to New
Mexico from Georgia, and in failing to leave Amalia. Evidence that bears on the question
of motive ordinarily has some probative value in a criminal case. *See, e.g., United States
v. MacPherson*, 424 F.3d 183, 185 n. 2 (2d. Cir. 2005); *United States v. Smith*, 292 F.3d
90, 100 (1st Cir. 2002) The district court recognized this connection, stating that evidence
of the appellant's "lack of interest in images of children makes it somewhat less likely that
he was searching for child pornography." On the same basis on which Dr. Raghavan's
proffered testimony has probative value with respect to the issue of intent, it also reflects
on motive.

### III.    Dr. Raghavan's Testimony is Reliable

The Government further argues that Dr. Raghavan's testimony is not reliable, in
the main because she does not establish when and where Ms. Wahhaj was subjected to
coercive control and by whom. Motion at 17. As detailed above, and noted with regard to
Dr. Raghavan's past testimony, it is entirely in keeping with the practice of experts in Dr.
Raghavan's field to opine on the generalized effects of coercive control and trauma
bonding in a given environment, and numerous courts have found that testimony of this
nature will assist the jury in contextualizing and assessing the behavior of defendants and
victims. *See Kumho Tire*, 526 U.S. at 152 ("The objective of [the *Daubert* gatekeeping]
requirement is to ensure the reliability and relevancy of expert testimony. It is to make
certain that an expert, whether basing testimony upon professional studies or personal
experience, employs in the courtroom the same level of intellectual rigor that
characterizes the practice of an expert in the relevant field.") *Id.* Dr. Raghavan elucidates
how her method has been tested and is validated in the peer-reviewed literature, describes
the standards and details her methodology with great specificity as well as demonstrating

that the methodology is generally accepted as reliable. As numerous courts have found and as the government has itself repeatedly asserted, her methodology is reliable under the Daubert factors.

## IV.   The Court Should Not Exclude Dr. Raghavan's Testimony Pursuant to Rule 403

The Court should decline to exclude or otherwise limit Dr. Raghavan's testimony pursuant to Rule 403, as the testimony will not bolster the credibility of any Defendants or the defense's factual narrative nor will it instruct the jury regarding the ultimate issues in the case. *See, e.g., Torres*, 2021 WL 1947503 at *7 ("In the context of this case, however, Dr. Raghavan's testimony regarding the generalities of domestic abuse will be no more inflammatory or prejudicial than the other evidence -- including allegations of kidnapping, physical and sexual abuse, and threats of deadly violence -- that will be presented to the jury.") The testimony is not prejudicial "psychiatric evidence" as the Government avers – Dr. Raghavan provides no diagnoses - and does not prevent the dangers of distracting or misleading the jury that evidence of Ms. Wahhaj's mental health diagnoses might. *See, e.g., United States v. Martinez*, 923 F.3d 806, 815 (10th Cir. 2019) (internal citations omitted).

Instead, her testimony is highly probative with respect to contextualizing Defendants' conduct and to assessing their intent and motive, as described above, and the Court should permit Dr. Raghavan to testify as outlined in her report. *See Gomez*, 67 F.3d at 1526 (noting that courts are to liberally admit expert testimony). Without improperly limiting the defense case by excluding Dr. Raghavan, the Court may note the "traditional and appropriate means" of undermining Dr. Raghavan's expert testimony, such as

"[v]igorous cross-examination" and "presentation of contrary evidence." Daubert 509 U.S. at 596.

## CONCLUSION

For all of the foregoing reasons, the Court should permit the testimony of Dr. Raghavan. She is qualified to testify and offer opinions consistent with her report for the jury's consideration in considering and assessing Ms. Wahhaj's actions.  Her testimony is reliable and will assist the jury. Furthermore, the issues identified by the government go to weight, not admissibility, and can be fully addressed through cross-examination and argument. Ms. Wahhaj further requests that the Court permit the defense to fully explore Dr. Raghavan's opinions and methodology in a Daubert hearing and to supplement the arguments in this response by oral argument at that hearing.

Respectfully submitted,

/s/ Ryan J. Villa
Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave NW Ste. C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

/s/ Justine Fox-Young
Justine Fox-Young
Justine Fox-Young, PC
5501 Eagle Rock Ave NE Ste C2
Albuquerque, NM 87113
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Defendant Subhanah Wahhaj*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2023 a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

/s/*Justine Fox-Young*
JUSTINE FOX-YOUNG