1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3    _____
                                )
4    UNITED STATES OF AMERICA,   )    No. 1:18-CR-02945-WJ
                                )
5              Plaintiff,        )
                                )    Pete V. Domenici U.S. Courthouse
6         vs.                    )    Bonito Courtroom
                                )    Albuquerque, New Mexico
7    JANY LEVEILLE, SIRAJ IBN    )    Wednesday, July 19, 2023
     WAHHAJ, HUJRAH WAHHAJ,      )
8    SUBHANAH WAHHAJ, and        )
     LUCAS MORTON,               )
9                                )
               Defendants.       )
10   _____)

11

12                  TRANSCRIPT OF PROCEEDINGS
                         JAMES HEARING
13          BEFORE THE HONORABLE WILLIAM P. JOHNSON
              CHIEF UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16   For the Plaintiff:   TAVO HALL
                          KIMBERLY BRAWLEY
17                        UNITED STATES ATTORNEY'S OFFICE
                          District of New Mexico
18                        Post Office Box 607
                          Albuquerque, New Mexico   87103
19

20   For Defendant        ARIC ELSENHEIMER
     Jany Leveille:       ANGELICA M. HALL
21                        FEDERAL PUBLIC DEFENDER
                          District of New Mexico
22                        111 Lomas Blvd., N.W., Suite 501
                          Albuquerque, New Mexico  87102
23

24

25

```
 1    APPEARANCES (Continued):

 2    For Defendant       SIRAJ IBN WAHHAJ, Pro se
      Siraj Ibn Wahhaj:
 3
      Defendant Wahhaj's  THOMAS CLARK
 4    Standby Counsel:    CLARK AND JONES, LLC
                          432 Galisteo Street
 5                        Santa Fe, New Mexico 87501

 6

 7    For Defendant       MARSHALL J. RAY
      Hujrah Wahhaj:      LAW OFFICES OF MARSHALL J. RAY, LLC
 8                        201 12th Street, N.W.
                          Albuquerque, New Mexico  87102
 9
                          DONALD KOCHERSBERGER
10                        BUSINESS LAW SOUTHWEST, LLC
                          320 Gold Avenue, S.W., Suite 610
11                        Albuquerque, New Mexico 87102

12
      For Defendant       JUSTINE FOX-YOUNG
13    Subhanah Wahhaj:    JUSTINE FOX-YOUNG, P.C.
                          5501 Eagle Rock Avenue, N.E., Suite C2
14                        Albuquerque, New Mexico  87104

15
      For Defendant       LUCAS MORTON, Pro Se
16    Lucas Morton:

17    Defendant Morton's  JOSEPH SHATTUCK
      Standby Counsel:    JOSEPH E. SHATTUCK, ESQ.
18                        8748 E. Belleview St.
                          Scottsdale, Arizona 85257
19

20    Reported by:        MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                          United States Court Reporter
21                        Phone:  (505)348-2334
                          Email:  Mary_Loughran@nmd.uscourts.gov
22

23        Proceedings reported by machine shorthand and transcript

24    produced by computer-aided transcription.

25
```

```
 1            USA v. LEVEILLE, et al. - 1:18-CR-02945-WJ

 2                         JAMES HEARING

 3                         I N D E X
```

```
 4   WITNESS                                          Page

 5   FBI SPECIAL AGENT TRAVIS TAYLOR

 6      DIRECT EXAMINATION BY MR. TAVO HALL ...............11

 7      CONTINUED DIRECT EXAMINATION BY MR. TAVO HALL .....81

 8      CROSS-EXAMINATION BY MR. MARSHALL RAY ............101

 9      CROSS-EXAMINATION BY MR. ARIC ELSENHEIMER ........119

10      CROSS-EXAMINATION BY MS. JUSTINE FOX-YOUNG .......128

11      CROSS-EXAMINATION BY MR. SIRAJ WAHHAJ ............151

12      QUESTIONS BY THE COURT ...........................159

13      REDIRECT EXAMINATION BY MR. TAVO HALL ............161
```

```
14

15                         * * * * *

16

17

18

19

20

21

22

23

24

25
```

1    USA v. LEVEILLE, et al. - 1:18-CR-02945-WJ

2    JAMES HEARING

3    * * * * *

4    (In Open Court at 9:42 A.M.)

5    THE COURT:  All right, this is United States vs. Jany

6    Leveille, Siraj Ibn Wahhaj, Hujrah Wahhaj, Subhanah Wahhaj, and

7    Lucas Morton, Case No. 18-CR-2945.

8    Would counsel enter their appearances for the record,

9    please.

10    MR. HALL:  Good morning, Your Honor.  Tavo Hall and

11    Kimberly Brawley on behalf of the United States.  And also with

12    us at counsel table is Special Agent Travis Taylor from the

13    FBI.

14    MR. ELSENHEIMER:  Good morning, Your Honor.  Aric

15    Elsenheimer and Angelica Hall on behalf of Ms. Leveille.  We're

16    also joined at counsel by Daniel Berg, who is a paralegal in

17    the FPD office.

18    MS. FOX-YOUNG:  Good morning, Your Honor.  Justine

19    Fox-Young on behalf of Subhanah Wahhaj, who is present.

20    MR. KOCHERSBERGER:  Good morning, Your Honor.  Don

21    Kochersberger and Marshall Ray on behalf of Hujrah Wahhaj, and

22    she is present, as well.

23    THE COURT:  And Mr. Morton, you're representing

24    yourself this morning?

25    MR. MORTON:  Yes, Your Honor.

1          THE COURT:  And Mr. Wahhaj, you're representing

2    yourself?

3          MR. WAHHAJ:  Yes, Your Honor.  Good morning.

4          THE COURT:  Good morning.  Are the writing hands --

5    okay, good.

6          Just as a preliminary matter -- let me grab my files.

7    Mr. Hall, just so we can make sure we're all on the same page

8    here, regarding the seven counts of the indictment, Count 1,

9    conspiracy to provide material support to terrorists, in a

10   nutshell, that's the actions of assembling the compound?

11         MR. HALL:  Yes, Your Honor.  It's several things that

12   are defined as material support under the statute.  So it

13   includes lodging, training, providing personnel.

14         THE COURT:  That's the conspiracy.  And then Count 2

15   is the actual actions of doing what you just stated?

16         MR. HALL:  Yes, Your Honor.

17         THE COURT:  Okay.  Now, Count 3, that charge is five

18   of the Defendants, right?  Subhanah Wahhaj and Hujrah Wahhaj

19   aren't charged in Count 3, correct?

20         MR. HALL:  It charges three of the Defendants, yes,

21   Your Honor.

22         THE COURT:  And that's the conspiracy to murder an

23   officer or employee of the United States, right?

24         MR. HALL:  Correct, Your Honor.

25         THE COURT:  I'm going to skip over Count 4.  Count 5

1    is the possession of a firearm while unlawfully in the United

2    States.  So the firearms charge is directed at Defendant Jany

3    Leveille, and then the other four Defendants are charged with

4    aiding and abetting that possession of firearms, correct?

5            MR. HALL:  Yes, Your Honor, correct.

6            THE COURT:  And then Count 6 charges four of the

7    Defendants.  It doesn't charge Mr. Siraj Ibn Wahhaj, because

8    he's the biological parent, but the other four are charged with

9    the conspiracy to kidnap the child who is referenced as John

10   Doe 1, and then Count 7 is the actual act of kidnapping,

11   correct?

12           MR. HALL:  Correct, Your Honor.

13           THE COURT:  Now, Count 4 charges all seven Defendants

14   with conspiracy to commit an offense against the United States.

15   In a nutshell, what is the conspiracy charged in Count 4?

16           MR. HALL:  Yes, Your Honor.  So that would go to the

17   Count 5 underlying offense, the 922 possession by a person

18   unlawfully in the United States.

19           THE COURT:  All right.  Now, in terms of what the

20   Government has to show to prove a conspiracy and a membership

21   in a conspiracy, the Government must show that two or more

22   people agreed to violate the law, that people knew at least the

23   essential objectives of the conspiracy, that the people

24   knowingly and voluntarily became a part of it, and that the

25   alleged co-conspirators were independent, and I'll cite United

1  States vs. Small.  And you've got case law, statements by

2  conspirators that are in furtherance of a conspiracy when they

3  are intended to promote the conspiratorial objectives.  And

4  then the Tenth Circuit, of course, has held there must be some

5  evidence independent from the alleged co-conspirator statements

6  linking the Defendants to the conspiracy or conspiracies

7  charged, and then, of course, there's the aspect of James.

8          How does the Government intend to proceed this

9  morning?

10         MR. HALL:  So Your Honor, the 34 exhibits -- and I

11  think it's actually more than that, because there are some

12  sub-exhibits -- are all being offered as proof of the existence

13  of the conspiracy, the purpose, and the members of the

14  conspiracy.  But a large portion of those are not going to

15  be -- like the statements that are in, for example, thousands

16  of pages of Facebook records, they're not being offered, and

17  they won't be offered at trial for proof of the matter asserted

18  -- or truth of the matter asserted, they're going to be

19  nonhearsay statements, or evidence of the existence of the

20  conspiracy and so on.  I assume we'll be briefing that

21  additionally after the hearing.

22         So we do have a chart that will be Exhibit 35, and

23  I'll pass that around when we get to it in the direct

24  examination.  The chart attempts to sort of distill all of

25  those exhibits down into an easy to follow format, and it's

1 color coded so the ones that are generally not being offered

2 for the truth of the matter asserted, they're being noticed and

3 they're being described here so that the existence of the

4 conspiracy can be supported.  But in terms of actual

5 co-conspirator statements under 801(d)(2)(E), those aren't

6 going to be offered in that regard.  And then the other --

7 well, the chart will make it clear, hopefully, that those

8 statements that remain are for that purpose, or partially, and

9 it could be one or the other.

10          So the Government is expecting, or is intending to go

11 forward today with a witness, the case agent who has done the

12 investigation on this case.  He will go through and describe

13 the existence of the conspiracy and the members and the

14 purpose, so the establishment of this background, and then

15 we'll go through the chart with him and just kind of hit the

16 main points that are in the exhibits and what the statements

17 that would be in furtherance of the conspiracy might be.  So

18 we'll touch those, but they'll be available for the Court, in

19 addition to our briefing that's already been filed, to sort of

20 be a road map.

21          And I do want to just make a couple of other things

22 clear.  In terms of the Charge 6, Count 6, the conspiracy to

23 commit kidnapping, Siraj Wahhaj is not charged with that,

24 obviously, because he's the biological father, but he is an

25 unindicted co-conspirator, and the factual nature of everything

1  that took place happened whether he's charged or not.  So we'll

2  be treating him in that manner in terms of statements and

3  actions.

4          Secondly, the United States is going to remove

5  Exhibit 28 from the filing.  It was never really going to be

6  offered for the truth of the matter asserted anyway.  I think

7  we thought at the time that that letter -- it's a letter from

8  Lucas Morton, handwritten at some point in his detention

9  post-arrest.  We thought the letter -- there were several

10 letters written by him.  Some were sent to the Government and

11 others, and we thought that that letter was one that was done

12 that way.  But we can't confirm yet, we aren't sure yet if it

13 was written just for the purposes of competency evaluation.

14         So in an abundance of caution, since we don't know

15 for sure that it was not, we'll just remove that for now with

16 the reservation, obviously, that if we can confirm that it was

17 not just written for the purpose of competency, it would still

18 be an admission by a party opponent, at least as to Lucas

19 Morton.  But we'll deal with that later.  It was never

20 something that was going to be offered as a statement for the

21 truth of the matter asserted here anyway, it was more in the

22 context of the existence of the conspiracy.  But 28 is removed.

23         THE COURT:  Okay.  Before we proceed with witness

24 testimony, did defense counsel want to state anything on the

25 record?

1      MR. ELSENHEIMER:  We just want to make clear for the

2  record that we fundamentally disagree with the idea that Siraj

3  Wahhaj is an unindicted co-conspirator on either of the

4  kidnapping charges.  He cannot be charged with that crime, and

5  you cannot conspire to commit something that is not a crime.

6  He is not an unindicted co-conspirator, and we would like to

7  have the opportunity to brief that, because we don't think that

8  they can piggyback on the incorrect legal assumption that

9  Mr. Wahhaj is an unindicted co-conspirator to bring in his

10 statements for Counts 6 and 7.  That's just a fundamental

11 misunderstanding of the law, and we would like to be able to

12 brief that issue, because it's really critical.

13      THE COURT:  Sure.  All right.  I mean, I think

14 clearly that should be briefed.

15      MS. FOX-YOUNG:  And Your Honor, we talked to the

16 Government this morning.  If it's the Court's will, we thought

17 we all could brief whatever issues come out of today's hearing

18 pretty quickly after receiving a transcript.  I know we have a

19 long day ahead of us, but we're all -- the parties are in

20 agreement to do that on the Court's time-line.  I'm sure that

21 there are going to be some other thorny legal issues that will

22 come up, and we'd like the opportunity to brief them.

23      THE COURT:  Okay.  Just a second.

24      All right, then, Mr. Hall, you may proceed.

25      MR. HALL:  Thank you, Your Honor.

1          The United States calls Special Agent Travis Taylor.

2  (FBI SPECIAL AGENT TRAVIS TAYLOR, GOVERNMENT WITNESS, SWORN)

3          MR. GARCIA:  Please have a seat and state your full

4  name for the record.

5          THE COURT:  Before you begin, Richard.

6  (A discussion was held off the record.)

7          THE COURT:  All right, you may proceed.

8          THE WITNESS:  Hello.  My name is Travis Taylor.

9          TESTIMONY OF FBI SPECIAL AGENT TRAVIS TAYLOR

10                    DIRECT EXAMINATION

11  BY MR. TAVO HALL:

12  Q.   Good morning, Agent Taylor.  Can you please share where

13  you are employed?

14  A.   I'm employed by the FBI.

15  Q.   And how long have you worked for the FBI?

16  A.   I've worked for the FBI in a capacity for approximately

17  nine years, and as a Special Agent for almost six.

18  Q.   And are you the case agent in this case, the United States

19  vs. Leveille, et al.?

20  A.   I became the case agent in August of 2018.

21  Q.   So you've been the case agent since August of 2018 until

22  present?

23  A.   Correct.

24  Q.   And as part of your duties as the case agent, did you

25  investigate possible conspiracies involving the Defendants in

1  this case?

2  A.   Yes, sir.

3  Q.   So I'd like to start big picture first, and then we'll

4  narrow down into some of the specific evidence that you became

5  aware of in your investigation.  But generally speaking, as a

6  Special Agent in the FBI, how do you go about investigating

7  conspiracies?

8  A.   Oftentimes through interviews, digital evidence, physical

9  evidence, sometimes through source reporting, things of that

10  nature.

11  Q.   And in your investigation of a conspiracy, generally, what

12  kind of evidence are you looking for to try to understand

13  whether there's an agreement?

14  A.   Communication among the parties that they are working

15  together for a goal, that they're helping one another either

16  financially, logistically, through lodging, other things of

17  that nature.

18  Q.   Do co-conspirators always explicitly lay out what their

19  agreements are and their purposes in easy to follow clear

20  language?

21  A.   Not always.

22  Q.   Do co-conspirators sometimes speak in coded or vague

23  language?

24  A.   Sometimes.

25  Q.   Do they sometimes assume that each other -- that they know

1   what each other are talking about without being explicit?

2   A.   Yes.

3   Q.   What about consistency, and you mentioned this a little

4   bit, but consistency of actions or alignment of actions by

5   multiple people.  Is that something that you look for in a

6   conspiracy investigation?

7   A.   Yes.

8   Q.   And what about corroborating evidence?  Do you try to

9   corroborate certain things that might help show if there's a

10  conspiracy or not?

11  A.   Sure.  You're looking for different sources of evidence

12  that show -- corroborate, say, a witness statement, or physical

13  evidence, or digital evidence that you found.

14  Q.   Is it fair to say that, like, the more people that say

15  they saw something, the more likely you are to follow that as

16  something that might have happened?

17         MR. ELSENHEIMER:  Objection, leading.

18         THE COURT:  Do the Rules of Evidence apply?

19         MR. ELSENHEIMER:  I don't think -- the Rules of

20  Evidence don't apply, but I don't think the Government can ask

21  leading questions on direct.

22         THE COURT:  I think they can in a hearing like this.

23  Overruled.

24  A.   Do you mind repeating the question?

25

1  BY MR. HALL:

2  Q.   Yes.  Is it fair to say that the more people who say they

3  saw something, the more likely you are to follow up on thinking

4  that that's something that happened?

5  A.   The more the people say something happened, or the more

6  that you find pieces of evidence indicating that it happened,

7  would be corroborating evidence that that may have occurred,

8  that that activity may have occurred.

9  Q.   Can you describe the conspiracy or the conspiracies that

10  you investigated in this case?

11  A.   Conspiracy to conduct kidnapping.  Conspiracy to provide

12  material support.  Conspiracy to assist an individual in

13  conducting 922(g), illegal alien in possession of a firearm.

14  And conspiracy to harm a Government official.  I believe I

15  covered all the conspiracies.

16  Q.   Sure, thank you.

17      Did you find any evidence of the existence of agreements

18  between the Defendants related to these four conspiracies in

19  your investigation?

20  A.   Yes.

21  Q.   So let's start -- I guess one way to organize this, and

22  one way I think we'll do it, is let's kind of go through each

23  conspiracy and we'll talk about some of the evidence that you

24  uncovered.  So we'll go through it that way, if that makes

25  sense.

1  A.    Sure.

2  Q.    So let's start with the kidnapping conspiracy.  And I will

3  refer to -- I know we've been saying JD 1, or John Doe 1, in

4  all the written materials.  I may just refer to him as

5  Abdul-Ghani, if that makes sense to you.

6  A.    Yes.

7  Q.    So who was Abdul-Ghani?

8  A.    Abdul-Ghani was a three-year-old who was the biological

9  son of Hakima Ramzi and Siraj Wahhaj.

10  Q.    And prior to -- well, at some point, was he taken in an

11  alleged kidnapping?

12  A.    Yes.

13  Q.    And prior to that, who did he live with primarily?

14  A.    Hakima Ramzi.

15  Q.    And that's his biological mother?

16  A.    Correct.

17  Q.    Did you learn of any evidence in your investigation that

18  the other Defendants knew that Abdul-Ghani lived primarily with

19  his mother?

20  A.    Through witness testimony, Hakima Ramzi lived with -- or

21  Abdul-Ghani lived with Hakima Ramzi at a different place than a

22  lot of the other Defendants.

23       THE COURT:  Would you spell the three-year-old's

24  name, please?

25       THE WITNESS:  A-b-d-u-l.  Ghani, G-h-a-n-i.  And then

1    last name Wahhaj, W-a-h-h-a-j.

2              THE COURT:  Thank you.

3    BY MR. HALL:

4    Q.   So you mentioned that through witness interviews and other

5    evidence, that you found evidence that the other Defendants

6    knew that Abdul-Ghani lived separately with his mother.  What

7    part -- where in the country was this?

8    A.   Atlanta, Georgia.

9    Q.   Did you uncover evidence that Abdul-Ghani needed special

10   care and medication?

11   A.   Yes.

12   Q.   And can you describe, just very generally, what that was?

13   A.   He was prescribed medication to assist with his seizures,

14   which was a birth defect called HIE, hypoxic ischemic -- I

15   can't remember exactly the medical term for it.  But he had a

16   prescription to help assist in preventing those seizures and

17   lessening the severity of those seizures.

18   Q.   And who primary provided the special care and medication

19   that he needed?

20   A.   Hakima Ramzi.

21   Q.   Did you uncover evidence that the Defendants knew that

22   Abdul-Ghani needed special care and medication?

23   A.   Siraj Wahhaj was aware of his prescription.  He did not

24   agree with the medicine, and because of that, due to witness

25   statements from individuals, Hakima Ramzi gave him half the

1   medication that was prescribed to him.  And several of the

2   witnesses also testified, I believe -- or through interviews,

3   discussed that he was not given medication while with Siraj

4   Wahhaj in New Mexico.

5   Q.   What about the other Defendants -- well, let me ask you

6   this.  Was it apparent from being around Abdul-Ghani that he

7   needed -- that he had medical issues?

8   A.   Yes.  I think everyone knew that he had a medical issue

9   from birth.

10  Q.   Can you describe very generally what the term ruqyah

11  means, as far as is relevant to this case?

12  A.   Ruqyah in western terms would be similar to an exorcism.

13  It could be conducted on an individual to rid them of jinns or

14  shaytans.

15  Q.   Was there any evidence that you uncovered during your

16  investigation that any of the Defendants took steps to learn

17  about ruqyah?

18  A.   Yes.

19  Q.   About when did that happen, at least as far as you're

20  aware?

21  A.   I believe it was October of 2017 that Siraj Wahhaj and

22  Hujrah Wahhaj went to the United Kingdom to attend, I believe

23  it was a seminar, from a sheik there who specializes in

24  conducting ruqyah.

25  Q.   And how does ruqyah play into the alleged conspiracy to

1    kidnap Abdul-Ghani?

2    A.   Well, so Jany Leveille believed that -- Jany Leveille and

3    Siraj believed that Abdul-Ghani was possessed by jinns and

4    shaytans and needed ruqyah to be conducted on him to rid his

5    body of that, and Jany Leveille had a revelation that they

6    needed to take the child in order to perform those ruqyahs.

7    Q.   Can you see that on your screen?

8    A.   Yes.

9    Q.   So I'm showing you what has been submitted as Government's

10   Exhibit 24.  At the top there, do you know who Captain Stubbs

11   and Detective Porter are?

12   A.   Yes.

13   Q.   Who are they?

14   A.   Police officers with Clayton County Police.

15   Q.   Is that -- what state is that?

16   A.   Georgia.

17   Q.   Did they have a role in the case somehow regarding the

18   kidnapping of Abdul-Ghani?

19   A.   Yes.

20   Q.   So based on the beginning part of this, do you recognize

21   what this document is?

22   A.   I believe it's a police report from them.

23   Q.   I'm scrolling down to Page 2, and you'll see the

24   highlighted portions there.  Can you just describe what is

25   being articulated in this police report based on the

1  highlighted parts?

2  A.    Would you like me to read the highlighted parts?

3  Q.    That works.

4  A.    "She advised that this is the result of his birth defect

5  and that Siraj thought that his son had the devil or jinn

6  inside of him.  Jamilla" -- who I believe is referring to

7  Jamilla Jihad -- "advised that Siraj believed that Hakima" --

8  believed to be Hakima Ramzi -- "was practicing black magic on

9  Abdul-Ghani.  Hakima then advised that Siraj returned from

10 London and that he did ruqyah on her son, Abdul" --

11 Abdul-Ghani.  "This was a result, also, that Siraj believed

12 that Abdul-Ghani had the devil in him, so he wanted to have the

13 jinn removed from him.  Jamilla advised that when Siraj Ibn

14 Wahhaj returned from London, that he had crazy ideas."

15         MS. FOX-YOUNG:  Your Honor, if we could just get the

16 Bates for the record, it'll help us track it.

17         THE COURT:  Sure.  Can you state that?

18         MR. HALL:  22389.

19 BY MR. HALL:

20 Q.    Who is Jamilla?

21 A.    Jamilla Jihad is a wife of Siraj Latif Wahhaj.

22 Q.    And who is that?

23 A.    The father of Siraj Ibn Wahhaj.  Siraj Latif Wahhaj is

24 located in New York and also has, I believe, a residence in

25 Atlanta Georgia, as well.

1  Q.   So is Jamilla Jihad like a stepmother in some ways, then?

2  A.   Yes.

3  Q.   To Siraj and any of the other Defendants?

4  A.   I believe so.

5  Q.   The other two Defendants being --

6  A.   Hujrah and Subhanah Wahhaj.

7  Q.   Okay.  So you touched on this briefly, but in addition to

8  Siraj Wahhaj's motivations and intent for taking Abdul-Ghani

9  from Hakima, was there evidence you uncovered of any other

10 Defendant who also wanted to have Abdul-Ghani taken away from

11 Hakima Ramzi?

12 A.   Through interviews and Jany's journal, Jany Leveille also

13 wanted to take Abdul-Ghani from his biological mother.

14 Q.   And what was Jany's reasoning?

15 A.   Well, when Hakima Ramzi became pregnant with Abdul-Ghani,

16 Jany Leveille also believed to be pregnant, as well.  After

17 some time, she I think it was stated as lost the pregnancy, but

18 Hakima Ramzi's pregnancy continued on and gave birth to

19 Abdul-Ghani.  There were statements that people would make, per

20 her journal, that people would make that Abdul-Ghani resembled

21 Jany Leveille.  And then Jany Leveille believed through black

22 magic that Hakima Ramzi stole Abdul-Ghani from her womb, and so

23 she believed the child to be hers.

24 Q.   Is this in addition to needing to get jinns or shaytans,

25 or exorcizing things out of Abdul-Ghani?  Did she share that

1   view with Siraj?

2   A.   Yes.

3   Q.   Was there evidence that you uncovered that the other

4   Defendants were aware of Siraj and Jany's reasonings for taking

5   Abdul-Ghani?

6   A.   Can you repeat the question?

7   Q.   Did you uncover any evidence that the other three

8   Defendants were aware of the reasoning that Jany and Siraj had

9   in taking Abdul-Ghani away from Hakima Ramzi?

10  A.   I believe there's statements from witnesses talking about

11  how they were aware that the family members, to include Hakima

12  Ramzi and Jamilla Jihad, had messaged Subhanah and others that

13  they would like to return the child to Hakima Ramzi, and that

14  Jany in her journals had written about the reasons for taking

15  Abdul-Ghani, which per some of the witnesses at the compound

16  was a well-known text.

17  Q.   Let me ask you this.  The other witnesses you referenced,

18  are these some of the children?

19  A.   Correct.

20  Q.   Were they aware of the reasoning and the basis behind why

21  Abdul-Ghani was taken?

22  A.   Yes.

23  Q.   I think you mentioned Jany's book --

24  A.   Yes.

25  Q.   -- that it also discussed the reasoning for this.

```
 1  A.    Yes.
 2  Q.    And was there evidence that you uncovered that the other
 3  Defendants were aware of the book?
 4  A.    Yes.
 5  Q.    Now, you mentioned this, I think, in terms of the online
 6  messages, but was there evidence that Subhanah, Hujrah, and
 7  Lucas Morton knew that Jany and Siraj were keeping Abdul-Ghani
 8  from Hakima Ramzi, that they knew that he had been taken away
 9  and he was being kept?
10  A.    Yes.
11  Q.    Was there any evidence that Subhanah, Hujrah, and Lucas
12  supported or helped Jany and Siraj keep Abdul-Ghani away from
13  Hakima Ramzi?
14  A.    Well, from Alabama to New Mexico, Lucas Morton, Subhanah
15  Wahhaj, and others transported Abdul-Ghani across state lines
16  to New Mexico.  Also, when talking to other family members
17  located in Georgia, who were asking to have the family return
18  Abdul-Ghani, several of them stated that the family was telling
19  lies and did not discuss where Abdul-Ghani was, or that they
20  were in possession of Abdul-Ghani.
21  Q.    Was there any evidence of what Subhanah, Hujrah, and Lucas
22  Morton's motivations or objectives might have been in assisting
23  Jany and Siraj?
24  A.    Well, per eyewitness testimony and her journal, Jany
25  Leveille was the leader of that group, being considered the
```

1    Biblical term of Mary, and she instructed others what to do

2    given that she'd receive messages from God and then would

3    translate them and give direction in that way, and the others,

4    per testimony and per her journal, would follow her direction.

5    Q.    So you're saying they believed -- are you saying that the

6    other three believed in Jany, or followed Jany?

7    A.    Correct.

8    Q.    And when you say per testimony, do you mean per witness

9    statements?

10   A.    Yes.

11   Q.    Just actually, how did Abdul-Ghani ultimately get taken

12   away from Hakima Ramzi?

13   A.    Jany Leveille, I believe, had a revelation that they

14   needed to take the child to conduct ruqyah, and so she

15   instructed Siraj Wahhaj to go to Hakima Ramzi's house and take

16   the child.  Siraj Wahhaj went to Hakima Ramzi's house and said

17   that he was going to take Abdul-Ghani to the park, and he never

18   returned.  He never returned Abdul-Ghani to Hakima Ramzi's

19   house, and instead brought Abdul-Ghani over to, I believe it

20   was where Jany was.

21   Q.    And after they had him over where Jany was, did they go

22   anywhere else in Atlanta with Abdul-Ghani, that you know of?

23   A.    I believe they went over to Hujrah's house, as well.

24   Q.    And so who all would have been there at Hujrah's house

25   once they had taken Abdul-Ghani?

1   A.   Hujrah and her daughter, and I believe Lucas Morton and

2   Subhanah were co-located there.  I can't say for sure at that

3   exact time.  And then the children, the remaining children of

4   Jany Leveille, Siraj, and Hujrah.

5   Q.   Now, is there any evidence that you uncovered where the

6   group you just mentioned at Hujrah's house became aware

7   directly of the fact that Hakima Ramzi wanted Abdul-Ghani back?

8   A.   There was messages from Hakima Ramzi trying to get in

9   contact with the group and with Siraj to return Abdul-Ghani,

10  and that he needed to be returned.

11  Q.   Did Hakima ever appear at Hujrah's house?

12  A.   I can't recall exactly.  I think there was a time that she

13  appeared, but I don't remember the date.

14  Q.   Sure.  Is there any evidence that you found that

15  Abdul-Ghani may have expressed a desire to return to his own

16  mom?

17  A.   There was a moment that he was -- he had mentioned that he

18  wanted to go home.

19       When you asked earlier about Hakima Ramzi, is this in

20  regard to the incident where she came with the police officer?

21  Q.   Yes.

22  A.   Yes, yes.

23  Q.   And that's responsive to my last question?

24  A.   Correct, yes.  Siraj Wahhaj, I think, opened the door

25  partially and discussed -- had conversations with the police

1  officer.

2  Q.   And what happened at the end of that interaction?

3  A.   Abdul-Ghani was not returned and the door was closed, and

4  I think Hakima Ramzi then had to file paperwork.

5  Q.   Did you find any evidence of the Defendants crossing state

6  lines with Abdul-Ghani after that?

7  A.   Yes.

8  Q.   Where did they go?

9  A.   First to Alabama.

10  Q.   And who went to Alabama?

11  A.   Siraj Wahhaj, Jany Leveille, Subhanah Wahhaj, Lucas

12  Morton, Hujrah Wahhaj, and then all their children,

13  collectively.

14  Q.   Was there any evidence that the Defendants, when they

15  left, expected -- or it seemed like they expected to be gone

16  for a long time?

17  A.   Well, they did pack a lot of their belongings with them,

18  and Hujrah disenrolled her child from school, saying there was

19  a family emergency and that her child would not be returning to

20  school, as well as bringing a box truck of items and at least

21  two other vehicles.

22  Q.   And to be clear, was the -- how did Abdul-Ghani get to

23  Alabama, in whose car?  Or who in the car was along with

24  Abdul-Ghani?

25  A.   Jany Leveille, Siraj Wahhaj, and her other children in a

 1  Ford Explorer.

 2  Q.   And why did they choose to go to Alabama?

 3  A.   Siraj Wahhaj had property there in Tuskegee, Alabama, or

 4  outside of Tuskegee, Alabama.

 5  Q.   And who else was already -- or who else was in Alabama?

 6  A.   I believe through witness statements that Lucas Morton and

 7  Subhanah Wahhaj had already departed and were there.

 8  Q.   Can you still see the screen?

 9  A.   Yep.

10  Q.   I'm pulling up what has been admitted as Exhibit 21.

11          MR. RAY:  Will you go ahead and give the Bates for

12  it, as well, when you pull these up?

13          MR. HALL:  Sure.  This one is 23531.

14  BY MR. HALL:

15  Q.   Do you recognize what this is?

16  A.   I do.

17  Q.   And can you describe generally what the document is?

18  A.   NYPD tracking online activity of the group and

19  communications they were having publicly with maybe a family

20  that was in Georgia and New York.

21  Q.   And do you know generally when this was put together?

22  A.   It appears to be August 13, 2018.

23  Q.   Is that before or after the Defendants were arrested?

24  A.   After.

25  Q.   So scrolling down to the second page here, there's a

1   bullet point that says:  "On December 5th, Hujrah tells her

2   daughter's school that her daughter would not be returning to

3   school because of a family emergency."  Is that what you were

4   referencing earlier?

5   A.    Yes.

6   Q.    Scrolling down to Page 8, it says:  "Also on December 5,

7   2017, Neemah Rashid created her Facebook profile and wrote in

8   her bio, 'This page was created to help find Abdul-Ghani.'"

9         Who is Neemah Rashid?

10  A.    The wife of Muhammad Wahhaj, who is the brother of Siraj

11  Wahhaj.

12  Q.    So the sister-in-law of Siraj Wahhaj?

13  A.    Yes.

14  Q.    And also Subhanah and Hujrah Wahhaj?

15  A.    Yes.

16  Q.    Now, here on Page 10, there's a yellow box around an entry

17  up from January 7th, 2018.  Are these, some of the statements

18  in there, what you referenced earlier in terms of some of the

19  Defendants making responses to online entreaties to bring

20  Abdul-Ghani back and rejecting them?

21  A.    Yes.

22  Q.    Some of it, at least?

23  A.    Yes.

24  Q.    And similarly here where it says January 8th, it notes

25  that Subhanah has blocked all the family, including Balkis.

1   Who is Balkis?

2   A.    Balkis is another wife of Siraj Latif Wahhaj.

3   Q.    And is she the mother of any of the Defendants?

4   A.    Yes.

5   Q.    Do you know -- if you don't know, it's all right, but do

6   you know who?

7   A.    Siraj Wahhaj.  I don't recall if she's the biological

8   mother of the others.

9   Q.    So around the time that some of these -- we're talking

10  about the Facebook page being created on December 5th about

11  Abdul-Ghani, the page that said this was created to help find

12  Abdul-Ghani.  Are you aware of whether there was also local law

13  enforcement involved in looking for Abdul-Ghani in Georgia?

14  A.    Yes.

15  Q.    And I think you mentioned this earlier, but which agency?

16  A.    Clayton County Police Department.

17  Q.    What steps are you aware of them taking to find

18  Abdul-Ghani around this time?

19  A.    They went to the house to speak to Siraj.  They also, I

20  believe in late December, spoke to Lucas Morton when he was

21  delivering a letter to Muhammad Wahhaj, and asked about the

22  whereabouts of Abdul-Ghani.  And then they continued to work

23  with the Taos County Sheriff's Office to try to locate

24  Abdul-Ghani in New Mexico.

25  Q.    And you mentioned earlier something about having to go to

1  the courts, or to get the courts involved.  Do you know if that

2  happened?

3  A.   Yes, it did.

4  Q.   What happened?

5  A.   I forget the legal term for it, but Hakima Ramzi got an

6  order to have the child returned, and there was a pickup order

7  for Siraj Wahhaj, as well, I believe.

8  Q.   Is it possible that the pickup order was for Abdul-Ghani,

9  and then an arrest warrant?

10  A.   An arrest warrant for Siraj Wahhaj, yes.

11  Q.   And general timeframe, do you know when that all happened?

12  A.   December 2017.

13  Q.   Was there any effort or concern by Hakima Ramzi or any

14  other family members regarding the -- well, was there any

15  concern expressed about the safety of Abdul-Ghani at this time?

16  A.   Yes.  I believe there are statements from Jamilla Jihad

17  saying that she was concerned because the child needed his

18  medication, and the same with Hakima Ramzi through interview,

19  she had the same concerns, as well.

20  Q.   And do you know if those concerns were made to the

21  Defendants, or made known to the Defendants?

22  A.   Yes.  I believe either publicly or through direct

23  messages.

24  Q.   Were there direct, like, text message communications or

25  efforts by any family members at this time?

1  A.   Yes.

2  Q.   Saying basically what you just said --

3  A.   Yes.

4  Q.   -- about the medication?

5       Did the Defendants -- you mentioned this a little bit, but

6  did the Defendants respond to these concerns?

7  A.   I believe some of them called them lies about Abdul-Ghani,

8  and then some of them didn't respond to any messages by family.

9  But there were several that responded saying that the

10 allegations against them were lies.

11 Q.   And was there any evidence that you found during your

12 investigation that any of the Defendants responded with

13 something along the lines of, yes, you're right, we should

14 bring him back, or we should give him his medication?

15 A.   There were statements, I think it might have been in

16 Jany's journal, where Siraj and Jany discussed not returning

17 Abdul-Ghani because the jinns were not removed from his body

18 yet, and then when Clayton County Police asked Lucas Morton

19 about the whereabouts of Abdul-Ghani, he answered in a way that

20 was evasive or did not answer the question.  And, yes.

21 Q.   Sure.  And we'll get to that event, as well.

22      I guess I'm just asking, was there any evidence to the

23 counter, in terms of the Defendants expressing agreement that,

24 oh, we should take him back?

25 A.   Not that I can recall.

1  Q.    I'm pulling up what is Exhibit 22.  Are you able to see

2  that?  That page is 23391.

3       Do you recognize what this document is?

4  A.    I do.

5  Q.    Can you describe briefly what it is?

6  A.    It was an interview of Nina and Jessica Morton, I believe

7  was their last name.  Family of Lucas Morton.  I think it's the

8  mother and sister, I believe.

9  Q.    If you go down to Page 3, the highlighted area, can you

10  describe what is being articulated there?

11  A.    Sure.  "When Jessica was speaking with Lucas sometime in

12  approximately November or December of 2017, she told Lucas all

13  about what blank had said about why Ibn took the boy away from

14  his mother.  Jessica heard Subhanah in the background say that

15  blank was lying and that Jessica and Nina should not believe

16  her."

17  Q.    And to be clear, who is Ibn in this?

18  A.    Siraj Wahhaj.

19  Q.    So it says November or December 2017.  Based on that

20  timing, can you place where the Defendants may have been,

21  geographically?

22  A.    Depending on the timing exactly in December, it could be

23  in Georgia, it could be in Alabama.  But, yes.

24  Q.    Okay.  Probably before they were in New Mexico, fair to

25  say?

1  A.    I would say that's a fair assessment.

2  Q.    Okay.  So is this -- you had mentioned some of these

3  responses online about calling these things lies.  Is this

4  similar, or is this what you were also referring to in terms of

5  evidence that the Defendants were, some of the Defendants

6  were --

7  A.    Yes, similar statements.

8  Q.    -- keeping the family away, keeping whoever is looking for

9  Abdul-Ghani away?

10  A.    Sure.

11  Q.    Okay.  So backing up just a little bit, is there a point

12  where the Defendants left Alabama with Abdul-Ghani?

13  A.    Yes.

14  Q.    And did you find evidence of a car crash in Alabama?

15  A.    Yes.

16  Q.    Can you describe, just generally, what happened there?

17  A.    Siraj Wahhaj, I believe, was driving a silver Ford

18  Explorer with Jany Leveille and their children located in the

19  Ford Explorer.  It was late at night, and per Jany's journal, I

20  believe, it was documented that he maybe had dozed off or

21  checked an e-mail at that moment, and went off the road,

22  causing the car to have a pretty severe accident.  Several of

23  the individuals in that car wreck were transported to the

24  hospital.  Farroll --

25  Q.    Who's Farroll?

1   A.   Farroll is the oldest son of Siraj Wahhaj and Jany

2   Leveille.   Farroll, Siraj Wahhaj, and it appears, per body cam

3   footage, that Abdul-Ghani was also there, remained at the car

4   crash scene while the others were transported to the hospital.

5   Q.   Just to be very technical, is Farroll the biological son

6   of Siraj Wahhaj?

7   A.   No.

8   Q.   Just Jany Leveille?

9   A.   Correct.

10   Q.   I pulled up on the screen Exhibit 17.   Based on the

11   description of what is in here -- also, that is Bates number

12   23335 -- are you familiar with what this document is?

13   A.   Yes.

14   Q.   Can you describe what it is, just very briefly?

15   A.   It's a Suspicious Activity Report from Alabama State

16   Troopers regarding the accident and some of the actions that

17   were taken post-accident.

18   Q.   And then starting on Page 3, there's the name Captain

19   Stubbs again.   So are you able to recognize what this document

20   is that's entitled Investigative Summary?

21   A.   Yes.

22        THE COURT:   What was the exhibit number on that,

23   again?

24        MR. HALL:   17.

25        THE COURT:   Thank you.

1    BY MR. HALL:

2    Q.   So if we go down to Page 4, can you just kind of describe

3    what is in the highlighted statements there, the highlighted

4    area there?

5    A.   Sure.  So Siraj Wahhaj is speaking to an Alabama State

6    Trooper, and Wahhaj stated to him that they were traveling from

7    Georgia to New Mexico to go camping.  The Trooper advised that

8    while he was conducting his crash investigation, he did not see

9    any camping equipment in the vehicle or any camping equipment

10   that had been thrown from the vehicle.  The Trooper advised

11   that he did observe several canned food items, cooking spices,

12   and clothes, but no camping equipment.

13   Q.   And I should be clear, based on the first line there, are

14   you able to tell when this crash happened?

15   A.   December 13, 2017.

16   Q.   Now, scrolling down to the bottom of Page 4, what kind of

17   statements are being described here?

18   A.   Mr. Wahhaj had stated to the Trooper that they had just

19   moved to Tuskegee, Alabama.  He did not know what their current

20   address was, only that it was on Shady Road off of U.S. 80.

21   The Trooper advised that he did some research on Shady Road and

22   he was unable to locate such address or area.

23       The Trooper advised that Mr. Wahhaj stated to him that he

24   worked for a company that did executive security and the name

25   of the company was Omewali St. Jude's Solutions.  The Trooper

1  advised he did some research for the company and searched the

2  e-mail address that Siraj Wahhaj provided, which was the e-mail

3  that's listed here.  The Trooper advised that he was unable to

4  find the website for that company.

5      The Trooper advised that Mr. Wahhaj provided him with a

6  phone number that he did not know from memory, because he

7  stated that he had just gotten a new phone.  The phone number

8  Mr. Wahhaj provided was 334-400-8659.  The Trooper advised that

9  Mr. Wahhaj was in possession of two cell phones that he

10  observed.

11  Q.   So based on the report here and based on just your

12  understanding of the case and your investigation, what is

13  significant about these statements?  Why would they be

14  suspicious requiring a Suspicious Activity Report?

15  A.   Well, he didn't really disclose the nature of why they

16  were going to New Mexico, or the reasons maybe that they had

17  left Georgia or Alabama, and I think the Suspicious Activity

18  Report was also in relation to his behavior regarding the

19  firearms that were in the car that the accident occurred in,

20  and that he would not move away from the vehicle and was very

21  concerned that those firearms would be taken from him.

22  Q.   Kind of what you're describing there, is that what's

23  encapsulated partially at the bottom of Page 5 in the

24  highlighted language, that talks about Mr. Wahhaj not wanting

25  to leave the vehicle?

1   A.   Would you like me to read it?

2   Q.   Sure.

3   A.   "Mr. Wahhaj was adamant about not leaving his vehicle.

4   Trooper advised that Mr. Wahhaj's behavior was very peculiar.

5   He advised that Mr. Wahhaj would not let his two male juveniles

6   that were still on the scene sit in his patrol vehicle and it

7   was cold outside.  Mr. Wahhaj wanted to be near his vehicle

8   constantly and kept watch over it.  Trooper advised that

9   Mr. Wahhaj was in possession of five firearms that he was aware

10  of, which would consist of three rifles and two handguns."

11  Mr. Wahhaj had also stated that he had a couple of rifles in

12  it, and I'm assuming that means the vehicle.

13  Q.   Yes.

14  A.   "Mr. Wahhaj repeatedly stated that he owned the firearms

15  legally and that he had a permit to carry outside of Georgia.

16  Trooper advised that Ms. Wahhaj continuously was watching over

17  the vehicle and making sure he was close to it at all times.

18  Mr. Wahhaj seemed to be very concerned about his weapons and

19  stated several times that they were his property and that he

20  owned them legally.

21      "Trooper advised that after the wrecker arrived and began

22  loading the vehicle, Mr. Wahhaj began to take his weapons and

23  other gear out of the vehicle.  Trooper advised that Mr. Wahhaj

24  became upset.  He thought the wrecker driver was going to take

25  his property to the wrecker yard and he would not be able to

1  receive it.  Mr. Wahhaj then took a video of him and the

2  wrecker driver on his cell phone.  Trooper advised that

3  Mr. Wahhaj was very adamant that he was going to take his

4  weapons and gear."

5  Q.   Now, you can stop there for now.  Just looking at Page 8,

6  did the Trooper in Alabama talk to any of the other Defendants

7  that night?

8  A.   Yes.  Jany Leveille.

9  Q.   And can you describe what the highlighted portion there

10 says, and what you know about Jany Leveille's response to the

11 Trooper?

12 A.   "Trooper advised that Ms. Leveille stated that they had

13 not moved to Tuskegee, Alabama, and that they only stayed there

14 overnight.  Trooper stated that Ms. Leveille stated that she

15 and Mr. Wahhaj were not legally married.  Ms. Leveille advised

16 that they were traveling from Georgia to New Mexico to see

17 Mr. Wahhaj's brother-in-law."

18 Q.   Now, let me scroll back up a little bit before we do that

19 on Page 7.  After the crash, what happened with the Defendants

20 immediately after, in terms of that --

21 A.   So I think the Trooper mentioned in his report that Siraj

22 Wahhaj was on his phone quite a lot, and soon after, Lucas

23 Morton showed up in a box truck that was towing a trailer, I

24 believe, and then they loaded all of the belongings from the

25 car wreck through the -- what would you call it?  The portal

1  through the cab of the box truck.  They did not want to open

2  the rear door of the box truck.

3  Q.   And so after that, who else got into the box truck?

4  A.   Siraj Wahhaj, believed to be Farroll, and Abdul-Ghani got

5  into the box truck with Lucas Morton and Subhanah's family.

6  Q.   And then did anybody else get in the box truck after that?

7  A.   I think it's unclear if Hujrah was there in the box truck

8  at the time, or if she was still in her personal vehicle that

9  was later found in Tennessee.

10  Q.   So at some point, did the Defendants all leave together

11  from Alabama?

12  A.   Yes.

13  Q.   And where were they all when they left Alabama?  Like, how

14  did they travel?

15  A.   In a caravan, or in the box truck heading west towards New

16  Mexico.

17  Q.   Now, before or around the time that they were leaving, do

18  you have any evidence who articulated or decided they should

19  all go from Alabama to New Mexico?

20  A.   Yes.  So they were in Alabama, per a minor's witness

21  statement, they were in Alabama for approximately two weeks,

22  and that it was rainy and very cold.  But per Jany's journal or

23  her book, she described that the land was cursed, and so they

24  decided from there to, per Jany's direction, go to Lucas

25  Morton's land in New Mexico.

1   Q.   So to be clear, Jany basically decided it?

2   A.   Yeah.  I think it's unclear if it was two weeks, which

3   came from a minor, or a few days.

4   Q.   Yeah.  When is one thing, but ...

5   A.   Sure.

6   Q.   Was there any evidence at that time, or at any time in

7   your investigation, that any Defendant made any statement or

8   any gesture at this point to the effect of, no, let's not go to

9   New Mexico, or let's go back home to Georgia and return

10  Abdul-Ghani?

11  A.   There's no evidence of that.

12  Q.   Now, is there evidence that the Defendants did all arrive

13  in New Mexico together?

14  A.   Yes.

15  Q.   And they all arrived in Lucas Morton's white box truck; is

16  that right?

17  A.   From what we know.

18  Q.   Do you know approximately when they arrived there?

19  A.   December of 2017, maybe mid to late December of 2017.

20  Q.   And when they arrived in New Mexico, did the Defendants

21  continue to keep and conceal Abdul-Ghani from his mother?

22  A.   There's no evidence that they told Hakima Ramzi or other

23  family members where Abdul-Ghani was, or where they were in

24  particular.

25  Q.   Was there any evidence that Abdul-Ghani died at some

1   point?

2   A.   Yes.

3   Q.   Do you know approximately when?

4   A.   Per the book that Jany had written, December 24th is the

5   date that she had put down as when his death was, and per other

6   photos that were recovered and digital evidence, it was most

7   likely before January of 2018, I believe.

8   Q.   And who was there when Abdul-Ghani died?

9   A.   Per witness statements, Siraj Wahhaj was conducting ruqyah

10  on Abdul-Ghani in the trailer on the compound.

11  Q.   Sorry; in the trailer on the compound?

12  A.   Where all the other, Subhanah Wahhaj -- where all the

13  other Defendants and their families were staying.

14  Q.   And do you know from your investigation what the

15  Defendants' reaction was to Abdul-Ghani's death?

16  A.   I believe Subhanah and Hujrah were both told by Jany about

17  what had happened, and one went back to doing laundry and the

18  other kind of smirked and went about doing their chores, per

19  what Jany Leveille had documented in her book.  And I think

20  Jany also had conversations with her brother, Yusuf Saber, in

21  Haiti that nobody was sad, because he died while the Qur'an was

22  being recited on him.

23  Q.   Did anyone seek medical attention when it was happening?

24  A.   No.

25  Q.   Did anyone call 911?

1    A.    No.

2    Q.    Did any of them -- did any of the Defendants do anything

3    to advise his mother, or any other family or friends in Atlanta

4    or elsewhere, that Abdul-Ghani had died?

5    A.    No.

6    Q.    What did the Defendants do with Abdul-Ghani's body when he

7    died?

8    A.    They, I believe, left him in the trailer for a period of

9    time, to observe him, and then he was stored underneath -- in a

10   lot of camper trailers, they have a bed in the bedroom that

11   lifts up where there's storage, and I believe he was stored

12   there for a period of time, as well.

13         Per witness statements, he began to smell, and so they

14   wrapped him -- they washed him and wrapped him in a tarp, and

15   put him inside of a cave that they had -- so there's about a

16   100-foot tunnel that was dug adjacent to the trailer, and

17   within that tunnel there was a cave that was dug out in which

18   they stored the body, because it was cooler, to kind of keep it

19   from decomposing.

20   Q.    The tunnel that you mentioned, was that naturally formed,

21   or how did that come to exist?

22   A.    No.  Lucas Morton and Farroll and I believe Jamil were

23   responsible for digging that tunnel, which had at least, if I

24   can recall, two compartments.  One was like a refrigerator

25   storage area, and one was a compartment in which Abdul-Ghani

1   was stored.

2   Q.   And you mentioned Jamil.  Who is Jamil?

3   A.   Jamil is the second oldest boy of Jany Leveille and his

4   biological father, Michael Louis-Jacques.

5   Q.   So after Abdul-Ghani died, how long did the Defendants

6   keep his body with them, either in the trailer or in the

7   tunnel?

8   A.   Until the body was discovered on August 6th, 2018.

9   Q.   While the Defendants were in New Mexico, did you find

10  evidence of any Defendant ever leaving the compound to go speak

11  to anyone on the outside?

12  A.   In late December, I believe December 31, 2017, Lucas

13  Morton delivered a handwritten letter by Jany Leveille to

14  Muhammad Wahhaj in Georgia.

15  Q.   And we will come back to the contents of that letter in a

16  bit, but while Lucas Morton was in Georgia, did he have any

17  encounters with law enforcement?

18  A.   Yes.

19  Q.   And which law enforcement agencies or persons, if you

20  know?

21  A.   I believe it was Clayton County PD.

22  Q.   I'm opening up, or pulling up what is Exhibit 23.  It's

23  starting with Bates 22613 on your screen.

24  A.   Yep.

25  Q.   So again here you see the names Detective Porter and Scott

1   Stubbs.  Are they the same Clayton County Police Department

2   detectives who were investigating the Abdul-Ghani kidnapping?

3   A.   Yes.

4   Q.   So do you recognize what this document entitled

5   Investigative Summary to be?

6   A.   Yes.

7   Q.   What is it?  Describe for us what it is.

8   A.   It's a summary of the conversation that Captain Stubbs had

9   with Lucas Morton regarding the whereabouts of Abdul-Ghani.

10  Q.   And can you articulate or summarize, or if you feel more

11  comfortable reading the highlighted part, however you feel, but

12  what was the nature of the conversation between Lucas Morton

13  and Captain Stubbs?

14  A.   It was questioning regarding the whereabouts of

15  Abdul-Ghani, but I'll read it for the Court.

16       "Captain Stubbs placed Lucas Morton on the phone.  I asked

17  Morton where Siraj Ibn Wahhaj and Abdul-Ghani Wahhaj were, at

18  which time he stated, 'I don't know.'  I then informed Morton

19  that I know he picked the family up from the accident scene in

20  Alabama.  I asked Morton where he took the family, to which he

21  stated, 'I don't remember.'  I then advised Morton that the

22  family told police that they were going to New Mexico for a

23  camping trip.  I informed him of the fact that I know that he

24  had his mail forwarded to New Mexico.  Finally I advised Morton

25  that if I find that he had concealed the location, or assisted

1  Siraj Ibn Wahhaj in any way that interferes with my

2  investigation, I will charge him locally as well as federally,

3  if applicable.  Morton simply responded, 'Okay.'

4       "Captain Stubbs later advised that Morton refused to give

5  him an address or phone number.  Captain Stubbs also advised

6  that he intercepted a letter that was intended to be delivered

7  by an individual by the name of Muhammad Wahhaj, brother of

8  Siraj Wahhaj, believed to be written by Jany Leveille."

9  Q.   And then if we scroll down to Page 3, this is a report

10 by -- can you tell just from the entry there?

11 A.   Yes.  December 31, 2018.

12 Q.   And is this from the Clayton County Police Department

13 Detective Stubbs?

14 A.   Yes.

15 Q.   So I think you mentioned earlier that the first report was

16 documenting a phone conversation between the law enforcement

17 officer and Lucas Morton.  How about this one?  Do you

18 understand -- or can you describe what's happening in this one?

19 A.   It appears that Clayton County PD had made physical

20 contact with Lucas Morton and they're advising him why they

21 were questioning him about the disappearance of Siraj Ibn

22 Wahhaj and Abdul-Ghani Wahhaj.

23      "Lucas Morton showed no reaction other than continuing to

24 look at me.  I then asked Mr. Morton if he knew the whereabouts

25 of either person.  He advised, no, he did not.  I then advised

1  Mr. Morton that I had information that he had picked up Siraj

2  Ibn Wahhaj and Abdul-Ghani and other parties on December 13,

3  2017, after being involved in an accident.  I then asked him

4  where they were at.  Morton advised that he did not know.

5       "I advised Mr. Morton that Abdul-Ghani was missing and he

6  had a pickup order to appear before the courts, and I needed to

7  know where he was at.  I then asked Mr. Morton for his phone

8  number so I could get in touch with him if he had any further

9  questions.  Morton advised, no, he did not want to give me his

10 phone number.  I then gave Morton my phone number along with my

11 cell phone on it, for him to contact me should he learn the

12 location of Siraj Ibn Wahhaj or Abdul-Ghani Wahhaj.  Morton

13 took my card and he then was released from the location."

14 Q.   So to just sort of distill this down in plain terms, is

15 this before or after Abdul-Ghani had been taken away?

16 A.   After.

17 Q.   Is this before or after Abdul-Ghani had died, based on

18 what you know?

19 A.   Based off what we know in the journal, it would have been

20 after.

21 Q.   Based on the contents of the letter that Lucas Morton

22 provided, does it also help you to understand whether

23 Abdul-Ghani had died already?

24 A.   Yes, because the letter refers to Isa coming back in

25 approximately four months.  Isa is the Islamic word for Jesus,

1    and per Jany's book, as well as witness statements from other

2    individuals, Abdul-Ghani was reportedly to be Isa and would be

3    resurrected as Isa.

4    Q.    So based on your understanding of the facts at this point

5    and your entire understanding of the investigation, were Lucas

6    Morton's statements that he did not know where John Doe or

7    Abdul-Ghani was true or false at this point?

8    A.    False.

9    Q.    And in your training and experience, and in terms of this

10   case, why would Lucas Morton give false statements to the

11   police officers?

12   A.    He knew that Abdul-Ghani was being sought, and he was

13   advised by Clayton County PD that there was a pickup order for

14   Abdul-Ghani Wahhaj, and knowing if they -- he knew that they

15   were being sought after, and by not telling where they were was

16   concealing the nature of where Abdul-Ghani was or what had

17   happened to him.

18   Q.    Just fast-forwarding a little bit, were there any other

19   occasions where Lucas Morton had interactions with law

20   enforcement prior to the Defendants arrests?

21   A.    Yes.

22   Q.    On or around June 30, 2018?  Sound right to you?

23   A.    Yes.

24   Q.    Do you know -- can you describe what happened on that

25   occasion?

1    A.    I believe it was New Mexico State Police that had gone

2    onto the property on Castillo Meadows in Amalia and was

3    speaking to Lucas Morton regarding the property dispute between

4    Jason Badger and Lucas Morton, and Lucas Morton was asked by, I

5    believe, a State Trooper or State Police Officer if they were

6    the only ones staying at the property, and Lucas Morton stated

7    that only him and his family with Subhanah Wahhaj were on the

8    property.

9    Q.    Was that true, that only him and Subhanah and his kids

10   were living at the property?

11   A.    No.

12   Q.    Who else was living there at the time?

13   A.    Jany Leveille, Hujrah Wahhaj, Siraj Wahhaj, and their

14   minor children.

15   Q.    And was Abdul-Ghani still -- his body still at the

16   compound at that point?

17   A.    Correct.

18   Q.    In your training and experience, is it the same reasons

19   why Lucas Morton gave false answers as when he was in Georgia?

20   A.    Yes.  And I think around this time, as well, per Jany's

21   book, they believed that the FBI was looking for them, as well.

22   I believe in her book towards this timeframe, I can't be

23   exactly sure, they believed the FBI was looking for them, so

24   Siraj Wahhaj and Jany Leveille would not come above ground.

25   The trailer was partially buried and covered by a tarp, and

1   they would not come above ground so as to not be spotted.

2   Q.   Was there any evidence on this occasion in this

3   interaction of Lucas Morton's demeanor and behavior in terms of

4   whether the police officer could come onto the property or not?

5   A.   I believe he told the police officer he could not enter

6   the property.

7   Q.   Just for the Court -- well, how do we know about Lucas

8   Morton's statements?  Where were those captured?

9   A.   I believe there was an audio recording device on the

10  police officer, and then they had a camera on the dashboard of

11  the patrol vehicle.

12          MR. HALL:  And we're not going to bring up those up,

13  but for the Court's awareness, those are Exhibits 33 and 34.

14  BY MR. HALL:

15  Q.   So when did law enforcement finally actually find and then

16  search the Defendants' compound, enter the compound?

17  A.   On August 3rd, 2018, Taos County and New Mexico State

18  OSI officers or agents entered the property and conducted a

19  search and I believe an arrest warrant, where they arrested

20  Siraj Wahhaj and Lucas Morton.

21  Q.   Leading up to that day on August 3rd, had there been any

22  statements that you were aware of, or any evidence that would

23  suggest that any of the Defendants had attempted to return

24  Abdul-Ghani, or tell anyone where he was?

25  A.   There's no evidence of that.

1   Q.   Did the law enforcement find Abdul-Ghani on August 3rd?

2   A.   No.

3   Q.   Were any of the Defendants arrested on that day?

4   A.   I believe Siraj and Lucas Morton were.

5   Q.   So if that's the case, then three of the Defendants were

6   not arrested; is that correct?

7   A.   Correct.

8   Q.   At that time on August 3rd, did any of the Defendants

9   tell any law enforcement person where Abdul-Ghani's body was?

10   A.   No.  Several of the Defendants on that day to either the

11   FBI and myself, or to local police and I believe it was CYFD,

12   stated that the last time -- generally stated that the last

13   time they saw Abdul-Ghani was in Georgia.

14   Q.   And is that true or false, that statement.

15   A.   That's false.

16   Q.   At the time, was there any evidence in your investigation

17   that the Defendants had instructed others not to talk about

18   where Abdul-Ghani was?

19   A.   Per interviews of the minor children, they were instructed

20   to not talk to police about Abdul-Ghani or they would all go to

21   jail.

22   Q.   I'm bringing up what is Exhibit 27c, and the Bates is

23   23720.  On Page 2, can you read -- or just describe what's

24   happening in this highlighted portion.

25   A.   Sure.  "I inquired whether there were more children in the

1  area, and she told me, 'Yes.'  I asked how many there were and

2  where they were located.  That's when an unidentified Black man

3  began to yell at her to stay quiet.  This man was peeking from

4  beyond the fortifying walls where he was in custody of deputies

5  and agents on the scene.  Sheriff Jerry Hogrefe was with

6  deputies and agents and directed one of the deputies to escort

7  the aforementioned male to a patrol car as he was yelling and

8  causing a disruption."

9  Q.   And based on what you know about what happened that day

10 and where the different Defendants were, are you able to

11 identify or understand who the unidentified man was?

12 A.   I believe that to be Siraj Wahhaj.

13 Q.   And where it says here that he was yelling at her to stay

14 quiet, do you know who "her" was?

15 A.   Based on the way it's written and where individuals were

16 arrested on the compound, it is likely to be Subhanah Wahhaj.

17 Q.   Could it have been one of the children?

18 A.   It could have been.

19 Q.   Do you see where it says here, "Communicated with one of

20 the female children who apparently was the oldest."

21 A.   There's three female children who were all approximately

22 eight years old at the time.

23 Q.   So is this the additional evidence that you were

24 referencing about the Defendants instructing others not to say

25 anything about Abdul-Ghani?

1  A.   This is in addition to statements that were obtained from

2  the children later by the FBI.

3          THE COURT:  And I missed this exhibit number.

4          MR. HALL:  Yes, Your Honor.  27c.

5          THE COURT:  27c, thank you.

6  BY MR. HALL:

7  Q.   So between August 3rd and August 6th, was Abdul-Ghani

8  found?

9  A.   On August 6th.

10  Q.   On August 6th?  Before then not?

11  A.   No.

12  Q.   At that time, did the three female Defendants who had not

13  yet been arrested, and I think you mentioned this, but just to

14  be clear, did they make any statements about the location of

15  where Abdul-Ghani was?

16  A.   No.  They -- well, yes.  They were questioned by the FBI,

17  to include myself, as well as local CYFD and I believe police,

18  and they mentioned through various different statements that

19  they had not seen him since last Eid celebration, or the last

20  time they saw him was in Georgia.

21  Q.   What is significant to you about the collective refusal to

22  say where Abdul-Ghani was?

23  A.   That they were obfuscating where Abdul-Ghani was, and the

24  last time that they saw him, they all had similar statements

25  regarding the whereabouts of Abdul-Ghani.

1   Q.    And so where was Abdul-Ghani ultimately found?

2   A.    In a cave that was located in a tunnel that was adjacent

3   to the trailer on the compound in Amalia, New Mexico.

4   Q.    So I think we'll transition, start to transition into two

5   of the other conspiracies now.  This last question sort of

6   starts that transition, and so I just want to ask you, apart

7   from I think what would be a logical understanding of avoiding

8   detection or not getting in trouble, was there any other reason

9   why the Defendants who were not yet arrested -- so the three

10  female Defendants -- would want to prolong Abdul-Ghani's

11  concealment and not being found?

12  A.    Sure.  Per Jany's book and statements from the children,

13  that Abdul-Ghani would be resurrected as Isa -- Jesus -- and

14  once he was resurrected, he would go to corrupt institutions,

15  those institutions being the education system, the banking

16  system, law enforcement, military, FBI and CIA, and change

17  those institutions, or try to convert those institutions, by

18  ways of Jany, Isa -- or Abdul-Ghani -- Siraj and Farroll going

19  to these institutions and, in essence, trying to get them to

20  convert to their ideology, and if they did not convert, they

21  would be executed or captured.

22  Q.    So --

23  A.    So to answer your question, at that time from August 3rd

24  to August 6th, I believe Jany had mentioned in one of her

25  books, or maybe it was a message to her brother, that he would

1  be resurrected in August of 2018, and so the potential or the

2  possibility was that they were thinking that that could occur.

3  Q.   So what you're saying is at that time in August, up to

4  August 6th, there was still -- is it fair to say that there was

5  still a belief by the Defendants that this event, this massive

6  event, was potentially imminent?

7  A.   Yes.

8  Q.   And obviously in your investigation, the body of

9  Abdul-Ghani, himself, would need to be not found in order for

10 that to happen.  Is that what you've kind of come to conclude,

11 or not?

12 A.   Possibly.

13 Q.   Possibly, all right.

14      So let's move on to the other conspiracies that you had

15 mentioned earlier and investigated.  We'll just call these the

16 2339(a) and the 1117 conspiracies.

17 A.   Sure.

18 Q.   Can you describe, just generally, what your understanding

19 of the terms material support, or the term material support,

20 means in the 2339(a) statute?  What kind of things?

21 A.   Sure.  Providing financial aid, expertise, advising,

22 housing, logistics to a group.

23 Q.   Does providing personnel?

24 A.   Personnel, yes.

25 Q.   Does personnel include providing yourself?

1  A.    Yes.

2  Q.    Now, did you find in your investigation any evidence that

3  indicated the existence of an agreement by the Defendants to

4  provide some of those things you just mentioned, some of those

5  material support things, to prepare for the killing or

6  attempted killing of federal officers?

7  A.    Yes.

8  Q.    Did you find evidence of an agreement by at least some of

9  the Defendants, and others not charged at the compound, to

10  murder federal officers or employees?

11  A.    I'm sorry, can you repeat that question?

12  Q.    Yes.  Did you find evidence of an agreement between some

13  of the Defendants and potentially others at the compound to

14  murder federal officers and employees?

15  A.    Yes.

16  Q.    So let's talk about some of that evidence.  I'm not going

17  to go through the whole story again.  You've laid out a lot of

18  the kind of time-line.  But you mentioned earlier that Lucas

19  Morton picked up all the Defendants and their children in

20  Alabama after the car crash, in addition to having Subhanah and

21  their children with him, right?

22  A.    Yes.

23  Q.    Was there anything about that event -- you mentioned this,

24  I think, but was there anything about that event that was also

25  significant not only to the kidnapping conspiracy, but also to

1  the 2339(a) and 1117 conspiracies, in terms of items that were

2  found?

3  A.   There were several weapons that were found and transported

4  from one vehicle to Lucas Morton's vehicle, and in particular,

5  through the cab of the box truck so as to not open the rear

6  door of the box truck.

7  Q.   Was there anything besides just firearms?

8  A.   Ammunition.

9  Q.   And any other --

10  A.   I think the State Trooper had listed that there was body

11  armor.  Per what we found in the search warrant, it appeared to

12  be chest rigs, things that you carry magazines in for use in a

13  -- for carrying magazines around.

14  Q.   And you mentioned this just a minute ago, but how did

15  Abdul-Ghani play a role in these conspiracies?  What was his

16  role?

17  A.   His role was to be Isa and he would be the messenger,

18  along with Jany, and they would go to these corrupt

19  institutions.  Siraj was supposed to be a protecter or

20  enforcer, along with Farroll, and Jamil also was taught in

21  defensive and offensive tactics while being at the compound.

22      So his role would be to go to these institutions and try

23  to convert these -- deliver the message to these institutions.

24  And if they did not believe or tried to hurt Jany or Siraj,

25  that a signal would be given by Siraj, either one or two being

1  the signal -- I think it was unclear per the witness statements

2  whether two was trouble, or one -- and that Farroll and Siraj

3  would then enter into a combat or tactical plan.

4  Q.   Now, just getting back to Abdul-Ghani, specifically, and

5  also kind of the description of the agreement or the

6  conspiracy, was that described anywhere in any of the evidence

7  that you found, in writings or anything?

8  A.   It was in Jany's writings, as well as it came from witness

9  statements from the minors, as well.

10 Q.   And what writings particularly are you thinking of?

11 A.   She has a book, a three-part book.

12 Q.   And what kind of things did the book provide or say?

13 A.   It had an ideological belief.  It had a system of how one

14 would discipline, how discipline would be carried out.  It had

15 kind of an historical event of how they came to New Mexico and

16 the reasons of them being there.  The roles that defined each

17 defendant, and future roles, I believe, for other individuals

18 that were not located at the property.

19 Q.   Exhibit 4, Bates Number 1157, scrolling all the way down,

20 on Page -- I guess I would say 97 of the exhibit.

21 A.   Yes.

22 Q.   Do you see this on the screen?

23 A.   Yes.

24 Q.   Can you just describe what this list, or these names kind

25 of correspond to?

1  A.   It has names of some of the Defendants, as well as the

2  brother of Jany Leveille, and assigns them titles that are

3  known in Biblical texts.

4  Q.   And what's the purpose, as far as you read through -- from

5  your familiarity with the book, what's the purpose of listing

6  these names?

7  A.   It gives them a title, and I think later on in the book,

8  it gives them roles, who was assigned to doing what on the

9  compound, or in the future objectives that the group had.

10 Q.   Did you find evidence in your investigation that the

11 Defendants kind of adopted or agreed with or took to these

12 roles or these historical titles given to them?

13 A.   Per the titles given to them and the statements from

14 witnesses and the book, it would seem to align with the roles

15 that they were given.

16 Q.   And they accepted those?  I guess that's what I was

17 asking.

18 A.   It would seem so.

19 Q.   Now, on Page 99, the top of the page there, can you just

20 read the first three lines, that first paragraph?

21 A.   First paragraph, two sentences?

22 Q.   Yes.

23 A.   "The following is a list of laws that were sent by Allah.

24 Please do your best to follow with humility and implement what

25 we experienced in order to facilitate a smoother journey."

1  Q.   And then if we go down to Pages 101 and 202, there appears

2  to be like a break in the book.

3  A.   Sure.

4  Q.   Can you describe what the break is and what the next,

5  like, following section is about?

6  A.   It's moving to a section regarding how married couples

7  relationship should be.

8  Q.   Now, how would you characterize these final parts of the

9  book?  Would it be fair to say that there's rules to follow?  I

10  mean, you just said there's rules, but is that your

11  understanding in the whole book --

12  A.   Yes.

13  Q.   -- that that's the purpose of these?  Is it fair to say

14  it's guidance to followers?

15  A.   Yes.

16  Q.   Did you find any evidence that the others, the others at

17  the compound, including the Defendants, knew about this book?

18  A.   There's several statements from witnesses of the minors

19  that they either read the book or had the book read to them,

20  and that the individuals, the Defendants, followed the roles

21  that were prescribed in the book and some of the commandments

22  that were given, such as the discipline part regarding when

23  Subhanah Wahhaj attempted to leave and the discipline that

24  occurred.  Did I answer your question?

25  Q.   Yes, I think so.  Was there any evidence that you

1  uncovered in your investigation that any Defendant expressed

2  disavowment or disagreement with the book, or with the idea of

3  Jany as the leader and the prophet?

4  A.   I don't believe there's any evidence that there was

5  disagreement with the book or the roles, or Jany's role in the

6  compound.

7  Q.   And I guess we've kind of said this already, but is there

8  evidence suggesting basically the opposite?

9  A.   Yes.

10  Q.   Is there evidence that others helped Jany write or

11  complete this book?

12  A.   Yes.

13  Q.   What evidence is that?

14  A.   I believe there's witness testimony, or witness statements

15  saying that Hujrah and Subhanah Wahhaj helped either edit or

16  write the book.

17  Q.   And who is Von -- Yusuf Saber, or Von?  Is it the same

18  person?

19  A.   Yes.

20  Q.   And who is that person?

21  A.   The brother of Jany Leveille who lives in Haiti.

22  Q.   Is there any evidence that you uncovered that he was

23  participating in or a part of the Defendants' group or

24  agreements that you were investigating?

25  A.   He was in communication throughout their time in New

1  Mexico with Jany Leveille.  He also had communication with

2  another witness named Anas White, in which he referred to the

3  group oftentimes as "we," meaning the other Defendants and

4  himself.  And Jany had asked him, or suggested to him or asked

5  that he write the book -- or translate the book in Haitian, as

6  well.

7  Q.   Okay.  We'll get to that.

8  A.   And he also provided, I think, a propane grill, or stated

9  that he was going to provide a propane grill.

10 Q.   Okay, so provided the physical grill.  What other role

11 would you describe him as playing in the group?  What function

12 did he have, or what were his conversations like with Jany

13 Leveille?

14 A.   They had several WhatsApp communications where she

15 described different things that were occurring at the compound.

16 You know, finding diamonds, and the condition in which

17 Abdul-Ghani was at, why he was deceased, and describing to him

18 that those were miracles.  And oftentimes he would be in

19 agreement that they are signs of miracles.

20 Q.   Was there any evidence that Von, or Yusuf, was providing

21 updates on ongoing investigations following the group?

22 A.   Yes.  I think he mentioned at one point that the FBI was

23 looking for them.  It might have been more general, as law

24 enforcement, but that they were being sought after.

25 Q.   So I have pulled up, I think you're able to see it,

1   Exhibit 10.  Are you able to see that extraction report?

2   A.   Yes.

3   Q.   Do you know what this document is and where it came from?

4   A.   It's an extraction report coming from electronic devices

5   that were found during the search of the compound.

6   Q.   I guess the first --

7   A.   The first part is Facebook Messenger, but I believe it

8   transitions to WhatsApp.

9            MR. HALL:  I think I'll have to get you the Bates

10  numbers.  There's a Bates number version.

11  BY MR. HALL:

12  Q.   So if we look at Page 146, the highlighted area there, can

13  you describe generally what's going on?

14  A.   It's a conversation with Yusuf, and believed to be with

15  Jany Leveille.  "They're keeping track of you guys.  I decided

16  to do some research and they know ya'll are going to New

17  Mexico.  They know Luqmon license plate when he pick ya'll up

18  from an accident in Alabama.  The article was published

19  December 22, 2017, so the mother and everyone else know where

20  ya'll are."

21  Q.   Is this an example of what you were talking about in terms

22  of providing updates on the investigation of the rest of the

23  Defendants?

24  A.   Yes.

25  Q.   Just generally in your understanding and your

1  investigation of these messages from Von, did Von message, as

2  far as you're aware, anybody else at the compound?

3  A.   Not that I'm aware of.

4  Q.   Now, we'll go to Page 232.  You mentioned this earlier,

5  but is this what you were talking about where Jany was

6  directing Von to translate her book for Haitians?

7  A.   Yes.

8  Q.   In your training and experience, is this something that

9  someone would ask for for a private journal that they want to

10  be kept private?

11  A.   No.

12  Q.   And what is she actually seeking for this book?

13  A.   Translations and potentially distribution.

14  Q.   And then if we go to Page 160, based on the date of these

15  messages, can you surmise what is happening with the

16  Defendants?

17  A.   Sure.  This appears to be post-arrest.  Jany is being

18  asked, "How are they doing?"  And if the kids spilled

19  something.  I think that's not a reference to liquid being

20  spilled, I think that's a reference to what was occurring in

21  the compound.  And the response was, "I don't know."

22  Q.   At this time, was Jany Leveille -- had she been arrested

23  on August 3rd?

24  A.   No.

25  Q.   And I don't know if you said this, but where were the

1   three women between August 3rd and August 6th?

2   A.   On August 3rd, they were interviewed by us, as well as

3   others at CYFD, and I think they were transported to a women's

4   shelter, and I believe they stayed there for approximately

5   three days.

6   Q.   So when Von was asking if the kids spilled something, this

7   is after two of the Defendants had been arrested; is that

8   right?

9   A.   Correct.

10  Q.   And the kids, what happened to the kids at that point?

11  A.   They were placed by CYFD with different foster parents.

12  Q.   Now, you had mentioned earlier about Lucas Morton's

13  appearance in Atlanta on December 31, 2017.

14  A.   Yes.

15  Q.   And you mentioned that he delivered a letter.  I'm

16  opening, or bringing up Exhibit 6.  Do you recognize what this

17  is?

18  A.   Yes.

19  Q.   What is this?

20  A.   A letter to Muhammad written by Jany Leveille.

21  Q.   And is this the letter that you were saying was being

22  delivered to Muhammad Wahhaj?

23  A.   Yes.

24  Q.   And can you just remind us who Muhammad Wahhaj is?

25  A.   Brother of Siraj Ibn Wahhaj, and Subhanah and Hujrah

1    wahhaj.

2    Q.    Now, we go down to Page 2 of the letter.  Does it indicate

3    that -- well, here it says:  "We told you to leave and follow

4    what Brother Luqmon is telling you."  Who's Brother Luqmon?

5    A.    That's believed to be Lucas Morton.

6    Q.    So this letter is contemplating -- is this letter

7    contemplating that Lucas Morton would be doing the delivering

8    of the letter?

9    A.    Yes.

10   Q.    But it's not believed to be written by Lucas Morton,

11   right?

12   A.    Correct.

13   Q.    And how do you know, or what makes you think it was

14   written by -- well, who do you think it was written by?

15   A.    Jany Leveille.

16   Q.    And what makes you think that?

17   A.    Can you scroll to the bottom?  I thought I remember it

18   maybe having her signature.  Or I remember one of the witness

19   statements from the minors that she had written a letter.

20   Q.    Based on the content of what it's describing -- it says,

21   "Allah says he will protect you always, so follow until he

22   makes you die as a martyr."  What does that mean, generally,

23   and then in the context of this investigation, to die as a

24   martyr?

25   A.    Dying in the name of God.

1    MR. ELSENHEIMER:  Objection.  Your Honor, I know the

2  Rules of Evidence don't apply, but this is pure speculation.

3  And in terms of establishing the existence of a conspiracy,

4  they need actual evidence and not just law enforcement

5  speculation about what something that is a vague religious

6  reference means in terms of a conspiracy.

7    THE COURT:  What's your response?

8    MR. HALL:  Your Honor, this is just the evidence, and

9  I think I can ask the witness about the other facts in the

10  investigation and whether it provides any context into what

11  this might mean.

12    THE COURT:  Do you want to lay foundation regarding

13  whether this is just rank speculation on the part of the

14  witness?

15    MR. HALL:  Sure.

16    THE COURT:  All right, go ahead.

17  BY MR. HALL:

18  Q.   In your investigation, did you have any cause to learn

19  about terms from the Islamic religion?

20  A.   Can you repeat that question?

21  Q.   In your investigation, did you have any reason to learn

22  about terms that were associated with the Islamic religion?

23  A.   Well, prior to this event, I worked terrorism in the FBI

24  for several years, as well as having studied Middle Eastern

25  studies, as well as taking classes in suicide terrorism, in

1  particular.  And then there's other contexts where Jany had

2  mentioned previously, while they were in Georgia, that Lucas

3  Morton and Siraj Wahhaj would leave Hujrah's house and go back

4  to Siraj's house, and that Lucas would die as a martyr.  And

5  per other witness statements, that Siraj Wahhaj and the group

6  was preparing for jihad, and jihad meant creating a jihad army,

7  which is another term that can have different meanings, but

8  definitely in the context, you can interpret what that

9  particular meaning is.

10      And so to relay why I said what I said, I think it's

11  related to other evidence that has been investigated in the

12  case, as to why I gave that context.

13          THE COURT:  The objection is overruled.

14          MR. HALL:  Thank you, Your Honor.

15  BY MR. HALL:

16  Q.  I'll just ask you, as you're talking about the

17  investigation of this case, you had mentioned what the

18  conspiracy or what the plan was going to be once Isa woke up.

19  Is there any reference in this letter to Isa and that plan?

20  A.  Yes.

21  Q.  Do you see it referenced in there, kind of in the middle?

22  A.  Yes.  "You will meet Isa also here in about four months in

23  sha Allah.  So hurry, do not drag your feet, leave whatever.

24  We told you to leave and follow what Brother Luqmon is telling

25  you.  Take all your money out of the bank and bring your guns.

1   And whatever you say to your dad will be a waste of time right

2   now and you will put all of us in danger."

3   Q.   And right before where you started here, where it says,

4   "by joining the righteous," who is that?  Does it say who the

5   righteous are?

6   A.   Well, in parenthesis next to it, it says, "us."

7   Q.   And based on your investigation and the context from where

8   this letter came from and why it was being written, based on

9   its own statements, who is "us"?

10  A.   I guess given the context and statements from other

11  witnesses, "us" would be the Defendants in New Mexico.

12  Q.   Would you also maybe describe that as, like, the followers

13  of Jany Leveille?

14  A.   Sure.

15  Q.   Now, what is significant about this letter in terms of

16  your investigation of the 2339(a) and the 1117 conspiracies?

17  A.   They're looking to bring other people into their group in

18  order to conduct the conspiracies of 1114 and 1117, and this is

19  an example of trying to recruit others into their group.

20  Q.   Would bringing money and guns to join them, would that

21  constitute material support as you understand the term?

22  A.   Yes.

23  Q.   What about bringing himself as personnel?

24  A.   Yes, as well.

25  Q.   Does the letter offer any, like, direction?  I guess you

1  mentioned a little bit here about talking to the dad, but does

2  it have any other direction about telling others whether or not

3  this letter should be distributed?

4  A.    I believe it was meant to be a private letter.

5  Q.    Now, in addition to this, was there any evidence that you

6  found in your investigation from the compound that would

7  suggest that the Defendants had agreed to materially support a

8  plan to kill or attempt to kill a federal officer?

9  A.    Can you state the question again?

10  Q.    Was there any other evidence you found to support the

11  2339(a) and 1117 conspiracies --

12  A.    Yes.

13  Q.    -- from the compound?

14  A.    Yes.

15  Q.    Was there evidence from the compound of firearms training?

16  A.    Yes.

17  Q.    Can you describe kind of what that was?

18  A.    Per testimony of the minor children, that the children

19  were being trained in close-quarters combat, speed reloads,

20  moving and shooting, and for defending the compound from law

21  enforcement.  And then they were asked if this was for

22  offensive purposes, as well, and they described that they would

23  then use, in essence, use these tactics when they went to these

24  corrupt institutions and attempted to convert them utilizing

25  these tactics, if necessary.

1  Q.    You mentioned this earlier, I think, but was there

2  evidence of the Defendants each having a role in the

3  conspiracies?

4  A.    Yes.

5  Q.    And where did that generally come from, that evidence?

6  A.    Witness statements, as well as the book that Jany had

7  written.

8  Q.    And what were the various roles that each Defendant was

9  supposed to play, according to these -- oh, I should ask, was

10 there anything that came from Von, as well, Von, the brother,

11 about roles?

12 A.    I can't recall about what Yusuf's statements were

13 regarding that.

14 Q.    We'll get there.

15       The roles, I guess, can you just describe them?

16 A.    Siraj was supposed to -- well, he was instructing the

17 others in how to conduct these maneuvers and tactics.  He was

18 also supposed to protect Jany and Isa when they went to conduct

19 these conversions of these corrupt institutions.  Also, Farroll

20 was also supposed to be utilized in this purpose.  Lucas Morton

21 did a lot of the training, but per the book, his role was to be

22 a teacher.  And, let's see.

23 Q.    Sorry, I may have missed this, but did you mention a role

24 for Subhanah Wahhaj?

25 A.    Subhanah Wahhaj's role was to take care of the household,

1  cook and clean.  Hujrah's was to take care of the compound when

2  the group left with Isa.  Jamil's role was to be a scholar, but

3  he also did some firearms training and tactics.

4  Q.   Was the word supervisor ever used for anyone?  For

5  example, was one of the other Defendants, if you remember,

6  supposed to be a supervisor?

7  A.   Are you referring to, like, Hujrah's role of being the

8  supervisor of the compound?  Yes.

9  Q.   I've got pulled up Exhibit 19, and this is actually a

10  condensed version.

11        MR. HALL:  Your Honor, we'll just bring it in as 19a,

12  because 19, I think, is 5,000 pages long, and there's really

13  only a small portion --

14        THE COURT:  I'm sorry, so this is just a subpart of

15  Exhibit 19?

16        MR. HALL:  Yes, Your Honor.  This is Exhibit 19a, and

17  it's just extracted pages put together from there --

18        THE COURT:  Okay.

19        MR. HALL:  -- just to try to make this a little less

20  painful in terms of going through it.

21        THE COURT:  I thought maybe around 11:30, we'd go

22  ahead and take an early lunch, because we've been going about

23  two hours.  Does that work for everyone?

24        MR. HALL:  Yes.  And Your Honor, I think a great spot

25  may be around 11:30, maybe a little before.  But once we finish

1   in maybe the next ten minutes, there's a point where I'll just

2   bring the chart up and we'll go through the chart.  So that

3   might be a good place to break.  So in 10 to 15 minutes.

4               THE COURT:  That sounds good.

5               MR. HALL:  Thank you, Your Honor.

6   BY MR. HALL:

7   Q.   Are you able to see this extracted Exhibit 19?

8   A.   Yes.

9   Q.   Now, we talked about these a lot, but are these

10  highlighted statements -- first of all, what is this?  What are

11  we looking at?

12  A.   I believe it's Facebook messages from Subhanah Wahhaj.

13  Q.   Okay.  Now, these highlighted ones are dated on

14  January 7th of 2018.  Are these more or similar to those

15  statements you had referenced earlier about rejecting the

16  entreaties to bring Abdul-Ghani back and calling everything

17  that he was missing lies?

18  A.   From what I've read so far, it appears to be similar

19  statements, yes.

20  Q.   Now, is this, based on your investigation, after or before

21  Abdul-Ghani had died?

22  A.   Most likely after.

23  Q.   Now, I just want to move down to the last page.  Okay, so

24  on this page, these statements are dated August 2nd, 2018.

25  What was going on with the group at around this time in terms

1  of how they were doing materially?

2  A.   Well, the statements here show that they were low on food

3  and that they were starving, and so there was an ask.  I think

4  it's here where they ask for money for food.

5  Q.   Can you see right here, who is -- well, who's LeShelle

6  Mocniak, if you know?

7  A.   The sister of Lucas Morton.

8  Q.   So where LeShelle asks, "Is this Luqmon or Subhanah," is

9  this response right up here responsive to that?

10 A.   Yes.

11 Q.   And so who was actually using Subhanah's Facebook account

12 at this point?

13 A.   Lucas Morton.

14 Q.   And who is Pana?

15 A.   That's short for Subhanah.

16 Q.   Now, here in the highlighted portion there, what statement

17 is it that Lucas, using Subhanah's account, says to his sister?

18 A.   "Fantastic!  Likewise for us.  Though we are going through

19 a major test from God to prepare to face the nation and their

20 issues."

21 Q.   And who is the "we," based on the context and your

22 understanding of the investigation?

23 A.   Given the context of the investigation, I would say the

24 Defendants, the five Defendants.

25 Q.   And you mentioned this before, but this was -- so this was

1  early August before they were detained or arrested.  Was there

2  a belief, in terms of your investigation, that the return of

3  Isa or the conspiracy to go out was imminent around this time?

4  A.   I believe there's statements from I believe Jany to her

5  brother, Yusuf, that it was in August, or a few days, that it

6  was going to -- that Isa was going to be resurrected.

7  Q.   Okay.  And was this a significant -- is there anything

8  significant about saying that they were going to be facing the

9  nation and their issues, in terms of your investigation?

10 A.   Those statements in the context of going into these

11 corrupt institutions, a lot of them being Government

12 institutions, would have a similar relation to their previous

13 training and statements.

14 Q.   Now, shifting just a little from the conspiracy that

15 you've described, in terms of the corrupt institutions and Isa

16 and leaving and going out, was there any additional evidence

17 that you found in your investigation about the Defendants

18 anticipating that federal officers would come to their

19 compound?

20 A.   Yes.

21 Q.   Was there any plan described about what to do if that was

22 going to happen?

23 A.   They had discussed if law enforcement came at night, that

24 they could shoot law enforcement and that they could get away

25 with it.  They had also staged firearms and ammunition at the

1  end of the tunnel in which they had an escape hatch prebuilt

2  in, and that per witness statements, the role of that tunnel

3  and those weapons being staged there was that Siraj and

4  Farroll, and I believe Lucas was mentioned in that, I'd have to

5  review my notes, was to use those firearms and weapons to hold

6  off law enforcement while the rest of the family escaped.

7  Q.   Was there any evidence that the Defendants were

8  anticipating or planning on a war?

9  A.   Yes.

10 Q.   I think you kind of just touched on this, but were there

11 roles that the Defendants would have in the war in terms of at

12 the compound, or what you were just describing?

13 A.   In particular, Siraj and Farroll had roles in conducting

14 combat.

15 Q.   Was there any evidence that the other Defendants at the

16 compound were aware of the plan to shoot federal agents if they

17 came to the compound?

18 A.   I believe there's statements from Jany, her minor witness

19 statements, suggesting that Jany said to start shooting, to

20 shoot first, something along those lines.  I'd have to review

21 the transcript to get it verbatim.

22 Q.   I'm pulling up what was submitted at Exhibit 27a.  Do you

23 know who -- well, based on what you see here, do you know who

24 Jason Rael is?

25 A.   Yes.  I believe he is a Taos county Sheriff's Office

 1   deputy.

 2   Q.   And are you familiar with what this document is, or can

 3   you describe what this document is?

 4   A.   A narrative, I think, about the search that occurred on

 5   August 6th.

 6           MR. HALL:  And the Bates is 23787.

 7   BY MR. HALL:

 8   Q.   So if we look at Page 12 here, can you describe what's

 9   being described in the highlighted areas?

10   A.   "I advised Morton we had a warrant for his brother out of

11   the state of Georgia.  Morton stated that it had nothing to do

12   with him.  Morton asked to see the search warrant."  Do you

13   want me to continue to the yellow, or read through?

14   Q.   You can just go down to the next yellow.

15   A.   "At one point while being detained, Morton stated if we

16   got hurt, it's our fault.  Morton also stated, 'You guys think

17   you're above the law, you guys are all going to get hurt big

18   time, I promise you.'"

19   Q.   And within the context of your investigation and what you

20   just described about the plan, what is significant about this

21   statement?

22   A.   The group still believed Isa would come back, and Isa,

23   being Jesus, would have powers.  I believe that that's what

24   this is referring to, is that there's still an event that's

25   going to occur in regards to what they had previously planned

1 to do in going to these corrupt institutions, being military,

2 law enforcement, and other Government agencies.

3 Q.   Is it also significant to the plan to shoot police

4 officers if they came to the compound?

5 A.   I mean, they're suggesting that these deputies are going

6 to get hurt, and he's promising that it'll happen.

7 Q.   When the officers did come to the compound on

8 August 3rd, was there any evidence that the Defendants were

9 actually prepared to carry out their plan to shoot federal

10 officers?

11 A.   Sure.  Per Taos County report, they had shown up to the

12 compound in marked vehicles and tactical equipment, and Lucas

13 Morton was outside.  He began reaching into the passenger side

14 of the box truck that was parked outside of the compound.  He

15 was detained without incident.  During a search incident to

16 arrest, they found a shotgun behind the passenger seat of the

17 box truck.

18     They then entered the compound and proceeded to the

19 trailer.  Inside the trailer was Jany Leveille, Siraj Wahhaj,

20 who had, I believe, six magazines loaded, as well as his AR and

21 a revolver in his pocket, and there were children holding

22 ammunition.  But the Taos County deputies couldn't be sure what

23 children were holding the ammunition.  And per witness

24 testimony from -- or witness statements from the minor

25 children, their plan was to shoot at law enforcement.  They

1  don't know why the grown-ups, the Defendants, did not.

2      One child stated that Jany Leveille instructed Siraj

3  Wahhaj to put down his weapon.  He placed his weapon by his

4  side, but did not move away from the weapon, and then

5  eventually deputies were able to gain control of him, in which

6  he had a revolver in his pocket.

7  Q.   You mentioned multiple children talking about this.  In

8  your investigation, how many of the children that you

9  interviewed knew about the plan or described the plan in some

10 way to shoot police officers or law enforcement who came to the

11 compound?

12 A.   I interviewed five children, some of them multiple times,

13 and I would say all five children had mentioned something along

14 the lines of preparing for jihad, an army of jihad to conduct a

15 war.  Or more specific, that's what the tactical training was

16 for.  And that I think one of them -- I believe one of the

17 eight-year-olds also talked about Luqmon, or Lucas Morton,

18 wanting to die as a martyr, as well.

19 Q.   Other than the five children all knowing about this, did

20 you have any other -- did you ever uncover any other evidence

21 that the other Defendants also were aware of the plan, in terms

22 of if law enforcement came to the compound?

23 A.   I think Jany had mentioned, or had made statements,

24 whether it was in her book or it was the minors who had

25 referenced her statements, saying that they would start

1   shooting if law enforcement came.  There was testimony, or

2   witness statements from the children that the Defendants had

3   spoke about shooting at law enforcement either if they came at

4   night, or during an eventual search warrant or arrest warrant,

5   using the tunnel for that purpose.

6   Q.   How big is the compound, the living quarters in the

7   compound?

8   A.   Well, there was a 22-foot trailer buried in the ground

9   surrounded by different tire structures.  There was about a

10  100-foot tunnel that led from the trailer out towards the edge

11  of the property, and the tunnel had various compartments in the

12  tunnel, as well as staged firearms and ammunition.

13  Q.   By staged, what do you mean?

14  A.   At the end of the tunnel where the escape hatch was, there

15  was several firearms and ammunition there.

16  Q.   And then finally, was there anything else found at the

17  compound, like written evidence, or written documentation, I

18  should say, that might indicate the Defendants' intent or plans

19  regarding a war at the compound?

20  A.   There was a notebook, handwritten, by one of the children.

21  It was believed to be Siraj's handwriting.  And it's -- the

22  title was, "Phases of a Terrorist Attack."  And it outlined how

23  to conduct a terrorist attack.

24  Q.   Was there anything in that document, that outline, that

25  describes like a fallback area, or a place where you would

1  have --

2  A.   Yes.

3  Q.   How would you describe it?

4  A.   A fallback position.

5  Q.   Let's move on to the last -- just a few more questions

6  regarding the gun possession conspiracy.  You've already

7  basically gone through the time-line and provided a lot of

8  facts, so just to kind of hit the very simple, straight-forward

9  points on that, was there any evidence in your investigation of

10  this case that suggested that the Defendants had an agreement

11  to allow Jany Leveille to possess a firearm?

12  A.   Can you repeat that question?

13  Q.   Was there any evidence in your investigation that the

14  Defendants had an agreement to allow Jany Leveille to possess a

15  firearm?

16  A.   Well, Jany was given a firearm in Georgia by Siraj Wahhaj.

17  She went to a shooting range in Georgia where, I believe per

18  witness statements, she fired a rented firearm.  And then while

19  on the property in New Mexico, she fired a firearm, as well.

20  Q.   Did all of the Defendants participate in firing firearms

21  at the compound?

22  A.   Per witness statements from the minor children, all

23  Defendants participated in firing a firearm at some point.

24  Q.   And was there a point in between Georgia and the firing of

25  a firearm with the rest of the Defendants by Jany Leveille as

1 | constructively possessing, or having the weapon around her?

2 | A.   There were several firearms being transported in the Ford

3 | Explorer that they crashed in that had Jany Leveille and Siraj

4 | Wahhaj and their children in.

5 | Q.   And based on your investigation, what is your

6 | understanding of Jany Leveille's immigration status throughout

7 | this time period?

8 | A.   She was out of status.

9 | Q.   And what does that mean, out of status?

10 | A.   Not a legal permanent resident, not a citizen, and I

11 | believe her work status had expired around that timeframe.

12 |         MR. HALL:  Your Honor, I almost got it on 11:30 on

13 | the dot, but it just turned to 11:31.

14 |         THE COURT:  Whatever is a good time.

15 |         MR. HALL:  I think that's a good time, and then we'll

16 | start up with the last bit.

17 |         THE COURT:  Then let's plan on resuming at, say,

18 | 1:00.  All right, we'll be in recess for lunch.

19 | (Recess was held at 11:31 A.M.)

20 | (In Open Court at 1:06 P.M.)

21 |         THE COURT:  All right, Mr. Hall, I guess we can pick

22 | up where you left off.  Go ahead and have a seat.

23 |         THE WITNESS:  Yes, Your Honor.

24 |

25 |

USA v. Leveille, et al.                          James Hearing
18-cr-2945                                          7/19/2023

1   CONTINUED DIRECT EXAMINATION

2   BY MR. TAVO HALL:

3   Q.   Agent Taylor, good afternoon.

4   A.   Good afternoon.

5   Q.   Before we move into the chart real quick, there were just

6   a couple of points I wanted to circle back and make sure we

7   touched on.

8       You had mentioned earlier about the evidence that you'd

9   seen and the investigation that described some of the roles

10  within the conspiracies of the Defendants, and you had

11  mentioned that you weren't sure if you remembered whether there

12  were other statements or other references to that, or evidence

13  to that effect.  I have on -- actually, Richard, can you pull

14  up the screen?  On the screen should be Exhibit 25a.  Do you

15  see it?

16  A.   Yes.

17  Q.   Just from the view here, do you recognize what this

18  exhibit is?

19  A.   It appears to be a Facebook Messenger conversation between

20  Anas White and Yusuf Saber.

21  Q.   And where did you obtain, or where did the FBI obtain

22  these screen shots from?

23  A.   There was an interview of Anas White in which Anas White

24  took screen shots of his conversations with Yusuf Saber.

25  Q.   And to be clear, these were -- this conversation happened

1  before or after the Defendants arrests?

2  A.   I believe after.

3  Q.   That said, what's the nature of the conversation,

4  generally?  What do they talk about?

5  A.   The events that occurred on the compound in New Mexico.

6  Q.   I'm going to start with Page 93, and can you just either

7  read or summarize, I guess, the messages that are highlighted

8  and the two right below it?

9  A.   Sure.  "So Pana opened Qur'an and she read that Allah has

10 a task for her until the end.  And it was to cook and clean

11 everyday.  Maryam confirmed.  9 months of cleaning and cooking

12 everyday."

13      "So she had to do it then huh?"

14 Q.   And the gray, who is the gray messages?  Is that Von

15 Yusuf, or is that Anas White?

16 A.   I believe the gray messages are Von Yusuf.

17 Q.   And the Pana, again, who is Pana?

18 A.   Subhanah Wahhaj.

19 Q.   And Maryam?

20 A.   Jany Leveille.

21 Q.   So is this another example of what you were describing as

22 a role for the group of people at the compound?

23 A.   Yes.

24 Q.   Now, going to Page 66, here again is a highlighted area.

25 Basically, the gist of these messages, can you describe, in

1  terms of what role it describes?

2  A.   It is describing how Jany was a teacher, and it starts

3  off -- or the highlighted portion is:  "She was really our

4  Qur'an teacher."

5       "Why was she the teacher, though, and not Ibn?"

6       "Because they all agreed that her explanation would make

7  more sense and when she says something would happen, it

8  actually happened."

9  Q.   And the statement where it says, "our Qur'an teacher,"

10  that's the gray.  So is that still Von Yusuf?

11  A.   Yes.

12  Q.   And then moving to Page 22, the highlighted text there,

13  can you describe what's happening in these messages?

14  A.   It's discussing what had happened to Abdul-Ghani and what

15  would happen after his death.  And it starts off saying:  "Then

16  right away Maryam called me and explained what I just told you,

17  and she said, 'Everyone is okay, because we know he died while

18  Ibn was reciting.  So no one got sad.  And they would wash him

19  every two to three days.  And for about four months, no change

20  in his body.  Ibn and Muhammad would wash him."

21  Q.   Who is Muhammad in this context, if you know?

22  A.   I believe they're referring to Farroll Louis-Jacques.

23  Q.   And is his name actually down farther below a little bit?

24  A.   Yes.

25  Q.   And then the next highlighted part there, where does it

1 say that Abdul-Ghani was kept, at first at least?

2 A.   That he wasn't always in the tunnel, and that he was in

3 Hujrah's room, as well.

4 Q.   And then that last highlighted one, is that similar?

5 A.   "Meaning the room Hujrah was sleeping in ... yes.  Ghani."

6 Q.   And the last question on this, did you uncover or find any

7 evidence that Von Yusuf, as part of his interactions with the

8 group and his role and his activities with the group, had an

9 understanding of the rest of the Defendants' mental state and

10 view of what they were doing at the compound, and generally?

11 A.   I would say that's accurate based off their conversations.

12 Q.   If you look at the screen and this highlighted area, can

13 you read the highlighted text there?

14 A.   "They knew they were going to get arrested.  They knew

15 this would be worldwide.  They knew that's how they would be

16 known.  They knew people would reject.  They knew they would be

17 in it by themselves, so they were ready.  But I am sure they

18 weren't ready for how it is happening."

19 Q.   And is that an example of what you were just describing?

20 A.   Yes.

21 Q.   Okay.  So at this point, I will hand you what has been

22 marked and provided as Exhibit 35.  I believe the Court has

23 copies of this.  We provided them before the break.

24      All right, so I'm going to try to go relatively

25 efficiently through here, and some of these we won't spend very

1    much time on at all.  But just generally speaking, this exhibit

2    in front of you, can you describe what it is, what it appears

3    to be, what it looks like?

4    A.    Different facts taken from various evidence that has been

5    collected in the investigation.

6    Q.    Okay.  So starting on Page 1, where it says, Exhibit 1,

7    the statements in the center column, where it says,

8    "Statements," do you know who relayed these statements?

9    A.    Farroll Louis-Jacques.

10   Q.    And who is that, again?

11   A.    The biological son of Jany Leveille and Michael

12   Louis-Jacques.

13   Q.    And was he there at the compound with the Defendants?

14   A.    Yes, he was.

15   Q.    And what was generally his role as you uncovered in your

16   investigation?

17   A.    He was to assist Siraj Wahhaj in the enforcement of their

18   ideology.

19   Q.    The statements here, were they relayed to you

20   personally --

21   A.    Yes.

22   Q.    -- during your interview with him, or multiple interviews

23   with him?

24   A.    Yes.

25   Q.    Now, in your interviews with him, did he hear these

1  statements that were described, or witness the events that are

2  described, or know the things that had happened that he's

3  telling you about through his own personal knowledge?

4  A.    Yes.

5  Q.    And is that because he was the person who was hearing the

6  statements or observing the events?

7  A.    Yes.

8  Q.    Now, if we move on to Page 2 and Exhibits 1a, 1b, 1c, and

9  1d, same basic questions:  who is relaying these statements?

10  A.    Farroll Louis-Jacques.

11  Q.    And he was telling them -- who was he telling them to?

12  Was he telling them to you?

13  A.    Yes.

14  Q.    And was he the hearer of the statements, or the observer

15  of the acts, himself --

16  A.    Both.

17  Q.    -- that he describes in here?

18      As we go on to Page 3, are those all familiar to you as

19  more of the statements that he, and evidence that he describes

20  to you in your interviews with him?

21  A.    Yes.

22  Q.    And on to Page 4, Exhibit 2, who is the person relaying

23  these statements?

24  A.    Jamil Louis-Jacques.

25  Q.    And who is he?

1  A.   The second oldest child, biological child, of Jany

2  Leveille and Michael Louis-Jacques.

3  Q.   Was he also present at the compound throughout the entire

4  time that the Defendants were there?

5  A.   Yes.

6  Q.   And was he telling these statements and observations to

7  you?

8  A.   Yes.

9  Q.   And was he the person viewing, observing, hearing or

10 experiencing the events and statements described in this center

11 column?

12 A.   Yes.

13 Q.   As we move on to Page 5 and on to Page 6, Exhibits 2a and

14 2b, same questions:  Who is the person relaying these

15 statements?

16 A.   Jamil Louis-Jacques.

17 Q.   Was it also during interviews with you, personally?

18 A.   Yes, as far as I can tell.  There was one interview that

19 was done with Jamil that wasn't with me.

20 Q.   As far as you know, everything in here that's described,

21 was he the person viewing, observing, experiencing, or hearing?

22 A.   Yes.

23 Q.   Now, on to Page 7 and Exhibit 3.  It's listed in here as

24 Jane Doe 1, but based on the -- well, do you know who Jane

25 Doe 1 is?

1   A.   I believe this is -- let's see.  Aisha Morton.

2   Q.   And if you need to, I can pull anything up, but --

3   A.   No, I believe it was Aisha Morton.

4        THE COURT:  Would you spell the first name.

5        THE WITNESS:  A-i-s-h-a.

6   BY MR. HALL:

7   Q.   And who is she?

8   A.   Daughter of Lucas Morton and Subhanah Morton -- or

9   Subhanah Wahhaj.

10  Q.   And around how old was she when you were -- did you

11  interview her personally, as well?

12  A.   I did.

13  Q.   How old was she around when you did that?

14  A.   Eight.

15  Q.   And was she at the compound with the Defendants throughout

16  the entire time?

17  A.   Yes.

18  Q.   And was she the person who was either experiencing or

19  observing or hearing the statements and events described in

20  these bullets?

21  A.   Yes.

22  Q.   Now, Exhibit 4 on Page 8, that is the book we talked about

23  a lot already, so I think we can skip that, in terms of you

24  knowing what it is and what's contained in it.  You've

25  described that.

1       And we'll skip up to Page 10, Exhibit 5, and it states,

2  "Jany's Writings," in addition to the books.  Are you aware of

3  what these writings are that would be in the exhibit, just off

4  this description?

5  A.   I believe this is in reference to her journal, like her

6  diary.

7  Q.   Diary or other -- is it just other handwritten --

8  A.   Handwritten notes.

9  Q.   -- notes or things?  Okay.  And Was that found at the

10 compound, as well, those writings?

11 A.   Yes, I believe so.

12 Q.   And is there anything in the content of those that makes

13 you feel confident that it was written by Jany Leveille?

14 A.   It has the same kind of content, like as far as what the

15 roles are.  That is also in her typed book.

16 Q.   And if it would help you to see the exhibit, I'm happy to

17 pull it up for you.  Just let me know.

18      We'll move on to Exhibit 6 at the bottom there.  That's

19 the letter to Muhammad Wahhaj.  And we talked about that a lot

20 already, right?

21 A.   Yes.

22 Q.   And was that letter collected from the Clayton County

23 Police Department as part of the evidence in this case?

24 A.   Yes.

25 Q.   So now as we move on to Page 11, the next section there is

USA v. Leveille, et al.                          James Hearing
18-cr-2945                                        7/19/2023

1  Exhibits 7 through 15.  These are described as "Chats, MMS and

2  SMS."  Can you describe real quickly what the difference is

3  between chats, MMS and SMS?

4  A.   SMS is short message -- I forget what the last S is for.

5  Q.   Service.

6  A.   Service.  Multimedia messages, which are pictures and

7  videos, typically.  And then chats can be WhatsApp or Facebook

8  Messenger.

9  Q.   And so just based on this description, do you know what

10 Exhibits 7 to 15 consist of, based on your investigation in

11 this case?

12 A.   Electronic extracts from electronic evidence that was

13 located at the New Mexico compound.

14 Q.   And when you say electronic evidence, are you saying

15 phones that were found at the compound?

16 A.   Phones, computers.

17 Q.   And so these are extracts from those devices?

18 A.   Yes.

19 Q.   Is there anything about the content of the extracts -- and

20 we looked at some of this in Exhibit 10 already -- that gives

21 you reason to believe that all or one of the Defendants was

22 using those devices at the compound?

23 A.   A lot of the content is similar to and corroborated by

24 other witnesses or physical evidence.

25 Q.   Are persons names listed in some of these extracts?

1   A.   Yes.

2   Q.   Now, if we move forward to Exhibit 16 on Page 15, these

3   are statements on the Alabama lapels.  So we talked about the

4   crash in Alabama already.  Are you aware that there were

5   recordings taken by the State Trooper through his lapel camera,

6   or maybe from the car, that were collected as part of the

7   evidence in this case?

8   A.   Yes.

9   Q.   And are those the lapel videos that you were referencing

10  when we talked about some of the statements that Siraj Wahhaj

11  and Jany Leveille made during that car crash?

12  A.   Yes.

13  Q.   So that would be the same for Exhibit 16a and 16b on

14  Page 16, just separate lapel segments?  Is that fair to say?

15  A.   Yes.

16  Q.   Same crash?

17  A.   Yes.

18  Q.   Same day?

19  A.   Yes.

20  Q.   And then Exhibit 17, that's the written motor vehicle

21  accident report.  Do you recall looking at that earlier?

22  A.   Yes.

23  Q.   And that also came from the Alabama -- well, did that also

24  come from the Alabama State Highway Patrol?  Or maybe I'm

25  getting the agency wrong.

1  A.    Alabama Law Enforcement Agency, their state police.

2  Q.    And that described the events of the car crash, as well?

3  A.    Yes.

4  Q.    Exhibit 18 is entitled, "Shooting Videos."  Do you know

5  what those shooting videos are?

6  A.    Yes.

7  Q.    Can you describe what they are and where you found them?

8  A.    We found them on electronic media that was located at the

9  Taos compound.  The contents of those videos are different

10 training techniques using firearms; shooting, moving,

11 reloading.  There was a video of someone on a motorcycle

12 conducting a drive-by with a pistol, I believe it was.

13 Q.    And who are the people depicted in these videos?

14 A.    Lucas Morton, Siraj Wahhaj, Farroll Louis-Jacques, and I

15 believe Jamil Louis-Jacques is also featured.

16 Q.    And you mentioned this, but I think you got these from

17 electronic devices that were found at the compound?

18 A.    Yes.

19 Q.    Now, moving to Page 18 and Exhibit 19, where it says,

20 "Facebook, Subhanah and Morton," is that description enough for

21 you to know what we're talking about, or do you want me to pull

22 up the exhibit?

23 A.    No, I believe I know what you're talking about.

24 Q.    Okay.  What are these statements, or what is this exhibit?

25 Where did they come from?

1   A.   Facebook Messenger.

2   Q.   And how did we get Facebook Messenger?

3   A.   I believe these were from search warrants on Facebook

4   Messenger that the FBI executed.

5   Q.   And just to be clear, the extractions from the phones that

6   we talked about earlier, could some of those also pick up the

7   same like messaging apps content?

8   A.   Yes.

9   Q.   But these are the ones that came from the Facebook search

10  warrant; is that right?

11  A.   I believe so.

12  Q.   Okay.  Now, moving to Page 20 and Exhibit 20, it says,

13  "Siraj Writing."  And the notebooks or the writings that are

14  described there, do you recognize what this exhibit is?

15  A.   Yes.

16  Q.   And can you describe where you found that, or those

17  materials?

18  A.   I believe it was in the tunnel of the Taos compound.

19  Q.   And then Number 21, Exhibit 21, same page, we also looked

20  at this earlier in your testimony, but the NYCPD Online

21  Activity Report, can you describe what that is and where it

22  came from?

23  A.   It's a report from NYPD regarding -- it's basically a

24  time-line of events that had occurred from the kidnapping

25  onward, and it was published post-August 3rd, 2018.

1   Q.    I'll have you turn to Page 22 and Exhibit 22.  "Subhanah

2   and Lucas Statements to Family."  We looked at this also

3   earlier, but do you recall the document or the exhibit where we

4   looked at the statements being made to Jessica and Nina?

5   A.    Yes.  That was in the 302.

6   Q.    And what is a 302?

7   A.    The interview of Nina and Jessica.

8   Q.    And that was done after the arrest of the Defendants?

9   A.    Yes.

10  Q.    Page 23, Exhibit 23, describes Lucas Morton's statements

11  to CCPD detectives.  We looked at these and talked about these

12  earlier, as well.  But what is this exhibit portraying?

13  A.    Lucas Morton hand delivering the letter approximately

14  December 31st, 2017, and being talked to by CCPD regarding the

15  whereabouts of Abdul-Ghani, and showing Lucas Morton's

16  evasiveness to answer the questions from the police department.

17  Q.    On Page 24, Exhibit 24, it states, "Siraj Wahhaj

18  Statements of Kidnapping," is what it's titled.  We looked at

19  these, as well, during the first part of the testimony.  I do

20  just want to bring this up just to be clear, because we didn't

21  talk about this other part.

22        So I will bring this onto your screen.  You mentioned

23  these already.  Can you describe what these pages are?

24  A.    Police report from Clayton County Police Department.

25  Q.    Based on the title here, is this also a police report from

1  Clayton County?

2  A.   Supplemental Report, yes.

3  Q.   And then based on the title of the document, Page 6 of

4  that exhibit, are you able to tell what this report is, where

5  it comes from, just based on the way it's written and based on

6  the description at the top?

7  A.   From Clayton County Police Department.

8  Q.   And usually when you see things like this, where it says,

9  "Case Manager," do you have an idea of what this document might

10  have been in reference to?

11  A.   I believe it's in reference to Georgia's version of child

12  protective services.

13  Q.   Okay.  So the highlighted statements here, where it says,

14  you know, BFA and BFA brother, down at the bottom, "His brother

15  told him about plans to relocate to Tuskegee," are you able to

16  tell from reading what, like, BFA would mean?

17  A.   I think it's in reference to biological father.

18  Q.   Who in this case would be?

19  A.   Siraj Wahhaj.

20  Q.   I'm moving on to Page 26, Exhibit 25, and I'll do 25 and

21  25a together, which is on Page 28.  Those exhibits, 25 and 25a,

22  are Von Yusuf, or Yusuf Saber.  We just talked about that.  We

23  just looked at some of those.  But can you describe what these

24  exhibits are?

25  A.   Conversations that Yusuf had with Jany Leveille, referring

1  to the group as "we," including himself.  And we corroborated

2  much of this -- a lot of it is corroborated between -- some of

3  the events that Jany was telling Yusuf corroborates a lot of

4  activities that occurred in her book.

5  Q.   And, like, what platform, or where did the content

6  actually come from for these exhibits?

7  A.   WhatsApp messaging, and I believe Facebook, as well.

8  Q.   And if I go back to 25a here, do you recognize what

9  platform that would be?

10 A.   That's Facebook Messenger.

11 Q.   Moving on to Page 30 and Exhibit 26, it says, "Jany's CYFD

12 Interview."  Jany made the statements in here to CYFD.  What is

13 CYFD?

14 A.   Child, Youth and Family Development, I believe is the

15 acronym.

16 Q.   And why would they have been involved?  Did you understand

17 during your investigation that they were involved, as well?

18 A.   Yes.

19 Q.   And why would that have been?

20 A.   From my understanding, due to the living conditions of the

21 11 children on the property.

22 Q.   And in this statement that's referenced in here, is that

23 consistent with other statements we've already talked about in

24 terms of what the Defendants responded with when the

25 authorities were trying to find Abdul-Ghani?

1  A.   Yes.

2  Q.   Now, moving to Page 32, Exhibit 27a, we looked at that

3  earlier, the statements in Sergeant Rael's report.  Are you

4  familiar with what that content was and what that report was

5  documenting?

6  A.   Yes.

7  Q.   And what was that, generally?

8  A.   Morton being evasive about the whereabout of -- or Morton

9  threatening that the deputies would be hurt and that -- he

10  basically promises that they will be hurt.

11  Q.   And that occurred on what day?

12  A.   August 3rd.

13  Q.   So 27b, 27c and 27d we didn't look at, but just based on

14  the title from OSI SA Torres or OSI SA Garcia, and then

15  TCSO/OSI -- what is OSI?  Do you know the acronym?  Is it

16  Office of Special Investigations?

17  A.   In New Mexico, like state insurance, I believe, is --

18  like, they investigate insurance frauds.

19  Q.   Are they just another law enforcement in New Mexico --

20  A.   Yes.

21  Q.   -- another law enforcement agency?

22     So are you familiar with the statements, through your

23  investigation, that are documented in these reports, and are

24  you familiar with the reports, generally?

25  A.   Yes.

1  Q.   And were they made on the same day, August 3rd, 2018?

2  A.   Yes.

3  Q.   So they were documenting the events of the search warrant;

4  is that fair to say?

5  A.   Yes.

6  Q.   Now, 29 on the next page, Page 33, Exhibits 29a and 29b,

7  these are described as statements to TCSO.  What's TCSO?

8  A.   Taos County Sheriff's Office.

9  Q.   And in 29b, it says, "Hogrefe Supplemental Report."  Do

10  you know who Hogrefe is?

11  A.   At the time, he was the Sheriff.

12  Q.   The Sheriff of Taos County?

13  A.   Yes.

14  Q.   And are you familiar with the statements that were

15  recorded in these reports?

16  A.   Yes.

17  Q.   And they were also made either on or between August 3rd

18  and August 6th.  Does that sound right to you?

19  A.   Yes.

20  Q.   Now, Exhibit 30 at the bottom there, it says:  "Lucas and

21  Farroll Statements to OSI Cappelli."  So OSI, again.  Is that

22  the same additional New Mexico law enforcement agency?

23  A.   Yes.

24  Q.   And are you familiar with the date of that report?

25  A.   August 3rd.

1  Q.    And generally, what kind of things were being recorded in

2  that exhibit?

3  A.    Statements from Morton that God was calling the shots, and

4  a statement from Farroll that he called himself Muhammad.

5  Q.    Now, Page 34, Exhibit 31, it says, "Jane Doe 2

6  Transcript."  Are you familiar with who Jane Doe 2 is in this

7  context?

8  A.    The biological daughter of Siraj and Jany.

9  Q.    And how old was she at -- did you speak to her, yourself?

10 A.    Yes.

11 Q.    And how old was she when you spoke with her?

12 A.    Eight.

13 Q.    Was she at the compound the entire time with the

14 Defendants?

15 A.    To my knowledge.

16 Q.    And are the statements and observations described in here

17 what she relayed to you personally?

18 A.    Yes.

19 Q.    And are the statements and observations and experiences,

20 are they things that she experienced, observed and heard

21 herself while she was at the compound?

22 A.    Yes.

23 Q.    Now, Page 35, Exhibit 32, Jane Doe 3.  Do you know who

24 Jane Doe 3 is?

25 A.    Hujrah Wahhaj's biological daughter.

1  Q.   And did you speak to her yourself?

2  A.   I did.

3  Q.   And how old was she around the time you spoke with her?

4  A.   Eight.

5  Q.   And was she at the compound the entire time with the

6  Defendants in New Mexico?

7  A.   To my knowledge.

8  Q.   And did she relay these things to you directly?

9  A.   Yes.

10 Q.   And the description of events and observations and

11 statements, did she see, hear and observe those things herself,

12 or experience those things herself --

13 A.   Yes.

14 Q.   -- as described here?  All right.

15      Now, moving to Page 37, Exhibits 33 and 34 are the same.

16 It says, "New Mexico State Police dashcam audio."  Are you

17 familiar with this exhibit?

18 A.   Yes.

19 Q.   And we talked about this earlier, right?

20 A.   Yes.

21 Q.   What is it documenting, generally?

22 A.   A conversation that a New Mexico State Police officer had

23 with Lucas Morton on the property in Taos, New Mexico.

24 Q.   And that was around -- on or about June 30th, 2018; is

25 that right?

1   A.    Correct.

2            MR. HALL:  One moment, Your Honor.

3            Your Honor, at this point I think we will pass the

4   witness.  And I just want to note for the Court's convenience,

5   the chart that we just went through, I had mentioned this

6   earlier, but a lot of the stuff in there that's blue is

7   evidence that the United States would be submitting not

8   necessarily for the truth of the matter asserted, so not

9   necessarily as co-conspirator statements, but for all the

10  separate reasons that Courts have recognized; context, the

11  significance that they were made, not necessarily that they

12  were true, those sorts of things.  And I'm sure this will come

13  up in the briefing more, but that's why they're blue and that's

14  why some of these other ones are white.

15           And with that, I'll pass the witness.

16           THE COURT:  Go ahead, Mr. Ray, if you want to go

17  first.

18           MR. RAY:  Thank you, Judge, yes.

19                          CROSS-EXAMINATION

20  BY MR. MARSHALL RAY:

21  Q.    Good afternoon, sir.

22  A.    Good afternoon.

23  Q.    If you don't mind, I wanted to ask you a few points of

24  clarification about the different conspiracies and the

25  time-lines of those conspiracies you had told us about.  And

1   I'm going to refer back to the -- if I misstate what you're

2   saying at any time, I depend on you to correct me.

3   A.   Sure.

4   Q.   So you talked about a conspiracy to provide material

5   support to terrorists, right?

6   A.   I stated material support earlier.

7   Q.   Okay.  When did that conspiracy begin, in your estimation?

8   A.   I guess it depends on how you may view it, the kidnapping

9   of Abdul-Ghani.  Abdul-Ghani was used as the motivation for the

10  next -- when he came back to life is when they would come and

11  do these, or commit these conversions of Government

12  institutions.  And so without the kidnapping of Abdul-Ghani,

13  then they wouldn't have had the ability to use that as their

14  motivation to complete their objective.

15  Q.   Okay, I'm not sure I followed.  Are you saying that there

16  was a conspiracy to provide material support before Abdul-Ghani

17  died, that this conspiracy was already in place?

18  A.   The conspiracy being that there was financial support, a

19  group of people contributing to the conspiracy.  And you could

20  articulate that without Abdul-Ghani, then there would not have

21  been the secondary conspiracy of using him to be a reason to

22  conduct these conversions of corrupt government institutions.

23  Q.   Okay, I think I got what you're saying.

24       So before Abdul-Ghani dies, you're saying that there was

25  some conspiracy to provide material support, but that a

1   secondary conspiracy arises sometime after Abdul-Ghani's death,

2   because he's going to be an object of that conspiracy?  Is that

3   what you're saying?

4   A.    Can you repeat that again?

5   Q.    Well, what it sounds like you're saying, and you tell me

6   if this is not what you said, you said there was a conspiracy

7   to provide material support that started sometime around the

8   time that they take Abdul-Ghani, but then you say there's a

9   secondary conspiracy which relates to Abdul-Ghani identifying

10  targets to convert or do something with.  Is that what you're

11  saving?

12  A.    I think if someone wants to make an argument that there

13  are parallel conspiracies, then one parallel is the kidnapping

14  conspiracy that begins when he was taken.  Without Abdul-Ghani

15  being taken, then you couldn't have the conspiracies of 1114

16  and 2339(a) and 1117, because he was used as the crux of

17  conducting the second part, or going out and converting these

18  corrupt government institutions.

19  Q.    Okay.

20  A.    Per what's in the book and witness statements.

21  Q.    So you've got a conspiracy to commit kidnapping, which

22  you're pegging the beginning of that conspiracy around the time

23  that they take Abdul-Ghani; is that right?

24  A.    For the kidnapping?

25  Q.    Yes.

1   A.   Yes.

2   Q.   And then you're saying that the conspiracy to provide

3   material support -- which is a separate conspiracy, right?

4   A.   Correct.

5   Q.   That that conspiracy begins when there's this doctrine of

6   Abdul-Ghani coming back as Isa and providing them with the

7   targets; is that correct?

8   A.   I think what I'm saying is that without him being taken,

9   then that conspiracy is never occurring.

10  Q.   Okay.  And I guess I'm just trying to ask a really simple

11  time-line question, like if you were putting dots on a

12  time-line.  Like right here on this day is when the kidnapping

13  conspiracy starts, in your estimation, and on this day is when

14  the conspiracy to provide material support begins.  Would you

15  be able to place a dot on a line graph of time passing by and

16  articulate that?

17  A.   It kind of seems like a legal question regarding when a

18  conspiracy can take place.  I think I said that the conspiracy

19  to provide material support, one could argue that it starts

20  when the kidnapping starts, because without Abdul-Ghani being

21  taken, then the conspiracy to commit 2339(a), with the 1114 and

22  1117, may not occur.

23  Q.   Well, let me try to articulate it in a factual way, then.

24  I don't want you to have to make legal conclusions.

25       What is the first statement in the time-line that you

1  think relates to providing material support to terrorists?

2  A.   Well, I never said terrorists, but providing material

3  support to this group to commit 1114 and 1117.

4       But to answer the question about when the first statement

5  would be to commit acts of 1114 and 1117 --

6  Q.   Okay.

7  A.   -- maybe around the late December timeframe when the

8  letter was given to Muhammad to bring your weapons and to come

9  and be a martyr would be an indication of the planning that's

10  starting to occur regarding going after corrupt institutions.

11  Q.   All right.  And I do apologize, I say conspiracy to

12  provide material support to terrorists, because I'm reading

13  that off the indictment.  So I appreciate your clarification

14  there.

15       So other conspiracies here, the conspiracy to commit an

16  offense against the United States, do you consider that to be a

17  parallel time-line to material support?  Is it essentially the

18  same thing?

19  A.   I would say that's correct.

20  Q.   All right, I appreciate that.

21       I want to ask you a few clarifications about this chart,

22  too, which the Court has been -- it's the chart that the United

23  States provided today, and I don't know what to call it.

24            MR. RAY:  What are we calling this?

25            MR. HALL:  Exhibit 35.

1  BY MR. RAY:

2  Q.   Exhibit 35.  It's marked as Government's Exhibit 35, and

3  I'm just going to go through it and just get some

4  clarifications on that.  For example -- and you don't have a

5  paper copy of it in front of you, do you?  Oh, you do.  Okay.

6      So turning to Page 2, 1a, 1b, 1c, 1d, if I understand this

7  right, these are statements that are coming from the mouth of

8  Farroll.  Do I understand that correctly?

9  A.   Yes.

10 Q.   Okay.  And I believe you testified in your direct

11 testimony today that Farroll explained these things in an

12 interview with law enforcement.  Was it you that interviewed

13 him?

14 A.   Yes.

15 Q.   And that interview happened on August 7th?  There was a

16 series of interviews, right, in August?  August 7th,

17 August 9th, August 21st, 2018, correct?

18 A.   Correct.

19 Q.   So this is all after you guys have conducted search

20 warrants and arrested people, correct?

21 A.   We had not.  The FBI had not arrested people at this time.

22 Q.   Somebody had arrested folks out there by this time?

23 A.   Yes.

24 Q.   And some of them were in custody by this time, right?

25 A.   Yes.

1  Q.   Okay.  And that same timeframe, more or less, holds true

2  if you go to Page 4 where you have Jamil, right?  The Jamil

3  statements, can you remind us how those came about?

4  A.   Through interviews.

5  Q.   Interviews in August to -- or, when did the interviews

6  happen?

7  A.   The dates aren't listed specifically here, but I'm almost

8  certain they all occurred in August of 2018.

9  Q.   And would that certainty also carryover to them coming

10  after search warrants had been executed out in Taos?

11  A.   That would have come after the August 6th Taos County

12  search warrant.

13  Q.   Okay, the interviews with Jamil would have come after the

14  August 6th search warrant, at least, right?

15  A.   Yes.

16  Q.   Interviews with law enforcement?

17  A.   Correct.

18  Q.   Okay.  And that also holds true for, going over to Page 6,

19  the Jamil transcripts from 8-10 and 8-21, 2a and 2b, in

20  Exhibit 35?  This was all drawn from interviews with Jamil

21  conducted by law enforcement in furtherance of the

22  investigation of what was going on in Taos, correct?

23  A.   Correct.

24  Q.   Talking about -- sometimes it gets referred to as Jany's

25  book, sometimes it's getting referred to as Jany's journal or

1   diaries.  It's fair to me that you call it whatever you want to

2   call it, but do you understand what I'm talking about as the

3   three-volume writing of Jany Leveille, or what you guys are

4   calling the writing of Jany Leveille?

5   A.   Yes, I'm familiar with that text.

6   Q.   Okay.  Do you consider everything in that writing to be

7   true or factual?

8   A.   A lot of the text that's in that writing has been

9   corroborated through witness statements, and so it would lead

10  you to believe that a lot of the things that are written down

11  in there are actual facts of events that occurred, because a

12  lot of it has been corroborated through either interviews or

13  recovered electronic medium.

14  Q.   Are there statements in that set of books that you

15  consider not to be true?

16  A.   I know of statements, I believe, that are not

17  corroborated, but I can't recall off the top of my head any

18  statements that were false.

19  Q.   Okay.  What are the statements you're thinking of that

20  were not corroborated?

21  A.   Just individuals that they tried to convert along their

22  travels.  We never found those individuals to identify that

23  that event actually took place.  I think there's like a taxi

24  driver that they had a discussion with.  The name isn't there,

25  so just stories like that that we could not corroborate.

1  Q.   Earlier today, one of the items that you testified to as

2  about Abdul-Ghani asking to go home to his mom.  Do you

3  remember giving testimony about that?

4  A.   Yes.

5  Q.   Did you draw that from Jany's journal, or did you have

6  some other source that provided that information?

7  A.   No, I believe that came from her book.

8  Q.   Okay.  Do you consider that to be corroborated or

9  uncorroborated?

10  A.   There are no other witnesses that I can recall that have

11  said that.

12  Q.   Okay.  And was it your understanding that Abdul-Ghani

13  actually couldn't speak?

14  A.   From speaking to the mother and other family members, he

15  did not speak in complete sentences.  I think they described

16  that he really couldn't speak.

17  Q.   Do you remember for certain anybody saying Abdul-Ghani had

18  any ability of speech, outside of Jany's journal?

19  A.   No, I can't recall that.

20  Q.   Okay.  There's also -- you made brief reference in your

21  testimony to law enforcement in Georgia trying to make contact

22  with Siraj after Hakima is reporting that he's taken

23  Abdul-Ghani, and am I correct that this is in about early

24  December of 2017?  Do I have that pretty close to right?

25  A.   I believe so.

1  Q.   And where do you get the information about -- and this

2  also -- I want to make sure that this is what you testified

3  about.  When you were testifying earlier, were you referring to

4  law enforcement in early December in Georgia trying to make

5  contact with Siraj on behalf of Hakima?  Is that your

6  understanding of what was happening?

7  A.   Yes.

8  Q.   Okay.  And where do you draw that from?

9  A.   I believe there's a police report that talks about a

10 police officer going up the steps of, I believe it was Hujrah's

11 house, and speaking to Siraj, and Hakima was behind the police

12 officer.

13 Q.   Have you seen that police report?

14 A.   I have, yes.

15 Q.   Has it been discussed today?  Is it in any of the exhibits

16 that were presented during your testimony?

17 A.   I don't recall seeing that specific police report today.

18 Q.   But you do recall seeing a police report that describes a

19 police officer going up the steps of Hujrah's house and

20 speaking to Siraj?

21 A.   Yes, I believe it was a police report.

22 Q.   All right.  Have you heard about any narrative along those

23 lines coming from any other source besides a police report in

24 Georgia?

25 A.   Not that I can recall.  I'd have to refer to my interviews

1  with Hakima, or interviews that people have done of Hakima.  It

2  also came up in those.

3  Q.   Okay.  If there were statements along those lines, if

4  there was a narrative along those lines in Jany's writings, do

5  you recall if you've seen it before?

6  A.   I can't recall.  It may be.  I don't remember.

7  Q.   Okay.  If something like that appeared in Jany's writings,

8  would you then consider it corroborated by the police report?

9  A.   Yes.

10 Q.   Going back to the idea of the resurrection of Abdul-Ghani

11 as Isa, do you know if there was any discussion of, or

12 prediction of Abdul-Ghani resurrecting or being associated with

13 Isa before his death?

14 A.   I don't think I have evidence that says that there were

15 discussions of that before his death.

16 Q.   Is the body of evidence that you've been looking at in

17 this case pointing to the Abdul-Ghani resurrection as Isa being

18 an idea that formed after his death?  Is it fair to say that?

19 A.   Based off the evidence I have, there's no indication of a

20 discussion happening before.

21 Q.   Okay.  You were also talking a little bit about how

22 different folks, different Defendants, and then some

23 non-Defendants, have identified roles.

24 A.   Sure.

25 Q.   What did you understand Hujrah Wahhaj's role to be?

1   A.    Based off, I think, witness statements as well as the book

2   that Jany had written, she was to run the compound after the

3   group went out with Isa to conduct these conversions.

4   Q.    And what does "run the compound" mean?

5   A.    That's just what was written, so --

6   Q.    Where was that written, "run the compound"?

7   A.    That's not verbatim.  I think it was supervising the

8   compound, overseeing it, something along those lines.

9   Q.    Were they calling it a compound, or are those your words?

10  A.    I'd have to refer to the transcript to identify how they

11  were calling it.

12  Q.    Okay.  But you're saying that you saw something written

13  that indicates that Hujrah was going to be a supervisor in some

14  capacity of -- is it of the property or of the people?  I mean,

15  is she like a property caretaker, or a housekeeper, or was she

16  running people and organizing a staff of people?

17  A.    I guess you could look at it differently.  I think the way

18  it's -- I don't remember correctly how it's transcribed.  It's

19  maybe the property, or if there's any individuals remaining on

20  the property.  I don't think it's very specific.

21  Q.    Are you possibly speculating a little bit about what the

22  instructions for her role might have meant?

23  A.    I think it just goes along the lines of saying, like,

24  running the compound, or the property.  What that means is

25  probably up to interpretation.

1  Q.   Okay.  Did you have any other indicators of what her role

2  was going to be?

3  A.   Between witness statements and the book, not that I can

4  recall.

5  Q.   And are any of these witness statements that you're

6  talking about statements that are trying to be entered in as --

7  you probably don't know this.  I'm not going to ask you this

8  question.  I withdraw that.

9       Sticking with, you know, our understanding of Hujrah's

10 role for a minute, did you have any evidence that Hujrah Wahhaj

11 knew about the custodial status or rights over Abdul-Ghani as

12 between Hakima and Siraj?

13 A.   I don't think there's comments like with Subhanah, saying

14 that these are lies, but she knew that Abdul-Ghani lived with

15 Hakima Ramzi, and that Hakima Ramzi gave birth to Abdul-Ghani.

16 I think that's probably what I can say as far as I can remember

17 of statements.  I don't think there were statements like

18 Subhanah being told to return the child.  But I can't recall if

19 all the e-mails or messages, if any of those were directed

20 specifically at Hujrah.

21 Q.   Okay.  But even going with that, right, so somebody on

22 social media or through some other means of communication

23 saying, bring the child back to Hakima -- I get that, right.

24 But what I'm asking is, does anybody know, outside of -- do you

25 have any evidence showing that Subhanah or Hujrah or anybody

1  else actually knows who's right and who has the legal right to

2  have Abdul-Ghani at this time?

3      I understand that they may know that Hakima wants

4  Abdul-Ghani back, but what I'm asking is a different question.

5  I'm asking, what do you have in your body of evidence, in your

6  investigation, that says Hujrah knew that Siraj didn't have the

7  right to, say, have Abdul-Ghani in his physical custody at this

8  time because of X order, or X restraining order, or, you know,

9  a hearing officer's statement back in Georgia?

10 A.   As far as, like, a legal order and whether they knew about

11 it, I don't think I have a particular document that says that.

12 It would have been if Lucas Morton relayed that information

13 when CCPD told Lucas Morton that there was a pickup order on

14 December 31st for Abdul-Ghani.

15 Q.   Okay.  And so before December 31st and that pickup order,

16 there actually weren't any orders in place by any court of law,

17 that you're aware of, or any law enforcement agency as to where

18 Abdul-Ghani was supposed to reside, whether with Siraj or

19 Hakima; is that fair?

20 A.   I believe that there were orders before December 31st.

21 Q.   That these folks knew about?

22 A.   I can't say that.

23 Q.   So when it comes to the time-line for the conspiracy to

24 commit kidnapping, are you placing it, you know, when people

25 might at least have constructive knowledge of some kind of an

1  order regarding where Abdul-Ghani should or shouldn't be, or

2  are you trying to place it before then?

3  A.   To me, that seems like a legal question on determining the

4  statute, as far as when is the child actually kidnapped versus

5  when did they know that there was a pickup order.

6  Q.   Well, is the simple answer, you don't know --

7  A.   To the legal --

8  Q.   -- to my question?

9  A.   I guess, can you repeat the question before I answer that?

10  Q.   Well, I guess what I'm just trying to ask you is, when do

11  you consider the conspiracy to kidnap Abdul-Ghani to begin?

12  Are you saying it's when people know or could at least have

13  constructive notice that Siraj wasn't supposed to have him, or

14  are you saying that before there was any type of legal notice

15  that Siraj was not supposed to have him that a conspiracy to

16  kidnap nevertheless existed?

17        MR. HALL:  I'm just going to go ahead and object.  I

18  think it calls for a legal conclusion, and it misstates the law

19  on what kidnapping is.

20        THE COURT:  Well, recognizing that the witness is not

21  a lawyer, if he can answer the question based on his

22  investigation, he can.  If he doesn't understand it, he can so

23  indicate.

24  A.   I understand the question, but I think that I'd be giving

25  my opinion and not necessarily how the Court or the law may

1   view when a conspiracy occurs.

2           THE COURT:  Do you want his opinion?

3   BY MR. RAY:

4   Q.   Let me ask you this:  You are the agent that is

5   investigating and bringing these criminal charges for

6   kidnapping against the folks sitting at that table, are you

7   not?

8   A.   I collect the facts and provide the facts to the U.S.

9   Attorney's Office.

10  Q.   That's all you do?  You don't have an opinion as to when

11  and whether a kidnapping happened, as a law enforcement officer

12  who has supported charges for these folks at this table?

13  A.   I don't think my opinion matters.  I collect the facts and

14  I present the facts to the U.S. Attorney's Office, and they

15  present them in a grand jury, or if there's a probable cause

16  arrest or search.

17  Q.   Do you think a kidnapping happened here?

18  A.   I do.

19  Q.   When did the kidnapping happen?

20  A.   I believe the kidnapping occurred when Jany Leveille

21  instructed Siraj Wahhaj to take Abdul-Ghani from his biological

22  mother against her wishes.

23  Q.   And would it matter to you if Siraj Wahhaj had a legal

24  right to take Abdul-Ghani at that time?  Would that change your

25  view of things?

1  A.    I'm not familiar on the state law regarding when you can

2  take a child and what paperwork you might need.

3  Q.    But we're not doing state law here today.  I mean, what's

4  your view under federal law, which you are trying to enforce

5  today and throughout these proceedings?

6          MR. HALL:  Same objection; legal conclusion.

7          THE COURT:  Where are you going?  I mean, I think he

8  answered the question.

9          MR. RAY:  I just want to know when the conspiracy

10 began.  He won't tell me.

11         THE COURT:  He just answered that.  In his opinion,

12 or in his view, it was when the child was taken from the

13 biological mother.  So he's answered the question.  Now ask the

14 next one.

15         MR. RAY:  Judge, if you would permit me to confer

16 with my co-counsel for a minute.

17         THE COURT:  Sure.

18 BY MR. RAY:

19 Q.    Do you have any evidence that anyone in this group was

20 planning conflict or confrontation with law enforcement before

21 Abdul-Ghani died?

22 A.    No.

23 Q.    Okay.  And similarly, do you have any evidence that the

24 Defendants expected conflict with law enforcement before

25 Abdul-Ghani was resurrected?

1  A.   Did they expect conflict with law enforcement prior to

2  Abdul-Ghani being resurrected?

3  Q.   Yes, sir.

4  A.   Well, I guess would you say that his resurrection was

5  supposed to occur roughly around April or in August?  Because

6  there were periods while they were in Taos that they believed

7  that law enforcement was watching and, per witness statements,

8  that they were going to kill law enforcement if they approached

9  the compound, or approached the property in Taos.  And at that

10 time, Abdul-Ghani had not been resurrected.

11 Q.   Okay.  And so there you're talking about these defensive

12 maneuvers that they purportedly would make if a raid happened,

13 right?  So what about --

14 A.   One of the witnesses also stated, in their own words, that

15 it was for offensive purposes, as well.

16 Q.   What was for offensive purposes?

17 A.   These trainings, close-quarters combat, firing.

18 Q.   And was that training, that offensive training, for this

19 idea of going out and converting agencies and institutions, and

20 if they didn't convert, then bad things would happen?

21 A.   Yes.

22 Q.   And is it your understanding of the evidence that that

23 offensive activity was supposed to happen after the

24 resurrection of Abdul-Ghani?

25 A.   Correct.

1    MR. RAY:  I'm going to pass the witness, Judge.

2    THE COURT:  Okay.

3    MR. RAY:  Thank you.

4                    CROSS-EXAMINATION

5    BY MR. ARIC ELSENHEIMER:

6    Q.   Good afternoon, Agent Taylor.

7    A.   Good afternoon.

8    Q.   How are you?

9    A.   I'm doing well.  You?

10   Q.   Good.  I want to turn your attention to Exhibit 6.  This

11   is what you've described as Ms. Leveille's letter to Muhammad,

12   I believe?

13   A.   Yes.

14   Q.   And is it correct to say that you got this letter from law

15   enforcement in Georgia?

16   A.   Clayton County, yes.  Or it was given to the FBI in

17   Clayton County and entered into our case file.

18             THE COURT:  Did you want that up on the screen?

19             MR. ELSENHEIMER:  I don't need to have it up on the

20   screen.

21   BY MR. ELSENHEIMER:

22   Q.   So the FBI got this from the Clayton County Police

23   Department?

24   A.   To my knowledge, yes.

25   Q.   And where did the Clayton County Police Department get

1  that letter?

2  A.   I believe they got it from Muhammad Wahhaj, but I can't

3  recall that mechanism and how that occurred.

4  Q.   Do you know if they got it from Jamilla Jihad, who got it

5  from Muhammad?

6  A.   I can't recall.

7  Q.   And where did Muhammad get the letter?

8  A.   From my knowledge, Lucas Morton gave him the letter.

9  Q.   And you don't know when that letter was written, correct?

10  A.   No, I don't.

11  Q.   And just to be clear, that letter is not signed by anyone,

12  correct?

13  A.   Correct.

14  Q.   I want to ask you about the firearms.  You testified that

15  one of the minor children, I believe it was either Farroll or

16  Jamil, said that Ms. Leveille either fired or handled a gun

17  twice; is that right?

18  A.   Can you repeat that?

19  Q.   I believe you testified -- and tell me which of the minor

20  children it was who told you this.  I think it was either

21  Farroll or Jamil.  They said that Ms. Leveille fired or handled

22  a gun twice; is that correct?

23  A.   I can't remember which, because they kind of have

24  overlapping statements, but that she was given a firearm by

25  Siraj Wahhaj while in Georgia, that they went to a gun range in

1  which she fired a rented firearm, and then while in Taos, she

2  fired an AR-15, is I believe what it says in the transcript.

3  Q.   Okay, let me just parse that out a little bit.  So you

4  don't know which of those individuals said that, Farroll or

5  Jamil, but one of them did?  For this hearing, it's one of the

6  children, right?

7  A.   Yes.  Some of those are overlapping, but there might be

8  information that was only in one of their statements.

9  Q.   Okay.  And there was a gun that they referred to that

10 Ms. Leveille had in Georgia, correct?

11 A.   Correct.

12 Q.   And there was a gun that Ms. Leveille had in Amalia?

13 That's what they told you?

14 A.   Fired a gun on it one day, yes.

15 Q.   And when was the gun allegedly handled or fired in

16 Georgia?

17 A.   I don't think they had a date.

18 Q.   You have no idea?

19 A.   No.

20 Q.   And when was the gun allegedly fired or handled in New

21 Mexico; in Amalia, New Mexico?

22 A.   They didn't provide a date.

23 Q.   You have no idea when that was?

24 A.   Correct.

25 Q.   Let me ask you about -- you've made a very brief reference

1  to Ms. Leveille's work visa and it having been expired.  Do you

2  remember that part of your testimony?

3  A.   I do.

4  Q.   And when was it that Ms. Leveille's work visa expired?

5  A.   I know we have that in the case file, but I can't recall

6  the exact date.

7  Q.   Do you know when her status in the United States ended?

8  A.   I can't recall the exact date.

9  Q.   Do you know if Ms. Leveille had knowledge that her status

10 ended when it allegedly ended?

11 A.   There was immigration paperwork found in her house, I

12 believe in a shoe box, that had to do with her status.  But to

13 answer the question about if she looked at those paperwork, I

14 can't say.

15 Q.   You don't know if she knew?

16 A.   No, I can't say.

17 Q.   Thank you.

18      In your testimony -- I'm going to just kind of use broad

19 terminology here.  You mentioned corrupt institutions and

20 killing an officer.  What law enforcement officer are they -- I

21 think you got that from one of the children, right?  Farroll or

22 Jamil; is that right?

23 A.   Yes, both.

24 Q.   And what law enforcement were they talking about?

25 A.   They mentioned, I think, the name military.  I believe

1  they mentioned the FBI by name.  I think they mentioned the

2  CIA, as well, and I believe they mentioned the military.  Not

3  law enforcement, but education and banking systems.

4  Q.   And you had mentioned corrupt institutions.  Is that what

5  it is?  So banking systems, and did you say education?

6  A.   Education system, and then including the other government

7  agencies that I had previously mentioned.

8  Q.   So where are these corrupt institutions that they were

9  talking about, Farroll and Jamil?

10  A.   Where are they?

11  Q.   Yeah, where are they?

12  A.   I mean, they didn't say, like, specifically in Taos, but

13  there are these institutions located all across the United

14  States.

15  Q.   Okay.  In terms of law enforcement, what law enforcement

16  were they talking about?  You said FBI and military, CIA.  But

17  what specifically are we talking about?  Just all across the

18  United States?

19  A.   Well, they didn't make a statement like the FBI office in

20  Santa Fe.  They, in general, made statements about the FBI, the

21  CIA, the military.

22  Q.   Just to be clear, following on that, AG, the child, was

23  going to be, according to what the children told you, raised

24  from the dead at some point, right?

25  A.   From what the children told me, and what was in Jany

1   Leveille's book.

2   Q.   And that child was going to be raised from the dead as --

3   you've used the term Isa?

4   A.   That's what they've used.

5   Q.   And you know that Isa is Christ, correct?

6   A.   Correct.

7   Q.   So the child was going to come back as the resurrected

8   Christ, right?  And at that point, based on what they told you,

9   the Antichrist would also come, correct?

10  A.   I think they referred -- are you talking about when they

11  referred to Jamilla Jihad as Dejal?

12  Q.   No.  I mean, they did mention the Antichrist, right, that

13  there was going to be an Antichrist that comes back?

14  A.   I can't recall exactly.

15  Q.   So in their telling and in their understanding of things,

16  and what your understanding of things is, when Christ comes

17  back from the dead, that Christ is going to go out and tell

18  them who to convert?  They're going to go tell them to convert

19  people, correct?

20  A.   From my understanding, yes.

21  Q.   To Christ, right?

22  A.   Yeah, to their ideological views.

23  Q.   Okay.  And it was Christ that was going to point them in

24  the direction that they were to go, right, this resurrected

25  Christ?

```
1   A.   Isa was going to direct them to go to whatever institution
2   and try to convert these institutions, per the statements of
3   the witnesses and her book.
4   Q.   Let me turn to a couple of questions that I think you
5   started your testimony with.  There was some discussion of
6   Siraj, Mr. Siraj Ibn Wahhaj, getting ruqyah training; is that
7   right?
8   A.   Yes.
9   Q.   And that ruqyah training was in England, correct?
10  A.   Yes.
11  Q.   And I think you mentioned that ruqyah is a term that has
12  some parallel to the term exorcism as we might know of it?
13  A.   I think that's a fair assessment.
14  Q.   So Mr. Siraj Ibn Wahhaj went to England to get ruqyah
15  training, right?
16  A.   Yes.
17  Q.   Ms. Leveille did not go with him to England, right?
18  A.   No.
19  Q.   And do you know when that happened, when there was ruqyah
20  training in England?
21  A.   I believe it was October 2017.  I have the exact dates in
22  my case file, but I don't remember the exact dates.
23  Q.   And Siraj was the individual who got his child from Hakima
24  Ramzi, correct?
25  A.   At the instruction of Jany Leveille, Siraj Wahhaj took
```

1  Abdul-Ghani from Hakima Ramzi.

2  Q.   But it was Siraj that went to Hakima's house and got AG,

3  right?

4  A.   Yes.

5  Q.   And it was Siraj who told Hakima that he was taking the

6  child to the park, correct?

7  A.   Yes.

8  Q.   And it was Siraj who said that he would be right back, or

9  be back shortly, something like that?

10  A.   Yes.

11  Q.   And just flashing forward a little bit, when Siraj was in

12  Alabama, you have a police report of after a car accident,

13  right?  And then you also have a video, correct?

14  A.   Yes.

15  Q.   I think you talked about that in your testimony earlier,

16  but just let me clarify a couple of things.  Siraj was at the

17  car when he was being interviewed -- or not interviewed, but

18  questioned by police officers about what happened with the

19  traffic accident, right?

20  A.   Yes.

21  Q.   And with him were, correct me if I'm wrong, Farroll,

22  Jamil, and AG, correct?

23  A.   It appears to be AG, but I don't think I could identify

24  precisely on the video.

25  Q.   And AG was in the car, correct?

1   A.   Yes.

2   Q.   And everyone else had went to the hospital?

3   A.   Correct.

4   Q.   And Siraj -- sorry.  There were guns in that car, correct?

5   A.   Per the Alabama State Trooper, yes.

6   Q.   Okay.  And Siraj said those guns were his, correct?

7   A.   Correct.

8   Q.   And he said he was going to New Mexico with his family?

9   A.   Yes.  He said he was going to go camping in New Mexico.

10  Q.   Let me just turn your attention to -- I believe this is

11  Exhibit 31.  I don't think you have to turn to it, because you

12  just testified to this, but if you need to, of course please

13  let me know.

14      This is Jane Doe 2's interview with law enforcement, I

15  believe, and according to Jane Doe 2 -- let me just make sure I

16  understand this.  She said Siraj said that he was glad God

17  helped him take his son; is that correct?

18  A.   Do you mind if I look at the exhibit?

19  Q.   I believe this is Exhibit 31.

20  A.   I've looked at Exhibit 31.

21  Q.   And so Jane Doe 2 said that Siraj told her that he was

22  glad God helped him take his son; is that correct?

23  A.   Yes, because Hakima was -- or they believed that Hakima

24  had taken AG from Jany Leveille's stomach.

25  Q.   And you said you don't have any evidence that Hujrah or

1  Subhanah, and I think you said others, knew the custodial

2  status of AG.  You don't have any evidence that Ms. Leveille

3  knew the custodial status of AG, either, do you?

4  A.   Other than knowing that it's Hakima Ramzi's child, I don't

5  have anything to say that they saw the paperwork regarding the

6  custodial status.

7        MR. ELSENHEIMER:  May I have just a moment, Your

8  Honor?

9        THE COURT:  Sure.

10        MR. ELSENHEIMER:  Nothing further, Your Honor.  I

11  pass the witness.

12        THE COURT:  Ms. Fox-Young.

13        MS. FOX-YOUNG:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15  BY MS. JUSTINE FOX-YOUNG:

16  Q.   Good afternoon, Agent.

17  A.   Good afternoon.

18  Q.   You testified earlier as to the aspects of material

19  support as you understand them.  Do you remember that?

20  A.   Yes.

21  Q.   Okay.  Is this an inclusive list?  And correct me if I'm

22  misstating anything.  Training, tactical planning, contributing

23  financial and other resources.

24  A.   Contributing yourself, as well.  Adding to the group.

25  Guidance.

1  Q.   Anything else?

2  A.   Not that I can think of at this moment.

3  Q.   When did federal surveillance of Siraj Ibn Wahhaj begin?

4          MR. HALL:  Your Honor, if counsel can clarify.  I

5  don't want to get into stuff we've already litigated in terms

6  of going back to other occasions and having to bring in

7  classified information.

8          THE COURT:  Are you talking about this case?

9          MS. FOX-YOUNG:  I am.  I'm talking about surveillance

10  before New Mexico.  The Government has made admissions going

11  back to '08 or '09.  I mean, I can, based upon the Government's

12  admissions in the unsealed documents, I can just start there,

13  Judge.  I'm not trying to elicit any kind of classified

14  information.

15          THE COURT:  That's fine.

16          MS. FOX-YOUNG:  Okay.

17  BY MS. FOX-YOUNG:

18  Q.   Are you aware of whether Siraj Ibn Wahhaj was surveilled

19  by the federal government prior to 2017?

20  A.   Yes.

21  Q.   Okay.  And was that surveillance in Georgia?

22  A.   Yes.

23  Q.   As case agent, are you aware of any evidence that any of

24  the Defendants in this case were engaged in activities that

25  qualify as aspects of material support while in Georgia, the

1  ones you just described before they left Georgia?

2  A.   No.

3  Q.   Okay.  So any surveillance that was done -- is it correct

4  to say that any surveillance that was done of these individuals

5  charged in this case in Georgia revealed no evidence whatsoever

6  that they were engaged in material support for terrorism; is

7  that right?

8  A.   I think to more accurately put it, the surveillance was

9  only conducted on Siraj, and during that time there was no

10 criminal charges brought against Siraj for material support.

11 Q.   Okay.  And beyond that, are you aware of any evidence that

12 any of these Defendants were engaged in material support to

13 terrorism while they were in Georgia?

14 A.   I'm sorry, can you repeat that again?

15 Q.   I think you qualified your answer and we're only talking

16 about surveillance, and that's because I asked you that

17 question.  So let me just say, is there any evidence that

18 you're aware of, of any kind, that any of these Defendants were

19 engaged in activities constituting material support to

20 terrorism while they were in Georgia?

21 A.   No.

22 Q.   Okay.  And how about while they were in Alabama?

23 A.   I think this kind of goes along with the other questioning

24 of when did the material support begin.

25 Q.   Well, and I'm not asking you for a legal conclusion about

1  that, I'm just asking about evidence of training, tactical

2  planning, guidance, contributing financial and other resources,

3  the list that we went down.  Did you see any of that in

4  Alabama?

5  A.   I did not see those particular things.  I think it would

6  depend on if you viewed the transportation of the individuals

7  out to New Mexico as part of the conspiracy.

8  Q.   Okay.  So other than transporting the individuals and

9  whatever they brought with them to New Mexico, and I understand

10 you testified about that, anything else that checks those boxes

11 that you've talked about being material support before these

12 folks arrived in New Mexico?

13 A.   No.

14 Q.   Okay.  Was there surveillance in Alabama?

15 A.   No.

16 Q.   But there was a search of the area where they stayed or

17 resided in Alabama, right?

18 A.   After their arrest in 2018, August of 2018.

19 Q.   And did that search uncover any evidence of any activities

20 constituting material support to terrorism, in your estimation?

21 A.   I think the only thing that it revealed is a similar built

22 structure on both properties.

23 Q.   Similar because it used tires, right?

24 A.   No.  It did use tires, but I can't remember the extent of

25 what the building was.  But from what I remember reading, it

```
 1   was similar, yes.
 2   Q.    Okay.  Did you testify at the grand jury?
 3   A.    Yes.
 4   Q.    Did anybody else testify at the grand jury?
 5   A.    Well, there's other --
 6   Q.    On this case.
 7   A.    -- witnesses that testified at the grand jury.
 8   Q.    Are you aware of any connections that any of the
 9   individuals charged in this case have with any known terrorist
10   organization?
11   A.    Do I know if any of these individuals have connections
12   with known terrorist organizations?
13   Q.    Is there any evidence to suggest that they do?
14   A.    I believe answering that question would put me into a
15   territory that we may not want to -- or I may not be allowed to
16   discuss.
17         MR. HALL:  Your Honor, I would also maybe object on
18   relevance, because that's not what the charge is about under
19   the conspiracy.
20         MS. FOX-YOUNG:  We're backed to, these folks are
21   charged with material support to commit terrorist acts.  I
22   think it's totally relevant whether they had any evidence of
23   any kind that they're connected to known terrorist
24   organizations.
25         THE COURT:  Well, the problem is, you haven't laid a
```

1   timeframe.  Just any time?  Because then you're getting

2   possibly into classified information that I haven't even looked

3   at.

4            MS. FOX-YOUNG:  And that's not my intention, Judge.

5   BY MS. FOX-YOUNG:

6   Q.   Let me say, after --

7   A.   I can probably answer your question in a way that --

8   Q.   After January 1st of 2017, is there any evidence that any

9   of these individuals had ties to known terrorist organizations?

10  A.   Can I try to answer in a way that might suit what you're

11  looking for?  I just -- there are times, many times, when we

12  investigate individuals who have communications with people who

13  are known to participate in terrorism activities, but

14  oftentimes those people don't actually conduct terrorism

15  activities, so they're not charged with that.

16       So to answer that question, if they've been in contact

17  with known terrorist groups, there are people who contact

18  people who are part of those groups, but not necessarily for

19  the reasons of terrorism.  So I don't want to -- am I being

20  clear in kind of what I'm getting at?

21  Q.   Are you saying that while some of the Defendants may have

22  contacted individuals affiliated with known terrorist

23  organizations, any contacts or communications they had did not

24  pertain to terrorist activities?

25  A.   I think that would be an accurate statement.

1    MS. FOX-YOUNG:  All right, Judge, I'm not going to go

2    any further.  We can explore that in another venue.

3    BY MS. FOX-YOUNG:

4    Q.  Was there any evidence after January 1, 2017, that anyone

5    charged in this case was transferring funds or property to or

6    from any known terrorist organization?

7    MR. HALL:  Your Honor, I think -- I'm objecting on

8    relevance, because 2339(b) is the charge that has to do with

9    foreign terrorist organizations.  Foreign terrorist

10   organizations is a conflation that is commonly made, but that's

11   not what they're charged with.  There's nothing about foreign

12   terrorist organizations that's relevant to this case.  That's a

13   2339(b) charge.  We have a 2339(a) charge.  So questions about

14   foreign terrorist organizations are not relevant to this case.

15   MS. FOX-YOUNG:  I'm asking about any known terrorist

16   organizations.  I mean, if it's not material support to

17   terrorism, Judge, I don't know what they're supporting.  But

18   I'm going to -- this is my last question in this vein.

19   THE COURT:  I'll sustain the relevancy objection that

20   was made before.  Go ahead and answer the next question, or ask

21   the next question.

22   MS. FOX-YOUNG:  Thank you, Your Honor.

23   BY MS. FOX-YOUNG:

24   Q.  Agent, you testified that there were witness statements --

25   well, let me ask you this.  Do you know when Subhanah Wahhaj

1  went to Alabama?

2  A.   I don't have the exact date.  We know from testimony or

3  witness statements that they went prior to Siraj Wahhaj.

4  Q.   And I understand if you don't remember right now on the

5  stand, but did you ever learn when she went to Alabama?

6  A.   Maybe I have a piece of evidence that says exactly when.

7  I can't recall the exact date when they went.  I believe they

8  went prior to Siraj Wahhaj going to Alabama.

9  Q.   Do you know how long prior?

10  A.   I can't recall with certainty.

11  Q.   Do you know if she went with Mr. Morton?

12  A.   I think in testimony it talks about that, but I can't be

13  certain.

14  Q.   Which witness testimony would you look to or rely on for

15  that information?

16  A.   The two older boys.

17  Q.   Ms. Leveille's boys?

18  A.   Yes.

19  Q.   Do you know when the other Defendants arrived in Alabama?

20  A.   I can -- I think there might be a time-line in one of the

21  exhibits.  But Hujrah Wahhaj withdrew her child December 5th,

22  so it would have been after December 5th.

23  Q.   Do you also rely on the statements of Ms. Leveille's older

24  boys for that information?

25  A.   Yes.

1   Q.   You testified that -- and I don't mean to misstate your

2   testimony, but I think you testified that Ms. Leveille said

3   that she received messages from God and the other Defendants

4   knew that; is that right?

5   A.   She would receive messages from, I believe, Gabriel, and

6   she would translate the messages for the group.

7   Q.   What, if any, evidence do you have that Subhanah Wahhaj

8   heard her say those things?

9   A.   The witnesses, being the children, talked about the adults

10  having multiple discussions in privacy, and that Jany Leveille

11  would get a message, open the Qur'an, and then give

12  instruction.

13  Q.   Which children told you that Subhanah Wahhaj heard

14  Ms. Leveille say those things?

15  A.   I believe it was at least the two older boys, but some of

16  the eight-year-old girls might have.  I'd have to review the

17  transcripts.

18  Q.   You testified that there were witness statements to the

19  effect that Lucas Morton wanted to die as a martyr, and that

20  those statements originated from time in Georgia.  Do you

21  remember that?

22  A.   Yes.

23  Q.   When -- who do you rely on for that information?

24  A.   Witness statements from the older boys, from Jany

25  Leveille, and I believe she also wrote about it in her book.

1  Q.   So you rely on witness statements from Ms. Leveille's two

2  older boys and on Ms. Leveille's journal for that piece of

3  information?

4  A.   Yes.

5  Q.   And do you know if -- are you alleging that Mr. Morton

6  actually said that he wanted to die as a martyr?

7  A.   I'd have to look at the transcript again.  I thought it

8  said something along the lines of, Lucas Morton and Siraj

9  Wahhaj were going back to the house and that Lucas Morton

10 wanted to die as a martyr.  But I'd have to review the

11 transcript to say that that's exactly how it was worded.

12 Q.   Which transcript would you rely on for that statement?

13 A.   I believe either Jamil or Farroll, and I believe one of

14 the eight-year-olds also spoke about it, but I'd have to review

15 the transcripts.

16 Q.   Okay.  Those are the interviews that you conducted, right?

17 A.   Yes.

18 Q.   Do you have any evidence that -- well, can you say exactly

19 when Hakima Ramzi made statements, as you testified, about

20 ruqyah being performed and the reasons for it?

21 A.   About Hakima Ramzi making statements about ruqyah being

22 performed?

23 Q.   Yeah, and the reasons for it.  Do you know when she talked

24 about that?

25 A.   I haven't previously testified about it.  Maybe there's a

1  discussion about it in an interview that someone had done with

2  Hakima Ramzi, but I can't recall her conversations regarding

3  that.

4  Q.   All right.  You testified that part of Ms. Leveille's

5  reasoning for wanting Mr. Wahhaj to take the child was that

6  black magic was being done by Ms. Ramzi, right?

7  A.   Correct.

8  Q.   Do you know when Ms. Leveille made those statements,

9  allegedly?

10  A.   Per statements from the children and her book, it would

11  have been before the kidnapping, or before the child was taken

12  from Hakima Ramzi.

13  Q.   That is, Farroll and Jamil told you that Ms. Leveille told

14  them that?

15  A.   I'm pretty certain both of them did, but I can review the

16  transcript and get an exact answer for you, if you'd like.

17  Q.   No, that's okay, thank you.  And I know you're answering

18  to the best of your ability and memory.

19       Do you have any evidence that Subhanah Wahhaj knew before

20  the kidnapping, the alleged kidnapping, that that was

21  Ms. Leveille's reasoning?

22  A.   No.

23  Q.   Do you have any evidence that Subhanah Wahhaj ever knew

24  that?

25  A.   That Hakima Ramzi was practicing black magic on

1   Abdul-Ghani or the other participants -- or the other

2   Defendants?

3   Q.   Yes.  Let me put a finer point on it.

4        Do you have any evidence that Ms. Wahhaj, Subhanah Wahhaj,

5   ever knew -- or that Ms. Leveille ever shared those views with

6   Ms. Subhanah Wahhaj, as to the baby being taken from her womb

7   and the black magic being performed?

8   A.   I know that the children knew about the black magic being

9   conducted on their family, and that Jany had wrote about it in

10  her book, that it was being conducted on her family, and that

11  it had been conducted on Abdul-Ghani.  But as far as statements

12  that Jany specifically told Subhanah that, I can't -- I don't

13  have those statements.

14  Q.   Do you know when Ms. Leveille wrote those things in her

15  book?

16  A.   No.

17  Q.   This is the book that was maintained on a computer in

18  Amalia, right?

19  A.   Yes.

20  Q.   When you talk about the book, you're talking about

21  something that was downloaded from a thumb drive, right?

22  A.   A thumb drive was inserted into the computer, and the file

23  was on the thumb drive.

24  Q.   Okay.  But sitting here today, you have no idea when

25  anything -- when that file was generated or any portions that

1  were generated?

2  A.   There may be logs.  I don't recall the dates of those

3  logs.

4  Q.   Thank you.

5      I believe you said that the agency had evidence that

6  Abdul-Ghani was only receiving half of his prescribed dose of

7  medication while in Georgia; is that right?

8  A.   Evidence in the sense that I believe that was in an

9  interview with Hakima Ramzi, that she discussed that.

10  Q.   Okay.  Is that the entire source of that information, an

11  interview with Hakima Ramzi?

12  A.   That I can recall.

13  Q.   Is there any report that documents that?

14  A.   I believe it's in an interview with Hakima Ramzi, but I'd

15  have to review the case file to pull that for you.

16  Q.   Do you have any -- do you know of any evidence that

17  suggests that Subhanah Wahhaj knew that Siraj Ibn Wahhaj and

18  Jany Leveille were keeping Abdul-Ghani from his mother while

19  they were still in Georgia?

20  A.   I'd have to look in the time-line of when those

21  communications happened with Subhanah to say, because there was

22  communications with Subhanah regarding returning the child,

23  Abdul-Ghani.  I don't think we know the exact day that she left

24  Georgia.  I'd have to review some of the messages that were

25  sent to Subhanah and her responses and kind of try to match

1  them up with the time-line.  There's a few days that we believe

2  they left within, but we don't know the exact day that they

3  left Georgia.

4  Q.   So as to Subhanah Wahhaj's alleged communications on the

5  subject and any knowledge that she had, is the body of evidence

6  that you're referring to those communications that you've

7  already testified about?  Let me ask this more clearly.

8      Other than the chats and the Facebook messages that the

9  Government presented that you've already testified about, do

10 you have any other source of knowledge as to what, if anything,

11 Subhanah Wahhaj knew about the taking of the child?

12 A.   I think originally you asked me when she knew that the

13 mother wanted him back; is that correct?  Versus when the child

14 was taken?

15 Q.   I'm just saying, other than the Facebook messages, the

16 WhatsApp messages, the chats, the SMS messages, do you have any

17 other source of information as to what Subhanah Wahhaj knew

18 about the taking of the child and the transporting of the

19 child?

20 A.   I don't think I have anything other than chats that I can

21 recall, other than Lucas Morton being advised by CCPD on

22 December 31st, and then Lucas Morton returning to the Taos

23 property.

24 Q.   So you don't have any witness testimony whatsoever on this

25 particular subject; is that right?

1   A.    Nothing I can recall.

2   Q.    Do you have any evidence that Subhanah Wahhaj was present

3   in the box truck when you testified that Mr. Morton came to

4   pick up the others in Alabama after the accident?

5   A.    I'd have to review the police report, which I know we

6   have, if it states that she was present.

7   Q.    Okay.  Would that be the only source of evidence in that

8   regard?

9   A.    I can't recall if the children specifically talked about

10  it.  I thought I remembered in an interview that it was

11  discussed, but I'd have to review it to give you a definitive

12  statement.

13  Q.    You testified that -- you testified with respect to the

14  screen shots of messages between Anas White and Ms. Leveille's

15  brother.  Do you recall that?

16  A.    Uh-huh; yes.

17  Q.    And I think it was in the course of that testimony that

18  you said there was evidence that Subhanah Wahhaj had read or

19  edited Ms. Leveille's journal; is that right?

20  A.    I don't remember if it was in that.  I believe one of the

21  children mentioned that Hujrah and Subhanah edited the book.  I

22  don't remember if that was -- I don't know if that was

23  mentioned in the Anas and Yusuf screen imagery.

24  Q.    Okay.  And you did testify about that, but you don't

25  remember which child told you that?

1  A.   I spoke to five children.  I'd have to review the

2  transcripts to make sure that I was definitive.

3  Q.   Is it your recollection that one of the five children told

4  you that Subhanah Wahhaj was involved in editing the journal?

5  A.   Yes.

6  Q.   And do you have any other witness testimony or other

7  evidence that Subhanah wahhaj did, in fact, ever read that

8  journal?

9  A.   Other than the children's witness statements?  Is that

10  what you're asking?

11  Q.   Well, you mentioned the one witness statement of one of

12  the children.  Other than that, is there any other evidence

13  that Subhanah Wahhaj ever read that journal?

14  A.   Not that I can recall right now.

15  Q.   And, in fact, one of the children actually told you that

16  Hujrah Wahhaj had not read the journal; is that right?

17  A.   I believe that's in one of the interviews.

18  Q.   I think you testified generally that some of the children

19  had told you something that led you to believe Subhanah Wahhaj,

20  among the others, knew or followed Jany's rules or dictates; is

21  that right?

22  A.   Yes.

23  Q.   What specifically did the kids tell you that led you to

24  believe that Subhanah wahhaj followed Jany's rules?

25  A.   To say specifically, I would like to review the

1  transcript.  But generally, that the Defendants took direction

2  from Jany, and I believe there's a statement from one of the

3  children, as well, that Subhanah got in trouble and that Jany

4  commanded that she cook and clean for all of the Defendants,

5  and that was part of her punishment.

6  Q.   What did she get in trouble for, as far as you understand

7  it?

8  A.   I believe it was expressing a desire to leave.  I'd want

9  to review the transcript to say specifically, but I think it

10 was along those lines.

11 Q.   When do you understand that she expressed a desire to

12 leave?

13 A.   I don't think there was a timeframe, but while in New

14 Mexico.  I don't have a particular date, but I believe while in

15 New Mexico was how it was characterized.

16 Q.   This is information that you got from who?

17 A.   I believe one of the children.

18 Q.   Is there other evidence to corroborate that she expressed

19 a desire to leave?

20 A.   I can't recall at this time.

21 Q.   I'm happy to show you this chart if you'd like to see

22 exactly what I referenced in just a moment, because I don't

23 know if you assembled it or not, but --

24 A.   I have it right here, if you just want to tell me.

25 Q.   Okay.  So I'm looking at Exhibit 35, Page 10, referencing

1  Exhibit 5.  This is a portion of the statements the Government

2  proffers from Ms. Leveille's writings.  Do you see where it

3  says something about the purpose of Subhanah's chastisement

4  being related to the jihad?

5  A.   I see what's here, yes.

6  Q.   Okay.  And I know you talked about some aspects or some

7  language from Ms. Leveille's writings being corroborated.  Have

8  you corroborated this language that Subhanah was chastised from

9  Jany?

10 A.   I'm guessing chastise being the discipline for actions.  I

11 believe one of the children said that she was disciplined for

12 the actions that I previously discussed.

13 Q.   Okay.  And then what is your understanding as to how that

14 was related, allegedly, to the jihad?

15 A.   Can you repeat that question?

16 Q.   So the language in here that the Government includes in

17 Exhibit 5, Document 156, is that Ms. Leveille "directed others

18 in all manner of things."  And then it says, "Referred to the

19 purpose of Subhanah's chastisement from Jany as related to 'the

20 jihad.'"  Did you explore and corroborate that statement?  Do

21 you know what the means?

22 A.   What the jihad means?

23 Q.   Well, that Subhanah's chastisement was related to the

24 jihad.

25 A.   Did I corroborate those other than by statements from the

1  children stating that she was disciplined?  I guess to answer

2  your question, that would be the corroboration if it's related

3  to the same event that she was chastised for.

4  Q.   All right.  And you've confirmed that she was punished,

5  correct?

6  A.   Yes.

7  Q.   There's a reference on Page 13 of this document, halfway

8  down, and this is also referenced in the pleadings.  It says,

9  "In or about April 2018, Subhanah wrote in her journal, 'Why

10  hasn't the FBI found us yet?'"

11  A.   Yes, I remember reading that.

12  Q.   Do you have a journal that you claim Subhanah Wahhaj

13  wrote, or that the Government claims Subhanah Wahhaj wrote?

14  A.   This is a journal, I believe it's in evidence, and one

15  page in there talks about, "Why hasn't the FBI found us."

16  Q.   Okay.  Well, can you tell me where that is in any of these

17  exhibits?  Have you actually seen that in an exhibit for this

18  hearing?  Because --

19  A.   I have seen it personally.  I can't -- I don't remember

20  per the exhibit list if we viewed it while here in the

21  courtroom today.

22  Q.   Okay.  But it's your testimony that Subhanah Wahhaj wrote

23  a journal, and that in that journal there's language, "Why

24  hasn't the FBI found us yet?"

25  A.   Yes.

1  Q.   And you think that's been produced to the defense?

2  A.   Well, it's in evidence, and the defense has come to the

3  FBI office and took pictures of all the evidence, to include

4  all the journals.

5  Q.   And this statement is within these materials referencing

6  chats, MMS, and SMS, but you're saying that it's not something

7  that's in a chat message, it's in a written journal; is that

8  right?

9  A.   If I remember correctly, I remember reading it in a

10  written journal.

11  Q.   Okay.  And your testimony is that that's in a -- was that

12  in a written journal that was recovered in Amalia, or at

13  Costilla Meadows?

14  A.   To the best of my memory, yes.  I remember reading it

15  personally, yes.

16  Q.   You testified that Ms. Leveille fired a weapon in Georgia,

17  or you had eyewitness testimony or witness testimony to that

18  effect, right?

19  A.   Yes.

20  Q.   Did she fire it at a firing range?

21  A.   That's what the testimony, or the statement said.

22  Q.   Which range?

23  A.   It was not specified.

24  Q.   The Government also has offered statements with the

25  editorial offering that Abdul-Ghani died in Subhanah Wahhaj's

1   presence.  What evidence is there that Abdul-Ghani died in

2   Subhanah Wahhaj's presence?  And I'm looking at Page 18 of

3   Exhibit 35.

4   A.   The eyewitness statements regarding that most likely were

5   referring to how Abdul-Ghani died in the presence of Siraj

6   Wahhaj, who notified Jany Leveille, who then notified Subhanah

7   and Hujrah that he had passed away.

8   Q.   Okay.  So it is not, then, your testimony that he died in

9   Subhanah Wahhaj's personal presence; is that right?

10  A.   That's correct.

11  Q.   You testified about writings allegedly completed by Siraj

12  Wahhaj with regard to the "Phases of a Terrorist Attack."  Do

13  you recall that?

14  A.   Uh-huh; yes.

15  Q.   And is it accurate to say that you have no idea when those

16  were written?

17  A.   I don't believe there's dates on those handwritten

18  documents, no.

19  Q.   And you have no other evidence as to when they were

20  written; is that right?

21  A.   That's correct.

22  Q.   Do you have any evidence that Subhanah Wahhaj ever read

23  those writings?

24  A.   No.

25  Q.   Or that she knew of their existence?

1   A.   No.

2   Q.   Page 37 of Exhibit 35 references -- the top portion in

3   white references information that you apparently learned from

4   Jane Doe 3, who said that Jamil read the book to them.  Do you

5   recall that?

6   A.   You're on Page 35?

7   Q.   I'm on Page 37 of Exhibit 35.

8   A.   Yes, I'm reading it.

9   Q.   All right.  I think you testified that Jane Doe 3 was

10  familiar with Ms. Leveille's writings, and that -- is that

11  right?

12  A.   I believe I previously testified to that.

13  Q.   Okay.  And that Jamil, Ms. Leveille's child, read the book

14  to them, and that Jane Doe 3 read the book.  That's what's

15  explained here; is that right?

16  A.   Yes.

17  Q.   Now, do you know, when she says that Jamil read the book

18  to them, is that referring to all the children, or some of the

19  children?  Do you know who "them" is?

20  A.   I don't think it was specified in the transcript, but I'd

21  have to look at the transcript.

22  Q.   Do you have any other evidence as to who Jamil allegedly

23  read the book to?

24  A.   No.

25          MS. FOX-YOUNG:  Your Honor, may I just have a moment?

1          THE COURT:  Sure.

2    BY MS. FOX-YOUNG:

3    Q.   Agent, what evidence do you rely on to say that Subhanah

4    Wahhaj fired a weapon in Amalia?

5    A.   Testimony or statements from the children.

6    Q.   And when did she allegedly fire a weapon?

7    A.   No date was specifically given.

8    Q.   Which weapon?

9    A.   I don't recall if they said what particular weapon it was.

10   I can recall that they gave a description of the weapon for

11   Jany, but I don't remember if they gave one for Subhanah.

12   Q.   Do you have any evidence that Subhanah Wahhaj knew that

13   Ms. Leveille was not legally in the United States at the time

14   that they were in Alabama?

15   A.   No.

16   Q.   Do you have any evidence that Subhanah Wahhaj knew Jany

17   Leveille was not legally in the United States when they were in

18   New Mexico?

19   A.   No.

20   Q.   You testified that Subhanah Wahhaj's role with respect to,

21   I think this is accurate, with respect to the material support

22   conspiracy was to cook for the family and to clean; is that

23   right?

24   A.   Yes.

25   Q.   Okay.  Do you have any evidence that she had any role

1  other than to cook and to clean?

2  A.   No.

3         MS. FOX-YOUNG:  Your Honor, that's all my questions.

4  I'll pass the witness.

5         THE COURT:  Mr. Wahhaj, do you have questions?

6         MR. WAHHAJ:  Yes, Judge.  How do you want me to -- do

7  you want me to use the microphone here?

8         THE COURT:  Yes, you can use the microphone from

9  there.

10        MR. KOCHERSBERGER:  Judge, do you want to take an

11  afternoon break?  We're halfway through the afternoon.

12        THE COURT:  Yes, let's take about a 15-minute break.

13  (Recess was held at 2:53 P.M.)

14  (In Open Court at 3:14 P.M.)

15        THE COURT:  You may proceed, Mr. Wahhaj.

16        MR. WAHHAJ:  Thank you, Judge.

17                    CROSS-EXAMINATION

18  BY MR. SIRAJ WAHHAJ:

19  Q.   Bear with me.  Good afternoon, Agent Taylor.

20  A.   Good afternoon, Mr. Wahhaj.

21  Q.   All right, just a couple of questions.  I didn't recall,

22  when did you become the case agent on this case?  What year?

23  A.   August 2018.

24  Q.   August 2018, okay.  Did you request it, or it was

25  appointed?

1  A.    Appointed.

2  Q.    Appointed, okay.  What's the process with a major case

3  like this of who gets what assignment?

4  A.    I was the only assigned terrorism agent in the Santa Fe

5  area.

6  Q.    Okay.  You mentioned on direct that Hakima was the primary

7  caregiver of Abdul-Ghani, or AG; is that correct?

8  A.    Yes.

9  Q.    Do you know that Siraj Wahhaj also shared that

10  responsibility?

11  A.    As the biological father.

12  Q.    So they had dual capability, or responsibility?  So both

13  were the caregivers, do you know?

14  A.    Siraj Wahhaj, yourself, was also a caregiver, yes.

15  Q.    Thank you.  You also testified to ruqyah as relieving

16  yourself from exorcism; is that correct?

17  A.    Ruqyah is used, per my understanding, to get rid of jinns

18  and shaytans.

19  Q.    Does ruqyah cover any other meaning outside of getting rid

20  of shaytans and --

21  A.    I don't know.

22  Q.    To your knowledge, can you also use ruqyah if you're sick?

23  A.    I don't know.

24  Q.    Can you describe what's the process of ruqyah?

25  A.    From the description from witnesses, it's reciting certain

1  Surahs and Qur'an verses on Abdul-Ghani.

2  Q.   Okay.  In what manner?

3  A.   The way that they described it was that yourself would

4  place a hand on Abdul-Ghani's forehead and recite Surahs or

5  different Qur'an verses, and then oftentimes Abdul-Ghani would

6  begin to have what they described as similar to seizures, the

7  symptoms of what would be a seizure.

8  Q.   Now, is there specific verses that you recite in ruqyah,

9  do you know?

10  A.   The children mentioned specific verses.  I don't remember

11  the verses by name.

12  Q.   Okay.  Do you know that Hakima was performing ruqyah on

13  AG?

14  A.   I don't believe I have statements from witnesses about

15  that.

16  Q.   Okay.  In conjunction with giving medicine?

17  A.   She did say that she did give medicine, yes.

18  Q.   Also with ruqyah, but you don't know if she did the ruqyah

19  with the medicine?

20  A.   Correct.

21  Q.   Okay, thank you.

22      You stated that from the report, officers came to Hujrah's

23  house with Hakima and Muhammad trying to receive -- to get back

24  Abdul-Ghani, or AG?

25  A.   I didn't say Muhammad was there.  Maybe that's in the

1   police report.

2   Q.   Why didn't the officer take back AG?

3   A.   I believe the officer told Hakima that she needed to file

4   paperwork.  I think that's in the report.

5   Q.   Paperwork to retrieve him?

6   A.   Yes.

7   Q.   Okay.  Now, you stated that he was at Hujrah's house?

8   A.   I believe that's what's in the report.  I can't say.  I

9   don't remember exactly.  I'd have to have it up in front of me.

10  Q.   So the officer knew that AG was at Hujrah's house, and he

11  still stated that for Hakima to retrieve AG, she has to go

12  through proper paperwork?

13  A.   That he does, or that she does?

14  Q.   That she does.

15  A.   I believe that's what's in the report.

16  Q.   Okay.  So they didn't charge Hujrah with harboring, or

17  kidnapping, or anything knowing that AG was in the house?

18  A.   No.

19  Q.   At that point, did Hakima file a complaint to bring the

20  officers to the house, or what was the process?

21  A.   What was the process that brought the officers to Hujrah's

22  house?

23  Q.   Yes.

24  A.   I don't recall exactly how that process started.

25  Q.   Okay.  Do you know how old Farroll and Jamil was when

1  Siraj married Maryam Islamicly?

2  A.   I believe six, but I -- right around six, I believe.

3  Q.   So who was six and what was the other age?

4  A.   I think Jamil was three years younger, I believe.

5  Q.   So Jamil three and Farroll six?

6  A.   Yes.

7  Q.   So who was their stepfather?

8  A.   Michael Louis -- or Siraj Wahhaj is their stepfather.

9  Q.   So who was their stepfather from the age that Farroll was

10 six and Jamil was three, to what age?

11 A.   I believe in August 2018, they would have been 15 and 13,

12 I believe.

13 Q.   Who did they live with, Farroll and Jamil?

14 A.   Jany Leveille and Siraj Wahhaj.

15 Q.   From the age of six and three until the age when they

16 became teenagers?

17 A.   Yes.

18 Q.   Thank you.

19      So is it fair to say that Siraj was acting as parentis

20 loco, in parentis loco, as the caregiver being a stepfather?

21          THE COURT:  I think he's talking about in loco

22 parentis.

23          MR. WAHHAJ:  Loco parentis, yes, sir.

24          THE COURT:  He's asking if you understand that term.

25 A.   I don't know that term.

1  BY MR. WAHHAJ:

2  Q.    Okay, thank you.

3      The rollover car accident, you stated that firearms was

4  witnessed by the Trooper, is that correct, in Alabama?

5  A.    I believe it's in the report that he saw five firearms.  I

6  believe that's what he put down in the report.

7  Q.    Do you know if any of the firearms was confiscated?

8  A.    Not to my knowledge.

9  Q.    Do you have any text messages from the Defendants stating

10  that I, Lucas Morton; I, Subhanah Wahhaj; I, Hujrah Wahhaj; I,

11  Maryam Leveille, have Abdul-Ghani, and Hakima, we are keeping

12  him?  Do you have any text messages or any media reports

13  stating those from the Defendants?

14  A.    The text messages were asking for Subhanah to return

15  Abdul-Ghani, and the messages replied back were saying, those

16  are lies and not to listen to the family in Georgia.

17  Q.    When the Taos County Sheriff's Office executed the search

18  warrant on August 3, 2018, did you know of any security

19  material that was found on the property in Amalia?

20  A.    Security material?

21  Q.    Yes.

22  A.    I don't remember if there was a business card that said

23  something about Executive Protection, or there was a badge

24  for -- what it was?  I'm trying to remember the name of it.

25  There was a badge for an organization, I can't recall the name,

1   but kind of along those -- maybe something about community,

2   like security or something like that.

3   Q.   Do you recall any security memo, like Executive

4   Protection, ESI, contractor courses, CDs, that were confiscated

5   in Amalia?

6   A.   Yes.  Yes, I do.

7   Q.   Did you make a correlation between the file that says,

8   "Phases of a Terrorist Attack," did you make the correlation

9   between any of the exercises in those courses?

10  A.   Did I connect the two together?

11  Q.   Yes.

12  A.   I looked at them all as separate information.

13  Q.   Excuse me?

14  A.   I looked at all of them as just information found, and the

15  "Phases of a Terrorist Attack" document is a handwritten

16  document that is from text from the internet.

17  Q.   So you never actually checked to see if that document was

18  one of the courses?

19  A.   That it was in one of the courses?

20  Q.   Yes, in one of the security courses.

21  A.   No.

22  Q.   Okay, thank you.

23       You also stated -- I just want to clear a few things up.

24  The FBI did a raid on Siraj's property in Alabama after the

25  raid in Amalia?

1  A.   There was a search warrant conducted on the Tuskegee

2  property.

3  Q.   When was that?  Was that done before or after the arrest

4  of the Defendants in this case?

5  A.   It was after August 3rd.  I don't remember the exact

6  date that it occurred.

7  Q.   Okay.  You relied on two sources to execute the search

8  warrant in this case, Maryam's books and the statements of

9  minor children; is that correct?

10  A.   The only search warrant the FBI conducted at the Taos

11  property was in September.  Is that what you're referring to?

12  Q.   I'm referring to this case.  To file a case against the

13  Defendants, you relied heavily on Jany's books and the

14  statements of the minor children, to file this case; is that

15  correct?

16  A.   There were a lot of statements from the children and from

17  Jany's book that were used in the affidavits.

18  Q.   Are there anything in Jany's book that specifically

19  outlines who the organizations that were supposed to be

20  attacked, and what are the specifics of the attacks, in Jany's

21  books?

22  A.   I don't recall if it lists the FBI, military, CIA in the

23  books.  That came from, definitely from the witness statements

24  of the minor children.

25  Q.   Of the minors, thank you.

1    MR. WAHHAJ:  No further questions.  Thank you, Judge.

2    I appreciate you.

3          THE COURT:  Mr. Morton, did you have any questions

4    that you wanted to ask, sir?

5          MR. MORTON:  No, Your Honor.  Thank you.

6          THE COURT:  Just to clarify for me, the term "Jany

7    Leveille's book," when you use that term, that was the document

8    that was on the computer that was several volumes?

9          THE WITNESS:  It's a digital file.  I think it was

10   three parts, in particular, yes.

11         THE COURT:  Okay.  Now, I don't know whether you used

12   it or some of the lawyers, but it was mentioned, or I heard the

13   term journal.  Is the journal and the book one and the same?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.  Now, there was the letter that you

16   talked about, the letter to Muhammad that allegedly Mr. Morton

17   delivered in December of 2017.  Were there other, in your

18   investigation, were there other documents or notes that you

19   attributed to Ms. Leveille, or is that --

20         THE WITNESS:  We have several, like, diaries, small

21   notebooks, with what appears to be handwriting.  I'd have to

22   look in several of the interviews with the children, but we

23   asked them, whose handwriting does this seem to be.  I know

24   that we asked that for the "Phases of a Terrorist Attack"

25   Notebook, and we also asked that for some of the other --

1          THE COURT:  So there's some of the diaries, then,

2   that you attribute to Ms. Leveille?

3          THE WITNESS:  Based off of, I think, statements from

4   the children that that looked like her handwriting.

5          THE COURT:  Okay.  The term -- based on your status

6   as the case agent and your investigation, as it relates to this

7   case, did you come to understand or do you have a general

8   understanding of the term black magic?

9          THE WITNESS:  Well, when I saw it -- when I heard it

10  from the children and then saw it written, I did some research

11  on what that means, and I asked -- I think I asked Hakima Ramzi

12  what that means, as well, because that's who was referred as to

13  using it, and, yes, I'm aware of kind of what it means.

14         THE COURT:  And what is this?  What is your

15  understanding?  Because also, you mentioned, I believe in your

16  interviews with the children, I think several times you relayed

17  that they said, that the children used the terms "practicing

18  black magic."  Did you come to an understanding of what that

19  meant?

20         THE WITNESS:  Putting spells on people.  I think they

21  referred to -- the kids referred to Jany speaking about, like,

22  poisoning food, and I'm trying to remember what else, how else

23  black magic was used.  But in essence, putting spells on people

24  and causing things to go wrong in people's lives.

25         THE COURT:  Is there redirect of the witness?

1      MR. HALL:  Just briefly, Your Honor.  And I'll just

2  pick up really quick on your last question, as well.

3                     REDIRECT EXAMINATION

4  BY MR. TAVO HALL:

5  Q.   Are you aware of any evidence about what the Defendants

6  thought caused their crash in Alabama, and whether black magic

7  was related to that, at all?

8  A.   I believe it was in Jany's book that Siraj had picked up

9  the phone to review an e-mail, and that's when the crash

10  happened, and that was referred to as like a spell, I believe

11  it was.  I'd have to look at the book to get the verbatim, but

12  I think that's the general -- how it was generally written.

13  Q.   Just a few questions to follow-up, Agent Taylor.  As a

14  Special Agent, you talked a little bit about your general

15  practice in investigating, and in investigating conspiracies.

16  You mentioned on direct that your job is to collect the facts.

17  Would you include in your job description collecting the facts

18  and then making reasonable inferences, in terms of like where

19  to investigate next and what stands out, what to follow up on,

20  that kind of stuff?

21  A.   I think that would be a fair assessment of how an

22  investigation is done.

23  Q.   You, yourself, you don't determine the beginning or the

24  end of a conspiracy, right?  You just kind of gather the

25  information; is that fair to say?

1  A.    Yes.

2  Q.    It's not up to you to decide when a conspiracy began,

3  correct?

4  A.    Correct.

5  Q.    Now, in your experience as a Special Agent investigating

6  conspiracy charges, or potential conspiracies, is it always

7  clear when a conspiracy begins, the exact date?

8  A.    Not usually, no.

9  Q.    And is that because -- well, why is that?

10  A.    I'm not present in those people's lives to know exactly

11  when conversations occurred, and oftentimes there's not some

12  paper contractual obligation as to when everyone is going to do

13  something together.

14  Q.    Now, on cross-examination, you were asked whether there

15  was evidence that you had found of -- I believe it was phrased

16  planned conflict with law enforcement, before Abdul-Ghani died.

17  And I just want to ask you if the transportation of multiple

18  firearms could be a sign of planned conflict with law

19  enforcement.

20  A.    Could be given that later on while they were in Amalia,

21  New Mexico, there was conversations about how to use those

22  firearms against law enforcement.

23  Q.    And could the construction of the compound, itself, be

24  indicative of a planned conflict with law enforcement?

25  A.    I think you could articulate that the tunnel and what the

1    witnesses said about the use of the tunnel, among other uses of

2    it, was as an escape tunnel to get away from law enforcement,

3    and where they would have an engagement using the firearms that

4    are at the end of the tunnel.

5    Q.   And those things we just talked about, those things

6    happened before Abdul-Ghani died, right?  At least some of the

7    construction?

8         The Defendants got to New Mexico before Abdul-Ghani died,

9    correct?

10   A.   It would appear so, yes.

11   Q.   You mentioned on cross that the 371 conspiracy which

12   relates to the possession of a firearm by an immigrant who's

13   not in legal status, that it would have started -- I think you

14   said there was no evidence of it until sometime in New Mexico,

15   or after Abdul-Ghani.  But I just want to ask you, just to

16   clarify, the conspiracy -- you did mention firearms training at

17   a range in Georgia; is that right?

18   A.   That's what one of the children had said.

19   Q.   And you mentioned that the group packed all the firearms,

20   or at least several firearms into the car that was found

21   crashed in Alabama?

22   A.   That's based off the Alabama State Trooper's witness of

23   firearms being at the location.

24   Q.   Are you aware of evidence in your investigation that

25   another Defendant also brought a gun on the group's trip,

1  besides Mr. Wahhaj?

2  A.    Hujrah Wahhaj was the owner of a Glock 26, I believe.

3  Q.    And brought that with?

4  A.    Yes.

5  Q.    Now, I just want to clarify again.  So basically using

6  reasonable inferences like we just discussed, when you were

7  investigating the beginning of the kidnapping conspiracy, you

8  mentioned on cross that you didn't know if any of the other

9  Defendants, meaning Jany, Hujrah, Subhanah, or Lucas Morton,

10  were aware of paperwork, custodial paperwork.  Do you recall

11  talking about that?

12  A.    Yes.

13  Q.    But in your investigation, are you aware of whether they

14  knew where Abdul-Ghani lived most of the time?

15  A.    It would appear so based off the children's statements

16  about where Abdul-Ghani lived, as well as interviews with

17  Hakima.

18  Q.    And where was that that he lived?

19  A.    At Hakima's residence.

20  Q.    Was that separate, or was that together with the rest of

21  the --

22  A.    A separate residence.

23  Q.    And you testified -- or, are you aware of information in

24  your investigation of the desperation by Hakima to get

25  Abdul-Ghani back?

1   A.    Yes.

2   Q.    Is it fair that in your investigation, there were concerns

3   about Abdul-Ghani's safety that was expressed to all of the

4   Defendants?

5   A.    Yes.

6   Q.    And that safety would have been related to his medicine

7   and his medical condition; is that right?

8   A.    Yeah.  I believe that was posted online.

9   Q.    Just a couple more questions here.  So if you look at the

10  chart that we have there for Jamil, Exhibit 2a/2b, you had

11  testified -- I think you had answered questions on

12  cross-examination that there wasn't evidence that Hujrah,

13  Subhanah and Morton all believed in Jany's prophecies or

14  followed Jany, but is it something that Jamil told you, that

15  they did all believe in Jany and follow Jany?

16  A.    I believe that's -- my chart's over there, but I believe

17  that's what's in the transcript, that they followed Jany.

18  Q.    Do you recall him telling you that generally?

19  A.    Generally, yes.

20  Q.    There was some questions on cross-examination about when

21  the book --

22        MR. HALL:  And Your Honor, I think to be clear, when

23  we say the book or the journal, we're talking about the volumes

24  and the big thing.  There are a good 20 or some odd pages of

25  handwritten, which is the next exhibit in line.  I'm not

1  talking about that.

2         THE COURT:  And I think what the witness indicated

3  was that that was referred to as diaries entries.  Right?

4         MR. HALL:  Right.  And I think that the word journal

5  has been used to talk about the bigger one.

6         THE COURT:  It's synonymous with a book.

7         MR. HALL:  Yes, Your Honor.

8  BY MR. HALL:

9  Q.   The question was about when that book, Jany's book, could

10  have been written, or was written, and I think you had answered

11  that you didn't know when it was written.  But can you say that

12  it was absolutely written after the kidnapping of Abdul-Ghani

13  had begun?

14  A.   It mentions it, so you would assume so.  And there's most

15  likely logs from the extraction, but I just don't recall.

16  Q.   Unless it's like the most amazing prophecies ever, it's

17  describing events going from Georgia all the way to New Mexico;

18  is that right?

19  A.   That is correct.

20  Q.   So it must have been written after they left Georgia?

21  A.   Yes.

22  Q.   You talked about the evidence about Subhanah and Hujrah's

23  knowledge or work with the book, Jany's book, and I think on

24  cross-examination you were asked if there was one of the

25  children witnesses who said that Hujrah did not read the book,

1  but I just want to clarify with you now -- if you want to see

2  the exhibit, you can.  But did that same witness then correct

3  herself, or rephrase and say that Hujrah did help with the

4  book?

5  A.   Do you mind if I look at it?

6  Q.   Sure.  I'm handing the witness Exhibit 35, and I think

7  it's on the right page, Page 37, at the top, the last bullet

8  point in the white column.

9  A.   "Jane Doe 3 was familiar with Jany's book that was written

10  on the computer, and she said that Jamil read the book to them,

11  and that she herself read the entire book."

12  Q.   And underneath that, did she say she didn't think Hujrah

13  knew about the book, and then she clarifies herself?

14  A.   Yes, she recalled that Hujrah helped with the book.

15  Q.   Is there any other evidence that you have in your

16  investigation that Hujrah and Subhanah had experience in

17  editing books or publishing books?

18  A.   Yes.  I believe they're both published authors.

19  Q.   And was there anything else regarding editing that either

20  of them had experience with?

21  A.   I want to say Hujrah did editing at one point.

22  Q.   Or possibly Subhanah, either one?

23  A.   Well, yes.

24          MR. HALL:  That's all I have, Your Honor.

25          THE COURT:  Is there anything else for this witness,

1    or may he step down?  Okay, thank you.  You may step down.

2              In terms of the hearing for today, Mr. Hall, is there

3    anything else in terms of evidence you were going to present?

4              MR. HALL:  No, Your Honor.  I believe the Court has

5    Exhibits 19a and 35, so I think that's all of it for the

6    hearing.

7              THE COURT:  I thought maybe we could do -- well, let

8    me ask this.  Anything further from the defense?

9              MR. RAY:  No, Your Honor.

10             THE COURT:  How did you want to proceed?  Was there

11   some talk about ordering a transcript of the hearing?

12             MR. HALL:  Yes, Your Honor.  I think --

13             THE COURT:  Did you want to order a transcript and

14   then do written closings?

15             MR. HALL:  I think that's what the defense wants.  I

16   think the United States is fine with arguing now, but is also

17   fine with written closings.

18             MR. RAY:  Yes, Your Honor, the defense's preference

19   would be to get the transcript and do written closings and do

20   some briefing on some of these especially thorny issues.

21             THE COURT:  Let me do this.  I want to take just a

22   real short break, and then if you want to make closing argument

23   now, you can, and then I'll keep the record open on this for

24   Defendants to submit written closings.  And then since the

25   Government, in effect, has the burden on this, then you can do

1    written rebuttal closing, if you want to.

2              MR. HALL:  Your Honor, if that's what the Court

3    prefers, I'm happy to do whatever is easiest and most efficient

4    for the Court.

5              THE COURT:  Well, that's why I want to look through

6    my notes and look through this.  That's why I want to take a

7    short break.  So this will take about five minutes, and then

8    we'll come back.

9    (Recess was held at 3:38 P.M.)

10   (In Open Court at 3:45 P.M.)

11             THE COURT:  So I guess everyone is in agreement for

12   written closings, then?  That's what I was going to suggest.

13   And then I think if the transcript -- I talked to my court

14   reporter, so sometime late Friday.  So I think the best thing

15   is for the attorneys to submit their written closings basically

16   on the same due date, and obviously Mr. Morton and Mr. Wahhaj

17   can likewise do the same if they want.  How much time do you

18   want, from when the transcript is done?

19             MR. KOCHERSBERGER:  Maybe two weeks, Your Honor.

20             THE COURT:  Two weeks?

21             MR. HALL:  That's acceptable, sir.

22             THE COURT:  All right, then two weeks from when the

23   transcript is prepared.  If it's prepared Friday, it'll be two

24   weeks from this Friday.

25             So it doesn't look like we need to carryover to

1  tomorrow, right?  And then the last thing I wanted to ask,

2  Mr. Hall, is I believe all your exhibits, except 35, were

3  submitted electronically?

4          MR. HALL:  And also 19a, which is just the condensed

5  subparts of 19.  So I gave that out in paper, but it's a part

6  of the 19 that's submitted electrically, if that makes sense.

7          THE COURT:  Okay.  Since 19 that's submitted is a

8  very lengthy document, can you submit 19a and 35

9  electronically?  I'm assuming you'll put it in -- it would be

10  in pdf, right?

11          MR. HALL:  Yes, Your Honor.

12          THE COURT:  Would you do that?  That way, all the

13  exhibits to this are electronic.

14          MR. HALL:  Sure.

15          THE COURT:  All right.  Anything else from

16  Defendants?

17          MR. RAY:  No, Your Honor.

18          THE COURT:  All right.

19          MS. FOX-YOUNG:  Your Honor, just one quick thing, a

20  carryover from yesterday.  Just for the Court's reference, I

21  think we're pretty close to a summary that the parties agree

22  on, a case summary.  We're conferring on that.  And I know I'd

23  said we'd get things to the Court in 24 hours, but I think

24  everybody was busy getting ready for today.  But I think we're

25  close, and hopefully we can submit one version to the Court on

1  that.  I know the questionnaires have to go out the 24th,

2  right?

3          THE COURT:  Right.  And actually, since we're not

4  going to be in hearings tomorrow, I'm going to spend some time

5  on the questionnaire.  So yeah, if you all can get a summary,

6  that would be great.  Now, is this an agreed upon summary, do

7  you think?

8          MR. HALL:  Not quite yet, but I don't see why it

9  wouldn't be.

10          THE COURT:  Okay.  I think that would be helpful.

11  And I think there ought to be some way -- I mean, in some of

12  the orders, we've done it in footnotes.  But I think there

13  ought to be -- I don't know if it needs to be a chart or just

14  something that identifies a summary of the counts, but within

15  that summary, that not all counts apply to all Defendants.

16  Maybe that's the best way to say it.

17          So with that, then, we'll be in recess.  Thank you.

18  (Proceedings adjourned at 3:48 P.M.)

19                          *  *  *  *  *

20

21

22

23

24

25

1                   IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF NEW MEXICO

3  _____
                                 )
4  UNITED STATES OF AMERICA,     )
                                 )
5            Plaintiff,          )
                                 )
6      vs.                       )      No. 1:18-CR-02945-WJ
                                 )
7  JANY LEVEILLE, SIRAJ IBN      )      JAMES HEARING
   WAHHAJ, HUJRAH WAHHAJ,        )
8  SUBHANAH WAHHAJ, and          )
   LUCAS MORTON,                 )
9                                )
             Defendants.         )
10 _____)

11           CERTIFICATE OF OFFICIAL COURT REPORTER

12        I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

13  Realtime Official Court Reporter, in and for the United States

14  District Court for the District of New Mexico, do hereby

15  certify that pursuant to Section 753, Title 28, United States

16  Code, that the foregoing is a true and correct transcript of

17  the stenographically reported proceedings held in the

18  above-entitled matter on Wednesday, July 19, 2023, and that the

19  transcript page format is in conformance with the regulations

20  of the Judicial Conference of the United States.

21  Dated this 22nd day of July, 2023.

22  _____
    MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23  UNITED STATES COURT REPORTER
    333 Lomas Boulevard, Northwest
24  Albuquerque, New Mexico  87102
    Phone:  (505)348-2334
25  Email:  Mary_Loughran@nmd.uscourts.gov