IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | Criminal No. 18-2945 WJ |
| **JANY LEVEILLE,** | ) | |
| **SIRAJ WAHHAJ,** | ) | |
| **SUBHANAH WAHHAJ,** | ) | |
| **HUJRAH WAHHAJ, and** | ) | |
| **LUCAS MORTON,** | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' OMNIBUS MOTION *IN LIMINE* TO EXCLUDE DEFENSE ARGUMENTS AND EVIDENCE

The United States respectfully moves this Court for an Order prohibiting any Defendant, their counsel, and any defense witnesses from asking any question, introducing any evidence, or making any statement regarding several matters described below while the jury is present.

### I.      Standards for Motions in Limine

A motion *in limine* is a request for guidance by the Court regarding an evidentiary question, which the Court may provide to aid the parties in formulating trial strategy.  *See Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir. 1995) (quoting *United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983), *aff'd*, 469 U.S. 38 (1984)).  Federal district judges enjoy broad discretion in respect to the ordering and presentation of proof and the handling of evidentiary questions.  *See*, *e.g.*, Fed. R. Evid. 104(a) ("[t]he court must decide any preliminary question about whether…evidence is admissible"); Fed. R. Evid. 611(a) (empowering district courts to exercise "reasonable control" over mode and presentation of evidence*); see also Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (approving use of *in limine* rulings as an adjunct of "the district

court's inherent authority to manage the course of trials").  One purpose of a motion *in limine* is to prevent the introduction at trial of irrelevant and/or extraneous material.  *United States v. Sanchez-Vasquez*, 2006 U.S. Dist. LEXIS 113956, *2 (D.N.M. Dec. 14, 2006) (unpublished) (Armijo, J.) (citing 75 Am. Jur. 2d *Trial* § 94 (2006)).  Conversely, evidence that is relevant under Fed. R. Evid. 401 and 402 should generally be admitted, but subject to, *inter alia*, Fed. R. Evid. 403.

## II.     United States' Motions to Exclude or Limit Improper Argument or Inadmissible Evidence

As with all criminal cases, this case is about whether the Defendants are guilty or not guilty of the crimes charged in the Superseding Indictment; nothing more, nothing less.  With that basic foundation, and pursuant to Federal Rules of Evidence 401, 402 and 403, the United States moves this Court to exclude altogether from trial several categories of anticipated defense arguments or evidence.

### 1.     <u>Allegations of Government Misconduct or Conspiracies</u>

Claims and allegations of misconduct by the "Government"[1] from the Defendants have been present throughout the pendency of this case.  This has included allegations of combined conspiratorial efforts by and between local and federal law enforcement agencies, lawyers, and even this Court to frame or otherwise illegally prosecute the Defendants because of their race and/or religion.  The United States expects that the Defendants will try to repeat previous claims that the TCSO "recklessly and intentionally" lied to get judicial approval for a search warrant,

---

[1] For purposes of this portion of this motion, the United States considers the "Government" to include, but is not limited to, the Taos County Sheriff's Office ("TCSO"), New Mexico State Police ("NMSP"), New Mexico Office of Superintendent of Insurance—Office of Special Investigations ("NMOSI"), New Mexico Children, Youth, and Families Department ("CYFD"), the Clayton County (Georgia) Police Department ("CCPD"), the Alabama Highway Patrol, and the FBI generally as well as specifically in New York, Georgia, and New Mexico.

that TCSO and CYFD conspired to wrest the Defendants' children away from them and wring incriminating statements out of the children, and that FBI agents perjured themselves in documents filed with the court and in testimony before the grand jury and this Court to push through false charges and ensure their illegal pretrial detention.  These allegations have been repeated in multiple pretrial filings without any actual evidence and have generally been denied where pertinent to a legal argument.

The United States also expects the Defendants will try to present allegations that the Government intentionally let the Defendants kidnap JOHN DOE, or carry on with the kidnapping of JOHN DOE, so that it could pursue and develop a terrorism investigation against one or more of the Defendants with the ultimate goal of fabricating terrorism charges against them at the expense of the safety and, ultimately, the life of JOHN DOE.  This allegation was raised in the Defendants' motion to dismiss for outrageous government conduct, Doc. 476. Suffice to say, there has never been any credible evidence of any of the alleged misconduct claimed by the Defendants; the idea that the Government knowingly sat back and allowed the Defendants' mistreatment of JOHN DOE to continue through his death so that it could concoct terrorism charges against them is as absurd as it is totally unfounded.  Absent actual evidence of misconduct by the Government, this Court should preclude the Defendants and their counsel from introducing any evidence, making any statement, or asking any questions of any witnesses regarding any such allegations of government misconduct, constitutional violations, and any conspiracies raised by the Defendants in their pretrial motions or statements to the Court.

The Defendants should not be allowed to present allegations of government misconduct, constitutional violations, or any other conspiracy theories raised in the pretrial litigation to the jury because, *inter alia*, these allegations are not relevant, and, even if they were, the probative

value of such allegations would be substantially outweighed by the prejudice and jury confusion such allegations would create.  *See* Fed. R. Evid. 401, 402, and 403.  To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  "Implicit in that definition are two distinct requirements: (1) The evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action." *United States v. Waldrip*, 981 F.2d 799, 806 (5th Cir. 1993) (citing *United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981)).  "Whether a proposition is of consequence to the determination of the action is a question that is governed by the substantive law" under which a defendant has been charged. *Hall*, 653 F.2d at 1005.  None of the Defendants' allegations of Government misconduct or conspiracies are probative to the Defendants' guilt or innocence of the charged offenses, or to any legal defense to the actual evidence of those offenses.  As such, they are not relevant and must be excluded.  *See, e.g., United States v. Baptista-Rodriguez*, 17 F. 3d 1354, 1363 (11th Cir. 1994) ("If the court determines that the defendant's proffered evidence is irrelevant or otherwise inadmissible, it should issue a ruling in limine precluding the introduction of that information at trial.").

Even if these baseless allegations or conspiracy theories were somehow relevant, they would be substantially outweighed by their risk of misleading the jury, distracting the jury, being a waste of time, and being prejudicial to the United States.  Such allegations, if allowed to be presented to the jury, would run the risk of creating mini-trials on issues that, by their very nature as conspiracy theories, would be impossible to disprove through proving endless negatives, and would be highly prejudicial to the United States' right to a fair trial governed by the rules of

evidence and procedure.  To assure a fair trial, such unrestrained conspiracy theorizing and baseless allegations should be excluded from presentation to the jury.

### 2.   <u>Selective Prosecution-Type Claims</u>

Similarly, the United States anticipates that the Defendants will attempt to argue, make comments, or introduce evidence about their religion and the offenses with which they are charged to the effect that they are being unfairly prosecuted because of their race and religion. Such claims or allegations should be litigated in a pretrial motion setting, not at trial in front of a jury whose purpose is to decide whether the Defendants are guilty or not guilty of the charges in the superseding indictment.  However, the Defendants did not file a motion raising this selective prosecution claim.  This is unsurprising, because such a claim requires specific showings and a high bar, neither of which the Defendants can meet.

The Supreme Court set forth the standards for proving a claim of selective prosecution in *United States v. Armstrong*, 517 U.S. 456 (1996).  Because the Attorney General and United States Attorneys are entitled broad discretion and a presumption of regularity in their prosecutorial decisions, "[i]n order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary" through demonstrating that a prosecutorial policy "had a discriminatory effect and . . . was motivated by a discriminatory purpose."  *Id.* at 464–65.  Thus, "[t]he standard applicable to a selective prosecution claim is a 'demanding one." *United States v. Glaub*, 910 F.3d 1334, 1340 (10th Cir. 2018).

The Defendants have not filed a motion to dismiss on grounds of or otherwise allege selective prosecution, which is unsurprising because there is not a credible claim to be made that the United States is prosecuting Defendants under a policy that has a discriminatory effect

against them or is motivated by a discriminatory purpose against Muslims, African

Americans, Haitians, or any other characteristic of the any of the Defendants.  Accordingly,

the Defendants should be prohibited from injecting any such irrelevant and unfairly

prejudicial arguments or trying to elicit some sort of evidence along these lines at trial.  Such

statements or arguments have no relevance to the Defendants' guilt or lack thereof; they

would serve no purpose other than to unfairly prejudice and confuse the jury and to encourage

jury nullification.  *See United States v. Gonzalez*, 596 F.3d 1228, 1237 (10th Cir. 2010)

(stating the court "disapprove[s] of the encouragement of jury nullification, which is a

violation of jurors' oath) (quoting *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir.

1983); *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996) (noting the perils of appeals to

jury nullification in the guise of an affirmative defense).

### 3.      Evidence of Defendants' "Good Conduct" or Absence of Criminal Conduct

The United States respectfully moves this Court to exclude from trial evidence of, or

reference to, any Defendant's specific instances of good conduct or absence of criminal conduct

on other occasions, including but not limited to, surveillance footage "evidence" of the

Defendants on occasions not depicting criminal conduct by the Defendants.  Such evidence is not

relevant to the determination of the Defendants' guilt of the charged offenses and therefore

should be excluded.

The Defendants have argued on multiple occasions that surveillance footage of the

Defendants not showing the Defendants engaging in criminal conduct, to include several months

of static pole camera footage from Georgia prior to the Defendants' taking JOHN DOE out of

Georgia, is somehow "exculpatory" to the charges against the Defendants.  The United States has

addressed these arguments previously, including in its response to the Defendants' motion to compel classified information.  *See* Doc. 741 at 11-13.

The law is well-established that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990).  Indeed, this Court has itself recognized that this sort of "absence of criminal conduct on other occasions" evidence is not exculpatory.  *See United States v. Real*, 2018 U.S. Dist. LEXIS 106675, 2018 WL 3118287, at *4 (D.N.M. June 25, 2018) (Johnson, C.J.) (citing cases).

In *Scarpa*, the Second Circuit affirmed the exclusion of evidence that an eavesdropping device had intercepted only "innocuous" conversations by the defendants and explained that criminal defendants "cannot hope to use a process of elimination to defend themselves by presenting evidence of their noncriminal activities." *Id.*  Indeed, evidence of noncriminal activities "would only be relevant if the indictment charged the defendants with ceaseless criminal conduct." *United States v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990); *see also United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2014) (affirming exclusion of "prior good act" evidence where defendants charged with terrorism offenses sought to introduce classified evidence of their non-criminal contacts with Spanish intelligence officials); *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (rejecting defense argument that "evidence of innocent travel [to Jamaica] was necessary to rebut the government's allegation that [the defendant] had been involved in other cocaine importations from Jamaica"); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming, in case involving fraudulent asylum applications, exclusion of evidence that defendant had "prepared other, non-fraudulent applications" because that evidence "was simply irrelevant to whether the applications charged as false statements were

fraudulent"); *United States v. Dobbs*, 506 F.2d 445, 447 (5th Cir. 1975) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant").

Here, the Defendants are not charged with "ceaseless criminal conduct." *Scarpa*, 913 F.2d at 1011.  The Defendants are charged with offenses and overlapping conspiracies that depended on and revolved around the kidnapping and eventual death and anticipated resurrection of JOHN DOE in New Mexico.  Footage of parked cars and rooftops from Georgia in 2015–2017, well before any of the charged offenses took place, is simply not relevant, nor is footage captured from a static pole camera in Georgia in December 2017, as this is after the Defendants had left the state with JOHN DOE.

Even if going about one's day without engaging in criminal conduct could be considered "good conduct," the video footage of this would constitute inadmissible character evidence under Federal Rule of Evidence 404(a).  Rule 404(a) generally prohibits the introduction of evidence of a person's character to prove that the person acted in conformity therewith on a particular occasion.  The only exception concerning the character of the accused specifies that such evidence is admissible only if it relates to a pertinent, or relevant, character trait.  *See* Fed.R.Evid. 404(a)(1).  If not related to a pertinent character trait, such evidence is not admissible.  *See United States v. Neighbors*, 23 F.3d 306, 310 (10th Cir. 1994) (holding that evidence that the defendant was asked to serve on the board of a substance abuse center because of his strong advocacy against drug abuse was not material to whether the defendant, a pharmacist, had violated federal drug statutes by over-ordering several kinds of drugs on behalf of the pharmacy where he worked and converting them to his own use); *United States v. Washington*, 106 F.3d 983, 999-1000 (D.C. Cir. 1997) (holding that a police officer's commendations were not admissible because the defendant's dedication, aggressiveness and

assertiveness in investigating drug dealing and carjacking was neither pertinent to, nor an essential element of, bribery, conspiracy, or drug and firearms charges with which he was charged).

Here, character evidence offered to prove the general good character of the defendants— such as religious piety, mosque attendance, or parenting young children, is not admissible because it is not pertinent to the material support, kidnapping, gun possession, and conspiracy charges in this case. For these reasons, evidence concerning the Defendants' purported lack of criminal conduct in surveillance footage on given occasions should be excluded from trial under Rules 401, 402, 403, and 404.

### 4.    Defendants' State of Mind and Mistaken Beliefs

The United States respectfully moves this Court for an Order excluding any Defendant from introducing evidence that goes toward a Defendant's mental state and intent beyond that needed to prove the charged offenses, and in particular that of kidnapping under 18 U.S.C. § 1201(a)(1). Specifically, no Defendant should be allowed to inject irrelevant claims of mistaken beliefs or state of mind about the legality of their abduction and concealment of JOHN DOE from his caregiving mother. The grounds for this request follow.

Any evidence of a Defendant's state of mind that does not go toward their intent to commit the physical act of a charged offense—here carrying away and concealing JOHN DOE in interstate commerce—is not admissible evidence at trial because it is not relevant to any Defendant's guilt or innocence. Relevant evidence tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. Irrelevant evidence, or that which does not make a fact of consequence more or less probable, is inadmissible. Fed. R. Evid. 402.

The Tenth Circuit recognizes the distinction between "general intent" and "specific intent" crimes. *See, e.g., United States v. Hatatley*, 130 F.3d 1399, 1404–05 (10th Cir. 1997); *United States v. Winchell*, 129 F.3d 1093, 1095–96 (10th Cir. 1997); *United States v. Blair*, 54 F.3d 639, 641–42 (10th Cir. 1995). A "general intent" crime requires only that the defendant intend to do the act that the law proscribes. *Blair*, 54 F.3d at 641; *United States v. Gonyea*, 140 F.3d 649, 653 (6th Cir. 1998) (citations omitted). In contrast, a "specific intent" crime is one that requires a defendant to do more than knowingly act in violation of the law. Put another way, a specific intent crime is "one whose definition requires a special mens rea above and beyond that which is required for the actus reus of the crime." *United States v. Starnes*, 583 F.3d 196, 209 (3d Cir. 2009) (citation omitted).

With regard to all of the charges in this case, the only questions at issue are the elements of the crimes. Section 1201(a)(1) of Title 18 states:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when: (1) the person is willfully transported in interstate commerce or foreign commerce . . . or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense . . . .

The kidnapping and conspiracy to commit kidnapping charges do not include any specific intent on the part of the Defendants above and beyond what is required for the actus reus of the crime, other than possibly a specific intent to violate the jurisdictional element of § 1201(a)(1) of transporting JOHN DOE. Even then, the government need only prove that the transportation ultimately crossed state lines and need not prove knowledge by a defendant that the transportation crossed a state line. *See United States v. Hattaway*, 740 F.2d 1419, 1427 (7th Cir. 1984); *United States v. Bankston*, 603 F.2d 528, 532 (5th Cir. 1979) (explaining that a conviction

under 18 U.S.C. § 1201 "does not require that an offender know that he is crossing state lines

[with the victim]").  Otherwise, "based on a 'plain language' analysis . . . the [federal]

kidnapping statute requires only general intent."  *United States v. Jackson*, 248 F.3d 1028, 1031

(10th Cir. 2001).[2]

The federal kidnapping statute is broken into several subsections describing different

ways in which the crime of kidnapping can be committed.  *See* 18 U.S.C. § 1201(a)(1)–(5).

Subsection (a)(1) is premised on the triggering of federal jurisdiction through interstate travel or

use of means of interstate commerce, while the other subsections are premised on the triggering

of federal jurisdiction through other means, such as taking place within federal territory

(§§ 1201(a)(2)–(3)) or due to the special status of the victims (§§ 1201(a)(4)–(5)).  Federal

circuits vary in their interpretation of the federal kidnapping statute's intent requirements and the

specific elements of the offense.  *Compare, e.g.*, Seventh Cir. William J. Bauer Pattern Crim.

Jury Instr. (2022 updates) (listing two elements for § 1201(a)(1) kidnapping offense) *with* Ninth

Cir. Model Jury Instr. 17.1 (rev. Mar. 2023) (listing three elements for § 1201(a)(1) kidnapping

offense) *and* Tenth Cir. Crim. Pattern Jury Instr. 2.55 (listing four elements for § 1201(a)(1)

kidnapping offense).  However, across the subsections, courts have consistently found all but

---

[2] Given the language of the second clause of § 1201(a)(1) and the analysis of the statute as a whole by courts that have had occasion to address the issue (discussed further below), proof that the "offender travels in interstate commerce or uses the mail or any means, facility, or instrumentality" of interstate commerce does *not* require such travel or use to be "willful," and thus does not require specific intent.  *See, e.g.* Ninth Cir. Model Jury Instr. 17.1 (rev. Mar. 2023) (delineating, as third element for § 1201(a)(1) offense, either "intentionally transporting victim across state lines" *or* the defendant merely traveling in interstate commerce or using means of interstate commerce).  In this case, the United States will prove interstate travel and use of means, facilities, and instrumentalities of interstate commerce in furtherance of the commission of the kidnapping of JOHN DOE.  Thus, for this reason as well, only general intent is required to prove kidnapping of JOHN DOE, and thus any claim or argument about the Defendants' mental states as far as their belief that their carrying away and concealment of JOHN DOE was not illegal is irrelevant and should be excluded at trial.

part of the jurisdictional element of § 1201(a)(1) to require only general intent, as the statutory language for the substance of the offense (i.e., the carrying away or abducting of the victim against the victim's consent) articulates only the requirement that the offender knowingly commit the actus reus of the offense without any additional specific intent as to the legality of the acts.  *See Jackson*, 248 F.3d at 1031 (holding § 1201(a)(5) is a general intent crime); *United States v. Sneezer*, 983 F.2d 920, 922 (9th Cir. 1992) (holding § 1201(a)(2) is a general intent crime).[3]

Thus, even § 1201(a)(1) (with which the Defendants in this case are charged) describes a general intent crime but for potentially the interstate transportation element, which courts have noted could (but does not necessarily) require some additional specific intent for a § 1201(a)(1) offense.  This is because only the jurisdictional element in § 1201(a)(1) contains the word "willfully," which *may* indicate a specific intent requirement for that element.  *See United Jackson*, 248 F.3d at 1031–32 (noting that § 1201(a)(1) "may require specific intent because of the inclusion of the word 'willfully'" with regard to interstate transportation); *Sneezer*, 983 F.2d at 922 (finding that specific intent is required to prove § 1201(a)(1) due to the inclusion of "willfully" with regard to the interstate transportation element); *but see Jackson*, 248 F.3d at 1032 n. 2 ("Of course, the word "willfully" does not always require specific intent." (citations omitted)).

---

[3] As the court noted in *Sneezer*, the federal kidnapping statue was amended in 1972 to remove the word "knowingly" from the essential elements of the offense applicable to all jurisdictional means of the commission of the offense, and to include the word "willfully" to modify subsection (a)(1)'s jurisdictional hook where the offender transports the victim.  983 F.2d at 922–23 and n. 2.  Thus, pre-1972 cases referring to § 1201(a) as a specific intent crime are inapposite, as they do not address the current language of the statute.  *Id.* at 923.

Additionally, many courts have agreed that the kidnapper's purpose is not an element of the offense and that § 1201(a)'s language stating the kidnapping be done "for ransom or reward or otherwise" describes simply a general intent by the kidnapper to hold the victim against their consent. *See, e.g.*, *Jackson*, 248 F.3d at 1031; *United States v. Atchison*, 524 F.2d 367, 371 (7th Cir. 1975) ("[P]urpose is not an element of the offense of kidnapping and need not be charged or proven to support a conviction."); *Gawne v. United States*, 409 F.2d 1399, 1403 (9th Cir. 1969) ("[I]n light of the language and legislative history of the 1934 amendment [to § 1201] a purpose to obtain pecuniary benefit [is] no longer required . . . [and] an illegal purpose need not be shown") (internal quotations and citations omitted).   Indeed, the "essence of the crime of kidnapping" is the "involuntariness of the seizure and detention" of the victim, which is "necessarily implie[d]" by the act of holding a kidnapped person "and with a willful intent to confine the victim," regardless of whether involuntariness is broken out into a separate element. *Chatwin v. United States*, 326 U.S. 455, 460, 464 (1946).

The bottom line is that the "essence" of the crime of kidnapping is the same in all § 1201 cases, to include§ 1201(a)(1), and it requires only general intent.  As the Tenth Circuit explained in *Jackson*, a "'willful intent to confine the victim' means that the perpetrator intended to do the things he did, which were proscribed by law."  248 F.3d at 1031 (quoting *Chatwin*, 326 U.S. at 460).  "It *does not* mean that [the perpetrator] acted to confine his victim or victims knowing such confinement was against the law."  *Id.* (emphasis added).  Thus, in this case, no specific intent is required for the United States to prove the substantive "essence" elements of kidnapping under 18 U.S.C. § 1201(a)(1).  The only aspect of the kidnapping charges that might require specific intent, if any, is the "willful" transportation of JOHN DOE by the Defendants.  Even then, arguments or statements by the Defendants about not believing their carrying away and

concealment of JOHN DOE was illegal would not be relevant to whether they intentionally transported him and that their transportation crossed state lines.  As such, no knowledge of the legality or illegality of any Defendant's actions is at issue, and no such evidence should be presented to the jury.  In this case, all evidence, proffers, or statements made by any Defendant relating to their mental state, as outlined above, are not relevant to the determination of their guilt and should be excluded at trial under Fed. R. Evid. 401.

    5.    **Mental Health, "Brainwashing," and Coercion Evidence**

The United States expects at least some Defendants will attempt to introduce evidence or statements about being "brainwashed" by other Defendantsor that they were tricked by other Defendants into believing they were in danger prior to leaving the Atlanta, Georgia area.  For the former, the United States anticipates some Defendants will attempt to argue that they were in a "cult" led by another co-Defendant.  As such, the other Defendants may try to argue that they were brainwashed or programmed to believe certain things that excuses their participation in the charged conspiracies and their actions taken in furtherance thereof.  For the latter, the United States anticipates some Defendants will attempt to argue or make statements that they left their lives and houses in Atlanta because they were being pursued by "assassins" or "mercenaries" who were going to kill them, and the only way to survive was to escape to Alabama and then New Mexico.

Both of these categories of arguments or statements implicate mental health evidence reserved only for insanity defenses and aim to smuggle in a duress or coercion defense or to improperly seek sympathy and excusal from the jury, clearly inviting nullification.  None of this evidence can properly be raised in this case, as it is irrelevant or will confuse the issues and mislead the jury.  At most, it could only support a defense of insanity, which only Defendant

Jany Leveille has properly raised.  As such, apart from Leveille's properly noticed insanity

defense, these arguments or statements should be excluded under Federal Rules of Evidence 401,

402, and 403, as well as 18 U.S.C. § 17(a).

> a.  *The evidence does not establish a legitimate coercion or duress defense.*

For purposes of guilt or innocence, the only proper purpose for mental health evidence to

be offered is toward a noticed insanity defense or to negate specific intent.  Claims of any

Defendant being a brainwashed member of a cult, unable to think or make their own decisions,

has no relevance to negate any element of specific intent and has no link to an insanity defense

for any Defendant other than Jany Leveille.  Similarly, claims of running from imagined

mercenaries or assassins as the impetus for transporting the abducted JOHN DOE from Georgia

to Alabama and ultimately to New Mexico also have no relevance to negate any element of

specific intent and has no link to an insanity defense (other than potentially Jany Leveille).

Rather, these claims are attempts to smuggle a coercion or justification defense before the jury.

But, as a matter of law, mental health evidence is not admissible as to those types of defenses.

*United States v. Dixon*, 901 F.3d 1170, 1176 (10th Cir. 2018).

A duress defense has three elements: "(1) an immediate threat of death or serious bodily

injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable

opportunity to escape the threatened harm."  *United States v. Portillo Vega*, 478 F.3d 1194, 1197

(10th Cir. 2007); *see also United States v. Reyes-Montano*, 2020 WL 733041, *5 (D.N.M. Feb.

13, 2020) (unpublished).  Similarly, a necessity defense requires a defendant to show that "(1)

there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and

(3) a direct, causal relationship is reasonably anticipated to exist between defendant's action and the avoidance of harm." *United States v. Al Rekabi*, 454 F.3d 1113, 1121 (10th Cir. 2006).[4]

A defendant has no absolute right to present the defenses of coercion, duress, or necessity at trial. *Portillo Vega*, 478 F.3d at 1200-01. Unless a defendant presents testimony or a proffer that meets "a minimum standard as to each element of the defense," *see Portillo Vega*, 478 F.3d at 1200-01, a district court properly exercises its "gate-keeping responsibilities" by precluding the presentation of evidence to the jury on the defense. *Id*. at 1202. Coercion and duress are both affirmative defenses that the defendant has the burden of proving at trial by a preponderance of the evidence. *Dixon v. United States*, 548 U.S. 1, 17 (2006); *Portillo Vega*, 478 F.3d at 1197. The test "makes clear that a particular defendant's subjective beliefs or perspectives are not controlling; they must be objectively reasonable." *Dixon*, 901 F.3d at 1181.

As an objective inquiry, "non-tangible psychological conditions that ostensibly alter the defendant's subjective beliefs or perceptions" have no place in it. *Id*. at 1183. Thus, for example, the Tenth Circuit considered and rejected an argument that PTSD-mental health evidence was admissible to support a duress defense. *Id*. at 1180-84. ("[T]he guidepost of our pattern instruction is not what is reasonable only through the PTSD-distorted lens of Ms. Dixon, but, rather, what is objectively reasonable."). Before allowing any Defendant to present any evidence related to a defense of duress or necessity to the jury, the Court should require the

---

[4] The Tenth Circuit uses the terms duress, justification, and coercion interchangeably with respect to this defense. *See* 10th Cir. Pattern Jury Inst. § 1.36 (2021); *United States v. Butler*, 485 F.3d 569, 572 n.1 (10th Cir. 2007). The Pattern Jury Instructions articulate the "duress or coercion" defense as establishing proof of: (1) an "unlawful and present, imminent and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to himself" or others"; (2) "no reasonable, legal alternative to violating the law" and "no chance both to refuse to do the criminal act and also avoid the threatened harm"; and (3) "a direct causal relationship could have been reasonably anticipated between engaging in the criminal action and avoiding the threatened harm." *Id*.

Defendant to proffer or present evidence that satisfies the Court that the Defendant can meet each element of such a defense by a preponderance of the evidence.  The failure to properly allege this defense and to present sufficient evidence on even one element merits the preclusion of any evidence on the theory at trial.  *See Portillo Vega*, 478 F.3d at 1202.

Here, nothing about the Defendants' anticipated claims of being brainwashed by a cult or cult leader, or having to leave Georgia with JOHN DOE and move to New Mexico to avoid assassins or mercenaries, can satisfy any of the elements of a duress or coercion defense, let alone all three.  Regarding the brainwashing or cult behavior category, this evidence does not purport to suggest that a brainwashed Defendant was under some sort of threat or causal relationship between the charged offenses and some impending danger from the so-called cult or cult leader.  This evidence is more an effort to improperly suggest insanity as a defense to excuse the Defendants' actions to the jury, and is discussed more below.

As for the potential assassin/mercenary category of argument, there is no objective evidence to support it.  The Defendants have not, and cannot, objectively shown the existence of an imminent threat of death or serious bodily injury, nor an objectively well-grounded fear that the threat would be carried out, nor that there was no possible way to avoid the threat without kidnapping JOHN DOE and leaving Georgia.  Rather, the vague idea that unknown persons were seeking to attack the Defendants, articulated in Defendant Leveille's testamentary books, demonstrate a made-up idea to provide the Defendants an excuse to leave Georgia with JOHN DOE.  Beyond that, there is certainly no evidence to suggest that the pretend assassins in any way required the Defendants to carry away JOHN DOE and conceal him in an underground system of tunnels in a military-style compound in the New Mexican brushland.  There likewise is no evidence that, in order to escape the threat of the assassins, they had to prepare and train for

"war" and to kill federal officers.  Thus, the Defendants cannot meet any element of a duress or

coercion defense, and this line of argument or category of evidence should be excluded.  *See*

*Portillo Vega*, 478 F.3d at 1202.

      b.  *The evidence is inadmissible to support a non-existent insanity defense or*
         *negate specific intent.*

Regarding this mental health evidence being used as a backdoor insanity defense, the law

is clear that the Defendants may not offer such evidence.  It is well-established that the Insanity

Defense Reform Act of 1984 (IDRA) significantly limits the role played by mental disease

evidence in criminal trials.  18 U.S.C. § 17(a).  As the Tenth Circuit has recounted, apart from

the insanity defense codified in 18 U.S.C. § 17(a), "IDRA eliminated all other affirmative

defenses or excuses based upon mental disease or defect."  *United States v. Brown*, 326 F.3d

1143, 1146 (10th Cir. 2003) (emphasis omitted); 18 U.S.C. § 17(a) ("Mental disease or defect

does not otherwise constitute a defense.").  As such, "IDRA bars the introduction of evidence of

a defendant's mental disease or defect to demonstrate that he lacked substantial capacity to

control his actions or reflect upon the consequences or nature of his actions."  *Brown*, 326 F.3d at

1146.

Apart from use in proving the insanity defense codified in the IDRA, the only other

recognized relevant purpose for mental health evidence is if the evidence proffered tends to

negate specific intent.  *Brown*, 326 F.3d at 1147.  While mental health evidence "can be

admissible" for such a purpose, the Tenth Circuit has warned "such cases will be rare," and that

"district courts must carefully scrutinize proposed psychiatric evidence to determine whether the

evidence rests upon a legally acceptable theory for negating intent."  *Id*.  Indeed, "admission of

such evidence will depend upon whether a defendant clearly demonstrates how such evidence

would negate intent" rather than "merely present a dangerously confusing theory of defense

more akin to justification or excuse." *Id*.

The particularities of *Brown* illustrate the high hurdle a defendant faces when proffering psychiatric evidence to negate specific intent.  In that case, the defendant attempted to introduce expert psychiatric testimony that the defendant suffered from chemical dependency and post-traumatic stress disorder (PTSD) and, as such, lacked "the capacity to conform his conduct to the requirements of the law" and was also "unable to make correct choices because of his mental conditions." *Id*. at 1148.

The Tenth Circuit affirmed the district court's decision to bar such evidence in *Brown*. As the court explained, there was no link between the mental health evidence proffered and the specific intent element: the doctor "did not opine on how [the defendant]'s post-traumatic stress disorder, coupled with chemical dependency, was either related to or tended to negate the requisite specific intent element." *Id*.  As such, there was no "link" between the mental health evidence and the United States' "proof of specific intent." *Id*.  Accordingly, the Tenth Circuit affirmed the district court's ruling that the evidence was inadmissible because the defendant "fail[ed] to connect his mental condition with any legally acceptable theory that he lacked specific intent." *Id*.

Here, none of the Defendants, other than Jany Leveille, even have a mental health diagnosis, let alone have demonstrated any connection between their anticipated mental health evidence and the negation of a specific intent element.  Other than Leveille, three of the Defendants have gone through competency evaluations and have all been deemed competent; Siraj Wahhaj has never had an evaluation or a diagnosis of any mental health disease or defect. The anticipated anecdotal mental health evidence of so-called "cult behavior" or avoiding "assassins," even if true and even if backed up by actual medical or scientific support, cannot

negate any specific intent element in any of the charges, as the Defendants all knowingly and intentionally performed the charged acts.  Vague references to "cult-like behavior" amongst the group of conspirators in this case do not suffice to turn the Defendants into automatons who did not know or intend to advance the criminal aims underlying the offenses with which they have been charged.

In short, even if there were proffers of mental health disease or defects, nothing would go to negating the specific intent of any of the charged offenses.  Indeed, the anticipated mental health arguments or evidence from the Defendants in this case constitutes the exact type of "dangerously confusing theory of defense more akin to justification or excuse" that the Tenth Circuit has warned about.  *Brown*, 326 F.3d at 1147.  As such, arguments or evidence intending to suggest some vague "mental illnesses" or beliefs "consistent with cult behavior" (*see, e.g.*, Doc. 735 at 2) may not be introduced as a backdoor insanity defense, and should be excluded.

As a separate matter, the Court should exclude these arguments or evidence under Rule 403.  As the Tenth Circuit has recognized, even where there is a marginal probative value to mental health evidence, "[c]ourts must be cautious" about admitting such evidence "because the jury may think that it provides an 'excuse' for misconduct or it may otherwise generate sympathy for the defendant."  *United States v. Martinez*, 923 F.3d 806, 815 (10th Cir. 2019).  Indeed, "psychiatric evidence presents an inherent danger that it will distract the jury[] from focusing on the actual presence or absence of mens rea."  *Id.* (quoting *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990).  The Supreme Court has echoed that concern: "[e]vidence of mental disease . . . can easily mislead."  *Clark v. Arizona*, 548 U.S. 735, 776 (2006).  The risk of such a "dangerously confusing theory" requires "district courts [to] carefully scrutinize

proposed psychiatric evidence to determine whether the evidence rests upon a legally acceptable theory." *Brown*, 326 F.3d at 1147.

Here, the potential "brainwashing" and "cult following" claims, or claims of running from imaginary mercenaries or assassins, constitute mental health evidence that has an extremely high risk of "confusing the issues" and "misleading the jury" and substantially outweighs any probative value it may have.  *See* Fed. R. Evid. 403.  As articulated above, the Defendants' potential mental health evidence's plain purpose is to introduce a theory of "justification or excuse" at a kidnapping, material support, and conspiracy trial.  *Brown*, 326 F.3d at 1147.  The Court can and should exclude this evidence under Rule 403, just as many other courts have similarly excluded mental health evidence at a jury trial.  *See, e.g.*, *id*. at 1148 (affirming exclusion of mental health evidence); *United States v. Allerheiligen*, 2000 WL 1055487 at *12-14 (10th Cir. 2000) (unpublished) (affirming exclusion of mental health testimony under rule 403); *United States v. Thompson*, 544 F. Supp. 3d 1159, 1171 (D.N.M. 2021) (Vazquez, J.) (excluding mental health evidence under Rule 403); *United States v. Overton*, 437 F. Supp. 3d 1078, 1087-88 (D.N.M. 2020) (Parker, J.) (excluding mental health evidence under Rule 403).

Similarly, any mental health evidence should be excluded because, notwithstanding all of the reasons articulated above, it would be an attempt by some or all of the Defendants to invite jury nullification by injecting some suggested excusals for their actions or invoking sympathy from jurors.  Encouraging of jury nullification is a forbidden trial tactic that has been repeatedly disapproved in all courts, including within the Tenth Circuit.  *See United States v. Gonzales*, 596 F.3d 1228, 1237 (10th Cir. 2010) ("[W]e disapprove of the encouragement of jury nullification[.]") (citing *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983) ("While we recognize that a jury may render a verdict at odds with the evidence and the law, neither the court nor counsel

should encourage jurors to violate their oath.")); *Crease v. McKune*, 189 F.3d 1188, 1194 (10th Cir. 1999) ("[T]here is no right to jury nullification.") (citing *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.")); *United States v. Rith*, 164 F.3d 1323, 1338 (10th Cir. 1999) ("To the extent the defendant's appeal seeks to require courts to facilitate jury nullification, the law is clear, a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law.").

Therefore, evidence that encourages nullification, such as mental health evidence related to being "brainwashed" or part of "cult behavior" should be excluded.  *See, e.g.*, *United States v. Gorham*, 523 F. 2d 1088, 1097-98 (D.C. Cir. 1975) (affirming trial court's refusal to admit evidence bearing no legal relation to the charges but which might encourage a "conscience verdict" of acquittal), *supplemented by* 536 F. 2d 410 (D.C. Cir. 1976); *United States v. Lucero*, 895 F. Supp. 1421, 1426 (D. Kan. 1995) ("[D]efendants are not entitled to present evidence which is irrelevant for any purpose other than to provoke the finder of fact to disregard the law.").

### 6.    Hearsay Statements

 The United States respectfully moves this Court exclude any out-of-court statement, offered for the truth of the matter asserted, without a valid hearsay exception.  Specifically, the United States requests the Court prohibit any Defendant from introducing evidence of their own, or any other witness's, prior statements that are offered for the truth of the matter asserted.  This includes statements of any Defendant to law enforcement personnel or New Mexico CYFD personnel at any point, as well as statements made by any Defendant to each other, to any

unindicted co-conspirators, or to any family or friends, including through social media or messaging applications.

Generally, an out of court statement, offered for the truth of the matter asserted is inadmissible as hearsay.  Fed. R. Evid. 801.   While certain statements are exempted from this definition, the proponent of the statement must establish the exception.  *United States v. Samaniego*, 187 F.3d 1222, 1224 (10th Cir. 1999).  The primary justification for the prohibition of hearsay is "the lack of any opportunity for the adversary to cross-examine" the declarant. *Anderson v. United States*, 417 U.S. 211, 220 (1974).

The Defendants should be excluded from introducing any witness's out-of-court statements offered for the truth of the matter asserted, including their own.  Specifically, the United States anticipates the Defendants will attempt to elicit out-of-court statements relating to their stated purported motivations or reasons for absconding with JOHN DOE to New Mexico and building their compound there, and statements they made to others that they had to take JOHN DOE because he and they were in danger (regardless of whether the danger was articulated), including to JOHN DOE's mother, Hakima Ramzi.  The United States also anticipates that the Defendants will attempt to introduce statements by unindicted co-conspirators, to include Defendant Leveille's brother "Von," for the truth of the matter asserted regarding the Defendants' existence and purpose in New Mexico.  Any attempt to elicit such statements from others would be an attempt to frustrate the United States' ability to cross-examine the Defendants or the declarants and would be an affront to the adversarial process. Accordingly, the United States moves for an order excluding any out-of-court statement offered for the truth of the matter asserted, without a valid hearsay exception.

**7.      Evidence and Argument about the Quality of Law Enforcement Investigations**

Similar to the conspiracy and government misconduct category of argument or evidence described above in motion number 1, the United States also respectfully moves this Court for an order prohibiting the Defendants from questioning witnesses about the quality of the government's pretrial investigation, or otherwise offering any such evidence at trial. This includes the quality or nature of the FBI Atlanta investigation preceding the charged timeframe in this case, the Clayton County (Georgia) Police Department's investigation initiated upon the abduction of JOHN DOE by the Defendants, the Taos County Sheriff's Office's investigation in New Mexico (to include assistance from the New Mexico State Police), and the FBI's investigation in New Mexico upon transfer from Atlanta. Evidence about the quality of the government's pretrial investigation is irrelevant under Fed. R. Evid. 401, would confuse the issues and mislead the jury under Fed. R. Evid. 403, and violates the general prohibition on such evidence set forth in *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998).

Ordinarily, a trial court should not allow a defendant to offer evidence about the quality of the pretrial investigation. *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998) *overruled on other grounds by* 184 F.3d 1206 (10th Cir.). The defense may not put "the government on trial" by suggesting "there might have been something more the government perhaps could have done" to identify additional evidence. *Id.* A defendant is not allowed to engage in unfounded speculation that the government's investigation was "shoddy" or "slanted." *Id.*

As noted above, the United States anticipates that the Defendants will attempt to blame their charges, the death of JOHN DOE, and the evidence collected against them on the government for intentionally refraining from locating and/or rescuing JOHN DOE and stopping the Defendants' ongoing kidnapping, material support, and murder conspiracies sooner. These

allegations are false and misleading, and should be excluded from presentation to the jury, as articulated above.

However, even if this narrative were adjusted to allege government incompetence by some or all of the various agencies involved, rather than a calculated and purposeful refusal to intervene in the Defendants' ongoing criminal conspiracies and actions sooner, it still would not constitute admissible evidence and still should be excluded from presentation to the jury.  Such evidence remains irrelevant.  Fed. R. Evid. 401.  The defense-proclaimed quality of the government's pretrial investigation does not make any fact of consequence in a case "more probable or less probable than it would be without the evidence."  *Id*.  Such evidence would also confuse the issues and mislead the jury.  *See* Fed. R. Evid. 403; *McVeigh*, 153 F.3d at 1192 (noting such evidence "would inevitably divert the jury's attention from the issues of the trial.").

To be sure, there is a narrow exception to the general rule that evidence about the quality of the government's pretrial investigation is inadmissible.  However, a defendant must satisfy a very high standard to meet this exception, and the Defendants cannot do so in this case. Specifically, the defendant must show that the allegedly "shoddy" investigative work actually undercuts the reliability of other trial evidence.  *McVeigh*, 153 F.3d at 1192.  For example, a defendant in a homicide case could offer evidence that the victim's relatives handled the purported murder weapons before turning them over to police.  *See id.* (citing *Lowenfield v. Phelps*, 817 F.2d 285, 291 (5th Cir. 1987)) (addressing habeas petition claiming trial defense counsel should have objected based on chain of custody to admissibility of murder weapons found by victim's family).  Nevertheless, the general rule is that evidence of allegedly deficient investigative work is inadmissible because it is not a jury's function to "determine whether the

government's investigation [was] . . . good or bad." *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994).

Nothing about the Defendants' expressed narrative about government conspiracies and purposeful inaction, or investigative incompetence undercuts the reliability of any trial evidence in this case. As the United States has articulated in great detail in its responses to the Defendants' motion to suppress the evidence found at their compound and the Defendants' motion to compel classified information, there were ongoing investigations by multiple agencies in multiple states that involved the Defendants, none of which were initially working together or for the same purposes. *See* Docs. 566, 741. The Defendants, working together as a group, intentionally tried to disappear from both law enforcement and family members looking for them and JOHN DOE by driving through the night from Georgia to the isolated compound they built in Amalia, New Mexico.

By the time the various law enforcement agencies had come together and learned of the actual precise location of Siraj Wahhaj and JOHN DOE in May 2018, the die was already cast. The abduction, transportation, and concealment of JOHN DOE, the treatment of JOHN DOE throughout the kidnapping until his death, the compound the Defendants built, the items the Defendants possessed there, the training they underwent, and the plans they materially supported and prepared for existed and would have been found in largely the exact same condition or state by law enforcement whether the Defendants had been arrested right away in May 2018 or later than the day they actually were arrested (JOHN DOE died in late December 2017). This is not a case of "whodunnit," where the person, location, and means of committing the charged offenses is disputable or possibly a mystery; nothing about the speed or quality of the investigation of any law enforcement agency undercuts the reliability of any other evidence in this case.

Accordingly, the Defendants should be prohibited from arguing or introducing evidence relating to the purported quality of the investigation by any of the various law enforcement agencies implicated.

### 8.        Inappropriate Legal Standards or Requirements

The United States respectfully moves this Court for an order prohibiting any Defendant from arguing or improperly stating the law in front of the jury.  Specifically, the Court should preclude any Defendant from stating or arguing that "terrorism," "terrorist ideology," "engaging in terrorism," "being a terrorist organization," "being a terrorist," or any similar variation, is in some way part of any of the elements of any of the charged offenses or of the United States' burden of proving the elements of any of the charged offenses in this case.

Misstatements of the law are an intrusion upon the guarded provinces of the jury, and it is well established that the jury is not to be subjected to unauthorized invasions.  *Remmer v. United States*, 347 U.S. 227, 229 (1965).  To the extent that the jury is tasked with being triers-of-fact, their ability to adequately try those facts is significantly hampered when counsel is allowed to improperly introduce and outline the legal standards and burdens which the evidence will be subject.  *See Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006) (in evaluating counselor's improper statements, "the ultimate question is whether the jury was able to fairly judge the evidence" in light of the counselor's conduct).

While the statements and arguments of counsel carry (generally) less weight with the jury than this Court's instructions, *see Boyde v. California*, 494 U.S. 370, 384 (1990), misrepresentations by counsel can have a decisive and lasting impact which goes beyond the curative limitations of an instruction to the jury.  *Id.*  To that end, and in order to avoid the

difficulties of evaluating a curative instruction *ex post facto*, the United States submits that the preservation of the jury's ability to fairly weigh the evidence in this case is contingent on minimizing the likelihood that defense counsel is unable to misstate the applicable law.

The Defendants have made clear that they intend to build up a straw man argument that the United States has charged them with being "terrorists" or materially supporting themselves as a "terrorist organization" in order to attack that false legal requirement in their defense. *See, e.g.*, Doc. 810. The Defendants would lead the jury further astray by presenting evidence that suggests that the Defendants can only be "terrorists" or belong to a "terrorist organization" if they ascribe to mainstream Islamist extremism, as Defendants or their experts define it, or follow an ideology advanced by a designated foreign terrorist organization such as al Qaeda or ISIS. This would appear to be based on a conflation of 18 U.S.C. § 2339B,[5] which is not charged in this case and is irrelevant, with § 2339A, which is charged. However, the law is clear that the 18 U.S.C. § 2339A charges in this in no way require proof of terrorism or supporting a terrorist organization. *See, e.g.*, *United States v. Abu Khatallah*, 151 F. Supp. 3d 116, 139 (D.D.C. 2015) (explaining that "the statutorily defined elements [of § 2339A] could not be clearer," and they do not include a "requirement that one's actions be connected to terrorism"); *United States v. Stewart*, 590 F.3d 93, 113 (2d Cir. 2009) (explaining defendant must provide support or resources knowing or intending such resources be used to commit "specific violent crimes"); *United States v. Sattar*, 314 F. Supp. 2d 279, 302 (S.D.N.Y. 2004), *aff'd*, 590 F.3d 93 (2d Cir. 2009) (describing offense as where defendant must provide support or resources knowing or intending such resources be used to commit

---

[5] This offense, titled "Providing material support or resources to designated foreign terrorist organizations," criminalizes providing material support "to a foreign terrorist organization," which is defined as "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act." 18 U.S.C. § 2339B(g)(6).

"enumerated criminal statutes"); *United States v. Abdi*, 498 F. Supp. 2d 1048, 1057 n.3 (S.D.
Ohio 2007) ("Section 2339A prohibits the provision of material support or resources
'knowing or intending' that they be used for executing violent federal crimes.").

Far from having to prove some notion of "terrorism" under § 2339A, the United States
need only prove that the Defendants provided material support knowing and intending that
such support would be used in the preparation or carrying out of another federal offense
enumerated in the statute.  *See United States v. Hassan*, 742 F.3d 104, 140 (4th Cir. 2014)
(setting forth elements of the offense).  Thus, "[t]he mere fact that Congress may have enacted
§ 2339A with terrorism in mind does not require prosecutors to prove that a person charged
under that statute actually engaged in (or conspired to engage in) 'terrorism.'"  *Abu Khatallah*.
151 F. Supp. 3d at 140.  This Court has already considered a Defense argument in this case
that the § 2339A charges must *require* intent or knowledge to support terrorism, and rejected
that argument, ruling that § 2339A is clear in its proscription and that it does not hinge on
material support to any particular designation of "terrorists" or "terrorism."[6]  *See* Doc. 578.
Thus, not only is it clearly the external law governing § 2339A, but it is the law of the case
here that the status of the Defendants as "terrorists" or engaging in "terrorism" is not relevant
to the jury's findings.

Given the clarity in the appropriate legal standard for § 2339A charges, arguments by

---

[6] If Congress had intended that § 2339A include a "terrorism" element, it had a ready-made
definition for "terrorism" at 18 U.S.C. § 2331 (defining "international terrorism" and "domestic
terrorism").  But § 2331 does not apply to § 2339A for the simple reason that the word
"terrorism" does not appear in the statute's language and thus does not incorporate § 2331's
definition of "terrorism."  While the Defendants assert that § 2339A includes a "terrorism"
element, nowhere do they refer to § 2331, which would presumably be the statute that would
apply if § 2339A included a "terrorism" element.  Rather, the Defendants seek to define
"terrorism" according to their own, mistaken definition.  By any definition, "terrorism" is not an
element of the offense and evidence that would purport to show that the Defendants cannot be
guilty of § 2339A because they did not engage in "terrorism" should not be allowed.

defense counsel that the United States cannot or did not prove the Defendants were engaged in "terrorism" would be clear misstatements of the law, and would confuse and mislead the jury. "[I]nstructing the jury as to the applicable law is the distinct and exclusive province of the court." *United States v. Moran*, 493 F.3d 1002, 1008 (9th Cir. 2007).  The Court will read to the jury an instruction that sets forth the elements and defines the terms applicable to § 2339A.  The Defendants must not be allowed to hijack the proceedings by injecting misstatements of the law for rhetorical effect or to attempt to insert legal requirements that do not exist.

   **9.**      **Pre-Trial Rulings**

   This Court should preclude the Defendants and their counsel from, while the jury is present, introducing any evidence, making any statement, or asking any questions regarding the contents of, or rulings on, any motions filed by either the Defendants or the Government prior to trial.  This includes in particular, but is not limited to, mentioning the contents of, or claims made within, defense motions to suppress evidence obtained by TCSO during execution of search warrants, to suppress statements by child witnesses in this case, to dismiss charges under a claim that a parent's immunity from prosecution under the federal kidnapping statute amounts to shared immunity for others who take part in that kidnapping, and to dismiss for outrageous government conduct.  *See* Fed. R. Evid. 401, 402 and 403.

   The reason such motions are required to be filed prior to trial, and ruled upon by the Court, is to maintain the ability of the judge to rule on questions of law, which in turn allows the jury to maintain their role as arbiter of facts.  When the parties have advanced contentions supporting or opposing a motion, and the trial judge has made a ruling without equivocation, "the parties are entitled to 'treat the ruling as the law of the case' and to rely on it." *United*

*States v. Mejia-Alarcon*, 995 F.2d 982, 986 (10th Cir. 1993) (quoting *Cook v. Hoppin*, 783 F.2d 684, 691 n.2 (7th Cir. 1986).

Here, the Defendants should be precluded from making statements or offering evidence insinuating that their constitutional rights were violated by TCSO's search warrant execution or post-arrest interviews of the Defendants' children.  They should also be precluded from making statements or offering evidence implying that the "government" acted outrageously by not finding and arresting them before JOHN DOE died, or that the legal immunity provided by the federal kidnapping statute to parents of abducted children blankets any co-conspirator of a parent with the same immunity.  The Court has considered briefings from the parties on these and many other issues raised in pretrial litigation, and has issued unequivocal rulings on them.  Thus, the arguments are preserved for appeal without need for any further objection or statement from the Defendants or their counsel.  *See Mejia-Alarcon*, 995 F.2d at 986.  As such, making reference in front of the jury to already-decided legal arguments would serve no legitimate purpose at trial, and would only serve to confuse or mislead the jury.  Accordingly, the Court should issue an order precluding such statements under Rules 401, 402, and 403.

### 10.   Claims that Defendants Siraj Wahhaj and Jany Leveille were Married

This Court should preclude the Defendants and their counsel from, while the jury is present, introducing any evidence or making any statement to the effect of asserting that Defendants Siraj Wahhaj and Jany Leveille were legally married.  *See* Fed. R. Evid. 401, 402 and 403.  The Court should also preclude Siraj Wahhaj and Jany Leveille from asserting any legal privilege based on a marital or spousal relationship between the two.  *See* Fed. R. Evid. 501.

Legal marriage has several consequences under the law, including potential for invoking privileges, ownership of community or marital property, inheritance, and other family relations implications, such as custody or guardianship of children or consideration as a "step-mother" to a spouse's existing children.  In addition, bigamy is a crime in several jurisdictions, including the States of New York, Georgia, and New Mexico, and claims that Siraj Wahhaj and Jany Levielle were married implicate these criminal laws as well.  *See* N.Y. C.L.S. Penal § 255.15 ("A person is guilty of bigamy when he contracts or purports to contract a marriage with another person at a time when he has a living spouse, or the other person has a living spouse . . . Bigamy is a class E felony."); O.C.G.A. § 16-6-21 ("An unmarried man or woman commits the offense of marrying a bigamist when he marries a person whom he knows to be the wife or husband of another."); N.M.S.A. § 30-10-1 ("Bigamy consists of knowingly entering into a marriage by or with a person who has previously contracted one or more marriages which have not been dissolved by death, divorce or annulment . . . Whoever commits bigamy is guilty of a fourth degree felony.").

Siraj Wahhaj legally married Hakima Ramzi in Morocco on October 28, 2004.  Their legal marriage was the reason Hakima Ramzi, as a Moroccan citizen, was able to come to the United States as a permanent resident so that she could join her U.S. citizen husband Siraj Wahhaj.  Siraj Wahhaj and Hakima Ramzi remained legally married from 2004 until at least August 7, 2018, when a divorce petition (filed by Hakima Ramzi on December 20, 2017) in the State of Georgia was finally able to be served on Siraj Wahhaj while he was in custody in New Mexico.[7]  According to discovery provided by Defendant Jany Leveille, on April 9, 2009, she

---

[7] In early December 2017, Siraj Wahhaj unequivocally stated his intention of divorcing Hakima Ramzi by stating in an email or text message to her, "I divorce you."  (Ramzi responded, stating that she, too, wished a divorce.)  While Siraj's statement "I divorce you" might be sufficient to effect a divorce under Islamic religious rules, it was not sufficient to dissolve a marriage under Georgia law.  Moreover, Siraj no doubt knew that formal divorce proceedings, including temporary child custody orders, were necessary and imminent.  During the pendency of the

and Siraj Wahhaj participated in an "Islamic marital ceremony."  Thus, Siraj Wahhaj's legally

recognized marriage to Hakima Ramzi pre-dates his purported marriage to Jany Leveille by five

years.  The United States is not aware of any evidence to suggest that the purported marriage

between Siraj Wahhaj and Jany Leveille was ever legally recognized by any state, nor any

evidence that Siraj Wahhaj's marriage to Hakima Ramzi was ever legally dissolved prior to the

Defendants' arrests in this case, let alone prior to Siraj Wahhah's purported marriage to Jany

Leveille.

Any evidence, statements, or arguments suggesting that Siraj Wahhaj and Jany Leveille

were married are false.  It is also irrelevant to any fact of consequence in this case, and is

inadmissible under Rules 401 and 402.  However, given some of the Defendants' anticipated

defenses in this case, as well as myriad possibilities for attempts to inject ideas of jury

nullification, evidence or arguments that Siraj Wahhaj and Jany Leveille were married also has

an extremely high risk of "confusing the issues" and "misleading the jury," which substantially

outweighs any probative value it may have.  *See* Fed. R. Evid. 403.  Given the demonstrable

falsity of any assertion of marriage between the two, the Court should issue an order precluding

any evidence, statement, or argument suggesting Siraj Wahhaj and Jany Leveille were married.

The Court should also preclude any assertion of any privilege grounded in the idea or claim that

there was a marriage between the two.

11.   **Plea Negotiations**:

This Court should preclude the Defendants and their counsel from, while the jury is

present, introducing any evidence, making any statement, or asking any questions regarding the

occurrence and/or substance of any plea negotiations that may or may not have taken place, as

---

offense conduct, Siraj remained legally married to Hakima, and he knew it.  Siraj was never at
any time married to Jany Leveille and his insistence that he was is a factual fiction.

such matters are not proper concerns for the jury. *See* Fed. R. Evid. 401, 402 and 403; *see also generally* Fed. R. Evid. 410. This should include any evidence, statement, or question to any witness about plea discussions or the substance of any plea negotiations with any co-defendants.

12.    **Offers to Stipulate**

This Court should preclude the Defendants and their counsel from, while the jury is present, introducing any evidence, making any statement, or asking any questions regarding the Defendants volunteering, offering, or in any manner agreeing to stipulate to certain facts unless some agreement between all parties with approval of the Court has been arranged concerning a stipulation. *See* Fed. R. Evid. 401, 402 and 403; *United States v. Schene*, 543 F.3d 627, 643 (10th Cir. 2008) ("It is 'unquestionably true as a general matter,' that 'the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." (quoting *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997)).

Although this point may be moot if the Defendants do not offer or request to stipulate to any facts, the United States requests that this Court issue an order that no such offers or requests be referred to in front of the jury.

13.    **Information Known Only to Defendant**

This Court should preclude the Defendants and their counsel from, while the jury is present, introducing any evidence, making any statement, or asking any questions regarding any information or facts which could only otherwise come to the jury's attention through the sworn testimony of the Defendants, unless any of the pertinent Defendant's counsel informs the Court that he or she will, in fact, testify. This is particularly important in this case, where there are multiple Defendants. While one Defendant may testify about his or her own personal knowledge

or statements, they may not testify about information that would only have been known by a co-Defendant who has not and will not testify.  Such testimony would constitute inadmissible hearsay under Fed. R. Evid. 802.

14.      **Defense Exhibits**

This Court should preclude the Defendants and their counsel from, while the jury is present, introducing any evidence, making any statement, or asking any questions regarding defense exhibits that have not previously been supplied to counsel for the United States.  Federal Rule of Criminal Procedure 16(d)(2) provides in pertinent part:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may ... prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

Under both Rule 16 and the Discovery Order in this case (Doc. 34), the Defendants are required  to provide reciprocal discovery to the government.  To date, no reciprocal discovery has been received by the United States from any Defendant other than Jany Leveille.  The United States is particularly concerned with this issue given that two of the Defendants have exercised their right to proceed pro se.  When those Defendants made that election, they agreed and acknowledged to the Court that they would be held to the same evidentiary and procedural rules as any other party.  Here, that would include abiding by the applicable discovery rules and orders in this case.  Thus, the United States asks that the Court enforce these rules and requirements fairly across all parties in this case, to include issuing an order precluding the Defendants and their counsel from, while the jury is present, introducing any evidence, making any statement, or asking any questions regarding defense exhibits that have not previously been supplied to counsel for the United States.

15.      **Reference to Potential Penalties or Sentences**

The United States respectfully moves the Court, for an order, *in limine*, prohibiting the Defendants from offering evidence of, discussing, mentioning, or otherwise putting forth, in any manner, in the jury's presence, any evidence or statements regarding Defendants' potential punishment, or any other issues related to their potential sentencing, including the maximum period of imprisonment authorized by statute and the application of the federal sentencing guidelines to their case.

As the Supreme Court has stated, "when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). According to the Tenth Circuit, "the law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law." *United States v. Rith*, 164 F.3d 1323, 1337 (10th Cir. 1999). Indeed, the Tenth Circuit Criminal Pattern Jury Instruction 1.04 advises jurors, in pertinent part, "It is . . . your duty to base your verdict solely upon the evidence, without prejudice or sympathy." Instruction 1.20 further states, "If you find the defendant guilty, it will be my duty [as the judge] to decide what the punishment will be. You should not discuss or consider the possible punishment in any way while deciding your verdict."

Here, this case is not a death penalty case, and the jury has no sentencing function. However, due to the mandatory minimum sentence of life in prison for the kidnapping charges where death results, if the jury were otherwise to find the Defendants guilty beyond a reasonable doubt, there is a danger that the Defendants will attempt to refer to that potential sentence, all but requesting the jury to disregard the law and nullify the Defendants' guilt on those charges. Based on the clear legal standards, the Court should preclude the Defendants from offering

evidence of, discussing, mentioning, or otherwise putting forth, in any manner, in the jury's presence, any evidence or statements regarding their potential punishments in this case, or any other issues related to their potential sentencing, including the maximum period of imprisonment authorized by statute, mandatory minimum period of imprisonment required by statute, and the application of the federal sentencing guidelines to this case.

### III.    United States' Motions to Admit Evidence

### 16.    <u>Evidence of Local Tip to FBI of Siraj Wahhaj's Firearms Training in Georgia</u>:

The United States requests that this Court issue a pretrial ruling on the admissibility of evidence that Defendant Siraj Wahhaj was under investigation by the FBI in Atlanta prior to the charged acts and timeframe in this case, and that the investigation was related to a tip from the public that Siraj Wahhaj was engaging in firearms training to such an extent that it caused the tipster concern.  The gun-training evidence provided to the FBI in Georgia, which lead the FBI to investigate Defendant Siraj Ibn Wahhaj, is so closely related to his criminal charges that it represents intrinsic evidence that may not be properly excluded under Federal Rule of Evidence 404(b).  *See United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011) ("If the contested evidence is intrinsic to the charged crime, then Rule 404(b) is not even applicable.") (citing *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997)).

Under Tenth Circuit precedent, the firearms training evidence constitutes intrinsic evidence of the charged crime.  In *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009), intrinsic evidence was defined as that which, "is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury."  When examining the topic, courts have held evidence to be intrinsic, "[w]hen the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single

criminal episode or the other acts were necessary preliminaries to the crime charged." *Irving*, 665 F.3d at 1212 (quoting *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993).

The firearms training evidence that the United States seeks to admit at trial fits squarely within the definition provided by this binding precedent because it is part of the "necessary preliminaries" to explain why the Defendants harbored dislike of the FBI and why the multi-state law enforcement investigation of JOHN DOE's disappearance evolved in the way that it did. Indeed, without this evidence, the jury will lack the context and background to fully appreciate the nature of the investigation of the charged conduct and why the events played out over the course of the charged timeframe as they did. The evidence also provides an important connection to the Defendants' firearms and tactical training at their compound in New Mexico, as it helps explain why Siraj Wahhaj was able (or believed he was able) to provide such training to the co-Defendants and others at the compound. In essence, the firearms training evidence helps complete the story for the jury.

Accordingly, the Court should issue a ruling that presentation of this background evidence is admissible as *res gestae* evidence in this case.

**17.  Evidence of Ruqyah Exorcisms Being Performed on Other Children and References to CYFD and Foster Parent Interactions with the Children**

Similarly, the United States requests that this Court issue a pretrial ruling on the admissibility of evidence that the other children at the compound were also subject to ruqyah exorcisms of the same sort that the Defendants subjected to JOHN DOE. Evidence of ruqyah rituals being performed on the other kids would stem from the same general time period as the rituals performed on JOHN DOE and will provide contextual information for the jury in explaining what ruqyah was like from a child's perspective and the manner in which the Defendants actually performed it. This evidence further establishes that the Defendants had

knowledge of the rituals and the manner and means to perform them.  This evidence further establishes the extent to which these rituals were used and perceived by the Defendants in the context of the offense conduct.  Thus, for the same reasons described above, evidence about the ruqyah rituals being performed on the other children is inextricably intertwined evidence that is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury."  *Parker*, 553 F.3d at 1314.

Also within this category of intrinsic evidence are references to New Mexico CYFD and foster parent interactions with the children shortly after the children were rescued from the compound in Amalia.  These interactions are critical in completing the story for the jury and are "necessary preliminaries to the crimes charged."  *Irving*, 665 F.3d at 1212.  It was these interactions, combined with some of the materials found at the compound, that first caught the attention of law enforcement regarding the charged offenses in this case.  There would be a factual gap and unexplained "preliminaries" if the facts that the children made concerning statements to CYFD and their foster parents cannot be discussed at trial.  Evidence of these interactions explain why the FBI then interviewed the children and why the children are testifying.

For these reasons, the United States requests that the Court issue a pretrial ruling finding that the evidence of the ruqyah exorcisms performed on other children at the compound and evidence of CYFD and foster parent interactions is admissible intrinsic or *res gestae* evidence.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

***Electronically filed July 31, 2023***
TAVO HALL
KIMBERLY BRAWLEY
Assistant United States Attorney
P. O. Box 607
Albuquerque, NM 87103
(505) 224-1484

*/s/ Electronically filed*
GEORGE C. KRAEHE
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530

I HEREBY CERTIFY that I filed the foregoing
pleading electronically through the CM/ECF system
which caused the opposing party of record to be
served by electronic means, as reflected on the Notice
of Electronic Filing. A copy of these instructions were
also mailed to Defendants Siraj Ibn Wahhaj and Lucas
Morton.

*/s/*
TAVO HALL