IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 18-CR-2945-WJ |
| vs. | ) | |
| | ) | |
| JANY LEVEILLE, | ) | |
| SIRAJ IBN WAHHAJ, | ) | |
| HUJRAH WAHHAJ, | ) | |
| SUBHANAH WAHHAJ, and | ) | |
| LUCAS MORTON, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' CLOSING STATEMENTS REGARDING ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

The United States respectfully submits the below closing statements related to the admissibility of several statements by the Defendants and other coconspirators, and requests that the Court find that the statements are admissible either as non-hearsay under Federal Rule of Evidence 801(c), statements of a party opponent under Rule 801(d)(2)(A), or statements by a coconspirator under Rule 801(d)(2)(E). The statements include those provided with the United States' October 15, 2019 Sealed Notice of Intent to Introduce Out-of-Court Statements (Doc. 156), and its supplemental notices filed June 2, 2023 (Doc. 781), June 23, 2023 (Doc. 816), and July 16, 2023 (Doc. 850). This pleading is submitted pursuant to the Court's order following the hearing on this issue held on July 19, 2023.

### PROCEDURAL BACKGROUND

On March 14, 2019, a federal grand jury returned a seven-count superseding indictment against the Defendants. Doc. 85. The charges in the superseding indictment include four conspiracies, those being: Conspiracy to Provide Material Support to Terrorists, in violation of

18 U.S.C. § 2339A (Count 1), Conspiracy to Murder an Officer or Employee of the United

States, in violation of 18 U.S.C. § 1117 (Count 3), Conspiracy to Commit an Offense Against the

United States, in violation of 18 U.S.C. § 371 (Count 4), and Conspiracy to Commit Kidnapping,

in violation of 18 U.S.C. § 1201(c) (Count 6).  *Id*.  Defendants Hujrah Wahhaj (Hujrah) and

Subhanah Wahhaj (Subhanah) are not charged in Count 3, and Defendant Siraj Ibn Wahhaj

(Siraj) is not charged in Count 6.  *Id*.

      Although Defendants Hujrah and Subhanah are not charged in Count 3, both Counts 1

and 3 allege common facts, namely that the Defendants sought to accomplish their conspiracies

by gathering firearms and ammunition; by transporting personnel, firearms, and ammunition

across state lines; by constructing and maintaining a training compound and lodging; by storing

firearms and ammunition in the training compound; and by constructing and maintaining a firing

range and engaging in firearms and tactical training with other members of the compound.  Doc.

85 at 2-6.  In addition, it is specifically alleged in the Superseding Indictment that:

- Siraj provided at least ten firearms to his coconspirators, and Hujrah provided at least one firearm, (Doc. 85 at 3);

- Jany Leveille (Leveille), Siraj, Hujrah, and Subhanah traveled from the State of Georgia to the State of New Mexico with firearms and ammunition, (Doc. 85 at 3);

- Subhanah provided financial support to her co-conspirators, (Doc. 85 at 4);

- The Defendants built and maintained a compound comprised of materials such as a wooden frame, a trailer, plastic tarp, and a tire wall and that they stored firearms and ammunition in the compound, (Doc. 85 at 4);

- Siraj and Lucas Morton (Morton) built a firing range on the compound and dug an underground tunnel leading away from the compound, (Doc. 85 at 4);

- The Defendants possessed and shot firearms on the compound, (Doc. 85 at 4-5);

- Leveille and Morton solicited one of Siraj's relatives to join the group in New Mexico, to bring money and firearms, and to die as a martyr, (Doc. 85 at 5); and

- Siraj and Morton trained persons, including other occupants of the compound, in firearms use and tactical maneuvers, and Leveille and Siraj instructed persons to be prepared to engage in jihad, to die as martyrs, and to engage in violent acts, including the killing of federal employees, officials, and military personnel, (Doc. 85 at 5).

For both Counts 1 and 3, it is alleged that the Defendants acted pursuant to a common agreement and interdependently.  Doc. 85 at 2, 6.

Although Siraj is not charged in Count 6 because the statute precludes him from being charged with kidnapping his own child, the facts and circumstances of John Doe's kidnapping are *res gestae* evidence that is admissible to help explain the evidence pertaining to the charges against Siraj.  Hence, the co-conspirator statements regarding the kidnapping are relevant and admissible against Siraj.  Moreover, as described in more detail below, Siraj was one of the primary conspirators in the conspiracy to kidnap JOHN DOE.  As such, statements made by him during the course of and in furtherance of the conspiracy are admissible under Rule 801(d)(2)(E), regardless of whether or not he personally has been spared indictment.

On October 15, 2019, the United States filed a Sealed Notice of Intent to Introduce Out-of-Court Statements.  Doc. 156, along with a CD containing 16 exhibits, Doc. 157.  On June 2, 2023, the United States filed its Supplemental Sealed Notice of Intent to Introduce Out-of-Court Statements, (Doc. 781).  June 23, 2023 (Doc. 816), and July 16, 2023 (Doc. 850).  On July 19, 2023, the Court held a *James* hearing wherein the United States presented evidence in support of his notices.

## ARGUMENT

### I.     Siraj Wahhaj Is an Unindicted Coconspirator and His Statements Are Eligible for Admission Under Rule 801(d)(2)(E)

The specific question of whether a coconspirator in a kidnapping conspiracy who has immunity from federal prosecution based purely on his status as a biological parent can be

deemed an unindicted coconspirator appears to have not been addressed by any other federal court. However, questions of first impression still have a correct answer. Here, the combination of logic, public policy, statutory interpretation, and analogous circumstances reveals that the correct answer plainly is that Siraj Wahhaj is an unindicted coconspirator for purposes of Rule 801(d)(2)(E). Specifically, the statements at issue that were made in the course and in furtherance of the kidnapping conspiracy include Siraj Wahhaj's statements to Hakima Ramzi that he was going to take JOHN DOE to an unknown address in Tuskegee, Alabama, along with the other coconspirators and that he was not going to give JOHN DOE back to her, as well as statements by Siraj Wahhaj to his brother, Muhammad Wahhaj, that he had tried to perform an exorcism to get the demons out of JOHN DOE and that Siraj was planning to move with the other coconspirators to Tuskegee, Alabama.[1] *See* Gov. Ex. 24.

As an initial matter, it is factually undisputed that Siraj Wahhaj was at the center of the Defendants' actions to take, conceal, and carry away JOHN DOE across several state lines. He and Hujrah Wahhaj travelled to the United Kingdom (UK) shortly before the kidnapping to learn how to do "ruqyah" exorcisms. *James* Hearing Transcript, July 13, 2023 ("Tr.") at 17:15-19:14. He was the one who took JOHN DOE away from his caregiving mother, in concert with Jany Leveille's encouragement. Tr. at 23:11-20. He was the one who performed the exorcism rituals on JOHN DOE, including the one during which the child died. Tr. at 40:4-13. The other Defendants were well aware of all of these facts. Tr. at 23:21-26:7; 40:14-41:19. The other Defendants were also aware that JOHN DOE's mother was his primary custodian and caregiver,

---

[1] Most statements by Siraj Wahhaj related to the kidnapping conspiracy are not offered for their truth, and therefore are not hearsay and are admissible for the significance of their being made or to show context or intent behind the conspiracy. Examples include statements by Siraj that JOHN DOE was possessed by the devil, that JOHN DOE had jinn inside of him, that Siraj wanted to take JOHN DOE so he could remove the jinn from him, and that Siraj believed that Hakima Ramzi was practicing black magic on JOHN DOE. *See* Gov. Ex. 24.

Tr. at 15:13-17:9, that she did not consent to his being taken, Tr. at 21:10-23:7, that she was worried for his health and desperately seeking JOHN DOE's return, 24:5-13; 29:13-30:10; 164:23-165:8, and that law enforcement was looking for JOHN DOE and Siraj Wahhaj, Tr. at 43:8-46:17; 47:18-48:6; 60:20-61:24.  Yet the Defendants persisted in participating in and furthering JOHN DOE's concealment and the covering up of their crime (and JOHN DOE's death), and never made a single statement or effort even suggesting an intent to leave the conspiracy.  Tr. at 39:6-11; 40:14-41:5; 48:21-25.

Given that a conspiracy may be inferred from the Defendants' conduct and evidence "indicating coordination and concert of action," it should be clear that the kidnapping conspiracy initially existed at least between Siraj, Hujrah, and Jany, and at least as early as Siraj and Hujrah's trip to the UK to learn ruqyah several weeks before JOHN DOE's abduction.  *United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009) (quotations and citations omitted).  By the time all five Defendants had joined together to take JOHN DOE across several state lines from Alabama to New Mexico, it should be clear that the conspiracy was ongoing amongst the five of them.  Thus, factually speaking, there should be no question that Siraj Wahhaj was an actively participating member of this conspiracy to kidnap JOHN DOE; in other words, he was a coconspirator.  The only question is the legal contention by the Defendants that Siraj Wahhaj's statutory immunity from prosecution somehow extends to construct a legal fiction that erases his acts and statements as a coconspirator as though those acts and statements never existed.

As a matter of evidence law, an extension of Siraj's parental immunity here would not be to the benefit Siraj Wahhaj, since he is already bestowed with immunity for the kidnapping and conspiracy to commit kidnapping charges.  Thus, it makes no difference to the holder of the immunity (Siraj) whether he is considered an unindicted coconspirator, or whether his statements

in furtherance of the kidnapping conspiracy are admissible against his coconspirators.  Rather, the Defense's claimed extension of immunity would only serve as a windfall to the coconspirators who are criminally liable by excluding relevant and probative evidence for which the law and the rules of evidence expect and presume admission.  *See* Rule 402 (presuming admissibility of relevant evidence).

Such exclusion of highly probative evidence would be contrary to the truth-seeking function of this and every other court, and, since no specific authority *requires* such exclusion here, it should be avoided as a matter of law and public policy.  *See United States v. Davis*, 564 U.S. 229, 237 (2011) ("Exclusion exacts a heavy toll on both the judicial system and society at large.  It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence.  And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.  Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'") (internal citations omitted).

Similarly, imposing the fiction that Siraj Wahhaj was not a coconspirator in the kidnapping of JOHN DOE based solely on his statutory immunity from prosecution would create perverse incentives.  This too would be contrary to public policy and Congress's clear concern with the very serious crimes of child kidnapping and kidnapping resulting in death.[2]  Such an

---

[2] For example, maximum punishments as severe as mandatory life in prison for kidnapping resulting in death, and mandatory minimum sentences of 20 years' imprisonment for kidnapping a child, evince the seriousness with which Congress views these crimes.  In addition, Congress has passed several laws recognizing the existence and seriousness of parental kidnapping, including the Missing Children's Act of 1982 (28 U.S.C. § 534(a)), the National Child Search Assistance Act of 1990 (42 U.S.C. § 5780), the Missing Children's Assistance Act (42 U.S.C. § 5771), and the Parental Kidnapping Prevention Act of 1980 (28 U.S.C. § 1738A).  Although Congress has so far elected to maintain the immunity from federal criminal prosecution provided to biological parents in 18 U.S.C. § 1201(a), these laws recognize that parental kidnapping is a serious criminal act, and they exist to support and enhance the fact that all 50 states and Washington D.C. criminalize parental kidnapping.  *See* Grasso, et al., *The Criminal Justice System's Response to Parental Abduction*, Juvenile Justice Bulletin, Office of Juvenile Justice

exclusion would encourage those who would conspire to kidnap a child, for whatever reason, to simply bring a biological parent into the conspiracy so that they may all shelter under the parent's statutory immunity, to include even his or her consideration as a coconspirator.  Sadly, it is all too easy to imagine a situation where an estranged parent is recruited and agrees to participate in a conspiracy to kidnap his or her child (perhaps for a cut of a ransom demand or simply for personal reasons).  Treating the parent in such a scenario as a non-conspirator for purposes of excluding relevant and probative evidence via statements made by the parent would only serve to incentivize conspirators to seek parental participation in such kidnapping conspiracies.  It cannot be that the law is meant to allow for such an exploitation by others of Congressional grace given to biological parents for the serious crime of kidnapping a child.

Indeed, the kidnapping statute itself, along with the Federal Rules of Evidence, gives no hint that a parent cannot be a participant in a conspiracy to kidnap their biological child. 18 U.S.C. § 1201(a) states that "whoever unlawfully seizes . . . any person, except in the case of a minor by the parent thereof . . . shall be punished by imprisonment for any term of years . . . ." The conspiracy section of the statue then simply states that if "two or more persons conspire to violate this act . . . each shall be punished . . . ."  § 1201(c).[3]  Thus, the statute merely states that a parent of a kidnapped child cannot be "punished," but nowhere does the statute suggest that the parent cannot perform the kidnapping or participate in a conspiracy to kidnap.

---

and Delinquency Prevention, U.S. Dept. of Justice (Dec. 2001), available at https://www.ojp.gov/pdffiles1/ojjdp/186160.pdf.

[3] At least one court has determined that the "shield" from punishment for kidnapping one's own biological child extends to punishment for conspiring to do so or aiding and abetting doing so as well.  *See United States v. Boettcher*, 780 F.2d 435, 436-37 (4th Cir. 1985).  However, the court in *Boettcher* made no statement one way or the other about the evidentiary consequences of a parent's participation in such a conspiracy, and implicitly acknowledged not only that the non-parent coconspirators were in fact conspirators with the parent, but that they could also be prosecuted as such.  *See id.* at 437.

Courts, including this Court just a few months ago, have treated the parental immunity provision in the federal kidnapping statute as an affirmative defense.  *See, e.g.*, *United States v. Torres*, 2023 U.S. Dist. LEXIS 49068 at *11–12 (D.N.M. Mar. 22, 2023) (Johnson, C.J.); *Miller v. United States*, 123 F.2d 715, 718 (8th Cir. 1941).  This is significant because it implies that a biological parent is not treated as a legal ghost or non-actor who is incapable of criminal action; to the contrary, a parent who kidnaps his or her own child can be charged and the conduct is subject to punishment unless and until they establish their immunity from punishment.  *See Miller*, 123 F.3d at 718 ("The burden was on the defendant to bring himself within the exception.").

In other words, a person who agrees with others to seize, confine, abduct, carry away, etc., a child has committed the act of conspiracy to kidnap, but if they are a parent of that child they simply may not be punished for it.  All others in the conspiracy are subject to being punished severely.  As such, when a parent does participate in a conspiracy to kidnap his or her own minor child, that participation is both acknowledged as real and condemned by law and public policy, despite Congress continuing to allow for the shielding of such parents from federal criminal punishment for such acts (though not state criminal punishment).  Nothing in Rule 801(d)(2)(E) or the cases interpreting the rule suggest a part of the analysis is to consider *why* a coconspirator is unindicted.

Thus, the logical conclusion, consistent with public policy, is to treat such a parent as what he or she in reality is—an unindicted coconspirator.  Accordingly, statements made in furtherance of the conspiracy by such an unindicted coconspirator must be admissible against the indicted coconspirators.

This is a common occurrence under Rule 801(d)(2)(E), and it is not relevant for purposes of the rule why the unindicted coconspirator was not indicted.  *See, e.g.*, *United States v. Baines*, 486 F. Supp. 2d 1288, 1295 (D.N.M. 2007) (finding fact that coconspirator had not been indicted "irrelevant to the court's determination of whether he was co-conspirator for purposes of Rule 801(d)(2)(E) admissibility") (citing *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073 n.5 (10th Cir. 2006) ("The co-conspirator hearsay exception contains no requirement that the declarant be a defendant, only that she be a member of the conspiracy.")); *United States v. Dickey*, 736 F.2d 571, 598 (10th Cir. 1984) (upholding testimony of unindicted coconspirator cooperator when the requirements of Rule 801(d)(2)(E) were met); *United States v. McManaman*, 606 F.2d 919, 926-27 (10th Cir. 1979) (finding statements by unindicted coconspirator who had died admissible under Rule 801(d)(2)(E)); *United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993) ("An individual need not be indicted to be considered a coconspirator for the purposes of rule 801(d)(2)(E)."); *United States v. Adkins*, 842 F.2d 210, 213 (8th Cir. 1988) ("Rule 801(d)(2)(E) … says nothing about whether the co-conspirator has been indicted, and, for the rule to be applicable, it makes no difference."); *United States v. Montes-Cardenas*, 746 F.2d 771, 779 (11th Cir. 1984) (finding that unindicted coconspirator was member of the same conspiracy as defendant and holding that "[s]tatements made by an unindicted coconspirator are admissible so long as the government makes the proper showing").

That a statutorily immune member of a conspiracy (such as a biological parent in a federal kidnapping conspiracy) may be an unindicted coconspirator for purposes of Rule 801(d)(2(E) is also evident through logical deduction from analogous situations.

First, the admissibility of coconspirator statements is based on the principle of agency, not on the principle of being directly contrary to a defendant's criminal liability interests.  *United*

*States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002). "It is "settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment." *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979). *See also United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998) (explaining that the "law is well settled" that statements may be admissible under Rule 801(d)(2)(E) "even if the defendant is not formally charged with any conspiracy"); *United States v. Shores*, 33 F.3d 438, 442 n. 3 (4th Cir. 1994) (same); *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (same). "Indeed, the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all." *Russo*, 302 F.3d at 45. All that is required is that the conspiratorial objective being furthered by the declarant's statement "coincide" with a conspiratorial objective of a conspiracy involving the defendant(s) and the declarant. *Id.* at 45–46; *Ellis*, 156 F.3d at 497 (stating requirements for admissibility of a statement in furtherance of an uncharged conspiracy to be "factually intertwined" with offenses being tried essentially boils down to "ordinary relevancy principles").

Here, the conspiratorial objective to take JOHN DOE from his mother and to conceal him so that the Defendants could keep JOHN DOE permanently hidden from his mother and the imagined black magic she was using was shared amongst all of the Defendants. Siraj Wahhaj was a participant and member of the agreement to take JOHN DOE from his mother, regardless of whether the agreement was charged in a conspiracy count against him in this case, and regardless of whether Siraj's participation in the conspiracy exposed him to federal criminal liability.[4] *United States v. Buchanan*, 787 F.2d 477, 482 (10th Cir. 1986) ("[T]here is no

---

[4] Indeed, Siraj Wahhaj could be charged with offenses stemming from this very same agreement in the state courts of Georgia (GA Code §§ 16-5-40; 16-5-45) and New Mexico (*see* N.M.S.A. §§ 30-4-1; 30-4-4), any and all of which would still support his statements in furtherance of the conspiracy being admissible in this case. *Buchanan*, 787 F.2d at 482. Further, Siraj Wahhaj

substance to the argument that the conspiracy found by the judge as a basis for application of the

co-conspirator exception, under Rule 801(d)(2)(E), must be a 'federal conspiracy.'" (citations

omitted)).  All that matters is that the conspiracy to kidnap JOHN DOE existed, thus creating

agency between the coconspirators, including Siraj Wahhaj, and thus bringing any statements he

made in furtherance of that conspiracy within Rule 801(d)(2)(E).

Second, it is well established that an overt act by any conspirator can be evidence of the

conspiracy, but the act need not itself be a crime.  *Braverman v. United States*, 317 U.S. 49, 53

(1942).  Nor does it matter if completion of the object of the conspiracy is "impossible."  *United*

*States v. Rodriguez*, 360 F.3d 949, 957 (9th Cir. 2004).  Along the same lines, a "person may be

liable for conspiracy even though he was incapable of committing the substantive offense."

*Salinas v. United States*, 522 U.S. 52, 63 (1997) (citing *United States v. Rabinowich*, 238 U.S.

78, 86 (1915)).

Third, it is well established that a conspiracy can still continue to exist (and statements in

furtherance of that conspiracy can still be admissible) even if one or more coconspirators are

arrested and removed from the conspiracy going forward.  *See United States v. Jimenez Recio*,

537 U.S. 270, 272 (2003); *United States v. Alcorta*, 853 F.3d 1123, 1139 (10th Cir. 2017);

*United States v. Melton,* 131 F.3d 1400, 1405 (10th Cir. 1997).  Similarly, a conspiracy does not

cease or fail to exist simply because one member of the conspiracy is or becomes immune from

punishment, such as by agreeing to cooperate.  *See United States v. Townley*, 472 F.3d 1267,

1274-75 (10th Cir. 2007); *United States v. Emuegbunam*, 268 F.3d 377, 396 (6th Cir. 2001)

---

could be civilly liable for his conspiracy to abduct and conceal JOHN DOE resulting in various
torts against JOHN DOE's mother.  All of these reasons (in addition to the shared purpose of his
participation in the federal kidnapping charges against the other four Defendants in this case)
establish the agency underlying the admissibility of any of his statements in furtherance of his
agreement with them to abduct and conceal JOHN DOE.  *Id.*; *Russo*, 302 F.3d at 45–46.

(holding statements made to coconspirator after he had been arrested and was cooperating with the government still constituted non-hearsay coconspirator statements under Rule 801(d)(2)(E) so long as the declarant coconspirators were capable of perpetuating the ongoing conspiracy).  It follows that a person who is merely statutorily immune from criminal punishment may still participate in a conspiracy, as the conspiracy charges against the other conspirators may proceed—even on evidence related to or stemming from the immune coconspirator.

Thus, based on these principles, even if Siraj Wahhaj's participation in JOHN DOE's kidnapping was not proscribed by law (though it surely is, he just cannot be punished for it), his acts as a coconspirator are still admissible as overt acts probative to the kidnapping conspiracy charge against the other Defendants.  Similarly, because Siraj was acting as a partner in the Defendants' agreement to take and conceal JOHN DOE for their own purposes, the principle of agency for Siraj as to the other conspirators makes his statements in furtherance of that conspiracy admissible as to the other coconspirators, even if Siraj was deemed "incapable" of committing kidnapping himself or the offense was not charged against him.

Finally, courts have long recognized that immunity for one conspirator, whatever it is based upon, does not normally extend to any coconspirators.  *See, e.g.*, *United States v. Dumeisi*, 424 F.3d 566, 580 (7th Cir. 2005) (explaining coconspirators with diplomatic immunity "cannot save [the defendant] from being prosecuted for the conspiracy" between him and the immune coconspirators); *United States v. Truong Dinh Hung*, 629 F.2d 908, 928-30 (4th Cir. 1980) (accepting that Vietnamese ambassador was an "unindicted coconspirator" despite his diplomatic immunity, and upholding conviction of coconspirator for espionage); *United States v. Melekh*, 193 F. Supp. 586, 592 (N.D. Ill. 1961) (stating there "is no reason to suppose that carte blanche

privileges" can be "accorded the immune person's activities in respect to third parties not so immune").

Nor does immunity from prosecution mean all acts taken by a coconspirator while he enjoyed immunity are inadmissible against coconspirators or to prove charges against a person other than charges to which he is specifically immune. *See United States v. Zhong*, 2018 U.S. Dist. LEXIS 199848 at *18 (E.D.N.Y. Nov. 26, 2018) ("Although Defendant is entitled to residual immunity from prosecution, the government may admit evidence of Defendant's acts while he was an accredited diplomat as direct evidence, and to prove Defendant's intent, planning, and knowledge of the alleged forced labor conspiracy."). Thus, like Siraj Wahhaj, though the ambassadors and diplomats could not be prosecuted for their conspiracies, the courts in these cases had no trouble acknowledging the fact that they were coconspirators.

These principles would appear to be self-evident with regard to kidnapping, as the few federal courts faced with similar fact patterns have found it uncontroversial that the government would prosecute coconspirators in parental kidnapping cases despite immunity existing for the parent. *See United States v. Sheek*, 990 F.2d 150 (4th Cir. 1993), and its unreported companion case, *United States v. Sheek*, 40 F.3d 1245 (4th Cir. 1994) (explaining that, where a biological mother conspired with child's step-father to kidnap her children, the step-father could be prosecuted for kidnapping even though mother could not); *Miller v. United Sta*tes, 123 F.2d 715 (8th Cir. 1941), *rev'd on other grounds*, 317 U.S. 192 (1942) (step-father who conspired with child's mother to kidnap mother's child does not fall within parental exclusion of federal kidnapping statute); *United States v. Jackson*, 2010 U.S. Dist. LEXIS 138613 at *5 (E.D. Tenn. Nov. 10, 2010) (rejecting claim that biological father was "entitled" to take his infant child away from the mother, and stating that father's immunity from kidnapping charges did not negate non-

parent aidor and abbettor's criminal liability for kidnapping); *cf. United States v. Boettcher*, 780 F. 2d 435, 437 (4th Cir. 1985) (referencing potential prosecution of two co-conspirators, despite applying the parental exemption under section 1201(a) to a parent who conspired to kidnap her child in violation of section 1201(c)).

For all of the reasons outlined above, there is no reason the statements made by a coconspirator parent would be inadmissible as to the other conspirators in a kidnapping conspiracy. Thus, Siraj Wahhaj's clear participation in the conspiracy to kidnap JOHN DOE establishes him as a member of the conspiracy, though an unindicted one. Although he cannot be punished for such participation under the federal statute, and is therefore not charged with the kidnapping counts here, any statements made by him in furtherance of that conspiracy that otherwise meet the minimal requirements for admission under Rule 801(d)(2)(E) are admissible under that rule, and it is "irrelevant" whether or why Siraj is unindicted. *Baines*, 486 F. Supp. 2d at 1295; *Buchanan*, 787 F.2d at 482. fAccordingly, the Court should treat Siraj like any other conspirator in making its determinations pursuant to the United States' *James* notices.

II.     **The Vast Majority of the Statements Noticed by the United States Are Admissible Non-Hearsay**

As stated in its previously filed notices, as well as at the *James* hearing, almost all of the statements included in the United States' notices are not actually hearsay and are admissible because they would not be offered for the truth of the matter asserted in the statements. *See* Docs. 156, 781, 816, and 850. Rather, they constitute various types of statement evidence that are well-accepted as non-hearsay and admissible subject to Federal Rules of Evidence 401-403.

Although the volume of statements made by the Defendants and known to the United States is so large that it is highly impractical to describe and analyze each statement, there are several examples of many of these types of admissible non-hearsay provided in the United

States' summary chart provided to the Court at the *James* hearing.  *See* Gov. Ex. 35 (reattached to this filing for the Court's convenience).  The United States respectfully asserts that these examples are sufficient to provide the Court with an understanding of the types of statements and the non-hearsay purposes for which they may be offered such that the Court can make preliminary rulings in line with the purpose of the *James* hearing.  It is both proper and appropriate for the Court to make these rulings by category and subject, and the Court need not analyze every single sentence provided in the United States' notices.  *United States v. Stein*, 985 F.3d 1254, 1269 (10th Cir. 2021) (upholding district court's review and admission after *James* hearing of coconspirator statements "in their entirety," and not "sentence-by-sentence").

The first type of non-hearsay statements are those that constitute evidence of the existence of the charged conspiracies, the purpose of the charged conspiracies, or the membership of the charged conspiracies.  In other words, these statements would be offered for the significance of the fact that they were made in evincing the existence, scope, and membership of the conspiracy, regardless of the truth of their content.  It is settled law that these types of statements or verbal acts are admissible against all coconspirators without need to even look to Rule 801(d)(2)(E).  *See, e.g.*, *United States v. Faulkner*, 439 F.3d 1221, 1226-27 (10th Cir. 2006).

The majority of the statements provided by the United States in its exhibits and presentation of evidence at the *James* hearing constitute these types of statements.  They were noticed and offered to demonstrate the existence of the four charged conspiracies, their purposes (to kidnap JOHN DOE, to provide or allow Jany Leveille to possess firearms and ammunition, to provide material support to preparations to kill or attempt to kill federal officers or employees, and to murder federal officers or employees), their makeup, that the Defendants knew at least the

essential objectives of the conspiracies, and that they knowingly and voluntarily became a part of the conspiracies. These statements also constitute the verbal acts demonstrating the concerted lines of effort undertaken by the Defendants in pursuit of their conspiracies' goals.

For example, statements by Jany Leveille in her testament or book that Hujrah Wahhaj and Siraj Wahhaj went to London to learn how to perform exorcisms, that she instructed Siraj Wahhaj to take JOHN DOE from his caregiving mother, and that she and Siraj Wahhaj decided to keep JOHN DOE and to conceal him from his mother evince the existence of the agreement to kidnap JOHN DOE before it even happened. *See* Gov. Ex. 4 at 21, 48-49; Tr. at 23:11-20. Similarly, there are many statements by several Defendants at various points in the conspiracies denying knowledge of JOHN DOE's whereabouts or his safety. *See, e.g.*, Tr. at 43:16-46:8; 47:1-48:14; 49:10-15; 51:12-25; 71:7-22; Gov. Exs. 19., 29(a), 29(b), 33, 34. This includes statements by the Defendants to each other and the children at the compound to not talk about JOHN DOE or say where he was, which evinces their agreement to continue to conceal JOHN DOE's location even after Lucas Morton and Siraj Wahhaj's arrests so that JOHN DOE's resurrection—which the Defendants believed was imminent—could come to pass, thus allowing the conspiracies to reach their ultimate goals. Tr. at 49:16-21; 50:2-51:2; Gov. Ex. 27(c). It also includes statements by the Defendants to outsiders, such as family and friends, rejecting any notion that the Defendants had absconded with JOHN DOE or that there was any reason for worry about JOHN DOE's safety—after JOHN DOE had died at the hands of the Defendants. *See* Tr. at 22:11-20; 30:5-10; 71:12-19; Gov. Ex. 19, 22.

Altogether, these types of statements are not hearsay because they are false statements— at all times when these statements were made the various Defendants making them did know where JOHN DOE was, did know they had taken him, and did know JOHN DOE was not safe

and sound.  Thus, these types of statements are offered for various reasons to show the existence

of the conspiracy or consciousness of guilt, but not for the truth of the matter asserted.  As such,

they are admissible non-hearsay.

Another example is the letter from Jany Leveille to Muhammad Wahhaj, delivered

personally by Lucas Morton, recruiting him to take all of his money out of the bank, bring his

guns, and join the Defendants in New Mexico, where he could meet "Isa" (JOHN DOE

resurrected) and die as a martyr.  Tr. at 64:20-67:24; Gov. Ex. 6.  This letter is evidence of who

the conspirators are (i.e., the Defendants in New Mexico, referred to as "the righteous" and

"us"), what its purpose is (to culminate in a violent confrontation with, among others, federal

officers where Muhammad could die as a martyr with them), and, as a whole, the existence of the

conspiracies to provide material support ("bring your guns" and provide himself as personnel)

and to kill or attempt to kill federal officers.  *Id.*  Similar statements offered for their significance

in evincing the existence of the material support and § 1117 conspiracies (and not for their truth)

include Lucas Morton's statement to law enforcement on the morning of the search warrant that

"You guys think you're above the law, you guys are all going to get hurt big time, I promise

you" (Tr. at 75:15-18, Gov. Ex. 27a) and statements by Siraj Wahhaj about shooting police that

came to their compound and telling the oldest teenage boy to "load up" with their weapons when

law enforcement did come to serve the search warrant (Tr. at 76:23-78:5; Gov. Ex. 1(d) at 34;

Ex. 2(b) at 60).

The second type of statements may not be assertions at all, but rather to show context of

the ongoing conspiracies.  As such, they are categorically not hearsay.  This would include

statements of tangentially related things or things that are already clear from other evidence, such

as statements evincing the fact that JOHN DOE died in the custody and control of the

Defendants.  *See Alcorta*, 853 F.3d at 1141 (citing *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1128-29 (10th Cir 2009)); Gov. Ex. 4 at 89; Ex. 2 at 31.  This also includes countless statements by the various Defendants expressing ideas or beliefs related to their shared purposes underlying the conspiracies, such as beliefs in Jany Leveille's ability to receive messages from God, Tr. at 22:21–23:7; 165:9–19; Ex. 4 at 39, and the group's persistent belief that JOHN DOE's resurrection (and follow-on cleansing of society) was imminent, *see* Tr. at 71:9–73:13; 75:22–76:2; Gov. Exs. 10, 19.

Other examples of these types of statements include Hujrah Wahhaj telling her daughter's school that her daughter would not be returning to school because of a family emergency (Tr. at 27:1-4; Gov. Ex. 21), which, when combined with other non-hearsay contextual statements in Jany Leveille's book about Hujrah's immediate willingness to join the kidnapping conspiracy and to follow Jany as a messenger from God (Gov. Ex. 4 at 39, 90) demonstrates the context of the conspirators' actions and things that are already clear from other evidence, namely that Hujrah Wahhaj took her child and willingly joined the Defendants' move to New Mexico. Similarly, statements by the Defendants about their beliefs justifying their conspiracies or motivating them could fall in this category also.  This would include statements by Subhanah Wahhaj foreshadowing the Defendants imminent plan to reveal "the truth" (i.e., risen Isa and Jany Leveille as the messenger), Gov. Ex. 10, or, as Lucas Morton put it, "to face the nation and their issues."  Tr. at 72:18-20; Gov. Ex. 19.

Third, utterances by the Defendants or others that constitute questions, requests, or demands are not assertions, and therefore cannot constitute hearsay.  *See Alcorta*, 853 F.3d at 1141 (citing *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1128-29 (10th Cir 2009)).  Several statements included in the United States' notices constitute these types of statements, including

Subhanah Wahhaj's wonderings why the FBI had not found them in New Mexico yet, Tr. at

146:7-15.  Another example would be Jany Leveille's statements in her testamentary book, such

as when she wonders "How could a Quranic recitation execute a child?" after JOHN DOE died

during one of the exorcisms the Defendants forced him to undergo.  Gov. Ex. 4 at 90.  Yet

another example is Jany Leveille's brother, Von "Yusuf" Leveille, asking Jany after Siraj

Wahhaj and Lucas Morton were arrested whether the "kids spilled something."  Gov. Ex. 10 at

160; Tr. at 62:17-63:9.  This reference to the kids' presumed knowledge about the Defendants'

conspiracies (which is independently known to be true, *see* Gov. Exs. 1–3, 31–32) evinces the

existence of the conspiracies but is not an assertion, and is therefore not hearsay.  These types of

non-assertion statements are self-evident, and may be recognizable by the parties and the Court

at any point if they come up, even if not addressed in detail here.

Thus, the vast majority of the statements provided by the United States in its notices, as

evidence at the *James* hearing, and in its chart in Exhibit 35 are admissible against all of the

Defendants because they do not constitute hearsay at all.  To the extent that a minority of

remaining statements would be, or could be construed as being, offered for their truth, they are

admissible as coconspirator statements under Rule 801(d)(2)(E), as discussed further below.

## III.    *James* Hearing Legal Background

To show the admissibility of statements under Rule 801(d)(2)(E), the United States must

show three elements by a preponderance of the evidence: (1) a conspiracy existed; (2) the

defendants and the declarant were members of the conspiracy; and (3) the statements were made

during and in furtherance of the conspiracy.  *See, e.g., United States v. Owens*, 70 F.3d 1118,

1123 (10th Cir. 1995); Fed. R. Evid. 801(d)(2)(E).  There is no requirement that coconspirators

testify at a hearing to prove the conspiracy; indeed, the Court may rely entirely on a single

witness to make the requisite finding.  *Id.* at 1123-24 (affirming a district court's conspiracy

finding after a *James* hearing where "[t]he government called only one witness.").  Moreover,

the Court may rely on hearsay for this pretrial determination as the rules of evidence do not

apply, except those on privilege.  Fed. R. Evid. 104(a), 1101(d)(1).

 Here, the Court has followed the preferred order of proof by receiving the United States'

notices and holding a *James* hearing to determine whether the predicates for the existence of the

charged conspiracies and the membership in them were satisfied, and, for any true hearsay

statements, whether the "in furtherance" requirement was shown.

## IV. The Conspiracies Existed Between Siraj Wahhaj, Jany Leveille, Subhanah Wahhaj, Hujrah Wahhaj, Lucas Morton, and Yusuf "Von" Leveille

 As noted above, the vast majority of the statements and evidence noticed and provided by

the United States, and the evidence elicited at the *James* hearing, constitutes admissible non-

hearsay that is evidence of the existence and makeup of the conspiracies.  Based on all of this

evidence, the United States asserts that the four charged conspiracies existed, and were made up

of, at the very least, the five Defendants.  In addition, the § 2339A conspiracy included Jany

Leveille's brother, Von Yusuf Leveille, as an unindicted coconspirator.

 To find that a conspiracy existed, there must be proof of four elements: (1) there was an

agreement to violate the law; (2) the declarant knew the essential objectives of the conspiracy;

(3) the declarant knowingly and voluntarily took part in the conspiracy; and (4) the

coconspirators were interdependent. *United States v. Rutland*, 705 F.3d 1238, 1249 (10th Cir.

2013).  "The specific intent required" for finding the existence of a conspiracy is merely "the

intent to advance or further the unlawful object of the conspiracy."  *United States v. Blair*, 54

F.3d 639, 642 (10th Cir. 1995).  The burden of proving the existence of a conspiracy is only by a

preponderance.  To meet this low bar, the United States need only provide some evidence, which

has been described as requiring more than a "scintilla," such that a reasonable mind would accept as "adequate" to support the conclusion that a conspiracy existed. *United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986).

Importantly, there is no requirement that the conspirators know that their objective is unlawful. "There need not, of course, be proof that the conspirators were aware of the criminality of their objective." *Ingram v. United States*, 360 U.S. 672, 678 (1959). Indeed, the Supreme Court has "squarely rejected" arguments that proof of a conspiracy requires a defendant to know "that his conduct violated federal law." *Blair*, 54 F.3d at 643 (citing *United States v. Feola*, 420 U.S. 671, 687 (1975)). "[T]he general rule, deeply rooted in the American legal system, is that ignorance of the law or a mistake of law is no defense to criminal prosecution" and that deeply rooted rule applies to the general conspiracy statute at issue here. *Blair*, 54 F.3d at 643 (citing *Cheek v. United States*, 498 U.S. 192, 199 (1991)).

Finally, the evidence necessary to clear the low bar of establishing the existence of a conspiracy may be, and often is, purely circumstantial and based on reasonable inferences from the alleged conspirators' conduct. "Because secrecy and concealment are frequently essential to a successful conspiracy, direct evidence of a conspiracy" like, say, a written contract, "is often hard to come by." *Wardell*, 591 F.3d at 1287. As such, the proof to show an agreement may be established "on circumstantial evidence." *Id*. A conspiracy may indeed be inferred "from the defendants' conduct" and evidence "indicating coordination and concert of action." *Id*. *See also United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009) ("[B]ecause a criminal conspiracy by its very nature is usually shrouded in a further conspiracy of silence, the common plan or purpose must often be, and may legitimately be, proved by circumstantial evidence.").

### A. Agreements with Regard to the Charged Offenses

As an initial matter, all four charged conspiracies largely overlap in time, place, and facts. Indeed, as an alternative, the United States emphasizes that the charged conspiracy offenses here could be viewed as subsets or sub-agreements within a single, larger conspiracy by the Defendants to take JOHN DOE and to separate themselves from the outside world so that they could train as an armed group and prepare for a religious-based cleansing of society with JOHN DOE as the prop or centerpiece. In so doing, the Defendants violated the various statutes charged, including agreeing to commit the four charged conspiracy offenses. Either way, there is evidence to support the Court's finding of the existence, membership, and purposes of the four charged conspiracies, whether as sub-parts of a single large conspiracy or as four separate but overlapping agreements.

First, there is much more than a scintilla that the Defendants agreed to kidnap JOHN DOE by permanently taking him from his mother and concealing their whereabouts with him. The conspiracy existed at least as early as the time that Hujrah Wahhaj and Siraj Wahhaj traveled to the UK to learn how to do the exorcisms, which Siraj Wahhaj expressed a desire to perform on JOHN DOE. This, combined with an agreement between all of the Defendants that JOHN DOE's mother was practicing black magic on JOHN DOE, whom she had stolen from Jany Leveille's womb, was the initial motivation for the kidnapping. *See* Gov. Ex. 4 at 21, 48-49; Ex. 2 at 11; Tr. at 23:11-20. Soon after taking him from his mother, Siraj Wahhaj informed JOHN DOE's mother that he would not be giving JOHN DOE back to her. Gov. Ex. 24 at 7. Similarly, there are many statements by Subhanah Wahhaj, Hujrah Wahhaj, Lucas Morton, and Jany Leveille at various points in the conspiracies falsely denying knowledge of JOHN DOE's whereabouts or his safety in order to allow their conspiracy to continue. *See, e.g.*, Tr. at 43:16-46:8; 47:1-48:14; 49:10-15; 51:12-25; 71:7-22; Gov. Exs. 19., 26, 29(a), 29(b), 33, 34. There

were also statements by the Defendants to each other and the children at the compound to not

talk about JOHN DOE or say where he was.  Tr. at 49:16-21; 50:2-51:2; Gov. Ex. 27(c).  All of

this evinces the continuation of their agreement to conceal JOHN DOE's location, even in the

days after Lucas Morton and Siraj Wahhaj's arrests on August 3, 2018, as the women had yet to

be arrested and JOHN DOE's body yet to be found (the body was not found until August 6,

2018).

      There were also statements by the Defendants to outsiders, such as family and friends,

rejecting any notion that the Defendants had absconded with JOHN DOE or that there was any

reason for worry about JOHN DOE's safety, even after JOHN DOE had died at the hands of the

Defendants.  *See* Tr. at 22:11-20; 30:5-10; 71:12-19; Gov. Ex. 19, 22.  Indeed, the coordinated

actions of all of the Defendants to cut off communications with anyone looking for them (except

to deny and obfuscate what they were doing on a few occasions), *see e.g.*, Gov. Ex. 21, who

knew they were on the run from law enforcement, *see, e.g.*, Gov. Exs. 10 at 146; Tr. at 60:20-24,

and who stayed underground at their compound in New Mexico for months because they all

thought they were being watched by the FBI, Tr. at 47:20-48:1, demonstrates that the Defendants

had an agreement to kidnap and conceal JOHN DOE.  Statements such as Subhanah Wahhaj's

that "There was no kidnapping" within days of the group concealing JOHN DOE in Alabama

expose the fact that there was indeed a kidnapping, and that all of the Defendants were in on it.

Gov. Ex. 19 at 9.

      Similarly, there is more than a scintilla that the Defendants agreed to provide material

support for preparations to kill or attempt to kill federal officers, and that Siraj Wahhaj, Jany

Leveille, and Lucas Morton had entered into an agreement to murder federal officers or

employees.  Evidence shows that this agreement was in place at least as of the time that all of the

Defendants had gathered in Tuskeegee, Alabama, if not before.  This is evidence by Jany's statement that the group was going to become the "people of the cave" where they would follow Jany's messages from God.  Gov. Ex. 4 at 52.  Hurjah Wahhaj added a gun to the group's collection when joining the move from Georgia through Alabama to New Mexico.  Tr. at 163:24–164:4.  And, in just the few weeks they were in Alabama, the group had begun to construct a similar compound as was eventually constructed in New Mexico.  Tr. at 131:21-25.

From Alabama, the Defendants transported several firearms, ammunition, and body armor with them to New Mexico.  Siraj Wahhaj was extremely vigilant and concerned about these items after the Defendants crashed and totaled their car when driving to New Mexico.  Tr. at 36:3–7; Gov. Ex. 17.  The Defendants' stories about where they were going and why they had so many firearms but no camping gear were not consistent and suspicious.  Tr. at 36:3–38:16; Gov. Ex. 17.  This evinces efforts by the Defendants to conceal the real purpose of their move, which was to begin their preparations to, *inter alia*, kill or attempt to kill federal officers or employees.  Further, the Defendants tried to recruit others to bring their money and guns and join them where they could die as martyrs.  *See* Gov. Exs. 6.  Even some of the children were aware of this recruitment, making it highly unlikely the other coconspirators at the cramped compound had no idea about it.  Gov. Ex. 1 at 28.  Though circumstantial, this evidence demonstrates the existence and knowledge of the agreement, which is then corroborated when JOHN DOE died and the plan developed into using the firearms and training with them for a specific time—when JOHN DOE woke up to lead them.

Further, all of the evidence about keeping JOHN DOE's body with them, believing that he was Isa and would come back to life to lead the group in a cleansing of the non-believers, to include killing persons from corrupt institutions including federal officers and employees, and

24

their numerous statements attempting to conceal JOHN DOE's whereabouts evince the Defendants' agreement about what their material support was in support of.  Tr. at 52:4-21; Gov. Exs. 1 at 22-29; 1(c) at 8.  On top of this, there is the evidence of the firearms training, *see, e.g.*, Gov. Ex. 18, and each of the Defendants' acceptance of their roles in this conspiracy, *see, e.g.*, Tr. at 56:10-59:9; 69:1-70:8, and everyone's knowledge—to include the teenage boys and even the eight-year-old girls—of the purpose of the guns and training, *see, e.g.*, Gov. Exs. 1 at 22-29; 3 at 28; 31 at 11; 32 at 11–13.  This same evidence evinces the agreement between Jany, Siraj, and Lucas to kill federal officers, as well as Jany Leveille's constructive possession of firearms as a person unlawfully in the United States.

## B. Knowledge of the Essential Objectives

To prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendants knew all the details or all of the members of a conspiracy. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). "Rather, the government only needs to demonstrate the defendant shared a common purpose or design with his alleged co-conspirators." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006).

Evidence that the Defendants shared a common purpose or design in all of the charged conspiracies is abundant.  Regarding the conspiracy to kidnap JOHN DOE, the evidence referenced above related to the existence of the agreement also demonstrates their shared knowledge of essential objectives, up to and including concealment of JOHN DOE's body even after Siraj Wahhaj and Lucas Morton were arrested.  Further, statements made by Jany Leveille, Siraj Wahhaj, and Hujrah Wahhaj in Georgia show that the Defendants planned to take JOHN DOE to Alabama to avoid JOHN DOE's mother's efforts to recover him, as well as law enforcement interventions and court orders that would have required JOHN DOE's return to his

25

mother's custody and care.  For example, Siraj Wahhaj mentioned moving to land he owned in Alabama, *see* Gov. Exs. 4 at 52–54; 24 at 7.  Jany and Hujrah's agreement and coordinated actions, including Hujrah's actions taking her daughter out of school, demonstrate a knowledge that the objective of "the plan" was to take JOHN DOE across state lines and hold him permanently.  Gov. Ex. 4 at 52–54; Tr. at 25:8-21.

When the group arrived in Alabama, Subhanah and Lucas Morton willingly and knowingly joined the conspiracies, similarly demonstrating knowledge that the plan had then become to take JOHN DOE across state lines to New Mexico, where they would become "the people of the cave" and where they could conceal JOHN DOE from law enforcement and his mother's attempts to find them.  *Id.*; Tr. at 22:11–23:7.  Evidence of the Defendants' coordinated actions and statements concealing JOHN DOE's whereabout show that all of the Defendants agreed to travel to New Mexico to follow and promote Jany Leveille as the messenger of God, and knew the purpose was to keep and conceal JOHN DOE there.  Tr. at 27:16-30:25; 37:21-38:25; Gov. Exs. 22; 25 at 9; 25(a).  Further, Von Leveille describes that "everyone" in the Defendants' group asked JOHN DOE whether his "mommy doing.something to u that you don't like," whether someone was doing "magic" to him, and "more" questions like that, and that JOHN DOE, who could not walk or talk, purportedly answered their questions by "shaking his head yes or no."  Gov. Ex. 25(a) at 20–21.  This indicates not only one of the purposes of the kidnapping agreement was to take JOHN DOE away from his caregiving mother, but also that all of the Defendants had knowledge of this purpose of their carrying away and concealing of JOHN DOE from his caregiving mother.  In other words, it describes the existence of the kidnapping conspiracy charged in Count 6.

Regarding the intertwined and overlapping § 2339A and § 371 conspiracies, the evidence described above also demonstrates the Defendants' knowledge of the essential objectives, to include the recruitment letter delivered to Siraj's brother by Lucas Morton (Ex. 6).  In addition, all of the Defendants were aware of the purpose of the firearms training and the construction of their compound as related to their plan to kill those who did not accept the risen Isa or were corrupt, and to shoot and kill federal law enforcement at their compound when they came.  *See, e.g.*, Gov. Exs. 6 (recruiting another to bring money and guns and join the Defendants), 4 at 1 (listing the "favored" who were members of the conspiracy) and at 75 (describing conspiracy); 19 at 21; Tr. at 72:18-20; Gov. Ex. 19. (Lucas Morton telling his sister that the Defendants were "prepar[ing] to face the nation and their issues.").  Each Defendant knew and accepted their role in the agreement to provide material support for preparations to kill or attempt to kill federal officers.  Tr. at 56:10-59:9; 69:1-70:8; 82:3-22; Gov. Exs. 2(b) at 28-29; 25(a).  They acted in concert to ensure nobody—law enforcement or otherwise—discovered them and derailed their plans.  *See, e.g.*, Gov. Ex. 19 at 17 (Subhanah foreshadowing to a friend on July 31, 2018 "The reality is I cant trust anyone at this point besides you.  Verrrry soon by brother, very soon we'll have a face to face and the truth will be declared!!"); Ex. 13 at 280 (Jany telling Von Yusuf Leveille on August 4, 2018 "[JOHN DOE] comes on Monday n it's all over").

This is also evidenced by the fact that the children, to include even the eight-year-old girls, were aware of these objectives of the agreement.  Gov. Exs. 3 at 28, 31 at 11, 32 at 11–13. It is not a difficult assumption that, if the small children knew, and the plans were being discussed and laid out in the cramped camper and through the shared project of Jany's testament book, all while excessive firearms tactics and training took place with the men outside, all of the adults also knew.  Similarly, all Defendants participated in shooting firearms at their compound

in New Mexico, and each Defendant knew and facilitated Jany Leveille's actual and constructive possession of the firearms.  Tr. at 79:16-80:4.

Finally, regarding the § 1117 conspiracy, the evidence suggests this agreement and Jany, Siraj, and Morton's knowledge of its essential objectives was in place at least at the time of the Defendants' occupation of their compound in New Mexico.  Again, the kids knew about the plan, Jany affirmed the plan to the kids, and Morton's and Siraj's firearms training, involving tactical maneuvers is well documented.  Further, the existence of the "Phases of a Terrorist Attack" document, which describes a fallback base similar to the compound the Defendants constructed, and the compound's construction itself, to include bullet-proof, broken-glass-topped barrier walls with channelized entries, firing platforms behind parts of the walls, and a 100-foot-long tunnel with a spider hole escape hatch and pre-staged weapons, all demonstrate the Defendants' plans of engaging in an armed conflict with police, to include the federal agents they believed were watching them.  *See, e.g.*, Gov. Exs. 1 at 62, 69-70; 27(a); 20; Tr. at 73:21-74:14; 75:15-18 (Morton telling TCSO officers coming to serve the search warrant "You guys think you're above the law, you guys are all going to get hurt big time, I promise you").  Indeed, Lucas Morton had a loaded shotgun next to him in the box truck he came out of, while Siraj and the oldest teenage boy (whose role was to shoot police and non-believers along with Siraj) were both armed, Siraj heavily so, when law enforcement came to the compound to serve a search warrant. Tr. at 76:11-77:18.  But for coconspirator Jany Leveille—knowing what the plan was—telling Siraj and her son to not shoot, there likely would have been a bloodbath that morning.  Tr. at 77:2-6.

Notably, FBI Special Agents interviewed five children who lived at the compound with the Defendants, and all five children knew about the Defendants' plans to prepare for a war, to

build an army for jihad, and that this was what the tactical training was for.  Tr. at 77:7-18.

Again, if five young children knew about these plans and purposes, the five adult Defendants

knew and discussed them.  Moreover, the group's collective knowledge about what they were

doing was summed up succinctly by coconspirator Von Yusuf Leveille, who stated "They knew

they were going to get arrested. They knew this would be worldwide. They knew that's how they

would be known. They knew people would reject. They knew they would be in it by themselves,

so they were ready."  Gov. Ex. 25(a) at 28; Tr. at 84:14-17.  Thus, the Defendants knew the

essential objectives of the conspiracies.

### C.  Knowing and Voluntary Participation

Proof of an individual's membership or participation in a conspiracy is not demanding.

The only requirement is that "he or she must have a general awareness of both the scope and the

objective of the enterprise to be regarded as a coconspirator," and a conspirator "need not know

of the existence or identity of the other members of the conspiracy or the full extent of the

conspiracy." *United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir. 2017) (citations and

quotations omitted).  Further, there is no recognized limiting principle as to admissibility for

conspiracy evidence simply because a conspirator did not know about a specific act or statement

of their coconspirators or because a conspirator joined a conspiracy after it had already begun.

*United States v. United States Gypsum Co*., 333 U.S. 364, 393 (1948) ("With the conspiracy thus

fully established, the declarations and acts of the various members, even though made or done

prior to the adherence of some to the conspiracy become admissible against all."); *United States*

*v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991) ("The fact that appellant may have joined the

conspiracy after its inception does not make his co-conspirators' previous statements

inadmissible.").  This Court has previously recognized this very point of law.  *See United States*

*v. Cook*, 2008 U.S. Dist. LEXIS 142761 at *4-5 (D.N.M. Sept. 11, 2008) (Johnson, J.) ("[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed.") (quotations and citations omitted).

All of the evidence described above showing the existence of the agreements and the Defendants' knowledge of their essential objectives also demonstrates the Defendants' knowing and voluntary participation in these conspiracies.  Regarding the kidnapping conspiracy, Hujrah and Siraj travelled to London in order to learn the exorcism rituals they would soon apply to JOHN DOE, and Jany worked together with them to take JOHN DOE from his mother in Georgia in order to perform those rituals, purportedly under the belief that she was practicing black magic on JOHN DOE by giving him his anti-seizure medication.  *See* Gov. Ex. 4 at 21, 39 (stating Hujrah had the "important mission" of confronting JOHN DOE's mother about the suspected witchcraft, and stating Jany and Siraj told Hujrah that Jany was the messenger of Allah, and "she accepted it as true, right away"); Ex. 24.

Lucas Morton and Subhanah Wahhaj then immediately and enthusiastically joined the ongoing conspiracy to kidnap JOHN DOE when the other Defendants brought him to Alabama. Knowing that JOHN DOE was almost entirely cared for by his mother, but was now being kept from her, denied his anti-seizure medicine, and that the other Defendants came to Alabama to avoid law enforcement and court intervention, they both vociferously made numerous statements indicating their participation and belief in the concealment of JOHN DOE, and numerous false statements about JOHN DOE's whereabouts and his safety.  *See* Gov. Exs. 19; 21; 22; 23; 29(a); 29(b); 33; 34; Tr. at 22:14-23:10.  They also not only willingly joined the group's transport of JOHN DOE and the firearms and ammunition with Jany Leveille, they actually facilitated it,

including helping the group get themselves and the firearms out of Alabama after the car crash before the Georgia authorities could find them.  *See* Tr. at 37:21-39:17.  When JOHN DOE died during an extended exorcism session, not a single adult at the compound sought medical attention, called 911, or did anything to relay the death to his mother or anyone else they knew to be searching desperately for him.  Tr. at 40:14- 41:5.

Regarding the §2339A and § 371 conspiracies, the evidence above similarly demonstrates the Defendants' knowing and voluntary participation.  For example, Lucas Morton delivered the recruitment letter, written by Jany Leveille, to Siraj Wahhaj's brother in Atlanta.  Tr. at 64:20-67:24.  All of the Defendants had roles, which they accepted, in the conspiracies, to include Hujrah sleeping in the same room as JOHN DOE's corpse for months and acting as a supervisor over the group's operations, Tr. at 56:10-59:9; 69:1-70:8; Gov. Ex. 25(a) at 22-23, and Subhanah learning to embrace her role doing the cooking and cleaning, Tr. at 69:23-70:3; Gov. Ex. 25(a) at 93.  Again, the group's collective knowledge about what they were doing was summed up succinctly by coconspirator Von Yusuf Leveille, who stated "They knew they were going to get arrested. They knew this would be worldwide. They knew that's how they would be known. They knew people would reject. They knew they would be in it by themselves, so they were ready."  Gov. Ex. 25(a) at 28; Tr. at 84:14-17.

Regarding the § 1117 conspiracy, Lucas Morton and Siraj Wahhaj's well documented firearms and tactical training speak for themselves, while Jany Leveille's statements to, at a minimum, some of the children make clear that she too knew the purpose of the firearms and the training was to prepare for a war with, among others, federal officers.  *See* Tr. at 74:7-76:25; Gov. Ex. 31 at 11.

Thus, for all of the charged conspiracies, the Defendants subject to those charges knowingly and voluntarily participated.

### D.  Interdependence

Finally, interdependence "may be shown when a defendant's activities 'facilitated the endeavors of other alleged co-conspirators or facilitated the venture as a whole.'" *Pickel*, 863 F.3d at 1252-53 (quoting *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1124 (10th Cir. 2011)).  Here, there is ample evidence of each Defendant facilitating the endeavors of the other coconspirators or the venture as a whole.  As provided above, each Defendant had a role, each Defendant took some sort of action that facilitated the kidnapping of JOHN DOE, the provision of weapons to Jany Leveille, and material support to the group's preparations to kill or attempt to kill federal officers or employees.  Indeed, whether it was Jany Leveille's divine messaging, Hujrah and Subhanah's efforts to build and solidify Jany's status as the messenger through her testament book that was to be distributed to all who might follow them, the entire group's building and maintaining the training compound and base, Lucas and Siraj's weapons and tactical training, and the group's efforts to recruit others to bring more guns and money to die as a martyr with them, everyone in the group played their part in the pursuit of their common goals.

### E.  Von "Yusuf" Leveille Was Also A Member in the § 2339A Conspiracy

Finally, all of these elements are similarly met for Von "Yusuf" Leveille, Defendant Jany Leveille's brother, with regard to the § 2339A conspiracy.  He considered himself part of the Defendants' group and was a believer and follower of Jany, including everything revolving around JOHN DOE.  He used the term "we" and "us" to describe the Defendants and himself as a group.  *See, e.g.*, Ex. 25(a) at 26 ("We all agreed on that" in response to a question of whether Jany was receiving word from Allah); *id.* (referring to the Defendants and himself as "all 6 of

us"), and told witnesses that he spoke with Jany just about every day and that he desired to join them in New Mexico but could not due to his location in Haiti. *See* Gov. Ex. 25 at 2. Much of this is corroborated by the messaging and Facebook activity between Jany and Von. *See* Gov. Exs. 7, 10. Jany also lists him and his family as a member of their righteous, chosen group in her testament book. Gov. Ex. 4 at 1; 97.

Von also describes some of the roles each person had within the conspiracy, including that Subhanah Wahhaj's role was "to cook and clean everyday" "until the end," Gov. Ex. 25(a). at 93; Jany's being to teach the group the Quran, *id.* at 66 ("she.was.really our Qur'an teacher); and part of Hujrah Wahhaj's role being to stay with and keep JOHN DOE's dead body with her in her room at the compound until the group moved it into one of the tunnels underneath the compound, *id.* at 22-23. Von himself had a role, in that he was supposed to translate Jany's testament book into Haitian Creole, with the implied purpose being to distribute it throughout Haiti when the time came. Tr. at 62:4-13; Ex. 10 at 232.

He also demonstrates his intimate knowledge of and support for the objective of the Defendants' material support and their ultimate plans. *See, e.g.*, Gov. Ex. 25(a) at 22 (stating Jany called him "right away" after JOHN DOE died and told him that "'Everyone is ok' with JOHN DOE's death because he died during the exorcism, "So no one got sad"). He was part of the group's planning discussions on how the attacks or battles with nonbelievers and federal officers would play out. *Id.* at 41 (stating that they would "discuss the way we think it will happen. It would actually happen differently then what we would discuss. Like example They would get caught or raid. Ibn would die. And [JOHN DOE] wake and revive him").[5]

---

[5] Compare also Von's reference to the Defendants' plans as similar to the Quranic story of "Nuh," Ex. 25(a) at 48, wherein Nuh warned people to worship and fear Allah, and obey Nuh, and when people rejected the warnings, it describes Allah drowning all of them and sending them into the fire, and Nuh's insistence to Allah that not a single disbeliever should be spared

Von also provided his own material and financial support to the group, including sending items for the Defendants to use, such as a propane grill. Exs. 25(a); 25 at 7; Tr. at 60:8-9. Essentially, Von encouraged Jany's leadership and guidance of the Defendants in their ongoing conspiracies. Ex. 25 at 6-7; Tr. at 60:10-19. And, in a textbook coconspirator role, he provided the others with updates on the ongoing law enforcement search for them. Tr. at 61:12-24. *Alcorta*, 853 F.3d at 1141.

After Siraj and Lucas were arrested, Von kept up with encouraging Jany and the others to persist in the conspiracy and "stay focused," Gov. Ex. 10 at 159-63, and articulated that the group had indeed discussed the plans with the kids, asking if Siraj and Lucas had been arrested because "the kids spilled something?". Tr. at 62:14-63:9; Gov. Ex. 10 at 160. And, in describing the group's mentality during the conspiracy after all of the other conspirators were arrested, Von described that "They knew they were going to get arrested. They knew this would be worldwide. They knew that's how they would be known. They knew people would reject. They knew they would be in it by themselves, so they were ready." Gov. Ex. 25(a) at 28; Tr. at 84:14-17.

Thus, Von "Yusuf" Leveille was a coconspirator in at least the material support conspiracy. That said, his statements entirely fall within one of the non-hearsay categories described above. His statements further establish the existence, scope, and membership of the charged conspiracies.

**V.      The Statements Were Made During and In Furtherance of the Conspiracies**

---

alive, with the group's own statement of purpose in Jany's testament ("Since Satan's given respite, Allah also promised to end it when Isa Ibn Maryam (Jesus) [JOHN DOE] resurrects and save society by sending I, the Mahdi to end injustice and oppression for human and jinnkind. The time is now."). Ex. 4 at 75.

Finally, the few statements in the United States' notices that may constitute hearsay due to their being offered for the truth of the matter asserted are still admissible under Rule 801(d)(2)(E).  For the statements proffered to be admissible under Rule 801(d)(2)(E), they must be made during and in furtherance of the conspiracy.  *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994).

Many types of statements beyond obvious assertions of conspiratorial objectives are considered "in furtherance" of a conspiracy.  For example, statements identifying other members of the conspiracy and statements describing their roles in the conspiracy are in furtherance of the conspiracy.  *Owens* 70 F.3d at 1125 (citing *United States v. Williamson*, 53 F.3d 1500, 1520 (10th Cir. 1995).  Similarly, statements made "for the purpose of concealing the ongoing conspiracy are in furtherance of the conspiracy and therefore admissible."  *United States v. Alcorta*, 853 F.3d 1123, 1138 (10th Cir. 2017); *United States v. Wolf*, 839 F.2d 1387, 1393 (10th Cir. 1988).  In addition, comforting coconspirators so that they will remain loyal, and keeping coconspirators advised of an ongoing investigation of the conspiracy are all "in furtherance." *Alcorta*, 853 F.3d at 1141.  Other examples that the Tenth Circuit has deemed to be "in furtherance" include statements explaining events of importance to the conspiracy, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, statements identifying a fellow coconspirator, and discussions of future intent.  *United States v. Perez*, 989 F.2d 1574, 1578-79 (10th Cir. 1993).

Coconspirator statements are admissible against all coconspirators no matter when those coconspirators entered the conspiracy, so long as they were uttered after the conspiracy started. *United States v. United States Gypsum Co.*, 333 U.S. 364, 393 (1948) ("With the conspiracy thus

fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy become admissible against all."); *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991) ("The fact that appellant may have joined the conspiracy after its inception does not make his co-conspirators' previous statements inadmissible."). This Court has previously recognized this. *See United States v. Cook*, 2008 U.S. Dist. LEXIS 142761 at *4-5 (D.N.M. Sept. 11, 2008) (Johnson, J.) ("[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed.") (citations omitted).

Thus, contrary to Defendants Subhanah and Hujrah Wahhaj's repeated claims in their responses to the United States' supplemental notice, it is irrelevant whether either (or both) of them were "aware of," "heard," or "agreed with" any statement of their coconspirators made in furtherance of any of the conspiracies they joined. *See, e.g.*, Doc. 836 at 5, 7; Doc. 819 at 4, 6, 7. As members of the conspiracies to kidnap JOHN DOE, to provide material support for preparing to kill federal officers, and to provide or allow Jany Leveille to possess firearms and ammunition, all statements by coconspirators—regardless of whether they were made before or after they joined the conspiracy—that are made in furtherance of the conspiracies are admissible against Subhanah, Hujrah, and every other Defendant, regardless of whether they knew or agreed with any of the statements.

Here, the main noticed statements (if they are not already admissible as non-hearsay context or for the significance of the fact that they were made) that fall into one of these categories are (1) Jany's testament book and certain statements within it,[6] (2) statements by the

---

[6] Similar type statements of intent of the conspiracy may be found in Jany's other writings, including messages (*see, e.g.*, Ex. 10 at 252 ("He [Allah] will kill the kaffir [infidels] in the

Defendants regarding their plans and intent to kill or attempt to kill federal officers, either at the compound or during proselytizing missions once JOHN DOE resurrected, and (3) the recruitment letter to Siraj's brother Muhammad.

**A.  The Defendants' "Testament of Jany Leveille" Book**

As an initial matter, what has been referred to in shorthand as "Jany's book" or "Jany's journal" is in reality a product of the Defendants' joint efforts to legitimize Jany as the chosen prophet of Allah and, by extension, the Defendants' group as the chosen or "righteous" people destined to rid the world of corrupt institutions and bad actors.  Thus, although it contains mostly statements that are not hearsay at all and are admissible on their own, the entirety of the testamentary book also constitutes a coconspirator statement that is admissible against all other Defendants.

That the book was made during the course of the conspiracies and in furtherance of the conspiracies is demonstrated by several pieces of evidence.  First, the book itself lists the chosen people as the Defendants and contains laws and rules to govern those who would follow Jany and join the group as the "righteous."  Ex. 4 at 1; 99; Tr. at 57:1-58:15.  Jany also expressed to coconspirator Von "Yusuf" Leveille that the book was meant to be translated into Creole and shared across Haiti as a testament to Jany's status as the Mahdi or prophet and to JOHN DOE's status as Isa.  Ex. 10 at 232; Tr. at 60:4-6; 62:4-13.  Further, Hujrah and Subhanah helped Jany write and edit the book to be an expression of the group's story, intent, and purpose, as they both had experience in writing and editing books themselves.  Ex. 32 at 16; Tr. at 59:10-16; 167:12-

---

people u will ask for permission because they do that only to oppose Allah and I.  And Allah is severe punishment.  They will taste it n will have the torment of the Fire.")  These types of statements are not hearsay because they are statements of intent of the conspirators, and not offered because they are true, but even if it were deemed to be offered for the truth of statements, they are in furtherance of the § 2339A and § 1117 conspiracies.

23.  The Defendants had roles in the conspiracies corresponding to the roles assigned to them in the book.  Ex. 2(b) at 28-29; Tr. at 57:1-18; 69:1-70:8.  And all of the Defendants were aware of the book and relied on it to guide their actions and beliefs, to include the conspiracies centering around their kidnapping of JOHN DOE and his resurrection to lead a violent religious revival around the world.  Tr. at 58:16-59:9.

In addition, Von's statements that, as a member of the § 2339A conspiracy, he had read Jany's book, and that Subhanah and Hujrah had helped Jany edit the book, is relevant to establish that Jany's book is not a personal "journal," but rather a religious testament and guiding text for the Defendants' entire group.  *See* Ex. 25 at 9.  The other Defendants and many of the children were also aware of and had read the book.  Tr. at 58:16-59:16.  Jany's book sought to build up their status as a chosen group, Jany's status as a prophet, JOHN DOE's status as Isa, and provide encouragement, motivation, and comfort to the other conspirators living in the difficult conditions in New Mexico, all in furtherance of the Defendants' overlapping conspiracies.  Thus, within all of this context, Jany's testamentary book as a whole is a non-hearsay statement by a coconspirator, admissible against all of the Defendants.

To the extent that there are statements within in that are offered for the truth of the matter asserted, such as that the Defendants took JOHN DOE from Hakima Ramzi, Ex. 4 at 48, that JOHN DOE died during an exorcism session on or about December 24, 2017, in New Mexico, *id.* at 89, that the other Defendants had little reaction to JOHN DOE's death, *id.* at 90 (*see also* Gov. Ex. 25(a) at 22), and that the Defendants would confront their enemies, to include killing those who denied them or their message, when JOHN DOE resurrected, *id.* at 43, 46, 72, 77.  These statements are corroborated by many other pieces of evidence.  *See* Gov. Exs. 1; 2; 3; 6; 24; 25; 25(a); 31; 32.  They are in furtherance because they explain events of importance to the

conspiracy, provide reassurance and serve to maintain trust and cohesiveness among the conspirators, inform each other of the current status of the conspiracy, and discuss future intent. *Perez*, 989 F.2d at 1578-79.

**B.  Statements by the Conspirators To, or Heard By, the Children**

Several other statements by the Defendants discuss future intent, inform each other of the current status of the conspiracy, explain events of importance to the conspiracy, describing roles in the conspiracies, and concealing the conspiracies were made to or heard by some of the older children the Defendants brought to the compound.  These statements are included in the transcripts of the interviews with the children.  When they testify at trial and relate the Defendants' statements, any of them that could potentially be deemed as being offered for their truth should be admissible under Rule 801(d)(2)(E), as all such statements would have been made in the course of and in furtherance of the conspiracies.

Examples of these statements are provided in the United States' chart of all of its coconspirator statement exhibits.  *See* Ex. 35.  These include that Siraj Wahhaj said that he wanted to train an army to fight for Jihad, Ex. 1 at 47; 1(d) at 27, that the Defendants all said or knew not to talk about JOHN DOE being at the compound or they'd all go to jail, Exs. 31 at 11; 32 at 21, and that at the Defendants all had roles, including that Siraj Wahhaj's was to "take care of" nonbelievers, Hujrah was going to be a supervisor, Subhanah was to cook and clean and show people how to maintain their houses, Jany was to be the messenger, and Lucas was to be a mentor, Ex. 1 at 29; 2(b) at 28.  Other examples include statements by Jany that JOHN DOE would tell the group which corrupt institutions to get rid of first, but the FBI was one of them, Ex. 1(c) at 8, that Jany told the group (and the group believed) the FBI was watching them, Ex. 1 at 38; that Siraj said they would shoot police if they came to the compound at night, Ex. 1 at 55-

39

56, and told the oldest boy to "load up" when the police came to serve the search warrant, Ex. 1 at 54.

Other statements include that Jany told everyone at the compound that their job was to correct the corrupt institutions and if people did not believe in their miracles, they would have to be killed.  Ex. 2(b) at 39.  Also included are the statements that Jany told her brother Von that everyone was ok when JOHN DOE died and that no one got sad, Ex. 25(a) at 22, and that all of the conspirators discussed how their plan would play out, to include discussing that they would get caught, Siraj would die, and then JOHN DOE would wake and revive him, Ex. 25(a) at 41. Finally, statements made in furtherance of the conspiracies described above include that the Defendants said there would be a war, and that they would shoot the "bad people" on the land in New Mexico and Siraj said if the police came they would fight them and he would kill them with guns, and Jany said they would fight the government.  Ex. 31 at 11-12.

In addition, Jany's statement that God would help them in the war, so it was better to train in shooting, Ex. 32 at 11-12, 17, and Siraj's statement that the men were training with guns to go to war because he really wanted to go to war, *id.* at 11, and the Defendants' statements that the plan was that when the police came they were going to shoot the police are all statements made during the course and in furtherance of all four of the conspiracies, because they all either inform the group of the conspiracies' purpose and execution, or further the group's efforts to keep law enforcement from finding JOHN DOE.

### C.  Recruitment Letter to Siraj Wahhaj's Brother, Muhammad

Finally, although offered for the significance of its creation and delivery, to the extent that the recruitment letter from the Defendants to Muhammad Wahhaj, or any of its contents, might be deemed offered for the truth of the statement, it too would be in the course of and in

furtherance of all four of the conspiracies.  The statements within the letter that Muhammad

Wahhaj could die as a martyr if he joined them, and he would meet Isa if he joined them, would

be in furtherance of the §§ 2339A and 1117 conspiracies.  Other statements, such as to bring his

guns and money to join them and not to tell any other family members about the group's plan or

their location, would be in furtherance of all of the conspiracies.[7]  In general, like the Jany

Leveille testament book, the letter itself is a statement of the conspirators that was made to

Muhammad Wahhaj in furtherance of their conspiracies, and it is admissible against all five

Defendants.

## CONCLUSION

In sum, the United States asserts that: (1) agreements encompassing all four charged

conspiracies existed, with the five Defendants[8] being aware of the essential purposes of these

conspiracies and knowingly, voluntarily, and interdependently participating in them; (2) Siraj

Wahhaj is factually and legally an unindicted coconspirator in the kidnapping conspiracy; (3) the

vast majority of statements by the coconspirators will be offered for various non-hearsay

purposes related to proving the elements of the conspiracy charges, and thus are admissible

against all Defendants; and (4) the few remaining statements of the conspirators in the noticed

evidence that may be deemed offered for their truth are still admissible under Rule 801(d)(2)(E),

as they were made in the course and in furtherance of one or more of the charged conspiracies.

---

[7] However, as articulated above, these statements are also requests or demands, and are not
assertions offered for their truth, so they are not hearsay in the first place.

[8] Although not charged with Count 3, there is plenty of evidence to show (and described herein)
that Hujrah and Subhanah Wahhaj were participants in the § 1117 conspiracy to kill federal
officers or employees.  However, the United States does not anticipate using any statements of
either of these Defendants as Rule 801(d)(2)(E) coconspirator statements to prove the § 1117
conspiracy charge against the other Defendants.

Accordingly, the United States seeks a pretrial ruling that all of these statements are admissible on the various grounds described herein and in its prior filings on this subject.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically Signed*
KIMBERLY A. BRAWLEY and
TAVO HALL
Assistant United States Attorneys
P.O. Box 607
Albuquerque, NM 87102
(505) 346-7274

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon defense counsel. A hard copy will be mailed to Defendant Lucas Morton at his address of record.

*Electronically Signed*
Tavo Hall
Assistant United States Attorney